FILED

DEC 1 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE APOLLO GROUP, INC. SECURITIES
LITIGATION

CASE NUMBER  1:06MS00558

JUDGE: Colleen Kollar-Kotelly

DECK TYPE: Miscellaneous

DATE STAMP: 12/19/2006

This Document Relates To:  All Actions

## DEFENDANT APOLLO GROUP, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM UNITED STATES DEPARTMENT OF EDUCATION

COME NOW defendant Apollo Group, Inc. ("Apollo"), by and through its undersigned

counsel, and respectfully moves the Court pursuant to Fed. R. Civ. P. 45(c)(2)(B) for an order

compelling the United States Department of Education ("DOE") to produce documents

responsive to Apollo's amended subpoena of July 3, 2006.

In support of this motion, Apollo respectfully invites the Court's attention to the attached

Memorandum of Points and Authorities, which is adopted and incorporated as if fully set out

herein, and to the accompanying Declaration of Daniel P. Muino.  This motion is made following

a conference of the parties, which did not resolve this issue.

## ORAL HEARING REQUESTED

Apollo respectfully requests a hearing on this motion pursuant to Fed. R. Civ. P. 78 and

Local Civ. R. 7(f).  Apollo requests that this motion be set for hearing on January 5, 2007.

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Apollo Group, Inc. ("Apollo") submits this Memorandum of Points and Authorities in support of its Motion to Compel Production of Documents from the United States Department of Education ("DOE").

### I.    INTRODUCTION

Apollo is a defendant in a securities class action pending in the District of Arizona (the "Securities Litigation"). Apollo, through its subsidiaries, including the University of Phoenix ("UOP"), is the largest for-profit provider of higher education in the United States. In early 2003, two former UOP employees brought a *qui tam* action alleging that UOP violated a ban on certain incentive compensation for recruiters. Under the False Claims Act, the United States Department of Justice was given an opportunity to intervene in the *qui tam* action, which it declined to do on May 7, 2003. Shortly thereafter, in August 2003, the DOE began a regulatory program review of UOP (the "Program Review") to ensure that it was in compliance with federal regulations, including the ban on incentive compensation. This litigation arose from the August 2003 Program Review.

During the program review, the DOE issued a Program Review Report (the "Report") accusing Apollo of violating the incentive compensation regulations. Apollo settled the Program Review issues with the DOE in September 2004. Plaintiff in this litigation is suing Apollo for allegedly failing to timely disclose the contents of the DOE's Report. However, Apollo firmly believes that the Report was legally and factually faulty and was not subject to disclosure. Among other things, the DOE's Report was only the first step in a multi-level review process, misstated the applicable federal regulatory standard, relied on erroneous information obtained from disgruntled former employees, and was issued without proper authorization.

To demonstrate the many flaws in the DOE's Report, Apollo has sought to obtain the DOE's underlying work papers from the Program Review. These documents are highly relevant to illuminating the Report's deficient legal and factual bases, the lack of authority for issuing the Report, and the Report's preliminary nature. In October 2004, Apollo served the DOE with a FOIA request seeking the work papers. The DOE produced approximately 5,252 pages of documents, but withheld more than 4,000 pages on the basis of several FOIA exemptions, including the deliberative process privilege, attorney-client privilege, attorney work-product protection, and personal privacy protection.

On July 3, 2006, Apollo served a subpoena on the DOE seeking the documents that had been withheld from the FOIA production (the requests of the July 3, 2006 subpoena are set forth in Appendix A hereto). The withheld documents included materials exchanged with third parties; witness statements; factual analyses, charts and presentations concerning the program review; drafts of interview questionnaires, the Report, and the settlement agreement; and communications and notes of DOE staff concerning the Program Review. In a letter dated July 13, 2006, the DOE refused to produce any documents in response to Apollo's subpoena, and failed even to provide a privilege log of the documents withheld, as required by Federal Rule of Civil Procedure 45(d)(2).

The documents Apollo seeks are highly relevant to its defense in the Securities Litigation and are not protected by any privilege. By failing to comply with the instructions of Apollo's subpoena (including the instruction to provide a privilege log of withheld documents), the DOE has waived all claims of privilege. Moreover, none of the privileges the DOE asserted in the FOIA proceedings are applicable in any event. The deliberative process privilege protects deliberations over agency policy, not factual, investigative materials of the kind sought by

Apollo. The attorney-client privilege protects advisory communications between agency attorneys and officials, not factual materials generated and collected by attorneys in an investigative process. The attorney work-product protection only covers materials created in anticipation of actual litigation; the program review was a regulatory process, not litigation.

For the reasons discussed herein, the DOE should be compelled to produce the program review work papers it withheld from its FOIA production.

## II.    FACTUAL BACKGROUND

### A.    The Securities Litigation

Apollo is a defendant in a securities class action pending in the District of Arizona. *See* Declaration of Daniel P. Muino ("Muino Decl."), submitted herewith, Exh. B. Apollo is the largest for-profit provider of higher education in the United States, operating through several subsidiaries, including UOP. *Id.* at 8. For-profit educational institutions are regulated by both federal and state agencies. In particular, the DOE conducts program reviews of educational institutions to ensure compliance with Title IV of the Higher Education Act of 1965 ("Title IV") and to oversee the administration of Title IV federal student loans.

The Securities Litigation arose out of the August 2003 Program Review and a program review report sent to Apollo in February 2004 (the "Report"). *Id.* at 13. The Program Review addressed Apollo's compliance with the Title IV regulations prohibiting payment of incentive compensation to enrollment counselors (*i.e.*, employees involved in recruiting new students). *Id.* After spending roughly a week in August 2003 interviewing UOP employees, DOE attorneys informed Apollo during an informal exit interview that there were no "systemic" findings of wrongdoing and, other than a few minor issues, the report would be favorable.

But the Report issued in February 2004 was not favorable. It accused Apollo of violating Title IV incentive compensation regulations by paying its enrollment counselors based on the

number of students they enrolled.  The Report was but the first step in a multi-level review process and Apollo perceived numerous flaws in the Report itself, including its misstatement of the applicable Title IV regulatory standard, its reliance on inaccurate information obtained from disgruntled former employees, and its unauthorized issuance by a junior DOE attorney.

The Report was only a preliminary step in the overall Program Review process.  A Final Program Review Determination is typically issued at the end of the program review process. Accordingly, Apollo had an opportunity to dispute the Report's propriety and provide additional information to alleviate the DOE's concerns.  After further discussion between Apollo and the DOE, the two sides entered into a settlement agreement on September 7, 2004, resolving all issues set forth in the Report.  The agreement called for Apollo to pay $9.8 million to settle the matter, but contained no findings or admissions of wrongdoing by Apollo and required no changes to Apollo's compensation policies.  The DOE did not issue a Final Program Review Determination.

During the Program Review process, Apollo publicly disclosed the occurrence of the Program Review itself and the existence of the Report.  Plaintiff alleges, however, that Apollo failed to disclose the contents of the Report in a timely manner, in purported violation of the securities laws.

Crucial to Apollo's defense in the class action is evidence demonstrating the many flaws in the DOE's Report, including its faulty legal and factual foundations and the lack of authorization for its issuance.  Accordingly, Apollo has sought to obtain the DOE's underlying work papers associated with the Report, including, *inter alia*, draft versions of the Report, internal notes of interviews with Apollo employees, notes and other documents relating to the exit interview in August 2003, and analyses of Apollo documents relating to enrollments and

enrollment counselor salaries. Although the DOE has produced some documents pursuant to Apollo's FOIA request, it has improperly withheld the underlying work papers that purported to inform the DOE's Report. Apollo's subpoena to the DOE seeks the production of relevant work papers.

**B.    Apollo's FOIA Request To The DOE**

On October 25, 2004, Apollo submitted a request to the DOE under the Freedom of Information Act ("FOIA") seeking the underlying work papers associated with the DOE's Report, broken down into the following categories:

(1) Draft versions of the Report;

(2) Internal notes concerning the Report, including notes of DOE interviews with Apollo employees;

(3) Notes and other documents relating to the informal exit interview the DOE provided in August 2003;

(4) Analyses performed by the DOE of Apollo documents relating to enrollments achieved by, and salaries paid to, Apollo enrollment counselors;

(5) Correspondence between the DOE and outside parties relating to the Report;

(6) DOE internal guidance, policy memoranda or other information used in connection with the program review and Report;

(7) Copies of any delegation of authority that authorized the Report's author to issue the Report.

Muino Decl., Exh. C. Apollo expressly stated that it was not seeking the names of any Apollo employees who did not want their identities disclosed to Apollo and that such information could be redacted. *Id.* at 2.

The DOE responded to Apollo's FOIA request with four interim response letters (dated December 29, 2004, February 18, 2005, February 28, 2005 and April 8, 2005) and a final response dated May 3, 2005. Muino Decl., Exhs. D-H. The DOE produced a total of 5,252 pages, but withheld 2,022 pages based on certain FOIA exemptions.[1]  *Id*. at Exh. H, at 3. Apollo appealed the DOE's FOIA response on June 15, 2005. *Id*. at Exh. I. On October 31, 2005, the DOE issued its final determination on Apollo's appeal, denying the appeal with respect to the 2,022 pages withheld from the original search. *Id*. at Exh. J, at 4. However, prompted by Apollo's concerns regarding the completeness of the DOE's document search, the DOE conducted a supplemental search that located 2,246 additional responsive documents. *Id*. Of these, the DOE produced 185 pages, but withheld the remaining 2,061 pages based on FOIA exemptions.

As the DOE did not provide Apollo with a log of the withheld documents, it is impossible to know exactly which documents were withheld. However, the DOE did describe the general categories of withheld documents in its final determination on Apollo's appeal:

- *Documents withheld under FOIA Exemption 5*

(1) Communications between the DOE and attorneys for the Relators in the *qui tam* action (*see* supra, fn. 1) sharing information from informants for use in the Program Review and *qui tam* action;

(2) Documents containing legal analysis and advice shared among the DOE, DOJ, and attorneys for the *qui tam* Relators regarding and antecedent to the DOJ's decision not to intervene in the *qui tam* action;

---

[1]   The DOE actually withheld a total of 2,171 pages, but Apollo's subpoena only seeks the 2,022 pages withheld under FOIA exemptions 5 and 7(C), described below.

(3)  Documents containing legal analysis and advice shared among DOE attorneys regarding and antecedent to the DOJ's decision not to intervene in the *qui tam* action;

(4)  Drafts of decision memorandum and letters prepared by DOE and DOJ attorneys regarding and antecedent to the DOJ's decision not to intervene in the *qui tam* action;

(5)  Communications and notes of the Program Review staff concerning investigation strategy;

(6)  Communications and notes of the Program Review staff concerning witness statements;

(7)  Drafts of interview questionnaires, the Report, and advice memoranda concerning issuance of the Report;

(8)  Communications between DOE attorneys and senior officials regarding the analysis in the Report;

(9)  Analysis created by DOE attorney Donna Wittman to identify the frequency of UOP's alleged violations of the Title IV incentive compensation regulations, for purposes of determining settlement amount;

(10)  Communications and notes of the Program Review staff concerning the information submitted by UOP to rebut the Report;

(11)  Drafts of charts and presentations regarding the DOE's calculations of numbers of alleged violations and potential amounts of fines;

(12)  Drafts of the settlement agreement.

- *Documents withheld under FOIA Exemption 7(C)*

(13)  Statements and other materials obtained from Apollo employees that identify third parties (either the employees themselves or other referenced individuals);

6

(14)  References to third parties contained in other case materials compiled by DOE

attorneys.

Muino Decl., Exh. J at 5, 7-9.

The FOIA exemptions invoked by DOE are designed to exclude certain classes of

documents from the ambit of FOIA discovery.  FOIA exemption 5 protects documents "which

would not be available by law to a party other than an agency in litigation with the agency."  5

U.S.C. § 552(b)(5).  The DOE invoked the deliberative process privilege, the attorney-client

privilege, and the attorney work-product protection to shield the documents withheld under

FOIA exemption 5.  FOIA exemption 7(C) protects any "records or information compiled for

law enforcement purposes" that "could reasonably be expected to constitute an unwarranted

invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

**C.**    **Apollo's Subpoena To The DOE**

In light of the DOE's refusal to produce the underlying Program Review work papers in

response to the FOIA request, Apollo served the DOE with a subpoena on June 5, 2006 seeking

production of the withheld documents.  Muino Decl., Exh. K.  On July 3, 2006, Apollo served an

amended subpoena, correcting the subpoena instructions, but otherwise seeking the same

documents.  *Id*. at Exh. A (Appendix A hereto recites the document requests from the July 3,

2006 subpoena).

Apollo's subpoena seeks three categories of documents:

(1)  Unredacted versions of any redacted documents the DOE produced pursuant to the

FOIA request;

(2)  The 4,083 pages of documents that the DOE withheld from its FOIA production; and

(3)  Various documents pertaining to the Program Review, the Report, or the *qui tam*

action, to the extent they are not covered by categories 1 and 2.

The subpoena specifically asked the DOE to provide a privilege log of documents withheld from production on grounds of any privilege or protection, as required by Federal Rule of Civil Procedure 45(d)(2). *Id*. at Exh. A, at 4.

The DOE responded to Apollo's amended subpoena in a letter dated July 13, 2006. *Id*. at Exh. L. The DOE declined to produce any documents in response to the subpoena, and did not provide a privilege log of withheld documents. Additionally, the DOE apparently failed to review the instructions of the amended subpoena, and instead relied upon the instructions of the original subpoena of June 5, 2006. As a consequence, the DOE interpreted the amended subpoena far more narrowly than is warranted by the subpoena's instructions.

Apollo is not seeking – through its subpoena or the instant motion – communications between the DOE and DOJ attorneys or documents regarding the decision not to intervene in the *qui tam* action. Instead, Apollo is seeking the DOE's underlying work papers that formed the basis for the Report at issue in the instant litigation.

## III.    ARGUMENT

Apollo seeks to compel production by the DOE of the complete Program Review work papers, comprising the following categories of documents:

(1)  Unredacted versions of any redacted documents the DOE produced pursuant to the FOIA request;

(2)  The 4,083 pages of documents that the DOE withheld from its FOIA production; and

(3)  Various documents pertaining to the Program Review, the Report, or the *qui tam* action, to the extent they are not covered by categories 1 and 2.

*See* Appendix A; Muino Decl., Exh. A. The DOE refused to produce these documents in

response to Apollo's FOIA request and the outstanding subpoena.[2]  Muino Decl., Exh. L.

A federal court litigant "can seek to obtain the production of documents from a federal agency by means of a federal subpoena" because the government "has waived its sovereign immunity" and federal regulations do not authorize an agency to "withhold documents from a federal court." *Houston Business Journal, Inc. v. Office of the Comptroller*, 86 F.3d 1208, 1212 (D.C. Cir. 1996); *Yousuf v. Samantar*, 451 F.3d 248, 257 (D.C. Cir. 2006) (holding that the United States is subject to Rule 45 subpoenas).

Pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), a party issuing a subpoena to a non-party may move to compel compliance if the non-party fails to comply.  A court must order compliance with the subpoena, unless the subpoena fails to allow a reasonable time for compliance or subjects the non-party to an undue burden.  Fed. R. Civ. P. 45(c)(3)(A).  When evaluating a subpoena directed to a non-party government agency, courts apply the relevancy standard set forth in Rules 26 and 45, "not the arbitrary and capricious standard of the Administrative Procedure Act." *In re Providian Financial Corp. Sec. Litig.*, 222 F.R.D. 22, 25 (D.D.C. 2004).  Under Rule 26, a party "may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1).  If information is withheld based on a claim of privilege, the non-party must support that claim with a "description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim."  Fed. R. Civ. P. 45(d)(2).

---

[2]  The DOE's July 13, 2006 letter declining to produce documents pursuant to Apollo's subpoena constitutes final agency action for purposes of the Administrative Procedure Act, thereby giving this Court jurisdiction to consider Apollo's motion to compel.  *See Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006) (holding that denial of a subpoena request is final agency action under the Administrative Procedure Act).

For the reasons explained herein, Apollo is entitled to obtain the complete Program Review work papers, which the DOE alone possesses.

**A.    The DOE Failed To Comply With The Instructions Of The Amended Subpoena, Thereby Waiving Any Claims Of Privilege**

It is apparent from the DOE's July 13, 2006 response to Apollo's amended subpoena that the DOE did not review and comply with the instructions of the amended subpoena. The DOE stated: "[Y]our subpoena specifically excludes a number of categories of records or information addressed in your FOIA request." Muino Decl., Exh. L at 2. Among the purportedly excluded categories were "records or portions of records identifying confidential sources and/or otherwise implicating personal privacy interests" and "records or portions of records protected by the attorney work product and/or attorney-client privileges." *Id*. at 2 n.3. Based on these supposed exclusions, the DOE concluded that only 165 of the more than 4,000 pages it withheld from the FOIA production were responsive to Apollo's subpoena. *Id*. at 2.

But the exclusions that the DOE invoked are found only in the instructions to Apollo's *original* subpoena – not the *amended* subpoena. *Compare* Muino Decl., Exh. K at 3 to Exh. A at 4. The amended subpoena did not exclude the aforementioned categories of documents from its ambit, but simply instructed the DOE to produce all responsive documents not already produced in their unredacted form. Muino Decl., Exh. A at 4. The fact that the DOE ignored the instructions of the amended subpoena renders its response completely deficient, as it provides no valid explanation for why the vast majority of requested documents were withheld. As the deadline for responding and objecting to Apollo's subpoena has long since passed, the DOE has waived any objections to the subpoena and must produce the responsive documents forthwith. *Tuite v. Henry*, 98 F.3d 1411, 1416 (D.C. Cir. 1996) ("a party objecting to a subpoena on the basis of privilege must both (1) object to the subpoena and (2) state the claim of privilege within

fourteen days of service"); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 48

(S.D.N.Y. 1996) (an untimely objection will only be considered "in unusual circumstances and

for good cause").

     Additionally, the DOE failed to comply with the subpoena's request for a privilege log.

Muino Decl., Exh. A at 4. The instructions of the amended subpoena called for the DOE to

identify each document withheld on the basis of privilege by specifying the date of the

document, its subject matter, and the persons addressed therein, together with the specific

privilege claimed. *Id.* A privilege log is a standard component of a subpoena response under

Rule 45. Fed. R. Civ. P. 45(d)(2) ("[w]hen information subject to a subpoena is withheld on a

claim that it is privileged . . . the claim shall . . . be supported by a description of the nature of the

documents, communications, or thing not produced that is sufficient to enable the demanding

party to contest the claim"); *Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, 1 (D.D.C.

1999) ("a 'privilege log' . . . has become, by now, the universally accepted means of asserting

privileges in discovery in the federal courts"). The DOE did not provide a privilege log to

Apollo, even for the 165 pages that the DOE believed were responsive to the subpoena.

     The DOE also has not provided a privilege log of the responsive documents it withheld

from the FOIA production. During the FOIA proceeding, the DOE asserted that it had no

obligation to provide a privilege log, as would be necessary in litigation. According to DOE,

"[i]t is well-established that an agency is under no obligation to produce such a detailed

accounting in the administrative process. 'There is no requirement that administrative responses

to FOIA requests contain the same documentation necessary in litigation.'" Muino Decl., Exh. J

at 13 (citation omitted). Now the DOE *is* facing discovery *in litigation*, yet five months after the

subpoena was issued, it still refuses to provide a privilege log. For this violation alone, the DOE

has waived any privilege claims as to the requested documents and should be ordered to produce

them to Apollo. *See GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 195 (D.D.C. 2003)

("The subpoenaed party must comply with the requirements of Fed. R. Civ. P. 45(d)(2)

[requiring a privilege log] . . . The rule is obviously mandatory. Failure to comply with it 'is

deemed to waive the underlying privilege claim.'") (*quoting In re Grand Jury Subpoena*, 274

F.3d 563, 576 (1st Cir. 2001) ("A party that fails to submit a privilege log is deemed to waive the

underlying privilege claim.")).

**B.      The Program Review Work Papers Are Relevant To Apollo's Defense**

The relevance of documents sought from a non-party government agency under Rule 45

is judged by the standard articulated in Rule 26. *In re Providian,* 222 F.R.D. at 25. Discovery

under Rule 26(b) is permitted over any non-privileged material "relevant to the claim or defense

of any party," or that "appears reasonably calculated to lead to the discovery of admissible

evidence."

The Program Review work papers are critically relevant to Apollo's defense in the

Securities Litigation. Plaintiff alleges that Apollo was obligated to make earlier disclosure of the

contents of the DOE's Program Review Report. Apollo contends that it had no obligation to

publicly disclose the Report, because, among other things, it was legally and factually flawed, it

was issued without proper authorization, and it was only a preliminary step in the overall

Program Review process. The Program Review work papers that Apollo seeks (including

witness statements, information supplied to the DOE by the *qui tam* Relators, drafts of the

Report, and DOE analyses of issues covered in the Report) go to the core of the Report's defects

by telling the story of its creation: (1) the factual information and witness testimony that was or

was not considered, (2) the DOE's understanding of the applicable legal standard, (3) the

analyses that were or were not undertaken to support the Report, and (4) the steps taken to obtain

approval and authorization for the Report's issuance.

Moreover, the work papers will be necessary to cross-examine the DOE's attorneys should they testify at trial. Plaintiff's counsel recently indicated that the DOE attorneys who were involved with the Program Review may testify at trial that the Report constituted a final determination by the DOE. The work papers (including notes, memoranda, and internal correspondence) may refute such testimony. Accordingly, the requested work papers are crucial to Apollo's trial preparation vis-à-vis the DOE witnesses.

**C.    The Program Review Work Papers Are Not Covered By Any Privilege Or Protection**

As discussed above, the DOE has waived any claim of privilege as to the subpoenaed documents by failing to provide a valid, timely response to the amended subpoena and failing to produce a log of allegedly privileged documents. Moreover, even if no waiver is found, the work papers that the DOE is withholding are not covered by any privilege or protection.

The DOE invoked FOIA exemptions 5 and 7(C) to shield more than 4,000 pages of relevant documents from discovery under FOIA. Muino Decl., Exh. J at 4-14. The DOE used FOIA exemption 5 (protecting documents "which would not be available by law to a party other than an agency in litigation with the agency") to assert the deliberative process privilege, the attorney-client privilege, and the attorney work-product protection. 5 U.S.C. § 552(b)(5). FOIA exemption 7(C) protects any "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

Of course, it is well-established that FOIA exemptions are applicable only in the context of FOIA proceedings and do not block civil discovery requests. *In re Subpoena Duces Tecum*, 439 F.3d 740, 754 (D.C. Cir. 2006) ("FOIA's exceptions to disclosure limit only the right to

information conveyed pursuant to that statute"); *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1348 (D.C. Cir. 1984) ("If information in government documents is exempt from disclosure to the general public under FOIA, it does not automatically follow the information is privileged within the meaning of rule 26(b)(1) and thus not discoverable in civil litigation. . . . [I]nformation unavailable under the FOIA is not necessarily unavailable through discovery."). Whether or not the DOE's claimed exemptions were rightly sustained in the FOIA proceedings, the DOE will need to establish privilege under the Federal Rules of Civil Procedure to fend off Apollo's subpoena. It is the DOE's burden to prove the applicability of any claimed privilege. *In re Lindsey*, 158 F.3d 1263, 1269 (D.C. Cir. 1998) ("[i]t is settled law that the party claiming the privilege bears the burden of proving that the communications are protected"). As discussed below, no such claim of privilege can be established.

1.     **The Deliberative Process Privilege Does Not Apply**

Under the deliberative process privilege, an agency can withhold "documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *Dept. of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The privilege will apply to materials that are (1) predecisional, and (2) deliberative. *Sealed Case*, 121 F.3d at 737. To properly invoke this privilege, the agency must provide a detailed specification of the information claimed as privileged and an explanation of why it properly falls within the scope of the privilege. *See Landry v. F.D.I.C.*, 204 F.3d 1125, 1131-32 (D.C. Cir. 2000).

The various categories of documents that the DOE has withheld are not covered by the deliberative process privilege. Categories 1 and 2 (*see supra*, pp. 5-7) are documents exchanged between the DOE and attorneys for the *qui tam* Relators (these documents reportedly contain

factual information used in the Program Review and *qui tam* action, as well as legal analysis and

advice relevant to both proceedings). Muino Decl., Exh. J at 7-8. To the extent these documents

contain factual information, these documents are not covered by the deliberative process

privilege, because they do not reflect internal deliberations held in confidence, but rather

information shared with a third party – the *qui tam* Relators. The privilege does not apply to

deliberations between a governmental agency and a non-governmental third party. *Mead Data*

*Central, Inc. v. Dept. of Air Force*, 566 F.2d 242, 259-60 (D.C. Cir. 1977) ("deliberations with a

non-governmental party outside the agency" are not covered by the "deliberative process

privilege"). Accordingly, any documents exchanged between the DOE and the *qui tam* Relators,

even if deliberative in nature, would not be subject to the privilege because they were

communicated with a party outside the DOE. *See Brownstein Zeidman & Schomer v. Dept. of*

*Air Force*, 781 F. Supp. 31 (D.D.C. 1991) (documents which are shared with people outside the

agency are not subject to deliberative process privilege).

   As for the other document categories, they fall outside the privilege either because they

contain factual information rather than deliberative discussion or because they do not reveal the

DOE's policy-making judgments. The deliberative process privilege does not protect factual

material or documents that merely recite a decision. *Sealed Case*, 121 F.3d at 737; *Mead Data*,

566 F.2d at 254 n.28 (deliberative process privilege "does not permit the nondisclosure of

underlying facts unless they would indirectly reveal the advice, opinions, and evaluations

circulated within the agency as part of its decision-making process"). Much of the material that

the DOE is withholding would appear to be purely factual in nature, not deliberative. This would

include witness statements, interview questionnaires, and factual analyses, charts and

presentations concerning UOP's alleged violations. *See supra*, pp. 5-7. Such factual material is

not protected by the deliberative process privilege. If any of these documents do contain protected deliberative discussion, the DOE should at least produce redacted versions with the deliberative comments removed. *See Dudman Communications Corp. v. Dept. of the Air Force*, 815 F.2d 1565, 1568-69 (D.C. Cir. 1987) ("[i]f a person requests particular factual material . . . the agency will usually be able to excise the material from the draft document and disguise the material's source, and thus the agency will usually be able to release the material without disclosing any deliberative process").

Moreover, the Program Review work papers presumably would not contain deliberations on the formulation of DOE policy, protected by the deliberative process privilege. The privilege cannot be invoked where "materials could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment." *Petroleum Info. Corp. v. Dept. of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). The DOE Program Review is a factual investigation, not an exercise in DOE policy-making. There is no indication that the authors of the Program Review Report and work papers were formulating DOE policy. Accordingly, the deliberative process privilege does not apply to the work papers. *See National Ass'n of Home Builders v. Norton*, 309 F.3d 26, 31 (D.C. Cir. 2002) ("[t]he privilege is designed to protect agency policy-oriented judgments and the processes by which policies are formulated, rather than purely factual, investigative matters").

Finally, it should be noted that "[t]he deliberative process privilege is a qualified rather than absolute privilege. The validity of such a privilege may depend upon 'a balance of the public interest in nondisclosure with the need for the information as evidence.'" *Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258 (D.D.C. 1995) (citation omitted). Illuminating the flaws in the DOE's Report is central to Apollo's defense in the Securities

Litigation. The process by which the Report was created and issued is directly relevant to establishing the Report's defects. The deliberative process privilege cannot apply when the underlying agency process itself is at issue in the litigation. *See Dept. of Economic Dev. v. Arthur Anderson*, 139 F.R.D. 594, 596 (S.D.N.Y. 1991) (holding that the deliberative process privilege is inapplicable where deliberations of government personnel are directly in issue).

### 2.    The Attorney-Client Privilege Does Not Apply

To invoke the attorney-client privilege, "an agency must demonstrate that the document it seeks to withhold (1) involves 'confidential communications between an attorney and his client' and (2) relates to 'a legal matter for which the client has sought professional advice.'" *Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004). For government lawyers, the "client" is the agency or department they represent. *See In re Lindsey*, 158 F.3d at 1269. As with the deliberative process privilege, it is the DOE's burden to establish the applicability of the attorney-client privilege as to each withheld document. *Alexander v. FBI*, 192 F.R.D. 42, 45 (D.D.C. 2000).

The attorney-client privilege clearly does not apply to documents exchanged between the DOE and the *qui tam* Relators (Categories 1 and 2, *see supra*, pp. 5-7). The privilege is only applicable to communications between an attorney and client held *in confidence*. *Schlefer v. U.S.*, 702 F.2d 233, 245 (D.C. Cir. 1983) ("[t]he privilege operates when 1) the communication from attorney to client is *confidential*, and 2) the communication is based on *confidential* information provided by the client") (emphases added). Any documents shared with the *qui tam* Relators were obviously not maintained in confidence by the DOE.

Nor can the DOE assert the "common interest exception" to extend the privilege to documents exchanged between the DOE and the *qui tam* Relators. Under the common interest exception, parties with a common interest in prosecuting *actual or anticipated litigation* may

share privileged information and materials without waiving the privilege. *See United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980). But the DOE and *qui tam* Relators did not have a common interest in prosecuting *actual or anticipated litigation* once the government declined to intervene in the *qui tam* action on May 5, 2003. A common interest between the Relators and the government could only exist if the government had *actually intervened* in the *qui tam* action. *See United States ex rel. Purcell v. MWI Corp.*, 209 F.R.D. 21, 27 (D.D.C. 2002) (limiting application of joint prosecution privilege to cases where the government decided to intervene in *qui tam* action). All of the Program Review work papers that Apollo seeks were created after May 5, 2003, when no common interest could have existed between the DOE and Relators.

As for the other categories of withheld documents, the attorney-client privilege is not applicable to the extent that the documents are not advisory communications between DOE attorneys and their clients, *i.e.*, DOE officials. The privilege only protects communications between an attorney and client for the purpose of obtaining legal advice. *Banks v. Office of Senate Sergeant-At-Arms*, 228 F.R.D. 24, 26 (D.D.C. 2005) ("[i]n this Circuit, 'the attorney-client privilege is narrowly circumscribed to shield from disclosure only those communications from a client to an attorney made in confidence and for the purpose of securing legal advice'"); *Judicial Watch*, 297 F. Supp. 2d at 267. Most of the documents the DOE has withheld appear to be factual materials prepared by DOE attorneys in the course of the Program Review investigation (for example, draft reports and questionnaires; witness statements; analyses, charts and presentations; notes of DOE attorneys; *see supra*, pp. 5-7), not advisory information communicated with DOE officials. In fact, only Category 8 (communications between DOE attorneys and senior officials regarding the analysis in the Report, *supra*, pp. 5-7) would seem to describe any communications between DOE attorneys and officials, and even this category is not

described in sufficient detail to determine whether the communications contained legal advice or simply conveyed factual information gathered during the Program Review.  Accordingly, the DOE has not demonstrated that the attorney-client privilege would apply to any of the withheld documents.

### 3.    The Attorney Work-Product Protection Does Not Apply

"The attorney work-product privilege protects disclosure of materials prepared by attorneys, or non-attorneys supervised by attorneys, in contemplation of litigation, that reveal information about an attorney's preparation and strategy relating to a client's case."  *Judicial Watch*, 297 F. Supp. 2d at 267.  The withheld documents are not covered by the work-product protection for at least two reasons.

First, some of the withheld documents would not qualify as DOE work product.  For example, any witness statements or other documents received from third parties are factual documents and not the work product of DOE attorneys.  *See In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977) ("facts which an attorney receives from a third party" are not privileged).  Likewise, any Apollo documents that have been withheld are not DOE work product.

Second, the work-product protection applies only to materials prepared *in anticipation of litigation*:  "In reviewing documents claimed to be protected by the work-product privilege, the court must determine 'whether, in light of the nature of the document or the factual situation in a particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'"  *Banks*, 228 F.R.D. at 26 (emphasis in original); *Alexander*, 192 F.R.D. at 46 ("[t]he burden of showing that the materials were prepared in anticipation of litigation is on the party asserting privilege").

The Program Review work papers that Apollo seeks were prepared in the process of a regulatory review, not in the context of litigation or in anticipation of litigation.  Accordingly,

none of the work papers are entitled to attorney work-product protection. *See Judicial Watch*, 297 F. Supp. 2d at 268 ("[Attorney work-product] privilege is limited in scope. It only exempts those documents prepared in contemplation of litigation, not to 'every written document generated by an attorney.'"). To properly withhold these documents, the DOE must show that they were "prepared with a specific claim supported by concrete facts which would likely lead to litigation." *See id.* The DOE has made no such showing.

### 4.    Documents Redacted In Their Entirety Must Be Produced

Many of the documents the DOE produced in response to Apollo's FOIA request were redacted, either in part or in their entirety. To the extent that these redactions cover the names and addresses of Program Review witnesses (information withheld pursuant to the informant's identity privilege), Apollo does not seek their production. *See Roviaro v. United States*, 353 U.S. 53, 59 (1957). However, the informant's identity privilege does not justify redacting entire witness statements or complete pages therefrom, as the DOE has done. *See* Muino Decl., Exh. I [Exh. 12].

The informant's identity privilege allows the redaction of witness names and personal information, but not the entire content of the witness's statement. *See Brittany Dyeing & Printing Corp. v. Envtl. Prot. Agency*, No. Civ. A 91-2711 (HHG), 1993 WL 13036144, **1-2 (D.D.C. March 12, 1993) (ordering the release of a *draft* enforcement summary report, final site report, notes from witness interviews, and witness affidavits, subject to redactions of names and other identifying information); *The Nation Magazine v. Customs Service*, 71 F.3d 885, 896 (D.C. Cir. 1995) ("an agency [may not] exempt from disclosure *all* of the materials in an investigatory record solely on the grounds that the record includes some information which identifies a private citizen or provides that person's name and address") (emphasis in original). Although it may be necessary to redact some substantive information in order to protect a witness's identity, any

such redaction must be narrowly drawn and cannot typically be extended to entire statements or

pages. *See Roviaro v. United States*, 353 U.S. 53, 59 (1957) (holding that the scope of the

privilege "is limited by its underlying purpose," and "where the disclosure of the contents of a

communication will not tend to reveal the identity of the informer, the contents are not

privileged"); *see also United States v. Brodie*, 871 F.2d 125, 129 (D.C. Cir. 1989) (stating that

privilege may a protect tape of an informant's statement, which could reveal the informant's

identity, but a transcript would not be similarly protected). The DOE's redaction of entire

witness statements and pages are without justification. Consequently, the DOE should be

compelled to produce the complete unredacted pages or should otherwise be made to produce

pages with more narrow redactions.

### IV.    CONCLUSION

For the reasons set forth herein, the DOE should be compelled to comply with Apollo's

subpoena and produce the Program Review work papers that it withheld from its FOIA

production.

Respectfully Submitted,

Dated:  December 18, 2006

Wayne W. Smith
Joseph P. Busch, III
Elizabeth A. Brem
Daniel P. Muino
Kristopher P. Diulio
GIBSON, DUNN & CRUTCHER LLP
4 Park Plaza, Suite 1400
Irvine, CA 92614
Telephone:  (949) 451-3800
Facsimile:  (949) 451-4220

Douglas R. Cox, SBN 459668

21

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Attorneys for Defendant Apollo Group, Inc.

100127621_2.DOC

22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | |
| | Civil Action No. _____ (D. Ariz., Case No. CV-04-2147-PHX-JAT) |
| This Document Relates To:  All Actions | **[PROPOSED] ORDER GRANTING DEFENDANT APOLLO GROUP, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY FROM UNITED STATES DEPARTMENT OF EDUCATION** |

Defendant's Motion to Compel was heard by the Court as previously noticed and scheduled.  The Court hereby GRANTS the Motion to compel the Department of Education to produce those documents previously withheld from Defendant and to make Department employees available for deposition.


Dated: _____          _____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused to be served a true and correct copy of the Defendant Apollo Group Inc.'s Motion to Compel Production of Documents from the United States Department of Education by regular U.S. mail this 18th day of December, 2006, upon the following:

Samuel M. Ward
Stephen Basser
Barrack, Rodos & Bacine
402 W. Broadway, Suite 850
San Diego, CA. 92101

Andrew S. Friedman
Bonnett, Fairbourn, Friedman
& Balint, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, AZ. 85012

Jeffrey Barrack
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA. 19103

John Dailey
Division of Business and Administrative Law
United States Department of Education
400 Maryland Ave., S.W.
Washington, D.C. 20202

Larry S. Newsom

*/*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE APOLLO GROUP, INC. SECURITIES
LITIGATION

This Document Relates To:  All Actions

Civil Action No. _____
(D. Ariz., Case No. CV-04-2147-PHX-JAT)

**DECLARATION OF KRISTOPHER P. DIULIO IN SUPPORT OF DEFENDANT
APOLLO GROUP, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
AND TESTIMONY FROM UNITED STATES DEPARTMENT OF EDUCATION**

I, Kristopher P. Diulio, declare that:

1.      I am an attorney licensed to practice in the State of California and admitted to

practice *pro hac vice* before the United States District Court for the District of Arizona.  I am an

associate at the law firm of Gibson, Dunn & Crutcher LLP and I am one of the attorneys of

record for defendant Apollo Group, Inc. ("Apollo") in a securities class action currently pending

in the District of Arizona.  I have personal knowledge of the facts set forth herein and if called as

a witness, I could and would competently testify as such.

2.      Prior to bringing the instant motion, I participated in a meet and confer discussion

with Joanna Dailey, counsel for the United States Department of Education ("DOE") on

December 15, 2006.  During that conference, the parties were unable to resolve the issues

presented in this motion.  In the conference, Ms. Dailey represented that the DOE would not

make available for deposition *any* employees, including any DOE employees Apollo may

subsequently subpoena.  This position is consistent with DOE's prior position regarding

depositions of employees.  *See* Ex. O.

2.      Attached as Exhibit A is a true and correct copy of the July 3, 2006 amended subpoena for the production of documents served on DOE on behalf of Apollo.

3.      Attached as Exhibit B is a true and correct copy of the Consolidated Class Action Complaint in the underlying action now pending against Apollo in the District of Arizona.

4.      Attached as Exhibit C is a true and correct copy of an October 25, 2004 letter from Douglas R. Cox, counsel for Apollo, to Joan M. Trumble of the DOE requesting the production of documents pursuant to FOIA (the "FOIA request").

5.      Attached as Exhibit D is a true and correct copy of the DOE's first interim response to the FOIA request, contained in a December 29, 2004 letter from Jeanne Van Vlandren, DOE Freedom of Information Act Officer, to Andrew S. Boutros, counsel for Apollo.

6.      Attached as Exhibit E is a true and correct copy of the DOE's second interim response to the FOIA request, contained in a February 18, 2005 letter from Jeanne Van Vlandren, DOE Freedom of Information Act Officer, to Andrew S. Boutros, counsel for Apollo.

7.      Attached as Exhibit F is a true and correct copy of the DOE's third interim response to the FOIA request, contained in a February 28, 2005 letter from Jeanne Van Vlandren, DOE Freedom of Information Act Officer, to Andrew S. Boutros, counsel for Apollo.

8.      Attached as Exhibit G is a true and correct copy of the DOE's fourth interim response to the FOIA request, contained in an April 8, 2005 letter from Jeanne Van Vlandren, DOE Freedom of Information Act Officer, to Douglas R. Cox, counsel for Apollo.

9.      Attached as Exhibit H is a true and correct copy of the DOE's fifth response to the FOIA request, contained in a May 3, 2005 letter from Jeanne Van Vlandren, DOE Freedom of Information Act Officer, to Douglas R. Cox, counsel for Apollo.

10.    Attached as Exhibit I is a true and correct copy of Apollo's appeal of the DOE's decision to withhold or redact documents in response to the FOIA request, contained in a June 15, 2005 letter from Douglas R. Cox, counsel for Apollo, to the Chief Information Officer of the DOE.

11.    Attached as Exhibit J is a true and correct copy of the DOE's final determination of Apollo's appeal, contained in an October 31, 2005 letter from Mitchell Clark, DOE Chief Information Officer, to Douglas R. Cox, counsel for Apollo.

12.    Attached as Exhibit K is a true and correct copy of a June 5, 2006 subpoena for the production of documents served on the DOE on behalf of Apollo.

13.    Attached as Exhibit L is a true and correct copy of a July 13, 2006 letter from Joanna Dailey, counsel for DOE, to Kristopher P. Diulio, counsel for Apollo, in response to the July 3, 2006 subpoena.

14.    Attached as Exhibit M is a true and correct copy of Plaintiff's December 7, 2005 initial disclose in the securities action.

15.    Attached as Exhibit N is a true and correct copy of a June 30, 2006 subpoena served on behalf of Apollo for testimony and documents from Donna M. Wittman.

16.    Attached as Exhibit O is a true and correct copy of a July 10, 2006 letter from Sarah L. Wanner, counsel for DOE, to Kristopher P. Diulio, counsel for Apollo, and Samuel Ward, counsel for Plaintiff, responding to the June 20, 2006 subpoena of Ms. Wittman.

17.    Attached as Exhibit P is a true and correct copy of a September 21, 2006 declaration of Jennifer Woodward, a DOE employee, in support of a motion to quash subpoenas

//

that Apollo had served on non-party witnesses in this action. In that declaration, Ms. Woodward

testified regarding DOE's conduct of the Program Review at issue in this litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

December 15, 2006, at Irvine, California.

_____
Kristopher P. Diulio

100129500_1.DOC

4

1  GIBSON, DUNN & CRUTCHER LLP
   WAYNE W. SMITH
2  ELIZABETH A. BREM
   JARED M. TOFFER
3  KRISTOPHER P. DIULIO
   4 Park Plaza, Suite 1400
4  Irvine, CA 92614
   Telephone: (949) 451-3800
5  Facsimile: (949) 451-4220

6  SNELL & WILMER L.L.P.
   JOEL P. HOXIE (#005448)
7  JAMES R. CONDO (#005867)
   JOSEPH G. ADAMS (#018210)
8  One Arizona Center
   Phoenix, AZ 85004-2202
9  Telephone: (602) 382-6353
   Facsimile: (602) 382-6070

10
   Attorneys for Defendants
11 APOLLO GROUP, INC.; TODD S. NELSON;
   KENDA B. GONZALES; AND DANIEL E.
12 BACHUS

13             IN THE UNITED STATES DISTRICT COURT

14                  FOR THE DISTRICT OF ARIZONA

15
   In re Apollo Group, Inc. Securities Litigation    Lead Case No. CV-04-2147-PHX-JAT
16

17
18 This Document Relates To: All Actions

19      NOTICE OF THIRD-PARTY SUBPOENA – UNITED STATES

20              DEPARTMENT OF EDUCATION

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

⌐ 7/3/06

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE

2  NOTICE THAT, pursuant to Federal Rules of Civil Procedure 34(c) and 45, defendants

3  Apollo Group, Inc., Todd S. Nelson, Kenda B. Gonzales, and Daniel E. Bachus

4  ("Defendants"), by and through their undersigned attorneys, will cause to be served the

5  attached subpoena on Leo Eiden, Custodian of Records, United States Department of

6  Education ("DOE"), 400 Maryland Avenue, SW, Washington, D.C. 20202. The attached

7  subpoena requires the production of the specified documents on or before July 19, 2006 at

8  12:00 p.m., at the offices of Gibson, Dunn & Crutcher, LLP, 1050 Connecticut Avenue,

9  N.W., Washington, D.C. 20036-5306.

10  A COPY OF THE SUBPOENA IS ATTACHED AND INCORPORATED HEREIN.

11  The documents sought to be produced are specified in detail in the attached subpoena, and its

12  exhibit. Defendants will attempt to serve this subpoena on the aforementioned party

13  forthwith.

14  Dated: July 3, 2006.                 GIBSON, DUNN & CRUTCHER LLP
                                          Wayne W. Smith
15                                        Elizabeth A. Brem
                                          Jared M. Toffer
16                                        Kristopher P. Diulio

17                                        SNELL & WILMER L.L.P.
                                          Joel P. Hoxie
18                                        James R. Condo
                                          Joseph G. Adams

19

20                                        By: *Kristopher P. Diulio*
21                                            Kristopher P. Diulio  (J.A.B.)

22                                        *Attorneys for Defendants*
                                          APOLLO GROUP, INC.; TODD S. NELSON;
23                                        KENDA B. GONZALES; AND DANIEL E.
                                          BACHUS
24

25  100033149_1.DOC

26

27

28

Gibson, Dunn &
Crutcher LLP

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

### DISTRICT OF  COLUMBIA

In Re Apollo Securities Litigation

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 04-2147-PHX-JAT
District of Arizona

TO: Leo Eiden, Custodian of Records
United States Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  SEE EXHIBIT A

| PLACE | DATE AND TIME |
|---|---|
| Offices of Gibson, Dunn & Crutcher, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5306 | July 19, 2006 at 12:00 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Kristopher P. Diulio* (CJ.A.R.) | July 3, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Kristopher P. Diulio, Attorney for Defendants, Gibson Dunn & Crutcher LLP, 4 Park Plaza, Suite 1400, Irvine, CA  92614
(949) 451-3800

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

100015595_1.DOC

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | |
|---|---|
| DATE | PLACE |
| SERVED: | |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

100015595_1.DOC

**EXHIBIT A**

**I.**

**DEFINITIONS**

For purposes of this Subpoena, the following terms shall have the meanings set forth below.

A.    "YOU" or "YOUR" shall mean or refer to the United States Department of Education ("DOE"), including its international, national, regional and local offices, and any of the DOE's divisions, branches, partners, employees, servants, representatives, agents, insurance companies, advisors, attorneys, accountants, consultants, investigators, assigns, or any other person or entity acting, or purporting to act, on YOUR behalf, either directly or indirectly.

B.    The term "APOLLO" shall mean or refer to the Apollo Group, Inc., and its subsidiary the University of Phoenix, including its officers, directors, managers, agents or employees and all persons or entities acting on its behalf.

C.    The phrase "PROGRAM REVIEW" shall mean or refer to the program review conducted by the DOE of the University of Phoenix in August 2003.

D.    The phrase "PROGRAM REVIEW REPORT" shall mean or refer to the program review report bearing the Program Review Control Number 200340922254, issued in or about February 2004.

E.    The term QUI TAM RELATORS shall mean or refer to Mary Hendow, Julie Albertson, or any representative of either party, including but not limited to Daniel Bartley and Nancy Kropp.

F.    The terms "DOCUMENT" and "DOCUMENTS" shall have the same meaning herein as in Fed. R. Civ. P. 34 and Fed. R. Evid. 1001(1).  For purposes of illustration and not limitation, "DOCUMENTS" shall mean and include all written or graphic matter or tangible things of every kind and description, however produced or reproduced, in YOUR actual or constructive possession, custody or control, or the actual or constructive possession, custody or control of YOUR attorneys, accountants, agents or representatives, including but not

Gibson, Dunn &
Crutcher LLP

limited to all originals (or copies where originals are unobtainable) of correspondence, memoranda, reports, applications, claims, insurance policies, printed matter, contracts, agreements, supplements, amendments and modifications of such contracts or agreements, licenses, ledgers, books of account, vouchers, bank checks, invoices, charge slips, receipts, working papers, statistical records, cost sheets, papers on file with the court, transcripts of testimony, proposals, bids, work papers, statistical records, minutes, inter-office communications, articles, studies, technical data, charts, graphs, account statements, confirmation receipts, brochures, computer data, computer readable data, computer discs, computer chips, files, bulletins, reviews, calculations, diagrams, printouts, sound recordings, films, videotapes, magnetic tapes, electronic mail, transaction files, notes, calendars, appointment books, diaries, time sheets, time logs, old papers, or anything similar to the foregoing, no matter how described or denominated, and any drafts thereof.

G.    The term "COMMUNICATION" shall mean every contact of any nature, whether written or oral, from one person to another, and any DOCUMENT evidencing such contact, including but not limited to correspondence, memoranda, notes or logs of telephone conversations, electronic mail, diaries, daily calendars, or other records of exchanges between persons.

H.    The terms "REFER," "REFERRING," "RELATE," "RELATING" and "PERTAINING" shall mean commenting on, regarding, discussing, describing, mentioning, reflecting, pertaining to or concerning, the subject matter of the request.

I.    The terms "CONCERN" or "CONCERNING" shall mean constituting, reflecting, identifying, stating, dealing with, relating to, connected with, analyzing, discussing, reporting, commenting on, setting forth, considering, pertaining to, referring to, describing, germane to, or otherwise relevant to the information sought.

Gibson, Dunn &
Crutcher LLP

2

## II.

## STATEMENT PURSUANT TO 34 C.F.R. § 8.3(a)

Pursuant to 34 C.F.R. Section 8.3(a), Defendant in the above-titled action seeks the production of DOCUMENTS RELATING to a PROGRAM REVIEW, by the Department of Education ("DOE"), of University of Phoenix, a subsidiary of the Apollo Group., Inc. One of APOLLO's defenses in the above-titled action is that the PROGRAM REVIEW REPORT is inaccurate and unsupported by credible evidence. The Department of Education possesses DOCUMENTS containing relevant facts RELATING to the PROGRAM REVIEW, and the issuance of the PROGRAM REVIEW REPORT, that are unavailable by any other means. The DOE is the one that conducted the PROGRAM REVIEW, gathered the DOCUMENTS underlying the PROGRAM REVIEW REPORT, and redacted DOCUMENTS requested pursuant to the Freedom of Information Act ("FOIA"). These DOCUMENTS are in the sole possession of the DOE, and there is no other party from which to obtain the relevant information contained therein. Only the DOE can provide the information RELATING to its own PROGRAM REVIEW.

Gibson, Dunn & Crutcher LLP

3

## III.

## INSTRUCTIONS

A.    This Subpoena shall not be deemed to ask for documents previously produced to APOLLO pursuant to FOIA requests to the extent such documents were produced in their complete and unredacted form.

B.    This Subpoena shall not be deemed to call for duplicate identical copies of DOCUMENTS.  A DOCUMENT with handwritten notes, editing marks, etc., shall not be deemed a duplicate identical to one without such notes or marks.

C.    All DOCUMENTS described in this Subpoena that have been destroyed must be identified.

D.    When the Subpoena calls for DOCUMENTS as to which YOU would claim any privilege or protection as a ground for non-production, in lieu of producing such DOCUMENTS, identify each document and provide the following information:

    1.    The privilege or protection that YOU claim precludes production;

    2.    The subject matter of the DOCUMENT;

    3.    The date on which the DOCUMENT was prepared, or the date that the DOCUMENT bears;

    4.    The identities of the author(s), addressee(s) and copyee(s) of the DOCUMENTS; and

    5.    Any additional facts on which YOU would base YOUR claim of privilege or protection.

E.    The DOCUMENTS should be produced in their original file folders, or in lieu thereof, any writing on the file folder from which such DOCUMENT is taken should be copied and appended to the document.  The source of all DOCUMENTS produced, and the person for whom, or the department, division or office for which such DOCUMENTS are maintained, shall be identified.

F.    The DOCUMENTS should be produced in their complete and unaltered form.  Attachments to DOCUMENTS should not be removed.  The DOCUMENTS should not be

Gibson, Dunn & Crutcher LLP

4

1    cut up, pasted over, redacted, or altered in any way for any reason, including alleged
2    nonrelevance.

3    ## IV.

4    ### DOCUMENTS TO BE PRODUCED

5    1.    All DOCUMENTS, in unredacted form, that were previously produced to
6    APOLLO pursuant to FOIA but were redacted in whole or in part, including but not limited to
7    documents produced in redacted form as part of the following FOIA transmissions:

8    (a)    December 29, 2004 – releasing 45 pages of records in whole or in part;
9    (b)    February 18, 2005 – releasing 243 pages of records in whole or in part;
10    (c)    February 28, 2005 – releasing 222 pages of records in whole or in part;
11    (d)    April 8, 2005 – releasing 2874 pages of records in whole or in part;
12    (e)    May 3, 2005 – releasing 1868 pages of records in whole or in part; and
13    (f)    October 31, 2005 – releasing 185 pages of newly located records in whole or in part.

14    2.    All DOCUMENTS previously requested by APOLLO that were withheld under
15    FOIA, including but not limited to:

16    (a)    2022 pages or portions of pages withheld from APOLLO in the five interim FOIA
17        transmissions on December 29, 2004 and February 18, February 28, April 8, and
18        May 3, 2005; and

19    (b)    2061 pages or portions of pages withheld from the newly located records in the final
20        FOIA transmission on October 31, 2005.

21    3.    Please produce the following DOCUMENTS to the extent they are not
22    produced in response to paragraphs 1 and 2 above:

23    (a)    All draft versions of the PROGRAM REVIEW REPORT;
24    (b)    Any drafts prepared after February 5, 2004 of a different or revised PROGRAM
25        REVIEW REPORT or of a Final Program Review Determination;
26    (c)    All DOCUMENTS constituting internal notes, memoranda or
27        COMMUNICATIONS RELATING to or CONCERNING the *qui tam* lawsuit filed
28        on March 7, 2003 against APOLLO by the QUI TAM RELATORS;

1  (d)  All DOCUMENTS RELATING to or CONCERNING COMMUNICATIONS

2       between YOU and the QUI TAM RELATORS;

3  (e)  All DOCUMENTS obtained from the QUI TAM RELATORS, any current of

4       former APOLLO employee or any other third-party in connection with the

5       PROGRAM REVIEW or the PROGRAM REVIEW REPORT;

6  (f)  All DOCUMENTS RELATING to or CONCERNING interviews or conversations

7       between YOU and any current or former APOLLO employees or any third-party,

8       including, but not limited to, all notes from interviews conducted in connection with

9       the PROGRAM REVIEW or the PROGRAM REVIEW REPORT;

10 (g)  All DOCUMENTS RELATING to or CONCERNING statements obtained from any

11      witness in connection with the PROGRAM REVIEW or the PROGRAM REVIEW

12      REPORT;

13 (h)  All DOCUMENTS RELATING to or CONCERNING any analyses performed by or

14      on behalf of the DOE involving the compensation of APOLLO enrollment

15      counselors, including but not limited to, the analysis described by Ms. Donna

16      Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004;

17      and

18 (i)  All DOCUMENTS RELATING to or CONCERNING any analyses performed by or

19      on behalf of the DOE with respect to the information produced by APOLLO in

20      response to the PROGRAM REVIEW and the PROGRAM REVIEW REPORT.

21

22  100032934_1.DOC

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

**CERTIFICATE OF SERVICE**

I, Teresa Stephens, declare as follows:

I am employed in the County of Orange, State of California; I am over the age of eighteen years and am not a party to this action; my business address is Jamboree Center, 4 Park Plaza, Suite 1400, Irvine, California 92614-8557, in said County and State. On July 3, 2006, I served the following document(s):

**NOTICE OF THIRD-PARTY SUBPOENA – UNITED STATES DEPARTMENT OF EDUCATION**

on the parties stated below, by the following means of service:

SEE ATTACHED SERVICE LIST

☒ **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY PERSONAL SERVICE:** I placed a true copy in a sealed envelope addressed to each person[s] named at the address[es] shown and giving same to a messenger for personal delivery before 5:00 p.m. on the above-mentioned date.

☐ **BY FACSIMILE:** From facsimile number (949) 451-4220 at _____ a.m./p.m., I caused each such document to be transmitted by facsimile machine, to the parties and numbers indicated above, pursuant to Rule 2008. The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration.

☐ **BY UPS NEXT DAY AIR:** On the above-mentioned date, I placed a true copy of the above-mentioned document(s), together with an unsigned copy of this declaration, in a sealed envelope or package designated by the United Parcel Service with delivery fees paid or provided for, addressed to the person(s) as indicated above and deposited same in a box or other facility regularly maintained by United Parcel Service or delivered same to an authorized courier or driver authorized by United Parcel Service to receive documents.

I am employed in the office of Jessica A. Boschee, a member of the bar of this court, and that the foregoing document(s) was(were) printed on recycled paper.

☒ **(FEDERAL)**      I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 3, 2006.

*Teresa Stephens*
Teresa Stephens

<u>Service List</u>

## <u>APOLLO – COUNSEL FOR PLAINTIFFS</u>

Jeffrey A. Barrack, Esq.
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600 (telephone)
(215) 963-0838 (facsimile
(also served via email to
jbarrack@barrack.com)

Samuel M. Ward, Esq.
Barrack, Rodos & Bacine
402 W. Broadway, Suite 850
San Diego, CA 92101
(619) 230-0800 (telephone)
(619) 230-1874 (facsimile
(also served via email to
sward@barrack.com)

Stephen R. Basser, Esq.
Barrack, Rodos & Bacine
402 W. Broadway, Suite 850
San Diego, CA 92101
(619) 230-0800 (telephone)
(619) 230-1874 (facsimile
(also served via email to
sbasser@barrack.com)

05-16-05    02:32pm    From-BARRACK - SAN DIEGO                    T-796   P.002   F-625

1  LEVENBAUM & COHEN
   GEOFFREY M. TRACHTENBERG (19338)
2  362 North 3rd Avenue
   Phoenix, AZ 85003-1504
3  Telephone: (602) 271-0183
   Facsimile: (602) 271-4018
4
   Local Counsel for the Class
5
   BARRACK, RODOS & BACINE
6  STEPHEN R. BASSER
   SAMUEL M. WARD
7  402 West Broadway, Suite 850
   San Diego, CA 92101
8  Telephone: (619) 230-0800
   Facsimile: (619) 230-1874
9
   BARRACK, RODOS & BACINE
10 LEONARD BARRACK
   GERALD J. RODOS
11 3300 Two Commerce Square
   2001 Market Street
12 Philadelphia, PA 19103
   Telephone: (215) 963-0600
13 Facsimile: (215) 963-0838
14 Lead Counsel for Lead Plaintiff, the Policemen's Annuity and
   Benefit Fund of Chicago and the Class
15
16                UNITED STATES DISTRICT COURT
17                    DISTRICT OF ARIZONA
18 In re APOLLO GROUP, INC.        ) Lead Case No. CV 04-2147-PHX-JAT
   SECURITIES LITIGATION          )
19                                ) CV 04-2204-PHX-EHC (Consolidated)
                                   ) CV 04-2334-PHX-RCB (Consolidated)
20 This Document relates to:       )
                                   ) CLASS ACTION
21      ALL ACTIONS.               )
                                   )
22                                ) JURY TRIAL DEMANDED
23
24    LEAD PLAINTIFF, THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF
         CHICAGO'S CONSOLIDATED CLASS ACTION COMPLAINT FOR
25              VIOLATIONS OF FEDERAL SECURITIES LAWS
26
27
28

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | NATURE OF THE ACTION | 1 |
| II. | JURISDICTION AND VENUE | 7 |
| III. | PARTIES | 8 |
| | A. Plaintiff | 8 |
| | B. Defendants | 8 |
| IV. | BACKGROUND FACTS | 10 |
| | A. Financial Aid Fraud and Unethical Practices by For-Profit Schools in the Late '80's and Early '90's Trigger Congressional Restrictions on Compensation | 10 |
| | B. Title IV Regulations and Funding — Critically Important to For-Profit Schools | 11 |
| | C. The Serious February 5, 2004 DOE Report Concluding that Apollo's UOP Operations Violate the Law Banning Incentive Compensation | 13 |
| | 1. Use of Incentive Compensation Based on Enrollments for Those Involved in Recruiting or Admission Activities in Violation of Title IV Requirements | 14 |
| | 2. UOP's Student Recruiting System Focused on the Numbers and Deployed a Sales Training and Compensation Program the DOE Characterized as "Smoke and Mirrors" Designed to Allow UOP to "Fly Under the Radar" of DOE Scrutiny | 15 |
| | 3. UOP Penalized Enrollment Counselors for Not Meeting the Enrollment Numbers and Used Intimidation Techniques | 23 |
| | 4. UOP's Recruiter Evaluation System and Salary Increases Reinforced the Focus on Hitting Enrollment Numbers — the Quantitative — While Trying to Deceive the DOE | 24 |
| | 5. Bonus Incentives Awarded Based on Securing Enrollments and Recruiting | 27 |
| | 6. Pressure to Enroll Unqualified Students | 28 |
| | 7. UOP's Intense Use of Title IV Funds as a Sales Tool Amid a Culture of Duplicity | 29 |
| | 8. Further Deceptive Practices to Mislead the DOE and Obstruct Its Program Review Audit and Investigation | 29 |
| | D. UOP Employee Whistleblowers Confirm Its Ongoing, Systemic and Illegal Enrollment Compensation Scheme and Deception of the DOE | 31 |

i

|   | E. | UOP's Illegal Enrollment Incentive Scheme and Related Unlawful Practices Are Also Confirmed by Numerous Knowledgeable Ex-Employees .................................................................................. 33 |
| V. | | MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD......................................................... 44 |
|   | A. | False and Misleading Statements During the Class Period ........................ 44 |
|   | B. | The DOE Report and Findings of Systemic Violations of the Law Is Finally Disclosed ....................................................................... 59 |
| VI. | | ADDITIONAL SCIENTER ALLEGATIONS ............................................... 69 |
|   | A. | Defendants Possessed Actual Knowledge of the February 5, 2005 DOE Report at All Times During the Class Period ............................................ 69 |
|   | B. | Defendants' Concealment of the DOE Report — Which They Actively Believed Was a Material Adverse Event — Further Demonstrates Their Requisite Scienter ....................................................................... 70 |
|   | C. | Attempts to Conceal UOP's Illegal Conduct from DOE Investigators Further Supports a Strong Inference of Scienter ..................................... 73 |
| VII. | | MISLEADING FINANCIAL STATEMENTS ............................................... 74 |
| VIII. | | CLASS ACTION ALLEGATIONS ....................................................... 76 |
| IX. | | ADDITIONAL ALLEGATIONS OF PRESUMPTION OF RELIANCE, FRAUD-ON-THE-MARKET AND CAUSATION ................................................... 78 |
| X. | | NO STATUTORY SAFE HARBOR ...................................................... 80 |
| XI. | | CLAIMS FOR RELIEF ............................................................... 81 |

1       Lead Plaintiff, The Policemen's Annuity and Benefit Fund of Chicago ("Lead
2  Plaintiff" or "Chicago Police Fund"), on behalf of itself and all other persons similarly
3  situated, by its undersigned attorneys, alleges the following based upon personal
4  knowledge as to itself and its own acts, and information and belief as to all other matters,
5  based upon, *inter alia*, the investigation conducted by and through its attorneys, which
6  included, among other things, a review of defendants' public documents, conference
7  calls and announcements made by defendants, United States Securities and Exchange
8  Commission ("SEC") filings, wire and press releases published by and regarding Apollo
9  Group, Inc., ("Apollo" or the "Company"), reports and advisories about the Company,
10  official reports of the United States Department of Education (the "DOE" or the
11  "Department"), information readily attainable on the Internet, forensic expert analysis
12  and interviews of knowledgeable witnesses.

13  **I.   NATURE OF THE ACTION**

14       1.    This is a federal securities class action on behalf of all persons and entities
15  who purchased or otherwise acquired the securities of Apollo between February 27,
16  2004, and September 14, 2004, inclusive (the "Class Period"), against the Company and
17  its top officers for violations of the federal securities laws arising out of defendants'
18  dissemination of false, deceptive and misleading statements concerning Apollo's results
19  and operations which caused the class to suffer significant damages.

20       2.    Apollo is a for-profit educational institution, which describes itself as a
21  provider of higher education to working adults.  Through its largest subsidiary, The
22  University of Phoenix, Inc., ("UOP"), which accounted for approximately 95% of
23  Apollo's revenues at all times material, and other subsidiaries of lesser financial
24  importance, including the Institute for Professional Development ("IPD"), the Company
25  offers programs and services at campuses and learning centers in 37 states, Puerto Rico,
26  and Canada. Apollo claims to be the largest private institution of higher education in the
27  United States based on enrollment in its educational programs.

28

1

3.    Throughout the Class Period, Apollo reported positive financial results and publicly disseminated press releases and filings with the SEC, attributing these results to strong growth in student enrollment in its degree programs, both at local campuses and online. A material portion of Apollo's revenue is derived from federal financial aid programs — Title IV funding — in which Apollo's students participated to receive tuition assistance.

4.    As a consequence of students' receipt of financial aid from the federal government — which accounted for approximately 62% of Apollo subsidiary UOP's revenue — the Company was subject to extensive regulation by governmental agencies, including licensing and accrediting bodies. In particular, the Higher Education Act of 1965, as amended ("HEA") and the regulations issued thereunder by the DOE, established numerous standards and regulations that Apollo and its controlled subsidiaries were required to satisfy in order to participate in the various federal student financial aid programs regulated under Title IV of the HEA. One of the most important regulations promulgated by Congress and administered by the DOE prohibits institutions that receive federal financial aid from paying commissions, bonuses or other incentives on the basis of the success of student recruitment, admission or financial aid awards — clearly banning the payment of incentive compensation, directly or indirectly, for student enrollments.

5.    This ban on paying incentive compensation tied to student enrollments was a critical feature of the 1992 renewal of the HEA and was meant to address significant and widespread abuses in the late 1980's and early 1990's that cost the U.S. government almost 8 billion dollars in student loan defaults. These abuses were the result of for-profit schools financially incentivizing their employees to enroll as many students as possible to exploit available Title IV funds, ultimately causing employees to submit

///

///

///

2

1   phony financial aid applications and enroll unqualified students in an effort to enroll a

2   greater number of students, thereby increasing their own compensation and school

3   profits.

4          6.    In its Form 10-Q filed on July 15, 2004, the Company acknowledged that

5   its success was dependent upon its compliance with Title IV regulations, stating, in

6   relevant part, as follows:

7          Our future success is highly dependent on our ability to obtain,
       maintain, or renew required regulatory approvals, accreditation or state
8          authorizations. We are subject to extensive private, federal and state
       regulation. The Higher Education Act of 1965, as amended, and the
9          related regulations govern all higher education institutions participating
       in Title IV programs.

10         7.    But while the defendants were paying lip service to their obligation to

11  comply with the law, UOP, which accounted for almost all of Apollo's revenue, was

12  flagrantly and systemically violating the ban on incentive compensation with respect to

13  student enrollments. Indeed, the situation had gotten so grave that shortly prior to the

14  commencement of the Class Period, and as a consequence of information provided by

15  UOP employee whistleblowers, the DOE conducted a thorough audit and investigation

16  at several UOP campuses and thereafter rendered a blistering Program Review Report

17  addressed to defendant Todd S. Nelson, Apollo's President and Chief Executive Officer,

18  ("Nelson") on February 5, 2004 (the "DOE Report"), containing "serious" findings and

19  conclusions. Summarizing the DOE Report was a February 5, 2004 cover letter to

20  defendant Nelson stating in pertinent part:

21         This report contains a *serious finding* regarding the school's substantial
       *breach of its fiduciary duty*; specifically that the University of Phoenix
22         (UOP) *systemically engages in actions designed to mislead the*
       *Department of Education and to evade detection of its improper*
23         *incentive compensation system for those involved in recruiting*
       *activities.* The *finding of noncompliance* is referenced to the applicable
24         regulations, and specifies the action required to comply with the
       regulations and statutes.

25

26  The DOE Report concluded as follows:

27         The actions of *UOP* and the *system* it has established *cultivates and*
       *maintains a corporate culture in defiance of UOP's fiduciary duty.*
28         UOP has *created an environment that pits the strong motivation of*

                                                        3

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

*individual gain against its fiduciary duty to the Department.* It is one that *flaunts* the Department's *regulations and the prohibition against incentive compensation based on enrollments.*

(DOE Report at 27)[1]

8.    Among its many findings, the DOE also reported that UOP:

- "hires its recruiters with the promise of lucrative *compensation for success in securing enrollments;*"

- "maintains a recruiter evaluation and salary system that provides *incentive payments based both directly and indirectly on success in securing enrollments;*"

- "provides substantive *incentives to* its staff to *recruit unqualified students* and *students who cannot benefit from the training offered;*"

- "systematically and *intentionally operates in a duplicitous manner* so as to *violate* the Department's *prohibition against incentive compensation while evading detection.*"

(DOE Report at 29).

9.    The DOE Report constituted a serious, adverse and material event as did its scathing findings and conclusions of rampant violations of the law. Its conclusions are supported by considerable relevant evidence and factual findings, as fully discussed below.

10.    On February 27, 2004, the first day of the Class Period, despite their receipt of the February 5, 2004 DOE Report, its findings and conclusions and the fact that the Company was indeed, failing to comply with the law with respect to compensation of enrollment counselors (also referred to herein as "student recruiters" or "recruiters"), defendants issued a press release announcing the dismissal of a *qui tam* lawsuit that had included allegations of improper compensation of UOP's enrollment counselors, adding that the government had declined to intervene in the lawsuit and suggesting to the market that there was no merit to those allegations. Defendants' February 27, 2004 press release falsely portrayed the import of the Court's dismissal of the *qui tam* lawsuit and deceived investors by failing to disclose the fact that not only

---

[1]    Emphasis added throughout.

4

1 had the government shown considerable interest in allegations of improper
2 compensation of enrollment counselors, but it had recently conducted an intensive
3 Program Review and investigation of UOP resulting in the DOE Report's findings and
4 conclusions of a serious, systemic and flagrant noncompliance with the law together
5 with intentional acts of "duplicitous" conduct so as to "violate the Department's
6 prohibition against incentive compensation while evading detection." (DOE Report at
7 29)

8        11.    Defendants' active concealment of the truth was patent and egregious. In
9 statements to the investment community on March 12, 2004, defendant Nelson coyly
10 disclosed the fact that the DOE was in the process of a "Program Review," but in a
11 manner intended to minimize its import and comfort investors that nothing untoward had
12 or would result from the investigation, while failing to disclose the fact that the
13 investigation was a serious and material event which already resulted in a detailed
14 investigative report and findings of UOP's violations of the law, as more fully discussed
15 below. In addition, the Company reported favorable results in its second and third
16 quarter fiscal 2004 reports, filed with the SEC, and in its press releases and follow on
17 conference calls communicating those results to the investment community. Defendants'
18 false, deceptive and misleading statements caused the price of Apollo's shares to
19 increase dramatically, from $76.23 at the advent of the Class Period to as high as $98.01
20 during trading on June 8, 2004, settling in at $97.93 at the close of trading that day — an
21 increase of over 28%.

22        12.    By the end of trading on June 22, 2004, Apollo's shares were still trading
23 vigorously, closing at $94.17. But, on June 23, 2004, the media reported an SEC
24 investigation of Apollo's competitor, Career Education, and on June 24, 2004,
25 announced that another competitor, Corinthian Colleges, was violating the law with
26 respect to student financial aid programs and Title IV funding. Investors in Apollo
27 became concerned, particularly in light of the DOE Program Review of Apollo's UOP's
28 operations that they had been informed was taking place, consequently driving the

5

1  trading price of Apollo's shares from $94.17 per share at the close of trading on June 22,

2  2004, to $85.85 per share in the following 2 days. Hoping to stem any further decline of

3  Apollo's stock price, comfort the market and renew investor enthusiasm in Apollo,

4  defendants disseminated favorable financial results and statements designed to assure

5  investors that not only should they not be concerned with issues respecting Apollo's

6  regulatory compliance but that, in fact, the recent disclosures suppressing Apollo's stock

7  price created a *buying opportunity* for its shares. At the same time, defendants

8  concealed from investors the DOE Report containing materially adverse findings and

9  conclusions that Apollo's UOP subsidiary was violating the ban on incentive

10  compensation with respect to student enrollments and engaging in other related unlawful

11  practices as a consequence, or that Apollo was looking for solutions to respond to the

12  material adverse impact on its business that would result from being compelled to

13  operate within the boundaries of the law. As a consequence, Apollo's stock continued to

14  trade at falsely inflated prices which caused investors' losses.

15        13.    The truth began to emerge on September 7, 2004. After the close of the

16  market, the Company announced that it had additionally agreed to pay a $9.8 million

17  fine imposed by the DOE in connection with its regulatory investigation into the issue of

18  Apollo's tying the compensation of its enrollment counselors to enrollments numbers.

19  The news caused the price of Apollo common stock to decline. Then, on September 14-

20  15, 2004, articles in the *Arizona Republic* and *The Wall Street Journal*, respectively,

21  disclosed more of the truth with regard to UOP's *flagrant violations of the law* with

22  respect to incentive compensation relating to student enrollments and the prior DOE

23  Report's findings and conclusions, including the DOE's findings of a *"culture of*

24  *duplicity,"* and instances in which UOP recruiters forged student signatures on loan

25  documents. Revelations of the DOE Report and the $9.8 million fine — *the largest ever*

26  *imposed by the DOE* — caused a further decline in the trading price of Apollo's shares,

27  as the market absorbed the adverse news, from a closing price of $80.63 on September

28  13, 2004 to $78.68 at the close of trading on September 15, 2004 and lower still to

6

1  $75.82 at market close on September 20, 2004 on trading volumes that were

2  significantly higher than the average daily trading volume of Apollo's shares.

3      14.  Meanwhile, the pressure to ultimately bring its operations fully within the

4  letter of the law had already begun to have a material adverse impact on Apollo. In

5  addition to paying a fine of $9.8 million with respect to UOP's flagrant violations,

6  Apollo started experiencing a slowing of year-to-year quarterly growth rates in

7  enrollments, revenue and net income.  Nonetheless, the disclosures of Apollo's

8  violations of the law and the DOE action pertaining thereto did not come soon enough as

9  investors who purchased or otherwise acquired Apollo securities during the Class Period

10  have suffered massive losses directly caused by defendants' false, deceptive and

11  misleading statements, in violation of the federal securities laws.

12  **II.    JURISDICTION AND VENUE**

13      15.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a)

14  of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule

15  10b-5, 17 C.F.R. §240.10b-5 promulgated thereunder.

16      16.  This Court has jurisdiction over the subject matter of this action pursuant

17  to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

18      17.  Venue is proper in this District pursuant to §27 of the Exchange Act, and

19  28 U.S.C. §1391(b) and (c). Apollo maintains its corporate headquarters in this District,

20  and many of the acts charged herein, including the preparation and dissemination of

21  materially false and misleading information, occurred in substantial part in this District.

22      18.  In connection with the acts alleged in this complaint, defendants, directly

23  or indirectly, used the means and instrumentalities of interstate commerce, including, but

24  not limited to, the mails, interstate telephone communications and the facilities of the

25  NASDAQ national market.

26  ///

27  ///

28  ///

7

III.  **PARTIES**

    **A.    Plaintiff**

    19.    Lead Plaintiff, the Chicago Police Fund, is a municipal pension fund with assets of approximately $3.4 billion that serves approximately 25,000 members, active and retired, and their families. It employs about 17 people in the city of Chicago. The Chicago Police Fund purchased 61,000 shares of Apollo common stock during the Class Period, as more fully set forth in Exhibit 1 hereto and was damaged thereby.

    20.    Lead Plaintiff's complaint consolidates all actions filed previously by shareholders in accordance with the April 1, 2005 Order respecting consolidation in the above captioned action.

    **B.    Defendants**

    21.    Defendant Apollo is a for-profit educational institution, which is incorporated in Arizona and maintains its principle executive offices at 4615 East Elwood Street, Phoenix, Arizona 85040. Through its subsidiaries, UOP, IPD, the College for Financial Planning Institute Corp. and Western International University, Inc., Apollo offers programs and services at campuses and learning centers in 37 States, Puerto Rico and Canada. During the Class Period, Apollo derived about 95% of its revenue from the operations of its primary subsidiary, UOP.

    22.    Defendant Nelson was, at all relevant times, the Company's President and Chief Executive Officer. Subsequent to June 30, 2004, Nelson was the Company's Chairman of the Board. On information and belief, Jane Doe Nelson is the spouse of defendant Nelson and is named herein for community property law purposes only.

    23.    Defendant Kenda B. Gonzales ("Gonzales") was, at all relevant times, the Chief Financial Officer, Secretary and Treasurer of the Company. On information and belief, John Doe Gonzales is the spouse of defendant Gonzales and is named herein for community property law purposes only.

    24.    Defendant Daniel E. Bachus ("Bachus") was, at all relevant times, the Chief Accounting Officer and Controller of the Company. On information and belief,

8

1  Jane Doe Bachus is the spouse of defendant Bachus and is named herein for community

2  property law purposes only.

3      25.    Defendants Nelson, Gonzales and Bachus are collectively referred to

4  herein as the "Individual Defendants."

5      26.    It is appropriate to treat the Individual Defendants as a group for pleading

6  purposes and to presume that the false, misleading and incomplete information conveyed

7  in the Company's public filings, press releases and other publications as alleged herein

8  are the collective actions of the narrowly defined group of defendants identified above.

9  Each of the above officers of Apollo, by virtue of his or her high-level positions with the

10  Company, directly participated in the management of the Company, were directly

11  involved in the day-to-day operations of the Company at the highest levels and were

12  privy to confidential proprietary information concerning the Company and its business,

13  operations, products, growth, financial statements and financial condition, as alleged

14  herein. Said defendants were involved in drafting, producing, reviewing, certifying and

15  disseminating the false and misleading statements and information alleged herein or

16  were aware or recklessly disregarded that false, deceptive and misleading statements

17  were being issued regarding the Company, and approved or ratified those statements, in

18  violation of the federal securities laws.

19      27.    As officers and controlling persons of a publicly-held company whose

20  common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded

21  on the NASDAQ during the Class Period, and governed by the provisions of the federal

22  securities laws, the Individual Defendants each had a duty to promptly disseminate

23  accurate and truthful information with respect to the Company's financial condition and

24  performance, growth, operations, financial statements, business, products, markets,

25  management, earnings and present and future business prospects, and to correct any

26  previously-issued statements that had become materially misleading or untrue, so that

27  the market price of the Company's publicly-traded securities would be based upon

28

9

1   truthful and accurate information. The Individual Defendants' misrepresentations and
2   omissions during the Class Period violated these specific requirements and obligations.
3       28.   The Individual Defendants, because of their positions of control and
4   authority as officers and/or directors of the Company, were able to and did control the
5   content of the various SEC filings, press releases and other public statements pertaining
6   to the Company during the Class Period. Each Individual Defendant was provided with
7   copies of the documents alleged herein to be misleading prior to or shortly after their
8   issuance and/or had the ability and/or opportunity to prevent their issuance or cause
9   them to be corrected. Accordingly, each of the Individual Defendants is responsible for
10  the accuracy of the public reports and releases detailed herein and is therefore primarily
11  liable for the representations contained therein.

12  **IV.   BACKGROUND FACTS**

13      **A.   Financial Aid Fraud and Unethical Practices by For-Profit
            Schools in the Late '80's and Early '90's Trigger
            Congressional Restrictions on Compensation**

14
15      29.   In the late 1980's and early 1990's, the United States government was
16  plagued by skyrocketing default rates respecting federally guaranteed student loans.
17  These increasing default rates were blamed largely on fraudulent and unethical
18  enrollment and recruitment practices at for-profit schools. In 1990 alone, $2 billion
19  worth of student loans went into default as the total value of defaulted loans reached $8
20  billion as stated in the *Chicago Tribune* article "Colleges Leery [sic] of Plan to Alter
21  Student Loan Program" dated January 27, 1991.

22      30.   In the wake of student loan defaults costing U.S. taxpayers billions of
23  dollars, government investigators uncovered a litany of fraudulent behavior and highly
24  unethical enrollment practices at for-profit schools including:

25      •   Falsifying student enrollment status on federal loan applications;

26      •   Paying homeless people to sign federal student loan applications;

27      •   Submitting financial aid applications for students who had no
            intention of attending classes; and

28

10

T-796  P.015/100  F-625

05-16-05    02:35pm    From-BARRACK - SAN DIEGO

- Actively recruiting students in mental health facilities, homeless shelters and public assistance offices.

31. The primary motivating root cause of these fraudulent and unethical practices was the practice of many for-profit schools of financially incentivizing their enrollment counselors to sign as many new students as possible — a large number of whom required financial aid offered by the government. In 1992, recognizing the need to put a halt to this practice motivating for-profit colleges to commit the fraudulent and highly unethical practices plaguing the industry, Congress reauthorized the HEA, but included new restrictions on the compensation of enrollment counselors at for-profit colleges. These new restrictions were designed to bring an end to the abuses of the federal student loan programs associated with Title IV funding. Among the most significant changes enacted in the reauthorization was the ban on incentive or commission based compensation for recruiters. By banning compensation tied to the number of students enrolled by a recruiter, Congress hoped to prevent many of the abuses that had bedeviled student loan programs over the course of the prior decade.

32. To that end, the HEA prohibits educational institutions from providing "any commission, bonus, or other incentive payment based *directly or indirectly* on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance...." 20 U.S.C. §1094(a)(20).

**B. Title IV Regulations and Funding — Critically Important to For-Profit Schools**

33. Like its competitors, UOP and the other schools operating under the umbrella of Apollo are largely dependent on tuition paid by students from loans obtained under Title IV. In order to maintain eligibility for Title IV funding and accreditation, UOP must conform to a battery of local, state and federal regulations. Failure to abide by the federal regulations underlying the Title IV funding can result in loss of accreditation and, consequently, loss of eligibility to accept student loans secured pursuant to Title IV. If a school loses accreditation, it is not again eligible for

11

1  accreditation for a period of 24 months.  Because for-profit secondary education

2  providers like Apollo are so dependent on Title IV loan programs, *any* negative or

3  potentially adverse news or announcements that might impact Title IV qualification or

4  otherwise adversely impact revenue derived from Title IV funding are important to

5  reasonable investors and are material to the market.

6      34.    Failure to comply with Title IV regulations requirements can result in

7  serious adverse consequences to a company — a situation that was well known.  For

8  example, in 2000, Computer Learning Centers, then publicly traded on the NASDAQ,

9  was ordered to repay $187,500,000 in loans provided by the federal government for

10  paying commissions to its admissions officers, a practice that is strictly barred by the

11  HEA.  Within a few weeks of this order, Computer Learning Center was forced to shut

12  its doors and file for bankruptcy.

13      35.    Title IV funding was critically important to Apollo's business, revenues,

14  profitability and success.  And because Title IV funding accounted for approximately

15  60% of its revenues, such funding constituted an important life blood sustaining Apollo.

16  Accordingly, *whether Apollo's affiliates' programs adhered to Title IV requirements,*

17  *especially those specific to compensation of its enrollment counselors*, was a *matter of*

18  *great importance to* the *Company*, its *management*, including the defendants *and the*

19  *investment community*.

20      36.    The DOE was given the responsibility by Congress to monitor for-profit

21  schools and their compliance with the law and is empowered to conduct Program

22  Review audits and investigations of such institutions for that purpose.  Since enacted, the

23  ban on incentive-based compensation has been rigorously enforced by the DOE with

24  respect to for-profit schools.  The mere threat of a loss of accreditation — one of

25  numerous penalties that can be imposed for violating the ban — can quickly undermine

26  investor confidence in the integrity and trustworthiness of the for-profit college whose

27  shares are publicly traded and can have material adverse consequences with respect to its

28  stock trading price.  As more fully discussed below, Apollo's UOP operations were

12

1  engaging in systemic violations of the incentive-based compensation ban with respect to

2  student enrollments at all times material in an effort to achieve revenue and enrollment

3  growth.  Aware of the impact that an adverse report resulting from an audit and

4  investigation by the DOE could and would have on investor confidence, defendants not

5  only failed to disclose to the public the DOE's material investigative findings regarding

6  Apollo, but actively sought to prevent its disclosure and continued to conceal from

7  investors Apollo's unlawful activities.

8      **C.    The Serious February 5, 2004 DOE Report Concluding that
          Apollo's UOP Operations Violate the Law Banning Incentive**
9          **Compensation**

10     37.    Commencing in the late summer of 2003, investigators from the DOE

11  undertook an audit and investigation pursuant to a Program Review at several campuses

12  of UOP, the largest subsidiary of Apollo.  The program review involved examination of

13  "pertinent forms, policies and procedures and personnel documentation at UOP...."

14  (DOE Report at 7).

15     38.    DOE staff visited UOP campuses in Phoenix, Oakland, San Jose, San

16  Francisco, Pleasanton and Livermore, as well as UOP's online campus.  In addition,

17  DOE staff interviewed more than 60 then current or former UOP enrollment counselors

18  regarding UOP's compensation practices.  (DOE Report at 7).

19     39.    As a consequence of its audit and investigation, on February 5, 2004, the

20  DOE rendered a written "Program Review Report" (DOE Report) addressed to

21  defendant Nelson respecting its findings and conclusions.  Summarizing the DOE Report

22  was a February 5, 2004 cover letter to defendant Nelson stating in pertinent part:

23         This report contains a ***serious finding*** regarding the school's ***substantial
           breach*** of its ***fiduciary duty***; specifically that the University of Phoenix
24         (UOP) ***systemically engages in actions designed to mislead the
           Department of Education and to evade detection of its improper***
25         ***incentive compensation system for those involved in recruiting
           activities.*** The ***finding of noncompliance*** is referenced to the applicable
26         regulations, and specifies the action required to comply with the
           regulations and statutes.

27

28

                                        13

1    The DOE Report concluded as follows:

2        The actions of UOP and the system it has established *cultivates and*
        *maintains a corporate culture in defiance of UOP's fiduciary duty.*
3        UOP has *created an environment that pits the strong motivation of*
        *individual gain against its fiduciary duty to the Department.* It is one
4        that *flaunts* the Department's *regulations and the prohibition against*
5        *incentive compensation based on enrollments.*

6    (DOE Report at 27)

7        40.    In concluding its Report, the DOE also found that UOP:

8        •    "hires its recruiters with the promise of *lucrative compensation*
9            *for success in securing enrollments;"*

10       •    "maintains a recruiter evaluation and salary *system that provides*
            *incentive payments based both directly and indirectly on*
11           *success in securing enrollments;"*

12       •    "provides substantive *incentives to* its staff to *recruit unqualified*
            *students* and *students who cannot benefit from the training*
13           *offered;"*

14       •    "*systematically* and *intentionally operates* in a *duplicitous*
            *manner* so as to *violate* the Department's *prohibition* against
15           incentive compensation *while evading detection."*

16   (DOE Report at 29).

17       41.    The DOE Report constituted a serious, adverse and material event as did

18   its scathing findings and conclusions of rampant violations of the law. Its conclusions

19   are supported by considerable relevant evidence and factual findings, as fully discussed

20   below.

21               1.    **Use of Incentive Compensation Based on Enrollments**
                        **for Those Involved in Recruiting or Admission**
22                      **Activities in Violation of Title IV Requirements**

23       42.    The DOE determined that during the Class Period and relevant times prior

24   thereto extending over a period of years, *Apollo's UOP for-profit educational*

25   *institution was continuously violating the longstanding HEA ban on incentive-based*

26   *compensation* for recruiting activities in the HEA and was *systemically engaging in*

27   *activities designed to mislead the DOE and otherwise evade detection of its improper*

28   *and illegal conduct.*

14

1    43.    *The DOE found that when hiring recruiters, UOP promises substantial*

2    *compensation.* The DOE was informed by most of the recruiters interviewed that when

3    they were hired, UOP told them that the job had tremendous financial potential and that

4    they could "make a lot of money," with UOP promising to double or triple their salary in

5    3 to 6 months if they successfully performed their duties — promises that enticed many

6    of the UOP employees to leave a higher paying job to work for that institution because

7    of the promise of the increase in salary in such a short period of time. "Drawn by the

8    lure of a large salary potential" a number of academic counselors and advisors

9    transferred to the higher paying recruiter position knowing that, had they not transferred

10    to the recruiting position, their salary would not only be lower, but their annual salary

11    increases would be minimal, generally only 2-8 percent. However, according to the

12    report, it did not take long before UOP's recruiters would "find out that *UOP bases their*

13    *salaries solely on the number of students they enroll.*" (DOE Report at 7-8).

14    2.    **UOP's Student Recruiting System Focused on the**
        **Numbers and Deployed a Sales Training and**
15       **Compensation Program the DOE Characterized as**
        **"Smoke and Mirrors" Designed to Allow UOP to "Fly**
16       **Under the Radar" of DOE Scrutiny**

17    44.    According to UOP's sales training program, recruiters are considered

18    "counselors in training" or "freshman" for their first 13 weeks of employment. Soon

19    after these recruiters are hired, they are required to attend a one-week "Sales Academy"

20    provided by regional and corporate management at the regional office. "The Admissions

21    Counselor Policy Guide for Admissions Managers and Directors of Enrollment"

22    disseminated by UOP considers this 13 week period to be a "developmental program"

23    where employees learn the system for tracking leads, contacts, appointments,

24    enrollments and other recruiting activities, such as the conversion of an appointment to

25    an application. During the Sales Academy training, these recruiters were taught sales

26    tactics designed to "pique the interest of potential students through the progression of

27    enrollment activities, such as probing need, fostering trust, creating urgency and

28    overcoming objections." Whether during or shortly after the initial 13 week period, new

15

1    recruits then attend a one week "Student Advisement Workshop" at UOP headquarters in
2    Phoenix Arizona, where they receive intense training on traditional sales techniques
3    including "probing and developing the potential customer's need for the product,
4    creating urgency and gaining commitment from the potential customer, and closing the
5    deal." According to recruiters, "in spite of the name of the training," the "Student
6    Advisement Workshop" deals "only with sales techniques and has little or nothing to do
7    with academically advising students." (DOE Report at 8).

8        45.    According to the DOE investigative findings, if a new recruiter enrolls
9    enough students during the first 13 weeks, his or her advancement will also include a
10   raise. Promotion to higher levels is determined on the basis of whether the enrollment
11   counselor "meets," "exceeds" or "always exceeds" expectations. Indeed, under UOP's
12   2002 "Enrollment Counselor Policy Guide," an enrollment counselor must have
13   accumulated at least 2 quarters of "often or consistently meets expectations" and cannot
14   have any quarters where his or her performance does not at least "meet expectations."
15   And under the 2002 guide, in order to be promoted to a higher pay level (from a low of
16   approximately $26,000.00 to the next level — EC II — with pay as high as $65,000.00),
17   the recruiter was required to have 3 consistent quarters where performance "often or
18   consistently exceeds expectations." (DOE Report at 8-9).

19       46.    Promotion to the title of "Senior Enrollment Counselor" ("senior
20   counselor") requires 4 consistent quarters where performance "often or consistently
21   exceeds expectations." A senior counselor may be promoted to the title of "Executive
22   Enrollment Counselor" by having 8 consistent quarters where performance "often or
23   consistently exceeds expectations." (DOE Report at 9).

24       47.    UOP measured success through the use of a "matrix," and the matrix was
25   used to determine salary. Freshman recruiters were given the matrix and were evaluated
26   weekly on their numbers. UOP's matrix established certain levels for enrollments
27   corresponding to "Meets," "Exceeds" or "Always" ratings that themselves would
28   determine the recruiters' overall rating and salary. Recruiters were urged to use this

16

1    matrix as their guide to reaching their desired "level of success" — an instruction given

2    to them at the so-called "Student Advisement Workshop." The DOE further found that

3    "[t]he matrix sets forth the rating ('meets,' etc.) associated with the number of

4    enrollments, and it is these criteria that supersede all others and actually determines

5    salary. Recruiters are keenly aware of how the matrix numbers establish their salaries."

6    (DOE Report at 9).

7        48.    According to one recruiter interviewed by the DOE, "it was common

8    knowledge among recruiters that *each enrollment is worth about $750 in annual*

9    *salary*." And while in recent years the matrix containing the enrollment expectations

10    and salary levels associated with the matrix were actually separated into 2 different

11    documents, recruiters simply had to put the 2 documents together in order to determine

12    their salary levels associated with enrollment numbers. (DOE Report at 9).

13        49.    UOP repeatedly reinforced the importance of enrollment numbers

14    throughout its orientation and training of recruiters as determined by the DOE and

15    confirmed by a document that was provided to newly hired recruiters entitled "The

16    Psychology of Enrollment Success at the University of Phoenix," which touted the

17    benefits and rewards of being a sales professional, including such assertions as:

18        • $$$ — No limit on income
    • Highest paid people in the world are salespeople

19        • Never have to worry about $$$ again
    • Top 20% Enrollment Counselors @ UOP =ave. $75,000+/yr

20          "other" 80%          ave. $25,000+/yr

21        • Top 20% = never worry about $$$

**The Winning Edge**

22
23    | | | |
|---|---|---|
| Counselor #1 | 100 Activities/half | $65,000 |
| Counselor #2 | 79 Activities/half | $36,000 |

24                                              $29,000

25
26              3.5 additional activities / month=$29,000

27    (DOE Report at 9-10)

28        50.    The *DOE investigation* further *confirms* that while the matrix listed

17

1  certain steps in the recruitment process, *the reality was that the number of students*
2  *enrolled is what affected recruiter salary*.  For example, "[s]ome of the recruiters
3  consistently exceeded the numbers for all steps except enrollments, yet received an
4  overall evaluation of 'needs improvement' simply because their enrollments failed to hit
5  the requisite number."  Indeed, the DOE investigators further found that "managers
6  simply falsified the numbers on the various factors to make the overall evaluation match
7  the enrollment number and that managers told them that if they get the enrollments, the
8  manager can make the other numbers match."  For example, one Manager told a
9  recruiter, "You get the enrollments and we'll take care of the matrix.  We can fudge the
10  numbers on the matrix." (DOE Report at 10).

11      51.     According to the DOE Report, "[a]ll recruiters indicated that they were not
12  shown the matrix, or told of how enrollments related to salary, until after they were
13  hired."  In addition, the investigation revealed that new recruiters were aware that
14  enrollment numbers determined their salary and generally knew that if they did "make
15  the numbers" they would be rewarded with a "good bump" but those who did not make
16  the numbers would not get the raise they expected when they were hired, with many
17  recruiters commenting that the bottom line was, "if the enrollments are not there, don't
18  expect a raise." (DOE Report at 10).

19      52.     UOP's own Corporate Director of Enrollment, who visited various UOP
20  locations to provide additional motivation and was known for his ability to motivate by
21  touting the financial rewards for making the numbers, was, according to the
22  investigation, quoted as telling recruiters: "It's all about the numbers.  It will always be
23  about the numbers.  But we need to show the Department of Education what they want
24  to see."  The DOE further found that 44 out of 61, or 72%, of the recruiters interviewed
25  stated that it was "always about the numbers" and that it was "all about 'butts in seats' or
26  'asses in classes'" — to use the vernacular commonly heard at UOP.  Indeed, some of the
27  recruiters interviewed acknowledged that the UOP's Corporate Director of Enrollment
28  himself characterized the compensation plan for recruiters as "smoke and mirrors" so

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1    that UOP could "fly under the radar" of the Department. And according to the DOE

2    Report, "[m]ore than one recruiter stated that they also heard the Director of Marketing

3    say, when discussing the salary compensation plan for recruiters, 'we're flying under the

4    radar of the Department,'" while both managers and recruiters referred to the matrix as a

5    "smokescreen" or "smoke and mirrors." And one recruiter who was interviewed

6    disclosed that *the matrix is a way to deceive the Department.*" These statements were

7    made "even though recruiters are aware that basing salary on enrollments is against the

8    law." (DOE Report at 10-11).

9        53.    UOP also used an elaborate tracking system designed to keep abreast of

10    commissionable sales and sales performance, and recruiters met with managers on a

11    daily, weekly and monthly basis to go over the numbers and even discuss how to

12    increase them in order to reach the desired salary, referred to as the "desired level of

13    success." (DOE Report at 11).

14        54.    Pursuant to UOP's elaborate tracking system, the Institution compiles a

15    "Commissionable Starts Report" for each recruiter at each location and sends them to the

16    Corporate Operations Manager at UOP's Headquarters in Phoenix, Arizona. The

17    Corporate Operations Manager prepares a separate list for each recruiter. A final

18    approved enrollment list together with the Commissionable Starts Report is bound by

19    location in a final Report referred to as the "Orange Book" and each bound report is

20    forwarded by UOP to each location. The final bound report shows total enrollments by

21    location as well as the final enrollments credited to each recruiter and each recruiter's

22    rejected enrollments. (DOE Report at 11). The DOE Report found:

23        a.    As part of the tracking system, the Corporate Operations
            Manager also updates a manually prepared Excel spreadsheet
24            maintained on a fiscal year basis that lists all recruiters and their
            final enrollments for each month. This spreadsheet actually
25            ranks UOP recruiters from all locations by the number of
            enrollments credited to them as of that date and is known as the
26            "Stack Rankings" and is sent monthly to the managers who
            generally distribute it to the recruiters. (DOE Report at 11).

27

28        b.    In an *apparent effort to deceive the DOE* or otherwise
            *camouflage* what was in *reality* a commissionable compensation
            scheme based on enrollments, the "Commissionable Starts

                                    19

1    Report" was named the "CPCC701 Enrollment Report." (DOE Report at 11).

2    55.    Recruiters' managers also used a manually prepared monthly report,

3    entitled "AC-Self Success Recap" in their monthly, quarterly and annual evaluations that

4    captured the student enrollment activities of each recruiter at the location including

5    actual number of students they enrolled. The "AC-Self Success Recap" was required to

6    be forwarded as an attachment to UOP's Corporate Enrollment office each month, no

7    later than the 5th of the following month, and is continually updated by the Marketing

8    Coordinators. (DOE Report at 12).

9    56.    According to the DOE's findings, "UOP's intense focus on numbers and

10   enrollments per recruiter permeates the working day of each recruiter" as managers

11   "bombard the recruiters with e-mails daily — listing the top performers based on

12   enrollments" and other recruiting activities. (DOE Report at 12).

13   57.    During "morning huddle" formally called an "OSIRA meeting," each

14   recruiter at each campus must report the number of enrollment activities accomplished

15   the day before. The purpose of these meetings is to motivate or humiliate the recruiters

16   based on their activities. At the morning huddles managers would "go over the numbers

17   and either praise or chastise each recruiter in front of the group." Recruitment managers

18   used a large board on which the activities of each recruiter were listed and posted

19   prominently except when "visitors" are expected. Each Monday their morning huddles

20   would include a recap of the prior week. And monthly, the meetings would involve a

21   monthly assessment and itemization of goals not met and issues that needed to be

22   resolved in order to meet those goals. (DOE Report at 12).

23   58.    UOP utilized these frequent meetings in order to bring home the point that

24   a recruiter's success in securing enrollments would equate to success in reaching his or

25   her salary goals, as exemplified in one recruitment manager's frequent refrain: "X is

26   going to make a lot of money at the end of this quarter because he has X enrollments."

27   And one recruiter told DOE Program Reviewers during the investigation that his

28

1   manager's tactic was to say: "How much money do you want to make? Well, here are

2   how many students you have to register to make that much." (DOE Report at 12-13).

3       59.    Beyond frequent face to face meetings, recruiters were also barraged with

4   e-mails to remind them where they ranked with respect to other recruiters while

5   emphasizing the target number of student enrollments. For example, e-mails uncovered

6   by the DOE investigation that were sent to recruiters on an On Line Team read:

7   • From a Director of Admissions on July 23, 2003 to ECs,
       entitled "July/August Goals":

8

9       Now you know what is at stake and the rewards available
        at the end of the month of August, please tell me what

10      your own personal goal is for July/August combined and
        what your goal is for your next 6-month review.  140?

11      130?  How much you would like to see your salary
        increase?

12  • From an Enrollment Manager to ECs, April 24, 2002,

13      entitled "Team Meeting this AM":

14      Make sure that if you didn't hit your matrix # for MEETS
        in June, that you do it in July. EC1 that means 14, EC2 is

15      16...any questions?

16  • From an Enrollment Manager to ECs, June 28, 2002,

17      entitled "Back to Basics":

18      Your job, as Admissions Counselors, and sales
        professionals is to get in touch with every one of them as

19      soon as possible to evaluate their needs and match the
        benefits of UOP with those needs, then close the sale.

20      The expectation for EC2 is that you meet the criteria of

21      your matrix, and enroll 16 new students each month.

22      The expectation for EC1 is that you also meet the criteria
        of your matrix, and enroll 14 new students each month.

23
        As a CIT, your shooting for Always Exceeds on your

24      matrix, and 30 new students in your first three months on
        the floor.

25
        These numbers and criteria are measured on a quarterly

26      basis, so know what your evaluation quarters are, and
        what your goals and running totals are.  This is your

27      process to manage.  You can use vacation time when it's
        made available to you, but make sure that your students

28      are taken care of, and that you still meet your

21

1  expectations. If your production levels can't be
2  maintained because of vacation time that you have planned, you need to work extra before and after the time off to make it a non-issue.

3

4  • From an Enrollment Manager to ECs, April 25, 2002, entitled "Please Reply to Me..Lunches":

5
6  We've regged 17 new students in the last 2 days, and 11 of those were on Tuesday, WAY TO GO!!! As of last night
7  we're at 57 REG and 36 APIN, more combined that either March or April, and we've only been prospecting for 5 days!!!!

8
9  Where are you in relation to your goal?? Right now you should plan on being at half-way (REG/APIN combined)
10  when you walk in the door next Wednesday (May 1). As a team we're at almost exactly 33% of our promised 275!!!

11  If you think of it, I have the REG-O-METER on my door, and I've been updating it for the last couple of days. Feel
12  free to add your own when you put 'em in REG!!

13  (DOE Report at 13-14).

14      60.   Recruiters received a spreadsheet on their computer desktops from one
15  Enrollment Manager depicting how many enrollments each such recruiter needed to
16  reach the next salary level. The following is an example:

|         | June | July | August | Sept | Oct | Nov |    |     |
|---------|------|------|--------|------|-----|-----|----|-----|
| Cleared | 14   | 13   | 14     | 15   | 20  | 14  | 90 | 45K |
| Goals   |      |      | 17     | 20   | 25  | 17  |    |     |

20
21  (DOE Report at 14-15).

22      61.   The forgoing spreadsheet exemplar was dated in July 2003 showing that
23  that particular recruiter had 27 enrollments by the end of July, and further showing what
24  was needed in order to achieve 90 enrollments in the 6 month period — the number that
25  would result in the recruiter's desired $45K dollar salary. According to the DOE
26  investigative findings, although the manager kept these spreadsheets updated and clearly
27  visible in the recruiters' desktops, during the Department's site visit, however, the
28  "manager deleted these spreadsheets from the recruiters' desktops." (DOE Report at 15).

22

3. **UOP Penalized Enrollment Counselors for Not Meeting the Enrollment Numbers and Used Intimidation Techniques**

62. According to the DOE and based on its extensive investigation, "[j]ust as recruiters are rewarded for meeting or exceeding the enrollment numbers, they are also penalized for not meeting the enrollment numbers." Recruiters reported that since managers were under significant pressure from UOP's corporate office to meet enrollment numbers, a recruiter's failure to meet enrollment goals set by UOP likewise caused the managers to fail and, as a consequence, "the managers 'tried to make their lives miserable' when their enrollment numbers are not high enough." (DOE Report at 15).

63. A number of recruiters reported that they were threatened with loss of their jobs by UOP if they failed to meet the numbers. "You are constantly threatened if you don't meet the numbers." And many recruiters who were also students at UOP feared losing their tuition benefits if they failed to meet enrollment numbers and that they felt they had to do whatever was necessary to meet the enrollment numbers to attain their degrees. (DOE Report at 15).

64. Even harsher methods were used to "punish" those who failed to meet enrollment numbers at the On Line Campus. According to most online recruiters interviewed by the DOE, managers used "heavy-handed intimidation tactics to humiliate them into improving their numbers." "Well known among the recruiters was the *'Red Room'* — a place viewed with fear and dread by recruiters" with whom the DOE reviewers spoke. Reviewers were sent to the Red Room as punishment for not meeting enrollment numbers required and such were expected by management. (DOE Report at 15).

65. Until such time as UOP ceased using the Red Room in late 2002, this glass encased room — visible for all in the area to see who was inside — was a place of humiliation amid an environment of high-pressure sales tactics to potential enrollees. Those sent to the Red Room were not allowed vacation time nor were they allowed

23

1  breaks other than those specifically assigned.  Recruiters were required to work in the

2  Red Room until such time as they attained the required number of student enrollments.

3  (DOE Report at 16).

4       66.    As an additional tactic, underperforming recruiters would have their leads

5  decreased by managers.  Those with high enrollment numbers received more leads with

6  consequent enrollment credits and salary "bumps."  Those recruiters who had less

7  enrollments had leads taken away, received no enrollment credits for former recruits,

8  received no salary increases and could potentially suffer a pay cut. (DOE Report at 16).

9       67.    According to the findings of the DOE, "[a] number of the recruiters noted

10  that those who did not 'meet the numbers' of enrollments would be deprived of leads and

11  floor time."  Floor time was valuable to recruiters because it gave them access to new

12  leads that came in as walk-ins, internet referrals or call-ins.  These fresh leads were

13  cherished by recruiters. (DOE Report at 16).

14       68.    Recruiters who missed numbers for any month received notification

15  immediately from UOP. And such recruiters received harsh emails from their managers

16  chastising them. (DOE Report at 16-17).

17       69.    The DOE also found that if a recruiter failed to meet specified numbers

18  that the recruiter was required to meet in order to retain his or her job, UOP would place

19  him or her on "decisional leave" — one day during which the recruiter was expected to

20  decide whether he or she "wishes to be successful at UOP."  "If the recruiter's

21  performance fails to 'meet' expectations, UOP fired him or her." (DOE Report at 17).

       **4.**    **UOP's Recruiter Evaluation System and Salary Increases Reinforced the Focus on Hitting Enrollment Numbers — the Quantitative — While Trying to Deceive the DOE**

22

23

24

25       70.    According to the DOE's investigation report and findings, over 70% of the

26  recruiters interviewed reported that the *basis for compensation was enrollment*

27  *numbers* and recruiting activities. *Literally every recruiter interviewed randomly or*

28  *outside of the work premises said that the number of enrollments determined their*

1  *salary.* Some even reported that while aware of highly subjective or qualitative factors
2  as part of their evaluation, their managers nonetheless always "assured them that *UOP*
3  *included these factors simply to deceive the Department and that UOP actually based*
4  *salary raises solely on the number of students a recruiter enrolls."* (DOE Report at
5  17).

6      71.    According to one recruiter interviewed by the DOE, when he asked his
7  manager how evaluation factors were determined he was told: *"Its enrollments. You*
8  *know its enrollments. It will always be enrollments."* UOP also monitored certain
9  "qualitative factors" in a way that, according to most recruiters interviewed by the DOE,
10  were nothing more than "conversions of the quantitative factors and are there simply to
11  deceive the Department." For example, a recruiter asked his manager during his
12  evaluation about these qualitative factors and how they were determined. In response,
13  the manager told the recruiter that "Job Performance" actually equates to the number of
14  new enrollments. "Communication" meant the number of conversions. "Customer
15  service" meant the number of leads to contact. "Working relationships" meant resolving
16  student issues to overcome objections and obstacles and "Judgment" meant getting
17  students in class. Indeed, this recruiter interviewed by the DOE actually wrote his
18  manager's response on his performance evaluation form which was then signed by both
19  his manager and his manager's supervisor. At bottom, it was the number of enrollments
20  that mattered: the remainder of the so-called "qualitative" factors were simply cosmetic
21  in order to camouflage that it was all about the numbers. (DOE Report at 17-18).

22      72.    Recruiters for UOP On Line further confirmed that the factor that actually
23  affected the salary level was the enrollments. For example, some of the recruiters
24  interviewed by the DOE consistently exceeded the numbers for all areas other than
25  enrollments. Nonetheless, they received an overall evaluation of "needs improvement"
26  because their enrollments failed to hit the expected numbers. They would not receive a
27  promotion in that instance. However, more than one recruiter said that managers simply
28  falsified the numbers on the various factors to make the overall evaluation match the

25

1  enrollment number and told them that if the recruiter gets the enrollments, the manager
2  can make the other numbers match.  The DOE further concluded that it was widely
3  known that the evaluation forms kept in the personnel files of the recruiters were
4  meaningless.  Recruiters also told DOE interviewers during the Program Review that
5  they were coached by managers prior to those interviews to say that their evaluations
6  and salaries were based on qualitative factors, not just enrollments.  And according to
7  the DOE investigation, several recruiters explained that the matrix was simply a joke and
8  that it was all about enrollments.  (DOE Report at 18).

9       73.    According to the DOE's investigative findings, *UOP's Director of*
10 *Enrollment confirmed* that the *"[p]romotions are based on exceeding numbers only."*
11 Different recruiters at various locations interviewed by the DOE further confirmed that it
12 was "enrollments that count" and that the "amount of money" was "dependent on how
13 many students...enrolled." (DOE Report at 18-19).

14      74.    According  to  the  DOE's  investigative  findings,    *"Recruiters*
15 *overwhelmingly confirmed that the number of enrollments was the 'bottom line.'*
16 Recruiters stated that even though the number of enrollments was the actual basis of
17 their salary, *management was always careful not to put this in writing due to*
18 *awareness that the Department prohibited incentive compensation based on*
19 *enrollments."* (DOE Report at 19).

20      75.    The DOE further found, based on its investigation and a review of the
21 salary history of UOP recruiters, in conjunction with "Stack Rankings," that UOP
22 consistently granted enormous salary increases to those with high enrollment numbers.
23 (DOE Report at 20).

24      76.    The "Stack Rankings" spreadsheet consisted of a list of all UOP
25 enrollment counselors at every UOP campus and the total number of enrollments
26 credited to each counselor.  The "Stack Rankings" were maintained and regularly
27 updated by UOP's Corporate Operations Manager.  The "Stack Rankings" were sent to
28 enrollment managers on a monthly basis.  In addition, the Corporate Operations

1    Manager maintained a file for each enrollment counselor that included the monthly

2    Stack rankings. (DOE Report at 11-12).

             **5.**     **Bonus**    **Incentives**    **Awarded**    **Based**    **on**    **Securing**
3                    **Enrollments and Recruiting**

4

5        77.     The DOE investigators further found that UOP awarded expense-paid trips

   for enrollments and provided incentive awards for securing enrollment applications,
6

7    including gift certificates for obtaining a certain number of applications, and winning

8    recruitment activity contests during months that enrollments were down or numbers

   were behind. A typical e-mail for these awards was as follows:
9

10          From:       Enrollment Director
           Sent:        1/17/2003

11          To:          NCAL ENROLLMENT
           Subject:     MAKING PROGRESS/CONTEST

12          Thank you for your commitment this past week...You have shown that
          January is not out of reach...And <u>sitting in my hot little hands is a</u>

13         <u>$100.00 dollar Toys R Us gift certificate just waiting to be taken from</u>
          <u>me and used.</u>

14          <u>HERE'S THE DEAL...</u>
          You have from today 1/17 until 5:00 PM on 1/24 to win it...HERE'S

15          HOW

16          1.       Whoever takes the most <u>APPLICATIONS FOR JANUARY from</u>
              <u>1/17 to 1/24 WINS...</u>

17          NOTE: IT TAKES <u>7</u> APPLICATIONS MINIMUM TO WIN

18

19          If each of us can add 3 applications between 1/17 and 1/24 we will be
          real close to our goal in January which will se the table for a SUPER

20          February...Regards,

21

22    (DOE Report at 23).

23        78.     DOE investigators further learned that in a quarterly meeting at the end of

24    Apollo's fiscal year, ending August 2003, UOP On Line gave overnight hotel stays to

25    recruiters who had 25 enrollments or more. Meanwhile, where numbers were not met,

26    recruiters might receive an e-mail from their manager informing them that overtime or

27    weekend time, without pay, would be required. (DOE Report at 23-24).

28        79.     In addition, UOP sponsored "Sperling Club Trip Awards" — all expense

27

1  paid trips for a recruiter and his or her partner pursuant to the "Sperling Club Trip
2  Award program" that could be won by successfully enrolling a specific number of
3  students within a given period of time.  The majority of recruiters interviewed by the
4  DOE confirmed their knowledge of the Sperling Club Trip Awards and all of them
5  confirmed that those awards were based solely on the number of the students recruiters
6  enrolled.  Indeed, enrollment mangers and recruiters "all confirmed that *Sperling Club*
7  *Trips for recruiters were awarded based solely on the number of enrollments*" with one
8  enrollment manager stating "Sperling is definitely based on enrollments.  There is a set
9  goal and the counselor has to obtain it in order to win."  The DOE investigators further
10  found that "*[a]ware of the Department's prohibition against incentives based on*
11  *recruiting activities, managers have typically masked the target number required to*
12  *win" with respect to enrollments* required for this Sperling Club Trip Award.  (DOE
13  Report at 22).

14              6.      **Pressure to Enroll Unqualified Students**

15      80.      The *DOE investigation further found that "UOP makes it very clear that*
16  *recruiters are to do whatever it takes to get the student to enroll," despite recruiters*
17  *frequently mentioned concern that there were student customers for whom UOP was*
18  *not a good educational option* because, for example, they could not reasonably expect
19  to complete a degree program at UOP and would be better served by other alternatives
20  such as community college.  DOE investigators found that UOP managers chastised
21  recruiters who suggested options other than UOP and that some managers told recruiters
22  that if a student dropped out after the first 5 week course, it should not be their concern
23  since, by then, both the recruiter and the manager would have received the enrollment
24  credit. (DOE Report at 24).

25      81.      DOE investigators further learned that *recruiters* stated that they were
26  *pressured by management to enroll students who were not qualified* and chastised by
27  managers for failing to pressure students into enrolling or staying in their first class, in
28  spite of the lack of financial resources.  UOP expected recruiters to overcome financial

                                    28

resource objections so that, for example, if the problem was insufficient funds, they were to encourage Title IV funding and if the Title IV funds were insufficient, pressure the students to seek a private loan. (DOE Report at 24).

### 7. UOP's Intense Use of Title IV Funds as a Sales Tool Amid a Culture of Duplicity

82. The DOE further found that UOP provided its recruiters with financial aid instruction on how to use Title IV funds to "overcome objections" and that at the On Line operation, recruiters were taught how to use the Title IV funding as an effective tool for closing the sale. Recruiters received instruction through a training program and sales materials that taught them how to use financial aid effectively as a sales tool. (DOE Report at 25).

### 8. Further Deceptive Practices to Mislead the DOE and Obstruct Its Program Review Audit and Investigation

83. Tellingly, the DOE further concluded that *UOP engaged in deceptive practices to mislead the Department in order to hide or otherwise camouflage the fact that it was violating the ban on incentive compensation for enrollments.* In that regard, the DOE concluded and reported as follows:

> The sales philosophy at UOP and practice is designed around *evasion* and relies upon euphemisms to *avoid detection by the Department.* UOP systemically established terminology and procedures to *hide the fact that UOP pays distinct and significant financial incentives solely based on recruiters' success in securing enrollments.* Since evaluations and salaries based on enrollments would be readily detectable by an auditor or Department reviewer, UOP refers to enrollments as *'activities'* or *'level one student information cards.'*
>
> Several recruiters told the reviewers that they had confronted their managers during evaluations about the fact that they were actually being evaluated on enrollments, not the 'fluff factors printed on the evaluation forms (the subjective factors: Judgment, Customer Service, etc.). All were told by UOP that *it will always be about enrollments.* One recruiter quoted his manager as saying: 'You know you are evaluated on the basis of enrollments and we've always talked about that. You know that. It's never ever been a secret that there is an enrollment number that you are expected to hit.' All On Line Campus recruiters who were

29

interviewed, except for those chosen for interview by UOP, stated that their salary was based on the number of students they enroll, a fact that managers reiterate frequently on an oral basis, although they never put it in writing.

Recruiters also told reviewers that whenever 'visitors' (government visitors, accreditation visitors) were expected, recruiters are coached by managers on what to say.  Typically, according to these recruiters, required enrollment and/or application numbers are very visibly posted on the walls and one desks.  When 'visitors' are expected, however, these posters and desk 'reminders' are removed until the visitors are gone.

Literally *every current* UOP employee who has worked longer than a year, expressed anxiety over possible retaliation by UOP.  Many commented on the fact that in the current economy, jobs are very difficult to find, and UOP never hesitates to replace anyone that it considers to be other than a loyal 'team player.'

*Recruiters consistently mentioned the focus and pressure to increase enrollments to report to Wall Street*.  Many expressed that while UOP at one time focused on the student and stressed ethical conduct, *the culture now is one where the emphasis is on increasing the numbers, the stock price and meeting Wall Street expectations*.  UOP's corporate culture, steeped in '*smoke and mirrors*,' creates a façade where some can survive, prosper and get rewarded.  Often *ethics are set aside*.

(DOE Report at 25-26).

84.    The DOE further concluded that UOP's behavior during the review program process further substantiated the ethical concerns expressed by current and former employees. For example, one recruiter said that her manager called her and one of her teammates aside when it was learned that the Department was reviewing the incentive compensation issue and was visiting the On Line Operation.  They were coached by the manager to say that salaries were based on a number of factors, not just enrollment.  The manager further instructed them that they were not to speak to any former UOP employees about what goes on at UOP.  In addition, after the announcement of the program review, UOP informed its recruiters that if they were contacted by someone from the Department for an interview, they were first to inform

30

1   management prior to speaking with him or her.  The DOE investigators further learned

2   that *recruiters uniformly stated that they felt very intimidated by UOP* due to this

3   pronouncement.  (DOE Report at 26).

4       85.    UOP management actually told some recruiters at the Northern California

5   locations that they should take leave or attend some function away from the premises.

6   But the Department followed up with respect to those absent interviewees and learned

7   after speaking to them that their reason for being absent was because they had

8   reputations for being honest and frank.  In another example of an effort to deceive the

9   DOE, investigators learned that at the On Line Campus, even though UOP generally

10  posted large banners ranking the recruiters by the number of enrollments they cleared,

11  these banners were removed shortly before the arrival of the reviewers for interviews of

12  On Line personnel.  And UOP spreadsheets posted on recruiters' computer desktops that

13  showed the salaries/enrollments "goals" were also removed the day of the reviewer's

14  arrival at the On Line Campus.  (DOE Report at 27).

15  **D.    UOP Employee Whistleblowers Confirm Its Ongoing,
        Systemic and Illegal Enrollment Compensation Scheme and**
16  **       Deception of the DOE**

17      86.    According to information related by knowledgeable UOP employee

18  whistleblowers Mary Hendow ("Hendow") and Julie Albertson ("Albertson") who were

19  employed as enrollment counselors prior to and within the Class Period:

20      •    UOP, in flagrant violation of the Title IV ban, compensated
             enrollment counselors, including themselves, based directly upon
21           enrollment activities;

22      •    UOP "stack ranks" counselors based upon their number of
             enrollments;
23

24      •    The top ranking counselors are among the highest paid
             counselors, receiving the highest salary as well as incentive trips,
25           awards and gifts based upon their enrollment numbers;

26      •    *UOP is fully aware of the illegality of its compensation scheme;*

27      •    UOP senior management openly boasted to UOP employees
             about duping the federal government regarding the UOP
28           compensation scheme;

        •    They boast that they create "smoke and mirrors" so that UOP can

                                        31

"fly under the radar" of the DOE regarding its illegal compensation scheme;

• UOP retitles documents to mask the illegal compensation scheme;

• Once the federal government began fining institutions for violating the HEA incentive compensation ban, UOP continued its compensation scheme and simply renamed the reports, removing the title "commissioned starts" ("starts" refers to student enrollments) from monthly reports verifying student enrollments;

• To further mask its illegal compensation scheme, UOP was maintaining separate review files on the enrollment counselors;

• One file contains legitimate review criteria produced to the federal government, and the other secret file containing the actual, illegal quantitative enrollment review criteria; and

• UOP also developed a glossary of "code words" used in documents to further disguise that compensation is based solely on enrollment activities.

87.    UOP management enrollment counselor Albertson, as of March 2004, was among the highest paid UOP enrollment counselors. Her salary far exceeded that of long-term enrollment counselors with lower enrollment activity levels, even though she had only been employed at UOP for 2 years at that time.

88.    According to Albertson, internally, UOP openly admits that enrollment counselors' salaries are tied to their enrollment numbers. When Albertson interviewed for an enrollment counselor position at the UOP San Jose campus in April 2000, UOP management expressly promised her salary increases based upon her enrollment activities. Albertson interviewed with a former UOP San Jose Enrollment Manager. During that interview, Albertson expressed concern that the UOP position paid less than her current job. The Enrollment Manager, however, prophetically assured Albertson that if she enrolled enough students, her salary would double within her first 9 months of employment. Albertson's starting salary was $32,000. Management told her that if she enrolled 119 students in her first 8 months, her salary would increase substantially. Albertson enrolled 148.5 students and UOP increased her salary to $88,000 at the end of the 8 month period. Based on her top enrollment numbers, UOP increased her salary

32

1  again to $90,640 at the end of the year.

2     89.   Hendow and Albertson further relate that in addition to salary, UOP

3  illegally compensated enrollment counselors based upon enrollments and enrollment

4  activities through trips, gifts and contest awards.  Counselors achieving enrollment

5  numbers set by management are rewarded with "Sperling Club" trips.  Hendow won

6  "Sperling" trips to La Costa Spa in Carlsbad, California, and Squaw Valley.  Albertson

7  won a trip to Universal Studios by enrolling 75 students during a 3 month period.  UOP

8  also sponsors enrollment contests based upon enrollment activities, with top counselors

9  winning for example, a Sonoma Mission Inn Hotel and Spa Package, lottery tickets or

10  gift certificates.  Hendow won a Sony DVD player based upon her number of new

11  applications.

12     90.   Hendow and Albertson have further confirmed that UOP places enrollment

13  counselors failing to reach acceptable enrollment activity levels on a "performance plan"

14  setting forth minimum enrollment activity goals.  Unsuccessful completion of a

15  "performance plan" leads to termination of the counselor's employment.

16     91.   Also, as related by Hendow and Albertson, in addition to maintaining its

17  illegal compensation scheme prior to and during the Class Period, UOP was knowingly

18  and intentionally deceiving the DOE regarding its violations of the HEA ban on

19  incentive compensation for recruiters.  As UOP's head of Corporate Enrollment openly

20  boasted, UOP masks its illegal compensation scheme through "smoke and mirrors" so

21  that UOP can "fly under the radar" of the DOE.  UOP's head of Corporate Enrollment

22  repeatedly emphasized to the enrollment counselors: "It's all about the numbers.  It will

23  always be about the numbers.  But we need to show the Department of Education what

24  they want to see."

25    E.   **UOP's Illegal Enrollment Incentive Scheme and Related**

26       **Unlawful Practices Are Also Confirmed by Numerous Knowledgeable Ex-Employees**

27     92.   Numerous former enrollment counselors, advisors and student recruiters

28  have also confirmed the fact that defendants were violating the federal government's ban

33

1    on incentive-based compensation respecting student enrollments at for-profit schools

2    prior to and during the Class Period.  These knowledgeable ex-employee confidential

3    sources relate the following:

4         a.    According to Confidential Source 1, who was employed as an

5    Employment Advisor at UOP's Pasadena, California location from August 2003 through

6    May 2004, performance reviews and any resulting salary or promotions during that time

7    were based on enrollment numbers.  The actual review process took place every 6

8    months;

9         b.    According to Confidential Source 2, who was employed as an

10    Employment Counselor at UOP's Arizona location from June 2001 through November

11    2004, UOP conducted quarterly reviews for enrollment counselors.  Salary promotions

12    from the quarterly reviews were based on a matrix — the primary factor from the matrix

13    for salary promotion was enrollment numbers.  According to Source 2, managers knew

14    that UOP could not legally compensate based on enrollment numbers, but if an

15    enrollment counselor hit his or her enrollment numbers, the managers would then

16    "adjust" the objectives from the matrix to meet salary promotion requirements.  There

17    were contests for awards based on enrollment numbers;

18         c.    According to Confidential Source 3, who was employed by UOP as an

19    Enrollment Counselor in its Sacramento, California location from April 2003 through

20    March 2004 — described as an inside sales position — Source 3's salary promotions

21    during that time were based on performance as compared to a matrix, but enrollment

22    numbers were the primary basis for Source 3's performance evaluation and any

23    consequent salary promotion.  One of the reasons Source 3 left UOP was that there was

24    an attitude of aggressive salesmanship or "poor salesmanship" at the Company.

25    Recruiters were encouraged to say whatever was needed to get people to enroll and

26    Source 3 was uncomfortable with the sales techniques.  Sperling Awards were given out

27    for meeting 110% of performance capability based on enrollment activities every 6

28

34

1   months. These awards consisted of trips to locations such as wineries in Napa and San

2   Francisco. Source 3 won a Sperling Award by meeting the criteria;

3        d.    According to Confidential Source 4, who worked in UOP's Las Vegas

4   administrative offices from approximately January 2002 through mid March 2004,

5   including employment in UOP's human resources division, while working as a human

6   resources liaison, Source 4 would receive, on a monthly basis, a Microsoft Excel

7   spreadsheet that included the salary of all employees in the Nevada region (including

8   UOP's Las Vegas and Reno campuses). If an employee received a raise, the reason for

9   that raise was indicated on the spreadsheet. When enrollment counselors received raises

10  it was because "their numbers had increased." It was UOP's policy to review enrollment

11  counselors every 3 months and during those reviews, changes to their salaries were made

12  based on how many enrollments the counselor had made during that period. Source 4

13  further confirmed that *salary increases were based solely on enrollment numbers*. This

14  compensation system was still in place at the time Source 4 left UOP in mid-March 2004

15  and continued thereafter. Source 4 is aware that the compensation system continued

16  thereafter based on conversations with a Director of Operations at one of UOP's

17  campuses;

18       e.    According to Confidential Source 5, a former UOP Enrollment Counselor

19  who was employed in that capacity at UOP's Wayne, Pennsylvania campus from

20  October 2003 through June 2004, Source 5 was made aware "every day" that UOP's

21  enrollment counselors were paid based on how many students they enrolled, and the fact

22  that compensation was dependent on enrollments was "ingrained" in enrollment

23  counselors in daily and weekly sales meetings. Enrollment managers coached

24  enrollment counselors, indicating that if they got "this many enrollments then their

25  salary would be this." According to Source 5, "if you wanted to get ahead, it was

26  understood that you had to get enrollments;"

27       f.    According to Source 5, in June 2004, UOP's compensation plan for

28  enrollment counselors was changed so that they received performance reviews every 6

35

1  months, rather than every 3 months. However, under this new plan, compensation could

2  increase or decrease based on enrollment numbers, whereas previously, compensation of

3  the enrollment counselors would increase based on more enrollments, but would stay the

4  same if his or her enrollments dropped. As of June 2004, when Source 5 left UOP,

5  enrollment counselors were still being compensated based on how many students they

6  enrolled. Source 5 further confirms that compensation for counselors at other campuses

7  was based on enrollments. In February 2004, Source 5 attended a 4 day training session

8  in Phoenix, Arizona. The session was attended by enrollment counselors from

9  throughout the nation where it was confirmed that compensation for counselors at those

10  other campuses was based on enrollments. In March 2004, Source 5 attended a training

11  session in Newport, Rhode Island, where attendees included trainees from UOP's

12  campuses in Pennsylvania, Boston, New Jersey and Virginia. Again, it was confirmed

13  that counselors at those campuses were also paid based on the number of students they

14  enrolled;

15       g.     Source 5 further relates that managers did not discourage discussion of the

16  compensation policies at UOP and were quite open about the fact that counselors needed

17  enrollments to get raises, except that managers gave instruction that, should Source 5

18  receive any calls from the media or other people not employed by UOP regarding

19  activities at the Company, no information should be provided about the University.

20  According to Source 5, an Enrollment Manager, Associate Director of Enrollment and

21  the Director of the Wayne Campus, each acknowledged that enrollment counselor

22  compensation was based on the number of students enrolled;

23       h.     According to Confidential Source 6, who was employed between

24  approximately February 2004 through August 2004 by Apollo in the position of Records

25  Evaluator at Apollo's Phoenix, Arizona location, and who was knowledgeable regarding

26  compensation policies for enrollment counselors as a result of Source 6's interest in

27  becoming an enrollment counselor and as a result of communications from enrollment

28  counselors in the course and scope of Source 6's employment as a records evaluator,

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1   UOP employment counselors were paid based on how many students they enrolled.

2   According to Source 6, whose awareness of incentive based compensation also grew out

3   of an effort to learn more about the position in anticipation of applying for a job as an

4   enrollment counselor at UOP On Line, enrollment counselor compensation was based on

5   enrollments at the following locations:  Santa Teresa and Albuquerque New Mexico

6   campuses, Arizona campuses and southern California campuses.  And while several

7   people recommended that Source 6 become an enrollment counselor because it would

8   enable Source 6 to earn more money, a number of people counseled against such a move

9   because "you have to get X number of enrollments to get X salary."  Enrollment

10  counselors that Source 6 spoke to consistently told Source 6 that their compensation was

11  tied to how many students they enrolled.  In addition, from mid-February 2004 through

12  August 2004, Source 6 received calls from enrollment counselors asking that Source 6

13  check student records to determine whether or not students had registered for masters

14  programs — in fact, enrollment counselors were paid a bonus when students enrolled as

15  undergraduates moved up into masters programs and this practice continued even after

16  Source 6's departure from the Company, as confirmed by communications that Source 6

17  had with then-current UOP employees;

18      i.      According to Confidential Source 7, who was employed as a Student

19  Services Coordinator with UOP from March 2003 through October 2004 in its Atlanta,

20  Georgia campus, those employed at the campus received a quarterly bonus based on the

21  number of students enrolled for the quarter if they "made the numbers."  Source 7 further

22  confirmed that UOP officers encouraged lying or misleading potential students as "part

23  of their practice."  Enrollment counselors would often lie to get students signed up, for

24  example, by lying to students about the transferability of credits from other institutions;

25      j.      According to Confidential Source 8, employed as a Student Services

26  Coordinator between March 2003 and August 2004 at the UOP campus in Plantation,

27  Florida, and who assisted different departments, entering new students in UOP systems

28  so that these students had access to online materials, employees in the Plantation campus

                                                37

1   received a quarterly bonus if the Plantation campus met its enrollment numbers for the

2   quarter. In addition, Source 8 confirmed that UOP enrolled students who were simply

3   not qualified, acknowledging that it would enroll "anyone off the street," including

4   students who "couldn't even speak English" and adding that while UOP claimed to be

5   "like a real university," their enrollment techniques more resembled "a sales pitch."

6   According to Source 8, *if an enrollment counselor did not meet his or her quota, he or*

7   *she would be fired or receive a reduction in pay;*

8          k.    According to Confidential Source 9, who was employed at UOP's Tulsa,

9   Oklahoma campus as an Enrollment Advisor from September 2003 through September

10  2004 and whose job responsibilities included contacting perspective students to schedule

11  appointments, answer questions that they may have and help them enroll at UOP,

12  management established certain numerical goals concerning enrollment that, if met,

13  would then lead to additional compensation increases.    Source 9 confirms that

14  enrollment numbers were the only criteria that truly effected compensation increases.

15  Management encouraged an aggressive attitude toward meeting enrollment number

16  goals and weekly meetings were held to discuss enrollment goals and progress towards

17  meeting them.    Those who did not meet their numbers were put on a disciplinary

18  program called the "Plan" and subjected to a probation period and were obliged to sign

19  documents stating that they would improve their performance. Those on the "Plan" who

20  were unable to increase their enrollment numbers were terminated. According to Source

21  9, a regional meeting was held in Santa Fe, New Mexico in May 2004 attended by the

22  President of UOP and various vice presidents at which time UOP's compensation policy

23  was discussed and those in attendance were alerted to the fact that compensation

24  increases or decreases were going to be more aggressive and that enrollment advisors'

25  salaries could decrease if enrollment number goals were not met;

26         l.    According to Confidential Source 10, who was employed by UOP in

27  Phoenix, Arizona as a Financial Aid Compliance Auditor from July 2001 to May 2004.

28  Source 10's responsibilities included reviewing financial aid information after it was

38

1    completed and certified to ensure that it was in compliance with federal regulations,
2    including such information from UOP campuses all over the country. According to
3    Source 10, beginning in 2002, an internal investigation was commenced after a
4    complaint was received from a student regarding the validity of his financial aid
5    application. The initial investigation looked into the files completed by the specific
6    enrollment counselor who handed out student applications. It was discovered that *many*
7    *financial aid forms had been fraudulently filled out* and signed by that counselor. As a
8    consequence, the investigation was then extended to other counselors at that campus and
9    eventually across all of UOP's campuses throughout the country as *widespread instances*
10   *of fraud relating to financial aid applications was discovered.* According to
11   Confidential Source 10, *approximately 30% of the files that were reviewed had been*
12   *fraudulently completed by enrollment counselors.* Source 10 believes based upon
13   experience as a Financial Aid Compliance Auditor that this fraud was being committed
14   by enrollment counselors because of pressure from management to process applications
15   more quickly. Indeed, by early 2003, *upper management was aware* of the fraudulent
16   completion and signing of applications by enrollment counselors and that it was
17   widespread and should have been reported to the DOE. Approximately at that time, a
18   conference call was conducted by the Vice President of Financial Aid, with all directors
19   and financial aid managers to discuss problems uncovered during the national internal
20   investigation, which was continuing when Source 10 left UOP's employment in May
21   2004;

22        m.    According to Confidential Source 11, who was employed at UOP from
23   May 2002 through February 2005 as an enrollment counselor at it's Kearny Mesa
24   campus in San Diego, enrollment counselors face "intense sales goals" and managers
25   would ask throughout Source 11's employment "are you going to hit your number?" — a
26   reference to how many students were actually enrolled. According to Source 11, UOP
27   held weekly sales meetings during which counselors' numbers were reviewed and
28   *enrollment counselors who failed to meet their numbers were threatened with being*

LD PLTFS CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1   *fired*.  Source 11's manager reviewed enrollments with Source 11 on a weekly basis.

2   During Source 11's tenure, the goals set for enrollment counselors actually became

3   increasingly difficult to meet; and

4       n.    Also according to Source 11, UOP gave "Sperling Awards" for top

5   performers, which usually entailed a weekend trip to a Sperling event.  Attendance at

6   these events awarded was based on the number of students enrolled.  Source 11 further

7   confirms that while UOP utilized a so called "matrix" of alleged "factors" to assess

8   compensation, and that a new matrix was released in approximately August 2004 with

9   additional factors, throughout Source 11's employment, the key factor in the matrix was

10  "purely ultimately the number" of enrollments and the other factors on the matrix were

11  not considered relevant by management, so much so that if a counselor met his or her

12  enrollment target, he or she would get a raise, even if all the other targets of the matrix

13  were missed and, by the same token, if every other matrix target but enrollments was

14  achieved, the enrollment counselor would not receive a raise.   Source 11 further

15  confirms that raises were based on a counselor's ability to meet their enrollment targets.

16      93.   Internet message board postings authored by UOP employees further

17  confirm UOP's *"used-car salesman" atmosphere* and the fact that "Enrollment

18  Counselors" were effectively nothing more than high-pressure salesmen incentivized by

19  UOP's compensation scheme to enroll as many students as they could and "meet the

20  numbers."  The financial incentive to enroll as many students as possible itself created

21  such used car salesman-like *and related deplorable sales tactics, the very type of abuses*

22  *that the HEA was attempting to end*, in part, through its ban on incentive compensation

23  for recruiters.  For example, these internet message board postings relate:

24      •    Honest Abe
             Posted: Sun Jan 18, 2004 4:18 pm Post subject: My Experience
25           as an Enrollment Counselor

26                                 *  *  *

27           As of fall 2001, Enrollment counselors were started at 28K or
             29K.  They needed to make a 'quota' within 3 months in order to
28           receive a raise.  For enrollment, income was commission based
             and always has been.  However, the Department of Education is

                                         40

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

NOT to know this. If the DOE really saw what was going on, they would pull Title 4 funding from the school which is financial aid.

- Posted: Thur May 13, 2004 9:00 pm Post subject: Re: I work there!

*  *  *

Danielle, I can tell you are a relatively new employee at UOP. I worked there for 10 years and as you know the work [sic] COMMISSION is never allowed to be said in relation to anything there, but you must be familiar with the MATRIX and it's pay incentives. When I worked there the top of the matrix was $120,000. I know that is no longer the case. You will be lucky to make $65,000. The demands on the matrix are far more demanding than they were when I first started working there. Employees that had been there prior to the new matrix had the choice of staying on the old matrix with new unattainable requirements or switching over to the new matrix with less stringent requirements.

*  *  *

I do believe that the school does help some students, but also does a disservice to many as there are many students who are enrolled there that shouldn't be.

Lilygirl

- UofP EC
  Posted: Thur June 03, 2004 8:59 pm Post subject: My Current Employment at UofP

I am a current employee of UofP as an Enrollment Counselor....I do feel the need to chime in.

*  *  *

As I stated before, the staff is professional at where I work. Saying that, a manager clearly told us, *'it's all about numbers.'* Simply put, you are either a salesperson or not. Even with Freshman EC's, the numbers are astronomical. So I do hear a lot of my fellow EC's half-assed and half-truthed their way to make that sale. I refuse to do that and by doing so, my numbers prove my point. I hear stories of 'not enough time,' 'too expensive,' blah, blah, blah. Unlike other counselors, I do sympathize with the customer. I guess that's where my niche comes from, even if I do make 100 calls/day. But *numbers are the bottom line.* I guess I can expect to be called in one day and hear those words, as Donald Trump says it, 'You're Fired!'

As stated before as well, I feel that there is a lot of micro-managing in my department. Oh my, one minute I could be 'tri-connected' to a manager and then my director of enrollment comes in and listens to my conversation. They try to mean well

41

1    but I end up *getting chewed up for not 'completing that sale.'*
     It's like Big Brother.

2

3    Starting salary for us was $29K, with a possibility of 45K within
     three months.   They tell us it's not commission, it's
     'PERFORMANCE' based...a *loophole for the Department of*

4    *Education to not investigate UofP.*

5                              *  *  *

6    I do take my job seriously and want to make more money but
     refuse to break my ethical code in doing so, unlike some of my

7    colleagues.

8    •  Mary
        Posted: Thur Jul 01, 2004 6:50 pm Post subject: Interview for

9       'Enrollment Counselor' position...

10   Here was my interesting experience at the University of
     Phoenix-St. Louis campus.  I actually applied for a job there

11   listed   on   the   monster.com   website   as   'Admissions
     Counselor'....The head of the department and two other

12   employees seemed very distraught that I had little to no
     marketing and retail experience. In the interview, they basically

13   came out and said 'This is a salesman's job.'   Enrollment
     Counselors are not really counselors — they are telemarketers.

14   Their job is to sit in a cubicle and make hundreds of phone calls
     a day just to get you in their school.   There quota is 4

15   applications per week.  They didn't care much about my desire
     for education, just whether or not I could make the company

16   some profits and if I cared enough about 'money.'  If you read
     the 'Enrollment Counselor' description on the Apollo Group, Inc.

17   website, then you will see a description that doesn't match what
     you REALLY are meant to do there.  Needless to say, I didn't

18   get the job.

19   •  Soon to be ex-employee
        Posted: Fri Jul 16, 2004 3:02 pm Post subject: Same thing

20

21   I to [sic] went through the same type of group interview.  the
     main concern that they asked was when I was in sales did I meet

22   my quotas. They told me the same its a sales position!

23   •  ex employee
        Posted: Sun Aug 22, 2004 9:45 pm Post subject: Letter is Real

24   I was an admission counselor for over a year and recently quit.
     (thank God).

25

26   ....Some of the practices of management from the top down
     could only be described as deplorable.

27   •  Sold Soul
        Posted: Mon Aug 23, 2004 4:40 pm Post subject: Current EC

28   experience

                              42

1    District of California granted our motion to dismiss the previously
2    disclosed qui tam action.

3    The qui tam action was brought by two of our current employees on behalf of themselves and the federal government and alleged that we improperly compensate our employees who are involved in the recruitment of new students. The government declined to intervene in the lawsuit.

5    ...'Although we had expected the dismissal of the qui tam lawsuit, we were very pleased to obtain this ruling.'

6

7    96.    This news caused the price of Apollo common stock to rise $3.44 per share

8    or 4.5% from its closing price of $76.23 the day before to close at $79.67 on March 1,

9    2004.

10    97.    Apollo's February 27, 2004 press release announcing the dismissal of the

11    *qui tam* lawsuit was deceptive and materially misleading in all respects. While it was

12    true that a *qui tam* lawsuit brought by 2 employees of UOP had been dismissed,

13    defendants' portrayal of that dismissal was highly inaccurate and falsely conveyed a

14    message that the *qui tam* lawsuit's allegations of improper compensation of employees

15    respecting the recruitment of new students was without merit. In fact, the dismissal was

16    based solely on the grounds that the False Claims Act violation asserted therein could

17    not be brought because such a claim requires that a false certification of compliance be

18    filed and the DOE does not require such a certification. While the description of the *qui*

19    *tam* lawsuit was itself false and misleading, what was even more misleading was

20    defendants' failure to refer to or disclose in any manner the DOE's investigation of

21    Apollo and most importantly, the DOE Report received just 3 weeks earlier on February

22    5, 2004, after the DOE's intensive audit and investigation, that found and concluded that

23    the Company was in flagrant violation of the law with respect to Title IV funding and

24    the related ban on incentive compensation respecting student enrollments, as more fully

25    discussed above, and as was factually alleged in the *qui tam* action.

26    98.    Defendants' statement that the government declined to intervene in the *qui*

27    *tam* suit, while technically accurate, was also, of course, completely misleading. As

28    defendants already knew, the DOE — an agency of the U.S. government — had

45

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1  vigorously stepped in and conducted a thorough audit and investigation, pursuant to a

2  Program Review, of UOP employee whistleblower complaints that UOP was violating

3  the law, including the ban on incentive compensation.

4      99.    On March 12, 2004, Apollo reported fiscal 2004 financial results for the

5  second quarter ending February 29, 2004.  The Company stated, in relevant part, as

6  follows:

7        Net income attributed to Apollo Education Group for the three months
         ended Feb. 29, 200[sic], was $63.0 million, or $.35 per diluted share,
8        compared to $42.6 million, or $.24 per diluted share, reported for the
         same period last year.
9
         Net income attributed to Apollo Education Group for the six months
10       ended Feb. 29, 2004, was $141.4 million, or $.79 per diluted share,
         compared to $96.4 million, or $.54 per diluted share, reported for the
11       same period last year.

12                                      *   *   *

13       Total consolidated revenues for Apollo Group Inc. for the three months
         ended Feb. 29, 2004, rose 34.4% to $396.9 million, compared with
14       $295.2 million in the second quarter of fiscal 2003.  The University of
         Phoenix accounted for 95.5% of the $372.2 million in net tuition
15       revenues from students enrolled in degree programs for the quarter
         ended Feb. 29, 2004.  Total revenues for University of Phoenix Online
16       for the three months ended Feb. 29, 2004, rose 57.4% to $184.1 million,
         compared with $117.0 million in the second quarter of fiscal 2003.
17
         Total consolidated revenues for Apollo Group Inc. for the six months
18       ended Feb. 29, 2004, rose 33.9% to $808.7 million, compared with
         $604.1 million in the same period last year. The University of Phoenix
19       accounted for 95.2% of the $759.8 million in net tuition revenues from
         students enrolled in degree programs for the six months ended Feb. 29,
20       2004. Total revenues for University of Phoenix Online for the six
         months ended Feb. 29, 2004, rose 59.3% to $361.8 million, compared
21       with $227.2 million in the same period last year.

22  Commenting on these results, defendant Nelson stated in pertinent part, as follows:

23       'We are pleased with the strong financial performance this quarter.  We
         are also pleased to see *continued strong growth in enrollments*, both
24       local and online.  We also reached a new milestone in enrollment at
         University of Phoenix, exceeding the 200,000 mark.'
25
         100.   On that same day, March 12, 2004, Apollo, via defendants Nelson and
26
    Gonzales, held a conference call with analysts to discuss its second quarter of fiscal
27
    2004 results.  During the call, defendant Nelson coyly mentioned a DOE Program
28

                                         46

1  Review, but without ever disclosing the serious nature of the review or the fact that the

2  DOE had already issued a scathing written report on February 5, 2004, of its material

3  and adverse findings and conclusions, as a product of its thorough review and

4  investigation, that Apollo's UOP was continuously and systemically violating the ban on

5  incentive compensation respecting student enrollments among other unlawful and

6  unethical practices. Instead, Nelson downplayed and minimized the Program Review

7  and concealed the DOE's Report and its adverse findings issued February 5, 2004, in his

8  discussions with analysts who were eager to know more about the review, as follows:

9      TODD NELSON:...The *next area would be U.S. DOE approval.* This
       area usually gets a lot of attention because of the visibility. .*Their*
10     *involvement usually comes in the form of a program review and*
       *(indiscernible) audit. These types of reviews are a normal part of*
11     *doing business,* and it is their responsibility to actually [sic] these types
       of reviews.   Over the years, we have had many of these kind of
12     reviews. For example, as most of you know, we currently have an OIG
       audit involving IPD that has been ongoing for several years. *We also*
13     *have an ongoing program review at The University of Phoenix.*

14     Over the years, although these reviews are complex and time-
       consuming, they have *never resulted in a material impact on Apollo.*
15     Our experience with the process is that, *first, there is a visit, then a*
       *preliminary draft* — or preliminary report or a draft *report is issued.*
16     *It has also been our experience that it is not unusual that these*
       *reports may contain negative comments.* Following the initial reports,
17     though, the institution then has an opportunity to research the issues in
       question and draft a response. This information is then considered by
18     the department, and a final report is issued. It is usually at this point
       that we realize if there is an issue and normally disclose that matter if it
19     involved any type of material consequences for the school.

20                              * * *

21     GREG CAPPELLI: One final one for Todd.   Todd, we have been
       getting more questions recently just about the Department of Ed. and
22     the processes that they go through during the year.  You mentioned the
       programming view (ph). How common is it, actually, for you to have a
23     program review? I'm sure you have had them, as you have mentioned,
       over the past 10 years.  And then any more color on specifically what,
24     in this case, we are looking for?

25     TODD NELSON:  Well, the bottom line is, in my history with the
       company, especially over the last 10 years, I don't know that there has
26     ever been a time when there hasn't been either a *program review* or an
       OIG audit going on. *So it's a very common thing for us...*  And so
27     basically, I guess, an answer to your question, we have these things, I
       guess, happening on a regular basis. And I would say the good news is
28     our track record has shown that, although during the process, I guess
       from our point of view, *your first draft reports or your first indication*

                                    47

1  *back from the initial visit is they usually have questions.  And, in
   some cases, a very negative reaction to things, in some cases a very*
2  *positive reaction.*

3  ...But the end result, which you have been able to see, has been very
   positive — I shouldn't say positive for us, but it has been *immaterial* to
4  us in a sense that *these are things that are, again, interpretation of
   regulations* versus any intent to do anything wrong.

5
   *The types of things that I think are the hot button that they certainly
6  look at with us and, I think, with everybody, in particular....*

7  *The other area is incentive compensation. Again, that's an area that I
   think all of us have been very interested in how they are interpreting*
8  *that....*

9  Unfortunately, again, you have got some period of time before and how
   those things are interpreted and what that actually means.  *The good
10 news from our point of view is that as we have looked at this and
   looked very carefully at what we do, the types of things that we would
11 be subject to would be saying, well, you need to change this.*  There
   may be some sort of a nominal fine type thing, but short of that we are
12 very comfortable that — nothing that would be material for us.  So we
   feel very good about that.

13
                              *   *   *
14

15 RICHARD CLOSE, ANALYST, JEFFERIES:  Congratulations as well.
   Todd, maybe hitting on that last point, do you have any sort of timetable
16 *when you think the program review will be completed or when any
   type of report will be issued?*

17 TODD NELSON:  *Well, it's, you know, again, tough to say.*  Much like
   with the OIG audit that IPD is involved in, from our point of view, once
18 we have had a chance to respond to any issues, that's when we would,
   again, feel if there's a problem or not.  And we had an opportunity to do
19 that in both cases, and we feel very good about that response.

20 Unfortunately, the next step sometimes takes months or years.  And in
   this particular case, our feeling is that if you just look at the pure, I
21 guess, calendar involved, we would hope that they would both be
   resolved soon and that if any others start in the meantime, that they
22 would also go through quickly.  And again, I only say that because I
   honestly can't remember a time in the last at least 10 to 12 years that we
23 have not had either one or the other or both going on.  *And I just want
   to point out again that that's a normal process.*  They are doing their
24 job by doing these kinds of reviews.

25 I think the type of thing that obviously causes most people concern
   would be, obviously, because of some of the things that are in the press
26 with some of the other education companies right now, would be how
   those things are — if they escalate to another level.  And we are very
27 comfortable that, certainly, as you can see from our track record, that
   has not ever happened with us.  But again, it's something that we just
28 take very seriously.  And we have an infrastructure in place to make
   sure that we deal with those things on a very proactive basis.
                                   48

RICHARD CLOSE: And then, on a different note, there is the positive news, I guess, on the whistle blower. Is that completely over now, or what exactly — where do you stand on that?

TODD NELSON: Well, *the good news is and we are early in the process, and the first was that it was dismissed, which was good.* Unfortunately, as you know, that doesn't necessarily mean it's over. The opposing counsel always has a chance to amend that or appeal that, and we expect that that is happening. And so, again, the good news is, at least through the first round, we are exactly where we thought we would be.

So other than that, we will respond. *And the old saying, and the truth shall set you free. We're just very grateful that we know what it is we're doing and we feel very comfortable about it.*

\* \* \*

KELLY FLYNN, ANALYST, UBS:   The question relates to the program review, again. I'm sorry to beat a dead horse here. But I'm hoping, Todd, you can just help to manage expectations a little bit more here. How many have you had? And then what are the circumstances that can bring them about? I know some are just regular, and sometimes some event brings them about.

And then, finally, what do you consider normal frequency, that we should expect down the road? If you could speak to that?

TODD NELSON: First off, as far as the amount, I can't really give you off the top of my head. I would say approximately, probably — I don't know, because they take several years to happen. But I would say, probably in the neighborhood of a half dozen or so.

As far as why — they can be brought about for a lot of different reasons. We have found that the most frequent reason from our point of view would be — and this is when they come in, you ask them, is there *reason why* you are here? And typically, the *normal response is no. This is just a known review* — you are a very large school. You receive a lot of Title IV dollars. And this is part of the process.

\* \* \*

And then your last question, as far as what do we considered [sic] normal, I would say, because we are a large and fast-growing university, that we *can pretty much expect one almost all the time.* It does not mean that you would have, necessarily, three or four going on. But I think, from our point of view, you would expect a program review that would start probably every couple of years. Because *I think once one gets in the process, it usually takes a couple of years.* And then, by the time that's over, you may have a few months before the next one starts. OAG [sic] audits are probably a little less frequent. But, again, our experience has been that they come through quite often.

101.  Defendant Nelson's failure to disclose the February 5, 2004 DOE Report

49

1   and its findings was purposeful and designed to hide from the investment community an

2   adverse event and facts that Nelson himself acknowledged in a letter to the DOE dated

3   March 1, 2004, *would cause "great harm"* if disclosed to Apollo's shareholders.

4   Indeed, Nelson's statements not only concealed the existence of the DOE Report, it also

5   deceptively misled the market into believing that nothing adverse had occurred, that no

6   adverse report had been rendered and that the DOE review in question was simply a

7   normal or routine event, thereby comforting investors.

8       102.    These deceptive and misleading statements caused the price of Apollo's

9   stock to increase from $77.75 at the close of trading on March 11, 2004 to close at

10  $80.77 on March 12, 2004 and higher still to close at $81.57 on March 15, 2004, the

11  next trading day.

12      103.    On April 13, 2004, the Company filed its second quarter report with the

13  SEC on a Form 10-Q signed by defendants Nelson, Gonzales and Bachus, reiterating its

14  previously announced results. In addition, the Company reported that, in connection

15  with an *audit of a small Apollo subsidiary, IPD* and certain of its client institutions'

16  administration of federal student aid programs, the DOE's Office of the Inspector

17  General found that IPD's client institutions improperly paid a percentage of its tuition

18  revenues to IPD for recruiting students, and that IPD's compensation of its employees

19  was based upon enrollment figures, in violation of statutory provisions prohibiting the

20  use of such incentive payments. According to the Form 10-Q, the OIG recommended to

21  the DOE that the Company repay any loans disbursed pursuant to the program. In

22  response to the audit relating not to Apollo's UOP operations but to the much smaller

23  IPD portion of its business, the Company said loan repayments were "not appropriate"

24  and that the audit would be resolved without any recourse to the Company:

25          The U.S. Department of Education Office of the Inspector General
            ("OIG") audited the administration of the federal student financial
26          assistance programs in connection with educational programs provided
            pursuant to contractual arrangements between IPD and certain of its
27          client institutions. In audit reports issues to eight client institutions, the
            OIG asserted that the client institutions violated the statutory prohibition
28          on the use of incentive payments for recruiting by paying IPD a
            percentage of tuition revenue. The reports further suggest that IPD paid

                                           50

its employees in a manner that included incentive-based compensation even though IPD based its compensation plans for recruiters on factors or qualities that were not solely related to the success in securing enrollments. Additionally, the audit reports question the client institutions' interpretation of the '12-hour rule.' *Although both IPD and the client institutions believe that the matters in question do not relate to student program or institutional eligibility and, therefore, believe a repayment of federal funds is not appropriate*, the OIG has recommended to the U.S. Department of Education that the client institutions be required to return to lenders all loan funds disbursed. IPD is currently in active negotiations with the U.S. Department of Education to eliminate or settle the issues raised in the audit reports. *Although the Company believes that the OIG's audits of certain IPD client institutions will be resolved without any material effect on its financial position, results of operations, or cash flows, and without any material change in IPD's business strategy, as with any program review or audit*, no assurance can be given as to the final outcome as the matters are not yet resolved.

104. The Form 10-Q also contained a certification submitted pursuant to Section 906 of the Sarbanes-Oxley Act Of 2002, signed by defendant Nelson, which purported to certify the veracity of the Company's financial statements, as follows:

> In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended February 29, 2004, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Todd S. Nelson, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:
>
> 1)  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A similar certification containing the same representations was signed by defendant Gonzales and included in the Form 10-Q.

105. Once again, and despite mentioning the audit of a very small Apollo controlled subsidiary — IPD — and findings of the DOE's Office of the Inspector General that IPD's client institutions improperly paid a percentage of its tuition revenues to IPD for recruiting students, defendants still purposely failed to disclose the DOE Report of February 5, 2004 or its findings or that UOP — which accounted for about

51

1  95% of Apollo's revenue compared to IPD, which accounted for a fraction of the
2  remaining 5% — was violating the ban on incentive compensation respecting
3  enrollments, a material event to the Company and investors.

4      106.   Defendants' false, deceptive and misleading statements, caused the price of
5  Apollo's shares to rise from $76.23 per share at the close of trading on February 27,
6  2004, the commencement of the Class Period, to as high as $98.01 during trading on
7  June 8, 2004, when it settled into its Class Period high at the close of trading of $97.93,
8  an increase of over 28%.

9      107.   At the close of trading on June 22, 2004, Apollo shares were still trading
10 vigorously, closing at $94.17. But on June 23 and 24, 2004, published reports were
11 issued concerning 2 of Apollo's competitors in the for-profit education field — Career
12 Education and Corinthian Colleges, Inc. On June 23, 2004, it was announced that the
13 SEC had commenced an investigation of Apollo's competitor, Career Education. On
14 June 24, 2004, the *Financial Times* reported, in a story entitled "College Fee Probe
15 Extends to Corinthian," that the DOE had uncovered violations in obtaining federal
16 loans at Corinthian's Bryman College campus in San Jose, California, including
17 allegations that school officials had helped students manipulate financial aid documents
18 to obtain the maximum possible toward tuition fees, by claiming extra dependents to
19 obtain additional financial aid. These reports about Apollo's competitor were viewed by
20 Apollo investors with some concern, particularly in light of the DOE Program Review of
21 Apollo's UOP operations that they were informed was taking place.

22     108.   These announcements, combined with the concerns of Apollo investors
23 that Title IV funding violations and related violations of the law could be widespread in
24 the industry, even though Apollo had time and again falsely informed the shareholder
25 that it was in complete compliance with all DOE regulations, caused the share price of
26 Apollo stock to decline, from a close of $94.17 on June 22, 2004 to close at $90.62 on
27 June 23, 2004, upon the Career Education announcement, on extraordinary volume of
28 6,271,300 shares and to decline even further to close at $85.85 on June 24, 2004 on

52

1  volume of over 14.7 million shares. However, investors still did not know and were not

2  informed that in fact, the DOE had concluded and formally reported to defendants that

3  Apollo's operations did violate the law. Thus Apollo's stock continued to trade at falsely

4  inflated values.

5      109. Eager to stop the decline in the trading price of Apollo shares, the

6  Individual Defendants disseminated a further series of false, deceptive and misleading

7  statements via media press releases and telephonic conference calls designed to restore

8  investor confidence in Apollo's regulatory compliance and allay investment community

9  concerns.

10     110. To that end, in a Company press release disseminated to the financial

11  community on June 24, 2004, Apollo reported fiscal 2004 financial results for the third

12  quarter ending May 31, 2004. The article stated in pertinent part:

13      Net income attributed to Apollo Education Group common stock for the
        three months ended May 31, 2004 was $101.1 million, or $.56 per
14      diluted share, compared to $69.8 million, or $.39 per diluted share,
        reported for the same period last year. Net income attributed to
15      University of Phoenix Online common stock for the three months ended
        May 31, 2004, was $8.2 million, or $.48 per diluted share, compared to
16      $4.4 million or $.27 per diluted share, reported for the same period last
        year.

17
        Net income attributed to Apollo Education Group common stock for the
18      nine months ended May 31, 2004 was $242.5 million, or $1.35 per
        diluted share, compared to $166.2 million, or $.94 per diluted share,
19      reported for the same period last year. Net income attributed to
        University of Phoenix Online common stock for the nine months ended
20      May 31, 2004, was $19.6 million, or $1.14 per diluted share, compared
        to $10.4 million or $.64 per diluted share, reported for the same period
21      last year.

22                              *  *  *

23      Total consolidated revenues for Apollo Group, Inc. for the three months
        ended May 31, 2004 rose 36.5% to $497.0 million, compared with
24      $364.2 million in the third quarter of fiscal 2003. The University of
        Phoenix accounted for 95.6% of the $464.5 million in net tuition
25      revenues from students enrolled in degree programs for the quarter
        ended May 31, 2004. Total revenues for University of Phoenix Online
26      for the three months ended May 31, 2004 rose 60.0% to $233.3 million,
        compared with $145.8 million in the third quarter of fiscal 2003.

27
        Total consolidated revenues for Apollo Group, Inc. for the nine months
28      ended May 31, 2004 rose 34.8% to $1.31 billion, compared with $968.2
        million in the same period last year. The *University of Phoenix*

                                      53

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1    *accounted for 95.4%* of the $1.22 billion *in net tuition revenues from students enrolled in degree programs for the nine months ended May 31, 2004.* Total revenues for University of Phoenix Online for the nine months ended May 31, 2004 rose 59.6% to $595.1 million, compared with $373.0 million in the same period last year.

2

3

4    111.    Thereafter, in a follow-up call with analysts that same day, defendant

5    Nelson further buoyed investor confidence and generated renewed market enthusiasm

6    for purchasing Apollo stock in representations and responses to analysts as follows:

7    TODD NELSON, PRES, CEO, DIRECTOR, APOLLO GROUP:....We appreciate you joining us this morning. We're very pleased to report third quarter results with an EPS number for Apollo of 56 cents versus a consensus of 51 cents and UOPX EPS number of 48 cents versus a consensus of 41 cents. We're also *very pleased to report strong enrollment.* With growth of over 239,000 students which despite being over 200,000 students it was a 27.6% increase.

8

9

10

11                            *  *  *

12    That's very strong lead growth in both our online and onground campuses. So that's very encouraging for further growth. *We are sorry that despite what we feel are very good results that some of the bad news in the space has put a cloud over today, which would have otherwise been a very good day. So it looks like maybe a good buying opportunity for both APOL and UOPX.* I have just two last comments before I turn the time over to Kenda.

13

14

15

16                            *  *  *

17    MARK MAROSTICA: ...I'm wondering if you could update us on the status of any program reviews taking place throughout Apollo at this point?

18

19    TODD NELSON: ...The *program review* at the University of Phoenix *continues to go* from our point of view *very smoothly.* There's been a request of information back from us. We obviously have conducted the research and gathered the information and it *looks great.*

20

21    And so our hope is that, you know, three to six-month time frame that we'll have that resolved. Again, as you know for us, for us it's a *normal course of business.* Certainly *nothing that we feel that the data that we produced will create any problems for us.*

22

23

24                            *  *  *

25    KELLY FLYNN: ...Greg just asked about the regulatory environment. You clearly emphasized your goal of to grow in a measured fashion. Is there anything you've seen in the past couple of months, you know, from within the states in general? I mean, any practices that you think have changed or things that...other companies might be doing that might, you know, bring about more regulatory scrutiny? I don't certainly mean it's only in the public university. But just within the whole university probably.

26

27

28

54

TODD NELSON: Well, I mean, I think that the comment that I made earlier is not aimed at any other company. Because I do think that there are some excellent companies out there....But I don't think that in and of itself is going to bring more scrutiny.

...As far as some of the other practices that some of the other companies are involved in, you know what?

It probably wouldn't be fair for me to comment on that. All I can say is I know most of them very well and *they're really fine companies*. And I think they're doing — trying to *do things the right way*. And with the exception of, again, you have as like your company and the other industries, you know, *disgruntled employees or former employees*.

Unfortunately, they can *get an audience*. And that's a bad situation for any company, not just the education companies. And I honestly think that is *having more of an impact on the stuff that you are seeing going on as far as regulatory scrutiny than any real substantive problem*.

\* \* \*

*The first thing out of their mouth has been when they talked to us is that, 'this is a routine audit.'* And you are one of the largest recipients of Title 4 funds, therefore, you know, we need to come look at you.... On the program review side, my experience has been it's usually triggered by something.

Again, it can be something significant. It can be something minor. *My opinion of the last program review probably had something to do with the Qui Tam lawsuit and some of the accusations being made*. And it's probably one of the reasons why they came in.

*But in our case, it's routine because again* when you're growing rapidly and when you are our size, there are a always lot of different sides....So these things cause and trigger that. So in answer to your question yet it is. *It doesn't necessarily have to be a negative thing.*

112. Defendant Nelson's remarks were false, deceptive and misleading. In truth, UOP was flagrantly, systemically and consistently violating the law with respect to student enrollments and related Title IV funding as discussed above. The DOE had already issued a scathing report noting such findings and Apollo's illegal and duplicitous conduct. Whistleblower claims that UOP was incentivizing student enrollment counselors in violation of the law were true and the Company was at risk of a substantial penalty. Indeed, defendants purposely failed to reveal the *negative* DOE Report knowing, as defendant Nelson conceded in his March 1, 2004 letter to the DOE, that doing so would cause *"great harm."* Nor was the Program Review simply "routine."

55

1   Meanwhile, the DOE Program Review was already beginning to have a material adverse
2   impact on Apollo. As it prepared to deal with anticipated declining enrollment and
3   consequent declines in the growth rate of revenue and net income resulting from being
4   forced to operate within the law, Apollo revoked its own historic ban on enrolling
5   students as young as 18 years old — thus expanding its potential student base.
6   Ultimately, sequential year-to-year quarter growth rates in enrollments, revenue and net
7   income would slow, as illustrated below in ¶¶ 124,125 and 126, and would have slowed
8   or declined even more significantly had UOP strictly and immediately adhered to the
9   letter of the law.

10       113. Defendants' strategy was successful. The above-mentioned false,
11   deceptive and misleading June 24, 2004 statements during the Apollo third quarter of
12   fiscal 2004 conference call, and Apollo's earnings announcement proceeding that call,
13   halted the further decline in the trading price of Apollo stock and caused the price of its
14   shares to increase from $85.85 on June 24, 2004 to as high as $88.70 on June 25, 2004,
15   and further still to as high as $89.75 in June 28, 2004, the next trading day.

16       114. On July 15, 2004, the Company filed its quarterly report with the SEC on
17   Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and
18   reaffirmed the Company's previously announced results. The Form 10-Q also contained
19   a certification submitted pursuant to Section 906 of The Sarbanes-Oxley Act Of 2002,
20   signed by defendant Nelson, that purported to certify the veracity of the Company's
21   financial statements, as follows:

22       In connection with the Quarterly Report of Apollo Group, Inc. (the
         "Company") on Form 10-Q for the three months ended May 31, 2004,
23       as filed with the Securities and Exchange Commission on the date
         hereof (the "Report"), I, Todd S. Nelson, Chairman of the Board,
24       President, and Chief Executive Officer of the Company, certify,
         pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906
25       of the Sarbanes-Oxley Act of 2002, that to my knowledge:

26       1)   the Report fully complies with the requirements of Section 13(a)
              or 15(d) of the Securities Exchange Act of 1934; and

27       2)   the information contained in the Report fairly presents, in all
28            material respects, the financial condition and results of operations
              of the Company.
                                                        56

A similar certification containing the same representation was signed by defendant Gonzales and included in the Form 10-Q.

115. However, once again, the defendants concealed and failed to disclose the serious DOE findings and conclusions reported to Apollo on February 5, 2004, or the fact that the Company's UOP subsidiary, which accounted for the great majority of its revenue — over 95% — had at all times material, been violating the ban on incentive compensation respecting student enrollments, as discussed above, while giving lip service to the need to comply with the requirements of the Higher Education Act of 1965, stating:

> *Our future success is highly dependent on our ability to obtain, maintain, or renew required regulatory approvals, accreditation, or state authorizations.* We are subject to extensive private, federal, and state regulation. The Higher Education Act of 1965, as amended, and the related regulations govern all higher education institutions participating in Title IV programs.
>
> *  *  *
>
> All higher education institutions participating in Title IV programs must be accredited by an association recognized by the U.S. Department of Education. *The U.S. Department of Education reviews all participating institutions for compliance with all applicable standards and regulations under the Higher Education Act.* Accrediting associations are required to include the monitoring of Title IV programs compliance as part of their accreditation evaluations under the Higher Education Act.
>
> *  *  *
>
> The Higher Education Act of 1965 and the related regulations adopted by the U.S. Department of Education also impose numerous requirements with which institutions participating in the Title IV programs must comply....*The failure to comply with any of the Title IV requirements could result in adverse action by the U.S. Department of Education* against us, including the termination of Title IV eligibility, the imposition of fines, or the imposition of liabilities by the U.S. Department of Education. Institute for Professional Development client institutions administer their own Title IV programs. The loss of Title IV eligibility would significantly reduce demand for our programs.

116. On August 25, 2004, the Company provided its business outlook for the first quarter of fiscal 2005 ending November 30, 2004 and the fiscal year ending August 31, 2005. Specifically, the Company stated:

57

We are pleased to report that we expect degree enrollments at local campuses to grow between 12% and 13% over the prior year at the end of the first quarter of fiscal 2005. In addition, we expect online degree enrollments to grow in excess of 40% over the prior year at the end of the first quarter of fiscal 2005.

Apollo Group Inc.

- We expect revenue for the quarter ending Nov. 30, 2004 to be between $529 million and $532 million and to be between $2.285 billion and $2.288 billion for fiscal 2005.

- Operating margin is expected to be between 32.5% and 33.0% for the quarter ending Nov. 30, 2004 and to be between 32.5% and 33.0% for fiscal 2005.

Excluding non-cash charges related to the conversion of University of Phoenix Online stock options into Apollo Education Group Class A stock options anticipated to be recognized in the fourth quarter of fiscal 2005, diluted earnings per share are expected to be $.56 for the quarter ending Nov. 30, 2004 and to be $2.40 for fiscal 2005.

117. In a follow-on conference call with the investment community on August 25, 2004, hosted by Apollo and defendants Nelson and Gonzales, the following was stated:

BRIAN, ANALYST, UBS: I was wondering if you could give us a little bit of a color around the current status of the program review?

TODD NELSON: Sure. As you know, this — the program review he's refers [sic] to is one that started last year that was a result of the [qui tam] lawsuit and in there they were talking about compensation. And so we've been going back and forth with the department to, you know, to reach a resolution on it. The good news is, from our point of view, that we still feel very comfortable that the outcome will end up not having any impact on our ability to grow our students or employees or anything of that nature. But as with any regulatory issue, I mean, it is not over until it is over. And so, you know, we hope to see it resolved within the next, hopefully within the next *few months*. And we find that — think that the end result will be, as I said, *not have any material impact on the company in any way*.

118. The defendants' August 25, 2004 statements in Apollo's Press Release and follow-on conference call sparked significant investor enthusiasm and caused the trading price of Apollo's shares to climb from a close of $73.34 per share on August 25, 2004 to as high as $80.47 and closing at $79.42 on August 26, 2004 on volume of 10,603,700 shares.

119. The statements contained in ¶¶95-117 were materially false and

58

1    misleading when made because defendants failed to disclose or indicate the following:

2        a.    the DOE issued a written report on February 5, 2004 following an

3    intensive investigation finding and concluding that Apollo's UOP division was in

4    violation of the law banning incentive compensation respecting student enrollment and

5    Title IV funding;

6        b.    that the Company improperly based recruiter's compensation on

7    enrollment figures, in violation of U.S. regulations that forbid schools whose students

8    receive federal financial aid from tying pay directly or indirectly to enrollments;

9        c.    that as a consequence of the foregoing, defendants were able to

10    demonstrate dazzling growth at schools such as UOP, and materially inflate the

11    Company's earning and net income at all relevant times;

12        d.    that, as a consequence, Apollo's financial statements were false, deceptive

13    and misleading by virtue of their failure to disclose the true nature and quality of a

14    material portion of its consolidated revenues and earnings so that investors would be

15    fairly and fully informed; and

16        e.    that Apollo's financial performance and would be adversely and materially

17    impacted as a consequence of yielding, albeit slowly or belatedly, to DOE pressure to

18    fully bring its operations within the ambit of the law.

19        B.    The DOE Report and Findings of Systemic Violations of the Law
             Is Finally Disclosed

20

21        120.    Then, on September 7, 2004, just after the Labor Day holiday weekend,

22    defendants for the first time revealed any information relating to any report from the

23    DOE, disclosing that the DOE had asserted a negatively toned report respecting UOP's

24    compensation scheme and imposed a $9.8 million fine.    Defendants attempted to

25    downplay the significance of the DOE Report and penalty and continued to actively

26    conceal the whole truth from investors.    In a conference call with the financial

27    community on September 7, 2004, defendant Nelson stated in pertinent part, with regard

28    to the DOE Investigation of its compensation policy, the following:

[G]iven the, I think, recent attention that regulatory issues in the education industry are receiving, we thought it would be helpful to at least provide an opportunity to take a few questions.

\* \* \*

[T]he University of Phoenix program review...is...centered around the same issue of incentive comp. And just a little history of that – *the conclusion of the actual fieldwork and ex (ph) interview, we felt positive about the progress of the review, although earlier this year, we then received an interim report, and we were surprised to see the negative tone of the report.*

\* \* \*

[W]e decided to settle this issue now rather than later for $9.8 million and put it behind us....

\* \* \*

*[B]ack in June, we introduced a new comp plan that had actually been being worked on for about a year that is just more transparent.*

\* \* \*

*[T]he old comp plan was not that clear. The new one is – again, it's much more transparent, I guess, for someone to come in and take a look at.*

121.    Defendants' partial disclosure caused the trading price of Apollo's stock to materially decline on September 7, 2004 and thereafter as the market absorbed the knowledge that UOP was fined $9.8 million by the DOE as a product of a negatively toned Program Review, falling from $83.74 a share at the close of the prior trading day on September 3, 2004, to $80.43 per share by the close of trading on September 10, 2004 on unusual trading volumes greatly exceeding their daily average.

122.    Defendants' disclosure about the DOE report was inadequate, failing to provide investors with any of the detail that the DOE Report referenced and its clear conclusions, as discussed above, respecting UOP's illegal conduct and deceptive practices betraying the integrity of Apollo's for-profit educational operations.

123.    And each of defendants' representations discussed above, that the DOE's Program Review, or, later, representations on September 7, 2004 that the DOE action and consequent fine would not have any material adverse impact on Apollo were false, deceptive and misleading. In truth, the $9.8 million fine that Apollo was required to pay

60

05-16-05    02:44pm    From-BARRACK - SAN DIEGO    T-796  P.065/100  F-625

1  represented the ***largest DOE fine in history*** and itself was material.  Beyond this, the
2  pressure on Apollo to clean up UOP's illegal and unethical sales and student enrollment
3  practices has materially and adversely impacted growth rates in enrollments, revenue
4  and net income, when comparing Q1 2004 and Q2 2004 to Q1 2005 and Q2 2005
5  (ending November 30 and February 28, respectively), reported after the close of the
6  Class Period, as illustrated below.

7      124.  The  following  chart  reflects  the  sequential  quarterly  year-to-year
8  comparisons of net income growth rates:



21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

125.   The following chart reflects the sequential quarterly year-to-year comparisons of revenue growth rates:



126.   The following chart reflects the sequential quarterly year-to-year comparisons of enrollment growth rates:



62

127. As the above charts demonstrate, Apollo's year-to-year enrollment, revenue and net income quarterly growth rates for Q1 2005 (ending November 30, 2004) and Q2 2005 (ending February 28, 2005) — the two quarters reported post-Class Period — when compared to the same quarters of the prior fiscal year, have significantly and materially declined, despite the fact that, in an effort to accommodate for what defendants recognized would be such declining growth rates, UOP surprisingly expanded its student enrollment population to include students as young as 18 years of age — thus now attempting to enroll a student age group that previously was considered to be anathema and problematic.

128. The trading price of Apollo shares continued to crumble as more material adverse information and disclosures regarding its business practices, lack of integrity and related DOE findings came to light and investors thereafter absorbed the new information.

129. On September 14, 2004, the *Arizona Republic* published an article on the DOE's "45 page report" entitled "Student-Recruitment Tactics Blasted by Feds," which stated, *inter alia*:

> *A government review of the University of Phoenix*, the country's largest for-profit *university*, paints a picture of a school so hungry to enroll new students that it has threatened and intimidated its recruitment staff in meetings and e-mail, pressured them to enroll unqualified students and covered up its practices to deceive regulators.
>
> ...a 45-page report obtained by the Arizona Republic...describes corporate culture overly focused on boosting enrollment. The review, based on site visits and interviews with more than 60 employees and former employees, *led to the largest settlement of its kind last week. The Phoenix-based university agreed to pay $9.8 million without admitting any wrongdoing.*
>
> * * *
>
> The Program Review Report details several examples of compensation and sales practices the department says range from illegal to unethical to aggressive. Federal law governing financial aid prohibits basing college recruiters' pay on enrollment.
>
> * * *
>
> In the report, enrollment counselors interviewed by regulators told of a glassed-in isolation room, called the Red Room, where underperformers

63

1   were put on display to work the phones under intense management
2   supervision.

    A group of San Jose recruiters recalled being told heads would be on a
3   chopping block if its numbers didn't come up; another recruiter said her
    manager told her she couldn't afford time away from the phones to go to
4   New York for her grandmother's funeral.

5   ...The regulations are in place to protect prospective students from
    being pressured and taxpayers from potential defaults on student loans.
6   About 60 percent of the school's tuition revenue comes from financial
    aid.
7
    ...The report ordered changes.   The school received the report in
8   February...

9   The Department of Education said the university was in violation
    because it:
10
    *  'Hires its recruiters with the promise of lucrative compensation for
11  success in securing enrollments.'

12  *  'Maintains a recruiter evaluation and salary system that provides
    incentive payments based both directly and indirectly on success in
13  securing enrollments.'

14  *  'Provides substantial incentives to its staff to recruit unqualified
    students and students who cannot benefit from the training offered.'
15
    *  'Systematically and intentionally operates in a duplicitous manner so
16  as to violate the department's prohibition against incentive
    compensation while evading detection.'
17
                              *   *   *
18
    Susan Aspey, spokeswoman for the Education Department, said it
19  stands by the report: 'We are both firm and fair in our administration of
    the law, and we act in the best interests of the students and taxpayers.
20  *This is the largest fine the department has ever imposed on a school.*'

21                            *   *   *

22  The report says *school officials took steps to deceive or thwart
    regulators* during the review, which included on-site visits in Arizona
23  and California a year ago.

24  It says some mangers in northern California told certain recruiters with a
    reputation for being outspoken to take leave or be out of the office
25  during the review.  Others told of posted materials ranking employees
    by enrollment performance coming down in advance of the visit.  In one
26  case, a recruiter saved a computer spreadsheet that had been displayed
    before the visit and showed it to regulators.  In another, Monopoly
27  money used in a contest to drum up applications was taken off a bulletin
    board, the report says.
28

                              64

05-16-05    02:45pm    From-BARRACK - SAN DIEGO    T-796    P.069/100    F-625

1   Overall, some employees interviewed said that an elaborate pay matrix
2   was about 'smoke and mirrors' and that the only thing that counted was
    enrollments.

3                                          *   *   *

4   Excerpts from the U.S. Department of Education's Program Review
    Report:
5
6   *   'UOP's intense focus on numbers and enrollments per recruiter
    permeates the working day of each recruiter.  Managers bombard the
    recruiters with e-mails daily — listing the top performers based on
7   enrollments, applications, calls and other recruiting activities, with the
    pace of e-mails pushing numbers escalating at the end of each fiscal
8   year as the annual report deadline nears.'

9   *   'The dynamics of public ownership, expectations of investors and
    lucrative stocks options to UOP officers are integral aspects of the UOP
10  system.  Employees at every level are made aware of the importance of
    meeting the enrollment numbers and revenue expectations of Wall
11  Street on a quarterly basis.'

12  *   '(A) number of recruiters stated that the allocation of fresh leads and
    floor time was both an intimidation and reward tool to manipulate them
13  into more aggressive and/or unethical tactics.'

14  *   'UOP makes it very clear that recruiters are to do whatever it takes to
    get the student to enroll...,Recruiters...stated that they are pressured by
15  management to enroll students who are not qualified.'

16  *   'The training program and sales materials for recruiters teaches [sic]
    them how to use financial aid effectively as a sales tool.  One of the
17  strategies is to ask the potential student: 'You can afford $50 per month
    for you bachelor's, can't you?''
18
19  *   'Recruiters consistently mention the focus and pressure to increase
    enrollments to report to Wall Street.  Many expressed that while UOP at
    one time focused on the student and stressed ethical conduct, the culture
20  now is one where the emphasis is on increasing the numbers, the stock
    price and meeting Wall Street's expectations.'
21
22      130.   Then, on September 15, 2004, yet another *Arizona Republic* article,

23  entitled "Univ. of Phoenix Pushes Ahead," disclosed a continuing practice of

    incentivizing enrollments in the summer of 2004, stating in relevant part:
24
25      The University of Phoenix disputes the government's portrait that it sells
        education with the zeal of a hard-charging telemarketer, *but recent*
26      *memos to recruiters reveal tactics similar to those recently cited by*
        *federal regulators.*

27      *Internal e-mail obtained by The Arizona Republic suggests a big push*
        *to enroll students this summer*, especially last month as the fiscal year
28      drew to a close for the school's publicly traded parent company, Apollo
        Group, Inc. *'Close those students' was a common refrain.*

                                          65

One e-mail from Aug. 13 reminds a team of recruiters that August is winding down and that it is poised for an enrollment boom.

'Get on the phones and be a part of this HUGE explosion of enrollments that will begin today and carry us through August!!!' the e-mail read.

It reminds the team that it is the last month to qualify for top-performers' trip to a resort and the 'last month before most of your reviews.' It lists the top recruiters by enrollments so far and asks, 'Who will be a part of the double-digit club and who will finish #1?!?!?!'

The contents are noteworthy because the company recently came under government scrutiny over federal financial-aid laws forbidding paying recruiters solely based on enrollments. A critical report detailed *what the government described as corporate culture overly focused on boosting enrollment.*

The company settled the issue with the U.S. Department of Education last week for a record $9.8 million fine.

\* \* \*

Dozens of employees and former employees contacted The Republic to confirm the pressure-filled, numbers-driven recruiting atmosphere after details of the report were published Tuesday.

\* \* \*

But still, the focus on enrollment goes on.

After the e-mail burst noted above, another e-mail went out to the same group announcing a goal of 750 enrollments by the end of the week, translating to three per recruiters. Those who signed up four students could wear jeans one day later in the month. That e-mail, too, reminded recruiters that most of their reviews were coming up.

This summer's push also included a drive to enroll employees and their spouses as students. An Aug. 6 memo to all University of Phoenix Online employees, who receive free tuition, offered a waiver of the application and electronic textbook fees. 'It's time to start, re-enter or continue your degree program!!!' the e-mail read. The university held an employee enrollment fair in one of its ballrooms.

In late June, the university announced a 'buy three, get the fourth free' promotion for classes for students starting in July. A script was sent to recruiters to help them pitch the promotion. It noted, among other things, that a passing grade was not required for the promotion.

If a student was reluctant to enroll, presumably due to money, it suggests conferencing in another employee 'to discuss the long-term payment options.'

Sales-drive memos

66

Excerpts from e-mail that managers sent to a team of University of Phoenix Online enrollment counselors for a sales drive last month:

Aug. 17: We have a BIG goal this week: 750 enrollments by Friday!! That means each rep needs 3 REG's (student registrations) this week!! For the last week of August...the last week of 75 percent of your reviews...the last week of promo, we can do this!!!!We have set up a wall of fame for this week. Anytime you get a REG, we want your autograph on the wall of FAME and how many REG's so far this week! All reps who enroll 4 students this week will get to wear jeans on 8/27.

Aug. 18: Here is where we are in our Drive for 750 enrollments!!! Let's keep it going and push extra hard so we can make it!!!

If anyone can do this, CENTRAL DIVISION CAN!!!

Aug. 19: We moved 139 students yesterday and continue to march towards our goal of 750 students....We need 200 students today and tomorrow which is a BIG job!!! Create that urgency and close those students!!

Aug. 31: August proved to be a record month for our employee team at online. Collectively they started almost 800 students!!!!! This was tremendous undertaking and they were dedicated to getting every last employee, faculty and spouse who wanted to begin a program into class! A very special thank you for all the hours they came in early and stayed late to make this happen.

Source: University of Phoenix employees

131. Also on September 15, 2004, *The Wall Street Journal* published an article entitled "Will Apollo's Bad Report Card Get Its Shares Grounded?" In relevant part, the article read:

Apollo Group, star of the for-profit education business, *just got a rare failing grade from regulators....A newly disclosed Education Department report blasts* Apollo Group Inc.'s flagship University of Phoenix for a *'culture of duplicity'* in which supervisors improperly lavished money on sales employees for signing up scores of new students, including those unable to cut it.

Federal investigators said recruiters -- called 'enrollment counselors' at the University of Phoenix -- faced pressures *more akin to car dealerships than colleges*. Forty-four of 61 counselors interviewed by the government told investigators that salaries were always about enrollment numbers. The Education Department said counselors were told they could as much as double or triple their starting salaries in three to six months if they signed up enough students.

...the report provides fresh details about sales practices in the for-profit education business. *It also raises the question of whether a too-aggressive approach contributed to Apollo's dazzling growth -- and if it now will be forced to tone down its approach and grow more slowly.*

67

The shares have dropped sharply in recent weeks as Apollo's peers faced various legal and regulatory assaults over their recruiting and placement practices, but Apollo's stock remains up about 18% year to date. Since the company's initial public offering in 1994, its shares have soared from 72 cents apiece to as high as $98 in June, adjusted for stock splits.

U.S. regulations forbid schools whose students receive federal financial aid from tying pay directly to enrollments. In 2003, about 60% of the University of Phoenix's revenue came from federal student aid, which comes in the form of grants and guaranteed loans. Violating the rules runs the risk of losing the aid.

Responding to a series of scandals in the 1980s and 1990s, the government has sought to prevent entrepreneurial schools from signing up students for programs that don't benefit them, then leaving them saddled with loans that they can't repay. Aid recipients are generally low-income students. Many rely heavily on federal aid and pay little or nothing out of pocket to cover tuition.

*Last week*, Apollo Group, based in Phoenix, disclosed it had agreed to pay $9.8 million to settle the sales-incentive allegations spelled out in the Education Department report. *But the company*, which said the inquiry covered 1998 through June 2004, *disclosed few details*. The Wall Street Journal reviewed a copy of the Education Department document, contents of which were detailed yesterday in the Arizona Republic.

* * *

Investigators said the school hired counselors at $26,000 a year from far higher-paying jobs, then promised to bump their salaries up to as much as $120,000 if they logged enough enrollments. Internal literature boasted of '$$-No limit on income' and 'Never have to worry about $$ again.'

Recruiters with over 200 student enrollments a year earned $80,000 to $100,000, regardless of their length of service, the report said. The university rewarded top performers with all-expense paid trips, including one to the Watergate Hotel in Washington, the report said. Counselors also received $100 gift certificates and spa packages.

* * *

Investigators said the company kept performance reviews that suggested the company used other criteria, such as rapport with students, to make it appear the company wasn't directly tying enrollments to compensation. But they described the efforts as *'smoke and mirrors' to avoid government detection*.

The *company pressured recruiters to sign up unqualified students*, such as those who don't have the money to complete the program, the report said. The recruiters would overcome objections by citing the availability of student aid, stressing no up-front costs and playing down loan-repayment obligations, investigators said.

68

former director of the Center for Corporate Financial Reporting at Colorado State University.

\* \* \*

...Nelson said. 'Our shareholders could well have been subjected to an unwarranted share-price drop had we disclosed the report prematurely and with these issues unresolved.'

\* \* \*

At the least, a lack of disclosure can hurt management credibility if negative details emerge later.

Apollo's stock fell last month after media coverage of the details in the reports. It declined 2.4 percent in a two-day period when stories appeared in The Arizona Republic, Wall Street Journal and other newspapers.

\* \* \*

Apollo's stock has since fallen further along with the rest of the for-profit education industry, hitting $68.01 last week, a low it hadn't seen since December...

Stinging review

The questions on disclosure by Apollo relate to a 'program review' of the University of Phoenix's recruiter compensation that dates to August 2003. As part of that review, Apollo received a 45-page report on the review in early February.

The government didn't mince words in its conclusion, saying the University of Phoenix 'systematically engages in actions designed to mislead the Department of Education and to evade detection of its improper incentive compensation for those involved in recruiting activities.'

\* \* \*

The department said the University of Phoenix, the nation's largest private university, with more than 200,000 students, had to make substantial changes to recruiters' and supervisors' salary compensation systems.

*Nelson did disclose the existence of the program review on a March 12 conference call with analysts but spoke of such reviews in general terms and as part of a broad regulatory update, given the high-profile scrutiny of some of its competitors. No mention was made of the report.*

\* \* \*

When shown Nelson's letter, obtained along with other correspondence under a public-records request, some experts said it appears that Apollo should have disclosed the report to investors.

71

1   They say that *Nelson's statement of the potential harm it could have*
2   *caused indicates the company considered it to be a material event.*

3   There are no hard-and-fast rules on what denotes materiality, but in
    general it is information that a reasonable investor needs to know in
4   order to make an informed decision about an investment, SEC
    spokesman John Heine said.

5   Apollo has pointed out that the amount it paid the government was not
6   material, and Nelson said in his response that it was less than 1 percent
    of the giant company's cash.

7   Still, materiality goes well beyond money, experts say.

8   Russell Piccoli, a securities attorney and litigator with the law firm
9   Marsical, Weeks, McIntyre and Friedlander in Phoenix, said a company
    can't have it both ways, saying it's not material but essentially telling
10  regulators it is.

11  *'If they had a fear that release of the information would have a*
    *significant effect on the market price of their shares, then that in and*
12  *of itself is evidence of the fact that it needs to be disclosed'*, he said.

13  Adds Carolyn Brancato, director of the Conference Board's Global
    Corporate Governance Research Center in New York, *'If the company*
14  *writes to someone else and says this is going to have a huge effect on*
    *it, then the company itself has determined that it is going to be*
15  *material.'*

16                                  *   *   *

17  There is also a question of whether Apollo might have mislead investors
    with its comments to analysts in conference calls about the program
18  review.

19  In response to a question from an analyst in June, Nelson said the
    program review at the University of Phoenix 'continues to go, from our
20  point of view, very smoothly.'

21  Correspondence through May between the two sides seems to indicate
    some tension.

22
    There was much interest in regulatory updates from Apollo that day
23  because the stock of one of its competitors was falling after a newspaper
    revealed a negative program report it had received from the department.
24  The company, Corinthian Colleges, disclosed some details after the
    newspaper report.  Two days earlier, another competitor announced a
25  formal SEC probe.

26  Piccoli said public companies can get into regulatory trouble if they
    know more than they are revealing about an issue of interest to
27  investors.

28  *'If you're making any sort of public statement that's calculated to*
    *reach the investing public, you have to tell the whole truth,'* he said.
                                        72

1  *'You can't tell half of it and in any way leave a misleading impression.'*

2  135.  Defendants' ongoing and purposeful concealment of the DOE Report even

3  in the face of direct analyst inquiries, which CEO Nelson's March 1, 2004 communique

4  to the DOE establishes they actively believed would cause "great harm" thus deflating

5  the trading price of Apollo's shares if disclosed, further and strongly demonstrates that

6  defendants possessed the requisite scienter when making their false, deceptive and

7  misleading Class Period statements artificially buoying and inflating the price of

8  Apollo's shares, as alleged above.

9  136.  Had the DOE Report been timely and adequately disclosed, the trading

10  price of Apollo securities would have been materially less during the Class Period.

11  **C.     Attempts to Conceal UOP's Illegal Conduct from DOE Investigators Further Supports a Strong Inference of Scienter**

12

13  137.  No doubt concerned that DOE Investigators would uncover significant

14  evidence of rampant violations of the law and illegal conduct associated with UOP's

15  flagrant violation of the ban on incentive compensation respecting student enrollments,

16  once management was made aware that DOE Investigators would be coming on site at

17  UOP campuses, a variety of efforts were undertaken to hide evidence or prevent DOE

18  Investigators from speaking to recruiters who could not be counted on to toe the

19  Company line.

20  138.  DOE Investigators found and concluded that UOP management or its

21  agents took numerous steps to conceal information of illegal conduct from them.  For

22  example, the DOE Report states:

23  > On the first day of the review, UOP officials were told that the focus of
24  > the review was the compensation plan for those involved in admissions
25  > activities, and that the review would encompass both Northern
26  > California and Phoenix locations and involve interviews with UOP staff.
27  > Shortly after this announcement, UOP management told some recruiters
28  > at the Northern California locations that they should take leave or attend
   > some function away from the premises.  When contacted by the
   > Department after the site visits, these recruiters indicated that they were
   > absent for interviews because they had reputations for being honest and
   > frank.

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1   (DOE Report at 26-27).

2       139.  And according to the DOE Report, efforts were made by UOP to remove

3   evidence of programs that violated DOE regulations once the Program Review was

4   announced. (DOE Report at 27).  In addition, spreadsheets that evidenced violations of

5   the ban on incentive compensation for student enrollments were deleted from computer

6   desktops with the intention that this information would not fall into the hands of DOE

7   Investigators.   Nevertheless, DOE Investigators obtained this computer spreadsheet

8   thanks to the fact that one of the enrollment counselors personally retained a copy.

9   (DOE Report at 15).

10      140.  Defendants' conscious knowledge of the fact that their compensation

11  scheme violated Title IV funding requirements and the ban on incentive compensation

12  for student enrollments is also established by the fact that UOP utilized a "matrix" and

13  an amendment thereof at all times material that purposefully attempted to camouflage

14  there illegal compensation scheme and used "code words" in a further effort to do so, as

15  found by the DOE Investigators and as confirmed by UOP enrollment counselors

16  Hendow and Albertson.

17  **VII.   MISLEADING FINANCIAL STATEMENTS**

18      141.  During the Class Period, Apollo reported in various press releases and

19  filings with the SEC, as more fully identified in ¶¶95-117 above, its purported financial

20  results including revenues, net income and earnings per share for its second quarter of

21  fiscal 2004 (ending February 28, 2004) and third quarter of fiscal 2004 (ending May 31,

22  2004.)   Each of Apollo's reported financial results in the aforementioned public

23  statements and filings were disseminated to the investment community and designed to

24  convey statements to investors that Apollo enjoyed continuing, sustained and robust

25  prosperity and growth, and that its then existing business condition and operations were

26  strong and healthy.

27      142.  Apollo's financial statements and the statements concerning its quarterly

28  results were each false, deceptive and misleading because they did not constitute a fair

74

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1    representation of the Company's operations due to defendants' active concealment of the
2    fact that the Company was relying on systemic violations of the law and regulations with
3    respect to Title IV funding and, further, had been and was continuing to enjoy and report
4    inflated growth rates in enrollments, revenues, net income and consequent earnings per
5    share by reason of those illegal activities, including consequent abuses as more fully
6    discussed above. Apollo's *financial reporting did not accurately or fully disclose the*
7    *true nature and quality of its revenues and earnings.*

8        143.   Apollo manipulated financial statements by allowing the Company to
9    generate fees which it was not entitled to or otherwise was obtaining through illegal
10   means, which could be required to be forfeited (via fines, judgments and costs associated
11   therewith) and which artificially inflated Apollo's revenue and earnings.

12       144.   Importantly, upon disseminating to the investment community its quarterly
13   financial results, defendants further deceived and misled investors by failing to disclose
14   the serious and adverse findings and conclusions of the February 5, 2005 DOE Report,
15   which, in and of itself, exposed the Company to serious risks of DOE imposed fines or
16   penalties respecting which the Company was required to both set aside adequate reserves
17   and inform investors given the materiality of the DOE Report and the duty of the
18   Company to adequately disclose known risk factors.

19       145.   Financial reporting is required to provide information that is useful to
20   present and potential investors and creditors and other users in making rational
21   investment, credit and similar decisions. (Financial Accounting Standards Board
22   ("FASB") Statement of Concepts No. 1, 34). Financial reporting should also provide
23   information about the economic resources of an enterprise, the claims of those resources,
24   and the effects of transactions, events and circumstances that change resources and
25   claims to those resources. (FASB Statement of Concepts No. 1, 40) Financial reporting
26   should be reliable in that it represents what it purports to represent. The concept that
27   information should be reliable as well as relevant is a notion that is central to accounting.
28   (FASB Statement of Concepts No. 2, 58-59). Apollo's financial results were also

1  required to comport with the principal of completeness, which means that nothing is left

2  out of the information that may be necessary to ensure that it validly represents

3  underlying events and conditions. (FASB Statement of Concepts No. 2, 79)

4      146.  The information defendants failed to disclose, including UOP's systemic

5  and continuing violations of the law to generate revenues and growth, or the fact that

6  those violations had now been revealed to and discovered by the DOE, which was

7  responsible for monitoring Apollo's compliance with the law, represented the type of

8  information which, because of regulations of the SEC and the national stock exchanges

9  and customary business practice, is expected by investors and securities analyst to be

10  disclosed.  It is the type of information that is known by corporate officials and their

11  legal and financial advisors to be the type of information which is expected to and must

12  be disclosed, particularly with regard to managements' discussion and analysis of those

13  financial results contained in SEC filings.  Apollo's report of financial results and

14  management's discussion and analysis of those results violated these basic principles,

15  regulations, customs and practices, failed to timely or adequately disclose to investors

16  the serious risks and adverse events already impacting or otherwise existing with respect

17  to Apollo's business and operations, failed to disclose material facts and events relating

18  to Apollo's financial performance which any reasonable investor would have considered

19  important in making a decision to invest in or otherwise transact with regard to Apollo

20  shares and further rendered Apollo's financial statements and the statements regarding

21  them false, deceptive and misleading.

22  **VIII.  CLASS ACTION ALLEGATIONS**

23      147.  Lead Plaintiff brings this action as a class action pursuant to Federal Rules

24  of Civil Procedure 23(a) and 23(b)(3).  The Class is defined as all persons and entities

25  who, during the Class Period, purchased or otherwise acquired the securities of Apollo

26  and who suffered damages caused by the defendants' acts (the "Class").  Excluded from

27  the Class are defendants, the officers and directors of the Company, at all relevant times,

28

76

1  members of their immediate families and their legal representatives, heirs, successors or

2  assigns and any entity in which defendants have or had a controlling interest.

3      148.   The members of the Class are so numerous that joinder of all members is

4  impracticable.  As of July 15, 2004, approximately 192.7 million shares of Apollo

5  common stock were outstanding.  While the exact number of Class members is unknown

6  to Lead Plaintiff at this time and can only be ascertained through appropriate discovery,

7  Lead Plaintiff believes there are thousands of members in the proposed Class.  Record

8  owners and other members of the Class may be identified from records maintained by

9  Apollo or its transfer agent and may be notified of the pendency of this action by mail,

10  using the form of notice similar to that customarily used in securities class actions.

11      149.   Lead Plaintiff's claims are typical of the claims of the members of the

12  Class as all members of the Class are similarly effected by defendants' wrongful conduct

13  in violation of federal law as complained of herein.

14      150.   Lead Plaintiff will fairly and adequately protect the interests of the

15  members of the Class and has retained counsel competent and experienced in class

16  action and securities litigation.

17      151.   Common questions of law and fact exist as to all members of the Class and

18  predominate over any questions solely affecting individual members of the Class.

19  Among the questions of law and fact common to the Class are:

20      a.    Whether the federal securities laws were violated by
            defendants' acts as alleged herein;

21

22      b.    Whether statements made by defendants to the investing
            public during the Class Period misrepresented material
            facts about the business, operations and financial

23            statements of Apollo; and

24      c.    Whether the members of the Class have sustained
            damages caused by the acts of defendants and, if so, what

25            is the proper measure of such damages.

26      152.   A class action is superior to all other available methods for the fair and

27  efficient adjudication of this controversy since joinder of all members is impracticable.

28  Furthermore, as the damages suffered by individual Class members may be relatively

77

1  small, the expense and burden of individual litigation makes it impossible for members

2  of the Class to individually redress the wrongs done to them. There will be no difficulty

3  in the management of this action as a class action.

4  **IX.   ADDITIONAL ALLEGATIONS OF PRESUMPTION OF RELIANCE, FRAUD-ON-THE-MARKET AND CAUSATION**

5      153.  Lead Plaintiff will rely, in part, upon the presumption of reliance

6  established by the fraud-on-the-market doctrine that:

7          a.    Defendants made public misrepresentations or failed to
8                disclose material facts during the Class Period;

9          b.    The omissions and misrepresentations were material;

10         c.    The securities of the Company traded in an open and
                 efficient market;

11
           d.    The misrepresentations and omissions alleged would tend
12               to induce a reasonable investor to misjudge the value and
                 prospects of the Company's securities; and

13
           e.    Lead Plaintiff and members of the class traded in Apollo
14               securities between the time the defendants failed to
                 disclose or misrepresented material facts and the time the
15               true facts were disclosed, without knowledge of the
                 omitted or misrepresented facts.

16
       154.  At all relevant times, the market for Apollo securities was an efficient
17
   market for the following reasons, among others:

18
           a.    Apollo stock met the requirements for listing, and was
19               listed and actively traded on the NASDAQ, a highly
                 efficient and automated market;

20
           b.    As a regulated issuer, Apollo filed periodic public reports
21               with the SEC and the NASDAQ;

22         c.    Apollo regularly communicated with public investors via
                 established market communication mechanisms, including
23               through regular dissemination of press releases on the
                 national circuits of major newswire services and through
24               other wide-ranging public disclosures, such as
                 communications with the financial press and other similar
25               reporting services; and

26         d.    Apollo was followed by several securities analysts
                 employed by major brokerage firms who wrote reports
27               that were distributed to the sales force and certain
                 customers of their respective brokerage firms. Each of
28               these reports was publicly available and entered the public
                 marketplace.

78

155. As a result of the foregoing, the market for Apollo securities promptly digested current information regarding Apollo from all publicly available sources and reflected such information in Apollo's stock price. Under these circumstances, the presumption of reliance applies to all those who purchased or acquired Apollo securities during the Class Period.

156. The alleged false, deceptive and misleading statements rendered by defendants during the Class Period credibly entered the market with such frequency and intensity that they succeeded, as they were intended, in overtaking and effectively neutralizing any information in the market that would have informed investors of the material adverse facts, trends and events that plagued Apollo, as alleged above. Indeed, although defendants were continuously faced with inquires by market professionals and the media, all seeking guidance relating to Apollo and the critical trends impacting its business, especially with respect to the DOE monitoring and related Program Review audit and investigation, defendants' false and misleading statements caused the market to believe that Apollo's business condition was healthy and that the Company was in compliance with critically important Title IV funding law and regulations, that any Program Review with respect to Apollo's business and operations would not place it at risk of any material adverse findings and conclusions by the DOE, and that such review by the DOE was merely done in the course and the scope of the DOE's regular monitoring of compliance activities.

157. Investors placed great reliance upon management's report and representations. The fact that defendants' frequent false statements credibly entered the market and comforted and convinced investors that Apollo was operating in compliance with Title IV funding law and regulations and successfully neutralized any disclosure of adverse information in the market with respect to for-profit schools in general, was demonstrated by the fact that defendants' false statements buoyed or inflated its stock price during the Class Period as previously alleged. When Apollo rendered its

79

1    September 7, 2004 disclosure of the fact that the DOE had rendered a Program Review

2    Report with a "negative tone" and that Apollo had agreed to pay a $9.8 million fine to

3    the DOE, and thereafter, when the truth about Apollo's unlawful practices was more

4    fully disclosed by the media on September 14, 2005 and September 15, 2004, the trading

5    price of Apollo's shares declined further from $83.74 at the close of trading on

6    September 3, 2004 to $75.82 at the close of trading on September 20, 2004, as the

7    market continued to absorb and become more fully acquainted with the true picture of

8    Apollo's business and operations.

9         158.  Defendants' false, deceptive and misleading statements, including their

10   omissions of material non-public adverse information, during the Class Period, were

11   directly causally connected to the significant damages to Class members who purchased

12   or otherwise acquired Apollo's securities at prices that were artificially inflated by reason

13   thereof, and thereafter saw Apollo's stock price drop significantly as a result of the truth

14   finally being disclosed.

15   **X.    NO STATUTORY SAFE HARBOR**

16        159.  The statutory safe harbor provided for forward-looking statements under

17   certain circumstances does not apply to any of the allegedly false statements pleaded in

18   this complaint. Many of the specific statements pleaded herein were not identified as

19   "forward looking statements" when made. To the extent there were any forward-looking

20   statements, there were no meaningful cautionary statements identifying important factors

21   that could cause actual results to differ materially from those in the purportedly forward-

22   looking statements. Alternatively, to the extent that the statutory safe harbor does apply

23   to any forward-looking statements pleaded herein, defendants are liable for those false

24   forward-looking statements because at the time each of those forward-looking

25   statements were made, the particular speaker knew that the particular forward-looking

26   statement was false, and/or the forward-looking statement was authorized and/or

27   approved by an executive officer of Apollo who knew that those statements were false

28   when made.

XI.    **CLAIMS FOR RELIEF**

## FIRST CLAIM

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

160.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

161.    During the Class Period, Apollo and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Apollo's securities; and (iii) cause Lead Plaintiff and other members of the Class to suffer losses.  In furtherance of this unlawful scheme, plan and course of conduct, defendants and each of them, took the actions set forth herein.

162.    Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

163.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §§210.1 *et seq.*, and Regulation S-K, 17 C.F.R. §§229.10 *et seq.* and other SEC regulations, including accurate and truthful information with respect

81

to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

164.    Apollo and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Apollo as specified herein.

165.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Apollo's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Apollo and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Apollo's securities during the Class Period.

1.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of

82

1    the Company's dissemination of information to the investing public which they knew or

2    recklessly disregarded was materially false and misleading.

3        2.    The defendants had actual knowledge of the misrepresentations and

4    omissions of material facts set forth herein, or acted with reckless disregard for the truth

5    in that they failed to ascertain and to disclose such facts, even though such facts were

6    available to them.  Such defendants' material misrepresentations and/or omissions were

7    done knowingly or recklessly and for the purpose and effect of concealing Apollo's

8    operating condition and future business prospects from the investing public and

9    supporting the artificially inflated price of it securities. As demonstrated by defendants'

10   overstatements and misstatements of the Company's business, operations and earnings

11   throughout the Class Period, defendants, if they did not have actual knowledge of the

12   misrepresentations and omissions alleged, were reckless in failing to obtain such

13   knowledge by deliberately refraining from taking those steps necessary to discover

14   whether those statements were false or misleading.

15       3.    The dissemination of the materially false and misleading information and

16   failure to disclose material facts, as set forth above, caused the market price of Apollo

17   securities to artificially increase during the Class Period.  Lead Plaintiff and the other

18   members of the Class acquired Apollo securities during the Class Period in ignorance of

19   the fact that market prices of Apollo's publicly-traded securities were artificially inflated,

20   and relying directly or indirectly on the false and misleading statements made by

21   defendants, or upon the integrity of the market in which the securities trade, and/or on

22   the absence of material adverse information that was known to or recklessly disregarded

23   by defendants but not disclosed in public statements by defendants during the Class

24   Period.

25       4.    At the time of said misrepresentations and omissions, Lead Plaintiff and

26   other members of the Class were ignorant of their falsity, and believed them to be true.

27   Had Lead Plaintiff and the other members of the Class and the marketplace known of the

28   true financial condition and business prospects of Apollo, which were not disclosed by

83

LD PLTFS CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1  defendants, Lead Plaintiff and other members of the Class would not have purchased or
2  otherwise acquired their Apollo securities, or, if they had acquired such securities during
3  the Class Period, they would not have done so at the artificially inflated prices that they
4  paid.

5      5.    By virtue of the foregoing, defendants have violated §10(b) of the
6  Exchange Act, and Rule 10b-5 promulgated thereunder.

7      6.    Lead Plaintiff and the Class members have suffered losses directly and
8  proximately caused by defendants' false, deceptive and misleading statements and
9  omissions as set forth above and as further demonstrated by the significant declines in
10 the trading price of Apollo's securities as the DOE Report and the truth about Apollo's
11 unlawful and improper incentive compensation system based on student enrollment and
12 related conduct were disclosed.

**SECOND CLAIM**

**(Violation of Section 20(a) of
the Exchange Act Against the Individuals Defendants)**

15     7.    Lead Plaintiff repeats and realleges each and every allegation contained
16 above as if fully set forth herein.

17     8.    The Individual Defendants acted as controlling persons of Apollo within
18 the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-
19 level positions, and their ownership and contractual rights, participation in and/or
20 awareness of the Company's operations and/or intimate knowledge of the false financial
21 statements filed by the Company with the SEC and disseminated to the investing public,
22 the Individual Defendants had the power to influence and control and did influence and
23 control, directly or indirectly, the decision-making of the Company, including the
24 content and dissemination of the various statements which Lead Plaintiff contends are
25 false and misleading.  The Individual Defendants were provided with or had unlimited
26 access to copies of the Company's reports, press releases, public filings and other
27 statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these

28

84

1 | statements were issued and had the ability to prevent the issuance of the statements or
2 | cause the statements to be corrected.

3 |   9.   In particular, each of these defendants had direct and supervisory
4 | involvement in the day-to-day operations of the Company and, therefore, is presumed to
5 | have had the power to control or influence the particular transactions giving rise to the
6 | securities violations as alleged herein, and exercised the same.

7 |   10.   As set forth above, Apollo and the Individual Defendants each violated
8 | §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and
9 | omissions as alleged in this Complaint.  By virtue of their positions as controlling
10 | persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

11 |   11.   Lead Plaintiff and the Class members have suffered losses directly and
12 | proximately caused by defendants' false, deceptive and misleading statements and
13 | omissions as set forth above and as further demonstrated by the significant declines in
14 | the trading price of Apollo securities as the DOE Report and the truth about Apollo's
15 | unlawful and improper incentive compensation system based on student enrollments and
16 | related conduct was disclosed.

17 |   WHEREFORE, Lead Plaintiff prays for relief and judgment against defendants
18 | on its own behalf and on behalf of the other plaintiffs and the Class as follows:

19 |   A.   Determining that this action is a proper class action and appointing
20 | plaintiff as Lead Plaintiff and its counsel as Lead Counsel for the Class and certifying it
21 | as class representative under the Federal Rules of Civil Procedure:

22 |   B.   Awarding compensatory damages in favor of Lead Plaintiff and the other
23 | Class members against all defendants, jointly and severally, for all damages sustained as
24 | a result of defendants' wrongdoing, in an amount to be proven at trial, including interest
25 | thereon;

26 |   C.   Awarding Lead Plaintiff and the Class their reasonable costs and expenses
27 | incurred in this action, including counsel fees and expert fees; and

28 |   D.   Such other and further relief as the Court may deem just and proper.

05-16-05    02:49pm    From-BARRACK - SAN DIEGO                    T-796   P.090/100   F-625

1

## JURY TRIAL DEMANDED

2    Lead Plaintiff hereby demands a trial by jury.

3                                    BARRACK, RODOS & BACINE
                                     STEPHEN R. BASSER
4                                    SAMUEL M. WARD

5

6                                    _____
                                          STEPHEN R. BASSER
7
                                     402 West Broadway, Suite 850
8                                    San Diego, CA  92101
                                     Telephone:  (619) 230-0800
9                                    Facsimile:  (619) 230-1874

10                                   BARRACK, RODOS & BACINE
                                     LEONARD BARRACK
11                                   GERALD J. RODOS
                                     3300 Two Commerce Square
12                                   2001 Market Street
                                     Philadelphia, PA  19103
13                                   Telephone:  (215) 963-0600
                                     Facsimile:  (215) 963-0838
14
                                     Lead Counsel for Lead Plaintiff the
15                                   Policemen's Annuity and Benefit Fund of
                                     Chicago and the Class
16

17

18

19

20

21

22

23

24

25

26

27

28

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

# EXHIBIT 1

### SWORN CERTIFICATION OF JOHN J. GALLAGHER, JR.
### ON BEHALF OF THE POLICEMEN'S
### ANNUITY AND BENEFIT FUND OF CHICAGO

I, John J. Gallagher, Jr. hereby certify and swear as follows:

1.    I am the Acting Executive Director of the Policemen's Annuity and Benefit Fund of Chicago ("PABF"). I have personal knowledge of the facts set forth herein and if called as a witness could and would competently testify thereto.

2.    On behalf of PABF, I have reviewed the consolidated complaint filed against Apollo Group, Inc. ("Apollo") and related parties alleging violations of the federal securities laws, and state that PABF is willing to serve as a lead plaintiff and a representative party on behalf of a class in this case and all other related cases that may be consolidated with it, including providing testimony at deposition and trial, if necessary.

3.    PABF did not purchase Apollo securities at the direction of its counsel or in order to participate in any private action under the federal securities laws.

4.    A description of PABF transactions in the securities of Apollo during the class period specified in the complaint is attached hereto as Exhibit A.

5.    PABF has not, with in the 3 year period preceding the date hereof, served as a lead plaintiff on behalf of a class in any action bought under the federal securities laws except the following:

*In re: DaimlerChrysler AG Securities Litigation*: case filed 11/28/00, Civil Action No. 1:00cv00993 (D.Del);

*In re: Siebel Systems, Inc. Securities Litigation*: case filed 3/10/04, Civil Action No. 3:04-cv-00983-CRB (N.D.Cal).

*Sebuck Global Enterprises, et al. v Apollo Group Inc., et al.*, case filed 10/12/04 No. 04-cv-2147 (D.Ariz.)

EXHIBIT 1 page 1 of 9

05-16-05    02:49pm    From-BARRACK – SAN DIEGO                      T-796    P.093/100    F-625

6.    In addition, the PABF has sought to serve as a class representative in the following cases under the federal securities laws within the last three years:

Rabbach, et al. v. ICG Communications, et al., No. 1:00-cv-01864-REB-BNB (D. Col.)

Feder v. Elec. Data Sys., No. 5:02cv207 (E.D. Tex. 2002)

In re Adelphia Communications Sec. Litig., No. 03cv5755 (S.D.N.Y. 2003)

Simpson v. Homestore.com, Inc., No. 01-CV-11115 GAF (CWx) (C.D. Cal. 2001)

Cox v. Delphi Corp., Civil Action No. 1:05cv02637 – NRB (S.D.NY 2005)

Priest v. Delphi Corp., Civil Action No. 2:05cv70907 - DPH (E.D. Mich. 2005)

7.    PBF will not accept any payment for serving as a representative party on behalf of a class beyond its pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May _13_, 2005                  _John J. Gallagher, Jr._
                                       John J. Gallagher, Jr.
                                       Acting Executive Director,
                                       Policemen's Annuity and Benefit Fund of Chicago

EXHIBIT _1_ pg 2of6

EXHIBIT A

EXHIBIT 1 page 3.

**CHPOL**
**APOL**
**Class Period: February 27, 2004 through September 14, 2004**

Account Manager: 2840066

| DATE | PURCHASES / ACQUISITIONS SHARES | PRICE/SH | AMOUNT | DATE | SALES / RETENTION SHARES | PROCEEDS PRICE | AMOUNT | PROFIT / (LOSS) |
|---|---|---|---|---|---|---|---|---|
| 04/05/2004 | 5,400 | $89.8565 | $ 485,225 | RETAINED | 5,400 | $74.0942 | $ 400,055 | $ (85,170) |
| 04/06/2004 | 1,600 | $89.8565 | 143,770 | RETAINED | 1,600 | $72.7830 | 116,053 | (25,718) |
| 04/13/2004 | 3,500 | $91.9839 | 321,944 | RETAINED | 3,500 | $73.7830 | 258,241 | (63,703) |
| 04/15/2004 | 2,200 | $91.9008 | 202,182 | RETAINED | 2,200 | $73.7830 | 162,323 | (39,859) |
| 04/15/2004 | 2,000 | $91.9329 | 183,866 | RETAINED | 2,000 | $73.7830 | 147,566 | (36,300) |
| 04/19/2004 | 400 | $91.9484 | 36,779 | RETAINED | 400 | $73.7830 | 29,513 | (7,266) |
| 04/19/2004 | 600 | $91.9484 | 55,169 | RETAINED | 600 | $73.5090 | 44,105 | (11,064) |
| 04/23/2004 | 2,200 | $91.6785 | 201,675 | RETAINED | 2,200 | $73.5090 | 161,720 | (39,955) |
| 04/27/2004 | 549 | $94.9569 | 52,131 | RETAINED | 549 | $73.5090 | 40,356 | (11,775) |
| 04/27/2004 | 1,051 | $94.1040 | 98,903 | RETAINED | 1,051 | $73.5090 | 77,258 | (21,645) |
| 04/27/2004 | 200 | $94.1040 | 18,821 | RETAINED | 200 | $73.2691 | 14,652 | (4,169) |
| 04/27/2004 | 5,200 | $91.6206 | 476,427 | RETAINED | 5,200 | $73.2591 | 677,147 | (95,480) |
| 06/21/2004 | 9,400 | $91.6206 | 861,234 | RETAINED | 9,400 | $72.0369 | 165,895 | (184,057) |
| 06/22/2004 | 2,300 | $86.8156 | 199,678 | RETAINED | 2,300 | $72.0369 | 380,828 | (79,302) |
| 06/24/2004 | 5,300 | $86.8156 | 460,128 | RETAINED | 5,300 | $71.8539 | 42,880 | (9,110) |
| 09/24/2004 | 600 | $86.8166 | 52,090 | RETAINED | 690 | $71.6541 | 322,353 | (6,708) |
| 09/25/2004 | 4,500 | $73.5691 | 331,061 | RETAINED | 4,500 | $71.6541 | 441,526 | (14,602) |
| 09/25/2004 | 6,200 | $73.5591 | 455,128 | RETAINED | 6,200 | $71.2139 | 78,335 | (12,971) |
| 08/07/2004 | 1,100 | $83.0054 | 91,306 | RETAINED | 1,100 | $71.2139 | 354,954 | (60,073) |
| 09/07/2004 | 5,000 | $83.0054 | 415,027 | RETAINED | 5,000 | $70.6908 | 129,422 | (20,667) |
| 09/07/2004 | 1,700 | $83.0054 | 141,109 | RETAINED | 1,700 | $70.8366 | | |
| **Account Totals:** | 61,000 | | $ 5,284,654 | | 61,000 | | $ 4,469,016 | $ (865,637) |
| | | | | | | | | |
| **Grand Total:** | | | | | | | | $ (865,637) |

1. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-11-2004.
2. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-12-2004.
3. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-13-2004.
4. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-14-2004.
5. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-23-2004.
6. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-29-2004.
7. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 11-01-2004.
8. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 11-02-2004.
9. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 11-04-2004.
10. Retention value was calculated using the average of the closing price from 09-16-2004 until the date of sale 11-05-2004.

EXHIBIT 1 page 4 of 6

# CERTIFICATE OF SERVICE

*In re Apollo Group, Inc. Sec. Litig.*
Lead Case No. 04-CV-2147-PHX-JAT

I, the undersigned, declare as follows:

That I am employed in the County of San Diego, State of California; I am over the age of eighteen years, and not a party to or interest in the within action; my business address is 402 West Broadway, Suite 850, San Diego, California 92101, and that on May 16, 2005, I served the within:

**LEAD PLAINTIFF, THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO'S CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

That there is a regular communication by mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of May, 2005, at San Diego, California.

*Alison K Sloan*
ALISON K. SLOAN

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

## Service List
## APOLLO - COUNSEL FOR PLAINTIFFS

Page:        1

Gerald J. Rodos Esquire
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:  (215)963-0600
Fax:        (215)963-0838

William S. Lerach Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101
Telephone:  (619)231-1058
Fax:        (619)231-7423

Samuel M. Ward Esquire
Barrack, Rodos & Bacine
402 West Broadway, Suite 850
San Diego, CA 92101
Telephone:  (619)230-0800
Fax:        (619)230-1874

Ramzi Abadou Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101
Telephone:  (619)231-1058
Fax:        (619)231-7423

Stephen R. Basser Esquire
Barrack, Rodos & Bacine
402 West Broadway, Suite 850
San Diego, CA 92101
Telephone:  (619)230-0800
Fax:        (619)230-1874

Lesley E. Weaver Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:  (415)288-4545
Fax:        (415)288-4534

Leonard Barrack Esquire
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:  (215)963-0600
Fax:        (215)963-0838

Patrick J. Coughlin Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:  (415)288-4545
Fax:        (415)288-4534

## Service List
## APOLLO - COUNSEL FOR PLAINTIFFS

Page:     2

Geoffrey M. Trachtenberg Esquire
Levenbaum & Cohen
362 North 3rd Avenue
Phoenix, AZ 85003
Telephone:   (602)271-0183
Fax:          (602)271-4018

Bruce G. Murphy Esquire
Murphy, Law Offices of Bruce G.
265 Llwyds Lane
Vero Beach, FL 32963
Telephone:   (772)231-4202
Fax:          (772)234-0440

Sharon M. Lee Esquire
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119-0165
Telephone:  (212)594-5300
Fax:          (212)868-1229

Marc M. Umeda Esquire
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone:  (619)525-3990
Fax:          (619)525-3991

Peter E. Seidman Esquire
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119-0165
Telephone:  (212)594-5300
Fax:          (212)868-1229

Richard A. Maniskas Esquire
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610)667-7706
Fax:          (610)667-7056

Robert D. Mitchell Esquire
Mitchell Law Offices, P.C.
Anchor Centre One, Suite 122B
2201 East Camelback Road
Phoenix, AZ 85016
Telephone:  (602)468-6450
Fax:          (602)468-1311

Tamara Skvirsky Esquire
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610)667-7706
Fax:          (610)667-7056

05-16-05    02:50pm    From-BARRACK - SAN DIEGO                    T-796    P.099/100    F-625

## Service List
### APOLLO - COUNSEL FOR PLAINTIFFS

Page:          3

Marc A. Topaz Esquire
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA  19087
Telephone:   (610)667-7706
Fax:          (610)667-7056


Rosemary J. Shockman Esquire
Shockman Law Office, P.C.
8170 North 86th Place, Suite 102
Scottsdale, AZ  85258
Telephone:   (480)596-1986
Fax:          (480)596-2689

## Service List
### APOLLO - COUNSEL FOR DEFENDANTS

Page:         1

Jared M. Toffer Esquire    *
Gibson, Dunn & Crutcher, LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA  92614-8557
Telephone:  (949)451-3800
Fax:            (949)451-4220


Wayne Warren Smith Esquire  *
Gibson, Dunn & Crutcher, LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA  92614-8557
Telephone:  (949)451-3800
Fax:            (949)451-4220


Elizabeth A. Brem Esquire      *
Gibson, Dunn & Crutcher, LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA  92614-8557
Telephone:  (949)451-3800
Fax:            (949)451-4220


Robert E. Palmer Esquire    *
Gibson, Dunn & Crutcher, LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA  92614-8557
Telephone:  (949)451-3800
Fax:            (949)451-4220


Joel Philip Hoxie Esquire   *
Snell & Wilmer
One Arizona Center
400 East Van Buren
Phoenix, AZ  85004-0001
Telephone:  (602)382-6000
Fax:            (602)382-6070


James R. Condo Esquire     *
Snell & Wilmer
One Arizona Center
400 East Van Buren
Phoenix, AZ  85004-0001
Telephone:  (602)382-6000
Fax:            (602)382-6070


    * Denotes service via facsimile

The shares have dropped sharply in recent weeks as Apollo's peers faced various legal and regulatory assaults over their recruiting and placement practices, but Apollo's stock remains up about 18% year to date. Since the company's initial public offering in 1994, its shares have soared from 72 cents apiece to as high as $98 in June, adjusted for stock splits.

U.S. regulations forbid schools whose students receive federal financial aid from tying pay directly to enrollments. In 2003, about 60% of the University of Phoenix's revenue came from federal student aid, which comes in the form of grants and guaranteed loans. Violating the rules runs the risk of losing the aid.

Responding to a series of scandals in the 1980s and 1990s, the government has sought to prevent entrepreneurial schools from signing up students for programs that don't benefit them, then leaving them saddled with loans that they can't repay. Aid recipients are generally low-income students. Many rely heavily on federal aid and pay little or nothing out of pocket to cover tuition.

*Last week*, Apollo Group, based in Phoenix, disclosed it had agreed to pay $9.8 million to settle the sales-incentive allegations spelled out in the Education Department report. *But the company*, which said the inquiry covered 1998 through June 2004, *disclosed few details*. The Wall Street Journal reviewed a copy of the Education Department document, contents of which were detailed yesterday in the Arizona Republic.

\* \* \*

Investigators said the school hired counselors at $26,000 a year from far higher-paying jobs, then promised to bump their salaries up to as much as $120,000 if they logged enough enrollments. Internal literature boasted of '$$-No limit on income' and 'Never have to worry about $$ again.'

Recruiters with over 200 student enrollments a year earned $80,000 to $100,000, regardless of their length of service, the report said. The university rewarded top performers with all-expense paid trips, including one to the Watergate Hotel in Washington, the report said. Counselors also received $100 gift certificates and spa packages.

\* \* \*

Investigators said the company kept performance reviews that suggested the company used other criteria, such as rapport with students, to make it appear the company wasn't directly tying enrollments to compensation. But they described the efforts as '*smoke and mirrors' to avoid government detection*.

The *company pressured recruiters to sign up unqualified students*, such as those who don't have the money to complete the program, the report said. The recruiters would overcome objections by citing the availability of student aid, stressing no up-front costs and playing down loan-repayment obligations, investigators said.

68

1    The *report cited 'a culture of duplicity,'* with *some counselors even*
2    *forging student signatures on loan documents.*

3        132.   All of this news negatively impacted the trading price of Apollo's stock —

4    causing it to fall from $80.63 at the close of trading in September 13, 2004 to $78.68 by

5    the close of trading in September 15, 2004 on volume of over 4.2 million and 2.8 million

6    shares on September 14 and 15, 2004, respectively, and further declining to $75.82 by

7    the close of trading on September 20, 2004, on trading volume of over 4.68 million

8    shares as the truth continued to be absorbed by the market.  Apollo's usual average daily

9    trading volume is 1.9 million shares.

10    **VI.    ADDITIONAL SCIENTER ALLEGATIONS**

11        **A.    Defendants Possessed Actual Knowledge of the February 5,**
         **2005 DOE Report at All Times During the Class Period**

12        133.   On February 5, 2004, the DOE rendered its thorough Program Review

13    Report memorializing its findings and conclusions, supported by significant evidence

14    provided by enrollment counselors, or recruiters, UOP employees and documentation,

15    that the Company was in violation of the law banning incentive compensation based on

16    student enrollments.  The DOE Report was also accompanied by a February 5, 2004

17    letter directed to and received by CEO Nelson clearly advising that "[t]his report

18    contains a *serious finding* regarding the school's substantial breach of its fiduciary duty;

19    specifically that the *University of Phoenix (UOP) systemically engages in actions*

20    *designed to mislead the Department of Education and to evade detection of its*

21    *improper incentive compensation system for those involved in recruiting activities.*"

22    Based on the foregoing, including Nelson's September 7, 2004 admission of the DOE

23    Reports' negative tone, defendants possessed actual knowledge at all times relevant to

24    the Class Period of the February 5, 2004 DOE Report and its material and adverse

25    findings and conclusions.  The existence or rendering of the DOE Report concerning a

26    matter of significant interest and critical importance to Apollo, the Individual

27    Defendants, and Apollo's stockholders, was purposely concealed from the market and

28

1   not disclosed by the defendants until September 7, 2004 — albeit inadequately — just

2   prior to the end of the Class Period, despite numerous instances in which defendants

3   spoke to the market, as more fully discussed above.

4          B.     **Defendants' Concealment of the DOE Report — Which They**
                  **Actively Believed Was a Material Adverse Event — Further**
5                 **Demonstrates Their Requisite Scienter**

6          134.   Apollo's management was aware at all times material that any criticism or

7   finding by the DOE that the for-profit college was in violation of the ban on incentive-

8   based compensation respecting student enrollments would be highly material and have

9   potentially devastating consequences with respect to investors' perception of the

10  Company and its stock price. On *March 1, 2004*, just weeks after receiving the DOE

11  Report on recruiter pay practices at UOP, *CEO Nelson told regulators that a disclosure*

12  *of the DOE Report would cause "great harm" to the Company's shareholders* — a

13  tacit admission of defendants' actual knowledge that the report was adverse and material.

14  This is confirmed by an article entitled "Apollo Told Feds: Inquiry News Would Cause

15  Harm," appearing in the *Arizona Republic* on October 19, 2004, reporting, in pertinent

16  part, as follows:

17         Within weeks of receiving a blistering government report on recruiter
           pay practices at the University of Phoenix, the school's parent company
18         told regulators that disclosure of the report would cause *"great harm"* to
           the company's employees, shareholders and students.
19
           The letter to the U.S. Department of Education and the apparent impact
20         the eventual release of the report had on Apollo's stock raise questions
           among some experts about whether the company properly disclosed the
21         investigation to shareholders.

22         The *experts say* the warning in the *March 1 letter, written by Apollo*
           *Group Inc. Chief Executive Todd Nelson, indicates the company*
23         *considered the report to be a material event, meaning under securities*
           *laws it must be disclosed in a timely manner.*
24
           Nelson and other executives never publicly mentioned the Feb. 5 report
25         until the matter was settled for a record $9.8 million in September and
           then only in passing on a conference call.
26
           'Given the CEO's statement to the Department of Education, investors as
27         well as the SEC should be alarmed as to why this information wasn't
           made available publicly on a timely basis,' said Lynn Turner, former
28         chief accountant for the Securities and Exchange Commission and

                                        70

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

1050 Connecticut Avenue, N.W.  Washington, D.C. 20036-5306

(202) 955-8500

www.gibsondunn.com

dcox@gibsondunn.com

October 25, 2004

Direct Dial

(202) 887-3531
Fax No.

(202) 530-9539

Client No.

Joan M. Trumble
OCIO/RIMS
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202-2110

Re:     *FOIA Request On Behalf of Apollo Group Inc. And The University of
Phoenix*

Dear Ms. Trumble:

This is a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(3)
and the Department of Education's implementing regulations, 34 C.F.R. § 5.13(c).  This request
is being submitted on behalf of our clients Apollo Group Inc. and its subsidiary, the University of
Phoenix (collectively, "Apollo").  As the Department may be aware, Apollo was sued recently in
federal district court in Arizona under the federal securities laws.  Much of this lawsuit focuses
on the Department's interim Program Review Report bearing the Program Review Control
Number 200340922254 ("Interim Report").  In order for Apollo to defend itself against this
lawsuit and, so that it may better understand the findings contained in the Interim Report, it is
critical that Apollo be given full and complete access to all underlying work papers associated
with, relating to, or otherwise regarding, the Interim Report, including, but not limited to, any
and all:

- draft versions of the Interim Report

- internal notes (including, but not limited to, all notes from interviews conducted with
  any and all current and former Apollo employees)

- all notes and other documents relating to the debriefing provided to Apollo at the
  conclusion of the Department's field work in August 2003

LOS ANGELES  NEW YORK  WASHINGTON, D.C.  SAN FRANCISCO  PALO ALTO
LONDON  PARIS  MUNICH  ORANGE COUNTY  CENTURY CITY  DALLAS  DENVER

## GIBSON, DUNN & CRUTCHER LLP

- analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including, but not limited to, the analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004 as well as all work papers generated during and documents used or relied upon in performing such analyses

- correspondence the Department has had with outside parties, including, but not limited to, correspondence between the Department and any *qui tam* relators that have filed suit against Apollo, and correspondence relating to the solicitation of witnesses or experts in connection with the preparation, revision, review or defense of the Interim Report

We are aware that the Department has responded to other FOIA requests seeking the same or similar documents. Thus, it should be comparatively easy to identify and provide these records.

To the extent that our request implicates the names of any current or former enrollment counselors who did not want their identities disclosed to Apollo, we are not opposed to the Department redacting the identity of these persons as long as the substantive notes or other records of these interviews are provided.

We also request copies of all Department internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Interim Report, the Department's examination leading up to the Interim Report, or the sanctions demanded during the negotiation process.

Finally, we request copies of any delegation of authority that authorized or purported to authorize Ms. Donna Wittman to issue the Interim Report.

We agree to pay all reasonable fees for the searching and reproduction of all documents and records falling within the scope of this request.

Also, because time is of the essence, we request expedited treatment of this request. At a minimum, we ask that the Department strictly comply with the 20-day time limit established by FOIA and the Department's regulations. It is evident that the Department has met or exceeded that 20-day limit for other requests seeking access to the Interim Report or other related records.

# GIBSON, DUNN & CRUTCHER LLP

I appreciate the Department's continued time and cooperation in this matter. Should you have any questions, please feel free to contact me.

Very truly yours,

Douglas R. Cox

DRC/plr

cc:    Jonathan A. Vogel
       Timothy J. Hatch

70299348_1.DOC

3



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE CHIEF INFORMATION OFFICER

Andrew S. Boutros                                      December 29, 2004
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

RE: FOIA Request No. 05-00093-F

Dear Mr. Boutros:

This is an interim response to Douglas R. Cox's letter, sent via e-mail, dated October 25, 2004, requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The request was received in this office on October 26, 2004 and was forwarded to the following offices within the Department to search for documents that may be responsive to your request: Office of Federal Student Aid (FSA) and Office of the General Counsel (OGC). In the letter, Mr. Cox asked for information relating to the Department's Interim Review of the University of Phoenix (UOP).

Specifically, Mr. Cox requested: "full and complete access to all underlying work papers associated with, relating to, or otherwise regarding, the Interim Report, including, but not limited to, any and all:

➢ Draft versions of the Interim Report;

➢ Internal notes (including but not limited to, all notes from interviews conducted with any and all current and former Apollo employees);

➢ All notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003;

➢ Analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including, but not limited to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004 as well as all work papers generated during and documents used or relied upon in performing such analyses; and

> Correspondence the Department has had with outside parties, including, but not limited to, correspondence between the Department and any *qui tam* relators that have filed suit against Apollo, and correspondence relating to the solicitation of witnesses or experts in connection with the preparation, revision, review or defense of such Interim Report."

Mr. Cox also requested the following:

> "Copies of all Department internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Interim Report, the Department's examination leading up to the Interim Report, or the sanctions demanded during the negotiation process; [and]

> Copies of any delegation of authority that authorized or purported to authorize Ms. Donna Wittman to issue the Interim Report."

Enclosed are 45 pages of documents responsive to portions of this request, as described below. These documents fulfill or partially fulfill the fourth, sixth and seventh bullet point of Mr. Cox's initial request. Please see the attached inventory for a list of the responsive documents provided in this interim response.

> Thirty-nine (39) pages of documents are responsive to the "analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including, but not limited to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004" portion of the request (fourth bullet point).

> Please note that the Department is continuing to process the specific part of this specific request that seeks "all work papers generated during and documents used or relied upon in performing such analyses."

> The "copies of all Department internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Interim Report, the Department's examination leading up to the Interim Report, or the sanctions demanded during the negotiation process" portion of the request (sixth bullet point) can be fulfilled as follows:

    a.  The Department has concluded that FSA's Program Review Guide responds to this portion of your request. You may access FSA's Program Review Guide at the following web address: http://www.ifap.ed.gov/IFAPWebApp/currentIposGuidanceTitle2Pag.jsp?p1=Program+Review+Guide&p2=c [Please note: an e-mail page citing this link is also enclosed as a responsive document to this Interim Response];

b. In addition, the February 5, 2004 Program Review Report to the University of Phoenix cites to the relevant regulatory authority(ies) relied upon by the Department. Throughout the Program Review Report the Department specifically cites to 34 C.F.R. § 668.14(b)(22), among other regulatory and statutory provisions. Your client already possesses the February 5, 2004 Program Review Report, and the regulatory citations notes within the Program Review Report are publicly available. However, for your convenience, we have provided you with one of several web sites from which this information can be retrieved: http://www.dtae.org/adminservices/WAISDocumentRetrieval.htm.

c. Enclosed find an additional 2 pages of documents responsive to this portion of your request [in addition to the 1 page noted in a].

➢ Lastly, three (3) pages of documents are responsive to the "copies of any delegation of authority that authorized or purported to authorize Ms. Donna Wittman to issue the Interim Report" portion of the request (seventh bullet point).

As we agreed during our conference call of November 5, 2004, we will continue processing your request and provide you with additional information as it becomes available from the respective program offices. Consequently, your FOIA request case file remains open. You will have the right to appeal this decision by writing within 30 days after this FOIA case closes. See 34 CFR § 5.81. It will not close until the Department provides you with a response regarding all outstanding responsive documents.

As of December 10, you have incurred costs totaling $522.08 associated with processing this Interim Response. We continue our research and will tabulate the costs on a monthly basis as we produce responsive records and process this request.

If you have any questions, please feel free to contact me at (202) 245-6651 or OCIO_FOIA@ed.gov.

Sincerely,

Jeanne Van Vlandren
Director, Regulatory Information Management Services
Freedom of Information Act Officer

Enclosures



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE CHIEF INFORMATION OFFICER

Andrew S. Boutros                                            December 29, 2004
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

RE: FOIA Request No. 05-00093-F

Dear Mr. Boutros:

This is an interim response to Douglas R. Cox's letter, sent via e-mail, dated October 25, 2004, requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The request was received in this office on October 26, 2004 and was forwarded to the following offices within the Department to search for documents that may be responsive to your request: Office of Federal Student Aid (FSA) and Office of the General Counsel (OGC). In the letter, Mr. Cox asked for information relating to the Department's Interim Review of the University of Phoenix (UOP).

Specifically, Mr. Cox requested: "full and complete access to all underlying work papers associated with, relating to, or otherwise regarding, the Interim Report, including, but not limited to, any and all:

> Draft versions of the Interim Report;

> Internal notes (including but not limited to, all notes from interviews conducted with any and all current and former Apollo employees);

> All notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003;

> Analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including, but not limited to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004 as well as all work papers generated during and documents used or relied upon in performing such analyses; and

> Correspondence the Department has had with outside parties, including, but not limited to, correspondence between the Department and any *qui tam* relators that have filed suit against Apollo, and correspondence relating to the solicitation of witnesses or experts in connection with the preparation, revision, review or defense of such Interim Report."

Mr. Cox also requested the following:

> "Copies of all Department internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Interim Report, the Department's examination leading up to the Interim Report, or the sanctions demanded during the negotiation process; [and]

> Copies of any delegation of authority that authorized or purported to authorize Ms. Donna Wittman to issue the Interim Report."

Enclosed are 45 pages of documents responsive to portions of this request, as described below. These documents fulfill or partially fulfill the fourth, sixth and seventh bullet point of Mr. Cox's initial request. Please see the attached inventory for a list of the responsive documents provided in this interim response.

> Thirty-nine (39) pages of documents are responsive to the "analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including, but not limited to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004" portion of the request (fourth bullet point).

> Please note that the Department is continuing to process the specific part of this specific request that seeks "all work papers generated during and documents used or relied upon in performing such analyses."

> The "copies of all Department internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Interim Report, the Department's examination leading up to the Interim Report, or the sanctions demanded during the negotiation process" portion of the request (sixth bullet point) can be fulfilled as follows:

   a. The Department has concluded that FSA's Program Review Guide responds to this portion of your request. You may access FSA's Program Review Guide at the following web address: http://www.ifap.ed.gov/IFAPWebApp/currentIposGuidanceTitle2Pag.jsp?p1=Program+Review+Guide&p2=c [Please note: an e-mail page citing this link is also enclosed as a responsive document to this Interim Response];

b.  In addition, the February 5, 2004 Program Review Report to the University of Phoenix cites to the relevant regulatory authority(ies) relied upon by the Department. Throughout the Program Review Report the Department specifically cites to 34 C.F.R. § 668.14(b)(22), among other regulatory and statutory provisions. Your client already possesses the February 5, 2004 Program Review Report, and the regulatory citations notes within the Program Review Report are publicly available. However, for your convenience, we have provided you with one of several web sites from which this information can be retrieved: http://www.dtae.org/adminservices/WAISDocumentRetrieval.htm.

c.  Enclosed find an additional 2 pages of documents responsive to this portion of your request [in addition to the 1 page noted in a].

➤  Lastly, three (3) pages of documents are responsive to the "copies of any delegation of authority that authorized or purported to authorize Ms. Donna Wittman to issue the Interim Report" portion of the request (seventh bullet point).

As we agreed during our conference call of November 5, 2004, we will continue processing your request and provide you with additional information as it becomes available from the respective program offices. Consequently, your FOIA request case file remains open. You will have the right to appeal this decision by writing within 30 days after this FOIA case closes. See 34 CFR § 5.81. It will not close until the Department provides you with a response regarding all outstanding responsive documents.

As of December 10, you have incurred costs totaling $522.08 associated with processing this Interim Response. We continue our research and will tabulate the costs on a monthly basis as we produce responsive records and process this request.

If you have any questions, please feel free to contact me at (202) 245-6651 or OCIO_FOIA@ed.gov.

Sincerely,

Jeanne Van Vlandren
Director, Regulatory Information Management Services
Freedom of Information Act Officer

Enclosures



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE CHIEF INFORMATION OFFICER

February 18, 2005

Andrew S. Boutros
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5306

RE:  FOIA Request No. 05-00093-F

Dear Mr. Boutros:

This is second interim response to Douglas R. Cox's letter, sent via a e-mail, dated October 25, 2004, requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The request was received in this office on October 26, 2004 and was forwarded to the following offices within the Department to search for documents that may be responsive to your request: Office of Federal Student Aid (FSA) and Office of the General Counsel (OGC).  In the letter, Mr. Cox asked for information relating to the Department's Interim Review of the University of Phoenix (UOP).

Specifically, Mr. Cox requested: "full and complete access to all underlying work papers associated with, relating to, or otherwise regarding, the Interim Report, including, but not limited to, any and all:

> ➤ Draft versions of the Interim Report;

> ➤ Internal notes (including but not limited to, all notes from interviews conducted with any and all current and former Apollo employees);

> ➤ All notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003;

> ➤ Analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselor's including, but not limit to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004 as well as all work papers generated during and documents used or relied upon in performing such analyses; and

> ➤ Correspondence the Department has had with outside parties, including, but not limited to, correspondence between the Department and any *qui tam* relaters that have filed suit against Apollo, and correspondence relating to the solicitation of witnesses or experts in connection with the preparation, revision, review or defense of such Interim Report."

Mr. Cox also requested the following:

> ➤ "Copies of all Department internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Interim Report, the Department's examination leading up to the Interim Report, or the sanctions demanded during the negotiation process; [and]

Page – 2 Gibson, Dunn & Crutcher                                February 18, 2005
05-00093-F

> Copies of any delegation of authority that authorized or purported to authorize Ms. Donna
  Wittman to issue the Interim Report."

On December 29, 2004, we sent you an interim response with 45 pages responsive to portions of the
request.

Enclosed are 243 pages of documents responsive to portions of this request as described below.

> Program Participation Agreements (PPA)
> Correspondence and documents related to UOP

However, certain information has been withheld according to the FOIA exemptions specified below:

a. Applicant's assigned D-U-N-S number because the Department has concluded that this
   information is exempt from disclosure under the FOIA, 5 U.S.C. § 552(b)(2). This provision
   exempts from disclosure predominantly internal matters of a substantial nature, the disclosure of
   which would risk the circumvention of a statute or Department regulation

b. Personal information on individuals has been withheld under exemption (b)(6) of the FOIA, 5
   U.S.C. § 552(b)(6) and Departmental regulation 34 CFR § 5.71(a). Disclosure of this information
   would constitute a clearly unwarranted invasion of personal privacy.

As we agreed during our conference call of November 5, 2004, we will continue processing your request and
provide you with additional information as it becomes available from the respective program offices.
Consequently, your FOIA request case file remains open. You will have the right to appeal this decision by
writing within 30 days after this FOIA case closes. See 34 CFR § 5.81. It will not close until the Department
provides you with a response regarding all outstanding responsive documents.

We will continue our research and will tabulate the costs on a monthly basis as we produce responsive records
and process this request.

If you have any questions, please contact the FOIA Office at 202-245-6651 or **OCIO_FOIA@ed.gov**

Sincerely,

Jeanne Van Vlandren
Director, Regulatory Information Management Services
Freedom of Information Act Officer

Enclosures



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE CHIEF INFORMATION OFFICER

Andrew S. Boutros                                        February 28, 2005
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

RE: FOIA Request No. 05-00093-F

Dear Mr. Boutros:

This is third interim response to Douglas R. Cox's letter, sent via a e-mail, dated October 25, 2004, requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The request was received in this office on October 26, 2004 and was forwarded to the following offices within the Department to search for documents that may be responsive to your request: Office of Federal Student Aid (FSA) and Office of the General Counsel (OGC). In the letter, Mr. Cox asked for information relating to the Department's Interim Review of the University of Phoenix (UOP).

Specifically, Mr. Cox requested: "full and complete access to all underlying work papers associated with, relating to, or otherwise regarding, the Interim Report, including, but not limited to, any and all:

- ➢ Draft versions of the Interim Report;

- ➢ Internal notes (including but not limited to, all notes from interviews conducted with any and all current and former Apollo employees);

- ➢ All notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003;

- ➢ Analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselor's including, but not limit to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004 as well as all work papers generated during and documents used or relied upon in performing such analyses; and

- ➢ Correspondence the Department has had with outside parties, including, but not limited to, correspondence between the Department and any *qui tam* relaters that have filed suit against Apollo, and correspondence relating to the solicitation of witnesses or experts in connection with the preparation, revision, review or defense of such Interim Report."

Mr. Cox also requested the following:

- ➢ "Copies of all Department internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Interim Report, the Department's examination leading up to the Interim Report, or the sanctions demanded during the negotiation process; [and]

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-4580
www.ed.gov

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Page – 2 Gibson, Dunn & Crutcher                                    February 28, 2005
05-00093-F

&gt;   Copies of any delegation of authority that authorized or purported to authorize Ms. Donna
      Wittman to issue the Interim Report."

On December 29, 2004, we sent you an interim response with 45 pages responsive to portions of the
request.

On February 18, 2005, we sent you second interim response with 234 pages responsive to portions of the
request.

Enclosed are 222 pages of documents responsive to portions of this request as described below.

&gt;   Student Complaints

However, certain information has been withheld according to the FOIA exemptions specified below:

a.   Personal information on individuals has been withheld under exemption (b)(6) of the FOIA, 5
     U.S.C. § 552(b)(6) and Departmental regulation 34 CFR § 5.71(a). Disclosure of this information
     would constitute a clearly unwarranted invasion of personal privacy.

As we agreed during our conference call of November 5, 2004, we will continue processing your request and
provide you with additional information as it becomes available from the respective program offices.
Consequently, your FOIA request case file remains open. You will have the right to appeal this decision by
writing within 30 days after this FOIA case closes. See 34 CFR § 5.81. It will not close until the Department
provides you with a response regarding all outstanding responsive documents.

We will continue our research and will tabulate the costs on a monthly basis as we produce responsive records
and process this request.

If you have any questions, please contact the FOIA Office at 202-245-6651 or **OCIO_FOIA@ed.gov**

Sincerely,

Jeanne Van Vlandren
Director, Regulatory Information Management Services
Freedom of Information Act Officer

Enclosures



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF THE CHIEF INFORMATION OFFICER

Mr. Douglas Cox                                                              April 8, 2005
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

Re:  **FOIA Request No. 05-00093-F**

Dear Mr. Cox:

This is a fourth interim response to your letter, sent via e-mail, dated October 25, 2004, requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The Department of Education is responding to your request and providing responsive documents as described in this letter on a compact disc (CD). The CD contains the actual responsive documents and also includes a "Read Me" file that provides guidance for use of the CD, to include a catalog of all the responsive documents.

Your request was received in this office on October 6, 2004 and was forwarded to the following offices within the Department of Education (Department) to search for documents that may be responsive to your request: Office of Federal Student Aid (FSA) and the Office of the General Counsel (OGC). In the letter, Mr. Cox asked for information relating to the Department's Interim Review of the University of Phoenix (UOP).

Specifically, Mr. Cox requested: "full and complete access to all underlying work papers associated with, relating to, or otherwise regarding, the Interim Report, including but not limited to, any and all:

❖  Draft versions of the Interim Report;

❖  Internal notes (including but not limited to, all notes from interviews conducted with any and all current and former Apollo employees);

❖  All notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003;

❖  Analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including but not limited to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004 as well

2 of 3 – Gibson, Dunn ⌐ ⌐ ⌐rutcher LLP                    April 8, 2005
05-00093-F

as all work papers generated during and documents used or relied upon in performing such analyses, and

❖ Correspondence the Department has had with outside parties, including, but not limited to, correspondence between the Department and any *qui tam* relators that have filed suit against Apollo, and correspondence relating to the solicitation of witnesses or experts in connection with the preparation revision review or defense of such Interim Report."

Mr. Cox also requested the following:

❖ "Copies of all Department internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was issued, relied upon or transmitted in connection with the Interim Report, the Department's examination leading up to the Interim Report, or the sanctions demanded during the negotiation process; [and]

❖ Copies of any delegation of authority that authorized or purported to authorize Ms. Donna Wittman to issue the Interim Report."

Enclosed is a CD that contains documents responsive to portions of this request, with a catalogue Table listing the documents. In all there are 2874 pages responsive to this portion of your request. The documents are organized into three PDF files as described below:

1. Notes and Other Documents Related to the Debriefing

❖ Documents responsive to "all notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003;

2. Analyses Performed by or on Behalf of the Department

❖ Documents responsive to "analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including but not limited to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004 as well as all work papers generated during and documents used or relied upon in performing such analyses"; and

3. Correspondence with Outside Parties

❖ Documents relating to "correspondence the Department has had with outside parties, including, but not limited to, correspondence between the Department and any *qui tam* relators that have filed suit against Apollo, and correspondence relating to the solicitation of witnesses or experts in connections with the preparation revision review or defense of such Interim Report."

2

3 of 3 – Gibson, Dunn. Crutcher LLP                                    April 8, 2005
05-00093-F

However, certain information has been withheld under each of these categories, and under, "internal notes (including but not limited to, all notes from interviews conducted with any and all current and former Apollo employees)," according to the FOIA exemptions specified below:

❖ Any and all inter-agency or intra-agency memoranda and correspondence as well as drafts of letters, memoranda, and correspondence reflecting the Department's deliberative process, attorney-client communications, and attorney-work product, have been withheld pursuant to 5 U.S.C. § 552 (b)(5).

❖ Pursuant to 5 U.S.C. § 552 (b)(6), any and all personal information (including, but not limited to, home telephone numbers, personal cell phone numbers, home email addresses, and home addresses) in which an individual has a privacy right has been withheld, where disclosure would constitute a clearly unwarranted invasion of personal privacy.

❖ In accordance with 5 U.S.C. § 552 (b)(7)(C), information that could reasonably be expected to constitute an unwarranted invasion of personal privacy in the law enforcement context (including but not limited to witness information and statements) has been withheld.

As agreed during a conference call with Mr. Cox on March 21, 2005, we will continue processing your request and provide you with all additional information by May 1, 2005. Consequently, your FOIA request file remains open. You will have the right to appeal this decision by writing within 30 days after this FOIA case closes. *See* 34 CFR § 5.81. It will not close until the Department provides you with a response regarding all outstanding responsive documents.

We will continue our research and tabulate the costs as we produce responsive records and process this request.

If you have any questions, please contact the FOIA office at (202) 245-6651 or OCIO_FOIA@ed.gov.

Sincerely,

Jeanne Van Vlandren
Director, Regulatory Information Management Services
Freedom of Information Act Officer

Enclosures:

1 CD "FOIA # 05-00093-F, U.S. Department of Education
Catalogue of Documents
"Read Me" File

3

**Readme File**

**FOIA # 05-00093 Redacted Documents**

There are three directories on this CD that are organized in the following manner:

1 - Notes and Other Documents Related to the Debriefing (6 files)
2 - Analyses Performed by or on Behalf of the Department (3 files)
3 - Correspondence with Outside Parties (8 files)

Also included is a catalogue of all the documents being delivered in "Documents.pdf"

These files can be opened with Adobe Acrobat reader (version 5.1 or later).

If you have trouble opening any of these files, please
call Stephanie Valentine, OCIO/RIMS at (202) 245-6610.

4th Interim
Response —
Original

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| | **3 - Correspondence with Outside Parties** | | |
| 1 | August 26, 2003 Email internal ED Re:UOP telephone call | 1 | 0 |
| 2 | August 26, 2003 Email internal OGC and other ED re: con call and next steps for UOP. | 1 | 0 |
| 3 | August 26, 2003 Email internal ED re: UOP interview notes | 1 | 6 pages |
| 4 | August 26, 2003 Email OGC re: U.S. ex rel Hendow v. UOP documents | 1 | 2 pages |
| 5 | August 26, 2003 Email OGC re: U.S. ex rel Hendow v. UOP documents | 1 | 2 pages |
| 6 | August 26, 2003 Email internal ED re: Developments in UOP case | | |
| 7 | August 26, 2003 Email internal ED re: UOP Emails and interview notes | 1 | 2 documents and 25 attached emails (see below) |
| 7a | August 20, 2003 Telephone Memo Witness Statement | 5 | 0 |
| 7b | August 20, 2003 Telephone Memo Witness Statement | 3 | 0 |
| 7c | August 25, 2003 email (Witness) re: UOP enrollment practices | 4 | 0 |
| 7d | August 24, 2003 email re: UOP enrollment practices | 2 | 0 |
| 7e | August 24, 2003 email re: UOP lead practices | 1 | 0 |
| 7f | August 24, 2003 email re: Go-time and goals | 2 | 0 |
| 7g | August 25, 2003 email re: resignation | 1 | 0 |
| 7h | August 25, 2003 email re: mailing of package | 1 | 0 |
| 7i | August 25, 2003 email re: daily results tracker | 2 | 0 |
| 7j | August 25, 2003 email re: performance enrolling students | 2 | 0 |
| 7k | Duplicate of 7j:  August 25, 2003 email performance enrolling students | 2 | 0 |
| 7l | August 25, 2003 email re: discrimination complaint. | 3 | 0 |
| 7m | August 25, 2003 email re: discrimination complaint | 3 | 0 |
| 7n | August 25, 2003 email re: leads | 1 | 0 |
| 7o | August 25, 2003 email re: letter to employee relations | 1 | 0 |
| 7p | August 25, 2003 email re: filing a complaint of discrimination | 2 | 0 |
| 7q | August 25, 2003 email re: filing a complaint of discrimination | 2 | 0 |
| 7r | August 25, 2003 email re: filing a complaint of discrimination | 1 | 0 |
| 7s | August 25, 2003 email re: about May enrollment numbers | 1 | 67 |
| 7t | August 25, 2003 email re: redistribution of leads | 2 | 0 |
| 7u | August 25, 2003 email re: question about leads | 2 | 0 |
| 7v | August 25, 2003 email re: resignation | 2 | 0 |
| 7w | August 25, 2003 email re: resignation | 2 | 0 |
| 7x | August 26, 2003 email re: Phone and team list at UOP | 1 | 0 |
| 7y | August 26, 2003 email re: procedures for students filing FAFSA information | 2 | 0 |
| 7z | August 26, 2003 email re: admissions and ADA at UOP | 2 | 1 |
| 7aa | August 26, 2003 email re: Lead policy at UOP | 2 | 5 |
| 7bb | August 26, 2003 email re: application process at UOP | 3 | 0 |
| 8 | August 26 Email internal ED forwarding email from witness | 1 | 0 |
| 9 | August 26, 2003 Email internal ED re: Interview notes for 8/20 | 1 | 10 |
| 10 | August 26, 2003 Email internal ED re: Interview notes for 8/19 | 1 | 10 |
| 11 | June 25, 2003 email internal ED re: deposition transcripts | 5 | 0 |
| 12 | May 7, 2003 Email OGC and internal ED re: UP allegations | 1 | 0 |
| 13 | June 11, 2003 email internal OGC re: UP travel authorization | 1 | 0 |
| 14 | June 20, 2003 email internal OGC and ED re: Incentive | 3 | 0 |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| | Compensation of IPD | | |
| 15 | June 20, 2003 email from re: Case | 1 | 0 |
| 16 | August 15, 2003 email re: FCA case | 1 | 0 |
| | **1 - Notes & documents on debriefing** | | |
| 500 | August 2, 2004 email to OGC re: UOP data | 2 | 0 |
| 501 | August 2, 2004 email internal ED re: UOP letter requesting materials | 1 | 0 |
| 502 | August 2, 2004 email re: UOP letter and fine letter | 1 | 0 |
| 503 | August 2, 2004 email internal ED and OGC re: UOP letters and analysis | 1 | 0 |
| 504 | August 3, 2004 email re: UOP charts | 1 | 1 |
| 505 | August 3, 2004 email re: contests and incentives | 1 | 0 |
| 506 | August 3, 2004 email re: contests and incentives | 1 | 3 |
| 507 | August 3, 2004 email re: UOP Employee Esquivel emails | 1 | 4 email attachments totaling 6 pages |
| 508 | August 3, 2004 email re: UOP – employee emails question on clean starts | 1 | 0 |
| 509 | August 3, 2004 email internal ED re: UOP charts | 1 | 0 |
| 510 | August 3, 2004 email to OGC re: UOP charts | 1 | 0 |
| 511 | August 3, 2004 email to OGC re: UOP charts | 1 | 0 |
| 512 | August 3, 2004 email to internal ED re: UOP charts | 1 | 0 |
| 513 | August 3, 2004 email re: question on clean starts | 1 | 0 |
| 514 | August 3, 2004 email re: question on clean starts | 1 | 0 |
| 515 | August 3, 2004 email to internal ED re: UOP charts | 1 | 0 |
| 516 | August 4, 2004 email re: question on clean starts | 1 | 0 |
| 517 | August 4, 2004 email re: question on clean starts | 1 | 0 |
| 518 | August 4, 2004 email re: UOP Report | 1 | 0 |
| 519 | August 4, 2004 email re: enrollment contests question | 2 | 0 |
| 520 | August 4, 2004 email re: UOP answers to numbers question | 1 | 0 |
| 521 | August 4, 2004 email internal ED re: UOP Scatter Charts – all recruiters | 1 | 0 |
| 522 | August 4, 2004 email forwarding emails from relator re: trip | 1 | 2 |
| 523 | August 4, 2004 email re: enrollment contest questions | 2 | 0 |
| 524 | August 4, 2004 email re: Goals | 2 | 0 |
| 525 | August 4, 2004 email internal ED re: UOP charts per our discussion | 1 | 0 |
| 526 | August 4, 2004 email re: enrollment contests question | 3 | 0 |
| 527 | August 4, 2004 email re: UOP Charts | 1 | 71 pages |
| 527 | August 4, 2004 email re: UOP Charts | 1 | 71 pages |
| 528 | August 4, 2004 email re: Revised Violations charts | 1 | 4 |
| 529 | August 4, 2004 email re: team scoring directions | 1 | 2 |
| 530 | August 4, 2004 email internal ED re: UOP anomalies | | |
| 531 | August 4, 2004 email internal ED re: notes from meeting with ED officials on UOP | 1 | 0 |
| 532 | August 5, 2004 email internal ED re: changes to UOP charts | 1 | 0 |
| 534 | August 5, 2004 email internal ED re: UOP briefing | 1 | 0 |
| 535 | August 5, 2004 email internal ED re: UOP anomaly feedback | 1 | 0 |
| 536 | August 5, 2004 email re: information from relator on contests | 1 | 0 |
| 537 | August 5, 2004 email re: enrollment contests question | 2 | 0 |
| 538 | August 5, 2004 email internal ED re: preparations for UOP meeting. | 2 | 0 |

2

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| 539 | August 5, 2004 email internal ED re: preparations for UOP meeting. | 2 | 0 |
| 540 | August 5, 2004 email re: enrollment contests question | 2 | 0 |
| 542 | August 6, 2004 email re: documents for UOP briefing | 1 | 0 |
| 543 | August 6, 2004 email re: documents for UOP briefing | 1 | 0 |
| 544 | August 6, 2004 email internal ED re: UOP Briefing Shell | 1 | 0 |
| 545 | August 6, 2004 email re: shell | 1 | 0 |
| 546 | August 6, 2004 email re: interviews not in database | 1 | 0 |
| 547 | August 6, 2004 email re: UOP contests | 2 | 0 |
| 548 | August 6, 2004 email re: results of conference call | 2 | 0 |
| 549 | August 6, 2004 email re: results of conference call | 2 | 0 |
| 550 | August 6, 2004 email re: UOP interview summary | 1 | 12 |
| 551 | August 6, 2004 email re: results of conference call | 2 | 0 |
| 552 | August 8, 2004 email internal ED and OGC re: UOP violations | 2 | 0 |
| 553 | August 8, 2004 email internal ED and OGC re: conversation | 1 | 2 |
| 554 | August 8, 2004 email to internal ED and OGC re: Performance Matrix | 2 | 2 |
| 555 | August 8, 2004 email to OGC and internal ED re: Farewell UOP. | 3 | 0 |
| 556 | August 9, 2004 email to OGC and internal ED re: UOP Briefing | 1 | 0 – although 1 icon there |
| 557 | August 9, 2004 email to internal ED and OGC re: witness interviews | 1 | 5 |
| 558 | August 9, 2004 email to internal ED and OGC re: Weekly OT qualifications for August | 2 | 0 |
| 559 | August 9, 2004 email to internal ED and OGC re: end of FY frenzy at UOP | 3 | 0 |
| 560 | August 9, 2004 email re: UOP contests | 2 | 0 |
| 561 | August 9, 2004 email to OGC and internal ED re: Corrected data for chart of violations | 1 | 0 – although 1 icon on email |
| 562 | August 9, 2004 email re: briefing of corrective actions | 1 | 1 |
| 564 | August 9, 2004 email to internal ED and OGC re: UOP information | 1 | 0 (1 icon but no attachment) |
| 566 | August 10, 2004 email to internal ED and OGC re: UOP con-call follow-up | 1 | 0 |
| 568 | August 10, 2004 email | 2 | 0 (1 icon but no attachment) |
| 569 | August 10, 2004 email re: UOP recruiter questions | 1 | 0 (1 icon but no attachment) |
| 570 | August 10, 2004 email re: UOP interviews | 1 | 0 (6 icons but no attachment) |
| 571 | August 10, 2004 email re: UOP interviews | 1 | 0 (2 icons but no attachment) |
| 572 | August 10, 2004 email re: UOP chart changes | 1 | 0 |
| 573 | August 10, 2004 email re: UOP chart changes | 1 | 0 |
| 574 | August 11, 2004 email re: UOP information | 2 | 0 |
| 575 | August 11, 2004 email re: UOP meeting | 1 | 0 |
| 576 | August 11, 2004 email re: UOP information | 3 | 0 |

FOIA 05-00093-F

| Doc No. | Description | No. of Pages | Attachments |
|---------|-------------|--------------|-------------|
| | **3 - Correspondence with Outside Parties** | | |
| 1000 | August 18, 2003 Email to internal ED re: witness interviews | 4 | 1 @4 pages |
| 1001 | August 19, 2003 Email to internal ED re: summary of witness interviews | 1 | 1 @3 pages |
| 1002 | August 19, 2003 Email to internal ED re: Witness interviews | 2 | 2 attachments 4 pages total |
| 1003 | August 19, 2003 Email to OGC and re: Witness interviews | 1 | 0 |
| 1004 | August 19, 2003 Email to OGC, and two others re: potential witnesses | 1 | 0 |
| 1005 | August 19, 2003 Email to OGC, and two others re: witness interview | 1 | 0 |
| 1006 | August 19, 2003 Email to OGC re: potential witnesses | 2 | 0 |
| 1007 | August 20, 2003 Email to OGC and CMT re: Witness interviews | 2 | 0 |
| 1008 | August 20, 2003 Email to OGC and CMT re: Witness interviews | 2 | 0 |
| 1009 | August 20, 2003 Email to OGC and CMT re: Witness interviews | 1 | 6 attachments 10 pages total |
| 1010 | August 19, 2003 Email to OGC and re: potential witnesses | 1 | 0 |
| 1011 | August 20, 2003 Email and CMT re: interviewing of witnesses | 1 | 0 |
| 1012 | August 20, 2003 Email and CMT re: feedback on interviewing of witnesses | 2 | 0 |
| 1013 | August 20, 2003 Email re: relation of information by relator/witness | 1 | 0 |
| 1014 | August 20, 2003 Email re: Opinion of UofP managers | 1 | 0 |
| 1015 | August 21, 2003 Email re: witness statements, potential witness | 1 | 0 |
| 1016 | August 21, 2003 Email OGC, CMT re: witness interviews | 2 | 0 |
| 1017 | August 21, 2003 Email OGC re: witness interviews | 1 | 0 |
| 1018 | August 21, 2003 Email CMT re: Witness interviews | 1 | 0 |
| 1019 | August 21, 2003 Email from CMT re: Witness interviews | 1 | 0 |
| 1020 | August 21, 2003 Email OGC re: Witness interview | 2 | 0 |
| 1021 | August 21, 2003 Email OGC re: Witness interviews | 2 | 0 |
| 1022 | August 21, 2003 Email OGC, and two others re: investigation | 1 | 0 |
| 1023 | August 21, 2003 Email to OGC re: witness statement | 1 | 0 |
| 1024 | August 21, 2003 Email re: Witness interviews | 3 | 0 |
| 1025 | August 22, 2003 Email OGC, CMT re: Witness interviews | 2 | 0 |
| 1026 | August 22, 2003 Email OGCre: Witness interviews, potential witness | 2 | 0 |
| 1027 | August 22,2003 Email OGC re: Witness contact information | 1 | 0 |
| 1028 | August 21, 2003 Email re: Witness contact information | 2 | 0 |
| 1029 | August 21, 2003 Email re: potential witness and contact information | 2 | 0 |
| 1030 | August 22, 2003 Email re: Witness | 1 | 0 |
| 1031 | August 22, 2003 Email re: investigation | 1 | 0 |
| 1032 | August 24, 2003 Email re: Witness interviews | 2 | 0 |
| 1033 | August 24, 2003 Email re: witness interviews | 1 | 0 |
| 1034 | August 25, 2003 Email re: Witness interviews and scheduling discussion phone call. | 1 | 16 attachments 36 pages total |
| 1035 | August 25, 2003 Email re: interview notes | 1 | 0 |
| 1036 | August 25, 2003 Email re: case organization/strategy | 2 | 0 |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| 1037 | August 25, 2003 Email OGC re: Witness interview and UofP top sellers retreat | 2 | 0 |
| 1038 | August 25, 2003 Email OGC re: Enroller Rankings | 2 | 1 attachment 1 page total |
| 1039 | August 25, 2003 Email OGC re: Enroller Rankings | 1 | 1 attachment 2 page total |
| 1040 | August 25, 2003 Email re: Scheduling conference call (1042, 1043, 1046, 1047) | 1 | 0 |
| 1041 | August 25, 2003 Email re: Witness interviews | 1 | 0 |
| 1042 | August 25, 2003 Email re: Scheduling conference call, witness interviews (1040, 1043, 1046, 1047) | 1 | 0 |
| 1043 | August 25, 2003 Email re: Scheduling conference call (1040, 1042, 1046, 1047) | 1 | 0 |
| 1044 | August 25, 2003 Email OGC, CMT re: Scheduling conference call and case strategy | 1 | 0 |
| 1045 | August 25, 2003 Email OGC re: witness interviews, investigation | 1 | 0 |
| 1046 | August 25, 2003 Email re: Scheduling of conference call (1040, 1042, 1043, 1047) | 1 | 0 |
| 1047 | August 225, 2003 Email re: Scheduling of conference call (1040, 1042, 1043, 1046) | 1 | 0 |
| 1048 | August 25, 2003 Email re: investigation | 4 | 0 |
| 1049 | August 25, 2003 Email CMT re: Witness interviews, potential witness | 2 | 0 |
| 1050 | August 25, 2003 Email re: Witness interviews, potential witness | 2 | 0 |
| 1051 | August 25, 2003 Email re: Witness interview | 1 | 0 |
| 1052 | March 10, 2004 Email re: presentation by UofP | 1 | 0 |
| 1053 | March 11, 2004 Email re: draft of letter to UofP | 2 | 0 |
| 1054 | March 11, 2004 Email OGC, CMT, internal ED re: UofP Response Letter redraft | 2 | 1 attachment 5 pages total |
| 1055 | March 12, 2004 Email re: draft of letter to UofP | 2 | 0 |
| 1056 | March 15, 2004 Email re: strategy and timing of meeting with UofP | 2 | 0 |
| 1057 | March 16, 2004 Email re: time and attendees to Uof P presentation | 1 | 0 |
| 1058 | March 17, 2004 Email re: time and attendees to Uof P presentation | 1 | 0 |
| 1059 | March 21, 2004 Email re: UofP presentation | 1 | 0 |
| 1060 | March 22, 2004 Email re: UofP presentation, KPMG analysis | 2 | 0 |
| 1061 | March 22, 2004 Email re: prior e-mail and conference call | 1 | 0 |
| 1062 | March 22, 2004 Email re: Meeting with UofP | 1 | 0 |
| 1063 | March 22, 2004 Email Internal ED, OGC re: UofP presentation, KPMG analysis | 1 | 0 |
| 1064 | March 22, 2004 Email re: UofP presentation, KPMG analysis | 1 | 0 |
| | 2 - Analyses | | |
| 1065 | March 26, 2004 Email re: additional information from UofP | 1 | 1 file attachment containing 2 spreadsheets of 8 pages each or 16 pages total |
| 1066 | March 30, 2004 Email re: KPMG analysis | 1 | 1 attachment 6 pages |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| | | | total |
| | **3 - Correspondence with Outside Parties** | | |
| 1067 | March 30, 2004 Email re: case preparation | 1 | 0 |
| | **2 - Analyses** | | |
| 1068 | April 1, 2004 Email Internal ED and OGC re: case preparation/progress | 1 | 0 |
| 1069 | April 7, 2004 Email CMT, and internal ED re: draft response to UofP | 1 | 1 attachment 7 pages total |
| 1070 | April 8, 2004 Email re: contact information and draft response to Uof P | 1 | 0 |
| 1071 | April 11, 2004 Email CMT re: preliminary data analysis and recommendations | 1 | 1 attachment 6 pages total |
| | **3 - Correspondence with Outside Parties** | | |
| 1072 | April 16, 2004 Email re: draft of response letter to UofP | 2 | 0 |
| 1073 | April 16, 2004 Email re: draft of response letter to UofP | 2 | 0 |
| | **2 - Analyses** | | |
| 1074 | April 19, 2004 Email re: preliminary data analysis | 1 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1075 | April 25, 2004 Email from re: witness information | 1 | 0 |
| 1076 | April 22, 2004 Email re: internal UofP meeting | 1 | 0 |
| 1077 | April 26, 2004 Email re: UofP internal information | 1 | 0 |
| 1078 | April 30, 2004 Email internal ED, OGC re: UofP follow-up letter | 1 | 1 attachment 6 pages total |
| 1079 | May 20, 2004 Email re: case progress/strategy | 2 | 0 |
| 1080 | July 8, 2004 Email re:E-mails | 1 | 1 attachment 2 pages total |
| | **2 - Analyses** | | |
| 1081 | July 9, 2004 Email re: possible meeting | 1 | 0 |
| 1082 | July 12, 2004 Email re: planning meeting | 1 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1083 | July 14, 2004 Email re: forward of internal UofP e-mail | 2 | 0 |
| | **2 - Analyses** | | |
| 1084 | July 14, 2004 Email re: meeting preparation and travel arrangements | 2 | 0 |
| 1085 | July 14, 2004 Email re: Recruiter Data | 1 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1086 | July 21, 2004 Email re: letter to UofP – follow up to July meeting | 1 | 1 attachment 2 pages total |
| 1087 | July 22, 2004 Email internal ED re: case progress/strategy | 1 | 0 |
| | **1 - Notes & documents on debriefing** | | |
| 1088 | September 1, 2004 Email re: WSJ news column | 2 | 0 |
| 1089 | August 20, 2004 email re: UofP negotiations | 2 | 0 |
| 1090 | August 20, 2004 Email re: UofP negotiations | 1 | 0 |
| 1091 | August 20, 2004 Email re: UofP negotiations | 1 | 0 |
| 1092 | August 24, 2004 Email re: UOPSucks.com and recruiter complaints | 1 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1093 | August 23, 2004 Email re: Relator FOIA request in qui tam case (1159) | 1 | 0 |
| | **1 - Notes & documents on debriefing** | | |
| 1094 | August 23, 2004 Email re: UofP interviewees | 1 | 0 |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| 1095 | August 24, 2004 Email re: UofP attys interviewing ED interviewees | 1 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1096 | August 24, 2004 Email re: UofP attys interviewing ED interviewees | 1 | 0 |
| | **2 - Analyses** | | |
| 1097 | August 24, 2004 Email CMT re: recruiter rankings | 7 | 0 |
| 1098 | August 25, 2004 Email re: UofP negotiations | 1 | 0 |
| 1099 | August 25, 2004 Email re: discussion w/KPMG and UofP attys interviewing ED interviewees | 2 | 0 |
| 1100 | August 25, 2004 Email re: discussion w/KPMG and UofP attys interviewing ED interviewees | 2 | 0 |
| 1101 | August 31, 2004 Email OGC re: UofP and other agency investigations | 1 | 0 |
| 1102 | August 20, 2004 Email J toOGC re: UofP negotiations | 1 | 1 attachment 1 page total |
| 1103 | August 20, 2004 Email R toOGC re: UofP negotiations | 1 | 0 |
| 1104 | August 25, 2004 Email OGC re: UofP negotiations (also on 1098) | 1 | 0 |
| 1105 | September 7, 2004 Email OGC re: Final settlement | 1 | 0 |
| 1106 | August 24, 2004 email OGC, CMT re: UofP attys interviewing ED interviewees, New Witness | 1 | 1 attachment 2 pages total |
| 1107 | August 24, 2004 Email OGC, CMT re: witness interview | 1 | 1 attachment 2 pages total |
| 1108 | August 24, 2004 Email OGC, CMT re: witness interview | 1 | 0 |
| | **2 - Analyses** | | |
| 1109 | August 25, 2004 Email OGC, CMT re: discussion w/KPMG | 2 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1110 | August 25, 2004 Email re: witness interview | 1 | 1 attachment 4 pages |
| 1111 | August 25, 2004 Email re: witness interview | 1 | 0 |
| 1112 | August 25, 2004 Email re: UofP attys interviewing ED interviewees | 1 | 0 |
| 1113 | August 30 2004 Email OGC, CMT re: new witness interview | 1 | 1 attachment 3 pages total |
| 1114 | August 26, 2004 Email re: Matrices | 1 | 0 – 3 pdf file icons but no attachments |
| 1115 | August 30, 2004 Email OGC, CMT re: new witness interview | 1 | 1 attachment 3 pages |
| 1116 | September 1, 2004 Email re: UofP starts and WSJ article (see 1088) | 2 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1117 | September 2, 2004 Email re: UofP attys interviewing ED interviewees | 2 | 0 |
| 1118 | September 1, 2004 Email re: UofP attys interviewing ED interviewees | 1 | 0 |
| | **1 - Notes & documents on debriefing** | | |
| 1119 | March 11, 2004 Email OGC re: draft letter to UofP (1120) | 1 | 0 |
| 1120 | March 11, 2004 Email OGC re: draft letter to UofP (1119) | 2 | 0 |
| 1121 | April 6, 2004 Email re: scheduling of meeting, data | 1 | 0 |
| 1122 | April 9, 2004 Email OGC re: UofP update – investigation status | 2 | 0 |
| 1123 | April 12, 2004 Email OGC re: Draft response letter to UofP | 1 | 1 attachment 7 pages |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---------|-------------|--------------|-------------|
| | (1124) | | total |
| 1124 | April 13, 2004 Email OGC re: Draft response letter to UofP (1123) | 1 | 1 attachment 7 pages total |
| 1125 | April 16, 2004 Email re: gift letter applicability to draft response letter to UofP (1126) | 1 | 0 |
| 1126 | April 16, 2004 Email re: draft response letter to UofP (1125) | 1 | 1 attachment 7 pages total |
| 1127 | April 27, 2004 Email re: Draft response letter to UofP | 1 | 1 attachment 6 pages total |
| 1128 | June 15, 2004 Email re: UofP update – investigation status (1130) | 1 | 0 |
| 1129 | June 18, 2004 Email re: qui tam case appeal | 1 | 0 |
| 1130 | June 21, 2004 Email re: UofP investigation status, priorities and OGC internal presentation scheduling (1128) | 2 | 0 |
| 1131 | June 29, 2004 Email re: copies of UofP response to ED's Feb 2004 program review report, | 1 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1132 | July 8, 2004 Email OGC re: Draft letter to Cox re release of PRR to FOIA requesters (1133) | 1 | 1 attachment 14 pages total |
| 1133 | July 8, 2004 Email OGC re: Draft letter to Cox re release of PRR to FOIA requesters (1132) | 1 | 1 attachment 15 pages total |
| | 1 - Notes & documents on debriefing | | |
| 1134 | July 12, 2004 Email re: UofP letter | 1 | 0 |
| 1135 | July 13, 2004 Email re: UofP and mystery message | 1 | 0 |
| 1136 | July 19, 2004 Email re: UofP internal OGC meeting | 1 | 0 |
| 1137 | August 2, 2004 Email re: Draft letter [re UofP?] | 1 | 0 |
| 1138 | August 3, 2004 Email re: upcoming UofP case status meeting (1140, 1141) | 1 | 0 |
| 1139 | July 22, 2004 Email OGCinternal ED re: UofP action items | 1 | 0 |
| 1140 | August 3, 2004 Email re: gifts issue, upcoming status meeting (1138, 1141) | 2 | 0 |
| 1141 | August 3, 2004 Email re: gifts issue, upcoming status meeting (1138, 1140) | 2 | 0 |
| 1142 | August 9, 2004 Email re: UofP meeting | 1 | 0 |
| | 1 - Notes & documents on debriefing | | |
| 1143 | August 11, 2004 Email re: UofP case strategy (1144, 1145) | 1 | 0 |
| 1144 | August 11, 20004 re: UofP case strategy (1143,1145) | 1 | 0 |
| 1145 | August 11, 2004 Email re: case/settlement strategy (1143,1144) | 1 | 0 |
| 1146 | August 13, 2004 Email re: Draft UofP settlement agreement | 1 | 1 attachment 3 pages total |
| 1147 | August 13, 2004 Email re: forwarded internal UofP email | 4 | 0 |
| 1148 | August 19, 2004 Email re: UofP negotiations | 1 | 0 |
| 1149 | August 20, 2004 Email re: UofP negotiations | 1 | 0 |
| 1150 | August 20, 2004 Email re: UofP negotiations | 1 | 0 |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---------|-------------|--------------|-------------|
| | **2 - Analyses** | | |
| 1151 | August 11, 2004 Email re: data (1153, 1154, 1155) | 3 | 0 |
| | **1 - Notes & documents on debriefing** | | |
| 1152 | August 11, 2004 Email re: handling of information, specifically witness interviews | 1 | 0 |
| | **2 - Analyses** | | |
| 1153 | August 11, 2004 Email re: data (1151, 1154, 1155) | 3 | 0 |
| 1154 | August 11, 20004 Email re: data (1151, 1153, 1155) | 4 | 0 |
| 1155 | August 11, 2004 Email re: data (1151,1153,1154) | 3 | 0 |
| | **1 - Notes & documents on debriefing** | | |
| 1156 | August 11, 2004 Email OGC, FSA, CMT re: case status | 1 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1157 | August 16, 2004 Email re: Relator FOIA request in qui tam case (1158) | 3 | 0 |
| 1158 | August 16, 2004 Fax re: Relator FOIA request in qui tam case (1157) | 4 | 0 |
| | **1 - Notes & documents on debriefing** | | |
| 1159 | August 18, 2004 Email re: Relator FOIA request in qui tam case (1093) | 1 | 0 |
| | **3 - Correspondence with Outside Parties** | | |
| 1160 | August 19, 2004 Email re: Apollo Group's Q3 '04 earnings conference call | 2 | 1 attachment 17 pages total |
| | **1 - Notes & documents on debriefing** | | |
| 1161 | August 19, 2004 Email re: forward of UOP On Line email | 2 | 0 |
| 1162 | August 19, 2004 Email re: UofP interviews (1163, 1164) | 1 | 0 |
| 1163 | August 19, 2004 Email re: UofP interviews (1162, 1164) | 1 | 0 |
| 1164 | August 19, 2004 Email re: UofP interviews (1162, 1163) | 1 | 0 |
| 1165 | August 19, 2004 Email re: witness count | 1 | 0 |
| | **2 - Analyses** | | |
| 1166 | August 19, 2004 Email re: data | 1 | 0 |
| | **1 - Notes & documents on debriefing** | | |
| 1167 | August 19, 2004 Email OGC, CMT re data | 1 | 0 |

9

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| | **1 - Notes & documents on debriefing** | | |
| 2000 | 8/13/04 e-mail OGC, re: Draft UOP settlement agreement | 1 | 3 |
| 2001 | 5/27/04 Memo re: Weekly activity report | 1 | 0 |
| 2002 | UoP Interviews Grouping by Location | 4 | 0 |
| 2003 | UofP Interview Notes | 2 | 0 |
| 2004 | 174 Ed. Law Rep. 257 | 6 | 0 |
| 2005 | 5/21/04 email OGC re FSA Pin access | 1 | 2 icons –not attached to email |
| 2006 | 5/21/04 Fax OGC, UofP response to letter of 4/29/04 | 1 | 6 |
| 2007 | 3/03/04 email internal ED re: UOP Response Memo | 1 | 1 (3pgs) UOP Response Memo |
| 2008 | 8/5/04 Letter re: Info response to draft program | 3 | 2 (folder 1.0, folder 1.1) |
| 2008a | Sperling Club Events Chart | 1 | 0 |
| 2008b | Folder 1.0 cover page | 1 | 0 |
| 2008c | Folder 1.1 cover page | 1 | 0 |
| 2008d | 5/4/04 email re: Sperling Club 2 | 2 | 0 |
| 2008e | 5/4/04 email re: Sperling Club 2 | 2 | 0 |
| 2008f | 5/4/04 email re: Turtle Bay, HI | 1 | 0 |
| 2008g | 5/4/04 email re: Hawaii, Waikoloa | 1 | 0 |
| 2008h | 9/10/03 email from Western Region re: Sperling Club Announc. 2 | 1 | 0 |
| 2008i | 5/6/04 email re: SanFrancisco | 2 | 0 |
| 2008j | 5/6/04 email re: Casino Night LAX | 2 | 0 |
| 2008k | Hawaii Campus Sperling Club Members | 1 | |
| 2008l | 8/21/02 email from Western Region re: Sperling Club Announcement | 2 | 0 |
| 2008 m | 3/12/02 email from Western Region re: Sperling Club Winners | 3 | 0 |
| 2008n | 5/4/04 email re: Monterrey & Palm Springs | 3 | 0 |
| 2008o | 4/5/01 email from Western Region re: Golden Nugget Sperling Club | 3 | 0 |
| 2008p | Sheraton Universal Group Arrival Report | 3 | 0 |
| 2008q | Casino Night Award Winners | 4 | 0 |
| 2008r | FY99 Sperling Club Official Guest List | 2 | 0 |
| 2008s | List Sperling Club 4 | 1 | 0 |
| 2008t | Folder 1.2 cover | 1 | 0 |
| 2008u | 8/4/04 email Western Region re: Sperling Club top performers | 1 | |
| 2008v | 8/4/04 email Western Region re: Sperling Club Info Pkts. | 1 | 0 |
| 2008 w | 8/4/04 email Western Region re: Sperling Packets | 1 | 0 |
| 2008x | 5/6/04 email re: San Diego Sperling Announcement | 1 | 0 |
| 2008y | 5/6/04 email re: Yosemite Sperling Club | 1 | 0 |
| 2008z | 8/4/04 email Western Region re: Sperling Mileage Allowance | 1 | 0 |
| 2008a a | 8/4/04 email Western Region re: Sperling Club SF Menu | 1 | 0 |
| 2008 | 8/4/04 email Western Region re: Sperling Club SF Info | 1 | 0 |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| bb | | | |
| 2008c c | 5/6/04 email re: Sperling Club SF Info | 1 | 0 |
| 2008d d | 6/4/03 email from Western Region re: Mileage Allowance for 5/16 Sperling Club | 2 | 0 |
| 2009 | 3/2/04 Fax to OGC | 1 | 1 (9 pgs.) UOP response memo |
| 2010 | Top O'The Hill FY 1999 info for all enrollment counselors. | 11 | |
| 2011 | (no date) List of names | 1 | |
| 2012 | 4/14/04 Letter re: 4/12 letter and program review report on incentive compensation | 6 | |
| 2013 | (no date) handwritten notes "Chart by Campus" (note back of p.2 "Harold FOIA Letter") | 2 | |
| 2014 | (no date)  To do list | 2 | |
| 2015 | 6/16/04 Yahoo finance news re: Apollo agreement with Labor | 1 | |
| 2016 | 6/30/04 Travel Itinerary | 3 | |
| **2017** | **3/19, 3/22?** **Actual enrollments by Counselor, FY, Salary** | **16** | |
| 2018 | 7/1/04 Fax OGC re: UoP Initial Salary History Report | 1 | 20 |
| 2019 | (no date) Six Month Performance Expectations | 1 | |
| 2020 | 8/7/04 Letter re: Response to 7/22/04 letter | 3 | |
| 2021 | Email Internal Ed | 4 | |
| 2022 | 3/1/04 Email, internal ED Re: Interview Notes | 1 | |
| 2023 | 2/9/04 email Internal ED re: How specifically did UOP mislead? | 1 | 0 |
| 2024 | 2/9/04 email Internal ED re: UOP Report in PDF Format | 1 | 1 |
| 2025 | 2/10/04 email OGC, Internal ED re: UOP Exit 8/22 | 3 | |
| 2026 | 2/10/04 email internal ED re: | 6 | |
| 2027 | 2/10/04 email re: IPD Questions | 2 | 1 (2 pgs) |
| 2028 | 2/12/04 email re: Con Call | 2 | 0 |
| 2029 | 2/15/04 email re: Con Call | 3 | |
| 2030 | 2/18/04 email re: UOP Investors and Insider Trading Concerns | 2 | 2 •UOP Stock Data spreadsheet •UOP Exit Interview Doc |
| 2031 | 2/20/04 email | | |
| 2032 | 2/26/04 email | 1 | |
| 2033 | 2/27/04 email | 1 | |
| 2034 | 2/26/04 email | 1 | |
| 2035 | 3/1/04 email | 3 | |
| 2036 | 3/3/04 email Internal ED | 1 | 1 (3pgs) UOP Response Memo |
| 2037 | 3/3/04 email Internal ED re: UoP response assessment memo | 2 | |
| 2038 | 3/3/04 email OGC | 2 | |
| 2039 | 3/4/04 email re: UOP | 1 | |
| 2040 | 3/4/04 email Follow-up | 1 | |
| 2041 | 3/8/04 email Internal ED re: Follow up letter to UOP response | 1 | 1-4pgs |
| 2042 | 3/8/04 email OGC re: UOP Meeting | 1 | 1 (4pgs) Draft letter |

11

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| | | | re: missing Documents |
| 2043 | 3/9/04 email re: UOP follow up letter response | 2 | 4 |
| 2044 | 2/24/04 email Internal ED | 1 | 1 (5 pgs) interview memo |
| 2045 | 2/25/04 email Internal ED re: 2/24/04 witness interview | 1 | 1 (3 pgs. Witness interview) |
| 2046 | 2/25/04 email Internal ED: email from online employee | 2 | 0 |
| 2047 | 2/26/04 email OGC re: Promise of Response this week | 1 | 0 |
| 2048 | 2/27/04 email Internal ED re: UoP Big Picture Considerations | 4 | 0 |
| 2049 | 2/27/04 email OGC re: qui tam suit | 1 | |
| 2050 | 3/1/04 email Internal ED | 1 | |
| 2051 | 2/9/04 email Internal ED re:UOP report in PDF format | 1 | |
| 2052 | 7/8/04 email re: emails | 1 | 1 (2 pgs) " additional emails" |
| 2053 | 7/8/04 email re: Interview Information | 1 | 1 (5 pgs) Analysis of Interview Support Post it "Interviews Salary Raises" |
| 2054 | 8/4/04 email Internal ED re: UOP | 1 | 1 UOP Mgmt Summary |
| 2055 | 9/30/04 email re: Another Witness | 1 | |
| 2056 | (no date) Draft powerpoint of UOP Briefing for 8/10/04 | 9 | 0 |
| 2057 | (no date) Chart "My favorite chart" re: summary of violations | 1 | |
| 2058 | (no date) Original Draft of UOP Briefing for 8/10/04 | | |
| 2059 | (no date) Handwritten notes (red pen) | 3 | |
| 2060a | Notes re: UOP Phone Interview 9/8/03 | 1 | |
| 2060b | Phone memo | 5 | |
| 2060c | Phone Memo | 2 | |
| 2061 | 6/20/04 email re: Document Request | 1 | 1 (5 pgs) Phoenixcontestresults .doc Marginalia on back of last page |
| 2062 | (no date) Handwritten notes on yellow paper

1 (both sides) | 1 | |
| 2063 | (no date) Handwritten notes on white paper | 3 | |

12

FOIA 05-00093-F

Fourth Interim Response<br/>4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| 2064 | (no date)<br>Handwritten notes "Gifts"<br><br>both sides | 1 | |
| 2065 | (no date)<br>Handwritten notes on yellow paper "Sperling" | 1 | includes post it "would it be helpful to....." |
| 2066 | (no date)<br>Handwritten notes<br>"Salaries" | 2 | |
| 2069 | 8/5/98 email re: FW Contest Results | 2 | |
| 2070 | (no date)<br>business card of Michael Schwartz, KPMG | | |
| 2071 | 2/13/04 Letter (KPMG) re: Apollo Group | 4 | 1 (4 pgs)<br>Terms and Conditions –<br>Advisory Services |
| 2072 | 5/7/04 Letter (KPMG) to (Apollo)<br>re: Matters related to ED preliminary program review report | 4 | 1 (2 pgs)<br>Description of Information Collected |
| 2073 | 3/22/04 meeting notes<br>Handwritten notes<br>"UOP Pre meeting" | 1 | 1 (6 pgs) |
| 2074 | 3/19/04 email<br>re: Employee statement of Responsibility | 1 | 1 (2 pgs) |
| 2075 | (no date)<br>Corrective Action Plan | 2 | |
| 2075a | 9.1.13<br>Reporting a Violation<br>Apollo Group Employee Manual | 1 | |
| 2075b | 9.9<br>Integrity, Security and Confidentiality…<br><br>Apollo Group Employee Manual | 2 | |
| 2075c | 9.13<br> Fiscal Misconduct Policy<br>Apollo Group Employee Manual | 1 | |
| 2075d | Apollo Accounting/Fraud Hotline | 2 | |
| 2075e | 9.1.13 Reporting a Violation or Suspected Violation<br>Apollo Group Employee Manual | 1 | |
| 2075f | Apollo Accounting/Fraud Hotline | 2 | |
| 2075g | 12/1/00 Memorandum to Employee Relations Administrators | 1 | |
| 2075 h | Overview of the Admissions Counselor Salary Admin. Program | 3 | |
| 2076 | 3/22/04<br>Apollo Group Presentation to ED, handout with notes | | |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---------|-------------|--------------|-------------|
| 2077 | 3/26/04 email OGC re: Additional Information provided by UOP | 1 | 2 (16 pgs) DOE Request 032504 by enrollments DOE request032504 by % change |
| 2078 | (no date) Depo Digest, ver. 2 | 24 | |
| 2079 | UOP Interview Notes  8/20/03 | 2 | |
| 2080 | UOP Interview Notes  8/20/03 | 2 | 0 |
| 2081 | UOP Interview Notes  8/25/03 | 1 | 0 |
| 2082 | UOP Interview Notes  8/27/03 | 3 | 0 |
| 2083 | UOP Interview Notes  8/20/03 | 3 | 0 |
| 2084 | UOP Interview Notes  8/18/03 | 3 | 0 |
| 2085 | UOP Interview Notes  8/22/03 | 3 | 0 |
| 2086 | UOP Interview Notes  8/22/03 | 2 | |
| 2087 | UOP Interview Notes  8/18/03 | 1 | |
| 2088 | UOP Interview Notes  8/18/03 | 2 | |
| 2089 | UOP Interview Notes  8/19/03 | 2 | |
| 2090 | UOP Interview Notes  8/18/03 | 3 | |
| 2091 | UOP Interview Notes  8/21/03 | 4 | |
| 2092 | UOP Interview Notes  8/21/03 | 4 | |
| 2093 | UOP Interview Notes | 3 | |

14

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---------|-------------|--------------|-------------|
|  | 8/22/03 |  |  |
| 2094 | UOP Interview Notes<br><br>8/21/03 | 2 |  |
| 2095 | UOP Interview Notes<br><br>8/26/03 | 2 |  |

15

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| | 3 - Correspondence with Outside Parties | | |
| 2400 | H&A v. UoP<br>UoP memo in support of motion to dismiss | | |
| 2401 | H&A v. UoP<br><br>Second Amended Complaint<br>Rec'd 3/8/04 | | |
| 2402 | H&A v. UoP<br>UoP Motion to Dismiss<br>Rec'd 10/28/03 | | |
| 2403 | H&A v. UoP<br>11/29/04<br>Appellants Appeal of 12(b)(6) "excerpts of the record" | | |
| 2404 | (No date) Notes from discussion | | |
| 2405 | 8/29/03 Letter UoP counsel re: H&A v. UoP<br>(rec'd 9/8/03)<br>Corrected Proof of Service of First Amended Complaint for Damages with demand for jury trial. | | |
| 2406 | Fax 5/5/03<br>Complaint for damages, demand for jury trial<br>Filed 3/7/04 | 13 | |
| 2407 | 5/22/03 NCAL OSIRA Meeting Guidelines | 13 | |
| 2408 | 2/25/03 Email re: Are You Focused | 2 | |
| 2409 | 1/31/03 Email re: Enrollment Leaderboard | 1 | |
| 2410 | 1/17/03 email NCAL Enroll re: making progress | 2 | |
| 2411 | September Contest App Tracking Log | 2 | |
| 2412 | 1/10/03 email NCAL enrollment re: sperling | 1 | |
| 2413 | 3/1/04 Fax re: Court order in UoP Case | 6 | |
| 2414 | 2/10/04 Routing Sheet<br>Relators sur-reply to reply memo of Defendant regarding D's motion to dismiss under 12(b)(6) | 6 | |
| 2415 | USHA.....v uop<br>Request to take judicial notice of ED Admin Findings, with supporting declaration | 7 | 2<br>•Proof of Service,<br>•Exhibit 1 |
| 2416 | 9th Cir Ct. of Appeals<br>Appellants Opening Brief on 12b6 motion | 58 | 1 (Pos) |
| 2417 | H&A v. UoP<br>Confidential transcript of deposition of Mary Hendow, 6.10.03 | | |
| 2418 | UofP AC Policies FY 2002 | 9 | |
| 2419 | UofP EC Policies FY 1999 | 8 | |
| 2420 | UofP EC Policies May 1999 | 8 | |
| 2421 | UoP Enrollment Counselor Policies Dec 1997-May 1998 | 7 | |
| 2422 | UoP Enrollment Counselor Policies June 1997-Nov 1997 | 7 | |
| 2423 | UoP Enrollment Counselor Policies Dec 1996-May 1997 | | |
| 2424 | UoP Enrollment Counselor Policies October 2002 | 11 | |
| 2425 | UoP Enrollment Counselor Policies December 2000 | 9 | |
| 2426 | Hendow....<br>Relators Memo in Opp to D's motion to dismiss Filed 1/20/04, rec'd 1/28/04 | 30 | 1 proof of service |

16

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| 2427 | Declaration of NK in support of Relators Memo of Points and Authorities in Opp to D's motion to dismiss Filed 1/20/04, rec'd 1/28/04 | 23 | |
| 2428 | Joint Status Report of Relators/Plaintiffs and Defendant UoP 1/20/04, rec'd 1/12/04 | 8 | |
| 2429 | 5/10/04 Routing Defendant's opposition to relators request to submit a sur-reply re defendant's motion to dismiss relators second amended complaint | 5 | |
| 2430 | 5/10/04 Relators sur-reply memo of points and author in response to reply memo of defendants re d's motion to dismiss | 9 | 1 pos |
| 2431 | 5/4/04 D's reply brief in support of its motion to dismiss relators second amended complaint pursuant to FRCP 12b6 | 21 | 1 pos |
| 2432 | 5/10/04 email OGC Article from Chronicle on scrutiny of for-profit school chains (5/14/04 issue) | 4 | |
| 2433 | Declaration in support of Relators memo of points and authorities in opp to d's motion to dismiss pursuant to frcp 12b6 | 23 | 1 •ExhibitB: Amicus Curae memo in conn. w/D's motion for Summary Judgment (8pgs) |
| 2434 | 4/20/04 Relators Memo of Points and Authorities in opposition to defendant's motion to dismiss pursuant to frcp12(b)(6) | 29 | 1 pos |
| 2435 | 5/3/04 Request to take judicial notice in support of relators opposi9tion to rd's motion to dismiss pursuant to frcp 12(b)(6) | 2 | 2 •Exhibit A •Order re Motion for Reconsideration and motion to continue trial date, entered/filed 12/4-5/03 |
| 2436 | 3/7/03 H & A v. UoP Disclosure Statement of Hendow & Albertson, Relator | | |
| 2437 | Request to take Judicial Notice in Support of Defendant University of Phoenix/s Motion to Dismiss pursuant to FRCP 12(b)(6) | 2 | 4 attach: •Gay v. Lincoln Tech (12 pgs) •POS (1 pg) •Bowman v. Ed. America (8 pgs) •POS (2 pgs) |
| 2438 | Defendant's Notice of Motion and Motion to Dismiss Relators Second Amended complaint pursuant to FRCP 12(b)(6) | 5 | |
| 2439 | Defendant's memorandum of points and authorities in support of its motion to dismiss relators second amended complaint pursuant to FRCP 12(b)(6) | 21 | |
| 2440 | Declaration of Robert T. Collins in support of ...... | 2 | 3 • 15 pgs. |

FOIA 05-00093-F

Fourth Interim Response
4/8/2005

| Doc No. | Description | No. of Pages | Attachments |
|---|---|---|---|
| | | | • 10 pgs<br>• 8 pgs |
| 2441 | 8/28/03<br>Letter to Court Clerk<br>Re: duplicate originals of second amended complaint for filing. | 1 | 0 |
| 2442 | Routing Sheet<br><br>H&A vUoP<br>Relators response to defendant UoP request for clarification regarding the courts 1/8/04 scheduling order | 1 | 2, 3 pgs<br>Response<br>POS |
| 2443 | Routing Sheet<br><br>H&A vUoP<br>Change of Address for Relators Attorney<br>10/27/03 | 1 | 2 (3pgs)<br>• COA<br>P•OS |
| 2444 | Starts Report<br>Downloaded 7/26 | 24 | 0 |
| 2445 | Apollo Performance Evaluation | 67 | 0 |
| 2446 | 7/25/03 email to UoP personnel re: June 9th CRF results | 1 | 0 |
| 2447 | 7/11/03 email to NCAL Enrollment | 1 | 0 |
| 2448 | 6/25/03 email to NCAL Enrollment, NCAL Directors re: July/August | 2 | 0 |
| 2449 | 6/30/03 email to NCAL Enrollment re: Do you like music? | 1 | 0 |
| 2450 | UoP/WICU/CFP/Apollo<br>Quick Reference Listing: Marketing and Enrollment | 12 | 0 |
| 2451 | 7/15/03 email NCAL enrollment, NCAL directors re: July/August Stack Ranking | 1 | 0 |
| 2452 | 7/30/03 OGC Routing Doc. Re: A/H Matter | 1 | 1 (20 pgs) |
| 2453 | 8/29/03 letter UoP re: H&A v. UoP, first amended complaint | 2 | 1 (16 pgs)<br>First Amended<br>Complaint |
| 2454 | H&A v. UoP<br>Re: Add'l Papers to be served... | 9 | 0 |
| 2455 | 8/27/03 letter H&A v. UoP | 1 | 0 |
| 2456 | 5/26/04<br><br>Re: dismissal order | 1 1pg | 2 (6 pgs total)<br>• 1 pg<br>• 5 pgs |
| 2457 | 5/20/04 Fax, | 4 | |
| 2458 | Appellants notice re no reporters transcripts ordered for appeal | 1 | 1 (POS) |
| 2459 | H&A v. UoP<br>Disclosure Stmt. Of H&A pursuant to the Fed False Claims Act | 21 | 1<br>packet of exhibits |
| 2460 | UoP "AC Self Success Recap" | | |
| 2461 | 7/25/03 email witness re: weekly referrals for July 18. | 1 | |



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE CHIEF INFORMATION OFFICER

**MAY 0 3 2005**

Mr. Douglas R. Cox
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

Re: **FOIA Request No. 05-00093-F**

Dear Mr. Cox:

This letter and accompanying documents represent the fifth and final response to Douglas R. Cox's letter, sent via e-mail, dated October 25, 2004, requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The Department of Education is responding to your request and providing responsive documents as described in this letter on a compact disc (CD). The CD contains the actual responsive documents and also includes a "Read Me" file that provides guidance for use of the CD, including a catalog of all the responsive documents.

The request was received in this office on October 6, 2004 and was forwarded to the following offices within the Department of Education (Department) to search for documents that may be responsive to your request: Office of Federal Student Aid (FSA) and the Office of the General Counsel (OGC). In the letter, Mr. Cox asked for information relating to the Department's Interim Review of the University of Phoenix (UOP).

Specifically, you requested: "full and complete access to all underlying work papers associated with, relating to, or otherwise regarding, the Interim Report, including but not limited to, any and all:

❖ Draft versions of the Interim Report;

❖ Internal notes (including but not limited to, all notes from interviews conducted with any and all current and former Apollo employees);

❖ All notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003;

❖ Analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including but not limited to, analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions

Page 2 of 4 – Gibson     n & Crutcher LLP                          May 3, 2005
FOIA Request No. 05 _ J93-F

with KPMG in August 2004 as well as all work papers generated during and
documents used or relied upon in performing such analyses, and

❖ Correspondence the Department has had with outside parties, including, but not
limited to, correspondence between the Department and any *qui tam* relators that
have filed suit against Apollo, and correspondence relating to the solicitation of
witnesses or experts in connection with the preparation revision review or defense
of such Interim Report."

You also requested the following:

❖ "Copies of all Department internal guidance, policy memoranda, or other
information, whether generic or specific to Apollo, that was issued, relied upon or
transmitted in connection with the Interim Report, the Department's examination
leading up to the Interim Report, or the sanctions demanded during the
negotiation process; [and]

❖ Copies of any delegation of authority that authorized or purported to authorize
Ms. Donna Wittman to issue the Interim Report."

We have previously sent you four interim responses dated December 29, 2004, February
18, 2005, February 28, 2005, and April 8, 2005.

Enclosed is a CD that contains documents responsive to portions of this request, with a
catalogue Table listing the documents.  In all, there are 1,868 pages responsive to this
portion of your request.  The Department has withheld 2,171 additional pages of
responsive materials in their entirety pursuant to FOIA exemption (b)(5).  The 1,868
pages of documents provided are organized into four PDF files as described below:

1.  Notes and Other Documents related to the Interim Report (164 Pages)

    ❖ Documents relating to the "[d]raft versions of the Interim Report;

2.  Notes and Other Documents related to the Debriefing (804 Pages)

    ❖ Documents responsive to "[a]ll notes and other documents relating to the
    debriefing provided to Apollo at the conclusion of the Department's field work in
    August 2003;

3.  Analyses Performed by or on Behalf of the Department (22 Pages)

    ❖ Documents responsive to "[a]nalyses, statistical or otherwise, performed by or on
    behalf of the Department involving the documentation and/or records Apollo
    produced to the Department relating to the number of enrollments achieved by,
    and the salaries and salary adjustments paid to, Apollo enrollment counselors,
    including but not limited to, analysis described by Ms. Donna Wittman and Ms.

2

Page 3 of 4 – Gibson,    & Crutcher LLP                            May 3, 2005
FOIA Request No. 05-    93-F

Katie Crowley in their discussions with KPMG in August 2004 as well as all
work papers generated during and documents used or relied upon in performing
such analyses"; and

4. Correspondence with Outside Parties (878 Pages)

❖ Documents relating to "[c]orrespondence the Department has had with outside
parties, including, but not limited to, correspondence between the Department and
any *qui tam* relators that have filed suit against Apollo, and correspondence
relating to the solicitation of witnesses or experts in connections with the
preparation revision review or defense of such Interim Report."

However, certain information has been withheld under each of these categories, and
under, "[i]nternal notes (including but not limited to, all notes from interviews conducted
with any and all current and former Apollo employees)", according to the FOIA
exemptions specified below:

❖ Any and all inter-agency or intra-agency memoranda and correspondence as well
as drafts of letters, memoranda, and correspondence reflecting the Department's
deliberative process, attorney-client communications, and attorney-work product,
have been withheld pursuant to 5 U.S.C. § 552 (b)(5) and the Department
regulation 34 C.F.R § 5.73(a). These provisions exempt from disclosure
information that is part of the deliberative process, and allow Department
employees to engage in frank and open discussions of issues, and to express their
views, opinions and recommendations without fear of outside pressures.

❖ Pursuant to 5 U.S.C. § 552 (b)(6), any and all personal information (including, but
not limited to, home telephone numbers, personal cell phone numbers, home
email addresses, and home addresses) in which an individual has a privacy right
has been withheld, where disclosure would constitute a clearly unwarranted
invasion of personal privacy.

❖ In accordance with 5 U.S.C. § 552 (b)(7)(C), information that could reasonably be
expected to constitute an unwarranted invasion of personal privacy in the law
enforcement context (including but not limited to witness information and
statements) has been withheld.

Provisions of the FOIA allow us to recover the costs pertaining to your request. You
have advance to the Department $5,000. As a commercial use requester, the fee for
processing your request totals $8,063.05. The breakdown for this cost is as follows: The
cost of search and review time of 310 hours totaled $6,498.15 plus a 16 percent
administrative costs of $1,039.70; duplication costs for 5,252 pages at $0.10 (cents) per
photocopied/imaged pages = $525.20.

3

Page 4 of 4 – Gibson       n & Crutcher LLP                                    May 3, 2005
FOIA Request No. 05-00093-F

A check for the amount of $ 3,063.05 should be made payable to U.S. Department of
Education (please include the FOIA number) and sent to the below address. Please note
that if payment is not received promptly, future FOIA request you may have will require
payment in advance.

**Payment Address:**

U.S. Department of Education
Office of the Chief Information Officer
400 Maryland Avenue, SW, PCP, 9th Floor
ATTN: FOIA Officer
Washington, DC 20202-4700

We now consider your case closed. You have the right to appeal this decision by writing,
within 30 days of your receipt of this letter. Your appeal should be **received by** the
FOIA office on or before June 8, 2005 to the following address:

**Appeals Address:**

Chief Information Officer
US Department of Education
400 Maryland Avenue, SW
FOB-6-2W31, ATTN: FOIA Appeals
Washington, DC 20202-4500

Your appeal should be accompanied by a copy of your initial letter of request and this
partial denial letter, and your response should contain any evidence of argument you wish
the Department to consider in making an administrative determination on your appeal.

If you have any questions, please contact the FOIA office at (202) 245-6651 or
OCIO_FOIA@ed.gov.

Sincerely,

Jeanne Van Vlandren
Director, Regulatory Information Management Services
Freedom of Information Act Officer

Enclosures:
1 CD "FOIA # 05-00093-F, U.S. Department of Education
Catalogue of Documents
"Read Me" file

4

**FOIA # 05-00093 Interim 5 Redacted Documents**

There are five (5) documents on this CD that are organized in the following manner:

1. Notes and Other Documents related to the Interim Report (***Interim 5 Category 1.pdf***)
2. Notes and Other Documents related to the Debriefing (***Interim 5 Category 2.pdf***)
3. Analyses Performed by or on Behalf of the Department (***Interim 5 Category 3.pdf***)
4. Correspondence with Outside Parties (***Interim 5 Category 4.pdf***)

The fifth document is an inventory of the documents included in the response (***Interim 5 Control Log.pdf***). The inventory shows the total number of documents, the page number location within the four PDF files, the number of pages of each document and its attachment (if applicable), the document date and a short description. The log is arranged and color-coded by category.

These files can be opened with Adobe Reader (version 5.1 or later).

If you experience problems opening any of these files, please call Jeanne Van Vlandren, Director, Regulatory Information Management Services, at (202) 245-6611.

OCIO / RIMS                    Control Log for Delivery of Documents

Date                04/27/05

CASE 05-00093

| CAT 1 | |
|-------|--|
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|--------|------|------|------|------|------|------|------|------|
| 1 | 1 | 2067 | 1 | 08/04/98 | 1 | | 1 | 8/4/98 email re: May's certificate winner |
| 2 | 2 | 2068 | 2 | 08/04/98 | 1 | | 1 | 8/4/98 email re: Fwd We have a winner!!! |
| 3 | 3 | 2201 | 3 | 10/07/03 | 2 | | 1 | email re: FW NCALFFL Clarification |
| 4 | 4 | 2203 | 5 | 09/25/03 | 1 | 5 | 1 | fax re: Stipulation extending time of D to respond to complaint |
| 5 | 5 | 2214 | 11 | 07/23/03 | 1 | 25 | 1 | Fax to OGC re: UoP AC Policy Guide |
| 6 | 6 | 2216 | 37 | 08/25/03 | 1 | 10 | 1 | email Internal ED re: Interview Notes Summary of interviews on Tuesday, 8/19 |
| 7 | 7 | 2218 | 48 | 08/25/03 | 1 | 10 | 1 | email to Internal ED re: Interview NotesSummary of interviews on Tuesday, 8/19 |
| 8 | 8 | 2219 | 59 | 08/25/03 | 1 | | 1 | 8/25/03 email re: Interview Notes |
| 9 | 9 | 172 | 60 | 12/09/98 | 4 | 0 | 1,2 | Email from NK to OGC and relators re: Sperling Club |
| 10 | 10 | 78 | 64 | 08/08/03 | 1 | 0 | 1,4 | Email OGC re: Protections for informants |
| 11 | 11 | 82 | 65 | 08/08/03 | 1 | 0 | 1,4 | Email OGC re: meeting date and numbers |
| 12 | 12 | 85 | 66 | 08/12/03 | 1 | 3 | 1,4 | Email OGC re: movie incentive email |
| 13 | 13 | 95 | 70 | 08/14/03 | 1 | 0 | 1,4 | Email re: List of UofP Locations |
| 14 | 14 | 102 | 71 | 08/14/03 | 1 | 92 | 1,4 | Email from SD to internal ED re: List of UOP Locations |
| 15 | 15 | 79 | 164 | 08/08/03 | 1 | 0 | 1,4 | Email from re: protections for informants |
| 16 | 1 | 1170 | 1 | 08/27/03 | 1 | 6 | 2 | Email re: interview strategy |
| 17 | 2 | 1187 | 8 | 09/03/03 | 1 | 0 | 2 | Email CMT re: UofP internal email - personnel changes |
| 18 | 3 | 1188 | 9 | 09/03/03 | 1 | 0 | 2 | Email re: UofP internal email - personnel changes (1187, 1191, 1192, 1193, 1194, 1196, 1199, 1204) |
| 19 | 4 | 1191 | 10 | 09/03/03 | 2 | 0 | 2 | Email CMT re: internal UofP email - personnel changes |
| 20 | 5 | 1193 | 12 | 09/03/03 | 3 | 0 | 2 | Email re: UofP personnel changes |
| 21 | 6 | 1194 | 15 | 09/03/03 | 3 | 0 | 2 | Email CMT re: UofP personnel changes (1187, 1188, 1191, 1192, 1193, 1196, 1199, 1204) |
| 22 | 7 | 1201 | 18 | 09/04/03 | 1 | 0 | 2 | Email re: UofP web stories |
| 23 | 8 | 1220 | 19 | 09/10/03 | 2 | 0 | 2 | Email re: Project |
| 24 | 9 | 1226 | 21 | 09/11/03 | 1 | 0 | 2 | Email re: qui tam case |

OCIO / RIMS                    **Control Log for Delivery of Documents**

Date            04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches<br>Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attachments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 25 | 10 | 1232 | 22 | 09/18/03 | 3 | 12 | 2 | Email to internal ED and OGC re: UofP program reg changes |
| 26 | 11 | 1253 | 37 | 10/04/03 | 1 | 0 | 2 | Email CMT re: enrollment contest |
| 27 | 12 | 1219 | 38 | 09/10/03 | 2 | 3 | 2 | Email re: Project (1220) |
| 28 | 13 | 178 | 43 | 12/10/03 | 4 | 0 | 2 | Email re: Sperling Club |
| 29 | 14 | 180 | 47 | 12/12/03 | 2 | 0 | 2 | Email internal ED re: UOP request for meeting |
| 30 | 15 | 1271 | 49 | 10/23/03 | 9 | 0 | 2 | Email re: AR article on education loans |
| 31 | 16 | 241 | 58 | n/a | 1 | 0 | 2 | Document on UOP Performance expectations |
| 32 | 17 | 269 | 59 | n/a | 16 | 0 | 2 | UOP Quick reference listing - marketing and enrollment |
| 33 | 18 | 274 | 75 | n/a | 1 | 0 | 2 | EC II Performance Expectations |
| 34 | 19 | 277 | 76 | n/a | 2 | 0 | 2 | Performance definitions |
| 35 | 20 | 286 | 78 | 10/07/02 | 6 | 0 | 2 | Expense Report Summary (No. W746783) |
| 36 | 21 | 287 | 84 | 12/31/02 | 3 | 0 | 2 | Expense Report Summary (No. W760784) |
| 37 | 22 | 288 | 87 | 11/26/02 | 3 | 0 | 2 | Expense Report Summary (No. W755037) |
| 38 | 23 | 289 | 90 | 02/04/03 | 3 | 0 | 2 | Expense Report Summary (No. W771757) |
| 39 | 24 | 290 | 93 | 01/04/04 | 4 | 0 | 2 | Expense Report Summary (No. W848700) |
| 40 | 25 | 291 | 97 | 01/20/04 | 10 | 0 | 2 | Expense Report Summary (No. W852142) |
| 41 | 26 | 292 | 107 | 12/18/01 | 2 | 0 | 2 | Expense Report Summary (No. W630247) |
| 42 | 27 | 293 | 109 | 01/07/02 | 4 | 0 | 2 | Expense Report Summary (No. W635849) |
| 43 | 28 | 294 | 113 | 10/14/98 | 5 | 0 | 2 | Expense Report Summary (No. 46949) |
| 44 | 29 | 295 | 118 | 10/29/98 | 4 | 0 | 2 | Expense Report Summary (No. 47670) |
| 45 | 30 | 296 | 122 | 11/02/98 | 5 | 0 | 2 | Expense Report Summary (No. 48471) |
| 46 | 31 | 297 | 127 | 11/05/98 | 3 | 0 | 2 | Expense Report Summary (No. 49827) |
| 47 | 32 | 298 | 130 | 12/01/98 | 2 | 0 | 2 | Expense Report Summary (No. 55323) |
| 48 | 33 | 299 | 132 | 12/15/98 | 6 | 0 | 2 | Expense Report Summary (No. 55726) |
| 49 | 34 | 300 | 138 | 12/31/98 | 7 | 0 | 2 | Expense Report Summary (No. 56434) |
| 50 | 35 | 301 | 145 | 01/11/99 | 3 | 0 | 2 | Expense Report Summary (No. 56756) |
| 51 | 36 | 302 | 148 | 01/19/99 | 6 | 0 | 2 | Expense Report Summary (No. 57530) |
| 52 | 37 | 303 | 154 | 03/15/99 | 4 | 0 | 2 | Expense Report Summary ( No. 59748) |
| 53 | 38 | 304 | 158 | 04/19/99 | 5 | 0 | 2 | Expense Report Summary (No. 62746) |
| 54 | 39 | 305 | 163 | 05/25/99 | 2 | 0 | 2 | Expense Report Summary (No. 65271) |
| 55 | 40 | 306 | 165 | 06/29/99 | 5 | 0 | 2 | Expense Report Summary (No. 66073) |
| 56 | 41 | 307 | 170 | 07/16/99 | 5 | 0 | 2 | Expense Report Summary (No. 70244) |
| 57 | 42 | 308 | 175 | 09/28/99 | 6 | 0 | 2 | Expense Report Summary (No. 77060) |

OCIO / RIMS          Control Log for Delivery of Documents

Date                04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attachments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 58 | 43 | 309 | 181 | 09/09/99 | 6 | 0 | 2 | Expense Report Summary (No. 75501) |
| 59 | 44 | 310 | 187 | 05/16/02 | 8 | 0 | 2 | Expense Report Summary (No. W707229) |
| 60 | 45 | 311 | 195 | 08/20/99 | 3 | 0 | 2 | Apollo Group Check Request - UOP Southfield Campus Petty Cash |
| 61 | 46 | 312 | 198 | 06/09/99 | 3 | 0 | 2 | Apollo Group Check Request - UOP Michigan |
| 62 | 47 | 313 | 201 | 03/04/03 | 3 | 0 | 2 | Internet Expenses - Expense Summary |
| 63 | 48 | 314 | 204 | 06/03/03 | 2 | 0 | 2 | Expense Summary (Starbucks, Shell, etc.) |
| 64 | 49 | 315 | 206 | 07/25/03 | 2 | 0 | 2 | Expense Summary (24338) |
| 65 | 50 | 316 | 208 | 02/11/99 | 3 | 0 | 2 | Apollo Group Check Request - UOP Michigan |
| 66 | 51 | 317 | 211 | 12/28/98 | 2 | 0 | 2 | Center for Professional Education Petty Cash Replenishment Request |
| 67 | 52 | 318 | 213 | 11/06/98 | 4 | 0 | 2 | Apollo Group Check Request - UOP Michigan |
| 68 | 53 | 320 | 217 | 09/10/98 | 1 | 0 | 2 | Receipts - UOP Michigan |
| 69 | 54 | 321 | 218 | 08/17/98 | 1 | 0 | 2 | Expense Report (37806) |
| 70 | 55 | 322 | 219 | 08/03/98 | 1 | 0 | 2 | Expense Report - UOP Michigan Petty Cash Reimbursement |
| 71 | 56 | 323 | 220 | 08/03/98 | 1 | 0 | 2 | Receipts - UOP Michigan (lottery tickets) |
| 72 | 57 | 324 | 221 | 07/21/98 | 4 | 0 | 2 | Expense Report (35591) |
| 73 | 58 | 325 | 225 | 07/08/98 | 4 | 0 | 2 | Expense Report (34366) |
| 74 | 59 | 326 | 229 | 06/27/98 | 1 | 0 | 2 | Receipts for Office Max and Tuscan Grill (15555) |
| 75 | 60 | 327 | 230 | 04/24/98 | 1 | 0 | 2 | Receipts for Metrocenter - employee of the month |
| 76 | 61 | 328 | 231 | 03/10/98 | 2 | 0 | 2 | Expense Report (11518) |
| 77 | 62 | 329 | 233 | 02/05/98 | 1 | 0 | 2 | Cash Reward |
| 78 | 63 | 330 | 234 | 10/29/98 | 1 | 0 | 2 | Cash Reward |
| 79 | 64 | 331 | 235 | 09/23/02 | 7 | 0 | 2 | Expense Report (No. W745101) |
| 80 | 65 | 332 | 242 | 05/01/01 | 3 | 0 | 2 | Expense Report (W469740) |
| 81 | 66 | 333 | 245 | 09/18/01 | 3 | 0 | 2 | Expense Report (W589202) |
| 82 | 67 | 334 | 248 | 01/24/02 | 4 | 0 | 2 | Expense Report (W644776) |
| 83 | 68 | 335 | 252 | 06/11/02 | 7 | 0 | 2 | Expense Report (W721163) |
| 84 | 69 | 336 | 259 | 08/07/02 | 2 | 0 | 2 | Expense Report (W738053) |
| 85 | 70 | 337 | 261 | 06/27/02 | 3 | 0 | 2 | Expense Report (W729343) |
| 86 | 71 | 338 | 264 | 07/19/02 | 6 | 0 | 2 | Expense Report (W735111) |
| 87 | 72 | 339 | 270 | 09/04/02 | 2 | 0 | 2 | Expense Report (W742580) |
| 88 | 73 | 340 | 272 | 08/30/02 | 3 | 0 | 2 | Expense Report (W741956) |
| 89 | 74 | 341 | 275 | 08/15/02 | 5 | 0 | 2 | Expense Report (W739266) |
| 90 | 75 | 342 | 280 | 02/05/98 | 5 | 0 | 2 | Expense Report (10740) |
| 91 | 76 | 343 | 285 | 02/12/98 | 2 | 0 | 2 | Apollo Group Check Request re: petty cash |
| 92 | 77 | 344 | 287 | 03/10/98 | 3 | 0 | 2 | Expense Report (11518) |
| 93 | 78 | 345 | 290 | 03/16/98 | 2 | 0 | 2 | Apollo Group Check Request re: petty cash |
| 94 | 79 | 346 | 292 | 04/10/98 | 3 | 0 | 2 | Apollo Group Expense Report (19150) |
| 95 | 80 | 347 | 295 | 04/24/98 | 2 | 0 | 2 | Apollo Group Check Request re: petty cash |
| 96 | 81 | 348 | 297 | 04/27/98 | 2 | 0 | 2 | Apollo Group check Request for UOP Michigan |
| 97 | 82 | 349 | 299 | 05/08/98 | 5 | 0 | 2 | Apollo Group Expense Report (24577) |
| 98 | 83 | 350 | 304 | 07/08/98 | 2 | 0 | 2 | Apollo Group Expense Report (34366) |
| 99 | 84 | 351 | 309 | 07/09/98 | 6 | 0 | 2 | Apollo Group expense Report (34339) |

OCIO / RIMS       Control Log for Delivery of Documents

Date                    04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attachments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 100 | 85 | 352 | 315 | 07/21/98 | 6 | 0 | 2 | Apollo Group Expense Report (35591) |
| 101 | 86 | 353 | 321 | 08/03/98 | 2 | 0 | 2 | Apollo Group Check Request - UOP Michigan |
| 102 | 87 | 354 | 323 | 08/17/98 | 6 | 0 | 2 | Apollo Group Expense Report (37806) |
| 103 | 88 | 355 | 329 | 09/15/98 | 3 | 0 | 2 | Apollo Group Check Request for UOP Woodland Hills - re: petty cash |
| 104 | 89 | 356 | 332 | 10/12/98 | 3 | 0 | 2 | Apollo Group check Request for UOP Michigan |
| 105 | 90 | 357 | 335 | 11/22/02 | 3 | 0 | 2 | Expense Report Summary (W753094) |
| 106 | 91 | 358 | 338 | 09/23/02 | 7 | 0 | 2 | Expense Report Summary (W745101) |
| 107 | 92 | 359 | 345 | 10/07/02 | 6 | 0 | 2 | Expense Report Summary (W746783) |
| 108 | 93 | 360 | 351 | 12/31/02 | 3 | 0 | 2 | Expense Report Summary (W760784) |
| 109 | 94 | 361 | 354 | 09/21/99 | 1 | 0 | 2 | Expense Report Summary (76593) |
| 110 | 95 | 362 | 355 | 11/26/02 | 3 | 0 | 2 | Expense Report Summary (W755037) |
| 111 | 96 | 363 | 358 | 01/08/03 | 3 | 0 | 2 | Expense Report Summary (W763064) |
| 112 | 97 | 364 | 361 | 02/04/03 | 3 | 0 | 2 | Expense Summary Report (W771757) |
| 113 | 98 | 365 | 364 | 01/20/04 | 10 | 0 | 2 | Expense Report Summary (W852142) |
| 114 | 99 | 366 | 374 | 01/04/04 | 4 | 0 | 2 | Expense Report Summary (W848700) |
| 115 | 100 | 367 | 378 | 09/30/03 | 3 | 0 | 2 | Expense Report Summary (W826286) |
| 116 | 101 | 368 | 381 | 07/25/03 | 3 | 0 | 2 | Expense Report Summary (W809058) |
| 117 | 102 | 369 | 384 | 06/03/03 | 3 | 0 | 2 | Expense Report Summary (W797163) |
| 118 | 103 | 370 | 387 | 03/04/03 | 6 | 0 | 2 | Expense Report (W779169) |
| 119 | 104 | 371 | 393 | 10/10/01 | 1 | 0 | 2 | Receipts from Walmart - batch 90820 |
| 120 | 105 | 372 | 394 | 11/16/01 | 1 | 0 | 2 | Receipt from Kmart - batch 92462 |
| 121 | 106 | 373 | 395 | 11/16/01 | 1 | 0 | 2 | Receipt from Target - batch 92461 |
| 122 | 107 | 374 | 396 | 12/11/01 | 1 | 0 | 2 | Receipt from Walmart and Ritz Camera - batch 93400 |
| 123 | 108 | 375 | 397 | 05/01/02 | 1 | 0 | 2 | Receipt from Walmart - batch 98635 |
| 124 | 109 | 376 | 398 | 05/14/02 | 1 | 0 | 2 | Receipt from Best Buy - batch 99057 |
| 125 | 110 | 377 | 399 | 06/05/02 | 1 | 0 | 2 | Receipt form Fry's - batch 99774 |
| 126 | 111 | 378 | 400 | 06/13/02 | 1 | 0 | 2 | Receipt from Best Buy - batch 100224 |
| 127 | 112 | 379 | 401 | 06/13/02 | 1 | 0 | 2 | Receipt from Fry's - batch 100222 |
| 128 | 113 | 380 | 402 | 06/13/02 | 1 | 0 | 2 | Receipt from Best Buy- batch 100224 |
| 129 | 114 | 381 | 403 | 06/19/02 | 1 | 0 | 2 | Receipt from Best Buy- batch 100414 |
| 130 | 115 | 382 | 404 | 07/10/02 | 1 | 0 | 2 | Receipt from Walmart- batch 101201 |
| 131 | 116 | 383 | 405 | 07/30/02 | 1 | 0 | 2 | Receipt for dvd - batch 102027 |
| 132 | 117 | 384 | 406 | 08/20/02 | 1 | 0 | 2 | Receipt from Target - batch 103167 |
| 133 | 118 | 385 | 407 | 08/26/02 | 1 | 0 | 2 | Receipt from Walmart - batch 103523 |
| 134 | 119 | 386 | 408 | 09/12/02 | 1 | 0 | 2 | Receipt from Walmart and Office Max - batch 401364 |
| 135 | 120 | 387 | 409 | 09/16/02 | 1 | 0 | 2 | Receipt from Walmart, Party City and Things Remembered - batch 104471 |
| 136 | 121 | 388 | 410 | 09/18/02 | 1 | 0 | 2 | Receipt from Best Buy - batch 104825 |

5/3/2005

OCIO / RIMS          **Control Log for Delivery of Documents**

Date                04/27/05

CASE 05-00093

| CAT 1 | |
|-------|--|
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivary PDF | Doc. Date | No. of Pages | No. of Pages Attach- ments | Document Category | Description for release |
|--------|--------------------|-------------------------------------------|--------------------------------------|-----------|--------------|----------------------------|-------------------|-------------------------|
| 137 | 122 | 389 | 411 | 09/19/02 | 1 | 0 | 2 | Receipt from Best Buy - batch 104861 |
| 138 | 123 | 390 | 412 | 10/04/02 | 1 | 0 | 2 | Receipt from Walmart- batch 105620 |
| 139 | 124 | 391 | 413 | 12/09/02 | 1 | 0 | 2 | Receipt from Best Buy - batch 109092 |
| 140 | 125 | 392 | 414 | 12/10/02 | 1 | 0 | 2 | Receipt from Target and Staples - batch 109193 |
| 141 | 126 | 393 | 415 | 12/20/02 | 1 | 0 | 2 | Receipt from Office Max and Best Buy - batch 109669 |
| 142 | 127 | 394 | 416 | 01/13/03 | 1 | 0 | 2 | Receipt from Walmart - batch 111113 |
| 143 | 128 | 395 | 417 | 01/27/03 | 1 | 0 | 2 | Receipt from Rite Aid and Target - batch 112442 |
| 144 | 129 | 396 | 418 | 01/29/03 | 1 | 0 | 2 | Receipt from Walmart and Mimi's Café - batch 112666 |
| 145 | 130 | 397 | 419 | 02/18/03 | 1 | 0 | 2 | Receipt from Walmart - batch 113943 |
| 146 | 131 | 398 | 420 | 02/19/03 | 1 | 0 | 2 | Receipt from Walmart and Party City - batch 114023 |
| 147 | 132 | 399 | 421 | 02/24/03 | 1 | 0 | 2 | Receipt from Starbucks, Bookstar and Target - batch 114210 |
| 148 | 133 | 400 | 422 | 03/06/03 | 1 | 0 | 2 | Receipt from Best Buy - batch 114911 |
| 149 | 134 | 401 | 423 | 03/25/03 | 1 | 0 | 2 | Receipt from Best Buy - batch 116010 |
| 150 | 135 | 402 | 424 | 03/25/03 | 1 | 0 | 2 | Receipt from Best Buy - batch 116010 |
| 151 | 136 | 403 | 425 | 03/25/03 | 1 | 0 | 2 | Receipt from Best Buy - batch 116010 |
| 152 | 137 | 404 | 426 | 04/15/03 | 1 | 0 | 2 | Receipt from Walmart - batch 117201 |
| 153 | 138 | 405 | 427 | 04/23/03 | 1 | 0 | 2 | Receipt from Fry's - batch 117601 |
| 154 | 139 | 406 | 428 | 07/14/03 | 1 | 0 | 2 | Receipt from Best Buy - batch 122640 |
| 155 | 140 | 407 | 429 | 09/08/03 | 1 | 0 | 2 | Receipt from Circuit City - batch 126806 |
| 156 | 141 | 408 | 430 | 09/11/03 | 1 | 0 | 2 | Receipt from Fry's - batch 127050 |
| 157 | 142 | 409 | 431 | 09/11/03 | 1 | 0 | 2 | Receipt from Target- batch 127050 |
| 158 | 143 | 410 | 432 | 09/16/03 | 1 | 0 | 2 | Receipt from Target and Thaifoon - batch 127348 |
| 159 | 144 | 411 | 433 | 09/17/03 | 1 | 0 | 2 | Receipt from Circuit City and Staples - batch 127400 |
| 160 | 145 | 412 | 434 | 10/20/03 | 1 | 0 | 2 | Receipt from GFS and Target - batch 130072 |
| 161 | 146 | 413 | 435 | 10/28/03 | 1 | 0 | 2 | Receipt from CompUSA - batch 130626 |
| 162 | 147 | 414 | 436 | 10/30/03 | 1 | 0 | 2 | Receipt from Fry's - batch 130887 |
| 163 | 148 | 415 | 437 | 10/30/03 | 1 | 0 | 2 | Receipt from CompUSA - batch 130907 |
| 164 | 149 | 416 | 438 | 12/08/03 | 1 | 0 | 2 | Receipt from Target - batch 133280 |
| 165 | 150 | 417 | 439 | 01/26/04 | 1 | 0 | 2 | Receipt from Target - batch 136182 |
| 166 | 151 | 418 | 440 | 02/05/04 | 1 | 0 | 2 | Receipt from Target- batch 136566 |
| 167 | 152 | 419 | 441 | 02/18/04 | 1 | 0 | 2 | Receipt from Target, Subway, Hoogerhyde - batch 137499 |
| 168 | 153 | 420 | 442 | 03/09/04 | 1 | 0 | 2 | Receipt from Sears- batch 139888 |
| 169 | 154 | 421 | 443 | 03/09/04 | 1 | 0 | 2 | Receipt from Sears- batch 139888 |
| 170 | 155 | 42 | 449 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP additional info |
| 171 | 156 | 43 | 452 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP additional info |
| 172 | 157 | 44 | 455 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP additional info |
| 173 | 158 | 57 | 458 | 07/24/03 | 3 | 27 | 2,4 | email re: Monthly evaluations at UOP |
| 174 | 159 | 47 | 458 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP additional info |

OCIO / RIMS              Control Log for Delivery of Documents

Date                    04/27/05

CASE 05-00093

| CAT 1 | |
|-------|--|
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq.# | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|-------|--------------------|------------------------------------------|--------------------------------------|-----------|--------------|----------------------------|-------------------|-------------------------|
| 175 | 160 | 48 | 461 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP additional info |
| 176 | 161 | 54 | 464 | 07/24/03 | 1 | 2 | 2,4 | email re: Apps in UOP |
| 177 | 162 | 60 | 467 | 07/28/03 | 1 | 2 | 2,4 | email re: Site visits |
| 178 | 163 | 64 | 470 | 07/30/03 | 1 | 21 | 2,4 | email re: Hendow Transcript |
| 157 | 142 | 41 | 488 | 07/03/03 | 1 | 1 | 2,4 | email re: UOP additional info |
| 158 | 143 | 147 | 492 | 08/27/03 | 1 | 1 | 2,4 | Email OGC re: witnesses |
| 159 | 144 | 150 | 494 | 08/28/03 | 1 | 2 | 2,4 | Email OGC re: witnesses |
| 160 | 145 | 158 | 497 | 08/27/03 | 1 | 1 | 2,4 | Email internal ED re: Developments in UOP case |
| 161 | 146 | 59 | 499 | 07/28/03 | 1 | 2 | 2,4 | email re: UOP Monthly evaluations and scheduling meeting |
| 162 | 147 | 61 | 502 | 07/28/03 | 2 | 0 | 2,4 | email re: UOP information |
| 163 | 148 | 68 | 504 | 07/31/03 | 3 | 0 | 2,4 | email internal ED re: UOP incentive of DVD player. |
| 164 | 149 | 71 | 507 | 08/06/03 | 1 | 0 | 2,4 | email internal ED re: UP documents |
| 165 | 150 | 145 | 508 | 08/25/03 | 4 | 0 | 2,4 | Email internal ED re: Apollo Group article on student-enrollment |
| 166 | 150 | 21 | 512 | 05/16/03 | 1 | 0 | 2,4 | email to relator attorneys re: meeting times |
| 167 | 151 | 22 | 513 | 05/29/03 | 2 | 0 | 2,4 | email to relator attorneys re: meeting times |
| 168 | 152 | 23 | 515 | 05/30/03 | 2 | 0 | 2,4 | Email re: meeting and question on UOP loan breakdown |
| 169 | 153 | 24 | 517 | 05/30/03 | 3 | 0 | 2,4 | Email re: UOP loan breakdown |
| 170 | 154 | 25 | 520 | 05/30/03 | 2 | 0 | 2,4 | email re: US ex rel Hendrow et al v. UofP |
| 171 | 155 | 26 | 522 | 05/31/03 | 3 | 0 | 2,4 | email re: 6 year breakdown of UOP funds |
| 172 | 156 | 28 | 525 | 06/02/03 | 3 | 0 | 2,4 | email re: request of 6 year breakdown of UOP funds |
| 173 | 157 | 29 | 528 | 06/02/03 | 3 | 0 | 2,4 | email from N. Kropp to JW re: index of documents |
| 173 | 179 | 40 | 531 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP additional info |
| 174 | 164 | 30 | 534 | 06/03/03 | 3 | 2 | 2,4 | email re: 6 year breakdown of UOP funds |
| 175 | 165 | 31 | 536 | June 5, 2003 | 2 | 0 | 2,4 | email re: UOP funding information |
| 176 | 166 | 32 | 538 | 06/06/03 | 1 | 0 | 2,4 | email re: document index |
| 177 | 167 | 33 | 539 | 06/23/03 | 2 | 0 | 2,4 | email re: witness and arranging meeting |
| 178 | 168 | 36 | 541 | 06/26/03 | 1 | 0 | 2,4 | email re: telephone conference |
| 179 | 169 | 39 | 542 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP |
| 180 | 170 | 45 | 545 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP additional info |
| 181 | 171 | 46 | 548 | 07/03/03 | 1 | 2 | 2,4 | email re: UOP additional info |
| 182 | 172 | 49 | 551 | 07/15/03 | 1 | 2 | 2,4 | email re: Daily Numbers UOP |
| 183 | 173 | 50 | 554 | 07/17/03 | 2 | 0 | 2,4 | email OGC re: Daily numbers for June 18, 2003 |
| 184 | 174 | 51 | 556 | 07/18/03 | 1 | 0 | 2,4 | email internal ED re: UOP review |

OCIO / RIMS                 **Control Log for Delivery of Documents**

Date                04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq.# | Seq.# by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 185 | 175 | 52 | 557 | 07/24/03 | 1 | 3 | 2,4 | email re: UOP Application Trend Report |
| 186 | 176 | 53 | 561 | 07/24/03 | 1 | 2 | 2,4 | email re: notes from meeting with Bill Brebaugh. |
| 187 | 177 | 55 | 564 | 07/24/03 | 1 | 2 | 2,4 | email re: July/Aug Stack Ranking |
| 188 | 197 | 1600 | 598 | 09/23/99 | 7 | 0 | 2/UofP | Expense Report (ERN77031) |
| 189 | 198 | 1601 | 605 | 10/21/99 | 5 | 0 | 2/UofP | Check Request (BN52336) |
| 190 | 199 | 1602 | 610 | 12/20/99 | 7 | 0 | 2/UofP | Expense Report (ERN85319) |
| 191 | 200 | 1603 | 617 | 12/20/99 | 4 | 0 | 2/UofP | Expense Report (ERN85571) |
| 192 | 201 | 1604 | 621 | 01/06/00 | 2 | 0 | 2/UofP | Expense Report (ERN86318) |
| 193 | 202 | 1605 | 623 | 02/15/00 | 4 | 0 | 2/UofP | Expense Report (ERN88770) |
| 194 | 203 | 1606 | 627 | 01/27/00 | 4 | 0 | 2/UofP | Check Request ($936.14) |
| 195 | 204 | 1607 | 631 | 02/18/00 | 6 | 0 | 2/UofP | Expense Report (ERN91245) |
| 196 | 205 | 1608 | 637 | 03/21/00 | 7 | 0 | 2/UofP | Expense Report (ERN96686) |
| 197 | 206 | 1609 | 644 | 05/01/00 | 3 | 0 | 2/UofP | Expense Report (ERN98704) |
| 198 | 207 | 1610 | 647 | 04/19/00 | 3 | 0 | 2/UofP | Check Request ($827.04) |
| 199 | 208 | 1611 | 650 | 07/25/00 | 3 | 0 | 2/UofP | Check Request ($840.11) |
| 200 | 209 | 1612 | 653 | 09/07/00 | 3 | 0 | 2/UofP | Expense Report (ERN119637) |
| 201 | 210 | 1613 | 656 | 09/27/00 | 4 | 0 | 2/UofP | Expense Report (ERN122712) |
| 202 | 211 | 1614 | 660 | 10/10/00 | 2 | 0 | 2/UofP | Expense Report (W379851) |
| 203 | 212 | 1615 | 662 | 11/02/00 | 6 | 0 | 2/UofP | Expense Report (ERN126033) |
| 204 | 213 | 1616 | 668 | 10/25/00 | 4 | 0 | 2/UofP | Expense Report (ERN126260) |
| 205 | 214 | 1617 | 672 | 11/06/00 | 4 | 0 | 2/UofP | Expense Report (W391758) |
| 206 | 215 | 1618 | 676 | 12/01/00 | 6 | 0 | 2/UofP | Expense Report (ERN130180) |
| 207 | 216 | 1619 | 682 | 12/12/00 | 7 | 0 | 2/UofP | Expense Report (ERN131879) |
| 208 | 217 | 1620 | 689 | 12/22/00 | 3 | 0 | 2/UofP | Expense Report (W412141) |
| 209 | 218 | 1621 | 692 | 12/21/00 | 6 | 0 | 2/UofP | Expense Report (W412666) |
| 210 | 219 | 1622 | 698 | 12/20/00 | 2 | 0 | 2/UofP | Expense Report (W411278) |
| 211 | 220 | 1623 | 700 | 01/22/01 | 2 | 0 | 2/UofP | Expense Report (W423932) |
| 212 | 221 | 1624 | 702 | 01/30/01 | 4 | 0 | 2/UofP | Expense Report (ERN136964) |
| 213 | 222 | 1625 | 706 | 02/12/01 | 4 | 0 | 2/UofP | Expense Report (ERN137527) |
| 214 | 223 | 1626 | 710 | 04/19/01 | 4 | 0 | 2/UofP | Expense Report (W464198) |
| 215 | 224 | 1627 | 714 | 04/30/01 | 4 | 0 | 2/UofP | Expense Report (ERN146196) |
| 216 | 225 | 1628 | 718 | 05/23/01 | 2 | 0 | 2/UofP | Expense Report (W533927) |
| 217 | 226 | 1629 | 720 | 01/11/01 | 4 | 0 | 2/UofP | Expense Report (ERN135147) |
| 218 | 227 | 1630 | 724 | 03/07/03 | 2 | 0 | 2/UofP | Expense Report (W775551) |
| 219 | 228 | 1631 | 726 | 01/07/03 | 6 | 0 | 2/UofP | Expense Report (W762824) |
| 220 | 229 | 1632 | 732 | 01/13/03 | 3 | 0 | 2/UofP | Expense Report (W764246) |
| 221 | 230 | 1633 | 735 | 09/03/03 | 2 | 0 | 2/UofP | Expense Report (W819277) |
| 222 | 231 | 1634 | 737 | 12/22/03 | 2 | 0 | 2/UofP | Expense Report (W846281) |
| 223 | 232 | 1635 | 739 | 01/07/02 | 2 | 0 | 2/UofP | Expense Report (W634395) |
| 224 | 233 | 1636 | 741 | 02/19/98 | 3 | 0 | 2/UofP | Expense Report (BN8433) |
| 225 | 234 | 1637 | 744 | 08/13/98 | 3 | 0 | 2/UofP | Expense Report ($1031.51) |
| 226 | 235 | 1638 | 747 | 05/01/98 | 2 | 0 | 2/UofP | Expense Report ($60.64) |
| 227 | 236 | 1639 | 749 | 09/24/01 | 2 | 0 | 2/UofP | Expense Report (W591925) |
| 228 | 237 | 1640 | 751 | 11/27/01 | 2 | 0 | 2/UofP | Expense Report (W618821) |
| 229 | 238 | 1641 | 753 | None | 1 | 0 | 2/UofP | UofP Summary of Reports |
| 230 | 239 | 1642 | 754 | 10/17/01 | 3 | 0 | 2/UofP | Expense Report (W602097) |
| 231 | 240 | 1643 | 756 | 11/08/01 | 2 | 0 | 2/UofP | Expense Report (W610773) |

5/3/2005

OCIO / RIMS          **Control Log for Delivery of Documents**

Date                04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 232 | 241 | 1644 | 759 | 11/30/01 | 4 | 0 | 2/UofP | Expense Report (W621341) |
| 233 | 242 | 1645 | 763 | 02/07/02 | 2 | 0 | 2/UofP | Expense Report (W652493) |
| 234 | 243 | 1646 | 765 | 12/19/01 | 2 | 0 | 2/UofP | Expense Report (W630917) |
| 235 | 244 | 1647 | 767 | 04/01/02 | 2 | 0 | 2/UofP | Expense Report (W680131) |
| 236 | 245 | 1648 | 769 | 05/05/02 | 2 | 0 | 2/UofP | Expense Report (01/02-04/02) |
| 237 | 246 | 1649 | 771 | 06/24/02 | 2 | 0 | 2/UofP | Expense Report (W727476) |
| 238 | 247 | 1650 | 773 | 01/12/03 | 3 | 0 | 2/UofP | Expense Report (W764307) |
| 239 | 248 | 1651 | 776 | 04/29/03 | 2 | 0 | 2/UofP | Expense Report (W790060) |
| 240 | 249 | 1652 | 778 | 04/29/03 | 2 | 0 | 2/UofP | Expense Report (W790105) |
| 241 | 250 | 1653 | 780 | 05/19/03 | 3 | 0 | 2/UofP | Expense Report (W794074) |
| 242 | 251 | 1654 | 783 | 08/28/03 | 4 | 0 | 2/UofP | Expense Report (W817952) |
| 243 | 252 | 1655 | 787 | 06/12/03 | 2 | 0 | 2/UofP | Expense Report (W798999) |
| 244 | 253 | 1656 | 789 | 07/10/03 | 2 | 0 | 2/UofP | Expense Report (W805597) |
| 245 | 254 | 1657 | 791 | 08/20/03 | 2 | 0 | 2/UofP | Expense Report (W815936) |
| 246 | 255 | 1658 | 793 | 10/07/03 | 2 | 0 | 2/UofP | Expense Report (W823874) |
| 247 | 256 | 1659 | 795 | 09/16/03 | 4 | 0 | 2/UofP | Expense Report (W822656) |
| 248 | 257 | 1660 | 799 | 08/13/03 | 2 | 0 | 2/UofP | Expense Report (W813496) |
| 249 | 258 | 1661 | 801 | 10/21/03 | 2 | 0 | 2/UofP | Expense Report (W831335) |
| 250 | 259 | 1662 | 803 | 02/04/04 | 2 | 0 | 2/UofP | Expense Report (W856741) |
| 251 | 1 | 177 | 1 | 12/10/03 | 4 | 0 | 3 | Email re: Sperling Club |
| 252 | 2 | 189 | 5 | 12/18/03 | 1 | 0 | 3 | Email re: UOP Program Review Draft |
| 253 | 3 | 202 | 6 | 01/07/04 | 3 | 0 | 3 | Email internal ED and OGC re: UOP employee complaints |
| 254 | 4 | 207 | 9 | 01/15/04 | 3 | 0 | 3 | Email internal ED and OGC re: Employee Statement of responsibility |
| 255 | 5 | 224 | 12 | 02/05/04 | 1 | 0 | 3 | Email internal ED re: 2nd heads up UOP Report |
| 256 | 6 | 225 | 13 | 02/05/04 | 1 | 0 | 3 | Email internal ED re: 2nd heads up UOP Report |
| 257 | 7 | 226 | 14 | 02/05/04 | 2 | 0 | 3 | Email re: 2nd heads up UOP Report |
| 258 | 8 | 227 | 16 | 02/05/04 | 2 | 0 | 3 | Email re: 2nd heads up UOP Report |
| 259 | 9 | 230 | 18 | 02/05/04 | 1 | 0 | 3 | Email internal ED re: UOP report mailed |
| 260 | 10 | 231 | 19 | 02/05/04 | 1 | 0 | 3 | Email re: 2nd Heads Up |
| 261 | 11 | 232 | 20 | 02/05/04 | 1 | 0 | 3 | Email OGC and DOJ re: Relator's sur-reply brief |
| 262 | 12 | 235 | 21 | 02/06/04 | 1 | 0 | 3 | Email re: UOP Program Review Report |
| 263 | 13 | 240 | 22 | n/a | 1 | 0 | 3 | Chart on gift cards |
| 264 | 1 | 1176 | 1 | 08/29/03 | 3 | 0 | 4 | Email re: qui tam service |
| 265 | 2 | 1182 | 4 | 08/29/03 | 1 | 1 | 4 | Email re: qui tam amended complaint |
| 266 | 3 | 1185 | 6 | 08/29/03 | 1 | 0 | 4 | Email re: qui tam amended complaint |
| 267 | 4 | 1192 | 7 | 09/04/03 | 2 | 0 | 4 | Email CMT re: UofP personnel changes |
| 268 | 5 | 1195 | 9 | 09/04/03 | 1 | 2 | 4 | Email re: UofP internal email - Sperling Club |

OCIO / RIMS              **Control Log for Delivery of Documents**

Date          04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq.# by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 269 | 6 | 1196 | 12 | 09/04/03 | 1 | 3 | 4 | Email re: UofP internal email - personnel changes (1187, 1188, 1191, 1192, 1193, 1194, 1199, 1204) |
| 270 | 7 | 1199 | 16 | 09/04/03 | 2 | 0 | 4 | Email re: UofP internal email - personnel changes |
| 271 | 8 | 1202 | 18 | 09/05/03 | 1 | 0 | 4 | Email re: UofP press release |
| 272 | 9 | 1203 | 19 | 09/05/03 | 1 | 0 | 4 | Email re: UofP personnel changes |
| 273 | 10 | 1204 | 20 | 09/05/03 | 2 | 0 | 4 | Email re: UofP personnel changes (1187, 1188, 1191, 1192, 1193, 1194, 1196,1199) |
| 274 | 11 | 1207 | 22 | 09/05/03 | 2 | 0 | 4 | Email re: UofP press release |
| 275 | 12 | 1210 | 24 | 09/05/03 | 1 | 0 | 4 | Email CMT re: Relator emails |
| 276 | 13 | 1233 | 25 | 10/07/03 | 2 | 0 | 4 | Email re: enrollment contest |
| 277 | 14 | 1223 | 27 | 09/10/03 | 1 | 2 | 4 | Email re: qui tam case |
| 278 | 15 | 1254 | 30 | 10/01/03 | 2 | 0 | 4 | Email re: enrollment contest (1253) |
| 279 | 16 | 1255 | 32 | 10/04/03 | 1 | 5 | 4 | Email CMT re: enrollment contest results for week #1 |
| 280 | 17 | 1257 | 38 | 10/09/03 | 2 | 0 | 4 | Email re: enrollment contest clarification |
| 281 | 18 | 1266 | 40 | 10/17/03 | 1 | 6 | 4 | Email re: AR article on Apollo |
| 282 | 19 | 1268 | 47 | 10/19/03 | 1 | 1 | 4 | Email CMT re: Interesting reading re: UofP |
| 283 | 20 | 2463 | 49 | 7/26/03□downl | 24 | 0 | 4 | Starts Report for Marketing Support Coordinators |
| 284 | 21 | 2464 see also: 2560 | 73 | 05/28/03 | 1 | 3 | 4 | email re: Weekly Recap Spreadsheet |
| 285 | 22 | 2465 see also: 2561 | 77 | 06/04/03 | 1 | 3 | 4 | email re: SF May '03 |
| 286 | 23 | 2466 see also: 2473 2562 2569 | 81 | 05/16/03 | 1 | | 4 | email re: Phone Count this week |
| 287 | 24 | 2467 see also: 2563 | 82 | 06/05/03 | 1 | | 4 | email re: Going for the Gold |
| 288 | 25 | 2468 see also: 2564 2470 2566 | 83 | 06/06/03 | 1 | 0 | 4 | email re: FW: June Gloom? No Way!! |
| 289 | 26 | 2469 see also: 2567 | 84 | 05/27/03 | 1 | 0 | 4 | email re:FW: Hitting the numbers... |

9                                              5/3/2005

OCIO / RIMS                **Control Log for Delivery of Documents**

Date            04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 290 | 27 | 2470 | 85 | 06/06/03 | 1 | 0 | 4 | email re:FW: June Gloom? No Way!!! |
| 291 | 28 | 2471 see also: 2565 | 86 | 05/27/03 | 1 | 0 | 4 | re: FW: Hitting the numbers |
| 292 | 29 | 2472 see also: 2568 | 87 | 05/28/03 | 1 | 0 | 4 | email re: FW: Yesterdays' final numbers |
| 293 | 30 | 2473 see also: 2466 2562 2569 | 88 | 05/20/03 | 1 | 0 | 4 | email re: FW Phone Count this week |
| 294 | 31 | 2477 see also: 2482 2532 2537 | 89 | October | 1 | | 4 | Approval of Deferred Commissionable starts |
| 295 | 32 | 2478 see also: 2534 | 90 | April | 1 | | 4 | Approval of Deferred Commissionable starts |
| 296 | 33 | 2479 see also: 2535 | 91 | 06/15/01 | 1 | | 4 | Enrollments by Rep: 5/1/01 - 5/31/01 |
| 297 | 34 | 2480 see also: 2536 | 92 | December | 1 | | 4 | Approval of Deferred Commissionable starts |
| 298 | 35 | 2481 | 93 | October | 1 | | 4 | Approval of Deferred Commissionable starts |
| 299 | 36 | 2482 see also: 2540 | 94 | November | 1 | | 4 | Approval of Deferred Commissionable starts |
| 300 | 37 | 2483 | 95 | November, 2000 | 2 | | 4 | Ncal Rep Log |
| 301 | 38 | 2484 see also: 2542 | 97 | June | 1 | | 4 | Approval of Deferred Commissionable starts |
| 302 | 39 | 2485 see also: 2543 | 98 | August | 1 | | 4 | Approval of Deferred Commissionable starts |
| 303 | 40 | 2486 see also: 2546 | 99 | FY 03 | 1 | | 4 | Enrollment Manager Actual vs. Plan OnCampus FY 03 |
| 304 | 41 | 2487 | 100 | FY 2002 | 1 | | 4 | Online FY 2002 |
| 305 | 42 | 2488 | 101 | FY 2003 | 1 | | 4 | DOE/ADOE Actual vs. Plan FY 2003 |
| 306 | 43 | 2489 see also: 2549 2548 2488 | 102 | FY 2003 | 1 | 0 | 4 | DOE/ADOE Actual versus Plan FY 2003 |
| 307 | 44 | 2490 see also: 2533 | 103 | 05/31/03 | 9 | | 4 | Gross New Enrollments On Campus Acs, FY 03 |
| 308 | 45 | 2491 see also: 2556 | 112 | (no date) | 2 | | 4 | Walk of Fame |

10                                                        5/3/2005

OCIO / RIMS                 Control Log for Delivery of Documents

Date                 04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq.# by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 309 | 46 | 2492 see also: 2573 | 114 | 06/23/05 | 1 | | 4 | Enrollments: San Jose Campus |
| 310 | 47 | 2493 see also: 2496 2574 2577 | 115 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 311 | 48 | 2494 | 116 | 06/24/05 | 1 | | 4 | Enrollments: San Jose Campus 2002 |
| 312 | 49 | 2495 | 117 | 05/13/02 | 1 | | 4 | Enrollments by Rep: 4/1/02 - 4/30/02 |
| 313 | 50 | 2496 | 118 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 314 | 51 | 2497 see also: 2578 | 119 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02 - 4/30/02 |
| 315 | 52 | 2498 see also: 2580 | 120 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 316 | 53 | 2499 see also: 2579 | 121 | 05/13/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 317 | 54 | 2500 see also: 2581 | 122 | 06/24/05 | 1 | | 4 | Enrollments: San Jose Campus |
| 318 | 55 | 2501 see also: 2582 | 123 | 05/13/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 319 | 56 | 2502 see also: 2502 | 124 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 320 | 57 | 2503 see also: 2513 2584 2594 | 125 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus Annual |
| 321 | 58 | 2504 see also: 2585 2593 | 126 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus |
| 322 | 59 | 2505 see also: 2586 | 127 | 07/01/01 | 1 | | 4 | Cover Page New Enrollments, July 2001 Neal |
| 323 | 60 | 2506 2587 | 128 | 09/07/01 | 1 | | 4 | Enrollments by Rep: 7/1/01-7/31/01 |
| 324 | 61 | 2508 see also: 2516 2589 2597 | 129 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus |
| 325 | 62 | 2509 2590 | 130 | 09/07/01 | 1 | | 4 | Enrollments by Rep: 7/1/01-7/31/01 |
| 326 | 63 | 2510 2591 | 131 | 09/09/01 | 1 | | 4 | Enrollments by Rep: 7/1/01-7/31/01 |
| 327 | 64 | 2511 see also: 2592 | 132 | 08/01/01 | 1 | | 4 | Cover Page New Enrollments, August 2001 Neal, SJ |
| 328 | 65 | 2512 | 133 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus |

6/3/2005

OCIO / RIMS                    **Control Log for Delivery of Documents**

Date                    04/27/05

CASE 05-00093

| CAT 1 | |
|-------|---|
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|--------|-------------------|-------------------------------|--------------------------------------|-----------|--------------|---------------------------|-------------------|------------------------|
| | | Doc No. | | | | | | |
| 329 | 66 | 2513 | 134 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus Annual |
| 330 | 67 | 2514 see also: 2595 | 135 | 10/09/01 | 1 | | 4 | Enrollments by Rep: 8/1/01-8/31/01 |
| 331 | 68 | 2515 see also: 2596 | 136 | 09/12/01 | 1 | | 4 | Enrollments by Rep: 8/1/01-8/31/01 |
| 332 | 69 | 2516 | 137 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus |
| 333 | 70 | 2517 | 138 | ?/??/01 | 1 | | 4 | Enrollments by Rep: 8/1/01-8/31/01 |
| 334 | 71 | 2518 see also: 2599 | 139 | June FY 2002 | 1 | | 4 | Cover Page New Enrollments, June 2002 Ncal, SJ |
| 335 | 72 | 2519 see also: 2608 | 140 | 12/10/01 | 1 | | 4 | Enrollments by Rep: 11/1/01-11/30/01 |
| 336 | 73 | 2520 2601 | 141 | ?/?/01 | 1 | | 4 | Enrollments by Rep: 10/1/01-10/31/01 |
| 337 | 74 | 2521 see also: 2602 | 142 | 11/14/01 | 1 | | 4 | Enrollments by Rep: 10/1/01-10/31/01 |
| 338 | 75 | 2523 see also: 2576 2604 | 143 | 05/07/02 | 1 | | 4 | Enrollments by Rep: 3/1/02 - 3/31/02 |
| 339 | 76 | 2524 see also: 2606 | 144 | 10/11/02 | 1 | | 4 | Enrollments by Rep: 9/1/02-9/30/02 |
| 340 | 77 | 2525 see also: 2607 | 145 | 07/15/02 | 1 | | 4 | Enrollments by Rep: 6/1/02 - 6/30/02 |
| 341 | 78 | 2526 see also: 2608 | 146 | 09/12/02 | 1 | | 4 | Enrollments by Rep: 6/1/02 - 6/30/02 |
| 342 | 79 | 2527 see also: 2609 | 147 | 06/24/05 | 1 | | 4 | Enrollments: SJ Campus |
| 343 | 80 | 2528 see also: 2610 | 148 | 11/08/01 | 1 | | 4 | Enrollments by Rep: 9/1/01 - 9/30/01 |
| 344 | 81 | 2529 see also: 2611 | 149 | 10/10/01 | 1 | | 4 | Enrollments by Rep: 9/1/01 - 9/30/01 |
| 345 | 82 | 2530 see also: 2612 | 150 | 7/8/01 | 1 | | 4 | Enrollments by Rep: 9/1/01 - 9/30/01 |
| 346 | 83 | 2531 see also 2463 | 151 | 06/11/03 | 24 | | 4 | Starts Report for Marketing Support Coordinators Downloaded 7/26 |
| 347 | 84 | 2532 | 175 | October | 1 | | 4 | Approval of Deferred Commissionable starts |
| 348 | 85 | 2533 | 176 | FY 2003 | 9 | | 4 | Gross New Enrollments On Campus Acs, FY 03 |
| 349 | 86 | 2534 | 185 | April | 1 | | 4 | Approval of Deferred Commissionable starts |
| 350 | 87 | 2535 | 186 | 06/15/01 | 1 | | 4 | Enrollments by Rep 5/1/01 - 5/31/01 |

12                                    5/3/2005

OCIO / RIMS                    **Control Log for Delivery of Documents**

Date                    04/27/05

CASE 05-00093

| | CAT 1 | |
|---|---|---|
| | CAT 2 | |
| | CAT 3 | |
| | CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 351 | 88 | 2536 | 187 | December | 1 | | 4 | Approval of Deferred Commissionable starts |
| 352 | 89 | 2537 | 188 | October | 1 | | 4 | Approval of Deferred Commissionable starts |
| 353 | 90 | 2538 see also: 2550 2553 | 189 | 11/10/00 | 1 | | 4 | Starts by Rep 10/1/00 - 10/31/00 |
| 354 | 91 | 2539 see also: 2552 | 190 | 12/12/00 | 1 | | 4 | Starts by Rep 11/1/00 - 11/30/00 |
| 355 | 92 | 2540 | 191 | November | 1 | | 4 | Approval of Deferred Commissionable starts |
| 356 | 93 | 2541 | 192 | 12/08/00 | 2 | | 4 | Starts by Rep November 2000 |
| 357 | 94 | 2542 | 194 | June | 1 | | 4 | Approval of Deferred Commissionable starts |
| 358 | 95 | 2543 | 195 | August | 1 | | 4 | Approval of Deferred Commissionable starts |
| 359 | 96 | 2544 | 196 | 08/12/01 | 1 | | 4 | Enrollments by Rep 8/1/01 - 8/31/01 |
| 360 | 97 | 2545 | 197 | (no date) | 3 | | 4 | UoP, N.Cal EC/AEC Expectations |
| 361 | 98 | 2546 see also: 2486 | 200 | FY 2003 | 1 | | 4 | Enrollment Manager Actual vs. Plan OnCampus FY 03 |
| 362 | 99 | 2547 | 201 | FY 2002 | 1 | | 4 | Enrollment Manager Actual vs. Plan Online FY 02 |
| 363 | 100 | 2548 | 202 | FY 2003 | 1 | | 4 | DOE/ADOE Actual vs. Plan FY 2003 |
| 364 | 101 | 2549 | 203 | FY 2003 | 1 | | 4 | DOE/ADOE Actual versus Plan FY 2003 |
| 365 | 102 | 2550 | 204 | 11/10/00 | 1 | | 4 | Starts by Rep 10/1/00 - 10/31/00 |
| 366 | 103 | 2551 | 205 | 09/12/01 | 1 | | 4 | Enrollments by Rep 8/1/01 - 8/31/01 |
| 367 | 104 | 2552 | 206 | 12/12/00 | 1 | | 4 | Starts by Rep 11/1/00 - 11/30/00 |
| 368 | 105 | 2553 **ok | 207 | 11/10/00 | 1 | | 4 | Starts by Rep 10/1/00 - 10/31/00 |
| 369 | 106 | 2556 | 208 | (no date) | 2 | 0 | 4 | Walk of Fame |
| 370 | 107 | 2558 | 210 | (no date) | 1 | 0 | 4 | Team Lists |
| 371 | 108 | 2559 | 211 | (no date) | 2 | | 4 | Handwritten notes |
| 372 | 109 | 2560 | 213 | 05/28/03 | 1 | 3 | 4 | email Re FW: Weekly Recap Spreadsheet |
| 373 | 110 | 2561 | 217 | 06/04/03 | 1 | 3 | 4 | email re: SF May '03 |
| 374 | 111 | 2562 | 221 | 05/16/03 | 1 | | 4 | email re: Phone Count this week |
| 375 | 112 | 2563 | 222 | 06/05/03 | 1 | | 4 | email re: Going for the Gold |
| 376 | 113 | 2564 | 223 | 06/06/03 | 1 | 0 | 4 | email re: FW: June Gloom? No Way!! |
| 377 | 114 | 2565 | 224 | 05/27/03 | 1 | 0 | 4 | re: FW: Hitting the numbers |
| 378 | 115 | 2566 | 225 | 06/06/03 | 1 | 0 | 4 | email re:FW: June Gloom? No Way!!! |

OCIO / RIMS          **Control Log for Delivery of Documents**

Date                    04/27/05

CASE 05-00093

| CAT 1 | |
|-------|-|
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attachments | Document Category | Description for release |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| 379 | 116 | 2567 | 226 | 05/27/03 | 1 | 0 | 4 | email re:FW: Hitting the numbers... |
| 380 | 117 | 2568 | 227 | 05/28/03 | 1 | 0 | 4 | email re: FW: Yesterdays' final numbers |
| 381 | 118 | 2569 | 228 | 05/16/03 | 1 | | 4 | email re: Phone Count this week |
| 382 | 119 | 2572 | 229 | 04/01/02 | 1 | | 4 | Cover Page, New Enrollments Ncal, SJ April 2002 |
| 383 | 120 | 2573 | 230 | 06/23/05 | 1 | | 4 | Enrollments: San Jose Campus |
| 384 | 121 | 2574 | 231 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 385 | 122 | 2575 see also: 2494 | 232 | 06/24/05 | 1 | | 4 | Enrollments: San Jose Campus |
| 386 | 123 | 2576 | 233 | 05/07/02 | 1 | | 4 | Enrollments by Rep: 3/1/02 - 3/31/02 |
| 387 | 124 | 2577 | 234 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 388 | 125 | 2578 | 235 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02- 4/30/02 |
| 389 | 126 | 2579 | 236 | 05/13/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 390 | 127 | 2580 | 237 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 391 | 128 | 2581 | 238 | 06/24/05 | 1 | | 4 | Enrollments: San Jose Campus |
| 392 | 129 | 2582 | 239 | 05/13/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 393 | 130 | 2583 | 240 | 06/06/02 | 1 | | 4 | Enrollments by Rep: 4/1/02-4/30/02 |
| 394 | 131 | 2584 | 241 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus Annual |
| 395 | 132 | 2585 | 242 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus |
| 396 | 133 | 2586 | 243 | FY 2001 | 1 | | 4 | Cover Page New Enrollments, July 2001 Ncal, SJ |
| 397 | 134 | 2587 | 244 | 09/07/01 | 1 | | 4 | Enrollments by Rep: 7/1/01-7/31/01 |
| 398 | 135 | 2588 | 245 | 9/9/2001[] | 1 | | 4 | Enrollments by Rep: 7/1/01-7/31/01 |
| 399 | 136 | 2589 | 246 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus |
| 400 | 137 | 2590 | 247 | 09/07/01 | 1 | | 4 | Enrollments by Rep: 7/1/01-7/31/01 |
| 401 | 138 | 2591 | 248 | 09/09/01 | 1 | | 4 | Enrollments by Rep: 7/1/01-7/31/01 |
| 402 | 139 | 2592 | 249 | 08/01/01 | 1 | | 4 | Cover Page New Enrollments, August 2001 Ncal, SJ |
| 403 | 140 | 2593 | 250 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus |
| 404 | 141 | 2594 | 251 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus Annual |
| 405 | 142 | 2595 | 252 | 10/09/01 | 1 | | 4 | Enrollments by Rep: 8/1/01-8/31/01 |
| 406 | 143 | 2596 | 253 | 09/12/01 | 1 | | 4 | Enrollments by Rep: 8/1/01-8/31/01 |
| 407 | 144 | 2597 | 254 | 06/23/05 | 1 | | 4 | Enrollments: SJ Campus |
| 408 | 145 | 2598 | 255 | ?/?/2001 | 1 | | 4 | Enrollments by Rep: 8/1/01 - 8/31/01 |

OCIO / RIMS           **Control Log for Delivery of Documents**

Date                    04/27/05

CASE 05-00093

| | CAT 1 | |
|---|---|---|
| | CAT 2 | |
| | CAT 3 | |
| | CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attachments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 409 | 146 | 2599 | 256 | | 1 | | 4 | Cover Page New Enrollments, June 2002 Neal, SJ |
| 410 | 147 | 2600 | 257 | 12/10/01 | 1 | | 4 | Enrollments by Rep: 11/1/01-11/30/01 |
| 411 | 148 | 2601 | 258 | ?/?/01 | 1 | | 4 | Enrollments by Rep: 10/1/01-10/31/01 |
| 412 | 149 | 2602 | 259 | 11/14/01 | 1 | | 4 | Enrollments by Rep: 10/1/01-10/31/01 |
| 413 | 150 | 2603 | 260 | ?/7/02 | 1 | | 4 | Enrollments by Rep: 3/1/02-3/31/02 |
| 414 | 151 | 2604 | 261 | 05/07/02 | 1 | | 4 | Enrollments by Rep: 3/1/02 - 3/31/02 |
| 415 | 152 | 2605 | 262 | 10/01/02 | 1 | | 4 | Handwritten Notes |
| 416 | 153 | 2606 | 263 | 10/11/02 | 1 | | 4 | Enrollments by Rep: 9/1/02-9/30/02 |
| 417 | 154 | 2607 | 264 | 07/15/02 | 1 | | 4 | Enrollments by Rep: 6/1/02 - 6/30/02 |
| 418 | 155 | 2608 | 265 | 09/12/02 | 1 | | 4 | Enrollments by Rep: 6/1/02 - 6/30/02 |
| 419 | 156 | 2609 | 266 | 06/24/05 | 1 | | 4 | Enrollments: SJ Campus |
| 420 | 157 | 2610 | 267 | 11/08/01 | 1 | | 4 | Enrollments by Rep: 9/1/01 - 9/30/01 |
| 421 | 158 | 2611 | 268 | 10/10/01 | 1 | | 4 | Enrollments by Rep: 9/1/01 - 9/30/01 |
| 422 | 159 | 2612 | 269 | ?/8/01 | 1 | | 4 | Enrollments by Rep: 9/1/01 - 9/30/01 |
| 423 | 160 | 255 | 270 | 04/14/04 | 7 | 0 | 4 | UOP Exhibit A - Business Travel Expense Policies |
| 424 | 161 | 256 | 277 | 04/14/04 | 1 | 0 | 4 | UOP Exhibit B - Purchasing Contracts Development Procedure |
| 425 | 162 | 257 | 278 | 04/14/04 | 1 | 0 | 4 | UOP Exhibit C - Apollo Group Corporate Purchasing Card Agreement |
| 426 | 163 | 258 | 279 | 04/14/04 | 2 | 0 | 4 | UOP Exhibit D - UOP Policy on Gifts and Gratuities |
| 427 | 164 | 273 | 281 | n/a | 1 | 0 | 4 | EC Performance Expectations |

OCIO / RIMS          Control Log for Delivery of Documents

Date          04/27/05

CASE 05-00093

| | CAT 1 | |
|---|---|---|
| | CAT 2 | |
| | CAT 3 | |
| | CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attachments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 428 | 165 | 278 | 282 | 01/01/02 | 1 | 0 | 4 | annual employee performance evaluation |
| 429 | 166 | 279 | 283 | n/a | 1 | 0 | 4 | EC I Ongoing Expectations |
| 430 | 167 | 1302 | 284 | 07/28/03 | 2 | 0 | 4 | Email re: more information (59) |
| 431 | 168 | 2618 | 286 | 05/22/03 | 10 | 0 | 4 | NCAL OSIRA Meeting Guidelines |
| 432 | 169 | 2619 | 296 | 01/22/02 | 1 | 2 | 4 | Fax re: Qui Tam Case |
| 433 | 170 | 2630 | 299 | 01/09/03 | 22 | | 4 | Disclosure Statement of relators.... |
| 434 | 171 | 2631 | 321 | (no date) | 2 | 0 | 4 | TOC from Disclosure statement of relators |
| 435 | 172 | 2632 | 323 | (no date) | 26 | | 4 | Disclosure Statement of relators |
| 436 | 173 | 2633 | 349 | (no date) | 1 | | 4 | TOC to Exhibits |
| 437 | 174 | 2634 | 350 | (no date) | 4 | | 4 | Exhibit 1 |
| 438 | 175 | 2635 | 354 | (no date) | 2 | | 4 | Exhibit 2 |
| 439 | 176 | 2636 | 356 | (no date) | 6 | | 4 | Exhibit 3 |
| 440 | 177 | 2637 | 362 | (no date) | 10 | | 4 | Exhibit 4 |
| 441 | 178 | 2638 | 372 | (no date) | 3 | | 4 | Exhibit 5 |
| 442 | 179 | 2639 | 375 | (no date) | 7 | | 4 | Exhibit 6 |
| 443 | 180 | 2640 | 382 | (no date) | 2 | | 4 | Exhibit 7 |
| 444 | 181 | 2641 | 384 | (no date) | 2 | | 4 | Exhibit 8 |
| 445 | 182 | 2642 | 386 | (no date) | 2 | | 4 | Exhibit 9 |
| 446 | 183 | 2643 | 388 | (no date) | 18 | | 4 | Exhibit 10 |
| 447 | 184 | 2644 | 406 | (no date) | 14 | | 4 | Exhibit 11 |
| 448 | 185 | 2645 | 420 | (no date) | 16 | 0 | 4 | Exhibit 12 |
| 449 | 186 | 2646 | 436 | (no date) | 2 | | 4 | Exhibit 13 |
| 450 | 187 | 2647 | 438 | (no date) | 18 | | 4 | Exhibit 14 |
| 451 | 188 | 2648 | 456 | (no date) | 3 | | 4 | Exhibit 15 |
| 452 | 189 | 2649 | 459 | (no date) | 3 | | 4 | Exhibit 16 |
| 453 | 190 | 2650 | 462 | (no date) | 2 | 0 | 4 | Exhibit 17 |
| 454 | 191 | 2651 | 464 | (no date) | 2 | 0 | 4 | Exhibit 18 |
| 455 | 192 | 2652 | 466 | (no date) | 3 | 0 | 4 | Exhibit 19 |
| 456 | 193 | 2653 | 469 | (no date) | 9 | 0 | 4 | Exhibit 20 |
| 457 | 194 | 2654 | 478 | (no date) | 11 | 0 | 4 | Exhibit 21 |
| 458 | 195 | 2655 | 489 | (no date) | 10 | 0 | 4 | Exhibit 22 |
| 459 | 196 | 2656 | 499 | (no date) | 6 | 0 | 4 | Exhibit 23 |
| 460 | 197 | 2657 | 505 | (no date) | 3 | 0 | 4 | Exhibit 24 |
| 461 | 198 | 2658 | 508 | (no date) | 2 | 0 | 4 | Exhibit 25 |
| 462 | 199 | 2700 | 510 | (no date) | 2 | 0 | 4 | Expense Report |

OCIO / RIMS    **Control Log for Delivery of Documents**

Date                   04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| | | | Doc No. | | | | | |
| 463 | 200 | 2701 | 512 | (no date) | 2 | 0 | 4 | Expense Report |
| 464 | 201 | 2702 | 514 | 04/30/03 | 2 | 0 | 4 | Expense Report (W790288) |
| 465 | 202 | 2703 | 516 | 06/24/03 | 2 | 0 | 4 | Expense Report (W801757) |
| 466 | 203 | 2704 | 518 | 08/21/03 | 2 | 0 | 4 | Expense Report (W815995) |
| 467 | 204 | 2705 | 520 | 02/15/04 | 2 | 0 | 4 | Expense Report (W759841) |
| 468 | 205 | 2706 | 522 | 01/19/04 | 2 | 0 | 4 | Expense Report (W852028) |
| 469 | 206 | 2707 | 524 | 02/10/04 | 2 | 1 | 4 | Expense Report (W858622) |
| 470 | 207 | 2708 | 527 | 08/28/02 | 2 | 2 | 4 | Expense Report (W741162) |
| 471 | 208 | 533 | 531 | 08/05/04 | 1 | 0 | 4-8 | August 5, 2004 email internal ED re: changes to UOP charts |
| 472 | 209 | 541 | 532 | 08/05/04 | 2 | 0 | 4-8 | August 5, 2004 email internal ED re: UOP Briefing Shell |
| 473 | 210 | 563 | 534 | 08/03/04 | 1 | 0 | 4-8 | August 9, 2004 email internal ED and OGC re: UOP violations chart |
| 474 | 211 | 565 | 535 | 08/10/04 | 1 | 0 | 4-8 | August 10, 2004 email internal ED and OGC re: UOP information |
| 475 | 212 | 567 | 536 | 08/10/04 | 1 | 0 | 4-8 | August 10, 2004 internal KD |
| 476 | 213 | 1400 | 537 | None | 1 | 0 | 4/MA | OSIRA meeting notes |
| 477 | 214 | 1401 | 538 | 08/21/01 | 8 | 0 | 4/MA | UofP Gross New Enrollments, FY 2001, Ground Admissions Counselors |
| 478 | 215 | 1404 | 546 | 10/13/00 | 2 | 0 | 4/MA | Email re: contest numbers |
| 479 | 216 | 1405 | 548 | 10/17/00 | 1 | 0 | 4/MA | Email re: contest winners (1407) (1408) |
| 480 | 217 | 1406 | 549 | 10/17/00 | 1 | 0 | 4/MA | Email re: job performance for the month |
| 481 | 218 | 1407 | 550 | 10/18/00 | 1 | 0 | 4/MA | Email re: contest winners (1405) |
| 482 | 219 | 1408 | 551 | 10/18/00 | 1 | 0 | 4/MA | Email re: contest winners (1405) |
| 483 | 220 | 1410 | 552 | 03/07/01 | 1 | 0 | 4/MA | Email re: enrollment numbers (1411) |
| 484 | 221 | 1411 | 553 | 03/09/01 | 2 | 0 | 4/MA | Email re: enrollment numbers (1410) |
| 485 | 222 | 1414 | 555 | 03/28/01 | 1 | 0 | 4/MA | Email re: enrollment contests |
| 486 | 223 | 1417 | 556 | 06/09/01 | 1 | 0 | 4/MA | Email re: Stack rankings (1418) |
| 487 | 224 | 1418 | 557 | 06/12/01 | 1 | 0 | 4/MA | Email re: stack rankings (1417) |
| 488 | 225 | 1419 | 558 | 06/12/01 | 1 | 0 | 4/MA | Email to UOP re: enrollment numbers (1420) |
| 489 | 226 | 1420 | 559 | 06/12/01 | 2 | 0 | 4/MA | Email re: enrollment numbers (1419) |
| 490 | 227 | 1421 | 561 | 08/14/02 | 1 | 0 | 4/MA | Email re: enrollment numbers |

OCIO / RIMS          **Control Log for Delivery of Documents**

Date          04/27/05

CASE 05-00093

| CAT 1 | |
|---|---|
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach- ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 491 | 228 | 1422 | 562 | 08/22/01 | 1 | 0 | 4/MA | Email re: monthly enrollment numbers |
| 492 | 229 | 1423 | 563 | 09/26/01 | 1 | 0 | 4/MA | Email re: Stack rankings |
| 493 | 230 | 1424 | 564 | 10/19/01 | 1 | 0 | 4/MA | Email re: Stack rankings for FY 01 |
| 494 | 231 | 1426 | 565 | 09/17/02 | 1 | 0 | 4/MA | Employee Performance Expectation (chart type 1) |
| 495 | 232 | 1427 | 566 | 09/26/02 | 3 | 0 | 4/MA | Employee statement of annual goals |
| 496 | 233 | 1430 | 569 | 10/14/02 | 1 | 0 | 4/MA | Employee Daily Self Success form |
| 497 | 234 | 1431 | 570 | 10/15/02 | 1 | 0 | 4/MA | Employee Daily Self Success form |
| 498 | 235 | 1432 | 571 | 10/22/02 | 1 | 0 | 4/MA | Employee Performance Expectation (chart type 2) |
| 499 | 236 | 1433 | 572 | 10/25/02 | 1 | 0 | 4/MA | Employee Performance Expectation (chart type 2) |
| 500 | 237 | 1434 | 573 | September, FY0 | 1 | 0 | 4/MA | Employee OSIRA report |
| 501 | 238 | 1435 | 574 | September, FY0 | 1 | 0 | 4/MA | Employee OSIRA report |
| 475 | 239 | 1436 | 575 | October, 2002 | 1 | 0 | 4/MA | Employee OSIRA report |
| 476 | 240 | 1437 | 576 | October, 2002 | 1 | 0 | 4/MA | Employee OSIRA report |
| 477 | 241 | 1438 | 577 | September, 200 | 1 | 0 | 4/MA | Employee OSIRA report |
| 478 | 242 | 1439 | 578 | October, FY03 | 1 | 0 | 4/MA | Employee OSIRA report |
| 479 | 243 | 1440 | 579 | October, 2002 | 1 | 0 | 4/MA | Employee OSIRA report |
| 480 | 244 | 1441 | 580 | None | 1 | 0 | 4/MA | Form: EC I Performance Expectations (chart type 1) |
| 481 | 245 | 1442 | 581 | None | 1 | 0 | 4/MA | Form: EC I Expectations (chart type 3) |
| 482 | 246 | 1443 | 582 | None | 2 | 0 | 4/MA | Form: EC I Expectations (chart type 4) |
| 483 | 247 | 1444 | 584 | None | 1 | 0 | 4/MA | Form: EC II Performance Expectations (chart type 1) |
| 484 | 248 | 1445 | 585 | None | 5 | 0 | 4/MA | Form: EC II Performance Expectations (chart type 5) |
| 485 | 249 | 1446 | 590 | None | 1 | 0 | 4/MA | Form: Senior EC Performance Expectations (chart type 1) |
| 486 | 250 | 1447 | 591 | None | 5 | 0 | 4/MA | Form: Senior EC Performance Expectations (chart type 5) |
| 487 | 251 | 1448 | 596 | None | 1 | 0 | 4/MA | Form: Executive EC Performance Expectations (chart type 1) |
| 488 | 252 | 1449 | 597 | None | 5 | 0 | 4/MA | Form: Executive EC Performance Expectations (chart type 5) |
| 489 | 253 | 1450 | 602 | None | 20 | 0 | 4/MA | Packet of all levels of EC Performance Expectations forms |
| 490 | 254 | 1451 | 622 | None | 1 | 0 | 4/MA | Form: Admissions Counselor Daily Self Success Form |
| 491 | 255 | 1452 | 623 | None | 1 | 0 | 4/MA | Form: Monthly Goals |
| 492 | 256 | 1453 | 624 | October, 2002 | 24 | 0 | 4/MA | Admissions Counselor Policy Guide |
| 493 | 257 | 1454 | 648 | October, FY03 | 1 | 0 | 4/MA | Employee OSIRA report |
| 494 | 258 | 1455 | 649 | October, FY03 | 1 | 0 | 4/MA | Employee OSIRA report |
| 495 | 259 | 1456 | 650 | 07/29/02 | 7 | 0 | 4/MA | Lead Source Analysis report |
| 496 | 260 | 1457 | 657 | 07/29/02 | 3 | 0 | 4/MA | Lead Status report |
| 497 | 261 | 1458 | 660 | 07/29/02 | 4 | 0 | 4/MA | Rep Activity report |
| 498 | 262 | 1459 | 664 | 07/29/02 | 3 | 0 | 4/MA | Lead Status report |
| 499 | 263 | 1460 | 667 | 07/29/02 | 6 | 0 | 4/MA | Lead Source Analysis report |
| 500 | 264 | 1461 | 673 | 08/09/02 | 1 | 0 | 4/MA | Completed Tasks report |
| 501 | 265 | 1462 | 674 | 07/29/02 | 3 | 0 | 4/MA | Rep Activity report |
| 502 | 266 | 1463 | 677 | 08/13/02 | 1 | 0 | 4/MA | Employee Performance Expectation (chart type 1) |
| 503 | 267 | 1464 | 678 | 08/13/02 | 1 | 0 | 4/MA | Employee Performance Expectation (chart type 1) |

18                                    5/3/2005

OCIO / RIMS                     **Control Log for Delivery of Documents**

Date                04/27/05

CASE 05-00093

| | CAT 1 | |
|---|---|---|
| | CAT 2 | |
| | CAT 3 | |
| | CAT 4 | |

| Seq. # | Seq.# by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 504 | 268 | 1465 | 679 | 11/27/02 | 1 | 0 | 4/MA | Employee Performance Expectation (chart type 1) |
| 505 | 269 | 1466 | 680 | 01/07/03 | 1 | 0 | 4/MA | Employee Performance Expectation (chart type 1) |
| 506 | 270 | 1467 | 681 | 01/08/03 | 1 | 0 | 4/MA | Employee Next Period Goals |
| 507 | 271 | 1469 | 682 | None | 4 | 0 | 4/MA | UofP Employee Performance Expectations (partial) |
| 508 | 272 | 2227 | 686 | | 1 | | 4/MA | Sperling Club Events List of Date, Location & Participants |
| 509 | 273 | 2228 | 687 | 04/16/99 | 3 | 0 | 4/MA | Congratulations Sperling Club Winner |
| 510 | 274 | 2229 | 690 | 10/28/98 | 2 | | 4/MA | email re: Sperling 4 Announcement |
| 511 | 275 | 2231 | 692 | 05/17/99 | 1 | 0 | 4/MA | Sperling Club 4 (Seattle May 1999) SHIRTS |
| 512 | 276 | 2232 | 693 | 03/30/99 | 2 | 0 | 4/MA | email re: Sperling 4 is Over |
| 513 | 277 | 2233 | 695 | 04/05/01 | 3 | 0 | 4/MA | email from Western Region re: Winners List for the Golden Nugget Sperling Club |
| 514 | 278 | 2234 | 698 | 02/13/01 | 2 | 0 | 4/MA | email NCAL enrollment re: Viva Las Vegas |
| 515 | 279 | 2236 | 700 | 09/03/03 | 2 | | 4/MA | email re: Sperling Club Announcement |
| 516 | 280 | 2282 | 702 | 10/25/00 | 1 | 0 | 4/MA | email NCAL SJ Enrollment re: SJ's numbers |
| 517 | 281 | 2283 | 703 | (no date) | 2 | 0 | 4/MA | Expected Funding Source Document |
| 518 | 282 | 2284 | 705 | 07/21/03 | 2 | 0 | 4/MA | Fax of News Clippings re: FBI probe of university Handwritten notes: blue ink on white paper |
| 519 | 283 | 2285 | 707 | 04/29/04 | 6 | 0 | 4/MA | Executed Letter re: Program Review Report |
| 520 | 284 | 2287 | 713 | 08/25/03 | 1 | 0 | 4/MA | email re: Investigation Status |
| 521 | 285 | 2288 | 714 | 08/25/03 | 1 | 0 | 4/MA | email re: More Information |
| 522 | 286 | 2289 | 715 | 08/25/03 | 1 | 0 | 4/MA | email Internal ED re: U of P (con call) |
| 523 | 287 | 2293 | 716 | 08/25/03 | 1 | 2 | 4/MA | email re: FW: July App Total |
| 524 | 288 | 2294 | 719 | 08/25/03 | 2 | 1 | 4/MA | email re: FW: July/Aug AC Stack Ranking |
| 525 | 289 | 2295 | 722 | 08/25/03 | 2 | 0 | 4/MA | email re: FW Top Performers Event |
| 526 | 290 | 2307 | 724 | 02/28/04 | 2 | 0 | 4/MA | email re: Apollo Group Press Release |
| 527 | 291 | 2313 | 726 | 09/13/03 | 1 | 3 | 4/MA | Fax transmission report |
| 528 | 292 | 2314 | 730 | 07/15/03 | 1 | 0 | 4/MA | email to NCAL Enrollment re: July/August Stack Ranking |
| 529 | 293 | 2319 | 731 | 08/12/03 | 1 | 2 | 4/MA | email re: Do you like movies? |
| 530 | 294 | 2323 | 734 | 08/27/03 | 1 | 14 | 4/MA | fax cover re: US ex rel Hendrow vs UofP |
| 531 | 295 | 2324 | 749 | 06/17/04 | 2 | 20 | 4/MA | Docketing Statement for Appeal |
| 532 | 296 | 2325 | 771 | 08/04/04 | 1 | 1 | 4/MA | email re: new piece of information |
| 533 | 297 | 2326 | 773 | (no date) | 7 | | 4/MA | UOP Presentation Briefing Handout  (color) |

OCIO / RIMS                    Control Log for Delivery of Documents

Date                    04/27/05

CASE 05-00093

| | |
|---|---|
| CAT 1 | |
| CAT 2 | |
| CAT 3 | |
| CAT 4 | |

| Seq. # | Seq. # by Category | PO Numbering System or Batches / Doc No. | Page Numbers within the Delivery PDF | Doc. Date | No. of Pages | No. of Pages Attach-ments | Document Category | Description for release |
|---|---|---|---|---|---|---|---|---|
| 534 | 298 | 2328 | 780 | 01/21/04 | 4 | 0 | 4/MA | Request for Clarification re: Courts 1/8/04 scheduling order |
| 535 | 299 | 2333 | 784 | 10/20/03 | 6 | 2 | 4/MA | Joint Status Report of Relators/Plaintiffs and Defendant, UOP |
| 536 | 300 | 2337 | 792 | 04/15/04 | 6 | | 4/MA | Letter from Apollo re: Response to 3/12/04 letter and prog. Review |
| 537 | 301 | 2671 | 798 | FY 2002 | 1 | 0 | 4/MA | New Enrollments April, 2002 |
| 538 | 302 | 2672 | 799 | (no date) | 1 | 0 | 4/MA | UOP Weekly Meeting Worksheet EC 1 |
| 539 | 303 | 2673 | 800 | (no date) | 1 | 0 | 4/MA | UOP Action Plan For.... |
| 540 | 304 | 2674 | 801 | (no date) | 1 | 0 | 4/MA | UOP EA Daily Self Monitoring Feedback |
| 541 | 305 | 2676 | 802 | (no date) | 1 | 0 | 4/MA | First Night in Seattle! Kiana Lodge |
| 542 | 306 | 2681 | 803 | 01/09/03 | 1 | 1 | 4/MA | H&A v. UOP Exhibits to Disclosure Statement |
| 543 | 307 | 2681a | 805 | | | 2 | 4/MA | Enrollment Activities with Corresponding Salary 1994, 1997, 2000 |
| 544 | 308 | 2681b | 807 | | | 1 | 4/MA | Chart: "Approval of Deferred Commissionable Starts" |
| 545 | 309 | 2681c | 808 | | | 5 | 4/MA | "Stack Ranking" Internal Management Emails |
| 546 | 310 | 2681d | 813 | | | 9 | 4/MA | Stack Rancking, Titled "Gross New Enrollments" |
| 547 | 311 | 2681e | 822 | | | 3 | 4/MA | UOP Enrollment Counselor Merit Increase Policy |
| 548 | 312 | 2681f | 825 | | | 6 | 4/MA | Management E-mails re: Enrollment Based Gifts, Bonuses, Trips |
| 549 | 313 | 2681g | 831 | | | 1 | 4/MA | Daily Enrollment Numbers Chart |
| 550 | 314 | 2681h | 832 | | | 1 | 4/MA | Weekly Enrollment Numbers Chart |
| 551 | 315 | 2681i | 833 | | | 1 | 4/MA | Monthly Enrollment Numbers Chart |
| 552 | 316 | 2681j | 834 | | | 14 | 4/MA | Matrix --Southern California, Northern California, Sacramento, Colorado |
| 553 | 317 | 2681k | 848 | | | 10 | 4/MA | Local Campus Performance Reviews --Relator Albertson |
| 554 | 318 | 2681l | 858 | | | 13 | 4/MA | Corporate Performance Reviews -- Relator Albertson |
| 555 | 319 | 2681m | 871 | | | 1 | 4/MA | Performance Plan |
| 556 | 320 | 2681n | 872 | | | 6 | 4/MA | Articles re: Other Schools Violating HEA Ban |
| | | TOTAL | 878 | | | | | |

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

1050 Connecticut Avenue, N.W. Washington, D.C. 20036-5306
(202) 955-8500
www.gibsondunn.com

dcox@gibsondunn.com

June 15, 2005

| | |
|---|---|
| Direct Dial | Client No. |
| (202) 887-3531 | T 03002-00030 |
| Fax No. | |
| (202) 530-9539 | |

**VIA HAND-DELIVERY**

Chief Information Officer
U.S. Department of Education
400 Maryland Avenue, S.W.
FOB-6-2W31, ATTN: FOIA Appeals
Washington, D.C. 20202-4500

> Re:  *Freedom of Information Act Appeal: Request No. 05-00093-F dated Oct. 25, 2004*

Dear Sir or Madam:

Pursuant to 5 U.S.C. § 552(a)(6)(A) and 34 C.F.R. § 5.81, Apollo Group, Inc. ("Apollo") hereby appeals the May 3, 2005 decision of the FOIA Office of the Department of Education (the "Office"), affirmed in the Office's letter of June 10, 2005 to Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), to withhold or redact an exceedingly large volume of documents and sections of documents responsive to the Freedom of Information Act ("FOIA") request made by Gibson Dunn on Apollo's behalf on October 25, 2004.

At the outset, we wish to underscore four points:

(1) We do not seek, and have never sought, information regarding individuals' privacy protected by Exemptions 6 and 7(C).

(2) To the extent any exemption applies, the statutory requirement of segregability commands that an agency "must provide reasonably segregable portions of the properly withheld documents." *Judicial Watch, Inc. v. Dep't of Justice*, 337 F. Supp. 2d 183, 185 (D.D.C. 2004).

LOS ANGELES  NEW YORK  WASHINGTON, D.C.  SAN FRANCISCO  PALO ALTO
LONDON  PARIS  MUNICH  BRUSSELS  ORANGE COUNTY  CENTURY CITY  DALLAS  DENVER

Tab E

Chief Information Officer
June 15, 2005

   (3) Many of the Office's errors are uncontestable, such as the failure to produce responsive attachments identified by e-mails that contain document icons.

   (4) Many of the legal positions taken by the Office are obviously erroneous, such as its reliance on exemptions that it has already ruled do not apply to the documents at issue.

Against this backdrop, the record of the Office's malfeasance and misfeasance is quite compelling.

## I. BACKGROUND

   On October 25, 2004, Gibson Dunn submitted a FOIA request to the Office, a copy of which is attached hereto as Exhibit 1. The request seeks, among other things, all underlying work papers relating to the Program Review Report bearing the Program Review Control Number 200340922254 (the "Report"). The work papers requested include, but are not limited to, any and all draft versions of the Report; internal notes (including all notes from interviews conducted with any and all current and former Apollo employees); all notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003; the Department's analyses involving the documents and/or records Apollo produced to the Department as well as the underlying work papers and documents for these analyses; and the Department's correspondence with outside parties. The request also seeks internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Department's examination leading up to the Report, or the sanctions demanded during negotiations, as well as copies of any delegation of authority that purported to authorize Donna Wittman to issue the Report.

   The Office's May 3 response was preceded by four interim responses, which were dated December 29, 2004, attached hereto as Exhibit 2; February 18, 2005, attached hereto as Exhibit 3; February 28, 2005, attached hereto as Exhibit 4; and April 8, 2005, attached hereto as Exhibit 5. The materials produced in the first three responses, which numbered 510 pages, were largely unresponsive to the substance of our requests and led to significant delay. The Office only began to produce relevant information in the fourth production, evidently sparked by our warning that we would consider further delay by the Office a constructive denial. *See* Letters from Cox to Van Vlandren of 2/28/05 and 3/4/05, at 3 and 1, respectively, attached hereto as Exhibits 6 and 7. On May 3, 2005 – some 190 days after the FOIA request was submitted – the Office issued its final substantive determination refusing production of many documents responsive to the request. A copy of that "final response" is attached hereto as Exhibit 8.

   The April 8 and May 3 letters disposed of Apollo's FOIA request on essentially the same purported bases. As stated in the May 3 letter, the Office withheld 2,171 pages in their entirety "pursuant to FOIA Exemption (b)(5)"; the materials the Office did produce were heavily – indeed often entirely – redacted. The Office claimed that its withholdings were justified for the following three reasons: (1) Exemption (b)(5) and 34 C.F.R. § 5.73(a); (2) Exemption (b)(6); and (3) Exemption (b)(7)(C). It appears that the Office is withholding witness information and statements only under 7(C). *See* Letter from Van Vlandren to Cox of 5/3/05, Exhibit 8, at 3 ("In

2

Chief Information Officer
June 15, 2005

accordance with 5 U.S.C. § 552(b)(7)(C), information . . . (including but not limited to witness information and statements) has been withheld.").

Since submitting our request on October 25, we have persistently followed up with the Office to communicate our concerns about the insufficiency of its response to the request. Through numerous letters, conversations, voicemail messages, and e-mail exchanges, we have pointed to major deficiencies that pervaded the Office's production. Assuming that the Office would seek to comply both with its legal obligations under FOIA and with its "policy of fullest disclosure," 34 C.F.R. § 5.70(F), we have diligently, but unsuccessfully, sought a sufficient response from the Office.

Our most recent attempt to address this situation via informal means was encapsulated in a May 13 letter to the Office. *See* Letter from Cox to Van Vlandren of 5/13/05, attached hereto as Exhibit 9. Notwithstanding our repeated requests to meet with the Office as soon as possible to discuss our letter and the Office's representation that we would receive a response on Monday, June 6, 2005, we did not hear from the Office until Friday, June 10, 2005. *See* Letter from Van Vlandren to Cox of 6/10/05, attached hereto as Exhibit 10. Even then, the Office's letter continued to embody obvious errors and to embrace positions that lack legal support.

As we have impressed repeatedly upon the Office from our initial request forward, Apollo is the defendant in a securities lawsuit in Arizona district court. At this point, the lawsuit has reached the stage where dispositive motions are being filed. The Office's failure to release documents that are subject to mandatory disclosure has hampered Apollo in that litigation.

In light of this reality, the need to address the defects in the Office's production has become immediate and critical.

As demonstrated below, and because the Office has refused to recede from its indefensible positions, this appeal cannot be avoided.

## II. PRODUCTION OF THE REQUESTED MATERIALS IS REQUIRED BY FOIA

FOIA is designed to "open agency action to the light of public scrutiny." *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989) (internal quotation marks and citations omitted). Although FOIA offers the government the opportunity to protect limited information under nine exemptions, in light of FOIA's "goal of broad disclosure, these exemptions have been consistently given a narrow compass." *Id.* at 151. Furthermore, the burden is on the Department "to justify the withholding of any requested documents" and remains with the Department "when it seeks to justify the redaction of identifying information in a particular document as well as when it seeks to withhold an entire document." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (internal citation omitted).

Our FOIA request sought the underlying work papers allegedly supporting the findings of the Report, which has already been released. By internal Department rules, creation of these work papers was required, and their submission with the Report was mandatory. *See* San Francisco Program Review Website K:\IPOS\Hansen\Sites\Templates\p2.htm ("When submitting program review reports, the specialist *must* include work papers supporting findings

3

Chief Information Officer
June 15, 2005

for the report.") (emphasis added). Yet, rather than allow Apollo to examine the Report work papers, the Office has inappropriately invoked FOIA's exemptions and has cloaked itself in a veil of administrative secrecy that defies FOIA's fundamental statutory command of disclosure.[1]

    1. <u>The Office's Wholesale Invocation Of Exemption 7(C) Is Directly At Odds With Its Earlier Statements And Defies Established FOIA Precedent.</u>

In its letters of April 8 and May 3, 2005, the Office invokes Exemption 7(C) to justify its redactions and withholdings. *See* Letters from Van Vlandren to Cox of 4/8/05 and 5/3/05, Exhibits 5 and 8, at 3 (stating that "[i]n accordance with 5 U.S.C. § 552(b)(7)(C), information . . . (including but not limited to witness . . . statements) has been withheld").

Remarkably, the Office invokes 7(C) to shield work papers that are part of the Report, despite having previously found that the Exemption did not apply to the Report. The Office already determined that the Report, specifically, was not compiled for a law enforcement purpose and thus could not meet the Exemption 7(C) threshold requirement. *See* Letter from Van Vlandren to Cox of 8/26/04, at 13, attached hereto as Exhibit 11. In no uncertain words, the Office stated:

> The Department has concluded that exemption (b)(7) does not preclude the release of the PRR, either in whole or in part, for the reasons set for the [sic] below . . . . *The Department disagrees with your characterization that the PRR was compiled for a law enforcement purpose.* Contrary to your conclusion, the PRR is a Congressionally mandated tool used by the Department to carry out its responsibilities under the Higher Education Act. The 2001 Program Review Guide, p. i.

(Emphasis added). Remarkably, the Office has now made a complete and self-serving about-face. In its letter of June 10, the Office now claims:

> The Department compiled the information at issue during the course of its investigation of UOP's compliance with section 487(a)(20) of Title IV of the Higher Education Act, as amended (HEA), 20 U.S.C. § 1094(a)(20), which prohibits the payment of any commission, bonus or other incentive based directly or indirectly on success in securing student enrollments. *Thus, the records responsive to your request were compiled for law enforcement purposes under FOIA.* During the referenced investigation, numerous individuals

---

[1] In its letter of June 10, the Office repeatedly expresses confusion regarding our request for the *complete* Report. *See, e.g.,* Letter from Van Vlandren to Cox of 6/10/05, Exhibit 10, at 2 ("[T]he only report issued by the Department in connection with the investigation, which is the subject of your FOIA request . . . was released to you in full."). As we have stated clearly, the full Report includes the work papers and other supporting material required to be included with the Report according to the Department's own instructions. The Office has repeatedly failed to address this point.

4

Chief Information Officer
June 15, 2005

> provided information to the Department in the form of formal statements and
> other documents or materials (*e.g.*, e-mail messages, hand-written notes, etc.).
> In some instances it was necessary to withhold entire documents in order to
> fully protect the identity of subject individuals. The Department properly
> invoked Exemption 7(C) in doing so.

(Emphasis added). The Office cannot have it both ways; and it has already acted on its prior conclusion that the Report was *not* compiled for law enforcement purposes. It is too late to undo that decision, which compels the conclusion that none of the witness information and statements or other materials can be protected under Exemption 7(C).

Furthermore, even if Exemption 7(C) applied, the Office has attempted to bootstrap the limited exemption for privacy interests into protection for entire pages of responsive documents. *See, e.g.*, FOIA Office Document Id. Numbers (hereinafter, "Docs." or, singularly, "Doc.") 43, 47, 64, 1009, 2417, 2445, collectively attached hereto as Exhibit 12.[2] This is a small subset of such documents; hundreds more are contained in the Office's flawed production. The D.C. Circuit has clearly held that such withholdings are not sanctioned by Exemption 7(C): "Exemption 7(C) ordinarily permits the Government to withhold *only* the specific information to which it applies, *not the entire page or document in which the information appears . . .* unless the exempt and nonexempt information are 'inextricably intertwined.'" *Mays v. Drug Enforcement Administration*, 234 F.3d 1324, 1327 (D.C. Cir. 2000) (emphases added) (holding that only names and personal information are "necessarily exempt"). To the extent any privacy interest is implicated by the documents, the balance between the public's interest in disclosure and individuals' interest in privacy is drawn by redacting names and personal information, not by withholding the content of any information such individuals supplied. *See Brittany Dyeing and Printing Corp. v. Envtl. Prot. Agency*, No. Civ.A. 91-2711(HHG), 1993 WL 13036144, **1-2 (D.D.C. March 12, 1993) (ordering the release of a draft enforcement summary report, final site report, notes from witness interviews, and witness affidavits, subject to redactions of names and other identifying information).

The Office's reliance in its June 10 letter on *SafeCard Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197 (D.C. Cir. 1991), readily demonstrates the absence of case support for the Office's erroneous wholesale withholdings under Exemption 7(C). The Office cites *SafeCard Services* for the proposition that "based upon the traditional recognition of the strong privacy interests inherent in law enforcement records, the 'categorical withholding' of information that identifies third parties in law enforcement records will ordinarily be appropriate under Exemption 7(C)." Letter from Van Vlandren to Cox of 6/10/05, Exhibit 10, at 2 n.4; *see also id.* at 2 ("It is appropriate to withhold information identifying third parties in law enforcement records on a categorical basis."). *SafeCard Services* does not stand for such a sweeping proposition. Indeed, the facts of *SafeCard Services* demonstrate conclusively the exact

---

[2]  The yellow cover pages contained in the exhibits reflect the Office's characterization of the documents, including the Office's errors, such as misidentification of the number of pages in a given document.

Chief Information Officer
June 15, 2005

  As an initial matter, the Office's August 26 position means that it cannot now invoke Exemption 5 to preclude production of the Report, which obviously includes those parts required to be included with the Report according to the Department's own instructions. *See* San Francisco Program Review Website K:\IPOS\Hansen\Sites\Templates\p2.htm. To hold otherwise would be for the Office to take directly inconsistent positions with respect to the same document.

  Furthermore, the Office provides no meaningful explanation for its invocation of the Exemption 5 privileges to cover both its extensive redaction of materials, as well as its withholding of an additional 2,171 pages of responsive materials in their entirety. Under FOIA, the burden rests with the Department to demonstrate the applicability of any exemption. The Office's analyses in its April 8 and May 3 letters boil down to three conclusory sentences that lack any case law citation. The Office's June 10 letter fares no better. The Office has failed to carry its burden.

  In this matter, the Office has not only failed to provide reasoning but has collapsed the three Exemption 5 privileges for purposes of its analysis: "Any and all inter-agency or intra-agency memoranda and correspondence as well as drafts of letters, memoranda, and correspondence reflecting the Department's deliberative process, attorney-client communications, and attorney-work product, have been withheld pursuant to 5 U.S.C. § 552(b)(5) and the Department's regulation 34 C.F.R. § 5.73(a)." Under the Department's regulations, denials of FOIA requests "shall contain reasons for the denial." 34 C.F.R. § 5.53(b). Accordingly, because the Office has not explained which Exemption 5 privilege applies to which document, it has failed to meet that legal requirement.

  The Office's attempt in its June 10 letter to resuscitate its deficient explanation is equally unavailing. Despite being given an opportunity to state the legal bases for its wholesale usage of Exemption 5, the Office once again refuses to do so. Not a single word is written to separate the application of the attorney-client, attorney work-product, or deliberative process privileges from one another. Indeed, the explanation given by the Office to justify its invocation of Exemption 5 focuses exclusively on the deliberative process privilege, calling into question whether any basis exists at all for the Office's reliance on the other two privileges. Thus, it seems likely, for example, that the Office has combined invocation of these privileges in its April 8 and May 3 letters to avoid identifying which documents it is shielding under the attorney-client privilege – for fear that the documents, on their face, do not satisfy the privilege's requirements.

  Furthermore, the withholdings and redactions at issue are themselves fundamentally flawed. Given that the Report originated "as a result of the Department's routine monitoring," *see* Letter from Van Vlandren to Cox of 8/26/04, Exhibit 11, at 12, the requested materials constitute a factual investigation. As the D.C. Circuit has held, the deliberative process privilege cannot be invoked where "materials could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment." *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). "The privilege is designed to protect agency policy-oriented judgments and the processes by which policies are formulated, rather than purely factual, investigative matters." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 31 (D.C. Cir. 2002) (internal quotation marks and citations omitted). There is no indication that the materials requested relate to formulation of or comment upon policy matters.

7

Chief Information Officer
June 15, 2005

There is no indication that the author of the Report had any policy role. These records may not be withheld under the guise of the deliberative process privilege.

Even if the deliberative process exemption applied, it would not protect factual material that does not disclose an agency's decision-making process. *See Mead Data Central, Inc. v. Dep't of the Air Force*, 566 F.2d 242, 254 n.28 (D.C. Cir. 1977) (stating that the deliberative process privilege "does not permit the nondisclosure of underlying facts unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process"). As the court stressed in *Dudman Communications Corp. v. Department of the Air Force*, 815 F.2d 1565, 1568-69 (D.C. Cir. 1987), the key question for Exemption 5 cases is "whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." The court held, with equal applicability here, "[i]f a person requests particular factual material . . . the agency will usually be able to excise the material from the draft document and disguise the material's source, and thus the agency will usually be able to release the material without disclosing any deliberative process." *Id.* at 1569.

Significantly, in its letter of June 10, the Office concedes that "[a]s a rule, the deliberative process privilege of Exemption 5 does not protect purely factual matters, or factual portions of otherwise deliberative memoranda." Letter from Van Vlandren to Cox of 6/10/05, Exhibit 10, at 3 (citing *EPA v. Mink*, 410 U.S. 73, 91 (1973)). The Office cites three cases for the unremarkable proposition that under certain circumstances factual material is such an integral part of the deliberative document that it may not be segregated from the deliberative document itself. *See Williams v. Dep't of Justice*, 556 F. Supp. 63, 65 (D.D.C. 1982) (fact sections within attorneys' working papers held to be deliberative because the "factual material is selective and presented often with characterization or passing comment"); *Wolfe v. Dep't of Health and Human Servs.*, 839 F.2d 768, 774-76 (D.D.C. Cir. 1988) (en banc) (records indicating which agency-proposed regulations were pending and the transmission information for proposed rules would reveal policy decisions by the Food and Drug Administration and also invite requesters into the deliberative process and therefore were not subject to disclosure); *Nat'l Wildlife Fed'n v. Forest Serv.*, 861 F.2d 1114, 1122 (9th Cir. 1988) (court upheld lower court release of factual material from draft Forest Plans and draft environmental impact statements but held that the remaining material consisted of "opinions and recommendations of Forest Service employees on factors that will serve as contributions in the decisionmaking calculus" and thus was not subject to disclosure). There is nothing to suggest that the thousands of pages redacted or withheld by the Office under Exemption 5 fall within the narrow holdings of these cases.

Moreover, the Office has undertaken no effort to segregate factual material from material it claims is deliberative in nature; instead, it has resorted to wholesale redactions and withholdings. The Office's failure to produce such non-exempt factual material in the context of a deliberative process claim is a violation of the requirement in 5 U.S.C. § 552(b), which mandates that "[a]ny reasonably segregable portion of a record shall be provided." The importance of the segregability requirement was recently affirmed for all exemptions in *Judicial Watch, Inc. v. Department of Justice*, 337 F. Supp. 2d 183, 185 (D.D.C. 2004). As the court held, "[t]he segregability requirement . . . does not carve out an exception for documents withheld pursuant to certain privileges. Rather, the requirement demands that regardless of

8

Chief Information Officer
June 15, 2005

*which* of the nine exemptions defendants assert, [agencies] must provide reasonably segregable portions of the properly withheld documents."

> 3. Correspondence With The Private Sector Litigants Cannot Be Protected By Exemption 5.

The Office has invoked Exemption 5 to protect documents covered by our request for the Department's correspondence with outside parties, including *qui tam* relators who filed suit against Apollo. *See, e.g.*, Docs. 1045, 1223, 2288, 2307, collectively attached hereto as Exhibit 13.[3] The program review is a non-delegable function to be performed exclusively by the Department. Any correspondence with the relators or their counsel, who are undoubtedly self-interested, cannot be protected by Exemption 5. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001) (stating that "consultants whose communications have typically been held exempt have *not* communicated with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant") (emphasis added).

> 4. Even In The Limited Materials It Has Produced, The Office Has Failed To Include Responsive Material.

The unjustifiably broad invocations of exemptions are accompanied by inconsistencies in treatment of the documents that were produced. A few examples will serve to represent an overwhelmingly large number of recurring errors and omissions, which demonstrate the Office's incomplete production:

- Exemption (b)(1) is invoked in several instances. *See, e.g.*, Docs. 2319, 2480, 2681(f), collectively attached hereto as Exhibit 14. Exemption (b)(1) protects matters of national security from disclosure. We find it hard to imagine any basis for invocation of this Exemption in the Office's production. Although the Office

---

[3] On March 7, 2003, relators filed a complaint against Apollo under seal pursuant to the False Claims Act in the United States District Court for the Eastern District of California. While the complaint remained under seal, the Department of Justice ("DOJ") investigated the relators' allegations to decide whether to intervene and assume control of the matter. On May 5, 2003, DOJ filed a Notice of Election to Decline Intervention, leaving the relators to pursue the case on their own.

The relators served an amended complaint upon Apollo in September 2003. Over the next several months, Apollo filed two motions to dismiss the relators' amended complaint for failure to state a claim under the False Claims Act. The District Court granted both of Apollo's motions, initially dismissing the complaint with leave to amend and subsequently dismissing the complaint with prejudice on May 20, 2004. The relators have appealed the District Court's dismissal of the action, and the matter is currently pending before the Ninth Circuit Court of Appeals.

9

Chief Information Officer
June 15, 2005

now, belatedly, concedes the error, this is emblematic of the evident desire to avoid production at any price that has characterized the Office's response. Moreover, each such error has imposed costs on Apollo. The June 10 letter acknowledges many other such errors that Apollo brought to the Office's attention. *See, e.g.,* Letter from Van Vlandren to Cox of 6/10/05, Exhibit 10, at 5-6 (acknowledging that the Office claimed to produce documents that it in fact failed to provide, gave an inaccurate listing of the number of pages in documents, and omitted from the index information about documents that were produced).

- We have received a number of e-mails from Jennifer Woodward's account that are addressed to recipients from whom we have not received any e-mails. *See, e.g.,* Docs. 9, 10, 533, 1095, 1210, 1255, 2042, collectively attached hereto as Exhibit 15. Notably, the Office has not produced any e-mails from the account of Ms. Wittman, the Report's author, an error we pointed out to the Office in our May 13 letter. *See* Letter from Cox to Van Vlandren of 5/13/05, Exhibit 9, at 3. We find it remarkable that the Office would suggest in response that Ms. Woodward was copied on every single communication relating to the Report, thus rendering unnecessary e-mails from any other accountholders. We are also troubled that the Office would choose to implement this alleged screening procedure, supposedly to spare Apollo additional printing and duplicating costs, but would only announce it after the fact, when challenged. The Office's procedure may well have missed key responsive e-mails. Just as private civil litigants are not at liberty to impose such an artificial screening procedure under the rules of discovery, the Office likewise is not at liberty to do so under the requirements of FOIA. To the extent the Department had a protocol of copying Ms. Woodward on every e-mail in an effort to preserve some claim of privilege, that approach is legally flawed and has been categorically rejected by the courts. *See, e.g., Neuder v. Battelle Pacific Northwest Nat'l Lab.,* 194 F.R.D. 289, 295 (D.D.C. 2000) (finding that "[i]n cases that involve in-house counsel, it is necessary to apply the privilege cautiously and narrowly lest the mere participation of an attorney be used to seal off disclosure" and stating that "documents prepared by non-attorneys and addressed to non-attorneys with copies routed to counsel are generally not privileged since they are not communications made primarily for legal advice") (internal quotation marks and citation omitted). The Office's obligation to produce e-mails remains unfulfilled.

- The non-responsiveness label is frequently applied to portions of documents that, based on context, are plainly responsive and should consequently have been produced in their entirety. *See, e.g.,* Docs. 59, 2042, 2337, 2531, 2681i, collectively attached hereto as Exhibit 16. One egregious example where the Office applies the non-responsive label refers to "former recruiters" whom Ms. Woodward is urging Kay Jacks to consider as part of the review of Apollo. *See* Doc. 1152, attached hereto as Exhibit 17. The wording of the e-mail demonstrates on its face the responsiveness of the redacted information. To the extent that this information implicates privacy interests, it can be protected by Exemption (b)(6), not by the "nonresponsive" label. Notwithstanding the Office's

10

Chief Information Officer
June 15, 2005

June 10 claims to the contrary, this treatment demonstrates that the Office has used the "nonresponsive" label inappropriately. Moreover, to the extent that such purportedly "non-responsive" documents include witness statements, the facts in those statements are fully produceable as set forth above.

- There are numerous documents that the Office has redacted *in their entirety* as non-responsive. *See, e.g.*, Docs. 1017, 1134, 1159, 2450, collectively attached hereto as Exhibit 18. There is no apparent basis to justify the Office's claim of non-responsiveness, nor is it clear why they were produced and redacted wholesale if they are truly non-responsive.

- There are numerous e-mails that contain document icons that have been produced without the corresponding file. *See, e.g.*, Docs. 532, 541, 556, 565, 570, 1166, 1210, collectively attached hereto as Exhibit 19. These attachments are critical to a complete response to Apollo's FOIA request. The Office's index often recognizes the existence of these icons but notes that they have not been provided. *See, e.g.*, Docs. 556, 570, 1114, collectively attached hereto as Exhibit 20. In its letter of June 10, after Apollo raised this issue, the Office states that it has only produced attachments referenced by an icon *if* the "referenced documents were attached, deemed responsive, and were currently maintained by the Department at the time of the request." Letter from Van Vlandren to Cox of 6/10/05, at 5. The Office's phraseology suggests that it undertook no meaningful effort to capture and produce attachments. Such a deficient document gathering procedure would not be acceptable in the context of private civil litigation. These attachments, all of which are unquestionably responsive to our FOIA request, must be produced. The implicit suggestion in the June 10 letter, that these documents cannot be produced because they have been destroyed, presents different and equally serious legal questions as to the timing and motivation of the destruction.

- Exemption (b)(5) is often cited by the Office in conjunction with Exemption (b)(6) and/or (b)(7)(C) to justify the redaction of entire pages. It is impossible to determine which Exemption is being invoked for which parts of the document. *See, e.g.*, Docs. 527, 2078, 2313, 2559, collectively attached hereto as Exhibit 21.

- Partial e-mails have been produced without the underlying e-mail strings/e-mail history. *See, e.g.*, Docs. 1077 and 1095, collectively attached hereto as Exhibit 22.

- In some documents, the name of the custodian of the e-mail is listed at the top of the document, whereas it is omitted in other cases. *Compare, e.g.*, Docs. 1109 and 2021 and Docs. 1191 and 1193, collectively attached hereto as Exhibit 23. There is, however, no indication that the identity is intentionally being redacted as exempt. *But see* Docs. 2447, 2639, 2681(f), collectively attached hereto as Exhibit 24 (name of the custodian of the e-mail appears to have been redacted, yet no exemption was invoked).

11

Chief Information Officer
June 15, 2005

- There are a number of documents that refer to the custodian as "Main Identity," making it impossible to determine from whose account it was produced. *See, e.g.*, Docs. 2464, 2465, 2466, collectively attached hereto as Exhibit 25.

- There are e-mails from which the transmission information appears to have been redacted. *See, e.g.*, Docs. 513, 2021, collectively attached hereto as Exhibit 26. In addition, a portion of document 513 seems to have been simply deleted with no exemption claimed.

- Some documents were not accurately redacted; the redaction tape appears to have been applied randomly and obscures information that seemingly was not intended to be redacted. *See, e.g.*, Docs. 2541, 2646, 2681k, collectively attached hereto as Exhibit 27.

Many more examples could be provided.

## III. CONCLUSION

For all of the foregoing reasons and because of the time sensitivity of Apollo's securities litigation, we request expedited treatment of this appeal and the prompt release of the records requested. As set forth above, the Office's arguments and errors are plainly indefensible.

We also request that this appeal be handled by Department personnel who were not involved in the preparation of the underlying Report or in the Office's handling of the request to date.

Pursuant to 5 U.S.C. § 552(a)(6)(A) and 34 C.F.R. § 5.85, we seek a decision on review by July 14, 2005. Should the appeal not be resolved by July 14, 2005, Apollo will deem this appeal to have been denied and will pursue its remedy in federal district court. *See* 5 U.S.C. § 552(a)(6)(C) ("Any person making a [FOIA] request to any agency for records . . . shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions . . . ."). As part of that suit, we would seek attorneys' fees and other litigation costs for the Department's mishandling of this matter.

The errors at issue here are serious, and the examples in this letter are only illustrative of the defects that pervade the Office's production. Moreover, our client has already been significantly prejudiced by the Office's unjustified errors and unduly broad invocation of what have uniformly been declared narrow exemptions. We have worked with the Office in good faith to resolve the issues raised in this FOIA request. The Office, however, has consistently thwarted our attempts to receive timely access to materials that cannot be protected under the

Chief Information Officer
June 15, 2005

exemptions claimed, thus defying the Department's commitment to a "policy of fullest disclosure," 34 C.F.R. 5.70(F), and prejudicing Apollo in its defense of private securities litigation.

    Thank you for your attention to this matter.

        Very truly yours,

        Douglas R. Cox

Enclosures

cc:  Kent D. Talbert, Esq.
      Timothy J. Hatch, Esq.

79320318_1 DOC

13



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE CHIEF INFORMATION OFFICER

October 31, 2005

Douglas R. Cox, Esq.
Gibson, Dunn and Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306

Dear Mr. Cox:

I am writing in response to your June 15, 2005 letter appealing the Department's
May 3, 2005 decision to deny in part the October 25, 2004 request of your clients, Apollo
Group, Inc. (Apollo) and its subsidiary, the University of Phoenix (the University), for
access to Department records, made pursuant to the Freedom of Information Act (FOIA),
5 U.S.C. § 552. This letter constitutes the Department's final determination on your
appeal; as such, it supersedes my letter to you dated August 19, 2005. I sincerely regret
the delay in issuing a final determination on your appeal.

## Background

Your October 25, 2004 FOIA request sought access to "all underlying work papers
associated with, relating to, or otherwise regarding, [a February 5, 2004 Department
Program Review Report bearing Program Review Control Number 200340922254 (the
Report)],[1] including, but not limited to, any and all:

- [Item 1] – draft versions of the . . . Report[;]

- [Item 2] – internal notes (including, but not limited to, all notes from interviews
  conducted with any and all current and former Apollo employees)[;]

---

[1]  Your FOIA request described the Report at issue as an "Interim Report." However, the following facts
support the conclusion that the Report in question was not a draft document subject to later revision: (1) the
title page of the Report contains the notation: "K:\IPOS\UOP Team\UOP Program Review Report
Final.doc-Last printed 1/5/2004 8:45 AM" (emphasis added); and (2) the Department considers Program
Review Reports to be public documents available under FOIA, and had in fact so disclosed this Report.
The fact that the Department's audit process contemplated issuances and decisions subsequent to the
Program Review Report (e.g., a Final Program Review Determination Letter, and, where warranted, a fine
notice) in no way alters the final status of the Report. As the parties acknowledged in their September 2004
Settlement Agreement resolving the underlying compliance review, the issuance of the Report was but "one
step in an ongoing process designed to foster institutional compliance with the law."

Page 2-Mr. Douglas R. Cox, Esq.

- [Item 3] – all notes and other documents relating to the debriefing provided to Apollo at the conclusion of the Department's field work in August 2003[;]

- [Item 4] – analyses, statistical or otherwise, performed by or on behalf of the Department involving the documentation and/or records Apollo produced to the Department relating to the number of enrollments achieved by, and the salaries and salary adjustments paid to, Apollo enrollment counselors, including, but not limited to, the analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004 as well as all work papers generated during and documents used or relied upon in performing such analyses[;]

- [Item 5] – correspondence the Department has had with outside parties, including, but not limited to, correspondence between the Department and any qui tam relators that have filed suit against Apollo, and correspondence relating to the solicitation of witnesses or experts in connection with the preparation, revision, review or defense of the . . . Report[;] . . .

- [Item 6] – all internal guidance, policy memoranda, or other information, whether generic or specific to Apollo, that was used, relied upon, or transmitted in connection with the Interim Report, the Department's examination leading up to the . . . Report, or the sanctions demanded during the negotiation process [; and] . . .

- [Item 7] – any delegation of authority that authorized or purported to authorize Ms. Donna Wittman to issue the . . . Report."

The Department's initial response to Apollo's referenced FOIA request comprised five transmissions in all – four interim responses (dated December 29, 2004 (releasing 45 pages of records and, additionally, providing requested information on regulatory and Department policy guidance); February 18, 2005 (releasing 243 pages of records in whole or in part); February 28, 2005 (releasing 222 pages of records in whole or in part); and April 8, 2005 (releasing an indexed CD producing 2874 pages of records in whole or in part)), and the above-referenced May 3, 2005 final response (releasing 1868 pages of requested records in whole or in part and advising Apollo of its right to file an administrative appeal). The Department denied Apollo access to 2233 pages of records in whole or in part, pursuant to 5 U.S.C. §§ 552(b)(1), (2), (5), (6), and/or 7(C) (FOIA Exemptions 1, 2, 5, 6, and 7(C), respectively). The Department also assessed fees in the aggregate amount of $8,063.05 in connection with the processing of your request.[2]

---

[2]  Between the Department's May 3, 2005 decision on your FOIA request and the submission of your appeal, the parties exchanged correspondence regarding the Department's decision, including a May 13, 2005 letter addressed to Ms. Van Vlandren, in which you raised a number of concerns regarding the legal sufficiency of the decision on your FOIA request, and Ms. Van Vlandren's response to you dated June 10,

Your appeal, challenging the Department's reliance on Exemptions 1, 5, and 7(C), and asserting improper failure to disclose other responsive materials and other deficiencies in the processing of your request, ensued.[3]

---

2005. This discretionary "pre-appeal" exchange of correspondence failed to resolve the parties' disputes regarding to what extent records responsive to your request must be made public.

[3] As your appeal does not challenge the Department's reliance on Exemptions 2 and 6 or its assessment of fees, those matters will not be discussed further herein.

## Determination on Appeal

Based on a careful review of the correspondence between the parties,[4] the records and information at issue in your appeal, and applicable legal precedent, I have determined that your appeal should be granted in part and denied in part. Specifically:

- I am granting your appeal as it pertains to the Department's redactions made pursuant to Exemption 1; however, I am not releasing information previously withheld pursuant to Exemption 1. Such information is exempt from disclosure under one or more other exemptions, as discussed at pages 12-13 below.[5]

- Your appeal raised a number of concerns regarding the completeness of the Department's search for records responsive to your request and its accounting for attachments to such records. Based on such questions, the Department has conducted a supplemental search for responsive records and a review of the records previously identified and/or produced to you. As a result of such efforts, the Department has located 157 additional responsive documents totaling 2246 pages. See enclosed CD entitled: "FOIA Request No. 05-00093-F: New Responsive Documents Identified in October 31, 2005 Appeal Determination."[6] These new documents are categorized into five PDF files, as follows: (1) Internal Notes; (2) Report Documents; (3) Correspondence; (4) Analyses; and (5) Missing Attachments. Id. As to these additional records, I have determined that approximately 185 pages may now be released to you in whole or in part. Id.

- However, as to 2022 pages or portions of pages previously withheld and approximately 2061 pages or portions of pages in the newly located records, I have determined that the Department properly denied, and/or should now deny, your request pursuant to Exemptions 2, 5, 6, and/or 7(C); I must therefore deny your appeal as it pertains to those pages. The reasons for my decision to deny your appeal in part are set forth below.

## Exemption 7(C)

Your appeal makes clear that your request did not seek, and you do not now want, access to identifying information concerning individuals of the type protected under Exemptions 6 and 7(C) (Appeal at 1); thus, such information is technically not responsive to your

---

[4] The correspondence between the parties relative to your appeal includes (in addition to the communications described at Note 2 above): (1) your June 15, 2005 appeal; (2) my August 19, 2005 letter to you concerning the appeal; and (3) your September 16, 2005 letter to me concerning the appeal.

[5] The records originally denied under Exemption 1 were first released to you, annotated to show correct exemption(s), with my letter to you dated August 19, 2005. They are reissued herewith.

[6] The referenced CD contains the new responsive documents (with appropriate redactions) and also includes a "Read Me" file that provides guidance for use of the CD, including a catalog of the new responsive documents.

request. Moreover, you do not question that identifying information in law enforcement records is protected under Exemption 7(C) (or, for that matter, under Exemption 6, in the event Exemption 7 is inapplicable).

Rather, your appeal argues that: (1) the records at issue do not qualify for Exemption 7 protection because they were not "compiled for law enforcement purposes"; (2) the Department's earlier decision to make the Report public compels it to disclose supporting work papers; and (3) even if Exemption 7 applies to these records, the Department has not met the requirement to segregate and release all information in the documents that do not implicate personal privacy. For the reasons stated below, I do not find your arguments persuasive.

Exemption 7(C) protects records or information compiled for law enforcement purposes, the disclosure of which could reasonably be expected to constitute an unwarranted invasion of personal privacy. 5 U.S.C. § 552(b)(7)(C). This exemption is the law enforcement counterpart to Exemption 6, the FOIA's fundamental privacy exemption. However, unlike Exemption 6, Exemption 7(C) provides virtually categorical protection for information about specific individuals referenced in law enforcement records. The U.S. Court of Appeals for the District of Columbia held in SafeCard Services v. SEC, 926 F.2d 1197, 1206 (D.C. Cir. 1991), that, based upon the traditional recognition of the strong privacy interests inherent in law enforcement records, the "categorical withholding" of information that identifies third parties in law enforcement records will ordinarily be appropriate under Exemption 7(C) because the identities of individuals who appear in law enforcement files would virtually never be "very probative of an agency's behavior or performance."

The Department compiled the records and information at issue in your appeal during the course of its focused investigation into the University's compliance with section 487(a)(20) of Title IV of the Higher Education Act, as amended (HEA), 20 U.S.C. §1094(a)(20), which prohibits the payment of any commission, bonus, or other incentive based directly or indirectly on success in securing student enrollments, and the ensuing negotiations to resolve the Report's findings that the University had violated the referenced statute. During the investigation, numerous individuals provided information to Department lawyers and program reviewers in the form of sworn testimony, other written statements, and various related documents and materials (e.g., e-mail messages, hand-written notes, etc.).

The records and information denied to you under Exemption 7(C) consist of: (1) statements and other materials obtained from witnesses and their representatives, or portions thereof, that identify third parties (either the witnesses themselves or other referenced individuals); and (2) references to third parties contained in other case materials created or compiled by Department attorneys and program reviewers working at their direction. In instances where it would be impossible to release any portion of a record without compromising personal privacy interests protected under Exemption 7(C) (e.g., as with e-mail communications regarding performance or team actions from UOP

Page 6-Mr. Douglas R. Cox, Esq.

supervisors sent only to their team members, and subsequently forwarded to the Department), the entire record was properly denied under Exemption 7(C).

Your appeal contends that the records and information denied under Exemption 7(C) do not meet the "compiled for law enforcement purposes" threshold and, therefore, do not qualify for Exemption 7 protection, apparently based solely on a statement in Ms. Van Vlandren's August 26, 2004 letter to you that the Department did not consider Exemption 7 to be a bar to public disclosure of the Report. Your position is without legal support.[7] On the contrary, in the Exemption 7 context, the "law" to be enforced within the meaning of the term "law enforcement purposes" includes civil statutes and statutes authorizing administrative (i.e., regulatory) proceedings. See, e.g., Rugiero v. United States Dep't of Justice, 257 F.3d 534, 550 (6th Cir. 2001), cert. denied, 534 U.S. 1134 (2002); Ctr. For Nat'l Policy Review on Race and Urban Issues v. Weinberger, 502 F.2d 370, 373 (D.C. Cir. 1974). You have admitted as much. See note 7 above. Thus, the records responsive to your request – amassed by Department lawyers and program reviewers in the course of investigating alleged violations of the law and negotiating a settlement with the University – were unquestionably compiled for law enforcement purposes under FOIA.

You further argue that the Department's disclosure of the Report to other FOIA requesters compels it to make public the work papers supporting the Report's findings (presumably including the witness statements denied to you in whole or in part under Exemption 7(C)). Your assertion is based on the following language cited out of context from a document entitled "San Francisco Case Team Program Review (draft) Policies and Procedures": "When submitting program review reports, the specialist must include work papers supporting findings for the report." Initially, I note that the authority relied on comprises suggested procedures contained in a draft document. Moreover, a closer reading of the entire document shows that the particular language cited describes the first step in a multi-layered process for the internal clearance of program review reports (i.e., the program review specialist's initial submission of the report for internal review); thus, it has no bearing on what is or is not required to be contained in a final Report. In any

---

[7]  In this regard, your appeal asserts that the Department is now bound by Ms. Van Vlandren's referenced "decision," and chides the Department for Ms. Van Vlandren's defense of the Exemption 7 redactions in her letter to you dated June 10, 2005, which you characterize as "a . . . self-serving about-face." The Department would be bound by its previous position only in the event it had released one or more of the records at issue in your appeal to another requester (i.e., disclosure of a record to one requester is generally considered to be a waiver of exemptions or privileges otherwise applicable to that same record vis-à-vis any other requester). Given that Ms. Van Vlandren's "decision" only concerned the Report – a document already disclosed to you in toto, and hence now in the public domain – your waiver argument has no bearing on the outcome of your appeal. Moreover, the position taken on this point in your appeal represents an about-face from your own earlier correct statement of the law in an April 5, 2004 letter to the Department's Deputy General Counsel, Kent D. Talbert, in which you urged the Department to afford Exemption 7 protection to the Report ("Under [the Department's] FOIA regulation at 34 C.F.R.] § 5.73(b), the phrase 'enforcement action' has been defined broadly to include any 'possible civil, criminal or administrative sanctions . . . [and] law enforcement purpose(s) under Exemption 7 . . . [include] civil and regulatory proceedings as well as . . . criminal matters").

Page 7-Mr. Douglas R. Cox, Esq.

event, I understand that FSA customarily makes program review reports public, but that supporting work papers are not made a part of such reports.

Finally, you contend, even assuming arguendo that the records and information at issue in your appeal are Exemption 7 law enforcement records, that the Department has engaged in "wholesale invocation of Exemption 7(C)" to deny access more broadly than is necessary to protect the identities of third parties and has improperly failed to segregate and release information not implicating protectible personal privacy interests. In particular, you assert that the Department's denial of access to entire witness statements was improper. Your September 16, 2005 letter to me states, "In the Department's April 8, 2005 and May 3, 2005 letters to Apollo, the Department explained that it was withholding 'on a categorical basis' witness statements under FOIA Exemption 7(C)." Initially, I note that a review of the referenced letters reveals that they contain no such language. Moreover, the redaction and withholding, on a categorical basis, of all information that could reasonably be expected to constitute an unwarranted invasion of personal privacy – including an entire witness statement where the disclosure of any portion of the statement would reveal the witness's identity to a knowledgeable requester – is entirely consistent with the legal authority cited above and, for that matter, in your appeal and follow-up correspondence. For all of these reasons, I have determined that the Department acted properly in protecting all information withheld pursuant to Exemption 7(C).[8]

**Exemption 5**

The records to which access is denied in whole or in part pursuant to Exemption 5 include:

Records Related to Deliberations, Legal Advice, and Legal Preparation During Consultations Among Department Lawyers, Attorneys for the Qui Tam Relators, and Department of Justice (DOJ) Attorneys Regarding and Antecedent to Government Decisions on May 5-6, 2003 Not to Intervene in Qui Tam Lawsuit and to Continue to Investigate Allegations as an Administrative Enforcement Matter:

- Communications between attorneys for the qui tam relators and Department lawyers (and their clients) regarding the lawsuit, and sharing with Department lawyers information from informants for use in both the regulatory enforcement action and the qui tam case [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges];

- Documents containing legal analysis and advice among Department, DOJ, and qui tam attorneys, and related notes, regarding and antecedent to the decision on

---

[8]  Moreover, as noted above, and discussed at pages 9 and 11-12 below, the information denied to you under Exemption 7(C) is also exempt in toto under the attorney work-product privilege of Exemption 5.

whether to intervene in the qui tam suit [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges];

- Documents containing legal analysis and advice among Department lawyers, and related notes, regarding and antecedent to the decision on whether to intervene in the qui tam suit [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges]; and

- Drafts of the decision memorandum and letters prepared and/or edited by Department and DOJ lawyers regarding and antecedent to the decisions on whether to intervene in the qui tam suit and/or to investigate allegations as an administrative enforcement matter [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges].

Records Related to Deliberations, Legal Advice, and Legal Preparation During the Investigation and Antecedent to the Issuance of the Report on February 5, 2004:

- Investigatory Team (i.e., Federal Student Aid (FSA) program staff and Office of General Counsel (OGC) lawyers) communications and notes concerning investigation strategy (e.g., questions as who to interview, when to interview, order and location of interviews, what kinds of questions to ask, and other general strategy questions) [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges];

- Investigatory Team communications and notes concerning witness statements (i.e., compilations of documents provided by witnesses, summaries of witness testimony, and other documents and notes related to the witness statements).

- Drafts of (1) interview questionnaires, (2) the Report, and (3) program and legal advice memoranda concerning issuance of the Report [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges];

- Communications between Department lawyers and senior officers regarding the analysis in the Report (e.g., discussions and legal advice regarding what was a violation of the regulation; what information justified a finding of violation; and whether the Department, as a policy matter, should seek to enforce this regulation at this time and in this manner) [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges]; and

- Communications from attorneys for the qui tam relators sharing advice and information from informants with Department lawyers [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges].

Page 9-Mr. Douglas R. Cox, Esq.

<u>Records Related to Deliberations, Legal Advice, and Legal Preparation Antecedent to the</u>
<u>September 7, 2004 Settlement Agreement between the Department and the University</u>:

- Analysis created by FSA Institutional Review Specialist Donna Wittman using data furnished by the University to identify percentages and frequencies of violations of the regulation, considered by the Department in determining the number of violations that had occurred, the seriousness of said violations (moderate, egregious, etc.), and in projecting the dollar amount of fines correlating to the number of violations for the purpose of calculating the amount of the final settlement [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges];

- Communications and notes among FSA staff and Department lawyers regarding information submitted by the University to rebut the findings in the Report PRR, in consultations regarding the policy decisions whether to engage in settlement negotiations and on what terms to settle [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges];

- Drafts of charts and presentations regarding the Department's calculations of the number of violations, potential amount of fines, and other supporting evidence of violations, prepared and edited by FSA staff and Department lawyers [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges]; and

- Drafts of the settlement agreement [withheld under the deliberative process, attorney work-product, and/or attorney-client privileges].

The documents withheld represent inter- and intra-agency deliberative materials, attorney work products and advice to clients antecedent to several Department legal and policy decisions; as such, they are exempt from disclosure under Exemption 5's deliberative process privilege, attorney work-product privilege, attorney-client privilege, or a combination of these privileges. 5 U.S.C. § 552(b)(5).

The deliberative process privilege of Exemption 5 protects internal documents that are both pre-decisional and deliberative, whose disclosure would have a chilling effect on the free exchange of opinions and ideas in an agency's decision-making process, in order to "prevent injury to the quality of agency decisions." 5 U.S.C. § 552(b)(5); <u>NLRB v.</u> <u>Sears, Roebuck and Co.</u>, 421 U.S. 132, 151 (1975). As a rule, the privilege does not protect purely factual matters or factual portions of otherwise deliberative memoranda. <u>See</u>, <u>e.g.</u>, <u>EPA v. Mink</u>, 410 U.S. 73, 91 (1973). However, an agency may withhold factual material in an otherwise deliberative document where either: (1) the selection or distillation of facts constitutes an exercise of judgment by agency personnel such that disclosure would "permit indirect inquiry into [their] mental processes" (<u>Williams v.</u> <u>United States Dept. of Justice</u>, 556 F. Supp. 63, 65 (D.D.C. 1982)); or (2) factual

information is so inextricably connected to deliberative material that its disclosure would expose or cause harm to the agency's deliberations (see, e.g., Wolfe v. HHS, 839 F.2d 768, 774-776 (D.C. Cir. 1988) (en banc)). A category of documents particularly likely to be found exempt under the deliberative process privilege is drafts; in this regard, the process by which a draft evolves into a final document can itself constitute a protectible deliberative process. See, e.g., National Wildlife Federation v. U.S. Forest Serv., 861 F.2d 1114, 1119 (9th Cir. 1988).

The second traditional privilege incorporated into Exemption 5 is the attorney work-product privilege, which protects documents and other memoranda prepared by an attorney in contemplation of litigation. See Hickman v. Taylor, 329 U.S. 495, 509-10 (1947); Fed. R. Civ. P. 26(b)(3) (codifying this privilege in the Federal Rules of Civil Procedure). The privilege is intended to protect the adversarial trial process by insulating the attorney's preparations from scrutiny. See Jordan v. United States Dep't of Justice, 591 F.2d 753, 775 (D.C. Cir. 1978) (en banc). The privilege sweeps broadly in a number of respects, extending, for example, to administrative proceedings as well as judicial litigation (see, e.g., Exxon Corp. v. Dep't of Energy, 585 F. Supp. 690, 700 (applying privilege to regulatory audits and investigations)); records of law enforcement investigations when they are "based upon a specific wrongdoing and represent an attempt to garner evidence and build a case against the suspected wrongdoer" (SafeCard Servs., supra, 926 F.2d at 1202; see also Feshbach v. SEC, 5 F. Supp. 2d 774, 783 (N.D. Cal. 1997)); and documents "relat[ing] to possible settlements" of litigation (United States v. Metro St. Louis Sewer Dist., 952 F.2d 1040, 1044-45 (8th Cir. 1992)). The privilege may also be used to protect documents prepared "by nonattorneys who are supervised by attorneys" (see, e.g., United States v. Nobles, 422 U.S. 225, 238-39 (1975); Diversified Indus. v. Meredith, 572 F.2d 596, 603 (8th Cir. 1977)) and documents shared with a party holding a common interest with the agency (see, e.g., Chilivis v. SEC, 673 F.2d 1205, 1211-12 (11th Cir. 1982)). Moreover, factual material is fully entitled to work-product protection. See United States v. Weber Aircraft Corp., 465 U.S. 792 (1984); FTC v. Grolier, Inc., 462 U.S. 19 (1983); Martin v. Office of Special Counsel, 819 F.2d 1181, 1187 (D.C. Cir. 1987); Tax Analysts v. IRS, 117 F.3d 607, 620 (D.C. Cir. 1997). This rule extends to facts contained in witness statements. See Martin, supra, 819 F.2d at 1187.

The attorney-client privilege of Exemption 5 concerns "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice"; however, unlike the attorney work-product privilege, the attorney-client privilege is not limited to the litigation context. Mead Data Central, Inc. v. United States Dep't of the Air Force, 566 F.2d 242, 25253 (D.C. Cir. 1977). The privilege applies both to facts divulged by a client to his attorney and to opinions given by an attorney to his client based upon, and reflecting, such facts (see e.g., Schlefer v. United States, 702 F.2d 233, 244 n.26). The privilege encompasses confidential communications made to attorneys not only by decisionmaking "control group" personnel, but also by lower-echelon employees. See Upjohn Co., et al. v. United States, et al., 449 U.S. 383, 392-97 (1981).

Your appeal argues, relative to the Department's reliance on Exemption 5, that: (1) the deliberative process privilege does not protect communications between the Department and attorneys for the qui tam relators; (2) the deliberative process privilege does not protect work papers supporting the findings in the Report; (3) the Department decisions to which the records at issue relate are not of a type protected by the deliberative process privilege; (4) even if some of the records denied to you are protected by Exemption 5, the Department has improperly failed to release factual information reasonably segregable from such privileged materials; (5) the Department has not articulated the bases for its assertion of the attorney work-product and attorney-client privileges; and (6) the Department has failed sufficiently to describe the documents at issue in your appeal and, as to each such document, to describe which privilege is asserted. For the reasons stated below, I find your arguments to be without merit. I must therefore deny your appeal as it pertains to the records denied under Exemption 5.

A number of courts have construed the scope of Exemption 5 to include various types of advice contained in communications originating with outside consultants. See, e.g., Dunns v. Bureau of Prisons, 804 F.2d 701, 704 n.5 (D.C. Cir. 1986) (employing a "functional rather than a literal test in assessing whether memoranda are 'inter-agency or intra-agency'"), cert. granted, judgment vacated on other grounds and remanded, 486 U.S. 1029 (1988). However, you contend that communications between the Department and the qui tam relators and their attorneys are not entitled to Exemption 5 protection because they do not meet the exemption's "inter-agency or intra-agency" threshold, citing Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 12 (2001), for the proposition that communications from self-interested individuals outside the Government cannot be protected as the advice of consultants. In fact, in Klamath Water Users, the Supreme Court limited its holding only to communications in which an "outside consultant" both has an interest in the outcome of the decisionmaking process and is competing with other existing parties for "[government] benefits inadequate to satisfy everyone[,]" specifically rejecting the broader exclusion for which your appeal cites the case. 532 U.S. at 12, n.4. Thus, Klamath is inapposite to the relationship between the Department and the qui tam relators, who were not competing against others for government benefits but, rather, were cooperating with the Department based on a common interest.

You also argue that Exemption 5 does not protect the work papers supporting the findings in the Report because you believe such materials were required to be made a part of the Report and the Report has been made public. As discussed at page 5 above, your argument in this regard is without merit because your assertion that the Department requires work papers to be included in program review reports is incorrect.

You contend further that the Department decisions to which the records at issue relate are not of a type protected by the deliberative process privilege. Specifically, citing Petroleum Info. Corp. v. Dep't of the Interior, 976 F.2d 1429 (D.C. Cir. 1992), you argue that the deliberative process privilege cannot be invoked where "materials could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment," 976 F.2d at 1435, and that the records at issue do not meet

Page 12-Mr. Douglas R. Cox, Esq.

this criterion because they relate to a purely factual investigation. On the contrary, the decisionmaking process which is the subject of your FOIA request – the Department's determination how to investigate, prosecute, and resolve the qui tam relators' allegations that the University had engaged in numerous serious violations of the law – consisted of a sequence of legal and policy judgments (i.e., how to investigate these allegations and prosecute the alleged violations, whether and how to issue the Report and what should be its findings, and whether and on what terms to settle the case). The unique manner in which the Department became aware of the alleged violations (through unsolicited information submitted by the qui tam relators rather than the more customary Department-initiated review of student and school records), the potentially enormous economic and policy implications of the case, the complex nature of the issues involved and the evidentiary analysis required to prove the violations, and the extraordinary cost of the investigation, all represented unprecedented challenges requiring Department lawyers and officials to exercise legal and policy judgment ab initio and at every step of the process. Thus, these decisions and the deliberations preceding them were without question legal or policy considerations of a character qualifying for Exemption 5 protection.

The Department properly denied access under Exemption 5 to the categories of records itemized above because they are reflective of the confidential deliberative processes that produced the Government's decisions regarding whether to intervene in the qui tam lawsuit, whether and in what form to issue the Report, and whether and on what terms to settle the case with the University. Your appeal argues that, even where Exemption 5 protects portions of these records, the Department has failed to release other purely factual portions of such documents that are reasonably segregable. However, I have determined, due to the special character of the documents at issue, that the otherwise releasable factual information withheld is in fact exempt from disclosure, either: (1) because the selection and presentation of such information reflects the mental processes of Department analysts and attorneys and/or is inextricably intertwined with the Department's deliberations (e.g., Ms. Wittman's analysis of the evidence and drafts of the Report and various related documents); or (2) because such information is contained in documents constituting attorney work-product or reflecting facts communicated in confidence by clients to their attorneys, as to which the FOIA does not require segregation and release (e.g., witness statements).

You also argue that the Department has not articulated the bases for its assertion of the attorney work-product and attorney-client privileges.[9] As the above descriptions of categories of documents denied under Exemption 5 and statement of the law demonstrate, the Department has properly invoked the attorney work-product and/or attorney-client privileges to deny access to the majority of the documents withheld under Exemption 5,

---

[9]   You express the opinion that Ms. Van Vlandren's failure to discuss the attorney privileges in her letter to you dated June 10, 2005 calls into question the Department's reliance on those privileges. I note in this regard that, rather than purporting to be an exhaustive discussion of all issues in your appeal, the referenced letter merely addressed the concerns raised in your May 13, 2005 letter to Ms. Van Vlandren (i.e., as your May 13 letter did not raise these issues, Ms. Van Vlandren did not discuss them in her June 10 response).

Page 13-Mr. Douglas R. Cox, Esq.

including: materials prepared by or at the direction of attorneys representing the Department, DOJ, and the qui tam relators, in contemplation of litigation regarding the University violations investigated, found, and ultimately resolved through settlement; related notes and communications that would reveal the referenced attorneys' litigation preparations; law enforcement records amassed for the purpose of investigating specific wrongdoing and building a case against the University, including witness statements;[10] documents relating to settlement negotiations; and confidential communications between Department, DOJ, and qui tam attorneys and their clients (i.e., facts divulged by the clients and attorney advice reflective of those facts).

Your September 16, 2005 letter to me asserts that DOJ's May 2003 decision declining to intervene in the qui tam lawsuit meant that litigation was no longer anticipated. This contention is at odds with the following facts: (1) at the time of the referenced DOJ declination, the Department had substantial evidence that the University had violated section 487(a)(20) of the HEA; (2) the Department advised DOJ, in view of the declination decision, that it was considering what administrative action to take against the University on account of the violation; (3) the purpose of the program review was to quantify the extent of the violation in order to determine an appropriate fine; (4) the University hotly contested the Report's finding of noncompliance with section 487(a)(20) of the HEA; and (5) the parties negotiated and entered into a compromise settlement of the case on terms including, inter alia, the University's payment of $9,800,000.00 to the Department. These facts clearly show that the Department's investigation and related activities were all undertaken by or at the direction of Department lawyers in anticipation of the litigation that in fact ensued.

Finally, your request that the Department state in detail, as to each record denied to you, the precise basis for the denial is, in essence, a demand for a Vaughn Index. The so-called Vaughn Index is a litigation tool designed to facilitate a trial court's rulings regarding whether records are rightly withheld or must be produced. Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). It is well-established that an agency is under no obligation to produce such a detailed accounting in the administrative process. "There is no requirement that administrative responses to FOIA requests contain the same documentation necessary in litigation." Crooker v. Central Intelligence Agency, Civil No. 83-1426, slip op. at 3 (D.D.C. Sept. 28, 1984). I have nevertheless provided the detailed information above regarding the categories of

---

[10]   Your September 16, 2005 letter to me questioned the Department's failure to label the witness statements withheld under Exemption 7(C) and Exemption 5 to show reliance on both Exemptions for the denial. I regret that such re-labeling of the documents themselves is not feasible because the Department's computer FOIA-processing program would require this task to be performed manually and page-by-page. As this letter makes clear that all witness statements are withheld under both exemptions, I have decided that both the expense and the delay that reviewing and relabeling the thousands of pages responsive to your request would entail is unwarranted.

Page 14-Mr. Douglas R. Cox, Esq.

documents at issue in your appeal and, as to each, its role in the Department's deliberations and the bases for the Department's denial determination.[11]

## Procedural Issues

Your appeal also raises a number of questions concerning alleged deficiencies in the Department's processing of your request. They may be summarized as follows: (1) questions regarding the Department's reliance on Exemption 1; (2) concerns regarding the adequacy of the Department's search for records responsive to your request; and (3) concerns regarding the Department's accounting for and redactions made to documents identified as responsive to your request.

## Exemption 1

The Department's assertion of Exemption 1 as the basis for denying access to four records responsive to your request (identified as documents 2007, 2319, 2480, and 2681(f) on the index produced to you) was the result of a typographical error related to the implementation of the Department's new FOIAXpress processing system. As the Department did not, in fact, intend to assert Exemption 1 as the basis for denying access to any records responsive to your request, and as discussed at pages 3-4 above, I am granting your appeal as it pertains to redactions made pursuant to Exemption 1; however, I am not releasing additional information in the referenced documents previously withheld under Exemption 1 to you at this time, because such information is exempt from disclosure under one or more other exemptions, for the reasons stated at pages 3-12 above. The documents in question were released to you with my August 19, 2005 letter, annotated to show the correct exemption(s); they are also reissued herewith. I appreciate your calling this error to our attention and apologize for any confusion caused by the mistake.

## Search, Accounting and Redaction Issues

Your appeal also asserts a number of deficiencies in the Department's processing of your request (i.e., you raise questions regarding the adequacy of the Department's search for responsive records, and our redacting, copying, and accounting for certain of the records produced to you).

First, based on your assertions (1) that the Department's initial search for records responsive to your request had failed to locate all documents responsive to your request and (2) that, as to certain of the documents previously identified as responsive to your request, the Department had failed, where these documents contained icons representing

---

[11]    In this regard, I note further that the Department has furnished indices to the records responsive to your request along with the documents themselves on the CDs produced previously and herewith. Such indices are furnished notwithstanding that the Department is not required to do so during the administrative process.

attachments, to account for such attachments, I initiated a supplemental search to locate additional responsive documents. As discussed at page 3 above, this search located a total of 2246 additional pages of documents deemed to be responsive to your request; the new documents are accounted for on the attached CD. See note 6 above.

Your appeal also raises questions regarding the Department's processing of your request with respect to certain previously identified responsive documents:

Documents Labeled Non-Responsive Rather Than Exemption 6 and/or Exemption 7(C) (Docs. 59, 1017, 1134, 1152, 1159, 2042, 2337, 2450, 2531, 2681j[12]) – Your appeal correctly points out that certain previously identified documents labeled non-responsive in whole or in part that are indeed non-responsive (i.e., Docs. 1017, 1134, 1159, and 2450) need not have been accounted for at all; and that other such documents should have been labeled Exemption 6 and/or Exemption 7(C) (where necessary to protect information implicating personal privacy interests in otherwise responsive documents). Please find copies of the latter category of documents (i.e.. Docs. 59, 1152, 2042, 2337, 2531, 2681j), annotated to show the correct exemption, attached. I appreciate your calling this error to our attention and apologize for any confusion caused by the mistake.

More Than One Exemption Cited for Redaction of Entire Pages (Docs. 527, 2078, 2313, 2559) – A review of the referenced documents confirms that they are privileged and thus exempt from disclosure in toto pursuant to Exemption 5; Exemptions 6 and/or 7(C) are also cited to show that the documents contain information exempt from disclosure in whole or in part under one or both of the FOIA privacy exemptions as well.

Accounting for Incomplete E-Mails (Docs. 1077, 1095, 513) – A review of the referenced documents reveals that the "missing" attachments were entered into the index of responsive documents in sequence as separate documents (i.e., attachment to Doc. 1077 entered as Doc. 1078; attachment to Doc. 1095 entered as Doc. 1096; attachment to Doc. 513 entered as Doc. 514).

Issues Re: E-Mail "Custodians" (Docs. 1109, 2021, 1191, 1193, 2447, 2639, 2681(f), 2464, 2465, 2466) – Your assertion that some e-mail communications were produced with the name of their "custodian" at the top of the document while others contained no such information reflects a misunderstanding of the referenced information. The name at the top of some of the referenced documents merely identifies the person from whose computer the document was printed in the course of processing your request, who may or may not be the custodian of the

---

[12] Although your appeal makes reference to "Doc. 2681i" (Appeal at p. 10), the corresponding document at Attachment 16 to your appeal is in fact Doc. 2681j; the confusion is presumably the result of the illegibility of the hand-written label at the bottom of the first page of Doc. 2681j.

Page 16-Mr. Douglas R. Cox, Esq.

document.[13]  The fact that some e-mail communications contain no such information reflects that it is possible to print just the responsive document without adding the name.  With respect to your query concerning the "Main Identity" designation at the top of certain responsive documents (i.e., Docs. 2464, 2465, 2466), a review of the referenced documents reveals that they were received from employees of the University; presumably, "Main Identity" identifies one of the University's MS Outlook accounts.

Redaction of E-mail Transmission Information (Docs. 513, 2021) – A review of the referenced documents reveals, as to Doc. 513, that no transmission information appears to have been redacted, and, as to Doc. 2021, that transmission information was redacted to protect the identity of witnesses, pursuant to Exemption 7(C).

Inaccurate Redactions (Docs. 2541, 2646, 2681k) – Your appeal correctly points out that the referenced documents were redacted inaccurately (apparently due to incorrect orientation of the document during redaction).  Please find copies of the referenced documents, correctly redacted, attached.[14]  I appreciate your calling this error to our attention and apologize for any confusion and inconvenience caused by the mistake.

**Right to Judicial Review**

This letter constitutes exhaustion of the administrative remedies available to you under FOIA.  You have the right to judicial review of this decision, pursuant to 5 U.S.C.

---

[13]  Of course, in instances where this information would identify a witness or a third party, it was properly redacted under Exemption 6 and/or Exemption 7(C).

[14]  The Department requests that Docs. 2541, 2646, and 2681k previously released to you be returned to the Department at your earliest convenience.  Thank you.

Page 17-Mr. Douglas R. Cox, Esq.

§ 552(a)(4), in the United States District Court for the district in which you reside, in which you have your principal place of business, in which the records are maintained, or for the District of Columbia.

Sincerely,

*Michell Clark*

Michell Clark
Acting Assistant Secretary for Management
and Chief Information Officer

Enclosures

1   GIBSON, DUNN & CRUTCHER LLP
    WAYNE W. SMITH
2   ELIZABETH A. BREM
    JARED M. TOFFER
3   KRISTOPHER P. DIULIO
    4 Park Plaza, Suite 1400
4   Irvine, CA 92614
    Telephone: (949) 451-3800
5   Facsimile: (949) 451-4220

6   SNELL & WILMER L.L.P.
    JOEL P. HOXIE (#005448)
7   JAMES R. CONDO (#005867)
    JOSEPH G. ADAMS (#018210)
8   One Arizona Center
    Phoenix, AZ 85004-2202
9   Telephone: (602) 382-6353
    Facsimile: (602) 382-6070

10
    Attorneys for Defendants
11  APOLLO GROUP, INC.; TODD S. NELSON;
    KENDA B. GONZALES; AND DANIEL E.
12  BACHUS

13              IN THE UNITED STATES DISTRICT COURT

14              FOR THE DISTRICT OF ARIZONA

15  ┌─────────────────────────────────────────┬─────────────────────────────────────
16  │ In re Apollo Group, Inc. Securities Litigation │ Lead Case No. CV-04-2147-PHX-JAT
17  ├─────────────────────────────────────────┤
18  │ This Document Relates To: All Actions    │
    └─────────────────────────────────────────┘

19          NOTICE OF THIRD-PARTY SUBPOENA – UNITED STATES

20                  DEPARTMENT OF EDUCATION

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE THAT, pursuant to Federal Rules of Civil Procedure 34(c) and 45, defendants Apollo Group, Inc., Todd S. Nelson, Kenda B. Gonzales, and Daniel E. Bachus ("Defendants"), by and through their undersigned attorneys, will cause to be served the attached subpoena on the United States Department of Education ("DOE"), 400 Maryland Avenue, SW, Washington, D.C. 20202. The attached subpoena requires the production of the specified documents on or before June 30, 2006 at 12:00 p.m., at the offices of Gibson, Dunn & Crutcher, LLP, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5306.

A COPY OF THE SUBPOENA IS ATTACHED AND INCORPORATED HEREIN. The documents sought to be produced are specified in detail in the attached subpoena, and its exhibit. Defendants will attempt to serve this subpoena on the aforementioned party forthwith.

Dated: June 5, 2006.

GIBSON, DUNN & CRUTCHER LLP
Wayne W. Smith
Elizabeth A. Brem
Jared M. Toffer
Kristopher P. Diulio

SNELL & WILMER L.L.P.
Joel P. Hoxie
James R. Condo
Joseph G. Adams

By: _____
        Jared M. Toffer

*Attorneys for Defendants*
APOLLO GROUP, INC.; TODD S. NELSON; KENDA B. GONZALES; AND DANIEL E. BACHUS

30390506_1.DOC

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

### DISTRICT OF  COLUMBIA

In Re Apollo Securities Litigation

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 04-2147-PHX-JAT
District of Arizona

TO: United States Department of Education
    400 Maryland Avenue, SW
    Washington, D.C. 20202

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  SEE EXHIBIT A

| PLACE | DATE AND TIME |
|---|---|
| Offices of Gibson, Dunn & Crutcher, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5306 | June 30, 2006 at 12:00 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Jared M. Toffer* | June 5, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Jared M. Toffer, Attorney for Defendants, Gibson Dunn & Crutcher LLP, 4 Park Plaza, Suite 1400, Irvine, CA  92614 (949) 451-4025

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

100015595_1.DOC

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | |
|---|---|
| DATE<br><br>SERVED: | PLACE |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

**EXHIBIT A**

**I.**

**DEFINITIONS**

For purposes of this Subpoena, the following terms shall have the meanings set forth below.

A.    "YOU" or "YOUR" shall mean or refer to the United States Department of Education ("DOE"), including its international, national, regional and local offices, and any of the DOE's divisions, branches, partners, employees, servants, representatives, agents, insurance companies, advisors, attorneys, accountants, consultants, investigators, assigns, or any other person or entity acting, or purporting to act, on YOUR behalf, either directly or indirectly.

B.    The term "APOLLO" shall mean or refer to the Apollo Group, Inc., and its subsidiary the University of Phoenix, including its officers, directors, managers, agents or employees and all persons or entities acting on its behalf.

C.    The phrase "PROGRAM REVIEW" shall mean or refer to the program review conducted by the DOE of the University of Phoenix in August 2003.

D.    The phrase "PROGRAM REVIEW REPORT" shall mean or refer to the program review report bearing the Program Review Control Number 200340922254, issued in or about February 2004.

E.    The term QUI TAM RELATORS shall mean or refer to Mary Hendow, Julie Albertson, or any representative of either party, including but not limited to Daniel Bartley and Nancy Kropp.

F.    The terms "DOCUMENT" and "DOCUMENTS" shall have the same meaning herein as in Fed. R. Civ. P. 34 and Fed. R. Evid. 1001(1).  For purposes of illustration and not limitation, "DOCUMENTS" shall mean and include all written or graphic matter or tangible things of every kind and description, however produced or reproduced, in YOUR actual or constructive possession, custody or control, or the actual or constructive possession, custody or control of YOUR attorneys, accountants, agents or representatives, including but not

1  limited to all originals (or copies where originals are unobtainable) of correspondence,
2  memoranda, reports, applications, claims, insurance policies, printed matter, contracts,
3  agreements, supplements, amendments and modifications of such contracts or agreements,
4  licenses, ledgers, books of account, vouchers, bank checks, invoices, charge slips, receipts,
5  working papers, statistical records, cost sheets, papers on file with the court, transcripts of
6  testimony, proposals, bids, work papers, statistical records, minutes, inter-office
7  communications, articles, studies, technical data, charts, graphs, account statements,
8  confirmation receipts, brochures, computer data, computer readable data, computer discs,
9  computer chips, files, bulletins, reviews, calculations, diagrams, printouts, sound recordings,
10 films, videotapes, magnetic tapes, electronic mail, transaction files, notes, calendars,
11 appointment books, diaries, time sheets, time logs, old papers, or anything similar to the
12 foregoing, no matter how described or denominated, and any drafts thereof.
13    G.    The term "COMMUNICATION" shall mean every contact of any nature,
14 whether written or oral, from one person to another, and any DOCUMENT evidencing such
15 contact, including but not limited to correspondence, memoranda, notes or logs of telephone
16 conversations, electronic mail, diaries, daily calendars, or other records of exchanges between
17 persons.
18    H.    The terms "REFER," "REFERRING," "RELATE," "RELATING" and
19 "PERTAINING" shall mean commenting on, regarding, discussing, describing, mentioning,
20 reflecting, pertaining to or concerning, the subject matter of the request.
21    I.    The terms "CONCERN" or "CONCERNING" shall mean constituting,
22 reflecting, identifying, stating, dealing with, relating to, connected with, analyzing,
23 discussing, reporting, commenting on, setting forth, considering, pertaining to, referring to,
24 describing, germane to, or otherwise relevant to the information sought.
25
26
27
28

Gibson, Dunn &
Crutcher LLP

2

## II.

## INSTRUCTIONS

A.    This Subpoena shall not be deemed to call for personal information (including, but not limited to, home telephone numbers, personal cell phone numbers, home addresses, email addresses and social security numbers) in which an individual has a privacy right and the disclosure of which would constitute an unwarranted invasion of personal privacy.  Such information may be redacted, as long as the substantive portions of the DOCUMENTS are provided.

B.    This Subpoena shall not be deemed to call for the names of any current or former APOLLO employees who requested that the DOE not release their identity to APOLLO.  To the extent DOCUMENTS responsive to this Subpoena include names of APOLLO employees who requested that their identity remain confidential, the DOCUMENTS should be produced in full with the employee names redacted.

C.    This Subpoena shall not be deemed to ask for documents previously produced to APOLLO pursuant to FOIA requests to the extent such documents were produced in their complete and unredacted form.  This Subpoena shall not be deemed to ask for the production of documents that are protected by the attorney work product or attorney-client privileges. To the extent documents were previously withheld or redacted under FOIA based on grounds other than the aforementioned privileges, this Subpoena seeks production of those documents in complete and unredacted form pursuant to the Federal Rules of Civil Procedure.

D.    This Subpoena shall not be deemed to call for duplicate identical copies of DOCUMENTS.  A DOCUMENT with handwritten notes, editing marks, etc., shall not be deemed a duplicate identical to one without such notes or marks.

E.    All DOCUMENTS described in this Subpoena that have been destroyed must be identified.

F.    When the Subpoena calls for DOCUMENTS as to which YOU would claim any privilege or protection as a ground for non-production, in lieu of producing such DOCUMENTS, identify each document and provide the following information:

3

1.   The privilege or protection that YOU claim precludes production;

2.   The subject matter of the DOCUMENT;

3.   The date on which the DOCUMENT was prepared, or the date that the DOCUMENT bears;

4.   The identities of the author(s), addressee(s) and copyee(s) of the DOCUMENTS; and

5.   Any additional facts on which YOU would base YOUR claim of privilege or protection.

G.   The DOCUMENTS should be produced in their original file folders, or in lieu thereof, any writing on the file folder from which such DOCUMENT is taken should be copied and appended to the document. The source of all DOCUMENTS produced, and the person for whom, or the department, division or office for which such DOCUMENTS are maintained, shall be identified.

H.   The DOCUMENTS should be produced in their complete and unaltered form. Attachments to DOCUMENTS should not be removed. The DOCUMENTS should not be cut up, pasted over, redacted, or altered in any way for any reason, including alleged nonrelevance.

## III.

## DOCUMENTS TO BE PRODUCED

1.   All DOCUMENTS, in unredacted form, that were previously produced to APOLLO pursuant to FOIA but were redacted in whole or in part, including but not limited to documents produced in redacted form as part of the following FOIA transmissions:

(a)   December 29, 2004 – releasing 45 pages of records in whole or in part;

(b)   February 18, 2005 – releasing 243 pages of records in whole or in part;

(c)   February 28, 2005 – releasing 222 pages of records in whole or in part;

(d)   April 8, 2005 – releasing 2874 pages of records in whole or in part;

(e)   May 3, 2005 – releasing 1868 pages of records in whole or in part; and

(f)   October 31, 2005 – releasing 185 pages of newly located records in whole or in part.

4

2.    All DOCUMENTS previously requested by APOLLO that were withheld under FOIA, including but not limited to:

(a)    2022 pages or portions of pages withheld from APOLLO in the five interim FOIA transmissions on December 29, 2004 and February 18, February 28, April 8, and May 3, 2005; and

(b)    2061 pages or portions of pages withheld from the newly located records in the final FOIA transmission on October 31, 2005.

3.    Please produce the following DOCUMENTS to the extent they are not produced in response to paragraphs 1 and 2 above:

(a)    All draft versions of the PROGRAM REVIEW REPORT;

(b)    Any drafts prepared after February 5, 2004 of a different or revised PROGRAM REVIEW REPORT or of a Final Program Review Determination;

(c)    All DOCUMENTS constituting internal notes, memoranda or COMMUNICATIONS RELATING to or CONCERNING the *qui tam* lawsuit filed on March 7, 2003 against APOLLO by the QUI TAM RELATORS;

(d)    All DOCUMENTS RELATING to or CONCERNING COMMUNICATIONS between YOU and the QUI TAM RELATORS;

(e)    All DOCUMENTS obtained from the QUI TAM RELATORS, any current of former APOLLO employee or any other third-party in connection with the PROGRAM REVIEW or the PROGRAM REVIEW REPORT;

(f)    All DOCUMENTS RELATING to or CONCERNING interviews or conversations between YOU and any current or former APOLLO employees or any third-party, including, but not limited to, all notes from interviews conducted in connection with the PROGRAM REVIEW or the PROGRAM REVIEW REPORT;

(g)    All DOCUMENTS RELATING to or CONCERNING statements obtained from any witness in connection with the PROGRAM REVIEW or the PROGRAM REVIEW REPORT;

Gibson, Dunn & Crutcher LLP

5

(h)    All DOCUMENTS RELATING to or CONCERNING any analyses performed by or on behalf of the DOE involving the compensation of APOLLO enrollment counselors, including but not limited to, the analysis described by Ms. Donna Wittman and Ms. Katie Crowley in their discussions with KPMG in August 2004; and

(i)    All DOCUMENTS RELATING to or CONCERNING any analyses performed by or on behalf of the DOE with respect to the information produced by APOLLO in response to the PROGRAM REVIEW and the PROGRAM REVIEW REPORT.

100000680_1.DOC

Gibson, Dunn & Crutcher LLP

6



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE GENERAL COUNSEL

July 13, 2006

Via U.S. Mail and
<u>Facsimile – (949) 451-4220</u>

Kristopher P. Diulio, Esq.
Gibson Dunn and Crutcher LLP
4 Park Plaza
Suite 1400
Irvine, CA 92614

      Re:    Amended Subpoena (July 3, 2006)
             <u>In Re: Apollo Securities Litigation</u>
             United States District Court (D. Ariz.)
             Case No: 04-2147-PHX-JAT

Dear Mr. Diulio:

I am responding to your amended subpoena for documents, dated July 3, 2006 and received by this Office and the Department's custodian of records on July 5, 2006. The referenced subpoena purports to compel the production on July 19, 2006 in connection with the above-referenced lawsuit, of certain Department records related to an August 2003 program review of the University of Phoenix, a subsidiary of your client, Apollo Group, Inc. (Apollo).

Please be advised that neither the custodian of the records requested nor any other officer, agent, or employee of the Department is authorized to produce records pursuant to your subpoena, and that the Department objects to and therefore intends respectfully to decline to comply with the demand stated in your subpoena, for the following reasons:

The Department is not a party to this litigation, which we understand to be a class action brought by shareholders making securities claims against Apollo. As Assistant United States Attorney Heather Graham-Oliver advised your colleague Jared M. Toffer, Esq., in her letter dated June 29, 2006, demands made on Department officers, agents or employees for the production of records in a legal proceeding to which the Department is not a party are subject to the requirements of 34 C.F.R. Part 8. The referenced regulation was promulgated to minimize the disruption of the Department's business that would be caused by compliance with subpoenas or other demands for testimony, to maintain control over Department records, and otherwise to protect the interests of the United States.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Kristopher P. Diulio, Esq.
Page 2.

The regulation prohibits Department officers, agents and employees from, <u>inter alia</u>, producing Department records in such matters without prior written authorization from the Secretary of Education or her designee, and describes criteria for such authorization. 34 C.F.R. § 8.5. Specifically, the Secretary may allow the production of Department records only if she determines that the demand satisfies the requirements of 34 C.F.R. § 8.3 and that disclosure –

> (1) Would be appropriate under the rules of procedure governing the matter in which the demand arises and other applicable laws, rules, and regulations; and

> (2) Would not be contrary to an interest of the United States, which includes furthering a public interest of the Department and protecting the human and financial resources of the United States.

34 C.F.R § 8.5(c).

A review of your demand under the standards in 34 C.F.R. § 8.5 makes clear that authorizing production of the documents sought would be contrary to the interests of the United States. Your client has previously sought access to all of the records responsive to your subpoena under the FOIA, and the Department has produced to you all responsive records that are not exempt from public disclosure under that statute.[1] Moreover, your subpoena specifically excludes a number of categories of records or information addressed in your FOIA request. As noted in my June 29, 2006 letter to Mr. Toffer, our analysis of Exhibit A to your subpoena[2] vis-à-vis all records assembled in processing your client's FOIA request has identified only 165 pages of records, or portions thereof, as responsive to your subpoena.[3] These records comprise internal materials such as

---

[1]  The Department processed your FOIA request dated October 25, 2004 seeking access to all underlying work papers associated with, relating to, or otherwise regarding the Program Review, in a series of initial responses (dated December 29, 2004; February 18, 2005, February 28, 2005, April 8, 2005, and May 3, 2005); and a final determination dated October 31, 2005. <u>See</u> October 31, 2005 Final Decision on FOIA Appeal. The Department produced to you in whole or in part some 5437 pages of records responsive to your FOIA request; and, as discussed below, of the records not produced to you under FOIA, only 165 pages, or portions thereof, are not excluded from your demand under the subpoena.

[2]  Your June 5 and July 3 subpoenas seek the production of identical documents. <u>See</u> June 5 subpoena at Exhibit A, and July 3, 2006 subpoena at Exhibit A.

[3]  Per the instructions in your subpoena, the following categories of records or portions of records are deemed not to be within the scope of the subpoena: (1) records or portions of records previously produced pursuant to FOIA; (2) records or portions of records identifying confidential sources and/or otherwise implicating personal privacy interests (previously denied pursuant to 5 U.S.C. §§ 552(b)(6) and/or (7)(C) (FOIA Exemptions 6 and/or 7(C)); and (3) records or portions of records protected by the attorney work product and/or attorney-client privileges (previously denied pursuant to 5 U.S.C. §§ 552(b)(5) (FOIA Exemption 5). Please note additionally that all of the documents listed at ¶¶ III(3)(a)–(i) of Exhibit A to

Kristopher P. Diulio, Esq.
Page 3.

correspondence tracking sheets, DUNS numbers, and documents concerning staff travel arrangements and itineraries relative to the Program Review, communications concerning the processing of FOIA requests related to the Program Review, and miscellaneous other information that is personal in nature or otherwise unrelated to the Program Review, previously denied in whole or in part as "nonresponsive" and/or pursuant to 5 U.S.C. § 552(b)(2) (FOIA Exemption 2).[4]  Allowing the production in response to your subpoena of documents previously determined to be exempt from public disclosure under FOIA would circumvent the statutory scheme created by the Congress when it enacted the FOIA for protecting privileged and otherwise sensitive government records, and would result in unnecessary duplication of the work the Department has already performed, contrary to the Department's interest in protecting the human and financial resources of the United States.

While the Department considers a demand for records that does not comport with the requirements of 34 C.F.R. Part 8 to be a request for access to Department records made under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (see 34 C.F.R. § 8.5(a)(2)), it is our position, inasmuch as the Department has previously responded to all aspects of your demand for production of documents, that 34 C.F.R. Part 8 does not require us to reprocess your subpoena as a request made under FOIA.

Should you have questions regarding this letter or wish to discuss this matter further, I can be reached at (202) 401-6599.

Sincerely,

Joanna Dailey
General Attorney
Division of Business and
Administrative Law

---

your subpoena fall within one or more of the categories excluded from your demand in the instructions at ¶¶ II(A)-(C) of Exhibit A.  See also October 31, 2005 Final Determination on FOIA Appeal.
[4]  I note that your client's June 15, 2005 FOIA appeal did not challenge any aspect of the Department's initial FOIA determination as it pertained to the 165 pages identified as responsive to your subpoena and previously denied in whole or in part under FOIA.  See June 15, 2005 FOIA Appeal from Douglas R. Cox, Esq.



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE GENERAL COUNSEL

## FACSIMILE TRANSMITTAL COVER SHEET

DATE: __7/13/06__                                             JUL 13 PM 2:04

TO: __Kristopher P. Diulio, Esq.__
__Gibson, Dunn and Crutcher__

FAX NO.: __949/451-4220__

From:    Joanna Dailey

       Telephone No.:  (202) 401-~~6700~~ 6599

       Fax No.:         (202) 401-9533

NUMBER OF PAGES (INCLUDING THIS COVER SHEET): __4__

MESSAGE:

Please see letter attached—
thanks!   jd

**PRIVILEGED AND CONFIDENTIAL – KINDLY RETURN UNREAD IF
TRANSMITTED OR RECEIVED IN ERROR – THANK YOU.**

400 MARYLAND AVE., S.W.  WASHINGTON, D.C. 20202-2110

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.*

1  LEVENBAUM & COHEN
   GEOFFREY M. TRACHTENBERG (19338)
2  362 North 3rd Avenue
   Phoenix, AZ 85003-1504
3  Telephone: (602) 271-0183
   Facsimile: (602) 271-4018
4
   Local Counsel
5
   BARRACK, RODOS & BACINE
6  STEPHEN R. BASSER
   SAMUEL M. WARD
7  402 West Broadway, Suite 850
   San Diego, CA 92101
8  Telephone: (619) 230-0800
   Facsimile: (619) 230-1874
9
   BARRACK, RODOS & BACINE
10 LEONARD BARRACK
   3300 Two Commerce Square
11 2001 Market Street
   Philadelphia, PA 19103
12 Telephone: (215) 963-0600
   Facsimile: (215) 963-0838
13
   Lead Counsel for Lead Plaintiff, the Policemen's Annuity
14 and Benefit Fund of Chicago and the Class

15              UNITED STATES DISTRICT COURT
16               DISTRICT OF ARIZONA
17
   In re APOLLO GROUP, INC.      )  Lead Case No. CV 04-2147-PHX-JAT
18 SECURITIES LITIGATION         )
                                 )  CLASS ACTION
19                               )
                                 )
   This Document relates to:     )
20                               )
        ALL ACTIONS.             )  CTRM:  503, 5th Floor
21 _____)  JUDGE: Hon. James A. Teilborg

22
        LEAD PLAINTIFF'S INITIAL DISCLOSURES PURSUANT
23       TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(1)
24
25
26
27
28

1    Lead Plaintiff, the Policemen's Annuity and Benefit Fund of Chicago, by its

2    counsel, states the following for its initial disclosures pursuant to Rule 26 of the Federal

3    Rules of Civil Procedure:

4    **I.    POTENTIAL WITNESSES**

5    The following individuals are likely to have discoverable information that support

6    plaintiffs' claims.    Relevant documents and information identifying knowledgeable

7    witnesses are presently in the possession, custody and control of the defendants.    Lead

8    Plaintiff reserves the right to supplement this list with the names of additional potential

9    witnesses whose identities are revealed in the course of discovery.

10    **A.    Current/Former Employees, Officers and Directors of the Apollo Group, Inc. or its subsidiaries**

11    **Defendants:**

12    The Apollo Group, Inc./The University of Phoenix, persons most knowledgeable/company representatives

13

14    Daniel E. Bachus
Kenda B. Gonzales
Todd S. Nelson

15

16    **Current and Former Directors and Officers:**

17    John Sperling
Peter Sperling

18    **Qui Tam Plaintiffs/Witnesses:**

19    Mary Hendow
c/o Daniel Robert Bartley
20    P.O. Box 686
Novato, CA  94948-0686

21

22    c/o Nancy Gail Krop
1534 Plaza Lane
Ste. 322
23    Burlingame, CA  94010

24    Julie Albertson
c/o Daniel Robert Bartley
25    P.O. Box 686
Novato, CA  94948-0686

26

27    c/o Nancy Gail Krop
1534 Plaza Lane
Ste. 322
28    Burlingame, CA  94010

1

Any individuals identified as knowledgeable persons or witnesses in the Qui Tam litigation.

**Current/Former Employees:**

Casey Adleman
8822 Birchwood Way
Jesup, MD 20794
(301) 725-2353

Richard Agoglia
590 N. Sunset Dr.
Chandler, AZ 85225
(602) 481-9350

Beth Aguiar
(480) 557-1736

Sophie Ainsworth
1371 Airglow Court
Henderson, NV 89014
(702) 898-0625

Jake Allen
(602) 387-6982

Miranda Allen
10400 Linn Station
Road, Suite 110
Louisville, KY 40222
502-423-0149

Timothy Ames
(480) 557-2000

Wanda Arnaud
65 Germantown Court
Cordova, TN 38018

Norma Atkins
230 Greens Farm Road
Branford, CT 6405
(203) 488-7401

Maria Bacerra
1172 S. Sandstone Ct.
Gilbert, AZ 85296
(480) 726-2671

Falana Bailey
420 Ivy Crescent
Chesapeake, VA 23325
(757) 424-4137

Christine Ball
2626 Portsmouth Pl.
Hephzibah, GA 30815
(706) 373-2089

Ryan Ball
4747 Hamilton Road,
Suite E
Columbus, GA 31904

Lauralyn Baltis
(480) 557-1421

Chad Bandy
11451 Katy Freeway,
Suite 100
Houston, TX 77079
713-465-9966

Mark Barelski
2305 E. Willow Wick
Rd.
Gilbert, AZ 85296
(480) 545-7146

Beth Barilla
(480) 927-0099

Jason Barlow
7445 E. Eagle Crest Dr.
#1057
Mesa, AZ 85207
(602) 363-8036

Jason Barlow
7445 E. Eagle Crest Dr.
#1057
Mesa, AZ 85207
(602) 363-8036

Lakeya Baskom
3619 S. 64th Lane
Phoenix, AZ 85043
(623) 478-8051

Sarah Batterson
704 West 4th Place
Mesa, AZ 85201
(480) 228-5669

Nicole Beach
927 W. Pecos Avenue
Mesa, AZ 85210
(480) 612-7589

Julie Behn
1521 Fifth Avenue
Belmont, CA 94002
(650) 591-0591

Justin Bell
727 Crestview Rd., Apt
C
Philadelphia, PA 19128
(215) 483-7117

Nancy Blackinship
(480) 557-1160

Patrick Bliss
14636 N. 49th Place
Scottsdale, AZ 85254
(602) 494-7086

Lynne Bowen
616 S Hardy Dr #234
Tempe, AZ 85281
(480) 209-8440

2

| | | |
|---|---|---|
| Wendy Brandt<br>(480) 557-1674 | Tanya Brieger<br>(601) 968-5988 | Kristi Brooks<br>3605 E. Los Altos Rd.<br>Gilbert, AZ 85297<br>(480) 235-8421 |
| Felicia Brown<br>9100 Dr. MLK St. N<br>Apt 506<br>St. Petersburg, FL<br>33702<br>(813) 789-3372 | Lori Brown<br>8520 W. Palm Lane Unit<br>1078<br>Phoenix, AZ 85037<br>(623) 594-9626 | Lisa Browning<br>Churchill Tower, 12400<br>Coit Road, Suite 200<br>Dallas, TX 75251<br>972-385-1055 |
| Josh Cage<br>8384 W. Melinda Ln..<br>Peoria, AZ 85382<br>(602) 369-7171 | Mark Cameron<br>4615 E. Elwwod St.<br>Phoenix, AZ 85040<br>(480) 966-5394 | Christopher Carmona<br>4624 East Elwood Street<br>Phoenix, AZ 85040<br>(480) 966-5394 |
| Dennis Carver<br>5373 S. Green Street<br>Salt Lake City, UT<br>84123<br>801-263-1444 | Michael Cesare<br>10065 E Sheena Dr.<br>Scottsdale, AZ 85260<br>(480) 614-8288 | Ben Chaib<br>(602) 387-7000 |
| Jay Chance<br>(601) 968-5988 | Lindbergh Chatman<br>8209 Peridot Drive<br>Apt#406<br>McLean, VA 22102<br>(330) 348-7447 | James Chitwood<br>20075 Watertower Blvd<br>Brookfield, WI 53045<br>262-785-0608 |
| Deryl Clark<br>131 Richard Place<br>Vacaville, CA 95687<br>(707) 448-5281 | Carolyn Clark-Ford<br>(248) 675-3734 | Shane Clem<br>8200 Roberts Drive Suite<br>300<br>Dunwoody, GA 30350<br>678-731-0555 |
| Robert Cohrs<br>7071 S Cherry Drive<br>Centennial, CO 80122<br>(303) 221-8799 | Robert Collins<br>4635 East Elwood St.<br>Phoenix, AZ 85040<br>(480) 557-1405 | Dawn Cook<br>68 N Roslyn<br>Waterford, MI 48328<br>(248) 318-9626 |
| Vickie Cooper<br>1639 E Verlea Dr<br>Tempe, AZ 85282<br>(480) 620-7130 | Mike Cottan<br>5373 S. Green Street<br>Salt Lake City, UT 84123<br>801-263-1444 | Janelle Couture<br>6242 Warner Avenue<br>#3D<br>Huntington Beach, CA<br>92647<br>(909) 997-7181 |
| Jeff Cross<br>12802 Tampa Oaks<br>Boulevard<br>Temple Terrace, FL<br>33637 | Mystena Crow<br>Suite 200<br>Mesa, AZ 85212<br>(480) 518-0261 | Roman Curko<br>14435 South 48th Street<br>#2115<br>Phoenix, AZ 85044<br>(480) 474-4388 |

3

| | | |
|---|---|---|
| Rekha Daniel<br>27 East Central Avenue<br>Apt Q<br>Paoli, PA 19301<br>(215) 661-0962 | Nicole Darmody<br>3800 Arco Corporate Drive,<br>Ste. 100<br>Charlotte, NC 28273<br>704-504-5409 | Candice David<br>5522 N 46th Lane<br>Glendale, AZ 85301<br>(480) 540-1318 |
| Cathy Davis<br>14660 N Desert Sage<br>Lane<br>Tucson, AZ 85739<br>(520) 825-9626 | James Dawson<br>10361 Old Field Road P.O.<br>Box 816<br>St. Francisville, LA 70775<br>(225) 926-3990 | Alex Diaz<br>4747 Hamilton Road,<br>Suite E<br>Columbus, GA 31904 |
| Rafael Diaz, Jr<br>2412 Stonebridge Drive<br>Orange Park, FL 32065<br>(904) 955-4765 | Erin Dixon<br>405 Vista Way<br>Fort Washington, MD<br>20744<br>(202) 409-2334 | Andy Drotos<br>5519 W. Chicago Street<br>Chandler, AZ 85226<br>(480) 557-2151 |
| Eric Dudley<br>1712 W. Saint<br>Catherine Ave.<br>Phoenix, AZ 85041<br>(602) 305-6189 | Victor Duque<br>(770) 351-1419 | Fatma El-Hamidi<br>Penn Center West Six,<br>Suite 100<br>Pittsburgh, PA 15276<br>412-747-9000 |
| Clarissa Falen<br>377 Olympian Way<br>Pacifica, CA 94044<br>(650) 359-8910 | Paul Farabaugh<br>4660 East Piedmont Road<br>Phoenix, AZ 85044<br>(480) 221-2360 | Scott Ferrin<br>3916 E. Dartmouth St.<br>Mesa, AZ 85205<br>(480) 664-6357 |
| Greg Fife<br>2280 Radcliffe Drive<br>Westlake, OH 44145<br>(440) 8992423 | Stephen Flatt<br>4500 Salisbury Road North,<br>Suite 200<br>Jacksonville, FL 32216<br>904-636-6645 | Larry Fleischer<br>(480) 557-1785 |
| Gina Fletcher<br>12857 Elmfield Lane<br>Poway, CA 92064<br>(858) 663-0866 | James Flowers<br>13201 S. Wakial Loop Apt<br>2125<br>Phoenix, AZ 85044<br>(602) 320-2933 | Mike Fontaine<br>10400 Linn Station<br>Road, Suite 110<br>Louisville, KY 40222<br>502-423-0149 |
| Demetrius Ford<br>1612 Ridge Haven<br>Drive #409<br>Arlington, TX 76006<br>(817) 793-5091 | Brandon Fowler<br>(480) 539-3960 | Ernest Fullerton<br>Penn Center West Six,<br>Suite 100<br>Pittsburgh, PA 15276<br>412-747-9000 |
| Gregory Gajewski<br>331 St. Johns Golf<br>Drive<br>St. Augustine, FL<br>32092<br>(904) 881-1225 | Jacqueline Gardner<br>2940 N. Blair<br>Royal Oaks, MI 48073<br>(248) 597-0968 | Julie Genovese<br>2076 Waterbury<br>Lakewood, OH 44107<br>(216) 256-6082 |

4

James Gentile
222 N Hudson PL
Chandler, AZ 85225
(480) 785-2145

Steve Giles
65 Germantown Court
Cordova, TN 38018

Mark Glennon
65 Germantown Court
Cordova, TN 38018

Jay Goin
4615 E. Elwwod St.
Phoenix, AZ 85040
(480) 966-5394

Kelly Gramling
11850 Dr. M.L. King Street
N. # 10201
St. Petersburg, FL 33716
(727) 418-7047

Shanda Grogan
3607 S. 121st E. Plc.
Tulsa, OK 74146
(918) 521-0005

Tim Gruber
7901 Stoneridge Drive,
Ste. 130
Pleasanton, CA 94588
(925) 847-7640

Jennifer Guardiani
4938 Umber Way South
Tampa, FL 33624
(813) 363-4879

Kimberly Hall
611 Windchase Lane
Stone Mountain, GA
30083
(404) 313-1749

Justin Hallock
2290 Lucien Way, Suite
400
Maitland, FL 32751
407-667-0555

Jodi Handwork
7419 S. Newport Way
Englewood, CO 90112
(303) 791-4233

Olaf Hanson
812 5th Ave. North #405
Seattle, WA 98109
(206) 265-1031

TJ Hartley
65 Germantown Court
Cordova, TN 38018

David Hasen
520 N Stapley 247
Mesa, AZ 85203
(480) 890-1176

Amy Beth Hendrix
4436 Day Lilly Lane
Oklahoma City, OK
73120
(405) 812-6759

Cynthia Hill
1014 Willowbrook Trail
Carrollton, TX 75006
(214) 226-1769

Teronda Holmes
106 Thornby Road
Irmo, SC 29063
(803) 407-5806

Stacey Hoon
9601 Country Rd Y
Mazomanie, WI 53560
(608) 643-0552

Darris Howe
(801) 905-4290

Melissa Hudson
2400 Waverly Place Lane
#2F
North Charleston, SC
29418
(843) 364-0973

R. Scott Huling
166 Coltsgate Drive
Kernersville, NC 27284
(336) 595-8227

Eve Jakob
197 South Criss Street
Chandler, AZ 85226
(480) 726-1924

Chuck Jarrell
3905 E. Amberwood Drive
Phoenix, AZ 85048
(480) 759-1955

Nina Johnson
544 Belvedere Road
Jackson, MS 39206
(601) 362-2677

Scott Jones
(801) 905-4243

Wendy Jones
1504 East Gary Street
Mesa, AZ 85203
(480) 668-6986

Wesley Jueckstock
13809 W. Rovey Ave.
Litchfield Park, AZ
85340
(623) 536-5396

5

| | | |
|---|---|---|
| Walid Kaakoush<br>Penn Center West Six,<br>Suite 100<br>Pittsburgh, PA 15276<br>412-747-9000 | Brian Kamedula<br>1412 Cypress Drive<br>Mount Prospect, IL 60056<br>(847) 738-8689 | Edward Kamenc<br>3 Pimlico Court<br>Hockessin, DE 19707<br>(302) 234-0237 |
| Katherine Kavanaugh<br>6416 W. Prickly Pear<br>Trail<br>Glendale, AZ 85310<br>(623) 825-3512 | Shelia Kell<br>Suite 150<br>Wichita, KS 67226<br>316-630-8121 | Jennifer Ketterer<br>6802 S 42nd Drive<br>Phoenix, AZ 85041<br>(602) 237-7114 |
| Jay Klagge<br>4615 E. Elwwod St.<br>Phoenix, AZ 85040<br>(480) 966-5394 | Heather Klein<br>5083 Voltaire St<br>San Diego, CA 92107<br>(760) 612-9650 | Rick Knight<br>11616 S. Papago Cir.<br>Phoenix, AZ 85044<br>(480) 219-8110 |
| Traci Knight<br>3022 E Brookwood Ct.<br>Phoenix, AZ 85048<br>(480) 215-7164 | Walter Kowalczyk<br>20075 Watertwoer Blvd.<br>Brookfield, WI 53045 | Lynne Krieger<br>78 Aris Avenue<br>Cheektowaga, NY<br>14206<br>(716) 895-9725 |
| Kim Kritchlow<br>10400 Linn Station<br>Road, Suite 110<br>Louisville, KY 40222<br>502-423-0149 | Bryan Kroelinger<br>700 S. Dickel St.<br>Anaheim, CA 92805<br>(714) 772-7702 | Cris Lang<br>Penn Center West Six,<br>Suite 100<br>Pittsburgh, PA 15276<br>412-747-9000 |
| Cynthia Leal<br>3118 E. Virgo Place<br>Chandler, AZ 85249<br>(602) 741-9071 | Greg Lester<br>10400 Linn Station Road,<br>Suite 110<br>Louisville, KY 40222<br>502-423-0149 | Ralph Liberatore<br>Penn Center West Six,<br>Suite 100<br>Pittsburgh, PA 15276<br>412-747-9000 |
| Bob Lifferth<br>5373 S. Green Street<br>Salt Lake City, UT<br>84123<br>801-263-1444 | Angelo Lioudakis<br>411 Pony Express Rd.<br>San Dimas, CA 91773<br>(909) 910-3765 | Steven Lokie<br>2145 W Broadway Road<br>Apt 165<br>Mesa, AZ 85202<br>(480) 833-2562 |
| Clancy Loschert<br>6088 Treaty Lane<br>Galloway, OH 43119<br>(614) 580-7609 | Rodney Luster<br>65 Germantown Court<br>Cordova, TN 38018 | David Maggio<br>3050 Rue D' Orleans<br>#3337<br>San Diego, CA 92110<br>(619) 602-5779 |
| Sharon Mahaffey<br>2014 N. Los Alamos<br>Mesa, AZ 85213<br>(480) 390-0338 | Terry Marler, Jr<br>118 Dampeer Street<br>Crystal Springs, MS 39059<br>(601) 892-9850 | Veronica Marrero<br>(860) 289-1182 |
| Brittany Martin<br>5127 Cape May Ave.<br>San Diego, CA 92107<br>(858) 774-0748 | Peter Martinez<br>(602) 387-7000 | Albert Mata<br>1400 N. Alma School<br>Rd. Apt#234<br>Chandler, AZ 85224<br>(480) 812-8990 |

6

| | | |
|---|---|---|
| Erich Matola<br>1432 Hackett Road<br>Ceres, CA 95307<br>(925) 998-1854 | Julia Maurer<br>5211 North 24th St. #206<br>Phoenix, AZ 85016<br>(678) 522-1410 | Jack McBride<br>4625 East Elwood Street<br>Phoenix, AZ 85040<br>(480) 966-5394 |
| LaShonda McCraw-<br>Edwards<br>111 Fargo Wood Dr.<br>Houston, TX 77015<br>(713) 805-8205 | Spencer McNiven<br>4103 S. Martingale Rd<br>Gilbert, AZ 85297<br>(480) 988-6263 | Rhonda Meador<br>111 I N. Mission Pk Blvd<br>2099<br>Chandler, AZ 85224<br>(602) 617-8092 |
| Matthew Melvin<br>190 Ryland St. Apt<br>1109<br>San Jose, CA 95110<br>(661) 331-3150 | Denise Mendoza<br>20930 Parthenia St. Unit<br>206<br>Canoga Park, CA 91304<br>(818) 300-3955 | Jennifer Mewes<br>222 N Jefferson<br>Liberty, MO 64068<br>(816) 868-0982 |
| Marci Miller<br>3590 N. First Street<br>San Jose, CA 95134 | Blair Mitchell<br>2311 Riverstone Dr.<br>Murfreesboro, TN 37128<br>(615) 397-1464 | Elden Monday<br>170 South Warner Road,<br>Suite 200<br>Wayne, PA 19087<br>610-989-0880 |
| Angela Moneymaker<br>6820 E Ludlow Drive<br>Scottsdale, AZ 85254<br>(480) 699-9516 | Leanne Moore<br>(602) 387-6127 | Hal Morgan<br>(480) 557-1270 |
| Erin Morris<br>2020 S. 106th lane<br>Tolleson, AZ 85353<br>(602) 387-7490 | Tim Moscato<br>8830 Stanford Boulevard,<br>Suite 100<br>Columbia, MD 21045<br>410-872-9001 | John Muench<br>Penn Center West Six,<br>Suite 100<br>Pittsburgh, PA 15276<br>412-747-9000 |
| Lynn Muherin<br>600 North Pine Island<br>Road, Suite 500<br>Plantation, FL 33324<br>954-382-5303 | Sarah Munoz<br>3425 Cannes Ave<br>Riverside, CA 92501<br>(714) 390-6915 | Kelly Murphy<br>3839 South Mill Avenue<br>Tempe, AZ 85282<br>(480) 967-5087 |
| Robert Murray<br>14000 N 94th Street<br>#2090<br>Scottsdale, AZ 85260<br>(602) 758-6228 | Nicole Murry<br>2301-D Valley Forge Ave<br>Temple, TX 76504<br>(254) 773-9842 | Priyanka Nanda<br>21797 Oakville Terrace<br>Ashburn, VA 20147<br>(571) 243-3988 |
| Audra Neubert<br>11921 W. Jefferson<br>Street<br>Avondale, AZ 85323<br>(602) 821-4839 | Robert Newcombe<br>3742 E Fruitvale Ave<br>Gilbert, AZ 85297<br>(602) 614-2651 | Regina Newell<br>(248) 645-3701 |

7

| | | |
|---|---|---|
| Eileen Nicholas<br>5373 S. Green Street<br>Salt Lake City, UT<br>84123<br>801-263-1444 | Andrea Nizzardini<br>8841 NW 78th PL, Apt<br>#418<br>Tamarac, FL  33323<br>(570) 807-6292 | Toni Nolen<br>4357 Timberlake Lane<br>Stone Mountain, GA<br>30083<br>(679) 427-7368 |
| Laura Palmer Noone<br>4615 E. Elwwod St.<br>Phoenix, AZ  85040<br>(480) 966-5394 | Michael Oberheim<br>4707 E Amberwood Drive<br>Phoenix, AZ  85048<br>(480) 704-5378 | Bert Ouderkirk<br>(602) 387-5930 |
| Timothy Pennock<br>141 W. Wilshire #114<br>Fullerton, CA  92832<br>(714) 420-3343 | Towanda Peppers<br>111 Wisteria Way<br>Pendleton, SC  29670<br>(864) 646-7254 | Aaron Perkins<br>2155 E Liberty<br>Lane#219<br>Phoenix, AZ  85048<br>(651) 208-3785 |
| Dante Pirtle<br>4350 Forest Way Dr SE<br>Apt. 13<br>Kentwood, MS  49512<br>(616) 949-7847 | Jodie Ploessl<br>4615 E. Elwwod St.<br>Phoenix, AZ  85040<br>(480) 966-5394 | Jim Potts<br>3214 North Sheridan<br>Road<br>Peoria, IL  61604<br>(309)696-4254 |
| Ryan Poulson<br>2263 E Spruce Dr<br>Chandler, AZ  85249<br>(480) 722-9627 | John Price<br>Churchill Tower, 12400<br>Coit Road, Suite 200<br>Dallas, TX  75251<br>972-385-1055 | Jeff Purcell<br>3003 E. Fremont Rd<br>Phoenix, AZ  85042<br>(602) 410-3910 |
| Mark Pyszkowski<br>1500 McConnor<br>Parkway, Suite 700<br>Schaumburg, IL  60173<br>847-413-1922 | Bruce Rapp<br>1849 S Power Rd Apt 2317<br>Mesa, AZ  85206<br>(800) 366-9699 | Tim Rees<br>7100 Fort Dent Way,<br>Suite 100<br>Seattle, WA  98188<br>206-268-5800 |
| Jennifer Rezucha<br>3590 N. First Street<br>San Jose, CA  95134 | Jerry Roger<br>(918) 622-4877 | Alecia Rojas<br>4050 East Hidalgo<br>Phoenix, AZ  85040<br>(602) 561-8515 |
| Susan Rosamond<br>4400 S. Quebec St S-<br>204<br>Denver, CO  80237<br>(303) 910-4403 | Shannon Rose<br>21 Lawndale Ave<br>Bristol, CT  6010<br>(860) 582-00677 | Deborah Ross<br>4224 E. Harwell Ct.<br>Higley, AZ  85236<br>(480) 830-7064 |
| Jill Rossi<br>2840 S. Camellia Drive<br>Chandler, AZ  85248<br>(480) 703-1085 | Lisa Rowley<br>550 W. Laredo Ave.<br>Gilbert, AZ  85233<br>(480) 497-1744 | Michael Ruiz<br>(800) 266-107 ext 61238 |
| Lori Santiago<br>(918) 622-4877 | Rachel Sargent<br>Penn Center West Six,<br>Suite 100<br>Pittsburgh, PA  15276<br>412-747-9000 | Jason Saunders<br>8914 Lighthorse Drive<br>Indianapolis, IN  46231<br>(317) 847-4801 |

8

| | | |
|---|---|---|
| Sharyn Schaefer<br>4202 E Cactus Road<br>Apt 7109<br>Phoenix, AZ 85032<br>(602) 486-0545 | Davis Schnurr<br>7275 Franklin Ave<br>Hollywood, CA 90046<br>(918) 269-0186 | Steven Schreiber<br>6019 East Vernon Ave<br>Scottsdale, AZ 85257<br>(480) 945-1761 |
| Kristen Schroeder<br>(860) 289-1182 | Lance Scott<br>3544 Indiana Street 17<br>San Diego, CA 92103<br>(619) 300-6659 | Daniel Shabra<br>7212 S 30th Street<br>Phoenix, AZ 85042<br>(602) 402-3332 |
| Lori Shaffer<br>(480) 557-1004 | Michelle Shrewsberry<br>301 Kyber Run Circle<br>Johnstown, OH 43031<br>(614) 325-9654 | Julie Siegrist<br>(602) 713-9882 |
| Vickey Simmons<br>875 West Pecos Road #<br>2168<br>Chandler, AZ 85225<br>(480) 792-0501 | Paul Smith<br>1224 S. Anvil Place<br>Chandler, AZ 85249<br>(480) 699-6582 | Alex Snook<br>3654 N. French Pl<br>Casa Grande, AZ 85222<br>(480) 248-2445 |
| Michael Snowdon<br>(303) 220-4828 | Jamie Spellacy<br>600 North Pine Island<br>Road, Suite 500<br>Plantation, FL 33324<br>954-382-5303 | Linda Starks<br>5910 E Nance St<br>Mesa, AZ 85215<br>(480) 219-7099 |
| Wallis Stemm<br>(602) 387-6129 | John Stover<br>1161 N Longmore St<br>Chandler, AZ 85224<br>(480) 461-1845 | Janie Sullivan<br>1164 W 21st Avenue<br>Apache Junction, AZ<br>85220<br>(480) 862-3031 |
| Jon Super<br>(480) 557-1112 | Andrew Sutherland<br>4960 Goodman Ave # 2318<br>Addison, TX 75001<br>(214) 673-5967 | Patrick Sutliff<br>(480) 557-1631 |
| Nathaniel Tague<br>921 W University #<br>1237<br>Mesa, AZ 85201<br>(480) 610-6882 | C. Shar Taliaferro<br>1442 Marshall Street<br>Baltimore, MD 21230<br>(540) 789-7449 | Jerrad Tausz<br>901 E 104th Street, Suite<br>200<br>Kansas City, MO 64131<br>816-943-9600 |
| Troy Thomas<br>916 NW 42nd<br>Oklahoma City, OK<br>73118<br>(405) 850-2627 | Jimmy Tighe II<br>P.O. Box 85<br>Chesterfield, MO 63006<br>(314_ 276-6764 | Wes Trujillo<br>1830 F Street # 4<br>Sacramento, CA 95814<br>(916) 613-7645 |
| Erin Twomey<br>1525 E Baseline Rd #<br>53<br>Tempe, AZ 85289<br>(480) 730-0497 | Barry Van Houten<br>9645 Holly Glen Way<br>Elk Grove, CA 95758<br>(619) 686-1191 | Francine Vasquez<br>1717 North Seton<br>Mesa, AZ 85206<br>(480) 641-8221 |

9

Andrea Villagomes
(602) 387-7000

Zelda Vinson
(916) 923-2107

David Warren
Penn Center West Six,
Suite 100
Pittsburgh, PA 15276
412-747-9000

Samar Waterworth
14820 S. 20th Place
Phoenix, AZ 85048
(480) 759-0856

Carolyn Wheeler
(480) 557-1422

Judy Wilburn
(918) 622-4877

Lindsey Williams
PO Box 1564 12405 E
13th Place
Tulsa, OK 74101
(918) 313-6402

Robin Williams
1545 Superior Place
Flower Mound, TX 75028
(972) 539-0524

Clark Wilson
2217 S. Taylor Dr
Tempe, AZ 85282
(480) 966-3616

Jamie Wilson
Mesa, AZ 85202
(480) 233-0376

Rob Woldoff
1110 E Belmont Ave.
Phoenix, AZ 85020
(623) 910-0769

Joseph Wolfer
9966 W. Runion Drive
Peoria, AZ 85382
(602) 387-6891

All current or former employees at Apollo Group, Inc., or its University of Phoenix subsidiary, including, but not limited to, all district managers, regional managers, student enrollment directors or counselors, and loan officers, as well as those individuals identified in the February 2004, Department of Education Program Review Report or who were interviewed by the Department of Education in connection with its related Program Review.

B.     **Current & Former Employees of the Department of Education**

Susan Aspey
Department of Education
400 Maryland Ave., SW
Washington, DC 20202
(202) 401-1576

David Bergeron
Department of Education
1990 K Street NW
Washington, DC 20006
(202) 5207-7815

James Castress
Department of Education
50 United Nations Plaza, Ste. 266
San Francisco, CA 94102
(415) 556-4295

Susan Crim
Department of Education
8930 Ward Parkway
Kansas City, MO 64114
(816) 268-0417

Shane Dunne
Department of Education
50 United Nations Plaza, Ste. 266
San Francisco, CA 94102
(415) 556-4170

Victoria Edwards
Department of Education
830 First St., NE
Washington, DC 20202
(202) 377-4277

10

Steve Hansen
Department of Education
50 United Nations Plaza, Ste. 266
San Francisco, CA  94102
(415) 556-4104

Linda Henderson
Department of Education
50 United Nations Plaza, Ste. 266
San Francisco, CA  94102
(415) 556-4123

Eugene Hickok
Department of Education
400 Maryland Ave SW Rm 6W315
Washington, DC  20202

Brian Jones
Department of Education
400 Maryland Ave SW Rm 6E313
Washington, DC  20202

Jonathan A. Vogel
Department of Education
400 Maryland Ave SW Rm 6E339
Washington, DC  20202

Donna Wittman
Department of Education
50 United Nations Plaza, Ste. 266
San Francisco, CA  94102
(415) 556-4291

All Department of Education investigators and employees involved in its Program Review concerning Apollo and the University of Phoenix, specifically including, but not limited to, those involved in investigations that took place between August 18, 2003 and August 23, 2003 and/or who were investigators or reviewers whose work product, in whole or in part, formed a basis for the DOE Program Review Report issued in February 2004.

**C.     Other Individuals Who May Possess Information Relevant to the Allegations of the Complaint**

Lynn Turner
Colorado State University
205 Rockwell Hall
Fort Collins, CO  80523

Carolyn Brancato
Global Corporate Governance Research Center
845 Third Avenue
New York, NY  10022-6679
(212) 339-0392

Kelly Flynn
UBS Warburg
2555 East Camelback Road
Phoenix, AZ  85016
(602) 957-5100

Richard Close
Jeffries & Company, Inc.
520 Madison Avenue, 12th Floor
New York, NY  10004
(646) 805-5400

11

1    Mark Marostica
     Piper Jaffrey
2    2525 E. Camelback Road, Suite 900
     Phoenix, AZ 85016
3    (800) 557-9417

4    Dawn Gilbertson
     Arizona Republic
5    200 E. Van Buren St.
     Phoenix, AZ 85004
6
     John Hechinger
7    Wall Street Journal
     200 Liberty St.
8    New York, NY 10281

9    **D.    Plaintiff**

10    A representative of the Policemen's Annuity and Benefit Fund of Chicago or

11   investment advisor regarding transactions in Apollo securities during the Class Period.

12   **II.    DOCUMENTS**

13    The following is a description of all non-privileged documents and data

14   compilations in the custody or control of Lead Plaintiff that are relevant to the disputed

15   facts alleged in Lead Plaintiff's Consolidated Complaint.

16    •    February 5, 2004 letter from Donna M. Wittman of the Department of

17   Education to Todd S. Nelson regarding DOE Program Review, attached hereto as

18   Exhibit A.

19    •    February 2004 Program Review Report regarding the compensation

20   practices of the University of Phoenix, attached hereto as Exhibit B.

21    •    September 14, 2004, Arizona Republic article titled "Student Recruitment

22   Tactics Blasted by Feds," attached hereto as Exhibit C.

23    •    September 15, 2004, Arizona Republic article titled "Univ. of Phoenix

24   Pushes Ahead," attached hereto as Exhibit D.

25    •    September 15, 2004, Wall Street Journal article titled "Will Apollo's Bad

26   Report Card Get its Shares Grounded?" attached hereto as Exhibit E.

27    •    October 19, 2004, Arizona Republic article titled "Apollo told Feds:

28   Inquiry News Would Cause Harm," attached hereto as Exhibit F.

12

1    • Trading table reflecting PABF's trading of Apollo's Securities during the

2 Class Period, attached hereto as Exhibit G.

3    • PABF investment authority, attached hereto as Exhibit H.

4    Additional non-privileged documents which Lead Plaintiff may use to support its

5 claims are in the possession of individuals or entities other than Lead Plaintiff,

6 including, but not limited to, the Apollo Group Inc., and/or University of Phoenix, their

7 individual officers and directors, and/or the Department of Education.

8 **III.    DAMAGES**

9    Lead Plaintiff will proffer a damages evaluation supported by expert analysis and

10 testimony and is presently unable to accurately quantify the precise dollar amount of

11 compensatory damages, which are believed to exceed many hundreds of millions of

12 dollars, suffered by class members who purchased or acquired Apollo securities within

13 the Class Period.

14 DATED: December 7, 2005                    Respectfully submitted,

15                                           BARRACK, RODOS & BACINE
                                            STEPHEN R. BASSER
16                                          SAMUEL M. WARD

17

18                                          SAMUEL M. WARD

19                                          402 West Broadway, Suite 850
                                            San Diego, CA 92101
20                                          Telephone: (619) 230-0800
                                            Facsimile:  (619) 230-1874
21
                                            BARRACK, RODOS & BACINE
22                                          LEONARD BARRACK
                                            3300 Two Commerce Square
23                                          2001 Market Street
                                            Philadelphia, PA 19103
24                                          Telephone: (215) 963-0600
                                            Facsimile:  (215) 963-0838
25
                                            Plaintiffs Lead Counsel for Lead Plaintiff,
26                                          the Policemen's Annuity and Benefit Fund
                                            of Chicago and the Class
27

28

LD PLTF'S INITIAL DISCLOSURES PURSUANT TO
FED. R. CIV. P. 26(A)(1) — Lead Case No. CV 04-2147-PHX-JAT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEVENBAUM & COHEN
GEOFFREY M. TRACHTENBERG
362 North 3rd Avenue
Phoenix, AZ  85003-1504
Telephone:  (602) 271-0183
Facsimile:  (602) 271-4018

Local Counsel

LD PLTF'S INITIAL DISCLOSURES PURSUANT TO
FED. R. CIV. P. 26(A)(1) — Lead Case No.  CV 04-2147-PHX-JAT

1  GIBSON, DUNN & CRUTCHER LLP
   WAYNE W. SMITH
2  ELIZABETH A. BREM
   JARED M. TOFFER
3  KRISTOPHER P. DIULIO
   4 Park Plaza, Suite 1400
4  Irvine, CA 92614
   Telephone: (949) 451-3800
5  Facsimile: (949) 451-4220
   kdiulio@gibsondunn.com
6
   SNELL & WILMER L.L.P.
7  JOEL P. HOXIE (#005448)
   JAMES R. CONDO (#005867)
8  JOSEPH G. ADAMS (#018210)
   One Arizona Center
9  Phoenix, AZ  85004-2202
   Telephone: (602) 382-6353
10 Facsimile: (602) 382-6070
   jadams@swlaw.com
11
   Attorneys for Defendant
12 APOLLO GROUP, INC.

13            **IN THE UNITED STATES DISTRICT COURT**

14              **FOR THE DISTRICT OF ARIZONA**

15

16 In re Apollo Group, Inc. Securities Litigation      Master File No.  CV-04-2147-PHX-JAT

17 _____          **CLASS ACTION**

18                                                **NOTICE OF SUBPOENA TO NON-**
   This Document Relates To:  All Actions          **PARTY– DONNA M. WITTMAN**
19

20

21      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

22      PLEASE TAKE NOTICE that, pursuant to Rules 30, 34(c) and 45 of the Federal Rules

23 of Civil Procedure, Defendant Apollo Group, Inc. ("Apollo"), through the undersigned

24 counsel, will cause to be served the attached subpoena on non-party Donna M. Wittman of

25 the U.S. Department of Education, 50 United Nations Plaza, Suite 266, San Francisco, CA

26 94102.  The attached subpoena requires the production of the specified documents on or

27 before July 17, 2006 at 12:00 p.m., at the offices of Gibson, Dunn & Crutcher LLP, One

28 Montgomery Street, Suite 3100, San Francisco, CA 94104-4505 and the deposition of Ms.

1  Wittman, commencing at 9:00 a.m. on July 21, 2006, and continuing thereafter, excluding

2  Sundays and holidays, until completed, at the offices of Paulson Reporting & Litigation

3  Services at 44 Montgomery Street, Suite 1100, San Francisco, CA 94104, or at such time and

4  place as may be mutually agreed upon by the parties' counsel.

5      The deposition will be videotaped and recorded stenographically. You are invited to

6  attend the deposition and participate to the extent permitted by the Federal Rules of Civil

7  Procedure.

8      A COPY OF THE SUBPOENA IS ATTACHED AND INCORPORATED HEREIN.

9  The attached subpoena and its exhibit specify, in detail, the documents sought to be produced.

10  Apollo will immediately attempt to serve this subpoena on Ms. Wittman.

11  Dated: June 30, 2006         GIBSON, DUNN & CRUTCHER LLP
                                    Wayne W. Smith
12                                  Elizabeth A. Brem
                                    Jared M. Toffer
13                                  Kristopher P. Diulio

14                                  SNELL & WILMER L.L.P.
                                    Joel P. Hoxie
15                                  James R. Condo
                                    Joseph G. Adams
16

17

18                          By: _____
                                    Kristopher P. Diulio
19

20                                  *Attorneys for Defendant*
                                    APOLLO GROUP, INC.
21

22

23  100030946_1.DOC

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Dena Kennedy, declare as follows:

I am employed in the County of Orange, State of California; I am over the age of eighteen years and am not a party to this action; my business address is Jamboree Center, 4 Park Plaza, Suite 1400, Irvine, California 92614-8557, in said County and State. On June 30, 2006, I served the following document(s):

**NOTICE OF SUBPOENA DEPOSITION TO NON-PARTY WITNESS – DONNA M. WITTMAN**

on the parties stated below, by placing a true copy thereof in an envelope addressed as shown below by the following means of service:

Samuel M. Ward
Barrack, Rodos & Bacine
402 W. Broadway, Ste. 850
San Diego, CA 92101

sward@barrack.com

General Counsel
U.S. Department of Education
Office of the General Counsel
400 Maryland Avenue, S.W., Room 4083, FOB-6
Washington, DC 20202-2100
**\*No e-mail service**

☒ **BY E-MAIL:** I e-mailed a true copy addressed as indicated in the attached service list, on the above-mentioned date.

☒ **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY FACSIMILE:** From facsimile number (949) 451-4220 at _____ a.m./p.m., I caused each such document to be transmitted by facsimile machine, to the parties and numbers indicated above, pursuant to Rule 2008. The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration.

☒ I am employed in the office of Kristopher P. Diulio, a member of the bar of this court, and that the foregoing document(s) was(were) printed on recycled paper.

☒ **(FEDERAL)**   I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 30, 2006.

_Dena Kennedy_
Dena Kennedy

NOTICE OF SUBPOENA TO NON-PARTY – DONNA M. WITTMAN

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

Northern  DISTRICT OF  California

In re Apollo Group, Inc. Securities Litigation

### SUBPOENA IN A CIVIL CASE

Case Number:[1] CV-04-2147-PHX-JAT
District of Arizona

TO: Donna M. Wittman
U.S. Department of Education
50 United Nations Plaza, Suite 266
San Francisco, CA  94102-4987

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>Paulson Reporting & Litigation Services, (415) 591-3333<br>44 Montgomery Street, Suite 1100, San Francisco, CA  94104 | DATE AND TIME<br>July 21, 2006 at 9:00 a.m. |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): SEE EXHIBIT A

| PLACE<br>Offices of Gibson Dunn & Crutcher LLP, One Montgomery Street, Suite 3100,<br>San Francisco, CA 94104-4505 | DATE AND TIME<br>July 17, 2006 at 12:00 p.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE<br>June 30, 2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Kristopher P. Diulio, Attorney for Defendant, Gibson Dunn & Crutcher LLP, 4 Park Plaza, Suite 1400, Irvine, CA  92614
(949) 451-3907

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

100030957_1.DOC

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE SERVED: | PLACE |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

100030957_1.DOC

**EXHIBIT A**

Defendant Apollo Group, Inc. ("Apollo") seeks testimony and documents from Donna M. Wittman regarding the program review of the University of Phoenix ("UOP") that was commenced by the Department of Education ("DOE") in August 2003, including the program review report that was issued in February 2004 and the negotiations between Apollo and the DOE following the issuance of the program review report.

In accordance with 34 C.F.R. § 8.3(a), the testimony and documents from Ms. Wittman about the program review process and negotiations with UOP are relevant to the allegations in this litigation and necessary for Apollo to defend itself. Because Ms. Wittman was personally involved in the program review, the substance of her testimony and documents in her possession are not available by any other means.

**I.**

**DEFINITIONS**

For purposes of this Subpoena, the following terms shall have the meanings set forth below.

A.     "YOU" or "YOUR" shall mean or refer to Donne M. Wittman, or any person or entity acting, or purporting to act on YOUR behalf, either directly or indirectly.

B.     The term "APOLLO" shall mean or refer to the Apollo Group, Inc., and its subsidiary the University of Phoenix, including its officers, directors, managers, agents or employees and all persons or entities acting on its behalf.

C.     The phrase "PROGRAM REVIEW" shall mean or refer to the program review conducted by the DOE of the University of Phoenix in August 2003.

D.     The phrase "PROGRAM REVIEW REPORT" shall mean or refer to the program review report bearing the Program Review Control Number 200340922254, issued in or about February 2004.

E.     The term QUI TAM RELATOR shall mean or refer to Mary Hendow, Julie Albertson, or any representative of either party, including but not limited to Daniel Bartley and Nancy Kropp.

Gibson, Dunn &
Crutcher LLP

F.    The terms "DOCUMENT" and "DOCUMENTS" shall have the same meaning herein as in <u>Fed. R. Civ. P</u>. 34 and <u>Fed. R. Evid</u>. 1001(1). For purposes of illustration and not limitation, "DOCUMENTS" shall mean and include all written or graphic matter or tangible things of every kind and description, however produced or reproduced, in YOUR actual or constructive possession, custody or control, or the actual or constructive possession, custody or control of YOUR attorneys, accountants, agents or representatives, including but not limited to all originals (or copies where originals are unobtainable) of correspondence, memoranda, reports, applications, claims, insurance policies, printed matter, contracts, agreements, supplements, amendments and modifications of such contracts or agreements, licenses, ledgers, books of account, vouchers, bank checks, invoices, charge slips, receipts, working papers, statistical records, cost sheets, papers on file with the court, transcripts of testimony, proposals, bids, work papers, statistical records, minutes, inter-office communications, articles, studies, technical data, charts, graphs, account statements, confirmation receipts, brochures, computer data, computer readable data, computer discs, computer chips, files, bulletins, reviews, calculations, diagrams, printouts, sound recordings, films, videotapes, magnetic tapes, electronic mail, transaction files, notes, calendars, appointment books, diaries, time sheets, time logs, old papers, or anything similar to the foregoing, no matter how described or denominated, and any drafts thereof.

G.    The term "COMMUNICATION" shall mean every contact of any nature, whether written or oral, from one PERSON to another, and any DOCUMENT evidencing such contact, including but not limited to correspondence, memoranda, notes or logs of telephone conversations, electronic mail, diaries, daily calendars, or other records of exchanges between PERSONS.

H.    The terms "REFER," "REFERRING," "RELATE," "RELATING" and "PERTAINING" shall mean commenting on, regarding, discussing, describing, mentioning, reflecting, pertaining to or concerning, the subject matter of the request.

I.    The terms "CONCERN" or "CONCERNING" shall mean constituting, reflecting, identifying, stating, dealing with, relating to, connected with, analyzing,

discussing, reporting, commenting on, setting forth, considering, pertaining to, referring to, describing, germane to, or otherwise relevant to the information sought.

## II.

## INSTRUCTIONS

A.    This Subpoena shall not be deemed to call for personal information (including, but not limited to, home telephone numbers, personal cell phone numbers, home addresses, email addresses and social security numbers) in which an individual has a privacy right and the disclosure of which would constitute an unwarranted invasion of personal privacy. Such information may be redacted, as long as the substantive portions of the DOCUMENTS are provided.

B.    This Subpoena shall not be deemed to call for the names of any current or former APOLLO employees who requested that the DOE not release their identity to APOLLO. To the extent DOCUMENTS responsive to this Subpoena include names of APOLLO employees who requested that their identity remain confidential, the DOCUMENTS should be produced in full with the employee names redacted.

C.    This Subpoena shall not be deemed to ask for documents previously produced to APOLLO pursuant to FOIA requests to the extent such documents were produced in their complete and unredacted form. This Subpoena shall not be deemed to ask for the production of documents that are protected by the executive, attorney work product or attorney-client privileges. To the extent documents were previously withheld or redacted under FOIA based on grounds other than third-party privacy or the aforementioned privileges, this Subpoena seeks production of those documents in complete and unredacted form pursuant to the Federal Rules of Civil Procedure.

D.    This Subpoena shall not be deemed to call for duplicate identical copies of DOCUMENTS. A DOCUMENT with handwritten notes, editing marks, etc., shall not be deemed a duplicate identical to one without such notes or marks.

E.    All DOCUMENTS described in this Subpoena that have been destroyed must be identified.

Gibson, Dunn &
Crutcher LLP

3

F.    When the Subpoena calls for DOCUMENTS as to which YOU would claim any privilege or protection as a ground for non-production, in lieu of producing such DOCUMENTS, identify each document and provide the following information:

      1.    The privilege or protection that YOU claim precludes production;

      2.    The subject matter of the DOCUMENT;

      3.    The date on which the DOCUMENT was prepared, or the date that the DOCUMENT bears;

      4.    The identities of the author(s), addressee(s) and copyee(s) of the DOCUMENTS; and

      5.    Any additional facts on which YOU would base YOUR claim of privilege or protection.

G.    The DOCUMENTS should be produced in their original file folders, or in lieu thereof, any writing on the file folder from which such DOCUMENT is taken should be copied and appended to the document.  The source of all DOCUMENTS produced, and the person for whom, or the department, division or office for which such DOCUMENTS are maintained, shall be identified.

H.    The DOCUMENTS should be produced in their complete and unaltered form.  Attachments to DOCUMENTS should not be removed.  The DOCUMENTS should not be cut up, pasted over, redacted, or altered in any way for any reason, including alleged nonrelevance.

## III.

## DOCUMENTS TO BE PRODUCED

1. All draft versions of the PROGRAM REVIEW REPORT, including any drafts created following the issuance of the PROGRAM REVIEW REPORT on or about February 5, 2004;

2. All DOCUMENTS constituting internal notes, memoranda or COMMUNICATIONS RELATING to or CONCERNING any *qui tam* lawsuit filed against APOLLO, including the *qui tam* filed by the QUI TAM RELATORS on March 7, 2003;

4

3. All DOCUMENTS RELATING to or CONCERNING COMMUNICATIONS between YOU and any current or former APOLLO employees, including the QUI TAM RELATORS ;

4. All DOCUMENTS obtained from any current of former APOLLO employee, including the QUI TAM RELATORS, or any other third-party in connection with the PROGRAM REVIEW or the PROGRAM REVIEW REPORT;

5. All DOCUMENTS RELATING to or CONCERNING interviews or conversations between YOU and any current or former APOLLO employees or any third-party, including, but not limited to, all notes from interviews conducted in connection with the PROGRAM REVIEW or the PROGRAM REVIEW REPORT;

6. All DOCUMENTS RELATING to or CONCERNING statements obtained from any witness in connection with the PROGRAM REVIEW or the PROGRAM REVIEW REPORT; and

7. All DOCUMENTS RELATING to or CONCERNING any analyses performed by or on behalf of the DOE involving the compensation of APOLLO enrollment counselors, including but not limited to, the analysis described by YOU and Ms. Katie Crowley in YOUR discussions with KPMG in August 2004.

8. All DOCUMENTS RELATING to or CONCERNING any analyses performed by or on behalf of the DOE with respect to the information produced by APOLLO in response to the PROGRAM REVIEW and the PROGRAM REVIEW REPORT.

100030983_1.DOC

07/11/06  14:25 FAX 202401539·     DEPT ED OGC     ☑002



# UNITED STATES DEPARTMENT OF EDUCATION

## OFFICE OF THE GENERAL COUNSEL
July 10, 2006

**By fax: 949-451-4220**

Kristopher P. Diulio, Esq.
Gibson, Dunn & Crutcher LLP
4 Park Plaza Suite 1400
Irvine, CA 92614

**By fax: 619-230-1874**

Samuel Ward, Esq.
Barrack, Rodos & Bacine
402 West Broadway, Suite 850
San Diego, CA 92101

> Re:     Subpoenas to Department of Education employee
> Donna Wittman in In re Apollo Group, Inc.
> Securities Litigation, No. CV 04-2147-Phx-JAT
> (D.Az)

Dear Mr. Diulio and Mr. Ward:

The Department has received the subpoenas you have each sent for testimony and documents from Department employee Donna Wittman in In re Apollo Group, Inc. Securities Litigation, No. CV-04-21460PHX-JAT (D. Az). The Department is not a party to the litigation, which we understand to be a class action raising securities claims against Apollo Group, Inc.

As you know, Department regulations published on August 5, 1992 prohibit Department employees from complying with a demand for testimony and documents in a proceeding to which the United States is not a party without the prior written authorization of the Secretary. See 34 C.F.R. Part 8, published at 57 Fed. Reg. 34646 (August 5, 1992). This regulation was promulgated to minimize the disruption of official duties caused by compliance with subpoenas or other demands for testimony, to maintain control over the release of official information, and to protect the interests of the United States. This is to inform you that the Department objects to your subpoenas and that in accordance with the regulations we are taking steps to prohibit Ms. Wittman from responding to those subpoenas.

Pursuant to 34 C.F.R. § 8.4, the Secretary may allow an employee to testify only if she determines that the demand satisfies the requirements of § 8.3 and that granting permission --

(i) Would be appropriate under the rules of procedure governing the matter in which

400 MARYLAND AVE., S.W., WASHINGTON. DC 20202-2110
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

the demand arises and other applicable laws, rules, and regulations; and

(ii) Would not be contrary to an interest of the United States, which includes furthering a public interest of the Department and protecting the human and financial resources of the United States.

34 C.F.R § 8.4(c)(1). A similar rule applies to documentary subpoenas. 34 CFR § 8.5.

After reviewing the present demands for testimony and documents under the standards in 34 C.F.R. § 8.4, it is clear that granting Ms. Wittman permission to testify and produce documents would be contrary to the interests of the United States. This is so for many reasons.

First, compliance with the demands would be inconsistent with the Department's interest in conservation of human and financial resources. Ms. Wittman would have to leave work at a time when she has work to do for the Department. Moreover, her appearance at this deposition would invite additional subpoenas directed at her and other employees, both in this litigation and in future litigation. The parties to this litigation have already issued multiple documentary subpoenas to the Department, which as you know the Department is handling in accordance with the Freedom of Information Act, so it is clear that permitting Ms. Wittman to testify would invite more subpoenas for testimony as well, in what appears to be high-stakes litigation. In addition, since the Department conducts many program reviews each year, future demands on the Department would be substantial if the Department were to agree to participate here.

Furthermore, the Department has resolved and settled the program review in question and has received funds in consideration as part of the settlement. The settlement agreement contains certain releases. It is not in the Department's financial interests to provide testimony on this now settled matter; the Department should not without cause reopen the matters it agreed to close, and doing so would create a disincentive to future settlement negotiations.

In addition, as mentioned, Gibson, Dunn & Crutcher submitted a prior subpoena for documents on behalf of Apollo Group in this same litigation as well as multiple requests under FOIA. The requests submitted under FOIA have been fully processed in accordance with that statute, resulting in production of thousands of responsive documents, and the earlier subpoena is currently undergoing that same processing. Mr. Ward, you likewise have submitted a previous subpoena for documents that, pursuant to Departmental regulations, is being processed through FOIA. Allowing Ms. Wittman to testify and produce documents would circumvent the process Congress set up in enacting FOIA and the extensive process the Department has established to implement that statute. It would also result in unnecessary and extensive duplication of the work the Department has already done and must continue to do in responding under FOIA to the parties' information requests. This is not in the interest of the United States.

Moreover, in the process of handling the FOIA requests, and in adjudicating an administrative appeal taken on behalf of Apollo Group by Gibson, Dunn & Crutcher, the

2

Department has asserted various privileges and FOIA exemptions. For example, the Department has withheld all deliberative materials. Likewise, Ms. Wittman's work on the program review was performed in coordination with Department attorneys and in response to qui tam litigation, resulting in withholding of documents protected by attorney/client and/or work product privileges. The documentary subpoenas issued by both sides indicate that a primary focus of the both parties in now seeking her testimony and documents is to inquire into the matters the Department has made a final determination are privileged and/or protected from disclosure under FOIA. For example, your demand, Mr. Ward, for documents from Ms. Wittman is expressly addressed to inquiring into the Department's deliberative processes. It is not in the Department's interest to allow the parties to circumvent the FOIA process by seeking information withheld in that process through third party subpoenas and subpoenas duces tecum rather than concluding the administrative process and/or seeking judicial review of the Department's final decisions through an action brought under FOIA. Nor is it in the Department's interest to undermine the deliberative process, attorney-client and work product privileges, either with regard to this specific matter or generally, by permitting Ms. Wittman to testify and produce documents. The deliberative process privilege protects internal documents that are pre-decisional and deliberative, thereby preventing a chilling effect on the free exchange of opinions and ideas in an agency's decisionmaking process, and precluding injury to the quality of agency decisions. This is a privilege the Department needs to preserve to accomplish its mission. It is equally inconsistent with the Department's interests to put Ms. Wittman in the position of responding to demands that she disclose the Department's investigatory techniques and processes, or matters protected by the attorney client and work product privileges.

In addition, neither party has demonstrated a need for testimony or documents from Ms. Wittman. Through the FOIA process, both sides either have, or will obtain, copies of the program review report and all other non-privileged, disclosable documents they have identified as of interest for purposes of the litigation, including any such documents Ms. Wittman maintains. Upon receiving the documents the parties will have full access to the facts bearing on the accuracy and validity of the report and the investigation that it describes. In addition, because Apollo Group is publicly traded, the terms of the settlement have been publicly disclosed and remain available to the public to the extent provided for in the securities laws. Note also that the Department is required to continue to honor any additional FOIA requests either side might submit to the extent such requests are consistent with the judgments of the United States Congress regarding public access to government documents. For these reasons, the requesters have not established any need for Ms. Wittman's testimony.

Finally, allowing Ms. Wittman to testify would give the appearance in the litigation that the Department is supporting whichever side in the litigation her testimony might happen to favor. This is not the case. The Department has no official or unofficial position regarding this case. It is not in the Department's interest to put itself in the false position of appearing to take sides.

Because compliance with the demand for testimony and documents would be contrary to the interests of the United States, the Department intends to direct Ms. Wittman not to comply with it.

3

If you have any questions on this matter, contact Joanna Dailey, General Attorney, U.S. Department of Education, Office of General Counsel, at (202) 401-6599.

Sincerely,

Sarah L. Wanner
General Attorney

4



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE GENERAL COUNSEL

## FASCIMILE TRANSMISSION COVER SHEET

DATE: __7/11/06__                                          TIME: _____

TO: ~~_____~~  A           Samuel Won

FAX NO: __949-451-4220__       619 230 1874

FROM: _____

#### DIVISION OF POSTSECONDARY EDUCATION
TELE:    202- 401-8302
FAX:     202- 401-5391

NUMBER OF PAGES INCLUDING COVER SHEET: __5_____

COMMENT: _____

_____

_____

_____

IMPORTANT NOTICE: This facsimile transmission is intended only for the use of the individual or entity to which it is addressed and may contain information that is PRIVILEGED, CONFIDENTIAL OR EXEMPT FROM DISCLOSURE under applicable law. If the reader of this message is not the intended recipient, or employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately and return the original message to us at the address below via the United States Postal Service.

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation

PETER D. KEISLER
Assistant Attorney General

KEVIN V. RYAN(CSBN 118321)
United States Attorney
JOANN M. SWANSON (CSBN 88143)
Chief, Civil Division
SARA WINSLOW (DCBN 457643)
Assistant United States Attorney
      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-6925
      Facsimile: (415) 436-6748
sara.winslow@usdoj.gov

MICHAEL F. HERTZ
MICHAEL D. GRANSTON
JAY MAJORS
Attorneys, Civil Division
      U.S. Department of Justice
      P.O. Box 261, Ben Franklin Station
      Washington, D.C. 20044
      Telephone:  (202) 307-0264
      Facsimile:  (202) 514-0280

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re Apollo Group, Inc. Securities Litigation | ) CASE NO. 06-MC-80270 PVT |
| | ) |
| | ) DECLARATION OF JENNIFER WOODWARD IN SUPPORT OF THE MOTION TO QUASH DEFENDANTS' SUBPOENAS TO ALBERTSON AND HENDOW |
| | Date: September 22, 2006 |
| | Time: 11:00 a.m. |
| | Place: Courtroom 5 |
| | Magistrate Judge Patricia V. Trumbull |

09/21/06  19:57 FAX 202 2605093        US DEPT ED OGC                    @002

I, Jennifer Woodward, declare as follows:

1.    I am an attorney at the United States Department of Education (Department).  Through my position as an attorney with the Department, I have personal knowledge concerning the Department's 2003-04 program review of the University of Phoenix (UOP).  Program review reports follow a site visit to a school during which program reviewers perform an audit of a school's participation in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq.  See generally 34 C.F.R. Part 668, Subpart H.  The report sums up the findings made by the reviewers and usually requests further information from the school in order to make a final determination as to whether the school owes monetary liabilities and/or fines as a result of the findings.   The next step in the program review process involves a period in which the school provides the Department with information responding to the report.  The Department then issues a Final Program Review Determination (FPRD) letter, which sets forth the liabilities associated with the findings and provides the school an opportunity to appeal the determination.  Because the Department does not assign liabilities to violations involving a school's payment of improper incentives to recruiters of students, a third document would have issued in this case, a fine notice.  Prior to the issuance of an FPRD and a fine notice, UOP paid the Department $9.8 million to settle the case.

2.    The UOP program review was unique in that its genesis was a qui tam False Claims Act complaint.  Through the Department's investigation of that case, the Department already had substantial evidence of UOP's violation of section 487(a)(20) of the Higher Education Act.  The purpose of the review was to quantify the extent of the violations in order to set an appropriate fine amount, which the Department anticipated that UOP would hotly contest.

DECLARATION IN SUPPORT OF MOTION TO QUASH        2
CASE NO. 06-MC-80270 PVT

09/21/06  19:57 FAX 202 2605093      US DEPT ED OGC                    ☑003

Thus, the entire program review process was conducted with an eye towards the administrative litigation the Department anticipated would follow (and that, indeed, did follow).

3.    While it is true that the government declined to intervene in the qui tam case, the Department advised the Department of Justice that the Department had substantial evidence that UOP had violated section 487(a)(20) of the Higher Education Act; and that, in view of the declination decision, the Department was considering what administrative action to take against UOP on account of the violation.

4.    Further, I have been advised by relators' counsel that counsel for Apollo Group may be in possession of a version of the February 2004 program review report issued by the Department to UOP that contains embedded, privileged information. I do not know how Apollo Group could have obtained a version of the report with embedded information.   In response to Apollo Group's FOIA request, the Department produced a pdf version of the Program Review report. It is my understanding that the embedded information cannot be obtained from the pdf version of the report and is only contained in the Microsoft Word version. The Department did not to my knowledge disclose the Microsoft Word version of the report in response to Apollo Group's FOIA request.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 21, 2006                    By: _Jennifer Woodward_

                                                  Jennifer Woodward

DECLARATION IN SUPPORT OF MOTION TO QUASH        3
CASE NO. 06-MC-80270 PVT