## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | ) <br> ) <br> ) <br> ) <br> ) 06-MC-0558 (CKK) <br> ) <br> ) <br> ) |
| **This Document Relates To: Subpoena Action (D. Ariz., Case No. CV-04-2147-PHX-JAT)** | ) <br> ) <br> ) |

## RESPONDENT'S OPPOSITION TO PETITIONER'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS And CROSS -MOTION TO QUASH

Pursuant to Fed. R. Civ. P. 26(b)(1) and 45(c)(3), the United States Department of

Education ("DOE / Department"), through counsel, hereby moves to quash the subpoena issued

to it by Petitioner.  Respondent also opposes Petitioner's motion to compel filed on December

19, 2006, in connection with a subpoena issued on July 3, 2006 seeking documents that had been

withheld from a previous FOIA production.[1]  Petitioner's subpoena should not be enforced

because *inter alia* (1) the information sought from DOE is privileged under the deliberative-

process, attorney-client and work product privileges; and (2) the information sought is not

relevant to any claim or defense in the underlying lawsuit.  In further support of this consolidated

---

[1] Petitioner, Apollo Group, Inc., filed a Motion to Compel the production of documents and the testimony of DOE employees who might be called to testify in the underlying securities matter, specifically Donna M. Wittman, Susan Espey and Jennifer Woodward.  The respondent objected to this and explained that in light of the Department's Touhy regulations its employees may not testify in response to non-party subpoenas regarding information acquired as part of their official duties without the specific authorization of the agency.  The respondent has maintained that it will not make its employees available to testify at trial and will contest any effort by either party to compel any appearance by these witnesses.  In light of this, petitioner has agreed to withdraw its motion to compel with respect to the testimony of the DOE employees.  Accordingly, the respondent will not address that aspect of the petitioner's Motion to Compel.

motion and opposition, DOE respectfully refers the Court to the attached memorandum of points

and authorities and the attached declarations.

Respectfully submitted,

/s/

_____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/

_____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____/s/

_____

HEATHER D. GRAHAM-OLIVER
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W.
Washington, D.C.  20530
(202) 305-1334

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE APOLLO GROUP, INC. SECURITIES LITIGATION** | ) ) ) ) ) 06-MC-0558 (CKK) ) ) ) |
| **This Document Relates To: Subpoena Action (D. Ariz., Case No. CV-04-2147-PHX-JAT)** | ) ) ) |

## MEMORANDUM IN SUPPORT OF THE DEPARTMENT OF EDUCATION'S CROSS-MOTION TO QUASH AND OPPOSITION TO PETITIONER'S MOTION TO COMPEL

The Respondent, Department of Education ("DOE / Department"), by and through undersigned counsel, files this memorandum in opposition to petitioner, Apollo Group, Inc.'s, Motion to Compel various documents that were not produced in a previous Freedom Of Information Act (FOIA) production. The DOE is not a party to the underlying action filed in the District of Arizona. The subpoenas for documents were issued under the authority of this Court.

## FACTUAL BACKGROUND

_____ Program review reports typically follow a site visit to a school during which Institutional Review Specialists perform a program review of a school's participation in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq. See generally 20 U.S.C. § 1099c-1; 34 C.F.R. § 668.112(b). Declaration of Jennifer L. Woodward, ¶ 5. The report sets forth the findings made by the Institutional Review Specialists and usually requests further information from the school in order to make a final determination as to whether the school owes monetary liabilities and/or fines as a result of the findings. Id. Following the issuance of the report, the next step in the program

review process involves an opportunity for the school to provide the Department with

information responding to the report.  Id., at ¶ 6.  The Department then issues a Final Program

Review Determination letter, which sets forth any liabilities to the Department for misspent

program funds and provides the school an opportunity to appeal the determination.  Id.

Sometimes program reviews result in findings that warrant a fine or other penal sanction in

addition to or in lieu of repayment of misspent program funds.  Id., at 7.  One type of finding

which can result in a fine rather than imposition of compensatory liabilities is payment by the

school of improper incentives for recruitment of students.  See 34 C.F.R. § 668.14(b)(22).   If the

Department proposes to impose a fine, a third document is generally issued, called a fine notice.

Id.

        The University of Phoenix ("University") program review was unusual in that its genesis

was a qui tam False Claims Act complaint.  Id., at ¶ 8.  While the government on May 6, 2003

declined to intervene in the qui tam case, the Department advised the Department of Justice that

the Department had substantial evidence that the University had violated section 487(a)(20) of

the Higher Education Act; and that, in view of the declination decision, the Department was

considering what administrative action to take against the University on account of the violation.

Id.

        In August 2003, the Department conducted an on-site program review at the University.

The purpose of the review was to substantiate the allegations, and, if appropriate, quantify the

extent of the violation, in order to set an appropriate fine amount, which the Department

anticipated the University would contest.  Id., at ¶ 9.  Thus, the entire program review process

was conducted with an eye towards the administrative litigation the Department anticipated

would follow (and that, indeed, would have followed in the absence of settlement).  Id., at ¶ 10.

The team that performed the program review consisted of four Institutional Review Specialists from the Department's Federal Student Aid (FSA) office, who received legal assistance from two attorneys from OGC.  Id., at ¶ 11.  During the program review, the investigative team interviewed over 90 witnesses and collected substantial evidence to support the findings in the program review report (Report).  Id.  Because many of the witnesses interviewed by the team still worked for the University, the team assured the witnesses that all efforts would be made by the Department to keep the personal identities of the witnesses confidential.  Id.

The team collaborated to complete the Report.  Together, the attorneys and Institutional Review Specialists collected supporting evidence, compiled witness interview statements, and communicated virtually on a daily basis during the conduct of the program review and the subsequent writing of the Report.  Id., at ¶ 12.

Prior to the issuance of the Report, the team shared many drafts and presented the analysis to their superiors and other Department officials before final clearance was given by the Department to issue the Report.  Id., at ¶ 13.  On February 5, 2004, the Department issued the Report to the University identifying a violation of the Higher Education Act's prohibition on incentive compensation to recruiters, 20 U.S.C. § 1094(a)(20).  Id., at ¶ 14.  From March 2004 through August 2004, the University responded orally and in writing to findings in the Report. As a result, many deliberations and communications occurred within the Department to discuss the University's response, and whether, and on what terms, to settle with the University.  Id., at ¶ 15.

On September 7, 2004, prior to the issuance of a Final Program Review Determination, and a fine notice, the University paid the Department $9.8 million to settle the case. Id., at ¶ 16. Beginning in October 2004, Apollo filed the first of a series of FOIA requests, followed by subpoenas, seeking information about the program review and the settlement. Id., at ¶ 17. All of the documents in possession of OGC and FSA that were located in response to the FOIA requests and relevant to the program review process and resulting settlement were reviewed and considered under the FOIA statute, including Exemption 5, pertaining to the deliberative process, attorney-client and attorney work-product privileges. Id. Kent D. Talbert is the General Counsel of the Department of Education. Under 20 U.S.C. § 3472, he, as General Counsel, has been delegated the authority by the Secretary of the Department to assert the deliberative process privilege with respect to documents and statements created, maintained or related to Departmental functions for which he holds delegated authority.

## ARGUMENT

### Plaintiff's Motion to Compel Should Be Denied Because the Subpoena Requests Are Burdensome And Seek Materials that Are Both Privileged And Irrelevant.

#### Deliberative Process Privilege

"The deliberative process privilege, also known as the 'executive' or 'governmental' privilege serves many purposes." Eugene Burger Management Corp. v. U.S. Dept. of Housing and Urban Development, 192 F.R.D. 1, 4 (D.C.C. 1999).[2] The main purpose of the privilege "which is well established in the law, is...to 'prevent injury to the quality of agency decisions.'"

---

[2] Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5), was created to incorporate the same common law privilege of deliberative process utilized in the civil discovery context. Fed. Open Mkt. Comm. V. Merill, 443 U.S. 340, 354 (1979); Martin v. office of Special Counsel, 819 F.2d 1181, 1184 (D.C. Cir 1987).

Cofield, et al. v. City of LaGrange, Georgia, 913 F.Supp. 608, 615 (D.D.C. 1996) (quoting

NLRB v. Sears Roebuck & Co., 421 U.S. 132, 151 (1975)).  The deliberative process privilege

prevents harm to the quality of agency decisions by shielding the opinions, conclusions, and

reasoning used in the administrative and decision making process of the government.  See United

States v. Morgan, (Morgan IV), 313 U.S. 40, 422 (1941); Petroleum Info Corp. v. Dept.  of the

Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992); Access Reports v. Dept. of Justice, 926 F.2d

1192, 1194-1195 (D.C. Cir.  1991); United States v. Farley, 11 F.3d 1385, 1389 (7th Cir. 1993).

The privilege is designed to encourage frank and uninhibited communication among

government officials in the course of creating public policy.  NLRB v. Sears, Roebuck & Co.,

421 U.S. 132, 149-151 (1975); Petroleum Info Corp., 976 F.2d at 1434; Access Reports, 926

F.2d at 1194-1195; Farley, 11 F.3d at 1389.  The deliberative process privilege remains in force

even after a final decision has been made because "disclosure at any time could inhibit the free

flow of advice."  Federal Open Market Committee v. Merrill, 443 U.S. 340, 360 (1979).  Further,

even factual materials are encompassed within the privilege if release of such materials would

harm the overall deliberative process.  National Wildlife Federation v. U.S. Forest Service, 861

F.2d 1114, 1118 (9th Cir. 1988) (citing Montrose Chemical Corp. of California v. Train, 491

F.2d 63, 71 (D.C. Cir. 1974)).

For a document to be covered by the deliberative process privilege, two requirements

must be met.  First, the document must be predecisional, i.e., "antecedent to the adoption of

agency policy."  Jordan v. U.S. Dept. of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc).

For a document to be predecisional, an agency need not have identified a specific decision in

connection with which the document was prepared.  NLRB v. Sears, Roebuck & Co., 421 U.S. at

151 n.18.  The Supreme Court has recognized that agency deliberations do not always ripen into agency decisions, and that ultimately the privilege is meant to protect the decisional <u>process</u>, rather than any particular document or decision.  <u>Id.</u>  It is sufficient for the agency to establish "what deliberative process is involved, and the role played by the documents in issue in the course of that process."  <u>Coastal States Gas Corp. v. Dept. of Energy</u>, 617 F.2d 854, 868 (D.C. Cir. 1980).

Second, the document must be deliberative in nature, <u>i.e.</u>, it must be "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters."  <u>Vaughn v. Rosen</u>, 523 F.2d 1135, 1143-44 (D.C. Cir. 1975).  Deliberative documents frequently consist of "advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated."  <u>NLRB v. Sears, Roebuck & Co</u>., 421 U.S. at 150.  Thus, the privilege covers recommendations, draft documents, proposals, analyses, suggestions, discussions, and other subjective documents that reflect the give-and-take of the consultative process.  <u>Coastal States</u>, 617 F.2d at 866.

Apollo is seeking the DOE's underlying work papers that formed the basis for the Interim Program Report.  <u>See</u> Petitioner's Motion to Compel at p. 10.  These work papers are clearly protected by the deliberative process privilege.  In addition, according to the December 15, 2006, declaration of counsel for Apollo, Apollo's  July 3, 2006 Notice of Third Party Subpoena includes a request for three categories of documents:

(1) Unredacted versions of any redacted documents the DOE produced pursuant to the FOIA request;


(2) The 4,083 pages of documents that the DOE withheld from its FOIA production; and

(3)  Various documents pertaining to the Program Review, the Report, or the <u>qui tam</u> action, to the extent they are not covered by categories 1 and 2.

The documents withheld based on the deliberative process privilege consist of materials that are both predecisional and deliberative and include:

<u>Records Related to Deliberations, Legal Advice, and Legal Preparation During the  Investigation and Antecedent to the Issuance of the Report on February 5, 2004:</u>

i.   Communications and notes among members of the investigatory team (<u>i.e.</u>, Federal Student Aid program staff and Office of General Counsel lawyers)) concerning investigation strategy (<u>e.g.</u>, questions as who to interview, when to interview, order and location of interviews, what kinds of questions to ask, and other general strategy questions);

ii.   Investigatory Team communications and notes concerning witness statements (<u>i.e.</u>, compilations of documents provided by witnesses, summaries of witness testimony, and other documents and notes related to the witness statements);

iii.   Drafts of (1) interview questionnaires, (2) the Report, and (3) program and legal advice memoranda concerning issuance of the Report;

iv.   Communications between Department lawyers and senior officers regarding the analysis in the Report (<u>e.g.</u>, discussions and legal advice regarding what was a violation of the Higher Education Act and the Department's regulations; what information justified a finding of violation; and whether the Department, as a policy matter, should seek to enforce the regulation at this time and in this manner); and

vi.   Communications from attorneys for the <u>qui tam</u> relators sharing advice and information

from informants with Department lawyers.

<u>Records Related to Deliberations, Legal Advice, and Legal Preparation Antecedent to the
September 7, 2004 Settlement Agreement between the Department and the University</u>:

i.      Analysis created by FSA Institutional Review Specialist, Donna Wittman, using data

        furnished by the University to identify percentages and frequencies of violations of the

        Higher Education Act, considered by the Department in determining the number of

        violations that had occurred, the seriousness of said violations (moderate, egregious,

        etc.), and in projecting the dollar amount of fines correlating to the number of violations

        for the purpose of calculating the amount of the final settlement;

ii.     Communications and notes among FSA staff and Department lawyers regarding

        information submitted by the University to rebut the findings in the Report, in

        consultations regarding the policy decisions whether to engage in settlement negotiations,

        and on what terms to settle;

iii.    Drafts of charts and presentations regarding the Department's calculations of the number

        of violations, potential amounts of any fines, and other supporting evidence of violations,

        prepared and edited by FSA staff and Department lawyers; and

iv.     Drafts of the settlement agreement.

<u>See</u>: Declaration of Kent D. Talbert, ¶ 6, 7.

        Due to the special character of the documents at issue, the information has been withheld

because the selection and presentation of such information reflects the mental processes of

Department analysts and attorneys, and/or is inextricably intertwined with the Department's

deliberations (<u>e.g.</u>, Department analysis of the evidence and drafts of the Report and various

related documents).   Declaration of Kent D. Talbert, ¶ 16.  In withholding each document, the

10

Department's interest and the interest of the public in protecting the decision-making process have been balanced against Apollo's need for the information requested.  Id., at ¶ 15.

In making this analysis, the specific information withheld has been determined to reveal the internal decision making processes of the Department throughout the program review and settlement negotiations.  Id.  Apollo has not explained any need for these documents that outweighs the Department's interest in nondisclosure.  Indeed, while Apollo has asserted it needs these documents to discredit the Report and to cross-examine Department witnesses, Apollo chose to settle the program review with the Department, thereby foregoing its opportunity to pursue its criticisms of the Report to judgment.   Id.  In addition, the Department employees, with the most knowledge of the Report i.e., Jennifer Woodward and Donna Wittman, will not appear at trial, negating Apollo's claims for the need for these documents for use in cross-examination.

To bolster this analysis, the program review, program review report, and the settlement negotiation process consisted of a sequence of legal and policy judgments (i.e., how to investigate the allegations and prosecute the alleged violations, whether and how to issue the Report and the nature of its findings, and whether and on what terms to settle the case).  Woodward Declaration, at ¶ 21.  The unusual manner in which the Department became aware of the alleged violations (through unsolicited information submitted by qui tam relators rather than the more customary Department-initiated review of student and school records), the potentially enormous economic and policy implications of the case, the complex nature of the issues involved, the evidentiary analysis required to prove the violation, and the extraordinary cost of the investigation, all represented highly unprecedented challenges requiring Department lawyers

11

and officials to exercise legal and policy judgment <u>ab initio</u> and at every step of the process.  <u>Id.</u>

### The attorney-client and attorney work-product privilege

The attorney-client privilege applies to facts divulged by a client to his attorney, and to opinions given by an attorney to his client based on those facts.  <u>Schlefer v. United States</u>, 702 F.2d 233, 245 (D.C.Cir. 1983); <u>Brinton v. Dept. of State</u>, 636 F.2d 600, 605 (D.C. Cir. 1980). The attorney-client privilege covers attorney-client communications when the specifics of the communication are confidential, even though the underlying subject matter is known to third parties.  <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 395-96 (1981); <u>In re Amicillin Antitrust Litig.</u>, 81 F.R.D. 377, 388-90 (D.D.C. 1978).

The Attorney work-product privilege protects documents and other memoranda prepared by an attorney in contemplation of litigation.  <u>See</u> <u>Hickman v. Taylor,</u> 329 U.S. 495, 509-10 (1947); Fed. R. Civ. P. 26 (b)(3) (codifying privilege in Federal Rules of Civil Procedure).  Its purpose is to protect the adversarial trial process by insulating the attorney's preparation from scrutiny and it usually attaches when some articulable claim, likely to lead to litigation, has arisen.  <u>See</u> <u>Jordan v. United States Dept. Of Justice</u>, 591 F.2d 753, 775 (D.C. Cir. 1978); <u>Coastal States</u>, 617 F.2d at 865.  The privilege is not limited to civil proceedings, but rather extends to administrative proceedings and to criminal matters as well.  <u>Exxon Corp. V. Dep't of Energy</u>, 585 F. Supp. 690, 700 (D.D.C. 1983) (regulatory audits and investigations); <u>see</u> <u>also</u> <u>Judicial Watch, Inc. V. Rossotti</u>, 285 F. Supp. 2d 17, 30-31 (D.D.C. 2003) (applying privilege to memorandum written by IRS associate chief counsel that discussed private financial information concerning prospective IRS employee); <u>Judicial Watch, Inc., v. Dep't of Justice</u>, 432 F.3d 366 (D.C. Cir. 2005) (attorney work-product privilege recognizing that segregability is not required

when a document is fully protected as attorney work product, due to the fact that the work-product privilege protects all materials prepared in reasonable anticipation of litigation, even if purely factual in nature).[3]

Jennifer Woodward, an attorney with the Department Office of the General Counsel has personal knowledge of the Department's 2003-04 program review of the University of Phoenix (University), owned by the Apollo Group, inc. <u>See</u> Jennifer Woodward Declaration at ¶ 1-3. Ms. Woodward has provided a declaration justifying the use of the attorney work product and attorney client communications privilege. The department withheld documents reflecting communications between OGC attorneys, program clients, third party informants for the purpose of providing legal advice. <u>Id</u>. These documents were exempt from disclosure based on the attorney-client privilege. These documents are among the documents Apollo seeks in its motion to compel. <u>Id</u>., at ¶18. Also, during the review for responsive documents, many of the withheld documents were prepared in anticipation of litigation by Department attorneys and program staff. <u>Id</u>., at 19. On this basis, these documents were designated as exempt from disclosure based on the work-product privilege. <u>Id</u>. These documents are among the documents Apollo seeks in its motion to compel.

### Relevancy Of Requests

As recently amended, Fed. R. Civ. P. 26(b) restricts party-controlled discovery to matters that are relevant to a claim or defense in the lawsuit. Specifically, the rule states that: "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or

---

[3] Plaintiff alleges that the Department did not produce a Privilege log. However, in the FOIA action the Department produced an extensive <u>Vaughn</u> index numbering each document that it did not produce, describing the document and type of privilege claimed.

defense of any party." Fed. R. Civ. P. 26(b)(1). Rule 26 no longer permits "subject matter" discovery as a matter of course. Instead, the rule now requires a showing of "good cause" for a party to obtain subject matter discovery. See Pulliam v. Continental Casualty Co., 2003 WL 1085939, *2 (D.D.C. 2003) ("This provision was amended in 2000 to narrow the party-controlled scope of discovery by requiring that discovery be relevant, not just to the subject matter of the case, but to the claim or defense of a party."). See also Comment to 2000 Amendment ("The Committee has heard that in some instances, particularly cases involving large amounts of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action. . . . The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery . . . [and] signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings").

The focus in the securities action is not on proving or disproving the legitimacy of the report but rather on when the disclosure was believed to have occurred and what the Department said to representatives of Apollo. Respondent states that plaintiff, in the underlying securities action, is suing Apollo for "allegedly failing to timely disclose the contents of the DOE's Report." See Motion to Compel, Introduction at p. 1. The Department has never refused to disclose information concerning potentially non-privileged information. In other words, the focus should be on the disclosure and whether Apollo's timing of disclosure was in good faith. None of the requests of the Petitioner shed any light on this essential issue. Apollo is seeking to obtain all of DOE's underlying work papers that formed the interim program review report. See

14

Motion to Compel <u>Introduction</u> at p. 1.  Not only is this request fundamentally improper and subject to privilege but the scope of Apollo's request is minimally relevant to the securities case but rather designed to defend itself against a potential <u>qui tam</u> action.  The <u>qui tam</u> action was filed, dismissed and is currently on appeal.  Given the tangential nature of the relevance of this type of documentary evidence the integrity of the investigation must be protected.

<u>CONCLUSION</u>

For the foregoing reasons, the petitioner's Motion to Compel should be denied.  As Ms. Woodward states in her declaration, the integrity of the program review process requires that the documents requested by Apollo remain protected from disclosure under the deliberative process, attorney work product, and/or attorney client privileges.  The documents are reflective of the confidential deliberative processes and attorney work product of the investigative team that produced the Department's decisions regarding whether, and in what form, to issue the Report, and whether, and on what terms to settle the case with the University.  Woodward Declaration ¶ 22.

Respectfully submitted,


/s/
_____
JEFFREY A. TAYLOR,
D.C. BAR # 498610
United States Attorney


/s/
_____
RUDOLPH CONTRERAS,
D.C. BAR # 434122

Assistant United States Attorney


_____/s/_____
                              _____
                              HEATHER D. GRAHAM-OLIVER
                              Assistant United States Attorney
                              Judiciary Center Building
                              555 4th St., N.W.
                              Washington, D.C.  20530
                              (202) 305-1334

16

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE APOLLO GROUP, INC.     |
SECURITIES LITIGATION,     |
    |
    |
    |
    |    Civil Action No. _____
    |
_____|

**DECLARATION OF KENT D. TALBERT**

I,    Kent D. Talbert, declare as follows:

1.    I am the General Counsel of the United States Department of Education (Department), and I have been employed at the Department since August 20, 2001. Prior to becoming the General Counsel, I was the Deputy General Counsel for Departmental and Legislative Service from August 2001 through May 2006. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") implementation, procedures, appeals and litigation for the Office of the General Counsel. I have been licensed to practice law in the state of South Carolina since 1985.

2.    In my official capacity as General Counsel of the Department, I supervise approximately 100 employees who staff a total of seven (7) legal divisions whose collective mission is to provide legal assistance to the Secretary concerning the programs and policies of the Department. Under 20 U.S.C. § 3472, I, as General Counsel, have been delegated the authority by the Secretary of the Department to assert the deliberative process privilege with respect to documents and statements created, maintained or related to those Departmental

1

functions for which I hold delegated authority. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.    Due to the nature of my official duties, I am familiar with the procedures followed by the Department in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. §552, and the Privacy Act of 1974, 5 U.S.C. §552a. Specifically, I am aware, through direct involvement and through information provided to me by subordinates, of the treatment that has been afforded the FOIA requests of Defendant Apollo Group Inc. ("Apollo"), to the Department for records concerning the Department's program review investigation, program review report ("Report") of the University of Phoenix ("University"), a subsidiary of Apollo, and the resulting settlement between the University and the Department.

4.    The purpose of this declaration is to provide the Court and Apollo with the Department's justification of its decisions to withhold information, otherwise responsive to Apollo's FOIA request, pursuant to FOIA Exemption 5, deliberative process privilege.

5.    This declaration supplements and hereby incorporates the declaration of Jennifer Woodward, dated January 19, 2007 ("Woodward Declaration"), which contains information concerning the Department's investigation and program review of the University, together with a description of the resulting Report and settlement with the University.

## DESCRIPTION OF THE RECORDS

6.      According to the December 15, 2006 declaration of counsel for Apollo, Apollo's

July 3, 2006 Notice of Third Party Subpoena includes a request for three categories of

documents:

> (1) Unredacted versions of any redacted documents the DOE produced pursuant
> to the FOIA request;
>
> (2)  The 4,083 pages of documents that the DOE withheld from its FOIA
> production; and
>
> (3)  Various documents pertaining to the Program Review, the Report, or the qui
> tam action, to the extent they are not covered by categories 1 and 2.

7.      The documents withheld based on the deliberative process privilege consist of

materials that are both predecisional and deliberative and include:

> a.  Records Related to Deliberations, Legal Advice, and Legal Preparation During
>
> the  Investigation and Antecedent to the Issuance of the Report on February 5,
>
> 2004:
>
>> i.   Communications and notes among members of the investigatory team
>>
>> (i.e., Federal Student Aid program staff and Office of General Counsel
>>
>> lawyers)) concerning investigation strategy (e.g., questions as who to
>>
>> interview, when to interview, order and location of interviews, what
>>
>> kinds of questions to ask, and other general strategy questions);
>>
>> ii.  Investigatory Team communications and notes concerning witness
>>
>> statements (i.e., compilations of documents provided by witnesses,

3

summaries of witness testimony, and other documents and notes

related to the witness statements);

iii.  Drafts of (1) interview questionnaires, (2) the Report, and (3) program

and legal advice memoranda concerning issuance of the Report;

iv.  Communications between Department lawyers and senior officers

regarding the analysis in the Report (e.g., discussions and legal advice

regarding what was a violation of the Higher Education Act and the

Department's regulations; what information justified a finding of

violation; and whether the Department, as a policy matter, should seek

to enforce the regulation at this time and in this manner); and

v.  Communications from attorneys for the qui tam relators sharing advice

and information from informants with Department lawyers.

b.  Records Related to Deliberations, Legal Advice, and Legal Preparation

Antecedent to the September 7, 2004 Settlement Agreement between the

Department and the University:

i.  Analysis created by FSA Institutional Review Specialist, Donna

Wittman, using data furnished by the University to identify

percentages and frequencies of violations of the Higher Education Act,

considered by the Department in determining the number of violations

that had occurred, the seriousness of said violations (moderate,

egregious, etc.), and in projecting the dollar amount of fines correlating

to the number of violations for the purpose of calculating the amount

4

of the final settlement;

    ii.  Communications and notes among FSA staff and Department lawyers regarding information submitted by the University to rebut the findings in the Report, in consultations regarding the policy decisions whether to engage in settlement negotiations, and on what terms to settle;

    iii.  Drafts of charts and presentations regarding the Department's calculations of the number of violations, potential amounts of any fines, and other supporting evidence of violations, prepared and edited by FSA staff and Department lawyers; and

    iv.  Drafts of the settlement agreement.

8.    Many of the above documents are also protected by the attorney-client and work product privileges, as I understand the Department to have consistently maintained and preserved such privileges in response to all FOIA requests and subpoenas. Nothing in this Declaration waives either of those privileges.

9.    The above documents withheld are voluminous, numbering over 4000 pages.

## DELIBERATIVE PROCESS PRIVILEGE

10.    Exemption 5 of the FOIA, 5 U.S.C. §552(b)(5), was created to incorporate the same common law privilege of deliberative process utilized in the civil discovery context. Fed. Open Mkt. Comm. v. Merrill, 443 U.S. 340, 354 (1979); Martin v. Office of Special Counsel, 819 F. 2d 1181, 1184 (D.C. Cir. 1987). The exemption protects from mandatory disclosure inter-

agency or intra-agency records that would not be available by law to a party other than an agency in litigation with the Department.

11.     The deliberative process privilege is designed to protect documents and communications which reflect the decision-making processes of government agencies where exposure of that process would result in harm and discourage open and frank discussions on matters of policy between and among decision makers.

12.     Without waiving the other privileges to which these documents are entitled, I assert the deliberative process privilege with respect to all documents related to this litigation that are currently withheld from Apollo on that basis in the course of responding to Apollo's FOIA requests and subpoenas.

13.     Since the program review of the University came to the Department's attention through a qui tam False Claims Act complaint, the investigatory team was lead by Jennifer Woodward and Russell Wolff in the Office of the General Counsel (OGC). While it is true that, on May 6, 2003, the government declined to intervene in the qui tam case, the Department advised the Department of Justice that the Department had substantial evidence that the University had violated section 487(a)(20) of the Higher Education Act; and that, in view of the declination decision, the Department was considering what administrative action to take against the University on account of the violations. Therefore, OGC was involved in the program review from its inception and the right to assert the deliberative process privilege for the documents and communications related to the Report and resulting settlement is within the authority of this office.

14.     In asserting this exemption, I note that the predecisional and deliberative nature

6

of the documents has been carefully reviewed and examined by attorneys in the Office of the General Counsel. Specifically, the documents are reflective of the confidential deliberative processes that produced the Government's decisions regarding whether and in what form to issue the Report, and whether and on what terms to settle the case with the University.

15.      In addition, in withholding each document, the Department's interest and the interest of the public in protecting the decision-making process have been balanced against Apollo's need for the information requested. In making this analysis, the specific information withheld has been determined to reveal the internal decision making processes of the Department throughout the program review and settlement negotiations. Apollo has not explained any need for these documents that outweighs the Department's interest in nondisclosure. Indeed, while Apollo has asserted it needs these documents to discredit the Report and to cross-examine Department witnesses, I note that Apollo chose to settle the program review with the Department, thereby foregoing its opportunity to pursue its criticisms of the Report to judgment. In addition, Apollo has not demonstrated that any Department witnesses will appear at trial, negating Apollo's claims of need for these documents for use in cross-examination. If such an appearance were in the offing, the employee would need to obtain permission from the Department to appear. 34 C.F.R. Part 8. The Department will not make these witnesses available to testify at trial or deposition and will contest any effort by either party to compel any appearance by these witnesses.

16.      Due to the special character of the documents at issue, information has been withheld, either: (1) because the selection and presentation of such information reflects the mental processes of Department analysts and attorneys, and/or is inextricably intertwined with

7

the Department's deliberations (<u>e.g.</u>, Department analysis of the evidence and drafts of the

Report and various related documents); or (2) because such information is contained in

documents constituting attorney work-product or reflecting facts communicated in confidence by

clients to their attorneys, as to which neither FOIA nor common law privileges require

segregation and release (<u>e.g.</u>, witness statements).

 

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.

Executed this 19th day of January, 2007.

Kent D. Talbert
General Counsel
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE APOLLO GROUP, INC.     |
SECURITIES LITIGATION,     |
     |
     |
     |
     |     Civil Action No. _____ |

**DECLARATION OF JENNIFER L. WOODWARD**

I,    Jennifer L. Woodward, declare as follows:

1.    I am an attorney with the United States Department of Education's (Department's) Office of the General Counsel (OGC) in the Postsecondary Education Division. I have been an attorney in that division since September 1992.

2.    The statements contained in this declaration are based upon my personal knowledge, and conclusions and determinations reached and made in accordance therewith.

3.    Through my position as an attorney with the Department, I have personal knowledge concerning the Department's 2003-04 program review of the University of Phoenix (University), owned by Defendant Apollo Group, Inc. (Apollo). Due to the nature of my official duties, I am familiar with the procedures followed by the Department when performing an institutional program review.

4.    The purpose of this declaration is to provide the Court and Apollo with facts leading to the Department's decision to withhold documents concerning the program review that had been requested by Apollo under the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and subsequent subpoenas. Such documents were withheld pursuant to FOIA Exemption 5, 5 U.S.C. § 552(b)(5) (deliberative process privilege, attorney work product privilege, and attorney

1

client communications privilege) and FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C) (identities of third party witnesses in the law enforcement records of the program review).

5.      Program review reports typically follow a site visit to a school during which Institutional Review Specialists perform a program review of a school's participation in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq.  See generally 20 U.S.C. § 1099c-1; 34 C.F.R. § 668.112(b).   The report sets forth the findings made by the Institutional Review Specialists and usually requests further information from the school in order to make a final determination as to whether the school owes monetary liabilities and/or fines as a result of the findings.

6.      Following the issuance of the report, the next step in the program review process involves an opportunity for the school to provide the Department with information responding to the report.  The Department then issues a Final Program Review Determination letter, which sets forth any liabilities to the Department for misspent program funds and provides the school an opportunity to appeal the determination.

7.      Sometimes program reviews result in findings that warrant a fine or other penal sanction in addition to or in lieu of repayment of misspent program funds.  One type of finding which can result in a fine rather than imposition of compensatory liabilities is payment by the school of improper incentives for recruitment of students.  See 34 C.F.R. § 668.14(b)(22).   If the Department proposes to impose a fine, a third document is generally issued, called a fine notice.

8.      The University program review was unusual in that its genesis was a qui tam False Claims Act complaint.  While the government on May 6, 2003 declined to intervene in the qui tam case, the Department advised the Department of Justice that the Department had

2

substantial evidence that the University had violated section 487(a)(20) of the Higher Education Act; and that, in view of the declination decision, the Department was considering what administrative action to take against the University on account of the violation.

9.     In August 2003, the Department conducted an on-site program review at the University. The purpose of the review was to substantiate the allegations, and, if appropriate, quantify the extent of the violation, in order to set an appropriate fine amount, which the Department anticipated the University would contest.

10.    Thus, the entire program review process was conducted with an eye towards the administrative litigation the Department anticipated would follow (and that, indeed, would have followed in the absence of settlement).

11.    The team that performed the program review consisted of four Institutional Review Specialists from the Department's Federal Student Aid (FSA) office, who received legal assistance from two attorneys from OGC, including myself. During the program review, the investigative team interviewed over 90 witnesses and collected substantial evidence to support the findings in the program review report (Report). Because many of the witnesses interviewed by the team still worked for the University, the team assured the witnesses that all efforts would be made by the Department to keep the personal identities of the witnesses confidential.

12.    The team collaborated to complete the Report. Together, the attorneys and Institutional Review Specialists collected supporting evidence, compiled witness interview statements, and communicated virtually on a daily basis during the conduct of the program review and the subsequent writing of the Report.

13.    Prior to the issuance of the Report, the team shared many drafts and presented the analysis to their superiors and other Department officials before final clearance was given by the Department to issue the Report.

14.    On February 5, 2004, the Department issued the Report to the University identifying a violation of the Higher Education Act's prohibition on incentive compensation to recruiters, 20 U.S.C. § 1094(a)(20).

15.    From March 2004 through August 2004, the University responded orally and in writing to findings in the Report. As a result, many deliberations and communications occurred within the Department to discuss the University's response, and whether, and on what terms, to settle with the University.

16.    On September 7, 2004, prior to the issuance of a Final Program Review Determination, and a fine notice, the University paid the Department $9.8 million to settle the case.

17.    Beginning in October 2004, Apollo filed the first of a series of FOIA requests, followed by subpoenas, seeking information about the program review and the settlement. I reviewed all of the documents in possession of OGC and FSA that were located in response to the FOIA requests and relevant to the program review process and resulting settlement. I considered whether each document was exempt from production under the FOIA statute, including Exemption 5, pertaining to privileges, and other exemptions under 5 U.S.C. § 552.

18.    During the course of my review of the responsive documents, I observed that a significant number of the documents reflected communications between other OGC attorneys, program clients, third party informants, and me, for the purpose of providing legal advice. On this basis, I designated the documents in question as exempt from disclosure based on the

attorney-client privilege. These documents are among the documents Apollo seeks in its motion to compel.

19.    During my review of the responsive documents, I observed that many of the documents were prepared in anticipation of litigation by Department attorneys and program staff. On this basis, I designated these documents as exempt from disclosure based on the work product privilege. These documents are among the documents Apollo seeks in its motion to compel.

20.    During my review of the responsive documents, I observed that many of the documents were deliberative and pre-decisional. To the best of my knowledge, Apollo had not, and has not, asserted any need for these documents outweighing the importance of protecting the values covered by that privilege. The documents in question included communications among lawyers for the qui tam relators, OGC attorneys, Department of Justice attorneys, third party informants, and/or program clients. On the foregoing basis, I designated these documents as exempt from disclosure based on the deliberative process privilege. These documents constitute the remainder of the documents Apollo seeks in its motion to compel.

21.    The program review, program review report, and the settlement negotiation process consisted of a sequence of legal and policy judgments (i.e., how to investigate the allegations and prosecute the alleged violations, whether and how to issue the Report and the nature of its findings, and whether and on what terms to settle the case). The unusual manner in which the Department became aware of the alleged violations (through unsolicited information submitted by qui tam relators rather than the more customary Department-initiated review of student and school records), the potentially enormous economic and policy implications of the case, the complex nature of the issues involved, the evidentiary analysis required to prove the

violation, and the extraordinary cost of the investigation, all represented highly unprecedented challenges requiring Department lawyers and officials to exercise legal and policy judgment <u>ab initio</u> and at every step of the process.

22.    The integrity of the program review process requires that the documents requested by Apollo remain protected from disclosure under the deliberative process, attorney work product, and/or attorney client privileges. The documents are reflective of the confidential deliberative processes and attorney work product of the investigative team that produced the Department's decisions regarding whether, and in what form, to issue the Report, and whether, and on what terms to settle the case with the University.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 19th day of January 2007.

Jennifer L. Woodward
General Attorney
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202