IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION<br><br><br><br>This Document Relates To:  All Actions | Case No. 06-MC-0558 (CKK)<br><br>(D. Ariz., Case No. CV-04-2147-PHX-JAT) |

**REPLY BRIEF IN SUPPORT OF APOLLO'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM UNITED STATES DEPARTMENT OF EDUCATION**

Defendant Apollo Group, Inc. ("Apollo") submits this Reply Memorandum of Points and Authorities in support of its Motion to Compel Production of Documents and in response to the Opposition to Apollo's Motion to Compel ("Opposition") filed by the United States Department of Education ("Department" or "DOE").

## I.        INTRODUCTION

Apollo has served the Department with a third-party subpoena pursuant to Federal Rule of Civil Procedure 45 seeking, among other items, work papers underlying a report prepared by Department employees that is the subject of an ongoing federal securities action in the District of Arizona. The documents covered by the subpoena are highly relevant to Apollo's defense in that securities case and are unavailable from any source other than the Department. Although the subpoena was validly issued, the Department refuses to comply with the subpoena.

It is axiomatic that government agencies must comply with third-party subpoenas. *Yousuf v. Samantar*, 451 F.3d 248, 257 (D.C. Cir. 2006) ("we hold the Government is a 'person' subject to subpoena under Rule 45 regardless whether it is a party to the underlying litigation"). To excuse its failure, the Department asserts objections that are simply inapplicable to the documents at issue in this dispute.

As an initial matter, the Department has continued to withhold documents wholesale without providing Apollo—or this Court—with the benefit of a privilege log as required by Federal Rule of Civil Procedure 45(d)(2). As a result, Apollo has been significantly prejudiced by the Department's trial-by-surprise litigation tactics; Apollo has had no choice but to resort to general challenges to the Department's claims of privilege rather than the refined, document-specific objections contemplated by the Federal Rules. Indeed, the fact that Apollo has been rendered powerless to identify exactly what documents are being withheld by the Department—

and to separately contest the assertion of privilege with respect to each individual document—is itself sufficient grounds for this Court to find that the Department has waived any otherwise cognizable claim of privilege. *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 195 (D.D.C. 2003).

The Department's substantive objections fare no better. The Department claims that the requested documents are shielded from production pursuant to the deliberative process privilege and the attorney-client and attorney work product privileges. However, in an earlier dispute between Apollo and the Department involving the report that gave rise to this litigation, the Department concluded that the report was "a result of the Department's routine monitoring" of Apollo's subsidiary, not as the Department now maintains, the result of "legal and policy judgments <u>ab initio</u> and at every step of the process." The deliberative process privilege cannot be invoked where "materials could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment," *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992), precisely the types of documents that are at issue here.

The Department's invocation of the attorney-client and attorney work product privileges is equally unavailing. As already noted, the Department previously stated that the report at issue here originated "as a result of the Department's routine monitoring" of Apollo's subsidiary. That attorneys may have worked on such a review does not change the fact that the review was a compliance audit requiring the reviewer to act in a regulatory, not a legal function. Because the attorneys involved in the program review were working in their capacity as regulators, side-by-side with other non-attorney regulators, the attorney-client privilege has no application to the documents in dispute. Similarly, because the documents at issue here were generated during the

course of the Department's program review of Apollo's subsidiary, it simply cannot be said that

the documents were created "in anticipation of litigation," a threshold requirement for the

application of the attorney work product doctrine.  And, the work product doctrine does not

justify the wholesale withholding of documents that contain factual information; for example,

interview notes that the Department has admitted withholding obviously are largely factual.

Opposition at 9.

      The record before this Court compels one conclusion:  the Department must be ordered to

produce all withheld documents called for by Apollo's subpoena.

## II.        FACTUAL BACKGROUND

      The documents sought by Apollo relate to a regulatory review that the Department

commenced in August 2003 (the "Program Review") of Apollo's wholly-owned subsidiary, the

University of Phoenix ("University").  As part of the Program Review, Apollo received an

interim Program Review Report in February 2004 (the "Report"), which is central to a federal

securities class action pending against Apollo in the District of Arizona.  The Report alleges that

the University violated regulations regarding the compensation of its recruiters.  Apollo has

always firmly disputed the allegations contained in the Report, including at the time it received

the Report, in its subsequent discussions with the Department, and in the current securities

litigation.

      Two declarations are attached to the Department's Opposition.  The first is from Kent D.

Talbert, the General Counsel of the Department; the second is from Jennifer L. Woodward, an

attorney in the Department's Office of the General Counsel.[1]  In both instances, the
Department's declarations directly contradict its prior position with respect to the same Report at
issue here.

On March 18, 2004, before the Report was made public, the Department notified Apollo
that it had received several third-party Freedom of Information Act ("FOIA") requests seeking
the Report.  DOE Letter, March 18, 2004, attached hereto as Exhibit A.  On April 5, 2004, in a
letter addressed to the Department, Apollo objected to the release of the Report for a number of
reasons, not least of which was that it believed the Report was a non-final statement of interim
findings that reflected the Department's "predecisional deliberative process."  Apollo Letter,
April 5, 2004, at 3, attached hereto as Exhibit B.  On August 26, 2004, the Department
categorically rejected Apollo's argument that the interim nature of the Report shielded it from
disclosure.  DOE Letter, August 26, 2004, at 12, attached hereto as Exhibit C.  Indeed, the
Department rejected nearly all of Apollo's arguments.  *Id.*  As a result of the Department's
determination of the FOIA issue, on September 2, 2004, the Report, with limited personal
information redacted, was released to the public.  *Id.*

On October 25, 2004, Apollo submitted a FOIA request to the Department seeking,
among other items, the underlying work papers that supposedly supported the Report.  For more
than a year, Apollo persistently communicated its concerns that the Department's responses to its
requests were insufficient.  Through numerous letters, conversations, voicemail messages, and e-

---

[1]    Apollo has objected and moved to strike from the record the declarations of Jennifer L.
Woodward and portions of the declaration of Kent D. Talbert.  Should the court sustain
the objections—and in light of the fact that the Department has not produced a privilege
log in this action—the record will contain no evidentiary support for the Department's
invocation of the attorney-client privilege and work product doctrine, and little to no
support for its invocation of the deliberative process privilege.

mail exchanges, Apollo highlighted major deficiencies that pervaded the Department's FOIA productions.  Apollo diligently—but unsuccessfully—sought a response from the Department that was consistent with its "policy of fullest disclosure."  34 C.F.R. § 5.70 (F).  That effort came to an end on October 31, 2005, when the Department issued its final determination concerning Apollo's FOIA appeal, wherein the Department concluded that it would not produce the documents that are the subject of this litigation.

On July 3, 2006, Apollo served a subpoena on the Department seeking the documents that had been withheld from the FOIA production.  The withheld documents included materials exchanged with third parties; witness statements; factual analyses, charts and presentations concerning the program review; drafts of interview questionnaires, the Report, and the settlement agreement; and communications and notes of Department staff concerning the Program Review.  On July 13, 2006, the Department refused to produce any documents in response to Apollo's subpoena, and failed even to provide a privilege log of the documents withheld, as required by Federal Rule of Civil Procedure 45(d)(2).

### III.    ARGUMENT

**A.    The Department's Failure to Produce a Privilege Log Has Resulted In Waiver Of Any Available Claim of Privilege**

The Department has not produced a log of the documents it has withheld under claim of privilege.  At best, the Department has filed self-serving declarations summarily stating that all documents not produced by the Department have been properly withheld.  These conclusory declarations—without a privilege log of withheld documents detailing what privileges have been relied upon for each document—fail to comply with the requirements of the Federal Rules of Civil Procedure.

Although featured prominently in Apollo's Motion to Compel, *see* Motion to Compel at 10-12, the Department's Opposition essentially ignores its failure to provide a privilege log to Apollo. Federal Rule of Civil Procedure 45(d)(2) states unequivocally that whenever documents are withheld pursuant to a claim of privilege, a party "shall" produce a privilege log. As such, a privilege log is the "universally accepted means of asserting privileges in discovery in federal courts." *See Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, 1 (D.D.C. 1999). In this case, not only was a privilege log required by the Federal Rules of Civil Procedure and the binding decisions of this Circuit, the subpoena served on the Department expressly demanded a log describing any documents it withheld. Motion to Compel, Declaration of Kristopher P. Diulio (Dec. 15, 2006), Ex. A at 4. Yet, to date, the Department has refused to provide a privilege log or even to address its failure to do so.

The Department's failure to produce a privilege log serves to waive any purported claim of privilege that may have been available. *See GFL Advantage Fund, Ltd.*, 216 F.R.D. at 195 ("The subpoenaed party must comply with the requirements of Fed. R. Civ. P. 45(d)(2) [requiring a privilege log] . . . . The rule is obviously mandatory. Failure to comply with it 'is deemed to waive the underlying privilege claim.'") (quoting *In re Grand Jury Subpoena*, 274 F.3d 563, 576 (1st Cir. 2001) ("A party that fails to submit a privilege log is deemed to waive the underlying claim.")); *cf. Natural Res. Defense Council v. Curtis*, 189 F.R.D. 4 (D.D.C. 1999) (holding that "passing reference to possible invasions of attorney-client or work product privileges is insufficient without a detailed privilege log" and finding that the demanding party was "entitled to the discovery it seeks now rather than later").

In a footnote, the Department claims that "in the FOIA action it has produced an extensive *Vaughn* index numbering each document that it did not produce, describing the

document and type of privilege claimed." Opposition at 13 n.3. The Department has done no such thing; it has *never* produced a privilege log or *Vaughn* index either in this litigation or in the previous FOIA dispute. The Department has only produced an inventory of the documents that it did produce. In fact, Apollo has consistently objected to the Department's failure to provide a *Vaughn* index. *See* Apollo Letter, May 13, 2005, at 2, attached hereto as Exhibit D ("We consequently request that you provide us with the reasons justifying each invocation of Exemption 5."); Motion to Compel, Diulio Decl., Ex. I at 7 ("Despite being given an opportunity to state the legal bases for its wholesale usage of Exemption 5, the Office once again refuses to do so. Not a single word is written to separate the application of the attorney-client, attorney work product, or deliberative process privileges from one another.").

As such, the only support the Department has provided for its assertion of privilege are the conclusory declarations of Mr. Talbert and Ms. Woodward; and those declarations not only fail to specify which documents are being withheld pursuant to a particular privilege, but they fail to state the predicate facts that support the claimed privilege. The D.C. Circuit has expressly held that such bald assertions are patently insufficient to support claims of privilege. *Senate of the Commonwealth of P.R. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (Ginsburg, Ruth Bader, J.); *Animal Legal Defense Fund, Inc. v. Dep't of the Air Force*, 44 F. Supp. 2d 295, 300-01 (D.D.C. 1999). In fact, in *Senate of the Commonwealth of P.R.*, the D.C. Circuit found an agency's proof to be "conclusory" notwithstanding the fact that the agency had provided "each document's issue date, its author and intended recipient, and the briefest of references to its subject matter" (823 F.2d at 585)—information entirely absent in the declarations here. Accordingly, whatever privilege may have applied to these documents has been waived.

This Court's analysis should begin—and end—with a determination that the Department has waived any available privilege, and Apollo is immediately entitled to all documents it seeks under its subpoena.

**B.    The Department Has Failed To Establish That The Withheld Documents Are Protected by Privilege**

Were the Court nonetheless somehow to overlook or excuse the Department's failure to produce a privilege log, it should still order the Department to comply with the subpoena. The Department asserts the deliberative process privilege, attorney-client privilege, and work product doctrine as bases for withholding documents called for by the subpoena. It is therefore the Department's burden to prove the applicability of the claimed privileges. *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (holding that burden is on agency to show that requested material falls within a FOIA exemption); *In re Lindsey*, 158 F.3d 1263, 1269 (D.C. Cir. 1998) (holding that party claiming attorney-client privilege bears the burden of proving the applicability of the privilege); *Coastal States Gas Corp. v. United States Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980) (holding that agency seeking the protection of the work product doctrine bears the burden of establishing elements necessary to invoke the doctrine). The Department has failed to meet that burden.

**1.    The Deliberative Process Privilege Has No Application To This Dispute**

Remarkably, the Department invokes the deliberative process privilege to shield nine categories of documents from production, *see* Opposition at 9-10, despite having previously found that the deliberative process privilege did not apply to the Report. The Department has already administratively "concluded that the [Report] itself is neither pre-decisional nor deliberative." DOE Letter, August 26, 2004, at 12. In no uncertain terms, the Department stated that:

> [T]he [Report] was created *as a result of* the Department's *routine monitoring* of the Title IV Federal Student Financial Assistance programs administered by the University.  The [Report] was *not* created for the purposes of the Department receiving advice or consultative services from [Apollo] *in order to render a policy decision.*  Rather, the [Report] specifically states that its intent is to advise the institution of the findings made as a result of the program review.  Moreover, the goal of the [Report] is to open up a dialogue between the Department and the University such that the findings of the [Report] can be resolved.

*Id.* at 12 (emphases added).

In extraordinary fashion, the Department—through Ms. Woodward's sworn declaration—now makes a complete and self-serving about-face:

> The program review, program review report, and the settlement negotiation process consisted of a sequence of legal and policy judgments (i.e., how to investigate the allegations and prosecute the alleged violations, whether and how to issue the Report and the nature of its findings, and whether and on what terms to settle the case).  The unusual manner in which the Department became aware of the alleged violations (through unsolicited information submitted by qui tam relators rather than the more customary Department-initiated review of student and schools records), the potentially enormous economic and policy implications of the case, the complex nature of the issues involved, the evidentiary analysis required to prove the violation, and the extraordinary cost of the investigation, all represented highly unprecedented challenges requiring Department lawyers and officials *to exercise legal and policy judgments ab initio and at every step of the process.*

Woodward Decl. at ¶ 21 (emphasis added); Opposition at 11-12; *see also* Talbert Decl. at ¶ 13 (The Office of General Counsel was "involved in the program review from its inception and the right to assert the deliberative process privilege for the documents and communications related to the Report and resulting settlement is within the authority of this office.").

The Department cannot have it both ways.  Having made the decision to release Apollo's Report based on its determination that the Report was the result of the Department's routine oversight activities—and not for purposes of rendering a policy decision—the Department

cannot now take a completely contradictory position, which once again would work to the prejudice of Apollo.[2]

Indeed, in a case such as this, the D.C. Circuit has held that the deliberative process privilege is inapplicable where "materials could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment." *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). "The privilege is designed to protect agency policy-oriented judgments and the processes by which policies are formulated, rather than purely factual, investigative matters." *Nat'l Ass'n of Home Builders*, 309 F.3d at 39 (internal quotation marks and citations omitted); *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). And because the Report was not created for the purposes of the Department rendering a policy decision, it necessarily follows that the nine categories of documents being withheld under the deliberative process privilege themselves cannot meet this standard. Accordingly, the documents at issue may not be withheld under the guise of the deliberative process privilege.[3]

---

[2]    The Department's change in position is not only suspicious in itself; in every instance, the Department has adopted whatever position seemed to offer the pretext calculated to deny Apollo access to the documents without regard for consistency.

[3]    The Department's invocation of the deliberative process privilege is further belied by the significant delay in the Department's assertion of the privilege. Apollo submitted its first request for documents under FOIA on October 25, 2004, yet the Department waited to assert the deliberative process privilege until April 8, 2005—a full 165 days after it received Apollo's request. *See* Motion to Compel, Diulio Decl., Exs. C and G. During those 165 days, the Department provided Apollo with three separate productions, namely, productions on December 29, 2004, February 18, 2005, and February 28, 2005. But in none of those productions did the Department assert the deliberative process privilege or even mention the applicability of the privilege to Apollo's FOIA request. Motion to Compel, Diulio Decl., Exs. D, E and F.

Significantly, even if the deliberative process exemption were to apply, it would not protect factual material that does not disclose an agency's decision-making process.  *See Mead Data Central, Inc. v. Dep't of the Air Force*, 566 F.2d 242, 254 n.28 (D.C. Cir. 1977) (stating that the deliberative process privilege "does not permit the nondisclosure of underlying facts unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process").  As the court stressed in *Dudman Communications Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568-69 (D.C. Cir. 1987), the key question in a case where the deliberative process privilege is at issue is "whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."  The court held, with equal applicability here, "[i]f a person requests particular factual material . . . the agency will usually be able to excise the material from the draft document and disguise the material's source, and thus the agency will usually be able to release the material without disclosing any deliberative process."  *Id.* at 1569.  Certainly, the documents the Department identifies as "notes concerning witness statements (i.e., compilations of documents provided by witnesses, summaries of witness testimony, and other documents and notes related to witness statements)," Opposition at 9; Talbert Decl. at ¶ 7.a.(ii), fall within this category of documents that must be produced.

Furthermore, contrary to the Department's assertion that communications "from attorneys for the qui tam relators sharing advice and information from informants with Department lawyers" is covered by the deliberative process privilege, *see* Opposition at 9-10; Talbert Decl. at ¶ 7(v), the D.C. Circuit has made clear that the privilege does not apply to deliberations between a governmental agency and a non-governmental third party.  *Mead Data Central, Inc.*, 566 F.2d

11

at 259-60 ("deliberations with a non-governmental party outside the agency" are not covered by the "deliberative process privilege").  Accordingly, any documents exchanged between the DOE and the *qui tam* relators (who are, by definition, outside of the DOE), even if deliberative in nature, are not subject to the privilege.  *See id*. at 258 (holding that information disclosed to party outside agency, seeking to invoke the deliberative process privilege, required disclosure, absent compelling justification for withholding).  Accordingly, the Department must produce all documents falling within this category.

### 2.    The Attorney-Client Privilege And Work Product Doctrine Are Inapplicable To This Dispute

As was true in the FOIA dispute, the Department once again has failed to provide any meaningful explanation for its invocation of the attorney-client privilege or attorney work product doctrine.  In fact, the Department invokes the privilege relying on nothing more than a series of self-serving, conclusory, general statements completely devoid of any factual support for any element of the claimed privilege—and even these self-protective assertions contain implicit concessions.  *See* Talbert Decl. ¶ 8 ("*Many* of the [deliberative process] documents are also protected by the attorney-client and work product privileges, as I understand the Department to have consistently maintained and preserved such privileges in response to all FOIA requests and subpoenas.") (emphasis added); Woodward Decl. ¶ 18 ("During my review of the responsive documents, I observed that a *significant number* of the documents reflected communications between other OGC attorneys, program clients, third party informants, and me, for the purpose of providing legal advice.  On this basis, I designated the documents in question as exempt from disclosure based on the attorney-client privilege.") (emphasis added); Woodward Decl. ¶ 19 ("During my review of the responsive documents, I observed that *many* of the documents were prepared in anticipation of litigation by Department attorneys and program staff.  On this basis, I

designated these documents as exempt from disclosure based on the work product privilege.")
(emphasis added).  Such bald assertions are patently insufficient to satisfy claims of privilege.
*Animal Legal Defense Fund, Inc.*, 44 F. Supp. 2d at 302 (rejecting as insufficient an agency
declaration that "simply paraphrases in conclusory terms the formal legal requirements" for a
privilege).

### a.    The Department Has Failed To Carry Its Burden Of Establishing the Attorney-Client Privilege

As a preliminary matter, the attorney-client privilege does not protect information that is
obtained from third parties and communicated to Department lawyers by Department employees
if "no new or confidential information concerning the Agency is imparted in the process."  *See
Schlefer v. United States*, 702 F.2d 233, 245 (D.C. Cir. 1983).  This is because the privilege only
protects communications that "contain private information concerning the agency."  *Coastal
States Gas Corp. v. United States Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980); *see also
Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 1997); *Schlefer*, 702 F.2d at 245.  Accordingly,
the attorney-client privilege clearly does not apply, for example, to the documents the
Department identifies in Paragraph 7, Subsection 5 of Mr. Talbert's declaration
("communications from attorneys for the qui tam relators sharing advice and information . . .
with Department lawyers."); *see also* Opposition at 9-10.  The privilege also does not protect
documents reflecting "[i]nterviews with persons not employed" by the Department.  *Tarpeh-Doe
v. United States*, No 88-0270-LFO, 1990 U.S. Dist. LEXIS 15330, *8-9 (D.D.C. Nov. 13, 1990).
And, more broadly, because the documents sought by Apollo do not contain private information
concerning the Department, the privilege is inapplicable.  *See Coastal States*, 617 F.2d at 863
(holding that agency documents, including communications between field auditors and agency

counsel, were not intended to "assist the agency in protecting its interests" and thus were not privileged).

For the attorney-client privilege to apply, the Department employees must be requesting or receiving legal advice. The privilege does not protect all communications with Department attorneys. Similarly, draft documents, such as drafts of the Report, are not protected by the attorney-client privilege because the drafts contain potential findings by the agency, as opposed to legal advice from the Department's counsel to the agency. *See General Elec. Co. v. Johnson*, No. 00-2855, 2006 U.S. Dist. LEXIS 64907, at *48-49 (D.D.C. Sept. 12, 2006) (holding that draft reports created by an attorney are "not protected by the attorney-client privilege because it is not legal advice; instead it amounts to an affirmative determination by the agency that the party is legally responsible for a specific violation, and assigns certain attendant responsibility and penalties").

The documents sought by Apollo do not fall within the bounds of the attorney-client privilege. *See id.* at *50 ("the privilege role of an attorney does not encompass the establishment of broad agency policy, adjudication of responsibilities, assessment of penalties, or other functions that create law"). To the extent counsel for the Department participated in the Program Review, those employees were involved in a regulatory review, as opposed to providing legal advice to the Department. *See* Woodward Decl. ¶ 11 ("The team that performed the program review consisted of four Institutional Review Specialists . . . who received legal assistance from two attorneys from OGC."). Ms. Woodward went on to describe the participation of Department attorneys in the program review process: "Together, the attorneys and Institutional Review Specialists *collected* supporting evidence, *compiled* witness interview statements, and *communicated virtually on a daily basis* during the conduct of the program review and the

subsequent writing of the Report." Woodward Decl. at ¶ 12 (emphases added). This is not a description of attorneys providing legal counsel to an agency, but is instead a description of Department attorneys acting as regulators and participating in fact-bound administrative review. Accordingly, these documents are not covered by privilege. *See General Elec.*, 2006 U.S. Dist. LEXIS 64907, at \*50 ("[W]hen an attorney is acting more in the nature of a business advisor, legislator, adjudicator, or regulator, the attorney-client privilege does not apply.") (citing *In re Lindsey*, 158 F.3d at 1269; *Coastal States*, 617 F.2d at 863; *Mead Data Central, Inc.*, 566 F.2d at 249, 253, 255 n.32).

  b.    **The Department Has Failed To Carry Its Burden Of Establishing the Applicability Of The Attorney Work Product Doctrine**

  As a basic rule, "[t]he work-product rule does not extend to every written document generated by an attorney; it does not shield from disclosure everything that a lawyer does." *Coastal States*, 617 F.2d at 864 (internal citation and quotation marks omitted). The mere fact that some documents may have been created by Department attorneys is not—standing alone— sufficient to apply the work product doctrine. *See id.* at 865 ("[I]f an agency were entitled to withhold any document prepared by any person in Government with a law degree simply because litigation might someday occur, the policies of FOIA would be largely defeated."). Yet the Department attempts to assert the privilege to withhold documents created by "Department attorneys and *program staff*." Woodward Decl. ¶ 19 (emphasis added); Opposition at 13. The Department clearly has gone too far.

  To enjoy the protection of the work product rule, the Department-created document must have been created "in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). The Department argues that the Program Review indeed may have resulted in litigation and that this fact brings "many" of the documents at issue under the protections of the attorney work product

doctrine.  Opposition at 13; Woodward Decl. at ¶ 10 ("[T]he entire program review process was conducted with an eye towards the administrative litigation the Department anticipated would follow (and that, indeed, would have followed in absence of the settlement).").  However, the Program Review was not conducted with an eye towards litigation; the Department has unequivocally stated that it was conducted "as a result of the Department's routine monitoring of the Title IV Federal Student Financial Assistance programs administered by the University" and with the "goal of opening up a dialogue between the Department and the University."  DOE Letter, August 26, 2004, at 12.

Furthermore, this exact argument that regulatory reviews are conducted in anticipation of litigation was rejected by the D.C. Circuit in *Coastal States*, in which the plaintiff sought documents from an agency relating to regulatory audits.  In affirming the District Court's order releasing agency documents, the Court of Appeals held that while it is "abstractly true" that regulatory audits may result in litigation, "the mere possibility is hardly tangible enough to support so broad a claim of privilege."  *Coastal States*, 617 F.2d at 865.  This same conclusion was reached by this Court in *Tarpeh-Doe*, wherein the Court held that agency-created "[d]ocuments prepared for an investigation as part of normal procedures or pursuant to regulation are not work product."  1990 U.S. Dist. LEXIS 15330, *7 (collecting cases).  The Court found that the mere "specter" of litigation was not enough to shroud the documents in the attorney work product privilege.  *Id.* at *5.  "Though this litigation could have been foreseen, there is no persuasive showing that [the State Department] prepared these documents in anticipation of it."  *Id.* at *8.

**C.      The Documents Sought By Apollo Are Highly Relevant To The Securities Litigation**

The documents sought by Apollo are highly relevant to the securities litigation because

both the accuracy of the Report is seriously at issue as well as the methodology employed by the Department in conducting the Program Review and drafting the Report. Apollo contends as part of its defense that it did not have a duty to disclose to the public and its investors a preliminary government report that contained obviously false, mistaken, internally inconsistent, and misleading information and was issued improperly by someone lacking authority to issue the Report. As such, part of Apollo's defense rests on the manner in which the Department conducted the Program Review and the sources of information relied upon by the Department in drafting the Report. Apollo is entitled to seek discovery of this information. Moreover, the evidence contained in the documents the Department is withholding is only available from the Department.

Discovery under Rule 26(b) is permitted over any non-privileged material "relevant to the claim or defense of any party," or that "appears reasonably calculated to lead to the discovery of admissible evidence." The Department concedes that the documents sought by Apollo are at least "minimally relevant," *see* Opposition at 15; in fact, the Department's characterization is an understatement given the critical importance of the Report to Apollo's defense in the securities litigation. Plaintiff in the securities litigation alleges that Apollo was obligated to make an earlier disclosure of the contents of the Report. Apollo contends on the other hand that it had no obligation to publicly disclose the Report, because, among other things, it was legally and factually flawed, it was issued without proper authorization, and it was only a preliminary step in the overall Program Review process. The documents that Apollo seeks (such as witness statements, factual information collected by the Department, drafts of the Report, and analyses of issues covered in the Report) go to the core of the Report's defects by telling the story of its creation: (1) the factual information and witness testimony that were or were not considered;

17

(2) the Department's plan for conducting the review; (3) the analyses that were or were not undertaken to support the Report; and (4) the steps taken to obtain approval and authorization for the Report's issuance.

## IV.  CONCLUSION

The Department continues to withhold improperly documents it has a legal obligation to produce pursuant to a lawful subpoena.  It has withheld these documents in violation of the Federal Rules of Civil Procedure and contrary to the prevailing case law of this Circuit.  For the reasons set forth in the Motion to Compel Production of Documents and herein, Apollo respectfully requests that this Court order the Department to produce all documents not produced pursuant to Apollo's subpoena.

Respectfully Submitted,

Dated:  January 26, 2007

/s/ Melanie L. Katsur

Melanie L. Katsur (DC Bar No. 484969)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

Wayne W. Smith
Joseph P. Busch, III
Daniel P. Muino
Kristopher P. Diulio
GIBSON, DUNN & CRUTCHER LLP
4 Park Plaza, Suite 1400
Irvine, CA 92614
Telephone:  (949) 451-3800
Facsimile:  (949) 451-4220

Attorneys for Defendant Apollo Group, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused to be served a true and correct copy of the Defendant Apollo Group Inc.'s Reply in Support of Motion to Compel Production of Documents from the United States Department of Education by regular U.S. mail this 26th day of January, 2007, upon the following:

Stephen R. Basser
Samuel M. Ward
Barrack, Rodos & Bacine
402 W. Broadway, Ste. 850
San Diego, CA  92101
sbasser @barrack.com
sward@barrack.com

Andrew S. Friedman
Bonnett, Fairbourn, Friedman & Balint
2901 North Central Ave., Suite 1000
Phoenix, AZ  85012
afriedman@bffb.com

General Counsel
United States Department of Education
Office of the General Counsel
400 Maryland Avenue, S.W., Room 4083, FOB-6
Washington, DC  20202-2100
**\* No email service**

Heather D. Graham-Oliver
United States Department of Justice
Judiciary Center Building
555 4th Street, N.W.
Washington, DC 20530
heather.graham-oliver@usdoj.gov

_____/s/Larry Newsom_____

Larry S. Newsom

# EXHIBIT A



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF THE GENERAL COUNSEL

March 18, 2004

By facsimile and US Mail
202-530-9539

Douglas R. Cox, Esquire
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

> Re:  Your Request on behalf of Apollo Group, Inc. for
> Confidential Treatment of Program Review Report of
> the University of Phoenix

Dear Mr. Cox:

I am writing in response to your letter to Jonathan Vogel of February 25, 2004 wherein you requested that "confidential treatment be accorded to the Interim Program Review Report bearing the Program Review Control Number 200340922254" (University of Phoenix Program Review Report) pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Executive Order 12600.

Please be advised that the U.S. Department of Education has received FOIA requests that seek access to the above referenced Program Review Report of the University of Phoenix. The purpose of this letter is to inform you, as counsel for the Apollo Group, Inc., the parent company of the University of Phoenix, that the Department is providing you with the opportunity to designate any information in the enclosed report which you consider to be "confidential commercial information," the disclosure of which by the Department could reasonably be expected to cause substantial competitive harm. *See* Exec. Order No. 12600. Please also provide any detailed rationale(s) for each such specific designation(s).

Please submit your designation(s) and rationale(s) no later than the close of business on Monday, March 29, 2004. The Department will promptly review your submission and thereafter provide a written determination.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Kent D. Talbert
Deputy General Counsel

Enclosure
CC: Jeanne Van Vlandren

# EXHIBIT B

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

1050 Connecticut Avenue, N.W. Washington, D.C. 20036-5306

(202) 955-8500

www.gibsondunn.com

dcox@gibsondunn.com

April 5, 2004

Direct Dial
(202) 887-3531

Fax No.
(202) 530-9539

*Ashley Stallings*
04/05/04

Client No.

Kent D. Talbert, Esq.
Deputy General Counsel
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202-2110

Re:    *FOIA Requests For Interim Program Review Report*

Dear Mr. Talbert:

On behalf of our clients, Apollo Group, Inc. and its subsidiary, the University of Phoenix (collectively, "Apollo"), we are writing in response to your letter of March 18, 2004. In your letter, you indicate that the Department of Education has received several requests under the Freedom of Information Act ("FOIA") for access to the Interim Program Review Report bearing the Program Review Control Number 200340922254. Pursuant to Executive Order 12600, your letter invites us to designate any information in the Interim Report that we believe is "confidential commercial information," the disclosure of which is exempt under § 552(b)(4) of FOIA (Exemption 4). Your letter also requests the rationales for our designations. We thank the Department for granting us an extension until April 5, 2004 to provide this response.

Before turning to the specifics of Exemption 4, however, and as we discussed, it is important to emphasize that the Interim Report should not be made publicly available at all under FOIA. If the Department ultimately agrees with that conclusion, the question of Exemption 4 designations will not arise.

The Interim Report is a highly peculiar document that contains many features that demonstrate that it should not be made publicly available. It is, on its face, not a statement of the Department's final position: indeed, it is the first step in the Department's own multi-level review process that expressly contemplates a response by Apollo (including a substantial

## GIBSON, DUNN & CRUTCHER LLP

Kent D. Talbert
April 5, 2004
Page 2

production of documents) that will help Department officials other than those who conducted the program review to determine the Department's final position. It is not evident on the face of the Interim Report that it was signed by an official of the Department having authority to issue such an Interim Report. It contains factual errors and internal inconsistencies. Much of the Interim Report is drawn, with excessive credulousness, from a dismissed *qui tam* complaint. The process envisioned by the Interim Report—which has not yet run its course—explicitly anticipates a further statement of position by Department officials other than those who conducted the program review, a position that has a solid factual basis and that will benefit from and be refined by Apollo's own analysis in response to the Interim Report. Given these features, and as set forth in greater detail below, the Department should withhold the Interim Report under FOIA.

The correctness of that legal conclusion is buttressed by the facts of this particular case. Here, as the Department is aware, Apollo strongly disputes the accuracy of the Interim Report. Representatives of Apollo have met with the Department and submitted facts and analysis sufficient to demonstrate that the Interim Report is predicated upon factual errors and a misunderstanding of Apollo's programs. That submission included an extended analysis, prepared by the independent auditing firm of KPMG on the basis of documents in the possession of the Department, highlighting analytical errors underlying the Interim Report's key conclusions. The Interim Report itself discloses that it was prepared without benefit of all the necessary documentation.

The Department, as a matter of fairness, equity and good government, must consider the overwhelming irreparable harm that premature disclosure of the Interim Report would have on Apollo, a publicly-traded company. The unfairness of that harm is exacerbated a thousand-fold when the Interim Report stands on such shaky factual ground. When all the facts are accurately considered by the Department, the Department will be satisfied that Apollo has faithfully met its obligations under § 487(a)(20) of the Higher Education Act of 1965, *amended by*, 20 U.S.C. §§ 1070 *et seq.* (1998) and the Department's implementing regulations, 34 C.F.R. § 668.14(b)(22) (2003).

At this stage, however, for the Department to release any interim findings—even after Apollo has pointed out serious and material inaccuracies contained within the Interim Report—when such disclosure will cause a real, significant and immediate impact on Apollo's stock price, is both unfair and unreasonable. No benefit to the public will be achieved by access to inaccurate preliminary findings and thus the mandate of FOIA is not served by disclosure of the Interim Report. Nor can that unfairness be avoided by simply describing the Interim Report as "preliminary" or "not final" in any public release.

If the Department disagrees with the legal analysis set forth herein, we respectfully suggest that because the Interim Report has features that suggest that it is in a class by itself, that the important legal issues involved in determining that such an Interim Report is "final" for

# GIBSON, DUNN & CRUTCHER LLP

Kent D. Talbert
April 5, 2004
Page 3

purposes of FOIA, should be authoritatively resolved by the Justice Department's Office of Legal Counsel pursuant to Executive Order 12146. *See also* 28 C.F.R. §§ 0.5, 0.25. Such a course would be particularly prudent given the clear threat of irreparable injury to Apollo, its shareholders and its employees.

     1. <u>The Interim Report Is Not "Final" And Should Be Withheld From Disclosure</u>. The Department's regulations clearly provide that only "final reports" of the Department may be subject to public inspection and copying. *See* 34 C.F.R. § 5.72(d). The term "final" means "[l]ast; conclusive; decisive; definitive; terminated; completed." BLACK'S LAW DICTIONARY 629 (6th ed. 1990); *see also* THE AMERICAN HERITAGE DICTIONARY 504 (2d ed. 1985) (defining "final" as "[o]f, pertaining to, or constituting the last element in a succession, process or procedure . . .; [u]ltimate and definitive; unalterable"). Here, the Interim Report is not a "final report;" it is a preliminary or initial document that on its face is subject to multiple levels of further review and consideration by the Department, and response by Apollo, and it is a document containing tentative findings that could change or, indeed, could be withdrawn by the Department. Under any characterization, the Interim Report is not "final," and, thus, § 5.72(d) prohibits its release.

     This conclusion is buttressed by the examples contained within the Department's own Appendix to Part 5 of Title 34 of the Code of Federal Regulations. Under the heading "Grants," the Appendix provides that only the "*[f]inal report* of any review or evaluation of grantee performance conducted or caused to be conducted by the Department" is "[g]enerally available." *Id.* (emphasis added). Similarly, under the heading "Contracts," the Appendix states that the "*[d]raft of [a] proposed final report submitted for comment prior to acceptance*" is "[g]enerally *not available*." *Id.* (emphases added). Thus, the Appendix highlights that the Department's regulations distinguish between final reports and preliminary reports or "draft final reports," with only the former being subject to disclosure. Accordingly, on their face, the Department's regulations protect the Interim Report from release.

     Furthermore, the distinction recognized by the Department's regulations between a "final report" and a "draft . . . final report" reflects an application of 5 U.S.C. § 552(b)(5) and 34 C.F.R. § 5.73(a), which shield from disclosure documents that reveal an agency's predecisional deliberative process, and that independently exempt from disclosure the Interim Report. *See Providence Journal Co. v. Dep't of Army*, 981 F.2d 552, 557-58, 560 (1st Cir. 1992) (a report by the Office of the Inspector General was a "predecisional" document because it was the product of a preliminary criminal investigation and because the Army command, not the Inspector General, was the final decision-maker regarding whether further disciplinary or prosecutorial actions would be brought against the target officers, and it was "deliberative" because the decision as to whether to bring such actions involved the same "consultative process" as the promulgation of agency disciplinary policy); *Nat'l Wildlife Fed'n v. Forest Serv.*, 861 F.2d 1114, 1115 (9th Cir. 1988) (working drafts of a national forest plan, working drafts of an environmental impact statement, and "previews" of the drafts, which are comments, criticisms, and recommendations made by another agency, were exempt from disclosure pursuant to

GIBSON, DUNN & CRUTCHER LLP

Kent D. Talbert
April 5, 2004
Page 4

Exemption 5); *Dudman Communications v. Dep't of Air Force*, 815 F.2d 1565, 1566, 1569 (D.C. Cir. 1987) (a preliminary draft of a historical work prepared and published by the Air Force was exempt from disclosure because release of the draft would reveal the government's deliberative process); *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1049 (D.C. Cir. 1982) (preliminary draft of an official military history was exempt from release on the ground that disclosure of editorial changes would result in the "disrobing of an agency decision-maker's judgment"); *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 259 (D.C. Cir. 1982) (draft material regarding an agency revenue ruling was predecisional and deliberative and thus eligible for Exemption 5 treatment); *Pies v. IRS*, 668 F.2d 1350, 1354 (D.C. Cir.1981) (draft proposed regulations and draft transmittal memorandum that did "not reflect the final opinion, interpretation or guidance of the agency" were exempt under Exemption 5). Thus, pursuant to 5 U.S.C. § 552(b)(5) and 34 C.F.R. § 5.73(a), the Interim Report should not be disclosed in response to any requests for access.

2. The Interim Report Is Not Subject To Disclosure Pursuant to 5 U.S.C. § 552(b)(7) And 34 C.F.R. § 5.73(b), Which Exempt From Disclosure Records Or Information Compiled For Law Enforcement Purposes. Under § 5.73(b), the phrase "enforcement action" has been defined broadly to include any "*possible* civil, criminal or administrative sanctions." (Emphasis added). Here, the Interim Report qualifies as "information" compiled for "enforcement purposes;" it is highly sensitive information relating to an open matter that can "possibl[y]" result in the imposition of sanctions. As such, the Interim Report falls within the purview of Exemption 7. *See, e.g., Pope v. United States*, 599 F.2d 1383, 1386 (5th Cir. 1979) (holding that enforcing the regulation of legal practice before the IRS was a "law enforcement purpose" under Exemption 7, which covers "civil and regulatory proceedings as well as . . . criminal matters"). Also, disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A); *see also* 34 C.F.R. § 5.73(b)(1). For purposes of this exemption, it is no longer necessary to show that disclosure "would interfere with" enforcement proceedings, only that disclosure "could reasonably be expected to interfere with" such proceedings. *See* Freedom of Information Reform Act of 1986 (FIRA), Pub. L. No. 99-570, § 2, subtitle N, 100 Stat. 3207, 3207-48 (1986). This change in language effectively broadened the scope of what may be protected from disclosure pursuant to Exemption 7(A). *See, e.g., Manna v. Dep't of Justice*, 51 F.3d 1158, 1164 n.5 (3d Cir. 1995) (stating that Congress amended the statute to "relax significantly" the standard for demonstrating interference).

Here, granting the public access to the Interim Report would reveal the scope, direction, focus, and nature of the Department's investigation. Public knowledge of this information may hinder or interfere with the Department's review—and with Apollo's and its employees' due process rights within that review. *See Amolsch & Madden, Inc. v. FTC*, 591 F.2d 809, 811 (D.C. Cir. 1978) (finding that an initial compliance report withheld by the FTC was exempt from disclosure pursuant to Exemption 7(A) because the report reflected the results of a lengthy FTC investigation and because the report looked toward "future"—as opposed to "past" or "completed"—adjudications). For example, to release the Interim Report at this stage in the Department's compliance audit could increase the likelihood that *qui tam* relators or other members of the public, such as the media or corporate watchdog groups, would interfere with,

**GIBSON, DUNN & CRUTCHER LLP**

Kent D. Talbert
April 5, 2004
Page 5

threaten, or taint the testimony of, Apollo personnel identified in the Interim Report by virtue of their titles, positions, or job responsibilities. This is the sort of harm that Exemption 7(A) seeks to prevent. *Cf., e.g., Judicial Watch, Inc. v. Dep't of Justice*, 102 F. Supp. 2d 6, 19-20 (D.D.C. 2000) (agreeing with the government that "prematurely disclosing documents related to witnesses in ongoing inquiries and investigations could result in witness tampering or intimidation . . . and could discourage the continued cooperation of these witnesses") (internal quotations and citation omitted) (alteration in original); *see also NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232 (1978) (turning to legislative history to explain that "the statutory language clearly suggests that the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against"). Furthermore, with respect to Apollo's and its employees' rights, the Department must consider 5 U.S.C. § 552(b)(7)(B) and 34 C.F.R. § 5.73(b)(2) (barring disclosure of information that would "deprive a person of a right to a fair trial or an impartial adjudication") and 5 U.S.C. § 552(b)(7)(C) and 34 C.F.R. § 5.73(b)(3) (prohibiting disclosure of information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy") as alternative grounds to withhold the Interim Report from disclosure. *See, e.g., Nat'l Archives & Records Admin. v. Favish*, --- S.Ct. ----, 2004 WL 609605, at *6 (Mar. 30, 2004) (explaining in the context of Exemption 7(C) that law enforcement documents obtained by government investigators "often contain information about persons interviewed as witnesses or initial suspects but whose link to the official inquiry may be the result of mere happenstance" and concluding that "[t]here is special reason, therefore, to give protection to this intimate personal data, to which the public does not have a general right of access in the ordinary course").

    3. <u>The Interim Report Is Flawed And Internally Inconsistent, And Its Release Would Impose Massive And Unfair Harm On Apollo, Its Shareholders and Its Employees</u>. Although FOIA reflects a policy of general disclosure, the Department must balance this objective against the compelling mandate that only truthful, accurate and reliable information be provided to the public—especially when the government has been put on notice through the submission of affirmative evidence that the very truthfulness, accuracy, and reliability of the information at issue is highly suspect. *Cf. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 751-52 (1989) (holding that disclosure of contents of FBI rap sheet to third parties could reasonably be expected to constitute an unwarranted invasion of personal privacy pursuant to Exemption 7(C), and thus were exempt, because at least in part, such rap sheets are sometimes "incorrect or incomplete"); *Transectechnology Corp. v. United States*, 22 Cl. Ct. 349, 379 (1990) (holding that the government "***cannot launch*** a technical data package into the procurement process if it ***has reason to know that the results called for are problematic***, unless it discloses the knowledge available to it concerning problems and possible solutions, or unless that information is already generally known by contractors in the field") (emphases added). FOIA embodies the Congressional judgment that the right to access attaches only to those governmental processes that as a general matter benefit from openness. *See Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989) (explaining that FOIA embraces a "general philosophy" of agency disclosure meant to insure "an ***informed*** citizenry vital to the functioning of a

**GIBSON, DUNN & CRUTCHER LLP**

Kent D. Talbert
April 5, 2004
Page 6

democratic society") (internal quotations and citation omitted) (emphasis added). The disclosure
of false and inaccurate material does not achieve the objective of an informed citizenry, or any
other positive goal espoused by FOIA for that matter; to the contrary, it undermines them. *Cf.
Favish*, --- S.Ct. ----, 2004 WL 609605, at *10 (holding that for purposes of Exemption 7(C),
FOIA requesters must satisfy two conditions prior to government disclosure: (1) "that the public
interest sought to be advanced is a significant one" and (2) that the "information is likely to
advance that interest"). It is for this reason, for example, that FOIA incorporates the deliberative
process privilege, which protects "against confusing the issues and *misleading* the public" by
dissemination of preliminary documents. *Providence Journal Co.*, 981 F.2d at 557, 561-62
(finding that because public release of the "recommendatory sections" of an Inspector General
report would either "'inaccurately reflect or prematurely disclose the views of the agency,'" the
Army was not required to reveal any information referenced in those sections of the report)
(citation omitted); *see also Nat'l Wildlife Fed'n*, 861 F.2d at 1118-19 (explaining that the
deliberative process privilege applies to documents the release of which would "inaccurately
reflect or prematurely disclose the views of the agency") (internal quotations and citation
omitted).

      Thus, from these principles emerges the rule that when dealing with "preliminary" and
potentially "inaccurate" documents, an affected party who points out "material inaccuracies" can
"ma[k]e a sufficient showing to overcome the public's right to access." *United States v. White*,
855 F. Supp. 13, 18 (D. Mass. 1994). Thus, in *White*, when a newspaper sought access to a
wiretap transcript that had previously been impounded by the district court during proceedings,
the court found after conducting a balancing test, that the government's request for confidential
treatment could not be honored because even though the transcript was "stamped 'preliminary'"
and contained misspellings and unintelligible utterances, "no one ha[d] pointed out any material
inaccuracies." *Id.* The contrapositive is true: A party indeed "does" make out a sufficient
showing to overcome the public's right to access, when such a party points out "material
inaccuracies" in the documents at issue. Furthermore, in other contexts, courts have found that
sensitive information cannot be released to the public during the early stage of proceedings,
especially when the subject of the information has not had "an opportunity to examine the
documentation and test the legality" of the underlying government actions. *See In re Globe
Newspaper Co.*, 729 F.2d 47, 55, 59 (1st Cir. 1984) (finding that transcripts generated pursuant
to wiretaps should not be produced to the public at the time of a bail hearing because "the press
and the public will have later opportunities to examine the material admitted at those hearings"
and because the defendants "have not yet had an opportunity to test the material admitted at the
hearings").

      As set forth above, Apollo has given the Department compelling reasons to believe the
Interim Report is factually inaccurate.

      Precisely because of the concerns for fairness and accurateness, courts in analogous
contexts have stricken from pleadings "immaterial, impertinent, or scandalous" material. FED.
R. CIV. P. 12(f). *See Hughes v. Kaiser Jeep Corp.*, 40 F.R.D. 89, 93 (D.S.C. 1966) (striking as

# GIBSON, DUNN & CRUTCHER LLP

Kent D. Talbert
April 5, 2004
Page 7

unnecessary, argumentative and prejudicial a reference that described the vehicle in which plaintiff's decedent was killed as a "death trap"); *Budget Dress Corp. v. Int'l Ladies' Garment Workers' Union*, 25 F.R.D. 506, 508-09 (S.D.N.Y 1959) (finding that in an action to recover treble damages for violation of the antitrust laws, defenses alleging various alleged conspiracies between plaintiff and several elements of the underworld, who were characterized as "strong arm men" and "racketeers," would be stricken as scandalous and legally insufficient). And, similarly, Rule 403 of the Federal Rules of Evidence also requires courts to exclude evidence from the record when its probative value is substantially outweighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury." FED. R. EVID. 403. *See Stump v. Gates*, 211 F.3d 527, 537 (10th Cir. 2000) (finding that in § 1983 action concerning destruction of evidence by a city's police chief, the district court erred reversibly in admitting into evidence a grand jury *report* accusing the police chief of improper conduct during the investigation of the decedent's death, since the report had little, if any, probative value and created high risk of prejudice and confusion). Thus, the Department must consider the effect that disclosure of the Interim Report at this time would have on Apollo. "It must be remembered that once there is disclosure, the information belongs to the general public." *Favish*, --- S.Ct. ----, 2004 WL 609605, at *10. "There is no mechanism under FOIA for a protective order allowing only the requester to see whether the information bears out his theory, or for proscribing its general dissemination." *Id.* Accordingly, this analysis decidedly points in favor of non-disclosure.

*     *     *

Accordingly, for the foregoing reasons, we respectfully urge the Department to withhold the entire Interim Report from public disclosure.

4. <u>Confidential Commercial And Financial Information Within The Interim Report Is Exempt From Disclosure</u>. In addition to the entire Interim Report being exempt from disclosure, information contained within the Interim Report is exempt from disclosure under 5 U.S.C. § 552(b)(4), which authorizes an agency to withhold commercial or financial information that is privileged or confidential (hereinafter, this information will be referred to as "Protected Information").

The Protected Information is "confidential" within the meaning of Exemption 4, and therefore exempt from disclosure under FOIA for at least three independent reasons: The Protected Information is of a type that Apollo "customarily" would not disclose to the public, and, to the extent it was provided voluntarily to the Department, it was shared with the Department with the reasonable expectation that it would not be released. *See Critical Mass Energy Project v. NRC*, 975 F.2d 871, 880 (D.C. Cir. 1972) (*en banc*) (explaining that an agency's unexercised authority or mere "power to compel" submission of information, does not preclude such information from being provided to an agency on a "voluntary" basis); *Parker v. Bureau of Land Mgmt.*, 141 F. Supp. 2d 71, 78 n.6 (D.D.C. 2001) (same). Thus, the Protected Information is "confidential" within the meaning of Exemption 4, as interpreted by District of Columbia Circuit in *Critical Mass Energy Project*, 975 F.2d at 879. To the extent that any

# GIBSON, DUNN & CRUTCHER LLP

Kent D. Talbert
April 5, 2004
Page 8

Protected Information was "required" to be submitted to the Department for purposes of the compliance review, the Protected Information is "confidential" within the meanings enunciated in *National Parks & Conservation Association v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974): that is, disclosure would (1) impair the Department's ability to obtain "necessary" information in the future, *see id.* and, would result in a diminution in the "reliability" or "quality" of such information, *see Critical Mass Energy Project*, 975 F.2d at 878, and (2) cause "substantial harm to the competitive positions" of Apollo. *Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770. With regard to the latter, disclosure of the Protected Information would cause substantial harm to Apollo's competitive position by permitting its competitors to "free-ride" on Apollo's methodologies and approaches, all of which represent the investment of substantial time, effort and money. *See McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 305-07 (D.C. Cir. 1999). Thus, under any of the tests of "confidentiality," the Protected Information is entitled to Exemption 4 treatment.

Just as FOIA protects the release of Apollo's Protected Information, so, too, does the Trade Secrets Act, 5 U.S.C. § 1905. The Trade Secrets Act is "'at least coextensive with that of Exemption 4 of FOIA.'" *McDonnell Douglas Corp.*, 180 F.3d at 305 (quoting *CAN Fin. Corp. v. Donovan*, 830 F.2d 1132, 1151 (D.C. Cir. 1987)). "[W]hen a person can show that information falls within Exemption 4, then the government is precluded from releasing it under the Trade Secrets Act." *Id.*

One category of Protected Information within the Interim Report involves the organizational structure of Apollo, the organizational chain of command for recruiters or enrollment counselors, the positions and responsibilities of the various employees involved in the student recruiting process, and, the techniques and methodologies used by Apollo to track student enrollments. To release to the public this sensitive commercial information would allow Apollo's competitors to: (1) scrutinize Apollo's methodology for recruiting and enrolling students; (2) observe Apollo's marketing and recruiting strategies, including its teaming and staffing techniques; (3) see fairly detailed information about Apollo's organizational structure, its personnel, the functions these personnel perform, and their relation to one another in the organizational chain of command; and (4) otherwise have an "inside look" at how Apollo competes for, attracts, and maintains its students. This category of Protected Information reflects Apollo's approach to run a university system efficiently and effectively. It, too, represents ingenuity and originality regarding how to recruit qualified students to the university setting. It is the product of years of experience and its disclosure would seriously undermine Apollo's competitive advantage by allowing competitors to have access to Apollo's ideas, processes, internal structure, and methodologies that they otherwise would not have access to or would have had to spend considerable time and funds to develop on their own. Accordingly, the disclosure of this information would cause substantial injury to Apollo's competitive position. It is for all these reasons that Apollo does not customarily release this information to the public. Therefore, this information is exempt from disclosure under FOIA Exemption 4.

# GIBSON, DUNN & CRUTCHER LLP

Kent D. Talbert
April 5, 2004
Page 9

Another category of "commercial or financial" Protected Information within the Interim Report includes information concerning employee compensation and the manner in which employee compensation is purportedly calculated. In the analogous context of procurement contracts, courts have held that pricing data included in contracts with, and proposals to, the government are exempt from disclosure under the FOIA if release of such data would substantially harm a contractor's competitive position. *See, e.g., McDonnell Douglas Corp.*, 180 F.3d at 306-07; *Gulf & Western Indus., Inc. v. United States*, 615 F.2d 527, 530 (5th Cir. 1979); *Cohen, Dunn & Sinclair, P.C. v. Gen. Servs. Admin.*, 1992 WL 1288023, at *3-4 (E.D. Va. Sept. 10, 1992) (not reported). Here, neither Apollo, nor to our knowledge, other for-profit institutions of higher education, customarily release employee compensation information to competitors. This is so because as in the government contracts context, to disclose the alleged compensation structures of Apollo's employees would allow competitors to copy Apollo's compensation system and to use their knowledge of Apollo's compensation packages to recruit Apollo employees, many of whom possess significant and valuable institutional knowledge. Thus, Apollo considers its compensation system to involve highly confidential commercial and financial information the disclosure of which would cause substantial harm to Apollo's competitive position.

To protect the disclosure of the Protected Information discussed herein, we have identified and redacted those sections of the Interim Report that are exempt from disclosure pursuant to Exemption 4 and the Trade Secrets Act. Apollo objects to the disclosure of this identified and redacted Protected Information. In the event that the Department disagrees with any of our redactions, then, consistent with Executive Order 12600, please contact me in advance of the release of any Apollo-related information discussed herein so that we can discuss the matter.

As will be seen by examination of the redactions, however, designations under Exemption 4 are unable to protect Apollo's interests described above. Thus, accepting Apollo's designations would not absolve the Department from consideration of the arguments that the Interim Report should not be released at all.

5. <u>Pursuant To FOIA, 5 U.S.C. § 552(a)(3) And 34 C.F.R. § 5.13(c) Please Provide Me With Copies Of All FOIA Requests Received By The Department Seeking Access To The Interim Report</u>. At this time, we are unable to determine whether our analysis has taken into account important and relevant facts or considerations that could only be revealed through access to each third-party FOIA request. Accordingly, we ask the Department not to release the Interim Report until we have been granted access to all third-party FOIA requests for the Interim Report, and have been given an opportunity to evaluate and if necessary, amend, the basis of our request for confidentiality.

GIBSON, DUNN & CRUTCHER LLP

Kent D. Talbert
April 5, 2004
Page 10

\*        \*        \*

We respectfully ask the Department to honor the FOIA process and the Department's own process for reviewing and correcting the substance of the Interim Report so that Apollo may be given a full, fair and meaningful opportunity to assess all relevant facts and considerations that may affect the analysis contained herein. To move forward otherwise, would expose Apollo to potentially serious and irreparable harm.

Thank you for the opportunity to work with your office to develop an appropriate response to the FOIA requests that the Department has received regarding access to the Interim Report. I appreciate your time and attention to this matter, which is extremely important to Apollo.

Should you have any questions, or wish to meet to discuss these important legal issues, please do not hesitate to contact me.

Very truly yours,

Douglas R. Cox

DRC/plr

cc:    Jonathan A. Vogel
       Todd S. Nelson
       Timothy J. Hatch

70280074_1.DOC

# EXHIBIT C



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE CHIEF INFORMATION OFFICER

AUG 2 6 2004

Douglas R. Cox, Esquire
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

   Re: FOIA Requests for Program Review Report
   <u>Request Nos. FSA/OIG/OGC-03-5355F; FSA-04-5745F; and FSA-04-5930F</u>

Dear Mr. Cox:

As one of the Freedom of Information Act Officers for the U.S. Department of Education
(Department), I am in receipt of your April 5, 2004 letter to Kent D. Talbert of the
Department's Office of the General Counsel (OGC). Your letter was in response to the
Department's invitation to designate information contained in the Program Review
Report (PRR), which your client, the Apollo Group, Inc. and its subsidiary, the
University of Phoenix (University), considered exempt pursuant to exemption (b)(4) of
the Freedom of Information Act (FOIA). 5 U.S.C. § 552(b)(4). The Department notes
that the process envisioned by Executive Order 12600 limits commentary and/or
objections to the release of information pursuant to FOIA exemption (b)(4). However,
OGC, at your request, has permitted you to raise other objections under the FOIA (5
U.S.C. §§ 552(b)(5) and (b)(7)), not related to Executive Order 12600. The Department
considers the arguments that you have raised under the FOIA (5 U.S.C. §§ 552(b)(5) and
(b)(7)) to be advisory in nature.

Upon review and consideration of your April 5, 2004 letter, the Department has
concluded that FOIA exemption (b)(4) does not support withholding the PRR, either in
whole or in part. The Department has also concluded that your recommended use of
FOIA exemptions (b)(5) and (b)(7) does not support withholding the PRR, either in
whole or in part. However, the Department has concluded that the recruiter/employee
names, titles, hire dates, exit dates and compensation amounts are properly excludable
under exemption (b)(6). 5 U.S.C. § 552(b)(6). The employee names, dates, and
compensation amounts are found at pages 2-4, pages 31-32, Appendix A, and Appendix
B of the PRR.

Pages two (2) through ten (10) of this letter will address your arguments relevant to the
Department's use of FOIA exemption (b)(4) in accord with the Executive Order 12600
process. The remainder of this letter will respond to your advisory recommendations
regarding FOIA exemptions (b)(5) and (b)(7).

Douglas R. Cox, Esquire

## (1)    Program Review Report

As an initial matter, the Department disagrees with your characterization of the PRR as an "interim program review report." In the normal course, the Department does not issue "interim" PRRs, since PRRs identify whatever findings the Department has made as a result of its review of a school's records and systems. The Department does, however, issue "interim" final determination letters when it is able to assess liabilities for only certain findings, and intends to take additional time to conclude other findings. In such cases, the determination letter is clearly marked as "interim." But for purposes of this FOIA analysis, the PRR is a discrete final action; its findings outline the alleged violations detected during the Department's review of the University's administration of its Title IV programs. In essence, the PRR represents a "fixed stop" in an ongoing process of assisting an institution in its efforts to comply with the law. Consequently, we do not consider the PRR to be an "interim" report.

Your April 5, 2004 letter also claimed that the PRR is "flawed and internally inconsistent, and its release would impose massive and unfair harm on Apollo, its shareholders and its employees." However, aside from making broad, conclusory statements, you have not presented a cognizable argument under the FOIA. Section 1099c-1(b) of the Higher Education Act affords an institution the opportunity to correct any administrative, accounting or record-keeping error during the program review process. This opportunity is clearly identified in the cover letter to the PRR when the Department requests that an institution "review and respond" to the findings of the PRR. It is the Department's understanding that your client responded to the PRR on March 19, 2004, April 14, 2004 and May 20, 2004. Consequently, your challenges to the reliability of the PRR were appropriate for those earlier responses.

## (2)    Exemption (b)(4) – Trade Secrets, Commercial or Financial Information

After a review of your redactions to the cover letter and PRR, the Department has concluded that the redactions submitted by the University pursuant to exemption (b)(4) are not sustainable, either in whole or in part.

Exemption 4 of the FOIA protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). In assessing the confidential nature of this information, we first determine whether it was a required or voluntary submission to the Department. The Department has concluded that the information submitted by the University, as contained in the PRR, represents a required submission because it is necessarily gathered and reviewed pursuant to the Department's carrying out of an on-site visit and/or review of an

2

Douglas R. Cox, Esquire

institutional program.[1]  "[T]he overall assessment of an institution's administrative and
financial capability is determined by examining an institution's FSA policies, procedures
and recordings." The 2001 Program Review Guide, p. I-3. Consequently, when the
Department reviews an institution as part of its monitoring functions, the institution must
provide the Department with access to certain information so that the Department may
carry out an effective and efficient review.  34 CFR 668.24.  Therefore, the information,
as contained in the PRR, is a required submission.

Because the Department has concluded that the University's information, as contained in
the PRR, was a required submission, the information will be withheld if its release will
impair the Department's ability to obtain necessary information in the future, or will
cause substantial harm to the competitive position of the person from whom the
information was obtained. National Parks & Conservation Ass'n v. Morton, 498 F.2d 756
(D.C. Cir. 1974).  The Department has concluded that release of this information will not
impair the Department's ability to obtain necessary information in the future.  As part of
the Title IV program review, the Department must gather and analyze institutional data
and records, and identify any weakness in the institution's procedures for administering
program funds. The 2001 Program Review Guide, p. I-1  The Department will continue
to exercise its authority to obtain such information in the future, notwithstanding the
release of the PRR.  Therefore, the matter at issue is whether release of this information
will cause substantial harm to the University's competitive position in the marketplace.

In analyzing the "substantial harm to the competitive position" of the submitter, the D.C.
Circuit has "emphasized" that the "important point for [the] competitive harm [analysis]
in the FOIA context . . . is that it is limited to harm flowing from the affirmative use of
proprietary information by competitors" and that this "should not be taken to mean
simply any injury to competitive position, as might flow from customer or employee
disgruntlement." Public Citizen Health Research Group v. FDA, et al., 704 F.2d 1280,
1291 (D.C. Cir. 1983) (emphasis added).  In other words, the FOIA cannot protect the
University from regular marketplace competition from other for-profit institutions of
higher education that compete for students.

Your April 5, 2004 letter outlined two (2) categories of protected information contained
in the PRR.  With regard to the first category, "the organizational structure of [the
University], the organizational chain of command for recruiters or enrollment counselors,
the positions and responsibilities of the various employees involved in the student
recruiting process, and the techniques and methodologies used by [the University] to
track student enrollments," you stated the following:

---

[1] If the information had been deemed to have been submitted voluntarily, the Department's analysis on the
release of the PRR under exemption (b)(4) would be in accord with Critical Mass Energy Project v. NRC,
975 F.2d 871 (D.C. Cir. 1992).

3

Douglas R. Cox, Esquire

> To release to the public this sensitive commercial information would allow Apollo's competitors to: (1) scrutinize Apollo's methodology for recruiting and enrolling students; (2) observe Apollo's marketing and recruiting strategies, including its teaming and staffing techniques; (3) see fairly detailed information about Apollo's organizational structure, its personnel, the functions these personnel perform, and their relation to one another in the organizational chain of command; and (4) otherwise have an "inside look" at how Apollo competes for, attracts, and maintains its students. This category of Protected Information reflects Apollo's approach to run a university system efficiently and effectively. It too, represents ingenuity and originality regarding how to recruit qualified students to the university setting. It is the product of years of experience and its disclosure would seriously undermine Apollo's competitive advantage by allowing competitors to have access to Apollo's ideas, processes, internal structure, and methodologies that they otherwise would not have access to or would have had to spend considerable time and funds to develop on their own.

While you have outlined the harm as stated above, you have not demonstrated in your correspondence how these stated harms would occur with the specific release of this category of information. Demonstration of competitive harm under FOIA exemption (b)(4) requires more than conclusory allegations of harm. See Public Citizen Health Research Group v. FDA, 2000 WL 34262802 (D.D.C. 2000); Public Citizen Health Research Group v. FDA, 185 F.3d 898 (D.C. Cir. 1999); TRIFID Corp. v. NIMA, 10 F.Supp.2d. 1087 (E.D. Mo. 1998). The use of FOIA exemption (b)(4) requires a demonstration of the "specific, credible, and likely reasons" why the release of this category of information would actually result in competitive injury to Apollo. Lee v. FDIC, 923 F.Supp. 451, 455 (U.S.D.C. S.D.NY 1996). More precisely, you have not demonstrated with specificity how the release of "the organizational structure of [the University], the organizational chain of command for recruiters or enrollment counselors, the positions and responsibilities of the various employees involved in the student recruiting process, and, the techniques and methodologies used by [the University] to track student enrollments" and its affirmative use by a competitor would cause substantial harm to Apollo's competitive position amongst the for-profit higher education institutions.

Your April 5, 2004 letter outlined a second category of protected information as "information concerning employee compensation and the manner in which employee compensation is purportedly calculated." You further stated that the release of this information would cause competitive harm because, "to disclose the alleged

4

Douglas R. Cox, Esquire

compensation structures of Apollo's employees would allow competitors to copy
Apollo's compensation system and to use their knowledge of Apollo's compensation
packages to recruit Apollo employees, many of whom possess significant and valuable
institutional knowledge. Thus, Apollo considers its compensation system to involve
highly confidential commercial and financial information the disclosure of which would
cause substantial harm to Apollo's competitive position."

As an initial matter, the Department notes that you refer to Apollo's employee
compensation structure as "alleged." To argue that the release of Apollo's employee
compensation structure would cause substantial harm to its competitive position, while
also citing its existence as "alleged," is inconsistent. You have not demonstrated how the
affirmative use of "information concerning employee compensation and the manner in
which employees compensation is purportedly calculated" by a competitor would cause
substantial harm to Apollo's competitive position.

You also provided the Department with a copy of the PRR identifying and redacting
those sections, which you assert are exempt from disclosure "pursuant to Exemption 4
and the Trade Secrets Act." Below, the Department will address each of your proposed
redactions.

### (a)    Redactions to PRR's Cover Letter from Donna Wittman to Todd S. Nelson

You have redacted the following information:

> This report contains a serious finding regarding the school's
> substantial breach of its fiduciary duty; specifically that the
> University of Phoenix (UOP) systematically engages in actions
> designed to mislead the Department of Education and to evade
> detection of its improper incentive compensation system for those
> involved in recruiting activities. The finding of noncompliance is
> referenced to the applicable regulations, and specifies the action
> required to comply with the regulations and statutes.

These statements do not contain confidential commercial or financial information.
Examples of items regarded as commercial or financial information include: business
sales statistics; research data; technical designs; customer and supplier lists; profit and
loss data; overhead and operating costs; and information on financial condition." U.S.
Dept. of Justice, Office of Information Policy, Freedom of Information Act Guide &
Privacy Act Overview (May 2000 ed.) (citing Gulf & Western Indus. v. United States,
615 F.2d 527 (D.C. Cir. 1979) and Consumers Union v. VA, 301 F. Supp. 796 (S.D.N.Y.
1969), appeal dismissed as moot, 436 F.2d 1363 (2d Cir. 1971)). These statements
represent a brief synopsis of the Department's findings, and do not represent commercial

5

Douglas R. Cox, Esquire

or financial information envisioned by the FOIA statute. Moreover, FOIA exemption (b)(4) requires that the confidential commercial or financial information be obtained from a person. 5 U.S.C. § 552(b)(4). The term "person" refers to a wide range of entities, including corporations. See Nadler v. FDIC, 92 F.3d 93 (2d Cir. 1996). However, the information at issue was generated by the federal government, and not "obtained from a person." Such information is excluded from exemption (b)(4) protection. See Maydak v. DOJ, 254 F.Supp.2d, 23 (D.D.C. 2003). While these statements are based upon information provided by the University, the conclusions found in these statements are the Department's conclusions and therefore, were not "obtained from a person." Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of these statements.

However, the cover letter does identify the University's D-U-N-S number. As you may know, the D-U-N-S number is the number by which an institution can draw down funds that have been awarded to it by the Department. The Department has concluded that the D-U-N-S number is exempt from disclosure under the FOIA pursuant to exemption (b)(2). 5 U.S.C. § 552(b)(2). This exemption precludes the disclosure of predominantly internal matters of a substantial nature, the disclosure of which would risk the circumvention of a statute or Department regulation. The Department has concluded that the release of Apollo's D-U-N-S number would place the Department's financial databases at risk, thus permitting the potential unauthorized draw down of funds. The D-U-N-S number will be redacted from the cover letter as well as on page 2 of the PRR.

### (b)    Table of Contents Redactions

Your redactions encompass the Department's generic statements of the University's recruiter compensation system. They also include more detailed statements of the Department's analysis of the University's recruiter system and statements of the alleged violations found. Again, these statements do not contain confidential commercial or financial information as defined in section 2(a) of this letter. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of the Department's generic statements regarding the University's recruiter compensation system.

### (c)    Redactions at pages 2-4 – "Institutional Review Data Sheet"

You have redacted a chart listing the University's Title IV programs and its advance system of payment for fiscal years 1999-2003. This chart outlines the amount of federal funds Apollo has received in order to support its Title IV program from fiscal year 1999 through fiscal year 2003. The Department acknowledges that this information can be considered commercial or financial information under the FOIA to the extent that it relates to Apollo's operation of its business and possibly impacts its strategy for seeking out and securing non-federal funds. Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (terms of FOIA exemption (b)(4) are to be given their

Douglas R. Cox, Esquire

"ordinary meanings"); see also American Airlines, Inc. v. National Mediation Board, 588 F.2d 863, 870 (2nd Cir. 1978) (citing Getman v. NLRB, 450 F.2d 670, 673 (D.C. Cir. 1971)) (information is commercial if in and of itself it serves a commercial function or is of a commercial nature); Washington Post Co. v. HHS, 690 F.2d 252 (D.C. Cir. 1982) (information is financial if there is financial interest in it). However, the Department has concluded that the release of this information would not cause substantial harm to Apollo's competitive position in the marketplace because it identifies the Title IV programs for which the University was eligible in fiscal years 1999-2003, and the amount of funds received under each of those programs. This information does not reveal anything relative to the University and the operations of its business. As a practical matter there is a strong public interest in knowing how the Department allocates Title IV funds to various educational institutions. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of the chart listing the University's Title IV programs and its advance system of payment for fiscal years 1999-2003.

You have also redacted a chart of University officials (and their titles) who were interviewed during the program review at the Phoenix, On-Line, San Jose, San Francisco, San Mateo, Livermore and Oakland campuses, as well as a notation regarding the interview of former University employees off-site and employees who chose not to reveal their identities. Based upon the same standard as cited in section 2(a) of this letter, the Department has again concluded that this information does not qualify as commercial or financial information that is excludable pursuant to exemption (b)(4). However, as stated previously, the Department has concluded that employee names and titles are properly excludable under exemption (b)(6). 5 U.S.C. § 552(b)(6). FOIA exemption (b)(6) permits the Department to withhold information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." In determining whether release of the information would constitute a clearly unwarranted invasion of personal privacy, one must identify and balance an existing protectible privacy interest against the public interest in disclosure, if any. In addition, the identifiable public interest must be one that sheds light on the Department's operations.

In this case, the University employees have a privacy interest in their names and positions. However, there is also a public interest in knowing how the Department carries out its obligation under Title IV. More specifically, the public has an interest in knowing how the Department monitors recipients of Title IV funds for compliance with the Higher Education Act. The Department has concluded that the University's employees' privacy interests in their names and positions is outweighed by the public's interest in knowing how the Department handles its Title IV responsibilities because the public is interested in knowing that the Department is taking the necessary steps to fulfill its statutory obligations. The public is not necessarily interested in knowing which specific person was interviewed for purposes of crafting the PRR. Consequently,

Douglas R. Cox, Esquire

exemption (b)(6) is applicable to preclude the release of the names and positions of the interviewed University employees, current and former.

At the end of page 4 of the PRR, you redacted the following statement:

> The reviewers also interviewed former UOP employees off site as well as additional current employees who do no want their identities revealed for fear of losing their jobs.

The Department has concluded that this sentence does not contain any confidential commercial or financial information, and does not identify a protectible privacy interest. Consequently, this sentence is releasable under the FOIA.

### (d)    Redactions at page 6 – "Section 2.4 Growth of Enrollments & Revenues"

You have redacted portions of a chart which lists the University's total degree students, on-line students and net revenue for 1991-2003, the University's corporate goal for 2002, and a statement of the frequency with which the University evaluates its recruiters' performance and award of salary increases.

Regarding the listing of the University's total degree students, on-line students and net revenue for 1991-2003, the Department acknowledges that this information can be considered commercial or financial information according to the standard outlined in section 2(c) of this letter, i.e. to the extent that it relates to Apollo's operation of its business and possibly impacts its strategy for seeking out and securing non-federal funds. However, the Department has concluded that the release of this information would not cause substantial harm to Apollo's competitive position in the marketplace because it merely represents the University's growth over a twelve-year period and does not identify any details as to how Apollo achieved this growth. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

Regarding the University's statement of its corporate goal for 2002, "[t]he UOP 2002 corporate goal was '5-5-5': Five Years, Five Million Students and Five Billion Dollars," the Department has concluded that the release of this information would not cause harm to Apollo's competitive position because it is does not reveal any details as to how Apollo would go about achieving this goal. Moreover, the University's corporate goal is merely a wish of what it would like to achieve within a five-year period; there is no guarantee that this goal would be met. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

As to the recruiter evaluation information, the Department has concluded that the release of this information would not cause harm to Apollo's competitive position because it is a

8

Douglas R. Cox, Esquire

statement of how often the reviews are completed, and does not detail the review process itself. If a competitor were to receive this information, it would be limited to knowing the frequency of reviews, but not to how the frequency of the reviews enabled the University to achieve its success in the marketplace. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

**(e)    Redactions at pages 6-7 – "Section 3 Scope of Review"**

You have redacted the following information:

> During the visit, areas of non-compliance were noted. The finding of non-compliance is referenced to the applicable regulations. The finding specifies the actions to be taken by UOP to bring operations of the financial aid programs into compliance with governing authority.

The Department has concluded that while these statements may arguably qualify as confidential commercial or financial information, FOIA exemption (b)(4) will not preclude their release. As stated under the standard outlined in Section 2(a) of this letter, these findings are Department-generated conclusions. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

**(f)    Redactions at pages 7-27 – "Section Findings & Requirements"**

You have redacted the Department's statement of the facts resulting from the program review and investigation, including statements of those interviewed. These findings include: the University's promises of substantial compensation when hiring recruiters; recruiter training/motivational methods and success measures; tracking recruiter commissionable sales and sales performance; accounts of current and former University employees; recruiter evaluation system; bonus incentive plans; use of Title IV funds; and alleged violations found by the Department.

As detailed under the standard outlined in section 2(c) of this letter, the Department acknowledges that this information can be considered commercial or financial information under the FOIA to the extent that it relates to Apollo's operation of its business. However, the Department has concluded that the release of this information would not cause substantial harm to Apollo's competitive position in the marketplace because the information generally discusses the University's business practices, and details the factual information gathered by the Department during its site visit related to the alleged specific regulatory violations identified in the PRR. The detailed information describes conduct that would not be acceptable by similar institutions participating in the federal student aid programs, and no competitive harm would be expected to arise from releasing such information. Release of the PRR is not likely to result in such injury as to

9

Douglas R. Cox, Esquire

preclude the University from being able to compete for future students in the for-profit higher education market. See Martin Marietta Corp. v. Dalton, 974 F.Supp. 37, 38, 40 (D.D.C. 1997) ("neither the revelation of cost and pricing data nor proprietary management strategies were likely to result in egregious injury as to disable [submitter from being] effective competitor").

You also redacted the following statement:

> The actions of UOP and the system it has established cultivates and maintains a corporate culture in defiance of UOP's fiduciary duty. UOP has created an environment that puts the strong motivation of individual gain against its fiduciary duty to the Department. It is one that flaunts the Department's regulations and the prohibition against incentive compensation based on enrollments.

The Department has concluded that while these statements may arguably qualify as confidential commercial or financial information, FOIA exemption (b)(4) will not preclude their release. As stated under the standard outlined in Section 2(a) of this letter, these findings are Department-generated conclusions. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (g)  Redactions at p. 30 – "Section 7 Requirements"

You have redacted the following statement:

> In response to this [PRR], UOP is required to make substantial and comprehensive changes to the salary compensation system for its recruiters and their direct supervisors.

You also redacted three (3) bullet items outlining specific documents and information that the Department seeks. In accord with the standard outlined in section 2(a) above, the findings and requirements were developed by the Department, and thus not obtained from a person. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (h)  Redactions at pages 31-32 – "Section 7 Requirements: Documents and Information to Be Provided"

In response to the PRR, the Department outlined several items of information for the University to supply. You have redacted information from paragraphs 3-10 of this section. In accord with the standard outlined in section 2(a) above, the findings and requirements were developed by the Department, and thus not obtained from a person.

10

Douglas R. Cox, Esquire

Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

However, in paragraph eight (8) of this section, the Department identified twelve (12) employees for whom the University must supply personnel files in response to the PRR. These employees are identified in a chart that lists their names, lump sum compensation amounts, and the dates that the compensation was received. In accord with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (i)    Redactions – "Appendix A: List of Recruiters Identified in Report"

You redacted recruiter names and hire dates. In accord with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (i)    Redactions – "Appendix B: List of Employees for Whom Personnel Records are to be Provided"

You redacted recruiter names, hire dates, and exit dates. In accordance with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (3)    Exemption (b)(5) – Inter-agency or Intra-agency Memorandums or Letters, and the Deliberative Process Privilege

FOIA exemption (b)(5) covers "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). While neither expanding nor creating new privileges, exemption (b)(5) incorporates all civil discovery privileges, including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege. Your recommendations have been made pursuant to the deliberative process privilege of exemption (b)(5). The purpose of the privilege is to allow agency officials to engage in frank and open discussions of issues, and to express their views, opinions and recommendations without the fear or restraint of outside pressure. In order for the privilege to be invoked, the information at issue must be both pre-decisional (coming before the adoption of an agency policy), and deliberative (a direct part of the deliberative process such that the information makes suggestions, or recommendations, or provides opinions on legal or policy matters).

11

Douglas R. Cox, Esquire

As an initial matter, the PRR must meet the threshold requirement of an inter-agency or intra-agency communication. More precisely, the communication would have to occur either among individuals of the Department or between individuals of the Department and another federal agency. However, the courts have expanded this threshold requirement to include outside consultants who are sometimes both practical and necessary for an agency to render a policy decision. See Durns v. Bureau of Prisons, 804 F.2d 701 (D.C. Cir.), cert. granted, judgment vacated on other grounds & remanded, 486 U.S. 1029 (1988). This exemption does not extend to those who are seeking a benefit from the Department to the detriment of others such as lobbyists or self-advocates. Department of the Interior v. Klamath Water Users protective Ass'n, 532 U.S. 1 (2001). In Klamath, several Native American tribes exchanged communications expressing their views regarding decisions that the Department of Interior would have to make regarding water allocation in the Klamath River Basin. The Native American tribes not only expressed their own interests, but also were seeking the government to act in favor of those interests. The Supreme Court held that the Native American tribes did not qualify as outside consultants to the Department of Interior, stating "the Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." Id. at 12.

The Department has concluded that the PRR does not meet this threshold requirement, and thus, FOIA exemption (b)(5) does not preclude release of this information. In this case, the PRR was created as a result of the Department's routine monitoring of the Title IV Federal Student Financial Assistance programs administered by the University. The PRR was not created for the purposes of the Department receiving advice or consultative services from your client in order to render a policy decision. Rather, the PRR specifically states that its intent is to advise the institution of the findings made as a result of the program review. Moreover, the goal of the PRR is to open up a dialogue between the Department and the University such that the findings of the PRR can be resolved; this characterizes the University as a lobbyist or self-advocate, rather than a consultant, and thus, the deliberative process privilege of exemption (b)(5) would not apply to preclude release of the PRR.

Assuming arguendo that the University did meet the threshold requirement of exemption (b)(5), the Department has concluded that the document itself is neither pre-decisional nor deliberative. As stated in the Department's Program Review Guide, "[t]he program review report is the official [Department] notification to the institution of the findings discovered during the on-site visit. The report lists the regulatory and statutory findings and establishes a prima facie case. The report also specifies required corrective actions, including a time frame for institutional response." The 2001 Program Review Guide, p. IX-1. Although the program review process envisions a dialogue between the Department and the institution to resolve shortcomings identified in the PRR, and which will ultimately be resolved with the Department, the PRR itself is a final document within the program review process. It outlines the Department's position as a result of the

Douglas R. Cox, Esquire

program review. It notes, as appropriate, that an institution has or has not breached its fiduciary duties under Title IV, and outlines necessary corrective action(s). While the Department provides the institution with notice and an opportunity to comment, those comments are not submitted with the idea that a new PRR will be issued.

Consequently, the Department has concluded that FOIA exemption (b)(5) does not preclude the release of the PRR, either in whole or in part.

#### (4)    Exemption (b)(7) – Information Compiled for Law Enforcement Purposes

Your letter of April 5, 2004 also relied upon FOIA exemptions (b)(7)(A), (b)(7)(B) and (b)(7)(C) to preclude release of the PRR. Exemption 7 of the FOIA, as amended, protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, [and] (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(7)(A), (b)(7)(B) and (b)(7)(C). The Department has concluded that exemption (b)(7) does not preclude the release of the PRR, either in whole or in part, for the reasons set for the below.

##### (a)    Exemption (b)(7) Threshold Requirement

As a threshold matter, exemption (b)(7) places the burden of proof upon the agency to demonstrate that the record in question was compiled for a law enforcement purpose. Quiñon v. FBI, 86 F.3d 1222 (D.C. Cir. 1996). The Department disagrees with your characterization that the PRR was compiled for a law enforcement purposes. Contrary to your conclusion, the PRR is a Congressionally mandated tool used by the Department to carry out its responsibilities under the Higher Education Act. The 2001 Program Review Guide, p. i. The PRR is one of many tools used by the Department in an effort to strike a balance between assisting schools in improving compliance through the development of corrective action plans and assessing liabilities resulting from non-compliance. Id. Even if the Department were to agree that the PRR was compiled for a law enforcement purpose (which it does not), the Department would still find that the specific subsections of exemption (b)(7) are not applicable to preclude the PRR's release, as discussed below.

##### (b)    Exemption (b)(7)(A) - Interfere with Enforcement Proceedings

With respect to exemption (b)(7)(A), there is no evidence that release of the PRR could interfere with enforcement proceedings. You have stated that release of the PRR "may hinder or interfere with the Department's review – and with Apollo's and its employees due process rights within that review." As stated earlier, the PRR represents a fixed stop

13

Douglas R. Cox, Esquire

in an ongoing process. A site visit occurred, and findings were thereafter made on the
visit. The PRR does not reveal the scope, direction or nature of any further action that
the Department may take regarding the University. In fact, the cover letter to the PRR
specifically requests the University "review and respond to the report, indicating the
corrective actions taken." At most, the PRR envisions a response from the University
and that response serves as a catalyst for further discussion. There is no way for the
Department to determine whether it will or will not engage in an enforcement proceeding
without knowing the University's response to the PRR. Additionally, we recognize and
acknowledge your concern that release of the PRR "could increase the likelihood that *qui
tam* relators or other members of the public, such as the media or corporate watchdog
groups, would interfere with, threaten, or taint the testimony of, Apollo personnel
identified in the [PRR] by virtue of their titles, positions, or job responsibilities."
However, and as previously stated in section 2(c) above, it is the Department's position
that those interests are privacy concerns to the University personnel, and in order to
protect those interests such information would be redacted pursuant to exemption (b)(6).
This information appears on pages 2-4, pages 31-32, Appendix A: List of Recruiters
Identified in Report and Appendix B: List of Employees for Whom Personnel Records
are to be Provided.

### (c)    Exemption (b)(7)(B) - Deprive a Person of a Right to a Fair Trial or an Impartial Adjudication

With respect to exemption (b)(7)(B), there is no evidence to suggest that any individual
University employee would be deprived of the right to a fair trial or impartial
adjudication. The PRR merely identifies the Department's findings.

### (d)    Exemption (b)(7)(C) - Expected to Constitute an Unwarranted Invasion of Personal Privacy

With respect to exemption (b)(7)(C), the Department has concluded that this exemption
does not preclude release of the PRR. The Department agrees that the University
employees identified in the PRR have a privacy interest in their names, titles, hire date,
exit date and compensation amounts; however, these privacy interests are protected under
exemption (b)(6) of the FOIA. Consequently, University employee names, titles, hire
dates, exit dates and compensation amounts as they appear on pages 2-4, pages 31-32,
Appendix A: List of Recruiters Identified in Report and Appendix B: List of Employees
for Whom Personnel Records are to be Provided will be redacted pursuant to FOIA
exemption (b)(6).

Douglas R. Cox, Esquire

### (5)    Request for all FOIA Requests Seeking Access to the PRR

At the conclusion of your letter, you asked for "copies of all FOIA requests received by the Department seeking access to the [PRR]." Enclosed please find copies of the FOIA requests we have received for the University's PRR.

### (6)    Conclusion

In sum, the Department disagrees with your conclusions that FOIA exemptions (b)(4), (b)(5) and (b)(7) preclude release of the University's PRR. The Department intends to release the University's PRR to the requesters no later than five working days from the date of this letter, September 2, 2004.

The Department has concluded that the employee/recruiter names, titles, hire dates, exit dates and compensation amounts are properly excludable pursuant to FOIA exemption (b)(6), and this information will be redacted from the PRR. This information is found at pages 2-4, pages 31-32, Appendix A: List of Recruiters Identified in Report and Appendix B: List of Employees for Whom Personnel Records are to be Provided.

The Department has also concluded the University's D-U-N-S number will be redacted from the cover letter and page 2 of the PRR pursuant to exemption (b)(2). To further assist you, we have provided a copy of the PRR in the form in which it will be released to the requesters.

Sincerely,

Jeanne Van Vlandren
Freedom of Information Act Officer
OCIO/RIMG

cc:    Kent D. Talbert, Esq. (OGC)
cc:    Jonathan A. Vogel, Esq. (OGC)

15

# EXHIBIT D

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

1050 Connecticut Avenue, N.W.  Washington, D.C. 20036-5306
(202) 955-8500
www.gibsondunn.com

dcox@gibsondunn.com

May 13, 2005

| | |
|---|---|
| Direct Dial | Client No. |
| (202) 887-3531 | T 03002-00030 |
| Fax No. | |
| (202) 530-9539 | |

BY HAND

Jeanne Van Vlandren
Director, Regulatory Information Management Services
Office of the Chief Information Officer
Department of Education
550 12th Street SW - Room 9150
Washington, D.C. 20202

      Re:   *FOIA 05-00093-F dated Oct. 25, 2004*

Dear Ms. Van Vlandren:

On behalf of our client, Apollo Group, Inc., I write to express our disappointment with the Department's April 8 and May 3, 2005 production of documents in response to our FOIA request. The Department's production does not satisfy its clear legal obligations.

The purpose of this letter is to identify examples of some pervasive problems in the production. This letter is an attempt to give the Department an opportunity to correct those problems short of litigation. The examples identified herein obviously do not encompass every improperly withheld or improperly redacted document.

1. The Department's Wholesale Invocation Of Exemption 7(C) Is Directly At Odds With Its Earlier Statements And Defies Established FOIA Precedent.

In its letters of April 8 and May 3, 2005, the Department invokes Exemption 7(C) to justify its indiscriminate redactions and withholdings. *See* Letters from Van Vlandren to Cox of 4/8/05 and 5/3/05, at 3, attached hereto as Exhibits A and B (stating that "[i]n accordance with

GIBSON, DUNN & CRUTCHER LLP

5 U.S.C. § 552(b)(7)(C), information . . . (including but not limited to witness . . . statements) has been withheld.").

Remarkably, the Department has invoked 7(C) despite having recently found that the Exemption was inapplicable to the Report.

The Department already determined that the Report, specifically, was not compiled for a law enforcement purpose and thus could not meet the Exemption 7(C) threshold requirement. *See* Letter from Van Vlandren to Cox of 8/26/04, at 13, attached hereto as Exhibit C. That decision by the Department compels the conclusion that none of the witness information and statements or other materials can be protected under Exemption 7(C).

Furthermore, even if Exemption 7(C) applied, the Department has attempted to bootstrap the limited exemption for privacy interests into protection for entire pages of responsive documents. *See, e.g.,* Department of Education Document Id. Numbers (hereinafter, "Docs." or, singularly, "Doc.") 64 and 2417, collectively Exhibit D. The D.C. Circuit has clearly held that such withholdings are not sanctioned by Exemption 7(C). To the extent that Section 7(C) can even be held to apply, "Exemption 7(C) ordinarily permits the Government to withhold *only* the specific information to which it applies, *not the entire page or document in which the information appears,* unless the exempt and nonexempt information are 'inextricably intertwined.'" *Mays v. Drug Enforcement Administration,* 234 F.3d 1324, 1327 (D.C. Cir. 2000) (emphases added) (holding that only names and personal information are "necessarily exempt").

2. <u>The Department Has Failed To Specify The Basis For Its Invocation Of Exemption 5 And Has Improperly Withheld Factual Material.</u>

In its August 26, 2004 letter, the Department concluded that the Report "itself is neither pre-decisional nor deliberative" under Exemption 5 and declared that "FOIA exemption (b)(5) does not preclude the release of the [Report], either in whole or in part." *See* Letter from Van Vlandren to Cox of 8/26/04, Exhibit C, at 12.

As an initial matter, the Department's position means that it cannot now invoke Exemption 5 to preclude production of the Report, which obviously includes those parts required to be included with the Report according to the Department's own instructions. *See* San Francisco Program Review Website K:\IPOS\Hansen\Sites\Templates\p2.htm.

The Department has now invoked Exemption 5 to cover materials without giving any indication whether the document-specific basis for its invocation rests in the deliberative process, attorney-client privilege, or work-product doctrine. Under the Department's regulations, denials of FOIA requests "shall contain reasons for the denial." 34 C.F.R. § 5.53(b). We consequently request that you provide us with the reasons justifying each invocation of Exemption 5, particularly given your unequivocal statement in your August letter that the Report is not covered by the deliberative exemption. This request is particularly urgent given the Department's withholding of an additional 2,171 pages under Exemption (b)(5). *See* Letter from Van Vlandren to Cox of 5/3/05, Exhibit B, at 2. Given that the Report originated "as a result of the Department's routine monitoring," *see* Letter from Van Vlandren to Cox of 8/26/04, Exhibit C,

2

GIBSON, DUNN & CRUTCHER LLP

at 12, it seems that correspondence and materials related to it were in the nature of a factual investigation. The deliberative process privilege cannot be invoked for such factual materials.

Even if the deliberative process exemption applied, it would not protect factual material. Failure to produce such non-exempt factual material in the context of a deliberative process claim is a violation of the requirement in 5 U.S.C. 552(b), which mandates that "[a]ny reasonably segregable portion of a record shall be provided."

3. Even In The Limited Materials It Has Produced, The Department Has Failed To Include Responsive Material.

The unjustifiably broad invocations of exemptions are accompanied by inconsistencies in treatment of the documents that were produced. A few examples will serve to represent recurring errors and omissions:

- The Department has failed to include any e-mails from Donna Wittman's account and has omitted e-mails from the accounts of other Department of Education staff involved in the program review.
- The non-responsiveness label is frequently applied to portions of documents that, based on context, are plainly responsive and should consequently have been produced in their entirety. *See, e.g.*, Docs. 59, 2042, 2337, 2681i, collectively Exhibit E.
- Exemption (b)(1) is invoked in several instances. *See, e.g.*, Docs. 2319, 2480, 2681(f), collectively Exhibit F. Exemption (b)(1) protects matters of national security from disclosure. We find it hard to imagine any basis for invocation of this Exemption in the Department's production.
- There are numerous e-mails that contain icons that have been produced without the corresponding file. *See, e.g.*, Docs. 532, 541, 556, 565, 570, 1166, 1210, collectively Exhibit G. These attachments are critical to a complete response to Apollo's FOIA request. Please produce these documents immediately.
- The index lists documents as produced that were in fact not provided. *See* Docs. 1067, 1094, and 2407. Please provide these documents immediately.
- The index frequently gives an inaccurate listing of the number of pages in a document. *See, e.g.*, Doc. 2418 (nine pages listed in index; only seven were produced), Doc. 2425 (nine pages listed in index, only six were produced), Doc. 2006 (six pages listed in index for attachment; only five were produced). *See* Exhibit H. In each of these examples, the index suggests that more pages should have been produced. Please produce the missing pages immediately. These errors are in addition to instances where the index omits information about the number of pages contained in a particular document. *See, e.g.*, Docs. 2400-2405.

The errors at issue here are serious. Our client will be significantly prejudiced by the Department's unduly broad invocation of what have uniformly been declared narrow exemptions. We have worked with the Department in good faith both to resolve the issues raised in the Report and in pursuit of this FOIA request. The Department, however, has consistently thwarted our attempts to receive timely access to materials that cannot be protected under the

3

GIBSON, DUNN & CRUTCHER LLP

exemptions claimed, thus defying its commitment to a "policy of fullest disclosure," 34 C.F.R. 5.70(F), and prejudicing Apollo in its defense of private securities litigation.

Pursuant to your May 3 letter, the time for filing an appeal has begun to run. We will pursue that appeal if necessary; but in an effort to minimize costs for both Apollo and the Department, and in order to permit the Department to reconsider, on an expedited but informal basis, its flawed handling of our FOIA request, we would like to receive a prompt response to this letter.

In addition, I will call you to set up an appointment to discuss these very important issues.

If we are driven to proceed with our appeal, this letter should not be construed in any way as limiting our ability to raise these or additional issues as part of that appeal.

Very truly yours,

Douglas R. Cox

Enclosures

cc: Timothy J. Hatch

70317573_1.DOC

4