IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE APOLLO GROUP, INC. SECURITIES
LITIGATION

Civil Action No. 06-MC-0558 (CKK)
(D. Ariz., Case No. CV-04-2147-PHX-JAT)

This Document Relates To:  All Actions

**DEFENDANT APOLLO GROUP, INC.'S OBJECTION TO EVIDENCE SUBMITTED
BY THE UNITED STATES DEPARTMENT OF EDUCATION IN OPPOSITION TO
MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM UNITED STATES
DEPARTMENT OF EDUCATION**

Defendant Apollo Group, Inc. ("Apollo"), by and through its undersigned counsel,

objects to the evidence submitted by the Department of Education in response to Apollo's

Motion to Compel Production of Documents as follows:

With respect to the Declaration of Jennifer L. Woodward filed in this matter, Apollo

objects to the entirety of it and moves to strike it, on the ground that, when Apollo attempted to

test the veracity of the statements she made in a nearly identical declaration filed in the United

States District Court for the Northern District of California at a deposition of her superior,

Apollo was blocked from examining her superior about the statements made.  This objection is

based on the Declaration of Joseph P. Busch, III, attached hereto as Exhibit 1.

With respect to the Declaration of Kent D. Talbert, Apollo objects to paragraph five

thereof on the ground that it relies wholly on the Declaration of Jennifer L. Woodward, and to

paragraphs eight and ten through sixteen on the ground that they constitute impermissible legal

argument in a declaration, and moves to strike those paragraphs on those grounds.

Respectfully Submitted,

Dated:  January 26, 2007

/s/ Melanie L. Katsur
Melanie L. Katsur (DC Bar No. 484969)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

Wayne W. Smith
Joseph P. Busch, III
Daniel P. Muino
Kristopher P. Diulio
GIBSON, DUNN & CRUTCHER LLP
4 Park Plaza, Suite 1400
Irvine, CA 92614
Telephone:  (949) 451-3800
Facsimile:  (949) 451-4220

Attorneys for Defendant Apollo Group, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused to be served a true and correct copy of the Defendant Apollo Group Inc.'s Objection to Evidence Submitted by the United States Department of Education in Opposition to Motion to Compel Production of Documents from the United States Department of Education by regular U.S. mail this 26th day of January, 2007, upon the following:

Stephen R. Basser
Samuel M. Ward
Barrack, Rodos & Bacine
402 W. Broadway, Ste. 850
San Diego, CA  92101
sbasser @barrack.com
sward@barrack.com

Andrew S. Friedman
Bonnett, Fairbourn, Friedman & Balint
2901 North Central Ave., Suite 1000
Phoenix, AZ  85012
afriedman@bffb.com

General Counsel
United States Department of Education
Office of the General Counsel
400 Maryland Avenue, S.W., Room 4083, FOB-6
Washington, DC  20202-2100
**\* No email service**

Heather D. Graham-Oliver
United States Department of Justice
Judiciary Center Building
555 4th Street, N.W.
Washington, DC 20530
heather.graham-oliver@usdoj.gov


_____ /s/ Larry Newsom _____

Larry S. Newsom

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE APOLLO GROUP, INC. SECURITIES
LITIGATION

Civil Action No. 06-MC-0558 (CKK)
(D. Ariz., Case No. CV-04-2147-PHX-JAT)

This Document Relates To:  All Actions

**DECLARATION OF JOSEPH P. BUSCH, III, IN SUPPORT OF DEFENDANT APOLLO GROUP, INC.'S OBJECTION TO EVIDENCE SUBMITTED BY THE UNITED STATES DEPARTMENT OF EDUCATION IN OPPOSITION TO MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM UNITED STATES DEPARTMENT OF EDUCATION**

I, Joseph P. Busch, III, declare as follows:

1.      I have personal knowledge of the facts recited herein and, if called and sworn as a witness, I would and could competently testify thereto.

2.      I am an attorney admitted to practice before the United States Supreme Court, the United States Courts of Appeal for the Third, Fifth, Ninth and Tenth Circuits, the United States District Courts for the Northern, Eastern, Southern and Central District of California, the United States District Court for the District of Colorado, and *pro hac vice* the United States District Court for the District of Arizona.  I am also admitted to practice before all courts of the State of California.

3.      I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, counsel for defendant Apollo Group, Inc. ("Apollo"), herein.

4.      On or about September 21, 2006, I was served with a copy of a declaration filed by Jennifer Woodward (Woodward Declaration I) in discovery proceedings pending in the

Northern District of California relating to the underlying securities action pending in the United States District Court for the District of Arizona ("Arizona District Court"). A true and correct copy of that declaration is attached hereto as Exhibit A. Woodward Declaration I has been marked previously as deposition exhibit 1701 in the underlying securities action pending in the Arizona District Court.

5.      I have reviewed the declaration of Jennifer Woodward filed in this proceeding on January 19, 2007 (Woodward Declaration II).

6.      While the sentences used by Ms. Woodward in the second and third paragraphs of Woodward Declaration I are not verbatim identical with the sentences found in paragraphs five through ten of Woodward Declaration II, they are similar in force and effect.

7.      On January 26, 2007, I attended and took the deposition of Brian Jones, the former general counsel of the United States Department of Education. At his deposition, Brian Jones identified Ms. Woodward as a former subordinate of his in February of 2004, which is the time that the program review report at issue was delivered to Apollo's subsidiary, the University of Phoenix. A true and correct copy of the rough version of the transcript ("Transcript"), with Mr. Jones' personal address redacted as requested by his counsel, is attached hereto as Exhibit B. Transcript at 18:4-10.

8.      When I attempted to examine Mr. Jones in his official capacity as Ms. Woodward's superior at the time of the events in question about the veracity of the statements made in paragraphs two and three of Woodward Declaration I (similar to the statements made in paragraphs five through ten of Woodward Declaration II), counsel for the United States, the very same counsel who filed the opposition to Apollo's motion, directed Mr. Jones not to answer the questions. Transcript at 36:18-40:13; 41:2-43:21.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  January 26, 2007

Joseph P. Busch, III

# EXHIBIT A

PETER D. KEISLER
Assistant Attorney General

KEVIN V. RYAN(CSBN 118321)
United States Attorney
JOANN M. SWANSON (CSBN 88143)
Chief, Civil Division
SARA WINSLOW (DCBN 457643)
Assistant United States Attorney
      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-6925
      Facsimile: (415) 436-6748
sara.winslow@usdoj.gov

MICHAEL F. HERTZ
MICHAEL D. GRANSTON
JAY MAJORS
Attorneys, Civil Division
      U.S. Department of Justice
      P.O. Box 261, Ben Franklin Station
      Washington, D.C. 20044
      Telephone:  (202) 307-0264
      Facsimile:  (202) 514-0280

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re Apollo Group, Inc. Securities Litigation | )<br>)<br>) | CASE NO. 06-MC-80270 PVT<br><br>DECLARATION OF JENNIFER WOODWARD IN SUPPORT OF THE MOTION TO QUASH DEFENDANTS' SUBPOENAS TO ALBERTSON AND HENDOW<br><br>Date: September 22, 2006<br>Time: 11:00 a.m.<br>Place: Courtroom 5<br>Magistrate Judge Patricia V. Trumbull |

I, Jennifer Woodward, declare as follows:

1.    I am an attorney at the United States Department of Education (Department).  Through my position as an attorney with the Department, I have personal knowledge concerning the Department's 2003-04 program review of the University of Phoenix (UOP).  Program review reports follow a site visit to a school during which program reviewers perform an audit of a school's participation in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq.  See generally 34 C.F.R. Part 668, Subpart H.  The report sums up the findings made by the reviewers and usually requests further information from the school in order to make a final determination as to whether the school owes monetary liabilities and/or fines as a result of the findings.   The next step in the program review process involves a period in which the school provides the Department with information responding to the report.  The Department then issues a Final Program Review Determination (FPRD) letter, which sets forth the liabilities associated with the findings and provides the school an opportunity to appeal the determination.   Because the Department does not assign liabilities to violations involving a school's payment of improper incentives to recruiters of students, a third document would have issued in this case, a fine notice.  Prior to the issuance of an FPRD and a fine notice, UOP paid the Department $9.8 million to settle the case.

2.    The UOP program review was unique in that its genesis was a qui tam False Claims Act complaint.  Through the Department's investigation of that case, the Department already had substantial evidence of UOP's violation of section 487(a)(20) of the Higher Education Act.  The purpose of the review was to quantify the extent of the violations in order to set an appropriate fine amount, which the Department anticipated that UOP would hotly contest.

DECLARATION IN SUPPORT OF MOTION TO QUASH         2
CASE NO. 06-MC-80270 PVT

Thus, the entire program review process was conducted with an eye towards the administrative litigation the Department anticipated would follow (and that, indeed, did follow).

3.     While it is true that the government declined to intervene in the <u>qui tam</u> case, the Department advised the Department of Justice that the Department had substantial evidence that UOP had violated section 487(a)(20) of the Higher Education Act; and that, in view of the declination decision, the Department was considering what administrative action to take against UOP on account of the violation.

4.     Further, I have been advised by relators' counsel that counsel for Apollo Group may be in possession of a version of the February 2004 program review report issued by the Department to UOP that contains embedded, privileged information. I do not know how Apollo Group could have obtained a version of the report with embedded information. In response to Apollo Group's FOIA request, the Department produced a pdf version of the Program Review report. It is my understanding that the embedded information cannot be obtained from the pdf version of the report and is only contained in the Microsoft Word version. The Department did not to my knowledge disclose the Microsoft Word version of the report in response to Apollo Group's FOIA request.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: September 21, 2006          By: _Jennifer Woodward_
                                       Jennifer Woodward




DECLARATION IN SUPPORT OF MOTION TO QUASH          3
CASE NO. 06-MC-80270 PVT

# EXHIBIT B

Jones rough - address redacted.TXT

CR
JB

1

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3    - - - - - - - - - - - - - -x

4  In Re                    :

5                           :  Case No.

6  APOLLO GROUP, INC.,      :  CV-04-2147-PHX-JAT

7  SECURITIES LITIGATION.   :

8                           :

9    - - - - - - - - - - - - - -x

10

11

12

13

14              DEPOSITION OF BRIAN W. JONES

15

16

17                     Washington, DC

18                     Friday, January 26, 2007

19

20

21

22

23

24  REPORTED BY:

25     Victoria L. Wilson

CR
JB

2

Jones rough - address redacted.TXT

1        Deposition of BRIAN W. JONES, called for

2    examination pursuant to subpoena, on Friday, January

3    26, 2007, in Washington, DC, at the law offices of

4    Gibson, Dunn & Crutcher, LLP, 1050 Connecticut

5    Avenue, N.W., at 10:11 a.m., before Victoria L.

6    Wilson, a Notary Public within and for the District

7    of Columbia, when were present on behalf of the

8    respective parties:

9

10                   On behalf of Plaintiff

11

12

13                   On behalf of Defendant

14

15

16

17

18

19

20

21

22

23

24

25

      CR
      JB

                                                            3

1                 P R O C E E D I N G S

2             VIDEO OPERATOR:  This is the deposition of

Jones rough - address redacted.TXT
3   Brian W. Jones taken on behalf of defendants in the

4   matter of in re Apollo Group, Inc., Securities

5   Litigation, Case Number CV042147-PHX-JAT, for the

6   United States District Court, District of Arizona.

7   This deposition is being taken at the offices of

8   Gibson Dunn, 1050 Connecticut Avenue, Washington,

9   D.C.  The time is approximately 10:11 a.m., date

10  January 26, 2007.  The court reporter is Vicky

11  Wilson on behalf of Barkley Court Reporters, 2040

12  Main Street, Suite 250, Irvine, California 92614.  I

13  am the video operator, Larry Flowers, also on behalf

14  of Barkley.  The reporter will now swear in the

15  witness.

16  Whereupon,

17                    BRIAN W. JONES

18  was called as a witness and, having first been duly

19  sworn, was examined and testified as follows:

20           VIDEO OPERATOR:  Will counsel identify

21  themselves and who they present.

22           MR. BUSCH:  My name is Joseph Busch from

23  Gibson Dunn & Crutcher.  I represent all four of the

24  named defendants.

25           MR. BAN:  My name is Bill Ban.  I'm with

     CR
     JB

                                              4


1   the firm of Barrack, Rodos & Bacine.  We represent

2   the plaintiff and the class.

3            MS. WANNER:  I'm Sarah Wanner with the

4   U.S. Department of Education.

5            MS. OLIVER:  My name is Heather Graham-

                       Page 3

Jones rough - address redacted.TXT

6    Oliver.  I'm an assistant United States attorney

7    representing the Department of Education and the

8    United States of America.

9         MR. DINH:  My name is Viet D. Dinh of

10   Bancroft Associates, PLLC, of Washington, D.C.  I

11   represent the witness Brian Jones.

12        MR. BUSCH:  And for the record, Ms. Wanner

13   is from the Office of General Counsel for the

14   Department of Education.

15        BY MR. BUSCH:

16   Q    Mr. Jones, would you state your name and

17   spell your last name for the record?

18   A    Sure.  It is Brian W. Jones, J-o-n-e-s.

19   Q    Mr. Jones, what is your occupation?

20   A    I'm currently executive vice president and

21   general counsel of college loan corporation.

22   Q    Are you an attorney?

23   A    I am, yes.

24   Q    Have you ever taken -- had your deposition

25   taken before?

CR
JB

5

1    A    I have not, no.

2    Q    Have you ever taken a deposition in your

3    professional capacity?

4    A    I have.

5    Q    Do you understand that you are under oath

6    today?

7    A    I do.

8    Q    Do you understand that the oath that you

Jones rough - address redacted.TXT

9  have taken has the same force and effect as though

10  it is were in a court of law?

11       A    I do.

12       Q    Do you understand that the reporter will

13  be preparing a transcript of today examination?

14       A    Yes, I do.

15       Q    Do you understand that you will have an

16  opportunity to review and correct the transcript?

17       A    Yes, I do.

18       Q    Do you understand that in the events that

19  corrections are made, that counsel at the time of

20  trial may comment on the changes to the deposition

21  transcript?

22       A    Yes, yes, I do.

23       Q    If I ask a question that you do not

24  understand, will you let me know?

25       A    Yes.

CR
JB

6

1       Q    Thank you very much.

2            Would you please -- let me withdraw that.

3            Are you here today pursuant to a subpoena?

4       A    Yes.

5            MR. BUSCH:   Let me have -- what we will

6  mark as Exhibit 1725.

7            (Jones Deposition Exhibit 1725

8             identified.)

9            (Witness reviewed the document.)

10           BY MR. BUSCH:

11      Q    Is Exhibit 1725 the subpoena that was

Page 5

Jones rough - address redacted.TXT
12   issued to you to appear here today?

13        A    Yes it is.

14        Q    Would you explain your education since

15   high school for the jury please?

16        A    Sure.  I attended college at Georgetown

17   University here in Washington, D.C., earned a

18   bachelor of science, and then attended law school at

19   the University of California Los Angeles.

20        Q    When did you receive your undergraduate

21   degree at Georgetown University?

22        A    In 1990.

23        Q    And when did you graduate from UCLA?

24        A    1993.

25        Q    After you left UCLA, did you engage in the

☐   CR
    JB

7

1    practice of law?

2         A    I did, yes.

3         Q    And where did you begin your practice?

4         A    I began my practice with the firm of

5    Shepherd Mullen Richter and Hampton, Los Angeles

6    based firm in its San Francisco office.

7         Q    And how long were you with Shepherd

8    Mullen?

9         A    Approximately two years.

10        Q    And after that, what did you do?

11        A    After that I moved to Washington D.C. and

12   ran a small thing tank here, the Center for New

13   Black Leadership, and did that for about

14   two-and-a-half years.

Jones rough – address redacted.TXT

15    Q    And after your service with the Center for

16  New Black Leadership, what did you do?

17    A    Went to work on -- on the hill for the

18  United States Senate committee on the  judiciary as

19  counsel for the committee.

20    Q    And who is chair of the committee at that

21  time?

22    A    Senator Orin Hatch.

23    Q    Thank you very much.  About did you at

24  some point in time leave the -- your position as

25  counsel to the U.S. Senate judiciary committee?

CR
JB

8

1    A    I did.

2    Q    And where did you go after that?

3    A    Returned to California and went to work as

4  deputy general counsel to then governor Pete Wilson

5  the governor of California at the time.

6    Q    How long were you in that position?

7    A    In that position, just a little over a

8  year.  It was at the end of his -- of his final term

9  in office.

10    Q    What did you do after that?

11    A    After that, I returned to private practice

12  in San Francisco, with the Currey, Ally, DeLaberkin,

13  Hirschfeld, Kelly and Cramer, an employment law firm

14  in San Francisco.

15    Q    And how long were you with you that firm?

16    A    Approximately three years.

17    Q    Where did you go after you left that firm?

Jones rough - address redacted.TXT
18      A     After I left -- well, while I was at that

19   firm, I was nominated by the president to be general

20   counsel of the United States Department of Education

21   so I left my firm and began working at the

22   department prior to my confirmation of that job and

23   then was confirmed, ultimately confirmed for the job

24   and spent four years in that capacity.

25      Q     When did you leave as general counsel for

CR
JB

9

1   the Department of Education?

2      A     In January of 2005.

3      Q     And where did you go from there?

4      A     To my current job as general counsel of

5   college loan corporation.

6      Q     What were your responsibilities as general

7   counsel for the Department of Education?

8      A     Well, the Office of General Counsel is the

9   -- the principal legal advisor to the secretary of

10   he had.  The general counsel is a -- is a statutory

11   role and in that capacity, I managed the off of

12   general counsel, which is an office with about 85

13   lawyers and another 20, 25 support staff, and so I

14   managed the office and advised the secretary on

15   legal matters affecting the department.

16      Q     Was there a policy making body within the

17   Department of Education during that time frame?

18      A     There was.

19      Q     What was it called?

20      A     The secretary created an institution

Jones rough - address redacted.TXT
21  called his executive team, essentially, which was

22  sort of the principal policy making body, it was the

23  policy approving body of the agency.

24      Q    Who were the members of the executive

25  team?

CR
JB

10

1       A    It was the secretaries, the department at

2   the secretary, the under secretary, the general

3   counsel, myself, and then the secretaries chief of

4   staff.

5       Q    Did you ever become acquainted with an

6   institution known as the University of Phoenix

7   during the time that you served as the general

8   counsel for the Department of Education?

9       A    I did, yes.

10      Q    And how did you become acquainted with

11  that institution?

12      A    Well, I -- I first became acquainted with

13  it when there -- I became aware of a program review

14  that was being undertaken.

15      Q    When did you first become aware of the

16  program review?

17      A    Well, I don't recall exactly but I would

18  estimate that it was probably sometime late in the

19  year of 2003, early 2004, in that time frame.

20      Q    What is a program review, if you have an

21  understanding of that?

22      A    Sure.  Roughly speaking, I mean it is a --

23  it is a review undertaken by the department where

Jones rough - address redacted.TXT
24   department employees in any one of the owe of the

25   program offices will go in and essentially audit the

CR
JB

11

1    activities of a -- of an institution that receives

2    funds from the department to ensure that its

3    complying with all of the applicable rules and

4    regulations that govern the use of that money.

5         Q    You use the term audit.  What did you mean

6    by that?

7         A    Well, again, roughly speaking, in a -- I'm

8    not using any term of art but essentially whether

9    the department or its employees go in and examine

10   the financial activities of an institution or any of

11   the other programmatic activities of an institution

12   to ensure its compliance with the applicable rules

13   and regulations.

14        Q    Is there an operating group, I'll use that

15   expression, within the Department of Education

16   called the office of the inspector general?

17        A    There is.

18        Q    Okay.  Does the Office of Inspector

19   General conduct program reviews?

20        A    I believe that it does, yes.

21        Q    Let me show you what has previously been

22   marked as Exhibit 140.

23        A    Okay.

24             MR. BUSCH:  Counsel, do you have a copy.

25             MR. DINH:  I have a copy, yes.

CR
JB

Jones rough - address redacted.TXT

12

1            MR. BUSCH:  Do you want another copy,
2    counsel?
3            MR. BAN:  I'll get my file.
4            MR. BUSCH:  Okay.  Let me give them to
5    counsel for the department.
6            MS. WANNER:  Thank you.
7            BY MR. BUSCH:
8        Q    Do you recognize this document, sir,
9    Exhibit 140?
10       A    I do, yes.
11       Q    And what is it?
12       A    This is the program review report that was
13   prepared by the department with respect to the
14   University of Phoenix.
15       Q    To your knowledge, did the Office of
16   Inspector General conduct the program review for the
17   University of Phoenix?
18       A    It appears not.  The title on this
19   document indicates that it was the office of student
20   financial assistance that conducted this review.
21       Q    When was the first time that you read
22   Exhibit 140 or I should say a copy of Exhibit 140,
23   since you have only been shown the actual Deposition
24   Exhibit today.
25       A    Sure.  I can't be certain but it was very

     CR
     JB

13

1    likely around the time that it was -- that it was
                     Page 11

Jones rough - address redacted.TXT

2    dated here, it is dated February 5th, so I would

3    presume that I saw it for the first time, read it

4    for the first time, within a few weeks of that date,

5    prior to that date.

6         Q    Okay.  Let me draw your attention to page

7    29.  For the record, the last four digits of the

8    Bates number is 1258.

9         A    Okay.

10        Q    Let me draw your attention to the -- it is

11   going to be the second full paragraph of the -- on

12   that page.  It is the paragraph that begins when

13   enacting.  Do you see that?

14        A    I do.

15        Q    If you would just read that to yourself,

16   sir.

17             (Witness reviewed the document.)

18        A    Okay.

19        Q    Have you had a chance to review that

20   paragraph?

21        A    I have, yes.

22        Q    Let me draw your attention to the -- to

23   where it says at the end, for example colon and then

24   there is a bullet point, the first bullet point

25   reads salary adjustments based on success in

CR
JB

14

1    securing enrollment remain prohibited.  Do you see

2    that?

3         A    I do, yes.

4         Q    Was that the position of the Department of

Jones rough - address redacted.TXT

5    Education in February of 2004?

6            MS. OLIVER:  Objection.

7            MR. BAN:  Counsel.  What's the nature of

8    your objection?

9            MS. OLIVER:  To the extent that you

10   learned of that -- the position of the Department of

11   Education in your role as an attorney and as a

12   result of discussions with policymakers in the

13   Department of Education, it would apply to, I think,

14   an attorney-client privilege and/or deliberative

15   process privilege.

16           MR. BAN:  Are you asking your witness not

17   to respond to that question based on the

18   deliberative process objection.

19           MS. OLIVER:  Yes, I am.

20           MR. DINH:  You may answer the question to

21   the extent that it is not -- it is not an --

22   incurred within the deliberative process privilege

23   or in your role as an attorney.  If you have

24   independent knowledge as to what the official public

25   position of the department is, you may answer that

CR
JB

15

1    but not any internal deliberations or impressions.

2            MR. BAN:  Excuse me just one moment more

3    counsel.  You are going to assert that privilege,

4    which I don't quibble with at all, I would urge you

5    to assert it consistently otherwise you will have a

6    waiver.

7            THE WITNESS:  May I confer with my counsel

Jones rough - address redacted.TXT

8  for just one second to clarify something in my mind

9  about the scope of this.

10       MR. BUSCH:  Yes.  Let's go off the record.

11  You have a constitutional right to confer with

12  counsel.

13       VIDEO OPERATOR:  We are off the record.

14  The time is approximately 10:25 a.m.

15       (Recess.)

16       VIDEO OPERATOR:  We are back on the

17  record.  The time is approximately 10:28 a.m.

18       MR. BUSCH:  Will the reporter please read

19  the pending questions to the witness?

20       (The reporter read the record as

21  directed.)

22    A    Okay.  And it was generally -- the

23  departments policy at the time, though at some point

24  in 2002, it was communicated that there was sort of

25  a -- something of a limitation to it in the sense

CR
JB

16

1  that the deputy secretary sort of --

2       MS. OLIVER:  Objection.  Objection.  I

3  object.  The United States objects to this testimony

4  in the sense that the only way that you would have

5  gotten the testimony or what the deputy secretary

6  would have said would be in your role as general

7  counsel.  I don't -- are you testifying as to what

8  you told Apollo or are you testifying as to

9  something that you learned as general counsel.

10       MR. BUSCH:  Let me -- well and itches

Page 14

Jones rough - address redacted.TXT

11  going to say.  Let me just lay a foundation.  And I

12  appreciate the voir dire of the witness.  Are you

13  testifying about a public statement made by the

14  deputy secretary.

15          THE WITNESS:  What I am testifying to is a

16  policy that was communicated to Phoenix's

17  representatives during our discussions and then a

18  policy that I think was generally understood in the

19  community of affected institutions.

20      Q    Would you then finish your answer?

21      A    And that is that there was a limitation

22  placed on that to say that salary adjustments based

23  on -- based solely on success in securing enrollment

24  were prohibited.  That was sort of the adjustment

25  that was made to the policy and that was

CR
JB

17

1   communicated I think at large to the interested

2   community.

3       Q    Okay.  And was -- when was that

4   communication made?

5       A    I can't be -- I can't be absolutely

6   certain but it was sometime in -- in 2003, late 2002

7   or early 2003.

8       Q    Let me draw your attention to page 28 of

9   Exhibit 140.  It is the prior page.  Let me draw

10  your attention to the paragraph, its the second full

11  paragraph on the page that begins as amended in

12  2002, the regulation now provides in relevant parts

13  that an institution degrees that, and then it

Page 15

Jones rough - address redacted.TXT

14    recites a regulation.  Do you see that?

15         A    I do, yes.

16         Q    Does that refresh your memory as to when

17    the position was announced that salary adjustments

18    based solely on success in securing enrollments

19    would be prohibited?

20         MR. DINH:  Why don't you go ahead and read

21    the entire regulation.

22         MR. BUSCH:  And if you need to, I'll draw

23    your attention to assist you to little II and then

24    paren cap A close pay reason.

25         (Witness reviewed the document.)

CR
JB

18

1         A    Yes.  I mean this refreshes my memory to

2    the extent that it must have occurred at some point

3    in 2002 rather than early 2003.

4         Q    Thank you.  Are you acquainted with an

5    individual at the Department of Education known as

6    Jennifer Woodward?

7         A    I am.

8         Q    And how are you acquainted with her?

9         A    She is a lawyer in the Office of General

10    Counsel, which I manage.

11         Q    First of all, did you ever discuss

12    Exhibit 140 with any representatives of the

13    University of Phoenix at any point in time?

14         A    I did not specifically, no.

15         Q    Did you ever discuss with any

16    representative of the University of Phoenix your

Page 16

Jones rough - address redacted.TXT

17  views as to Jennifer Woodward's objectivity?

18      A    Not that I recall.  Not that I recall, no.

19      Q    Are you acquainted with a gentleman by the

20  name of Vic Klatt, K-l-a-t-t?

21      A    Yes.  Yes.

22      Q    Did you understand that he was a

23  representative of the University of Phoenix in early

24  2004?

25      A    Yes.

CR
JB

19

1       Q    Okay.  Are you acquainted with a gentleman

2   by the name of Douglas Cox?

3       A    Okay.

4       Q    COX.  Did you understand that he was an

5   attorney representing the university of Phoenix?

6       A    Yes.

7       Q    Are you acquainted with a gentleman by the

8   name of Timothy Hatch, H-a-t-c-h?

9       A    Yes.

10      Q    And did you understand he was an attorney

11  representing --

12      A    Yes.

13      Q     -- the University of Phoenix?

14      A    Uh-huh.  Uh-huh.

15      Q    Okay.  Do you recall ever having expressed

16  any concerns to either of those individuals about

17  your perceptions as to Jennifer Woodward's

18  objectivities?

19      A    You know, not specifically, no, not

Jones rough - address redacted.TXT

20  specifically with respect to Jennifer, no.  We did

21  have discussions about just general Phoenix's

22  concern about, you know, biasses and things like

23  that.

24      Q    What did you discuss about the concepts of

25  or the concerns about bias?

☐   CR
    JB

20

1      A    Generally, you know, there was a concern

2   that had been expressed by Phoenix from the very

3   beginning, I think of their communications with us

4   at the department about this matter, that there was

5   a bias against the University of Phoenix.  I think

6   that, you know, when we did talk -- I mean I think

7   that there was a sense on my part and others at the

8   department that, you know, certainly there are, you

9   know, institutional biasses, I think, that do exist

10  from time to time, you know, and I should be clear

11  about what I mean by the term bias.  What I mean by

12  that is, you know, essentially, institutions like

13  the University of Phoenix for profit institutions

14  engaged in he had, you know, just the nature of the

15  he had marketplace, has changed over the years and I

16  do think that inside the department, there is often

17  a mistrust of for profit institutions engaged in the

18  he had marketplace activity.  And so I did have

19  those kind of discussions with -- with

20  representatives of Phoenix just agreeing with that

21  -- with that idea.

22      Q    Do you recall approximately when you had

Page 18

Jones rough - address redacted.TXT

23  -- let me withdraw that.

24      Did you have more than one such

25  conversation on the topic of institutional bias?

CR
JB

21

1      A    I think that's fair to say, yes.

2      Q    Do you recall when the first time you had

3  such a conversation was?

4      A    Not specifically, no.

5      Q    Do you recall having had any discussions

6  with representatives of the University of Phoenix

7  within a couple of weeks after Exhibit 140 was

8  issued?

9      A    Very likely I would have had a

10  conversation with Vic Klatt shortly after that time.

11  I don't know that I would have specifically spoken

12  to Mr. Cox or Mr. Hatch at that time but I likely

13  would have tone to Mr. Klatt at that time.

14      Q    Okay.  Let me show you what has previously

15  been marked as Exhibit 28.  This is a letter dated

16  February 9th, 2004.

17          MR. BAN:  I have one.  Thank you counsel.

18          MR. BUSCH:  Okay.

19          (Witness reviewed the document.)

20      Q    Have you had a chance to look at Exhibit

21  28?

22      A    I have, yes.

23      Q    Do you recall if you ever received a copy

24  of Exhibit 28 back in February of 2004?

25      A    I do recall receiving it.

Jones rough - address redacted.TXT

22

1       Q    Okay.  Do you recall having any

2  discussions about Exhibit 28 with any

3  representatives the University of Phoenix?

4       A    You know, again, I don't recall having a

5  specific discussion about this letter but -- but,

6  again, this was received around the time of the

7  program review report.  I likely was -- likely did

8  have a conversation with Mr. Klatt, certainly, at

9  around that time and so this may have been something

10 that we discussed.  I just simply don't recall a

11 specific discussion about this letter.

12      Q    Okay.  Do you recall a specific -- any

13 conversation about the topics or the statements made

14 in the letter?

15      A    Yes.

16           MR. BAN:  Objection to form.  Is that with

17 people with Phoenix or with anyone, counsel?

18           MR. BUSCH:  Thank you.

19           BY MR. BUSCH:

20      Q    With anybody at the University of Phoenix?

21      A    Yes.

22      Q    Okay.  Thank you.

23           What topics do you recall having discussed

24 with the University of Phoenix as expounded in

25 Exhibit 28?

23

Jones rough - address redacted.TXT

1      A      Well, this is -- you know, just -- this is
2    in pretty direct form, I think, a nice encapsulation
3    of their overall concern that they expressed about
4    the program review report which is why I think they
5    reached out to -- to me and others in my office and
6    others in the department at the time and so to the
7    extent that this letter is intended to complain
8    about the -- the program review report, about the
9    objectivity of the program review itself or the
10   language in the report or the findings in the
11   report, then, yes, those are the kind of things that
12   I -- that I talked to representatives of the
13   University of Phoenix about.
14     Q      Okay.  Let me draw your attention to the
15   third page of the exhibit and the second paragraph
16   on that page references both how the department
17   handled computer learning center and how the
18   department handled ITT educational services.  Do you
19   see that?
20     A      Yes.
21     Q      Do you recall having had any discussion
22   with representative of the University of Phoenix
23   about the handling of those other two matters?
24     A      Not so much about the computer learning
25   center matter.  You know, that was -- that was a

CR
JB

24

1    matter that was really resolved before I arrived at
2    the department and I didn't then and don't know.

Page 21

Jones rough - address redacted.TXT

3          MS. OLIVER:  Objection.  Are you answering

4     his question?

5          THE WITNESS:  Yes.  And don't know --

6     don't now no much about that but I did discuss the

7     resolution of the ITT matter and how that was owe

8     how that was handled.

9          BY MR. BUSCH:

10     Q    What do you recall was discussed about the

11     handling of the ITT matter?

12     A    Well, I think it was just generally that,

13     you know, that that was resolved, again, after a

14     program review, it was resolved in a circumstance in

15     which the department reached a settlement agreement

16     with ITT.  That agreement was negotiated by a deputy

17     general counsel in my office and Mr. Cox, who was

18     also representing Phoenix in this matter.

19     Q    Okay.  Did you have any discussions with a

20     representative of the University of Phoenix as to

21     whether that approach to the University of Phoenix

22     program review report would be followed in its case?

23          MR. BAN:  Objection to form.

24          MS. OLIVER:  Objection.

25          THE WITNESS:  I'm not sure I understand.

CR
JB

25

1          BY MR. BUSCH:

2     Q    Okay.  Did you have any discussions with a

3     representative of the University of Phoenix as to

4     whether the department would follow the approach

5     that was used in the ITT case in terms of resolving

Jones rough - address redacted.TXT

6   the program review report issued to the University

7   of Phoenix?

8       A    Well, I think what we talked about was

9   that -- that the ITT matter ultimately was resolved

10  in, you know, in a reasonably amicable way by

11  engaging in settlement discussions and so I think

12  that there was a discussion with representatives of

13  University of Phoenix that that would be a -- you

14  know, a -- an effective means of resolving this

15  program review report, as well.

16      Q    Did you discuss at all with any

17  representative of the University of Phoenix where in

18  the process of conducting program reviews the

19  program review report itself was?

20      A    Well, to the extent that, you know, we

21  were talking about sort of the detail of the

22  process, I likely wouldn't have been having those

23  conversations.  That likely would have been a

24  conversation that my department at the, Jonathan

25  Vogel would have been having with University of

☐   CR
JB

26

1   Phoenix's lawyers.  To the extent I was having any

2   kind of discussion about the program review report

3   and, you know, talking about how ITT was resolved

4   and the like, that, again, would have been a pretty

5   high level conversation, very likely with Mr. Klatt

6   where the discussion simply would have been, you

7   know, perhaps we ought to look to the ITT approach

8   as a model for how to resolve this.  Any detail

Page 23

Jones rough - address redacted.TXT

9   about what that process would look like specifically

10  as to what documents Phoenix would be asked to

11  submit or, you know, how those documents would be

12  reviewed, et cetera, those discussions would have

13  been had by Mr. Vogel, he would have been sort of

14  the front line person so to speak?

15      Q    The context of the process for handling a

16  program review, does the object of a program review

17  report have any appellate rights from the program

18  review report itself?

19          MR. BAN:  Objection to form.

20          THE WITNESS:  I'm not sure I understand

21  what you mean by the object of the program review.

22          BY MR. BUSCH:

23      Q    For example, the University of Phoenix?

24          MR. BAN:  Objection, I think you are

25  asking this witness for a legal opinion.

CR
JB

27

1           THE WITNESS:  You are asking me if the

2   University of Phoenix has appeal rights from a

3   program review report?

4           BY MR. BUSCH:

5       Q   Yes.

6       A   Well, you know, just administratively

7   speaking, I mean the subject of any administrative

8   action by the department would always have resort to

9   appeal an administrative action to the secretary and

10  then of course would have whatever legal rights

11  accrue to it beyond that.

Page 24

Jones rough - address redacted.TXT

12      Q    Have you ever heard in your capacity as

13  general counsel at the Department of Education the

14  phrase final program review determination?

15           MR. BAN:  Objection to form.

16           MS. OLIVER:  Objection.

17           THE WITNESS:  Have I --

18           MS. OLIVER:  Objection.  I will assert,

19  again, the attorney-client privilege and/or

20  deliberative process privilege.

21           MR. BAN:  Are you instructing the witness

22  not to answer counsel.

23           MS. OLIVER:  I'm instructing the witness

24  not to answer the question.

25           BY MR. BUSCH:

CR
JB

                                                    28


1       Q    Are you acquainted, sir, with the policy

2  guides issued by the Department of Education?

3       A    Specifically?

4       Q    Yes.

5       A    You know, I'm -- I'm aware that there are

6  program review guides.  I can't say that I have

7  specific knowledge of the details of them.

8           MR. BAN:  There is no question pending.

9           MR. BUSCH:  No.

10           MR. BAN:  Could we go off the record for

11  just a second.

12           VIDEO OPERATOR:  We are off the record.

13  The time is approximately 10:48:00 a.m.

14           (Recess.)

Jones rough - address redacted.TXT

15          VIDEO OPERATOR:  We are back on the

16    record.  The time is approximately 10:50 a.m.

17          MS. OLIVER:  To.

18          MR. BUSCH:  Counsel, would you like to

19    make a statement for the record?

20          MS. OLIVER:  Yes, I would.  To the extent

21    that the documents that counsel is showing this

22    witness, to the extent that they are public

23    documents and that the witness has any independent

24    knowledge of the document other than his employment

25    with the Department of Education as general counsel,

   CR
   JB

29

1     then the USA would not be objecting, but if his

2     knowledge is solely based on his employment as the

3     general counsel, then the United States is not

4     waiving its privileges, particularly its

5     deliberative process privilege, to -- with respect

6     to this witness's testimony of -- about that

7     document.

8           MR. BUSCH:  Thank you, counsel.

9           BY MR. BUSCH:

10    Q     I'm going to show the witness now the

11    version of the program review guide dated August 31,

12    2001, from the Department of Education that was

13    marked as Exhibit 701 in these proceedings.  I only

14    have one cone, unfortunately.  If counsel, I do have

15    a copy on my clean if counsel wants to come and

16    look.

17          MR. BAN:  Thank you.

Jones rough - address redacted.TXT
18          BY MR. BUSCH:

19      Q    Let me just show you this document, sir.

20          (Witness reviewed the document.)

21          BY MR. BUSCH:

22      Q    Have you ever seen a document entitled

23  program review guide issued by the Department of

24  Education?

25      A    I have not seen this document before.

☐  CR
   JB

30

1       Q    Okay.  Do you know if the documents

2   published by the Department of Education and

3   available on its public Web site are intended for

4   use by the public?

5       A    Yes, they are.

6       Q    Let me show you what we have previously

7   marked as Exhibit 301 and we will come back to that,

8   come back to it, but I just want to --

9           MR. BAN:  Thank you --

10          BY MR. BUSCH:

11      Q    Can you identify Exhibit 301, sir?

12      A    Yes.  This is an owe an e-mail from Doug

13  Cox to Todd Nelson, Robert Collins, Kenda Gonzales

14  and Timothy Hatch and it is enclosing the settlement

15  agreement, universities of Phoenix reached with the

16  department.

17      Q    Okay.  Can you identify the last three

18  pages of the exhibit?

19      A    The last three pages are the -- institute

20  the pages of the settlement agreement.

Page 27

Jones rough – address redacted.TXT
21    Q    Okay.  Did you approve this document?

22        MS. OLIVER:  Objection.  I instruct the

23    witness not to answer that question.  We a

24    certificate our privileges.

25        MR. BAN:  Also object to the fact that the

☐    CR
     JB

31

1    question includes the cover page to the document

2    that we have seen.

3        MR. BUSCH:  I will withdraw the question

4    and just if focus on the last three pages.

5        BY MR. BUSCH:

6    Q    Did you approve the last three pages of

7    the document?

8        MS. OLIVER:  Objection.  I think that was

9    the question you asked before.

10        MR. BUSCH:  No I changed it to the last

11    three pages.

12        MS. OLIVER:  Okay.  I object to that

13    question.  I assert my privilege and I instruct the

14    witness not to answer.

15        MR. BUSCH:  Okay.  For the record, the

16    United States permitted both Mr. Vogel and secretary

17    Hickock to answer that question.

18        BY MR. BUSCH:

19    Q    Let me draw your attention to paragraph

20    one, Roman numeral A.  Do you see that the second

21    sentence reads, the program review report was one

22    step in an ongoing process designed to foster

23    institutional compliance with the law?  Do you see

Jones rough - address redacted.TXT
24    that?

25        A    Yes.  I do.  Yes.

                                                        32


1        Q    Okay.  Good.  Okay.  Was that a true

2    statement?

3            MS. OLIVER:  Objection.  I instruct the

4    witness not to answer that question.  The United

5    States is asserting its privileges with respect to

6    that question.

7            BY MR. BUSCH:

8        Q    Can you identify the signature of Victoria

9    Edwards?

10       A    I see what appears to be the signature --

11   the signature of Victoria Edwards.

12       Q    I understand.  Okay.  But do you recognize

13   -- are you acquainted with her signature apart from

14   seeing that there is a signature on that page above

15   her name?

16       A    No, sir, I'm not acquainted with her

17   signature.  I don't know what her signature looks

18   like but that appears to be --

19       Q    Did you have any discussions with any

20   representative of the University of Phoenix after

21   having received Exhibit 28, the letter of

22   February 9, about whether or not the program review

23   report was one step in an ongoing process designed

24   to foster institutional compliance with the law?

25       A    I believe, yes, I believe the answer to

Jones rough - address redacted.TXT

33

1    that question is yes, that I did have that type of

2    discussion with representatives of the University of

3    Phoenix.

4        Q    And what was discussed on that topic?

5        A    Well, I think that what we had

6    communicated, and, again, I specifically would have

7    had this conversation very likely with Mr. Klatt,

8    that when the program review report came in, there

9    would be an opportunity for the University of

10   Phoenix to respond to it, that we would examine, we

11   as the department, would examine what was submitted,

12   and there would be, you know, some analysis of that

13   he was and that there -- you know, again, there may

14   be changes to what the ultimate -- to what the

15   ultimate findings are and I think presumed in that

16   conversation with Mr. Klatt is the idea that the

17   program review report was one part of a multi step

18   process.

19            MR. BAN:  Objection.  Move to strike as

20   not responsive.

21            BY MR. BUSCH:

22       Q    Did you ever refer to the program review

23   report in your conversations with representatives of

24   the University of Phoenix as a draft?

25       A    I don't know that I ever used that

        CR
        JB

34

1    specific word.

Page 30

Jones rough - address redacted.TXT

2      Q     Let me draw your attention to Exhibit 28

3   to the third page, to the last full paragraph on --

4   excuse me -- it is the last paragraph on the page,

5   beginning with we believe.  Do you see that?

6      A     On the last page?

7      Q     Excuse me.  Page three.

8      A     Where are we here.

9            MR. DINH:  What exhibit are you referring

10   to counsel.

11            MR. BUSCH:  We are looking at Exhibit 28,

12   which is a February 9 letter.  I'm sorry.  You are

13   getting a lot of paper and I appreciate that it is

14   sometimes --

15      A     On page three.  Yes.

16      Q     Yes, and it begins we believe?

17      A     Yes, sir.

18      Q     The first sentence says we believe that

19   the department should withdraw the report.  Do you

20   see that?

21      A     I do.

22      Q     Was that topic ever discussed by you with

23   any representative of the University of Phoenix?

24      A     Not with me specifically that I recall.

25      Q     Did you ever express to anyone at the

CR
JB

35

1   University of Phoenix that the Department of

2   Education was considering revising the program

3   review report to tone down the rhetoric?

4      A     I don't recall saying that we were going

Page 31

Jones rough - address redacted.TXT

5   to revise the report to tone down the rhetoric.

6   Again, I think that the discussions that I was

7   having, anyway, were, again, about the idea of the

8   program review report being the first step and that

9   -- and I understood that Phoenix was upset about it,

10  about the language, the tone of the report, but,

11  again, I think that at least in the conversations

12  that I had, what was being communicated was, look,

13  this is just the first step.  You will have an

14  opportunity to respond.  We will take seriously your

15  submission and we will look at it and we will

16  examine the findings and so, again, I think that

17  what we were conveying at least what I was

18  conveying, again, likely to Mr. Klatt, was that at

19  the end of the day, this, you know, may not be, you

20  know, the last statement of the department on the

21  issue and so, you know, any of these concerns you

22  have about Tony may, in fact, get dealt with once

23  you make a submission to us and we have an

24  opportunity to examine what you submit.

25      Q    Let me draw your attention in that same

CR
JB

36

1   paragraph on page three to the third sentence where

2   it discusses a potential disclosure of the program

3   review report.  Do you see that?

4       A    I do.

5       Q    Do you recall having had any discussions

6   with a representative of the University of Phoenix

7   about that topic?

Page 32

Jones rough - address redacted.TXT

8    A    Specifically, I -- I do not. This, again,

9    I know that this conversation occurred but I -- I

10    was not involved with this conversation.

11    Q    And I'm only going to ask you a yes or no

12    -- to answer yes or no on the next question. Is the

13    basis of your knowledge that that topic was

14    discussed based upon communications that you had

15    internally at the department in your capacity as

16    general counsel?

17    A    Yes.   That's correct.

18    Q    Let me show you what we have previously

19    marked as Exhibit 1701. It is a copy of a

20    declaration of Jennifer Woodward that was filed in

21    the United States district court for the northern

22    district of California in relation to some discovery

23    motions that have taken place in this matter.

24          MR. BUSCH:  You don't have that.

25          MR. BAN:  I have never seen this. That's

CR
JB

37

1    off the record.

2          (Discussion off the record.)

3          MR. BUSCH:  I have to find my copy now.

4          MR. BAN:  You want this back Joe.

5          MR. BUSCH:  No, because that's not fair to

6    you and I have got a copy of my hard drive here

7    someplace.

8          BY MR. BUSCH:

9    Q    In her declaration on page two at line

10    nine, she states, the report sums up, referring to

Page 33

                    Jones rough - address redacted.TXT
    11    program review report, sums up the findings made by
    12    the reviewers and usually requests further
    13    information from the school in order to make a final
    14    determination as to whether the school owes monetary
    15    liabilities and/or fines as a result of the
    16    findings.  Do you see that?
    17         A    I do see that.
    18         Q    Was that the policy followed by the
    19    Department of Education back in February of 2004
    20    with respect to program review records?
    21              MS. OLIVER:  Objection.  The United States
    22    asserts its privilege on -- with respect to that
    23    question and instructs the witness not to answer.
    24              MR. BUSCH:  Counsel, how can you do that
    25    when I am reading from a document that the United

 []   CR
      JB

                                                    38


     1    States has filed.
     2              MS. OLIVER:  I object to the question.
     3              BY MR. BUSCH:
     4         Q    Are you going to answer sir?
     5              MS. OLIVER:  I instruct the witness not to
     6    answer the question.
     7              MR. BUSCH:  Are you going to following the
     8    instruction of the United States Attorney.
     9         A    I am, yes.
    10         Q    Okay.  Thank you.
    11              Let me draw your next attention on page
    12    two to line 13, actually it may be 12, this is kind
    13    of between the lines, it says the next step in the
                            Page 34

Jones rough - address redacted.TXT

14    program review process involved a period in which

15    the school provides the department with information

16    responding to the report.  Do you see that?

17        A    Yes.

18        Q    Was that the policy followed by the United

19    States Government -- excuse me -- the United States

20    Department of Education back in February of 2000?

21             MS. OLIVER:  Objection.  The United States

22    asserts its privilege as with respect to that

23    question and I instruct the witness not to answer

24    that question.

25             BY MR. BUSCH:

CR
JB

39

1        Q    Let me draw your attention to the next

2    sentence.  The department then issues a final

3    program review determination (FPRD) letter which

4    sets forth the liabilities associated with the

5    findings and provides the school an opportunity to

6    appeal the determination.  Do you see that?

7        A    Yes, I see that.

8        Q    Okay.  Looking at that, does that refresh

9    your memory about final program review

10   determination, a question I asked you a little bit

11   ago?

12             MR. BAN:  Objection to form.

13             MS. OLIVER:  Objection.  Could you clarify

14   that question a little bit better, please, because I

15   don't know if I should be asserting my privilege

16   with respect to that.

Page 35

Jones rough - address redacted.TXT

17          MR. BUSCH:  His testimony simply was that

18    he does not recall ever having heard the term and

19    I'm asking if now looking at this document, that

20    refreshes his memory.  And that's either yes, no, or

21    I don't know.

22          THE WITNESS:  I should clarify.  I don't

23    think I said that I had not heard the term final

24    program review determination.  I thought there was

25    an objection interposed there and I don't think I

☐    CR
     JB

                                                        40


1    responded.

2          MR. BUSCH:  Okay.

3          BY MR. BUSCH:

4      Q    Have you ever heard -- okay.  I'll stand

5    corrected on your memory, sir.

6          Was that the procedure followed by the

7    United States Department of Education as stated in

8    that sentence beginning at lines 13 through 17 in

9    Ms. Woodward's declaration, Exhibit 1701?

10          MS. OLIVER:  Objection, the United States

11    asserts its privilege with respect to that question

12    and would instruct the witness not to answer the

13    question.

14          MR. BUSCH:  How quickly can I get a copy

15    of this transcript because I'm going to be filing it

16    with the United States District Court for the

17    District of Columbia today.

18          COURT REPORTER:  Report?

19          MR. BUSCH:  Yes.

                  Page 36

Jones rough – address redacted.TXT

20          COURT REPORTER:  Can we go off the record.

21          VIDEO OPERATOR:  Sure.  We are off the

22  record.  The time is approximately 11:08 a.m.

23          (Discussion off the record.)

24          VIDEO OPERATOR:  We are back on the

25  record.  The time is approximately 11:08:00 a.m.

 ⬚  CR
    JB

41

1          BY MR. BUSCH:

2      Q    Commencing at page two at line 22, the

3   sentence, do you see the sentence the UOP program

4   was reviewed was unique and that its genesis was KEY

5   TAM false claims act complaint?

6      A    Yes.

7      Q    Was that true in this instance?

8          MS. OLIVER:  Objection.  The United States

9   interposes its privileges with respect to that

10  question and instructs the witness not to answer the

11  question.

12          MR. BUSCH:  Again, for the record, the

13  United States did not object to that question by

14  Mr. Vogue gel.

15          BY MR. BUSCH:

16     Q    Did you ever discuss with any

17  representative of the department -- excuse me -- any

18  representative of the University of Phoenix whether

19  or not KEY TAM action pending in you earn district

20  of California served as the genesis of the UOP

21  program review?

22          MR. BAN:  Objection to form.  States facts

Page 37

Jones rough - address redacted.TXT

23  not in evidence.

24          THE WITNESS:  I did not specifically have

25  that conversation with anyone.  Again, that was an

CR
JB

42

1  issue that was raised in an apology lowest letter to

2  us and so, again, I know that that was a matter of

3  discussion but I had specifically didn't have that

4  conversation with anyone.

5          BY MR. BUSCH:

6      Q    Okay.  Let me draw your attention to the

7  next?

8          MR. DINH:  Just one moment.  Can you

9  limit, Mr. Jones, your answers to what you actually

10  no and discussed.

11          THE WITNESS:  Yes.  Yes.

12          BY MR. BUSCH:

13     Q    The next sentence begins or reads, excuse

14  me, through the departments investigation of that

15  case, the department already had substantial

16  evidence of UOP's violation of section 487 (A) (20)

17  of the higher education act.  Do you see that?

18     A    Yes.

19     Q    Okay.  The next sentence reads, the

20  purpose in part the purpose of the review was to

21  quantify the extent of the violations in order to

22  set an appropriate fine amount.  Do you see that?

23     A    Yes.

24     Q    Is that the way that program reviews are

25  generally conducted where a predetermine nation is

Page 38

Jones rough - address redacted.TXT

43

1    made prior to the review being conducted?

2            MR. BAN:  Objection to form.  Counsel,

3    that misstates the document.  You didn't read the

4    complete sentence.

5            MS. OLIVER:  Objection.  The United States

6    interposes its privileges with respect to that

7    question and instructs the witness not to answer.

8            MR. BUSCH:  Do you have the full sentence

9    in front of you sir.

10           THE WITNESS:  I do, yes.

11           BY MR. BUSCH:

12      Q    Is that the way that the Department of

13   Education typically handles program reviews?

14           MR. BAN:  Again, Counselor I'm going to

15   object.  Misstated.  He stated that he had the full

16   sentence in front of.  You did not ride the full

17   sentence you stopped at the comma after the word

18   amount.

19           MS. OLIVER:  Objection, the United States

20   interposes its privileges with respect to that

21   question and instructs the witness not to answer.

22           BY MR. BUSCH:

23      Q    Did you ever have any discussions with

24   representatives of the universities of Phoenix that

25   the staff that had conducted the program review had

44

Jones rough - address redacted.TXT

1    predetermined the results of the review before
2    conducting it?
3              MR. BAN:  Objection to form.
4              THE WITNESS:  Can I ask you to repeat the
5    question for me.
6              MR. DINH:  Can you read back the question
7    to the witness please.
8              MR. BUSCH:  I will have the reporter read
9    it back.
10             (The reporter read the record as
11   directed.)
12             MR. BAN:  Objection to form and states
13   facts not in evidence.
14             THE WITNESS:  No.
15             BY MR. BUSCH:
16      Q    Okay.  Did -- drawing your attention back
17   to Exhibit 140, which is the program review report
18   itself, did you ever have any conversations with any
19   representatives of the University of Phoenix about
20   the authority of Donna witness man to sign the
21   program review report?
22      A    No, not about Ms. Whitman's authority, no.
23      Q    Did you have any conversations with any
24   representatives of the University of Phoenix about
25   the authority of anybody to have issued Exhibit 140?

☐   CR
    JB

                                                        45


1       A    Not that I recall, no.
2       Q    Let me show you what we have previously

                       Jones rough - address redacted.TXT
 3    marked as Exhibit 1702.

 4              MR. BAN:  Thank you John.

 5              (Witness reviewed the document.)

 6              BY MR. BUSCH:

 7        Q    Have you had a chance to review

 8    Exhibit 1702?

 9        A    I have, yes.

10        Q    Was this the policy that was followed by

11    the Department of Education in 2004 with respect to

12    the release of program review reports --

13              MR. BAN:  Objection to form.

14              BY MR. BUSCH:

15        Q    -- under --

16              MR. BAN:  Sorry.

17              BY MR. BUSCH:

18        Q    -- FOIA?

19              MR. BAN:  Objection to form.

20              THE WITNESS:  I have not specifically seen

21    this document before today.  As I review it, the

22    substance of the document, you know, the approach

23    that it spells out for the release of program review

24    reports, was the policy that was -- that was

25    followed, in fact.

☐   CR
    JB

                                                          46


 1              BY MR. BUSCH:

 2        Q    Okay.  Let me show you a copy of

 3    Exhibit 29, which is a letter dated March 1, 2004.

 4              (Witness reviewed the document.)

 5              BY MR. BUSCH:

                          Page 41

Jones rough - address redacted.TXT

6   Q    Have you had a chance to review the

7   exhibit.

8   A    I ever, yes.

9   Q    Do you recall having received a copy of

10  Exhibit 29 back in -- sometime in March of 2004?

11  A    I don't as I sit here today recall having

12  received it but it does list me here among the cc's

13  so I imagine that I must have.

14  Q    Do you recall having had any conversations

15  with any representative of the University of Phoenix

16  about Exhibit 29?

17  A    No, not specifically.

18       MR. BUSCH:  I will make an offer of proof

19  for the record that on March 22nd, 2004, there was a

20  conference among representatives of the Department

21  of Education and representatives of the University

22  of Phoenix.  I will also represent that you did not

23  attend that meeting.  I make that offer of proof

24  because my question is do you recall having had any

25  conversations about that meeting after it took place

CR
JB

47


1   with any representatives of the University of

2   Phoenix.

3       MR. BAN:  Objection to form.

4       THE WITNESS:  You know, not a specific

5   recollection.  It is difficult to have a specific

6   recollection about any particular meeting because,

7   as I recall, you know, my deputy general counsel met

8   with Phoenix on -- Phoenix's representatives on more

Jones rough - address redacted.TXT
9    than one occasion and he would have always come in

10   and discussed that with me.

11          MS. OLIVER:  Objection.

12          BY MR. BUSCH:

13   Q    Well, and who was your deputy general

14   counsel?

15   A    Jonathan Vogel.

16   Q    Do you recall having had any conversations

17   with representatives of the University of Phoenix

18   about a presentation that had been made at the

19   March 22 meeting by KPMG on behalf of the University

20   of Phoenix?

21          MR. BAN:  Objection to form.

22          THE WITNESS:  I do remember being told

23   about a meeting with KPMG.  I don't recall the

24   specific discussion.

25          MR. DINH:  Again, can you read back the

☐   CR
JB

48

1    question, please?

2           (The reporter read the record as

3    directed.)

4           MR. DINH:  Is your answer limited to the

5    scope of the question.

6    A    It is, yes.

7           MR. DINH:  And is that consistent with the

8    previous answers.

9    A    Yes.

10          MR. DINH:  Thank you.

11          BY MR. BUSCH:

Jones rough - address redacted.TXT
```
12      Q    In other words, you recall having had a
13 discussion of that topic with representatives of the
14 University of Phoenix but there is nothing that
15 sticks out of your mind other than the fact that
16 that discussion on that topic occurred?
17      A    That's correct.
18      Q    Okay.  Let's mark Exhibit 1726.
19           (Jones Deposition Exhibit 1726
20            identified.)
21           (Witness reviewed the document.)
22           BY MR. BUSCH:
23      Q    Can you identify Exhibit 1726?
24      A    Yes.  It is a -- it is a weekly activity
25 report sent to me by Harold Jenkins, the assistant
```

☐  CR
   JB

49

```
1 general counsel for post secondary education.
2      Q    Do you recall having had any conversations
3 about the dismissal of the can he take him action
4 pending in the Eastern District of California with
5 representatives of the University of Phoenix?
6      A    Not specifically, no.  No.
7      Q    Let me show you what we will mark as
8 Exhibit 1727.
9           (Jones Deposition Exhibit 1727
10           identified.)
11           BY MR. BUSCH:
12      Q    Exhibit 1727 is a copy of an e-mail on
13 which you were not a copy and addressee but it is an
14 e-mail August 4th, 2004.  I just ask you to review
```

Page 44

Jones rough - address redacted.TXT

15    it.

16         (Witness reviewed the document.)

17    Q    Did you have any conversations with

18    Mr. Klatt in the summer of 2004 about communications

19    between the University of Phoenix and deputy

20    secretary Eugene Hickock?

21         MR. BAN:  Objection to form and objection

22    to the use of this document without putting the

23    witnesses recollection on the record first.

24         THE WITNESS:  Yes, it appears from this

25    document that I -- that I must have.

CR
JB

50

1         BY MR. BUSCH:

2    Q    Well, I'm just asking whether or not

3    Mr. Klatt will testify about that but just simply do

4    you recall if you had such a conversation?

5         MR. BAN:  Objection to form.

6         THE WITNESS:  It is not -- that would have

7    specifically related to the assistant depth see

8    secretary I just don't recall his name having been

9    invoked in any of those conversations.

10         BY MR. BUSCH:

11    Q    Do you recall having had a meeting among

12    yourself, the deputy secretary, Dr. Hickock, and

13    others at the Department of Education on or about

14    August 11th, 2004?  I'm only asking for a yes or no?

15         MR. BAN:  Objection the form.

16         THE WITNESS:  Yes.

17         BY MR. BUSCH:

Jones rough - address redacted.TXT

18    Q    Okay.  Had a final position regarding the

19   2003 program review report been reached by the

20   department at any time prior to that meeting?

21          MR. BAN:  Objection to form.

22          THE WITNESS:  Can you read back the

23   question.

24          MR. BUSCH:  Yes.

25          MR. BAN:  Counsel, are you objecting to

CR
JB

51

1    that question?

2           MS. OLIVER:  Did you read back the

3    question please.

4           MR. BUSCH:  It is going to be read.

5           (The reporter read the record as

6    directed.)

7           MS. OLIVER:  I object to the question.

8    I'm asserting our privileges with respect to that

9    question.  And instructing the witness not to answer

10   that.

11          BY MR. BUSCH:

12    Q    Did you have any discussions with

13   Mr. Klatt about that meeting after it occurred?

14    A    Yes.

15          MR. BAN:  Objection to form.

16          BY MR. BUSCH:

17    Q    And what were your conversations with

18   Mr. Klatt about that meeting?

19    A    Well, again, just generally speaking, we

20   talked about that meeting, the sense that it was a

Jones rough - address redacted.TXT
21    productive meeting in sense that Phoenix had an

22    opportunity I think to sort of spell out its

23    concerns, that from the departments perspective --

24         MS. OLIVER:  Objection to the extent of

25    your answer with respect to owe and maybe I'm not

CR
JB

52

1    following correctly but I assume that this is what

2    you told the representatives of Phoenix; is that

3    correct.

4         THE WITNESS:  Correct.  Yes.

5         BY MR. BUSCH:

6    Q    The question is, and I'll repeat it again,

7    and what were your conversations with Mr. Klatt

8    about that meeting?

9    A    Again, generally, that conversation was

10    limited to the idea that we both felt that it had

11    been a productive meeting, that Phoenix had had an

12    opportunity to express its concerns and that from

13    the departments perspective, we felt that it was --

14    that it was a productive because we heard those

15    concerns, I think, that I had -- I communicated to

16    Mr. Klatt that, you know, I thought that we should

17    be able to, you know, resolve this in a way that

18    would be reasonably amicable based upon our hearing

19    their concerns and their hearing our concerns about

20    Phoenix's -- the underlying findings in the report

21    and some of our concerns about Phoenix's conduct.

22    Q    Okay.  Do you recall that there was a

23    meeting on August 11th, 2004, at which only

Page 47

```
                    Jones rough - address redacted.TXT
24   individuals from the Department of Education

25   attended?
```

53

```
 1          MR. BAN:  Objection to form.
 2          MS. OLIVER:  You can answer that with a
 3   yes or no.
 4          BY MR. BUSCH:
 5     Q    Yes or no.
 6     A    I'm sorry.  Could I ask you to repeat the
 7   question just one more time to make sure I've got
 8   it.
 9          (The reporter read the record as
10   directed.)
11     A    I just -- based upon that date, I don't --
12   I can't be certain of a particular meeting on that
13   date.
14     Q    Let me show you what we have marked as
15   Exhibit 1718 previously.
16          (Witness reviewed the document.)
17     A    Okay I do recall this meeting being
18   scheduled.
19     Q    Okay.  Do you recall having discussed the
20   meeting which is referenced in Exhibit 1718 with
21   Mr. Klatt?
22          MR. BAN:  Objection; form.
23          THE WITNESS:  I don't recall discussing
24   this meeting with Mr. Klatt.  I can't even be
25   certain whether I, in fact, phoned in to this
```

Jones rough - address redacted.TXT

54

```
1    meeting, you know, this e-mail suggests that I may
2    have phoned in but I don't recall the meeting
3    specifically.
4         BY MR. BUSCH:
5    Q    Do you recall a meeting subsequent to the
6    meeting on August 11th at which representatives of
7    the department and the University of Phoenix
8    attended?
9         MR. BAN:  Objection to form.
10   A    I do, yes.
11   Q    Do you recall when that occurred?
12   A    Again, not -- not precisely but it was
13   certainly sometime in August.
14   Q    Okay.
15        MR. BUSCH:  Is 1728 our next in order?
16        COURT REPORTER:  Yes.
17        BY MR. BUSCH:
18   Q    Let me show you what we will mark as
19   Exhibit 1728.
20        (Jones Deposition Exhibit 1728
21         identified.)
22        (Witness reviewed the document.)
23   Q    Does looking at Exhibit 1728 refresh your
24   memory?
25   A    Yes.
```

    CR
    JB

55

```
1    Q    Okay.  When was the -- the meeting that
```

Jones rough - address redacted.TXT

2   took place between representatives of the University

3   of Phoenix and the Department of Education that you

4   attended?

5       A    It was on August 19th, 2004.

6       Q    Do you recall if there was a subsequent

7   meeting that day with other representatives of the

8   two parties?

9       A    Yes.  I do recall that Mr. Vogel and

10  Mr. Cox met later in that day, I believe.

11      Q    Okay.  Thank you.  In terms of the meeting

12  that you attended, would you describe what happened?

13      A    It was -- it was, again arcs high level

14  meeting involving the deputy secretary and the under

15  secretary of the department and myself and the chief

16  executive officer of the Apollo Group that owns the

17  University of Phoenix and -- and Apollo and

18  Phoenix's lobbyist, Vic Klatt, and, you know, again,

19  that meeting was not really intended -- and didn't,

20  in fact, get into great detail about the underlying

21  findings in the program review report, it was really

22  a -- again, a higher level meeting where Mr. Nelson

23  had an opportunity to, I think, really just express

24  his owe his overarching concerns about the process

25  of the program review, about the tone, the language

☐   CR
     JB

56

1   of the program review report, to, I think, more --

2   in a general sense, a high level sense, to try to

3   offer some rebuttal to some of the of the findings

4   of the program review report and then for us, from

Jones rough - address redacted.TXT

5   the departments perspective, to be able, again, to

6   express our concern that we -- that we did believe

7   that there were some serious allegations, some

8   serious findings associated with the program review

9   report and, again, to state our position.

10          MR. BAN:  Move to strike as nonresponsive.

11          THE WITNESS:  So the --

12          BY MR. BUSCH:

13      Q   You may continue.

14      A   The overall purpose of the meeting really

15   I think was for each side to sort of set out its

16   concerns about the others position and try to see if

17   there wasn't a way that we could move forward.

18          MR. BAN:  I apologize for mistiming my

19   objection.  I insert the objection now.

20          BY MR. BUSCH:

21      Q   In terms of -- let me withdraw that.

22          Did anybody on behalf of the Department of

23   Education express at that meeting that the

24   department was prepared to take a final position on

25   the program review report?

☐   CR
    JB

57

1       A   Not that I -- not that I recall.

2       Q   Okay.  Do you recall anything else that

3   was discussed in the meeting that took place on --

4   on August 19th that you attended?

5          MR. BAN:  Objection to form.

6          THE WITNESS:  Again, my specific

7   recollection of the owe of the conversation at this

Jones rough - address redacted.TXT

8    point is vague but what was very clear was that we

9    were getting near the end of this process.  We had

10   -- we had reviewed the submission that the

11   University of Phoenix had made and -- and I think it

12   was time to here Phoenix's sort of, you know, final

13   word on this and to try to bring it to some closure.

14          MR. BAN:  Objection.  Move to strike.

15   Nonresponsive.  Witness.

16          BY MR. BUSCH:

17      Q    How long did that meeting last?

18      A    As I recall, you know, it was not an

19   inordinately long meeting so to the best of my

20   recollection, it was less than an hour.

21      Q    Did you have a conversation later that

22   evening with Mr. Klatt after the meeting between

23   Mr. Vogel and Mr. Cox?

24      A    I very likely would have.  Again, you

25   know, because the -- you know, the passage of time,

CR
JB

58

1    my specific recollection is not great but generally

2    speaking, I can say that Mr. Klatt and I frequently

3    spoke after Mr. Cox and Mr. Vogel met.

4      Q    Okay.  Let me show you what we will mark

5    as 1729.

6          (Jones Deposition Exhibit 1729

7           identified.)

8          MR. BAN:  Thank you counsel.

9          BY MR. BUSCH:

10     Q    Can you identify Exhibit 1729?

Page 52

Jones rough - address redacted.TXT

11      A     Sure.  It is an e-mail exchange between
12   myself and Mr. Klatt.
13      Q     Does this e-mail contain what is still
14   your private cell phone number?
15      A     No, it is not still my private cell phone
16   number.
17      Q     I was going to designate the transcript as
18   confidential then.
19      A     No, it is not.
20      Q     Okay.  Looking at Exhibit 1729, does that
21   refresh your memory as to whether or not you had a
22   conversation with Mr. Klatt?
23      A     It does, yes.
24      Q     Okay.  Do you recall what was discussed
25   that evening between the two of you?

  CR
  JB

                                                    59


1      A     Again, not -- not specifically.  I would
2   imagine that we had our discussion about, you know,
3   our impressions of the earlier meeting with
4   Mr. Nelson and the principles of the department.
5   Again, where we agreed that it was a productive
6   meeting, and then very likely spoke about Mr. Cox's
7   and Mr. Vogel's discussions later in the day.
8      Q     Was there any discussion of numbers in
9   terms of settlement amounts that evening?
10      A     I don't know if -- if we would have had
11   that conversation, that kind of conversation that
12   evening.
13      Q     Do you recall at any time after the

Jones rough - address redacted.TXT

14   meeting on August 19th having discussed with

15   Mr. Klatt numbers that might be considered in terms

16   of resolving the program review report?

17        A    At some point, yes, we did -- we did have

18   those kind of discussions.  I don't -- I don't

19   recall at what point we began to have those

20   discussions but we did have those conversations.

21        Q    Okay.  Do your conversations with

22   Mr. Klatt during the period after August 19th tend

23   to run together in your mind?

24        A    They do.

25        Q    Okay.

       CR
       JB

                                                        60


1         A    They do.

2         Q    Can you recall what was discussed in terms

3    of settlement amounts?

4              MS. OLIVER:  With Mr. Klatt?

5              BY MR. BUSCH:

6         Q    With Mr. Klatt.

7              MR. BUSCH:  Thank you, counsel.

8              THE WITNESS:  What I recall is Mr. Klatt,

9    you know, again, expressing the view that his client

10   was simply not in a position where they felt that

11   they could, you know, resolve this for, you know, a

12   substantial number.  He, at some point, as I recall,

13   you know, was -- was very concerned about, you know,

14   getting too high into the seven figure range.  At

15   some point I explained to him that, look, our

16   position was that we, you know, felt that there was,

                         Page 54

Jones rough - address redacted.TXT

17   you know, some serious -- there was some serious

18   findings here and that from our perspective, you

19   know, we -- we just were not in a position where we

20   could entertain a settlement, you know, less than

21   somewhere in the $10 million range.  And so we -- we

22   had discussions in that range.

23           BY MR. BUSCH:

24       Q   Okay.  Do you recall at some point

25   Mr. Klatt expressing that the University of Phoenix

CR
JB

61

1   might entertain a demand in the range of $3 million

2   to $4 million?

3       A   I do.  I do recall that I think, you know,

4   initially, he was somewhere in the -- in the low

5   seven figures.  It was something like offer in the

6   range of $15 million?

7           MR. BAN:  Objection the form.  States

8   facts not in evidence.

9           THE WITNESS:  I don't specifically

10  remember that number but, again, that -- based upon

11  what I communicated to Mr. Klatt, I think that's

12  about where -- where we were, where we felt that,

13  you know, was a fair number to resolve the matter.

14          BY MR. BUSCH:

15      Q   Exhibit 301 indicates that the amount of

16  settlement is $9.8 million?

17          MR. BAN:  That's the settlement agreement,

18  counsel?

19          MR. BUSCH:  Yes.

Page 55

Jones rough - address redacted.TXT

20      BY MR. BUSCH:

21      Q    Was that number reached in terms of -- in

22  conversations between you and Mr. Klatt?

23      A    It was agreed on in conversations between

24  Mr. Klatt and me, yes.

25      Q    How did that come about, if you would

☐   CR
    JB

                                                    62

1   describe that, please?

2           MS. OLIVER:  Objection as to -- I'm not

3   quite clear.  If you would like to limit your

4   question a little bit, but the United States has an

5   objection in terms of how it came about with respect

6   to discussions internally within the OGC's office

7   and if Department of Education and instruct the

8   witness not to answer with respect to that.

9           MR. BAN:  Object to form.

10          MR. BUSCH:  I'll just rephrase the

11  question.

12          BY MR. BUSCH:

13      Q    Would you please describe the

14  conversations between yourself and Mr. Klatt that

15  led to the $9.8 million number, if you can recall.

16  Witness?

17      A    Sure.  As I said, when Mr. Klatt and I

18  were speaking on the phone, he had expressed a

19  concern on behalf of his client that they, for

20  whatever reason, simply, you know, couldn't get much

21  beyond the 3 or $4 million or whatever the low seven

22  figure number was that he had initially proposed.  I

                        Page 56

Jones rough - address redacted.TXT

23    had conveyed to him that that was just not

24    acceptable to us, just begin the scope of the

25    findings.  And so ultimately where Mr. Klatt seemed

□    CR
JB

63

1    to sort of stake his position was that his client

2    could -- he thought that his client could, you know,

3    pay more than the three or four million that was

4    discussed but he just thought that he could not get

5    his clients to an eight figure number, that they

6    would just as soon sue the department before

7    agreeing to something like that.  And so, you know,

8    we continued to talk about the matter over some

9    period of time, I don't recall how long, and

10    ultimately where we ended up agreeing was on the 9

11    point 8 number.

12        Q    Okay.  Do you recall approximately when it

13    was that the agreement was reached between you and

14    Mr. Klatt on the $9.8 million number?

15        A    I don't specifically but it wasn't a very

16    long -- it wasn't a very long period of time after

17    the -- you know, after that August 19th.

18        Q    I have previously shown you Exhibit 301,

19    the settlement agreement.  And you have already been

20    instructed with respect to whether or not you

21    approved that agreement.

22        A    Yes.

23        Q    Did you participate in any of the

24    discussions that led to the negotiation of that

25    document?

Jones rough - address redacted.TXT

64

1           MS. OLIVER:  Objection.

2           BY MR. BUSCH:

3      Q    With representatives of the University of

4    Phoenix?

5      A    Not -- not that I recall.  As I recall,

6    this document was really hammered out among the

7    lawyers at the table and that would have been

8    Mr. Cox and Mr. -- and Mr. Vogel.  I don't -- I

9    don't believe that Mr. Klatt and I would have gotten

10   into the actual document itself.

11     Q    Did you have any communications with

12   either Mr. Cox or Mr. Hatch about the language to be

13   contained in the settlement agreement?

14     A    No, I don't believe I did, not that I

15   recall.

16     Q    Were all of your communications with

17   respect to the settlement agreement limited to

18   communications internally at the Department of

19   Education?  And I'm only seeking a yes or no answer.

20     A    Yes.

21          MR. BUSCH:  Counsel, I'll tender the

22   witness.

23          MR. BAN:  Okay.  I need a break.

24          MR. BUSCH:  Okay.

25          VIDEO OPERATOR:  We are off the record.

65

Jones rough - address redacted.TXT

1   The time is approximately 11:45 a.m.

2

3           (Recess.)

4           VIDEO OPERATOR:  We are back on the

5   record.  The time is approximately 11:56 a.m.  This

6   is the beginning of tape number two.

7                       EXAMINATION

8           BY MR. BAN:

9       Q    It is still good morning, so good morning

10  Mr. Joan, for the next four minutes.  My name is

11  Bill Ban and I'm with the plaintiffs in the

12  securities litigation against the Apollo Group,

13  Inc..  I just have a few questions for you today.

14      A    Sure.

15      Q    I want to fill in one or two gaps, if I

16  can.  Can you please tell us your home address?

17      A    Sure.  It is [redacted]

18  [redacted].

19      Q    Okay.  And you indicated before that you

20  had graduated from Georgetown in 1990; is that

21  correct?

22      A    That's correct.

23      Q    What was your major at Georgetown?

24      A    I was a finance major.

25      Q    I would like to refer you to an exhibit we

☐   CR
    JB

                                                    66


1   looked at a little bit earlier today, it was

2   previously marked as Exhibit 1072 and it is a

                        Page 59

Jones rough - address redacted.TXT

3    memorandum -- it appears to be on United States

4    Department of Education letterhead.  Do you have

5    that document in front of you, sir?

6        A    Yes, I do.  Well, 1702?

7        Q    Is it 1702?  I thought it was 1072?

8        A    This.

9        Q    Yes, that's it?

10            MR. BUSCH:  1702.

11            MR. BAN:  Thank you.  I appreciate that

12    for the record.  I'll have to go in for a dyslexia

13    check up.

14            BY MR. BAN:

15        Q    With respect to Exhibit 1702, had you seen

16    that document prior to today, sir?

17        A    I had not, no, sir.

18        Q    Okay.  And while you were working for the

19    Department of Education as its general counsel, was

20    this a document that you saw and reviewed in your

21    ordinary duties as general counsel in that

22    department?

23            MR. BUSCH:  Objection; lack of foundation.

24            THE WITNESS:  No, sir.

25            MR. BAN:

    CR
    JB

                                                    67


1        Q    During your deposition today, you

2    indicated that there were one or more portions of

3    this document that you felt were still the policy of

4    the Department of Education at the time that you

5    were general counsel.  Do you recall that testimony?

                        Page 60

Jones rough - address redacted.TXT
```
 6     A    Yes.

 7     Q    Okay.  I would like to refer you to the

 8  third paragraph of the first page of Exhibit 1702,

 9  please.

10     A    Uh-huh.

11     Q    I would like to ask you to read that

12  paragraph to yourself.  Please.

13     A    Okay.

14          (Witness reviewed the document.)

15          MR. DINH:  While the witness is reading

16  that, I would ask the transcript be made

17  confidential given his home address has been given.

18          MR. BAN:  You are entitled to do that

19  under the confidentiality law, counsel.

20          MR. DINH:  Thank you.

21          THE WITNESS:  Okay.

22          BY MR. BAN:

23     Q    Have you read that paragraph, sir?

24     A    I have, yes.

25     Q    Just to basically summarize so we can -- I
```

    CR
    JB

68

```
 1  can ask you one or two questions, it refers to the

 2  policy of some regional offices with respect to

 3  disclosing FPRDs; is that correct?

 4     A    Yes.

 5     Q    Okay.  What is an FPRD please?

 6     A    A final program review determination.

 7     Q    And it always states that some regional

 8  office it is would not disclose program review
```

Page 61

Jones rough - address redacted.TXT
 9   reports; is that correct?

10       A    Yes.

11       Q    Okay.  Is that a policy that you have

12   addressed while you were general counsel at the

13   Department of Education?

14       A    Not.

15            MS. OLIVER:  Is that a yes or no question?

16            BY MR. BAN:

17       Q    Yes, you can answer that yes or no.

18       A    Not -- no, not generally.  Not the general

19   practice, no.

20       Q    And did you ever while you were general

21   counsel to did Department of Education ever review

22   the appropriateness of having an FOAA disclosure

23   policy for the Department related to program review

24   reports?  That's a general question yes or no

25   question, sir?

CR
JB

69

 1       A    Well, again, not a general overamping

 2   policy.  I mean we addressed the issue in specific

 3   fashion.

 4       Q    Okay.  Moving on from that document, sir,

 5   in your various conversations with Apollo and

 6   University of Phoenix personnel and their team of

 7   attorneys with respect to the program review, did

 8   you ever state in words or substance that you agree

 9   that the program review was flawed?

10       A    Well, no, not -- not -- search not before

11   reviewing any information that UOP would have

                    Jones rough - address redacted.TXT
12  submitted to us.

13      Q    In your various conversations with Apollo

14  and the University of Phoenix personnel and its team

15  of attorneys, did you ever state in words or

16  substance that the DOE would withdraw the program

17  review report?

18      A    No.

19      Q    In conversations with Apollo and UOP and

20  its team of attorneys, as you testified to earlier,

21  did you ever state in words or substance that the

22  DOE would revise the program review report?

23      A    Not categorically like that, no.

24      Q    And in your conversations with Apollo and

25  UOP an its team of attorneys, did you ever state in

CR
JB

                                                    70

1   words or in substance that the financial penalty to

2   Apollo would only be a few hundred thousand dollars?

3       A    No.

4       Q    In your conversations with Apollo and UOP

5   and its team of attorneys, did you ever state in

6   words or substance that they should just sit tight

7   and this who I will thing will just blow over?

8       A    No.

9       Q    In fact, sir, to your personal knowledge

10  is the Department of Education ever withdraw the

11  program review report that it issued on

12  February 4th, 2004, to the UOP?

13      A    No, it did not.

14      Q    In fact, to your personal knowledge, sir,

                        Page 63

Jones rough - address redacted.TXT

15    did the DOE ever repudiate the program review report

16    that we are talking about here?

17        A    No.

18        Q    And sir, to your personal knowledge, did

19    the DOE ever reject the findings of program review

20    report that it sent to Apollo in February 2004.

21        A    No.

22        Q    Sir, to your knowledge did the DOE in fact

23    settle the matter with Apollo based on the program

24    review report for $9.8 million?

25            MR. DINH:  Can you read back the question

☐   CR
    JB

71

1    to the witness again and to us?

2            (The reporter read the record as

3    directed.)

4            THE WITNESS:  Yes.  Yes.

5            MR. BAN:  I have no further questions at

6    this time.

7            MR. BUSCH:  Okay.  Counsel asked you a

8    question in conversations with the DOE that's --

9    with Apollo and its team of attorneys did you

10    everybody state in words or substance that the DOE

11    would revise the program review report and your

12    answer was not categorically like that, no.  What

13    did you mean?

14        A    What I meant by that was that, you know,

15    there was never a discussion to say, you know, when

16    program review report came out, I certainly never

17    communicated to anybody that the University of

Page 64

Jones rough - address redacted.TXT

18    Phoenix that we would categorically revise that --

19    that report.  Again, what was conveyed to Phoenix,

20    by me, was that, again, this is -- this is our --

21    you know, these are our find, you have an

22    opportunity to respond to those findings, we will

23    review whatever you submit and we will proceed from

24    there.  It would be possible based upon what Phoenix

25    provided to us that there may be some revision to

CR
JB

72

1    the program review report but I never said

2    categorically that we would revise it.

3        Q    Are the what is three pages of Exhibit 301

4    the settlement agreement between Apollo -- excuse me

5    -- the University of Phoenix as defined in the

6    agreement and the Department of Education?

7             MR. BAN:  Objection to form.

8             THE WITNESS:  Could I have the question

9    read back here while I find the document.

10            MR. BUSCH:  Sure.

11            (The reporter read the record as

12   directed.)

13       A    Yes.

14            MR. BUSCH:  I have no further questions.

15            MR. BAN:  I have no further questions.

16            MR. DINH:  Just one clarifying question.

17                    EXAMINATION

18            BY MR. DINH:

19       Q    There were a number of areas where counsel

20   for both sides asked you for a recollection of

Page 65

Jones rough - address redacted.TXT

21  specific conversations.  With respect to those

22  questions, your answer was limited to conversations

23  that were actually made and not on mental

24  impressions that you had at the time?

25      A    Yes, that's my understanding.  That is my

CR
JB

73

1  understanding.

2           VIDEO OPERATOR:  We are off the record.

3  The time is approximately --

4           MR. BUSCH:  Well, let me -- we can go off

5  the videotape.  It is just simply in terms of --

6           MR. BAN:  We have to put a stip on the

7  record.

8           VIDEO OPERATOR:  We are off the record.

9  The time is approximately 12:05 p.m.  This

10  conclusion the video portion of the deposition of

11  Mr. Brian Jones.

12           MR. BUSCH:  Thank you.  The stipulation

13  that we have had is that the original of the

14  transcript will be prepared and provided to counsel

15  for the witness, Mr. Did I know, that the witness

16  will have 30 days within which to review and to make

17  corrections to the transcript.  Mr. Did I know will

18  advise all counsel of any changes to the transcript.

19  The original but will then be sent to me for safe

20  keeping until the time of trial.  In the interim, a

21  certified copy may be used for any purpose.  The

22  witness may sign it under penalty of perjury as

23  opposed to before a notary public to make it easier

Page 66

Jones rough - address redacted.TXT
24  for the witness to review it that way.  And the

25  reporter is relieved of her obligations under the

▯  CR
    JB

74

1  Federal Rules of Civil Procedure.

2           MR. BAN:  I believe that's our standard

3  operating procedure counsel.

4           MR. BUSCH:  I believe that that is what it

5  is.

6           MR. BAN:  Off the record.

7           (Discussion off the record.) (12:04 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25