IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | Case No. 06-MC-0558 (CKK) |
| | (D. Ariz., Case No. CV-04-2147-PHX-JAT) |
| This Document Relates To:  All Actions | |

**SUPPLEMENTAL BRIEF PURSUANT TO ORDERS OF MARCH 12 AND APRIL 16, 2007 TO COMPEL THE DEPARTMENT OF EDUCATION TO SUPPLEMENT ITS DOCUMENT PRODUCTION OF CATEGORY FIVE AND SIX DOCUMENTS**

In the almost five months since Apollo Group, Inc. ("Apollo") filed its current motion to compel and ten months since it served its subpoena, the United States Department of Education ("Department") has only begun to comply with its obligations under Rule 45 by producing certain documents and privilege logs.  Yet even with this recent step, the Department continues to fail to meet its obligation under the Federal Rules of Civil Procedure and the parties' Joint Agreement, despite Apollo's willingness to significantly limit the relevant documents it is seeking from the Department.

The Department has produced what it purports to be its final privilege logs for categories five and six, along with a limited set of documents pursuant to this Court's March 12, 2007 and April 16, 2007 Orders ("March 12 Order" and "April 16 Order," respectively) and the parties' April 12, 2007 Joint Agreement (the "Joint Agreement").  The Department's category five and six privilege logs reveal, on their face, that the Department continues to withhold 74 documents that are not protected from discovery by any privilege.  And, the Department has failed to properly produce all of the non-privileged documents required by the Joint Agreement.  The failures at issue here are intensified given the impending deadline of June 8, 2007, the date by

which the parties must file reply briefs on cross-motions for summary judgment in the

underlying securities action pending in the United States District Court for the District of

Arizona. The documents at issue here are needed for review and analysis by Apollo prior to the

filing of its brief in the securities case.

## I.    FACTUAL BACKGROUND

Apollo, a defendant in a securities class action pending in the District of Arizona, served

the Department with a Rule 45 subpoena on July 3, 2006, seeking documents relevant to its

defense. As set forth in this Court's March 12 Order, the Department refused to comply with the

subpoena and Apollo brought a motion to compel before this Court. After extended briefing, this

Court ordered the Department to produce a privilege log to allow the Court and Apollo to assess

the Department's claims of privilege. March 12 Order at 1. The Court also suggested that the

parties engage in discussions to speed the Department's response by limiting the scope of the

documents sought by Apollo. *Id.*

Following the Court's March 12 Order, the parties engaged in negotiations to expedite

the Department's production of a privilege log. These negotiations resulted in the Joint

Agreement that was filed with this Court on April 12, 2007. In the Joint Agreement, the parties

agreed to place the documents withheld by the Department into six categories. To speed the

Department's production of a privilege log, and in exchange for the Department's agreement to

produce certain documents, Apollo agreed to no longer seek in its current motion documents

responsive to three of the six categories covered by Apollo's subpoena. Those three categories

presently excluded from consideration are categories one, three and four. In turn, the

Department agreed to produce approximately 1,625 pages from categories five and six, and to

produce privilege logs for the remaining category five and six documents. Joint Agreement at 3-

4. For the category two documents, the Department agreed to produce a privilege log by June 7, 2007. *Id.* at 5. The parties also agreed to a briefing schedule for Apollo to challenge, if necessary, the Department's category five and six privilege logs.[1]

## II.    THE DEPARTMENT HAS NOT COMPLIED WITH THE TERMS OF THE JOINT AGREEMENT BY ERRONEOUSLY REDACTING CERTAIN PRODUCED DOCUMENTS

Despite Apollo's agreement to limit the categories of documents it is seeking, the Department has not complied with the reduced terms of the parties' Joint Agreement by including overbroad redactions of many of the documents that it did produce.

Although Apollo does not seek the production of names and addresses of program review witnesses properly withheld pursuant to the informant's identity privilege (*see* Court's March 12, 2007 Opinion at 10 n.2), the Department has broadly redacted information that is not protected by that privilege. In fact, the Department's production is replete with instances where the Department has over-redacted documents in an attempt to remove information, ostensibly relying on the informant's identity privilege.

The informant's identity privilege is limited in that it only protects the identity of the witness interviewed, not the substance of their communications. *See Westinghouse Elec. Corp. v. Burlington*, 351 F.2d 762, 768 (D.D.C. 1965) ("The content of the communication is not privileged."); *see also Rovario v. United States*, 353 U.S. 53, 60 (1957) (explaining that "the scope of the privilege is limited by its underlying purpose"). Furthermore, the privilege is

---

[1]    The parties set a briefing schedule in the Joint Agreement that allows Apollo to file a brief challenging the Department's withholdings within five days of receiving the final category 5 and 6 privilege logs, which were received on May 14, 2007. The Department's final category two privilege log is due by June 7, 2007, following receipt of which Apollo may have additional challenges to the Department's assertions of privilege.

waived once the identity of the witness has been disclosed.  *See Westinghouse*, 351 F.2d at 768

(holding that once a witness "identifies himself as an informer the privilege disappears").[2]

## A.    Erroneous Redactions Of The Contents Of Witnesses' Communications

The Department has invoked the privilege to redact information that falls well outside the

scope of the privilege, even though the scope of the informant's identity privilege is limited to

protecting the ***identity*** of informers who wish to remain anonymous.  *See id.* ("The privilege is

maintained to encourage possible informers in the future by giving some assurance of

anonymity."); *see also United States v. Brodie*, 871 F.2d 125, 129 (D.C. Cir. 1989) (stating that

the privilege may protect the tape of a statement that could reveal the witness's identity, but it

would not protect from disclosure a transcript of the statement).  Notwithstanding this blackletter

rule, it appears that the Department has invoked the privilege to broadly redact information from

witness interview summaries that far exceed that which is necessary to preserve the anonymity of

certain witnesses.

One egregious example of the Department's redaction of information that is not

privileged can be found in the witness summary at DOE APOL 0908[3] (attached as Exhibit C),

which contains the following paragraph:

---

[2]    Although the Department initially withheld or produced redacted copies of interview
summaries from the 62 witnesses identified in the Wittman Report at 2-4 (attached as
Exhibit A) and the 31 witnesses who have identified themselves to Apollo in their
deposition or by executing an affidavit (*see* April 25, 2007 Letter, attached Exhibit B),
the Department has since produced or agreed to produce unredacted copies of those
summaries.  Apollo reserves the right to challenge the Department's redactions to the
extent it does not produce unredacted summaries of the interviews of witnesses who have
been identified to Apollo.

[3]    The documents produced by the Department pursuant to the Joint Agreement were not
labeled with Bates numbers.  For the convenience of the Court and all parties, Apollo has
[Footnote continued on next page]

> I spoke with [redacted] of the [redacted] campus. She said that she has always been evaluated on a number of quantitative and qualitative factors, not just enrollments. She indicated that this has been the case at [redacted][redacted] and [redacted]. She worked in [redacted] as an EC in [redacted] and said she ***never*** heard of or knew of any contests where EC's could win anything for enrollments or apps.

(emphasis added). From this paragraph, it is quite clear that the Department has not redacted the name of an "informant" whose testimony Apollo would "resent"; instead, the Department is attempting to cloak in secrecy the identity of a witness who provided information to the Department that ***contradicts*** the supposed findings of the Wittman Report. In addition, the Department has redacted the identity of campuses where the witness worked and where the witness's supervisors used both quantitative and qualitative factors to evaluate her and, in one instance, the year in which she worked at one of the campuses. Clearly, such redactions are unjustified. These redactions also call into question whether the Department—without legal basis—is engaging in self-serving behavior by attempting to avoid producing information that undermines the supposed accuracy and reliability of the program review report.

The documents produced by the Department consistently contain redactions of information that are not protected from disclosure by the informer's identity privilege. The following list of documents are stark examples where the privilege has been improperly applied:

- There is no basis for the Department redacting generic factual information from witness interview summaries, such as the number of UOP locations or the physical location of the interview. *See* DOE APOL 0138 (attached as Exhibit D).

---

[Footnote continued from previous page]
applied Bates numbers to the documents produced by the Department, starting with DOE APOL 0001.

- The Department has redacted all names from witness interviews, including the names
  of people quoted by the witness participating in the interview. For example, the
  Department made the following redaction at DOE APOL 0354 (attached as Exhibit
  E):

  > When asked which managers had specifically said the bottom line is
  > what counts, she said that just about every manager, including:
  > [redacted], [redacted] ([redacted] manager), [redacted] and [redacted].
  > She said that [redacted] (almost apologetically) said to her that she had
  > to meet her numbers . . .

  In this example, the Department has redacted the names of other UOP employees,
  including managers, to whom the witness attributed hearsay statements, rather than
  the name of the witness providing the information to the Department. *See also e.g.,*
  DOE APOL 0343-0349, 0560-0567 (attached as Exhibit F) (in separate copies of the
  same interview summary, the Department redacted in one summary the identity of
  UOP managers mentioned by the witness in one of those summaries). But only the
  identity of the witness providing information to the Department is protected from
  disclosure, not the substance of their communications, such as the identities of other
  UOP employees identified by the witness. *See Westinghouse*, 351 F.2d at 768.
  Furthermore, Apollo is entitled to the names of its ostensible corporate agents to
  whom individual witnesses have attributed purported evidence of non-compliance by
  UOP.

- Still another example of the Department's unjustified redactions appears at DOE
  APOL 0328-0329 and DOE APOL 0330-0331 (both attached as Exhibit G). The first
  portions of these two documents contain the same witness interview summary, yet the
  documents are not similarly redacted. At DOE APOL 0329, the Department redacted

the statement "I don't trust her to tell us the truth, and she will surely keep

information from us unless forced to talk," which is unredacted at DOE APOL 0331.

There is no basis for the Department redacting the statement at DOE APOL 0329,

which does not include any information that would identify the witness.

Based on these obvious errors, Apollo requests the Court to order the Department to

reproduce the witness interview summaries and notes in a form that only redacts witness

identifying information such as the name, address, social security number, phone number, or

email address of any witness whose identity has not previously been disclosed to Apollo.  The

Department should not redact non-identifying factual information, including, for instance, dates,

locations, substantive comments, or the identities of persons the witness mentioned in their

interview.

### III.    CATEGORY FIVE DOCUMENTS UNJUSTIFIABLY WITHHELD

Category five documents consist of "Department analysis of the information provided by

Apollo in response to the issuance of the February 5, 2004 Program Review Report"  *See* Joint

Agreement at 1.  Pursuant to the Joint Agreement, the Department produced 138 pages of

documents falling within category five.  The Department has completely withheld an additional

27 documents, consisting of 943 pages, and redacted addition pages from category five, as listed

on its privilege log.  *See* Category Five Privilege Log (attached as Exhibit H).

The Department generally uses five different descriptions to describe the subject matter

of the documents included on its category five privilege log:

1. Documents concerning recruiter salary and enrollment data provided by UOP, documents 1-3, 28[4];

2. Documents concerning UOP's response to the Wittman Report, documents 4-5;

3. Documents concerning charts prepared by the Department illustrating violations by UOP, documents 6-9, 18-20;

4. Documents concerning UOP's recruiter matrix, documents 10, 12-17, 21-27; and

5. Documents concerning corrective actions taken by UOP, document 11.

To justify its withholding of these 27 documents and additional redactions, the Department invokes the deliberative process privilege, attorney work product doctrine and the "confidential witness information privilege."  Notably, the Department does not claim the attorney-client privilege as justification for withholding any documents on its category five or six privilege logs.

From the Department's own descriptions, it is clear that the documents withheld by the Department concern information UOP provided to the Department and the Department's response to that information.  As set forth below, these documents are not protected from disclosure by privilege.

**A.      The Deliberative Process Privilege Is Inapplicable To The Program Review**

As Apollo has asserted repeatedly, the deliberative process privilege is simply inapplicable to this matter because the Department has previously "concluded that the [Wittman Report] itself is neither pre-decisional nor deliberative."  August 26, 2004 Department Letter, at 12 (attached as Exhibit I).  This is so because the deliberative process privilege is limited in that

---

[4]   Although the Department did not number the documents on its privilege log, Apollo will refer to the documents in the order that they appear on the log.

it does not protect from disclosure materials that "could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment." *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992).

Although the Department has since claimed otherwise in an effort to resist Apollo's subpoena, the fact remains that the Department has already stated that:

> [T]he [Wittman Report] was created as a result of the Department's ***routine monitoring*** of the Title IV Federal Student Financial Assistance programs administered by the University. The [Wittman Report] was not created for the purposes of the Department receiving advice or consultative services from [Apollo] ***in order to render a policy decision***. Rather, the [Wittman Report] specifically states that its intent is to ***advise the institution of the findings*** made as a result of the program review. Moreover, the goal of the [Wittman Report] is to open up a dialogue between the Department and the University such that the findings of the [Wittman Report] can be resolved.

Exhibit I at 12 (emphases added). Having determined that the Wittman Report was the result of ***routine monitoring*** to advise the institution of its findings—not to render a policy decision—and having relied on that basis to publicly release the Wittman Report to the prejudice of Apollo the Department cannot now reverse course and claim otherwise.

**B.     The Deliberative Process Does Not Protect Factual Or Investigative Matters**

Even if the deliberative process privilege were somehow to apply to the program review, the privilege does not protect from disclosure "purely factual, investigative matters." *Nat'l Ass'n of Home Builder v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002). To the extent the documents withheld by the Department contain factual information, those documents or portions of documents are not covered by the deliberative process privilege because they do not reflect internal Department deliberations. *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the

material is so inextricably intertwined with the deliberative section of documents that its disclosure would inevitably reveal the government's deliberations."); *Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 254 n.28 (D.C. Cir. 1977) (deliberative process privilege "does not permit the nondisclosure of underlying facts unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process"); *see also Carter v. United States Dep't of Commerce*, 307 F.3d 1084, 1088 (9th Cir. 2002) (holding that the deliberative process privilege does not protect data compiled and modified by agency).

Here, the Department's privilege log describes the documents that it has withheld under the deliberative process privilege as concerning purely factual matters, including "recruiter salary history data," UOP's "recruiter matrix" and "scatter chart[s] of [UOP] violations." Exhibit H at 1-3. Thus, even if the privilege somehow applied to a subset of the program review material, it would not apply, for example, where the Department was simply commenting on factual information provided by Apollo or attempting to document a basis for the factual allegations contained in the Wittman Report. *Id.* All such documents, therefore, are subject to production. *See Dudman Communications Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568-69 (D.C. Cir. 1987) (finding that "the agency will usually be able to excise the material from the draft document . . . and thus the agency will usually be able to release the material without disclosing any deliberative process").

Furthermore, even if the deliberative process privilege had some application to some of the documents at issue, "[t]he deliberative process is a qualified rather than absolute privilege. The validity of such a privilege may depend upon 'a balance of the public interest in nondisclosure with the need for the information as evidence.'" *Dominion Cogan, D.C., Inc. v.*

*District of Columbia*, 787 F. Supp. 258, 268 (D.D.C. 1995). Here, the Department's handling of the program review is absolutely central to Apollo's defense in the securities class action. In fact, Plaintiff in the securities action is arguing that the Wittman Report should be admitted into evidence for the truth of the matters asserted within the Report. *See* Lead Plaintiff's Response and Separate Counterstatement of Facts in Support of Opposition to Defendants' Motion for Summary Judgment, at 56 (attached as Exhibit J) ("The findings and conclusions of the DOE Report are amply supported by documentary and testimonial evidence unearthed in the course of discovery."). As such, the process by which the Wittman Report was created and the Department's conduct during the program review are directly relevant to establishing the defects in that process and the inaccuracies contained in the Wittman Report. The deliberative process privilege cannot apply when the underlying agency process itself is at issue in the litigation—as it is here. *See Dep't of Economic Dev. v. Arthur Anderson*, 139 F.R.D. 594, 596 (S.D.N.Y. 1991) (holding that the deliberative process privilege is inapplicable where the deliberations of government personnel are at issue).

**C.    Similarly, The Work Product Doctrine Does Not Shield Category Five Documents From Discovery**

The work product doctrine does not protect from disclosure documents that contain factual information, such as the charts and draft analyses prepared by the Department during its ***routine monitoring*** of UOP's regulatory compliance. *See Coastal States Gas Corp. v. United States Dep't of Energy*, 617 F.2d 854, (D.C. Cir. 1980) (holding that the threat of litigation based on a regulatory review is "hardly tangible" enough to support work product protection).

For the work product doctrine to protect a document from discovery, the document must have been created "in anticipation of litigation." Fed. R. Civ. P. 26(b)(3). Here, again, the Department itself has described the program review as "routine monitoring of the Title IV

Federal Student Financial Assistance programs administered by [UOP]."  Exhibit H at 12.

Although the Department has since made a self-serving about face claiming that the program

review was conducted with an eye towards "administrative" litigation, Declaration of Jennifer

Woodward at ¶¶ 10, 19, the argument that regulatory reviews are conducted in anticipation of

litigation has been flatly rejected by the courts of this circuit.  *See Coastal States*, 617 F.2d at

865 (affirming District Court order releasing agency documents because although regulatory

review may result in litigation, "the mere possibility is hardly tangible enough to support so

broad a claim of privilege"); *Tarpeh-Doe v. United States*, No. 88-0270, 1990 U.S. Dist. LEXIS

15330, *7 (D.D.C. Nov. 13, 1990) ("Documents prepared for an investigation as part of normal

procedures or pursuant to regulation work are not work product.").

      Furthermore, in this instant matter, the attorney work product doctrine does not protect

from disclosure the ***specific*** documents listed on the Department's privilege log.  Importantly,

"[t]he work product doctrine does not extend to every written document generated by an

attorney; it does not shield from discovery everything that a lawyer does."  *See Coastal States*,

617 F.2d at 864.  "[I]f an agency were entitled to withhold any document prepared by any person

in Government with a law degree simply because litigation might someday occur, the policies of

FOIA would be largely defeated."  *Id.* at 865.  Likewise, the mere fact that the analysis of factual

information during a regulatory review was received by Department attorneys does not convert

the documents into work product.

      Notably, the Department claims work product protection for every document on its

category five privilege log, even though 17 of the 27 withheld documents were authored by non-

lawyers Donna Wittman, Susan Crim or Katie Crowley.  *See*  Exhibit H.  There is no suggestion

from the Department, let alone any evidence—nor can there be—that any of this work was done

at the direction of an attorney in anticipation of litigation. To the contrary, the context of the program review and the Department's own log demonstrate that the documents were prepared by a regulatory review team during a "routine" regulatory review. For example, the documents withheld by the Department include the following "titles," as identified by the Department:

- UOP Recruiter Data (Exhibit H at 1);

- UOP Initial Salary History (*Id.*);

- UOP Presentation – Heads Up on KPMG Analysis (*Id.* at 2);

- UOP Apparent anomaly feedback (*Id.*);

- UOP Charts (*Id.* at 3, 6-7); and

- UOP Info 8/10/2004 (*Id.* at 3-6).

Based on the Department's own descriptions—which depict documents that contain factual information or documents prepared during a regulatory review—the Department cannot legitimately assert the work product doctrine to shield these documents from discovery.

**D.      The Department Has Withheld Its Final Analysis In Breach Of The Joint Agreement**

As a separate matter, and curiously, although the Department agreed to produce documents supporting its "***final***" analysis, the memorandum the Department produced describing its analysis is dated April 11, 2004 (*see* Exhibit K), months ***before*** the Department received all of the information that it had requested from Apollo. In contrast, the majority of the documents listed on the Department's category five privilege log are dated in August 2004, and would appear to include the Department's actual "final" analysis. *See* Exhibit H. Although, as set forth above, Apollo is entitled to all of the documents that analyze its response to the Department's regulatory program review, Apollo specifically requests this Court to order the Department to

produce its bona fide *final* analysis pursuant to the terms of the Joint Agreement, including the August 2004 analysis and charts.

Finally, to the extent the Department has completely withheld documents in category five based on the informant's identity privilege, as set forth above in Section II, the Department should produce the documents with witness identifying information redacted as necessary and appropriate.

### IV.    CATEGORY SIX DOCUMENTS IMPROPERLY WITHHELD

The documents at issue in category six are absolutely critical to Apollo's defense in the securities class action, so much so, that Apollo respectfully requests the Court to zero-in on these documents in assessing the merits of the Department's category six privilege claims.  The importance and value of these documents simply cannot be overstated by Apollo.

For category six, the Department has produced 876 pages and has withheld 49 additional documents, containing 761 pages.  *See* Category Six Privilege Log (attached as Exhibit L).  A review of the Department's category six privilege log reveals that the Department is attempting to withhold from Apollo documents that are essential to Apollo's defense and properly discoverable under the rules of decision of this Circuit.

At issue are two groups of documents included on the Department's category six privilege log (Exhibit L):

1. Transcripts from the Department's depositions of *qui tam* relators Julie Albertson and Mary Hendow, documents 1, 3-4; and

2. Email communications between the Department and *qui tam* relators or their counsel, documents 6-49.

The Department asserts the deliberative process privilege and work product doctrine for each document that is listed on its category six privilege log, and further asserts the "confidential

witness information" privilege and joint prosecution privilege for select documents.  As with the documents in category five (discussed above, *see* Section III), the Department does not assert the attorney-client privilege to justify its withholding of any document in category six.  And, as discussed below, the privileges asserted by the Department do not protect from disclosure the documents falling within category six.

**A.      The Department Has Improperly Withheld The Relators' "Deposition Transcripts"[5]**

The Department has produced the August 20 and 21, 2003 witness interview summaries of the interviews of the *qui tam* relators, but, in an extraordinary and completely indefensible move, has withheld their June and July 2003 "deposition transcripts" claiming that they are protected by the deliberative process privilege, attorney work product doctrine, and informant's identity privilege.  Exhibit L at 1-2.  This withholding, however, is entirely unsupportable based not only on the scope of those privileges, but also in light of the Department's informed decision to produce select summaries from interviews of the same witnesses that concern the same subject matter; the latter facts is a clear acknowledgment on the part of Department that the documents at issue are not privileged.  There is simply no rational basis for the Department to produce the August 2003 interview summaries from the *qui tam* relators, while simultaneously refusing to

---

5      The Department uses the phrase "deposition transcripts" to describe these documents. Apollo is unaware of any adversarial proceeding other than the *qui tam* lawsuit and the securities class action lawsuit where the relators' depositions might have been taken.  The Department has since attempted to clarify that these are "statements" that "were taken by Department attorneys."  May 7, 2007 Letter at 3 (attached as Exhibit M).  The Department's description may simply be a poor characterization for the fact that one or more interviews were taken under oath and transcribed.  Regardless of the description, if interview **summaries** are subject to production, "transcripts" are ***necessarily*** also subject to production.

produce the June and July interview statement that were taken in connection with the exact same regulatory review.

The identities of the *qui tam* relators are known to Apollo, so there is absolutely no basis to withhold the deposition transcripts pursuant to the informant's identity privilege. *See Westinghouse*, 351 F.2d at 768. To the extent the relators' deposition transcripts reveal the identity of other informants, the names of those informant's may be redacted pursuant to the methods discussed in Section II.

Similarly, there is no work product or deliberative process protection of factual information provided to the Department. *See Petroleum Info.*, 976 F.2d at 1435; *see also* Sections III.A-C. And, the factual information received from the relators cannot be converted into work product simply because it was received by a Department attorney. *Coastal States*, 617 F.2d at 862-63. Therefore, there does not appear to be any rational basis for treating the relators' "deposition transcripts" differently than their interview summaries—which the Department has voluntarily produced.

In an effort to bolster its withholding of these transcripts, the Department claims that the transcribed statements are privileged because they "were taken by two Department attorneys prior to the August 2004 program review in order to glean specific information regarding the attorney's scope and plan for the program review." May 7, 2007 Letter at 3 (Exhibit M).

But the statements do not convert into work product simply because they were taken by an attorney. *Coastal States*, 617 F.2d 854 at 864 ("The work product doctrine does not . . . shield from discovery everything that a lawyer does."). Indeed, the Department has acknowledged the correctness of this assertion by virtue of the fact that it has produced ***dozens*** of other statements and interview summaries, including interviews that were conducted by Department attorneys.

*See* Summaries of Interviews Conducted by Department Attorneys Jennifer Woodward and Russell Wolff (attached as Exhibit N). And, as stated previously, the work product doctrine does not apply to a regulatory review, such as the University of Phoenix program review, which was not conducted in anticipation of litigation. Fed. R. Civ. P. 26(b)(3); *Coastal States*, 617 F.2d at 865 (holding that in a regulatory review, "the mere possibility [of litigation] is hardly tangible enough to support so broad a claim of privilege"); *Tarpeh-Doe*, 1990 U.S. Dist. LEXIS 15330 at *7 ("Documents prepared for an investigation as part of normal procedures or pursuant to a regulation are not work product.").

The date of the interviews is equally irrelevant to this analysis. The Department admits that the withheld statements were taken in connection with the program review, even though they were taken prior to Apollo being informed of the field portion of the review in August 2003. The application of the work product doctrine simply cannot hinge on whether the documents were created before or after Apollo was notified of the field visit in August. Instead, to qualify as work product, the documents must be prepared in anticipation of litigation. Fed. R. Civ. R. 26(b)(3). Here, however, the Department concedes that the interviews at issue were conducted in connection with the regulatory program review. Accordingly, the pre-August 2003 statements regarding the program review are no more work product than the August 20 and 21, 2003 statements the Department has properly produced.

Furthermore, both *qui tam* relators Julie Albertson and Mary Hendow were deposed in the securities class action and any prior "deposition transcripts"—that concern the same subject—are essential for Apollo to identify any prior inconsistent statements that may be used for impeachment at trial.

Finally, the purported reason for withholding the documents—*i.e.*, that they might disclose how the attorneys involved intended to conduct the program review—is now moot. The program review not only has been completed, but it has been completely settled and resolved. *See* Settlement Agreement (attached as Exhibit O). Thus, there is no reason to withhold the sworn statements taken from the *qui tam* relators.

Accordingly, Apollo respectfully requests this Court to order the production of all supposed "deposition transcripts" being withheld by the Department.

**B.     Email Communications Between The Department and Relators**

Although the Department has produced dozens of emails among it and the *qui tam* relators and/or their counsel, the Department has also withheld 44 similar emails and included these emails on its category six privilege log. *See* Exhibit L at 2-13. Comparing the descriptions on the Department's privilege log with the emails that the Department did produce, Apollo is unable to identify a consistent methodology to distinguish between the emails the Department produced and those that it selectively withheld.

For example, the Department describes on its privilege log email communications where the relators provide information regarding "recommendations for site selection for the program review." Exhibit L at 4. This appears to be the exact same subject of the emails the Department produced, for example, at DOE APOL 0857-1005 (email communications between the Department and *qui tam* relators or counsel regarding the program review) (attached as Exhibit P). The Department has further attempted to distinguish the emails that have been withheld by claiming that they "include specific questions from the attorneys to the *qui tam* relators regarding what locations the Department should go to during the program review, what documents to review and the types of questions to ask." May 7, 2007 Letter at 3 (Exhibit M). This explanation, however, fails to justify the Department's withholdings.

In fact, the exact same subjects that the Department is attempting to withhold appear throughout the emails that the Department did produce.  For example:

- The Department has produced emails where the *qui tam* relators forward documents, through their counsel, to Department attorney Jennifer Woodward. *See* DOE APOL 0746-0836 (Exhibit P).

- The Department has produced emails wherein the *qui tam* relators respond to "specific" questions from Department attorneys Jennifer Woodward and Russell Wolff.  *See* DOE APOL 0850-0851 (Exhibit P).

- The Department has produced emails wherein the *qui tam* relators provide Department attorneys with witnesses and locations that the Department should visit, and suggest questions that the review team should ask.  *See* DOE APOL 0862-0890 (Exhibit P).

The Department has thus already produced emails from the same authors, to the same recipients that bear on the same subjects as those it is now trying to withhold.

There is simply and absolutely no justification for the Department producing select emails with the *qui tam* relators or their counsel, while simultaneously withholding emails that concern the exact **same subject** and are circulated to the **same recipients**.  Accordingly, Apollo is left with the distinct impression that the Department has selectively withheld documents that further undermine the supposed accuracy and validity of the Wittman Report.

For each of the email communications with relators or their counsel included on the category six privilege log, the Department describes the document as containing information the relators provided, either directly or indirectly, to the Department.  There is no dispute, however, that emails between the Department and relators or their counsel are not privileged—as evidenced by the numerous identical emails the Department has produced to Apollo.  *See* Emails Between the Department and *Qui Tam* Relators or Their Counsel (attached as Exhibit P).  Furthermore, such third-party information is not protected from disclosure.  *See Petroleum Info.*, 976 F.2d at 1435 ("Under the deliberative process privilege, factual information generally must

be disclosed.").  In addition, the fact that this information exists in a communication between the

Department and a third party destroys any privilege that may have applied.  *See Mead Data*, 556

F.2d at 259-60 (holding that the deliberative process privilege does not protect "deliberations

with a non-governmental party outside the agency").  Simply put, asking "specific questions" of

the relators is not a basis for transforming communications with a third party during a regulatory

review into work product.

    Even if some privilege were to somehow protect these third-party documents from

disclosure, the Department's production of dozens of emails between it and relators or their

counsel completely waives the privilege with respect to any documents or information that fall

within the ***subject matter*** of the voluntarily produced communications.  *See In re Sealed Case*,

877 F.2d 976, 981 (D.C. Cir. 1989) (a waiver of privilege extends "to all other communications

relating to the same subject matter").

    Finally, it is worth noting that in the underlying securities litigation, there is no common

interest between the *qui tam* relators and the government because the government declined to

intervene in the *qui tam* action.  This fact is acknowledged by the Department, which has

produced numerous emails between itself and the *qui tam* relators' counsel, including emails

where *qui tam* counsel ***explicitly*** states in the email that the communication is protected by the

"joint prosecution privilege."  *See* DOE APOL 0913, 0936, 0967, 0973 (included in Exhibit P).

Even were the joint prosecution privilege to apply, the production of these emails would waive

that privilege.

    Strangely, the Department has not produced any communications with *qui tam* relators

after September 1, 2004 and its privilege log does not include any emails that were created after

August 9, 2004.  To the extent there were additional communications among the Department and

the *qui tam* relators and/or their counsel—which one expects there certainly must have been—the Department must likewise produce those communications.

Accordingly, Apollo requests the Court to order the Department to produce all email communications and other documents between the *qui tam* relators or their counsel and the Department.

## V.    CONCLUSION

In the almost five months since Apollo filed its current motion to compel and ten months since it served its subpoena, the Department has only begun to comply with its obligations under Rule 45.  Although the Department has now produced some documents and privilege log information, it continues to withhold non-privileged documents and fails to properly assert the basis for its privileges, even though Apollo has agreed to significantly restrict the documents it is seeking.  For the reasons set forth in this motion and Apollo's prior briefs, Apollo respectfully requests this Court to order the Department to produce the following:

- All witness statements with the contents of the witnesses' communications unredacted, including generic factual information and the identities of the people mentioned by the witness;

- All of the Department's analysis of the information provided by Apollo during the program review, including the 27 documents included on the category five privilege log;

- *Qui tam* relators' "deposition transcripts," listed as three documents on the category six privilege log; and

- All email communications between the Department and the *qui tam* relators or their counsel, including the 44 documents listed on the category six privilege log.

Respectfully Submitted,


Dated:  May 21, 2007                    /s/ Melanie L. Katsur
                                        Melanie L. Katsur (D.C. Bar No. 484969)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, N.W.
                                        Washington, DC 20036
                                        Telephone:  (202) 955-8500
                                        Facsimile:  (202) 467-0539


                                        Wayne W. Smith
                                        Joseph P. Busch, III
                                        Daniel P. Muino
                                        Kristopher P. Diulio
                                        GIBSON, DUNN & CRUTCHER LLP
                                        4 Park Plaza, Suite 1400
                                        Irvine, CA 92614
                                        Telephone:  (949) 451-3800
                                        Facsimile:  (949) 451-4220

                                        Attorneys for Defendant Apollo Group, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused to be served a true and correct copy of the
Defendant Apollo Group Inc.'s SUPPLEMENTAL BRIEF PURSUANT TO ORDERS OF
MARCH 12 AND APRIL 16 TO COMPEL THE DEPARTMENT OF EDUCATION TO
SUPPLEMENT ITS DOCUMENT PRODUCTION OF CATEGORY FIVE AND SIX
DOCUMENTS by regular U.S. mail this 21st day of May, 2007, upon the following:

Stephen R. Basser
Samuel M. Ward
Barrack, Rodos & Bacine
402 W. Broadway, Ste. 850
San Diego, CA 92101
sbasser@barrack.com
sward@barrack.com

Heather D. Graham-Oliver
United States Department of Justice
Judiciary Center Building
555 4th Street, N.W.
Washington, DC 20530
heather.graham-oliver@usdoj.gov

Andrew S. Friedman
Bonnett, Fairbourn, Friedman & Balint
2901 North Central Ave., Suite 1000
Phoenix, AZ 85012
afriedman@bffb.com

General Counsel
United States Department of Education
Office of the General Counsel
400 Maryland Avenue, S.W., Room
4083, FOB-6
Washington, DC 20202-2100


 _/s/Dena Kennedy_____
Dena Kennedy

# EXHIBIT A-1

Case No. 06-MC-0558 (CKK)



**UNITED STATES DEPARTMENT OF EDUCATION**
STUDENT FINANCIAL ASSISTANCE
SCHOOLS CHANNEL/CASE MANAGEMENT AND OVERSIGHT
CASE MANAGEMENT TEAM, SOUTHWEST-SAN FRANCISCO TEAM
50 UNITED NATIONS PLAZA, ROOM 266, S.F., CA 94102
(415) 556-4295          FEB 0 5 2004

EXHIBIT NO. 204
10-24-06
Young
Vicki L. Champion, RPR

Todd S. Nelson, President
Apollo Group, Inc., Parent Company
University of Phoenix
4615 East Elwood Street
Phoenix, Arizona 85040

RE:    PROGRAM REVIEW REPORT
Program Review August 18 through August 22, 2003
University of Phoenix, OPEID 020988 00
PRCN:    200340922254
TIN:      8603443647 DUNS: 089306492

Dear Mr. Nelson:

On August 18, 2003 through August 22, 2003, a program review was conducted of the Title IV Federal Student Financial Assistance programs administered at your institution. The findings of that review are presented in the enclosed report.

This report contains a serious finding regarding the school's substantial breach of its fiduciary duty; specifically that the University of Phoenix (UOP) systemically engages in actions designed to mislead the Department of Education and to evade detection of its improper incentive compensation system for those involved in recruiting activities. The finding of noncompliance is referenced to the applicable regulations, and specifies the action required to comply with the regulations and statutes.

Please review and respond to the report, indicating the corrective actions taken by UOP. Your response should be sent directly to me within 45 days. So that I can easily identify your program review response, please use the Program Review Control Number (PRCN) as shown above (PRCN 200340922254).

If you have any questions concerning the report, please call our office at (415) 556-4291.

Sincerely,

*Donna M. Wittman*

Donna M. Wittman
Institutional Review Specialist
Southwest Case Management Division
Institutional Participation and Oversight Service

Enc.
cc:    James S. Castress, Area Case Director
       Linda Henderson, Co-Team Leader
       Susan Crim, Administrative Actions and Appeals Division, Kansas City Case Management Team
       Martina Fernandez-Rosario, Program Review Specialist, San Francisco Case Management Team
       Shane Dunne, Program Review Specialist, San Francisco Case Management Team
       Steve Hansen, Program Review Team Leader
       David Bergeron, Department of Education Distance Learning Demonstration Project
       North Central Association of Colleges and Schools

K:\IPOS\UOP Team\UOP Program Review Report Final.doc-Last printed 1/5/2004 8:59 AM

*We help put America through school.*

**CONFIDENTIAL**                                              APOL 0001228

PROGRAM REVIEW REPORT / PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Program Review, 8/18/2003 – 8/22/2003

## TABLE OF CONTENTS

1 INSTITUTIONAL REVIEW DATA SHEET ......................................................... 2

2 BACKGROUND .................................................................................................. 5

  2.1 *Entity* ............................................................................................................ 5

  2.2 *Programs* ...................................................................................................... 5

  2.3 *Admission Standards.* .................................................................................. 5

  2.4 *Growth of Enrollments & Revenues.* ........................................................... 6

3 SCOPE OF REVIEW ......................................................................................... 6

4 DISCLAIMER ..................................................................................................... 7

5 FINDINGS AND REQUIREMENTS ................................................................... 7

  5.1 *Recruiter Compensation System* ................................................................. 7

    5.1.1    When Hiring Recruiters, UOP Promises Substantial Compensation ...................... 7

    5.1.2    UOP Student Recruiting System – Focus on the Numbers ...................................... 8

        5.1.2.1    Sales Training – "Smoke & Mirrors" .................................................. 8

        5.1.2.2    Tracking Commissionable Sales and Sales Performance ................. 11

        5.1.2.3    UOP's Aggressive Sales Motivation System .................................... 12

        5.1.2.4    Intimidation Techniques .................................................................... 15

    5.1.3    Recruiter Evaluation System Reinforces & Ranks the Quantitative ...................... 17

    5.1.4    Salaries Actually Based on Quantity of Recruiting Activities ................................. 20

  5.2 *Bonus Incentives Awarded on Basis of Success in Securing Enrollments and Quantity of Recruiting Activities* ................................................................... 22

    5.2.1    Sperling Club Trip Awards ..................................................................................... 22

    5.2.2    Prizes, Gifts and Bonuses ..................................................................................... 23

  5.3 *Ramifications / Results of System in Practice* ............................................ 24

    5.3.1    Pressure to Enroll Unqualified Students ............................................................... 24

    5.3.2    Focus on Obtaining Credit for Enrollment, Not Completing Education .................. 24

    5.3.3    Intense use of TitleIV Funds as Sales Tool / Culture of Duplicity .......................... 25

  5.4 *Conclusion: UOP Violated Incentive Compensation Prohibitions and Breached its Ffiduciary Duty.* ................................................................................... 25

    5.4.1    Deceptive Practices to Mislead Department .......................................................... 25

    5.4.2    Cover Up During Review ........................................................................................ 26

6 REFERENCES ................................................................................................. 27

7 REQUIREMENTS ............................................................................................. 30

Appendix A: List of Recruiters identified in Report
Appendix B: List of Employees for Whom Personnel Records are to be Provided



UNITED STATES DEPARTMENT OF EDUCATION
Student Financial Assistance
Schools Channel / Case Management & Oversight
Case Management Team, Southwest-San Francisco Team
50 United Nations Plaza, Suite 266
San Francisco, California  94102-4987
Voice: (415) 556-4295  FAX: (415) 437-8206

# PROGRAM REVIEW REPORT
## PRCN 200340922254
## University of Phoenix, OPEID 020988 00
## Site Visit of 8/18/2003 – 8/22/2003

CONFIDENTIAL                                          APOL 0001230

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 2

## 1   INSTITUTIONAL REVIEW DATA SHEET

| Institutional Data | |
|---|---|
| OPE ID#: | 020988 00 |
| EIN: | 860344364 |
| DUNS: | 089306492 |
| PPA | Full Certification; Expiration Date:  June 30, 2007 |
| TYPE AND CONTROL: | Proprietary For-Profit |
| ACCREDITATION: | North Central Association of Colleges & Schools |
| Cohort Default Rates | 1999 – 4.6%     2000 – 5.2%     2001 – 5.8% |

| University of Phoenix  Advance System of Payment | | | | | |
|---|---|---|---|---|---|
| Title IV Program | FY 1999 | FY 2000 | FY 2001 | FY 2002 | FY 2003 |
| Federal Pell Grant | 11,129,538 | 10,178,395 | 28,394,739 | 51,322,322 | 62,215,646 |
| Federal Direct Loan Programs | 0 | 0 | 0 | 0 | 0 |
| Federal Family Educational Loans | 327,196,185 | 369,067,501 | 486,925,511 | 758,572,984 | 804,578,572 |
| SEOG | 0 | 0 | 21,200 | 1,776,584 | 1,230,889 |
| Perkins Loan | 0 | 0 | 40,000 | 759,000 | 642,000 |
| FWS | 0 | 0 | 0 | 0 | 0 |
| Total | 338,325,723 | 379,245,896 | 515,381,450 | 812,430,890 | 868,667,107 |

| Program Review Data | |
|---|---|
| DATES OF REVIEW: | August 18 – 22, 2003 |
| ED REVIEWERS | Donna Wittman, Martina Fernandez-Rosario and Shane Dunne, Southwest Case Management Team; Susan Crim, Kansas City Case Management Team |
| SCOPE OF REVIEW: | Fiscal Records / Enrollment Counselor Compensation Documentation, August 1, 1998 through August 22, 2003 |
| Corporate Institutional Officials Interviewed | |
| Todd S. Nelson | President and CEO, Apollo Group, Inc. |
| Kenda B. Gonzales | Chief Financial Officer, Apollo Group, Inc. |
| Bob Collins | Vice President of Student Financial Aid, Apollo Group, Inc. |
| Diane L. Thompson, Esq. | Vice President, Human Resources, Apollo Group, Inc. |
| Bill Brebaugh | Senior Vice President, Enrollment, Apollo Group, Inc. |
| Beverly Young | Corporate Operations Manager, University of Phoenix |
| Heather Cornell | Director of Learning/New Product Development |
| Seth Dosick | Senior Training Manager, Corporate Enrollment, University of Phoenix |
| Phoenix Campus Officials Interviewed | |
| Melinda Fernandez | Nursing Enrollment Counselor |

CONFIDENTIAL

APOL 0001231

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 3

| | |
|---|---|
| Cylisha Willis | Enrollment Counselor in Training, Certificate Programs |
| Alison Andersen | Enrollment Counselor |
| Jacqueline Laone | Enrollment Counselor |
| On-Line Campus Officials Interviewed on Site | |
| Brian Mueller | Chief Executive Officer and Vice President |
| Aaron Wettstein | Director of Admissions, East Coast Division, On-Line Campus |
| Susan Franceschi | Enrollment Manager, East Coast Division, On-Line Campus |
| Craig Lewandowski | Enrollment Counselor, East Coast Division, On-Line Campus |
| Mathew Kuhnau | Enrollment Counselor, East Coast Division, On-Line Campus |
| Dawn Donatoni | Enrollment Counselor, On-Line Campus |
| David Charnock | Enrollment Counselor, On-Line Campus |
| Charles Hansen | Enrollment Counselor, On-Line Campus |
| Felicia Wilbon | Financial Aid Specialist, East Coast Division, On-Line Campus |
| San Jose Campus Officials Interviewed on Site | |
| Ann Tye | Associate Director of Enrollment |
| Tamara Garcia | Admissions Manager – San Jose Campus |
| Robert Jacobs | Enrollment Counselor I |
| Charlotte Gould | Enrollment Counselor I |
| Teresa Salazar | Enrollment Counselor II |
| Rebecca Mackover | Enrollment Counselor I |
| Kathy Schorsch | Enrollment Counselor II |
| Jenny Khan | Enrollment Counselor I |
| Fifi Guibegna | Marketing Coordinator |
| Mary Hendow | Senior Enrollment Counselor |
| Rashida Mirza | Enrollment Counselor I |
| Tamara Nasser | Enrollment Counselor |
| Nada Kegley | Enrollment Counselor I |
| Neale Marquez | Enrollment Counselor |
| San Francisco Campus Officials Interviewed on Site | |
| Don Rose | Enrollment Counselor |
| James Wojtak | Enrollment Counselor |
| Mike McKay | Admissions Manager – San Jose |
| Melanie Enriquez | Marketing Coordinator |
| Suzanne Osbourne | Enrollment Counselor |

APOL 0001232

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 4

| San Mateo Campus Officials Interviewed on Site | |
|---|---|
| Julie Albertson | Senior Enrollment Counselor |
| Shawn Watson | Enrollment Counselor I |
| Livermore Campus Officials Interviewed on Site | |
| Marci Miller | Admissions Manager - Flex Net Program |
| Lisa Wayne | Admissions Manager – Admissions Manager - Livermore |
| Karoline Motola | Marketing Support Coordinator |
| Konstanze Salenga | Enrollment Counselor II |
| Melissa Epperson | Enrollment Counselor II |
| Shannon Bartz | Enrollment Counselor I |
| Victoria Fields | Enrollment Counselor I |
| Daniel Waterman | Vice President/ Director – Northern CA Region |
| Brent Silveria | Enrollment Counselor I – Flex Net |
| Lisa Martinez | Marketing Coordinator |
| Julie O'Farrell | Enrollment Counselor I – Flex Net |
| Karen Phuong | Enrollment Counselor I – Flex Net |
| Tim Gruber | Director of Enrollment – Northern CA |
| Oakland Campus Officials Interviewed on Site | |
| Mary Barilovits | Enrollment Counselor |
| Michelle Chinello | Enrollment Counselor |
| Laura Wallace | Admissions Manager – Oakland Campus |
| Alicia Naval | Enrollment Counselor |
| Leah Johnson | Enrollment Counselor |
| Sheri Catalano | Enrollment Counselor |
| Sheri Preston | Marketing Coordinator |

The reviewers also interviewed former UOP employees off site as well as additional current employees who
do not want their identities revealed for fear of losing their jobs.

APOL 0001233

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 5

### I.    INTRODUCTION

Section 487(a)(20) of Title IV of the Higher Education Act of 1965, as amended (HEA), 20
U.S.C. §1094(a)(20), prohibits the payment of any commission, bonus or other incentive
payment based directly or indirectly on success in securing enrollments.

### 2    BACKGROUND

#### 2.1    Entity

The University of Phoenix (UOP) was established in 1976 by John Sperling to provide higher
education to working adults.  In 1981, Mr. Sperling incorporated Apollo Group, Inc. (Apollo), now
the parent corporation of The University of Phoenix, Inc.  Apollo Group, Inc. operates through its
subsidiaries, The University of Phoenix; Institute for Professional Development; The College for
Financial Planning Institute Corporation; and Western International University, Inc.  As of August
31, 2002, UOP operated at 176 locations in 37 states, Puerto Rico and Canada.  In its 2002
Annual Report, Apollo boasted that it was the largest private provider of higher education in the
United States.  Id.

In the early 1990s, UOP issued an initial public offering (IPO).  Its debut on the public stock
market yielded an infusion of over $34 million in December 1994, and Apollo doubling its total
enrollments between 1998 and 2002.  Its growth fueled its stock price, resulting in a share of
stock – priced at $0.72 at its initial public offering (adjusted for stock splits) – selling at $63.36
by the close of its 2003 fiscal year, August 31, 2003.

In October 2000, Apollo issued another class of stock to track the economic performance of its
online division.  University of Phoenix Online (UOPX).  UOPX stock initially selling at $6.98 per
share, sold for $64.50 per share as of the close of the 2003 fiscal year.

#### 2.2    Programs

UOP offers degree programs and related areas of specialization, including Associate of Arts in
General Studies, Bachelor of Science in Business, Bachelor of Science in Criminal Justice
Administration, Bachelor of Science in Human Services, Bachelor of Science in Health Care
Services and Bachelor of Science in Information Technology.  UOP also offers Master of Arts in
Education, Organizational Management, Business Administration, Counseling and Nursing.  It
also offers continuing education for teachers, custom training for corporations and various
certificate programs.

In 1993, UOP began offering distance education (On Line programs) and in 2001, UOP was
admitted to the Department's Distance Education Demonstration Program as part of the second
cohort of participants.   UOP refers to its on line operation as the On Line Campus.  The On
Line Campus operation is located in Phoenix, Arizona.

#### 2.3    Admission Standards.

Historically, UOP required students to be 23 years of age and have at least two years of
practical work experience and described its mission as the provision of "current, real-world
education" to working adults.  As of approximately two years ago, however, UOP lowered the
age requirement to 21 and eliminated the work experience requirement.

CONFIDENTIAL                                    APOL 0001234

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 6

### 2.4   Growth of Enrollments & Revenues

Apollo's total degreed enrollments in 1991 of 17,571 grew to 200,100 in 2003.  Revenues grew correspondingly, from $69 million in 1991 to $1.3 billion in 2003.  The On Line operation, UOPX, began slowly in 1993, but began mushrooming in 2000.  On Line students numbered only 1,114 in 1993, but grew to 79,400 by 2003.  The following chart depicts the enrollment, revenues and stock price history of both Apollo (APOL) and the On Line tracking stock, UOPX:

| Year | Total Deg Students | On Line Students | Net Revenue | APOL Stock $* | UOPX Stock $ |
|------|-------|-------|-------------|------------|------------|
| 1991 | 17,571 |  | $    68,782,000 |  |  |
| 1992 | 21,163 |  | $    81,865,000 |  |  |
| 1993 | 24,987 | 1,114 | $    97,545,000 |  |  |
| 1994 | 30,200 | 1,600 | $    12,472,000 | $   0.72 |  |
| 1995 | 36,848 | 2,400 | $  163,429,000 | $   2.63 |  |
| 1996 | 46,935 | 3,700 | $  214,275,000 | $   7.56 |  |
| 1997 | 57,382 | 4,660 | $  279,195,000 | $  10.57 |  |
| 1998 | 71,400 | 7,200 | $  384,877,000 | $  15.22 |  |
| 1999 | 86,800 | 10,700 | $  496,846,000 | $   9.75 |  |
| 2000 | 100,900 | 16,000 | $  609,997,000 | $  18.14 | $   6.98 |
| 2001 | 124,800 | 29,200 | $  769,474,000 | $  26.25 | $  21.00 |
| 2002 | 157,800 | 49,900 | $ 1,009,455,000 | $  41.83 | $  28.78 |
| 2003 | 200,100 | 79,400 | $ 1,340,000,000 | $  63.36 | $  64.50 |

* Stock price adjusted for stock splits.  Source:  Annual Reports Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K), from 1996 through 2002.

Apollo's past aggressive growth is magnified in its goals for the future.  The UOP 2002 corporate goal was "5-5-5": Five Years, Five Million Students and Five Billion Dollars.

The dynamics of public ownership, expectations of investors and lucrative stock options to UOP officers are integral aspects of the UOP system.  Employees at every level are made aware of the importance of meeting the enrollment numbers and revenue expectations of Wall Street on a quarterly basis.  For recruiters of students, UOP stresses the enrollment numbers on a daily, weekly, monthly and quarterly basis.  UOP evaluates its recruiters' performances and provides for salary increases following initial recruiter training, with annual salary evaluations thereafter (at the end of each fiscal year).[1]

## 3   SCOPE OF REVIEW

A program review was conducted of UOP on August 18, 2003 through August 22, 2003 to determine UOP's compliance with §487(a)(20) of the Higher Education Act of 1965, as amended, 20 U.S.C. §§1070, et seq. (HEA) and 34 C.F.R. §668.14(b)(22).  The review consisted of, but was not limited to, an examination of UOP's policies and procedures regarding

---

[1] Until the 2000 Fiscal Year, UOP reviewed the salaries of its recruiters every six months, with salary to be adjusted up or down depending on the recruiters' performance.  The Admissions Counselor Policy Guides provide only for annual salary evaluations thereafter and do not mention the reduction of salary.  UOP's Admissions Counselor Policy Manuals also provide that in addition to these standard salary reviews for recruiters, a salary evaluation is performed after initial training.

APOL 0001235

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 7

admissions practices and recruiters' compensation. The reviewers examined the pertinent forms, policies and procedures and personnel documentation at UOP relating to Title IV administration, and conducted interviews with appropriate institutional personnel.

Prior to arrival at UOP, notice of the program review was provided by telephone and fax.

The on-site review encompassed visits to Apollo corporate headquarters, the Phoenix Campus, the Online Campus as well as five campuses in UOP's Northern California Division—Oakland, San Jose, San Francisco, Pleasanton and Livermore.

During the visit, areas of non-compliance were noted. The finding of non-compliance is referenced to the applicable regulations. The finding specifies the actions to be taken by UOP to bring operations of the financial aid programs into compliance with governing authority.

## 4    DISCLAIMER

This program review was focused and thorough with regard to the issues of concern. It cannot be assumed to be all-inclusive. The absence of statements in the report concerning specific practices and procedures of UOP must not be construed as acceptance, approval or endorsement of those specific practices and procedures. Furthermore, it does not relieve UOP of its obligation to comply with all of the statutory or regulatory provisions governing the Title IV programs.

## 5    FINDINGS AND REQUIREMENTS

**FINDING #1:  Use of Incentive Compensation Based on Enrollments for Those Involved in Recruiting or Admission Activities in Violation of Title IV Requirements**

### 5.1  Recruiter Compensation System

#### 5.1.1   When Hiring Recruiters, UOP Promises Substantial Compensation

The reviewers interviewed more than 60 present and former recruiters of students (called "enrollment counselors" by UOP) prior to, during and after the site visit. While on site, the reviewers asked specifically to speak to those involved in enrolling students, both "on ground" as well as "on line." UOP officials chose certain recruiters to be interviewed. The reviewers also, however, randomly chose other recruiters, and interviewed those referred by other UOP employees.

Most of the recruiters said that when hired, UOP told them that the job had tremendous financial potential, and that they "could make a lot of money." UOP promised to double or triple their salary in three to six months if they successfully perform their duties. Many of the employees left a higher paying job to work for UOP because of the promise of the increase in salary in such a short period of time.

Drawn by the lure of a large salary potential, UOP employees in other positions transfer to jobs as recruiters. In particular, a number of academic counselors and advisors transferred to the higher paying recruiter position. Had these academic advisors not transferred to a recruiting position, they knew that their salary would not only be lower, but that annual salary increases would be minimal, generally only 2-8%.

CONFIDENTIAL

APOL 0001236

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 8

UOP's recruiters soon find out that UOP bases their salaries solely on the number of students they enroll.

### 5.1.2   UOP Student Recruiting System – Focus on the Numbers

#### 5.1.2.1   Sales Training – "Smoke & Mirrors"

UOP considers recruiters to be "counselors in training" or "freshmen" for their first 13 weeks of employment. During this time, they receive on-the-job training at the location at which they work. Soon after being hired, recruiters attend a one-week "Sales Academy" provided by regional and corporate management at the regional office. The Admissions Counselor Policy Guide for Admissions Managers and Directors of Enrollment considers this 13 week-period to be a "developmental program." Employees learn the system for tracking leads, contacts, appointments, enrollments and other recruiting activities, such as the conversion of an appointment to an application. At the Sales Academy, recruiters learn sales tactics designed to pique the interest of potential students through the progression of enrollment activities, such as probing need, fostering trust, creating urgency and overcoming objections. These sales lessons are reinforced by one-on-one instruction at the school location. Recruiters also receive an orientation in the UOP methodology and history, learn about the programs of UOP and the UOP model of providing educational programs for working adults.

Recruiters are oriented to the personnel policies of UOP and are provided an Enrollment Counselor Policy Guide. Updated annually, the Guide details the recruiter salary levels, evaluation procedures, and rules pertaining to the crediting of enrollments to recruiters for purposes of recruiters' performance. The Guide for 2002 establishes the following salary levels:

| | |
|---|---|
| Freshman Admissions Counselor | $26,000 - $36,000 |
| Admissions Counselor I (ECI) | $26,000 - $40,000 |
| Admissions Counselor II (ECII) | $36,000 - $65,000 |
| Admissions Counselor (Senior EC) | $65,000 – $100,000 |
| Executive Admissions Counselor (Exec. EC) | $75,000 - $120,000 |

Either during, or shortly after, the initial 13-week period, the new recruiter also attends a one week "Student Advisement Workshop" (SAW) at UOP headquarters in Phoenix, Arizona. The SAW is an intense training on traditional sales techniques:  probing and developing the potential customer's need for the product, creating urgency and gaining commitment from the potential customer, and closing the deal. Typical of sales training, SAW is one of the tools UOP uses to motivate its sales force. Recruiters said that in spite of the name of the training, the SAW deals only with sales techniques and has little or nothing to do with academically advising students.

Freshmen recruiters advance to the title of "Enrollment Counselor I" (ECI) upon completion of their 13-week developmental program. Advancement to ECI may only be a change in job title, but if the new recruiter enrolls enough students during the 13 weeks, the advancement will also include a raise. Promotion to higher levels is determined on the basis of whether the counselor "meets", "exceeds" or "always exceeds" expectations[2]. Under the 2002 Guide, in order to be promoted to the title of "Enrollment Counselor II" (ECII), a recruiter must have three consistent

---

[2] Under the 2003 Admissions Counselor Guide, an ECI must have accumulated at least two quarters of Often or Consistently Meets Expectations and cannot have any quarters where his or her performance does not at least "Meet Expectations."

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 9

quarters where performance "often or consistently exceeds expectations." Promotion to the title
of "Senior Enrollment Counselor" (Senior EC) requires four consistent quarters where
performance "often or consistently exceeds expectations." A Senior EC may be promoted to the
title of "Executive Enrollment Counselor" by having eight consistent quarters where performance
often or consistently exceeds expectations.

Early in a recruiter's training, UOP teaches a recruiter how UOP measures success through the
use of a "matrix." The matrix lists specific recruiting activities, the numbers expected for each
activity, and how these numbers relate to an overall rating of either "meets expectations," "often
exceeds expectations" or "always exceeds expectations" – a rating that determines salary.
Freshmen recruiters receive a matrix for each of the 13 weeks of training and they are
evaluated weekly on their weekly numbers. The July 2003 SAW training coached counselors to
refer to enrollments as "level one student information cards." At this training, UOP established
that at the end of the 13-week training, the following expectations would determine the
recruiter's overall rating and salary:

> 30-43 level one information cards (enrollments) = Meets
> 44-59 level one information cards (enrollments) = Exceeds
> 60+ level one information cards (enrollments) = Always
> "Have no more than a 20% flake" (drop-out rate)

At SAW, UOP urges recruiters to use the matrix as a guide to reach their desired "level of
success."

The matrix sets forth the rating ("meets," etc.) associated with the number of enrollments, and it
is these criteria that supercede all others and actually determine salary. Recruiters are keenly
aware of how the matrix numbers establish their salaries. At one time, the matrix had the salary
printed on the matrix itself so that a recruiter could readily determine the number of enrollments
needed to make a specific salary level. One recruiter said that it was common knowledge
among recruiters that each enrollment is worth about $750 in annual salary. In recent years, the
matrix (containing the enrollment expectations) and salary levels associated with the matrix are
separated into two documents such that recruiters have to simply put the two documents
together to determine the salary levels associated with enrollment numbers.

UOP repeatedly reinforces the importance of enrollment numbers throughout its orientation and
training of recruiters. Among the documents provided to newly hired recruiters is a document
entitled "The Psychology of Enrollment Success at the University of Phoenix." This document
touts the benefits and rewards of being a sales professional at UOP, including assertions such
as:

- $$$ - No limit on income
- Highest paid people in the world are salespeople
- Never have to worry about $$$ again
- Top 20% Enrollment Counselors @ UOP  = ave. $75,000 +/yr
  "other" 80%                           ave. $25,000 +/yr.
- Top 20% = never worry about $$$

The Winning Edge

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 10

|  | | |
|---|---|---|
| Counselor #1 | 100 activities[3]/half | $65,000 |
| Counselor #2 | 79 activities/half | $36,000 |
|  | | $29,000 |

3.5 additional activities / month = $29,000

In the case of On Line recruiters, several recounted that their managers told them that UOP calculates their salaries on the basis of one half of the number of students each recruiter enrolls in a six month period; e.g., 90 students enrolled in six months equals $45,000 in salary. On Line recruiters said that even though the matrix lists a number of steps in the recruitment process, such as telephone calls, conversions, etc., the reality is that none of these factors actually affect recruiter salary – except the number of students enrolled. Some of the recruiters consistently exceeded the numbers for all steps except enrollments, yet received an overall evaluation of "needs improvement" simply because their enrollments failed to hit the requisite number. More than one recruiter said that managers simply falsified the numbers on the various factors to make the overall evaluation match the enrollment number and that managers told them that if they get the enrollments, the manager can make the other numbers match. For example, one manager told a recruiter: "You get the enrollments and we'll take care of the matrix. We can fudge the numbers on the matrix."

All recruiters indicated that they were not shown the matrix, or told of how enrollments related to salary, until after they were hired. Recruiters who had not yet completed their first salary evaluation were unaware that their salary would be based on anything but numbers of recruiting activities. New recruiters knew that numbers determined their salary, and generally knew that if they did "make the numbers" they could get a "good bump," but if they did not make their numbers, they would not get the raise they had expected when they were hired. Many commented that the bottom line was: if the enrollments are not there, don't expect a raise.

In addition to these training/motivational methods, UOP's Corporate Director of Enrollment visits the various UOP locations to provide additional training and motivation to recruiters. This corporate officer is known for his ability to motivate by touting the financial rewards of making the numbers, even though recruiters are aware that basing salary on enrollments is against the law. This Director of Enrollment; however, was quoted as telling recruiters: "It's all about the numbers. It will always be about the numbers. But we need to show the Department of Education what they want to see." Forty-four out of 61, or 72%, of the recruiters interviewed stated that it was always about the numbers – all about "butts in seats" or "asses in classes –" to use the vernacular commonly heard at UOP. One recruiter stated that, "the culture in the organization gravitated away from quality education and quality counseling, to getting bodies in the door. The number of enrollments is what counts."

According to some recruiters, while the Corporate Director of Enrollment stresses the big dollars that come with high enrollments, he characterizes the compensation plan for recruiters as "smoke and mirrors" so that UOP can "fly under the radar" of the Department. More than one recruiter stated that they also heard the Director of Marketing say, when discussing the salary compensation plan for recruiters, "we're flying under the radar of the Department." Both managers and recruiters referred to the matrix as a "smokescreen" or "smoke and mirrors."

---

[3]Over the years, UOP has utilized various euphemisms to define the number of students a recruiter enrolls. Many times, UOP simply uses the word "enrollment" or "activity." As previously mentioned, during 2003 SAW training and on the 2003 matrix, UOP uses the phrase "Level One Student Information Card."

                APOL 0001239

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 11

One recruiter, who recalled the Corporate Director of Enrollment saying "we're flying under the radar of the Department," believes that the "matrix is a way to deceive the Department."

### 5.1.2.2    Tracking Commissionable Sales and Sales Performance

In order to track the numbers on the matrix, UOP uses an elaborate tracking system to follow the student's enrollment progression and to track which recruiter is given credit for the enrollment. The computerized system called "Galaxy" tracks incoming calls, outgoing calls, leads to appointments, conversion of appointments to applications, scheduled appointments, actual appointments, referrals, applications, enrollments and "flakes" (withdrawals). UOP tracks these recruiting activities daily. Recruiters meet with their managers on a daily, weekly and monthly basis to go over the numbers and discuss how to increase them in order to reach the desired salary, sometimes referred to as the "desired level of success."

Recruiters maintain a manual list of each student they have enrolled when the application is completed. They then send this list to a regional marketing support coordinator. On a monthly basis, the regional marketing support coordinator prepares a list of all new enrollees and determines which students have attended at least three nights – the point in time at which the recruiter may receive credit for salary purposes -- and also the point at which UOP can charge 100% of the tuition for the course and no longer must pay a refund. The marketing support coordinator then compiles what UOP has traditionally called a "Commissionable Starts Report"[4] for each recruiter for transmittal to UOP headquarters. UOP then checks whether each new enrollee has made satisfactory payment arrangements. If the student has met the attendance and financial arrangement criteria, UOP tentatively gives the recruiter credit for the enrollment, and the student will be on the Commissionable Starts Report of the recruiter for the month. UOP then compiles the Commissionable Start Report for every recruiter at each location and sends them to the Corporate Operations Manager at UOP headquarters in Phoenix, Arizona.

The primary job of the Corporate Operations Manager is to track enrollments to assure that each recruiter receives the appropriate enrollment credit for a "quality enrollment" (an enrollment that has met both attendance and financial arrangement criteria) and to prepare a monthly report that lists enrollments by campus and by enrollment counselor. Upon receipt of the Commissionable Starts Report for each recruiter, the Corporate Operations Manager again checks whether the enrollment meets the above-listed attendance and financial criteria. For enrollments that fail to meet these criteria, she strikes their names from the Commissionable Starts Report and prepares a final approved list of students for which each recruiter will be credited. The Corporate Operations Manager then prepares a separate list for each recruiter. The final approved enrollment list, together with the Commissionable Starts Report showing the stricken students, are then bound by location in a final report referred to as the "Orange Book." UOP then sends the bound report to each location. This final bound report shows total enrollments by location as well as the final enrollments credited to each recruiter as well as each recruiter's rejected enrollments.

The Corporate Operations Manager then also updates a manually prepared Excel spreadsheet, maintained on a fiscal year basis, that lists all recruiters and their final enrollments for each month. This spreadsheet ranks all UOP recruiters from all locations by the number of enrollments credited to date. This spreadsheet is known as the "Stack Rankings," which UOP

---

[4] For years, this report has been referred to as a "Commissionable Starts Report" and ECs referred to it as such. The report is also referred to as a "Commissionable Starts Report" in the instruction manual for the system that generates it. In recent years, UOP changed some of the references to the Report to "CPCC701 Enrollment Report."

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 12

sends monthly to the managers who generally distribute it to recruiters. The Corporate
Operations Manager maintains a file on each recruiter in the organization that contains all
Commissionable Starts Reports and all the monthly Stack Rankings.

In addition to the above procedures, at the local campus level, the Marketing Coordinators
continually update and compile a manually prepared monthly report, entitled AC-Self Success
Recap. This report captures the enrollment activities of each recruiter at the location. The
report describes the "Meets Expectations" standards of each enrollment activity contained within
a recruiter's matrix (Outbound Calls, Scheduled Appointments, Referrals, Corporate Information
Cards, Student Information Cards, and Enrollments) and the actual numbers achieved by the
counselor. The report also captures the conversion rates of each recruiter from "Level One
Student Info. Cards" (initial student enrollment) to an enrollment for which the recruiter will
receive credit (three classes and financial arrangements). This report has been identified by
many of the recruiters as the actual tool the recruiters' managers use in their monthly, quarterly
and annual evaluations. UOP requires each manager to forward this report as an attachment to
UOP's Corporate Enrollment office each month, no later than the fifth of the following month.

### 5.1.2.3    UOP's Aggressive Sales Motivation System

UOP's intense focus on numbers and enrollments per recruiter permeates the working day of
each recruiter. Managers bombard the recruiters with emails daily -- listing the top performers
based on enrollments, applications, calls and other recruiting activities, with the pace of emails
pushing numbers escalating at the end of each fiscal year as the annual report deadline nears.

Each campus holds a daily "morning huddle," formally called an "OSIRA meeting" at which each
recruiter must report the number of enrollment activities accomplished the day before. At these
meetings, the recruiters also report their goals for the day, projecting, based on their schedule,
the number of outbound calls, the number of appointments scheduled and other recruiting
activities they expect to perform. These meetings serve to motivate or humiliate the recruiters
based on their activities. Managers go over the numbers and either praise or chastise each
recruiter in front of the group. The managers then stress the weekly goals and applications
UOP requires by the end of the week. The recruitment managers use a large board on which
the statistics of activities of each recruiter are listed. Except when "visitors" are expected, UOP
managers prominently post the board that lists these statistics.

On Mondays, the morning huddles also include a recap of the prior week. On a monthly basis,
the meetings involve a monthly assessment and itemization of goals not met, and issues that
need to be resolved in order to meet the goals. Managers also use these meetings to make
announcements regarding the overall performance. For example, one Enrollment Director, in a
teleconference with Northern California locations during an OSIRA meeting in the Fall of 2002
said:

> My job is on the line. And I need you guys to perform. And there will be no exceptions.
> If you're not doing your job, you're going to lose your job. And if you're not hitting your
> goals, that's how we're going to measure if you're doing the job. And by the way, I don't
> mean applications in. I mean starts."

UOP used these frequent meetings to drive home the message that a recruiter's success in
securing enrollments would equate to success in reaching his or her salary goal. For example,
one recruitment manager would frequently say: "X is going to make a lot of money at the end of
this quarter because he has X enrollments." It was common for managers to remind a recruiter

APOL 0001241

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 13

how many more enrollments were needed to get his or her stated salary goal. For example,
one recruiter told the program reviewers that his manager's tactic was to say: "How much
money do you want to make? Well, here are how many students you have to register to make
that much:"

UOP also frequently runs sales promotions, targeting the increase of enrollments at the end of
each fiscal quarter. Such promotions may include the waiver of fees or the cost of books for
student customers. Referred to as "blitzes," promotions are generally offered around the end of
each quarter. During some "blitzes," UOP managers mandate that recruiters work unpaid
overtime by working evenings and Saturdays.

In addition to the frequent face-to-face meetings, managers barrage recruiters with emails to
remind them where they are on a ranking basis with respect to other UOP recruiters and
emphasize the target number of student enrollments. Examples of such emails sent to
recruiters on an On Line team read:

- *From a Director of Admissions on July 23, 2003 to ECs, entitled "July/August
  Goals":*

  > Now you know what is at stake and the rewards
  > available at the end of the month of August, please
  > tell me what your own personal goal is for July/August
  > combined and what your goal is for your next 6 -
  > month review. 140? 130? How much you would like
  > to see your salary increase?

- *From an Enrollment Manager to ECs, April 24, 2002, entitled "Team Meeting
  this AM"*

  Make sure that if you didn't hit your matrix # for MEETS in June, that you do it in

  July. EC1 that means 14, EC2 is 16...any questions?

CONFIDENTIAL

APOL 0001242

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 14

- *From an Enrollment Manager to ECs, June 28, 2002, entitled "Back to Basics":*

  Your job, as Admissions Counselors, and sales professionals is to get in touch with every one of them as soon as possible to evaluate their needs and match the benefits of UOP with those needs, then close the sale.

  The expectation for EC2 is that you meet the criteria of your matrix, and enroll 16 new students each month.

  The expectation for EC1 is that you also meet the criteria of your matrix, and enroll 14 new student each month.

  As a CIT, you're shooting for Always Exceeds on your matrix, and 30 new students in your first three months on the floor.

  These numbers and criteria are measured on a quarterly basis, so know what your evaluation quarters are, and what your goals and running totals are. This is your process to manage. You can use vacation time when it's made available to you, but make sure that your students are taken care of, and that you still meet your expectations. If your production levels can't be maintained because of vacation time that you have planned, you need to work extra before and after the time off to make it a non-issue.

- *From an Enrollment Manager to ECs, April 25, 2002, entitled "Please Reply to Me .. Lunches"*

  We've regged 17 new students in the last 2 days, and 11 of those were on Tuesday, WAY TO GO!!! As of last night we're at 57 REG and 36 APIN, more combined that either March or April, and we've only been prospecting for 5 days!!!!

  Where are you in relation to your goal?? Right now you should plan on being at half-way (REG/APIN combined) when you walk in the door next Wednesday (May 1). As a team we're at almost exactly 33% of our promised 275!!!

  If you think of it, I have the REG-O-METER on my door, and I've been updating it for the last couple days. Feel free to add your own when you put 'em in REG!!

One enrollment manager puts a spreadsheet on her recruiters' computer desktops that shows how many enrollments each recruiter needs to reach the next salary level. The following is an example:

APOL 0001243

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 15

|  | June | July | August | Sept | Oct | Nov |  |  |
|---|---|---|---|---|---|---|---|---|
| Cleared | 14 | 13 | 14 | 15 | 20 | 14 | 90 | 45K |
| Goals |  |  | 17 | 20 | 25 | 17 |  |  |

The recruiter who provided us the above spreadsheet explained that her manager placed it on her desktop at the end of July. It shows that the recruiter had 27 enrollments by the end of July. The August through November numbers reflect the number of "cleared" enrollments (non-withdrawals) that the recruiter will need in order to have 90 enrollments in the six-month period – an enrollment number that would result in the recruiter's desired $45,000 salary. Typically, the manager keeps these spreadsheets updated and clearly visible on the recruiters' computer desktops. During the Department's site visit, however, the manager deleted these spreadsheets from the recruiters' desktops. (The reviewers obtained a copy of the spreadsheet from a recruiter who had saved the file before the manager deleted it from the computer desktop.)

### 5.1.2.4   *Intimidation Techniques*

Just as recruiters are rewarded for meeting or exceeding the enrollment numbers, they are also penalized for not meeting the enrollment numbers. Under UOP's salary policies, UOP also pays managers and directors on the basis of the number of enrollments secured by the recruiters under their supervision. Recruiters said that their managers were under a lot of pressure from UOP's corporate office to meet enrollment numbers. When recruiters fail to meet the enrollment goals set by UOP, the managers made it clear that the recruiters are causing the managers to fail. Many recruiters stated that the managers "tried to make their lives miserable" when their enrollment numbers are not high enough.

A number of recruiters stated that UOP did not hesitate to threaten them with loss of their jobs if they failed to meet the numbers. Several recruiters indicated that some managers' styles are so oppressive that even though one may be a top performer one week and praised as the "greatest," the same person is being threatened with termination the next week. "You are constantly threatened if you don't meet the numbers."

Many recruiters expressed concern about losing their tuition benefits if they failed to meet enrollment numbers. Some recruiters who were students indicated that they only intended to stay long enough to finish their degrees at UOP, and that they had to do whatever was necessary to meet the enrollment numbers to attain that goal.

At the On Line Campus, even more harsh methods were used to "punish" those who failed to meet enrollment numbers. Most On Line recruiters stated that their managers used heavy-handed intimidation tactics to humiliate them into improving their numbers. For example, one admissions director (one supervisory level above the admissions manager) is known to tell recruiters, when they fail to make the required enrollments, that they are "stealing from Brian Mueller" (CEO of UOP On Line).

Well known among the recruiters was the "Red Room" – a place viewed with fear and dread by recruiters with whom the reviewers spoke. Sixteen of the On-Line recruiters who were interviewed confirmed knowledge of the Red Room, and several were actually sent to the Red Room, as punishment for not meeting the number of enrollments required and/or expected by management.

APOL 0001244

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 16

The Red Room was a large room in which tables were lined up in the middle of the room. The room was encased in glass so that all in the area could see who was there. Banks of telephones were on the table, around which the underperforming recruiters were crowded to make telephone calls. Wires hung from the ceiling to provide power to the computers sitting on the tables. Senior recruiters and managers hovered over the unfortunate recruiters, listening to their calls and closely monitoring them. Those who were sent to the Red Room were allowed no vacation time and were allowed no breaks other than those specifically set for those working there. A recruiter sent to the Red Room was required to immediately leave his or her desk and take his or her computer there. Recruiters were required to work in the Red Room until they had attained the required number of enrollments. Recruiters indicate that UOP ceased using the Red Room in late 2002.

At both the On Ground and On Line campuses, a number of recruiters stated that the allocation of fresh leads and floor time was both an intimidation and reward tool to manipulate them into more aggressive and/or unethical tactics. Recruiters viewed leads as the source of obtaining enrollments and salary "bumps." When a recruiter was underperforming, managers would decrease the leads provided to the recruiter. Also, when a recruiter left UOP, the manager would divide up the former recruiter's enrollments. The granting of leads and credit for a former recruiter's enrollments was up to each manager. Those who had high enrollment numbers received more leads, enrollment credits and salary "bumps." Those with less enrollments had leads taken away, received no enrollment credits from former recruiters, received no salary increases and could have potentially suffered a pay cut. A number of the recruiters noted that those who did not "meet the numbers" of enrollments would be deprived of leads and floor time. A day of floor time means that the recruiter gets new leads that come in as walk-ins, as internet referrals, or call-ins. These fresh leads are cherished by recruiters.

This was confirmed by some of the new recruiters as well. Some recruiters were given very little floor time, which prevented them from meeting the number of enrollments expected by UOP. As one recruiter said, "UOP will make you successful if they want to--if they don't want to make you successful, they force you out."

Some Northern California recruiters indicated that in 2002, managers became very intimidating because the enrollment numbers were not up to par. San Jose recruiters were told that their "heads would be on a chopping block" if they did not hit their numbers. UOP also expected recruiters to meet their required enrollment numbers regardless of whether they had vacations, honeymoons, a death in the family, illness or other events that interrupted their work schedules. As one manager stated:

> The expectation will be that if you aren't at your goal by 3/8 (for March) and 4/5 (for April), you and I will plan what additional time you'll be in the office on weekdays and on weekends to get the job done and get back on track. We need to quit thinking of this as a 40 hr/week job, and remember that we're getting paid to at least meet expectations (me included).

One recruiter recounted how her manager responded when she told him that she may need to go to New York for her grandmother's funeral. He said: "You can't afford the time away from the phone. You can't afford five days bereavement leave. And if you go, you have to prove that you went to the funeral and that she is dead."

A recruiter who misses the numbers for any month receives immediate notification from UOP. Managers closely supervise all activities of recruiters, scrutinizing their time as tracked in the

CONFIDENTIAL

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 17

computer system. Recruiters who do not enroll sufficient numbers receive harsh emails from their manager chastising them.

The formal procedure for discipline of recruiters is set forth in the UOP personnel handbook and is commonly called "going on plan." The employee is given a written warning, set forth in a "Warning Letter" or "Discussion Memorandum." These warnings follow an established UOP format for recruiters. They begin by stating that the recruiter has failed to meet the expectations of the position of an Enrollment Counselor, and specify the numbers that the recruiter must meet in order to retain his or her job. Typically the memo sets forth a table such as the following, showing the "Weekly Goals" and the recruiter's actual performance for a three-month period:

| Activities (Weekly Results) | Goals (Weekly) | May (Weekly Avg) | June (Weekly Avg) | July (Weekly Avg) |
|---|---|---|---|---|
| Contact to Activity | 6% | 2.5% | 7% | 0 |
| New Enrollments | 3 | 2 | 1.25 | .5 |
| Inbound Calls | 40 | 63 | 50 | 46 |
| Outbound Calls | 250 | 393 | 363.25 | 368 |
| Referrals | 1 | 0 | 0 | 0 |
| Lead to Contact | 45% | 55.5% | 47.8% | 39.8% |

Of course, of these activities, only enrollments possess any real significance.

If the recruiter fails to meet these numbers, UOP places him or her on "decisional leave" – one day during which the recruiter is to decide whether he or she "wishes to be successful at UOP." During "decisional leave", the recruiter is not allowed to engage in enrollment activities and is required to set forth a plan of performance improvement to present to his or her manager. If the recruiter's performance fails to "meet" expectations, UOP fired him or her.

### 5.1.3   Recruiter Evaluation System Reinforces & Ranks the Quantitative

More than 70% of the recruiters reported that they were unaware of any basis for compensation other than enrollment numbers and recruiting activities. It is remarkable that the only recruiters who said that their salary also included qualitative factors, such as customer service, were recruiters chosen by UOP to be interviewed by the reviewers. *Literally every recruiter interviewed randomly or outside of the work premises said that the number of enrollments determined their salary.* Some reported that while they were aware that their evaluation form included some "qualitative, highly subjective" factors, their managers always assured them that UOP included these factors simply to deceive the Department and that UOP actually based salary raises solely on the number of students a recruiter enrolls.

During the quarterly evaluations with recruiters, managers consistently focused on the quantitative factors, particularly enrollments. The evaluation forms, however, also list certain qualitative factors at the bottom. Such factors include "Job Performance," "Working Relationships," "Communication" and "Customer Service." These qualitative factors, according to most recruiters, are simply conversions of the quantitative factors and are there simply to deceive the Department.

One recruiter recounted that he had asked his manager how these factors were determined and was told: "It's enrollments. You know it's enrollments. It will always be enrollments." Another recruiter queried his manager during his evaluation about each of these qualitative factors and

APOL 0001246

# EXHIBIT A-2

Case No. 06-MC-0558 (CKK)

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 18

how they are determined. His manager told him that "Job performance" equates to the number of new enrollments, "Communication" means the number of conversions; "Customer Service" means the number of leads to contact, "Working Relationships" means resolving student issues to overcome objections and obstacles and "Judgment" meant getting students in class. This recruiter wrote his manager's response on his performance evaluation form. The form was then signed by both his manager and his manager's supervisor.

On Line Campus recruiters stated that even though the matrix lists a number of factors, such as telephone calls, conversions, etc., none of these factors actually affect the salary level – only enrollments. Some of the recruiters consistently exceeded the numbers for all areas except enrollments, yet received an overall evaluation of "needs improvement," simply because their enrollments failed to hit the expected number. Thus, if they did exceed expectations in all areas except enrollments, there would be no promotion. More than one recruiter said that managers simply falsified the numbers on the various factors to make the overall evaluation match the enrollment number. Managers told them that if the recruiter gets the enrollments, the manager can make the other numbers match.

Recruiters were generally aware that there was a Department prohibition against incentive compensation for enrollments. Thus, it was widely known that the evaluation forms kept in the personnel files were meaningless. Recruiters told reviewers that during the program review, prior to interviews with recruiters, some managers coached their employees to say that their evaluations and salary are based on the qualitative factors, not just enrollments. One of these managers said that it was all "just smoke and mirrors" when referring to the matrix. More than one recruiter said that "the matrix is just a smokescreen," and that "everyone knows that the matrix is a joke." Another recruiter stated that his manager told him that, "Your matrix says that you have to bring in 100 leads a month. Your pay and performance review are based on that." Another recruiter said that her manager told her that, "The matrix doesn't matter, it's the Regs [meaning registrations or enrollments]. We can manipulate the matrix any way. You get the Regs and we'll take care of the matrix." Another recruiter said, "The matrix is a lot of bologna. The matrix talks about customer service, communications, judgment, but when you talk to your manager, the manager tells you that it is the enrollments. If you get 50 Regs/quarter, then you can earn $50K."

According to one Director of Enrollment (previously a recruiter), the qualitative annual review to discuss professional development is just the "touchy, feely" review. "Promotions are based on exceeding numbers only. Other factors that are considered for the annual review are: rapport with students; referrals; etc. These are evaluated for the small annual raise." The following comments about the "qualitative" review were made by different recruiters at the various locations visited by the reviewers:

- "The qualitative factors in the employee handbook are not mentioned. My manager told me that evaluations and salary are based only on the matrix, specifically Info. Cards" – enrollments.

- "If you get the regs., the other numbers of phone calls, appointments, etc., magically appear."

- "Reviews are really based on quantitative factors: They make the things match, but it's really the number of enrollments you have."

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 19

- "The matrix talks about customer service, communications, judgment; but when you talk to your manager, the manager tells you that it is the enrollments that count."

- "The amount of money was dependent on how many students I enrolled. Other factors such as communication are not mentioned."

- One manager told a recruiter during an evaluation: "The qualitative has to align with whatever is on the first page (the quantitative numbers). . . . We have got to make the qualitative portion of your review match where you fit on your numbers."

Some recruiters indicated further that it was widely known that supervisors would simply adjust the "qualitative factors" to match the numbers. Recruiters overwhelmingly confirmed that the number of enrollments was the "bottom line." Recruiters stated that even though the number of enrollments was the actual basis of their salary, management was always careful not to put this in writing due to awareness that the Department prohibited incentive compensation based on enrollments. Recruiters who asked their managers to put the enrollment requirements in writing were refused.

One enrollment director, who had also been an enrollment manager, and was hired in the early 1990s, recalls that when she was hired, the matrix included the number of enrollments. With this old matrix, evaluations were very straightforward. The number of enrollments established the salary. In the late 1990s, however, the Corporate Director of Enrollment issued a directive to managers explaining that UOP could no longer directly put the number of enrollments on the matrix because to compensate recruiters based only on the number of students enrolled was illegal. As a result, UOP introduced "qualitative" factors into the matrix. In addition, UOP began maintaining two files on recruiters; one was the "activity" file, kept at the local campus; the second was the Human Resource/official personnel file, kept in headquarters in Phoenix. The "official" human resource file contains only qualitative ratings. The quantitative data is kept in the activity file and forms the basis for salary evaluations.

This director explained that during performance evaluations, the manager sits down with a recruiter and goes over the recruiter's enrollment goals (number of telephone calls required to be made to prospective students, number of appointments required, number of interviews required out of the appointments set, number of enrollments required per given time period) and compares them to how the recruiter actually performed with respect to these goals. Enrollments are weighted more heavily than other steps in the recruitment process, because a recruiter can make 300 telephone calls, but if they are not "converting" them to enrolled students, then the number of calls made is not important. The matrix is a tracking tool that managers and recruiters use on a weekly basis to track actual performance to goals. As always, the more students a recruiter enrolls, the more money he or she earns.

The switch to including qualitative factors in a performance evaluation was difficult for many managers. With the extra layer, some managers sent evaluations that contained high ratings for a recruiter's ability to communicate well, for instance, when the recruiter was failing to meet his or her enrollment goals. Some managers suggested a pay raise anyway, based on the fact that the recruiter "often or always exceeded expectations" in the manager's opinion in all of the qualitative categories. According to one manager, when this occurred (that a promotion was recommended based on the qualitative factors instead of enrollments) headquarters rejected the recommendation.

CONFIDENTIAL

APOL 0001248

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 20

As a result of this confusion by some managers, in late 1999 or early 2000, UOP's Corporate Director of Enrollment came up with a "key"—a document that explained to directors of enrollment how properly to convert quantitative factors into qualitative factors. This key was a line-by-line reproduction of the qualitative factors off of UOP's standard performance evaluation, the one maintained in the "official" personnel file with a translation of how managers should equate these factors with a recruiter's quantitative enrollment numbers. For instance, the key said that if a recruiter wasn't making enough telephone calls, the manager should check the "requires improvement" or the "unsatisfactory" box in category IV. 4. (IV. "Working Relationships" 4."Establishes and promotes constructive working relationships").

### 5.1.4  Salaries Actually Based on Quantity of Recruiting Activities

The evaluation system at UOP, designed to obfuscate the fact that salary evaluations for recruiters is founded solely on the number of students a recruiter enrolls and, did, in fact, result in significant financial rewards for those who rose to the top of the Stack Rankings. For example, UOP promised one recruiter, hired in April 2000 at $32,000, that her salary would double in nine months if she enrolled 116 students – a number that fell in the "exceeds expectations" category on the matrix for the time period. According to UOP's matrix, enrollments in excess of 120 for six months rates as "always exceeds." Under the UOP Enrollment Counselor Policy Effective Fiscal Year 1999, the "always exceeds" salary level is $76,000 - $110,000. This recruiter enrolled 148 students in her first nine months, resulting in an "always exceeds" rating in her first evaluation. UOP increased her salary to $88,000, a raise of $56,000 per year, as of February 1, 2002, only ten months after UOP hired her.

UOP's salary history data substantiates that the above example is no exception. Salaries for recruiters consistently tracked the matrix / salary guidelines set forth in the UOP Enrollment Counselor Policies for each year since August 1, 1999. Thus, as in the above example, some new recruiters, hired at $28,000 - $32,000, received phenomenal raises in their first year, such as:

| Recruiter | # Enrollments In 6 mos Prior to Evaluation | Salary Before Evaluation | Raise | Salary after Evaluation |
|---|---|---|---|---|
| #1, hired 6/1999 | 136 | $28,000 | $58,000 | $86,000 a/o 4/2000 |
| #2, hired 6/1999 | 112 | $32,000 | $47,700 | $79,700 a/o 3/2000 |
| #3, hired 5/2000 | 151 | $28,000 | $57,000 | $85,000 a/o 3/2001 |
| #4, hired 3/2000 | 127 | $30,000 | $50,000 | $80,000 a/o Jan 2001 |
| #5, hired 6/2001 | 100 | $34,000 | $24,000 | $58,000 a/o 3/2002 |
| #6, hired 4/2002 | 100 | $30,000 | $37,000 | $67,000 a/o 5/2003 |

APOL 0001249

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 21

Recruiters who fell lower on the Stack Rankings– those who were in the "meets" range for new recruiters–generally 76 – 95 enrollments for six months,[5] received no raise or only a small percentage increase (2% - 10%) raise.

| Recruiter | # Enrollments In 6 Mos prior to Evaluation | Salary Before Evaluation | Raise | Salary after Evaluation |
|---|---|---|---|---|
| #7, hired 4/1999 | 98 | $41,300 | $1,700 | $43,000 a/o 6/2000 |
| #8, hired 11/1999 | 79 | 32,000 | $4,000 | $36,000 a/o 9/2000 |
| #9, hired 11/1999 | 93 | $38,000 | $2,000 | $40,000 a/o 9/2001 |
| #10, hired 1/2000 | 57 | $28,000 | $1,000 | $29,000 |
| #11, hired 9/2001 | 77 | $33,000 | $1,600 | $34,600 |

As a result of the evaluations UOP performs quarterly, the school reviews recruiters' salaries annually.[6] The evaluation form sets forth the various factors of the matrix, rating each factor as "Unsatisfactory", "Requires Improvement", "Meets Expectations", "Often Exceeds Expectations" or "Always Exceeds Expectations." At the bottom of the form, the manager checks an overall performance level of the recruiter, on a quarterly basis. UOP then establishes the salary of the recruiter based on this bottom line rating (Meets, etc.). If the recruiter meets the performance requirements for promotion, the manager completes a Personnel Action Form recommending a salary increase or promotion. This form must then be approved by those in the chain of command at the local level before being sent to the Corporate Operations Manager, the person responsible for maintaining the Stack Rankings, who once again verifies that the enrollments attributed to the recruiter are accurate. The Corporate Operations Manager's approval was obtained on all raises and promotions of recruiters reviewed.

A review of the salary history of UOP recruiters, in conjunction with the Stack Rankings, demonstrates that UOP consistently grants enormous salary increases to those with high enrollment numbers. Generally, recruiters with over 200 enrollments per year have salaries in the $80,000 - $100,000 range, regardless of how long they have worked for UOP. Recruiters who reach this enrollment target can be assured that UOP will reward them with whatever raise necessary to reach this salary level. For example, UOP gave recruiter #1 a $58,000 raise, bringing his salary to $86,000 per year, in 2000 when he enrolled 239 students and was #9 out of 430 in the Stack Rankings. UOP awarded recruiter #3 a $57,000 raise, increasing her salary to $85,000, in 2001 when she enrolled 280 students and was #6 out of 396 in the Stack Rankings. UOP provided recruiter #4 a $50,000 raise, increasing her salary from $30,000 to $80,000 in 2001, a fiscal year in which she enrolled 210 students and ranked #33 out of 396 in the Stack Rankings.

---

[5] The matrix enrollment requirements for each category varied slightly from year to year and between areas of the country. Also, the enrollment requirements for ratings were different depending on whether a recruiter was new or experienced (more than one year).

[6] Currently, and as of the 2000 Fiscal Year (year beginning September 1, 1999), salary evaluations are performed annually after the evaluation following initial training. In prior periods, these evaluation and salary review periods have varied from six months to nine months.

APOL 0001250

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 22

Until the year 2000, UOP historically also decreased recruiters' salaries when they failed to
maintain their level of enrollments. The salary history data of UOP also confirms this practice.

### 5.2 Bonus Incentives Awarded on Basis of Success in Securing Enrollments and Quantity of Recruiting Activities

#### 5.2.1 Sperling Club Trip Awards

Named after the UOP founder, John Sperling, UOP sponsors "Sperling Club Trip Awards."
Sperling trips are all-expense paid trips, for the recruiter and his or her partner, to a nice
location. Sperling trips cost UOP between $500 - $1,000 per winner. Under the Sperling Club
Trip Award program, recruiters may win a Sperling Trip by successfully enrolling a specific
number of students within a given period of time. For example in one Sperling Trip promotion,
UOP promised that recruiters who enrolled 71 students during the months of June through
August 2000 would receive a Sperling trip. One recruiter who won this award enrolled 76
students. She indicated that the trip included wining, dining, awards, kudos, a trip to Universal
Studios, a trophy and a plaque. The trip was all-expenses paid, including the expenses of her
husband. This recruiter also won a Sperling trip to Las Vegas, and since she significantly
exceeded the enrollment goal, UOP also gave her $100 worth of gambling chips.

The majority of recruiters interviewed confirmed knowledge of the Sperling Club Trips. All
confirmed that the awards are based on solely on the number of students recruiters enrolled.
UOP management in Phoenix insisted that Sperling Club Awards are based on a number of
factors, not just enrollments. However, enrollment managers and recruiters all confirmed that
Sperling Club Trips for recruiters were awarded based solely on the number of enrollments.
One enrollment manager stated: "Sperling is definitely based on enrollments. There is a set
goal and the counselor has to obtain it in order to win."

Sperling Club Trip Awards are announced and promoted by managers via email to recruiters.
For example, one email recently announced that a Sperling trip is coming up and explained that
in order to win, a recruiter must get 50 new students to enroll and complete the first course.
Several recruiters confirmed that they had won Sperling Club Trips. Such trips included an all-
expense paid trip for one recruiter and her husband to Washington D.C., where UOP covered
the costs of accommodations at the Watergate Hotel. This recruiter said that her manager
informed her that she had won by sending her the following email: ". . ., it's official. Every new
enrollment has been confirmed and you have achieved president's level of the Sperling Trip"

In the recent past, managers have been more careful about announcing the number of
enrollments required for a Sperling Club Trip. Aware of the Department's prohibition against
incentives based on recruiting activities, managers have typically masked the target number
required to win. For example, one director of enrollment sent an email that stated: "You all
know that I celebrated my 50th birthday. So seniors, you know how many enrollments are
needed. You all know what birthday I celebrated this month." Recently, however, for the 2003
September Sperling Trip to San Francisco, the director of enrollment orally announced the
requirements rather than sending an email: EC2s and senior ECs would need 34 starts (not
applications) and freshmen and EC1s would need 25. This was announced at an OSIRA
meeting attended by all recruiters at the location.

CONFIDENTIAL

APOL 0001251

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 23

### 5.2.2 Prizes, Gifts and Bonuses

In addition to awarding expense-paid trips for enrollments, UOP provides incentive awards for securing enrollment applications or numbers of other recruiting activities. A number of recruiters confirmed having received gift certificates from their managers for obtaining a certain number of applications or otherwise winning a recruiting activity contest within a given period of time. Such incentive awards included:

- $100 Macy's or other gift certificate
- $100 dinner gift certificate
- DVD player
- $100 Toys R Us gift certificate
- Electronic digital camera
- Spa packages
- Ski tickets
- Lottery tickets
- A's Baseball tickets
- Cash
- Portable CD Player

UOP ran these contests during months that enrollments were down or numbers were behind. They generally focused around quarterly or annual reporting periods.

Enrollment managers and recruiters confirmed that UOP bases these awards solely on the numbers of certain recruitment activities.

A typical email for these awards is the following:

> From:  Enrollment Director
> Sent:  1/17/2003
> To:  NCAL ENROLLMENT
> Subject:  MAKING PROGRESS/CONTEST
> Thank you for your commitment this past week. . . You have shown that January is not out of reach. . . And <u>sitting in my hot little hands is a $100.00 dollar Toys R Us gift certificate</u> *just waiting to be taken from me and used.*
> *HERE'S THE DEAL . . .*
> You have from today 1/17 until 5:00 PM on 1/24 to win it. . . HERE"S HOW
>     1. Whoever takes the most <u>APPLICATIONS FOR JANUARY from 1/17 to 1/24 WINS. . .</u>
> NOTE:  IT TAKES <u>7</u> APPLICATIONS MINIMUM TO WIN
>
> If each of us can add 3 applications between 1/17 and 1/24 we will be real close to our goal in January which will set the table for a SUPER February. . . Regards,

At the On Line Campus, contests were run from time to time, based on enrollments or applications within a given period of time, but such contests were far less generous. They included a free dinner at PF Changs or a similar prize. In the quarterly meeting at the end of the most recent fiscal year, ending August 2003, UOP On Line gave overnight hotel stays to recruiters who had 25 enrollments or more.

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 24

UOP's On Line Campus also frequently ran contests that awarded time off – usually Fridays – where application targets are met within a specific timeline. On the other hand, where numbers were not met, recruiters might receive an email from their manager informing them that overtime or weekend time, without pay, would be required.

### 5.3   Ramifications / Results of System in Practice

#### 5.3.1   Pressure to Enroll Unqualified Students

Recruiters frequently mentioned their concern for student customers for whom UOP was not a good educational option, such as customers who, because of their family and financial situation, could not reasonably expect to complete a degree program at UOP and would be better served by other alternatives, such as a community college. UOP managers chastise recruiters who suggest anything other than UOP. UOP makes it very clear that recruiters are to do whatever it takes to get the student to enroll. Some mangers told recruiters that if a student drops after the first five-week course, it should not be their concern, because by then, the recruiter and the manager will have received the enrollment credit.

Recruiters at both On Ground and On Line stated that they are pressured by management to enroll students who are not qualified. They indicated that managers chastise them for failing to pressure students into enrolling or staying in their first class, in spite of the lack of financial resources. UOP makes it clear that recruiters are expected to find a way to "overcome objections," e.g., if the problem was insufficient funds, encourage Title IV funding. If the objection was insufficient Title IV funds, pressure the student to seek a private loan.

Some recruiters who were also UOP students expressed concern that UOP kept students in class even though they were unable to perform. Some mentioned that UOP pressured instructors to pass all students, regardless of performance.

#### 5.3.2   Focus on Obtaining Credit for Enrollment, Not Completing Education

From its monthly Commissionable Sales Reports, to its Admissions Counselor Policy Guide, to its repeated reminders from managers, UOP reinforces to recruiters that UOP evaluates and pays them solely on the basis of how many students they enroll. Recruiters recounted how they are careful to follow students until they met the criteria that resulted in credit to the recruiter's enrollment count for purposes of salary: specifically, that the student must attend three nights of the first five-week course of a bachelors' program or, for graduate students, attend two nights of a graduate class and be scheduled to attend a second class. After the student has met these criteria, the managers do not want the recruiters to spend time with a student. UOP requires them to pursue new enrollments, not follow those who have already completed one course.

Many recruiters thought that this system of selling the student and then dropping them once the enrollment credit is earned, underscores UOP's lack of concern for its students. Those who had been at UOP for several years all stressed that at one time, UOP had been more student and education oriented. After its Wall Street debut, however, UOP eliminated the focus on students and became increasingly aggressive in its obsession with numbers: new enrollments, meeting Wall Street expectations, maintaining profit margin. This is especially acute in the case of UOP On Line, where in quarterly meetings with recruiters, the Chief Operating Officer has stated that

APOL 0001253

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 25

he intends for "UOP On Line to be the Microsoft of on line education" and that "UOPX will crush Capella"[7] or other competitors, "like a grape."

### 5.3.3   Intense use of Title IV Funds as Sales Tool / Culture of Duplicity

Recruiters at the On Line Campus were aware that many improprieties involving Title IV funding and the enrollment process occurred in order to receive credit for enrollments. "People do a lot of sneaky things to get regs (enrollments)." For example, there was one recruiter who created an entire FAFSA and completed all the forms for the student. He created the login and password for the student and the student could not even get into his account because he did not have his password. Recruiters also represented that Title IV funds would pay all costs, and that students would have no out of pocket expense for their UOP education, when, in fact, Title IV funding does not cover all costs. These recruiters all expressed concern that students recruited in this manner were being deceived, because UOP begins vigorous collection efforts as soon as a student withdraws or completes a program – an event that catches many students by surprise. One recruiter went so far as to say that he hears recruiters "lie to students every day."

A number of recruiters at the On Line Campus were aware of instances where other recruiters had forged or "cut and pasted" student signatures electronically onto master promissory notes and other enrollment documents in order to get the application or enrollment credit by announced deadlines. Employees recounted that one recruiter was so good at forging student signatures, that he was dubbed "The Doctor." One manager expected his recruiters to complete paperwork that the student is required to complete. He went so far as to train new recruiters how to complete or modify a student's paperwork in order to expedite the credit of an enrollment.

At the On Line Operation, recruiters are taught how to use Title IV funding as an effective tool for closing a sale. UOP On Line provides its recruiters with financial aid instruction on how to use Title IV to "overcome objections.". The training program and sales materials for recruiters teaches them how to use financial aid effectively as a sales tool. One of the strategies is to ask the potential student: "You can afford $50 per month for your bachelors, can't you?" The recruiter then tells the prospective student that all they really need to complete for now is the first five-week course. Title IV funding covers the costs of this course. Students can then withdraw, work on getting CLEP credits and return in a year or two at a higher grade and loan eligibility level. Students do not have to pay back any loan money until six months after withdrawal and the loan payments will only be about $50 per month because the loan is only for the first five-week course. This way, there is no "out-of-pocket" cost. A number of recruiters mentioned this strategy as very effective in "overcoming objections."

### 5.4   Conclusion:  UOP Violated Incentive Compensation Prohibitions and Breached its Fiduciary Duty

#### 5.4.1   Deceptive Practices to Mislead The Department

The sales philosophy at UOP and practice is designed around evasion and relies upon euphemisms to avoid detection by the Department. UOP systemically established terminology and procedures to hide the fact that UOP pays distinct and significant financial incentives solely based on recruiters' success in securing enrollments. Since evaluations and salaries based on

---

[7] Capella University, headquartered in Minneapolis, Minnesota, is one of UOP's largest competitors for on line students.

APOL 0001254

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 26

*enrollments* would be readily detectable by an auditor or Department reviewer, UOP refers to enrollments as "*activities* or *"level one student information cards."*

Several recruiters told the reviewers that they had confronted their managers during evaluations about the fact that they were actually being evaluated on enrollments, not the "fluff" factors printed on the evaluation forms (the subjective factors: Judgment, Customer Service, etc.). All were told by UOP that it will always be about enrollments.  One recruiter quoted his manager as saying: "You know you are evaluated on the basis of enrollments and we've always talked about that.  You know that.  It's never ever been a secret that there is an enrollment number that you are expected to hit."  All On Line Campus recruiters who were interviewed, except for those chosen for interview by UOP, stated that their salary was based on the number of students they enroll, a fact that managers reiterate frequently on an oral basis, although they never put it in writing.

Recruiters also told reviewers that whenever "visitors" (government visitors, accreditation visitors) were expected, recruiters are coached by managers on what to say.  Typically, according to these recruiters, required enrollment and/or application numbers are very visibly posted on the walls and on desks.  When "visitors" are expected, however, these posters and desk 'reminders' are removed until the visitors are gone.

Literally *every current* UOP employee who has worked longer than a year, expressed anxiety over possible retaliation by UOP.  Many commented on the fact that in the current economy, jobs are very difficult to find, and UOP never hesitates to replace anyone that it considers to be other than a loyal "team player."

Recruiters consistently mentioned the focus and pressure to increase enrollments to report to Wall Street.  Many expressed that while UOP at one time focused on the student and stressed ethical conduct, the culture now is one where the emphasis is on increasing the numbers, the stock price and meeting Wall Street expectations.  UOP's corporate culture, steeped in "smoke and mirrors," creates a façade where some can survive, prosper and get rewarded.  Often ethics are set aside.

### 5.4.2   Cover Up During Review

UOP's behavior during the program review process further substantiates the ethical concerns expressed by both current and former employees.

One of the On Line recruiters said that her manager called her and one of her teammates aside when it was learned that the Department was reviewing the incentive compensation issue and would visit the On Line operation.  The manager coached them to say that salaries were based on a number of factors, not just enrollments.  The manager further instructed them that they were not to speak to any former UOP employees about what goes on at UOP.

After the announcement of the program review, UOP informed its recruiters that if they were contacted by someone from the Department for an interview, they were first to inform management prior to speaking with him or her.  Recruiters uniformly stated that they felt very intimidated by UOP due to this pronouncement.

On the first day of the review, UOP officials were told that the focus of the review was the compensation plan for those involved in admissions activities, and that the review would encompass both Northern California and Phoenix locations and involve interviews with UOP

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 27

staff. Shortly after this announcement, UOP management told some recruiters at the Northern California locations that they should take leave or attend some function away from the premises. When contacted by the Department after the site visits, these recruiters indicated that they were absent for interviews because they had reputations for being nonest and frank.

At the San Francisco location prior to the announcement of the program review, UOP was operating a contest for recruiters that awarded prizes based on the number of applications. This contest (for the busiest month of August) was celebrated by placing Monopoly money on a bulletin board in the office with numbers (corresponding to Applications obtained). Once a recruiter achieved the requisite number of Applications, they could lift the number and find the prize underneath. The lower numbers consisted of lottery tickets, but some of the higher prizes reached into the hundreds of dollars in cash. Upon announcement of the program review, however, UOP removed the Monopoly game.

At the On Line Campus, UOP generally posts large banners ranking the recruiters by the number of enrollments cleared. UOP removed these banners shortly before the arrival of the reviewers for interviews of On Line personnel. The UOP spreadsheets posted on recruiters' computer desktops that showed the salary / enrollment "goals" were also removed the day of the reviewers' arrival at the On Line Campus.

The actions of UOP and the system it has established cultivates and maintains a corporate culture in defiance of UOP's fiduciary duty. UOP has created an environment that pits the strong motivation of individual gain against its fiduciary duty to the Department. It is one that flaunts the Department's regulations and the prohibition against incentive compensation based on enrollments.

6    REFERENCES

Sections 487(a) and 487(a)(20) of the Higher Education Act require that:

> In order to be an eligible institution for the purposes of any program authorized under this title an institution . . . shall . . . enter into a program participation agreement with the Secretary. The agreement shall condition the initial and continuing eligibility of the institution to participate in a program upon compliance with the following requirements:

> . . . The institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . .

From July 1994 until November 2002, the General Provisions regulations at 34 C.F.R. §668.14(b)(22) codified this prohibition of commissions or incentives based on securing enrollments in the section relating to Program Participation Agreements, as follows:

> By entering into this program participation agreement, an institution agrees that . . . it will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payments based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance. .

CONFIDENTIAL

APOL 0001256

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 28

The Department amended the provision to specify 12 "safe harbor" compensation and payment plans. These "safe harbors[4] were designed to allow institutions to maintain compensation plans that provide for increases to fixed compensation while remaining in compliance with the HEA and implementing regulations. 67 Fed. Reg. 51723 (Aug. 8, 2002). These "safe harbors" included:

- 34 CFR §668.14(b)(22)(ii)(A): Adjustments to fixed employee compensation
- 34 CFR §668.14(b)(22)(ii)(B): Enrollments in programs that are not eligible for Title IV
- 34 CFR §668.14(b)(22)(ii)(C): Contracts with employers
- 34 CFR §668.14(b)(22)(ii)(D): Profit-sharing or bonus payments to all employees
- 34 CFR §668.14(b)(22)(ii)(E): Compensation based upon program completion
- 34 CFR §668.14(b)(22)(ii)(F): Clerical pre-enrollment activities
- 34 CFR §668.14(b)(22)(ii)(G): Managerial and supervisory employees
- 34 CFR §668.14(b)(22)(ii)(H): Token gifts to students or alumni
- 34 CFR §668.14(b)(22)(ii)(I): Profit distributions based on ownership
- 34 CFR §668.14(b)(22)(ii)(J): Internet-based activities
- 34 CFR §668.14(b)(22)(ii)(K): Payments to third parties for non-recruitment activities
- 34 CFR §668.14(b)(22)(ii)(L): Payments to third parties for recruitment activities

As amended in 2002, the regulation now provides, in relevant parts, that an institution agrees that:

    (i) It will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds. . . .

    (ii) Activities and arrangements that an institution may carry out without violating the provisions of paragraph (b)(22)(i) of this section include, but are not limited to:

        (A) The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. For this purpose, an increase in fixed compensation resulting from a cost of living increase that is paid to all or substantially all full-time employees is not considered and adjustment.

        (E) Compensation that is based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter. For this purpose, successful completion of an academic year means that the student has earned at least 24 semester or trimester credit hours or 36 quarter credit hours, or has successfully completed at least 900 clock hours of instruction at the institution.

        (F) Compensation paid to employees who perform clerical "pre-enrollment" activities, such as answering telephone calls, referring inquiries, or distributing institutional materials.

CONFIDENTIAL

APOL 0001257

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 29

> (G) Compensation to managerial or supervisory employees who do not directly
> manage or supervise employees who are directly involved in recruiting or admissions
> activities, or the awarding of title IV, HEA program funds.
>
> (H) The awarding of token gifts to the institution's students or alumni, provided that
> the gifts are not in the form of money, no more than one gift is provided annually to
> an individual, and the cost of the gift is not more than $100.

34 C.F.R. §668.14(b)(22).

The first safe harbor, pertaining to salary adjustments, was designed to create a "balance
between the need of an institution to base its employees' salaries or wages on merit, and
concern that such adjustments do not make the statutory prohibition against the payment of
commissions bonuses, and other incentive payments meaningless." 67 Fed. Reg. 51723 (Aug.
8, 2002). The Secretary of Education stressed, in the Preamble to the Notice of Proposed
Rulemaking, that while salary adjustments based on merit do not, *per se* violate the prohibition;
salary adjustments based solely on the number of students recruited, admitted, enrolled, or
awarded financial aid do not fall within the safe harbor. Id. The safe harbor was not intended to
exclude salary adjustments that are "formulated in a way that circumvents the statutory
prohibition against incentive payments." Id.

When enacting §487(a)(20) of the HEA in 1992, the conference report indicated that the drafters
did not mean to imply that institutions could not base salaries or salary increases on merit. The
Congressional concern addressed by §487(a)(20) was to prevent an institution from providing
incentives to its staff to enroll unqualified students. 67 Fed. Reg. 67053 (Nov. 1, 2002). The
regulation was drafted to set forth specific arrangements that constitute legitimate business
practices that did not support the enrollment of unqualified students. Id Thus, in discussing the
various safe harbors, the Secretary repeated the theme that a payment practice will not fall
within a safe harbor when it is tied to student recruitment. For example:

- salary adjustments based on success in securing enrollments remain prohibited;
- denial of cost of living increases tied to student recruitment remain prohibited;
- a third party marketing firm that pays its employees on the basis of activities related to
  recruitment, admissions, enrollment or financial aid also violates the prohibition.

67 Fed. Reg. 67056-67057 (Nov. 1, 2002).

Applying this guidance to UOP's system of recruiter salary compensation, we find that UOP:

- hires its recruiters with the promise of lucrative compensation for success in securing
  enrollments;
- maintains a recruiter evaluation and salary system that provides incentive payments
  based both directly and indirectly on success in securing enrollments;
- provides substantial incentives to its staff to recruit unqualified students and students
  who cannot benefit from the training offered;
- systematically and intentionally operates in a duplicitous manner so as to violate the
  Department's prohibition against incentive compensation while evading detection.

Accordingly, UOP is in direct violation of §487(a)(20) of the Higher Education Act.

CONFIDENTIAL

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 30

## 7    REQUIREMENTS

The requirements herein apply to all UOP institutions, including University of Phoenix, University of Phoenix On Line and Western International University.

In response to this Program Review Report, UOP is required to make substantial and comprehensive changes to the salary compensation system for its recruiters and their direct supervisors. It must also provide the specific documents and information specified below. UOP's response must include:

- policies and procedures for notifying and training its recruiters, admissions managers and admissions directors of the Department's rule prohibiting any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities;

- policies and procedures for any employee of UOP to notify the Department directly and confidentially, by contacting the San Francisco Case Management Team of any plan or program that provides any commission, bonus or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities;

- policies and procedures specifically providing that no retaliation shall be made against any such employee who provides the notification outlined above.

*Documents and Information to Be Provided.*

1. Salary History Report. UOP is to conduct a review of its salary records for all employees (both UOP and WIU) engaged in any student recruiting or admission activities on or after September 1, 1998 to the date of its response and prepare a salary history report for all such employees, including admissions counselors and managers. Such report must be in either Excel or Access format and be provided electronically, setting forth the following information with respect to each such employee:

    a. Last Name
    b. First Name
    c. Social Security Number
    d. Date of hire and position for which hired
    e. Beginning salary
    f. Date and amount of each salary change
    g. Amount of each salary change
    h. Each position held at UOP and beginning date for each position
    i. Employee's current status (current employee, terminated, leave of absence)
    j. For terminated employees, the date of termination

2. Monthly Starts/Enrollments Report for each recruiter employed by UOP or WIU for all employees engaged in any student recruiting or admission activities on or after September 1, 1998. Such report must be in either Excel or Access format and be provided electronically, setting forth the following information with respect to each such employee:

CONFIDENTIAL                                                        APOL 0001259

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 31

    a.  Last Name
    b.  First Name
    c.  Social Security Number
    d.  Month and Year
    e.  Number of enrollments for each month

3.  Admissions' Managers and Directors' Documentation used on or after September 1, 1998 to the present, including training materials, instructions, memorandum, charts or any other documents that were provided to, used by and/or were in effect for the purpose of guiding or instructing managers, directors and those involved in management as to how to evaluate any employee, in the position of: enrollment or admissions counselor, academic counselor, financial intake specialist, re-entry counselor, includng, but not limited to the "key" and all memoranda and email transmitting the same used to instruct managers with respect to the rating of various factors listed on any evaluation form, matrix and/or other document used in employee evaluations.

4.  Admissions Counselors and Admissions Managers and Directors' Matrixes in effect on or after September 1, 1998 to the present:

5.  Student Status Report for all students from and after September 1, 1999 to the present. Such report should set forth the following on a fiscal year basis by location:

    a.  Total enrollments
    b.  Total number of students in each status tracked by UOP and WIU, including students who have the status "temporary drop"
    c.  Total number of students enrolled who have not attended in the sixty days prior to your response
    d.  Total number of students who have not attended for 180 days or more prior to your response

6.  Copies of any and all documents, from or after September 1, 1998 to the date of your response, including emails, memoranda, letters and any other correspondence addressing awards, bonuses or incentive compensation provided to any person or entity engaged in any student recruiting or admission activities, including, but not limited to, Sperling trip awards, gift certificates, trips, hotel stays provided to On Line recruiters in 2003 and electronic equipment.

7.  Explanation of and full listing of all "lump sum" payments made from and after September 1, 1998 to the present, to any person or entity engaged in any student recruiting or admission activities.

8.  Please specifically explain the following lump sum amounts paid to the following employees, setting forth in your explanation the basis of such payment. Please also provide a copy of the full personnel file for each of the following employees:

| Recruiter | Amount | Date |
|---|---|---|
| Tracy Coomes | $840 | 4/1/02 |
| Nikki Sandoval | $2,018 | 2/1/03 |
| Sandra Ryan | $2,000 | 10/1/02 |
| Karen Berkowitz | $2,080 | 9/1/02 |

CONFIDENTIAL

APOL 0001260

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 32

| Recruiter | Amount | Date |
|---|---|---|
| Leslie Bruga | $1,883 | 10/1/02 |
| Wendy Vasquez Osborn | $2,550 | 3/1/03 |
| David Ober | $2,490 | 8/1/02 |
| Dean Markado | $1,890 | 4/1/03 |
| JoAnn Drescher | $1,640 | 9/1/02 |
| Eydie Lake | $900 | 6/1/02 |
| Renee Hovden | $1,689 | 5/1/03 |
| Tina Duran | $2,080 | 10/1/02 |

9.  Attached to this report as Appendix B is a list of UOP employees.  In your response, provide a copy of the full personnel file, all evaluations and matrixes and all documents contained in the individuals' files maintained by the Corporate Operations Manager, Beverly Young.  Note:  all employees identified in #8 above are also on Appendix B.

10. A copy of the Excel spreadsheets maintained by the Corporate Operations Manager, Beverly Young, that sets forth recruiter salary and evaluation data for each recruiter, from September 1, 1999 through the date of your response.  (Copies of two such spreadsheets, covering part of the 2003 Fiscal Year, entitled "Online Rep Comp 03.xls" and "On Ground REPCOMP 3.xls" were provided to the reviewers during the site visit.)

CONFIDENTIAL

APOL 0001261

University of Phoenix Program Review Report
Appendix A:  List of Recruiters Identified in Report

| Reference # | Name | Location | Hire Date |
|---|---|---|---|
| 1 | Upham, Daren | On Line | 6/29/1999 |
| 2 | Barker, Larry | Scal Fou and Diamond Bar | 10/28/1996 |
| 3 | Nunez, Evelyn | Cen - Co | 5/16/2000 |
| 4 | Hughes, Janie | Ncal – Bak. | 3/28/2000 |
| 5 | Polk-Bridges, Dawn | Hou | 6/12/2001 |
| 6 | Ghere, Amy (Carol.A.) | Cen – Tul | 4/29/2002 |
| 7 | Keck, Irving | Phx-Apo-All Companies | 4/12/1999 |
| 8 | Quynh, Beth | SW – Las | 11/29/1999 |
| 9 | Burch Gillman, Holly | SW – Las | 11/29/1999 |
| 10 | Mandeville, Carey | SE – Jac | 1/31/2000 |
| 11 | Lodermeier, Jamie | NW – Utah, Sal | 9/4/2001 |

CONFIDENTIAL

APOL 0001262

Appendix B:  List of Employees for Whom Personnel Records are to be Provided

| No. | Name | Location | Hire Date | Exit Date |
|-----|------|----------|-----------|-----------|
| 12 | Adams, Missy (Melissa) | Phx-Uop-Online Campus-3157 | 11/27/00 | 08/12/02 |
| 13 | Allen, Kelley | Phx-Uop-Online Campus-3157 | | |
| 14 | Armstrong, Jennifer | Phx-Uop-Online Campus-3157 | 01/28/02 | |
| 15 | Ball, Ryan | Dun-Uop-Se-Atlanta Main & Jacksonville | 02/22/02 | |
| 16 | Barker, Larry | Dia-Uop-Scal-Diamond Bar | 10/28/96 | |
| 17 | Baum, Nicole | Hou-Uop-Cen-Westside | 08/20/01 | |
| 18 | Berkowitz, Karen | Phx-Apo-All Companies-4605 | 09/19/94 | |
| 19 | Biggs, Sam | Phx-Uop-Online Campus-3157 | 08/07/00 | |
| 20 | Blundell, Irene | Phx-Uop-Online Campus-3157 | 01/27/86 | |
| 21 | Bruga, Leslie | Phx-Uop-Online Campus-3157 | 02/28/92 | |
| 22 | Sparks,Loriann M | Phx-Uop-Online Campus-3157 | 10/16/00 | |
| 23 | Cinkus, Linda | On Line | | |
| 24 | Clayton, Molly | Phx-Uop-Online Campus-3157 | 11/16/01 | |
| 25 | Coomes, Tracy | Bar-Uop-Se-Baton Rouge | 06/19/01 | |
| 26 | Daniel, Julia | WIU | | |
| 27 | Daugherty-Suess,Erin J | Lon-Uop-Cen-Co Main | 08/27/01 | |
| 28 | Dirrim, Jeffrey D. | Phx-Uop-Online Campus-3157 | 07/24/00 | 8/12/02 |
| 29 | Drescher, Jo Ann | Tuc-Uop-Sw-Tucson | 04/18/95 | |
| 30 | Duran, Tina | Phx-Apo-All Companies-4605 | 07/14/97 | |
| 31 | Earl, Saralyn | SW – Las Rancho | 9/26/01 | |
| 32 | Eiting, Veronica | Phx-Uop-Online Campus-3157 | 7/10/00 | 5/1/03 |
| 33 | Finn, Anthony | Phx-Uop-Online Campus-3157 | 06/18/01 | |
| 34 | Freeman, Tina | Phx-Apo-All Companies & Scottsdale | 9/9/91 | |
| 35 | Fuqua, Susan | Nas-Se-Uop-Nashville Main | 07/16/02 | |
| 36 | George, Dawn | Tem-Uop-Se-Tampa | 09/04/02 | |
| 37 | Gittus, Barbara | Phx-Apo-All Companies & On Line | 11/17/93 | |
| 38 | Griffin, Sandra | Phx-Uop-Online Campus-3157 | 10/16/01 | |
| 39 | Hatch, Josh | Phx-Uop-Online Campus-3157 | 03/05/01 | |
| 40 | Hill, Cynthia | Bro-Uop-Mdw-Milwaukee | 06/01/01 | |
| 41 | Hoggins, Bradley J. | Sal-Uop-Nw-Utah Main | 06/04/01 | |
| 42 | DeLong,Renee A (Hovden) | Phx-Uop-Online Campus-3157 | 07/19/99 | |
| 43 | Irwin,Christopher W | Pas-Uop-Scal-Pasadena | 05/06/97 | |
| 44 | Ismail, Arzina | Sou-Uop-Mdw-Detroit Main | | |
| 45 | Jones, Lynette | Phx-Uop-Online Campus-3157 | 03/19/01 | 9/4/02 |
| 46 | Jones, Spencer | Phx-Uop-Online Campus-3157 | 5/16/01 | |
| 47 | Kayer, Denise | Phx-Uop-Online Campus-3157 | 02/16/99 | 1/6/03 |
| 48 | Kimmell, Jason | Phx-Uop-Online Campus-3157 | 10/29/01 | |
| 49 | Klatt, Julie | Wes-Uop-Cen-Westminster | 2/17/98 | |
| 50 | Kramer, Jon B. | Phx-Uop-Online Campus-3157 | 4/3/00 | |
| 51 | Lake, Edwina E. | Phx-Uop-Online Campus-3157 | 12/27/95 | |
| 52 | Lardizabal, Claudia | San-Uop-Cen-Santa Theresa | 03/29/99 | |
| 53 | Levin, Barry | Scal-Woodland Hills & Gardena | 8/12/96 | 7/3/02 |

APOL 0001263

University of Phoenix Program Review Report
Appendix B, Page 2

| No. | Name | Location | Hire Date | Exit Date |
|-----|------|----------|-----------|-----------|
| 54 | Lewis, Scott | Phx-Uop-Online Campus-3157 | 4/30/01 | |
| 55 | Lindsten, Carlyn | Chu-Uop-Scal-Chula Vista | 06/05/02 | |
| 56 | Lodermeier, Jamie | Sal-Uop-Nw-Utah Main | 09/04/01 | |
| 57 | Markado, Dean G | Woo-Uop-Scal-Woodland Hills | 01/4/93 | |
| 58 | Martinez, Shannon | Phx-Uop-Online Campus-3157 | 10/12/98 | |
| 59 | Maxson, Sherri | Phx-Uop-Online Campus-3157 | 03/05/01 | |
| 60 | Mendoza, Ricardo | Woo-Uop-Scal-Woodland Hills | 04/20/99 | |
| 61 | Merrill, Chad J | Phx-Uop-Online Campus-3157 | 02/20/01 | |
| 62 | Mollette, Judie | Phx-Uop-Online Campus-3157 | 05/15/00 | |
| 63 | Montenegro, Franz J | Woo-Uop-Scal-Woodland Hills | 10/10/99 | |
| 64 | Montross, Jacob L | Phx-Uop-Online Campus-3157 | 09/05/00 | |
| 65 | Moss, Cindy | Phx-Uop-Online Campus-3157 | | |
| 66 | Mulligan, Lisa | Phx-Apo-All Companies & On Line | 07/20/98 | |
| 67 | Murdock, Barbara | WIU | | |
| 68 | Nebeck, Russell J | Phx-Uop-Online Campus-3157 | 01/03/00 | |
| 69 | Nunez, Evelyn | Lon-Uop-Cen-Co Main | 05/16/00 | |
| 70 | Ober, David R | San-Uop-Scal-San Bernardino | 11/13/00 | |
| 71 | Olney, Heather | Dia-Uop-Scal-Diamond Bar | 12/11/00 | |
| 72 | Paul, William A | Nas-Se-Uop-Nashville Main | 07/16/02 | |
| 73 | Perez, Claudia | Yum-Uop-Sw-Yuma | 06/04/01 | |
| 74 | Perna, Mary Ann | Ont-Uop-Scal-Ontario | 12/09/96 | |
| 75 | Pollack, Jennifer M | Phx-Uop-Online Campus-3157 | 11/13/00 | 5/8/03 |
| 76 | Rauth, Elizabeth | Phx-Uop-Online Campus-3157 | 04/19/99 | |
| 77 | Ridge, Judith | Phx-Uop-Online Campus-3157 | 07/24/00 | |
| 78 | Ries, Nathan | Phx-Uop-Online Campus-3157 | 07/24/00 | |
| 79 | Rocha, Milo | Phx-Uop-Online Campus-3157 | 11/13/00 | |
| 80 | Rogers, Robbin | Phx-Uop-Online Campus-3157 | | |
| 81 | Ryan, Sandra | Phx-Apo-All Companies | 03/22/93 | |
| 82 | Rutherford, Andrea | Phx-Uop-Online Campus-3157 | 12/10/01 | |
| 83 | Savell, Jason | Phx-Uop-Online Campus-3157 | 10/01/01 | |
| 84 | Sandoval, Nikki | Phx-Apo-All Companies | 06/15/99 | |
| 85 | Schrader, Dwight | Phx-Uop-Online Campus-3157 | 12/11/00 | |
| 86 | Seamons, Tawyna | Phx-Uop-Online Campus-3157 | 11/07/96 | |
| 87 | Shah, Monal V | Pla-Uop-Se-Plantation | 09/29/99 | |
| 88 | Shumaker, Brian | Phx-Uop-Online Campus-3157 | 10/16/01 | |
| 89 | Sobrino, Pedro | Puerto Rico | | |
| 90 | Spranger, Lisa | Phx-Uop-Online Campus-3157 | 10/30/00 | |
| 91 | Swanson, Matthew | Las-Uop-Sw-Rancho | 10/25/99 | |
| 92 | Taylor, William | Phx-Uop-Online Campus-3157 | 12/11/00 | |
| 93 | Thomas, James | Phx-Uop-Online Campus-3157 | 02/20/01 | 10/08/01 |
| 94 | Thomas, Randy | Phx-Uop-Online Campus-3157 | 10/16/01 | |
| 95 | Tichenor, Charles | Phx-Uop-Online Campus-3157 | 07/19/99 | 01/15/02 |

CONFIDENTIAL

APOL 0001264

University of Phoenix Program Review Report
Appendix B, Page 3

| No. | Name | Location | Hire Date | Exit Date |
|---|---|---|---|---|
| 96 | Tlapa, Margie E | Fou-Uop-Scal-Fountain Valley | 06/25/02 | |
| 97 | Ufer, Kimberly | Phx-Uop-Online Campus-3157 | 10/20/00 | |
| 98 | Upham, Darren | Phx-Uop-Online Campus-3157 | 06/29/99 | 04/26/01 |
| 99 | Vanlandingham, Sally | Phx-Uop-Online Campus-3157 | 03/06/00 | 11/13/02 |
| 100 | Vasquez Osborn, Wendy | Lon-Uop-Cen-Co Main | 05/03/99 | |
| 101 | Voss, David | Phx-Uop-Online Campus-3157 | 07/10/00 | |
| 102 | Wettstein, Russ | WA ? | | |
| 103 | Wingate, Bobby J. | Phx-Uop-Online Campus-3157 | 11/27/00 | 03/14/03 |
| 104 | Yaghoubi, Sam | Phx-Uop-Online Campus-3157 | 05/16/01 | |
| 105 | Yamashita, Nikki | Phx-Uop-Online Campus-3157 | 01/25/99 | |
| 106 | Zembledge, Emily | Phx-Uop-Online Campus-3157 | 08/27/01 | |
| 107 | Zobisch, Paula | Tul-Uop-Cen-Tulsa Main | 05/25/99 | 12/31/01 |
| 108 | Abruscato, Kathleen D | Phx-Uop-Online Campus-3157 | 4/14/2003 | |
| 109 | Adler, Robert K | Phx-Uop-Online Campus-3157 | 8/12/2002 | |
| 110 | Aguiar, Karen L | Pit-Uop-Ne-Pittsburgh Campus | 4/17/2002 | 07/18/02 |
| 111 | Aiken, Douglas M | Tem-Uop-Se-Tampa | 5/30/2003 | |
| 112 | Akey, Scott A | Sou-Uop-Mdw-Detroit Main | 5/16/2001 | 01/17/02 |
| 113 | Alava, Ignacio R | Phx-Apo-All Companies-4605 | 3/22/1999 | |
| 114 | Albert, Shari | Phx-Uop-Online Campus-3157 | 3/3/2003 | |
| 115 | Aldridge, Paul D | Phx-Uop-Online Campus-3157 | 4/2/2001 | 12/7/2001 |
| 116 | Alfaro, Peraza,Jose I | Phx-Uop-Online Campus-3157 | 1/6/2003 | |
| 117 | Allen, Kalan L | Phx-Uop-Online Campus-3157 | 5/27/2003 | |
| 118 | Allen, Travis J | Sal-Uop-Nw-Utah Main | 12/3/1998 | 6/10/2002 |
| 119 | Allocco, Joseph A | Phx-Uop-Online Campus-3157 | 5/13/2002 | 6/5/2002 |
| 120 | Amengual, Michael | Phx-Uop-Online Campus-3137 | 7/28/2003 | |
| 121 | Anderson, Carrie T | Way-Uop-Ne-Philadelphia Campus | 11/15/2001 | 8/28/2002 |
| 122 | Antenorcruz, Tracy J | Scal – Fountain Valley & Pasadena | 6/15/1992 | |
| 123 | Appleton, April L | Okl-Uop-Cen-Oklahoma City Main | 8/19/2002 | |
| 124 | Arciniega, Patrick | Phx-Uop-Online Campus-3157 | 6/16/2003 | |
| 125 | Arguello, Floyd J | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 126 | Arias, Javier M | Phx-Uop-Online Campus-3157 | 12/9/2002 | 12/9/2002 |
| 127 | Baez, Carmen | Gua-Uop-Se-Postal | 2/9/1989 | |
| 128 | Bafus, Michael W | Phx-Uop-Online Campus-3157 | 1/29/2001 | 12/2/2002 |
| 129 | Baird, Joann | San-Uop-Scal-San Marcos | 11/15/2001 | 2/14/2003 |
| 130 | Baker, Wanda | Roc-Uop-Ne-Rockville | 1/6/2003 | 1/28/2003 |
| 131 | Baldwin, Theodore W | Phx-Uop-Online Campus-3157 | 5/13/2002 | 5/20/2002 |
| 132 | Balint, Holly L | Tuc-Uop-Sw-Tucson | 2/1/2002 | |
| 133 | Barksdale, Aaron P | Phx-Uop-Online Campus-3157 | 7/15/2002 | |
| 134 | Beach, Conan C | Phx-Uop-Online Campus-3157 | 8/27/2001 | |
| 135 | Becker, Frederick C | Phx-Uop-Online Campus-3157 | 1/7/2002 | 5/6/2002 |

CONFIDENTIAL

University of Phoenix Program Review Report
Appendix B, Page 4

| No. | Name | Location | Hire Date | Exit Date |
|-----|------|----------|-----------|-----------|
| 136 | Bellefeuille, Philip C | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 137 | Biddlingmeier, Cynthia A | Phx-Uop-Online Campus-3157 | 4/14/2003 | |
| 138 | Blackmore, Hannah L | Phx-Uop-Online Campus-3157 | 10/22/2001 | 4/8/2003 |
| 139 | Blakely, Kristen N | Phx-Uop-Online Campus-3157 | 10/21/2002 | |
| 140 | Blakes, Johnathan K | Phx-Uop-Online Campus-3157 | 6/16/2003 | |
| 141 | Booth, Christa M | Phx-Uop-Online Campus-3157 | 4/1/2002 | |
| 142 | Borelli, Alysa J | NW – Seattle &  Sac-Rancho Cordova | 11/10/1998 | |
| 143 | Bostock, Ronald A | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 144 | Boyle, Christopher J | Phx-Apo-All Companies-4605 | 7/24/2000 | |
| 145 | Bracken, Brian | Phx-Uop-Online Campus-3157 | 12/9/2002 | |
| 146 | Bradshaw, Dave R | Phx-Uop-Online Campus-3157 | 1/3/2000 | |
| 147 | Braxton, Derek L | Hou-Uop-Cen-Westside   - | 12/10/2001 | |
| 148 | Brenay, Jonathan D | Phx-Uop-Online Campus-3157 | 6/16/2003 | |
| 149 | Brewer, Robert N | Phx-Uop-Online Campus-3157 | 12/3/2001 | |
| 150 | Brewer, Wilbert | Phx-Uop-Online Campus-3157 | 8/18/2003 | |
| 151 | Brooks, Andrew D | Phx-Uop-Online Campus-3157 | 8/27/2001 | |
| 152 | Bruno, Jamie M | Way-Uop-Ne-Philadelphia Campus | 10/15/2002 | |
| 153 | Buckland, Dean G | Phx-Uop-Online Campus-3157 | 6/4/2001 | |
| 154 | Butzbach, Monika U | Phx-Uop-Online Campus-3157 | 4/14/2003 | |
| 155 | Calandro-Jason, Krishan J | Phx-Uop-Online Campus-3157 | 4/1/2002 | |
| 156 | Cervantes, Jana J | Phx-Apo-All Companies-4605 | 9/17/2001 | 7/29/2003 |
| 157 | Chandler, Linda M | Phx-Apo-All Companies-4605 | 5/29/2001 | 12/20/02 |
| 158 | Chavez, Anna L | Phx-Uop-Online Campus-3157 | 3/19/2001 | 9/14/2001 |
| 159 | Chiasson, Jeanine B | Dal-Uop-Cen-Dallas Main Campus | 7/14/2003 | |
| 160 | Chitwood, Kathleen B | Sou-Uop-Mdw-Detroit Main | 4/3/1995 | 6/1/2001 |
| 161 | Christensen, Sinae F | Phx-Uop-Online Campus-3157 | 9/3/2002 | 10/3/2002 |
| 162 | Church, Jared Y | Phx-Uop-Online Campus-3157 | 8/5/2002 | |
| 163 | Clarkson, Carrilyn | Phx-Uop-Online Campus-3157 | 8/18/2003 | |
| 164 | Cluff, Jeremiah F | Phx-Uop-Online Campus-3157 | 12/10/2001 | 4/5/2002 |
| 165 | Colella, Charles A | Phx-Uop-Online Campus-3157 | 7/7/2003 | |
| 166 | Contreras, Maria L | Mai-Uop-Se-Orlando | 7/29/2002 | |
| 167 | Corbett, Roger E | San-Uop-Ncal-San Francisco | 10/22/2001 | 12/21/01 |
| 168 | Costello, Kenneth T | Phx-Uop-Online Campus-3157 | 1/6/2003 | |
| 169 | Cotter, Ashley E | Phx-Apo-All Companies-4605 | 10/26/1999 | 3/31/2000 |
| 170 | Coulter, John K | Phx-Uop-Online Campus-3157 | 7/28/2003 | |
| 171 | Couret, Julie T | Sea-Uop-Nw-Seattle Main Campus | 7/28/2003 | |
| 172 | Crapo, Mariko D | Phx-Uop-Online Campus-3157 | 7/28/2003 | |
| 173 | Crosland, Bryan T | Phx-Uop-Online Campus-3157 | 6/16/2003 | |
| 174 | Crouse, Brian H | Phx-Uop-Online Campus-3157 | 5/27/2003 | |
| 175 | Cull, Jason T | Phx-Apo-All Companies-4605 | 10/30/2000 | 8/8/2003 |

CONFIDENTIAL

APOL 0001266

University of Phoenix Program Review Report
Appendix B, Page 5

| No. | Name | Location | Hire Date | Exit Date |
|---|---|---|---|---|
| 176 | Curtis, Lisa A | Sou-Uop-Mdw-Detroit Main | 8/5/2002 | |
| 177 | Cutrer, Shelly C | Phx-Uop-Online Campus-3157 | 6/16/2003 | |
| 178 | Dabbouseh, Maher | Sch-Uop-Mdw-Chicago Main | 2/3/2003 | |
| 179 | D'Alessio, Michele | Tem-Uop-Se-Tampa | 9/10/2001 | |
| 180 | Damico, Peter R | Tul-Uop-Cen-Tulsa Main Campus | 7/16/2001 | 01/27/03 |
| 181 | Dann, Barbara M | Phx-Uop-Online Campus-3157 | 10/16/2001 | |
| 182 | Davidson, Alice | San-Uop-Cen-Santa Theresa | 11/19/2002 | |
| 183 | Dawson, Ian N | Phx-Uop-Online Campus-3157 | 3/24/2003 | |
| 184 | DeMarco, Michelle A | Way-Uop-Ne-Philadelphia Campus | 6/2/2003 | 06/04/03 |
| 185 | Derby, Shayne M | Phx-Uop-Online Campus-3157 | 12/10/2001 | |
| 186 | DeRubis, Audrey A | Col-Uop-Cen-Southern Co Campus | 10/18/1999 | |
| 187 | DiLeone, Michael F | Phx-Uop-Online Campus-3157 | 9/30/2002 | 11/08/02 |
| 188 | Dion, Melissa B | Phx-Apo-All Companies-4605 | 8/3/1998 | |
| 189 | Donovan, Thomas L | Phx-Uop-Online Campus-3157 | 4/1/2002 | |
| 190 | Doolin, Kristin A | Jac-Uop-Se-Jacksonville | 4/13/1992 | 11/27/02 |
| 191 | Douthilt, Scott O | Phx-Uop-Online Campus-3157 | 5/13/2002 | |
| 192 | Drinkall, Denyce A | Ont-Uop-Scal-Ontario | 6/11/1990 | 03/15/02 |
| 193 | Duke, Patricia | Las-Uop-Sw-Rancho | 8/30/2000 | 05/24/02 |
| 194 | Dukelow, Rebecca | Phx-Uop-Online Campus-3157 | 7/16/2001 | |
| 195 | DuMond, Monica R | Sal-Uop-Nw-Utah Main Campus | 5/16/2001 | |
| 196 | Dunn, Tish N | Lon-Uop-Cen-Co Main Campus | 7/7/2003 | |
| 197 | Dyke, Michelle A | Pla-Uop-Se-Plantation | 6/10/2002 | |
| 198 | Eccher, Wendy M | Lon-Uop-Cen-Co Main Campus | 10/22/2001 | 10/29/01 |
| 199 | Edenburgs, Falonia C | Phx-Uop-Online Campus-3157 | 12/9/2002 | |
| 200 | Edman, Laura L | Fou-Uop-Scal-Fountain Valley | 1/2/2003 | |
| 201 | Eigen, Eleanor | Tuc-Uop-Sw-Tucson | 7/11/1994 | 03/29/02 |
| 202 | Elliott, Tricia C | Phx-Uop-Online Campus-3157 | 8/10/1998 | 11/01/01 |
| 203 | Ence, Richard P | Phx-Uop-Online Campus-3157 | 8/27/2001 | |
| 204 | English, Stephen C | Phx-Uop-Online Campus-3157 | 4/1/2002 | |
| 205 | Epperson, Aimee L | Wal-Uop-Ncal-Walnut Creek | 3/12/2001 | 09/05/03 |
| 206 | Erbland, Catherine J | Nov-Uop-Ncal-Novato | 9/26/2001 | 07/15/02 |
| 207 | Erickson, Brian M | Phx-Uop-Online Campus-3157 | 1/28/2002 | |
| 208 | Evans, Jonathan W | Dal-Uop-Cen-Dallas Main Campus | 5/13/2002 | 12/30/02 |
| 209 | Falls, Nina L | Phx-Uop-Online Campus-3157 | 6/4/2001 | 08/24/01 |
| 210 | Farina, Joseph A | Sch-Uop-Mdw-Chicago Main | 10/21/2002 | 10/28/02 |
| 211 | Farley, Ryan J | Pro-Uop-Nw-Provo | 2/2/2000 | |
| 212 | Faulds, Gerald C | Phx-Uop-Online Campus-3157 | 1/6/2003 | |
| 213 | Faultner, Kristine D | Phx-Uop-Online Campus-3157 | 10/1/2001 | 8/19/2002 |
| 214 | Felder, Yolanda R | Fai-Uop-Sac-Fairfield | 1/29/2001 | 8/17/2001 |
| 215 | Fernandez, Andrew M | Phx-Uop-Online Campus-3157 | 7/7/2003 | |

CONFIDENTIAL

APOL 0001267

University of Phoenix Program Review Report
Appendix B, Page 6

| No. | Name | Location | Hire Date | Exit Date |
|-----|------|----------|-----------|-----------|
| 216 | Ferro, Lisa M | Phx-Uop-Online Campus-3157 | 7/7/2003 | |
| 217 | Fessler, Patricia A | Phx-Uop-Online Campus-3157 | 8/12/2002 | 3/28/2003 |
| 218 | Figgins, Jon T | Phx-Uop-Online Campus-3157 | 3/24/2003 | 6/13/2003 |
| 219 | Fischer, Kerri T | San-Uop-Scal-Rancho Bernardo | 6/4/2001 | 4/1/2003 |
| 220 | Forh, Cyrenius N | Sac-Uop-Ncal-Creekside | 9/24/2001 | 3/29/2002 |
| 221 | Forlino, Victor C | Phx-Uop-Online Campus-3157 | 2/19/2002 | |
| 222 | Foster, Bryan D | Phx-Uop-Online Campus-3157 | 2/3/2003 | |
| 223 | Foster-Hamilton, Rafhia R | Way-Uop-Ne-Philadelphia Campus | 12/9/2002 | 12/26/02 |
| 224 | Frederick, Kevin L | Sou-Uop-Mdw-Detroit Main | 8/5/2002 | 2/20/2003 |
| 225 | Frigo, Wendy D | Phx-Apo-All Companies-4605 | 1/2/2001 | 9/19/2002 |
| 226 | Friley, Tracey A | Wal-Uop-Ncal-Walnut Creek | 11/27/2000 | 7/13/2001 |
| 227 | Gale, Kenneth J | Dia-Uop-Scal-Diamond Bar | 9/20/2000 | 4/25/2002 |
| 228 | Galindo, David P | Phx-Uop-Online Campus-3157 | 5/27/2003 | |
| 229 | Geil, Matthew S | Fre-Uop-Ncal-River Park | 2/5/2001 | 1/24/2003 |
| 230 | Glass, Benjamin Daniel | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 231 | Golmic, Lori R | Pit-Uop-Ne-Pittsburgh Campus | 6/17/2002 | |
| 232 | Gonda, Craig W | Phx-Uop-Online Campus-3157 | 6/3/2002 | |
| 233 | Gonzales, Leo | Phx-Uop-Online Campus-3157 | 9/17/2001 | 9/16/2002 |
| 234 | Goodwyn, Johnny P | Phx-Uop-Online Campus-3157 | 8/18/2003 | |
| 235 | Greer, Joel E | Phx-Uop-Online Campus-3137 | 5/5/2003 | |
| 236 | Grodner, Mark W | Bar-Uop-Se-Baton Rouge | 5/30/2001 | 4/26/2002 |
| 237 | Gropel, Christopher G | Phx-Uop-Online Campus-3157 | 12/9/2002 | |
| 238 | Hamilton, Ron L | Alb-Uop-Cen-Alb Main Campus | 2/18/2003 | |
| 239 | Hancock, Roland K | Phx-Uop-Online Campus-3157 | 8/18/2003 | |
| 240 | Harper, Renee L | Phx-Uop-Online Campus-3157 | 9/30/2002 | |
| 241 | Hauptman, Joseph M | Phx-Apo-All Companies-4605 | 4/3/2000 | 6/15/2001 |
| 242 | Havranek, Jodi L | Phx-Uop-Online Campus-3157 | 11/16/2001 | |
| 243 | Hawkins, Shirley P | Phx-Uop-Online Campus-3157 | 7/28/2003 | |
| 244 | Haws, David M | Mer-Uop-Nw-Boise Main Campus | 8/19/2003 | |
| 245 | Haydon, Dayna D | Phx-Uop-Online Campus-3157 | 11/4/2002 | |
| 246 | Haynes, Ronshawdra P | Hou-Uop-Cen-Westside | 9/16/2002 | |
| 247 | Heath, Christopher J | Phx-Uop-Online Campus-3157 | 12/9/2002 | 12/9/2002 |
| 248 | Henry, Sherri A | Phx-Uop-Online Campus-3157 | 5/13/2002 | 5/23/2003 |
| 249 | Hobbs, Tyler V | Phx-Uop-Online Campus-3157 | 1/6/2003 | |
| 250 | Holt, Jesse B | Phx-Uop-Online Campus-3157 | 12/10/2001 | 07/22/03 |
| 251 | Hollins, Trinnette N | Phx-Uop-Online Campus-3157 | 2/3/2003 | |
| 252 | Hollis, Delane L | Phx-Uop-Online Campus-3157 | 10/29/2001 | 11/1/2002 |
| 253 | Holt, Mary G | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 254 | Hopkins, Alissa | SE – Atlanta and On Line | 12/1/1997 | |
| 255 | Horton, Terrance K | Sea-Uop-Nw-Seattle Main Campus | 7/1/2003 | |

APOL 0001268

University of Phoenix Program Review Report
Appendix B, Page 7

| No. | Name | Location | Hire Date | Exit Date |
|-----|------|----------|-----------|-----------|
| 256 | Howell, Valerie E | Phx-Uop-Online Campus-3157 | 9/17/2001 | 3/3/2003 |
| 257 | Huelsmann, Melia C | Sil-Uop-Mdw-St. Louis Main | 7/16/2001 | 4/26/2002 |
| 258 | Hughes, Darin S | Phx-Uop-Online Campus-3157 | 12/9/2002 | 2/24/2003 |
| 259 | Jagard, Jeffrey F | Phx-Uop-Online Campus-3157 | 3/19/2001 | 8/10/2001 |
| 260 | Jefferson, Jerrick L | Sou-Uop-Mdw-Detroit Main | 5/21/2002 | 12/31/02 |
| 261 | Jensen, Thayne E | Phx-Uop-Online Campus-3157 | 4/22/2002 | |
| 262 | Jernigan, Jeffrey M | Phx-Uop-Online Campus-3157 | 7/7/2003 | |
| 263 | Jespersen, Wade A | Phx-Uop-Online Campus-3157 | 12/9/2002 | |
| 264 | Johnson, John C | Phx-Uop-Online Campus-3157 | 4/14/2003 | |
| 265 | Johnson, Stephen H | Tuc-Uop-Sw-Tucson | 6/4/2001 | 12/5/2001 |
| 266 | Johnston, Ryan D | Tig-Uop-Nw-Portland Main | 3/27/2000 | 8/31/2001 |
| 267 | Jones, Jeston L | Phx-Uop-Online Campus-3157 | 11/4/2002 | |
| 268 | Jones, Stephanie G | Dun-Uop-Se-Atlanta Main Campus | 12/2/2002 | |
| 269 | Jubran, Joey M | San-Uop-Scal-San Marcos | 9/21/1999 | 8/15/2001 |
| 270 | Kaiser, Kirk H | Phx-Uop-Online Campus-3157 | 7/2/2001 | |
| 271 | Kazman, Debora L | Phx-Uop-Online Campus-3157 | 7/7/2003 | |
| 272 | Kennard, Lon H | Sal-Uop-Nw-Utah Main Campus | 4/29/2002 | |
| 273 | Kenzslowe, Angela K | Phx-Apo-All Companies-4605 | 5/30/2000 | 11/15/01 |
| 274 | Knowles, Aaron M | Jac-Uop-Se-Jacksonville | 5/16/2002 | 7/7/2003 |
| 275 | Koon, Matthew J | Tig-Uop-Nw-Portland Main | 4/16/2001 | 6/24/2002 |
| 276 | Kosmatka, Kimberly A | Phx-Uop-Online Campus-3157 | 11/4/2002 | 11/20/02 |
| 277 | Lafontain, Rachel J | Phx-Uop-Online Campus-3157 | 1/16/2001 | |
| 278 | Lalau, Rose C | Hon-Uop-Wes-Hawaii Main Campus | 8/21/2000 | 10/15/01 |
| 279 | Lamb, Dean M | Fou-Uop-Scal-Fountain Valley | 6/11/2001 | |
| 280 | Lanier, Ilona Y | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 281 | Lasser, Scott | Bra-Uop-Ne-Boston Campus | 11/11/2002 | 7/3/2003 |
| 282 | Lassus, Darius | Phx-Apo-All Companies-4615 | 12/3/2001 | |
| 283 | Law, Rosalynn | Roc-Uop-Ne-Rockville | 9/9/2002 | |
| 284 | Lee, Kristina M | San-Uop-Scal-San Bernardino | 2/26/2001 | |
| 285 | Leos, Jennifer L | Phx-Uop-Online Campus-3157 | 6/3/2002 | |
| 286 | Lewis, Kevin C | Phx-Uop-Online Campus-3157 | 4/14/2003 | |
| 287 | Lihilihi, Clayton M | Hon-Uop-Wes-Hawaii Main Campus | 1/21/2003 | 5/16/2003 |
| 288 | Lincoln, Michael D | Nov-Uop-Ncal-Novato | 1/16/2001 | 9/18/2001 |
| 289 | Lipari, Vincent T | Phx-Uop-Online Campus-3157 | 3/3/2003 | |
| 290 | Logan, Langston D | Lat-Uop-Sac-Lathrop | 5/7/2001 | 10/1/2001 |
| 291 | Loporto, Laura J | Sch-Uop-Mdw-Chicago Main | 4/8/2002 | 10/21/02 |
| 292 | Lorts, Calvin R | Phx-Uop-Online Campus-3157 | 6/3/2002 | 6/17/2002 |
| 293 | Lovely, Scott A | Phx-Uop-Online Campus-3157 | 9/30/2002 | |
| 294 | Lowell, Keith M | Phx-Uop-Online Campus-3157 | 8/18/2003 | |
| 295 | Lunt, Andrew J | Phx-Uop-Online Campus-3157 | 11/16/2001 | |

CONFIDENTIAL

University of Phoenix Program Review Report
Appendix B, Page 8

| No. | Name | Location | Hire Date | Exit Date |
|---|---|---|---|---|
| 296 | Lurie, Aimee S | Westminster & Tucson | 10/1/1998 | 1/18/2002 |
| 297 | Lvov, Igor O | Phx-Uop-Online Campus-3157 | 12/9/2002 | 12/9/2002 |
| 298 | Mackey, Stacy L | Phx-Uop-Online Campus-3157 | 12/9/2002 | 3/21/2003 |
| 299 | Malone, James B | Phx-Uop-Online Campus-3157 | 1/6/2003 | 8/1/2003 |
| 300 | Marino, Steven R | Sea-Uop-Nw-Seattle Main Campus | 11/8/2002 | 11/27/02 |
| 301 | Martinez, Roberto | San-Uop-Cen-Santa Theresa | 5/31/2002 | |
| 302 | Masalta, Joseph S | Way-Uop-Ne-Philadelphia Campus | 6/24/2002 | 8/21/2002 |
| 303 | Maskell, Troy R | Phx-Uop-Online Campus-3157 | 7/16/2001 | 7/22/2002 |
| 304 | Mathiesen, Eric H | Phx-Uop-Online Campus-3157 | 4/22/2002 | 3/1/2003 |
| 305 | Matteson, Jennifer R | Phx-Uop-Online Campus-3157 | 2/3/2003 | |
| 306 | May, Timothy B | Fre-Uop-Ncal-River Park | 1/31/2002 | |
| 307 | McCarthy, Christy L | Phx-Uop-Online Campus-3157 | 9/3/2002 | |
| 308 | McClearn, Brenda | Phx-Uop-Online Campus-3157 | 8/18/2003 | |
| 309 | McCoy, William M | Phx-Uop-Online Campus-3157 | 7/28/2003 | |
| 310 | McCrory, Jodene M | Las-Uop-Sw-Rancho | 7/22/2003 | |
| 311 | McCune, Mark A | Pas-Uop-Scal-Pasadena | 8/1/1997 | 5/15/2002 |
| 312 | McCurdy, Allen P | Phx-Uop-Online Campus-3157 | 6/24/2002 | 7/25/2002 |
| 313 | McDonald, Kelly E | Phx-Uop-Online Campus-3157 | 2/19/2002 | |
| 314 | McDonnell, Robert J | Chu-Uop-Scal-Chula Vista | 2/5/2001 | |
| 315 | McHatton, Albert J | Phx-Uop-Online Campus-3157 | 12/9/2002 | |
| 316 | Mendenhall, Mark O | Phx-Uop-Online Campus-3157 | 2/3/2003 | |
| 317 | Mentink, Richard W | Sea-Uop-Nw-Seattle Main Campus | 8/13/2003 | |
| 318 | Mercado, Anthony Y | Fou-Uop-Scal-Fountain Valley | 5/4/1992 | 3/15/2002 |
| 319 | Messerschmidt, Deborah A | Mai-Uop-Se-Orlando | 3/11/2002 | 4/19/2002 |
| 320 | Michelle, Lorrayne | Phx-Uop-Online Campus-3157 | 1/6/2003 | |
| 321 | Michels, Robin R | Orl-Uop-Se-South Orlando | 6/7/2001 | 7/5/2002 |
| 322 | Miles, Garrett L | Phx-Uop-Online Campus-3157 | 3/24/2003 | |
| 323 | Mines, Andre | Phx-Uop-Online Campus-3157 | 7/8/2003 | |
| 324 | Mooney, Pham V | Phx-Uop-Online Campus-3157 | 12/9/2002 | |
| 325 | Morehouse, James A | Phx-Uop-Online Campus-3157 | 8/12/2002 | 12/16/02 |
| 326 | Morgan, Elicia L | Liv-Uop-Ncal-Livermore | 5/5/2003 | |
| 327 | Mosley, Deborah J | Phx-Uop-Online Campus-3157 | 2/22/2000 | 11/8/2001 |
| 328 | Mueller, Brian S | Phx-Uop-Online Campus-3157 | 5/13/2002 | |
| 329 | Muhaimin, Abdul M | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 330 | Munley, Phillip A | Oak-Uop-Ncal-Oakland | 2/4/2002 | 5/23/2002 |
| 331 | Muro, Gilda A | Hon-Uop-Wes-Hawaii Main Campus | 1/22/2001 | 5/16/2003 |
| 332 | Murray, Andrea L | Phx-Uop-Online Campus-3157 | 2/19/2002 | |
| 333 | Myrand, Karen C | Sou-Uop-Mdw-Detroit Main Camp | 3/11/2002 | 4/8/2003 |
| 334 | Nave, Tanya L | Phx-Apo-All Companies-4605 | 8/21/2000 | 9/18/2001 |
| 335 | Naylon, Joyce E | Lon-Uop-Cen-Co Main Campus | 11/25/2002 | |

CONFIDENTIAL

APOL 0001270

University of Phoenix Program Review Report
Appendix B, Page 9

| No. | Name | Location | Hire Date | Exit Date |
|---|---|---|---|---|
| 336 | Neal, Elizabeth K | Phx-Uop-Online Campus-3157 | 4/22/2002 | |
| 337 | Nees, Carol A | Tuc-Uop-Sw-Tucson | 9/30/1991 | |
| 338 | Nevzoroff, Jacob E | Phx-Uop-Online Campus-3157 | 6/22/1998 | |
| 339 | Nichols, Latanya E | Mai-Uop-Se-Orlando | 6/8/1998 | 9/28/2001 |
| 340 | Nocifora, Mark A | Phx-Apo-All Companies-4615 | 6/23/2003 | |
| 341 | Nomura, Claire R | Pla-Uop-Se-Plantation | 4/23/2003 | |
| 342 | Ohara, Kristen A | Pit-Uop-Ne-Pittsburgh Campus | 5/2/2001 | 6/20/2002 |
| 343 | Olsen, Carly J | Phx-Apo-All Companies-4615 | 2/28/2003 | 8/1/2003 |
| 344 | Olson, Terry E | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 345 | O'Neill, Barbara Jeanne | Sch-Uop-Mdw-Chicago Main Camp | 3/26/2003 | |
| 346 | Ortiz, Mark R | Phx-Uop-Online Campus-3157 | 9/10/2001 | |
| 347 | Osborn, Wendy Vasquez | Ont-Uop-Scal-Ontario | 5/3/1999 | |
| 348 | Palmquist, Keith A | Phx-Uop-Online Campus-3157 | 12/9/2002 | 8/15/2003 |
| 349 | Parlon, Leslie F | Phx-Uop-Online Campus-3157 | 3/24/2003 | |
| 350 | Pautz, Troy D | Phx-Uop-Online Campus-3157 | 2/19/2002 | |
| 351 | Paxson, Theresa L | Okl-Uop-Cen-Oklahoma City Main | 12/17/2001 | 3/14/2003 |
| 352 | Payne, Trenton A | Cla-Uop-Nw-Clackamas | 9/10/2001 | |
| 353 | Peterson, Mark A | Phx-Uop-Online Campus-3157 | 9/30/2002 | |
| 354 | Pett, Jennifer L | Sal-Uop-Nw-Utah | 10/6/1997 | |
| 355 | Plaza, Hilda | Gua-Uop-Se-Postal | 9/11/1990 | |
| 356 | Pollard, Eric C | Met-Uop-Se-Louisiana | 9/5/2000 | 7/26/2001 |
| 357 | Posey, Katherine L | Sac-Uop-Ncal-Creekside | 8/31/1998 | 1/21/2003 |
| 358 | Poshka, Rhonda J | Phx-Uop-Online Campus-3157 | 11/4/2002 | |
| 359 | Powell, Dollyanne | San-Uop-Scal-Kearny Mesa | 5/16/2002 | |
| 360 | Preston-Humanick, Michele M | Phx-Uop-Online Campus-3157 | 2/3/2003 | 6/27/2003 |
| 361 | Price, Dan O | Sal-Uop-Nw-Utah Main Campus | 2/16/2001 | |
| 362 | Quinn, Virginia T | Sll-Uop-Mdw-St. Louis Main | 1/20/2003 | |
| 363 | Ramirez, Kira C | Fre-Uop-Ncal-River Park | 2/5/2003 | 4/14/2003 |
| 364 | Raymond, Horace J | Phx-Uop-Online Campus-3157 | 10/1/2001 | |
| 365 | Reilly, Kevin A | Way-Uop-Ne-Philadelphia Campus | 4/14/2003 | |
| 366 | Richardson, Lori G | Phx-Uop-Online Campus-3157 | 12/9/2002 | |
| 367 | Ricketts, Karyn B | Fou-Uop-Scal-Fountain Valley | 7/9/1990 | 1/1/2003 |
| 368 | Ricks, Christian S | Phx-Uop-Online Campus-3157 | 10/1/2001 | |
| 369 | Robinson, Joshua M | Phx-Uop-Online Campus-3157 | 6/16/2003 | |
| 370 | Rodriques, Carly S | San-Uop-Ncal-San Francisco | 6/20/2000 | 12/13/02 |
| 371 | Rogers, Bradley E | Phx-Uop-Online Campus-3157 | 3/24/2003 | |
| 372 | Romero, Annita | Phx-Uop-Online Campus-3157 | 1/6/2003 | |
| 373 | Rosen, Tracie L | Phx-Uop-Online Campus-3157 | 6/18/2001 | 7/15/2003 |
| 374 | Ross, Linda M | Phx-Uop-Online Campus-3157 | 3/3/2003 | 8/15/2003 |
| 375 | Ross, Shayna B | Bra-Uop-Ne-Boston Campus | 9/23/2002 | 9/24/2002 |

University of Phoenix Program Review Report
Appendix B, Page 10

| No. | Name | Location | Hire Date | Exit Date |
|---|---|---|---|---|
| 376 | Rothenbush, Austin C | Tem-Uop-Se-Tampa | 3/3/2003 | 4/3/2003 |
| 377 | Ruiz, Armida | San-Uop-Cen-Santa Theresa | 12/16/2002 | |
| 378 | Ruiz, Mercedes | Pla-Uop-Se-Plantation | 6/26/2000 | 9/22/2000 |
| 379 | Russell, Alicia R | Phx-Uop-Online Campus-3157 | 2/19/2002 | 10/21/02 |
| 380 | Russo, Daniel L | Phx-Uop-Online Campus-3157 | 2/20/2001 | |
| 381 | Ruvolo, Brendan M | Phx-Uop-Online Campus-3157 | 9/3/2002 | |
| 382 | Salenga, Konstanze M | Wal-Uop-Ncal-Walnut Creek | 3/18/2002 | |
| 383 | Salk, Scott G | Phx-Uop-Online Campus-3157 | 2/19/2002 | |
| 384 | Saunders, Seth D | Phx-Uop-Online Campus-3157 | 1/3/2000 | 10/8/2001 |
| 385 | Saxton, David E | Phx-Apo-All Companies-4605 | 12/29/2000 | 12/29/00 |
| 386 | Schackman, Brian D | Pla-Uop-Se-Plantation | 2/3/2003 | |
| 387 | Schlapfer-Arlock, Tanya M | Phx-Uop-Online Campus-3137 | 7/7/2003 | 7/10/2003 |
| 388 | Schneider, Erica A | Phx-Apo-All Companies-4605 | 11/1/2002 | |
| 389 | Schneider, Pamela M | Sou-Uop-Mdw-Detroit Main | 3/19/2001 | 9/5/2002 |
| 390 | Schreiber, Steven P | Phx-Uop-Online Campus-3157 | 6/24/2002 | 1/28/2003 |
| 391 | Segura, Michael C | San-Uop-Cen-Santa Theresa | 2/18/2003 | |
| 392 | Sheltra, Christina R | Phx-Uop-Online Campus-3157 | 7/28/2003 | |
| 393 | Sheppard, Glenn K | Phx-Uop-Online Campus-3157 | 8/12/2002 | |
| 394 | Siemen, John H | Phx-Uop-Online Campus-3157 | 6/4/2001 | |
| 395 | Simmons, Virgle S | Phx-Uop-Online Campus-3157 | 9/3/2002 | 9/30/2002 |
| 396 | Slade, W B | Phx-Uop-Online Campus-3157 | 11/4/2002 | |
| 397 | Small, Harriet D | Phx-Uop-Online Campus-3157 | 6/16/2003 | |
| 398 | Smith, Donna P | Tul-Uop-Cen-Tulsa Main Campus | 6/29/2001 | 7/10/2001 |
| 399 | Smith, Joel S | Bar-Uop-Se-Baton Rouge | 10/15/2002 | 12/6/2002 |
| 400 | Smith, Laura K | Phx-Uop-Online Campus-3157 | 11/16/2001 | |
| 401 | Snapp, Michael J | Phx-Uop-Online Campus-3157 | 1/16/2001 | 10/16/01 |
| 402 | Snavely, Kelly J | Phx-Uop-Online Campus-3157 | 11/4/2002 | |
| 403 | Spagnola, Johnny P | Phx-Uop-Online Campus-3157 | 9/3/2002 | |
| 404 | St Pierre, Lionel P | Phx-Uop-Online Campus-3157 | 2/3/2003 | |
| 405 | Stacy, Jennifer R | Phx-Uop-Online Campus-3157 | 9/30/2002 | 3/21/2003 |
| 406 | Stair, Alicia A | Spo-Uop-Nw-Spokane Campus | 7/14/2003 | |
| 407 | Stalcup, Rebekah F | Phx-Uop-Online Campus-3157 | 12/16/2002 | |
| 408 | Stone, Jeffrey W | Phx-Uop-Online Campus-3157 | 3/24/2003 | 5/2/2003 |
| 409 | Stover, Patrick L | Phx-Uop-Online Campus-3157 | 8/27/2001 | 10/31/02 |
| 410 | Talbot, Scott N | Lon-Uop-Cen-Co Main Campus | 4/23/2001 | 8/30/2002 |
| 411 | Tang, Pui S | Jac-Uop-Se-Jacksonville | 4/14/2003 | |
| 412 | Taylor, Sara M | Phx-Uop-Online Campus-3157 | 11/4/2002 | |
| 413 | Tibbetts, Kari M | Phx-Uop-Online Campus-3157 | 8/1/2003 | |
| 414 | Tisdale, Virginia L | Mai-Uop-Se-Orlando | 5/1/2000 | 4/16/2001 |
| 415 | Toth, Debora L | Fou-Uop-Scal-Fountain Valley | 6/16/1997 | |

CONFIDENTIAL

University of Phoenix Program Review Report
Appendix B, Page 11

| No. | Name | Location | Hire Date | Exit Date |
|---|---|---|---|---|
| 416 | Townsend, Michelle A | Phx-Apo-All Companies-4605 | 1/8/2001 | |
| 417 | Towse, Sara A | Phx-Uop-Online Campus-3157 | 12/9/2002 | |
| 418 | Trepagnier, Christine F | Mel-Uop-Se-Louisiana | 2/25/1998 | 6/29/2001 |
| 419 | Turner, Gloria K | Phx-Apo-All Companies-4605 | 6/26/2000 | |
| 420 | Vandecar, William T | Phx-Uop-Online Campus-3157 | 6/3/2002 | 11/27/02 |
| 421 | Vega, Marissa J | Tuc-Uop-Sw-Tucson | 1/22/1996 | |
| 422 | Venkatachalam, Jayashree | San-Uop-Ncal-San Jose | 2/8/2002 | 8/18/2003 |
| 423 | Vomastic, Dennis A | Phx-Uop-Online Campus-3157 | 10/1/2001 | 10/17/01 |
| 424 | Waite, Jason J | Phx-Uop-Online Campus-3157 | 4/22/2002 | |
| 425 | Waite, Thomas P | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 426 | Wakes, Sandra | Phx-Uop-Online Campus-3157 | 6/18/2001 | |
| 427 | Walden, Stephen M | Phx-Uop-Online Campus-3157 | 4/14/2003 | |
| 428 | Walkiewicz, Gregory J | Phx-Uop-Online Campus-3157 | 9/30/2002 | |
| 429 | Wallace, Laura | Oak-Uop-Ncal-Oakland | 4/13/1998 | |
| 430 | Wallin, Kurt D | Phx-Uop-Online Campus-3157 | 12/9/2002 | 5/30/2003 |
| 431 | Walsh, Renee D | Pit-Uop-Ne-Pittsburgh Campus | 12/21/2000 | 8/16/2002 |
| 432 | Weinstein, Michael S | Phx-Uop-Online Campus-3157 | 8/12/2002 | |
| 433 | Wells, Tonya R | Fre-Uop-Ncal-River Park | 5/30/2002 | |
| 434 | Welsh, Brian S | Way-Uop-Ne-Philadelphia Campus | 5/13/2002 | |
| 435 | Wern, Eric C | Phx-Uop-Online Campus-3157 | 4/22/2002 | 5/27/2003 |
| 436 | Westover, Amanda J | Phx-Uop-Online Campus-3157 | 1/6/2003 | 8/21/2003 |
| 437 | Whatcott, Brandon J | Phx-Uop-Sw-Ahwatukee | 6/17/2002 | |
| 438 | White, John B | Phx-Uop-Online Campus-3157 | 4/14/2003 | |
| 439 | Wilkerson, Angela N | Phx-Uop-Online Campus-3157 | 5/13/2002 | |
| 440 | Williams, Aaron S | Phx-Uop-Online Campus-3157 | 7/7/2003 | |
| 441 | Williams, Darryl E | Phx-Uop-Online Campus-3157 | 9/17/2001 | 8/13/2002 |
| 442 | Williams, Jennifer | Phx-Uop-Online Campus-3157 | 2/3/2003 | |
| 443 | Williams, Jessica L | Tul-Uop-Cen-Tulsa Main Campus | 12/30/2002 | 5/30/2003 |
| 444 | Wilson, Duane A | Phx-Uop-Online Campus-3157 | 3/3/2003 | |
| 445 | Wilson, Jacob A | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 446 | Wirth, Elisha J | Phx-Uop-Online Campus-3157 | 8/27/2001 | |
| 447 | Wooldridge, Tonyette C | Phx-Uop-Online Campus-3157 | 2/19/2002 | 6/3/2002 |
| 448 | Worden, Sharon A | Roc-Uop-Ne-Rockville Lc | 6/24/2002 | 6/25/2002 |
| 449 | Yanda, Alan F | Tig-Uop-Nw-Portland Main | 2/1/1999 | |
| 450 | Zarro, Kristin D | Phx-Uop-Online Campus-3157 | 5/5/2003 | |
| 451 | Zest, Gordon P | San-Uop-Scal-Del Mar | 3/14/2001 | 8/3/2001 |
| 452 | Zimmerman, Todd T | Ind-Uop-Mdw-Cleveland Main | 2/3/2003 | 2/5/2003 |
| 453 | Zlotoff, Jaime B | Phx-Uop-Online Campus-3157 | 8/12/2002 | 5/14/2003 |
| 454 | Zufelt, Daniel P | Phx-Uop-Online Campus-3157 | 3/3/2003 | |

CONFIDENTIAL

APOL 0001273

# EXHIBIT B

Case No. 06-MC-0558 (CKK)

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

4 Park Plaza  Irvine, California 92614-8557
(949) 451-3800
www.gibsondunn.com

KDiulio@gibsondunn.com

April 25, 2007

## VIA EMAIL AND FIRST CLASS MAIL

| | |
|---|---|
| **Direct Dial** | **Client No.** |
| (949) 451-3907 | T 03002-00032 |
| **Fax No.** | |
| (949) 475-4630 | |

Heather D. Graham-Oliver
Assistant United States Attorney
Department of Justice
555 Fourth St., N.W.
Washington, DC 20530

Re:    *In re Apollo Group, Inc. Securities Litigation, No. 06-558 (D.D.C.)*

Dear Ms. Graham-Oliver:

We are in receipt of the Department of Education's ("Department") privilege log and voluntary production of category 5 documents, pursuant to the parties' April 12, 2007 plan.

According to the Department, category 5 contains approximately 1,000 pages of documents, of which the Department has voluntarily produced 137 pages. Thus, the Department has withheld 863 pages of documents on the basis of privilege. However, the privilege log for category 5 documents lists only 27 documents, 25 of which are described as "[e]mail communication." On its face, the log does not appear to include all of the category 5 documents that have been withheld by the Department. We request that the Department closely evaluate the situation and take prompt corrective action as is necessary. As we have discussed on many occasions, Apollo regards the category 5 documents as particularly critical to its summary judgment briefing. Apollo needs all category 5 documents or a complete privilege log of all those documents as soon as possible, but no later than April 30, 2007.

Also, to facilitate our review of the privilege log, and in light of the potential error we have already identified as set forth in the preceding paragraph, Apollo requests that the Department produce its category 5 log with an additional column that identifies for each listed document (a) the number of pages contained within the document, and (b) the number of duplicates that are not separately listed on the log. Apollo further requests that this same information be included on the Department's privilege log for categories 2 and 6.

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO
LONDON   PARIS   MUNICH   ORANGE COUNTY   CENTURY CITY   DALLAS   DENVER

# GIBSON, DUNN & CRUTCHER LLP

Heather D. Graham-Oliver
April 25, 2007
Page 2


We have also received a partial production of documents from category 6, which includes summaries of witness interviews. The Department has redacted witness identifying information based on the common law "informer privilege." Apollo, of course, reserves the right to challenge those redactions with the Court.

As an initial matter, however, it appears that some of the summaries in which identifying information is redacted concern witnesses who have waived the privilege by identifying themselves to Apollo. As you know, the informer privilege has limited application. It shields only the identity of a witness and, even then, the privilege may be waived by the witness. *Westinghouse Elec. Corp. v. Burlington*, 351 F.2d 762, 768 (D.D.C. 1965) (holding that once a witness "identifies himself as an informer the privilege disappears").

Several witnesses have identified themselves, whether in their deposition, in an affidavit, or by initiating a whistleblower action against Apollo. Accordingly, to the extent the privilege is applicable, it has been waived by at least the following witnesses:

1.   Julie Albertson
2.   Maria Arce
3.   Shannan Bartz
4.   Sheri Catalano
5.   David Charnock
6.   Dawn Donatoni
7.   Melanie Enriquez
8.   Susan Franceschi
9.   Tamara Garcia
10.  Charlotte Gould
11.  Mary Hendow
12.  Leah Johnson
13.  Jenny Kahn
14.  Nada Kegley
15.  Jacqueline Laone
16.  Matthew Kuhnau
17.  Michael McKay
18.  Marci Miller
19.  Julie O'Ferrall
20.  Don Rose
21.  Konstanze Salenga
22.  Lisa Wayne
23.  Aaron Wettstein
24.  Cylisha Willis
25.  James Wojtak

# GIBSON, DUNN & CRUTCHER LLP

Heather D. Graham-Oliver
April 25, 2007
Page 3


Furthermore, it appears that the Department has produced summaries from the interviews of Apollo executives, including executives at the University of Phoenix. The contents of these summaries make clear that these witnesses are not "informers" whose identity is protected by the privilege. Furthermore, these executives have waived the privilege by voluntarily identifying themselves and the information they provided to the Department. Accordingly, consistent with controlling case law, Apollo further requests that the Department produce unredacted witness interview summaries concerning Apollo corporate executives, including:

        1.      Bill Brebaugh
        2.      Bob Collins
        3.      Heather Cornell
        4.      Seth Dosick
        5.      Brian Mueller
        6.      Diane Thompson

Apollo reserves the right to challenge all of the Department's redactions upon further review of the documents. In the meantime, Apollo requests that the Department immediately produce unredacted summaries from the above-identified witnesses, all of whom have clearly waived the informer privilege.

Very truly yours,

Kristopher P. Diulio

KPD/kpd


cc:    Christine M. Rose
       Wayne W. Smith
       Douglas R. Cox
       Joseph P. Busch, III

100212829_1.DOC

# EXHIBIT C

Case No. 06-MC-0558 (CKK)

**Rose, Christine**

| | |
|---|---|
| **From:** | Wittman, Donna |
| **Sent:** | Thursday, August 28, 2003 3:49 PM |
| **To:** | 'Mary Hendow' |
| **Cc:** | Julie Albertson; Dan Bartley; Nancy Krop; Fernandez-Rosario, Martina; Woodward, Jennifer; Wolff, Russell; Dunne, Shane; Crim, Susan |
| **Subject:** | RE: Witnesses |

Mary, I am following up on your email and information of yesterday.  I called Tammy about the shredding issue and she said that she is unaware of any shredding outside the regularly scheduled shredding.  She said they use ShredIt and gave me the number.  I called ShredIt and they advised that they have been there only at their regularly scheduled time – every Friday, that they were there on 8/1, 8/8, 8/15, 8/22 and the next pick up is scheduled for 8/29.  If someone came on Monday, 8/18, please let me know how you know this.  If there was a pick up on 8/18, it was not ShredIt.

I spoke with ▮▮▮▮▮▮ of the ▮▮▮▮▮▮ campus.  She said that she has always been evaluated on a number of quantitative and qualitative factors, not just enrollments.  She indicated that this has been the case at ▮▮▮▮ ▮▮▮▮▮▮and▮▮▮▮▮.  She worked in ▮▮▮▮▮▮ as an EC in ▮▮▮▮ and said she never heard of or knew of any contests where ECs could win anything for enrollments or apps.

I have left a message early this morning on the voice mail of▮▮▮▮▮▮ at work.  When she did not return my call and I called back, her office indicated that she decided to take an early vacation and that she will not be back until next Tuesday.

If you have anyone else we could contact from other locations, please let us know.

Sincerely,

Donna Wittman



-----Original Message-----
**From:** Mary Hendow [mailto:▮▮▮▮▮▮]
**Sent:** Wednesday, August 27, 2003 2:36 PM
**To:** Donna.Wittman@ed.gov; Martina.Fernandez-Rosario@ed.gov
**Cc:** Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop
**Subject:** Witnesses

Hi Donna and Martina,

It was nice to speak with you both.  Per our conversation this morning, I am forwarding the contact information for two potential witnesses, who currently work for UOP.

▮▮▮▮▮▮works at a campus in ▮▮▮▮▮▮ as an ECII, employed since ▮▮▮▮▮▮ She attended SAW with Julie.  Her work phone number is▮▮▮▮▮▮ ext▮▮▮her home phone number is▮▮▮▮▮▮

▮▮▮▮▮▮is an ECII at the ▮▮▮▮▮▮Campus.  She joined UOP in ▮▮▮▮▮▮in the ▮▮▮▮▮▮ Learning Center, left UOP for about a year and was hired at the ▮▮▮▮▮▮ Learning Center.  I spoke with her late last year and she confirmed that the compensation plan was the same at all campuses where she had worked.  She asked me if I had heard of the "hundred plus club", when I asked what that was, she said it referred to all the counselors in Phoenix who make more than $100k per year.  She wasn't able to send her matrix, and when her manager overheard our conversation about compensation, she told her to get back to work. Work phone number is ▮▮▮▮▮▮ If you call her, you may need to ask for her for the phone number of her

DOE APOL 0908

4/24/2007

home or on her cell so that she can speak to you freely.

Julie says there is another employee, ████████ who is a ████████████████ working out of the ████████ Campus. She transferred from ████████ where she worked as an ECII.

Hope this helps.

Sincerely,

Mary Hendow

DOE APOL 0909

'/2007

# EXHIBIT D

Case No. 06-MC-0558 (CKK)

INTERVIEW OF ███████



Russ Wolff and Jennifer Woodward conducted this interview with ████████ on ████████, in ████████ at ████████, ███████ current employer. ████████ has a ████ degree from the ████████ an ██ from ████████ and a ████ degree in computers from the ████████

She began working for UP on a part time basis in ████████ as a recruiter of students. At the time, she was working full time as a ████████ salesperson and UP could not offer her enough money to work for them on a full time basis. UP only offered her $24K per year. As a half time employee, UP paid her $12K per year, and ██ continued to work in ████████ sales. In ████████, UP offered to pay her $48K per year to be a ████████ manager, so she quit ████████ sales and became a full time employee at UP's ████████ campus. ████████ ████████████████████████████████████, UP was paying her $86K as director ████ ████████ had grown to ████ locations; ████ had ████████████ and ███ recruiters under her supervision.

When ████ first started working at UP, ████████ the ████████ corporate vice president since the late ████, told her that the amount of money she could earn was based on a simple and straightforward formula. UP evaluated its recruiters every six months and the number of students they enrolled determined the amount of salary they earned. In ████ UP did not cover this fact up. "Starts," however, was the constant in determining recruiter salaries the entire time ████ worked at UP. A "start" or an "enrollment" were UP's terms for students who enrolled and actually attended the first three classes. If a recruiter did not enroll enough students, UP fired him or her.

The very first performance "matrix, " UP's chart for recruiter compensation, ████ recalled contained a list of "activities;" i.e., steps in the recruitment process, such as making telephone calls to potential students, setting appointments with potential students, whether the appointee actually showed up for an interview, whether the interviewee actually enrolled and whether the enrollee actually "started." The matrix put together the activities and conversion rates—in other words, the number of students started was the measure of a recruiter's efficiency in conducting the previous steps in the recruitment process. ████ saw many different iterations of the matrix while employed at UP.

At some point [when??], she recalled ████████ from UP's corporate headquarters in Phoenix, Arizona, issuing a directive telling managers that UP could no longer directly put the number of starts/enrollments on the matrix because to compensate recruiters based only on starts was illegal. As a result, UP introduced "qualitative" factors onto the matrix. As another result, UP kept two files on recruiters; one was the "activity" file, which was kept at the local campus; the second was the Human

DOE APOL 0138

Resources/official personnel file, kept in headquarters in Phoenix. The "official" HR file contained only qualitative ratings. The quantitative data was kept in the activity file.

·During performance evaluations, ███ would sit down with a recruiter and go over the recruiter's enrollment goals (number of telephone calls required to be made to prospective students, number of appointments required to be set with them, number of interviews required to be conducted out of the appointments set, number of enrollments required per given time period) and compare them to how the recruiter actually performed with respect to these goals. Enrollments were weighted more heavily than other steps in the recruitment process, because a recruiter could make 300 telephone calls, but if they weren't "converting" them to enrolled students, then the number of calls made wasn't important. The matrix was a tracking tool that she and the recruiters used on a weekly basis to track actual performance to goals. As always, the more students a recruiter enrolled, the more money he or she could earn.

███ says the switch to including qualitative factors in a performance evaluation was difficult for many managers. Before, it was a straightforward, how many you enrolled equaled how much money you made. With the extra layer, apparently some managers sent evaluations that containing high ratings for a recruiter's ability to communicate well, when the recruiter was failing to meet his or her enrollment goals. The managers suggested a pay rise anyway, based on the fact that the recruiter "often or always exceeded expectations" in the manager's opinion in all of the qualitative categories. ███ said that she herself would never have even considered sending an evaluation of an employee to corporate that wasn't based on the quantitative factors. "If it was based just on qualitative factors, without corresponding quantitative factors, I knew it would be rejected."

As a result of this confusion by some managers, ████████ came up with a "key"—a document that explained to directors of enrollment how properly to convert quantitative factors into qualitative factors. ███ said that ███████████s administrative assistant, sent this document to all directors of enrollment via an email in ███ or ███. She recalled it being a 6 –7 page spreadsheet attachment to the email. It was a line-by-line reproduction of the qualitative factors off of UP's standard performance evaluation, the copy of which ███ identified and is attached hereto, with a translation of how managers should equate these factors with a recruiter's quantitative enrollment numbers. For instance, ███ said that ███ key said that if a recruiter wasn't making enough telephone calls, the manager should check the "requires improvement" or the "unsatisfactory" box in the IV. 4. (IV. "Working Relationships" 4."Establishes and promotes constructive working relationships") category.

Because the stated purpose of this document was to assist enrollment managers in properly filling out performance evaluations forms, ███ as director of enrollment for ████████ gave the document to all of the enrollment managers she supervised and instructed them on how to use it. She assumed that other directors of enrollment across the country would have done the same thing.

2

DOE APOL 0139

Bill Brebaugh provided training meetings every six months for all directors of enrollment nationwide. There were approximately 25 directors of enrollment across the country when ▮▮▮ left in ▮▮▮ She recalled the last meeting being in Houston in April 2001. Bill primarily conducted these meetings, but she remembers Todd Nelson speaking at them as well.

As a director of enrollment, ▮▮▮ received a bonus every quarter. UP awarded these bonuses for several different reasons, such as, for starting a new program and for starting enough students to meet the campus' budgeted goal.

In addition, recruiters, enrollment managers and directors could qualify for an all expense paid week/five day trip to a fun location for himself or herself and a guest, which included air fare, meals, group activities, plus a per diem amount for personal entertainment expenses. What qualified a recruitment employee for these trips was getting the most starts at a campus. She recalled the trips as being to New Orleans, Bermuda, Seattle and Vancouver, Canada. UP hyped these trips constantly and used them to reward the top enrollment producers. UP stopped offering these trips as incentives in 1999 or 2000.

Recruiters could also receive Starbuck's gift certificates, movie tickets and lottery tickets (valued at $25 or under) if they started the most students in a given time frame, i.e., "rep of the week".

▮▮▮ said that she knows of two other former UP recruitment personnel who currently work for ▮▮▮. The first is ▮▮▮, who works in the ▮▮▮ the second works in ▮ as the director of ▮▮▮ for one of ▮▮▮ could not recall her name). This woman was an enrollment manager in one of UP's ▮▮▮ campuses. These women may agree to speak with us and may recall/possess the key document explained above.

▮▮▮ resigned from UP in ▮▮▮ The reason she cited was because she had recently been a student at UP and was appalled at the lack of quality of the educational programs. She raised a big fuss about this and got into a huge dispute with UP corporate. She left on very bitter terms when UP rebuffed her concerns. ▮▮▮ believed that she could no longer in good conscience continue to market UP to students because of the lack of quality of the education. ▮▮▮ signed a "do not disparage" agreement with UP and as a result insisted that the Department not use her name or reveal any factual information about her that might show her identity to UP. She fears that UP will retaliate against her despite the fact that everything she said to us she claims is true and not in any way a disparagement of UP. We assured her that we would keep her name and identity completely confidential.

3

DOE APOL 0140

# EXHIBIT E

Case No. 06-MC-0558 (CKK)

Interview notes by Martina Fernandez-Rosario
August 21, 2003
University of Phoenix
███████████████ Center

Interview with ████████████ Senior Admissions Counselor

████████ has been with the University of Phoenix since ███████ She stayed at home with her children (for about ███████), and returned to work when her youngest child was ██ She heard from UOP from ████████ who works at UOP- ██████ (██████ and ███████, who is also an enrollment counselor in ██████ (██████. Per ████ her is one of the counselors who does very well (top counselors) and makes good money.

████ initially interviewed for the job with ████████ and ██████████ was the manger in ████████ and is now the director of ██████ on-line. ██████ is now the director of enrollments at the ██████ campus.

At the time ████ started with UOP, there was only one level of admissions counselor, unlike the different levels they have now (Associate/ECI/ECII/Senior, etc.), so ████ started as an associate, with a base salary of $24,000. Her job duties were mostly to call students and to try to set up appointments for them to meet with the enrollment counselors. She was told that if she did well, then she would have an opportunity to get a salary increase. In defining WELL, ████ said that it was the number of appointments she was able to set up for the counselors and how many students actually kept their appointment, and ultimately how many of the students enrolled.

After ██ months, ████ went to work in ████████ and was promoted to ECI, and was given a small salary increase to $28,000. During that time, the counselors got reviews every six months, so they had the opportunity to increase their salary twice a year. ████████ numbers were very good, so her salary increased from $28,000 to $40,000 to $60,000 to $80,000 to $97,000. In around ████ the performance reviews for purposes of salary increases were done annually, instead of every six months.

Evaluations done in ████████ were all done based on how many students ████ was enrolling. The matrix (although different that what is currently being used) was used during that time. The matrix use for her evaluations actually stated how many students ████ had enrolled during the specific period of time. And, although the performance reviews were being filled out, what really mattered and what was really discussed during the review was only the number of students she had enrolled.

████ stated that she has heard many of the managers repeatedly say that the number of applications/enrollments is what really counts. All the other stuff is not really that

DOE APOL 0353



important because if you meet your numbers, that means that you are making the phone calls, setting appointments, etc.  When asked which managers had specifically said that the bottom line is what counts, she said that just about every manager, including: ███████ (███████ manager), ███████ and ███████ She said that (almost apologetically) said to her that she had to meet her numbers...*I believe she said that this was because of the pressure that was being placed on them.)*

███████confirmed that all of the evaluation documents (matrix and performance review documents) were signed by her and her supervisor.  She has copies of all those documents and will be willing to provide a copy of those documents to our office, if necessary.  ███████also verified that all of the prior employee handbooks (perhaps prior to ███████) had the number of enrollments needed in order for the enrollment counselor to receive a salary increase.  The matrix used during that time also had the number of enrollments required for the different salary levels.

███████, a trainer from Corporate who came to do some training last week, told them (the enrollment counselors) that all actions listed on the matrix will lead to enrollments, and basically that's what ultimately counts.  ███████ the new manager, also reiterated this.  ███████*is new to* ███████*but not new to* ███████ *She came from* ███████

███████last annual performance review was in October ███████ for fiscal year September 1, ███████through August 31, ███████ The review was with ███████numbers were not good, and she was placed in "requires improvement," so ███████needed to increase her numbers.

███████said that she must enroll at least 10-12 students per month, to be performing at the bare minimum (meets). There is a lot of pressure on her to meet her numbers.  ███████ ███████told ███████that her enrollment numbers need to be in double digits, and that she needs to enroll at least 10 students per month or else there would be trouble *(meaning her job would be in trouble.)*

There was a teleconference that took place in October ███████ Basically, all of the enrollment counselors were there and so was the manager, ███████ The call was to tell the counselors that they needed to increase their enrollments.  ███████told them that if they didn't hit their numbers, he would lose his job, and so would they!  After the call, ███████gathered the more senior staff (███████ ███████ ███████ and ███████these ladies (now in ███████, ███████, ███████, and ███████ quit), and told them that they needed to increase their numbers because they specifically were being targeted.

We asked███████ if she believed that all of the UOP campuses are doing the same things when it comes to compensation based on enrollments and she confirmed that YES, it is the same across the regions.  The only difference may be a small cost of living allowance for the different geographical areas.

███ confirmed again for us that the salary range is definitely based on the number of students that enroll/start school. The ███████location is the highest paid when it comes to enrollment counselors' salaries.

Per █ █████████(corporate) is the one that approves the salary increases. ███████ ████is also involved in the approvals.

As far as number of enrollments necessary for promotions, ████said that in █████ she believes that the number to meet was 176 in order to get the promotion. ████enrolled 185 students, so meeting the numbers was not a problem. She met/exceeded the numbers, so she got the raise. ████has been told, repeatedly, and truly believes that all increases in salary and/or promotions are all "dependent on the number of enrollments."

In reviewing the matrix, █████said that she was told by her manager that she needed to enroll at a minimum 10-12 students per month, and hopefully enroll enough to average 16 students a month, in order to meet her requirements. During her last evaluation with ████████████did not meet the number of enrollments, but █████████gave her an overall rating of "meet" for the quarter, since ████did well in other areas. ██████ then told████that she "got yelled at" by ████████ because the number of enrollments was not met.

Per ████, everyone there (the enrollment staff) in ███████ believes that the numbers have to be met and that it is all about the number of enrollments.

SAW training: As a senior counselors, ████has been wanting to be a trainer at the SAW training for new hires. However, she has not been allowed to go because her enrollment numbers are not high enough. She did attend SAW training when she was first hired. The people/trainers were█████████and█████████ The message she got at that training was that if you wanted to make the money, you need to enroll students. They talked about how the counselor could go from $25,000 to $50,000, it just depended on them and how many students they enrolled.████remembers that the old employee handbooks (███████) had the actual number of enrollments required in order to make a certain amount of money.

The last meeting with█████████ when the new matrix was introduced/rolled-out (*I believe she said* ████, he said that the matrix was new, but there was nothing to worry about as long as they met the numbers per month. If the counselor met the numbers, than everything was OK.

████confirmed that she has heard both ████████ and ████████say the phrase: "flying under the radar of the Department/DOE" and, has heard ████████use the term "smoke & mirrors." She has heard ██████████ say "you know how the game is played, so just get the numbers."

████ again confirmed that it is commonly know that "it's just about the numbers" (number of enrollments).

**DOE APOL 0355**

About the Sperling Club: ████ said that it is based on number of enrollments/starts. If you get a certain number of enrollments, than you get to go. About the other less expensive prizes, ████ said that they are done regularly and usually come from ████ or ████ The gift certificates to Toys R Us, DVD players, etc., are usually based on number of applications submitted as the contest is for a short period of time. Sometimes the e-mail is sent by ████████ but usually from ████████

When asked if she has ever heard anyone talk about having to match up the numbers in the matrix with the performance evaluation form, ████ said that she has heard ████ ████ and ████████ say that they have to align the performance evaluation so that whatever is reported on the matrix (quantitative) agrees with the what is reported on the performance evaluation form (qualitative).... This is only for the annual review. The quarterly reviews are strictly based on the numbers reported on the matrix. This, per ████ and ████ is needed in order to comply with Dept. of Education regulations.

████ confirmed that she has been told, practically every time by every manager, that in order to get a promotion, counselors have to enroll a certain number of students. The bottom line is "how many students you start."

████ said that the counselors in ████ were very scared of losing their jobs if they talked to us (Department). When asked if she had been instructed on what to say ████ said that ████ told them to be honest, but just to answer what they were asked.

*My impression of ████████ is that she is a hard working employee who is very honest and will tell the truth, even if told to do otherwise. She has been at UOP for a ████ and knows a lot about the organization. It is possible that because she is a senior enrollment counselor and because or her salary, management may be trying to get her out. I was surprised to find out that only 4 of the 120+ counselors in the ████ region are senior counselors, and only 12 are EC2. All others are EC1 or associate counselors... that means that most of the counselors are relatively new employees.*

# EXHIBIT F

Case No. 06-MC-0558 (CKK)

Interview notes by Martina Fernandez-Rosario
███████ 2003 @ 1:10pm
University of Phoenix
██████ Learning Center
███████████████

Interview with ████████████ – Senior Admissions Counselor

████ has been with UOP for ████ years. She started with UOP on ████████████ in the ████ campus. She initially interviewed with █████████ ████ enrollment manager). She transferred to ████████ in ████████

During the time she worked at the ████████ location, ████████ was her manager from ████████ to ████████.

Background: ████ worked for ████████████ for ████ years prior to coming to UOP, and before that she worked for the ████████ She learned of the job at UOP because she was a student at the ████████ campus (as of ████████ She has now completed the undergraduate degree and has taken some classes towards her masters.

During her interview with ████████ they discussed expectations, duties, etc. They discussed the expectations as far as enrollments and ████ was told that her pay would be judged based on number of enrollments. The matrix was not discussed at the time. ████ understood that her salary would double is she enrolled X number of students in the following 9 months. Her starting salary was $32,000.

At her 90 day review, ████ was again told that it was about the numbers. She was clear on what she needed to do to get promoted...... enroll many students. The review was not in writing, and somewhat generic. She was told that nothing else mattered, only the enrollments. *When asked to define enrollments,* ████ *said, "the student has to attend at least two nights – attendance is tracked by marketing coordinator who also checks for attendance. If the student stays, it is reported to* ████ *at Corporate.* ████████ *then approves the student as a "start."* She was told by ████████ that she was doing great and right on target. First month: enrolled 4 students
                                       Second:     enrolled 9 students
                                       Third:      enrolled 19 students
Again, ████ was not presented with the matrix. She knew she was doing great, as far as enrollments, so there was really nothing to worry about. ████ salary was increased from $32,000 to $60,000. ████████ sent ████ enrollment numbers to corporate (████████████) for approval of her increase.

*After about 1 month after* ████ *started,* ████████ *told her that the number of enrollments needed for the highest tier (salary scale) was 119 students – to get the most money.*

**DOE APOL 0343**

During ████ first year, salaries could be adjusted UP or DOWN, depending on performance.

████: ████ 9 months review was with ████████. ████ enrolled more than 119 students, and her salary was then increased to $90,000. At this review, ████████ presented the matrix to ████ and told her that her numbers (enrollments) qualified her for the raise. Her salary was increase to $88,000 and she was promoted to EC2. The next step for ████ was Senior enrollment counselor.

████ was told that if she enrolled 15-18 students a month, then she would be promoted to senior status. Again, she reiterated that the number of students is what mattered.

*Part of the reason* ████ *wanted to become a senior counselor was so that she could serve as a trainer at the SAW training for new hires. And, although she achieved the status of senior enrollment counselor, she has not been given the opportunity to be a trainer at SAW. The reason..... her numbers are not good enough.*

████ ████ next review/evaluation was again with ████████, ████ told her that she finished 12th in the country, so she qualified for another salary increase. Her salary was increased from $88,000 to $90,640. ████ enrolled around 240 students, and was rated as "often exceeds." She was told that she would have the opportunity to provide training at the SAW training, but again, as she started before, she has not yet had the opportunity.

*When I asked* ████ *about the qualitative portion of her review, or even if there was really a qualitative portion of the review, she said that it really is all quantitative. They make things match, but it's really the number of enrollments you have.*

As a senior counselor, ████ is required to enroll 18 students per month. Because she is at a new location, which is not really yet a learning center with the necessary resources and support, she has been given some relief, but is still expected to enroll 10-13 students per month.

████ *told me about the time when she was* ████████████ *(I believe sometime in* ████████. She told her manager that she was going to be out for a few weeks to ████████████ Her manager told her that why did she have to ████ *during their busiest time of the year, and why did she have to be out for several weeks. She was told that she still was going to be expected to get the total number of enrollments required (basically, she would have to work harder the next month so that she could get the average required by the end of the quarter.)* ████ *is now* ████████████████ *and the pressure is on her to get at a minimum of 10-13 per month, despite the fact that she doesn't have the support (advertising and such), and she cannot work 50-60 hours a week due to* ████████ ████ *told her to "do whatever it takes to meet the numbers."*

DOE APOL 0344

█████████ ██ *said that she had to get a doctor's note to say that she couldn't be at work for so many hours.*

███████ told me about a teleconference that took place last October ██ ██████ told the admissions counselors that the heat was on, and they needed to meet the numbers. If thy didn't meet the numbers, he was going to lose this job, and so would they. After the call, ██████████ took several of them (the more senior staff) into a room and told them that "their heads were on a chopping block." This is presumably because their were the more senior staff and making the most money.

██████ says that there are unofficial monthly reviews with the staff (manager and counselor). Some of these reviews are done electronically, so there is not going to be any documentation of the meeting.

█████████ Annual review with █████████ ████ was told that the quantitative factors need to match the qualitative factors on the annual evaluation review form in order to comply with the Department of Education. If give a rating of "meets" due to the numbers, than they have to make the qualitative factors reflect the same. █████████ said that they know that they are not supposed to do it (pay based on numbers) by they do it anyway.

When asked if she has ever heard anyone use the phrase; Flying under the radar of the Department, █████ said that she had head █████████ say that at an all enrollment counselors meeting.

██████ told me that █████████ tried to coach her on what to say. He said that she didn't have to lie, but not volunteer anything. When he asked what she would say about how they got paid, she said that he knew that they got paid based on enrollments and he say, yeah... but there are other things....

At this point, █████ is still expected to enroll 10-13 student per month. She's developing new leads now. People don't really know about the ████████ location, so it's difficult when people don't know where the school is.

About the Sperling Club, █████ says that it's based on enrollments. It's usually for a three month period. She has won three times:

> In █████ she won a trip to Universal Studios. They usually have a meeting, give out awards, and then get a night's stay at the hotel. It's usually based on a certain number of enrollments... 50 or 100..
> On █████████ based on enrollments. She was supposed to go to Phoenix, but instead they went to Monterey. That contest required 50 enrollments.
> In █████████ she won a trip to Las Vegas. Based on enrollments. The requirement was 50 enrollments, and she enrolled 51 students.

Other awards: In February ▮▮▮ she won a gift certificate to Toys R Us for $100. This was based on the number of applications submitted. There are pretty regular and the notices for these awards usually come from ▮▮▮▮▮▮▮ Other prizes offered have been such things as: DVD players, tickets, etc.

▮▮▮ is willing to provide a copy of her complete personnel file. She has kept copies of all documents since her employment with UOP. She is willing to provide a copy upon our request.

▮▮▮ *did not receive a raise after her last review. She does not expect to get a raise next evaluation either because management has been telling her that she had not met her numbers. She feels that they are trying to push her out because she is a senior counselor and because of her salary.*

▮▮▮ *appears to be a very nice lady, well education, and hard worker. She appears to be someone who likes to help students, but definitely feels the pressure from management to enroll students, whether they are qualified or not to attend UOP. She will be truthful when asked questions, no matter what management may instruct her to do.*

Interview notes by Martina Fernandez-Rosario
██████ 2003
University of Phoenix
████████ Learning Center
████████████

Interview with ████████████ – Enrollment Counselor II

██████ background, prior to coming to UOP, was in ████████████ She started her employment with UOP in ████ as an academic counselor (post enrollment) in the ████ campus.  In January ████ she transferred to the admission department as an enrollment counselor.

As an enrollment counselor, ████ earned $28,000 a year.  ████████████ who in now in ████ alerted her to the fact that she could make more money as an admissions counselor, so she decided to transfer.   Since she was already working for UOP as an academic counselor, she didn't really have to go through formal interviews to get the job. She started her job as an enrollment counselor earning $30,000.

Regarding salary, ████ was told that she would have the opportunity "to get  more money".. "the harder you worked, the better you would be compensated." She needed to meet a certain number of enrollments…. The more students you enroll, the more money you make.

Her first review was with ████████████ in September ████ She was told that based on her job performance she had exceeded expectations.  She remembers that she enrolled 107 students.  And, because she exceeded expectations, her salary would be increased to $60,000/year.

After her review in ████ the reviews then went to every six months and salaries were adjusted every six months.  Salaries could go up or down, based on the number of starts/enrollments.  In the year ████ the salaries then remained the same.  During ████ and ████ her salary reached a high of $84,000 and a low of $56,000.  After the year ████ the evaluation process also changed and were no longer being done every six months, but annual reviews were now being done.  ████ years ago, the salary ranges were identified with corresponding number of enrollments needed (this is an old version of the matrix that apparently had the numbers written in, as to the number of enrollments required in order to get a certain salary.)

In ████████████, ████████████ did her last evaluation and placed her in "meets."  The bottom line is that she needed to get enrollments, and since her numbers of enrollments were not there, she did not get a raise.  ████ also told her that she ████████ needed to "match" the numbers on the matrix and where she ████████ was placed, with the qualitative standards on her ████ annual evaluation form.  This was done so that the

**DOE APOL 0347**

qualitative standards reflected the quantitative rating based on the rating given on the matrix, which was solely based on the number or starts/enrollments.

██████ says that if the counselors don't get a least a "meets" then they go on "Plan." When they get put on plan, not much really happens. They are supposed to meet with their manager on a regular basis. They are basically told that they have to increase the numbers. Usually, when the person is put on plan, they make things difficult for them and they just get tired of it and end up leaving the company. They (UOP) don't want to go through all the steps needed to fire someone, so they make it difficult to the point that the person goes away on their own.

██████ attended the SAW training after 3 months of beginning her job as a counselor. In that training, they talked mostly about customer service, sales, academics, etc. The trainer was ██████████ and other managers. Compensation not discussed. ██████ is more of a motivational speaker. He came out to the campus within the last month and spoke about where UOP (as a company) is going.

As far as compliance goes, she has heard ████████ say the phrase, "we're flying under the radar of the Department" at one of the ██████ meetings. She has also heard the term "smoke & mirrors," but cold not remember for sure if she had heard ██████ say it.

As far as evaluations, she believes that the bottom line is the number of students you start/enroll.

Sperling Club: Winning Sperling is definitely based on enrollments. It's usually every 6 months or so, and they look at the overall number of enrollments. After 9/11, it has been very difficult to win anything. She has not won anything after that. It seems to her that UOP has cut back on things like Sperling trips. There was a new trip to SF, but she did not register because she knew that she did not qualify. Other prizes that are given out such as DVD players, etc., are based on applications. The last one for a DVD was sent by ██████████. The notices are usually sent by ██████████ or ██████████.

██████ recalls hearing ██████████ say that "it's all about the numbers."

Last ████ there was a teleconference with all the admissions counselors and ██████████. This was a very ugly situation and ██████████ said that he was the messenger, and that the message was really coming from ████████. The message was that they needed to enroll more students because they need to meet certain expectations, and that those expectations had to be met or his job was on the line, and so was theirs. ██████ was there and after the call, she called the more senior people into the office and told them that they were the people who were being targeted because they made the most money. She told them that their jobs were on the line and that they needed to make the numbers. The counselors in the meeting with ██████████ were: ██████████ ██████ and ████████.

DOE APOL 0348

██████ said that she is not too worried right now, but that she's heard that UOP may go back to adjusting salaries every six months, the way it was done in the past.  The also feels that they may be trying to push the more senior counselors out because they can hire new ones and work them hard and not promote them if they don't make the numbers.

██████ *is a nice lady who appears to be very upfront and honest.  She has always been a top performer, so the numbers have really not been much of a problem for her.  She always met the numbers, but after  9/11, things haven't been the same as far as enrollments.  They also have many more counselors that make it harder now for them to get the numbers required of them.  I believe that* ██████ *will be truthful and will answer questions honestly.*

Interview notes by Martina Fernandez-Rosario
August 20, 2003 @ 1:10pm
University of Phoenix
San Mateo Learning Center
1834 South Norfolk Street
San Mateo, CA 94403
(650) 655-3994

Interview with Ms. Julie Albertson – Senior Admissions Counselor

Julie has been with UOP for 3 ½ years. She started with UOP on April 24, 2000, in the San Jose campus. She initially interviewed with Jennifer Rezucka (SJ enrollment manager). She transferred to San Mateo in January '03.

During the time she worked at the San Jose location, Marci Miller was her manager from April 2000 to January 2003.

Background: Julie worked for Norwest Financial for 2 years prior to coming to UOP, and before that she worked for the YMCA. She learned of the job at UOP because she was a student at the San Jose campus (as of Feb. '02). She has now completed the undergraduate degree and has taken some classes towards her masters.

During her interview with Jennifer, they discussed expectations, duties, etc. They discussed the expectations as far as enrollments and Julie was told that her pay would be judged based on number of enrollments. The matrix was not discussed at the time. Julie understood that her salary would double is she enrolled X number of students in the following 9 months. Her starting salary was $32,000.

At her 90 day review, Julie was again told that it was about the numbers. She was clear on what she needed to do to get promoted…… enroll many students. The review was not in writing, and somewhat generic. She was told that nothing else mattered, only the enrollments. *When asked to define enrollments, Julie said, "the student has to attend at least two nights – attendance is tracked by marketing coordinator who also checks for attendance. If the student stays, it is reported to Bev Young at Corporate. Bev Young then approves the student as a "start."* She was told by Marci Miller that she was doing great and right on target. First month: enrolled 4 students
                                Second:       enrolled 9 students
                                Third:          enrolled 19 students
Again, Julie was not presented with the matrix. She knew she was doing great, as far as enrollments, so there was really nothing to worry about. Julie's salary was increased from $32,000 to $60,000. Marci Miller sent Julie's enrollment numbers to corporate (Heather and Bill Brebaugh) for approval of her increase.

*After about 1 month after Julie started, Marci Miller told her that the number of enrollments needed for the highest tier (salary scale) was 119 students – to get the most money.*

DOE APOL 0560

During Julies first year, salaries could be adjusted UP or DOWN, depending on performance.

**12/2000:** Julie's 9 months review was with Marci Miller. Julie enrolled more than 119 students, and her salary was then increased to $90,000. At this review, Marci Miller presented the matrix to Julie and told her that her numbers (enrollments) qualified her for the raise. Her salary was increase to $88,000 and she was promoted to EC2. The next step for Julie was Senior enrollment counselor.

Julie was told that if she enrolled 15-18 students a month, then she would be promoted to senior status. Again, she reiterated that the number of students is what mattered.

*Part of the reason Julie wanted to become a senior counselor was so that she could serve as a trainer at the SAW training for new hires. And, although she achieved the status of senior enrollment counselor, she has not been given the opportunity to be a trainer at SAW. The reason..... her numbers are not good enough.*

**01/2002:** Julie's next review/evaluation was again with Marcie Miller. Marcie told her that she finished 12th in the country, so she qualified for another salary increase. Her salary was increased from $88,000 to $90,640. Julie enrolled around 240 students, and was rated as "often exceeds." She was told that she would have the opportunity to provide training at the SAW training, but again, as she started before, she has not yet had the opportunity.

*When I asked Julie about the qualitative portion of her review, or even if there was really a qualitative portion of the review, she said that it really is all quantitative. They make things match, but it's really the number of enrollments you have.*

As a senior counselor, Julie is required to enroll 18 students per month. Because she is at a new location, which is not really yet a learning center with the necessary resources and support, she has been given some relief, but is still expected to enroll 10-13 students per month.

*Julie told me about the time when she was going to get married (I believe sometime in July/August '02). She told her manager that she was going to be out for a few weeks to get married and go on her honeymoon. Her manager told her that why did she have to get married during their busiest time of the year, and why did she have to be out for several weeks. She was told that she still was going to be expected to get the total number of enrollments required (basically, she would have to work harder the next month so that she could get the average required by the end of the quarter.) Julie is now expecting a baby – due in December 2003 – and the pressure is on her to get at a minimum of 10-13 per month, despite the fact that she doesn't have the support (advertising and such), and she cannot work 50-60 hours a week due to her pregnancy.* Marci Miller told her to "do whatever it takes to meet the numbers." Julie's baby is due

DOE APOL 0561

in December 2003. *Julie said that she had to get a doctor's note to say that she couldn't be at work for so many hours.*

Marcie told me about a teleconference that took place last October 2002. Tim Gruber told the admissions counselors that the heat was on, and they needed to meet the numbers. If thy didn't meet the numbers, he was going to lose this job, and so would they. After the call, Marci Miller took several of them (the more senior staff) into a room and told them that "their heads were on a chopping block." This is presumably because their were the more senior staff and making the most money.

Julie says that there are unofficial monthly reviews with the staff (manager and counselor). Some of these reviews are done electronically, so there is not going to be any documentation of the meeting.

**01/2003:** Annual review with Marci Miller. Julie was told that the quantitative factors need to match the qualitative factors on the annual evaluation review form in order to comply with the Department of Education. If give a rating of "meets" due to the numbers, than they have to make the qualitative factors reflect the same. Marci Miller said that they know that they are not supposed to do it (pay based on numbers) by they do it anyway.

When asked if she has ever heard anyone use the phrase: Flying under the radar of the Department, Julie said that she had head Bill Brebauh say that at an all enrollment counselors meeting.

Julie told me that Mike McKay tried to coach her on what to say. He said that she didn't have to lie, but not volunteer anything. When he asked what she would say about how they got paid, she said that he knew that they got paid based on enrollments and he say, yeah... but there are other things....

At this point, Julie is still expected to enroll 10-13 student per month. She's developing new leads now. People don't really know about the San Mateo location, so it's difficult when people don't know where the school is.

About the Sperling Club, Julie says that it's based on enrollments. It's usually for a three month period. She has won three times:

- ➤ In 2000, she won a trip to Universal Studios. They usually have a meeting, give out awards, and then get a night's stay at the hotel. It's usually based on a certain number of enrollments... 50 or 100..
- ➤ On September 11, 2001, based on enrollments. She was supposed to go to Phoenix, but instead they went to Monterey. That contest required 50 enrollments.
- ➤ In November 2001, she won a trip to Las Vegas. Based on enrollments. The requirement was 50 enrollments, and she enrolled 51 students.

Other awards: In February 2003, she won a gift certificate to Toys R Us for $100. This was based on the number of applications submitted. There are pretty regular and the notices for these awards usually come from Tim Gruber. Other prizes offered have been such things as: DVD players, tickets, etc.

Julie is willing to provide a copy of her complete personnel file. She has kept copies of all documents since her employment with UOP. She is willing to provide a copy upon our request.

*Julie did not receive a raise after her last review. She does not expect to get a raise next evaluation either because management has been telling her that she had not met her numbers. She feels that they are trying to push her out because she is a senior counselor and because of her salary.*

*Julie appears to be a very nice lady, well education, and hard worker. She appears to be someone who likes to help students, but definitely feels the pressure from management to enroll students, whether they are qualified or not to attend UOP. She will be truthful when asked questions, no matter what management may instruct her to do.*

DOE APOL 0563

Interview notes by Martina Fernandez-Rosario
Interview conducted by Martina Fernandez-Rosario and Shane Dunne
August 21, 2003
University of Phoenix
San Jose Learning Center
3590 North First Street
San Jose, CA  95134
(408) 678-1103

Interview with Ms. Mary Hendow:  Senior Admissions Counselor

Mary has been with the University of Phoenix since April 1997.  She stayed at home with her children (for about 10 years), and returned to work when her youngest child was 2 [she also worked at Standard Insurance.  SFD].  She heard from UOP from her sister-in-law who works at UOP- Phoenix (Sandra Ryan) and her brother, who is also an enrollment counselor in Phoenix (Peter).   Per Mary, her sister-in-law is one of the counselors who does very well (top counselors) and makes good money.

Mary initially interviewed for the job with Vince Grell and Debra Johnson.  Vince was the manger in San Jose, and is now the director of Phoenix on-line.  Debra Johnson is now the director of enrollments at the Hawaii campus.

At the time Mary started with UOP, there was only one level of admissions counselor, unlike the different levels they have now (Associate/ECI/ECII/Senior, etc.), so Mary started as an associate, with a base salary of $24,000.  Her job duties were mostly to call students and to try to set up appointments for them to meet with the enrollment counselors.  She was told that if she did well, then she would have an opportunity to get a salary increase.  In defining WELL, Mary said that it was the number of appointments she was able to set up for the counselors and how many students actually kept their appointment, and ultimately how many of the students enrolled.

After 6 months, Mary went to work in Pleasanton and was promoted to ECI, and was given a small salary increase to $28,000.  During that time, the counselors got reviews every six months, so they had the opportunity to increase their salary twice a year.  Mary's numbers were very good, so her salary increased from $28,000 to $40,000 to $60,000 to $80,000 to $97,000 [by October 1999 SFD].  In around 1999, the performance reviews for purposes of salary increases were done annually, instead of every six months.

Evaluations done in 1997 & 1998 were all done based on how many students Mary was enrolling.  The matrix (although different that what is currently being used) was used during that time.  The matrix used for her evaluations actually stated how many students Mary had enrolled during the specific period of time.  And, although the performance reviews were being filled out, what really mattered and what was really discussed during the review was only the number of students she had enrolled.

DOE APOL 0564

Mary stated that she has heard many of the managers repeatedly say that the number of applications/enrollments is what really counts. All the other stuff is not really that important because if you meet your numbers, that means that you are making the phone calls, setting appointments, etc [Sounds exactly like ▮▮▮▮▮▮ SFD]. When asked which managers had specifically said that the bottom line is what counts, she said that just about every manager, including: Vince, Kris Plachy (Sacramento manager), Jennifer Razucha, and Marci Miller. She said that Marci Miller (almost apologetically) said to her that she had to meet her numbers…*I believe she said that this was because of the pressure that was being placed on them.) [the enrollment management policy guide explicitly states new enrollments are the basis for a raise SFD]*

Mary confirmed that all of the evaluation documents (matrix and performance review documents) were signed by her and her supervisor. She has copies of all those documents and will be willing to provide a copy of those documents to our office, if necessary. Mary also verified that all of the prior employee handbooks (perhaps prior to 1999) had the number of enrollments needed in order for the enrollment counselor to receive a salary increase. The matrix used during that time also had the number of enrollments required for the different salary levels.

Jan Clevenger, a trainer from Corporate who came to do some training last week, told them (the enrollment counselors) that all actions listed on the matrix will lead to enrollments, and basically that's what ultimately counts. ▮▮▮▮▮ the new manager, also reiterated this. ▮▮▮▮▮*is new to San Jose, but not new to Phoenix. She came from* ▮▮▮▮▮

Mary's last annual performance review was in October 2002, for fiscal year September 1, 2001 through August 31, 2002. The review was with Marcie Miller. Mary's numbers were not good, and she was placed in "requires improvement," so Mary needed to increase her numbers.

Mary said that she must enroll at least 10-12 students per month, to be performing at the bare minimum (meets). There is a lot of pressure on her to meet her numbers. Marcie Miller told Mary that her enrollment numbers need to be in double digits, and that she needs to enroll at least 10 students per month or else there would be trouble *(meaning her job would be in trouble.)*

There was a teleconference that took place in October 2002. Basically, all of the enrollment counselors were there and so was the manager, Marci Miller. The call was to tell the counselors that they needed to increase their enrollments. Tim Gruber told them that if they didn't hit their numbers, he would lose his job, and so would they! After the call, Marci Miller gathered the more senior staff (Mary Hendow (SJ), Julie Albertson (now in San Mateo), Kathie (SJ), Theresa Salazar (SJ), Babette and Maria (these ladies quit), and told them that they needed to increase their numbers because they specifically were being targeted.

We asked Mary if she believed that all of the UOP campuses are doing the same things when it comes to compensation based on enrollments and she confirmed that YES, it is the same across the regions. The only difference may be a small cost of living allowance for the different geographical areas.

Mary confirmed again for us that the salary range is definitely based on the number of students that enroll/start school. The Phoenix location is the highest paid when it comes to enrollment counselors' salaries.

Per Mary, Bev Young (corporate) is the one that approves the salary increases [she may communicate the approvals, but Bill Brebaugh makes the decision. See email provided by Julie Albertson SFD]. Heather Cornell is also involved in the approvals.

As far as number of enrollments necessary for promotions, Mary said that in 1999, she believes that the number to meet was 176 in order to get the promotion. Mary enrolled 185 students, so meeting the numbers was not a problem. She met/exceeded the numbers, so she got the raise. Mary has been told, repeatedly, and truly believes that all increases in salary and/or promotions are all "dependent on the number of enrollments."

In reviewing the matrix, Mary said that she was told by her manager that she needed to enroll at a minimum 10-12 students per month, and hopefully enroll enough to average 16 students a month, in order to meet her requirements. During her last evaluation with Marcie Miller, Mary did not meet the number of enrollments, but Marcie Miller gave her an overall rating of "meet" for the quarter, since Mary did well in other areas. Marcie then told Mary that she "got yelled at" by Tim Gruber because the number of enrollments was not met.

Per Mary, everyone there (the enrollment staff) in San Jose believes that the numbers have to be met and that it is all about the number of enrollments.

SAW training: As a senior counselors, Mary has been wanting to be a trainer at the SAW training for new hires. However, she has not been allowed to go because her enrollment numbers are not high enough. She did attend SAW training when she was first hired. The people/trainers were Bill Brebaugh and Alexas Lim. The message she got at that training was that if you wanted to make the money, you need to enroll students. They talked about how the counselor could go from $25,000 to $50,000, it just depended on them and how many students they enrolled. Mary remembers that the old employee handbooks (June 1997) had the actual number of enrollments required in order to make a certain amount of money.

The last meeting with Tim Gruber, when the new matrix was introduced/rolled-out (*I believe she said 10/02*), he said that the matrix was new, but there was nothing to worry about as long as they met the numbers per month. If the counselor met the numbers, than everything was OK.

**DOE APOL 0566**

Mary confirmed that she has heard both Tim Gruber and Bill Brebaugh say the phrase: "flying under the radar of the Department/DOE" and, has heard Bill Brebaugh use the term "smoke & mirrors." She has heard Tim Gruber say "you know how the game is played, so just get the numbers."

Mary again confirmed that it is commonly known that "it's just about the numbers" (number of enrollments).

About the Sperling Club: Mary said that it is based on number of enrollments/starts. If you get a certain number of enrollments, than you get to go. About the other less expensive prizes, Mary said that they are done regularly and usually come from Daniel Waterman or Tim Gruber. The gift certificates to Toys R Us, DVD players, etc., are usually based on number of applications submitted as the contest is for a short period of time. Sometimes the e-mail is sent by Karoline Matola, but usually from Tim Gruber.

When asked if she has ever heard anyone talk about having to match up the numbers in the matrix with the performance evaluation form, Mary said that she has heard Marci Miller and Tim Gruber say that they have to align the performance evaluation so that whatever is reported on the matrix (quantitative) agrees with the what is reported on the performance evaluation form (qualitative).... This is only for the annual review. The quarterly reviews are strictly based on the numbers reported on the matrix. This, per Tim and Marci, is needed in order to comply with Dept. of Education regulations [None of my interviewees (including the managers) were able to affirmatively state that these forms were ever signed by either the employee or the manager SFD]

Mary confirmed that she has been told, practically every time by every manager, that in order to get a promotion, counselors have to enroll a certain number of students. The bottom line is "how many students you start."

Mary said that the counselors in San Jose were very scared of losing their jobs if they talked to us (Department). When asked if she had been instructed on what to say, Mary said that Ann Tye told them to be honest, but just to answer what they were asked.

*My impression of Ms. Mary Hendow is that she is a hard working employee who is very honest and will tell the truth, even if told to do otherwise. She has been at UOP for a long time and knows a lot about the organization. It is possible that because she is a senior enrollment counselor and because or her salary, management may be trying to get her out. I was surprised to find out that only 4 of the 120+ counselors in the NorCal region are senior counselors, and only 12 are EC2. All others are EC1 or associate counselors... that means that most of the counselors are relatively new employees.*

**DOE APOL 0567**

# EXHIBIT G

Case No. 06-MC-0558 (CKK)

Interview notes by Martina Fernandez-Rosario
██████ 2003   @ 12:30 pm
University of Phoenix
██████ Learning Center

████████ is an Admissions Manager.  She has worked at the ████ and ██████ campuses.

She started with UOP in ████ n the ████ campus as a Re-Entry Counselor.  The position required a lot of phone calls and basically reconnecting with students who had left the school.  She was assigned to work with the nursing students, and most of her job dealt with making phone calls.

She then became an enrollment counselor and worked on enrolling students.  When I showed her the Matrix, she said that she was not familiar with it.  She was never evaluated or ever evaluated any employee using the Matrix.  She said that another form was used, but it did not include the numbering as is on the current Matrix.

████████ is responsible for two teams:
The Flex-net Team:  This team focuses on serving students who want to do the on-line or distance ED course.  They don't ever have to go into the campus for anything.  This team consists of: ████████ ████████ location – has been with UOP over ████
████████
████████
████████ - Since ████
The team was started in May ████
These are basically "on-line" counselors and do everything with the student via internet, e-mail, etc.  The student never has to go into the campus.  This team will be going to the "matrix" system, but has not yet had the training or any reviews.

The Outbound Team:
This team focuses on contacting students who have expressed an interest in UOP, but have not enrolled or followed up with an appointment, etc.  This team was started in December ████ so they have not had an evaluation yet.  These team members are: ████████████████, and ████ - all recently hired.  This team will not be on the Matrix, but something similar.  They have not yet had evaluations.

████████ did not say that the number of enrollments is the bottom line, but she did say that if the counselors are not meeting the other numbers (phone calls, appointments, etc.), then the enrollment numbers were not going to be there, and the counselor would not be promoted.

She said that the campus had been notified of the Department's visit, but was not told why.

After asking ▮▮▮▮ again about the evaluation process and the matrix, she said that per her understanding, if an employee met 2 "often exceeds" and 1 "meets" in three consecutive quarters, then they would be eligible to go from EC1 to EC2.

*From what I can gather, ▮▮▮▮ is not talking. She avoided eye contact most of the time and I got the feeling that she was just not going to say anything.*

**DOE APOL 0329**

Interview notes by Martina Fernandez-Rosario
August 19, 2003   @ 12:30 pm
University of Phoenix
█████████████ Learning Center
████████████████████

████████████ is an Admissions Manager.  She has worked at the ████ and ████████
campuses.

She started with UOP in ████ in the ████████ campus as a Re-Entry Counselor.  The
position required a lot of phone calls and basically reconnecting with students who had
left the school.  She was assigned to work with the nursing students, and most of her job
dealt with making phone calls.

She then became an enrollment counselor and worked on enrolling students.  When I
showed her the Matrix, she said that she was not familiar with it.  She was never
evaluated or ever evaluated any employee using the Matrix.  She said that another form
was used, but it did not include the numbering as is on the current Matrix.

████████████ is responsible for two teams:
The Flex-net Team:  This team focuses on serving students who want to do the on-line or
distance ED course.  They don't ever have to go into the campus for anything.  This team
consists of:  ████████████ ████ location – has been with UOP over 1 year
                        ████ – █ year
                        █ – █ years
                        - Since ██████
The team was started in May █
These are basically "on-line" counselors and do everything with the student via internet,
e-mail, etc.  The student never has to go into the campus.  This team will be going to the
"matrix" system, but has not yet had the training or any reviews.

The Outbound Team:
This team focuses on contacting students who have expressed an interest in UOP, but
have not enrolled or followed up with an appointment, etc.  This team was started in
December ████, so they have not had an evaluation yet.  These team members are:
████████████████████ and ██████ all recently hired.  This team
will not be on the Matrix, but something similar.  They have not yet had evaluations.

████ did not say that the number of enrollments is the bottom line, but she did say that if
the counselors are not meeting the other numbers (phone calls, appointments, etc.), then
the enrollment numbers were not going to be there, and the counselor would not be
promoted.

**DOE APOL 0330**

She said that the campus had been notified of the Department's visit, but was not told why.

After asking ███ again about the evaluation process and the matrix, she said that per her understanding, if an employee met 2 "often exceeds" and 1 "meets" in three consecutive quarters, then they would be eligible to go from EC1 to EC2.

*From what I can gather, ███ is not talking. She avoided eye contact most of the time and I got the feeling that she was just not going to say anything. I don't trust her to tell us the truth, and she will surely keep information from us unless forced to talk.*


**\*\*\*\*\*\*\*\*\*\***

Follow-up interview with ███████ on Thursday, August 28, 2003   10:10am

Asked ████████ about the Flex-Net Program, and requested any type of consumer information available.

Flex-Net:  Combination of classroom and Internet
           First & Last class   -   In the classroom
           $2^{nd}, 3^{rd}, 4^{th}$, classes   -   On line

The Flex-Net (FN) Team enrolls students who are interesting in doing a combination of the two. The program is basically the same as the on-ground program, but provides the student the flexibility to do most of the course on line.  The Flex-Net team is responsible for enrolling all students enrolling in the Flex-Net program for all ███████  The team in ████████ enrolls the student, but the student attends the 1st and 5th nights, at the nearest campus to their home.

Once the student enrolls, and if the student wishes to apply for FA, the FN counselor sets up an appointment with the FA advisor at the location nearest to the student.  The FN counselors direct the student to apply on line and also refers them to the web-site on where the student can apply for FA on line.  All the documentation is then provided by the student to the FA advisor.  The FN counselor contacts the student again only if there is a problem with the enrollment application.

The Flex-Net Team is not on the matrix system yet because it is such a new team.  They will be measured by the standards on the matrix as soon as the evaluations are due and when the Team has had a little more experience and training.  The Team is very new and although the Flex-Net program has been around for a few years, there was only one counselor, who didn't really have any guidance and/or training on her particular job.

DOE APOL 0331

# EXHIBIT H

Case No. 06-MC-0558 (CKK)

5/14/2007

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 5 Documents

| Document Date | Document Author | Title of Document | Subject Matter of Document | All Known Recipients | Privilege Asserted | Number of Pages in Document |
|---|---|---|---|---|---|---|
| 7/14/04 | Donna Wittman | UOP Recruiter Data | Email communication from employee to attorneys sending draft of University of Phoenix recruiter salary history data for review and comment | Russell Wolff, Jennifer Woodward | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachment - 127 pages |
| 3/19/04 | Jennifer Woodward | (none) | Draft data run of University of Phoenix Salary Enrollment Data | Donna Wittman | Deliberative Process, Attorney Work Product, Confidential Witness Information | 16 pages |
| 7/11/04 | Donna Wittman | UOP Initial Salary History report | Fax communication sending draft data report of the University of Phoenix recruiter salary history requesting review and comment | Jennifer Woodward | Deliberative Process, Attorney Work Product, Confidential Witness Information | 20 pages |
| 3/3/04 | Donna Wittman | UOP Response Assessment Memo | Email communication from employee to other employees and attorneys sending an initial assessment of the University of Phoenix's response to the program review report | Oliver Guinn, Jennifer Woodward, Russell Wolff, Susan Crim, Martina Rosario-Fernandez, Linda Henderson, Jim Castress | Deliberative Process, Attorney Work Product | email - 1 page; attachment - 3 pages |
| 3/22/04 | Susan Crim | RE: UOP Presentation-Heads Up on KPMG Analysis | Email communication from employee forwarding email communication providing information and commentary on the University of Phoenix response to program review report | Mary Gust, Donna Wittman, Terri Shaw, Victoria Edwards, Geneva Coombs, Jennifer Woodward, Russell Wolff, Jonathan Vogel, Linda Henderson, Jim Castress | Deliberative Process, Attorney Work Product | 2 pages |

1

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 5 Documents

| Date | Author | Subject | Description | Recipients | Privilege | Notes |
|---|---|---|---|---|---|---|
| 8/4/04 | Donna Wittman | UOP ConCall follow-up, Revised Violations Chart | Email communication from employee to attorneys and one other employee providing a revised draft of the violations chart and requesting review and comment | Jennifer Woodward, Russell Wolff, Jim Castress | Deliberative Process, Attorney Work Product, Witness Information | email - 1 page; attachment - 4 pages |
| 8/4/04 | Donna Wittman | UOP Apparent anomaly feedback | Email communication from employee to attorneys providing other employees providing a draft violation chart for review and comment | Jennifer Woodward, Russell Wolff, Susan Crim, Jim Castress, Linda Henderson | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachment - 87 pages |
| 8/5/04 | Jennifer Woodward | RE: UOP - Apparent anomaly feedback | Email communication from attorney to employees and another attorney providing recommendations re: University of Phoenix draft violation chart | Donna Wittman, Susan Crim, Russell Wolff, Jim Castress, Linda Henderson | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page |
| 8/5/04 | Katie Crowley | RE: Updated UOP Charts per our Discussion | Email communication from employee to attorneys and other employees sending edits and recommendations of the draft scatter chart of University of Phoenix Violations | Donna Wittman, Jennifer Woodward, Russell Wolff | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachment - 87 pages |
| 8/9/04 | Katie Crowley | RE: Corrected Data for Chart of Summary of Violations | Email communication from employee to other employees and attorneys sending a revised draft of the briefing shell re: internal presentation to Department officials on University of Phoenix Recruiter Matrix | Donna Wittman, Jennifer Woodward, Russell Wolff, Susan Crim | Deliberative Process, Attorney Work Product | email 1 page; attachment - 13 pages |

5/14/2007

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 5 Documents

| 8/9/04 | Donna Wittman | Briefing Corrective Action Memo | Email communication from employee to attorney and another employee sending memo re: corrective actions taken by the University of Phoenix in response to Program Review Report | Jennifer Woodward, Katie Crowley | Deliberative Process, Attorney Work Product | email - 1 page; attachment - 1 page |
|---|---|---|---|---|---|---|
| 8/10/04 | Jennifer Woodward | RE: UOP Concall Follow-Up on Question Raised | Email communication from attorney to other employees and attorneys providing additional information on employee's response and follow up to Department officials related to University of Phoenix Recruiter Matrix | Donna Wittman, Jonathan Vogel, Russell Wolff, Susan Crim, Jim Castress, Geneva Coombs, Victoria Edwards, Jeff Baker, James Manning, Linda Henderson, Kay Jacks, Katie Crowley, Terri Shaw | Deliberative Process, Attorney Work Product | email - 1 page |
| 8/10/04 | Russell Wolff | FW: UOP charts | Email communication from attorney to attorney discussing edits and recommendations for charts on University of Phoenix Recruiter Matrix prepared by employee | Jennifer Woodward, Donna Wittman | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 2 pages; attachment - 51 pages |
| 8/10/04 | Russell Wolff | RE: UOP Info 8/10/2004 | Email communication from attorney to attorney and employees providing edits and recommendations to draft briefing shell prepared by employee for internal presentation re: University of Phoenix Recruiter Matrix | Katie Crowley, Jennifer Woodward, Donna Wittman | Deliberative Process, Attorney Work Product | email - 1 page |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 5 Documents

| | | | | | |
|---|---|---|---|---|---|
| 8/10/04 | Katie Crowley | RE: UOP Info 8/10/2004 | Email communication from employee to attorneys and other employees providing edits and recommendations to draft briefing shell prepared by employee for internal presentation re: University of Phoenix Recruiter Matrix | Russell Wolff, Jennifer Woodward, Donna Wittman | Deliberative Process, Attorney Work Product | email - 2 pages |
| 8/11/04 | Jennifer Woodward | RE: UOP Info 8/10/2004 | Email communication from attorney to attorney and employees providing edits and recommendations to draft briefing shell prepared by employee for internal presentation re: University of Phoenix Recruiter Matrix | Katie Crowley, Russell Wolff, Donna Wittman | Deliberative Process, Attorney Work Product | email - 2 pages |
| 8/11/04 | Jennifer Woodward | RE: UOP Info 8/10/2004 | Email communication from attorney to attorney and employees providing edits and recommendations to draft briefing shell prepared by employee for internal briefing to Department Officials re: University of Phoenix Recruiter Matrix | Katie Crowley, Russell Wolff, Donna Wittman | Deliberative Process, Attorney Work Product | email - 3 pages |

5/14/2007

In Re: Apollo Group, Inc. Securities Litigation
Privilege Log of Category 5 Documents

| Date | Author | Subject | Description | Recipients | Privilege | Size |
|---|---|---|---|---|---|---|
| 8/5/04 | Katie Crowley | RE: Updated UOP Charts per our Discussion | Email communication from other employees sending a revised salary incentive chart re: University of Phoenix violations | Donna Wittman, Jennifer Woodward, Russell Wolff | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachment - 87 pages |
| 8/5/04 | Katie Crowley | RE: Updated UOP Charts per our Discussion | Email communication from employee to attorneys and other employees sending edits and recommendations of the draft scatter chart of University of Phoenix Violations | Jennifer Woodward, Donna Wittman, Russell Wolff | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachment - 87 pages |
| 8/9/04 | Donna Wittman | UOP Violations ChartsUPD.xls | Email communication from employee to attorneys and other employees sending a revised draft scatter chart of University of Phoenix Violations | Katie Crowley, Jennifer Woodward, Russell Wolff, Susan Crim | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachment - 64 pages |
| 8/10/04 | Jennifer Woodward | FW: UOP Info 8/10/2004 | Email communication from attorney to supervisory attorneys sending electronic copies of revised briefing documents re: internal briefing to Department officials on University of Phoenix Recruiter Matrix | Harold Jenkins, Fred Marinucci, Terri Shaw, Jonathan Vogel, Kay Jacks, Russell Wolff, Jennifer Woodward, Susan Crim, Donna Wittman, Jim Castress, Geneva Coombs, Victoria Edwards, Jeff Baker, James Manning | Deliberative Process, Attorney Work Product | email - 1 page; attachments - 20 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 5 Documents

| Date | Author | Subject | Description | Recipients | Privilege | Pages |
|---|---|---|---|---|---|---|
| 8/10/04 | Katie Crowley | UOP Info 8/10/2004 | Email communication from employee to employees and attorneys sending electronic copies of revised briefing documents re: internal briefing to Department officials on University of Phoenix Recruiter Matrix | Terri Shaw, Jonathan Vogel, Kay Jacks, Russell Wolff, Jennifer Woodward, Susan Crim, Donna Wittman, Jim Castress, Geneva Coombs, Victoria Edwards, Jeff Baker, James Manning | Deliberative Process, Attorney Work Product | email - 1 page; attachments - 20 pages |
| 8/5/04 | Katie Crowley | RE: UOP Briefing Shell Recruiter Matrix | Email communication from employee to employees and attorneys sending updated draft briefing documents re: internal briefing to Department officials on University of Phoenix Recruiter Matrix | Donna Wittman, Russell Wolff, Mary Gust, Susan Crim | Deliberative Process, Attorney Work Product | email - 1 page; attachments - 2 pages |
| 8/4/04 | Donna Wittman | RE: Updated UOP Charts per our Discussion | Email communication from employee to employee and attorneys forwarding draft charts incorporating changes and suggestions re: University of Phoenix Recruiter Matrix | Katie Crowley, Jennifer Jim Castress, Linda Henderson, Susan Crim | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachments - 52 pages |
| 8/3/04 | Jennifer Woodward | RE: UOP Charts | Email communication from attorney to attorney and employee responding to and making edits to draft charts prepared by employee for internal briefing to Department officials re: University of Phoenix Recruiter Matrix | Kay Jacks, Geneva Coombs, Jim Castress, Linda Henderson, Russell Wolff, Susan Crim | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachments - 57 pages |

5/14/2007

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 5 Documents

| 8/3/04 | Jennifer Woodward | FW: UOP Charts | Email communication from attorney to attorneys forwarding draft charts prepared by employee for internal briefing to Department officials re: University of Phoenix Recruiter Matrix | Fred Marinucci, Harold Jenkins, Kay Jacks, Geneva Coombs, Jim Castress, Linda Henderson, Russell Wolff, Susan Crim | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachments - 57 pages |
|---|---|---|---|---|---|---|
| 8/3/04 | Donna Wittman | UOP Charts | Email communication from employee to employee and attorneys forwarding draft charts prepared by employee for internal presentation to Department officials re: University of Phoenix Recruiter Matrix | Jennifer Woodward, Kay Jacks, Geneva Coombs, Jim Castress, Linda Henderson, Russell Wolff, Susan Crim | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachments 57 pages |
| 8/11/04 | Donna Wittman | Preliminary UOP Analysis | Memorandum to attorneys on preliminary data analysis of the UOP salary system providing a recommended course to attorneys | Jennifer Woodward, Russell Wolff | Deliberative Process redactions of recommendation | Bates pages DOE APOL 0001, 0005, 0006, 0007, 0106 |

# EXHIBIT I

Case No. 06-MC-0558 (CKK)



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF THE CHIEF INFORMATION OFFICER

AUG 2 6 2004

Douglas R. Cox, Esquire
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

> Re: FOIA Requests for Program Review Report
> <u>Request Nos. FSA/OIG/OGC-03-5355F; FSA-04-5745F; and FSA-04-5930F</u>

Dear Mr. Cox:

As one of the Freedom of Information Act Officers for the U.S. Department of Education
(Department), I am in receipt of your April 5, 2004 letter to Kent D. Talbert of the
Department's Office of the General Counsel (OGC). Your letter was in response to the
Department's invitation to designate information contained in the Program Review
Report (PRR), which your client, the Apollo Group, Inc. and its subsidiary, the
University of Phoenix (University), considered exempt pursuant to exemption (b)(4) of
the Freedom of Information Act (FOIA). 5 U.S.C. § 552(b)(4). The Department notes
that the process envisioned by Executive Order 12600 limits commentary and/or
objections to the release of information pursuant to FOIA exemption (b)(4). However,
OGC, at your request, has permitted you to raise other objections under the FOIA (5
U.S.C. §§ 552(b)(5) and (b)(7)), not related to Executive Order 12600. The Department
considers the arguments that you have raised under the FOIA (5 U.S.C. §§ 552(b)(5) and
(b)(7)) to be advisory in nature.

Upon review and consideration of your April 5, 2004 letter, the Department has
concluded that FOIA exemption (b)(4) does not support withholding the PRR, either in
whole or in part. The Department has also concluded that your recommended use of
FOIA exemptions (b)(5) and (b)(7) does not support withholding the PRR, either in
whole or in part. However, the Department has concluded that the recruiter/employee
names, titles, hire dates, exit dates and compensation amounts are properly excludable
under exemption (b)(6). 5 U.S.C. § 552(b)(6). The employee names, dates, and
compensation amounts are found at pages 2-4, pages 31-32, Appendix A, and Appendix
B of the PRR.

Pages two (2) through ten (10) of this letter will address your arguments relevant to the
Department's use of FOIA exemption (b)(4) in accord with the Executive Order 12600
process. The remainder of this letter will respond to your advisory recommendations
regarding FOIA exemptions (b)(5) and (b)(7).

Douglas R. Cox, Esquire

## (1)    Program Review Report

As an initial matter, the Department disagrees with your characterization of the PRR as
an "interim program review report." In the normal course, the Department does not issue
"interim" PRRs, since PRRs identify whatever findings the Department has made as a
result of its review of a school's records and systems. The Department does, however,
issue "interim" final determination letters when it is able to assess liabilities for only
certain findings, and intends to take additional time to conclude other findings. In such
cases, the determination letter is clearly marked as "interim." But for purposes of this
FOIA analysis, the PRR is a discrete final action; its findings outline the alleged
violations detected during the Department's review of the University's administration of
its Title IV programs. In essence, the PRR represents a "fixed stop" in an ongoing
process of assisting an institution in its efforts to comply with the law. Consequently, we
do not consider the PRR to be an "interim" report.

Your April 5, 2004 letter also claimed that the PRR is "flawed and internally inconsistent,
and its release would impose massive and unfair harm on Apollo, its shareholders and its
employees." However, aside from making broad, conclusory statements, you have not
presented a cognizable argument under the FOIA. Section 1099c-1(b) of the Higher
Education Act affords an institution the opportunity to correct any administrative,
accounting or record-keeping error during the program review process. This opportunity
is clearly identified in the cover letter to the PRR when the Department requests that an
institution "review and respond" to the findings of the PRR. It is the Department's
understanding that your client responded to the PRR on March 19, 2004, April 14, 2004
and May 20, 2004. Consequently, your challenges to the reliability of the PRR were
appropriate for those earlier responses.

## (2)    Exemption (b)(4) – Trade Secrets, Commercial or Financial Information

After a review of your redactions to the cover letter and PRR, the Department has
concluded that the redactions submitted by the University pursuant to exemption (b)(4)
are not sustainable, either in whole or in part.

Exemption 4 of the FOIA protects from disclosure "trade secrets and commercial or
financial information obtained from a person [that is] privileged or confidential." 5
U.S.C. § 552(b)(4). In assessing the confidential nature of this information, we first
determine whether it was a required or voluntary submission to the Department. The
Department has concluded that the information submitted by the University, as contained
in the PRR, represents a required submission because it is necessarily gathered and
reviewed pursuant to the Department's carrying out of an on-site visit and/or review of an

2

Douglas R. Cox, Esquire

institutional program.[1]  "[T]he overall assessment of an institution's administrative and financial capability is determined by examining an institution's FSA policies, procedures and recordings." The 2001 Program Review Guide, p. I-3. Consequently, when the Department reviews an institution as part of its monitoring functions, the institution must provide the Department with access to certain information so that the Department may carry out an effective and efficient review.  34 CFR 668.24.  Therefore, the information, as contained in the PRR, is a required submission.

Because the Department has concluded that the University's information, as contained in the PRR, was a required submission, the information will be withheld if its release will impair the Department's ability to obtain necessary information in the future, or will cause substantial harm to the competitive position of the person from whom the information was obtained. National Parks & Conservation Ass'n v. Morton, 498 F.2d 756 (D.C. Cir. 1974).  The Department has concluded that release of this information will not impair the Department's ability to obtain necessary information in the future.  As part of the Title IV program review, the Department must gather and analyze institutional data and records, and identify any weakness in the institution's procedures for administering program funds. The 2001 Program Review Guide, p. I-1  The Department will continue to exercise its authority to obtain such information in the future, notwithstanding the release of the PRR.  Therefore, the matter at issue is whether release of this information will cause substantial harm to the University's competitive position in the marketplace.

In analyzing the "substantial harm to the competitive position" of the submitter, the D.C. Circuit has "emphasized" that the "important point for [the] competitive harm [analysis] in the FOIA context . . . is that it is limited to harm flowing from the affirmative use of proprietary information by competitors" and that this "should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement." Public Citizen Health Research Group v. FDA, et al., 704 F.2d 1280, 1291 (D.C. Cir. 1983) (emphasis added).  In other words, the FOIA cannot protect the University from regular marketplace competition from other for-profit institutions of higher education that compete for students.

Your April 5, 2004 letter outlined two (2) categories of protected information contained in the PRR.  With regard to the first category, "the organizational structure of [the University], the organizational chain of command for recruiters or enrollment counselors, the positions and responsibilities of the various employees involved in the student recruiting process, and the techniques and methodologies used by [the University] to track student enrollments," you stated the following:

---

[1] If the information had been deemed to have been submitted voluntarily, the Department's analysis on the release of the PRR under exemption (b)(4) would be in accord with Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992).

3

Douglas R. Cox, Esquire

> To release to the public this sensitive commercial information would allow Apollo's competitors to: (1) scrutinize Apollo's methodology for recruiting and enrolling students; (2) observe Apollo's marketing and recruiting strategies, including its teaming and staffing techniques; (3) see fairly detailed information about Apollo's organizational structure, its personnel, the functions these personnel perform, and their relation to one another in the organizational chain of command; and (4) otherwise have an "inside look" at how Apollo competes for, attracts, and maintains its students. This category of Protected Information reflects Apollo's approach to run a university system efficiently and effectively. It too, represents ingenuity and originality regarding how to recruit qualified students to the university setting. It is the product of years of experience and its disclosure would seriously undermine Apollo's competitive advantage by allowing competitors to have access to Apollo's ideas, processes, internal structure, and methodologies that they otherwise would not have access to or would have had to spend considerable time and funds to develop on their own.

While you have outlined the harm as stated above, you have not demonstrated in your correspondence how these stated harms would occur with the specific release of this category of information. Demonstration of competitive harm under FOIA exemption (b)(4) requires more than conclusory allegations of harm. See Public Citizen Health Research Group v. FDA, 2000 WL 34262802 (D.D.C. 2000); Public Citizen Health Research Group v. FDA, 185 F.3d 898 (D.C. Cir. 1999); TRIFID Corp. v. NIMA, 10 F.Supp.2d. 1087 (E.D. Mo. 1998). The use of FOIA exemption (b)(4) requires a demonstration of the "specific, credible, and likely reasons" why the release of this category of information would actually result in competitive injury to Apollo. Lee v. FDIC, 923 F.Supp. 451, 455 (U.S.D.C. S.D.NY 1996). More precisely, you have not demonstrated with specificity how the release of "the organizational structure of [the University], the organizational chain of command for recruiters or enrollment counselors, the positions and responsibilities of the various employees involved in the student recruiting process, and, the techniques and methodologies used by [the University] to track student enrollments" and its affirmative use by a competitor would cause substantial harm to Apollo's competitive position amongst the for-profit higher education institutions.

Your April 5, 2004 letter outlined a second category of protected information as "information concerning employee compensation and the manner in which employee compensation is purportedly calculated." You further stated that the release of this information would cause competitive harm because, "to disclose the alleged

4

Douglas R. Cox, Esquire

compensation structures of Apollo's employees would allow competitors to copy
Apollo's compensation system and to use their knowledge of Apollo's compensation
packages to recruit Apollo employees, many of whom possess significant and valuable
institutional knowledge. Thus, Apollo considers its compensation system to involve
highly confidential commercial and financial information the disclosure of which would
cause substantial harm to Apollo's competitive position."

As an initial matter, the Department notes that you refer to Apollo's employee
compensation structure as "alleged." To argue that the release of Apollo's employee
compensation structure would cause substantial harm to its competitive position, while
also citing its existence as "alleged," is inconsistent. You have not demonstrated how the
affirmative use of "information concerning employee compensation and the manner in
which employees compensation is purportedly calculated" by a competitor would cause
substantial harm to Apollo's competitive position.

You also provided the Department with a copy of the PRR identifying and redacting
those sections, which you assert are exempt from disclosure "pursuant to Exemption 4
and the Trade Secrets Act." Below, the Department will address each of your proposed
redactions.

### (a)   Redactions to PRR's Cover Letter from Donna Wittman to Todd S. Nelson

You have redacted the following information:

> This report contains a serious finding regarding the school's
> substantial breach of its fiduciary duty; specifically that the
> University of Phoenix (UOP) systematically engages in actions
> designed to mislead the Department of Education and to evade
> detection of its improper incentive compensation system for those
> involved in recruiting activities. The finding of noncompliance is
> referenced to the applicable regulations, and specifies the action
> required to comply with the regulations and statutes.

These statements do not contain confidential commercial or financial information.
Examples of items regarded as commercial or financial information include: business
sales statistics; research data; technical designs; customer and supplier lists; profit and
loss data; overhead and operating costs; and information on financial condition." U.S.
Dept. of Justice, Office of Information Policy, Freedom of Information Act Guide &
Privacy Act Overview (May 2000 ed.) (citing Gulf & Western Indus. v. United States,
615 F.2d 527 (D.C. Cir. 1979) and Consumers Union v. VA, 301 F. Supp. 796 (S.D.N.Y.
1969), appeal dismissed as moot, 436 F.2d 1363 (2d Cir. 1971)). These statements
represent a brief synopsis of the Department's findings, and do not represent commercial

5

Douglas R. Cox, Esquire

or financial information envisioned by the FOIA statute.  Moreover, FOIA exemption (b)(4) requires that the confidential commercial or financial information be obtained from a person. 5 U.S.C. § 552(b)(4).  The term "person" refers to a wide range of entities, including corporations. See Nadler v. FDIC, 92 F.3d 93 (2d Cir. 1996).  However, the information at issue was generated by the federal government, and not "obtained from a person."  Such information is excluded from exemption (b)(4) protection. See Maydak v. DOJ, 254 F.Supp.2d, 23 (D.D.C. 2003).  While these statements are based upon information provided by the University, the conclusions found in these statements are the Department's conclusions and therefore, were not "obtained from a person." Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of these statements.

However, the cover letter does identify the University's D-U-N-S number.  As you may know, the D-U-N-S number is the number by which an institution can draw down funds that have been awarded to it by the Department.  The Department has concluded that the D-U-N-S number is exempt from disclosure under the FOIA pursuant to exemption (b)(2). 5 U.S.C. § 552(b)(2).  This exemption precludes the disclosure of predominantly internal matters of a substantial nature, the disclosure of which would risk the circumvention of a statute or Department regulation. The Department has concluded that the release of Apollo's D-U-N-S number would place the Department's financial databases at risk, thus permitting the potential unauthorized draw down of funds. The D-U-N-S number will be redacted from the cover letter as well as on page 2 of the PRR.

### (b)    Table of Contents Redactions

Your redactions encompass the Department's generic statements of the University's recruiter compensation system.  They also include more detailed statements of the Department's analysis of the University's recruiter system and statements of the alleged violations found.  Again, these statements do not contain confidential commercial or financial information as defined in section 2(a) of this letter.  Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of the Department's generic statements regarding the University's recruiter compensation system.

### (c)    Redactions at pages 2-4 – "Institutional Review Data Sheet"

You have redacted a chart listing the University's Title IV programs and its advance system of payment for fiscal years 1999-2003.  This chart outlines the amount of federal funds Apollo has received in order to support its Title IV program from fiscal year 1999 through fiscal year 2003.  The Department acknowledges that this information can be considered commercial or financial information under the FOIA to the extent that it relates to Apollo's operation of its business and possibly impacts its strategy for seeking out and securing non-federal funds. Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (terms of FOIA exemption (b)(4) are to be given their

Douglas R. Cox, Esquire

"ordinary meanings"); see also American Airlines, Inc. v. National Mediation Board, 588 F.2d 863, 870 (2nd Cir. 1978) (citing Getman v. NLRB, 450 F.2d 670, 673 (D.C. Cir. 1971))(information is commercial if in and of itself it serves a commercial function or is of a commercial nature); Washington Post Co. v. HHS, 690 F.2d 252 (D.C. Cir. 1982) (information is financial if there is financial interest in it). However, the Department has concluded that the release of this information would not cause substantial harm to Apollo's competitive position in the marketplace because it identifies the Title IV programs for which the University was eligible in fiscal years 1999-2003, and the amount of funds received under each of those programs. This information does not reveal anything relative to the University and the operations of its business. As a practical matter there is a strong public interest in knowing how the Department allocates Title IV funds to various educational institutions. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of the chart listing the University's Title IV programs and its advance system of payment for fiscal years 1999-2003.

You have also redacted a chart of University officials (and their titles) who were interviewed during the program review at the Phoenix, On-Line, San Jose, San Francisco, San Mateo, Livermore and Oakland campuses, as well as a notation regarding the interview of former University employees off-site and employees who chose not to reveal their identities. Based upon the same standard as cited in section 2(a) of this letter, the Department has again concluded that this information does not qualify as commercial or financial information that is excludable pursuant to exemption (b)(4). However, as stated previously, the Department has concluded that employee names and titles are properly excludable under exemption (b)(6). 5 U.S.C. § 552(b)(6). FOIA exemption (b)(6) permits the Department to withhold information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." In determining whether release of the information would constitute a clearly unwarranted invasion of personal privacy, one must identify and balance an existing protectible privacy interest against the public interest in disclosure, if any. In addition, the identifiable public interest must be one that sheds light on the Department's operations.

In this case, the University employees have a privacy interest in their names and positions. However, there is also a public interest in knowing how the Department carries out its obligation under Title IV. More specifically, the public has an interest in knowing how the Department monitors recipients of Title IV funds for compliance with the Higher Education Act. The Department has concluded that the University's employees' privacy interests in their names and positions is outweighed by the public's interest in knowing how the Department handles its Title IV responsibilities because the public is interested in knowing that the Department is taking the necessary steps to fulfill its statutory obligations. The public is not necessarily interested in knowing which specific person was interviewed for purposes of crafting the PRR. Consequently,

7

Douglas R. Cox, Esquire

exemption (b)(6) is applicable to preclude the release of the names and positions of the interviewed University employees, current and former.

At the end of page 4 of the PRR, you redacted the following statement:

> The reviewers also interviewed former UOP employees off site as well as additional current employees who do no want their identities revealed for fear of losing their jobs.

The Department has concluded that this sentence does not contain any confidential commercial or financial information, and does not identify a protectible privacy interest. Consequently, this sentence is releasable under the FOIA.

> ### (d)    Redactions at page 6 – "Section 2.4 Growth of Enrollments & Revenues"

You have redacted portions of a chart which lists the University's total degree students, on-line students and net revenue for 1991-2003, the University's corporate goal for 2002, and a statement of the frequency with which the University evaluates its recruiters' performance and award of salary increases.

Regarding the listing of the University's total degree students, on-line students and net revenue for 1991-2003, the Department acknowledges that this information can be considered commercial or financial information according to the standard outlined in section 2(c) of this letter, i.e. to the extent that it relates to Apollo's operation of its business and possibly impacts its strategy for seeking out and securing non-federal funds. However, the Department has concluded that the release of this information would not cause substantial harm to Apollo's competitive position in the marketplace because it merely represents the University's growth over a twelve-year period and does not identify any details as to how Apollo achieved this growth. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

Regarding the University's statement of its corporate goal for 2002, "[t]he UOP 2002 corporate goal was '5-5-5': Five Years, Five Million Students and Five Billion Dollars," the Department has concluded that the release of this information would not cause harm to Apollo's competitive position because it is does not reveal any details as to how Apollo would go about achieving this goal. Moreover, the University's corporate goal is merely a wish of what it would like to achieve within a five-year period; there is no guarantee that this goal would be met. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

As to the recruiter evaluation information, the Department has concluded that the release of this information would not cause harm to Apollo's competitive position because it is a

8

Douglas R. Cox, Esquire

statement of how often the reviews are completed, and does not detail the review process itself. If a competitor were to receive this information, it would be limited to knowing the frequency of reviews, but not to how the frequency of the reviews enabled the University to achieve its success in the marketplace. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (e)    Redactions at pages 6-7 – "Section 3 Scope of Review"

You have redacted the following information:

> During the visit, areas of non-compliance were noted. The finding of non-compliance is referenced to the applicable regulations. The finding specifies the actions to be taken by UOP to bring operations of the financial aid programs into compliance with governing authority.

The Department has concluded that while these statements may arguably qualify as confidential commercial or financial information, FOIA exemption (b)(4) will not preclude their release. As stated under the standard outlined in Section 2(a) of this letter, these findings are Department-generated conclusions. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (f)    Redactions at pages 7-27 – "Section Findings & Requirements"

You have redacted the Department's statement of the facts resulting from the program review and investigation, including statements of those interviewed. These findings include: the University's promises of substantial compensation when hiring recruiters; recruiter training/motivational methods and success measures; tracking recruiter commissionable sales and sales performance; accounts of current and former University employees; recruiter evaluation system; bonus incentive plans; use of Title IV funds; and alleged violations found by the Department.

As detailed under the standard outlined in section 2(c) of this letter, the Department acknowledges that this information can be considered commercial or financial information under the FOIA to the extent that it relates to Apollo's operation of its business. However, the Department has concluded that the release of this information would not cause substantial harm to Apollo's competitive position in the marketplace because the information generally discusses the University's business practices, and details the factual information gathered by the Department during its site visit related to the alleged specific regulatory violations identified in the PRR. The detailed information describes conduct that would not be acceptable by similar institutions participating in the federal student aid programs, and no competitive harm would be expected to arise from releasing such information. Release of the PRR is not likely to result in such injury as to

9

Douglas R. Cox, Esquire

preclude the University from being able to compete for future students in the for-profit higher education market. See Martin Marietta Corp. v. Dalton, 974 F.Supp. 37, 38, 40 (D.D.C. 1997) ("neither the revelation of cost and pricing data nor proprietary management strategies were likely to result in egregious injury as to disable [submitter from being] effective competitor").

You also redacted the following statement:

> The actions of UOP and the system it has established cultivates and maintains a corporate culture in defiance of UOP's fiduciary duty. UOP has created an environment that puts the strong motivation of individual gain against its fiduciary duty to the Department. It is one that flaunts the Department's regulations and the prohibition against incentive compensation based on enrollments.

The Department has concluded that while these statements may arguably qualify as confidential commercial or financial information, FOIA exemption (b)(4) will not preclude their release. As stated under the standard outlined in Section 2(a) of this letter, these findings are Department-generated conclusions. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (g)    Redactions at p. 30 – "Section 7 Requirements"

You have redacted the following statement:

> In response to this [PRR], UOP is required to make substantial and comprehensive changes to the salary compensation system for its recruiters and their direct supervisors.

You also redacted three (3) bullet items outlining specific documents and information that the Department seeks. In accord with the standard outlined in section 2(a) above, the findings and requirements were developed by the Department, and thus not obtained from a person. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (h)    Redactions at pages 31-32 – "Section 7 Requirements: Documents and Information to Be Provided"

In response to the PRR, the Department outlined several items of information for the University to supply. You have redacted information from paragraphs 3-10 of this section. In accord with the standard outlined in section 2(a) above, the findings and requirements were developed by the Department, and thus not obtained from a person.

10

Douglas R. Cox, Esquire

Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

However, in paragraph eight (8) of this section, the Department identified twelve (12) employees for whom the University must supply personnel files in response to the PRR. These employees are identified in a chart that lists their names, lump sum compensation amounts, and the dates that the compensation was received. In accord with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (1)    Redactions – "Appendix A: List of Recruiters Identified in Report"

You redacted recruiter names and hire dates. In accord with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (i)    Redactions – "Appendix B: List of Employees for Whom Personnel Records are to be Provided"

You redacted recruiter names, hire dates, and exit dates. In accordance with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (3)    Exemption (b)(5) – Inter-agency or Intra-agency Memorandums or Letters, and the Deliberative Process Privilege

FOIA exemption (b)(5) covers "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). While neither expanding nor creating new privileges, exemption (b)(5) incorporates all civil discovery privileges, including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege. Your recommendations have been made pursuant to the deliberative process privilege of exemption (b)(5). The purpose of the privilege is to allow agency officials to engage in frank and open discussions of issues, and to express their views, opinions and recommendations without the fear or restraint of outside pressure. In order for the privilege to be invoked, the information at issue must be both pre-decisional (coming before the adoption of an agency policy), and deliberative (a direct part of the deliberative process such that the information makes suggestions, or recommendations, or provides opinions on legal or policy matters).

11

Douglas R. Cox, Esquire

As an initial matter, the PRR must meet the threshold requirement of an inter-agency or intra-agency communication. More precisely, the communication would have to occur either among individuals of the Department or between individuals of the Department and another federal agency. However, the courts have expanded this threshold requirement to include outside consultants who are sometimes both practical and necessary for an agency to render a policy decision. See Dums v. Bureau of Prisons, 804 F.2d 701 (D.C. Cir.), cert. granted, judgment vacated on other grounds & remanded, 486 U.S. 1029 (1988). This exemption does not extend to those who are seeking a benefit from the Department to the detriment of others such as lobbyists or self-advocates. Department of the Interior v. Klamath Water Users protective Ass'n, 532 U.S. 1 (2001). In Klamath, several Native American tribes exchanged communications expressing their views regarding decisions that the Department of Interior would have to make regarding water allocation in the Klamath River Basin. The Native American tribes not only expressed their own interests, but also were seeking the government to act in favor of those interests. The Supreme Court held that the Native American tribes did not qualify as outside consultants to the Department of Interior, stating "the Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." Id. at 12.

The Department has concluded that the PRR does not meet this threshold requirement, and thus, FOIA exemption (b)(5) does not preclude release of this information. In this case, the PRR was created as a result of the Department's routine monitoring of the Title IV Federal Student Financial Assistance programs administered by the University. The PRR was not created for the purposes of the Department receiving advice or consultative services from your client in order to render a policy decision. Rather, the PRR specifically states that its intent is to advise the institution of the findings made as a result of the program review. Moreover, the goal of the PRR is to open up a dialogue between the Department and the University such that the findings of the PRR can be resolved; this characterizes the University as a lobbyist or self-advocate, rather than a consultant, and thus, the deliberative process privilege of exemption (b)(5) would not apply to preclude release of the PRR.

Assuming arguendo that the University did meet the threshold requirement of exemption (b)(5), the Department has concluded that the document itself is neither pre-decisional nor deliberative. As stated in the Department's Program Review Guide, "[t]he program review report is the official [Department] notification to the institution of the findings discovered during the on-site visit. The report lists the regulatory and statutory findings and establishes a prima facie case. The report also specifies required corrective actions, including a time frame for institutional response." The 2001 Program Review Guide, p. IX-1. Although the program review process envisions a dialogue between the Department and the institution to resolve shortcomings identified in the PRR, and which will ultimately be resolved with the Department, the PRR itself is a final document within the program review process. It outlines the Department's position as a result of the

12

Douglas R. Cox, Esquire

program review. It notes, as appropriate, that an institution has or has not breached its fiduciary duties under Title IV, and outlines necessary corrective action(s). While the Department provides the institution with notice and an opportunity to comment, those comments are not submitted with the idea that a new PRR will be issued.

Consequently, the Department has concluded that FOIA exemption (b)(5) does not preclude the release of the PRR, either in whole or in part.

### (4)    Exemption (b)(7) – Information Compiled for Law Enforcement Purposes

Your letter of April 5, 2004 also relied upon FOIA exemptions (b)(7)(A), (b)(7)(B) and (b)(7)(C) to preclude release of the PRR. Exemption 7 of the FOIA, as amended, protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, [and] (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(7)(A), (b)(7)(B) and (b)(7)(C). The Department has concluded that exemption (b)(7) does not preclude the release of the PRR, either in whole or in part, for the reasons set for the below.

#### (a)    Exemption (b)(7) Threshold Requirement

As a threshold matter, exemption (b)(7) places the burden of proof upon the agency to demonstrate that the record in question was compiled for a law enforcement purpose. Quiñon v. FBI, 86 F.3d 1222 (D.C. Cir. 1996). The Department disagrees with your characterization that the PRR was compiled for a law enforcement purpose. Contrary to your conclusion, the PRR is a Congressionally mandated tool used by the Department to carry out its responsibilities under the Higher Education Act. The 2001 Program Review Guide, p. i. The PRR is one of many tools used by the Department in an effort to strike a balance between assisting schools in improving compliance through the development of corrective action plans and assessing liabilities resulting from non-compliance. Id. Even if the Department were to agree that the PRR was compiled for a law enforcement purpose (which it does not), the Department would still find that the specific subsections of exemption (b)(7) are not applicable to preclude the PRR's release, as discussed below.

#### (b)    Exemption (b)(7)(A) - Interfere with Enforcement Proceedings

With respect to exemption (b)(7)(A), there is no evidence that release of the PRR could interfere with enforcement proceedings. You have stated that release of the PRR "may hinder or interfere with the Department's review – and with Apollo's and its employees due process rights within that review." As stated earlier, the PRR represents a fixed stop

13

Douglas R. Cox, Esquire

in an ongoing process. A site visit occurred, and findings were thereafter made on the visit. The PRR does not reveal the scope, direction or nature of any further action that the Department may take regarding the University. In fact, the cover letter to the PRR specifically requests the University "review and respond to the report, indicating the corrective actions taken." At most, the PRR envisions a response from the University and that response serves as a catalyst for further discussion. There is no way for the Department to determine whether it will or will not engage in an enforcement proceeding without knowing the University's response to the PRR. Additionally, we recognize and acknowledge your concern that release of the PRR "could increase the likelihood that *qui tam* relators or other members of the public, such as the media or corporate watchdog groups, would interfere with, threaten, or taint the testimony of, Apollo personnel identified in the [PRR] by virtue of their titles, positions, or job responsibilities." However, and as previously stated in section 2(c) above, it is the Department's position that those interests are privacy concerns to the University personnel, and in order to protect those interests such information would be redacted pursuant to exemption (b)(6). This information appears on pages 2-4, pages 31-32, Appendix A: List of Recruiters Identified in Report and Appendix B: List of Employees for Whom Personnel Records are to be Provided.

### (c)    Exemption (b)(7)(B) - Deprive a Person of a Right to a Fair Trial or an Impartial Adjudication

With respect to exemption (b)(7)(B), there is no evidence to suggest that any individual University employee would be deprived of the right to a fair trial or impartial adjudication. The PRR merely identifies the Department's findings.

### (d)    Exemption (b)(7)(C) - Expected to Constitute an Unwarranted Invasion of Personal Privacy

With respect to exemption (b)(7)(C), the Department has concluded that this exemption does not preclude release of the PRR. The Department agrees that the University employees identified in the PRR have a privacy interest in their names, titles, hire date, exit date and compensation amounts; however, these privacy interests are protected under exemption (b)(6) of the FOIA. Consequently, University employee names, titles, hire dates, exit dates and compensation amounts as they appear on pages 2-4, pages 31-32, Appendix A: List of Recruiters Identified in Report and Appendix B: List of Employees for Whom Personnel Records are to be Provided will be redacted pursuant to FOIA exemption (b)(6).

14

Douglas R. Cox, Esquire

### (5)    Request for all FOIA Requests Seeking Access to the PRR

At the conclusion of your letter, you asked for "copies of all FOIA requests received by the Department seeking access to the [PRR]." Enclosed please find copies of the FOIA requests we have received for the University's PRR.

### (6)    Conclusion

In sum, the Department disagrees with your conclusions that FOIA exemptions (b)(4), (b)(5) and (b)(7) preclude release of the University's PRR. The Department intends to release the University's PRR to the requesters no later than five working days from the date of this letter, September 2, 2004.

The Department has concluded that the employee/recruiter names, titles, hire dates, exit dates and compensation amounts are properly excludable pursuant to FOIA exemption (b)(6), and this information will be redacted from the PRR. This information is found at pages 2-4, pages 31-32, Appendix A: List of Recruiters Identified in Report and Appendix B: List of Employees for Whom Personnel Records are to be Provided.

The Department has also concluded the University's D-U-N-S number will be redacted from the cover letter and page 2 of the PRR pursuant to exemption (b)(2). To further assist you, we have provided a copy of the PRR in the form in which it will be released to the requesters.

Sincerely,

Jeanne Van Vlandren
Freedom of Information Act Officer
OCIO/RIMG

cc:    Kent D. Talbert, Esq. (OGC)
cc:    Jonathan A. Vogel, Esq. (OGC)

15

# EXHIBIT J

Case No. 06-MC-0558 (CKK)

1  BONNETT, FAIRBOURN,
     FRIEDMAN & BALINT, P.C.
2  ANDREW S. FRIEDMAN (005425)
   FRANCIS J. BALINT, JR. (007669)
3  2901 North Central Avenue, Suite 1000
   Phoenix, AZ 85012
4  E-mail afriedman@bffb.com
   Telephone: (602) 274-1100
5  Facsimile: (602) 274-1199

6  Co-Local Counsel

7  BARRACK, RODOS & BACINE          BARRACK, RODOS & BACINE
   STEPHEN R. BASSER                LEONARD BARRACK
8  SAMUEL M. WARD                   MARK R. ROSEN
   402 West Broadway, Suite 850     JEFFREY A. BARRACK
9  San Diego, CA 92101              3300 Two Commerce Square
   E-mail: sbasser@barrack.com      2001 Market Street
10 Telephone: (619) 230-0800        Philadelphia, PA 19103
   Facsimile: (619) 230-1874        E-mail: lbarrack@barrack.com
11                                  Telephone: (215) 963-0600
   Lead Counsel for Lead Plaintiff, the   Facsimile: (215) 963-0838
12 Policemen's Annuity
   and Benefit Fund of Chicago and the Class

13

14                UNITED STATES DISTRICT COURT

15                    DISTRICT OF ARIZONA

16 In re APOLLO GROUP, INC.        )  Lead Case No. CV 04-2147-PHX-JAT
   SECURITIES LITIGATION           )
17 ─────────────────────────────── )  CLASS ACTION
                                   )  ORAL ARGUMENT REQUESTED
18 This Document relates to:        )
                                   )  LEAD PLAINTIFF'S RESPONSE AND
19        ALL ACTIONS.             )  SEPARATE COUNTERSTATEMENT
                                   )  OF FACTS IN SUPPORT OF
20                                 )  OPPOSITION TO DEFENDANTS'
                                   )  MOTION FOR SUMMARY
21                                 )  JUDGMENT
                                   )
22                                 )  CTRM: 503, 5th Floor
   ─────────────────────────────── )  JUDGE: Hon. James A. Teilborg
23

24

25

26

27

28
   ─────────────────────────────────────────────────────────────────
   LD. PL. RESP. AND SEPARATE COUNTERSTMT. OF FACTS ISO OPP'N TO DEF'S.MOT, CV 04-2147-PHX-JAT

counsel for the *qui tam* relators — precisely because they recognized how important and germane those statements could be to the prosecution or defense of the immediate case.

Magistrate Trumbull did not opine that the DOE Report was not required to be disclosed, nor did Magistrate Trumbull find that enrollment counselors' statements to the DOE were not relevant to whether UOP was violating the ban on incentive compensation.

**Denied**. Enrollment counselors' understanding as to how they were compensated is relevant and Defendants' effort to confuse the issue by referencing a discovery dispute with *qui tam* relators' counsel regarding counsels' work product is without merit, and lacks probative value. In addition, Magistrate Trumbell's tentative order is not binding, nor is it the law of the case.

**Defendants' Amended Statement, ¶ 29:**

During discovery, several ECs were deposed regarding their compensation by UOP and some ECs acknowledged that factors other than enrollments were considered, while others testified that only enrollments counted toward compensation. [Ex. 25 (*Compare* Depositions of Shannon Bartz (46:12-49:6), Julie O'Ferrall (47:12-48:7), and Donald Rose (28:10-20), *with* Depositions of Maria Arce (118:15-20) and Leah Johnson (89:22-25)).]

**Lead Plaintiff's Objection and Response to ¶ 29:**

OBJECTION:

**Irrelevant** as previously noted.

RESPONSE:

**Disputed.** Lead Plaintiff **disputes** Defendants' contention that factors other than enrollments were considered with regard to the compensation of enrollment counselors and **disputes** that Enrollment Counselors Bartz, O'Ferrall and Rose are credible or disinterested. Even if Defendants' challenge to the DOE Report is relevant to the core issue in this case — which it is not — any such challenge itself is specious and insufficient. The overwhelming testimony from former enrollment counselors not

beholden to Apollo/UOP and the DOE Report is supportive of the findings of the DOE Report.  Further:

1.    On February 5, 2004, the DOE issued the DOE Report with specific findings and conclusions that UOP was violating the ban on incentive compensation. *See* Defs.' ASOF Ex. 16.

2.    Apollo was violating the federal ban on incentive compensation by paying salaries and other incentives, including the Sperling Club Trip Awards, to enrollment counselors based solely on their new student enrollment numbers and student enrollment activities.  *See* Defs.' ASOF Ex. 16 at APOL0001237, 46, 49, 51, 53 and 54.

3.    The DOE Report was issued in the course and scope of activities respecting which the Department of Education has authority, and pursuant to its powers of regulatory compliance and enforcement.

4.    The DOE Report constitutes "public record and report" within the meaning of the Federal Rules of Evidence, Rule 803, a fact that Defendants acknowledged in seeking judicial notice of the DOE Report.  *See* Docket #192, Defendants' Request for Judicial Notice in Support of Motion to Dismiss at 5-6.

5.    According to the DOE Report "*[l]iterally every recruiter interviewed randomly or outside of the work premises said that the number of enrollments determined their salary*."  *See* Defs.' ASOF Ex. 16 at APOL0001246 (emphasis in original).

6.    The findings and conclusions of the DOE Report are amply supported by documentary and testimonial evidence unearthed in the course of discovery.  Lead Plaintiff also directs the Court to ¶¶ 53-63, 88-124, of the Counterstatement of Facts.  In addition, included in the Ward Declaration in this regard are exhibits A & B to the expert report of Jay Finkelman, Ph.D., listing those enrollments counselors who received very significant pay increases in one single pay period between 1999 – 2003 – irrespective of UOP's professed Enrollment Counselor Compensation Guide – and enrollment counselors who actually received more than two salary increases in a twelve

LD. PL. RESP. AND SEPARATE COUNTERSTMT. OF FACTS ISO OPP'N TO DEF'S.MOT, CV 04-2147-PHX-JAT

1  month period – despite not being permitted under federal laws and guidelines.  *See* Ward
2  Decl. Ex. 39.

3    **I.**    The credibility and accuracy of the testimony of Shannon Bartz relied
4  upon by Defendants is at issue and contradicted by other credible, relevant evidence:

5    **(a)**    Ms. Bartz is not independent and, to the contrary, was represented by
6  Gibson, Dunn & Crutcher, with whom she signed a retainer agreement and spoke with
7  on the phone several times and met for approximately three hours approximately one
8  week before her deposition.  *See* Ward Decl. Ex. 41 (Bartz Dep.) at 70:8-10; 71:22-72:1;
9  72:6-73:3.  UOP agreed to pay Gibson, Dunn & Crutcher to represent Bartz.  *See id.* at
10  74:18-21.

11    **(b)**    While Bartz denied that the term "telemarketing" was ever used during her
12  UOP "sales academy" training and that her enrollment counselor position was not a
13  "telemarketing position," that testimony is utterly contradicted by the "sales academy"
14  training modules specifically entitled "[t]elemarketing" that were used to instruct
15  enrollment counselors in the use of "effective telemarketing techniques."  *See* Ward
16  Decl. Ex. 42 at APOL0514823-842; Ward Decl. Ex. 43 (Gruber Dep.) at 157:19-158:22
17  (authentication).  The fact that the enrollment counselor position was effectively a
18  telemarketing job was confirmed by many former enrollment counselors.  *See*
   Counterstatement of Facts ¶¶ 103-105.

19    **(c)**    While Bartz testified that enrollments were not discussed in the daily
20  meeting held on her campus, (Ward Decl Ex. 41 (Bartz Dep.) at 121:21-22; 122:6-10),
21  she nonetheless conceded that the enrollment counselors on her team posted their daily
22  numbers on a white board in her manager's office (*id.* at 123:16-22); that the daily
23  statistics on phone calls, appointments schedules, appointments held, referrals and
24  applications were all recorded on the white board (*id.* at 124:4-8); and the white board
25  was used during the daily morning meetings to see how counselors were doing on their
26  activities (*id.* at 182:18-23).

27
28

**(d)** While Bartz testified that she was "not aware" of any occasion where people were criticized or punished for not meeting their numbers, and that she was not familiar with a "Red Room," nor had she "heard anything about it" (Bartz 147:6-19) and was not familiar enough with the phrase "decision making leave" to "describe what it was," (Bartz 148:21-149:4) other documentary and testimonial evidence identifies "decision making leave," threats of termination and the use of the "Red Room" for those enrollment counselors who are not meeting numbers. *See* Counterstatement of Facts ¶¶ 110-4.

**(e)** Bartz further had a reason to color her testimony favorably towards Defendants: at the time of her deposition. Her husband is an employee of UOP, who worked as an enrollment counselor at UOP before his current position as a nursing advisor (*id.* at 76:20-77:7; 81:3-11) and is entitled to receive free tuition for courses at UOP while he remains an employee at UOP (*id.* at 81:25-82:13).

**(f)** Despite her allegiance to UOP and representation by its attorneys at UOP's expense, Bartz admitted to the fact that there were "stack rankings" of all enrollment counselors based upon enrollments (*id.* at 50:25-51:4) and testified that she was uncertain if stack ranking were used to determine counselors' compensation and salaries (*id.* at 51:11-14).

**(g)** Further, Bartz admitted that a leaderboard similar to stack rankings was used in the Northern California campuses to rank counselors based on enrollments for the month and tracked applications, though she stated that she was not aware of it being used in deciding a counselor's compensation (*id.* at 58:16-20; 58:25-59:7; 128:18-22).

**(h)** Bartz also admitted receiving an email entitled, *Daily Numbers*, which was a daily email that tracked enrollments for each Northern California campus and that also tracked applications for enrollment counselors (Ward Decl. Ex. 41 (Bartz Dep.) at 59:11-14, 129:24-130:3).

**(i)** Further, Bartz admitted receiving a "Meets Expectations Report," advising counselors as to what they needed to do on a weekly basis to meet their monthly goals,

1    and that such report tracked actual and planned applications, appointments and referrals
2    by each counselor with respect to student enrollments. (*id.* at 135:5-24; 136:2-137:21;
3    138:14-139:8).

4    **(j)**    Indeed, in reviewing these reports, Bartz stated only that she was "not
5    aware" if they were used by management to see whether or not enrollment counselors
6    were meeting numerical goals. She confessed that no report was sent to enrollment
7    counselors informing them whether or not they were meeting or exceeding expectations
8    with respect to the so-called "qualitative" factors such as counseling work, completeness
9    of paperwork or leadership abilities and, that indeed, the ***only*** reports that were
10   circulated to enrollment counselors with respect to their ongoing performance were
11   reports dealing with "quantitative" — numerical — goals respecting student enrollment
     activities. (*id.* at 130:24-131:12).

12   **(k)**    When confronted with a document written by UOP's Daniel Waterman,
13   Vice President and Director of Enrollments for Northern California Campus, whereupon
14   it was stated, "focus your folks on doing all of the little things that will help keep the
15   August butts in seats," and even after having read the passage, Bartz nonetheless
16   maintained that she had never heard that phrase, "butts in seats," used at UOP. *Id.* at
17   92:1, 92:7-22, 93:2-12; Ward Decl. Ex. 44.  Other enrollment counselor deponents had
18   confirmed the use of the phrase "butts in seats" by UOP management.    *See*
19   Counterstatement of Facts ¶ 116.

20   **(l)**    Bartz admitted to participating and, even on some occasions, winning
21   contests dealing with enrollments or applications – contests that dealt with quantitative
22   categories such as enrollments, applications and referrals (Ward Decl. Ex. 41 (Bartz
23   Dep.) at 143:15-144:16; 145:8-12).

24   **(m)**    Bartz admitted to the Sperling Club Awards granted for reaching a certain
25   number of enrollments during a time period (Ward Decl. Ex. 41 (Bartz Dep.) at 51:21-
26   25).  Several deponents have confirmed that the Sperling Club awards were ***solely*** based
27   on achieving student enrollment numbers. *See* Counterstatement of Facts ¶¶ 57-63.

28

**II.**     The credibility and accuracy of the deposition testimony of Julie O'Ferrall relied upon by Defendants is also at issue or is contradicted by other credible, relevant evidence and despite her allegiance to UOP, deposition questioning extracted important admissions.

**(a)**     At the time of her deposition on January 19, 2007, O'Ferrall was still employed by the University of Phoenix as an enrollment manager. *See* Ward Decl. Ex. 45 (O'Ferrall Dep.) at 9:17-22;

**(b)**     O'Ferrall acknowledged hearing the phrase, "butts in seats" (*id.* at 52:3-6);

**(c)**     O'Ferrall acknowledged that one of the training materials used at the "sales academy" has the term "telemarketing" (*id.* at 18:22-25), and that she found the term telemarketing to be demeaning (*id.* 66:19-24).    Sales academy training materials specifically include a module entitled "telemarketing" (Ward Decl. Ex. 42).    Other witnesses have also confirmed the "telemarketing training" at the sales academy and that the enrollment counselor position was a telemarketing position.    *See* Counterstatement of Facts ¶¶ 103-105;

**(d)**     O'Ferrall acknowledged that stack rankings list enrollment counselors based on the number of their enrollments. *See* Ward Decl. Ex. 45 (O'Ferrall Dep.) at 40:13-20;

**(e)**     With regard to her discussions and interviews with the Department of Education during the Program Review, quizzically, or perhaps conveniently, O'Ferrall stated that she ***did not recall*** discussing what her salary was based upon (*id.* at 44:20-25);

**(f)**     Her "affidavit," executed on August 24, 2004 and presently being relied upon by Defendants, was executed only a couple of weeks prior to her annual employee performance evaluation and potential raise (or decrease in salary) for the period of May 2003 to May 2004 (*id.* 28:6-11; 61:12-21);

**(g)**     O'Ferrall's affidavit of August 24, 2004 was prepared by counsel at Gibson Dunn (*id.* 61:23-62:17) and was cleverly stated in the present tense: "I am evaluated"

I.D. PL. RESP. AND SEPARATE COUNTERSTMT. OF FACTS ISO OPP'N TO DEF'S.MOT, CV 04-2147-PHX-JAT

and "the factors on which I am evaluated" and "I am also evaluated and compensated" which, at that particular then-current point in time would be consistent with the corrective action taken by UOP following the DOE's demand for corrective action in response to the findings and conclusions of the DOE Report. *See* Defs.' ASOF Ex. 25.

**III.** The content of the deposition testimony of Donald Rose as well as his demeanor illustrate that his testimony is highly impeachable. Rose's testimony simply lacks credibility and is internally contradictory.

**(a)** Rose is an enrollment manager with UOP, a position that he aspired to even when, at the request of UOP's attorneys, he executed his August 23, 2004 statement being used by Defendants to support their motion; *see* Ward Decl. Ex. 46 (Rose Dep.) at 121:11-17, *see also* Defs.' ASOF Ex. 25.

**(b)** Rose's legal representation by Gibson, Dunn & Crutcher at his deposition was being paid for by UOP. (*id.* at 75:1-6). Rose testified that he is a "team player." (*id.* at 75:7-8). In fact, Rose knew many of the questions that were going to be asked by his counsel at Gibson, Dunn & Crutcher, and some of the questions were even written out to his knowledge. *See id.* at 75:15-76:1.

**(c)** In 2003, he was thinking about being promoted from Enrollment Counselor II to a managerial position. He interviewed for a managerial position on December 19, 2003. *See id.* at 122:14-123:2;

**(d)** While initially claiming that the enrollment counselor position is not a sales position "unless you consider …recruiting to be within the genre of sales" (Rose 84:10-17), Rose nevertheless later admitted that he used the telephone to market UOP programs to potentially new students; made a lot of calls on the telephone on a daily basis to potentially new students; and that "to do well," a person would have to make a certain number of calls, although refused to admit that he had to make a certain number of calls a day. (*id.* at 84:10-85:21);

**(e)** While initially denying attending, or even the existence of a 13 week training program upon being hired by UOP, upon further questioning, Rose conceded

that the phrase "13-weeks" sounded familiar to him and that after 13 weeks he may have received a review (*id.* at 78:21-79:3);

(**f**)    While Rose at least conceded that upon employment he attended the Northern California Sales Academy, he did not remember seeing the Academy's modules entitled "Telemarketing."  Ward Decl. Ex. 46 (Rose Dep.) at 88:21-89:6;

(**g**)    Rose emphatically denied that the enrollment counselor position is a "telemarketing" position (*id.* at 64:25-65:2), although others who served as enrollment counselors testified that it was a telemarketing position. *See* Counterstatement of Facts ¶¶ 103-105.

(**h**)    Although Rose was an enrollment counselor in the Northern California campuses and admitted that enrollment managers had to focus on the numbers, he claimed that he did not personally focus on the numbers; denied ever hearing Bill Brebaugh use the phrase "enrollments cure everything"; and denied hearing Waterman say "butts in seats." (*Id.* at 86:4-87:2).  Other deponents have heard that phrase "butts in seats" and there is even an email documenting the use of such phrase.  *See* Counterstatement of Facts ¶ 116.

(**i**)    Rose testified that he would never personally use the phrase "asses in classes," though he had heard it in a joking manner at UOP.  He would never use such a phrase because it is "insensitive" and because UOP considers itself to be "progressive," and hence would not use such terminology.  *Id.* at 85:23-87:14;

(**j**)    Nevertheless, and despite his firm admonition that the phrase "asses in classes" is "insensitive" and that no such terminology would ever be used at UOP because UOP is "progressive," Rose was compelled to admit on cross-examination that in an email to a friend, Gina Garcia, on January 29, 2004, he stated that he was going to "F------ kill someone." *Id.* at 107:6-10; Ward Decl. Ex. 47;

(**k**)    And, while Rose professed that he did not focus on the numbers (Rose 86:7-10), nonetheless, in that same email to Gina Garcia in which he proclaimed that he was going to "F------ kill someone," he acknowledged sending a series of "numbers" —

which he was initially unable to identify but, upon further cross-examination, confirmed charted the number of "student enrollments." Ward Decl. Ex. 46 (Rose Dep.) at 104:12-108:1. And while he refused to admit that he was upset about the numbers for that month for the San Francisco location (*id.* at 108:24-109:8) indeed he was blasé about this and about how he did not focus on the numbers (because he's not a numbers guy) — and of course, would not personally use such an insensitive phrase as "assess in classes," he nonetheless expressed his desire to "F---- kill someone" because of the San Francisco "numbers." *Id.* at 108:24-110:1.

(**l**)    Rose denied ever seeing a document/report entitled "Enrollments by Rep" (Ward Decl. Ex. 48) even though it records his personal enrollments for the month of September 2004. Ward Decl. Ex. 46 (Rose Dep.) at 96:2-11;

(**m**)    Rose further claimed never to have seen a "Commission Over Starts Report." (Ward Decl. Ex. 49) dated August 18, 2003 that provides the names of enrollment counselors; redacted names of students the counselors have enrolled; the program in which the student is enrolled; enrollments by enrollment counselors for each campus; and the total for enrollments, though he admitted that deposition Exhibits 1009 and 89 look like the same type of report. Ward Decl. Ex. 46 (Rose Dep.) at 96:12-99:10;

(**n**)    And while Rose denied a focus on the numbers, when confronted with Exhibit 1010 (Ward Decl. Ex. 50), dated March 17, 2003, he acknowledged that the document is a string email from the admissions manager for the San Francisco/San Mateo campuses, stating that the team must commit to three applications per day in order to meet their application goals for the month of March, 2003. *See* Ward Decl. Ex. 46 (Rose Dep.) at 99:20-100:8; Ward Decl. Ex. 50.

(**o**)    Further demonstrating the emphasis on enrollment numbers, Rose acknowledged stack rankings reporting new enrollments by each enrollment counselor on a monthly basis. *See* Ward Decl. Ex. 51;

(**p**)    Rose further affirmed the receipt of an email addressed to Northern California Enrollment which would be circulated to enrollment counselors and their

1  managers and the receipt of an email dated October 19, 2003 from Daniel Waterman

2  constituting the "NCAL Meets Expectation Report." Ward Decl. Ex. 51; Ward Decl. Ex.

3  46 (Rose Dep.) at 126:12-127:16;

4    **(q)**    Nevertheless, Rose claimed that he did not remember a document known

5  as the "Meets Expectations Report." Ward Decl. Ex. 46 (Rose Dep.) at 131:7-23;

6    **(r)**    Rose refused to acknowledge that poor enrollment numbers were reviewed

7  in the morning meetings or "huddles," and further claimed that there was no focus on the

8  numbers." *Id.* at 139:22-140:17;

9    **(s)**    Nevertheless, and despite saying that there is no focus the numbers, Rose

10  admitted under cross examination that when the stack rankings were published, everyone

11  knew the numbers of everyone else's and that everyone would know if someone else was

    a poor performer. *See id.* 141:2-11;

12    **(t)**    Despite stating that there was no focus on the numbers, and that he

13  personally did not focus on the numbers, under cross examination, Rose was forced to

14  admit that, after being given a "status as to where…the other enrollment counselors

15  stand with respect to phone calls only," indicating that Rose was in the top rank with 200

16  calls, and upon receiving such an email of May 16, 2003, he ***immediately asked for a***

17  ***raise***. *Id.* at 92:25-93:3, 100:19-101:16; Ward Decl. Ex. 53;

18    **(u)**    Rose was also confronted at his deposition with an exhibit (Ward Decl. Ex.

19  91) which was an example of an email string linking compensation to daily numbers. In

20  response to that email Rose, after referencing another enrollment counselor's enrollment

21  numbers supporting a raise, stated that he should receive "***one of those under-the-table***

22  ***raises***," indicating in his email that he will ***demand*** such a raise after August. Ward

23  Decl. Ex. 46 (Rose Dep.) at 101:25-103:24;

24    **(v)**    Rose was further compelled to acknowledge that if a person's performance

25  requires improvement, that person was placed on a "performance plan" — a form of

26  disciplinary action — and that he received a "performance plan" warning. (*Id.* at 29:4-

27  12);

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(w)**    While Rose testified that he never felt pressure from his managers to enroll new students (*id.* at 30:3-6), nevertheless, he was compelled under cross examination to acknowledge receipt of Exhibit 1003 (Ward Decl. Ex. 54), an email dated May 2, 2003 from his manager discussing Rose's April 2003 performance, emphasizing the importance of enrollment counselors meeting their enrollment goals; and that he received this email because his enrollment numbers were unsatisfactory, while further admitting that enrollment counselors who did not receive "satisfactory enrollment numbers were placed on a performance plan from time to time" and that he himself was placed on such a plan at one time.  Ward Decl. Ex. 46 (Rose Dep.) at 29:4-12, 30:13-25, 132:16-20, 137:18-138:21;

**(x)**    Indeed, with respect to the May 2, 2003 warning from his manager, Rose was further told that "continued underperformance will not be acceptable and will result in formal corrective action" – comments that Rose was compelled to admit under cross-examination "wasn't a good thing" and related to his job performance.  *Id.* at 141:15-142:19;

**(y)**    Despite the fact that Rose refused to acknowledge that this May 2, 2003 email motivated him to increase his enrollment numbers, he nonetheless acknowledged that the email motivated him to work harder, and that he printed the email out and posted it up on his cubical wall, though he claimed never to have thereafter reread the email, or even knew what it said. *See id.* at 143:6-144:5;

**(z)**    Although Rose refused to admit that there were other disciplinary tools used besides the performance plan, including a salary decrease, he nonetheless admitted under cross examination that he was aware that enrollment counselors could be fired. *See id.* at 138:24-139:21;

**(aa)**    Quizzically, Rose testified that he never recalled receiving emails from his managers discussing goals related to job performance, despite testimony to the contrary *See id.* at 30:10-12;

**(bb)**    Despite maintaining that enrollments was not the only way an enrollment counselor could attend Sperling Club, upon cross examination, Rose admitted to receiving an email of January 16, 2003 from his director of enrollments that set out the numerical goals an enrollment counselor needed to reach in order to qualify for the Sperling Club trip.  *See id.* at 132:9-134:6; Ward Decl. Ex. 55;

**(cc)**    The January 16, 2003 email from Director of Enrollment Gruber to Northern California Enrollment, which Rose admitted receiving, clarified that an enrollment counselor "with 9 months or more on the job must enroll 50 new students between January 1 and March 31, 2003" and an enrollment counselor who had been with UOP for less than 9 months must enroll "45 new students" within the "same period of time" in order to qualify for the Sperling trip.  Ward Decl. Ex. 46 (Rose Dep.) at 133:13-22; Ward Decl. Ex. 55.

**(dd)**    Rose only acknowledged the January 16, 2003 email indicating the amount of new student enrollments enrollment counselors must attain to achieve eligibility to attend a Sperling Club trip after he was shown the email (*id.*) and after he previously refused to admit that from time to time, communications were sent requiring a certain number of enrollments or appointments from an enrollment counselor to qualify for the Sperling Club event.  Ward Decl. Ex. 46 (Rose Dep.) at 119-22-120:19;

**(ee)**    Despite the foregoing, Rose claims to have told the DOE interviewers when he was interviewed during the Program Review that he was "not really a numbers person" (*id.* at 51:11-20), although Rose concedes that the DOE interviewer did not believe his story.  *Id.* at 145:24-146:5;

**(ff)**    Finally, despite his claim that he did not personally focus on the numbers, under cross examination, Rose was compelled to admit that he had prepared a Powerpoint presentation entitled, "Leading SF Beyond 2004," which he wanted to use as a presentation in preparation for his interview for the enrollment manager position. Discussing his qualifications for the job, Rose highlighted the fact that his student applications were in the "double digits 8 of 12 months in '03," and with regard to his

66

1   philosophies, he stated "starts over apps… recruiting graduates" (explaining that starts
2   means students who attend class a certain number of times).  *Id.* at 91:8-92:23; Ward
3   Decl. Ex. 56.

4   **Defendants' Amended Statement, ¶ 30:**

5       The Wittman Report [Ex. 16] is internally inconsistent.  By way of example:

6       a.    The Wittman Report claims on page 9 that "it was common knowledge
7       among recruiters that each enrollment is worth $750 in annual salary."  But
8       on page 10, the Wittman Report states that salaries are calculated "on the
9       basis of one half of the number of students each recruiter enrolls in a six
10      month period; e.g., 90 students enrolled in six months equals $45,000 in
11      salary."  The formula on page 10 values each enrollment at $500 in salary,
12      $250 less than the claim on page 9.  [*Id.* at 9-10.]

13      b.    Page 20 of the Wittman Report includes the claim that "Salaries Actually
14      Based on Quantity of Recruiting Activities," a claim that is purportedly
15      supported by a chart of select EC raises.  [Ex. 16 (Wittman Report) at 20-
16      21.]  But recruiter #6 on the chart enrolled 100 students and received a
17      $30,000 raise to $67,000, while recruiter #7 on the chart enrolled 98
18      students and received a $1,700 raise to $43,000.

19  **Lead Plaintiff's Objection and Response to ¶ 30:**

20      <u>OBJECTION</u>:

21      **Irrelevant** and **misidentifies** DOE Report.

22      <u>RESPONSE</u>:

23      **Denied**.  Defendants' selective citation to the DOE Report ignores the fact that
24  enrollment counselors with different levels of experience were required to achieve
25  different levels of enrollments.  *See* Ward Decl. Ex. 57 (2/16/06 Thompson Dep.) at
26  66:25-68:14.  Thus, the statements referred to by Defendants are not internally
27  inconsistent.  In addition, prior to the implementation of the new compensation plan in

28

<center>67</center>

185.   The active concealment by Defendants of the adverse findings of the DOE Report rendered the September 7, 2004 statements regarding the Program Review false and misleading.

186.   The September 7, 2004 statements regarding the Program Review were made with actual knowledge that the DOE had required Apollo to take corrective action in response to the adverse findings of the Program Review Report. *Supra* ¶¶ 68-81.]

187.   The September 7, 2004 statements did not fully or fairly disclose the corrective steps or actions that Apollo had taken, rendering them false and misleading.

188.   Each of Defendants' Class Period statements was made while Defendants knew of the DOE Report, its adverse findings and conclusions and its call for corrective action.

DATED:  May 11, 2007                        Respectfully submitted,

                                                          BONNETT, FAIRBOURN,
      FRIEDMAN & BALINT, P.C.
ANDREW S. FRIEDMAN
FRANCIS J. BALINT, JR.
2901 North Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  (602) 274-1100

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
SAMUEL M. WARD


                                             s/ Samuel M. Ward
                                        SAMUEL M. WARD

402 West Broadway, Suite 850
San Diego, CA  92101
Telephone:  (619) 230-0800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARRACK, RODOS & BACINE
LEONARD BARRACK
MARK R. ROSEN
JEFFREY A. BARRACK
WILLIAM J. BAN
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Telephone:  (215) 963-0600

Lead Counsel for Lead Plaintiff, the
Policemen's Annuity and Benefit Fund of
Chicago

LD. PL. RESP. AND SEPARATE COUNTERSTMT. OF FACTS ISO OPP'N TO DEF'S.MOT, CV 04-2147-PHX-JAT

# EXHIBIT K

Case No. 06-MC-0558 (CKK)

**Memorandum**
**Preliminary UOP Data Analysis** █████████████████

To:    **Jennifer Woodward, Russ Wolff, OGC**

From:  **Donna Wittman**

cc:    **Linda Henderson, Jim Castress, Susan Crim, Martina Fernandez-Rosario, Shane Dunne,
Steve Hansen**

Date:  **April 11, 2004**

The purpose of this memo is to brief you on my preliminary data analysis of the UOP salary system. ███
████████████████████████████████████████████████████. Attached with this memo is
an excel spreadsheet that provides both data and scatter charts in support of my conclusions herein. In
short, I find the data to substantially support the conclusion that UOP has substantially and repeatedly
violated the incentive compensation prohibition. The data indicates at least 46,000 violations. ██████

A.  DATA USED FOR ANALYSIS ........................................................................................... 1

B.  SALARY RULES APPLIED FOR ANALYSIS .............................................................. 2

C.  SALARY DATA ANALYSIS RESULTS ......................................................................... 4

D.  LUMP SUM BONUS PAYMENTS ................................................................................. 5

E.  AWARDS, CONTEST AND PRIZE INCENTIVES ..................................................... 5

F.  ███████████████████ ...................................................................................... 6

A.    **Data Used for Analysis**

In response to a Program Review Report Requirement, UOP provided:

- electronic spreadsheets listing each recruiter and his or her enrollments as shown on the
"stack rankings" from FY2000 – FY 2003. These spreadsheets reflect enrollments on a
semi-annual basis, listing the enrollments credited to recruiters for the six months ending
in February and August of each year. We had requested this data on a monthly basis.
Bob Collins said that UOP only keeps the data on a monthly basis until the end of the
year and then discards the monthly data, keeping only the semi-annual records, with the
monthly enrollments shown only for the last six months of each fiscal year.
- Hard copy of each recruiter's enrollments, on a semi-annual basis ("stack ranking") for
FY1999
- Salary history from FY2000 through February 23, 2004 for every UOP recruiter,
reflecting 13,438 salary records, including salary on being hired, each salary change
thereafter and salary on termination (AllSal Table). This data also reflects salaries of
recruiters before they became recruiters and after they ceased being recruiters due to
promotion into management or transfer into a non-recruiting position.

Initially we had run a stat sample of all recruiters identified on the salary history data base. Review of the
data provided by UOP, in its response as well as data provided while we were on site, however, revealed
that UOP failed to provide any enrollment data on a large percentage of these recruiters. Further, since
UOP has a large turnover of recruiters, many of these recruiters left UOP before or shortly after their first
annual salary evaluation.

In order to perform an accurate analysis, it would be necessary to limit the analysis only to recruiters for whom we were provided enrollment data, i.e., the stack rankings. The salary records indicated a total of 5,151 recruiters (AllRecruitersFromSalaryData Table) between September 1, 1999 and February 23, 2004. UOP provided enrollment data on only 2,525 of these recruiters. (EENoFromStackRankList Table.) The remaining recruiters were either hired recently, or their employment was of such short duration that UOP did not report any enrollments[1]. The 2,525 recruiters for whom enrollment data was obtained was our universe for performing the analysis herein.

The stack ranking data was reviewed carefully to correct name spellings and each recruiter was assigned a unique number. (EENofromStackRankList Table.) The salary history data was then analyzed to eliminate all recruiters for whom we had no enrollment data. (Out of a statistical random sample of 347, UOP provided enrollment data for only 206.) This data was then reviewed to assign the appropriate unique number for each salary event for each recruiter on the enrollment data base.

From the 13,438 salary records, I removed the records where the termination date and effective date of salary were the same, since such records did not represent any salary change based on enrollments. Also omitted were salary changes for recruiters during periods they were not in a recruiter position, e.g., working as an academic counselor or in management.

Recruiters were identified by dates of hire compared with dates on which enrollment data began, as well as matching of names and locations in order to match salary data with enrollment data. The record of enrollments from 2000 through 2003 were tables of 3,542 records, each record reflecting the number of enrollments for a recruiter in any given fiscal year on a semi-annual basis. Each record showed the enrollments as of the end of February and August, as well as the total annual enrollments per recruiter. This data was put into a table (StackRankingData Table) and then merged with the salary data table, sorted by the assigned unique number of each employee so that the enrollments and salary events could be analyzed for a match (SalaryEnrollmentAnalysis Table). As to the 1999 enrollments, such data was input manually for recruiters who could be matched.

**B.    Salary Rules Applied for Analysis**

In order to accurately match enrollments with salary changes, the salary evaluation policies of UOP, as set forth in their Enrollment Counselor Policy Guides for each year were used. UOP changes these rules annually and applies different rules, depending on whether a recruiter is new or experienced, and as of FY2001, depending on whether a recruiter was an ECI, ECII, Senior EC or Executive EC. For each recruiter, salary changes always followed specific evaluation periods, such periods generally being determined as either eight or nine months after the date of hire, then every 12 months thereafter. FY 1999 was an exception, for UOP made salary evaluations every six months

- For FY 1999, new recruiters were first evaluated and the salary adjusted seven months after the date of hire. Thereafter, all recruiters were evaluated, and salaries adjusted, either up or down, every six months.
- For FY 2000, new recruiters' evaluation period was for the first eight months, from the first of the month in which they were hired. Thereafter, recruiters' salary evaluations are every 12 months, on the anniversary of their first evaluation. Salaries were adjusted either up or down, depending on the prior 12 months of performance.
- For FY 2001 and 2002,
  - new recruiters receive a salary evaluation within their 90 day training period as a Counselor in Training and then become an EC1 (salary range to $40,000).

---

[1] Turnover at Apollo schools is significant. 1,000 of the 5,151 recruiters have been hired since September 1, 2003. Out of the total of 5,151 recruiters, 2,560 (49.7%) have terminated their employment, with 1,503 (29.2%) terminating at or before their first salary review. Of the 5,151 employees working as recruiters since September 1, 1999, only 10% (516) have worked two years or more. Less than 5% (254) have worked 3 years or more for Apollo and less than 2% have five or more years of tenure.

- An EC1 who has three consistent quarters where performance "often or always exceeds expectations" (110 enrollments or more per six months under the matrixes for Northern California), was eligible for promotion to ECII (salary range to $80,000).
- In order for an ECII to be eligible for promotion to Senior EC (salary range to $100,000), a recruiter must have four consistent quarters where performance "often or always exceeds expectations" (110 enrollments or more per six months under the matrixes for Northern California).
- While a recruiter may not meet the requirements for promotion, he or she may still receive a "merit" raise of 1 – 7%, depending on where a recruiters' salary was in his or her salary range and whether the recruiter's evaluation was:

  - "Unsatisfactory": 0%
  - "Requires Improvement": 0-2%
  - "Meets Expectations": 2-4%
  - "Often Exceeds Expectations": 3-5%
  - "Always Exceeds Expectations": 5-7%

- For FY2003:
  - new recruiters receive a salary evaluation within their 13 week training period as a Counselor in Training and then become an EC1, with the salary established according to their performance during the 13 weeks, as follows:
    - Meets expectations for each of the 13 weeks: $26,000 - $40,000
    - Often Exceeds for each of the 13 weeks: $40,000 - $47,000
    - Consistently Exceeds for each week of the 13 weeks: $47,000 - $54,000
    - If they fall below the Meets for the 13 weeks, recruiters were not eligible for a salary increase
  - An EC1 who has two out of three quarters where performance "often or always exceeds expectations" (110 enrollments or more per six months under the matrixes for Northern California), and has none of the three quarters below "meets" was eligible for promotion to ECII (salary range to $80,000).
  - In order for an ECII to be eligible for promotion to Senior EC (salary range to $100,000), a recruiter must have three out of four consistent quarters where performance was "often or always exceeds expectations" (110 enrollments or more per six months under the matrixes for Northern California).
  - While a recruiter may not meet the requirements for promotion, he or she may still receive a "merit" raise of 1 – 10%, depending on the same criteria as for FY 2001 and FY 2002.

In order to accurately apply the UOP rules to each salary evaluation and determine the precise relationship, if any, to the resulting salary, we would need to be provided the enrollment data for each recruiter on a monthly basis, since evaluation periods were tied to hiring dates. Since UOP asserts that providing enrollment data on a monthly basis would be too burdensome, we utilized the best available data – choosing enrollment data that most close aligned with evaluation periods. Enrollments assigned to any particular salary change were the enrollments reported for the year ending in the nearest February or August (except in some instances where UOP provided enough enrollment data to more precisely determine enrollments in the period aligning with the salary change), except for the year 1999 and for new recruiters. In 1999, salaries were adjusted every six months. New recruiters almost always received a raise after training, generally two to four months following becoming a recruiter.

For FY 2003, additional analysis needs to be performed. To date, we have not yet included the salary changes for recruiters receiving the raise tied to their first 13 weeks of performance. UOP did not provide enrollment data for any recruiter after August 31, 2003. In order to assess these salary increases, it would be necessary to have the enrollment data.

The recruiters with whom we spoke all indicated that they received their first salary evaluation after one full six month period "on the floor". Thus is it was necessary to look at the data and determine which

DOE APOL 0003

semiannual enrollment numbers represented the first full six months "on the floor". After the initial salary review based on the first six months on the floor, recruiters are evaluated annually, except in 1999 when salary evaluations took place every six months. (In March of 2004, UOP returned to the policy of evaluations every six months.) Thus, the relevant enrollment figures for experienced recruiters are those for a one year period. In order to correctly compare these six month and one year periods, all enrollments used on a six, eight (FY2000) or nine month (FY2001 through FY2003) basis were annualized. For example, if a recruiter had 82 enrollments during his or her first full six month period, 164 enrollments were used to determine whether the recruiter's salary related to enrollment numbers.

*Additional Factors to take into account:* In addition to the above facts concerning the UOP salary rules, two additional factors must be taken into account:

- For fiscal years prior to the CLC case, FY 2001, UOP typically adjusted salaries up and down – a practice it proposes to reinstate under the "tentative corrective action plan" submitted in response to the Program Review Report. With the well published CLC case, recruiters recounted that UOP management advised that Department rules would no longer allow downward adjustments of salary. From FY 2001 through FY 2003, downward adjustments significantly dropped.
- UOP's salary scales vary for regions of the country. Thus, the salary scale for Northern California is higher than that for recruiters in Florida. The salary scale for recruiters in Puerto Rico is substantially lower than the scale for all other UOP locations.

It is important to note that the KPMG analysis and presentation on March 22 took none of the above factors into account. It did not apply the UOP published salary rules for each year. It did not attribute salaries to enrollments in any way, e.g.: a recruiter with a starting salary of $28,000 who enrolled 200 people in her first nine months might receive a $60,000 raise shortly after these enrollments are logged, resulting in salary of $88,000. That same person may become a manager and the data will reflect 0 enrollments. KPMG would attribute the 200 enrollments to the starting salary and the 0 enrollments to the $88,000, even though the $28,000 starting salary could not be related to the subsequent enrollments and the $88,000 salary could not have been related to the non-enrollments following the award of the salary.

## C.  SALARY DATA ANALYSIS RESULTS

The data analysis shows 1,717[2] total salary changes for recruiters that appear to be based on enrollments. The UOP matrix and evaluation system for recruiters essentially promises a substantial bonus, payable as salary on an annualized basis, spread over 26 payments each year. Each payment represents an opportunity to incentivize a recruiter to increase the payment by increasing enrollments, or represents a disincentive with the threat of a salary decrease for failing to maintain enrollment numbers.

The correlation between enrollments and salary is evident in the data. There are some anomalies, but review of the employee's file generally provides an explanation for the anomaly.

These 1,717 salary changes represent approximately **42,276 payments of incentives** based on enrollments. Recruiters representing these changes are found at 77 UOP locations, including WIU. Approximately ½ of these 1,717 changes, 698, were at UOP On line. The actual value paid in these incentive payments total almost $19 Millions in payments.

We have prepared spreadsheets setting forth the data and scatter charts similar to those presented by UOP. One chart reflects salary / enrollment data for the entire FY 1999-2003 period. Additional charts are broken down by fiscal year. The charts dramatically show the correlation between enrollments and salary. The few variations are easily attributable to the following:

- Recruiters with high enrollments and lower salaries are those from Puerto Rico

---

[2] The data needs to be carefully checked for final errors prior to issuance of an FPRDL. Also, the 2003 salary adjustments need to be added.

DOE APOL 0004

- Recruiters with high salaries and lower enrollments are recruiters who had earned the higher scale in a prior year and UOP did not adjust it down following the CLC case;
- Some variation is to be expected due to the fact that there are regional salary differences across the country;
- Some variation is attributable to the fact that UOP did not provide enrollment data on a monthly basis for most of the periods analyzed. It was necessary to make a close approximation and annualize enrollment numbers in many cases.

Based on our conclusion that the salary scheme of UOP violates the incentive compensation prohibition under Title IV, we recommend that a substantial fine be imposed. At its last "Earnings Call" conference, Todd Nelson described all settlements thus far with the Department as "nominal". This would include the several million dollar settlement involving the late refund issue a few years ago. We should also consider the fact that UOP will receive more than $1 Billion in Title IV in this award year and have total revenues at or in excess of $2 Billion. Further consideration must be given to the fact that UOP is aware that the Department has previously found this salary compensation scheme to violate Title IV in the IDP case. Instead of taking any action to actually correct its incentive policy, it plans to intensify the incentive features for its recruiters by adjusting salaries up and down every six months. Recruiters who have had the plan explained to them describe the plan as "more commission based".



## D.    Lump Sum Bonus Payments

In addition to the payments made as incentives on a "salary" basis, UOP paid lump sum bonuses to some recruiters. UOP asserts that these lump sum payments are paid to recruiters who are already at the top of their salary range. However, we found some of the bonuses paid to recruiters who were not at the top of their salary range. Further, we required UOP to disclose and report to us all such lump sum payments. They did disclose some, but we found some additional such bonus payments that UOP did not disclose.

Thus far, we have located 23 such bonus payments totaling $37,228. These bonus payments also correlate to enrollments and appear simply to be additional incentive payments.

- Total Amount of Lump Sum Bonuses discovered:        $37,228
- 

## E.    Awards, Contest and Prize Incentives

UOP also has historically awarded various prizes, gift certificates, trips, etc., based on enrollment activities – such as the most applications or actual enrollments. UOP admitted that it has given 11,125 such incentives, but insists that they are proper and that 10,405 of them were "nominal", defined by UOP as under $100 in value. UOP has indicated in its latest correspondence that it is continuing to research the remaining 720 items. The letter I drafted most recently requires UOP to disclose all 11,125 incentives and provide more detail on each (value, recipient, criteria for award, description of award.)

For purposes of making an estimate, realizing that we have yet to have disclosure from UOP, we are making the following assumptions:

- 3,468 of these incentives, 1/3 of the purported 10,405 "nominal" incentives are improper and in violation of the incentive compensation rules
- 720 incentives, all in excess of $100, are in violation of the incentive compensation rules.
- Estimated value of Incentive Gifts:      $562,833
- 
- 
- 

F.

# EXHIBIT L

Case No. 06-MC-0558 (CKK)

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

| Document Date | Document Author | Title of Document | Subject Matter of Document | All Known Recipients | Privilege Asserted | Number of Pages in Document |
|---|---|---|---|---|---|---|
| 7/30/2003 | Jennifer Woodward | FW: Hendow Transcript | Email communication responding to employee who prepared and attached Deposition Digest of Mary Hendow which was compiled by employee for Department attorneys re: deposition taken by Department attorneys related to the University of Phoenix Program Review | Susan Crim, Jim Castress, Martina Rosario Fernandez, Donna Wittman, Nan Shepard, Russell Wolff | Deliberative Process, Attorney Work Product, Confidential Witness Information | email - 1 page; attachment - 21 pages |
| 1/9/2003 | Daniel Bartley & Nancy Krop | Disclosure Statement of Qui Tam Relators Pursuant to the Federal False Claims Act | Substantive document filed in United States District Court, Eastern District of California in relation to Qui Tam action filed against the University of Phoenix and protected by court order | Jennifer Woodward, Russell Wolff | Attorney Work Product, Joint Prosecutorial Privilege, Document Under Court Order, Confidential Witness Information | 155 pages |
| 6/10/2003 | Jennifer Woodward | Document titled "Deposition of Mary Hendow Confidential Transcript" | Confidential Witness Statement for Mary Hendow taken by two Department attorneys at inception of decision-making process related to the University of Phoenix Program Review | Jennifer Woodward, Russell Wolff | Attorney Work Product, Joint Prosecutorial Privilege, Confidential Witness Information | 186 pages |

In Re: Apollo Group, Inc. Securities Litigation
Privilege Log of Category 6 Documents

5/14/2007

| Date | Author | RE | Description | Recipients | Privilege | Length |
|---|---|---|---|---|---|---|
| 7/28/2003 | Jennifer Woodward | RE: FD: Monthly Evaluations | Email communication from Jennifer Woodward, ED attorneys to qui tam relators attorneys forwarding Depositions of Julie Albertson and Mary Hendow taken by Department attorneys related to the University of Phoenix Program Review | Jennifer Woodward, Russell Wolff, Nancy Krop, Daniel Bartley, Julie Albertson, Mary Hendow | Attorney Work Product, Deliberative Process Privilege, Confidential Witness Information | email - 1 page; attachment 1 - 114 pages; attachment 2 - 170 pages |
| 9/24/2003 | Donna Wittman | FYI: FW: UOP - New Matrix Email from Witness E | Email communication from employee to ED attorney and another employee forwarding communication from witness where the information provided re: a HR issue is so inextricably intertwined that it is not possible to redact information without revealing the identities of witnesses. | Witness E, Susan Crim, Jennifer Woodward and Russell Wolff | Attorney Work Product, Deliberative Process Privilege, Confidential Witness Information | email - 2 pages |
| 7/24/2003 | Daniel Bartley | University of Phoenix - Site Selection | Email communication from attorneys for qui tam relators to ED attorneys providing information requested re: recommendations for site selection for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop | Attorney Work Product, Deliberative Process | email - 2 pages |
| 7/25/2003 | Jennifer Woodward | RE: University of Phoenix - Site Selection | Email communication from ED attorneys to qui tam relators attorneys asking questions and requesting information re: recommendations for site selection for the program review | Daniel Bartley, Nancy Krop, Russell Wolff | Attorney Work Product, Deliberative Process | email - 2 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

| 7/28/2003 | Daniel Bartley | Fwd: Site Visits | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: recommendations for site selection for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop | Attorney Work Product, Deliberative Process | email - 1 page; attachment - 2 pages |
| 7/28/2003 | Nancy Krop | Information | Email communication from qui tam relators attorneys to ED attorneys providing information from clients re: recommendations for site selection for the program review | Jennifer Woodward, Russell Wolff, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 3 pages |
| 7/28/2003 | Nancy Krop | More Information | Email communication from qui tam relators attorneys to ED attorneys providing information from clients re: recommendations for site selection for the program review | Jennifer Woodward, Russell Wolff, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 2 pages |
| 7/28/2003 | Jennifer Woodward | Re: More Information | Email communication from ED attorneys to qui tam relators attorneys thanking them for information re: recommendations for site selection for the program review | Daniel Bartley, Nancy Krop, Russell Wolff | Attorney Work Product, Deliberative Process | email - 2 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

| 7/29/2003 | Nancy Krop | Client Thoughts re: Site Visits | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: recommendations for site selection and documents to review for the program review | Jennifer Woodward, Russell Wolff, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 2 pages |
| 7/29/2003 | Julie Albertson | Re: Client Thoughts re: site visits | Email communication from qui tam relator to ED attorneys and qui tam relator attorneys re: questions to ask and documents to request during the program review | Jennifer Woodward, Russell Wolff, Nancy Krop, Daniel Bartley, Mary Hendow | Attorney Work Product, Deliberative Process | email - 2 pages |
| 7/30/2003 | Nancy Krop | Fwd: STARTS | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: documents to request and review for the program review | Jennifer Woodward, Daniel Bartley, Mary Hendow, Julie Albertson | Attorney Work Product, Deliberative Process | email- 1 page |
| 7/30/2003 | Nancy Krop | Julie's Thoughts | Email communication from qui tam relators attorney to ED attorney forwarding information and question from client re: the Department's program review and necessary evidence | Jennifer Woodward | Attorney Work Product, Deliberative Process | email- 1 page |

5/14/2007

| Date | Author | Subject | Description | Recipients | Privilege | Type |
|---|---|---|---|---|---|---|
| 7/30/2003 | Nancy Krop | Suggestions from Mary re: site visits | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: site selections for the program review and documents to locate. | Jennifer Woodward, Nancy Krop, Daniel Bartley, Julie Albertson, Mary Hendow | Attorney Work Product, Process | email - 1 page |
| 7/30/2003 | Nancy Krop | Site visits | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: site selections and recommendations for the program review | Jennifer Woodward, Daniel Bartley | Attorney Work Product, Process | email- 1 page |
| 8/1/2003 | Nancy Krop | Re: Site Visits | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: site selections and recommendations for the program review | Jennifer Woodward, Daniel Bartley, Mary Hendow | Attorney Work Product, Deliberative Process | email- 1 page |
| 8/1/2003 | Nancy Krop | Information re NorCal Document/Witness location | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: documents to request and sites to review for the program review | Jennifer Woodward, Julie Albertson | Attorney Work Product, Deliberative Process | email - 2 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

5/14/2007

| 8/6/2003 | Daniel Bartley | Fwd: SF Visit re UoP | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: documents to request and witness recommendations for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop, Daniel Bartley, Julie Albertson, Mary Hendow | Attorney Work Product, Deliberative Process | email- 1 page |
| 8/6/2003 | Julie Albertson | Re: Fwd: SF Visit | Email communication from qui tam relator to ED attorneys and qui tam relator attorneys re: witness recommendations for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop, Daniel Bartley, Mary Hendow | Attorney Work Product, Deliberative Process | email 1 page |
| 8/6/2003 | Daniel Bartley | Fwd: SF Visit re UoP | Email communication from qui tam relators attorney to ED attorney forwarding information from client re: the recommendations for witnesses for Department's program review | Jennifer Woodward, Russell Wolff, Nancy Krop, Process | Attorney Work Product, Deliberative Process | email - 1 page; attachment - 1 page. |
| 8/7/2003 | Jennifer Woodward | Questions | Email communication from ED attorneys to qui tam relators attorneys asking questions and requesting information re: recommendations for site selection and witness contacts and information for the program review | Daniel Bartley, Nancy Krop, Russell Wolff | Attorney Work Product, Deliberative Process | email - 1 page |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

5/14/2007

| 8/8/2003 | Daniel Bartley | University of Phoenix: Julie & Mary's Responses to Your Questions | Email communication from qui tam relators attorneys to ED attorneys responding to questions and forwarding information from clients re: documents to request and witness information for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop | Attorney Work Product, Deliberative Process | email- 5 pages |
| 8/8/2003 | Daniel Bartley | University of Phoenix: qui tam relators Julie & Mary's Responses to Your Questions | Email communication from qui tam relators attorneys to ED attorneys providing client's response to Department's questions and forwarding information from clients re: documents to request and witness information for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop | Attorney Work Product, Deliberative Process | email- 5 pages |
| 8/11/2003 | Daniel Bartley | Fwd: University of Phoenix: Julie & Mary's Responses to Your Questions | Email communication from qui tam relators attorneys to ED attorneys providing client's response to Department's questions and forwarding information from clients re: documents to request and witness information for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop, Julie Albertson, Mary Hendow | Attorney Work Product, Deliberative Process | email - 1 page; attachment - 6 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

| Date | From | Re: | Description | To | Privilege | Type |
|---|---|---|---|---|---|---|
| 8/14/2003 | Jennifer Woodward | Re: U.S. ex rel. Hendow et al. v. U of P forwarding document written by ED attorney titled Locations - who to interview and what documents to find requesting qui tam relators attorney to review and provide further information or recommendations | Email communication | Nancy Krop | Attorney Work Product, Deliberative Process | Email - 1 page; attachment - 7 pages |
| 8/14/2003 | Daniel Bartley | University of Phoenix | Email communication from qui tam relators attorney to ED attorney forwarding information from client re: recommendations for witnesses and records for Department's program review | Jennifer Woodward, Russell Wolff, Nancy Krop | Attorney Work Product, Deliberative Process | email - 2 pages |
| 8/14/2007 | Daniel Bartley | Re: U of P | Email communication from qui tam relators attorney to ED attorney forwarding information from client re: the recommendations for site selections for Department's program review | Jennifer Woodward, Russell Wolff, Nancy Krop | Attorney Work Product, Deliberative Process | email - 1 page |
| 8/14/2003 | Nancy Krop | Re: U of P | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: recommendations for site selection and documents to review for the program review | Jennifer Woodward, Russell Wolff, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 1 page |

5/14/2007

5/14/2007

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

| | | | | | |
|---|---|---|---|---|---|
| 8/14/2003 | Nancy Krop | Re: U.S. ex rel. Hendow et al. v. U of P | Email communication from ED attorney forwarding information and recommendations for witness questions and records to obtain during Department's program review | Jennifer Woodward, Daniel Bartley, Mary Hendow, Julie Albertson | Attorney Work Product, Deliberative Process | email - 1 page |
| 8/14/2003 | Russell Wolff | Re: U of P | Email communication from Daniel Bartley to qui tam relators attorneys asking questions and requesting information re: recommendations for site selection for the program review | Jennifer Woodward, Daniel Bartley, Nancy Krop | Attorney Work Product, Deliberative Process | email - 2 pages |
| 8/14/2003 | Daniel Bartley | Re: U of P | Email communication from attorneys for qui tam relators to ED attorneys providing information requested re: recommendations for site selection for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop | Attorney Work Product, Deliberative Process | email - 2 pages |
| 8/14/2003 | Nancy Krop | UOP Internal Website Information: Information for Donna | Email communication from qui tam relators attorneys to ED attorneys forwarding information from clients re: information on documents and internal UOP information for the program review | Jennifer Woodward, Daniel Bartley, Mary Hendow, Julie Albertson | Attorney Work Product, Deliberative Process | email - 1 page |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

| 8/15/2003 | Julie Albertson | Re: U.S. ex rel. Hendow et al. v. U of P | Email communication from qui tam relators attorney to ED attorney forwarding information from client re: contact information to discuss the Department's program review and questions to ask counselors | Jennifer Woodward, Daniel Bartley, Mary Hendow, Julie Albertson | Attorney Work Product, Deliberative Process | email- 1 page |
| 8/17/2003 | Nancy Krop | Re: UOP Internal Website Information: Information for Donna | Email from qui tam relators attorney to ED attorney forwarding Memo providing edits and recommendations to document written by ED attorney titled Locations - who to interview and what documents to find | Jennifer Woodward | Attorney Work Product, Deliberative Process | email- 1 page; attachment - 11 pages |
| 12/18/2003 | Nancy Krop | A beginning of an answer | Email communication from qui tam relators attorney to ED attorney forwarding information and responding to question from ED attorney with information from client re: the Department's program review | Jennifer Woodward | Attorney Work Product, Deliberative Process | email - 1 page |
| 8/15/2003 | Nancy Krop | Fwd: RE: UOP Internal Website Information: Information for Donna | Email communication from qui tam relators attorney to ED attorney forwarding information from client re: the Department's program review and documents to locate and witnesses to speak to | Jennifer Woodward, Russell Wolff, Nancy Krop, Daniel Bartley, Julie Albertson, Mary Hendow | Attorney Work Product, Deliberative Process | email - 2 pages |

| Date | Author | Subject | Description | Recipients | Privilege | Type |
|---|---|---|---|---|---|---|
| 8/15/2003 | Nancy Krop | Fwd: Re: U.S. ex rel. Hendow et al. v. U of P | Email communication from qui tam relators attorneys to ED attorneys responding to questions and forwarding information from clients re: documents to request and site locations for the program review | Jennifer Woodward, Russell Wolff, Nancy Krop, Daniel Bartley, Julie Albertson, Mary Hendow | Attorney Work Product, Deliberative Process | email - 4 pages |
| 8/15/2003 | Nancy Krop | Answers to Questions from Jennifer | Email communication from qui tam relators attorneys to ED attorneys providing client's response to Department's questions and forwarding information from clients re: documents to request and site locations for the program review | Jennifer Woodward, Russell Wolff, Daniel Bartley, Julie Albertson, Mary Hendow | Attorney Work Product, Deliberative Process | email - 1 page |
| 8/3/2004 | Daniel Bartley | Re: Fwd: Do you like movies? | Email communication from qui tam relators attorney to ED attorney responding to specific question and request for information regarding recruiter awards at University of Phoenix | Jennifer Woodward, Nancy Krop | Attorney Work Product, Deliberative Process | email - 1 page |
| 8/3/2004 | Nancy Krop | Enrollment Contests Question | Email communication from qui tam relators attorney to ED attorney responding to specific question and request for information regarding recruiter awards at University of Phoenix | Jennifer Woodward, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 1 page |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

| 8/4/2004 | Daniel Bartley | United States ex rel. Hendow v. University of Phoenix: "Do you like movies?" | Email communication from qui tam relators attorney to ED attorney providing information from clients responding to specific question and request for information regarding recruiter awards at University of Phoenix | Jennifer Woodward, Nancy Krop | Attorney Work Product, Deliberative Process | email - 1 page |
| --- | --- | --- | --- | --- | --- | --- |
| 8/4/2004 | Jennifer Woodward | Re: Enrollment Contests Question | Email communication from ED attorney to qui tam relators attorney asking more specific questions and requesting information regarding recruiter awards at University of Phoenix | Nancy Krop, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 2 pages |
| 8/4/2004 | Jennifer Woodward | Re: Enrollment Contests Question | Email communication from ED attorney to qui tam relators attorney asking more specific questions and requesting information regarding recruiter awards at University of Phoenix | Nancy Krop, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 3 pages |
| 8/5/2004 | Nancy Krop | Fwd: Re: Enrollment Contests Question | Email communication from qui tam relators attorney to ED attorney forwarding information from clients that responds to specific question and request for information regarding recruiter awards at University of Phoenix | Nancy Krop, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 2 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 6 Documents

| 8/5/2004 | Jennifer Woodward | Re: Re: Enrollment Contests Question | Email communication from ED attorney to qui tam relators attorney asking more specific questions and requesting information regarding recruiter awards at University of Phoenix | Nancy Krop, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 2 pages |
| --- | --- | --- | --- | --- | --- | --- |
| 8/6/2004 | Nancy Krop | UOP Contests | Email communication from qui tam relators attorney to ED attorney forwarding information from clients that responds to specific question and request for information regarding recruiter awards at University of Phoenix | Nancy Krop, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 2 pages |
| 8/9/2004 | Nancy Krop | Fwd: Re: UOP Contests | Email communication from qui tam relators attorney to ED attorney forwarding information from clients that responds to specific question and request for information regarding recruiter awards at University of Phoenix | Nancy Krop, Daniel Bartley | Attorney Work Product, Deliberative Process | email - 2 pages |

5/14/2007

# EXHIBIT M

Case No. 06-MC-0558 (CKK)



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

_____

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

May 7, 2007

**via E-mail**
kdiulio@gibsondunn.com

Kristopher P. Diulio, Esq.
Gibson Dunn and Crutcher LLP
4 Park Plaza
Suite 1400
Irvine, CA  92614

Re:    In Re: Apollo Securities Litigation
       United States District Court (D. D.C.)
       Case No: 06-0558

Dear Mr. Diulio:

I am writing in response to your letter sent via electronic means on Friday, May 4, 2007. However, because of my schedule relating to other matters including my participation in depositions on Friday, May 4, 2007, I did not actually receive your letter until this morning.

In order to efficiently process the documents, the Department of education (Department) did not include in its review duplicative Apollo personnel records provided to the Department by Apollo. When categorizing the documents, the Department had included 298 pages of Apollo personnel records since the documents were attached to a series of witness statements. In your letter, you raise concerns that the 298 pages were excluded from the release. Therefore, attached to this letter the Department has produced a PDF file with the 298 pages of Apollo's personnel records at your request.

Secondly, you argue that the Department has failed to log redactions other than witness identifying information. In one specific instance, the Department did not log redactions made in documents produced under Category 5. *See* DOE APOL 0001-0006. The privilege asserted for these redactions is the deliberative process privilege. The redactions protect information that represent a recommendation made to superiors at the Department regarding a specific course of action. The Department will revise the Category 5 log to include the redactions regarding such recommendation. Additionally, the Department will review the documents released for any other redactions where the deliberative process privilege is asserted. However, other than this one recommendation, the Department is not aware of any other redactions made pursuant to privileges other than witness identifying information.

In response to concerns raised by your April 25, 2007 letter, the Department re-released documents without redactions of statements made by corporate executives. Additionally, the Department released revised versions of statements by Ms. Albertson and Ms. Hendow during the program review since the identities of those witnesses had been voluntarily revealed when they filed a *qui tam* action in federal court. Although you list a number of individuals that may have voluntarily revealed their witness identities to Apollo, you provide no documentation or assurance to the Department that their identities are truly known and are not just speculation. Therefore, until such assurances are made that witnesses have voluntarily revealed themselves to Apollo, the Department will continue to protect all witness identities other than the qui tam relators.

In your May 4, 2007 letter, you raise a number of concerns regarding the Department's redactions of witness identifying information. The Department will review the documents released and produce documents where interview dates and Apollo corporate executives were previously redacted. However, the Department will not voluntarily release information that would reveal a witness's identity. The Department and Apollo may disagree as to the extent of which certain information may reveal who a witness is. In some cases, if the Department revealed the location and supervisors of a witness, then when read together with the substance of the witness statement, a witness's identity may be revealed. Therefore, in those circumstances, the Department will not reveal this information to Apollo. The Department will review all witness statements to ensure that as much factual information is released to Apollo while ensuring that the witness's identity is not revealed. Additionally, the Department will associate a letter for each witness and provide a list with the Bates number pages attributed to that witness.

In your letter, you also raise concerns regarding the Category 5 Privilege Log and accompanying 138 pages of Category 5 documents produced by the Department. The Department voluntarily produced two sets of data in response to this request. First, the Department produced the April 11, 2004 analysis memorandum and data regarding information provided by Apollo. See DOE APOL 0001-0100. Thereafter, settlement discussions were had with Apollo and as a result the Department reviewed the data and created a number of scatter charts for consideration of Department officials. Those draft scatter charts and the resulting data sets were appropriately logged in the Category 5 Privilege Log. The final August 2004 scatter charts and supporting data was produced to Apollo. See DOE APOL 0102-0137. Unlike the

April 11, 2004 review of the data, Ms. Wittman did not prepare a memorandum to accompany the August 2004 data sets and scatter charts.

In your letter, you also raise concerns regarding the Category 6 Privilege Log relative to the deposition transcripts. The "deposition transcripts" protected by the Department are appropriately protected by the attorney work product privilege since the statements were taken by Department attorneys and not the qui tam relator's counsel. In order to remedy the confusion regarding the transcripts, the Department will revise the Category 6 log to refer to the document as a confidential witness statement and not a deposition. The statements were taken by two Department attorneys prior to the August 2004 program review in order to glean specific information regarding the attorney's scope and plan for the program review. Therefore, the documents are distinguished as work product in comparison to the relator's statements to program investigators during the actual program review in August 2004 which were voluntarily released by the Department. Additionally, the emails protected in the Category 6 privilege log can be distinguished from email communications released because the emails include specific questions from the attorneys to the *qui tam* relators regarding which locations the Department should go to during the program review, what documents to review and the types of questions to ask.

Finally, in your letter you raise concerns regarding the witness statements withheld in full because information was "inextricably intertwined." The Department is willing to produce redacted versions of witness statements previously withheld in full under the Category 6 privilege log with the exception of the qui tam relator's confidential statements made to attorneys addressed in the paragraph above.

Per the Joint Agreement, the Department is in the process of reviewing and logging those documents that fit under "Category 2: Internal Department documents concerning the conduct of the program review other than documents contained in Category 1." The Department assures you that all documents have and will continue to be reviewed and logged including notes with Apollo representatives regarding the program review exit interview. In your May 4, 2007 letter, you state that the notes were not included in the Category 6 production.

In this specific instance, the Department had categorized these notes as documents concerning the conduct of the program review.  Therefore, the Department will make every effort to include these documents in the Category 2 privilege log as soon as possible.

Very truly yours,


Jeffrey Taylor
United States Attorney


/s/

By:    _____

Heather Graham-Oliver
Assistant United States Attorney


Cc:     Christine M. Rose (via email)

# EXHIBIT N

Case No. 06-MC-0558 (CKK)

INTERVIEW OF ████████



Russ Wolff and Jennifer Woodward conducted this interview with ████████ on ████████, in ████████ at ████████, ████████ current employer. ████████ has a ████ degree from the ████████ an ██ from ████████ and a ████ degree in computers from the ████████

She began working for UP on a part time basis in ████████ as a recruiter of students. At the time, she was working full time as a ████████ salesperson and UP could not offer her enough money to work for them on a full time basis. UP only offered her $24K per year. As a half time employee, UP paid her $12K per year, and ████ continued to work in ████████ sales. In ████████, UP offered to pay her $48K per year to be a ████████ manager, so she quit ████████ sales and became a full time employee at UP's ████████ campus. ████████ ████████ ████████ ████████ ████████, UP was paying her $86K as director ████ ████████ had grown to ████ locations; ████ had ████████ ████████ and ████ recruiters under her supervision.

When ████ first started working at UP, ████████ the ████████ corporate vice president since the late ████, told her that the amount of money she could earn was based on a simple and straightforward formula. UP evaluated its recruiters every six months and the number of students they enrolled determined the amount of salary they earned. In ████ UP did not cover this fact up. "Starts," however, was the constant in determining recruiter salaries the entire time ████ worked at UP. A "start" or an "enrollment" were UP's terms for students who enrolled and actually attended the first three classes. If a recruiter did not enroll enough students, UP fired him or her.

The very first performance "matrix, " UP's chart for recruiter compensation, ████ recalled contained a list of "activities;" i.e., steps in the recruitment process, such as making telephone calls to potential students, setting appointments with potential students, whether the appointee actually showed up for an interview, whether the interviewee actually enrolled and whether the enrollee actually "started." The matrix put together the activities and conversion rates—in other words, the number of students started was the measure of a recruiter's efficiency in conducting the previous steps in the recruitment process. ████ saw many different iterations of the matrix while employed at UP.

At some point [when??], she recalled ████████ from UP's corporate headquarters in Phoenix, Arizona, issuing a directive telling managers that UP could no longer directly put the number of starts/enrollments on the matrix because to compensate recruiters based only on starts was illegal. As a result, UP introduced "qualitative" factors onto the matrix. As another result, UP kept two files on recruiters; one was the "activity" file, which was kept at the local campus; the second was the Human

DOE APOL 0138

Resources/official personnel file, kept in headquarters in Phoenix. The "official" HR file contained only qualitative ratings. The quantitative data was kept in the activity file.

·During performance evaluations, ▉ would sit down with a recruiter and go over the recruiter's enrollment goals (number of telephone calls required to be made to prospective students, number of appointments required to be set with them, number of interviews required to be conducted out of the appointments set, number of enrollments required per given time period) and compare them to how the recruiter actually performed with respect to these goals. Enrollments were weighted more heavily than other steps in the recruitment process, because a recruiter could make 300 telephone calls, but if they weren't "converting" them to enrolled students, then the number of calls made wasn't important. The matrix was a tracking tool that she and the recruiters used on a weekly basis to track actual performance to goals. As always, the more students a recruiter enrolled, the more money he or she could earn.

▉ says the switch to including qualitative factors in a performance evaluation was difficult for many managers. Before, it was a straightforward, how many you enrolled equaled how much money you made. With the extra layer, apparently some managers sent evaluations that containing high ratings for a recruiter's ability to communicate well, when the recruiter was failing to meet his or her enrollment goals. The managers suggested a pay rise anyway, based on the fact that the recruiter "often or always exceeded expectations" in the manager's opinion in all of the qualitative categories. ▉ said that she herself would never have even considered sending an evaluation of an employee to corporate that wasn't based on the quantitative factors. "If it was based just on qualitative factors, without corresponding quantitative factors, I knew it would be rejected."

As a result of this confusion by some managers, ▉ came up with a "key"—a document that explained to directors of enrollment how properly to convert quantitative factors into qualitative factors. ▉ said that ▉ s administrative assistant, sent this document to all directors of enrollment via an email in ▉ or ▉. She recalled it being a 6 –7 page spreadsheet attachment to the email. It was a line-by-line reproduction of the qualitative factors off of UP's standard performance evaluation, the copy of which ▉ identified and is attached hereto, with a translation of how managers should equate these factors with a recruiter's quantitative enrollment numbers. For instance, ▉ said that ▉ key said that if a recruiter wasn't making enough telephone calls, the manager should check the "requires improvement" or the "unsatisfactory" box in the IV. 4. (IV. "Working Relationships" 4. "Establishes and promotes constructive working relationships") category.

Because the stated purpose of this document was to assist enrollment managers in properly filling out performance evaluations forms, ▉ as director of enrollment for ▉ gave the document to all of the enrollment managers she supervised and instructed them on how to use it. She assumed that other directors of enrollment across the country would have done the same thing.

DOE APOL 0139

Bill Brebaugh provided training meetings every six months for all directors of enrollment nationwide. There were approximately 25 directors of enrollment across the country when █████ left in ███████ She recalled the last meeting being in Houston in April 2001. Bill primarily conducted these meetings, but she remembers Todd Nelson speaking at them as well.

As a director of enrollment, █████ received a bonus every quarter. UP awarded these bonuses for several different reasons, such as, for starting a new program and for starting enough students to meet the campus' budgeted goal.

In addition, recruiters, enrollment managers and directors could qualify for an all expense paid week/five day trip to a fun location for himself or herself and a guest, which included air fare, meals, group activities, plus a per diem amount for personal entertainment expenses. What qualified a recruitment employee for these trips was getting the most starts at a campus. She recalled the trips as being to New Orleans, Bermuda, Seattle and Vancouver, Canada. UP hyped these trips constantly and used them to reward the top enrollment producers. UP stopped offering these trips as incentives in 1999 or 2000.

Recruiters could also receive Starbuck's gift certificates, movie tickets and lottery tickets (valued at $25 or under) if they started the most students in a given time frame, i.e., "rep of the week".

█████ said that she knows of two other former UP recruitment personnel who currently work for █████████████. The first is █████████, who works in the █████████████ the second works in █████████████ as the director of █████████ for one of █████████████ could not recall her name). This woman was an enrollment manager in one of UP's █████████████ campuses. These women may agree to speak with us and may recall/possess the key document explained above.

█████ resigned from UP in █████████████ The reason she cited was because she had recently been a student at UP and was appalled at the lack of quality of the educational programs. She raised a big fuss about this and got into a huge dispute with UP corporate. She left on very bitter terms when UP rebuffed her concerns. █████ believed that she could no longer in good conscience continue to market UP to students because of the lack of quality of the education. █████ signed a "do not disparage" agreement with UP and as a result insisted that the Department not use her name or reveal any factual information about her that might show her identity to UP. She fears that UP will retaliate against her despite the fact that everything she said to us she claims is true and not in any way a disparagement of UP. We assured her that we would keep her name and identity completely confidential.

3

DOE APOL 0140

**INTERVIEW WITH** ██████████████

August 19, 2003

████████████ was interviewed by Russ Wolff and Jennifer Woodward in

██████████ was hired at UP in ████████ as an Enrollment Counselor I by ████████ at UP's ████████ location at $33K per year.  His sole employment responsibility was to enroll students.  He was "forced" to resign ("worked out") by manager, ████████ in ████████  He claims that this was because he and ████ simply did not get along.  He claims that he was the senior recruiter-the recruiter with the most seniority at the ████ location.  During most of his tenure at UP, his manager was ████████ ████ has since been transferred to the ████ location of UP.  ████████████, his first manager now lives in ████████  She, too, was "squeezed out" of UP.

After being employed at UP for approximately ████ years, UP promoted ████████ to an Enrollment Counselor II.  Associated with this promotion was a salary increase.  His new salary was $60K per year.  The "bottom line" for this promotion and raise was enrollments.  ████████ said that ████████ pretended that the grounds for ████████ raise was how many phone calls made and how many appointments with potential students ████████ made, but that the true reason was because of how many students ████████ enrolled.

He had to work lots of overtime hours in order to enroll as many students as he did.  When he called UP's HR (human resources) department, they told him he was an exempt employee.  He does not understand why because he was not a manager and had no supervisory duties at UP.  He says he made a lot of money for UP and intends to pursue this issue of why UP failed to pay him overtime with a lawyer.

Upon being hired, he received from ████████████ a UP enrollment counselor employee manual dated ████████████, which he brought with him and showed to us.  He says he also received a matrix from ████████ ████████ that listed the number of outbound calls, number of appointments scheduled, the number of appointments seen, the number of referrals, the number of corporate info and the number of students enrolled, and then columns noting whether those numbers always met,

often met, or simply met expectations or whether those numbers required improvement or were unsatisfactory. He says that ███████ told him that if he enrolled enough students, his salary could double.

He received training at a SAW in Phoenix Arizona about two months after he was hired. This training consisted of a couple of days of intense sales technique training; theme was "put salt in the wound," i.e., make the potential student feel badly that he or she was not going back to school. He also received sales training at the ███████ campus. The recruiters learned there that enrollment counselors at UP are considered professional sales persons and that their jobs consisted of "purely sales."

He met Bill Brebaugh at these sales training sessions. Bill was a very good pep talker and public speaker with a lot of energy. His role is to motivate the enrollment department.

For the first 9 months, he had trouble enrolling enough students to qualify him for a raise, due to traditionally slow months (winter, holidays, etc.), but the number of students he enrolled picked up tremendously between January ████ and September ████. In September ████ he received a performance evaluation by ████. This consisted of a meeting with ████ in ███████ office. ████ told ████ that ████ was putting him in for a raise to $40K per year. ████ told ████ that he wanted $60K. ████ got angry because of this demand, but then came back and told ████ that he had "negotiated" for him to get ██████ a raise to $60K. ████ told him that when he discussed ████ s raise with Beverly Young, the person in Phoenix responsible for determining recruiter raises, the only thing she wanted to know was how many students did he enroll. ██████ recalled that he enrolled about 130 students in nine months.

██████ told ██████ and some of the newly hired recruiters that UP began calling the number of students enrolled (enrollments) on the matrix, "level one student info cards" in order to deceive the Department of Education. ("Technically, we can't call them enrollments").

He seemed to vaguely recall that ██████ also went through some "qualitative" factors such as communication, judgment, working relationships with ██████ at the time of his review, but that the bottom line issue that ██████ discussed was how many students he enrolled. ██████ said, "You got what you wanted," i.e., your $60K per year.

To celebrate ██████ promotion, ████ and ████ boss, ██████████ took him out to dinner at a very nice restaurant where they all had too much to drink-he went back to the office to "sleep it off."

Because ██████ enrolled so many students, he also won a trip to Tahoe for two with a nice hotel stay-this was called a Sperling trip and was based solely on how many students he enrolled in a quarter. He also recalls that there were some occasional contests for recruiters for who could enroll the most students in a given period of time. The winner would receive prizes such as a video camera.

Once ████ transferred to ██████, ████████████ became the manager. ████ was extremely difficult to work for and caused a number of people to become "stressed out." One recruiter actually became physically ill and gained a tremendous amount of weight as a result of the stress. ██████ says that ████ put far too much pressure on the recruiters to enroll students.

██████ has concerns about the quality of instructors at UP. He claims that UP will hire anybody to teach and that sometimes instructors' spouses show up to fill in.

INTERVIEW WITH ████████████

████████ was interviewed by Russ Wolff and Jennifer Woodward on ████████ at her home in ████████████

████████ has a ██ degree in ████████ from █████ She has been an ████████ at two other schools prior to working for UP. When she applied for the counselor position at UP's ████████ campus in about August ████ she actually thought she was responding to an ad for an ██████████████ Instead, the manager who interviewed her, ████████████ explained that the position was for student recruiting and convinced her to give the job a try. This interview was quite long—an hour and a half. ████████ explained to her how much money she could make based on how many students she enrolled and offered her $32K per year as a starting salary. ████████ gave her an Enrollment Counselor Policies Handbook, effective 12/2000, along with a matrix. ████████ signed for the Handbook, and ultimately didn't keep the matrix. By putting these two documents together (Handbook at 5-7), ████ told ████ she could tell the range of how much money she could make after her first 8 months at UP. ████████ never mentioned anything about other factors such as communication skills, judgment or work relationships as having a bearing upon her salary. ████████ referred to a student recruited as a "start," but told ████ not to call them starts, but rather "enrollments." At the time, ████████ thought this was because the term start was demeaning to a student.

████████ took the job, even though she did not want to be in sales and did not think she had the right personality to succeed. She was also attending ████████ pursuing her ████████████ at █████ She really liked her co-recruiters and she managed to perform very well during her first 8 months by enrolling a lot of students, about 112. ████████ promoted her to an Enrollment Counselor II position for which ████ received a salary increase from $32K to $73K per year. During her performance evaluation after her first 8 months, ████████ told her that she was going to ask ████████████ for a certain amount—she asked for $74,000—and then she subsequently found out that she received $73,000. ████████ further told her that if she did not continue to enroll the same number of students, her $73K per year would go right back down to $32K per year. She also told her that she would have added responsibilities with her new title of ECII that would include enrolling a greater number of students to go on to the next level (Sr. counselor) and to then earn even more money. Potentially, she would also have to train new counselors, but that never happened.

**DOE APOL 0144**

After receiving her performance evaluation based on the "numbers", she may have gone through a second separate, and brief, review to discuss the qualitative factors. However, her actual review was not based on these factors.

Each day, she and the other recruiters had to fill out a sheet that listed how many phone calls they made to potential students, how many appts. scheduled, how many appointments made and how many students enrolled for that day. ███████ kept these numbers on a white board also on a daily basis. Each morning in what was called OSIRA meetings, ██████ would meet with the recruiters and they would discuss their goals from the previous day and whether they had met them. ██████ would chastise them if they had failed and did not have a good reason why.

Each time one of the recruiters enrolled a student, they had to ring a bell to announce the enrollment!

In addition to the pay increase, ██████ and the others received other "incentives" to enroll students. These included the opportunity to win trips, known as "Sperling" trips and lottery tickets. In ██████, ██████ won a Sperling trip to Las Vegas for her and her husband, which included airfare and all expenses. There was only one event that she was required to attend during the trip and that was a dinner with awards and kudos given to winners—UP called the trip a "training," but in fact it was all pleasure.

She recalled another trip that was offered to the Napa valley. She thought it was odd because emails and other communications referred to the number of "grapes" a recruiter had to achieve in order to win this trip. They referred to "who was stomping the most grapes."

She attended SAW training in ██████ that consisted of a week of intense sales motivation training. She also provided us with some cassette tapes and a videotape she received for training purposes. The gist included, "if you want to make the money, here's what you have to do," "never take no for an answer." Truly sales mentality. Some of her potential recruits told her that they thought she sounded as if she was trying to "sell them." If a recruiter started to slump in the number of students enrolled, they were required to take further training.

Because of her ██████, ██████ left UP for a quarter in ██████. She felt that she could not handle the job demands and school at the same time any longer. She returned in ██████. In order to receive the same amount of pay, she had to write a letter (she gave us a copy) explaining why she deserved this

DOE APOL 0145

level of pay (quote from it).  ████████told her that the job was going to be more difficult.  Pressure had increased and if ████████ "didn't make her numbers, she'd be out."

She occasionally received emails from students who were happy with her, but she said that these did not play a part in her pay increase.  When asked about the qualitative factors, she had no recollection of ever having seen or anyone making reference to those factors.  She thinks that the level of her pay was based entirely on the number of students she recruited.

Beginning in August ████ the pressure on recruiters began to intensify to an uncomfortable level.  ████ and her boss, ████████ began to threaten to fire them if they didn't produce enough enrollments.  Previously, she knew that her salary could go down if she didn't enroll enough students, but now the very existence of her job was being threatened.  Previously, recruiters had to insure that students were "financially compliant," i.e., that they could actually pay for tuition (go through the financial aid office), but now they were told to even recruit students for classes that started that very evening.  "Enroll them now and we'll figure it out later."

████████ decided that this was just not where she wanted to be because there was too much pressure and it was just too degrading.  She is looking to pursue a ████████ ████ and at the end of ████████████, she resigned from UP.  She is currently employed.

3

**DOE APOL 0146**

# EXHIBIT O

Case No. 06-MC-0558 (CKK)

EXHIBIT NO. 301
11-3-06
NELSON
Vicki L. Champion, RPR

| | |
|---|---|
| **From:** | Cox, Douglas R. [DCox@gibsondunn.com] |
| **Sent:** | Tuesday, September 07, 2004 9:43 AM |
| **To:** | Todd Nelson (E-mail); Robert T. Collins (E-mail); Kenda B. Gonzales (E-mail); Hatch, Timothy J. |
| **Cc:** | sfreeman@ppsv.com; Vic Klatt (E-mail) |
| **Subject:** | FYI -- Executed Settlement Agreement |
| **Attachments:** | Settleme.pdf |



Settleme.pdf (170
KB)

          PRIVILEGED AND CONFIDENTIAL, ATTORNEY-CLIENT COMMUNICATION

     The executed settlement agreement.  Victoria Edwards has a new title.  Bob, I will
UPS the original to you.

===============================================================================

This message may contain confidential and privileged information.  If it has been sent to
you in error, please reply to advise the sender of the error and then immediately delete
this message.
===============================================================================

1

Confidential                                                      APOL 0440748

UNITED STATES DEPARTMENT OF EDUCATION

IN THE MATTER OF
THE UNIVERSITY OF PHOENIX

### SETTLEMENT AGREEMENT

The United States Department of Education (the "Department") and the University of
Phoenix Inc. and Western International University Inc. (together "UOP") enter into this
Settlement Agreement ("Agreement") for the purpose of resolving the Department's program
review regarding compliance by UOP with 20 U.S.C. §1094(a)(20) (the "statute") and 34 C.F.R.
§668.14(b)(22) (the "regulation") during the period from September 1, 1998 through June 30,
2004. To avoid the burdens and expenses of continuing the program review, and any other or
future Department proceedings or litigation that may arise from the program review, except as
referenced in paragraph I.E., and for other good and valuable consideration, the receipt and
sufficiency of which is acknowledged, the parties hereby agree to resolve the program review as
follows:

I.

A.    The Department reviewed UOP's methods of compensating recruiters of students
(the "methods") during the period from September 1, 1998 through February 29, 2004 and
UOP's implementation of the methods (the "implementation"), and the Department issued a
program review report, dated February 5, 2004. The program review report was one step in an
ongoing process designed to foster institutional compliance with the law. The program review
report explicitly invited and anticipated review and response by UOP. UOP provided the
Department with a response to the program review report, including statistical analyses
addressing and purporting to rebut the program review report's conclusions. UOP strongly
disputes the program review report's methodology and conclusions. This Agreement resolves all
issues raised in the program review report, and no final program review determination has been
or will be issued.

B.    This Agreement, and all negotiations relating to it, and any proceedings taken
hereunder, are not an admission or concession by either party of any liability, wrongdoing or
violation whatsoever. But to resolve the program review, and to avoid the cost of future
litigation, UOP agrees to pay the sum of $9,800,000 to the Department. UOP will make this
payment by sending a check made payable to the "U.S. Department of Education," within 15
calendar days of receiving a copy of this Agreement that has been fully executed by both parties,
to the following address:

> Office of the General Counsel
> U.S. Department of Education
> 400 Maryland Avenue, S.W.
> Room 6E300
> Washington, D.C. 20202

Confidential                                                              APOL 0440749

C.    The Department acknowledges that recently published revisions to the regulation clarify the scope and meaning of the statute. *See* Federal Student Aid Programs, 67 Fed. Reg. 67048, 67049 (Nov. 1, 2002) (codified at 34 C.F.R. § 668.14) (effective July 1, 2003) (amending § 668.14 "to clarify the statutory program participation agreement provision concerning incentive payment restrictions").

D.    This Agreement does not waive, compromise, restrict or settle any future actions against UOP by the Department pursuant to 34 C.F.R. Part 668, Subparts G and H for any alleged violation of the statute or the regulation that occurs outside of the time period covered by the program review. This Agreement also does not waive, compromise, restrict or settle any past, present or future actions by the Department pursuant to 34 C.F.R. Part 668, Subparts G and H that are unrelated to the program review.

E.    The Department does not have the authority to, and this Agreement does not, waive, compromise, restrict or settle any past, present or future violations by UOP, its trustees, officers or employees of the criminal laws of the United States or any action initiated against UOP, its trustees, officers or employees for civil fraud against the United States under 31 U.S.C. §§ 3729-33. Notwithstanding the preceding sentence, the Department warrants and acknowledges that it is not presently aware of any investigations, regulatory proceedings, or administrative or enforcement actions currently contemplated by, or pending before the Department or any other federal agency that relate to the methods or implementation.

F.    Subject to paragraphs I.D. and I.E. of this Agreement, the program review is hereby officially closed and the Department will not (i) undertake any further administrative investigation, audit, review, analysis, examination, inquiry, probe or proceeding whatsoever regarding the methods or the implementation during the period of September 1, 1998 through June 30, 2004; (ii) institute or pursue any other or future administrative action or proceeding against UOP with respect to, arising out of or in any way relating to the methods or the implementation during the period of September 1, 1998 through June 30, 2004; or (iii) impose on UOP any penalty, repayment liability, administrative fine or other sanction (including, without limitation, changing the method by which the institution requests, and the Department provides, federal student financial aid) with respect to, arising out of or in any way relating to the methods or the implementation during the period of September 1, 1998 through June 30, 2004. The Department acknowledges and agrees that this Agreement does not constitute a basis for: a) asserting that UOP lacks administrative capability or financial responsibility under 34 C.F.R. § 668.15, 34 C.F.R. § 668.16, or 34 C.F.R. Part 668, Subpart L; or b) placing or maintaining UOP under a provisional form of Title IV Program Participation Agreement.

II.

A.    Each party agrees to pay its own costs with regard to the program review and settlement.

Confidential                                                                                          APOL 0440750

B.    UOP and the Department each warrant and represent that its undersigned representative is authorized to sign this Agreement on its behalf and bind that party to all of the terms and provisions herein.

C.    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings between counsel for the parties, and the parties themselves, with respect to the matters provided for herein. Any amendment to this Agreement must be in writing and signed by the parties to this Agreement or their successors.

D.    Each of the parties participated and cooperated in the drafting and preparation of this Agreement. Accordingly, the parties agree that neither this Agreement nor its terms should be construed against either of the parties by reason of its lack of participation in the drafting or preparation of the Agreement.

UOP and the Department have each read this Agreement, understand the terms and provisions herein and cause this Agreement to be executed by its duly authorized representative.


DATED: _____9/3_____, 2004

_____
Todd S. Nelson
Chairman and Chief Executive Officer
Apollo Group, Inc.


DATED: _____9/7_____, 2004

_____
Victoria Edwards
~~Acting Director~~ General Manager
~~Case Management & Oversight~~ School Eligibility
Federal Student Aid                                         Channel
United States Department of Education


Page 3 of 3

Confidential                                         APOL 0440751

# EXHIBIT P-1

Case No. 06-MC-0558 (CKK)

Page 1 of 1

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Thursday, August 14, 2003 12:45 PM |
| **To:** | Woodward, Jennifer |
| **Subject:** | RE: U.S. ex rel. Hendow et al. v. U of P |

Hi

Donna can reach Mike at my home office ██████████ this morning anytime before 10:45 a.m. CA time -- then Mike has a meeting to attend. I am happy to talk with Donna about the items to recover.

O

Nancy

At 11:53 AM 8/14/2003 -0400, you wrote:

Here is the review document:

Also, I was just thinking that perhaps you DO need to be on the call with Mike and Donna—or perhaps Mary/Julie—because they can explain what it is that we will be looking for (neither Mike nor Donna is going to know).

DOE APOL 0857

Page 1 of 2

## Rose, Christine

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Thursday, August 14, 2003 2:52 PM |
| **To:** | Woodward, Jennifer |
| **Subject:** | RE: U.S. ex rel. Hendow et al. v. U of P |

Hi

I'm running out the door. I think it would be good for Donna and me to talk about the documents we believe are online and in e-mail, and then she can have a more intelligent discussion with Mike about how to obtain those documents. Donna can try to reach me any time after 12:45 p.m.CA time on my cell phone today (I'll be at my folks house; hopefully they can entertain Skyler while Donna and I chat). Then, she could chat with Mike after that or tomorrow? Or, Donna can reach both me and Mike tomorrow, around 9 a.m. CA time at my home office -- ▮▮▮▮▮▮▮▮

Thanks

Nancy

650/740-3326.At 01:42 PM 8/14/2003 -0400, you wrote:

> Just got back from my meeting. Is there any OTHER time that Donna can contact Mike since it is now after 10:45 in CA?

>> -----Original Message-----
>> From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
>> Sent: Thursday, August 14, 2003 12:45 PM
>> To: Woodward, Jennifer
>> Subject: RE: U.S. ex rel. Hendow et al. v. U of P

>> Hi

>> Donna can reach Mike at my home office ▮▮▮▮▮▮▮▮this morning anytime before 10:45 a.m. CA time -- then Mike has a meeting to attend. I am happy to talk with Donna about the items to recover.

>> O

>> Nancy

>> At 11:53 AM 8/14/2003 -0400, you wrote:

>>> Here is the review document:

>>> Also, I was just thinking that perhaps you DO need to be on the call with Mike and Donna--or perhaps Mary/Julie--because they can explain what it is that we will be looking for (neither Mike nor Donna is going to know).

**DOE APOL 0858**

Page 2 of 2

DOE APOL 0859

Page 1 of 1

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, August 14, 2003 8:11 PM |
| **To:** | JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | UOP: 9th Circuit case on imposition of FCA treble damages & per-incident fines |

Jennifer and Russ

F.Y.I.:

http://caselaw.lp.findlaw.com/data2/circs/9th/0216778p.pdf

*U.S. v. Mackby*, upholding trebles and $5000 per claim fines on 111 false claims.

Regardless of how any assessment of fines and penalties against the University of Phoenix may ultimately be labeled, reference to this case could be very helpful incident to negotiating/justifying payment of a substantial sum.

Dan Bartley

cc Nancy Krop

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0860

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 15, 2003 11:54 AM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | ███████████ ████████████ DanielBartleyLaw@aol.com |
| **Subject:** | Julie's feedback |

Hi Jennifer, Russ:

Comments from Julie:

Not every counselor will have been given a copy of his/her matrix. UOP has gotten very savvy in just showing counselors what they have to do but not giving them out readily. I can bring a copy of each matrix. My recommendation is that each team has a copy of the matrix and asks the counselors what it is. They have all seen one but many will not have copies of one. She definitely should ask (for copies of their matrix) though because you never know who keeps what.

I know for a fact that ██████████ has copies of her reviews, matrixes etc. She would definitely be willing to share with the DOE. She is an ex-employee. I have already forwarded her contact information.

Thanks

Nancy

1

DOE APOL 0861

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 15, 2003 5:43 PM |
| **To:** | Woodward, Jennifer |
| **Subject:** | Re: Help |

Here you go!:

██████████ returns from ██████ Friday, August 15th. She works for the ██████████ and is off work right now. Now would be a perfect opportunity for them to contact her. She would be more than happy to fill them in on details. I also know that she too has copies of matrixes, reviews and other documentation that she would gladly turn over if Jennifer and Russ just ask. Her home number is ████ ██████████ Cell phone number is ██████████

At 04:51 PM 8/15/2003 -0400, you wrote:

Nancy, I am trying to find the email with former recruiter ██████████ phone number and haven't succeeded- might you have it handy?  Thanks so much.

4/26/2007

DOE APOL 0862

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Sunday, August 17, 2003 9:09 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | ██████████████████ ; ██████████ DanielBartleyLaw@aol.com |
| **Subject:** | more witness information |

hi folks –

mary has the following information for you.  thanks.  nancy:

████████████ will know how to reach ████████████████ is a former employee who worked in
SF as an admissions counselor and then in ███████ as an ████ ██████████. I believe she now lives in
████████████████ but is in contact with ████████
He may also have contact information for another former manager, ██████████████████████ was at
one time ████████████████ She now lives in ████████ but has family is ████████████
If Jennifer is able to reach ██████████████ he will be able to help her reach another former employee,
████████████ who was the ████████████ campus when he resigned. ████████████████████
will have contact numbers for former employees, as well, if he cooperates.

DOE APOL 0863

## Rose, Christine

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, August 19, 2003 12:03 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Interviewing recruiters |

Hi

I left messages on the cell and at the hotel, and thought I'd e-mail as well. Mary says her manager Ann Tye directed everyone to answer DOE questions, but not to volunteer any information.

Mary says her co-workers are asking her whether they should volunteer to tell the DOE the management comments they've heard about trying to deceive the DOE (in particular, the "flying under the radar" comments). Mary's told them to tell the DOE whatever they know. But Mary is thinking that it would be good for the DOE interviewers to specifically ask the recruiters if they have heard anyone at UOP make comments about trying to deceive the DOE, such as the flying under the radar comment. Recruiter ███████ brought up the issue to Mary.

Thanks

Nancy

1

DOE APOL 0864

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, August 19, 2003 6:26 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com; ▬▬▬▬▬▬ ▬▬▬▬▬▬ |
| **Subject:** | More witnesses |

Hi

Mary and Julie know a couple more former employees they believe may be good folks for your team to interview:

1. ▬▬▬▬▬▬▬▬▬▬▬ from San Jose.

2. ▬▬▬▬▬ former employee of the Sacramento campus

They will forward to me the contact information for those two witnesses.

Thanks.

Nancy

DOE APOL 0865

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, August 19, 2003 6:34 PM |
| **To:** | Russell.Wolff@ed.gov; Jennifer.Woodward@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com; ████████████████████ |
| **Subject:** | Current Employee Interviews |

Hi Russ. Jennifer

More information for you from Julie and Mary:

Per Julie: ████████████████████████████████████████████
████████████████████████████████████████████████████████████

Per Mary:  at the 9 a.m. meeting with her manager Ann Tye, Ann said to
answer the DOE questions honestly.  Ann also said that nobody has to give
the DOE their reviews. Ann said if she's asked, she'll just give the DOE a
blank form.  San Jose counselors are telling Mary they are VERY nervous
about losing their jobs if they tell the DOE the truth.  So we'll see what
they do in their interviews.

Mary does not know why anyone is saying documents are at Fresno.  Fresno is
the financial aid center for NorCal.
The Sperling criteria for enrollment counselors is starts only, now and
before.  Sperling contests were just for enrollment until the year 2000.

That's all for now!

Nancy

1

DOE APOL 0866

## Rose, Christine

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, August 19, 2003 11:43 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Subject:** | Fwd: RE: More witnesses |

Russ, Jennifer -- FYI, more witness contact information from Mary below.  Thanks. Nancy

> From: "Mary Hendow" < ██████████████
> Cc: "Mary Hendow" < ██████████████
>     "Julie Albertson" < ████████████,
>     "Dan Bartley" <Danielbartleylaw@aol.com>,
>     "Nancy Krop" <nkrop@kroplaw.com>
> Subject: RE: More witnesses
> Date: Tue, 19 Aug 2003 19:37:44 -0700
> X-Mailer: Microsoft Outlook IMO, Build 9.0.2416 (9.0.2911.0)
> Importance: High
> To:nkrop@kroplaw.com
> X-Loop-Detect:1



██████████████ Worked for Heather Cornell when Heather was DOE at NorCal.  May also have been a counselor at one time.

██████████████ worked at San Jose and San Francisco. Left due to low enrollments.

████████████

██████████████ worked at the Pleasanton campus, was a top enrollment counselor. ██████████████ resigned.

████████████

DOE APOL 0867

███████(will return from ██████September)  cell: ████████
home: ███████████

████████████████ enrollment counselor  Pleasanton campus, worked
for Cheryle Bough.

There are others that Julie will send in the morning

-----Original Message-----
**From:** Nancy G. Krop [mailto:nkrop@kroplaw.com]
**Sent:** Tuesday, August 19, 2003 3:26 PM
**To:** Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Cc:** DanielBartleyLaw@aol.com; █████████████  ███████████████
**Subject:** More witnesses

Hi

Mary and Julie know a couple more former employees they believe may be good folks for
your team to interview:

1. ████████████  ██████████████████from San Jose.

2. ██████████████former employee of the Sacramento campus

They will forward to me the contact information for those two witnesses.

Thanks.

Nancy

**DOE APOL 0868**

**Rose, Christine**

| | |
|---|---|
| From: | Nancy G. Krop [nkrop@kroplaw.com] |
| Sent: | Wednesday, August 20, 2003 11:56 AM |
| To: | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| Cc: | DanielBartleyLaw@aol.com; ████████████████ ████████ |
| Subject: | Urgent: Concerns re Current Interviews |

Hi Russ, Jennifer

Wanted to pass on to you feedback from Julie and Mary about the employee interviews.

1. Oakland. ███████████ (a counselor who is ready to talk with the DOE, give the DOE her documents and is very upset that her manager wants her to lie to the DOE) was asked to attend a meeting ████ morning from ████████. She is very open to speaking with the DOE as is her co-worker ████████ They are however nervous that they can get fired for telling the truth. ████ and ████████ will both need assurances of confidentiality from the DOE interviewer.

2. San Francisco. Julie had two separate conversations with SF reps. Here is her information:

"One was ████████ who told me that the interviewer asked him questions about winning DVD players etc. He told them no. He has never won because he never enrolled enough students to. He also said that they were asking him questions about being paid on enrollment and was vague and did not answer. When I asked ████ but ████ we are paid based on enrollment" he answered, "well yeah I know that". ████ also laughed and said, "Yeah when they met with ████████ she tried to enroll him" and laughed.

Also spoke with ████████ this evening. He told me that they were in a meeting this morning laughing about the DOE and the interviewer. Some one asked, wanna know how you get the interviewer out of your office fast?, the new guy ████ stated, "yeah fart". The San Francisco team is laughing in the face of the DOE and Mike McKay the manager is joining in with them. I was absolutely disgusted with them. ████ also said, well UOP is clean as a whistle they don't pay us on commission. ████ feels because he is salaried he is not paid on commission. He readily admits that in order to get a raise he has to hit his numbers. ████████ has heard ████ say on many occasions that I am making nothing now, I need to enroll so I can get a raise."

Mary had the following to add:

"████ was at our campus today, he met with DOE in SF. He was joking about his meeting with other counselors in SJ. It sounds like one of the questions is "did you ever win a DVD player?" most counselors could truthfully answer "no" to that question. All were eligible for the contest, however."

My suggestions for the interviewers: don't only ask the counselors if they ever won anything. More critical is whether they ever participated in a contest to win anything; what were the contest requirements; who won the contest, do they have documents regarding these contests, etc. Also, rather than just open ended questions, I suggest that the interviewers directly ask the counselors if their enrollment numbers impact their compensation. Can they increase their compensation through their enrollment activities. If so, explain.

3. San Jose

1

Mary reported that counselors are very nervous about their jobs -- that their jobs will be in jeopardy if they tell the truth to the DOE. As much as your interviewer can assure them confidentiality would be extremely helpful in getting the truth from the counselors.

4.    Friendly Witnesses.

Mary received feedback that a friendly witness felt very intimidated by Russ. We need these folks to feel comfortable coming forward so please address that situation as you can.

Thanks.

Nancy

2

DOE APOL 0870

**Rose, Christine**

| | |
|---|---|
| From: | Nancy G. Krop [nkrop@kroplaw.com] |
| Sent: | Wednesday, August 20, 2003 12:05 PM |
| To: | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| Cc: | ███████████, ████████████████ DanielBartleyLaw@aol.com |
| Subject: | More interviewing information |

Hi Russ, Jennifer

More information for the interviewers:

New counselors have a 15 week evaluation.  The San Jose manager may try to
hide that information from the interviewer.

The San Jose manager Ann advised the counselors to "answer only what we
were asked, nothing more...don't offer information". So, the interviewer is
going to have to ask very direct questions, not just open ended questions
hoping for information.

Thanks

Nancy

1

DOE APOL 0871

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Wednesday, August 20, 2003 1:01 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Another Former Employee |

Hi

Julie, Mary thought you could try to reach another former employee for a telephone interview:

▉▉▉▉▉▉ ▉▉▉▉▉▉ (▉▉▉▉▉▉). He was a counselor and manager at the ▉▉▉ campus. He worked for several years with UOP.

Thanks

Nancy

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Wednesday, August 20, 2003 7:29 PM |
| **To:** | DanielBartleyLaw@aol.com; Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Subject:** | Update from Client: Pressure from Management, and more |

Hi

Here's the update today from Julie:

San Mateo/San Francisco:
   Julie's manager Mike tried to coach Julie how to answer the DOE questions. Mike told her that the DOE is asking about Sperling trips, and whether they are paid based on enrollment. Julie told Mike she is paid based on enrollment. Mike got very angry with her, told her not to say that. Mike told Julie to tell the DOE her performance reviews are with H.R. Julie said no, I'll tell the DOE I have copies of my reviews. Mike was furious. Mike said that when he was asked about Sperling contests, he simply said he'd never won one.
   Mike directed Julie to speak to ████████.
   ████ is up for a promotion. ████ bragged to Julie, "I played Ronald Reagan --I could not recall a thing." ████ told Julie, "hey UOP might get a slap on the hand for all their illegal activities, but UOP is too large and can buy their way out of anything."
   After her interview, Mike asked Julie what she told the DOE. Mike got real angry when Julie said she told them the truth and it was none of his business.

████████
   Manager Laura told ████ to take the day off today when ████ tried to return to work today. ████ said she wants to talk to the DOE and she's very angry that Laura is trying to keep her from the DOE.

That's it for now.

Nancy

DOE APOL 0873

4/24/2007

## Rose, Christine

**From:** DanielBartleyLaw@aol.com
**Sent:** Wednesday, August 20, 2003 8:59 PM
**To:** nkrop@kroplaw.com
**Cc:** Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Subject:** Re: Update from Client: Pressure from Management, and more

Nancy

My, some these UoP managers certainly are intrepid, cavalier, and obnoxious.

Like a snake writhing under a boot.

Dan

cc Jennifer and Russ

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0874

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Thursday, August 21, 2003 12:27 AM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Another current employee witness |

Hi Jennifer, Russ

Julie suggests your team speak with a current employee, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"We also had a conversation with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ for ▮▮ today. ▮▮▮▮ was on the phone with her prior to Martina coming out nervous about what he would say and losing his job. He asked ▮▮▮▮▮ if she heard what was going on and if she has spoken with the DOE yet. He told me that she stated "No way, I am staying out of the office. If they talk to me I will have to tell the truth. I am not lying for this company." She then came into our campus later that evening and reiterated to me the same thing she said to ▮▮▮▮ She said, " I have been here too long and know too much. I would not lie to the DOE." She will not be in the office at all tomorrow and only stopping in very briefly Friday am.

Nancy

1

DOE APOL 0875

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Thursday, August 21, 2003 12:32 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Subject:** | DOE Interviewers |

Hi Jennifer, Russ

Please pass on to Shane that both of  the relators are very pleased with
the interviewers and the job that they are doing.  Please give our
apologies to Shane for any hurt feelings.

Thanks
Nancy

1

DOE APOL 0876

## Rose, Christine

**From:** DanielBartleyLaw@aol.com
**Sent:** Thursday, August 21, 2003 1:51 PM
**To:** Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Cc:** nkrop@kroplaw.com
**Subject:** Re: Another current employee witness

In a message dated 8/21/2003 10:41:16 AM Pacific Daylight Time, Jennifer.Woodward@ed.gov writes:

Sounds as if we aren't going to be able to speak with her, if she's never going to be there, so this isn't very useful information.

-----Original Message-----
From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
Sent: Thursday, August 21, 2003 12:27 AM
To: Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
Cc: DanielBartleyLaw@aol.com
Subject: Another current employee witness

Hi Jennifer, Russ

Julie suggests your team speak with a current employee, ███████
████████████████████

"We also had a conversation with███████████, The ███████████
███████for███today.███was on the phone with her prior to Martina coming out nervous about what he would say and losing his job. He asked Clarissa if she heard what was going on and if she has spoken with the DOE yet. He told me that she stated "No way, I am staying out of the office. If they talk to me I will have to tell the truth. I am not lying for this company." She then came into our campus later that evening and reiterated to me the same thing she said to ████. She said, " I have been here too long and know too much. I would not lie to the DOE." She will not be in the office at all tomorrow and only stopping in very briefly Friday am.

Nancy

Jennifer and Russ

I am e-mailing Relators right now to ask whether they can ascertain and supply ████████home address or telephone number.

Dan

cc Nancy

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
**Mail Address:** Post Office Box 686, Novato, CA 94948 0686
**Street Address:** 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message

**DOE APOL 0877**

is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0878

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Thursday, August 21, 2003 1:38 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com; mbjaboards@worldnet.att.net; maryroseh@earthlink.net |
| **Subject:** | Information from Clients re the Renegade Managers! |

Hi Russ, Jennifer

Julie believes we have the paper trail to expose any claim by UOP that errant managers are setting salaries (I haven't spoken yet with Mary about this claim). Julie believes we have the paper trail that salaries are set/approved by corporate enrollment.

When the DOE completes interviewing the top Phoenix officials, we would appreciate it if you could share with us all their claims so that Julie/Mary can provide the rebuttal documentary and/or witness evidence. The evidence will show that it is not errant managers acting without corporate knowledge, but rather these managers following corporate enrollment direction, and now taking the fall for their corporate loyalty.

Thanks

Nancy

1

DOE APOL 0879

## Rose, Christine

**From:** DanielBartleyLaw@aol.com
**Sent:** Thursday, August 21, 2003 1:48 PM
**To:** JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Cc:** nkrop@kroplaw.com
**Subject:** Re: Urgent: Concerns re Current Interviews

In a message dated 8/21/2003 10:03:46 AM Pacific Daylight Time, nkrop@kroplaw.com writes:

> From: "Dunne, Shane" <Shane.Dunne@ed.gov>
> To: "Woodward, Jennifer" <Jennifer.Woodward@ed.gov>, "Wittman, Donna"
>     <Donna.Wittman@ed.gov>, "Crim, Susan" <Susan.Crim@ed.gov>,
>     "Fernandez-Rosario, Martina" <Martina.Fernandez-Rosario@ed.gov>
> Cc: "Wolff, Russell" <Russell.Wolff@ed.gov>, "'nkrop@kroplaw.com'"
>     <nkrop@kroplaw.com>
> Subject: RE: Urgent: Concerns re Current Interviews
> Date: Thu, 21 Aug 2003 01:30:21 -0400
> X-Mailer: Internet Mail Service (5.5.2655.55)
> X-Loop-Detect:1
>
> Couple more comments:
>
> I never interviewed ▓▓▓▓▓▓▓
>
> Also, ▓▓▓▓▓ and I never engaged in any enrollment activity. I was introduced to her by ▓▓▓▓▓▓.
> In fact, this exchange was poignant enough because I had to ask ▓▓▓▓▓ to leave after the
> introduction (when she attempted to sit in on the interview). There was a few moments awkward
> moments where ▓▓▓▓▓ had to call someone to give me permission to interview ▓▓▓▓▓ There was
> no ambiguity in ▓▓▓▓▓ mind as to who I was and why I was there.
>
> Jennifer, I think it might be better to not share the relators thoughts and criticisms about our interviewing
> techniques. This has been really demoralizing to read and just not productive.
>
> Thanks

Jennifer and Russ

Notwithstanding the fact that any reasonable person would take personal offense at the snide, crude, and terribly insulting remarks made by UoP managers, one must consider the source. Relators hope you and Russ can convince the investigators that, notwithstanding the terribly offensive content of this information, the information is helpful to your investigative process and very revealing about how some of the UoP managers are being very cavalier, obstructive and contemptuous in their effort to conceal from the investigators evidence of unlawful conduct.

Dan

cc Nancy

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If

**DOE APOL 0880**

Page 2 of 2

you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies
you may have made of this message. Thank you.

Page 1 of 1

**Rose, Christine**

From: Nancy G. Krop [nkrop@kroplaw.com]
Sent: Thursday, August 21, 2003 1:55 PM
To: Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
Cc: DanielBartleyLaw@aol.com

hi Jennifer, Russ

More Information from Julie about the deception of her manager Mike McKay:

Mike advised me that when asked by the interviewer about Sperling trips, he just said " I have never been on a Sperling trip as a manager." I told him that all my Sperling trips had been based on starts. He said "me too but I just said that to avoid telling them and I hid all my Sperling plaques that were in my office prior to him coming."

More information from Julie about compensation is based on the numbers, and keeping Daniel Waterman in the loop:

After I met with their reviewer, Mike asked me what I said to them so he could go back and report to Daniel. I told him that I was not comfortable telling him that so he can just go back and report it to Daniel. He didn't care too much for that answer. While the interviewer was talking with Sean, Mike and I were having a conversation regarding my maternity leave. I have always told him that I will be taking full advantage of the time allowed to me. He was always under the impression that was only 3 months. After telling him, depending on my financial situation, I anticipate between 3-6 months time off. He was shocked and said, "You know you might want to reconsider that because the new matrix is coming out and your salary will go up and down again." I asked him why my salary would be decreased, " well because you won't have any numbers for six months." I told him that I didn't think they could do that and he told me, "well you better look into it if you don't want to reduce your salary."

Nancy

**DOE APOL 0882**

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 22, 2003 11:22 AM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Fwd: RE: Another current employee witness |

Please see information below re ▮▮▮▮▮ in case an interviewer has an opportunity to speak with her. Thanks.

> From: "Mary Hendow" <▮▮▮▮▮▮▮▮▮▮▮▮>
> To: "Nancy G. Krop" <nkrop@kroplaw.com>
> Subject: RE: Another current employee witness
> Date: Thu, 21 Aug 2003 17:35:50 -0700
> X-Mailer: Microsoft Outlook IMO, Build 9.0.2416 (9.0.2911.0)
> Importance: Normal
> X-Loop-Detect:1
>
> ▮▮▮▮▮ was an enrollment counselor in ▮▮ Then an ▮▮▮▮▮▮▮▮ in ▮▮ She left UOP shortly after ▮▮▮▮▮▮▮▮▮ She returned in ▮▮▮▮ as an Admission Counselor in ▮ and then transferred to ▮ She left to work for ▮▮▮▮▮▮ and then returned to UOP as a ▮▮▮▮▮▮▮▮ about a year ago. She should know about compensation.

-----Original Message-----
**From:** Nancy G. Krop [mailto:nkrop@kroplaw.com]
**Sent:** Thursday, August 21, 2003 11:21 AM
**To:** Woodward, Jennifer; Russell.Wolff@ed.gov
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DanielBartleyLaw@aol.com
**Subject:** RE: Another current employee witness

Jennifer, Russ,

I'm hoping that one of the San Francisco interviewers would be willing to speak with ▮▮▮▮▮ after this week. Particularly since she says she knows so much that she is willing to share with the DOE.

Thanks
Nancy

At 01:38 PM 8/21/2003 -0400, you wrote:

Sounds as if we aren't going to be able to speak with her, if she's never going to be there, so this isn't very useful information.

-----Original Message-----

4/24/2007

From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
Sent: Thursday, August 21, 2003 12:27 AM
To: Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
Cc: DanielBartleyLaw@aol.com
Subject: Another current employee witness

Hi Jennifer, Russ

Julie suggests your team speak with a current employee, ███████████████
████████████████████████

"We also had a conversation with████████████████████████████████████
██████████for██today.█████was on the phone with her prior to Martina
coming out nervous about what he would say and losing his job. He asked
████████if she heard what was going on and if she has spoken with the DOE
yet. He told me that she stated "No way, I am staying out of the office. If
they talk to me I will have to tell the truth. I am not lying for this
company." She then came into our campus later that evening and reiterated
to me the same thing she said to ████ She said, " I have been here too
long and know too much. I would not lie to the DOE." She will not be in the
office at all tomorrow and only stopping in very briefly Friday am.

Nancy

DOE APOL 0884

Page 1 of 1

**Rose, Christine**

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Friday, August 22, 2003 11:42 AM |
| **To:** | Russell.Wolff@ed.gov; JENNIFER.WOODWARD@ED.GOV |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Fwd: FW: Can you get home telephone/address for ▮▮▮▮▮▮▮ |

DOE APOL 0885

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | Mary Hendow [maryroseh@earthlink.net] |
| **Sent:** | Thursday, August 21, 2003 8:46 PM |
| **To:** | Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop |
| **Subject:** | FW: Can you get home telephone/address for ██████████ |

Sure.  Her number is ██████████

-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Thursday, August 21, 2003 10:54 AM
**To:** ██████████████████████████
**Cc:** nkrop@kroplaw.com
**Subject:** Can you get home telephone/address for Clarissa Falen?

Mary and Julie

Can either of you get the home address and/or telephone number of ██████████████ in order that the DOE investigators may have the option of contacting her there?

Dan

cc  Nancy

PS  I'm still in Oregon, but simply checking my e-mail this morning before leaving for a day out with the family. Will have my cell phone ██████████████ on, but reception is spotty due to the mountains.

Tel ██████████ Room 323  (til checkout tomorrow late morning)

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

DOE APOL 0886

4/24/2007

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

**DOE APOL 0887**

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, August 21, 2003 1:51 PM |
| **To:** | Woodward, Jennifer; Wolff, Russell |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Re: Another current employee witness |

In a message dated 8/21/2003 10:41:16 AM Pacific Daylight Time, Jennifer.Woodward@ed.gov writes:

> Sounds as if we aren't going to be able to speak with her, if she's never going to be there, so this isn't very useful information.
>
> -----Original Message-----
> From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
> Sent: Thursday, August 21, 2003 12:27 AM
> To: Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
> Cc: DanielBartleyLaw@aol.com
> Subject: Another current employee witness
>
>
> Hi Jennifer, Russ
>
> Julie suggests your team speak with a current employee, ▮▮▮▮▮▮▮▮▮, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>
> "We also had a conversation with ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ for ▮▮ today. ▮▮▮▮ was on the phone with her prior to Martina coming out nervous about what he would say and losing his job. He asked ▮▮▮▮▮▮ if she heard what was going on and if she has spoken with the DOE yet. He told me that she stated "No way, I am staying out of the office. If they talk to me I will have to tell the truth. I am not lying for this company." She then came into our campus later that evening and reiterated to me the same thing she said to ▮▮▮▮ She said, " I have been here too long and know too much. I would not lie to the DOE." She will not be in the office at all tomorrow and only stopping in very briefly Friday am.
>
> Nancy

Jennifer and Russ

I am e-mailing Relators right now to ask whether they can ascertain and supply ▮▮▮▮▮▮▮▮▮▮ home address or telephone number.

Dan

cc Nancy

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message

**DOE APOL 0888**

is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0889

4/24/2007

Page 1 of 1

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 22, 2003 11:26 AM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Witness ▓▓▓▓▓ |

Hi

Mary relayed this information:

I spoke with ▓▓▓▓ again today, she assured me she would call Jennifer. She has been very, very busy with personal matters and is still new at the company where she works....

DOE APOL 0890

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Monday, August 25, 2003 1:02 PM |
| **To:** | Jennifer.Woodward@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Investigation Status |

Hi Jennifer

When would be a good time for us to touch base about the status of the DOE
investigation?  Good times for me to chat are around 9 a.m. CA time on
Tuesday or Thursday this week (Dan, do those times work for you?)

Thanks

Nancy

DOE APOL 0891

1

**Rose, Christine**

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Monday, August 25, 2003 2:26 PM |
| **To:** | Jennifer.Woodward@ed.gov; nkrop@kroplaw.com |
| **Cc:** | Russell.Wolff@ed.gov |
| **Subject:** | Re: Investigation Status |

In a message dated 8/25/2003 10:17:59 AM Pacific Daylight Time, Jennifer.Woodward@ed.gov writes:

> We need time to sort everything out, plus obviously we have other cases to deal with this week.  We will let you know ASAP, though, but tomorrow is definitely out.

OK

Dan

**DOE APOL 0892**

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 22, 2003 12:14 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | More information |

Hi

Bob Barker (UOP Pres., in Phoeniex), Diane Pusche (Regional VP, in Fountain Valley, CA), and 2 men were in the San Jose campus parking lot yesterday.  Someone else reported they thought they saw Diane Thompson (H.R. Director, Phoenix) there as well.  Speculation was these people were all headed to Pleasanton to destroy the documents that "do not exist" at Pleasanton.

Will be interesting to see if anyone will share with the DOE the purpose of these folks flying in from Phoenix and Fountain Valley.

Nancy

DOE APOL 0893

## Rose, Christine

| | |
|---|---|
| **From:** | Woodward, Jennifer |
| **Sent:** | Tuesday, August 26, 2003 2:56 PM |
| **To:** | Crim, Susan; Wittman, Donna; Dunne, Shane; Fernandez-Rosario, Martina; Castress, Jim |
| **Cc:** | Wolff, Russell |
| **Subject:** | FW: Developments in UoP Case |

Here are the points from relators' counsel, as previously summarized by Russ' earlier email:

-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Tuesday, August 26, 2003 2:46 PM
**To:** JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Cc:** nkrop@kroplaw.com
**Subject:** Developments in UoP Case

Jennifer and Russ

For your convenience, this e-mail is a summary for you of the following information I conveyed to each of you today via voice mail messages:

• Relators assert that President of Apollo Group has issued a voice mail announcement to all UoP employees telling them the Department of Education investigation is over and, in so many words, that there is nothing to be concerned about.

• The documents shredding service yesterday was busy engaging in a special shredding appearance, above and beyond their regularly scheduled visits.

• Julie Albertson relates that ████████████████ is "very eager" and "very interested" ins peaking to your. ████████████asked that we convey her cell phone number to the Department of Education in order that your interviewers may contact her at their earliest opportunity. ████████████cell number is ███████████

• I today faxed to Assistant United States Attorney Michael Hirst a copy of the First Amended Complaint, and asked him to confirm that he has no objection to it being filed not under seal. I also faxed to him a copy of my latest version of my draft courtesy letter to UoP and Apollo Group house counsel.

• Nancy and I plan on serving the summons, Complaint, First Amended Complaint, and related papers upon UoP's process agent, CT Corporation Systems, in Los Angeles this coming Friday, August 29. On the same day, we plan on faxing to UoP and Apollo Group house counsel my courtesy letter and a copy of the Second Amended Complaint.

Dan Bartley

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Mail Address:** Post Office Box 686, Novato, CA 94948 0686
**Street Address:** 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
**Tel 415 898 4741 Fax 415 898 4841**

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0894

Remembered something                                                      Page 1 of 1

# Rose, Christine

**From:** Fernandez-Rosario, Martina
**Sent:** Tuesday, August 26, 2003 5:07 PM
**To:** Wittman, Donna; Dunne, Shane; Woodward, Jennifer; Wolff, Russell; Crim, Susan
**Subject:** FW: Remembered something

More confirmation of the importance of the number of enrollments.

-----Original Message-----
**From:** ███████████ [mailto:███████████
**Sent:** Monday, August 25, 2003 10:10 AM
**To:** 'Martina.Fernandez-Rosario@ed.gov'
**Subject:** Remembered something

I hope this finds you doing well this Monday!!

I answered a question incorrectly on ███████during our interview.  As I thought about the many questions that were asked, I realized that I had indeed been told by a manager to "do whatever it takes to get the student started."

I was working with a student who had a BA from SJSU, however, he only had ████ years of work experience. When I told my manager (████████) that the application was kicked back, he told me "no one ever checks on this information.  Do whatever it takes to get him started!"

Not sure if this is important or not, but I did want to let you know.

████████████████████████████████████████████████

████████████████

*Admissions Counselor*

*University of Phoenix,* ████████ *Campus*

████████████

**DOE APOL 0895**

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | Wittman, Donna |
| **Sent:** | Wednesday, August 27, 2003 1:28 PM |
| **To:** | Fernandez-Rosario, Martina; Dunne, Shane; Crim, Susan; Woodward, Jennifer; Wolff, Russell |
| **Cc:** | Castress, Jim; Henderson, Linda |
| **Subject:** | UOP - More Employee ▉ Emails |

Team, more emails from ▉▉▉▉▉

The May one is interesting. In May, the UOP website apparently directed students to complete the wrong FAFSA. Note that the manager directs: "For June new enrollments that start June 5th or June 12, the admissions advisor should ensure the student completes the 02-03 FAFSA prior to REGing the student."



FW: wrong fafsa year

The following email shows the constant pressure for enrollment numbers. If they hit the number, they can take off by noon on Friday. This happens frequently.



FW: Goal for the week, and my ...

**DOE APOL 0896**

Message                                                                    Page 1 of 2

**Rose, Christine**

| | |
|---|---|
| **From:** | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| **Sent:** | Wednesday, August 27, 2003 12:29 PM |
| **To:** | Wittman, Donna |
| **Subject:** | FW: wrong fafsa year |
| **Importance:** | High |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Miscellaneous.

▓▓▓▓▓▓▓▓▓
**Admissions Counselor**
**University of Phoenix** ▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Fax** ▓▓▓▓
▓▓▓▓▓**@phoenix.edu**

-----Original Message-----
**From:** ▓▓▓▓▓
**Sent:** Tuesday, May 27, 2003 7:40 AM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Subject:** FW: wrong fafsa year
**Importance:** High

Team...here's clarification on the 03-04 FAFSA issues....se the red section below with the deadline expectations...Thursday at COB or we take them out on Friday morning

-----Original Message-----
**From:** ▓▓▓▓▓
**Sent:** Tuesday, May 27, 2003 7:10 AM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Subject:** wrong fafsa year
**Importance:** High

Team here is the message sent by Jeff Sonnenberg....if your managers aren't allowing you to reg students for the 29th due to wrong fafsa year let them know Jeff said differently and we will be working together to fix the fafsa app, but they are allowed to start!

-----Original Message-----
**From:** Jeff Sonnenberg
**Sent:** Thursday, May 22, 2003 4:03 PM

DOE APOL 0897

Message                                                                                           Page 2 of 2

**To:** ONLINE ACCOUNTING DEPT; ONLINE ENROLLMENT
**Cc:** Dilek Aydas; Vince Grell
**Subject:** FAFSA Processing
**Importance:** High

Hi,

For the past 3 weeks, applyweb has been directing students to the 03-04 FAFSA regardless of the student's anticipated start date. This was done in error and will be corrected this evening. As of tomorrow, students with an anticipated start date prior to June 18th will be directed properly to the 02-03 FAFSA. Students with an anticipated start date of June 19th or after will be directed to the 03-04 FAFSA and 03-04 UOP financial aid paperwork. (More information will follow in another email regarding which paperwork can be used for the last two start dates in June.)

Many of you have already informed your students that are starting in May to be sure to complete the 02-03 FAFSA and not the 03-04 FAFSA. Thank you for doing this. The following is the protocol for those students who completed the 03-04 FAFSA that are starting in May (or June 5th or 12th).

- For students starting May 15th or 22nd, the FIS will contact the student and get him/her to complete the 02-03 FAFSA.
- For students starting May 29th, the admissions advisor and FIS should work jointly to call the student and inform him/her that 02-03 FAFSA is needed. For students who have all paperwork completed and accurate, but completed the 03-04 FAFSA, the student can be REG'd at this time. However, we need you to contact the student and have the student complete the 02-03 FAFSA by the start date (may 29th). Students that have not completed the 02-03 FAFSA by the end of Thursday (May 29th) may be removed Friday (May 30th) morning from class and asked to move to a future start date. We do not anticipate having to do this as we expect the students that have been impacted should be able to complete the 02-03 FAFSA by next Thursday.
- For June new enrollments that start June 5th or June 12, the admissions advisor should ensure the student completes the 02-03 FAFSA prior to REGing the student.

We regret the extra work this may cause you and your students. We hope we caught most of these students proactively and that it will not affect the majority of the May 29th new enrollments. You can determine which FAFSA a student completed by either reviewing the E-sign confirmation page (upper left corner should have an 02-03 Logo) or your FIS can check the students FAFSA status on the fafsa.ed.gov website (Choose the 2002-2003 FAFSA as the year and type when doing the "check status" option.)

Please remember the 02-03 FAFSA requires the student to use 2001 taxes while the 03-04 FAFSA requires 2002 taxes.

Please contact me if you have any questions.


Jeff Sonnenberg
National Director of Business & Finance
University of Phoenix Online

DOE APOL 0898

Message                                                                  Page 1 of 1

## Rose, Christine

**From:** ███████████████████

**Sent:** Wednesday, August 27, 2003 12:34 PM

**To:** Wittman, Donna

**Subject:** FW: Goal for the week, and my cell #

Miscellaneous.

████████████

**Admissions Counselor**
**University of Phoenix** ████████

███████████████████

███████████

**Fax** ████████████

███ @phoenix.edu

-----Original Message-----
**From:** ████████████
**Sent:** Monday, August 18, 2003 10:40 AM
**To:** ████████████████████████████████████

████████████████████████████████████████████

**Subject:** Goal for the week, and my cell #

Now that I HAVE a cell phone, you guys should have that information to get in touch with me if you need to.

You can call me anytime at ████████ if I don't answer at my desk, or you have an emergency of some kind.

Also, ████ just accepted our Team Goal of 44 REG this week to take off by Noon on Friday (11:00 if everything is in since the FA deadline will be Noon)....don't worry, I have 3 in REG right now, and one on the way myself so the part that you guys are responsible for is still just 40.

████████████

**Admissions Manager**
**University of Phoenix** █████████

██████████████

**fax** █████

███████ @phoenix.edu

DOE APOL 0899

4/24/2007

Page 1 of 1

## Rose, Christine

**From:** Woodward, Jennifer
**Sent:** Wednesday, August 27, 2003 2:14 PM
**To:** Wittman, Donna; Fernandez-Rosario, Martina; Dunne, Shane; Crim, Susan
**Cc:** Wolff, Russell
**Subject:** FW: Developments in UoP Case

INFO from relators:

-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Wednesday, August 27, 2003 1:57 PM
**To:** JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Cc:** nkrop@kroplaw.com
**Subject:** Fwd: Developments in UoP Case

Jennifer and Russ

FYI

Dan

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Mail Address: Post Office Box 686, Novato, CA 94948 0686**
**Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405**
**Tel 415 898 4741 Fax 415 898 4841**

**Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.**

DOE APOL 0900

## Rose, Christine

**From:** Mary Hendow (████████████████)
**Sent:** Tuesday, August 26, 2003 6:35 PM
**To:** Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop
**Subject:** RE: Developments in UoP Case

Hi Dan,

Daniel Waterman held a short meeting today at the San Jose Learning Center.  He said that the preliminary review exit interview was good, and this appears to be a routine matter.

Yesterday, Tamara Garcia (our new manager) relayed the message that the investigation was concluded.  Today, Daniel said there may be some additional interviews by the DOE, and he appreciates our cooperation. ████████ asked if the DOE had access to our reviews and Daniel assured us that they had complete access to our personnel files in Phoenix and he is unsure as to why they want to see our copies.

When asked by ████████ if this was normal and what was the review about, Daniel responded that this is a good thing.  He believes the review is to make sure we are not improperly counseling students or paid by commission.  He talked briefly about the HEA and how UOP is the largest user of Title IV funds and that there are many regulations in place to protect our tax dollars.

The shredding service appeared last Friday.  I was sitting with ████████████ and ████████████ when the shredders were working and ████████ made the comment that they had just been at the campus earlier in the week.  (not sure how often they pick up, but it seems to be more bi-weekly than twice weekly).

Mary

-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Tuesday, August 26, 2003 11:47 AM
**To:** ████████████████████
**Cc:** nkrop@kroplaw.com
**Subject:** Fwd: Developments in UoP Case

DOE APOL 0901

**Rose, Christine**

| | |
|---|---|
| **From:** | Woodward, Jennifer |
| **Sent:** | Wednesday, August 27, 2003 2:15 PM |
| **To:** | Wolff, Russell; Wittman, Donna; Dunne, Shane; Fernandez-Rosario, Martina; Crim, Susan |
| **Subject:** | FW: Business As Usual at UoP |

FYI:

-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Wednesday, August 27, 2003 2:02 PM
**To:** JENNIFER.WOODWARD@ED.GOV;
**Cc:** nkrop@kroplaw.com
**Subject:** Business As Usual at UoP

Russ and Jennifer

Mary Hendow reported yesterday: "My new manager, Tamara Garcia, promised anyone who "hit their goal" (goal=students who sign the roster this week) could take Friday off."

Also, Mary indicated that she left work early yesterday and does not anticipate returning to work this week.

We are still on track for service of the *qui tam* complaint this Friday.

Dan Bartley

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

**Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.**

DOE APOL 0902

**Rose, Christine**

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Wednesday, August 27, 2003 5:44 PM |
| **To:** | JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Fwd: Witnesses |

Jennifer and Russ

FYI

Dan

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0903

Page 1 of 1

## Rose, Christine

**From:** Mary Hendow [████████████]
**Sent:** Wednesday, August 27, 2003 5:36 PM
**To:** Wittman, Donna; Fernandez-Rosario, Martina
**Cc:** Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop
**Subject:** Witnesses

Hi Donna and Martina,

It was nice to speak with you both.  Per our conversation this morning, I am forwarding the contact information for two potential witnesses, who currently work for UOP.

████████ works at a campus in ████████ as an ECII, employed since ████████ She attended SAW with Julie.  Her work phone number is ████████ ext. ███ her home phone number is ████████

████████ is an ECII at the ████████ Campus.  She joined UOP in ████████ in the Learning Center, left UOP for ████████ and was hired at the ████████ Learning Center.  I spoke with her late last year and she confirmed that the compensation plan was the same at all campuses where she had worked.  She asked me if I had heard of the "hundred plus club", when I asked what that was, she said it referred to all the counselors in Phoenix who make more than $100k per year.  She wasn't able to send her matrix, and when her manager overheard our conversation about compensation, she told her to get back to work.

Work phone number is ████████ If you call her, you may need to ask for her for the phone number of her home or on her cell so that she can speak to you freely.

Julie says there is another employee, ████████, who is a ████████ working out of the ████████ Campus.  She transferred from ████████ where she worked as an ECII.

Hope this helps.

Sincerely,

Mary Hendow

DOE APOL 0904

Page 1 of 1

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, August 28, 2003 1:43 PM |
| **To:** | JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Fwd: Witnesses |

Jennifer and Russ

FYI, in response to your inquiry.

Dan

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

**DOE APOL 0905**

# EXHIBIT P-2

Case No. 06-MC-0558 (CKK)

**Rose, Christine**

| | |
|---|---|
| **From:** | Mary Hendow [███████████████] |
| **Sent:** | Wednesday, August 27, 2003 10:20 PM |
| **To:** | DanielBartleyLaw@aol.com |
| **Cc:** | Nancy Krop; Julie Albertson |
| **Subject:** | RE: Witnesses |

Both women moved to ██████ to work for █████ ████████ was the ████████████ fired because of her numbers. I'm sure she signed an agreement not to disparage UOP. Jennifer mentioned that she planned to interview ████ and ████ at a later date. Not sure if that ever occurred.


Mary



-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Wednesday, August 27, 2003 6:20 PM
**To:** ██████████████████████████████
**Cc:** nkrop@kroplaw.com
**Subject:** Fwd: Witnesses


In a message dated 8/27/2003 3:55:37 PM Pacific Daylight Time, Jennifer.Woodward@ed.gov writes:

Thanks much. This reminds me of a question for Mary. Mary spoke of two others in Denver, ████████████ who now work for ████ Did they work for the ████ campus of UP, or did they come from a location?


Mary


Do you know?


Dan


cc Nancy, Julie

4/24/2007

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

**DOE APOL 0907**

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | Wittman, Donna |
| **Sent:** | Thursday, August 28, 2003 3:49 PM |
| **To:** | 'Mary Hendow' |
| **Cc:** | Julie Albertson; Dan Bartley; Nancy Krop; Fernandez-Rosario, Martina; Woodward, Jennifer; Wolff, Russell; Dunne, Shane; Crim, Susan |
| **Subject:** | RE: Witnesses |

Mary, I am following up on your email and information of yesterday. I called Tammy about the shredding issue and she said that she is unaware of any shredding outside the regularly scheduled shredding. She said they use ShredIt and gave me the number. I called ShredIt and they advised that they have been there only at their regularly scheduled time – every Friday, that they were there on 8/1, 8/8, 8/15, 8/22 and the next pick up is scheduled for 8/29. If someone came on Monday, 8/18, please let me know how you know this. If there was a pick up on 8/18, it was not ShredIt.

I spoke with ███████ of the ████████ campus. She said that she has always been evaluated on a number of quantitative and qualitative factors, not just enrollments. She indicated that this has been the case at ███ of ████████ and ████. She worked in ████████ as an EC in ████ and said she never heard of or knew of any contests where ECs could win anything for enrollments or apps.

I have left a message early this morning on the voice mail of ████████ at work. When she did not return my call and I called back, her office indicated that she decided to take an early vacation and that she will not be back until next Tuesday.

If you have anyone else we could contact from other locations, please let us know.

Sincerely,

Donna Wittman

-----Original Message-----
**From:** Mary Hendow [mailto: █████████]
**Sent:** Wednesday, August 27, 2003 2:36 PM
**To:** Donna.Wittman@ed.gov; Martina.Fernandez-Rosario@ed.gov
**Cc:** Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop
**Subject:** Witnesses

Hi Donna and Martina,

It was nice to speak with you both. Per our conversation this morning, I am forwarding the contact information for two potential witnesses, who currently work for UOP.

████████ works at a campus in ████████ as an ECII, employed since ████████. She attended SAW with Julie. Her work phone number is ████████ ext ████ her home phone number is ████████

████████ is an ECII at the ████████ Campus. She joined UOP in ████████ in the ████████ Learning Center, left UOP for about a year and was hired at the ████████ Learning Center. I spoke with her late last year and she confirmed that the compensation plan was the same at all campuses where she had worked. She asked me if I had heard of the "hundred plus club", when I asked what that was, she said it referred to all the counselors in Phoenix who make more than $100k per year. She wasn't able to send her matrix, and when her manager overheard our conversation about compensation, she told her to get back to work. Work phone number is ████████ If you call her, you may need to ask for her for the phone number of her

home or on her cell so that she can speak to you freely.

Julie says there is another employee, ███████████ who is a █████████████████████ working out of the ███████████ Campus.  She transferred from █████████████ where she worked as an ECII.

Hope this helps.

Sincerely,

Mary Hendow

DOE APOL 0909

'/2007

## Rose, Christine

**From:**  Mary Hendow ██████████████████

**Sent:**  Thursday, August 28, 2003 8:10 PM

**To:**  Wittman, Donna

**Cc:**  Julie Albertson; Dan Bartley; Nancy Krop; Fernandez-Rosario, Martina; Woodward, Jennifer; Wolff, Russell; Dunne, Shane; Crim, Susan

**Subject:**  RE: Witnesses

Hi Donna,

The person who said she saw the shredders on Monday was ████████████ a very good friend of ████████ Sounds like ████████ has been coached. Julie believes ████████ will be an honest witness.

Mary

> -----Original Message-----
> **From:** Wittman, Donna [mailto:Donna.Wittman@ed.gov]
> **Sent:** Thursday, August 28, 2003 12:49 PM
> **To:** 'Mary Hendow'
> **Cc:** Julie Albertson; Dan Bartley; Nancy Krop; Fernandez-Rosario, Martina; Woodward, Jennifer; Wolff, Russell; Dunne, Shane; Crim, Susan
> **Subject:** RE: Witnesses
>
> Mary, I am following up on your email and information of yesterday. I called Tammy about the shredding issue and she said that she is unaware of any shredding outside the regularly scheduled shredding. She said they use ShredIt and gave me the number. I called ShredIt and they advised that they have been there only at their regularly scheduled time - every Friday, that they were there on 8/1, 8/8, 8/15, 8/22 and the next pick up is scheduled for 8/29. If someone came on Monday, 8/18, please let me know how you know this. If there was a pick up on 8/18, it was not ShredIt.
>
> I spoke with ██████████████ of the ██████████ campus. She said that she has always been evaluated on a number of quantitative and qualitative factors, not just enrollments. She indicated that this has been the case at ██████████ and ██████████. She worked in ██████████ as an EC in ██████████ and said she never heard of or knew of any contests where ECs could win anything for enrollments or apps.
>
> I have left a message early this morning on the voice mail of ████████████ at work. When she did not return my call and I called back, her office indicated that she decided to take an early vacation and that she will not be back until next Tuesday.
>
> If you have anyone else we could contact from other locations, please let us know.
>
> Sincerely,
>
> Donna Wittman

> -----Original Message-----
> **From:** Mary Hendow [mailto:maryroseh@earthlink.net]
> **Sent:** Wednesday, August 27, 2003 2:36 PM
> **To:** Donna.Wittman@ed.gov; Martina.Fernandez-Rosario@ed.gov
> **Cc:** Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop
> **Subject:** Witnesses

DOE APOL 0910

Hi Donna and Martina,

It was nice to speak with you both. Per our conversation this morning, I am forwarding the contact information for two potential witnesses, who currently work for UOP.

████████ works at a campus in ██████ as an ECII, employed since ████████ She attended SAW with Julie. Her work phone number is ██████████ ext. ███ her home phone number is ███

████████ is an ECII at the ██████████ Campus. She joined UOP in ████████ in the ███ ██████ Learning Center, left UOP for about a year and was hired at the ████████ Learning Center. I spoke with her late last year and she confirmed that the compensation plan was the same at all campuses where she had worked. She asked me if I had heard of the "hundred plus club", when I asked what that was, she said it referred to all the counselors in Phoenix who make more than $100k per year. She wasn't able to send her matrix, and when her manager overheard our conversation about compensation, she told her to get back to work.
Work phone number is ████████ If you call her, you may need to ask for her for the phone number of her home or on her cell so that she can speak to you freely.

Julie says there is another employee, ████████ who is a ████████████ working out of the ████████ Campus. She transferred from ████████ where she worked as an ECII.

Hope this helps.

Sincerely,

Mary Hendow

DOE APOL 0911

4/24/2007

## Rose, Christine

**From:**  DanielBartleyLaw@aol.com
**Sent:**  Tuesday, August 26, 2003 2:24 PM
**To:**  JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Cc:**  nkrop@kroplaw.com
**Subject:** United States ex rel. Hendow v. University of Phoenix

FYI

Dan Bartley

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Mail Address: Post Office Box 686, Novato, CA 94948 0686**
**Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405**
**Tel 415 898 4741 Fax 415 898 4841**

**Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.**

DOE APOL 0912

4/24/2007

## Rose, Christine

**From:** DanielBartleyLaw@aol.com
**Sent:** Tuesday, August 26, 2003 2:23 PM
**To:** Deb.Duckett@usdoj.gov
**Subject:** Re: University of Phoenix documents

In a message dated 8/26/2003 11:09:01 AM Pacific Daylight Time, Deb.Duckett@usdoj.gov writes:

> Dan, I just got an email from our receptionist that Michael received two faxes from you...your cover
> sheets says there are 15 pages, but we only received 3 on each fax. Our outside email appears to be up
> and running so if you would like to send Michael an email with the documents, his address is
> michael.hirst@usdoj.gov.
>
> Thanks!
>
> ~Deb~

Deb

So sorry -- I'm just learning how to fax directly from my new IBM notebook computer. Think I just now finally did it
right. Fax now has been completely transmitted and should be on your machine.

The text of fax cover sheet that accompanied the full 15 pages that finally transmitted to Mike is:

**From: Daniel Robert Bartley**

**To: Michael Hirst, Assistant U.S. Attorney**

**Re:** *United States ex rel. Hendow v. University of Phoenix*

CONFIDENTIAL COMMUNICATION PROTECTED BY JOINT PROSECUTION PRIVILEGE, ATTORNEY-
CLIENT PRIVILEGE, AND WORK PRODUCT PRIVILEGE

Enclosed is a copy of an amended complaint that co-counsel Nancy Krop and I intend to file, and would
like to serve this Friday.

This amended pleading alleges the same causes of action and core set of facts as the original Complaint.
The only difference is that it contains five new paragraphs pleading particulars that distinguish this case
from the set of facts in United States ex rel Graves v. ITT Educational Services. Under these special
circumstances, we ask you to let us know you have no objection to the subject First Amended Complaint
being filed not under seal, via fax (to Bartley Law Offices at 415 898 4841) or via e-mail (to
DanielBartleyLaw@aol.com).

We make this request because we need to proceed with service upon Defendant University of Phoenix
without further delay in order to avail Relators of the protections against retaliation afforded by the False
Claims Act, and in order to comply with time lines established by the Court's setting of an October 27
scheduling conference.

If you need to discuss by phone, I may be reached at my cell phone, 415 847 2060. Thanks much.
******************

Also, Deb, in case you are able to open it, for your and Mike's convenience, the First Amended Complaint is
attached in WordPerfect.

Dan Bartley
**Daniel Robert Bartley Law Offices**

**DOE APOL 0913**

4/24/2007

E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

**DOE APOL 0914**

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Friday, August 29, 2003 1:20 AM |
| **To:** | JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | ALL "GO" FOR UOP QUI TAM COMPLAINT BEING SERVED FRIDAY, AUGUST 29 |

Russ and Jennifer

Just a note to let you know that I today spoke by telephone with my process service firm in Southern California. They confirmed they received the FedEx packet and a subsequent fax from me, conveying all papers for service. Such will be served tomorrow on UOP's registered agent, CT Corporation Systems, in Los Angeles. Also, first thing in the morning, I shall fax to the head lawyers for UOP and Apollo my letter, conveying to them a courtesy copy of the First Amended Complaint.

Also, FYI, below is the text of the final revised version of my courtesy letter to head counsel for UOP and Apollo Group, respectively, which I already mailed today and will be faxing first thing Friday morning. The only change from the prior draft sent to you is a case citation that Nancy and I added on the subject of whistleblower retaliation being *verboten* by the FCA (*Moore v. California Institute of Technology Jet Propulsion Laboratory*, 275 F.3d 838 (9th Cir. 2002). I today mailed to you both clean signed copies of the First Amended Complaint, the courtesy letter, and related papers.

On the issue of shredding, I suspect I was in practice long before shredding machines even became popular. Though I've handled many hundreds of cases, I'm yet to encounter the one where the defendant actually fesses up to destroying evidence.

In the same light, I'm yet to encounter the case where the CEO of the company gives the rank and file anything other than smiling reassurances that there is absolutely nothing to worry about.

Dan


[BARTLEY LAW OFFICES LETTERHEAD]

August 29, 2003


Karl Gauby, Vice President and General Counsel        Via Fax Transmission and
Apollo Legal Services        Via United States Mail
The Apollo Group
4615 East Elwood Street
Phoenix, AZ 85040

Daniel Litteral, Staff Counsel
Academic Legal Services
The University of Phoenix
4605 East Elwood Street
Phoenix, AZ 85040

Re:  United States of America ex rel. Hendow, et al., v. University of Phoenix, et al.
 Case #CIV.S-03-0457 GEB DAD, U.S. District Court, Eastern District of California

Dear Mr. Gauby and Mr. Litteral:

My co-counsel Nancy Krop and I represent Mary Hendow and Julie Albertson, University of Phoenix employees who are Relators in the above-referenced qui tam action pursuant to the False Claims Act.

**DOE APOL 0915**

Enclosed is a courtesy copy of the First Amended Complaint filed in this action, which until recently was sealed, as required by the False Claims Act. We are in the process of having this and related papers served upon The University of Phoenix's registered agent for service of process in California.

Please note that a joint scheduling conference report is due to be filed on or before October 14, 2003, in anticipation of the joint scheduling conference set for October 27, 2003, at 9:00 a.m., before Hon. Judge Garland E. Burrell, Jr., the district judge assigned to this case.

This letter constitutes notice and a demand upon The Apollo Group and The University of Phoenix to preserve evidence under Cedars-Sinai Medical Center v. Superior Court, 18 Cal.4th 1, 12 (1988), and parallel federal case authority. In particular, please maintain, and immediately cease shredding, disposing of, otherwise destroying, or purging information on employee performance matrixes, employee stack rankings, employee award programs, employee personnel files (human resources, corporate enrollment, local campus files), and all other documents concerning enrollment employee compensation and performance.

Karl Gauby, Esq., and Daniel Litteral, Esq.
August 29, 2003
Page Two

This notice and demand to save evidence from destruction embraces: paper records, computer files, e-mail archives, voice mail archives, faxes, memos, charts, any minutes of meetings of a board of directors, any summaries, any schedules, memoranda, handwritten notes, statements, letters, telegrams, intra-office communications, sticky notes, reports,
diaries, day-timers, desk calendars, pocket calendars, notebooks, day books, logbooks,
appointment books, telephone call logs, company newspapers, expense reports, pamphlets, periodicals, worksheets, costs sheets, lists, graphs, charts, index, record, partial or complete report of telephone or oral conversation, compilations, tabulations, studies, analyses, transcripts, minutes, accounting records, data sheets, computer hard disks, computer diskettes, video tapes, video disks, audio tapes, audio disks, computer floppy disks, CD-ROMs, computer diskettes, slide presentations, Power Point presentations, other computerized slide presentations, movie films, and all other memorials of any conversations, dictation, meetings, conferences, directives, and deliberations, by telephone or otherwise, and any other writing or recording, which is in your possession, custody or control, or in the possession, custody or control of any servant or agent of The Apollo Group and the University of Phoenix.

Relators Hendow and Albertson are still employees at University of Phoenix, showing up for work every day. The False Claims Act expressly forbids any retaliation by the University against Ms. Hendow and/or Ms. Albertson, arising from their disclosures in furtherance of their qui tam action. 31 U.S.C. 3730(h); Moore v. California Institute of Technology Jet Propulsion Laboratory, 275 F.3d 838 (9th Cir. 2002). California Labor Code 1102.5 provides additional protection against retaliation. Theses same protections also extend to any other employees who make disclosures in furtherance of this qui tam action. No recrimination, intimidation, or retaliation, or threat of same, however, subtle, is permitted vis-a-vis Relators or vis-a-vis potential witnesses. Additionally, an employer may not adopt or enforce a rule that preventing or dissuading an employee from truthfully disclosing information to a government or law enforcement agency. The False Statements Act, 18 U.S.C 1001, expressly prohibits false statements to government agencies.

Ms. Hendow and Ms. Albertson each hereby requests an opportunity to inspect her personnel file pursuant to California Labor Code 1198.5. At your election, such inspections may be accomplished by providing a complete copy of each personnel file to my office, together with an invoice for photocopying charges.

Very truly yours,

Daniel Robert Bartley

cc Nancy G. Krop, Esq.

DOE APOL 0916

drb:st

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

**Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.**

**DOE APOL 0917**

## Rose, Christine

| | |
|---|---|
| **From:** | JULIE ALBERTSON [█████████████████████] |
| **Sent:** | Friday, August 29, 2003 10:03 AM |
| **To:** | Mary Hendow; Wittman, Donna |
| **Cc:** | Dan Bartley; Nancy Krop; Fernandez-Rosario, Martina; Woodward, Jennifer; Wolff, Russell; Dunne, Shane; Crim, Susan |

**Subject:** Re: Witnesses

Hi Donna,

I have had several conversations in the past with ████ and how UOP pays people. I do believe she will tell the truth. However, I am not sure if she is at work, she will talk. My suggestion is to see if she would be willing to call you back outside of the University. Her entire family, including herself have been in the military and I do not believe lying is in her nature. But, if they have been coached, I am not sure what she will say. She makes a lot of money and has a mortgage to pay. I believe that she will fear UOP firing her if she cooperates with you.

Julie
JULIE ALBERTSON

----- Original Message -----
**From:** Mary Hendow
**To:** Wittman, Donna
**Cc:** Julie Albertson ; Dan Bartley ; Nancy Krop ; Fernandez-Rosario, Martina ; Woodward, Jennifer ; Wolff, Russell ; Dunne, Shane ; Crim, Susan
**Sent:** Thursday, August 28, 2003 5:09 PM
**Subject:** RE: Witnesses

Hi Donna,

The person who said she saw the shredders on Monday was ████████████ a very good friend of ████████
Sounds like ████ has been coached.  Julie believes ████ will be an honest witness.

Mary

‐‐‐‐‐Original Message-----
**From:** Wittman, Donna [mailto:Donna.Wittman@ed.gov]
**Sent:** Thursday, August 28, 2003 12:49 PM
**To:** 'Mary Hendow'
**Cc:** Julie Albertson; Dan Bartley; Nancy Krop; Fernandez-Rosario, Martina; Woodward, Jennifer; Wolff, Russell; Dunne, Shane; Crim, Susan
**Subject:** RE: Witnesses

Mary, I am following up on your email and information of yesterday.  I called Tammy about the shredding issue and she said that she is unaware of any shredding outside the regularly scheduled shredding.  She said they use ShredIt and gave me the number.  I called ShredIt and they advised that they have been there only at their regularly scheduled time - every Friday, that they were there on 8/1, 8/8, 8/15, 8/22 and the next pick up is scheduled for 8/29.  If someone came on Monday, 8/18, please let me know how you know this.  If there was a pick up on 8/18, it was not ShredIt.

I spoke with ████████████ of the ████████ campus.  She said that she has always been evaluated on a number of quantitative and qualitative factors, not just enrollments.  She indicated that this has been the case at ████████████ and ████████ She worked in ████████████ as an EC in ████ and said she never heard of or knew of any contests where ECs could win anything for enrollments or apps.

DOE APOL 0918

I have left a message early this morning on the voice mail of ██████████ at work. When she did not return my call and I called back, her office indicated that she decided to take an early vacation and that she will not be back until next Tuesday.

If you have anyone else we could contact from other locations, please let us know.

Sincerely,

Donna Wittman


-----Original Message-----
**From:** Mary Hendow [mailto:████████████]
**Sent:** Wednesday, August 27, 2003 2:36 PM
**To:** Donna.Wittman@ed.gov; Martina.Fernandez-Rosario@ed.gov
**Cc:** Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop
**Subject:** Witnesses

Hi Donna and Martina,

It was nice to speak with you both. Per our conversation this morning, I am forwarding the contact information for two potential witnesses, who currently work for UOP.

██████████ works at a campus in ████████ as an ECII, employed since ██████████ She attended SAW with Julie. Her work phone number is ████████ ext.█████ her home phone number is █████

██████████ is an ECII at the ████████Campus. She joined UOP in ████████ in the ████ ████████Learning Center, left UOP for about a year and was hired at the ████████ Learning Center. I spoke with her late last year and she confirmed that the compensation plan was the same at all campuses where she had worked. She asked me if I had heard of the "hundred plus club", when I asked what that was, she said it referred to all the counselors in Phoenix who make more than $100k per year. She wasn't able to send her matrix, and when her manager overheard our conversation about compensation, she told her to get back to work.
Work phone number is████████████ If you call her, you may need to ask for her for the phone number of her home or on her cell so that she can speak to you freely.

Julie says there is another employee,████████████ who is a████████████████████working out of the████████████ Campus. She transferred from████████████where she worked as an ECII.

Hope this helps.

Sincerely,

Mary Hendow

DOE APOL 0919

## Rose, Christine

**From:**   DanielBartleyLaw@aol.com
**Sent:**   Friday, August 29, 2003 7:59 PM
**To:**     JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Cc:**     nkrop@kroplaw.com
**Subject:** University of Phoenix Served Qui Tam Amended Complaint; Outside Counsel Calls

Jennifer and Russ

My process server, Attorneys Diversified, in Ventura, confirms that the University of Phoenix registered agent for service of process, CT Corporation System, in Los Angeles, was served today, August 29, at 1:45 p.m.

Also, at 3:55 p.m. today, I received a telephone call from the Apollo Group's outside counsel, John Cohen, who politely called to confirm that there was a notice of the DOJ decision not to intervene, etc. I explained to him that such notice, the order unsealing, etc., were served upon UOP's registered agent today; that I did not want to burden my fax machine or house counsel's fax machines with everything that was served, since it was quite a bit of paper. Mr. Cohen explained that he is "not a litigator" and would not be litigation counsel of record on the case. Nothing else of substance was discussed.

Mr. Cohen's contact data are:

John Cohen, Esq.
Snell & Wilmer
One Arizona Center
Phoenix, AZ 85004
Tel 602 382 6247
Fax 602 382 6070
E-mail JCohen@SWLAW

Dan Bartley

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0920

## Rose, Christine

**From:** DanielBartleyLaw@aol.com
**Sent:** Thursday, September 04, 2003 10:09 AM
**To:** JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Cc:** nkrop@kroplaw.com
**Subject:** Fwd: Sperling Club Announcement

Jennifer and Russ

F.Y.I.

Dan Bartley

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Mail Address: Post Office Box 686, Novato, CA 94948 0686**
**Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405**
**Tel 415 898 4741 Fax 415 898 4841**

**Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.**

DOE APOL 0921

Message                                                                          Page 1 of 2

## Rose, Christine

| | |
|---|---|
| **From:** | JULIE ALBERTSON ███████████████ |
| **Sent:** | Wednesday, September 03, 2003 10:54 AM |
| **To:** | Nancy Krop; Dan Bartley; Mary Rose |
| **Subject:** | Fw: Sperling Club Announcement |

Hi Dan,

Here is an email from our region regarding the Sperling contest. They are very savvy because they do not outline the
qualifications for the contest. Although, it is my impression that each DOE has to get approval from Dianne Pusch as to the
criteria of each department (Academics, Financials and Enrollment). Would you agree Mary?
JULIE ALBERTSON
----- Original Message -----
**From:** Julie Albertson
**To:** ███████████████
**Sent:** Friday, August 29, 2003 9:54 AM
**Subject:** FW: Sperling Club Announcement


-----Original Message-----
**From:** Western Region
**Sent:** Wednesday, January 15, 2003 11:10 AM
**Subject:** Sperling Club Announcement

## Are you a High Roller?


We think you are! We know you're the kind of person who brings more than just luck to the
table in order to accomplish your goals. You bring skill, enthusiasm and a proven desire to
be one of the University's true front runners.


Mark your calendar for May 16th and plan to take your place in the High Rollers Circle at
the exclusive Club Sperling Casino! We've rolled the dice and come up with an action
packed evening at the elegant Hilton Los Angeles. You can play roulette, craps, blackjack
and more to win your choice of prizes.


As a Sperling Club member, you and your guest will also enjoy a welcome cocktail
reception, overnight accommodations at the Hilton Los Angeles Hotel and breakfast the next
morning. In addition to its convenient location, this luxury property offers three restaurants,
room service, stunning gardens for strolling, a sparkling swimming pool and four whirlpool
spas. You just can't lose!

**DOE APOL 0922**

Ready to get lucky? Then, here's how to tip the odds in your favor:

1. Circle May 16 -- High Rollers Day at Club Sperling Casino

2. Pick your special guest and remind them to put this date on their calendar, too

3. Review qualifications for your department with your supervisor

4. Track your progress during Jan, Feb, & Mar

5. Pack your bags!

Chances are good we'll see you there!

Dianne Pusch

Senior Vice President

Western Region

DOE APOL 0923

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, September 04, 2003 10:28 AM |
| **To:** | JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Fwd: VP / Campus Director |

Jennifer and Russ

FYI

Dan

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0924

Message                                                                    Page 1 of 3

## Rose, Christine

| | |
|---|---|
| **From:** | JULIE ALBERTSON ▇▇▇▇▇▇▇▇▇▇▇▇ |
| **Sent:** | Wednesday, September 03, 2003 10:51 AM |
| **To:** | Mary Hendow; Dan Bartley; Nancy Krop |
| **Subject:** | Re: VP / Campus Director |

I agree with Mary. I do not believe that this is UOP's way of showing corrective action regarding the DOE. It would be a very difficult sell to the DOE that their renegade VP is now in charge of the entire enrollment department.

Julie
JULIE ALBERTSON

----- Original Message -----
**From:** Mary Hendow
**To:** Mary Hendow ; Julie Albertson ; Dan Bartley ; Nancy Krop
**Sent:** Tuesday, September 02, 2003 8:33 PM
**Subject:** FW: VP / Campus Director

I suspect this has been in the works for some time. Per Tim, when Daniel demoted Tim, Daniel asked Tim to keep the demotion quiet until the end of the fiscal year.

It's hard to believe this is a "corrective action" on the part of UOP...they have put Daniel in charge of the Enrollment Department.

-----Original Message-----
**From:** Sami Hendow [mailto:▇▇▇▇▇▇▇▇▇▇]
**Sent:** Tuesday, September 02, 2003 7:38 PM
**To:** Mary Rose Hendow (E-mail)
**Subject:** FW: VP / Campus Director

-----Original Message-----
**From:** Mary Hendow [mailto:▇▇▇▇▇▇▇▇▇▇▇▇]
**Sent:** Tuesday, September 02, 2003 5:26 PM
**To:** ▇▇▇▇▇▇▇▇▇▇

**DOE APOL 0925**

Message

**Subject:** FW: VP / Campus Director

-----Original Message-----
**From:** Daniel Waterman
**Sent:** Tuesday, September 02, 2003 4:10 PM
**To:** NCAL ALL EMPLOYEES
**Subject:** VP / Campus Director


It is with mixed emotions that I announce a change in my role with the Northern California Campus. Effective September 8th , I will be moving to the position of Vice-President / Director of Enrollment. I have had the privilege and honor of being the VP / Campus Director for over five years, and during that time NCal has grown and evolved significantly with many, many success stories over the years. While I am sad to be leaving my current role, I am excited about working closely with the Enrollment Department. We have tremendous opportunities to provide access to working adults who will receive the benefits of a great education, and with an awesome Enrollment Team in place we will see an increasing number of new students joining the NCal Campus. Dianne Pusch, the West Region Vice-President, will be overseeing the campus until there is a new Campus Director in place.


We are heading into a new fiscal year and a new beginning for this campus, and the potential in all areas of this organization is limitless. Here's to continuing to be the leader in adult education ! Please direct any comments or questions to Dianne Pusch, Chris Helmueller or myself.


Daniel Waterman

VP / Director

University of Phoenix

Northern California Campus

(ph) 925-416-4100  (fax) 925-734-6353

DOE APOL 0926

4/24/2007

DOE APOL 0927

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, September 04, 2003 10:36 AM |
| **To:** | JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | VP / Campus Director a Demotion? |

Jennifer and Russ

FYI

On the other hand, I just now read this e-mail from Mary Hendow about Waterman, opining this in fact was a demotion.

Dan Bartley

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0928

## Rose, Christine

| | |
|---|---|
| **From:** | Mary Hendow █████████████ |
| **Sent:** | Thursday, September 04, 2003 12:41 AM |
| **To:** | Nancy G. Krop; Woodward, Jennifer; Wolff, Russell |
| **Cc:** | DanielBartleyLaw@aol.com; █████████████ |
| **Subject:** | RE: VP / Campus Director |

This is a demotion...he now has Tim Gruber's job, but still retains a VP title...

-----Original Message-----
**From:** Nancy G. Krop [mailto:nkrop@kroplaw.com]
**Sent:** Wednesday, September 03, 2003 9:02 AM
**To:** Mary Hendow; Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Cc:** DanielBartleyLaw@aol.com; █████████████
**Subject:** Re: FW: VP / Campus Director

Hi

**I guess Daniel Waterman is not one of the NorCal campus "renegade managers" given this apparent promotion from NorCal Campus VP/Campus Director to VP/Director of Enrollment in Phoenix???**

**Nancy**

**From:** Daniel Waterman
**Sent:** Tuesday, September 02, 2003 4:10 PM
**To:** NCAL ALL EMPLOYEES
**Subject:** VP / Campus Director

It is with mixed emotions that I announce a change in my role with the Northern California Campus. Effective September 8th , I will be moving to the position of Vice-President / Director of Enrollment. I have had the privilege and honor of being the VP / Campus Director for over five years, and during that time NCal has grown and evolved significantly with many, many success stories over the years. While I am sad to be leaving my current role, I am excited about working closely with the Enrollment Department. We have tremendous opportunities to provide access to working adults who will receive the benefits of a great education, and with an awesome Enrollment Team in place we will see an increasing number of new students joining the NCal Campus. Dianne Pusch, the West Region Vice-President,  will be overseeing the campus until there is a new Campus Director in place.

DOE APOL 0929

We are heading into a new fiscal year and a new beginning for this campus, and the potential in all areas of this organization is limitless. Here's to continuing to be the leader in adult education ! Please direct any comments or questions to Dianne Pusch, Chris Helmueller or myself.

Daniel Waterman

VP / Director

University of Phoenix

Northern California Campus

(ph) 925-416-4100  (fax) 925-734-6353

DOE APOL 0930

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | Woodward, Jennifer |
| **Sent:** | Saturday, October 04, 2003 2:39 PM |
| **To:** | Wittman, Donna; Dunne, Shane; Crim, Susan; Fernandez-Rosario, Martina |
| **Cc:** | Wolff, Russell |
| **Subject:** | FW: Fw: NCALFFL Team Scoring Directions |

Team--fyi.

-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Thursday, October 02, 2003 7:16 PM
**To:** JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Subject:** Fwd: Fw: NCALFFL Team Scoring Directions

Jennifer and Russ

FYI

Dan

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0931

**Rose, Christine**

| | |
|---|---|
| From: | Wittman, Donna |
| Sent: | Wednesday, September 10, 2003 1:39 PM |
| To: | Wolff, Russell; Woodward, Jennifer; Fernandez-Rosario, Martina; Dunne, Shane; Crim, Susan Castress, Jim; Henderson, Linda |
| Cc: | |
| Subject: | UOP On Line - July/August goals |

I have just received this from one of the Team Leads at On Line. The email from Wettstein, the enrollment director, makes it clear that salary is tied to enrollment "goals".

-----Original Message-----
From: ▇▇▇▇▇▇
To: 'Donna.Wittman@ed.gov'
Sent: 9/10/2003 1:09 PM
Subject: FW: July/August goals

Donna,

   The numbers you see below, or the reference to goals is referring to Reg's (Registered) students. If you have any questions please feel contact me on my cell phone ▇▇▇▇▇▇▇▇

Thanks,
   ▇▇▇▇▇

-----Original Message-----
From: ▇▇▇▇▇▇
Sent: Monday, September 08, 2003 8:21 AM
To: ▇▇▇▇▇▇
Subject: FW: July/August goals

-----Original Message-----
From: ▇▇▇▇▇▇▇
Sent: Friday, July 25, 2003 2:16 PM
To: ▇▇▇▇▇
Subject: RE: July/August goals

Sounds like a good solid plan, keep up the good effort! Enjoy your raise and spread the word, we take care of our reps!

-----Original Message-----
From: ▇▇▇▇▇▇
Sent: Wednesday, July 23, 2003 10:02 AM
To: ▇▇▇▇▇▇▇
Subject: RE: July/August goals

Hi ▇▇▇▇

 First of all I want to thank you for processing my review, and taking into account incidences that occurred in the past. I also appreciate the time you took to meet with me directly.

My Jugust goal is 26. As far as my next 6 month review I am shooting for 85. I would like my salary to continue to increase by a few thousand on a regular basis as my consistency strengthens.

1

DOE APOL 0932

Thanks,

  ----Original Message-----
From:
Sent: Wednesday, July 23, 2003 8:47 AM
To:

Subject: July/August goals

Now you know what is at stake and the rewards available at the end of
the month of August, please tell me what your own personal goal is for
July/August combined and what your goal is for your next 6 - month
review.  140?  130?  How much you would like to see your salary
increase?

If you have any questions, please contact me.  Good luck.

Director of Admissions
University of Phoenix Online

**DOE APOL 0933**

**Rose, Christine**

| | |
|---|---|
| From: | Wittman, Donna |
| Sent: | Wednesday, September 10, 2003 1:42 PM |
| To: | Wolff, Russell; Woodward, Jennifer; Fernandez-Rosario, Martina; Dunne, Shane; Crim, Susan |
| Cc: | Castress, Jim; Henderson, Linda |
| Subject: | UOP:  6 month targets for ▮▮▮▮▮▮ |

Additional evidence of focus on enrollment numbers.

-----Original Message-----
From: ▮▮▮▮▮▮
To: 'Donna.Wittman@ed.gov'
Sent: 9/10/2003 1:14 PM
Subject: FW: 6 month targets

Donna,

 For a review you can found in "requires improvement", "meets
requirements", "often exceeds requirements", and "always exceeds
requirements". As you can see below for my next review the main focus,
in fact the only focus mentioned on this email is enrollments/
registered students.

▮▮▮▮

-----Original Message-----
From: ▮▮▮▮▮▮
Sent: Friday, July 25, 2003 2:23 PM
To: ▮▮▮▮▮▮
Subject: 6 month targets


▮▮▮▮
Here are the targets that we spoke of.
QTR 3 = Often

QTR 4 target =

QTR 5 target =

The schedule that ▮▮▮ will work toward is:

June = 5

July = 1

August = 26 (1+26x1.35= 36)

Qtr 4 total would be 41 an solid Often

Sept = 15

Oct = 20

Nov = 15

Qtr 1 total would be 50 which is an Always

This would give ▮▮▮ 91 enrollments

These are stick #'s. Pad them to help with drops.

THINGS HE CAN WORK ON = consistency. Always double digits. Not killing

1

**DOE APOL 0934**

herself at the end of a qtr.

▮▮▮▮▮▮▮▮
Admissions Manager
University of Phoenix ▮▮▮▮▮▮▮

office:   ▮▮▮▮▮▮▮▮
fax:
email:    ▮▮▮▮▮▮▮@phoenix.edu <mailto:▮▮▮▮▮▮▮@phoenix.edu>
website:  <http://www.uopxonline.com/> www.uopxonline.com

DOE APOL 0935

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Monday, September 22, 2003 10:21 AM |
| **To:** | JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | United States ex rel. Hendow v. University of Phoenix |

**CONFIDENTIAL COMMUNICATION PROTECTED BY ATTORNEY-CLIENT PRIVILEGE, WORK PRODUCT PRIVILEGE, AND JOINT PROSECUTION PRIVILEGE**

**Russ and Jennifer**

**Below are Mary's notes regarding the UOP meeting she and Julie attended. These notes were communicated to Nancy and me via an e-mail last night, September 21.**

**I remain in Kentucky today, but, due to professional and family obligations back in California, plan to return to California tomorrow (Tuesday the 23rd). My father, miraculously, is persevering, though feebly so, against all odds.**

**Dan**

cc Nancy

**MARY HENDOW'S NOTES:**

First of all, let me say that Julie took notes and she probably will have much to add to my synopsis.

Kathy says it was like there was an elephant in the room and nobody wanted to talk about it. Her first impression was that they are very nervous/worried about our case/DOE investigation. Secondly, she said it made sense that he had to address this.

███████████ and ███████████████ were very nice and both discussed horror stories with management. ███████████ was just promoted from Adm. Manager in ███████████ to Associate DOE in ███████████████ actually told me that she had great respect for me and especially for filing this lawsuit.

Bill Brebaugh was scheduled to speak just before lunch for fifteen minutes. He appeared a little disorganized and not as fluid in his speech as he usually is. He brought with him several sections from various newspapers.

He read a headline about a merger and acquisition and said that that often indicates a sign of growth, but perhaps a weakness within the organization. UOP has grown "organically" (by enrolling students) rather than by acquiring other schools. He then made it clear that UOP, as the largest university always had a opportunity to "sniff" the acquired school first. "UOP is the 800 pound gorilla…We have ZERO debt and a Billion dollars in the bank"

He read a headline about a drug company being investigated by the FDA for fraudulently selling drugs…(under another label, or black market). The went on to say that this is a position UOP will never find themselves in because of their "integrity…you all may have heard of what's been going on here in NCAL, and you need to know we are the largest because we do things the right way…" (I think I heard an imperceptible, but collective gasp in the room). He gave a little lesson on how to calculate MKT CAP. And that UOP's was high because it had never missed its projections for any quarter since the company went public..this means investors trust UOP and invest more money, more profitability, etc. (some people mentioned that they found this remark insulting, considering

**DOE APOL 0936**

salary levels)

He talked about the average income made by category of counselor: New =30, ECII= 50, Senior=80.  That very soon a new program would be rolled out that would allow people to increase salary more quickly.  He spoke about the difference in income as the difference in a counselor's expectations, that those who want to make more, will work harder and earn it and be happy.  Those who want to make more, but don't do what it takes are miserable ... need a check on reality.  He would never do the job for 30k it's just too hard.  Those who go above and beyond are rewarded.

Afterward, many people asked if I felt uncomfortable and were amazed that he said this.

During a breakout session after lunch.  Laura Bartlett, recently promoted to Executive Admission Counselor (first in NCAL) and top ranked counselor for FY/2003 in NCAL continually spoke about her success.  She told us all: it's all about apps (applications), I don't worry about calls or even appointments, I just do what it takes to get the application.  She might be someone the DOE should speak with, although she is very coachable, and if UOP knew DOE was going to interview her, they would coach her.

█████████ from the███campus had just returned from SAW in Phoenix, where "by mistake" the three counselors from ██████ were at a hotel by themselves, with no car.  This severely hampered their ability to interact and bond with the other SAW participants.  She told me that ████ had told her that soon our salaries would be changing up/down on a semi-annual basis...she couldn't remember when she was told (probably before the DOE came in).  ████ and ████████ also mentioned that they had been told by management that as long as the reviews were quantitative *and* qualitative, they were legal.

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0937

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | Wolff, Russell |
| **Sent:** | Tuesday, September 30, 2003 8:51 PM |
| **To:** | 'Nancy G. Krop ' |
| **Cc:** | Woodward, Jennifer |
| **Subject:** | RE: Another Witness:  confidential information |

Great, thanks, Nancy.  I will speak with Jennifer about this development in the morning.

-----Original Message-----
From: Nancy G. Krop
To: DanielBartleyLaw@aol.com; Russell.Wolff@ed.gov; Jennifer.Woodward@ed.gov;
Sent: 9/30/2003 6:47 PM
Subject: Another Witness:  confidential information

Hi Folks

There is another witness confirming the illegal compensation scheme at UOP.  She is willing to speak with Jennifer and Russ.

████████        ████████ (h); ████████      (cell - the best no. to reach her)

████ was the top enrollment counselor at the ████████ campus.  She worked there ████████████.  She was paid solely on meeting her enrollment numbers.

She heard Bill Brebaugh boast about "flying under the radar" at a Jan. ████ sales motivational meeting, about how UOP could get away with its illegal scheme.

At each review, her manager went over the matrix and salary charts with her so ████ knew how much she could make, based solely on her numbers.

Nancy


Law Offices of Nancy G. Krop
E-mail:  nkrop@kroplaw.com
236 West Portal Avenue, #321
San Francisco, California  94127
Tel. 415/566-9743   Fax 415/566-2754
Tel. 650/344-5306   Fax 650/344-5307

Confidentiality Note:  This email may contain information that is privileged, confidential and/or otherwise legally protected.  If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message is strictly prohibited.  If you have received this e-mail in error, please contact the sender by e-mail or telephone (650/344-5306) and destroy all copies.  Thank you.

1

DOE APOL 0938

Message                                                                      Page 1 of 2

## Rose, Christine

| | |
|---|---|
| **From:** | JULIE ALBERTSON [████████████████] |
| **Sent:** | Wednesday, October 01, 2003 10:14 PM |
| **To:** | Dan Bartley; Nancy Krop; Mary Rose |
| **Subject:** | Fw: NCALFFL Team Scoring Directions |

Here is an email sent by SF coordinator to me. It is sent from Karoline Matola advising how to keep score and what the
coordinators have to do each week to make sure points are tallied and sent in on time.

Julie
JULIE ALBERTSON
----- Original Message -----
**From:** Julie Albertson
**To:** ████████████████
**Sent:** Tuesday, September 30, 2003 10:17 AM
**Subject:** FW: NCALFFL Team Scoring Directions


-----Original Message-----
**From:** ████████████
**Sent:** Tuesday, September 30, 2003 10:17 AM
**To:** Julie Albertson
**Subject:** FW: NCALFFL Team Scoring Directions

FYI....

-----Original Message-----
**From:** Karoline Matola
**Sent:** Thursday, September 25, 2003 12:40 PM
**To:** NCAL ENROLLMENT COORDINATORS; NCAL ENROLLMENT MGRS
**Subject:** NCALFFL Team Scoring Directions

Below are the steps (put together thanks to Tamar) that need to be taken in order to record and report your
NCALFFL Team results. Read the directions carefully and watch for due dates. I will send out another
confirmation regarding BDS activity and how it will be scored. If you have any questions after reviewing this, feel
free to call me. Thanx!

There are two parts to the NCALFFL report process:

# 1. Learning Center's Weekly Results
## A.   Monday- collect the Learning Center's Matrixes with your Manager (Referee)*

**Disclaimer:**   Be sure that you set the ACSR and the AC Success Form as a high
priority and that it is completed early on in the day, because Managers may be
using this to obtain the Matrix numbers.

It is very important that you obtain the matrixes for your learning center, by
Tuesday morning at the absolute latest to meet the deadline. If you don't receive

DOE APOL 0939

the matrixes from the referees by Tuesday am the learning center's counselors will receive zero points. Make it your priority to stay on top of your manager for this information.

   B.   Take the matrixes and determine the counselors' points for the week. (Use your playbook for point structure, check with referees if not sure.

   C.   Tuesday morning- e-mail <u>NCAL ENROLLMENT COORDINATORS</u> with your learning center's results*
        ex/ "WC Weekly Results"
   D.   Print out the e-mails from the other Mkt Coords and find out your team members' points
        Record the points on your score card
   E.   Make copies of all the Matrixes and inter-office Karoline Matola with them (Livermore- CR-C101)*
           Karoline will be distributing them to the appropriate teams (Note: make sure each matrix has the AC name on it)

           ***To be done by 10AM on Tuesday morning!!!***

   F.   Once you have received your team's, file the matrixes in your playbook under the counselor's corresponding tab

## 2.   Team Points
   A.   Use the weekly results e-mail to total your entire team's points and record any missing points
   B.   E-mail Karoline with the results*
        ex/ "WC Team Pts"
           ***To be done by 12PM on Tuesday***

   *Bonus Point Cards (green cards received from teammates at NCALFF party) are to be used as a boost to help your team stay ahead. When used by a counselor for bonus points that must be stapled to their matrix for that week and sent to Karoline*

## Rose, Christine

**From:** Woodward, Jennifer

**Sent:** Saturday, October 04, 2003 2:40 PM

**To:** Fernandez-Rosario, Martina; Crim, Susan; Wittman, Donna; Dunne, Shane

**Cc:** Wolff, Russell

**Subject:** FW: Fw: Week 1 NCALFFL Results

Unbelievable!!

-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Thursday, October 02, 2003 7:16 PM
**To:** JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Subject:** Fwd: Fw: Week 1 NCALFFL Results

Jennifer and Russ

FYI

Dan

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Mail Address: Post Office Box 686, Novato, CA 94948 0686**
**Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405**
**Tel 415 898 4741 Fax 415 898 4841**

**Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.**

DOE APOL 0941

Message                                                                        Page 1 of 1

## Rose, Christine

| | |
|---|---|
| **From:** | JULIE ALBERTSON██████████████████ |
| **Sent:** | Wednesday, October 01, 2003 10:13 PM |
| **To:** | Nancy Krop; Dan Bartley; Mary Rose |
| **Subject:** | Fw: Week 1 NCALFFL Results |

Hi Dan and Nancy,

I thought this was a good piece of information for Jennifer and Russ. In our all enrollment meeting Friday, September 14th we were advised that there would be a contest going on. They gathered people from each campus in enrollment and split them up on teams. The theme was the Super bowl. Each week teams earn points based on referrals, applications and appointments seen. The idea is the two teams each week with the highest points "playoff" each other. The team that wins the most games and goes to the "super bowl" wins a party with gifts.

I thought this was very interesting for Russ and Jennifer. It appears even the Department of Education visiting them hasn't deterred them from their practices. I will also forward another email detailing the guidelines for their information.

Julie
JULIE ALBERTSON
----- Original Message -----
**From:** Julie Albertson
**To:** ██████████████████
**Sent:** Wednesday, October 01, 2003 10:06 AM
**Subject:** FW: Week 1 NCALFFL Results

-----Original Message-----
**From:** Karoline Matola
**Sent:** Wednesday, October 01, 2003 10:00 AM
**To:** Karoline Matola; NCAL ENROLLMENT
**Subject:** RE: Week 1 NCALFFL Results

For those who don't know their own team #.....
-----Original Message-----
**From:** Karoline Matola
**Sent:** Wednesday, October 01, 2003 9:53 AM
**To:** NCAL ENROLLMENT
**Subject:** Week 1 NCALFFL Results

# The winners of the first game are "The App Kickers" (team 3) with a total of 35 points!

### See the attached for the official scores...

DOE APOL 0942

# All Team Score Card

Key:
M= Meets = 6p
O= Often = 7p
A= Always = 8p
R= Requires Ir

| Team | Team Names | WK1 | WK2 | WK3 | WK4 | WK5 | WK6 | WK7 | WK8 | WK9 | WK10 | WK11 | WK12 | WK13 | Play-Off |
|------|-----------|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|------|------|------|----------|
| ONE | Mad Hatters | 25 | | | | | | | | | | | | | |
| TWO | Aplnators | 32 | | | | | | | | | | | | | |
| THREE | App Kickers | 35 | | | | | | | | | | | | | |
| FOUR | Grape Lifesavers | 21 | | | | | | | | | | | | | |
| FIVE | Appsters | 26 | | | | | | | | | | | | | |
| SIX | Stompers | 15 | | | | | | | | | | | | | |

Games    #3

Points based on:
Appointments held
Referrals



DOE APOL 0943

3pt extra= Cor

# All Team Score Card

Applications

DOE APOL 0944

# All Team Score Card

  

pts
ts
)pts
mprovement = 0pts

All Team Score Card

rp. Activity

DOE APOL 0946

## Rose, Christine

| | |
|---|---|
| **From:** | Woodward, Jennifer |
| **Sent:** | Wednesday, October 08, 2003 2:09 PM |
| **To:** | Wittman, Donna; Fernandez-Rosario, Martina; Crim, Susan; Dunne, Shane |
| **Cc:** | Wolff, Russell |
| **Subject:** | FW: Fw: NCALFFL Clarification |

This is helpful.  It lays out that only enrollments or steps that lead to enrollment count towards winning the contest.  It would be nice to know what the "prizes" are.  I'll see if Dan can find out.


-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Tuesday, October 07, 2003 10:48 PM
**To:** Russell.Wolff@ed.gov; JENNIFER.WOODWARD@ED.GOV
**Subject:** Fwd: Fw: NCALFFL Clarification

Russ and Jennifer

FYI

Dan Bartley

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Mail Address:** Post Office Box 686, Novato, CA 94948 0686
**Street Address:** 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
**Tel 415 898 4741 Fax 415 898 4841**

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

Message                                                                                                Page 1 of 2

# Rose, Christine

**From:**    JULIE ALBERTSON <span style="background:black">███████████</span>
**Sent:**    Tuesday, October 07, 2003 10:21 PM
**To:**      Nancy Krop; Dan Bartley
**Subject:** Fw: NCALFFL Clarification

Thought you might want to forward this to Jennifer and Russ. This is a contest that is in effect through January. The winning team gets a party and "prizes".
JULIE ALBERTSON
----- Original Message -----
**From:** Julie Albertson
**To:** <span style="background:black">████████</span>
**Sent:** Tuesday, October 07, 2003 5:17 PM
**Subject:** FW: NCALFFL Clarification

-----Original Message-----
**From:** Karoline Matola
**Sent:** Tuesday, October 07, 2003 5:05 PM
**To:** NCAL ENROLLMENT
**Subject:** NCALFFL Clarification

Due to the miss-communication of the score reporting, I am asking each Marketing Coordinator to go back and re-report Week 1 (9/22-9/26) and Week 2 (9/29 - 10/3) scores for their learning centers. To clarify, points are awarded as described below, make extra note of comments listed in red. Once I have received the official numbers for each team tomorrow I will announce the winners for both week 1 and week 2.

Recording Points:

Marketing Coordinators will be responsible for recording, in ink, all TOUCHDOWNS, extra points and bonus points on the official score card found in the team's playbook. Games won must be recorded too.  Total points must be reported to the Official Statistician by Tuesday at 12:noon each week.  Individual performance matrix forms should be stored in the team's playbook.  Individual performance matrix must be reviewed and initialed by a Referee each week.

**Admissions Counselor:**  Must reach "MEETS" in the areas of Referrals, Appointments Seen and Applications (all 3 areas must be in meets to score any points), *as described in the UOP matrix,* in a week to receive a touchdown.  To receive extra points, at least two of these areas must be in ""OFTEN" or two in "ALWAYS", *as described in the UOP matrix.*  Bonus points will be awarded for "Corporate Activities" that are scheduled and held by you; however you may opt to have a BDS attend.

**Associate Admission Counselors:**  Must reach "MEETS" in the areas of Scheduled Appointments and Appointments Seen, *as described in the UOP Matrix,* in a week to receive a touchdown.  To receive extra points, one of the two performance areas must be in "OFTEN" or one in "ALWAYS" *as described in the UOP matrix.*

DOE APOL 0948

Bonus points will be awarded for reaching "MEETS" in the performance area of Referrals during a week.

**Business Development Specialists:** Must reach "MEETS" in the areas of Lead Generation, *as described on the UOP matrix,* in a week to receive a touchdown. To receive extra points, you must reach "OFTEN" or "ALWAYS", *as described in the UOP Matrix.* Bonus points will be awarded for Appointments Seen during a week.

**Green Point Cards:** These can be used at any time, but can only be used once. Coordinators will need to right the name of the rep or team on the back and submit them each week with their matrixes.

Karoline M. Matola
Administrative Services Supervisor
University of Phoenix
Northern California Campus
(925) 965-6175
(925) 416-4075 FAX

ATTITUDE*first*

DOE APOL 0949

4/24/2007

## Rose, Christine

**From:** DanielBartleyLaw@aol.com
**Sent:** Friday, October 17, 2003 12:25 AM
**To:** JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov
**Cc:** nkrop@kroplaw.com
**Subject:** Fwd: Weekly Success Forms

Jennifer and Russ

FYI

Dan

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Mail Address: Post Office Box 686, Novato, CA 94948 0686**
**Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405**
**Tel 415 898 4741 Fax 415 898 4841**

**Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.**

DOE APOL 0950

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | Mary Hendow ▮▮▮▮▮▮▮▮ |
| **Sent:** | Friday, October 17, 2003 12:17 AM |
| **To:** | Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop |
| **Subject:** | Weekly Success Forms |

The San Jose Enrollment team had its daily morning huddle today, headed by enrollment manager, Tamara Garcia.

Tamar reiterated the importance of each counselor taking ownership of the numbers reported.

1)      We are each responsible to report the number of appointments scheduled, the number of Corporate contacts turned in (because Galaxy doesn't track) as well as any "power calls" made (these are outbound calls made from a list and not tracked in Galaxy.

2)      Each counselor is responsible to verify that the number for each category on the success form (which correspond to our matrix) is correct, as well.

She finished with an admonishment: "you have all been told this three times now, you are each responsible to turn in your numbers and verify the accuracy of the numbers. The reports are emailed to you each week." then she held up the form with two hands and made sure each of us took a good look, as she said: " I am not going to tell you this again, this is your paycheck here, folks. I can't do anything about these numbers once they go to corporate, and corporate does your review".

Counselors present: Mary Hendow, Kathy Schorsch, Rashida Mirza, Jenny Kahn, Tamara Nasser (?), Robert Jacobs, Nada Kegley, and Teresa Salazar.

Feel free to pass this on to Russ and Jennifer, if you think they would find it of value.

Hard to believe that they still haven't changed their verbage or mentality!!! This is the same manager who, with a straight face, informed us that the qualitative matrix will be factored (though she doesn't know how) with the new weighted matrix (quantitative factors equal 100%) for our reviews.

I truly hope we prevail  AND get them to change the way they do business!!

**DOE APOL 0951**

## Rose, Christine

**From:** DanielBartleyLaw@aol.com
**Sent:** Friday, October 17, 2003 6:26 PM
**To:** Russell.Wolff@ed.gov; JENNIFER.WOODWARD@ED.GOV
**Cc:** nkrop@kroplaw.com
**Subject:** Fwd: Great Apollo Article!!!

Jennifer and Russ

FYI

Dan

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Mail Address:** Post Office Box 686, Novato, CA 94948 0686
**Street Address:** 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
**Tel** 415 898 4741 **Fax** 415 898 4841

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0952

## Rose, Christine

| | |
|---|---|
| **From:** | JULIE ALBERTSON ███████████████████ |
| **Sent:** | Friday, October 17, 2003 5:19 PM |
| **To:** | Nancy Krop; Dan Bartley |
| **Cc:** | Mary Rose |
| **Subject:** | Fw: Great Apollo Article!!! |

Dan and Nancy,

We received this article today. I thought it had great insight on Apollo and how they have battled the reputation of a degree mill. Read it in its entirety. It makes for some great reading and insight on how we might be able to argue our case.

Julie
JULIE ALBERTSON
----- Original Message -----
**From:** Julie Albertson
**To:** ████████████████
**Sent:** Friday, October 17, 2003 11:39 AM
**Subject:** FW: Great Apollo Article!!!


-----Original Message-----
**From:** Daniel Waterman
**Sent:** Friday, October 17, 2003 11:24 AM
**To:** NCAL ENROLLMENT
**Subject:** FW: Great Apollo Article!!!


-----Original Message-----
**From:** Ayla Dickey
**Sent:** Friday, October 17, 2003 9:25 AM
**To:** UOP CAMPUS VP DIRECTORS; UOP ALL MARKETING; UOP DOE; UOP DEANS
**Cc:** Terri Hedegaard
**Subject:** Great Apollo Article!!!

For those of you who haven't yet seen it... the text below is from yesterday's Arizona Repubic article on Apollo. It was a great piece with front-age Business section coverage (including photo) and an additional entire page of the business section. We have ordered about 100 copies of the paper and we will send each campus an actual paper copy. We are also looking into reprint pricing and will let you all know when we get that information back.

Thanks!!!
Ayla



Sun never seems to set on Apollo Group

Dawn Gilbertson
The Arizona Republic
Oct. 16, 2003 12:00 AM

A stock with twice the sizzle Home Depot had in its prime.

**DOE APOL 0953**

Message

Sales charts as steep as a young Microsoft.

A Dell-like business model that rocked an industry.

From its bare-bones base in an Interstate 10 industrial park, Apollo Group Inc. and its fast-paced, for-profit University of Phoenix have gone from maverick to mogul in less than a decade on Wall Street.

Apollo shares have risen more than 8,000 percent since their December 1994 debut and rank among the top 10 performing large-company stocks of the past decade. Annual sales have zoomed from $125 million to more than $1.3 billion; profits from $4.9 million to $247 million.

It is a hypergrowth story with few speed bumps. Just last week, the company reported a 60 percent spike in online enrollments for the fourth quarter.

And it is the story of a company that reinvented itself. While it continues to expand its bricks-and-mortar locations, it has become an Internet learning giant. Apollo accomplished this tremendous growth while improving its academic reputation. But as Apollo enters its 10th year as a public company, the question on investors' minds is this: Can the rocket ride continue?

Wall Street analysts, money managers and other observers overwhelmingly think so, although all note that the eye-popping growth rates can't continue given the University of Phoenix's expanding size and the tough math that goes with that. It is the largest private university in the nation with 175,000 students.

There also are some nascent concerns about the business, from increasing competition for online students to declining revenue per student, and lingering issues about the University of Phoenix's academic quality.

Still, more than half the analysts who follow the stock rate it a strong buy or a buy, even in this post-Enron era of heightened ratings scrutiny. Most of the rest rate it a hold for now because of this year's almost 50 percent run-up, but say they like the long-term prospects. Standard and Poor's bumped its target price for the stock to $86 from $75 after Apollo's earnings report last week.

"It's pretty amazing, the consistency of this company," said Barbara Walchli, a Phoenix-based portfolio manager for the Aquila Rocky Mountain Equity Fund, which has owned Apollo shares for three years.

**A lot to like**

Supporters find plenty to like about Apollo, which gets 90 percent of its revenue from University of Phoenix tuition.

Among the biggest advantages they see:

**\* Market leadership and national brand.**

Apollo has about 10 percent of the $13.2 billion for-profit higher education market. Sean Gallagher, senior analyst for Boston-based research and consulting firm Eduventures Inc., calls that share "very, very, very significant."

As the pioneer in for-profit education - John Sperling founded Apollo in 1973 - the company is the gold standard for the industry, Gallagher said.

"Apollo is just way ahead of the pack in terms of its size and in terms of its awareness and its marketing budget," he said.

Such is its impact that the industry newsletter *Nontraditional*

---

**FYI**

**Apollo Group Inc.**

\* Headquarters: Phoenix.

\* Business: Adult education. Subsidiaries include the University of Phoenix, Western International University, the Institute for Professional Development and the College for Financial Planning.

\* Total student enrollment: 200,000-plus.

\* CEO: Todd Nelson.

\* Stock symbol: APOL on Nasdaq.

**Head of the class**

Fast facts about Apollo Group Inc., parent of the University of Phoenix, Western International University and two specialty schools:

\* Largest private educational institution in the country, with more than 200,000 students.
\* Largest buyer of business textbooks in the United States.

\* Projected to have 100,000 online students by next summer.

---

**FYI**

\* Has 5,446 employees in Arizona.

DOE APOL 0954

4/24/2007

*Students Report* earlier this year ran a two-part special report titled "The Phoenix Effect."

The company's outsized marketing budget, with $74 million spent on the University of Phoenix Online alone, according to one estimate, gives it a national name that dramatically eases its entry into new cities and states. Some competitors use different names for different programs.

"It's sort of a Wal-Martesque approach to education" marketing, Gallagher said.

**\* Innovation and flexibility.**

Apollo prides itself on its new business developments and quick response to changes in the job market.

The company was early in the online education game - 14 years ago - seeing it as a way to attract students who couldn't make it to one of its campuses or a traditional school. It tested the idea in Colorado, where winter weather was a hindrance.

"We didn't get into distance education because we saw everybody else do it," Apollo CEO Todd Nelson said at a meeting of entrepreneurs in Phoenix this summer. "We looked at the market we were serving and said, 'What's preventing them from actually getting the product or going to school?' "

Nelson recalls the initial dial-up computer system being so slow "you could see the type scroll across the screen."

Today, online is Apollo's rocket fuel and a key reason for all the optimism.

Executives forecast 50 percent growth for the fiscal year that began in September. By August, it expects to have 100,000 online students.

Apollo has two new ventures that company officials and analysts say are especially promising: Resource and FlexNet.

Resource is a new electronic publishing division that delivers textbook chapters, simulations and other study materials electronically. Students pay a little less than they would for textbooks, and the profit margins for Apollo are supersized, Nelson said. It is expected to bring in about $150 million for the company this year.

The idea sprang from Apollo founder Sperling and was shaped by one of the University of Phoenix's deans, who was having trouble getting copies of *Harvard Business Review* cases quickly for his students, Nelson said.

"The publishing industry doesn't really work," Nelson said. "Well, it works, but it's not efficient and not for our students."

FlexNet is a new program, initially offered in smaller cities like Spokane, Boise and Wichita, where students take the first and last week of a course on campus and the rest online. It's a way to expand to markets that can't support a full campus and also saves

**Getting your degree**

The University of Phoenix promotes itself on the basis of its convenience for its students and the career relevance of its degree programs.

\* Classes are designed for adults who are already employed and looking to advance their careers. The target student is 23 or older; the school recently started admitting 21- and 22-year-olds.

\* Students are able to learn in a traditional classroom setting or online from home or work. Some programs mix the two, with students attending first and last classes in a classroom and doing the rest of the coursework online.

\* Classes are typically just six weeks long and students can take breaks to fit coursework around business or personal schedules.

\* The school says it is possible to obtain a degree in two to three years, rather than the four or five common for many bachelor's programs.

\* 60 percent of tuition revenue comes from students' employers.

\* While the school offers an associate of arts degree in general studies, most of its degrees are business-related. They include bachelor of science degrees in accounting, business administration, management, marketing

\* 80 lobbyists on payroll with annual budget of $20 million to $25 million.

\* Spends nearly $1,300 in marketing for every online student enrolled, vs. $35 for every student enrolled online at the University of Massachusetts.

\* Largest single recipient of corporate reimbursement dollars for education and training.

*Sources: Apollo Group, Eduventures*

DOE APOL 0955

# EXHIBIT P-3

Case No. 06-MC-0558 (CKK)

Message

money on leasing.

Apollo touts its ability to adapt quickly to employers' needs. It listens closely to them because about 60 percent of its tuition revenue comes from corporations subsidizing workers' educations. AT&T is its largest corporate customer.

A few years ago, when the University of Phoenix noticed a drop in MBA enrollments from Intel Corp. in Chandler, it immediately talked to managers there.

and finance; and master's degrees in business administration, accounting and human resources management.

*Sources: University of Phoenix, Republic reporting*

It turned out they had enough MBAs floating around. University officials asked what kind of training they needed, and Intel said a technology management degree. Apollo created one.

"Not only has our enrollment since then doubled, but it was one of our fastest-growing programs for about two years," Nelson said.

Steven Crow, executive director of the Higher Learning Commission of the North Central Association of Colleges and Schools, the regional group that accredits Apollo and traditional universities from Arizona State University to Northwestern, said he has been impressed by Apollo's focus.

"They've developed a very customer-friendly approach to education," he said.

## * Demographics.

The demand for higher education is expected to surge as the children of baby boomers graduate from high school.

"You have some of the largest graduating classes of the last few decades that are coming out of high school," Gallagher said. "On top of that, more and more high school students are going on to college."

In its regulatory filings, Apollo quotes Department of Education statistics that show that more than 6 million, or 40 percent of all students enrolled in higher education programs, are over the age of 24. That number is projected to reach 6.5 million in 2007 and 6.7 million in 2011.

The University of Phoenix targets working adults 23 and older, although it recently began accepting 21- and 22-year-olds.

It serves as an alternative to traditional universities and attracts students who want to finish degrees or get advanced degrees to move up in their careers.

"We have found the right market that is in need," Nelson said.

## * Room to grow.

Despite its meteoric growth, the University of Phoenix operates in just 28 states. It has plans for all 50 states, most recently gaining a foothold in the Northeast with long-sought approval to operate in New Jersey. Nelson expects it to be the school's fourth-largest market, behind California; New York, where it is still seeking approval; and Texas.

Existing campuses are still growing, too. Nelson points to Tucson, which is its most successful city by far in terms of market penetration. It is still growing at 5 percent to 6 percent a year there, he said.

"That shows us that we haven't, in our oldest, deepest campus, even hit a wall yet," Nelson said.

In online, the company says demand is so strong it recently added admissions counselors to handle the leads. It is scouting sites for new buildings to complement the six it already has that support the online operations.

It is in the early stages of exploring international expansion and has attracted more than 3,000 students with little effort.

Keep an eye on

DOE APOL 0956

4/24/2007

With a stock in the stratosphere – the company's price/earnings ratio is a staggering 50, nearly double the level of the S&P 500 – and a throng of Wall Street analysts and investors watching its every move, Apollo is walking a tightrope.

One slipup, any sign that growth is slowing, and the air could come out of the stock.

"They need to execute precisely," Gallagher said. "There's not a lot of room for error."

Even after the earnings report last week that analysts alternately described as solid and strong, questions were raised.

"Is it enough?" was the headline on Merrill Lynch's report. The firm, which has a hold rating on the stock, said enthusiasm for Apollo may be tempered by a decline in revenues per online student, slowing growth, and the fact that Apollo didn't beat Wall Street's expectations by as much as it has in the past.

Nelson is more than mindful of the high expectations, practically begging analysts on a conference call in August to lower their profit expectations to the company's projected levels. He warned that too-high targets could affect the company's aggressive expansion plans this year.

In an interview, Nelson said Apollo would never stray from its business plan to please Wall Street, but admits the pressure is there.

He has called managing the sky-high expectations of investors one of the biggest challenges the company faces over the next five years.

### Rising reputation

Another challenge is raising the University of Phoenix's academic credibility.

The issue has dogged the company from the start, when it was labeled a diploma mill because of its short courses, part-time faculty and for-profit focus.

The company's nationwide growth, stock market success and maturity have all but wiped out that moniker.

"The academic model of Phoenix doesn't seem to be the issue as much as it once was," Crow said.

Crow said the university's early years were "agony" for the accrediting agency because critics questioned whether the agency had good standards for including the school in the same mix as traditional universities. Apollo officials didn't help with their attitude of superiority, he said. Today, in contrast, they present the school as an alternative to traditional universities.

"It's only been within the past five or six years that they really have sort of risen up to have national prominence," Crow said. "It's not a main-line institution, but its model, and its leaders have in fact been accepted in the main line."

That sentiment is similar to comments offered by Mike Dickson,( director of graduate admissions at Arizona State University.

"I think we serve different missions and different student populations," he said. "I am sure this is some overlap, but I think in most cases, students who are looking for a traditional university environment are different from University of Phoenix students."

The University of Phoenix is geared toward "non-traditional, adult students who typically go to school on a part-time basis," Dickson said. Most ASU students are younger and attend school full time.

"I'd be hard pressed to say the University of Phoenix is eating into ASU's market share, or vice versa," Dickson said. "I hope that overall, we are educating more people between us, not divvying up students. That way we can produce a better-educated populace."

Because of its unique model and newness, the Higher Learning Commission kept Apollo on what Crow calls a short leash for years. After a recent audit, it was loosened considerably, he said, meaning less frequent reviews.

There are still plenty of skeptics, of course.

Susan Shultz, president of SSA Executive Search International in Phoenix, said the University of Phoenix's reputation has

DOE APOL 0957

Message                                                                                    Page 6 of 6

definitely improved, but notes that certain employers still are looking for a higher academic pedigree.

In her case, Shultz said she gives more scrutiny to a candidate who has the University of Phoenix vs. Harvard on his resume.

"I just look for something a little extra," she said.

Kevin Wilde, a University of Phoenix MBA graduate, raised the credibility issue with Nelson at an Enterprise Network meeting this summer at the Phoenix Country Club.

Wilde, a salesman, told him the degree was perceived as "MBA lite" during a recent job search he went through.

That irked him, he said, because it was a rigorous program.

"How do you counter that concern, that while you're doing fantastic financially and you're meeting all the needs of these students, the academics and those who are supposedly in the know still look down upon these types of degrees?"

Nelson called the credibility issue one of his favorite subjects. He likened criticism of the University of Phoenix's model to getting into a fistfight with a bodybuilder.

"They're always looking at their arms, instead of where the punches are coming from," he said.

He urged Wilde, who had landed a good job, to be patient.

"It may be a little frustrating now, but give it another five years, another 10 years," he said. "We're very pleased with where we are, and we're continually doing things to upgrade that reputation."


Reach the reporter at dawn.gilbertson@arizonarepublic.com or (602) 444-8617


Ayla Dickey
Associate Vice-President
Public Relations and eBusiness
Apollo Group, Inc., University of Phoenix
ayla.dickey@phoenix.edu
480-557-2952
602-383-2370 Fax

DOE APOL 0958

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, December 09, 2003 5:14 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | ██████████████ , ████████████████ DanielBartleyLaw@aol.com |
| **Subject:** | Fwd: Sperling Club |

Hi

FYI -- UOP is doing another Sperling trip contest -- this one to Yosemite.  Just curious, Russ and Jennifer, as to how UOP justifies these trips under the regs?

Nancy


Law Offices of Nancy G. Krop
E-mail: nkrop@kroplaw.com
1534 Plaza Lane, #322
Burlingame, California  94010
Tel. 650/344-5306  Fax 650/344-5307

Confidentiality Note:  This email may contain information that is privileged, confidential and/or otherwise legally protected.  If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message is strictly prohibited.  If you have received this e-mail in error, please contact the sender by e-mail or telephone (650/344-5306) and destroy all copies. Thank you.

-----Original Message-----
**From:** Daniel Waterman
**Sent:** Tuesday, December 02, 2003 4:32 PM
**To:** NCAL ENROLLMENT
**Subject:** FW: Sperling Club
**Importance:** High


Team.........it has been brought to my attention that some of you may find the picture on this e-mail "offensive" or in "poor taste".  I do apologize to any of you who have taken offense to this picture.  It was not meant to "portray" anything negative about any of you personally or the team in general.  Other pictures or representations of "reaching new heights" would have been more appropriate and should have been utilized.  Sperling Club is a great opportunity for all and is a positive aspect of being a part of UOP and the Enrollment Department. Once again I do apologize and I appreciate you bringing this to my attention.


Daniel

**DOE APOL 0959**

4/24/2007

-----Original Message-----
**From:** Daniel Waterman
**Sent:** Tuesday, December 02, 2003 1:30 PM
**To:** NCAL ENROLLMENT
**Subject:** Sperling Club
**Importance:** High

# Want to Reach New Heights?



**If you answered YES then we have just the thing that will help make it happen..........SPERLING CLUB !!!!**

DOE APOL 0960

December,January, and February are the months for this edition of Sperling Club. The actual event will take place in May and the eligible participants will be going to Yosemite !!!!!  Check out this address on the internet..........

http://www.tenayalodge.com/

NOW is the time to work on qualifying for this event because every month counts, and for every month to count you need every week to count, and for every week to count you need every day to count !  Is that enough counting for you ??????

**More info will be forthcoming on qualifications and eligibility requirements, however, its no secret that you need to have your activity levels in a often or always exceeds category and you need to have those activities result in students starting class. Details will follow............**

Go Team!

DOE APOL 0961

4/24/2007

Page 4 of 4

DOE APOL 0962

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Wednesday, December 10, 2003 1:05 PM |
| **To:** | Woodward, Jennifer |
| **Subject:** | RE: Sperling Club |

Yes, and I believe some/most? contests are based on obtaining a set number of enrollments (within the prescribed contest time), which would be clearly prohibited.

At 10:01 AM 12/10/2003 -0500, you wrote:

> I believe their thinking is that because employees of other division are included (academics, etc.) that the trips are okay. We can argue; however, that the sole reason admissions employees are chosen to go is numbers. That's why one of our questions to each recruiter has been whether he or she viewed the trip as an incentive to recruit more students. They all said, "of course."
>
> -----Original Message-----
> From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
> Sent: Tuesday, December 09, 2003 5:14 PM
> To: Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
> Cc: ████████████ ████████████ DanielBartleyLaw@aol.com
> Subject: Fwd: FW: Sperling Club
>
> Hi
>
> FYI -- UOP is doing another Sperling trip contest -- this one to Yosemite. Just curious, Russ and Jennifer, as to how UOP justifies these trips under the regs?
>
> Nancy
>
>
> Law Offices of Nancy G. Krop
> E-mail: nkrop@kroplaw.com
> 1534 Plaza Lane, #322
> Burlingame, California 94010
> Tel. 650/344-5306 Fax 650/344-5307
>
> Confidentiality Note: This email may contain information that is privileged, confidential and/or otherwise legally protected. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message is strictly prohibited. If you have received this e-mail in error, please contact the sender by e-mail or telephone (650/344-5306) and destroy all copies. Thank you.
>
> -----Original Message-----
> From: Daniel Waterman
> Sent: Tuesday, December 02, 2003 4:32 PM
> To: NCAL ENROLLMENT
> Subject: FW: Sperling Club
> Importance: High

**DOE APOL 0963**

Team.........it has been brought to my attention that some of you may find the picture on this e-mail "offensive" or in "poor taste". I do apologize to any of you who have taken offense to this picture. It was not meant to "portray" anything negative about any of you personally or the team in general. Other pictures or representations of "reaching new heights" would have been more appropriate and should have been utilized. Sperling Club is a great opportunity for all and is a positive aspect of being a part of UOP and the Enrollment Department. Once again I do apologize and I appreciate you bringing this to my attention.

Daniel

-----Original Message-----
From: Daniel Waterman
Sent: Tuesday, December 02, 2003 1:30 PM
To: NCAL ENROLLMENT
Subject: Sperling Club
Importance: High

# Want to Reach New Heights?

DOE APOL 0964



**If you answered YES then we have just the thing that will help make it happen..........**SPERLING CLUB !!!!

December,January, and February are the months for this edition of Sperling Club. The actual event will take place in May and the eligible participants will be going to Yosemite !!!!! Check out this address on the internet..........

## http://www.tenayalodge.com/

NOW is the time to work on qualifying for this event because every month counts, and for every month to count you need every week to count, and for every week to count you need every day to count !  Is that enough counting for you ??????

**More info will be forthcoming on qualifications and eligibility requirements, however, its no secret that you need to have your activity levels in a often or always exceeds category and you need to have those activities result in students starting class. Details will follow...........**

Go Team!

DOE APOL 0966

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Wednesday, August 04, 2004 12:25 PM |
| **To:** | Woodward, Jennifer |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Fwd: FW: Important: Your help is needed |

CONFIDENTIAL COMMUNICATION PROTECTED BY JOINT PROSECUTION PRIVILEGE, ATTORNEY-CLIENT PRIVILEGE, AND WORK PRODUCT RULE

Jennifer,

F.Y.I.

Dan

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Website BartleyLawOffices.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0967

FW: Important: Your help is needed                                      Page 1 of 2

## Rose, Christine

| | |
|---|---|
| **From:** | Julie Albertson [Julie.Albertson@phoenix.edu] |
| **Sent:** | Wednesday, August 04, 2004 11:52 AM |
| **To:** | 'danielbartleylaw@aol.com' |
| **Subject:** | FW: Important: Your help is needed |

Hi Dan,

Thought you would find this interesting. You can email me any comments to my home email. This is work.

-----Original Message-----
**From:** Jo Hoffmeier
**Sent:** Tuesday, August 03, 2004 9:22 PM
**To:** NCT ALL EMPLOYEES
**Cc:** Kenda Gonzales; Dianne Pusch
**Subject:** FW: Important: Your help is needed

Hi there everyone!   Please see the message below from Dianne Pusch.  If you have any of these documents Dianne has requested, please respond to the specified address or fax by noon on Wednesday 8/4/04.  Thanks so much for your assistance.

<div align="center">

Jo Hoffmeier, V/P Director
Northern California Territory
Sacramento Valley, Bay, Central Valley Campuses
University of Phoenix
(916) 923-2107
ext. 61208
Fax: (916) 648-9130

</div>

Hi everyone,

I have a special favor to ask.  Would you please check through your files for emails and other announcements pertaining to any Sperling Club trip?

Please take a moment to find any electronic or hard copy documents relating to Sperling Club and forward those directly to our

Western Region mailbox (just type Western Region in your "To" line of the email). Please send this information off by 12n tomorrow, Wednesday.  If you find something in hard copy, you may fax it to me at:  714) 371-9023.

**DOE APOL 0968**

4/24/2007

Thank you for your help, I really appreciate your support in this request!

Dianne

PS - if you see that I've missed any teams or individuals in your Campus, please forward this onto them.

Dianne Pusch

Senior Regional Vice President

**University of Phoenix**

(714) 371-9010 ext. 31102

DOE APOL 0969

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Wednesday, August 04, 2004 12:54 PM |
| **To:** | Woodward, Jennifer |
| **Cc:** | ████████████████, ████████████████, DanielBartleyLaw@aol.com |

**Subject:** Fwd: FW: SPERLING GOALS

Hi Jennifer

Wasn't sure if you had the e-mail below re a Sperling contest based solely on enrollments, not just applications.

Thanks.

Nancy

-----Original Message-----
**From:** Tim Gruber
**Sent:** Thursday, January 16, 2003 10:15 AM
**To:** NCAL ENROLLMENT
**Subject:** SPERLING GOALS


**ATTITUDE**first Team:

# The SPERLING goals are approved...Here's what you need to do to earn your trip.

## HOW DO I QUALIFY?

**DOE APOL 0970**

AC's with 9-months or more on the job must enroll <u>50 NEW students</u> between January 1st and March 31st.  These are not applications we are talking about, but rather, NEW ENROLLMENTS.


AC's with less than 9-months on the job must enroll <u>45 NEW students</u> in the same period of time.


AM's must hit <u>110%</u> for the three month period.


BDS's must generate <u>320 leads</u> and achieve a minimum of <u>15% from Lead to Appointment</u>.

*ATTITUDEfirst*

**Tim Gruber**

**Director of Enrollment**

**Northern California Campus**

**7901 Stoneridge Drive #130**

**Pleasanton, California 94588**

twgruber@apollogrp.edu

**Phone: (925) 416-4144**

<u>**www.phoenix.edu**</u>

**DOE APOL 0971**

## Rose, Christine

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Thursday, August 05, 2004 12:08 PM |
| **To:** | Woodward, Jennifer |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Fwd: Re: Attachment to Jennifer's e-mail |

Hi gang,

I am sure I have emails regarding contests. I just don't have any time during the week to research it. I can do it over the weekend. With my commute to SF, I am lucky to get home just in time to feed and bath my son and put him down (and then me...I'm exhausted :-)

I will look through all my hard copies as well as emails this weekend. Please let Jennifer know for me.

Julie

**DOE APOL 0972**

Page 1 of 1

## Rose, Christine

**From:**    DanielBartleyLaw@aol.com
**Sent:**    Sunday, August 08, 2004 6:49 PM
**To:**      Woodward, Jennifer
**Cc:**      nkrop@kroplaw.com
**Subject:** Fwd: New piece of information (U.S. ex rel. Hendow v. University of Phoenix)

CONFIDENTIAL COMMUNICATION PROTECTED BY JOINT PROSECUTION PRIVILEGE, ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT RULE

Jennifer

F.Y.I.

Dan Bartley

**Daniel Robert Bartley Law Offices**
**E-mail** DanielBartleyLaw@aol.com
**Website BartleyLawOffices.com**
**Mail Address: Post Office Box 686, Novato, CA 94948 0686**
**Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405**
**Tel 415 898 4741 Fax 415 898 4841**

**Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.**

DOE APOL 0973

**Rose, Christine**

| | |
|---|---|
| **From:** | ███████████ |
| **Sent:** | Sunday, August 08, 2004 2:01 PM |
| **To:** | Nancy G. Krop |
| **Cc:** | DanielBartleyLaw@aol.com; ███████████ |
| **Subject:** | New piece of information |

Hey gang,

I found this binder in my new office at work. It had pages of published "best practices" that UOP puts out to help motivate and assist enrollment in so called "being successful". I think you, as well as Jennifer, will find Gail Cameron, Las Vegas-Nevada, especially interesting. How nice of CORPORATE to date it for us too :)
Now, if we weren't paid based on enrollment, then why ever would CORPORATE publish this article in their "best practices"?

DOE APOL 0974

4/26/2007

## JANUARY 1999 ENROLLMENT BEST PRACTICES
### *How I Stay Motivated...*
### *(Things that I Read, Do, Listen To, or Think About)*

**Donn Webb, Jacksonville – Florida (continued):**
Goal Setting...I also like to set my own goals in addition to the ones set by my DOE. For example, by the end of this half I want to be in the top 75 of all enrollment counselors...so I set weekly and monthly goals of what I need to do in order to accomplish this. I keep track of appointments scheduled, the number of actual appointments, the number of apps received and the number of new enrollments. I use an Excel spreadsheet that compares my actual numbers to my projected goals, so I can constantly see if I'm on pace to achieve my goals.

Contests...There's nothing like a contest to keep EC's motivated. We all have that competitive spirit that brings out the best in each of us. A contest amongst your fellow EC's seems to take everyone to the next level.

**Dustin Phillips, UOP Online/South Mountain - Arizona:**
4 KIDS UNDER 5 YRS OLD!

**Ehab Hanna, Henderson Learning Center – Nevada:**
I stay motivated by listening to Selling and Motivational tapes in the car on a regular basis. Also, I read current articles, books, and success stories to make me the best on the job and in my personal life.

**Erika Steinlauf, Tampa -- Florida:**
I call an already existing student that I know loves the university, his/her program, and/or me and I chat with them to see how everything is going. This helps me to remember that I am making a difference in people's lives and helps me stay motivated to get back on the phones or back into a cheerful mood and do my job effectively.  :-)

**Gail Cameron, Las Vegas – Nevada:**
I am motivated by counting my new enrollments that have already cleared for the half that I am currently in, then I set the money goal that I want to reach.  I figure out how many new enrollments I need for the remainder of the half and then set weekly and daily goals that I need to reach to exceed my income goal.   And the more money I earn, the more stock purchases I make which increases my savings in stock options watching this grow keeps me motivated!

**Geli Klimek, Jacksonville – Florida:**
Motivation! We all need it one time or another throughout the day.  How do I stay motivated?  Here are some of the things I do:

1) MUSIC...This is my favorite motivational technique.  The kinds of music that motivate me are upbeat, in a major chord, have some movement going on, but no words (words in music tend to distract me).  I even have music CD with subliminal messages regarding self-confidence and getting into action!  Believe it or not, my best days (both in meetings and on phones) occur when I listen to that CD!

\* Indicates Outstanding Best Practice Winner.

DOE APOL 0975

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, August 19, 2004 7:41 AM |
| **To:** | Woodward, Jennifer |
| **Subject:** | Apollo Group's Q304 earnings conference call . . . |

Jennifer

FYI:  Attached in pdf, with a material excerpt set forth in text below, is the transcript from APOL's Q304 earnings conference call.

In the conference call, CEO Todd Nelson makes a pointed reference to this being an election year, with the two parties taking divergent views toward regulation of business post-Enron.

He also mentions how "disgruntled employees or former employees" can "get an audience and that's a bad situation . . .."  He indicates the disgruntled employees and former employees themselves are the problem, and contends there is not "any substantive problem."

Dan


## SOME EXCERPTS FROM THE ATTACHED CONFERENCE CALL TRANSCRIPT:

"The program review at the University of Phoenix continues to go, from our point of view, very smoothly they have been – you know, they have requested some information back from us, we obviously have conducted the research, gathered the information and it looks great. And so, our hope is that, you know, three to six months' timeframe, that we will have that result. And, again, as you know, that's just, for us it's a normal course of business. Certainly nothing – nothing that we see, we feel that the data that we produced will create any problems for us."

And later in the transcript…

<Q – Howard Block>: Okay. And then if we look at some of the manuals and things that the Department of Education makes available, in their definition or description of program review, they make it sound as though there is usually some sort of a trigger or a catalyst for them to conduct a program review. Is that true or and more importantly, was it true in the case of the review that you are undergoing right now?

<A – Todd Nelson>: No, I think you are right. I do think that there are usually some things that trigger that, but some of those things that trigger that can be extremely minor. One of the things that we found interesting in our interaction with the OIG, because I am the one who gets the call when the OIG does an audit. The first thing out of their mouth has been, when they talked with us is, this is a routine audit and you are one of the largest recipients of, you know, Title IV funds, therefore — you know, we need to come look at you. We need to look at big schools like you, so that's on the OIG side. On the department of – on the Program Review Side, my experience is that it usually is triggered by something and again it can be something significant, it can be something minor. My opinion at the last program review probably had something to do with the fact that, you know, with that "qui tam" lawsuit and some of the acquisitions being made and it's probably one of the reasons why they came in. But, in our case it's routine, because again, when you are growing rapidly and when you are our size, there are always a lot of issues. And we are different, as you know. We look very different than a traditional university, the fact that our students are adults, the fact that they are not heavily reliant upon financial aid like a lot of other traditional universities, the fact that our courses are sequential versus simultaneous courses that you have in a traditional university. We don't operate on an academic or calendar year, the same

DOE APOL 0976

way that a lot of other institutions do. So, these things cause and trigger that. So in answer to your question, yes it is – it doesn't necessarily have to be a negative thing.

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Website BartleyLawOffices.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

**DOE APOL 0977**

4/26/2007

| Apollo Group, Inc. | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company ▲ | Ticker ▲ | Event Type ▲ | Date ▲ |

## ▨ MANAGEMENT DISCUSSION SECTION

### Todd Nelson, President, Chief Executive Officer and Director Apollo Group, Inc.

Thank you. We appreciate you joining us this morning. We are very pleased to report third quarter results with an EPS number for Apollo of 56 cents, versus a consensus of 51 cents, and UOPX EPS number of 48 cents versus a consensus of 41 cents. We are also very pleased to report strong enrollment, with growth of over 239,000 students, which despite being over 200,000 students, it was a 27.6% increase. With University of Phoenix Online growing at 52% and we are very excited that there are now over 100,000 students and UOP On-ground campuses growing at 13 percent. We are also very encouraged by what we see in the older campuses – our over 5-year campuses, which had a very strong quarter growth rate of over 6.6 percent.

We are also very encouraged by what we see in the lead flow area. We see very strong lead growth in both our Online and On-ground campuses, so that's very encouraging for future growth. We are sorry that despite what we feel are very good results that some of the bad news in the space has put a cloud over today, which would have otherwise been a very good day. So, it looks like maybe a good buying opportunity for both APOL and UOPX.

I have just two last comments before I turn the time over to Kenda. First, from our perspective, the potential for growth continues to look overwhelmingly positive. For example, an article I recently read that was the San Francisco-based National Center for Public Policy and Higher Education, they issued a report that outlined the serious issues faced by the state's community college system and point to the tidal wave of students that have been expected – that will be expected over the next several years. According to the report, the state's 108 community colleges will face an increase of 700,000 students by 2010 and this is all obviously in the context of diminishing state support. And with our being in many different states, this crisis is similar in many other states and we know that Apollo Group is well positioned to help relieve some of this pressure. So, again we feel very, very positive about our growth potential.

Lastly, internally, we've never felt better about the condition of Apollo and we certainly look forward to the opportunities that lie ahead. Kenda?

### Kenda Gonzales, Chief Financial Officer, Secretary and Treasurer

Thank you, Todd. Starting with Apollo Group, Inc. revenue related to students enrolled in degree programs increased 35.6% for the third quarter of fiscal 2004 to $464.5 million compared to $342.6 million for the third quarter of fiscal 2003. During the third fiscal quarter, we were able to leverage instructional costs and services due primarily to our ability to leverage direct costs necessary to support the increase in degree student enrollments.

Selling and promotional costs increased as a percentage of revenue in the quarter ended May 31st, 2004, primarily as a result of an increase in enrollment advisors' compensation and an increase in advertising expenditures. The University of Phoenix currently has 51 local campus locations, of which 26 are less than five years old.

During the third quarter of fiscal 2004 we were able to continue to leverage general and administrative expenses. Our operating margin increased to 35.2% for the third quarter compared to 32.1% for the third quarter of the previous fiscal year. Net income for the third quarter of fiscal 2004 increased 47.2% to $109.3 million compared to $74.3 million for the third quarter of fiscal 2003.

DOE APOL 0978

**corrected transcript** *(vertical, left margin)*

**callstreet** *(vertical, left margin)*

| **Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| *Company ▲* | *Ticker ▲* | *Event Type ▲* | *Date ▲* |

Turning to the balance sheet, cash and marketable securities were $1.3 billion at May 31st 2004. Net receivables were $136.3 million, which equates to 30-days sales outstanding. At May 31st 2004, we had reserved $11.6 million against our receivable balance and during the third quarter we wrote-off $6.6 million of student receivables. Shareholders equity at the end of May was $1.3 billion. Depreciation and Amortization Expenses were $12.9 million for the third quarter of fiscal 2004 compared to $11.7 million for the third quarter of fiscal 2003. Capital Expenditures for the three months ended May 31st, 2004 were $27.1 million compared to $11.9 million during the quarter ended May 31st, 2003. Net cash provided by operating activities was $161 million for the third quarter compared to $97.5 million for the third quarter of the previous fiscal year. During the third quarter of fiscal 2004, we purchased 250,000 shares of APOL and 191,500 shares of UOPX. We have 90 – roughly $95 million remaining of the amount authorized by our Board of Directors for stock buybacks.

Turning to University of Phoenix Online. Total revenues for the third quarter of fiscal 2004 increased 60% to $233.3 million compared to $145.8 million during the third quarter of fiscal 2003. Net income for the quarter ending May 31st, 2004 increased 80.3% to $57.1 million compared to $31.7 million for the third quarter of fiscal 2003.

We are increasing our fiscal 2004 guidance related to expected diluted earnings per share attributed to Apollo Education Group from $1.77 to $1.83, and expected earnings per share guidance attributed to University of Phoenix Online is increasing from $1.47 to $1.55 for fiscal 2004. Todd?

**Todd Nelson, President, Chief Executive Officer and Director Apollo Group, Inc.**

Okay, thanks Kenda. We would now be happy to answer a few questions.

DOE APOL 0979

# EXHIBIT P-4

Case No. 06-MC-0558 (CKK)

**callstreet**

**corrected transcript**

| **Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| *Company* ▲ | *Ticker* ▲ | *Event Type* ▲ | *Date* ▲ |

## QUESTION AND ANSWER SECTION

Operator: Thank you. Ladies and gentlemen, at this time we will be opening up the call for the question and answer session. Please press the star then the number one on your touchtone phone, if you would like to ask a question. If your question has been answered and you wish to withdraw your request, you may do so by pressing star then two. If you are on a speakerphone, please pick up your telephone handset before entering your request. One moment please for the first question.

Your first question comes from Trace Urdan with ThinkEquity.

<Q – Trace Urdan>: Hey, good morning everyone. Todd, I'm going to get right at the issue related to the stock performance in the group here and I guess that, the thing I've heard the most from people this morning is related to the guidance for the fourth quarter. And I think you guys have a pretty well established pattern at this point of issuing very conservative guidance on a forward quarterly basis, and then, you know, fortunately outperforming against that guidance. And, the question I think that are on some peoples' minds at this point that I am going to put to you is, do you see – is there anything about the tone of business to suggest that you are – you may not be following that same pattern again at this point. In other words, you know, given the context of where these stocks are and how much investors are nervous about the future performance, is there anything to be read or not read into your guidance with respect to your own confidence in your own business going forward?

<A – Todd Nelson>: Actually I am glad you asked that question right upfront. Let me just start by saying, if you look at the education space really there are – and I think there are some very good companies there, but there are still two types of companies. Ours tends to be different than most of the rest, because we don't deal that much in some of the, our Career College or Trade School areas. And so, I can't, you know I can't really speak towards their uses as far their potential growth. So let me just talk about ours and our guidance.

In answering your question, the answer is no. In fact, we have probably never felt stronger about our guidance and continuing the pattern that we have in the past. The only thing that I have noticed though over the last couple of months is that, some of the models that I have looked at have started to increase or accelerate the growth rate for Online. And so, we just – as we went out, as you know, last year we had given guidance of 50% growth for Online and 12 to 14% growth for our On-ground campuses. That was a very pleasant and positive surprise for everybody. I think, this last year, they thought that we would be under that. And so we were very excited but yes, we did expect this year would be the way that it, turned out the way that it has. But what's happened is we've noticed that some have started to ratchet that up; and we want to make sure that we keep people focused on the fact that our guidance is something based on not the market potential, but our commitment to making sure that we continue to have infrastructure in place to ensure that the quality education is taking place. That is our number one priority.

The second is providing, you know, the customer service that again supports these students, so we not only get them in, but we keep them in, and they have the, you know, not only quality education but a good academic experience, a good educational experience. So because of that, really not a change in our tone, we just want to remind people that again when you get close to a quarter of a million students, with plans to hopefully someday have over a million students that, you know, we need to make sure that the growth continues to occur in an orderly fashion. And honestly Trace, that's one of the big factors why, you know, we feel that growing the way we are is, I don't want to say the best way, but it is a safe way, because we don't have to keep our arms around as many regulatory issues. Because we are dealing with, you know, with, you know, if you take for example The University of Phoenix, we are dealing with one accreditation relationship; one relationship with the US Department of Education; and one relationship with the states that we are operating in. And so it's very important for us to again, that some of the models out there don't get too aggressive

DOE APOL 0980

:callstreet

corrected transcript

| Apollo Group, Inc. | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company ▲ | Ticker ▲ | Event Type ▲ | Date ▲ |

because we don't want people to start to follow those models versus the guidance that we are giving.

So, no in fact, just the opposite, we have honestly never felt better about the strength of the company going forward. You know, we want to make sure as we had said last year that, you know, when you start to hit the number – the large number of students that we have, that it's more important that you grow in a consoled manner than you just put the pedal down and grow at all costs. We just won't do that. But, if you look at that, where we are, and the ability to have, you know, Apollo Group growing at 28 percent, approximately 28 percent in enrolments with tuition increases, you know, in the 4 to 6 percent. At our size to still be growing at a 30% revenue clip and gaining leverage at the bottom line, so that we are increasing earnings higher than that – you know, we feel pretty good about things.

**<Q – Trace Urdan>:** Okay, fair enough Todd. Well, just one really quick follow-up to that exact point. The, you know, the law of large numbers and I think what we are really talking about here is this phenomenal growth you have had Online and the law of large numbers suggests that this is going to decelerate at some point. I mean, as you guys look forward, do you anticipate that there is some level of growth that you are going to sort of get to, that you think will be sustainable over some longer period of time?

**<A – Todd Nelson>:** Yeah, in fact – it was your piece that also picked up this California issue and so, you know, that the potential of it – we are not worried about the potential size of the market and then you start to add international into the mix and it really gets very exciting. But, I do think that, you know, as we have said before, our feeling is that the On-ground campuses are going to continue to do about as they have. You know, we expect double-digit growth out of them for honestly, the foreseeable future. Online, again because of that very large number you are going to start to see over time that percentage decelerate.. But, what will happen is, because that is now a larger portion of our students – percentage of our students versus On-ground, that the overall growth rate of Apollo Group, you are not going to see change much from what it is now, collectively that is. Individually you will start to see that grow to some degree, but we see that as a self-imposed growth rate versus that there is market potential, or more competition, or something of that nature. But, I do think, out over several years, we feel that, you know, that Online and On-ground can sustain a growth rate not that far different than where we are now at that 27, 28% level.

**<Q – Trace Urdan>:** Okay, thanks Todd.

**<A – Todd Nelson>:** You bet.

Operator: Your next question comes from Derek Wilder with Piper Jaffray.

**<Q – Mark Marostica>:** Hi guys, it is actually Mark Marostica with Piper.

**<A – Todd Nelson>:** Mark, I thought you would be congratulating us that we were, you know, 5 and 7 cents over. But I guess it doesn't matter much anymore.

**<Q – Mark Marostica>:** I know, it's very admirable. I wanted to just touch on a couple of themes related to the enrollment growth and actually your margins as well, and that's Online class size. Could you comment on where you ended up in the quarter on the Online class size or student to instructor ratio and how you see that progressing by the end of fiscal '05?

**<A – Todd Nelson>:** Sure, well the nice thing for us is we have seen an increase in the class size of Online. And that has a – some of the new programs that they have implemented have had a – actually, surprisingly, it's grown faster than what we expected. I don't have the exact number. One of the last reports that I received is that they were now over 11 students versus 10, which was in the past with a goal to get obviously, to you know, to 15. On-ground is also improving, but it's a

DOE APOL 0981

callstreet
•● callstreet

corrected transcript

| **Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| _Company ▲_ | _Ticker ▲_ | _Event Type ▲_ | _Date ▲_ |

little bit more difficult there, because again your – some of the campuses that are small and some of the newer campuses don't have the amount of flexibility to add students — combine groups and add students from groups that dropped out previously into existing groups. But, we are seeing a slight increase there as well to where it's now over 15 to 1 for On-ground. So, we are very excited about what we see happening. On-ground is about what we expected, but Online is making faster progress than what we had anticipated.

**<Q – Mark Marostica>:** Okay, great. I wanted to also just ask about Resource too. Would you characterize your current penetration with Resource as fully implemented at this point and if so, what would that be actually in numbers?

**<A – Todd Nelson>:** Yeah, in fact, we were – in fact the major implementation took place in March and we now have over 90 plus percent of our students on Resource at the University of Phoenix. And the thing that's for us very – what we feel very positive about is the academic, the feedback from the students and faculty from an academic perspective is overwhelmingly positive, and that really has been our priority. So, we would say that it's fully implemented, that few percentage points that are not on Online – excuse me, are not on Resource, it's only because they are small programs and they are really, may never be plans to get them fully on Resource. The thing that has made Resource possible, and why it's very difficult for others to repeat, or to, although they will probably claim to duplicate what it is we do, but because of our large number of students, we are able to – it's a very expensive - for us anyway, it's a very expensive process to set Resource up. But, when you, again, you know, allocate that across 200,000 students, it's very inexpensive. But, that is when each program is large. But, some of the smaller programs there is just again, will be sometime in the future that we would bring them on, but again, it's over 90 plus percent of the students. So, yes, it is. Go ahead.

**<Q – Mark Marostica>:** I was going to ask, any change in the feedback from students or faculty as to the value and just overall feedback as to whether it's meeting the needs of people?

**<A – Todd Nelson>:** No. In fact – I – not that I wasn't confident, but I have been just wonderfully surprised that the feedback – the negative feedback has just been almost non-existent. And, I– anytime you implement anything, no matter how good it is you tend to get, you know, operational problems or just because it's a change in general, you get some negative feedback. It has been overwhelmingly positive from both the student and the faculty's perspective, you know, points of view. So, we are – I just wish that all of our implementation of new programs could go as smoothly as this one has.

**<Q – Mark Marostica>:** And then last question, I will turn it over. Just on the heels of the announcement regarding Corinthian's program, review from the Department of Education today, I am wondering if you could update us on the status of any program reviews taking place throughout Apollo at this point?

**<A – Todd Nelson>:** Sure. We, you know, the two that we've talked about in the past, the OIG audit of IPD continues to go very well. You know, we are very close to reaching an agreement with them, one that we feel very good about. And, it's basically ending up where we had said it would, which is always good. More importantly in our dealing with our contracts – our IPD contract, we have been extremely appreciative of their support and working with us on it as well. And, I feel that it is – it will be a real positive boost for IPD, because I do think that even though it went smoothly, and again we felt that it was not necessary to be happening. It does have a bit of a negative impact on some of those contracts, because they are small schools, not used to dealing with some of these bigger issues. So, we feel that 1) It's going to be resolved very, very soon; and 2) we think that that will be a nice catalyst to help maybe give IPD a boost as well. The program review at the University of Phoenix continues to go, from our point of view, very smoothly they have been – you know, they have requested some information back from us, we obviously have conducted the research, gathered the information and it looks great. And so, our hope is that, you know, three to

DOE APOL 0982

| Apollo Group, Inc. | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company ▲ | Ticker ▲ | Event Type ▲ | Date ▲ |

six months' timeframe, that we will have that result. And, again, as you know, that's just, for us it's a normal course of business. Certainly nothing – nothing that we see, we feel that the data that we produced will create any problems for us.

**<Q – Mark Marostica>:** Okay, thanks. I will turn it over.

Operator: Your next question comes from Bob Craig with Legg Mason.

**<Q – Robert Craig>:** Well I will congratulate you. Anyway, just a couple of questions. I take it, Todd, from your initial response to Trace's question, you've said repeatedly on several of these calls that lead flow is still strong. I take it you really haven't noticed any change in trend in terms of lead flow that you could comment on?

**<A – Todd Nelson>:** No. In fact, I appreciate you asking that, because, no, lead flow is remarkably positive. And, I think that the evolution of how Internet leads are generated and the ability to control what is a qualified lead and the fact that we have – and, I am so grateful that some very talented people in both Online and On-ground that are involved in this, that it has continued to remain strong. I think the only reason why you would see, you know, and let's deal with Online, because that's more where you will see it, more of a deceleration in their growth rate is just the fact that they have 100,000 students and they are, you know, growing, adding over 50,000 students. And, that is when you are subtracting out drops in graduations, and to maintain that is – I mean, that's a, just operationally, it's something that is, for us, we just watch very carefully, because we are not going to let our graduation rates or our retention rates, our learning outcome suffer for our growth rate. And, so, that's why, as you know, I think it's just – it's good long-term growth strategy for us to, you know, to obviously not maintain that 50% growth rate for the next five years, although market potential is there. Our feeling is that, again, it's just, you know, slowly bring that down. And, I mean slowly, and I think that – but, it's certainly not the result of the lead flow.

**<Q – Robert Craig>:** One thing that could certainly help you keep that growth rate up there is penetration on the international side. Could you bring us up-to-date as to where you stand there, and where you think that might go over the next 12 to 18 months?

**<A – Todd Nelson>:** Yeah. In fact, you know, the international marketing in particular is something that we – is a bit of an unknown as far as the upside. Right now, we now have 130 counselors in Online selling international programs. We have over 6,000 students. And we really haven't put the pedal down there. We are just in a position right now where we are trying to test it out as we've said in quarters in the past. But, when you start to bring that market potential into there – it just does get overwhelming – the opportunity for growth. And, let me comment on one other area that also continues to look very promising that we really have not factored into any of our growth rate, or any of our guidance for next year is the 18 to 23-year-old market that we also feel, although again, it's way too early to predict how much upside. But, as was asked earlier, you know, is there some potential for upside? Absolutely. If this – our new initiatives in this area, not only through Axia, which is part of Western International University, but now through the University of Phoenix. If they go even close to what we are expecting, there is some nice upside potential out there for fiscal 2005. I mean, it's just – I mean let's just be honest. It is an entire new market that will be opening to us. We have the infrastructure in place, we now have the experience, with the curriculum that has been developed through Axia that we feel will be very effective. But, you know, our nature is to be conservative. So, we don't want to include that in the guidance going forward. But, let's be honest, our plans are to be doing that starting this fall, and it does have some real potential upside for us.

**<Q – Robert Craig>:** Todd, is your plan to lower the age restriction at UOP to 18 this fall?

**<A – Todd Nelson>:** The plan is to remove any age restriction from the University of Phoenix. And, it will be just as soon as we can work with, you know, within the academic structure of the

DOE APOL 0983

| **Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company▲ | Ticker▲ | Event Type▲ | Date▲ |

University of Phoenix, as well as any type of regulatory issues, which we don't obviously foresee any. But, those are the only things that need to happen, and we are working quickly to do that.

**<Q – Robert Craig>:** Okay. I will just ask one more question, I apologize for so many. But, in terms of uses for cash, I know you spent, you know, $35, $40 million to buy back your own stock this quarter. I guess a couple of questions is that, is there likely to be some increase in the authorization for share repurchase. And, we will ask it again, we have asked it before, but about the potential buy-in of the University of Phoenix Online?

**<A – Todd Nelson>:** Yeah. With what we see as far as, from our point of view, the opportunities for Apollo Group, I will tell you the best way for us to spend a dollar of cash is to buy back Apollo Group and UOPX stocks, especially with, you know, what we have seen happen with the price the last couple of days with some of the news in this space affecting it. You know, in answer to your question, we have a wonderful Board, they are very wise. And, I am certain, at these prices especially they are going to authorize as much cash as we would request to continue to buy back. And, it really is a great investment today for us. And so, in answer to your question, absolutely.

**<Q – Robert Craig>:** Is that likely to be the vehicle used instead of a formal offer to buy-in University of Phoe nix Online?

**<A – Todd Nelson>:** Well, you know, that's a real technical question. I probably should be a little careful about how I answer it. I think that as much as we can buy, without having to do it through some sort of formal offering. I think is better for everybody, I think it then doesn't either inflate or suppress the price in a way that's maybe not the way the natural market would flow. So, we will buy as much as we can this way. And then, when we feel that it's maybe not – there is no more, I guess capacity to do that, then, we would probably do it through, yes, some sort of formal offering.

**<Q – Robert Craig>:** Okay, great. Thanks, Todd.

**<A – Todd Nelson>:** Thank you.

Operator: Your next question comes from Richard Close with Jefferies.

**<Q – Richard Close>:** Yes, and congratulations on a good quarter. Todd, I was just curious, you mentioned something earlier and I wonder if you could maybe give us a little bit more details on it. You talked about, you know, ensuring quality, and I was wondering if you could just sort of give us a feel of, you know, the controls you guys have in place both Online and On-ground, obviously the system is really big now and you guys, you know, have done a great job over your history and, you know, and just maybe a little bit details on, you know, what you have in place?

**<A – Todd Nelson>:** Sure. You know, I am grateful for the fact that I have been with Apollo for a long time because I did have an opportunity to run a campus 17 years ago. And, my background was more finance and marketing. And one thing I learned very quickly is that the academic structure, our organizational structure within the University of Phoenix and within Apollo Group, is extremely strong. And they are very much devoted to maintaining those standards of quality and actually improving them. And that tension and it is a healthy tension, that exists there, continues today. If you look at, we have a campus review process where all of our campuses are reviewed. There is a reporting structure as far as compliance with academic policies. There are issues that are very visible to the outside investors and people who are looking at the company, just the fact that our class size is small. You know, from your education as well that interaction with a faculty member is one of the most valuable parts of your education. Well, in a class size that we have had obviously that ensures this type of interaction and there is no plan even if those changes that we have talked about of maybe moving Online to 15 and On-ground to 20 that you are going to see any kind of deterioration in that. We also have the central academic functions that exist at the University of Phoenix, honestly some of the top people in the country in these particular content

DOE APOL 0984

| Apollo Group, Inc. | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company ▲ | Ticker ▲ | Event Type ▲ | Date ▲ |

areas. In fact, when I attend some of their meetings and interact with them, I am overwhelmed with some of the ideas that they have, and they are very much -- and they want to spend our money which is good, to make sure that those programs are new, not only on the conservative leading edge but the real cutting edge of what's going on in the learning environment. And that's really a direct result of that philosophical approach is what you saw happen with Resource. That has happened with the adult model, that John founded, you know, years ago, which was -- it wasn't based on making money, which is what unfortunately some of the people now are getting the education space for.. It was based on quality education and that is a culture that, you know, I will just say, it certainly has existed to this point with no plans to change it. But, there are checks and balances throughout the entire system to maintain again the policies and the standards that existed. One last point, and that is with our faculty, we're very fortunate in that as you know, we have the largest faculty probably in the United States, right now. And, that is something that we spend a lot of effort with, we are very appreciative of, and again having sat through many faculty assessments and sat through many University of Phoenix classes, that piece alone is probably one of the biggest reasons that we have been successful in providing you know, the quality in the classroom.

**<Q – Richard Close>:** And, just a follow on real quick, what about the, you know, you are opening up more schools; you are talking about going 18 to 24. You know, how are you attracting the people, how do you feel with respect to the quality of the individuals coming into your system to work. And, you know, maybe turnover rates and such?

**<A – Todd Nelson>:** Sure. Well, I think, you know, we are not going to change any of our approach of that the, you know, how we screen our students and the qualifications and so on. We are going to maintain the standards that we have, and the screening process. The curriculum is very structured. And, so it's not, you don't have the ability to water it down like some other programs do. So, that in and of itself maintains that level of quality and performance that has to exist. We have noticed in our pilots with Axia College that there are different factors involved in recruiting the students. But, again nothing that we feel is something that is going to create a problem for us. There are things involved with parents that are involved in decisions, there are things that again, you know, you don't have to deal with, with your 24 and older year old student. But, you know, again we feel that just not only from what we think, but what we've experienced with Axia that it's going to be a very positive market for us.

**<Q – Richard Close>:** Well, actually I was talking more on the employee side, do you feel comfortable there with respect to bringing in quality people and going through training and such.

**<A – Todd Nelson>:** Oh, sure. Yeah, I mean again -- I think that, one of the things that we've learned and has encouraged us to pursue this with the University of Phoenix as well is that, the same issues -- many of the same issues that these students have -- at a younger age, they have at the older age as well.. And again, it isn't based on speculation, it's based on, you know, what we have experienced. And so the comment I was making earlier about dealing with parent issues and some of the others, does obviously require a little different skill set that some of our employees will need. But as far as the other things, making sure that they have the financial resources to get in the program, making sure that they have the academic advisement to deal with faculty issues, grade issues, you know, scheduling issues. And then the technical counselors to help them with any kind of, you know, technology issues they have. The issues are basically the same.

**<Q – Richard Close>:** Okay, thank you. Great job.

**<A – Todd Nelson>:** Thanks.

Operator: Your next question comes from Greg Cappelli with CSFB.

DOE APOL 0985

| Apollo Group, Inc. | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
| *Company* ▲ | *Ticker* ▲ | *Event Type* ▲ | *Date* ▲ |

**<Q – Gregory Cappelli>:** Hi guys, Greg and Eric. Nice job. Todd, I guess, just given you have been in the sector for twenty years or so. Give us your thoughts right now just from an overall regulatory perspective, is there a witch-hunt from regulators right now, are they – are they out to try and get, you know, the for-profits in the sector. And maybe you can relate this – what we are going through now kind of back – back to your time a little bit, give us your thoughts?

**<A – Todd Nelson >:** Sure. I mean – I don't – let me just first start off by saying I don't think that there is a witch-hunt going on. I think that there is a couple of factors that are affecting, I guess the publicity that is going on with these issues. One is it is an election year and because of that, I think that there, you know, that there is certainly a desire to either one show that if you are on the Republican side, show that you are doing something about any kind of business, not just education, any kind of business where problems are going on. And then on the Democratic side, you are doing it; you would be supporting that to show that the Administration isn't doing it. So, I think that has compounded it. I think the second issue is that you have, you know, some bad companies outside of the space, you know, like your Enrons and Worldcoms and those kind of folks who obviously, you know, get everybody's attention, I am talking about from the regulatory side. So, they want to make sure that they are keeping a watchful eye on things. And I think those two factors alone have obviously caused some increased scrutiny in the education companies. Having said that, I do think that if a company is doing what they should that they will avoid most of those problems, you can't avoid some of the publicity issues and I think a lot of that is what's going on now. I do say that – in all this I'm grateful that Apollo Group is structured the way that it is and I commented on this earlier that, only having a few relationships, regulatory relationships to nurture and to stay on top of and make sure that you are in compliance with is, for us anyway, is a lot less difficult than maybe somebody who has multiple relationships to maintain. I am not saying it is better or worse, I'm just saying for us it is easier to be able to maintain and monitor those standards making sure that we are doing what we need to be doing.

**<Q – Gregory Cappelli>** Okay, thanks. Just wanted to touch back on Online growth for a minute, sorry if I missed this earlier on the call but I saw, you know, obviously the guidance in the fourth quarter. And, then I heard a few of your other comments about potential upside, is – could you give us just some thoughts on what's going on with WIU, and is there, you know, what the Online initiative is there and is that something that – I thought that your comment there means that that's where the upside could come from, unlikely from the traditional Online space that you already have now?

**<A – Todd Nelson >:** Well, you know, the law of large numbers has obviously some impact on Online growth within the University of Phoenix Online through its current market. I think that, you know, again I just want to make sure people, I mean, that people realize that a 50% growth rate when you have over 100,000 students in Online, is nothing to be ashamed of. And I think that going forward as we have said that, you know, out over several years you are going to see that decelerate down to, you know, a number that is in the 25 to 30% growth rate, you know, and I think that that again is a self-imposed growth rate based on our current infrastructure. Now, you know, if things continue to go well and we are obviously working on initiatives that would allow us to possibly maintain a higher growth rate longer, we will continue to do that. But we don't want to give guidance in that respect, because I think that it might take, you know, some time, but no when it comes to the WIU initiative, I would hope– not hope, our plan would be next year is to try and give guidance and direction that people are looking at the Online growth within Apollo Group, and the On-ground growth within Apollo Group versus just the University of Phoenix and that – there is all kind of strategic reasons for doing that but let's use WIU as an example. If for example we decided to use WIU as really more of an Online 18 to 23-year-old vehicle and the University of Phoenix as the vehicle for the 18 to 23-year-old market. I am not saying that we will do that, but having that flexibility I think opens up a lot of really exciting opportunities for us especially as you, you know, are contacted by a potential student and if they are more interested in an associates degree possibly, you know, channeling that through a WIU versus a UOP and some opportunity to have the same sales force selling both programs. I mean there is a lot of potential for us as far as

**DOE APOL 0986**

**corrected transcript ∙ callstreet**

| Apollo Group, Inc. | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company ▲ | Ticker ▲ | Event Type ▲ | Date ▲ |

flexibility that way and then for maximizing our growth rate. The biggest factor is, and we will do our part in this, is to help guide people towards the fact that you know, and we will make some effort obviously in fiscal year '05 to start to get everybody focused on what is our online growth rate and it doesn't have to be specific to the University of Phoenix.

**<Q – Greg Cappelli>:** Okay. So, we could see a couple of different platforms here potentially going forward and you would be -- you would be giving out an Online number which would include those if that happens?

**<A – Todd Nelson>:** Absolutely, in fact – Greg, we would make it very clear what we were doing and, you know, as we always have in the past, communicate very effectively upfront. I just think that it is – it's a better way to measure Apollo Group as you know, what are you are doing, because I think as far as a company versus just one school within the system.

**<Q – Greg Cappelli>:** Okay. Just two more quick ones. The – I heard the percentage of students on Resource now, I know March was a big move for a lot of students that moved. What was their percentage before?

**<A – Todd Nelson>:** A>: Yeah, about – well, just approximately 40,000 students and right now we have, not quite 200,000 students, but pretty darn close.

**<Q – Greg Cappelli>:** Okay. So, that was a huge move in the spring. So, I am guessing that is this the right way to think about this. When I look at the margin that you put up on the quarter and the margin on performance, did that play and maybe this is a good question for Kenda as well, did that play a major part of the margin getting where it was in the quarter? And I am guessing that would last for another three quarters?

**<A – Todd Nelson>:** It had some impact on it, yes. I wouldn't say that it was the only thing that caused the margins to increase, but yes, that had some and I think that, in answer to your question, you will see it will take several quarters still; it's not going to happen all over the next two or three quarters. But, you will start to see Resource having more of an impact on the margin expansion than it has in the past.

**<Q – Greg Cappelli>:** Okay. Final quick one for Kenda, the – we are just walking through our free cash flow model here. Can you reach -, is $500 million in the ballpark for free cash flow in fiscal '05?

**<A – Kenda Gonzales>:** In fiscal '05, I think that would be in the ballpark, I thought you were going to ask about fiscal '04 and I was going to say that's pretty aggressive.

**<Q – Greg Cappelli>:** Yeah.

**<A – Kenda Gonzales>:** Fiscal '05, I think that would be something that we could potentially achieve, yes.

**<Q – Greg Cappelli>:** Okay. Thanks a lot guys.

Operator: Your next question comes from Kelly Flynn with UBS.

**<Q – Kelly Flynn>:** Thanks. I just have a couple of quick ones. I think everyone has been kind of getting at this, but I just want to ask, Todd, last year at this time you gave some sort of preliminary comments on '05 expectations for Online. Can you share anything more detailed with us at this time?

DOE APOL 0987

**Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004
*Company* ▲ | *Ticker* ▲ | *Event Type* ▲ | *Date* ▲

**<A – Todd Nelson>:** Well, you know, the only thing at this point – we will come out as we normally do you know in late August, which is near the end of our fiscal year and give a little more detailed guidance. But, I think that, you know, preliminarily what we see as far as On-ground, you know, you would expect either a very similar rate or a slight decrease, maybe a percentage point or two at the most, nothing material. But, I think that's just, I think that's just good business on our part to help keep that expectation reasonable with several initiatives out there that offer some potential upside. And then, on the Online side of it, you know, again it's a little too early to tell as far as for fiscal '05. But, you know, I would think that as we have said before, you are going to start to see some deceleration in the – in that growth rate. Nothing drastic, but some slight deceleration

**<Q – Kelly Flynn>:** Okay. Do you think like 45%, would that be reasonable?

**<A – Todd Nelson>:** Well, without, you know, again I probably should wait until, you know, the mid to end of August to be very specific about it. But, it certainly doesn't, if you look at where we are through the fourth quarter, you normally don't have things drop that first quarter.

**<Q – Kelly Flynn>:** Okay.

**<A – Todd Nelson>:** And afterwards some, you know, 50% down to 40 percent, so 45 certainly seems, again without committing, certainly seems like it's reasonable.

**<Q – Kelly Flynn>:** Okay, great. Sorry Kenda for badgering you on that. Okay, I also have a question related to, sort of what Greg just asked, sort of about the regulatory environment; you've clearly emphasized your goal of, you know, to grow in a measured fashion. Is there anything you've seen in the past couple of months, you know, from within the space in general, I mean any practices that you think have changed or things that are going on in this space that might – that you are concerned about kind of the industry's reputation or that, you know, specific things that other companies might be doing that might, you know, bring about more regulatory scrutiny, and I don't certainly mean it only in the public universe, but just within the whole universe broadly?

**<A – Todd Nelson>:** Well, you know, I mean I think that, you know, the comment that I made earlier is not – is not aimed at any other companies because I do think that there are some excellent companies out there. But, I mean, it's just – it's common sense that the more companies that you own or schools that you own, that you own you make it more difficult to manage that particular process. But I don't think that in and of itself is going to bring more scrutiny. I think that once the election is over, I think that hopefully anyway that some of the grandstanding that's going on both sides will subside and you won't see as much as you do now. And so, just that alone would help. As far as some of the other practices that some of the other companies are involved in. You know what? It probably wouldn't be fair for me to comment on that, all I can say is that I know most of them very well and they are really fine companies. And I think they are doing, trying to do things the right way, and with the exception of again you have as – like your company and the other industries, you know, disgruntled employees or former employees unfortunately, you know, they can get an audience and that's a bad situation for any company, not just the education companies, and I honestly think, that is having more of an impact on the stuff that you are seeing going on as far as regulatory scrutiny than any real substantive problem.

**<Q – Kelly Flynn>:** Okay, great. That's really helpful. Thanks Todd.

Operator: Your next question comes from Howard Block with Banc of America Securities.

**<Q – Howard Block>:** Good morning Todd and Kenda and congratulations on a great quarter. First question is I think this is the third year in a row where we've seen this sequential decline in the year-over-year growth rate going from the second quarter into the third quarter. So, the 3Q's growth rate is lesser than – lower than the second quarter. Is there any reason for that, anything in your business that maybe seasonally would, you could attribute this to?

DOE APOL 0988

| **Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| _Company ▲_ | _Ticker ▲_ | _Event Type ▲_ | _Date ▲_ |

**<A – Todd Nelson>:** Yeah, in fact I am very grateful you asked that question Howard and it is, there is a psychological issue that again – you know, that happens in that third quarter. You know, how students are thinking about enrolling, how the business is managed, how our business is managed, as far as you know, when you trying to motivate people who are involved in enrolling students. And so, you are absolutely right, you know, you see a little of bit a lull or a drop in third quarter, it just it is. And nothing is alarming from, you know, from our point of view, but it is just something that again is affected by the mentality of our employees and our students. Yeah, not that it's unhealthy at all but it is just – if that is – that is something that we've several time – several months, several years, excuse me. And the other area is graduations; that is you know, the time when our graduation ceremonies are scheduled and so you see people really pushing during this quarter to get done. And so what happens is you have people leaving the pipeline during that quarter.

**<Q – Howard Block>:** Okay and then it's interesting to hear what you had to say about sort of the notion of consolidated degree enrollments rather than the split between the two. It looks as though, this is for about four years in a row now, I think something like 15 out of 16 quarters, we've seen year-over-year acceleration in consolidated degree enrollments. Any reason why that wouldn't continue going into the fourth quarter?

**<A – Todd Nelson>:** N, n ot necessarily, I mean, I think that again the composition of the overall number and the fact that Online is becoming a larger percentage of our students and when you are talking about Apollo Group growing at 27% enrollment. And they are growing at 50% – yeah, I mean you are right. I mean, when you do the math it does look very positive and that's why as I said, I really do believe that it's just – it's a healthy number where we can maintain the quality and retention in customer service levels. And, you know, that's how the company is run; it's not run on an individual entity basis. I mean, infrastructure, the centralized infrastructure in so many areas of the company – it's one company. IT, accounting, the academic area at University of Phoenix, human resources, again so, if you were to ratchet the expectation up across the board to 50% for that, although central - , I think that the quality of the company would be sacrificed for a short-term growth rate. We would much more be interested and will run the company in a way that –we would like to maintain that, you know, that 20, high-20 to 30% growth rate – revenue growth rate to over a 10 to 20-year period versus, you know, ratcheting it up for a 2 or 3-year period.

**<Q – Howard Block>:** Okay. And then if we look at some of the manuals and things that the Department of Education makes available, in their definition or description of program review, they make it sound as though there is usually some sort of a trigger or a catalyst for them to conduct a program review. Is that true or and more importantly, was it true in the case of the review that you are undergoing right now?

**<A – Todd Nelson>:** No, I think you are right. I do think that there are usually some things that trigger that, but some of those things that trigger that can be extremely minor. One of the things that we found interesting in our interaction with the OIG, because I am the one who gets the call when the OIG does an audit. The first thing out of their mouth has been, when they talked with us is, this is a routine audit and you are one of the largest recipients of, you know, Title IV funds, therefore — you know, we need to come look at you. We need to look at big schools like you, so that's on the OIG side. On the department of – on the Program Review Side, my experience is that it usually is triggered by something and again it can be something significant, it can be something minor. My opinion at the last program review probably had something to do with the fact that, you know, with that "qui tam" lawsuit and some of the acquisitions being made and it's probably one of the reasons why they came in. But, in our case it's routine, because again, when you are growing rapidly and when you are our size, there are always a lot of issues. And we are different, as you know. We look very different than a traditional university, the fact that our students are adults, the fact that they are not heavily reliant upon financial aid like a lot of other traditional universities, the fact that our courses are sequential versus simultaneous courses that you have in a traditional

DOE APOL 0989

**‑callstreet**

**corrected transcript**

| **Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| *Company* ▲ | *Ticker* ▲ | *Event Type* ▲ | *Date* ▲ |

university. We don't operate on an academic or calendar year, the same way that a lot of other institutions do. So, these things cause and trigger that. So in answer to your question, yes it is – it doesn't necessarily have to be a negative thing.

**<Q – Howard Block>:** Okay. And then my last question, is on the 18 to 21-year-old initiative is this something where you have been for years turning away 18 to 21 year-olds and now all of a sudden you are just going to open your arms to them, or do you actually have to initiate something on the marketing or processing side, in order to open the doors to these folks?

**<A – Todd Nelson>:** In answer to your question, both. One is we have turned away tens of thousands of potential students to this point and obviously, we are going to no longer turn them away, in a few months that is. And secondly, at the same time though, we are going to be aggressive in marketing to that population as well. So, yes we have been turning away and yes we are going to need to do some things, because we want to, you know, maximize on the opportunity that's out there.

**<Q – Howard Block>:** Great. Thank you very much – again congratulations.

**<A – Todd Nelson>:** Thanks Howard.

Operator: Your next question comes from Gary Bisbee with Lehman Brothers.

**<Q – Gary Bisbee>:** Hi, thanks and I will add my congratulations to another very strong quarter. Well, Todd, since you have been answering most of the questions, I will aim a couple at Kenda to even it out a little bit. You know, looking at the margins this quarter, a couple of things jumped out at me. In terms of the gross margins it looked like Online was basically flat year-over-year and I am wondering is this, you know, are we getting towards a level where this starts to peak out, unless you are able to really dramatically increase that average class size? And in terms of the campus base, the gross margin was drastically different. It was substantially better year-over-year, I wonder if you could comment on, you know, both of those thoughts?

**<A – Kenda Gonzales>:** You know, I think that and you don't have all the details quite yet in front of you because we filed the allocation numbers in that footnote with the Q, but I think that we have seen the year-over-year gross margin improve at Online, overall from an external cost standpoint. And a lot of that has to do with as Todd alluded to earlier, the class size increase that we have seen, that happens in the instructional cost and services line item primarily. So, we have seen that improve, as well as, the improvement that you see at the On-ground campuses. But, I think probably part of the improvement you see at On-ground is because of the allocations and part of what you are seeing at Online is because of the allocations.

**<Q – Gary Bisbee>:** Okay. And it seems like...

**<A – Kenda Gonzales>:** You will have better clarity on that when we file the Q.

**<Q – Gary Bisbee>:** Yeah, no, point taken, but it seems like the Online one is pretty dramatic. Is that the largest driver of what was a huge year-over-year gain or is you know, is Resource been a big chunk of that?

**<A – Kenda Gonzales>:** Well, we – obviously Resource is a big chunk, not entirely, but the class size drivers for faculty pay again is a large amount of that. We have also added, you know, during the quarter and we talked about in the press release, the number of you know, we added one new campus in Louisville, Kentucky, but in addition we added 9 new learning centers, which is, you know, a lot of real estate for us to add. And again, those real estate costs show up in the instructional cost and services line as well.

DOE APOL 0990

| Apollo Group, Inc. | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company ▲ | Ticker ▲ | Event Type ▲ | Date ▲ |

**<Q – Gary Bisbee>:** Right. Well moving down…

**<A – Todd Nelson>:** And one thing on the Online side of it too, you know, they obviously, when you look at them exceeding consensus by 7 cents, they could tell early in the quarter that it was going to be a very strong financial quarter. So, they are obviously adding infrastructure and doing other things, expenditures that are a part of what they hopefully will expect to see during fiscal '05 as far as, you know, again ensuring, you know, future growth, as well as the infrastructure to, you know, keep the retention up. So, you know, again and that's, you know, just having run a campus before is -- what happens is, is that, you know, you do try and be very careful on a quarter-by-quarter basis, as far as, how your margins look. But, far more important is when you see financially you are so far ahead, when you are at the first month into a quarter you do start to spend money which is good management for future quarters. And obviously Online being 7 cents over this quarter, they have sought and received approvals to be spending money for, you know, fiscal '05.

**<Q – Gary Bisbee>:** Okay. And would that be a similar explanation as to why on the campus base side of things, selling and promotional expenses were dramatically higher year-over-year. You just saw the gross margin was going to be so strong that you took the opportunity to advertise more or is there something else?

**<A – Kenda Gonzales>:** Right. And also you know, generally during the third quarter we start to ramp up our enrollment counselors for the fourth quarter push, so that they are employed and trained and ready to go in the fourth quarter.

**<Q – Gary Bisbee>:** Okay, and then just one last one. Bigger picture question, you know, the 18 to 23-year-old opportunity would seem to open up a huge new base of students. But I -- thinking back a few years, you know, one of the things you talked about that was special about your model was, you know, the older adults had a different classroom atmosphere than your traditional age kid. Do you fear at all that by opening this up will, you know, change one of the things that's been a draw for non-traditional students historically. And what work have you done to get comfortable with that?

**<A – Todd Nelson>:** Well, absolutely, your assumption is right. Putting them in the same classroom would create potentially some issues. And so the answer is no, they will be segregated into two different paths, so to speak. But obviously, those two paths can merge down the road very quickly, because, you know, we currently have, as you know, just a 21-year-old requirement anyway. But, in answer to your question, yes they will be segregated. The work that Axia has done has been extremely impressive and something that can be used in any of our schools, not just in Axia. The other thing I wanted to point out, you know, as I mentioned earlier, that quote from the study that was done. Community college types are obviously potential students, but working students are really going to be our major focus, regardless of age. Because again, they have certain needs that our model is built around, and to get into very large nice markets, they also have a few more resources to help them -- have well, the financial resources to attend school.

**<Q – Gary Bisbee>:** Okay just to clarify that last point. So you are going to -- under the University of Phoenix brand begin to admit tracks of younger students in addition to continuing to grow what the core focus has always been, some point in the next few months?

**<A – Todd Nelson>:** Well, we are going to continue to market and promote our working adult programs, as well as our working student programs. And, academically, you know, and again, it's a little early to be, you know, describing this in great detail. But, obviously, they would be segregated initially just because, again, they have different needs, they have fewer credit hour requirements, they don't have the work experience. And so, it is a better learning environment to again have them segregated at the beginning.

**<Q – Gary Bisbee>:** Okay, great. Thanks for clarifying that.

DOE APOL 0991

**corrected transcript** ● **callstreet**

| **Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company▲ | Ticker▲ | Event Type▲ | Date▲ |

**<A – Todd Nelson>:** Thank you.

Operator: Your next question comes from Jeff Silber with Harris Nesbitt.

**<Q – Jeff Silber>:** Thanks a lot. I know it's getting late. I have a couple of quick questions. Kenda, this one is probably for you. I just wanted to get a little bit of clarification on any potential tracking stock buyback. There seems to be some confusion, if and when a premium kicks in, and I was wondering if you could just kind of walk us through it?

**<A – Kenda B. Gonzales>:** Sure. As the prospectus states right now, last October, we flat-lined it at 10% premium. There has been a, I think a little bit of confusion in the market with regards to when the market cap of UOPX achieves a level of 60% of Apollo, the premium would go away. But, I think where the confusion lies is that you do not include in that calculation of UOPX market cap the 95 million shares that Apollo retained. So, really, it's just the public float that would be considered on UOPX to calculate that market cap for that 60% measure. And, clearly, we are well below the 60 percent. So, as of right now, the 10% premium would apply.

**<Q – Jeff Silber>:** Okay, great. Thanks that's helpful. Also, just in terms of helping us model going forward, can you just review your plans for new campus openings over the next year or so roughly, on a quarter-by-quarter basis?

**<A – Kenda B. Gonzales>:** Well, on a quarter-by-quarter basis, again, we are in the budget process for the next year. What we can tell you is, in the fourth quarter – through the third quarter, we've opened five new campuses. To refresh everyone's guidance, we've said seven to nine this fiscal year. Our feeling is that we will be at the upper end of that range. Through the fourth quarter, we are planning on opening Jersey City and Minneapolis here shortly. And then, probably two more in August, although we have not specifically determined which two at this point. Because, we have some that could open in August, some that could spill over into September. But, we have a list of probably five that we are looking at, at this point, Augusta, Georgia; Springfield, Missouri; Cheyenne, Wyoming, and then, we also have recently received approval to open in Austin and San Antonio, Texas. So, again which one of those will hit August and which will spill over into the first quarter, but they will all be right in that timeframe.

**<Q – Jeff Silber>:** Yeah. I think and I know it's a little bit too early to look at '05, but do you think that seven and nine number will stay about the same, change up, or down?

**<A – Kenda B. Gonzales>:** Yeah. No, we think it will probably be about the same at seven to nine.

**<Q – Jeff Silber>:** Okay. Fantastic, thanks so much.

Operator: Your next question comes from Sara Gubins with Merrill Lynch.

**<Q – Sara Gubins>:** Yes, hello. I was hoping to get an update on the FlexNet program, and how the rollout of that is going?

**<A – Todd Nelson>:** Well, we are actually very excited about FlexNet, I am glad somebody asked. We have now 8,500 students in FlexNet. It's being offered in 45 campuses. And, from our point of view, something that is going to be very interesting, we think positive over time, is we now have 4 FlexNet-only campuses. And, so, we are, again, very excited about the potential, and what FlexNet means to us.

**<Q – Sara Gubins>:** Is that starting to have any impact on margins, or is it still just too small to really have much of an impact?

---

DOE APOL 0992

| Apollo Group, Inc. | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
|---|---|---|---|
| Company▲ | Ticker▲ | Event Type▲ | Date▲ |

**<A – Todd Nelson>:** Well, because the University of Phoenix is growing so fast, and FlexNet is still such a small piece of it, it's really not having any impact – significant impact on margins now. I do think though, by the latter part of fiscal year '05, you are going to start to see some, much like you have with Resource and class size, some potential margin expansion because of that as well.

**<Q – Sara Gubins>:** Great, and then, just one other quick one. It looked like the average tuition per student was up this quarter more than it had been in the last two quarters sequentially. And, I am just wondering if there was any mix change driving that in terms of either programs, or levels of degrees that were being sought?

**<A – Kenda B. Gonzales>:** You know, what I would say, and what I have, you know, pretty consistently said when asked that question is, you really need to look at the last 12 months number. When you are looking quarter-to-quarter, if you are comparing for example second quarter to third quarter, remember we don't offer courses during the last two weeks of the calendar year. So, you know, that skews your revenue per student number. And, you really need to look over a last 12 months basis. And, when you do that, I think you would see a little more consistency in the number, where the amount is very similar to our tuition price increases at the campuses.

**<Q – Sara Gubins>:** Okay, so not much by way of mix changes?

**<A – Kenda B. Gonzales>:** No.

**<Q – Sara Gubins>:** Okay, thank you.

**Operator:** Your next question comes from Corey Greendale with First Analysis.

**<Q – Corey Greendale>:** Hi, good morning. Just a couple of quick ones. First of all, just one more question on the 18- to 21-year-old initiative. Would the idea be to roll that out throughout the entire system simultaneously? Or, might it be sort of in larger cities at first and then kind of slowly through the system?

**<A – Todd Nelson>:** I don't necessarily think it would be slowly. But, yes, it will be actually taken out through specific campuses and regions before it's just taken out across the system. You know, from our way of operating is to not hype things and over-promise, and then under-deliver. We would rather roll it out, make sure that it is functioning correctly, and then go from there.

**<Q – Corey Greendale>:** Right. And then, can you give us an update on any of the state licensure processes?

**<A – Todd Nelson>:** As far as the states that are pending right now are Connecticut, New York, Delaware, South Carolina and Iowa, with Nebraska and Washington D.C. planned right behind that. And, our hope is that, by the end of the calendar year, the five that we mentioned will be completed. So, we are pretty excited about what's around the corner.

**<Q – Corey Greendale>:** Great. And then, just one last one, sort of, I guess following up on this question about mix changes. I am particularly interested if you are seeing any demand trends in IT, or healthcare kinds of programs?

**<A – Todd Nelson>:** Well, you know, our IT programs have remained relatively stable, and we are not seeing a decrease in demand. But, not really seeing a change in – well, either way. As far as healthcare, you know, it's interesting, because at the professional level, we are actually growing about as fast as we can grow in that area just because of the need for management positions within the nursing area, which is where we are largely. And then, with plan to, you know, from our point of view, one of the areas that is under-served, and that we have plans to be involved in, you know,

DOE APOL 0993

| **Apollo Group, Inc.** | APOL | Q3 2004 Earnings Call | Jun. 24, 2004 |
| Company▲ | Ticker▲ | Event Type▲ | Date▲ |

over the next 12 months is in the RN-level nursing area. So, we are looking for some exciting things in that area.

<Q – Corey Greendale>: Okay, thanks a lot guys.

<A – Todd Nelson>: Thank you very much.

### Kenda B. Gonzales, Chief Financial Officer

I think with that, we have gone over time. So, we will go ahead and turn it back to the operator, and we will finish this call then.

Operator: This concludes today's conference call. Thank you for your participation.

**Disclaimer**
The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of CallStreet, LLC. CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, CallStreet, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted CallStreet, LLC 2004. CallStreet and CallStreet, LLC are trademarks and service marks of CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.

DOE APOL 0994

Message                                                                     Page 1 of 7

## Rose, Christine

| | |
|---|---|
| **From:** | Wittman, Donna |
| **Sent:** | Tuesday, August 24, 2004 11:04 AM |
| **To:** | Woodward, Jennifer; Wolff, Russell; Crim, Susan; Fernandez-Rosario, Martina; Dunne, Shane |
| **Subject:** | FW: CENTRAL REGION RANKINGS WITH 1 DAY LEFT... |

Of course this confirms what ▮▮▮▮ says - Rewards and determination of "top performers" is based solely on enrollments - don't see any references here to "talk time" or "appins". With this sort of daily barrage, it is easy to see why they all conclude that salary is based solely on enrollments. The "soft skills" are only mentioned on paper and may be discussed during the formal evaluation once a year, but that certainly does not overcome the loud, continuous, colorful blare of "it's the regs that count!"

-----Original Message-----
**From:** ▮▮▮▮ [mailto: ▮▮▮▮ ]
**Sent:** Tuesday, August 24, 2004 7:59 AM
**To:** Wittman, Donna
**Subject:** FW: CENTRAL REGION RANKINGS WITH 1 DAY LEFT...

**Admissions Counselor**
**University of Phoenix** ▮▮▮▮

Fax ▮▮▮▮

▮▮▮▮ @phoenix.edu

-----Original Message-----
**From:** Sam Biggs
**Sent:** Tuesday, August 24, 2004 7:57 AM
**Subject:** CENTRAL REGION RANKINGS WITH 1 DAY LEFT...

This is it...time to wrap up all the loose ends and get your last few students into class!!! We have some amazing performances this month and we still have the last day to go...

#1 David Stone closing his month out strong with 26 REG's so far!!! #2 Natalia Mihilli with 24 strong enrollments in August and # 3 in the 20's as well, Tabitha Thornhill with 20 students this month!!! We have 3 reps in the elite 20's club and looks like we could have several more!!!

Look at these AMAZING performers: With 19 students we have Dwane Newbold pushing the 20's club!! A large group of excellent reps with 18 students: Jason Chapman, Corrin Williams, Steve Whitener, Amy Hayden, Camille Detrizio. With 17 students we have Ben Maldonado and Christy Hoffman. 2 reps helping 16 students

**DOE APOL 0995**

4/26/2007

start school in August: Bret Levesque, and Suhail Ghubril.  Look at this large group
who have 15 REG's: Alicia Waite, Sharon Gildea, Dan Klingensmith, Jeff Cook,
Vince Rodriguez, Rebeca DiPuccio, Brenda Amacker, Christy McCarthy, Patrick
DeNitto, Troy Shipman, Ken Wheeler, and Kenn Korecky!!!!

## And the list goes on with our double digit club...

# 80 REP's in the double digit club!!!
CONGRATULATIONS TO ALL IN THE DOUBLE DIGIT
CLUB!!  38 more that are on the cusp of joining that club!!

Only a few hours left so lets push for an amazing finish!!!  RUN THROUGH THE
FINISH LINE WITH 1-3 MORE STUDENTS TODAY!!

| REP NAME | REG | APIN |
|---|---|---|
| David Stone | 26 | 1 |
| Natalia Mihilli | 24 | 0 |
| Tabitha Thornhill | 20 | 0 |
| Dwane Newbold | 19 | 2 |
| Jason Chapman | 18 | 3 |
| Corrin Williams | 18 | 2 |
| Steve Whitener | 18 | 2 |
| Amy Hayden | 18 | 1 |
| Camille Detrizio | 18 | 0 |
| Ben Maldonado | 17 | 4 |
| Christy Hoffman | 17 | 2 |
| Bret Levesque | 16 | 4 |
| Suhail Ghubril | 16 | 0 |
| Alicia Waite | 15 | 8 |
| Sharon Gildea | 15 | 3 |
| Daniel Klingensmith | 15 | 2 |
| Jeffrey Cook | 15 | 2 |
| Vince Rodriguez | 15 | 1 |
| Rebeca DiPuccio | 15 | 1 |
| Brenda Amacker | 15 | 1 |
| Christy McCarthy | 15 | 1 |
| Patrick DeNitto | 15 | 1 |
| Troy Shipman | 15 | 0 |
| Ken Wheeler | 15 | 0 |
| Kenn Korecky | 15 | 0 |
| Amy Kriser | 14 | 1 |
| Susan Tucker | 14 | 1 |
| Mark Forney | 14 | 0 |
| Irene Saigh | 13 | 3 |
| Alisha Hentges | 13 | 2 |
| Carri Clarkson | 13 | 2 |

DOE APOL 0996

Message                                                                 Page 3 of 7

| Name | | |
| --- | --- | --- |
| Dave Funk | 13 | 2 |
| Rusty Blair | 13 | 1 |
| Richard King | 13 | 1 |
| Michael Henderson | 13 | 1 |
| Brent Boardman | 13 | 1 |
| Derrick Smith | 13 | 1 |
| LTanya ONeil | 13 | 1 |
| Wendy Rodriguez | 13 | 0 |
| Aaron VanderBand | 13 | 0 |
| Adam Weik | 13 | 0 |
| Larry Barnette | 13 | 0 |
| Tonia Shaw | 13 | 0 |
| Kamran Moghadam | 12 | 5 |
| Keith Lowell | 12 | 2 |
| Seela Farani | 12 | 1 |
| Brian Kraus | 12 | 1 |
| Nathan Tijerina | 12 | 1 |
| Sean Rollinson | 12 | 1 |
| Devan Boone | 12 | 1 |
| David Williams | 12 | 1 |
| Karen Hinkle | 12 | 1 |
| Nicholas Poptanycz | 12 | 1 |
| Shawn Young | 12 | 0 |
| Sarah Wilkins | 12 | 0 |
| Nicholas Weherley | 11 | 5 |
| Jennifer Stewart | 11 | 2 |
| Erik Olsen | 11 | 2 |
| Robert Krosting | 11 | 1 |
| Monika Butzbach | 11 | 1 |
| Jerry Fagan | 11 | 1 |
| Danny Price | 11 | 1 |
| Alison Williams | 11 | 1 |
| Julie Field | 11 | 0 |
| Jennilyn Bell | 11 | 0 |
| Greg Napier | 11 | 0 |
| Angela Elsensohn | 11 | 0 |
| Sean Shivers | 11 | 0 |
| Trent Barber | 10 | 4 |
| Jeremiah Hayes | 10 | 3 |
| Falonia Edenburgs | 10 | 2 |
| Joseph Pompeo | 10 | 2 |
| Elaina Persely | 10 | 2 |
| Ryan Cunningham | 10 | 2 |
| Justin Gerrard | 10 | 1 |
| Jonny Tashjian | 10 | 1 |
| James Fuller | 10 | 1 |
| Rosamaria Sagastume | 10 | 1 |
| Ross Chambers | 10 | 0 |
| Darrin Moses | 10 | 0 |
| Kelly Byram | 9 | 2 |
| Jodi Havranek | 9 | 2 |
| Larry Trujillo | 9 | 2 |
| Esther Mendoza | 9 | 2 |

This
group
is

DOE APOL 0997

4/26/2007

Message                                          Page 4 of 7

| | | | |
|---|---|---|---|
| Desiree Kretsch | 9 | 1 | very |
| Jason Perkins | 9 | 1 | close |
| Renee Santillan | 9 | 1 | to |
| Dallas Ryan Womack | 9 | 1 | double |
| Thomas Vukovich | 9 | 1 | digits!!! |
| Jason Deaton | 9 | 1 | |
| Mindy Grodzki | 9 | 0 | |
| Rhonda Livermore | 9 | 0 | |
| Craig Stein | 9 | 0 | |
| Stephanie Cirillo | 9 | 0 | |
| Charles Rehling | 9 | 0 | |
| Jared Harguess | 9 | 0 | |
| Richard Elzy | 9 | 0 | |
| Barb Dorsett | 9 | 0 | |
| Jessica Robertson | 9 | 0 | |
| Carl Jones | 9 | 0 | |
| Robin Mabry | 8 | 3 | |
| Ron Arrington | 8 | 2 | |
| Ron Woods | 8 | 1 | |
| Wendell Macnab | 8 | 1 | |
| Jeff Prince | 8 | 1 | |
| Katherine Kavanaugh | 8 | 1 | |
| Shanita Patterson | 8 | 1 | |
| Jennifer Myers | 8 | 1 | |
| Kimberly Hinthorn | 8 | 1 | |
| Ryan Winklepeck | 8 | 0 | |
| Jared Henderson | 8 | 0 | |
| Kristi Kindred | 8 | 0 | |
| Preston Windus | 8 | 0 | |
| Paul Fernandez | 8 | 0 | |
| Perri Moxley | 8 | 0 | |
| Michael Hagele | 8 | 0 | |
| Cammie DeFriese | 8 | 0 | |
| Timothy Nacke | 8 | 0 | |
| Meagan Taylor | 7 | 2 | |
| Jeff Deist | 7 | 2 | |
| Sam Abney | 7 | 2 | |
| Eric Granado | 7 | 1 | |
| Bert Pompa | 7 | 1 | |
| Merri Drake | 7 | 1 | |
| Rebecca Nino | 7 | 1 | |
| Ryan Lingenfelter | 7 | 1 | |
| Derek Wamsley | 7 | 1 | |
| Peter Coleridge | 7 | 1 | |
| Aaron Williams | 7 | 1 | |
| Jennifer Palmer | 7 | 1 | |
| William Johnston | 7 | 0 | |
| Norman Roberts | 7 | 0 | |
| Helen See | 7 | 0 | |
| Taline Agha | 7 | 0 | |
| Heather Banks | 7 | 0 | |
| Tim Hunt | 7 | 0 | |

DOE APOL 0998

Message                                                                          Page 5 of 7

| Name | | |
|---|---|---|
| Mike Kelly | 7 | 0 |
| Reva Woods | 7 | 0 |
| Quill Nebecker | 7 | 0 |
| Racquel Miller | 7 | 0 |
| Leroy Swart | 7 | 0 |
| Thomas Joyce | 7 | 0 |
| Brian Fentress | 7 | 0 |
| Heather Janisse | 7 | 0 |
| Kalan Allen | 6 | 5 |
| Mack Chapman | 6 | 3 |
| Ben Bowman | 6 | 2 |
| Marc LaFleur | 6 | 2 |
| Lori Richardson | 6 | 1 |
| Robert Wagner | 6 | 0 |
| Ty Perkins | 6 | 0 |
| Eric Freiholtz | 6 | 0 |
| Erik Johnson | 6 | 0 |
| Kathleen Doyle | 6 | 0 |
| David Maxton | 5 | 4 |
| Tim Grijalva | 5 | 3 |
| Earnest Riley | 5 | 2 |
| Paula Petry | 5 | 2 |
| Brett Walker | 5 | 2 |
| Randy Fordham | 5 | 2 |
| Christina Weinmann | 5 | 2 |
| Jay Pollman | 5 | 2 |
| Nathan Hardy | 5 | 2 |
| Brett Brewer | 5 | 1 |
| Jonathan Sweeney | 5 | 1 |
| Rachel Haas | 5 | 1 |
| Alisa Cunningham | 5 | 1 |
| Jeremy Slaughter | 5 | 1 |
| Jon Roeder | 5 | 1 |
| Salene Martinez | 5 | 1 |
| Bobby Dixon | 5 | 1 |
| Michael Powers | 5 | 1 |
| Nicholas Westbrook | 5 | 0 |
| Tre Williams | 5 | 0 |
| John Aguilar | 5 | 0 |
| Sonia Silva | 5 | 0 |
| Keith Marsh | 5 | 0 |
| Tara Southard | 5 | 0 |
| Barbara Staten | 5 | 0 |
| Ben Ramos | 5 | 0 |
| Rainey Alben | 5 | 0 |
| Edmond Bardwell | 5 | 0 |
| Greg Johnson | 5 | 0 |
| Harry Fisher | 5 | 0 |
| Shawn Cardona | 4 | 6 |
| Josh Pearson | 4 | 4 |
| Ivan Mack | 4 | 3 |
| Mark Mendenhall | 4 | 2 |
| Donna Gamblin | 4 | 1 |

DOE APOL 0999

| | | |
|---|---|---|
| Jeff Johnston | 4 | 1 |
| Jared Lemmon | 4 | 1 |
| Deberah Dillon | 4 | 1 |
| Stefanie Skousen | 4 | 1 |
| Chad Handley | 4 | 1 |
| Craig Bailey | 4 | 1 |
| Aaron Lesniewski | 4 | 1 |
| Joshua Ellis | 4 | 1 |
| John Gable | 4 | 1 |
| Kenneth Jones | 4 | 1 |
| Casey Waller | 4 | 0 |
| Tyler Workman | 4 | 0 |
| Zachary Pruett | 4 | 0 |
| Eric Jackson | 4 | 0 |
| Jason Hyatt | 4 | 0 |
| Ken Smith | 4 | 0 |
| Britt Chandler | 4 | 0 |
| Annmarie Lidberg | 3 | 4 |
| Melanie Hartnett | 3 | 3 |
| Brian Bremer | 3 | 2 |
| Chad Cox | 3 | 2 |
| Wesley Jueckstock | 3 | 1 |
| James Eccel | 3 | 1 |
| Kirk Duxbury | 3 | 1 |
| Jane Taylor | 3 | 1 |
| Blake Rawlings | 3 | 1 |
| Nicole Young | 3 | 0 |
| Tahesha Collins | 3 | 0 |
| Bradley Humphrey | 3 | 0 |
| Katrina Brown | 3 | 0 |
| Kellee Barnes | 3 | 0 |
| Tamar Gade | 3 | 0 |
| Guy Spelts | 3 | 0 |
| Regina Marquez | 3 | 0 |
| Michele Bashor | 2 | 2 |
| Christopher Quick | 2 | 2 |
| Dan Denniston | 2 | 1 |
| Milan Jovanovic | 2 | 1 |
| Todd Uebel | 2 | 0 |
| David Cox | 2 | 0 |
| Missy Martineau | 2 | 0 |
| David Cruz | 2 | 0 |
| Chris Chase | 2 | 0 |
| Scott Rogers | 2 | 0 |
| Bert Wong | 2 | 0 |
| Jody Adair | 2 | 0 |
| Bob Lein | 2 | 0 |
| Jolene Elliott | 2 | 0 |
| Tom Martone | 2 | 0 |
| Tony Seiden | 1 | 1 |
| Chuck Michel | 1 | 1 |
| Jeff Maholland | 1 | 0 |
| Brett Peterson | 1 | 0 |

**DOE APOL 1000**

Message

| | | |
|---|---|---|
| Jerome Johns | 1 | 0 |
| Brooke Halbison | 1 | 0 |
| Carrie Rios | 1 | 0 |
| Ken Meyers | 0 | 2 |
| Conrad Neuenschwander | 0 | 1 |
| Mark Poulsen | 0 | 0 |
| Jeremy Foutz | 0 | 0 |
| Joel Reeder | 0 | 0 |

**Samuel J. B. Biggs**
Senior Admission Manager - Central Division
University Of Phoenix Online
Phone: 800.366.9699 Ext. 6930

**DOE APOL 1001**

4/26/2007

Page 1 of 1

## Rose, Christine

**From:** Woodward, Jennifer
**Sent:** Wednesday, August 25, 2004 2:18 PM
**To:** Wittman, Donna; Wolff, Russell
**Subject:** FW: Gibson attorneys at UOP

FYI.

-----Original Message-----
**From:** Nancy G. Krop [mailto:nkrop@kroplaw.com]
**Sent:** Wednesday, August 25, 2004 1:35 PM
**To:** Woodward, Jennifer
**Cc:** DanielBartleyLaw@aol.com
**Subject:** Gibson attorneys at UOP

Hi Jennifer

Thought you'd be interested to know that Gibson, Dunn & Crutcher attorneys are visiting Northern California UOP campuses over the past several days, attempting to get signed statements from current counselors that they are not compensated based on enrollment numbers. I don't know if the attorneys are at other campuses as well. My feedback from Mary is that at the San Jose campus, counselors are confirming to the attorneys that they are paid based solely on enrollment numbers.

Nancy

Law Offices of Nancy G. Krop
E-mail: nkrop@kroplaw.com
1534 Plaza Lane, #322
Burlingame, California 94010
Tel. 650/344-5306  Fax 650/344-5307

Confidentiality Note: This email may contain information that is privileged, confidential and/or otherwise legally protected. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message is strictly prohibited. If you have received this e-mail in error, please contact the sender by e-mail or telephone (650/344-5306) and destroy all copies. Thank you.

**DOE APOL 1002**

★

**Rose, Christine**

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, September 02, 2004 3:00 PM |
| **To:** | Woodward, Jennifer |
| **Subject:** | UOP attempting to get witnesses to change their stories . . . |

In a message dated 9/1/2004 8:55:17 PM Pacific Daylight Time, ███████████writes:

Below is the draft statement by a coworker who did not at this time want his name used. He did not sign the statement which was prepared by the UOP attorneys (including grammatical errors):

I, —————, declare:

1.  I'm an Enrollment Counselor at the ███████ campus of the University of Phoenix. I've held this position for ███████████           Prior to that I were an

Associate Admissions Counselor in the Outbound Team at the ███████campus. As an Associate Admissions Counselor, I wasn't reviewed based on enrollments in any way. I had the standard corporate review. As an Enrollment Counsel, I'm reviewed with respect to my enrollments, but also with respect to non-enrollment factors. I understand the Matrix was, in fact, used as a review tool, even thought enrollments were the main factor.

2.  I spoke with the DOE approximately ██████████████ as an Enrollment Counselor. At that time, of my interview, I believed that the Matrix was largely a training tool. I now understand that the Matrix is not only a training tool, but is, in fact, used in the Enrollment Counselor review process. I was not threatened or told by anyone at the company that I should be anything but honest with anyone from DOE.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed August ██ 2004 at ███████ California

Jennifer

FYI

Looks like the UOP management are busy bees, having their attorneys do a bit of lobbying with the UOP enrollment counselors, trying to get them to repudiate prior statements made to the Department of Education incident to the ongoing investigation.

If I were UOP management and counsel, I would be very careful to avoid any conduct that, regardless of warm and fuzzy outer packaging, arguably gives an appearance of intimidation of, and tampering with, a federal witness.

Dan

Daniel Robert Bartley Law Offices

**DOE APOL 1003**

E-mail DanielBartleyLaw@aol.com
Website BartleyLawOffices.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

**DOE APOL 1004**

**Rose, Christine**

---

**From:**     MRH █████████████████

**Sent:**     Wednesday, September 01, 2004 11:55 PM

**To:**       Nancy Krop; Dan Bartley; Julie Albertson; MH

**Subject:**  statement

Below is the draft statement by a coworker who did not at this time want his name used.  He did not sign the statement which was prepared by the UOP attorneys (including grammatical errors):

I, ------------, declare:

1.  I'm an Enrollment Counselor at the ████████campus of the University of Phoenix. I've held this position for █████████████████████ Prior to that I were an Associate Admissions Counselor in the Outbound Team at the████████campus.  As an Associate Admissions Counselor, I wasn't reviewed based on enrollments in any way.  I had the standard corporate review.  As an Enrollment Counsel, I'm reviewed with respect to my enrollments, but also with respect to non-enrollment factors. I understand the Matrix was, in fact, used as a review tool, even thought enrollments were the main factor.

2.  I spoke with the DOE approximately ██████████████████████as an Enrollment Counselor.  At that time, of my interview, I believed that the Matrix was largely a training tool.  I now understand that the Matrix is not only a training tool, but is, in fact, used in the Enrollment Counselor review process. I was not threatened or told by anyone at the company that I should be anything but honest with anyone from DOE.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed August ██, 2004 at ████████California

**DOE APOL 1005**

4/26/2007

# Interview memo:  University of Phoenix

**To:**     File
**From:**   Donna Wittman
**Date:**   8/19/2003
**Re:**     **Interview on Site, Cylisha Willis, Current Enrollment Counselor, Phoenix Campus ,
            8/19/03; Interviewee Not chosen by UOP Management**

Ms. Willis has been an enrollment counselor only since 6/2/2003.  Previously, she had been a hair stylist.  She has been enrolled at UOP for a bachelors since 4/29/03.  Her job is to enroll students in certificate programs, the longest of which is 8 1/2 months.  The programs are HR management, tech programs, medication, college of financial planners.

When hired, she interviewed with a lot of peopel.  She was interviewed by Nancy Boyer.  She has received on-the-job training so far.  She will go to SAW in September or October.

She understands that her salary is performance based.  She will receive her first quarterly evaluation on 9/1.  She understands that there is a quota of enrollments - a budget of 33 per month.  She has not been given a matrix now because there will be a new one and someone at 'corporate' is working on it.  She understands that her salary will be based on the number of enrollments and her tenure.  She understands that if she exceeds her budget or goal, she will get a raise.  She does not know what happens if you do not meet your goals.

She has heard of no contests for enrollments since she has been hired.  She says that she is pretty new, so she is just learning the system.

DOE APOL 1464

**Rose, Christine**

| | |
|---|---|
| From: | Nancy G. Krop [nkrop@kroplaw.com] |
| Sent: | Friday, August 15, 2003 11:54 AM |
| To: | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| Cc: | DanielBartleyLaw@aol.com |
| Subject: | Julie's feedback |

Hi Jennifer, Russ:

Comments from Julie:

Not every counselor will have been given a copy of his/her matrix. UOP has gotten very savvy in just showing counselors what they have to do but not giving them out readily. I can bring a copy of each matrix. My recommendation is that each team has a copy of the matrix and asks the counselors what it is. They have all seen one but many will not have copies of one. She definitely should ask (for copies of their matrix) though because you never know who keeps what.

I know for a fact that Maria Arce has copies of her reviews, matrixes etc. She would definitely be willing to share with the DOE. She is an ex-employee. I have already forwarded her contact information.

Thanks

Nancy

1

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 15, 2003 5:43 PM |
| **To:** | Woodward, Jennifer |
| **Subject:** | Re: Help |

Here you go!:

Maria Arce returns from Europe Friday, August 15th. She works for the school district and is off work right now. Now would be a perfect opportunity for them to contact her. She would be more than happy to fill them in on details. I also know that she too has copies of matrixes, reviews and other documentation that she would gladly turn over if Jennifer and Russ just ask. Her home number is ████ ████ Cell phone number is ████████

At 04:51 PM 8/15/2003 -0400, you wrote:

> Nancy, I am trying to find the email with former recruiter Maria Arce's phone number and haven't succeeded- might you have it handy? Thanks so much.

DOE APOL 1466

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Wednesday, August 20, 2003 11:56 AM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com; |
| **Subject:** | Urgent:  Concerns re Current Interviews |

Hi Russ, Jennifer

Wanted to pass on to you feedback from Julie and Mary about the employee
interviews.


1. Oakland. ████████████████(a counselor who is ready to talk with the DOE,
give the DOE her documents and is very upset that her manager wants her to
lie to the DOE) was asked to attend a meeting Wed. morning from 9-11 a.m.
She is very open to speaking with the DOE as is her co-worker ████████████
They are however nervous that they can get fired for telling the
truth. ██████and ██████████will both need assurances of confidentiality from
the DOE interviewer.

2. San Francisco. Julie had two separate conversations with SF
reps.  Here is her information:

    "One was Don Rose who told me that the interviewer asked him questions
about winning DVD players etc. He told them no. He has     never won because
he never enrolled enough students to. He also said that they were asking
him questions about being paid on   enrollment and was vague and did not
answer. When I asked Don" but Don we are paid based on enrollment" he
answered, "well   yeah I know that". Don also laughed and said, "Yeah when
they met with ██████she tried to enroll him" and laughed.

    Also spoke with ████████████this evening. He told me that they were in a
meeting this morning laughing about the DOE and the   interviewer. Some one
asked, wanna know how you get the interviewer out of your office fast?, the
new guy ████stated, "yeah fart". The San Francisco team is laughing in the
face of the DOE and Mike McKay the manager is joining in with them. I was
absolutely disgusted with them. ████also said, well UOP is clean as a
whistle they don't pay us on commission. ████feels because he
is    salaried he is not paid on commission. He readily admits that in order
to get a raise he has to hit his numbers. ██████has    heard ████say
on many occasions that I am making nothing now, I need to enroll so I can
get a raise."

    Mary had the following to add:

    ██████was at our campus today, he met with DOE in SF. He was joking about
his meeting with other counselors in SJ. It sounds    like one of the
questions is "did you ever win a DVD player?" most counselors could
truthfully answer "no" to that question. All were     eligible for the
contest, however."

My suggestions for the interviewers:  don't only ask the counselors if they
ever won anything.  More critical is whether they ever participated in a
contest to win anything; what were the contest requirements, who won the
contest, do they have documents regarding these contests, etc. Also,
rather than just open ended questions, I suggest that the interviewers
directly ask the counselors if their enrollment numbers impact their
compensation.  Can they increase their compensation through their
enrollment activities.  If so, explain.

3.  San Jose

1

Mary reported that counselors are very nervous about their jobs -- that their jobs will be in jeopardy if they tell the truth to the DOE.  As much as your interviewer can assure them confidentiality would be extremely helpful in getting the truth from the counselors.

4.    Friendly Witnesses.

Mary received feedback that a friendly witness felt very intimidated by Russ.  We need these folks to feel comfortable coming forward so please address that situation as you can.

Thanks.

Nancy

2

DOE APOL 1468

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Wednesday, August 20, 2003 7:29 PM |
| **To:** | DanielBartleyLaw@aol.com; Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Subject:** | Update from Client: Pressure from Management, and more |

Hi

Here's the update today from Julie:

San Mateo/San Francisco:
      Julie's manager Mike tried to coach Julie how to answer the DOE questions. Mike told her that the DOE is asking about Sperling trips, and whether they are paid based on enrollment.  Julie told Mike she is paid based on enrollment.  Mike got very angry with her, told her not to say that.  Mike told Julie to tell the DOE her performance reviews are with H.R.  Julie said no, I'll tell the DOE I have copies of my reviews.  Mike was furious.  Mike said that when he was asked about Sperling contests, he simply said he'd never won one.
      Mike directed Julie to speak to Don.
      Don is up for a promotion.   Don bragged to Julie, "I played Ronald Reagan --I could not recall a thing."  Don told Julie, "hey UOP might get a slap on the hand for all their illegal activities, but UOP is too large and can buy their way out of anything."
      After her interview, Mike asked Julie what she told the DOE.  Mike got real angry when Julie said she told them the truth and it was none of his business.

      Manager Laura told ▇▇▇▇ to take the day off today when ▇▇▇ried to return to work today. ▇▇▇▇said she wants to talk to the DOE and she's very angry that Laura is trying to keep her from the DOE.

That's it for now.

Nancy

DOE APOL 1469