**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE APOLLO GROUP, INC. SECURITIES LITIGATION** | )<br>)<br>)<br>)<br>) **06-MC-0558 (CKK)**<br>) **(D. Ariz., No. CV-04-2147-PHX-JAT)**<br>)<br>)<br>)<br>)<br>) |
| **This Document Relates To: Subpoena Action** | |

## INTRODUCTION

Since this Court's March 12, 2007 Order, the United States Department of Education ("Department") has diligently worked to respond to the extensive and broadly scoped subpoena from Apollo Group, Inc. ("Apollo"). On April 12, 2007, the Department and Apollo entered into a Joint Agreement whereby the Department agreed to make a voluntary and discretionary production of specific documents in exchange for Apollo's agreement to limit the scope of the subpoena. In the past two months – pursuant to the Joint Agreement – the Department has: 1) produced more than 1600 pages of documents in response to the subpoena; (2) reviewed the more than 4000 additional pages of documents contained in Categories 2, 5 and 6; and (3) produced privilege logs to Apollo for all documents and portions of documents not released to Apollo.

The Department has worked diligently in fulfilling its obligations under the Joint Agreement, in spite of Apollo's new and supplemental demands for additional information. Notwithstanding these supplemental demands, the Department has responded to them and worked with Apollo to resolve a number of questions and issues raised by Apollo. In this

context, the Department is now perplexed by the tone of Apollo's May 21, 2007 Brief, its statements that the Department "continues to fail to meet its obligation under the Federal Rules of Civil Procedure and the joint Agreement" and its decision to include in the Brief arguments concerning issues already addressed by the Department. See Plf's Brief at p. 1. These issues were addressed to Apollo's apparent satisfaction in letters and document productions prior to the filing of the Brief. In short, many of the concerns raised by Apollo concerning the releases of interviews where the identities of informers are known, are now moot.

Further, although Apollo claims that the Department's diligent and thorough review of the documents, its production and assertion of privileges is dilatory, the fact is that the Department acted timely and in accordance with the Joint Agreement. On the other hand, the Department queries why, Apollo waited more than five months to file its motion to compel, knowing that briefs were to be filed in the underlying lawsuit. In any event, the Department stands by its assertion of the deliberative process privilege, attorney work product privilege and informer identity privilege with respect to the documents not produced in response to the subpoena and respectfully asks the Court to sustain its assertion of these privileges.

Respectfully submitted,

/s/

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/

_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/
_____
HEATHER D. GRAHAM-OLIVER
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W.
Washington, D.C.  20530
(202) 305-1334

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | ) ) ) ) ) **06-MC-0558 (CKK)** ) **(D. Ariz., No. CV-04-2147-PHX-JAT)** ) ) |
| This Document Relates To: Subpoena Action | ) ) ) ) |

## FACTUAL BACKGROUND

On April 12, 2007, the parties came to a joint agreement whereby the Department would make certain voluntary and discretionary productions of documents without waiving any privileges as to the other documents at issue, in exchange for Apollo's withdrawal of its motion to compel the Department to respond to three of the six categories of documents agreed to by the parties.[1] According to the precepts of the Joint Agreement, the Department released information to Apollo on April 13, 2007, April 18, 2007, April 25, 2007 and April 30, 2007. After rolling

---

[1] The Department and Apollo agreed to the following categorization of documents:

(1) Internal Department documents that explicitly seek or provide legal advice;
(2) Internal department documents concerning the conduct of the program review other than documents contained in Category 1;
(3) Internal department drafts of the Wittman Report;
(4) Internal department documents concerning the settlement with Apollo or settlement meetings with Apollo;
(5) Department analysis of the information provided by Apollo in response to the issuance of the February 5, 2004 Program Review Report; and
(6) All documents communicated to or received from third parties, including witness statements and communications with Apollo or the *qui tam* relators or their counsel.

In exchange for Apollo's agreement to withdraw its motion to compel as to documents in Categories 1, 3 and 4, the Department agreed, as a matter of administrative discretion, to produce to Apollo specific documents from Categories 5 and 6. The parties also agreed that in exercising its administrative discretion to produce specific documents, the Department has not waived any applicable privileges for those remaining documents, which were not produced. See Joint Agreement filed on April 12, 2007.

productions of the Category 5 and 6 privilege logs,[2] the Department produced a final privilege

log to Apollo on April 30, 2007 that was later revised and updated per Apollo's request on May

14, 2007.

Furthermore, upon receiving information from Apollo regarding witnesses that have

voluntarily identified themselves to Apollo, the Department released additional witness

statements to Apollo on May 7, 2007, May 16, 2007 and May 23, 2007.  Finally, the Department

produced privilege logs of Category 2 documents to Apollo weekly on April 30, 2007, May 7,

2007, May 14, 2007, May 21, 2007, May 29, 2007, and June 4, 2007.  The final Category 2

privilege log was completed and produced to Apollo on June 7, 2007.

The documents at issue are limited to the following:

- Witness statements/notes where the Department has redacted identifying
  information for 45 of the 100 witnesses.

- Twenty-seven (27) documents listed in the Category 5 Privilege log
  consisting of email communications between Department attorneys and
  Federal Student Aid staff forwarding attachments amongst themselves of
  draft documents, draft data sets and draft scatter charts related to the
  Department's analysis of the information provided by Apollo.  All of this
  information was used for settlement purposes.  See  Declaration of Kent
  D. Talbert.

- Three (3) documents listed in the Category 6 Privilege log consisting of
  confidential witness interviews taken by Department attorneys to assist in
  formulating the strategy of the program review.

---

[2]   The Category 5 and 6 Privilege logs are not attached to the Department's memorandum because they have been
submitted to the Court by Apollo as Exhibit "H" and "L".

- Forty-three (43) documents listed in the Category 6 Privilege log consisting of email communications between and among Department attorneys, *qui tam* relators counsel and the *qui tam* relators pertaining to opinions, recommendations, or advice about how to conduct the program review.  <u>See</u> Declaration of Kent D. Talbert.

## **LAW OF PRIVILEGES**

I.      <u>Deliberative Process Privilege</u>

The deliberative process privilege protects internal documents that are both pre-decisional and deliberative, whose disclosure would have a chilling effect on the free exchange of opinions and ideas in an agency's decision-making process, in order to "prevent injury to the quality of agency decisions."  <u>NLRB v. Sears, Roebuck and Co.</u>, 421 U.S. 132, 151 (1975).  Its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government.  <u>Id.</u>, at 150.  Courts have recognized that the deliberative process privilege generally serves three basic purposes: (1) it protects and promotes candid discussions within a government agency; (2) it prevents public confusion from premature disclosure of agency opinions before the agency establishes its final policy; and (3) it protects the integrity of an agency's decision.  <u>See</u>, <u>Tigue v. United States Dep't of Justice</u>, 312 F.3d 70, 76 (2d Cir. 2002); <u>Alexander v. FBI</u>, 192 F.R.D. 50, 55 (D.D.C. 2000).

Generally, a document is predecisional if it was generated before the adoption of an agency policy and deliberative if it reflects the give-and-take of the consultative process.  <u>Judicial Watch, Inc., v. Food & Drug Admin.</u>, 449 F.3d 141, 151 (D.C. Cir. 2006) (citations omitted).  Documents prepared for the purpose of assisting an agency decision-maker in arriving at a decision are predecisional.  <u>See</u> <u>Hopkins v. United States Dep't of Housing & Urban Dev.</u>,

929 F.2d 81, 84 (2d Cir. 1991); Nat'l Congress for Puerto Rican Rights v. City of N.Y., 194

F.R.D. 88, 92 (S.D. N.Y 2000).  In Judicial Watch, the court addressed undated documents,

stating that "[d]ates are but one way to illustrate a chronology."  449 F3d at 151.  Moreover,

"documents dated after [a decision was made] may still be predecisional and deliberative with

respect to other, nonfinal agency policies. . . ."  Id.  Furthermore, agency decision-making is a

continuous process, generating documents that could be prior to one decision, while being

subsequent to another related decision.  Agencies are, and properly should be, engaged in a

continuing process of examining their policies; this process will generate memoranda containing

recommendations that do not ripen into final agency decisions; and the lower courts should be

wary of interfering with this process.  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 n.18

(1975).  A document embodying an outcome of the decision-making process, the decision itself,

generally is not privileged, even though it originally may have been drafted as a

recommendation.  See Sterling Drug, Inc. v. FTC, 450 F2d 698 (D.C. Cir. 1971).

  As a rule, the privilege does not protect purely factual matters or factual portions of

otherwise deliberative memoranda.  See, e.g., EPA v. Mink, 410 U.S. 73, 91 (1973).  However,

an agency may withhold factual material in an otherwise deliberative document where either: (1)

the selection or distillation of facts constitutes an exercise of judgment by agency personnel such

that disclosure would "permit indirect inquiry into [their] mental processes" (Williams v. United

States Dept. of Justice, 556 F. Supp. 63, 65 (D.D.C. 1982)); or (2) factual information is so

inextricably intertwined with deliberative material that its disclosure would expose or cause harm

to the agency's deliberations (see, e.g., Wolfe v. HHS, 839 F.2d 768, 774-776 (D.C. Cir. 1988)

(en banc)).

A category of documents particularly likely to be found privileged under the deliberative process privilege are drafts; in this regard, the process by which a draft evolves into a final document can itself constitute a privileged deliberative process.  See, e.g., National Wildlife Federation v. U.S. Forest Serv., 861 F.2d 1114, 1119 (9th Cir. 1988).   Drafts are by their nature, deliberative, and they are rarely relevant.  See Grossman v. Schwarz, 125 F.R.D. 376, 385 (S.D.N.Y. 1989).  Drafts represent the personal opinion of the author, not yet adopted as the final position of the agency.  See Judicial Watch v. Clinton, 880 F.Supp. 1, 13 (D.D.C. 1995), aff'd, 76 F.3d 1232 (D.C. Cir. 1996).

While an exception to the deliberative process exists where "the deliberative process itself [is] directly in issue," Dominion Cogen, D.C., Inc. v. District of Columbia, 878 F.Supp. 258, 268 (D.D.C. 1995), the facts in the instant case do not bear out the implementation of the principle.  It is not the deliberative process that is at issue, rather according to Apollo it is the factual accuracy of the Program Review document itself.

Attorney Work Product Privilege

The attorney work-product privilege protects documents and other memoranda prepared by an attorney in contemplation of litigation.  See Hickman v. Taylor, 329 U.S. 495, 509-10 (1947); Fed. R. Civ. P. 26(b)(3) (codifying this privilege in the Federal Rules of Civil Procedure).  The privilege is intended to protect the adversarial trial process by insulating the attorney's preparations from scrutiny.  See Jordan v. United States Dep't of Justice, 591 F.2d 753, 775 (D.C. Cir. 1978) (en banc).  The privilege sweeps broadly in a number of respects, extending, for example, to: administrative proceedings as well as judicial litigation (see, e.g., Exxon Corp. v. Dep't of Energy, 585 F. Supp. 690, 700 (applying privilege to regulatory audits and investigations)); records of law enforcement investigations when they are based upon

5

specific allegations of wrongdoing and "represent an attempt to garner evidence and build a case against the suspected wrongdoer" (SafeCard Services v. SEC, 926 F.2d 1197, 1202 (D.C. Cir. 1991); see also Feshbach v. SEC, 5 F. Supp. 2d 774, 783 (N.D. Cal. 1997)); and documents "relat[ing] to possible settlements" of litigation (United States v. Metro St. Louis Sewer Dist., 952 F.2d 1040, 1044-45 (8th Cir. 1992)).

The privilege also protects documents prepared "by nonattorneys who are supervised by attorneys" (see, e.g., United States v. Nobles, 422 U.S. 225, 238-39 (1975); Diversified Indus. v. Meredith, 572 F.2d 596, 603 (8th Cir. 1977)). Moreover, factual material is fully entitled to work-product protection. See United States v. Weber Aircraft Corp., 465 U.S. 792 (1984); FTC v. Grolier, Inc., 462 U.S. 19 (1983); Martin v. Office of Special Counsel, 819 F.2d 1181, 1187 (D.C. Cir. 1987); Tax Analysts v. IRS, 117 F.3d 607, 620 (D.C. Cir. 1997).

The privilege extends not only to documents setting forth the mental processes and impressions of attorneys, but also to documents or portions of documents that set forth factual information compiled by or for attorneys. See In Re Sealed Case, 676 F.2d at 809; Willingham, 228 F.R.D. at 3-4. However, opinion work product, which includes interviews, summaries of witness statements, memoranda, correspondence, drafts of documents, investigative reports and any other materials reflecting the thought processes of attorneys, has received expansive protection. See Hickman, 329 U.S. at 511; In Re Sealed Case, 146 F.3d at 884; Willingham, 228 F.R.D. at 6 (explaining that compilations of attachments are protected as opinion work product because such compilations reveal attorney strategy and mental processes). Courts justify the broader expanse of the work-product privilege because it is intended not merely to maintain confidentiality but also to preserve the vitality of the adversary system. Hickman, 329 U.S. at 809; Rockwell Int'l Corp. v. Dep't of Justice, 235 F.3d 598, 605 (D.C. Cir. 2001) (quotation

omitted).  Similarly, a party does not automatically waive the work-product privilege by disclosure to a third party.  Id.

Opinion materials are virtually undiscoverable unless the party seeking production can show extraordinary need.  See generally Upjohn v. United States, 449 U.S. 383, 400-402 (1981) (noting that some courts preclude discovery of opinion materials altogether); Willingham, 228 F.R.D. at 5; Fed. R. Civ. P. 26(b)(3) (distinguishing opinion from ordinary work product as warranting special protection:  "[in] ordering discovery of [ordinary work product] when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney . . . concerning the litigation").

Factual or "ordinary" work product includes facts known or gathered by counsel in the course of legal representation.  However, factual work product is only discoverable upon a sufficient showing of need, which requires that there is no reasonable alternative source for the same or substantially equivalent information, and that the party has a substantial need for the information.  See  Fed. R. Civ. P. 26(b)(3); U.S., ex rel., Singh v. Bradford Regional Medical Center, 2007 U.S. Dist. LEXIS 39662 *6, 7 (WD Pa. 5/31/07).

As in SafeCard Services, the program review here – an investigation by Department attorneys and staff into specific allegations of third party misconduct here – was performed in anticipation of a possible administrative action brought by the Department and the litigation that in fact resulted when Apollo contested the report.  See 926 F.2d at 1202.  This program review was not routine, but rather a review conducted in response to specific reports of misconduct made by the qui tam relators.  See the Declarations of Donna Wittman (Wittman Declaration), Institutional Review Specialist with the Department of Education's Federal Student Aid (FSA) Office; and Jennifer Woodward (Woodward Declaration), an attorney with the Department's

Office of the General Counsel, attached hereto.  As such, the Department's program review of the University of Phoenix was unquestionably undertaken in anticipation of litigation rather than as a general administrative review.  See Lutheran Soc. Services, 186 F.3d at 968-69.  In fact, the *qui tam* action had already been filed.  While some of the information withheld is factual in nature, Apollo has failed to justify a substantial need for it as required pursuant to Fed. R. Civ. P. 26(b)(3).

Informer Identity Privilege

It is well established that the government has a right to protect an informer's identity in order to maintain a free flow of information to the government.  Roviaro v. United States, 353 U.S. 53 (1957).  The government may protect information under the informer identity privilege when the information would tend to reveal the identity of the informer.  Id.  Furthermore, in this Circuit, it has been held that the privilege in question belongs to the government and not to the informer.  Westinghouse Electric v. City of Burlington,Vermont, 351 F. 2d 762, 768 (D.C. Cir. 1965).  "The purpose of the privilege is not to protect the particular informer from retaliation, but to protect the flow of information to the Government.  However, it rests on the assumption that a citizen, recognizing the risk of retaliation, will be more likely to inform if he knows that his identity will be kept secret."  Id.  When determining whether the privilege should be upheld, the court balances the relevance of the information with possible defenses, seriousness of the litigation, the possible significance of the informer's information, and other relevant factors.  Id.  Furthermore, courts have determined that once the government has claimed the privilege, an opposing party cannot overcome the privilege with only a showing of hope that the evidence in the file will lead to conflicting testimony or impeaching evidence.  Stephens Produce Co., Inc. v. National labor Relations Board, 515 F. 2d 1373, 1377 (8th Cir. 1975).

## ARGUMENT

## The Department Complied with the Terms of the Joint Agreement When Redacting Witness Communications

In the Joint Agreement, the Department estimated that it would produce approximately 1625 pages of documents, which pertained specifically to witness statements. After careful review of the documents, the Department provided Apollo approximately 1600 pages. For the convenience of the parties, the Department provided Apollo with a list assigning a letter to each of the 100 witnesses and identifying the corresponding Bates page numbers for that witness.[3] See attached, as Exhibit 1.

Based on Apollo's representations and production of documentation that the identities of 55 of these witnesses were known to Apollo as of May 9 and May 16, 2007, the Department produced approximately 250 pages of witness statements to Apollo without redacting any identifying information. Accordingly, for those witnesses that were already known to Apollo, the witness statements and/or notes pertaining to them were released without redactions. Thus, all of the witness statements have been provided and only the Department's redaction of identifying information for 45 witnesses remains at issue. Consequently, as previously stated, per the Joint Agreement, the Department has produced to Apollo redacted versions of the witness statements/notes for 45 witnesses. The statements themselves set forth the facts relied upon by the Department in the program review without revealing the identities of these still-confidential sources.

The April 12, 2007 Joint Agreement states that "the Department will produce all notes of witness interviews, exclusive of information identifying said witnesses." While the parties also

---

[3]   At the end of the list, it references two "witness" names. Although referred to as "witnesses", those names are actually the names of the relators.

agreed therein not to log redactions of identifying information of witnesses, and the Agreement contains examples of "identifying information" (i.e., a witness's name, address, telephone number and/or email address), the Agreement nowhere limits the scope of identifying information to be protected. The Department redacted all identifying information because, it is clear from the circumstances of these witnesses' testimony, that other information redacted by the Department would also identify them. For example, where an office consists of only six employees, four of whom were interviewed and two of whom are females, the Department revealed that a female was interviewed, but redacted the name of the supervisor and the location of the office since such information would likely lead to the identification of the witness.[4]

When considering whether the informer identity privilege is properly applied, the Supreme Court has concluded, "No fixed rule with respect to disclosure is justifiable." Roviaro v. United States, 353 U.S. 53, 62 (1957). Rather, the Court has adopted a balancing test in which "the public interest in protecting the flow of information [should be weighed] against the individual's right to prepare his defense." Id. In asserting the privilege with respect to the identifying information at issue here, the Department has appropriately concluded that the public interest in protecting its confidential sources outweighs Apollo's need for such information.

During program reviews, government informants consistently request that witness interviews be kept confidential for fear of reprisal by their employer. The protection of witness identities is vital to preserving the flow of information to the government from such informants. The identification of informants to the organization being investigated would have a chilling

---

[4] Of the examples that Apollo cites to the Court as "egregious" errors in redacting, the Department argues: (1) that such errors have been corrected by producing witness statements in full; and (2) that office locations and first line supervisors' names are protected by the parties' Agreement because disclosing such information would reveal the witnesses' identities. Documents numbered DOE APOL 0354, 0343-0349, 0328-0329, and 0330-0331 have now been released to Apollo and can be found at DOE APOL 0560-0571, 1516-1518, 1523-1524, and 1525-1529. Since the Department has corrected such errors, Apollo's argument regarding the Department's compliance with the terms of the Joint Agreement is unfounded.

effect on the future flow of information to the government.  Ms. Wittman attests that the cooperation of employees and students of schools under investigation is vital to the Department's efforts to ensure that such institutions are complying with applicable statutes and regulations. See Wittman Declaration.  If courts do not preserve these protections, government agencies would find it difficult to obtain the cooperation of witnesses whose testimony may be contrary to the interests of their employer.

While Apollo claims that it needs access to these informers' identities to document deficiencies in the Program Review report, such is not the case.  In view of the fact that the Department has produced to Apollo the facts and substance of the witness interviews, Apollo may contest both the validity of facts and information communicated to the Department, and the Department's reliance on such information in the Program Review report.  Thus Apollo's need for the information, if any, is clearly outweighed by the need articulated by the Department to protect the identities of its confidential informants and the flow of information from such individuals.  It is the Department's standard practice to protect informants from reprisal by their employing institution and to promote open communication from such sources to the Department regarding potential violations of the Higher Education Act.  Furthermore, Ms. Wittman specifies that the fear and anxiety of retaliation expressed by the witnesses during *this* program review far exceeded that encountered in any other review she has performed in her 13 years of government service.  See Wittman Declaration, ¶ 9, 10, 11 and 12. In short, the circumstances present here -- vulnerable and anxious witnesses whose testimony is critical to a government investigation -- are exemplary of the public interest in protecting such sources in order to ensure the free flow of information to the government.

Revealing the identities of the informers under these specific circumstances would likely have an enormous chilling effect on any cooperation the Department might receive in the future from employees at such federally-funded institutions, to the detriment of the mission of Federal Student Aid to process millions of student financial aid applications; disburse billions of dollars in aid funds to students through schools; enforce financial aid rules and regulations; and partner with schools, financial institutions and guaranty agencies to prevent fraud, waste and abuse.

### The Department Has Justifiably Withheld Category 5 Documents

(1) Draft Documents

Per the Joint Agreement, the Department released 137 pages of data and trend line analysis to Apollo. Apollo's assertion that the information provided is not the Department's "final analysis" is incorrect. In the Department's May 7, 2007 letter, the Department explained the documents and data sets that were produced to Apollo. The Department voluntarily produced two sets of data in response to the subpoena. The first set produced was the data produced in conjunction with the April 11, 2004 Wittman analysis memorandum. The Department produced the April 11, 2004 analysis Wittman memorandum along with the supporting data. See DOE APOL 0001-0100. This memo represents a written analysis of the data relied upon in the program review and other data received from Apollo after the report was released. This is the only written memorandum that was created. See Wittman Declaration, ¶ 13.

Thereafter, Apollo submitted information to the Department contesting the Program Review report. Ultimately, settlement discussions resulted between Apollo and the Department throughout the summer of 2004. During this time, the Department reviewed all of the data and created a number of additional scatter charts and graphs for Department officials to consider when deciding whether to settle the program review. It is the draft scatter charts and data sets

that have not been released. Apollo now seeks these *draft* scatter charts and data sets that were internally reviewed and deliberated on during the settlement discussions. The Department has appropriately logged those *draft* documents in the Category 5 Privilege Log based on their deliberative and attorney work product nature. See Declaration of Kent D. Talbert, General Counsel of the Department of Education. The final scatter charts and supporting data were released by the Department to Apollo in August 2004. See DOE APOL 0102-0137.[5]

Ms. Wittman did not prepare a memorandum to accompany the August 2004 data sets and draft scatter charts and thus, the April 11, 2004 memorandum and the August 2004 data sets and scatter charts and supporting data released to Apollo represents the Department's final data analysis. The program review report was based on the data sets already produced to Apollo (and derived from Apollo's *own* salary records produced to the Department during the course of the program review) as well as on the witness interviews. Therefore, the Department has fulfilled its obligations under the Joint Agreement regarding the Category 5 documents.

(2) E-Mail Communications with attachments.

In the privilege log prepared for Category 5, the Department asserts the deliberative process privilege and the attorney work-product privilege for twenty-seven (27) documents comprising of email communications between the Department's attorneys and Federal Student Aid (FSA) staff including Institutional Review Specialist Wittman discussing and suggesting changes to draft data sets and draft scatter charts; specifically, they represent opinions and recommendations between Department lawyers and FSA staff working under their supervision concerning what data to include, how to describe the data, how to categorize the violations, the number of violations, etc. The charts and data were prepared for presentation to Department officials including the Deputy General Counsel for Postsecondary and Regulatory Service and

---

[5]   The final and last data sets and scatter charts were released.

the Chief Operating Officer of Federal Student Aid for internal use in determining whether or not to settle with Apollo and, if so, on what terms.  <u>See</u> Declaration of Kent D. Talbert, General Counsel, Department of Education.  Therefore, the documents are not only draft documents protected by the deliberative process privilege but also attorney work product since the Department was contemplating, in the event settlement negotiations proved unsuccessful, both that it would be necessary to take an administrative action against Apollo and that Apollo would contest such an action in administrative litigation.  <u>See</u> Declaration of Kent D. Talbert and Jennifer Woodward.

Apollo contends that the Department decisions to which the records at issue relate are not of a type protected by the deliberative process privilege.  Specifically, citing <u>Petroleum Info. Corp. v. Dep't of the Interior</u>, 976 F.2d 1429 (D.C. Cir. 1992), Apollo argues that the deliberative process privilege cannot be invoked where "materials could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment," 976 F.2d at 1435, and that the records at issue do not meet this criterion because they relate to a purely factual investigation.

On the contrary, Apollo is now seeking to gain access to those documents created by the Department after the program review report was issued but before the Department made a policy decision to settle the program review with Apollo.  Clearly, the documents and internal communications created within the Department during this time period are deliberative documents leading up to the policy decision to settle with Apollo.  Department lawyers prepared briefings including recommendations to Department decision-makers when considering settlement options; such documents reviewed the analysis in the program review report and presented such information in various forms to said Department officials.    Draft documents of

14

such analysis implicate the Department's thinking in making the decision to settle with Apollo and are, thus, protected by the deliberative process and attorney work product privileges. Disclosure of such documents would have a chilling effect on the internal exchange of views in settlement discussions, to the detriment of future settlement negotiations. See Talbert Declaration, attached hereto.

Apollo asserts that DOJ's May 2003 decision declining to intervene in the *qui tam* lawsuit meant that litigation was no longer anticipated. This contention is belied by the following facts: (1) at the time of the referenced DOJ declination, the Department had substantial evidence that the University had violated section 487(a)(20) of the HEA; (2) the Department advised DOJ, in view of the declination decision, that it was considering what administrative action to take against the University on account of the violation; (3) the purpose of the program review was to quantify the extent of the violation in order to determine an appropriate fine; (4) the University hotly contested the Report's finding of noncompliance with section 487(a)(20) of the HEA; and (5) the parties negotiated and entered into a compromise settlement of the case on terms including, *inter alia*, the University's payment of $9,800,000.00 to the Department. These facts clearly show that the Department's investigation and related activities were all undertaken by or at the direction of Department lawyers in anticipation of the litigation that in fact ensued. Therefore, the Department's assertion of the attorney work product privilege for the category 5 documents at issue must be upheld.

### The Department Has Justifiably Withheld Category 6 Documents

In the April 12, 2007 Joint Agreement, the parties clearly agreed that, "in exercising its administrative discretion to produce specific documents, the Department has not waived any applicable privilege(s) for those remaining documents, which will not voluntarily be produced."

Agreement, n. 1.  Therefore, any argument by Apollo that the Department has waived its privileges related to certain documents is untrue.  Apollo's claim concerning the Category 6 documents still at issue should therefore be dismissed to the extent it is based on the "waiver" argument rather than on any substantive challenge to the Department's assertion of privileges.

The Department has properly invoked the attorney work-product privilege to deny access to the Category 6 documents at issue, comprising three documents that are confidential witness interviews taken by department attorneys in anticipation of litigation and forty-three documents that are email communications between and among Department attorneys, *qui tam* relators' counsel and the *qui tam* relators pertaining to opinions, recommendations, or advice about how to conduct the program review.  See Declaration of Kent D. Talbert.

(1)  Relators' witness statement.

Apollo requests the Court to compel production of the relators' "deposition transcripts." As the Department explained to Apollo by letter dated May 7, 2007, although this document is titled a "deposition transcript," it is in fact a witness interview taken by OGC attorneys, Jennifer Woodward and Russell Wolff, after the Department had decided to perform a program review focusing on the allegations of the *qui tam* relators. <u>See</u> Woodward Declaration.

Ms. Woodward and Mr. Wolff conducted such interview with an eye towards future litigation with Apollo in that the interview itself is titled "deposition transcript."  Additionally, Ms. Woodward and Mr. Wolf interviewed the relators on the record with a court reporter present in order to garner information and details on how to conduct the program review.  In this specific circumstance, two Department attorneys took a leadership role in steering the direction of the program review, anticipating at each step that Apollo would challenge any Departmental  action in litigation.  Releasing such privileged work product information would reveal the attorneys'

entire plan and strategy for the Department's program review and the anticipated final action based thereon. Woodward Declaration, ¶ 9, 10, 12.

After Ms. Woodward and Mr. Wolff took the statement of the relators, the attorneys processed the information and continued to plan the Department's strategy in performing the program review. Woodward Declaration, ¶ 9, 10. The three documents representing the interviews of the *qui tam* relators have been withheld pursuant to the work product privilege.

In addition, the attorneys met with the Institutional Review Specialists to discuss how to conduct the program review and followed up by going back to the relators to ask focused questions on whom to interview, what types of documents to request, which locations to perform the review, etc. Woodward Declaration, ¶ 10, 14. The email communications back and forth with the relators and their counsel are protected by the attorney work product privilege because the Department attorneys were extracting specific information from its key witnesses in order to plan and strategize on how to perform the program review. In order to get this information, Apollo would have to show substantial need. Apollo has failed to do so, in fact Apollo knows who the relators are and has either deposed or acquired statements from them.

The attorneys were involved in the program review from its inception because the review was performed with an eye towards litigation anticipating that it might bring an administrative action or that Apollo would contest any fine imposed by the Department. That this is the case is borne out by the fact that Apollo not only did contest but also settled the Department's findings in the program review.

## CONCLUSION

For all of the foregoing reasons, the Department of Education requests that

Apollo's Motion to Compel be denied.

Respectfully submitted,

/s/

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/

_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/

_____
HEATHER D. GRAHAM-OLIVER
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W.
Washington, D.C.  20530
(202) 305-1334

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE APOLLO GROUP, INC. SECURITIES )
LITIGATION )
)
)
) 06-MC-0558 (CKK)
) (D. Ariz., No. CV-04-2147-PHX-JAT)
)
)
This Document Relates To: Subpoena Action )
)
_____ )

## DECLARATION OF DONNA WITTMAN

I,      Donna Wittman, declare as follows:

1.      I am an Institutional Review Specialist with the United States Department of Education's Federal Student Aid, (FSA) in the San Francisco Regional Office. I have been an Institutional Review Specialist at FSA since September 6, 1994.

2.      The statements contained in this declaration are based upon my personal knowledge, and conclusions and determinations reached and made in accordance therewith.

3.      Through my position as an Institutional Review Specialist with the Department, I have personal knowledge concerning the Department's 2003-04 program review of the University of Phoenix (University), owned by Defendant Apollo Group, Inc. (Apollo). Due to the nature of my official duties, I am familiar with the procedures followed by the Department when performing an institutional program review.

4.      The purpose of this declaration is to provide the Court and Apollo with facts leading to the Department's decision to withhold documents concerning the program review that had been requested by Apollo under various subpoenas. Such documents were withheld

1

pursuant to the deliberative process privilege, attorney work product privilege and the informer identity privilege.

5.      Program review reports typically follow a site visit to a school during which Institutional Review Specialists perform a program review of a school's participation in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq.  See generally 20 U.S.C. § 1099c-1; 34 C.F.R. § 668.112(b).   The report sets forth the findings made by the Institutional Review Specialists and usually requests further information from the school in order to make a final determination as to whether the school owes monetary liabilities and/or fines as a result of the findings.

6.      During program reviews, Institutional Review Specialists often interview student and employee witnesses to gather information on the potential violations of the Higher Education Act.  In order to promote the free flow of information to the Department, Institutional Review Specialists often agree to protect the identities of the confidential witnesses interviewed.  The Department offers such anonymity to its witnesses since witnesses often fear retaliation from the employing institution.  Most often employees fear harassment by the institution and/or loss of their job if they were to cooperate with the Department's program review.

7.      If the Department had to reveal the identities of the confidential witnesses interviewed, then witnesses may not cooperate with program reviews in the future since employees would fear retaliation from the employing institution.

8.      In August 2003, the Department conducted an on-site program review at the University.  The purpose of the review was to investigate the allegations of the qui tam case re: violations of section 487(a)(20) of the Higher Education Act, and, if appropriate, quantify the

extent of any violation, in order to set an appropriate fine amount, which the Department anticipated the University would contest.

9.    During the program review, the investigative team interviewed over 90 witnesses and collected substantial evidence to support the findings in the program review report (Report). Because many of the witnesses interviewed by the team still worked for the University, the team assured the witnesses that all efforts would be made by the Department to keep the personal identities of the witnesses confidential.

10.    In many cases, revealing the office or the supervisor where the employee was interviewed would be likely to lead to revealing the identity of the witness.  This is so because many of the offices where employees feared retaliation were small settings of 6-10 employees under one supervisor.

11.    During this program review, except for those witnesses chosen by UOP management to be interviewed, all employees stated that they expected UOP to retaliate.  The employees expressed fear of losing their jobs.  Some former employees indicated that the influence and retaliatory history of UOP were so extensive that they would not be willing to speak unless they could do so anonymously.

12.    In my experience as an Institutional Review Specialist, generally during program reviews I have encountered some reluctance and concern from employees on providing information as witnesses.  However, the fear and anxiety of the UOP employees was extraordinary in comparison to any other program review.  Every employee seemed to know another former employee that had been fired out of retaliation.  Therefore, it is my belief and experience that if the witness identities kept confidential thus far were revealed, the release of

such information would have a chilling effect on the free flow of information from employees at institutions in the future.

13.     On April 11, 2004, I provided a memorandum to Jennifer Woodward and Russell Wolf of the Office of General Counsel titled UOP Preliminary Data Analysis. See DOE APOL0001-0006. This is the only written memorandum analysis of the data that I provided to Department after the issuance of the program review report. Although I worked with the Office of the General Counsel and my superiors at FSA to create scatter charts of the information while the Department was considering whether to settle with UOP in August of 2004, I did not provide any final written analysis of the data that Apollo provided when responding to the program review report.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 11th day of June 2007.


Donna Wittman
Institutional Review Specialist
U.S. Department of Education

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | ) ) ) ) ) 06-MC-0558 (CKK) ) (D. Ariz., No. CV-04-2147-PHX-JAT) ) ) This Document Relates To: Subpoena Action ) ) ) |

## DECLARATION OF JENNIFER L. WOODWARD

I,       Jennifer L. Woodward, declare as follows:

1.       I am an attorney with the United States Department of Education's

(Department's) Office of the General Counsel (OGC) in the Postsecondary Education Division.

I have been an attorney in that division since September 1992.

2.       The statements contained in this declaration are based upon my personal

knowledge, and conclusions and determinations reached and made in accordance therewith.

3.       Through my position as an attorney with the Department, I have personal

knowledge concerning the Department's 2003-04 program review of the University of Phoenix

(University), owned by Defendant Apollo Group, Inc. (Apollo).  Due to the nature of my official

duties, I am familiar with the procedures followed by the Department when performing an

institutional program review.

4.       The purpose of this declaration is to provide the Court and Apollo with facts

leading to the Department's decision to withhold documents concerning the program review that

had been requested by Apollo under the Freedom of Information Act, 5 U.S.C. § 552 (FOIA),

and subsequent subpoenas.  Such documents were withheld pursuant to FOIA Exemption 5, 5

U.S.C. § 552(b)(5) (deliberative process privilege, attorney work product privilege, and attorney client communications privilege) and FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C) (identities of third party witnesses in the law enforcement records of the program review).

5.    Program review reports typically follow a site visit to a school during which Institutional Review Specialists perform a program review of a school's participation in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq. See generally 20 U.S.C. § 1099c-1; 34 C.F.R. § 668.112(b). The report sets forth the findings made by the Institutional Review Specialists and usually requests further information from the school in order to make a final determination as to whether the school owes monetary liabilities and/or fines as a result of the findings.

6.    Following the issuance of the report, the next step in the program review process involves an opportunity for the school to provide the Department with information responding to the report. The Department then issues a Final Program Review Determination letter, which sets forth any liabilities to the Department for misspent program funds and provides the school an opportunity to appeal the determination.

7.    Sometimes program reviews result in findings that warrant a fine or other penal sanction in addition to or in lieu of repayment of misspent program funds. One type of finding which can result in a fine rather than imposition of compensatory liabilities is payment by the school of improper incentives for recruitment of students. See 34 C.F.R. § 668.14(b)(22). If the Department proposes to impose a fine, a third document is generally issued, called a fine notice.

8.    The University program review was unusual in that its genesis was a qui tam False Claims Act complaint. While the government on May 6, 2003 declined to intervene in the

qui tam case, the Department advised the Department of Justice that the Department had

substantial evidence that the University had violated section 487(a)(20) of the Higher Education

Act; and that, in view of the declination decision, the Department was considering what

administrative action to take against the University on account of the violation.

   9.  Prior to the program review, but after the Department declined to intervene in the

qui tam action, in June of 2003, Russell Wolff, Attorney, OGC, and I interviewed the qui tam

relators with their counsel present.  Because we anticipated that the program review would lead

to further administrative litigation with Apollo, we interviewed the relators in sworn testimony

before a court reporter.  We asked pointed questions of the relators in order to garner information

related to the planning strategy for the program review.  Therefore, as attorneys, we were

involved in the determining the strategy of the program review from its inception.

   10.  After completing the interviews of the qui tam relators, Mr. Wolff and I were

regularly communicating with the relators and their counsel when planning the program review.

We asked specific questions of the relators through email communications gathering information

related to the strategy of the program review, including what locations to focus on, what

documents to ask for, and who to interview.

   11.  In August 2003, the Department conducted an on-site program review at the

University.  The purpose of the review was to substantiate the allegations, and, if appropriate,

quantify the extent of the violation, in order to set an appropriate fine amount, which the

Department anticipated the University would contest.

   12.  Thus, the entire program review process was conducted with an eye towards the

administrative litigation the Department anticipated would follow (and that, indeed, would have

followed in the absence of settlement).

13.    The team that performed the program review consisted of four Institutional Review Specialists from the Department's Federal Student Aid (FSA) office, who received legal assistance from two attorneys from OGC, including myself.  During the program review, the investigative team interviewed over 90 witnesses and collected substantial evidence to support the findings in the program review report (Report).  Because many of the witnesses interviewed by the team still worked for the University, the team assured the witnesses that all efforts would be made by the Department to keep the personal identities of the witnesses confidential.

14.    The team collaborated to complete the Report.  Together, the attorneys and Institutional Review Specialists collected supporting evidence, compiled witness interview statements, and communicated virtually on a daily basis during the conduct of the program review and the subsequent writing of the Report.

15.    Prior to the issuance of the Report, the team shared many drafts and presented the analysis to their superiors and other Department officials before final clearance was given by the Department to issue the Report.

16.    On February 5, 2004, the Department issued the Report to the University identifying a violation of the Higher Education Act's prohibition on incentive compensation to recruiters, 20 U.S.C. § 1094(a)(20).

17.    From March 2004 through August 2004, the University responded orally and in writing to findings in the Report.  As a result, many deliberations and communications occurred within the Department to discuss the University's response, and whether, and on what terms, to settle with the University.

18.    On September 7, 2004, prior to the issuance of a Final Program Review Determination, and a fine notice, the University paid the Department $9.8 million to settle the case.

19.    Beginning in October 2004, Apollo filed the first of a series of FOIA requests, followed by subpoenas, seeking information about the program review and the settlement. I reviewed all of the documents in possession of OGC and FSA that were located in response to the FOIA requests and relevant to the program review process and resulting settlement. I considered whether each document was exempt from production under the FOIA statute, including Exemption 5, pertaining to privileges, and other exemptions under 5 U.S.C. § 552.

20.    During my review of the responsive documents, I observed that many of the documents were interviews and documents provided by confidential informants during the program review conducted by Department attorneys and program staff. On this basis, I designated these documents as privileged based on the information identity privilege. These documents are among the documents Apollo seeks in its motion to compel.

21.    During my review of the responsive documents, I observed that many of the documents were prepared in anticipation of litigation by Department attorneys and program staff. On this basis, I designated these documents as privileged based on the work product privilege. These documents are among the documents Apollo seeks in its motion to compel.

22.    During my review of the responsive documents, I observed that many of the documents were deliberative and pre-decisional. To the best of my knowledge, Apollo had not, and has not, asserted any need for these documents outweighing the importance of protecting the values covered by that privilege. The documents in question included communications among lawyers for the qui tam relators, OGC attorneys, Department of Justice attorneys, third party

informants, and/or program clients.   On the foregoing basis, I designated these documents as privileged based on the deliberative process privilege.  These documents constitute the remainder of the documents Apollo seeks in its motion to compel.

23.    The program review, program review report, and the settlement negotiation process consisted of a sequence of legal and policy judgments (i.e., how to investigate the allegations and prosecute the alleged violations, whether and how to issue the Report and the nature of its findings, and whether and on what terms to settle the case).  The unusual manner in which the Department became aware of the alleged violations (through unsolicited information submitted by qui tam relators rather than the more customary Department-initiated review of student and school records), the potentially enormous economic and policy implications of the case, the complex nature of the issues involved, the evidentiary analysis required to prove the violation, and the extraordinary cost of the investigation, all represented highly unprecedented challenges requiring Department lawyers and officials to exercise legal and policy judgment ab initio and at every step of the process.

24.    The integrity of the program review process requires that the documents requested by Apollo remain protected from disclosure under the deliberative process, attorney work product, and/or attorney client privileges.  The documents are reflective of the confidential deliberative processes and attorney work product of the investigative team that produced the Department's decisions regarding whether, and in what form, to issue the Report, and whether, and on what terms to settle the case with the University.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 12th day of June 2007.

Jennifer L. Woodward
General Attorney
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | ) ) ) ) ) **06-MC-0558 (CKK)** ) **(D. Ariz., No. CV-04-2147-PHX-JAT)** ) ) |
| This Document Relates To: Subpoena Action | ) ) ) ) |

## DECLARATION OF KENT D. TALBERT

I,      Kent D. Talbert, declare as follows:

1.      I am the General Counsel of the United States Department of Education (Department), and I have been employed at the Department since August 20, 2001.  Prior to becoming the General Counsel, I was the Deputy General Counsel for Departmental and Legislative Service from August 2001 through May 2006.   I have been licensed to practice law in the state of South Carolina since 1985.

2.      In my official capacity as General Counsel of the Department, I supervise approximately 100 employees who staff a total of seven (7) legal divisions whose collective mission is to provide legal advice to the Secretary of Education (Secretary) concerning the programs and policies of the Department.  Under 20 U.S.C. § 3472, the Secretary has delegated to me, as General Counsel, the authority to assert the deliberative process privilege with respect to Departmental records created, maintained or otherwise related to the Departmental functions for which I am responsible.  The statements contained in this declaration are based upon my

personal knowledge, upon information provided to me in my official capacity, and upon
conclusions and determinations reached and made in accordance therewith.

3.    As General Counsel, I am familiar with the procedures followed by the
Department when it performs an institutional program review pursuant to Title IV of the Higher
Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq. See generally 20 U.S.C. § 1099c-
1; 34 C.F.R. § 668.112(b).  Specifically, I have knowledge, through direct involvement and/or
through information provided to me by subordinates, of the treatment that has been afforded
Defendant Apollo Group Inc.'s ("Apollo's") FOIA requests and subsequent subpoenas, seeking
access to Department records concerning a 2003 program review of the University of Phoenix
("University"), a subsidiary of Apollo, of the resulting program review report ("Report"), and the
September 7, 2004 settlement between the University and the Department.

4.    The purpose of this declaration is to state to the Court and Apollo the basis for the
Department's assertion of the deliberative process privilege with respect to the documents listed
in the Departments privilege logs for Category 5 and for Category 6 records.[1]

## DESCRIPTION OF THE RECORDS

5.    The documents denied to Apollo based on the deliberative process privilege
consist of materials that are both predecisional and deliberative and include:

(1)    Category 5 Privilege Log Email communications between Department

---

[1] In the April 12, 2007 Joint Agreement, the parties agreed to sort the documents responsive to Apollo's subpoena
into six categories including: (1) Category 5: Department analysis of the information provided by Apollo in response
to the issuance of the February 5, 2004 Report; and (2) Category 6: Documents communicated to or received from
third parties, including witness statements and communications with Apollo or the qui tam relators or their counsel.

attorneys and Federal Student Aid staff, which forward draft documents,[2] draft data sets and draft scatter charts related to the Department's analysis of the information provided by Apollo subsequent to the issuance of the program review report but prior to the decision by the Department to settle the program review with Apollo; and

    (2)    Category 6 Privilege Log Email communications between and among Department attorneys, qui tam relators' counsel and the qui tam relators pertaining to opinions, recommendations, or advice about how to conduct the program review.[3]

## DELIBERATIVE PROCESS PRIVILEGE

6.    The deliberative process privilege protects documents and communications that reflect the decision-making processes of government agencies, where disclosure would expose that process to the detriment of open and frank discussions on matters of policy between and among decision makers.

7.    Since the program review of the University came to the Department's attention through a qui tam False Claims Act complaint, this program review was unusual in that the investigatory team was lead by OGC attorneys, Jennifer Woodward and Russell Wolff. While it is true that, on May 6, 2003, the government declined to intervene in the qui tam case, the

---

2 The draft documents consist of power point slides prepared to brief Department officials when considering whether and on what terms to settle with the University.

3  The emails and email attachments withheld and listed in the Privilege log for Category 5 and 6 documents also contain attorney work product information.  However, the purpose of this declaration is to establish the deliberative process privilege.

Department advised the Department of Justice that the Department had substantial evidence that

the University had violated section 487(a)(20) of the Higher Education Act; and that, in view of

the declination decision, the Department was considering what administrative action to take

against the University on account of the violations.  The program review was initiated and

directed by OGC; thus it is within my authority to assert the deliberative process privilege as it

pertains to the documents and communications related to the program review report, and the

resulting settlement negotiations.

8.    The program review referenced in Paragraph 8 above was unusual in that its

genesis was a qui tam False Claims Act complaint.  Soon after the Department decided not to

intervene in the qui tam action, the Department decided that it would perform an on site program

review of the University in order to investigate the allegations made by the qui tam relators and,

if appropriate, to quantify the extent of any violation found and determine an appropriate fine at

all stages of this process.  The Department anticipated that the University would initiate litigation

to contest any Department finding adverse to the University.

9.    In August 2003, the Department conducted an on-site program review at the

University.  On February 5, 2004, the Department issued the Report to the University identifying

a violation of the Higher Education Act's prohibition on incentive compensation to recruiters, 20

U.S.C. § 1094(a)(20).

10.    During the time period from March 2004 through August 2004, the Department

engaged in a series of deliberations to determine: (1) how to address the University's responses

to the findings in the Report; (2) whether to settle with the University; and (3) the terms of the

settlement.  The email communications and attachments listed in the Category 5 Privilege log,

4

relate to the Departments consideration of whether or not to settle with the University.

11.    On September 7, 2004, prior to the issuance of a Final Program Review Determination, and a fine notice, the University paid the Department $9.8 million to settle the case.

12.    The program review, program review report, and the settlement negotiation process comprised a series of Department legal and policy decisions (i.e., how to investigate the allegations and prosecute the alleged violations, whether and how to issue the Report, what should be its findings, and whether and if so, on what terms to settle the case). The unusual manner in which the Department became aware of the alleged violations (through unsolicited information submitted by qui tam relators rather than the more customary Department-initiated review of student and school records), the potentially enormous economic and policy implications of the case, the complex nature of the issues involved, the evidentiary analysis required to prove the violation, and the extraordinary cost of the investigation, all represented highly unprecedented challenges requiring Department lawyers and officials to exercise legal and policy judgment ab initio and at every step of the process.

13.    The emails and attachments are reflective of the confidential deliberative processes that produced the Government's decisions regarding whether and how to conduct the program review, whether and in what form to issue the Report, and whether and on what terms to settle the case with the University. Additionally, almost all of the Category 5 emails include attachments. Those attachments comprise draft documents generated by Department attorneys and program staff involved in making decisions related to whether and on what terms to settle with the University; disclosure of such drafts would reveal the nature of the Department's

deliberations. Furthermore, almost all of the Category 6 communications asserting the deliberative process privilege comprise email communications generated in efforts by OGC attorneys pertaining to opinions, recommendations, or advice about the Department's strategy and approach for conducting the program review.

14.    In addition, the Department's interest and the interest of the public in protecting the integrity of the government's decision-making process outweigh any need of Apollo for the information requested. In making this analysis, the Department has determined that the specific information withheld, if disclosed, would reveal the internal decision making processes of the Department throughout the program review and settlement negotiations. Apollo has not articulated a compelling need for these documents, much less a need that outweighs the Department's interest in nondisclosure. Indeed, while Apollo has asserted it needs these documents to discredit the Report and to cross-examine Department witnesses, I note that Apollo chose to settle the program review with the Department, thereby foregoing its opportunity to pursue its criticisms of the Report to judgment. In addition, Apollo has not demonstrated that any Department witnesses will appear at trial, negating Apollo's claims of need for these documents for use in cross-examination. If such an appearance were in the offing, the employee would need to obtain permission from the Department to appear. 34 C.F.R. Part 8. The Department will not make these witnesses available to testify at trial or deposition and will contest any effort by either party to compel any appearance by these witnesses.

15.     For all of the foregoing reasons, I assert the Department's deliberative process privilege with respect to the documents or portions of documents described in the privilege logs for Categories 5 and 6.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 15th day of June, 2007.

Kent D. Talbert
General Counsel
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

In Re: Apollo Securities Litigation
United States District Court (D. D.C.)
Case No: 06-558

| Witness Identity | Bates Pages Associated with Witness |
|---|---|
| A | 0138-0140, 0960 |
| B | 0141-0143, 0863 |
| C | 0144-0145, 0861-0862 |
| D | 0154-0155, 0423-0426 |
| E | 0155-0156 |
| F | 0160-0162, 0433-0466 |
| G | 0162-0164 |
| H | 0164-0166 |
| I | 0167-0169, 0294-0302, 0677-0722 |
| J | 0319 |
| K | 0320-0321, 0936 |
| L | 0322-0324 |
| M | 0325 |
| N | 0326-0327 |
| O | 0328-0334 |
| P | 0335-0336 |
| Q | 0337-0338 |
| R | 0339-0341 |
| S | 0342, 0866 |
| T | 0347-0349 |
| U | 0350-0352, 0901 |
| V | 0357-0358, 0937 |
| W | 0359-0361, 0901 |
| X | 0362-0364, 0864, 0910, 0910, 0918 |
| Y | 0365-0366, 0901 |
| Z | 0367-0369, 0895 |
| AA | 0370-0371 |
| BB | 0372-0376 |
| CC | 0377-0378 |
| DD | 0379 |
| EE | 0380-0382 |
| FF | 0383-0385 |
| GG | 0386-0388 |
| HH | 0393-0394 |
| II | 0395-0396 |
| JJ | 0397-0398 |
| KK | 0399-0400 |
| LL | 0401-0402 |
| MM | 0403-0405, 0880, 0936 |
| NN | 0406-0407 |
| OO | 0408-0410, 0869, 0873 |
| PP | 0411-0413 |

In Re: Apollo Securities Litigation
United States District Court (D. D.C.)
Case No: 06-558

| QQ | 0414-0415 |
|---|---|
| RR | 0416 |
| SS | 0417 |
| TT | 0419-0421, 0960 |
| UU | 0467-0559, 0590-0594, 0673-0674, 0896-0899, 0995 |
| VV | 0572, 0869, 0873, 0894 |
| WW | 0573-0574 |
| XX | 0575, 0932-0934 |
| YY | 0576-0579 |
| ZZ | 0580-0581 |
| AAA | 0582-0583 |
| BBB | 0584 |
| CCC | 0585-0588 |
| DDD | 0589 |
| EEE | 0595-0596 |
| FFF | 0597-0598 |
| GGG | 0599, 0904, 0908, 0910-0911, 0918-0919 |
| HHH | 0600-0601 |
| III | 0602-0605 |
| JJJ | 0606-0611 |
| KKK | 0612 |
| LLL | 0613 |
| MMM | 0614 |
| NNN | 0615-0616 |
| OOO | 0617 |
| PPP | 0618-0620, 0653-0656 |
| QQQ | 0621-0624, 0646-0647 |
| RRR | 0625-0626 |
| SSS | 0627-0628 |
| TTT | 0629-0630 |
| UUU | 0631-0632 |
| VVV | 0633, 0669-0672, 0675-0676 |
| WWW | 0634-0635 |
| XXX | 0636-0637 |
| YYY | 0638-0639, 0645 |
| ZZZ | 0640-0642 |
| AAAA | 0643-0644, 0648-0652 |
| BBBB | 0657-0658 |
| CCCC | 0659-0661 |
| DDDD | 0664-0665, 0995 |
| EEEE | 0666-0668 |
| FFFF | 0865, 0867-0868 |

| | |
|---|---|
| GGGG | 0865, 0867-0868 |
| HHHH | 0867 |
| IIII | 0867 |
| JJJJ | 0867 |
| KKKK | 0867, 0938 |
| LLLL | 0867 |
| MMMM | 0868 |
| NNNN | 0868 |
| OOOO | 0869, 0880 |
| PPPP | 0872 |
| QQQQ | 0875, 0877, 0883-0888 |
| RRRR | 0890 |
| SSSS | 0904, 0908, 0910-0911, 0918-0919 |
| TTTT | 0904, 0909, 0911, 0919 |
| * Witness Hendow | 0226-0293, 0353-0356, 0389-0392, 0662 |
| * Witness Albertson | 0343-0346 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | ) |
| | ) |
| | ) |
| | ) |
| | ) 06-MC-0558 (CKK) |
| | ) |
| | ) |
| | ) |
| This Document Relates To: Subpoena Action | ) |
| | ) |
| | ) |

<u>**ORDER**</u>

_____**ORDERED** that Apollo's Motion to Compel is hereby DENIED.


_____
UNITED STATES DISTRICT JUDGE