IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | Case No. 06-MC-0558 (CKK) |
| | (D. Ariz., Case No. CV-04-2147-PHX-JAT) |
| This Document Relates To:  All Actions | |

## SUPPLEMENTAL BRIEF PURSUANT TO ORDERS OF MARCH 12 AND APRIL 16, 2007 TO COMPEL THE DEPARTMENT OF EDUCATION TO PRODUCE CATEGORY TWO DOCUMENTS

The United States Department of Education ("Department") has now produced to Apollo Group, Inc. ("Apollo") its final category two privilege log that lists a mere 52 emails, each of which the Department claims is exempt from discovery by the deliberative process and work product privileges.  But the category two privilege log suffers from two significant defects in that it fails to account for all of the internal communications the Department is purportedly withholding and because the documents listed by the Department are not protected by either the deliberative process privilege or work product protection.

The parties have categorized and narrowed the scope of documents sought by Apollo pursuant to the Court's March 12, 2007 and April 16, 2007 Orders ("March 12 Order" and "April 16 Order," respectively) and the parties' April 12, 2007 Joint Agreement (the "Joint Agreement").  At issue in this brief are the category two documents, which concern "Internal Department documents concerning the conduct of the program review other than documents contained in Category 1."  Joint Agreement at 1.  Category one, which is not at issue, is limited to documents that "explicitly seek or provide legal advice."  *Id.*

## FACTUAL BACKGROUND

Apollo has addressed previously the history and factual context of its longstanding dispute with the Department and will not repeat that factual history again here. *See* Apollo's January 26, 2007 Brief and May 21, 2007 Brief. For purposes of this Supplemental Brief, the Court needs to know that the Department has not produced any "category two" documents, although it produced a category two privilege log on June 7, 2007 pursuant to the parties' Joint Agreement. The category two privilege log demonstrates on its face that the Department is unjustifiably withholding key, relevant, unprotected documents. The Department's category two withholdings are the subject of this brief.

The 52 email communications listed on the category two privilege log (attached as Exhibit A) fit into eight categories:

1. Documents concerning "announcing the program review" to the University of Phoenix ("UOP"), documents 1-4.[1]

2. Documents concerning program review "interview questions," documents 5, 11, 16-18, 21-22.

3. Emails that were forwarded from the *qui tam* relators concerning "site selection" for the program review, documents 6-10.

4. Communications with the *qui tam* relators regarding the program review, documents 12-15, 19-20, 26-27, 31, 38.

---

[1] For the convenience of the Court and all parties, Apollo will refer to the unnumbered documents listed on the category two privilege log in the order they appear on the log.

5. Documents concerning "interviews" conducted during the program review and factual "evidence" that was obtained, documents 23-24, 28-29, 32-34, 36, 39, 42-52.

6. Documents concerning the program review "process," documents 25, 37.

7. Documents concerning the August 22, 2003 "exit interview" between Department and Apollo representatives, documents 30, 35, 40.

8. An email concerning a telephone call with Apollo employee Bob Collins, document 41.

According to the Department, each of the 52 emails listed on the category two privilege log is protected from disclosure by the deliberative process privilege and work product protection. Consistent with the parties' Joint Agreement, the Department does not claim that any of the 52 documents listed on the category two privilege log are protected from discovery by the attorney-client privilege.

## I. THE DEPARTMENT'S PRIVILEGE LOG DOES NOT ACCOUNT FOR ALL OF THE INTERNAL DOCUMENTS CONCERNING THE PROGRAM REVIEW

The Department's category two log lists only 52 emails, 43 of which are dated from August 2003, five from July 2003, three from September 2003, and one from November 2003. *See* Exhibit A. The emails included on the category two log are notable given (1) the small number of emails included on the log, and (2) the fact that there are only four emails after August 2003.

According to the declaration of Department attorney Jennifer Woodward, the program review team "communicated virtually on a ***daily*** basis during the conduct of the program review and the subsequent writing of the Report." June 12, 2007 Declaration of Jennifer L. Woodward

("Woodward Decl.") at ¶ 14 (emphasis added).  Yet this "daily" communication is simply not reflected in the Department's category two privilege log.

In fact, the Report drafted by Department employee Donna Wittman was not sent to Apollo until February 6, 2004—six months *after* the bulk of the emails listed on the category two privilege log.  Furthermore, the documents produced by the Department demonstrate that as late as August 23, *2004*, the program review team was still interviewing witnesses in connection with the UOP program review.  *See* DOE APOL 0664-0668 (attached as Exhibit B).  The limited number of emails on the Department's category two privilege log does not account for the full timeframe in which the program review was on-going.

The documents produced by the Department and the testimony from a Department attorney are therefore inconsistent with the Department's claim that *only* 52 emails have been withheld based on the assertion of privilege.  Although one would expect that some additional emails have been withheld pursuant to category one (communications explicitly seeking or providing legal advice), category one simply cannot account for the *months* of *daily* emails that appear to be missing from the Department's privilege log.

Because of these apparent inconsistencies, Apollo requests that the Court order the Department to reproduce its category two privilege log with *all* internal communications that concern the conduct of the program review and do not explicitly seek or provide legal advice.[2]

---

[2]  Apollo raised the issue of the apparent inadequacy of the Department's log via letter on June 21, 2007 (attached as Exhibit C).  As of the filing of this Brief, the Department has not responded to the issues identified by Apollo.

## II.    THE DELIBERATIVE PROCESS PRIVILEGE DOES NOT PROTECT THE DOCUMENTS LISTED ON THE PRIVILEGE LOG

The deliberative process privilege protects from disclosure "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).  As such, the privilege serves three policy purposes:  (1) "to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism," (2) to "protect against premature disclosure of proposed policies before they have been finally formulated or adopted," and (3) to "protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

Here, the Department broadly argues that ***all*** internal communications among staff-level employees are protected from discovery, even though the Department's privilege log demonstrates that the communications (1) were not between staff members and the ultimate decisionmakers regarding the program review, and (2) these communications concern a factual regulatory investigation, as opposed to any proposed policy of the Department.

To properly invoke the privilege, the Department must establish that the withheld documents are "both predecisional and deliberative."  *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006).  In contrast, the deliberative process privilege does not protect documents that state or explain a decision that has already been made, and it does not protect material that is purely factual, unless the material is inextricably intertwined with the deliberative sections of the document.  *See NLRB v. Sears, Roebuck & Co*., 421 U.S. at 151.

## A.    Category Two Documents Are Not Predecisional

A document is predecisional to the extent it was "generated before the adoption of agency policy." *Coastal States*, 617 F.2d at 866. Specifically, a predecisional document must have been "prepared in order to assist an agency decisionmaker in arriving at his decision." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 184. When evaluating the deliberative process privilege, a Court considers the "identity and position of the author and any recipients of the document, along with the place of those persons within the decisional hierarchy." *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir. 1994) (citing *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1192 (D.C. Cir. 1991)).

The documents listed on the Department's category two privilege log concern the Department's conduct of the program review. Joint Agreement at 1. Specifically excluded from category two are any documents concerning the Department's ultimate settlement with the DOE or any drafts of the Wittman Report—which the parties placed in categories three and four. Joint Agreement at 1-2. Thus, by the terms of the parties' own agreement, the category two documents do not concern the decision to later release the Wittman Report or settle the program review. Instead, the parties have specifically agreed that the category two documents are limited to the ***conduct*** of the program review.

The Department previously "concluded that the [Wittman Report] itself is neither pre-decisional nor deliberative." August 26, 2004 Department Letter, at 12 (attached as Exhibit D). This is so because the deliberative process privilege is limited in that it does not protect from disclosure materials that "could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment." *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992).

Although the Department has since claimed otherwise in an effort to resist Apollo's subpoena, the fact remains that the Department has already stated that:

> [T]he [Wittman Report] was created as a result of the Department's ***routine monitoring*** of the Title IV Federal Student Financial Assistance programs administered by the University. The [Wittman Report] was not created for the purposes of the Department receiving advice or consultative services from [Apollo] ***in order to render a policy decision***. Rather, the [Wittman Report] specifically states that its intent is to ***advise the institution of the findings*** made as a result of the program review. Moreover, the goal of the [Wittman Report] is to open up a dialogue between the Department and the University such that the findings of the [Wittman Report] can be resolved.

Exhibit D at 12 (emphases added). Having determined that the Wittman Report was the result of ***routine monitoring*** to advise the institution of its findings—not to render a policy decision—and having relied on that basis to publicly release the Wittman Report (to the prejudice of Apollo) the Department cannot now reverse course and claim otherwise. Accordingly, the Department's internal communications regarding the ***conduct*** of the program review—antecedent to any consideration of whether to settle the program review—are simply not predecisional and not protected from discovery by the deliberative process privilege.

Because the issue of "whether and how to issue the [Wittman Report]" and "whether and on what terms to settle the case" are not at issue here pursuant to the parties' definition of category two documents, the Department is left to argue that policy decisions were made during the conduct of the actual program review field visit. But rather than point to any specific "policy judgments" made ***during*** the program review, the Department instead broadly argues that Department officials had to exercise unspecified "legal and policy judgment *ab initio* and at every step of the process." Woodward Decl. at ¶23; June 15, 2007 Declaration of Kent D. Talbert at ¶ 12. To accept the Department's broad claim is to accept that every government regulatory action is protected by the deliberative process privilege—thus eviscerating the policy

behind the privilege and crippling public-access statutes, such as the Freedom of Information Act, 5 U.S.C. § 552. *See generally Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9-10 (2001) (the deliberative process privilege does not protect "Government secrecy"); *Coastal States*, 617 F.2d at 866.

The earliest document on the category two privilege log is from July 25, 2003, concerning "site selection" for the program review—by which time the decision to conduct the program review had already been made. And the latest document on the category two privilege log is November 25, 2003—a "Fed Ex package" of documents obtained from UOP interviewees. Apollo and the Department did not enter into negotiations to settle the program review until August 2004, and Apollo did not respond to the Wittman Report until after it was received in February 2004.

The dates of the documents alone demonstrate that none of the documents included on the category two privilege log is relevant to the Department's decisions to (1) initiate a program review of UOP or (2) settle the program review in September 2004. And the category two privilege log specifically does not include drafts of the Wittman Report or documents "concerning the settlement with Apollo or settlement meetings with Apollo." Joint Agreement at 1. These decisions, therefore, cannot serve as a basis for the Department's invocation of the deliberative process privilege. Because the Department has not identified any "policy" decision made during the ***course*** of the program review that are relevant to and post-date the documents listed on the category two privilege log, the Department has not established that the category two documents are predecisional.

Even though the Department has failed to identify any specific ***policy*** decisions made during the conduct of the program review, the category two privilege log on its face belies any

such claim because (1) the email communications are solely amongst the program review team and did not encompass any Department decisionmakers, and (2) the subject of the email communications relates solely to a factual investigatory review devoid of any analysis, interpretation or opinion of Department *policy*.

### 1.    Withheld emails do not include communications with Department decisionmakers

According to the Department, the team that conducted the program review consisted of four Institutional Review Specialists from the Department's Federal Student Aid ("FSA") office and two attorneys from the Department Office of General Counsel ("OGC").  Woodward Decl. at ¶ 13.  The four employees from FSA were (1) Donna Wittman, (2) Martina Fernandez-Rosario, (3) Shane Dunne, and (4) Susan Crim, while the two OGC employees were (1) Jennifer Woodward and (2) Russell Wolff.  *Id.*; Wittman Report at 2 (attached as Exhibit E); Exhibit A. Each of these staff-level Department employees were involved in the conduct of the program review, including visits to UOP campuses and the interviewing of witnesses.  *See* DOE APOL 0664-0668 (Interview summaries completed by Ms. Woodward and Mr. Wolff) (attached as Exhibit F).

These Department employees were responsible for actually conducting the program review ***fieldwork*** in this program review; they are not the Department decisionmakers charged with Department policy.  Instead, the task of negotiating and settling the program review was left to decisionmakers who were all senior to the Department employees who conducted the program review fieldwork.  Notably, 51 of the 52 emails listed on the category two privilege log were drafted by one of the six members of the program review field team.  And not a single one of the 52 emails on the category two privilege log was sent to anyone within the Department's Office of the Secretary, any of the leadership of the FSA office, or to the Department's General Counsel

or Assistant General Counsel.  Yet it was those decisionmakers who participated in the

negotiations and decisions regarding the program review and ultimate settlement.  The

Department's category two privilege log thus fails to demonstrate any "opinions" of the staff-

level program review team were transmitted to any Department decisionmaker.

### 2.    The withheld emails concern a factual review, not policy judgments

Likewise, the subjects of the documents listed on the category two privilege log does not

support the claim that they concern "legal and policy judgments."  The bulk of the documents at

issue concern interviews of current and former UOP employees.  *See* Exhibit A at Documents 5,

11, 16-18, 21-24, 28-29, 32-34, 36, 39, 42-52.  The conduct of a factual interview does not

necessitate any legal or policy judgment.  Similarly, the factual decision of which sites to visit

during the program review (Documents 6-10) does not implicate any Department policy.  Rather

it is a mere factual question that should focus on which evidence-gathering process would give

an accurate representation of UOP's operations.

Furthermore, the Department's own documents reveal that these factual questions (who

to interview and where to visit) were made with the assistance of the *qui tam* relators.  *See* DOE

APOL 0785, 0842-0842, 0861-0890 (Communications from *qui tam* relators selecting program

review sites and witnesses) (attached as Exhibit G).  As parties outside of the agency—with

interests that are adverse to Apollo and UOP—any such communications and factual

considerations cannot be protected by the deliberative process privilege.  *See Klamath*, 532 U.S.

1, 9-10 (2001) (holding that deliberative process privilege does not protect documents submitted

to agency by third-party with a direct interest in the agency's proceedings).  Here, the on-going

*qui tam* action and the *qui tam* relators direct participation in the program review process reveals

the serious interest the *qui tam* relators had in the Department's program review of UOP.  Given

this interest, the information the *qui tam* relators provided to the Department falls outside of the scope of the deliberative process privilege. *Id.*

The point of the deliberative process privilege "is not to protect Government secrecy pure and simple." *Id.* at 9. The failure to identify any opinions regarding Department policy that were communicated to decisionmakers precludes the application of the deliberative process privilege. Furthermore, the fact that many of the communications the Department claims as privileged begin with information submitted by the third-party *qui tam* relators further precludes the application of the deliberative process privilege.

**B.    Category Two Documents Are Not Deliberative**

A document is "deliberative" to the extent it "reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866. Although the privilege protects "an agency's internal deliberations," its does not protect "communications that explain a decision that has already been made." *Tax Analysts v. IRS*, 294 F.3d 71, 80 (D.C. Cir. 2002) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 151-52).

Even if the deliberative process privilege were somehow to apply to the program review, the privilege does not protect from disclosure "purely factual, investigative matters." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002) ("*Home Builders*"). Documents that contain factual information are not covered by the deliberative process privilege because they do not reflect internal Department deliberations. *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative section of documents that its disclosure would inevitably reveal the government's deliberations."); *Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 254 n.28 (D.C. Cir. 1977) (deliberative

process privilege "does not permit the nondisclosure of underlying facts unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process"); *see also Carter v. United States Dep't of Commerce*, 307 F.3d 1084, 1088 (9th Cir. 2002) (holding that the deliberative process privilege does not protect data compiled and modified by agency).

In *Home Builders*, an association invoked FOIA to obtain documents relating to site-specific investigations conducted by the Department of the Interior. *Home Builders*, 309 F.3d at 30. The district court held that the deliberative process privilege does not exempt such specific factual information from disclosure. In affirming the district court, the D.C. Circuit described "a distinction between factual information, which 'generally must be disclosed,' and 'materials embodying officials' opinions,' which are 'ordinarily exempt.'" *Id.* at 39 (citing *Petroleum Info.*, 976 F.2d at 143). As such, the deliberative process privilege "is designed to protect agency policy-oriented judgments and the processes by which policies are formulated, rather than 'purely factual, investigative matters.'" *Id.* Because the information at issue in *Home Builders* did not concern the agency's "preliminary positions or ruminations" about any "particular policy judgment," the information could not "reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating ***judgment***." *Id.* (emphasis added).

Here, the Department's privilege log does not describe documents containing "officials' opinions," but rather the factual information gathered from the *qui tam* relators, through witness interviews, and visits to UOP campuses. Rather than listing potential opinions concerning "policy-implicating judgment," the category two privilege log includes documents concerning "site selection," witness interviews, and descriptions of the documents "collected" during the

program review.  *See* Exhibit A.  This privilege log thus describes documents that do not implicate any ***policy judgments***, but rather simply describe a factual regulatory investigation.

      In addition, it is well established that the deliberative process privilege does not "protect communications that implement an established policy of an agency." *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981).  Here, the program review team was simply implementing the Department's policy of enforcing the incentive compensation regulations and conducting a factual determination to "quantify" the extent of any violations by UOP.  Woodward Decl. at ¶ 11.  The Department has demonstrated no "policy" that was under consideration or alteration to existing policy that was suggested by any of the six members of the regulatory program review team and thus the deliberative process privilege does not apply.

      Furthermore, as addressed above, the email communications at issue here were not sent to or from the Department decisionmakers who actually controlled and ultimately settled the program review.  Thus, these emails cannot contain staff-members "opinions" that are protected by the deliberative process privilege because the category two privilege log demonstrates that those opinions—to the extent they were not simply a recitation of factual information during a regulatory review—were not communicated up the chain to the actual decisionmakers.

      Therefore, these documents—regarding the ***conduct*** of a regulatory review—do not involve the requisite "give-and-take of the consultative process."  *See Coastal States*, 617 F.2d at 866.  Instead, the documents listed on the category two privilege log concern the non-policymaking actions regarding a factual investigation and are thus outside of the scope of the deliberative process privilege.  *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 150 (holding that the deliberative process privilege is limited to documents that reflect the process by which government decisions and policies are formulated).

Not only has the Department failed to meet the prerequisite for application of the privilege, the Department has also failed to establish that protecting these documents from disclosure furthers the privilege's policy goal of fostering frank exchange of policy opinions between subordinates and decisionmakers because these communications do not contain any of the program review team's opinions regarding Department policy nor were these communications transmitted to Department decisionmakers.

**C.    The Privilege Should Not Apply When The Conduct Of The Agency Is At Issue**

Even if the deliberative process privilege somehow applied to the documents listed on the category two privilege log, the privilege would yield in light of the relevance and need for these documents in the securities litigation. *See Dominion Cogan, D.C., Inc. v. District of Columbia*, 787 F. Supp. 258, 268 (D.D.C. 1995) ("The deliberative process is a qualified rather than absolute privilege. The validity of such a privilege may depend upon 'a balance of the public interest in nondisclosure with the need for the information as evidence.'").

Whenever the deliberative process privilege is asserted, "the district court must undertake a fresh balancing of competing interests" that includes (1) "the relevance of the evidence," (2) "the availability of other evidence," (3) "the seriousness of the litigation," (4) "the role of the government," and (5) "the possibility of future timidity by government employees." *In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 634 (D.C. Cir. 1992).

In the securities litigation in which Apollo is a defendant, the "factual accuracy" of the Wittman Report is undermined by the ***process*** in which it was created. Rather than conducting an independent review of UOP's compliance with the incentive compensation regulations, the program review team simply set forth to "quantify the extent of the violation" alleged by the disgruntled and biased *qui tam* relators. Woodward Decl. at ¶ 11. The independence and

thoroughness of the program review team's work is further drawn into question by the documents that the Department has produced, which demonstrate that the locations the Department team visited and the witnesses the Department team interviewed were in fact *selected* by the *qui tam* relators.  *See* Exhibit G.  Thus, as this court has already concluded, the documents sought by Apollo are highly relevant to the securities litigation.  *See In re Apollo Group, Inc. Sec. Litig.*, No. 06-MC-0558 (CKK), March 12, 2007 Memorandum Opinion at 14 ("The Court agrees with Apollo, that 'the manner in which the [DOE] conducted the Program Review and the sources of information relied upon by the [DOE] in drafting the Report' are relevant to Apollo's defense in the underlying securities action.").

    In addition, the Plaintiff in the securities action relies heavily on the Wittman Report in support of its allegations against Apollo.  *See* Lead Plaintiff's Consolidated Class Action Complaint at ¶¶ 7-10, 37-85 (attached as Exhibit H).  As such, the process by which the Wittman Report was created and the Department's conduct during the program review is not only relevant, but at issue in the securities litigation, and the deliberative process privilege cannot apply when the underlying agency process itself is at issue in the litigation.  *See Dep't of Economic Dev. v. Arthur Anderson*, 139 F.R.D. 594, 596 (S.D.N.Y. 1991) (holding that the deliberative process privilege is inapplicable where the deliberations of government personnel are at issue).

    There is no dispute that the securities action facing Apollo is serious, with the Plaintiff asserting a monetary claim of hundreds of millions of dollars.  *See* Exhibit H at ¶¶ 148-58.  And the genesis for the securities action is the program review conducted by and Wittman Report drafted by Department employees.  Thus, the role of the government is directly at issue in the

securities litigation.  These facts lead to the conclusion that the deliberative process privilege must yield to the discovery of the Department's conduct of the program review.

### D.    Factual information contained in the documents must be disclosed

"Under the deliberative process privilege, factual information generally must be disclosed."  *See Petroleum Info.*, 976 F.2d at 1435.  Here, the Department's privilege log describes the documents that it has withheld under the deliberative process privilege as concerning purely factual matters, including "feedback" from *qui tam* relator Julie Albertson, information from UOP's "Internal Website," witness "interviews" and "site selection" for the program review field visit.  *See* Exhibit A at 2-14.  Even if the privilege somehow applied to some of these communications, it would not apply, for example, where the Department was simply forwarding or commenting on factual information provided by Apollo, the *qui tam* relators, or the witnesses who were interviewed.  *Id.*  All such documents are subject to production.  *See Dudman Communications Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568-69 (D.C. Cir. 1987) (finding that "the agency will usually be able to release the material without disclosing any deliberative process").

## III.    THE WORK PRODUCT DOCTRINE DOES NOT PROTECT THE CATEGORY TWO DOCUMENTS FROM DISCOVERY

### A.    Work Product Protection Does Not Apply To This Program Review

The work product doctrine does not apply to a regulatory review, such as the UOP program review, which was not conducted in "anticipation of litigation."  Fed. R. Civ. P. 26(b)(3); *Coastal States*, 617 F.2d at 865 (holding that in a government regulatory review, "the mere possibility [of litigation] is hardly tangible enough to support so broad a claim of privilege"); *Tarpeh-Doe v. United States*, No. 88-0270, 1990 U.S. Dist. LEXIS 15330, at *7

(D.D.C. Nov. 13, 1990) ("Documents prepared for an investigation as part of normal procedures or pursuant to a regulation are not work product.").

<strong>1.    The program review involved the "routine monitoring" of UOP</strong>

The Department itself has described the program review as "routine monitoring of the Title IV Federal Student Financial Assistance programs administered by [UOP]."  Exhibit D at 12.  Although the Department has since made a self-serving about face claiming that the program review was conducted with an eye towards "administrative" litigation, Woodward Decl. at ¶¶ 10, 19, the argument that regulatory reviews are conducted in anticipation of litigation has been flatly rejected by the courts of this circuit.  *See Coastal States*, 617 F.2d at 865 (affirming District Court order releasing agency documents); *see also Tarpeh-Doe*, 1990 U.S. Dist. LEXIS 15330, at *7.

Furthermore, "[t]he work product doctrine does not . . . shield from discovery everything that a lawyer does."  *Coastal States*, 617 F.2d at 864.  Nor does the work product doctrine protect factual information provided to the Department by the *qui tam* relators, their counsel, or witnesses interviewed by the program review team.  *See Petroleum Info.*, 976 F.2d at 1435.  And the fact that some of this information was collected by or forwarded to Department attorneys does not convert that information into work product.  *See Coastal States*, 617 F.2d at 862-63.

Notably, the Department claims work product protection for **every** document on its category two privilege log, even though 27 of the 52 withheld emails were authored by non-lawyers.  *See* Exhibit A.  And the balance of the 23 emails were drafted by Department attorneys Jennifer Woodward and Russell Wolff—who themselves were members of the program review team.  Woodward Decl at ¶ 13; Exhibit A; *see also Coastal States*, 617 F.2d at 865 ("[I]f an agency were entitled to withhold any document prepared by any person in Government with a

17

law degree simply because litigation might someday occur, the policies of FOIA would be largely defeated."). There is no suggestion from the Department, let alone any evidence—nor can there be—that any of this work was done at the direction of an attorney in ***anticipation*** of litigation. To the contrary, the context of the program review and the Department's own log demonstrate that the documents were prepared by a regulatory review team during an ordinary regulatory review. For example, the documents withheld by the Department include the following "titles," as identified by the Department:

- University of Phoenix – Site Selection (Exhibit A at 2-3);

- Site Visits (*Id.* at 3);

- U.S. ex rel. Hendow et al. v. U. of P (*Id.* at 4-5, 11);

- [*Qui tam* relator Julie Albertson's] feedback (*Id.* at 4);

- UOP Internal Website Information:  Information for Donna (*Id.* at 4, 6-7);

- University of Phoenix Exit on 8/22/03 (*Id.* at 9-10, 12);

- Interview in Oakland (*Id.* at 13); and

- UOP Additional Interview Notes (*Id.* at 14).

       **2.**      **The program review had not reached a point where the Department could reasonably anticipate litigation**

In *Coastal States*, the D.C. Circuit affirmed a district court's decision that rejected an agency's claims that documents created during a regulatory audit were protected by the work product doctrine. *Id.* at 865-66. The documents were discoverable because the agency did not establish that "litigation was fairly foreseeable at the time the memoranda were prepared." *Id.* at 865. Simply because "many of the memoranda deal with specific factual situations is not sufficient" to protect them from discovery. *Id.*

As in *Coastal States*, the documents at issue here were prepared during the Department's ***routine monitoring*** of UOP's regulatory compliance. Although it was certainly theoretical that the program review—just as any other interaction between a regulator and the regulated—may result in litigation, the Department could not have reasonably anticipated an ***actual*** legal claim at the time the documents listed on the category two privilege log were prepared.

The Department argues that the work product doctrine "sweeps broadly in a number of respects, extending for example, to: administrative proceedings as well as judicial litigation," June 15, 2007 Brief at 5 (citing *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 700 (D.C. Cir. 1983)). But the cited authority does not support so broad a claim. Instead, the district court in *Exxon* found that "administrative litigation certainly ***can*** beget court litigation," but that such a result was not certain. *Id.* (emphasis added). Furthermore, the court acknowledged that there remained the question of whether "documents at issue were not truly created 'in contemplation of litigation' in that they were prepared at nonadversarial stages when the possibility of litigation remained an open question." *Id.* at 700-01. The court also repeated the rule set forth in *Coastal States* that the agency "must establish in its affidavits or indexes that a ***specific claim*** has arisen, was ***disputed*** by the company, and was being ***discussed*** in the memorandum." *Id.* at 700 (emphasis added) (citing *Coastal States*, 617 F. 2d at 866).

In the current action, the documents listed on the category two privilege log (1) fail to establish any ***specific legal claim*** that had arisen by Apollo, and (2) they do not establish that Apollo was aware of, let alone had ***disputed***, any such claim. Because all of the documents on the category two log precede the Wittman Report, the Department necessarily cannot meet the test set forth in *Coastal States* and *Exxon.* Simply put, these documents were created during the

regulatory program review at a point in the process that had not yet devolved into any claim or litigation.

On this point, it is helpful to examine the Department's process for conducting a program review. At the beginning of the program review, a team conducts a site visit to review an institution's compliance with Title IV of the Higher Education Act of 1965. Woodward Decl. at ¶ 5. Following the on-site visit, a program review report will set forth the findings "made by the Institutional Review Specialists." *Id.* According to the Department's Program Review Guide, the program review report will include a "time frame" for the institution to respond to the "prima facie" case contained in the program review report. Department Program Review Guide at IX-1 (attached as Exhibit I). As such, the program review report also "requests further information from the school in order to make a final determination as to whether the school owes monetary liabilities and/or fines." Woodward Decl. at ¶ 5. Thus, at the time of the program review report, *no final determination has been made* regarding whether an institution is in compliance with Title IV or whether it owes any monetary liabilities.

After an institution receives the program review report, the school has the opportunity "to provide the Department with information responding to the report." *Id.* at ¶ 6. At this point— when the institution is providing factual information requested by the Department—no final determination has been made by the Department regarding whether the institution is in compliance with Title IV or whether it owes any monetary liabilities. It was during this step in the process that UOP and the Department settled the program review at issue here.

Following the institution's response to the program review report, and the Department's consideration of that response, the Department may issue a Final Program Review Determination ("FPRD"), which includes the Department's determination as to any financial liabilities owed by

the institution and provides the school, for the first time, the opportunity to appeal the decision within the Department. *Id.* at 6; Exhibit I at IX-7. Prior to issuance of the FPRD, there is nothing for the institution to appeal or litigate, because the Department has not made a final determination as to whether any liability is owed or any noncompliance exists.

If the institution chooses to challenge the FPRD, it may request a hearing before a Department hearing officer. 34 C.F.R. §§ 668.113-668.118. Following any adverse ruling from a Department hearing officer, the school may appeal the finding directly to the Secretary of the Department. *See* Exhibit I at IX-8. The "final decision" for purposes of seeking judicial review is not made until *after* either the Secretary decides on the appeal from the hearing officer or the institution fails to appeal to the Secretary within 30 days of the hearing officer's decision. 34 C.F.R. § 668.121. Thus, any judicial litigation between an institution and the Department cannot occur prior to a final decision by the Secretary. And, any "administrative litigation" cannot occur prior to the issuance of a FPRD. This is so because there is nothing for the parties to "litigate" prior to the issuance of the FPRD.

In this case, no litigation *ever* resulted between the Department and Apollo or UOP as a result of the program review. Instead, the parties settled the program review in September 2004, without the Department ever issuing an FPRD or a fine notice. Woodward Decl. at ¶ 18. Prior to, and without any issuance of a FPRD or fine notice by the Department, the Department cannot allege a "specific claim" contested by Apollo, over which the Department could seriously or genuinely anticipate litigation.

Based on the Department's own descriptions—which depict documents that contain factual information or documents prepared during a *regulatory* review—the Department cannot assert the work product doctrine to shield these documents from discovery.

**B.    Information Communicated With Third Parties Are Not Protected From Discovery**

Even if some privilege were to somehow protect the category two documents from disclosure, the Department's communications with the *qui tam* relators or their counsel and other third parties completely waives any applicable protection.  *See In re Sealed Case*, 877 F.2d 976, 981 (D.C. Cir. 1989) (a waiver of privilege extends "to all other communications relating to the same subject matter"); *United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) (finding voluntary disclosure of work product materials waives the protection if "such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary").

Here, much of the information withheld by the Department exists in communications between the Department and the third party *qui tam* relators, or other current or former Apollo employees, and that communication destroys any privilege or protection that may have applied. *See Mead Data*, 556 F.2d at 259-60.  Rather than attempting to maintain the secrecy of the information the Department is withholding from Apollo, the record demonstrates that this same information was communicated to and from third party *qui tam* relators.  *See* Exhibit A at Documents 6-10, 12-15, 19-20, 26-27, 31, 38.

**C.    Documents Concerning Communications With Apollo Are Not Privileged**

Several emails included on the Department's category two privilege log reflect communications between representatives of the Department and Apollo.  Specifically, documents 30, 35, and 40 concern the August 22, 2003 "exit interview" between the program review team and Apollo officials, and document 41 concerns a telephone call with Apollo employee Robert Collins.  *See* Exhibit A.

The Plaintiff in the securities litigation has actively disputed the testimony of the Apollo representatives who attended the August 22, 2003 exit interview, thus the communications made during that meeting are extremely relevant in the securities litigation. As such, there is an immense need to obtain any Department documents concerning the communications that were made during the August 22, 2003 meeting.

Neither the deliberative process privilege nor the attorney work product doctrine applies because these emails appear to concern communications between Department employees and Apollo representatives. *See Mead Data Cent.*, 556 F.2d at 259-60 (the deliberative process privilege does not protect communications "with a non-governmental party outside the agency"); *see also Petroleum Info.*, 976 F.2d at 1435. Accordingly, Apollo requests that the Department be compelled to promptly produce all such documents.

**CONCLUSION**

For the reasons set forth in this brief and Apollo's prior briefs, Apollo respectfully requests this Court to order the Department to produce the following:

- All email communications forwarding information from the *qui tam* relators, Apollo, and witnesses interviewed during the program review process, documents 6-10, 12-15, 19-20, 26-27, 31, 38;

- All documents concerning the conduct of the UOP program review, including selection of locations to visit during the program review and documents concerning the interviews of current or former UOP employees, documents 1-5, 11, 16-18, 21-25, 28-29, 32-34, 36-37, 39, 42-52;

- The three documents concerning the August 22, 2003 "exit interview" between the program review team and Apollo representatives, documents 30, 35, 40; and

- The email concerning a telephone call with Apollo employee Robert Collins, document 41.

Respectfully Submitted,

Dated:  July 10, 2007

/s/ Melanie L. Katsur

Melanie L. Katsur (D.C. Bar No. 484969)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

Wayne W. Smith
Joseph P. Busch, III
Kristopher P. Diulio
GIBSON, DUNN & CRUTCHER LLP
4 Park Plaza, Suite 1400
Irvine, CA 92614
Telephone:  (949) 451-3800
Facsimile:  (949) 451-4220

Attorneys for Defendant Apollo Group, Inc.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I have caused to be served a true and correct copy of the Defendant Apollo Group Inc.'s SUPPLEMENTAL BRIEF PURSUANT TO ORDERS OF MARCH 12 AND APRIL 16, 2007 TO COMPEL THE DEPARTMENT OF EDUCATION TO PRODUCE CATEGORY TWO DOCUMENTS by regular U.S. mail this 10th day of July, 2007, upon the following:

Stephen R. Basser
Samuel M. Ward
Barrack, Rodos & Bacine
402 W. Broadway, Ste. 850
San Diego, CA 92101
sbasser@barrack.com
sward@barrack.com

Heather D. Graham-Oliver
United States Department of Justice
Judiciary Center Building
555 4th Street, N.W.
Washington, DC 20530
heather.graham-oliver@usdoj.gov

Andrew S. Friedman
Bonnett, Fairbourn, Friedman & Balint
2901 North Central Ave., Suite 1000
Phoenix, AZ 85012
afriedman@bffb.com

General Counsel
United States Department of Education
Office of the General Counsel
400 Maryland Avenue, S.W., Room
4083, FOB-6
Washington, DC 20202-2100

_____/s/Dena Kennedy_____
Dena Kennedy

# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE GENERAL COUNSEL

June 7, 2007

**<u>Via Email</u>**

Kristopher P. Diulio, Esq.
Gibson Dunn and Crutcher LLP
4 Park Plaza
Suite 1400
Irvine, CA 92614

      Re:    <u>In Re: Apollo Securities Litigation</u>
              United States District Court (D. D.C.)
              Case No: 06-558

Dear Mr. Diulio:

In accordance with the Joint Agreement filed April 12, 1007 by the parties in the above matter, the Department is enclosing the final privilege log for the Category 2 documents.

              Sincerely,

              Christine M. Rose

              Agency Counsel
              Division of Business and Administrative Law

Cc:    Heather D. Graham-Oliver (via email)
       Samuel M. Ward (via email)

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| Document Date | Document Author | Title of Document | Subject Matter of Document | All Known Recipients | Privilege Asserted | Number of Pages in Document |
|---|---|---|---|---|---|---|
| 8/14/03 | Linda Henderson | RE: U of P | Email communication from employee to ED attorneys and other employees re: conduct of program review and strategies for announcing the program review of the University of Phoenix | Russell Wolff, Jennifer Woodward, Jim Castress, Susan Crim, Donna Wittman, Martina Fernandez-Rosario, Shane Dunne | Deliberative Process Privilege; Attorney work product privilege | 2 |
| 8/14/03 | Donna Wittman | University of Phoenix Announcement Letter | Email communication from employee to ED attorneys and other employees forwarding draft letter to the University of Phoenix announcing the program review | Russell Wolff, Jennifer Woodward, Jim Castress, Susan Crim, Martina Fernandez-Rosario, Shane Dunne, Linda Henderson | Deliberative Process Privilege; Attorney work product privilege | email – 1 page; attachment - 4 pages |
| 8/14/03 | Shane Dunne | Re: University of Phoenix Announcement Letter | Email communication from employee to ED attorneys and other employees providing edits to draft letter to the University of Phoenix announcing the program review | Russell Wolff, Jennifer Woodward, Jim Castress, Susan Crim, Martina Fernandez-Rosario, Shane Dunne, Linda Henderson, Donna Wittman | Deliberative Process Privilege; Attorney work product privilege | email – 1 page |

1

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| 8/14/03 | Russell Wolff | Re: University of Phoenix Announcement Letter | Email communication from employee to ED attorneys and other employees providing edits to draft letter to the University of Phoenix announcing the program review | Jennifer Woodward, Jim Castress, Susan Crim, Martina Fernandez-Rosario, Shane Dunne, Linda Henderson, Donna Wittman, Shane Dunn | Deliberative Process Privilege; Attorney work product privilege | email - 1 page; attachment - 4 pages |
|---|---|---|---|---|---|---|
| 8/14/03 | Susan Crim | Draft questions | Email communication from employee to ED attorneys and other employees forwarding first draft of program review interview questions for review and comment. | Jennifer Woodward, Jim Castress, Susan Crim, Martina Fernandez-Rosario, Shane Dunne, Linda Henderson, Donna Wittman, Shane Dunn | Deliberative Process Privilege; Attorney work product privilege | email - 1 page; attachment - 5 pages |
| 7/25/03 | Jennifer Woodward | FW: University of Phoenix -- Site Selection | Email communication forwarding email from relators' counsel regarding site selection for the program review to ED attorneys and other employees | Jim Castress, Martina Fernandez-Rosario, Donna Wittman, Nan Shepard, Russell Wolff, Harold Jenkins | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages |

2

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/25/03 | Martina Fernandez-Rosario | Re: University of Phoenix -- Site Selection | Email communication from ED employee to ED attorneys and employees regarding site selection and the scope of the program review specifically asking about what types of records and information they will have access to. | Jennifer Woodward, Jim Castress, Donna Wittman, Nan Shepard, Russell Wolff, Harold Jenkins | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages |
| 7/25/03 | Jennifer Woodward | Re: University of Phoenix – Site Selection | Email communication from ED attorneys and employees regarding site selection and the scope of the program review responding to question about which information and records to review. | Martina Fernandez-Rosario, Jim Castress, Donna Wittman, Nan Shepard, Russell Wolff, Harold Jenkins | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages |
| 7/25/03 | Jennifer Woodward | FW: University of Phoenix -- Site Selection | Email from ED attorney to employee regarding strategy for the program review and question on access to records. | Donna Wittman | Deliberative Process Privilege; Attorney work product privilege | email – 2 pages |
| 7/28/03 | Jennifer Woodward | FW: Site Visits | Email communication from ED attorney to ED attorneys and employees forwarding information from relators re: site selection and strategy for the program review. | Jim Castress, Martina Fernandez-Rosario, Donna Wittman, Nan Shepard, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 1 page, attachment - 2 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| | | | | | |
|---|---|---|---|---|---|
| 8/15/03 | Donna Wittman | RE: Draft questions | Email communication from ED employee to ED attorneys and employees re: draft questions for the program review | Martina Fernandez-Rosario, Susan Crim, Russell Wolff, Jennifer Woodward, Shane Dunne, Linda Henderson, Jim Castress | Deliberative Process Privilege; Attorney work product privilege | email - 1 page |
| 8/15/03 | Russell Wolff | RE: RE: U.S. ex rel. Hendow et al. v. U of P | Email communication from ED attorney to ED attorney responding to email from relators providing information re: strategy for the program review | Jennifer Woodward | Deliberative Process Privilege; Attorney work product privilege | email - 5 pages |
| 8/15/03 | Jennifer Woodward | FW: Julie's feedback | Email communication from ED attorneys to ED attorneys and employees forwarding information from relators regarding strategy for the program review | Donna Wittman, Martina Fernandez-Rosario, Susan Crim, Shane Dunne, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 1 page |
| 8/15/03 | Jennifer Woodward | FW: RE: UOP Internal Website Information: Information for Donna | Email communication from ED attorney to ED attorneys and employees forwarding communication from relators re: UOP internal website information pertinent to the program review | Donna Wittman, Martina Fernandez-Rosario, Susan Crim, Shane Dunne, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 3 pages |

4

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| 8/15/03 | Jennifer Woodward | RE: RE: U.S. ex rel. Hendow et al. v. U of P | Email communication from ED attorney to ED attorneys and employees regarding strategy for the program review. | Martina Fernandez-Rosario, Donna Wittman, Susan Crim, Shane Dunne, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 5 pages |
| --- | --- | --- | --- | --- | --- | --- |
| 8/15/03 | Russell Wolff | RE: Draft questions | Email communication from ED attorney to ED attorneys and employees regarding program review strategy and attaching edits to draft questions for the program review. | Donna Wittman, Martina Fernandez-Rosario, Susan Crim, Jennifer Woodward, Shane Dunne, Linda Henderson, Jim Castress | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages, attachment - 2 pages |
| 8/15/03 | Martina Fernandez-Rosario | RE: Draft questions | Email communication from ED employee to ED attorneys and employees discussing questions for program review forwarding form questionnaire for the review. | Russell Wolff, Donna Wittman, Susan Crim, Jennifer Woodward, Shane Dunne, Linda Henderson, Jim Castress | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages, attachment - 3 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| Date | From | Subject | Description | Recipients | Privilege | Document Type |
|---|---|---|---|---|---|---|
| 8/15/03 | Shane Dunne | RE: Draft questions | Email communication from ED employee to ED attorneys and employees regarding form questionnaire for program review | Martina Fernandez-Rosario, Russell Wolff, Donna Wittman, Susan Crim, Jennifer Woodward, Linda Henderson, Jim Castress | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages |
| 8/17/03 | Jennifer Woodward | FW: UOP Internal Website Information: Information for Donna | Email communication from ED attorney to ED attorneys and employees regarding strategy for the program review and attaching a revised "game plan" for the review. | Donna Wittman, Martina Fernandez-Rosario, Shane Dunne, Susan Crim, Jim Castress, Linda Henderson, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages; attachment - 11 pages |
| 8/17/03 | Donna Wittman | RE: UOP Internal Website Information: Information for Donna | Email communication from ED employee to ED attorneys and employees re: "game plan" for the program review | Jennifer Woodward, Martina Fernandez-Rosario, Shane Dunne, Susan Crim, Jim Castress, Linda Henderson, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 3 pages |

6

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| 8/18/03 | Jennifer Woodward | RE: UOP Internal Website Information: Information for Donna | Email communication from ED attorney to ED attorneys and employees re: changes made to program review questions and providing a copy of revised questionnaire | Donna Wittman, Martina Fernandez-Rosario, Shane Dunne, Susan Crim, Jim Castress, Linda Henderson, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 4 pages, attachment - 4 pages |
| --- | --- | --- | --- | --- | --- | --- |
| 8/18/03 | Jennifer Woodward | RE: UOP Internal Website Information: Information for Donna | Email communication from ED attorney to ED attorneys and employees re: changes made to program review questions and providing a copy of revised questionnaire | Donna Wittman, Martina Fernandez-Rosario, Shane Dunne, Susan Crim, Jim Castress, Linda Henderson, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 4pages, attachment - 4 pages |
| 8/20/03 | Shane Dunne | San Francisco Interviews 8/19 | Email communication from ED employee to ED attorneys and employees providing interview notes. | Russell Wolff, Jennifer Woodward, Martina Fernandez-Rosario, Donna Wittman, Susan Crim | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages |
| 8/20/03 | Shane Dunne | RE: Tomorrow | Email communication from ED employee to ED attorneys responding to email from ED employee re: interviews. | Martina Fernandez-Rosario, Jennifer Woodward, Russell Wolff, Susan Crim, Donna Wittman | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages |

7

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| 8/25/03 | Shane Dunne | RE: U of P | Email communication from ED employee to ED attorneys and employees re: arranging a conference call to discuss program review between investigators and ED attorneys and relaying information on the process of the program review | Susan Crim, Martina Fernandez-Rosario, Donna Wittman, Russell Wolff, Jennifer Woodward | Deliberative Process Privilege; | email - 2 pages |
| 8/21/03 | Jennifer Woodward | FW: Update from Client: Pressure from Management, and more | Email communication from ED attorney to ED attorneys and employees forwarding information re: program review from relators' counsel. | Susan Crim, Donna Wittman, Martina Fernandez-Rosario, Shane Dunne, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 1 page |
| 8/21/03 | Jennifer Woodward | FW: Another current employee witness | Email communication from ED attorney to ED attorneys and employees forwarding information re: program review from relators' counsel. | Donna Wittman, Susan Crim, Martina Fernandez-Rosario, Shane Dunne, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 1 page |
| 8/21/03 | Russell Wolff | RE: Urgent: Concerns re Current Interviews | Email communication from ED attorney to ED attorney and employee re: conduct of program review interviews responding to ED employee's concerns. | Shane Dunne, Jennifer Woodward | Deliberative Process Privilege; | email - 3 pages |

8

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| Date | From | Subject | Description | To | Privilege | Document |
|---|---|---|---|---|---|---|
| 8/22/03 | Shane Dunne | RE: Another current employee witness | Email communication from ED employee to ED attorneys and employees re: program review interviews. | Martina Fernandez-Rosario, Jennifer Woodward, Donna Wittman, Susan Crim, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages |
| 8/25/03 | Russell Wolff | FW: University of Phoenix Exit on 8/22/03 - NOTE NEW INFO ON INTERVIEWS | Email communication from ED attorney to ED attorneys forwarding email communication from ED employee re: program interviews and U of P exit conference. | Harold Jenkins, Jennifer Woodward | Deliberative Process Privilege; Attorney work product privilege | email - 4 pages |
| 8/25/03 | Jennifer Woodward | RE: Update from Client: Pressure from Management, and more | Email communication from ED attorneys and employees answering question re: program review witness. | Donna Wittman, Susan Crim, Martina Fernandez-Rosario, Shane Dunne, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email - 2 pages |
| 8/27/03 | Susan Crim | Livermore/Pleasanton | Email communication from ED employee to ED attorney describing and forwarding document where investigator provides perspective on information collected and recommendations on next steps in program review for Livermore/Pleasanton campus. | Jennifer Woodward | Deliberative Process Privilege; Attorney work product privilege | email - 1 page, attachment - 5 pages |

9

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/10/03 | Susan Crim | Proposed consolidated topic list | Email communication from ED employee to ED attorneys and employees forwarding draft of topics list of evidence obtained from the program review | Jennifer Woodward, Shane Dunne, Martina Fernandez-Rosario, Donna Wittman, Russell Wolff | Deliberative Process Privilege; Attorney work product privilege | email – 1 page, attachment - 6 pages |
| 9/9/03 | Susan Crim | RE: Index of e-mails/documents (REVISED) | Email communication from ED employee to ED attorneys and employees attaching revised list of evidence obtained from the program review. | Susan Crim, Jennifer Woodward, Russell Wolff, Shane Dunne, Donna Wittman, Martina Fernandez-Rosario | Deliberative Process Privilege; Attorney work product privilege | email – 1 page, attachment - 22 pages |
| 8/25/03 | Donna Wittman | RE: University of Phoenix Exit on 8/22/03 - NOTE NEW INFO ON INTERVIEWS | Email communication from ED employee to ED attorneys and employees re: conduct of program review. | Russell Wolff, Jennifer Woodward, Martina Fernandez-Rosario, Shane Dunne, Susan Crim, Jim Castress, Linda Henderson, Steve Hansen | Deliberative Process Privilege; Attorney work product privilege | email – 4 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/25/03 | Susan Crim | Fed Ex package | Email communication from ED employee to ED employee re: Fed Ex package containing documents obtained from U of P interviewees and providing an attached list of documents in the package. | Donna Wittman | Deliberative Process Privilege; Attorney work product privilege | email - 1 page, attachment - 11 pages |
| 8/8/03 | Jennifer Woodward | Game plan for 8/18 Review | Email communication from ED attorney to ED employees and attorneys re: program review strategy | Jim Castress, Martina Fernandez-Rosario, Donna Wittman, Susan Crim, Russell Wolff | Deliberative Process Privilege; Attorney Work Product Privilege | email - 1 page, attachment - 7 pages |
| 8/15/03 | Jennifer Woodward | RE: RE: U.S. ex rel. Hendow et al. v. U of P | Email communication from ED attorney to ED employees and attorneys re: program review strategy | Martina Fernandez-Rosario, Donna Wittman, Susan Crim, Shane Dunne, Russell Wolff | Deliberative Process Privilege; Attorney Work Product Privilege | email - 5 pages |
| 8/19/03 | Martina Fernandez-Rosario | RE: Interviews of Staff in San Francisco | Email communication from ED employee to ED attorneys and employees re: program review strategy | Shane Dunne, Jennifer Woodward, Russell Wolff, Donna Wittman, Susan Crim, Linda Henderson, Jim Castress | Deliberative Process Privilege; Attorney Work Product Privilege | email - 2 pages, Interview attachments already released. |

In Re: Apollo Group, Inc. Securties Litigation

Privilege Log of Category 2 Documents

| 8/25/03 | Russell Wolff | FW: University of Phoenix Exit on 8/22/03 | Email communication from ED attorney to ED attorneys re: program review and strategy | Harold Jenkins, Jennifer Woodward | Deliberative Process Privilege; Attorney Work Product Privilege | email - 4 pages |
|---------|---------------|-------------------------------------------|-------------------------------------------------------------------------------------|----------------------------------|----------------------------------------------------------------|-----------------|
| 8/27/03 | Donna Wittman | RE: UOP – Bob Collins Telephone Call this Morning | Email communication from ED employee to ED attorneys and employees re: program review strategy | Martina Fernandez-Rosario, Shane Dunne, Susan Crim, Jennifer Woodward, Russell Wolff, Jim Castress, Linda Henderson | Deliberative Process Privilege; Attorney Work Product Privilege | email - 1 page |
| 8/27/03 | Jennifer Woodward | RE: Livermore/ Pleasanton | Email communication from ED attorney to ED employee re: program review strategy | Susan Crim | Deliberative Process Privilege; Attorney Work Product Privilege | email - 1 page |
| 8/27/03 | Jennifer Woodward | RE: UOP Interviews Tomorrow | Email communication from ED attorney to ED employees and attorneys re: program review strategy | Martina Fernandez-Rosario, Donna Wittman | Deliberative Process Privilege; Attorney Work Product Privilege | email - 1 page |
| 8/27/03 | Jennifer Woodward | Interviews at Livermore/Pleasanton tomorrow | Email communication from ED attorney to ED employees and attorneys re: strategy for interview process | Martina Fernandez-Rosario, Donna Wittman, Shane Dunne, Russell Wolff, Susan Crim | Deliberative Process Privilege; Attorney Work Product Privilege | email - 1 page, attachment - 6 pages |

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| 8/27/03 | Martina Fernandez-Rosario | RE: UOP Interviews Tomorrow | Email communication from ED employee to ED attorney and employee re: program review strategy | Jennifer Woodward, Donna Wittman | Deliberative Process Privilege; Attorney Work Product Privilege | email - 1 page |
|---------|---------------------------|----------------------------|-----------------------------------------------------------------------------------------------|-------------------------------------|----------------------------------------------------------------|----------------|
| 8/27/03 | Russell Wolff | RE: UOP Interviews Tomorrow | Email communication from ED attorney to ED attorney re: program review strategy | Jennifer Woodward | Deliberative Process Privilege; Attorney Work Product Privilege | email - 2 pages |
| 8/27/03 | Jennifer Woodward | RE: UOP Interviews Tomorrow | Email communication from ED attorney to ED employees re: program review strategy | Martina Fernandez-Rosario, Donna Wittman | Deliberative Process Privilege; Attorney Work Product Privilege | email - 2 pages |
| 8/28/03 | Shane Dunne | Interviews in Oakland | Email communication from ED employee to ED attorneys and employees re: program review interviews | Jennifer Woodward, Russell Wolff, Donna Wittman, Martina Fernandez-Rosario, Susan Crim | Deliberative Process Privilege; Attorney Work Product Privilege | email - 1 page |

13

In Re: Apollo Group, Inc. Securities Litigation

Privilege Log of Category 2 Documents

| Date | | Title | Description | Recipients | Privilege | Document |
|---|---|---|---|---|---|---|
| 8/29/03 | Donna Wittman | UOP Online - New Info / Interview Notes | Email communication from ED employee to ED attorneys and employees re: program review interviews | Jennifer Woodward, Russell Wolff, Martina Fernandez-Rosario, Shane Dunne, Susan Crim, Linda Henderson, Jim Castress | Deliberative Process Privilege; Attorney Work Product Privilege; Informer Identity Privilege | email - 2 pages Interview attachments already released. |
| 8/29/03 | Jennifer Woodward | UP Topics | Email communication from ED attorney to ED employee listing topics for program review interviews | Susan Crim | Deliberative Process Privilege; Attorney Work Product Privilege | email – 1 page |
| 8/27/03 | Susan Crim | Livermore/Pleasanton | Email communication from ED employee to ED attorney attaching compilation of interview notes and other information from program review | Jennifer Woodward | Deliberative Process Privilege; Attorney Work Product Privilege | email - 1 page, attachment - 5 pages |
| 9/9/03 | Donna Wittman | UOP Additional Interview Notes | Email communication from ED employee to ED attorney and employees re: program review and including notes on entrance conference | Jennifer Woodward, Martina Fernandez-Rosario, Shane Dunne, Susan Crim, Jim Castress, Linda Henderson, Russell Wolff | Deliberative Process Privilege; Attorney Work Product Privilege | Email – 1 page; interviews previously released; one attachment - 4 pages |

14

# Interview memo:  University of Phoenix

**To:**      File

**From:**   Donna Wittman

**Date:**   8/8/2004

**Re:**      Telephone Interview, ███████████   ███████████

---

████████ called me Friday and told me that she recently moved and finally found the ec guides and matrixes and other docs from when she was at UOP.  She will FedEx them to me on Sat. for Monday delivery.  She said that she referred ███████████ & ███████████ a current UOP ████████ recruiter who was on her team.  He says things are worse there.

I asked ████████ to tell me exactly what she recalled about what was said in her evaluations.  I told her that if you look at the evaluation forms, there is nothing on there about enrollments.  She sent all her evaluations in the FedEx package.  She insisted that it was always a numbers game and the numbers – of enrollments – was all that counted.  They would sometimes talk about the conversions, talk time, but it was the enrollments that counted.

She is sending one sheet, called a daily report, it showed how to break out your day.  Over in the top of the form, it says to hit always you should be having 3 refs / day, 8 apps per week which is 5 enrollments.

The daily report was also how you tracked calls.  They (UOP) always looked at you daily, weekly, monthly, quarterly.  On a quarterly basis the manager would always go over where you are on track to get a raise, stay the same or even keep money you are getting. ████████████ is very upset, because there is more talk about taking the money away.

She recalled when she received her raise, from about 28K to 55K.  ███████████ her manager, had said if you want to get to $35 K, you need to put in you need 75-90, for 40s-50s you need to get 90-105.  Someone with 114 got 65k.  If you are above 105, the sky is the limit.  That is for an ECI.  They expected 45/quarter for a raise.  But 36-40 is a meets and below is a requires improvement.

For the first quarter, they used a 1-5-10 rule.  You had to have 1 in the first month, 5 in the 2nd and 10 in the 3rd.  You were expected to then get at least 10 each month thereafter for a raise.  ECIIs were required to hit 30/quarter and Srs must get 45/quarter.

████████ has worked for a number of other schools, and now works for ████████  I asked her, that since the job of a recruiter is to enroll, we would expect all schools to require recruiters to enroll, but what is the difference between UOP and other schools.  She said that there is a tremendous difference.  At a community college, for example, they certainly want production, but there is not the tremendous pressure that is imposed at UOP.  At UOP, after the UOPX IPO, we began having quarterly "rah, rah" meetings, where ████████ and management would pump the troops up.  He would make everyone chant "UOPX".  Also the pay structure at UOP differs greatly from other schools. At ████████ she is expected to enroll and the numbers they track and evaluate her on are:  (1) the number of interviews she has; and (2) the percentage of enrollments who stay.  So if she only has 3 enrollments, but they stay, she is not dinged because the number is low.  Also, UOP awards these "wildly outrageous" salaries with huge differences based on enrollments.  At other schools, the salary changes and differences are not great, pretty minor in comparison.

DOE APOL 0646

As to the hotel awards and gifts: The hotel contest last year was one that a lot of people complained about . It was based on enrollments. But they could not bring their spouses. And they were required to attend sales meetings.

I told her that I had seen emails where regs would be given out for winners. Exactly what is a "reg" and does this just be an application. She said that:

- a "reg" is the same as an enrollment. A reg or enrollment is not just an application or "appin". The student has registered, paid any required application fee, made arrangements for financing, all financial aid has been completed, books are ordered. The student may or may not have attended his or her first class and may yet become a no-show. Many of the contests were based on regs.

- salary is established on the basis of "starts". The difference between a reg and a start is that a start is used to determine salary. A student is not a start unless he or she has attended the first three classes. You will not know your final starts until a month after the reg.

She commented how easily it was for managers to manipulate the starts a recruiter gets. They could dole out the starts of those who quit or the starts they had before they were a manager. She said that she felt it would be more equitable to mete these starts out evenly among the team, but the way UOP does it is to use them as a carrot to entice recruiters to boost their salary.

She said that what they say on paper and what they say in the meetings are two totally different things.

She said the same was true about her evaluations. She would score high on customer service, product knowledge and other factors, but get a low overall rating because : "why are you not getting enrollments." She said that when ▮▮▮▮▮▮▮▮gave her the first evaluation, she had had a good 9 months. ▮▮▮▮▮told her that she was getting the raise because of enrollments and did not say that the raise for other factors.

She said that her friend ▮▮▮▮▮▮▮▮says that the quality of leads has gotten so bad. He used to be able to reg 15/month, but it is down to 7 or so now. That is because they run such promos as: pop-up ads that ask you if you would like two free movie tickets. When the person clicks yes, they are told to contact a UOP reg and given a telephone or email. ▮▮▮▮▮says that these people have no interest in school, they just want the free movie tickets.

She was talking to a friend who knows two women recently hired by UOPX. These two women were all excited about the opportunity there. They were told that they could be making $60,000 in just a few months. "Little do they know."

She indicated that she will be more than glad to answer any of my questions in the future and apologized for not sending the documents earlier.

Very cooperative, bright, likable lady. She has three children and appears very bright. She mentioned that she did finish her masters degree at UOP.

DOE APOL 0647

# Interview memo:  University of Phoenix

**To:**    File

**From:**  Donna Wittman

**Date:**  2/23//2004

**Re:**    Telephone Interview. ██████████, current e.c., ████ ████████████(Home), ████
          ████████ (cell); ███████████████

---

████████, Current Admissions Counselor, UOP, ████████ called me as a result of being referred by DOL investigator, ████████ had interviewed him in the course of the DOL investigation. Due to issues raised by ████, she referred him to me.

His contact : cell ████████████
Home: ████████████████

████ moved from ████████ He was working fo4 █████ a █████████████ company. Before that for ███ a ████████ Due to the economic downturn in ████████ he and his girlfriend moved to ████████ He started at UOP ██████ as an enrollment counselor on ████████

He commented that there are a "lot of fishy things going on."

He went to UOP for the job because he knew someone at UOP. When hired, he started at 28k. He was told that his pay increase was based on a matrix. The matrix incorporated things like phone time, incoming calls, outgoing calls, "weird lead to contact percentage", contact to activity, activity defined as someone who filled out application. He thinks he was told early on that his salary could not be based on regs. He said it was real ambiguous.

Then during training, they went over the matrix. At the bottom of the matrix, they would insert the no. of regs, but this was not written not on the sheet. After a couple of weeks, his manager asked him how much money he would you like, that it could be up to $50K. He said that he would like to make 40- 45K. His manager then wrote down a series of numbers on the paper, showing the number of regs and salaries, but she would not let me have the piece of paper. This is how many regs you need, she indicated. He said that he thought it was based on the matrix. She (his manager) said "you need these regs". Mgr is ████████

I asked what he meant by "fishy things": He could never get a straight answer on how to get paid. Supposed to be six months, then an evaluation. He was in training for 3 wks in July, then ramp up one wk., then August 1 was his first month. At the end of February 2004, he was supposed to get a review, but it did not come. He was supposed to get monthly, quarterly and six month reviews. He has received none, not even an oral evaluation.

In his first month, he had weekly reviews, then none for 6 wks. He then asked for a review, and was given six weekly reviews at once, all filled out. He signed them and dated them the day he got them. He has had no review since. He is going to go ask for a review.

I asked if he had heard of any new comp plan. He heard that they are gong to have a plan where salary could go up and down. Now salary can only go up. His friend just had a review, and was informed that

● Page 1

DOE APOL 0648

he did not have enough regs for a salary increase. Each quarter they are supposed to have these factors rated (meets, etc.) Under the system you must have 2 consecutive quarters of often or always.

He has a friend, who was hired with him, who was evaluated recently and was told that he did not have enough regs during time, and must wait another 3 weeks for a salary review. The manager told his friend that she could do something to help his salary, except for the fact that he had one month with 7 or 8 enrollments, but all dropped, leaving him a zero month.

"Something is just not right."

UOP expects them to get 15-20 regs per month but the average is four. His girlfriend, who moved with him from ████████ is an academic counselor at UOP ██████ Her students have a lot of misinformation about TIV and payment expectations. Sometimes, students get through the 6th class before they find some kind of problem with FFEL. Misinformation by enrollment counselors is a constant source of problems.

UOP has been "beating the drum about not falsifying documents", but the environment encourages it because it is based on greed. 9 or 10 people have left out of his 16 person team since he has been there (since July ████ Almost everyone is unhappy. The only people who say nothing are those enrolled in school because they want to get their free education. It seems that UOP is making an example every month or so of someone who gets fired for falsifying documents.

One of the things he has heard, it may be conjecture, was that when UOP went public, employees enrolled in classes to get loans and buy stock.

His girlfriend says she really has problems because ecs say anything. "Take this class, see if you like it." The ecs don't inform them fully of financial aid. They are not told that will be indebted to UOP and have their credit ruined.

There is a lot of dissatisfaction from people hired recently. A lot of them are from the dot com bubble. They, like him and his girlfriend, have experience in the business world and are aware of how badly UOP manages.

It is very distasteful." He feels rotten working there.

He said that most employees there are intimidated. He, however, is going to call it like he sees it.

**Observation:** This guy could make a good witness. He is very cooperative and wanted to assist in any way he can. He indicated that he is going to ask for an evaluation and will give me feedback as to just exactly what is said. Shortly after the end of my conversation, he forwarded me the email below.

DOE APOL 0649



Donna,

The prize has yet to be determined as most things are. Movie tickets or sporting event tickets or the possibility of a dinner somewhere all have been discussed.

Thank you!

At 05:08 PM 02/23/2004 -0500, you wrote:

>
>Thank you for speaking with me today.  And many thanks for the email you
>forwarded.  Very interesting.
>
>Your manager references a contest.  What is the prize for the winner(s)?
>
>-----Original Message-----
>From:
[<mailto:
>Sent: Monday, February 23, 2004 1:27 PM
>To: donna.wittman@ed.gov
>Subject: FW: King of the Hill Update, March and other items
>:)!!!!!!!!!!!!
>
>
>
>Thank you for speaking with me today.  I'm forwarding an email I received
>recently from my manager. At the end of this email she discusses REG
>expectations.
>
>Thank you.
>
>
>
> >X-Originating-IP: [204.17.16.253]
> >From:
> >To: "
> >Subject: FW: King of the Hill Update, March and other items
:)!!!!!!!!!!!!
> >Date: Thu, 19 Feb 2004 07:48:06 -0700
> >X-Mailer: Internet Mail Service (5.5.2657.72)
> >
> >
> >-----Original Message-----
> >From:
> >Sent: Thursday, February 19, 2004 7:46 AM
> >To:

> >
> >Subject: King of the Hill Update, March and other items :)!!!!!!!!!!!
> >

● Page 3

DOE APOL 0650

> >First of all, I would like to thank ▮▮▮ for coming up with the game plan
> >for the contest and communicating it to all of you. I would also like to
> >thank ▮▮ for keeping the "scorecard" yesterday.  This is a
> >time-consuming task so his help was much appreciated. Many of you,
> >however, seem to have your own ideas about how it should be handled.
> >
> >What I would like to propose is that each of you tally your own score
> >after receiving the printout.   Please email it to both ▮▮▮ and myself
> >and use the following point system:
> >
> >Outbound calls x 1
> >Talktime x 2
> >Inbound calls x 3
> >
> >Please do not make/receive personal phone calls during this time period if
> >you can possibly avoid it.  I have received complaints about this as well
> >and it is not fair to rack up calls or talk time with personal calls.
> >
> >The whole idea of having the contest is to encourage everyone to get on
> >the phone first thing in the morning and blitz.  Hopefully, this will
> >become a habit and our productivity will increase.  Please keep in mind
> >that the minimum # of outbound calls is 50 per day (if you are a Level 1)
> >and the minimum talk time is 2.5 hours (if you are a Level 1).
> >
> >Our team results for February were less than satisfactory and we really
> >need to make this up in March.  A very small handful of you came in last
> >weekend and others of you who declined said you would be here this
> >Saturday.  I would strongly encourage you to work some extra hours if you
> >can find the time.  If you have missed work recently, it is likely that
> >you have fallen behind. If you have been in this department longer than 6
> >months, the expectation is that you will have 10 REG's monthly.  This may
> >not always be possible but there is absolutely no excuse for having less
> >than 5 in any month.
> >
> >Please let me know if you have any questions or comments about the
> >expectations, the contest, or anything else.
> >
> >Thank you!
> >
> >▮▮▮▮▮▮▮▮▮▮
> >Admissions Manager
> >University of Phoenix ▮▮▮▮▮ Campus

DOE APOL 0651

```
> >Phone:       ████████████████
> >Direct Phone: ████████
> >Fax:        ████████████████
> >Email:      ████
> >UOP Website:
>
<<http://www.uopxonline.com/>http://www.uopxonline.com/>http://www.uopxon
line.com/
>
> >
```

DOE APOL 0652

**Rose, Christine**

| | |
|---|---|
| **From:** | ████████████████████ |
| **Sent:** | Friday, February 20, 2004 5:26 PM |
| **To:** | Wittman, Donna |
| **Subject:** | Harrasment by Manager at University of Phoenix Online |

Hi Donna,

I got your email from a friend of mine that had been in a similar situation.  I know that this may be a pain for you, but I would like to discuss harrasment and discrimination with you ASAP.  Iknow you are busy but could you please call me on my cell phone at ████████ ██████ so I can describe the situation to you?  If I don't hear from you by Monday, I will call you early next week.  I would appreciate it.  Thank you.

████████████████
Admissions Counselor
University of Phoenix Online
work: ████████████
work email: ████████████████████████

Introducing the New Netscape Internet Service.
Only $9.95 a month -- Sign up today at http://isp.netscape.com/register

Netscape. Just the Net You Need.

DOE APOL 0653

**Rose, Christine**

From:     ███████████
Sent:     Thursday, February 26, 2004 10:47 AM
          Wittman, Donna
.ct:      UOP

Donna,

I do have copies of a report that █████ distributes at least twice a day.  This report
shows APINs and REGs.  This chart is supposed to motivate us to put more people in REG and
to show who is moving people from APIN status to REG.  Most of the time, this report also
shows how many REG's each Admissions Counselor has.  Would you like to have me fax some of
these reports to you?  Also, I gave ████ your phone number and I hope she will call you.

---

Introducing the New Netscape Internet Service.
Only $9.95 a month -- Sign up today at http://isp.netscape.com/register

Netscape. Just the Net You Need.

1

**Rose, Christine**

From:          ████████████████
Sent:          Friday, February 27, 2004 9:23 AM
To:            Wittman, Donna
Subject:       Faxes

Good Morning,

I faxed you 20 pages last night but I never received a confirmation page. Please let me know if you received these email and reports. Also, I have a stack about an inch thick of similar email and reports from the past if you would like those as well. After I leave today, I will not have access to a fax machine so, if you didn't receive the fax or if you would like a copy of all these documents, please email me your mailing address and I will put these in the mail later today.

I spoke with ████ again yesterday and she is afraid that she will lose her job if she is caught talking to anyone from the DOE and she can not afford to be unemployed. But, I think if she gets pushed to far by ████████ then she may be willing to send you her documents.

If it's not to much work for you, I would like to be updated on this issue as it progresses.

I hope to hear from you soon,

████████████

Introducing the New Netscape Internet Service.
Only $9.95 a month -- Sign up today at http://isp.netscape.com/register

Netscape. Just the Net You Need.

DOE APOL 0655

**Rose, Christine**

From:
Sent:                    Thursday, February 26, 2004 3:50 PM
                         Wittman, Donna
  ect:                   RE: UOP

It looks like they may be getting ready to walk me out of here today so I will fax what I
can before I go. Call me if you need any clarification.

"Wittman, Donna" <Donna.Wittman@ed.gov> wrote:


>
>Thank you so much. Yes, I would definitely like to have you fax me these
>reports. My fax is (415) 437-8206. Thank you also for referring ▮ I
>would welcome the opportunity to speak with her at her convenience. If she
>would email or call me with a telephone number and day and time when she
>would be available, I would welcome the chance to interview her.
>
>Donna Wittman
>
>
>-----Original Message-----
>From: ▮
>Sent: Thursday, February 26, 2004 7:47 AM
>To: Donna.Wittman@ed.gov
>Subject: UOP
>
>
>Donna,
>
>    ▯o have copies of a report that ▮ distributes at least twice a day.
>     ▯ report shows APINs and REGs. This chart is supposed to motivate us to
>▯ c more people in REG and to show who is moving people from APIN status to
>REG. Most of the time, this report also shows how many REG's each
>Admissions Counselor has. Would you like to have me fax some of these
>reports to you? Also, I gave ▮ your phone number and I hope she will call
>you.
>

>
>
>Introducing the New Netscape Internet Service.
>Only $9.95 a month -- Sign up today at http://isp.netscape.com/register
>
>Netscape. Just the Net You Need.
>

Introducing the New Netscape Internet Service.
Only $9.95 a month -- Sign up today at http://isp.netscape.com/register

Netscape. Just the Net You Need.

1

**DOE APOL 0656**

# Interview memo:  University of Phoenix

**To:**   File

**From:**   Donna Wittman

**Date:**   8/8/2004

**Re:**   Telephone Interview. ██████████████████████ ████████████████████████████
█████████████████

---

███████████ was referred to me by ██████████ and █████ have ████████████████████████████

████████████ had worked for ███████████ an ████████████ for ████████ When █
and ██████ merged, ██ terminated that contract, putting all workers at ██████████████ out of work.  He
heard about the job from other████████████workers who found jobs at UOPX.  He recalls receiving an
email from either██████████████or former fellow worker notifying ██████████████workers that they could
be making up to 50K after six months at UOP.

He started his job at UOPX a little less than two years ago.  When he called for his first interview, UOPX
people told him that he could be in the mid-30s in three months and at 50K six months after that.   The
first interview was the strangest job interview he had ever had.  There were 16 applicants in the room
with three or four UOP people.  They divided the applicants into pairs and gave each pair five minutes to
get to know each other.  After the five minutes, they were each to give a presentation on why UOP
should hire their "partner".  Both he and his "partner" were hired.

In training, they reiterated the salary promise that he was told when he called for an interview -- that he
could be in the mid-30s in three months and up in the 50s after six months if he got a certain number of
regs.  They explained that after a certain period of time and with certain number of regs, you could make
X.

████████ has been working as a recruiter.  He had worked with ██████████████████████████
███████████████████████████████ - — ██████████████ His manager used to be
█████████████ His manager now is ███████████████ is a good manager, he believes.  She was a
recruiter only ████████months when she was made a manager.  "She really regged a lot."  ██████ is very
unhappy with UOP and has obtained a job at "██████████████████████████████████
████████████ She has not given her notice yet and will not until ███████ two weeks before she starts at
███on ██

He said that he would talk to ██████and see if she will talk to me.  He is to let me know on Monday, 8/9
or Tuesday, 8/10.

What do you recall about your evaluations?  They have a matrix with a lot of categories.  The categories
don't really matter and everyone knows this.  You can be in "Exceeds" on all categories but regs, but if
you don't have the regs, it does not matter what else you do.  In his evaluations with████████████told
him that he did well in every way, but that it was the regs have the most weight.  On the matrix, they call
regs "contact to activity".  "Activity" is the regs, and this is all that counts on the matrix.

DOE APOL 0657

They try to hide what they are really doing (setting salary based on regs) with this matrix, but in truth it does not matter. If you get the regs, they other categories do not matter. And conversely, if you don't get the regs, doing well in everything else does not matter.

When ████ would go over his matrix, he would tell him "If you get X regs, you will get a promotion". ████ told him that, also.

████████ cannot see any way this is going to change unless the Department makes them. He feels that UOPX is on such a downhill spiral, desperate to report growth to the investors.

Right now, he is not at "meets" on his regs. Under the new matrix, he would receive a pay cut. So he has taken a job in ████████████, starting ████████████ That is the only way he can avoid a cut.

When he started, he was motivated, excited. It has gone down hill. There is increasing pressure for regs. But it is so much more difficult. They get very few leads compared to when he was hired ██ years ago. Now the leads are of really poor quality. There are people who work really hard. Hard, ethical work, however, really helping students, is not rewarded. They only want the regs.

The managers really use intimidation tactics. So many of the recruiters are young and inexperienced and do not realize how unethical they are. Tactics are like: Managers will come around and say, "I realize you are trying to feed a family on 28K, but we are going to give you a pay cut. "

████████ said that I could call him at any time and wished us luck in trying to change the culture and environment.

████████ is soft-spoken and does not sound as if he is bearing a grudge. He does sound very beaten down. He asked that we not use his name because he cannot afford to lose the job.

DOE APOL 0658

# Interview memo:  University of Phoenix

**To:**      File

**From:**  Donna Wittman

**Date:**  8/8/2004.  Sunday 11:41 AM

**Re:**      Follow- up Telephone Interview, ▊▊▊▊▊▊ or ▊▊▊▊▊▊

Referred by ▊▊▊▊▊, former ▊▊▊ recruiter.

▊▊▊▊▊▊ his wife, answered.  She was very talkative. ▊▊▊ is not available right now and will call me later, was a student.  I introduced myself and she said that she was glad that someone is investigating because it is pretty clear, from what she has heard from her husband and his friends, there is quite a disconnect between education and business ethics.  She is in

She finished her ▊▊▊ at UOP because the waiting list at ▊▊▊ was about a year and ½.  She would go to ▊▊▊ if she had to do it over again.  The academic standards are much lower than ▊▊▊ but she had completed her pre-requisites at ▊▊▊▊▊▊ and had little left to complete.  At UOP, it was a hit-or-miss situation with the instructors.  Some were great, some bad.  She said that her UOP education was not at the caliber of her colleagues from ▊▊▊▊  As to her current employer, physicians, those that are familiar with UOP would not hire a graduate from UOP if a masters degree was a requirement of the job.  She was hired based on the strength of her ▊▊▊▊▊ transcript and fact that she is also obtaining a ▊▊▊▊▊▊▊ degree.  She has a strong ▊▊▊▊▊ background. She works on

She stated that she knows that UOP must be violating our rules because they set quotas.  In her field, the ▊▊▊ strictly prohibits any incentives to entice ▊▊▊▊▊.  She can't believe that the Department of Education would not have something very similar.

2:45 PM  Call back at 6:00 PM

▊▊▊▊▊ was hired at UOP ▊▊▊▊ in April ▊▊  He received his BA at ▊▊▊▊▊▊ and worked in the ▊▊▊ industry.  He was hired to work in the ▊▊▊ division at ▊▊

When he was hired, they told him the job involved changing lives, helping students.  After being hired, he was told that he would start at the starting salary of $28K, but that after six months he would receive a salary review and could make up to $36,000 at that time.  His first review was six months after being hired.   When hired he was told that his salary after six months was based on the number of students enrolled.  It was never written anywhere.  On his 2nd review, 3 months later, he could have received another increase,  He did not get it, though, solely because of the number of students enrolled.

He said that he really enrolled enough students to get the raise, but because of ▊▊▊▊▊ ▊▊▊▊▊, many of his students did not finish.  It was only ▊▊▊▊▊ that prevented him from "making the numbers and getting the raise".  He met all the other variables outlined in the matrix, but it did not matter because of the enrollments. ▊▊▊▊ his manager, expressly told him that the reason for not getting a raise was due to his enrollments. ▊▊▊▊ was very upset about this since the lack of sufficient enrollments was beyond his control.  He thought it very unfair that they would not put the enrollment requirement in writing.  He drafted an email and sent it to his manager to try to get them to clearly state what the requirements were for a "bump".  His manager responded, saying "in a round about way" that it was the enrollments.  He will make a copy of the email and send it to me.

● Page 1

**DOE APOL 0659**

During evaluations, UOP would do an overall average of the last three months, calls, etc. – normal quantitative measures. Under the old matrix, they never mentioned number of enrollments. But in the evaluations, they would go over those factors, but it was only the enrollments that determined the overall performance. If a person did well on all factors except enrollments, they would still end up with a "requires" or "unsatisfactory". If a person did not make the numbers on other factors (calls, etc.) but made the enrollments, then got a raise. He had a friend who was low on everything, but had enrollments. His friend got a good bump..

Could you tell me what UOP told you specifically as to which enrollments related to which salary?

To get the maximum raise to $36K, you needed 36 in 3 mos. From 20-35 enrollments would get an incremental raise, 2%, 4%, etc. If you were below 20 in 3 months, you get no raise. Every three months they receive an evaluation.

He was recently given a written warning. As they always do, they did not put the reason in writing as lack of regs, but that was the reason. They stated the reason in writing as inadequate outbound calls. They will never put in writing that it is the enrollments. Everyone knows its really the regs. When it is just you and the manager, the manager tells you "it's the regs". But in writing – they never put it in writing.

What can you tell me about the new matrix in effect now?

They now list enrollments on the matrix. They say that it counts as a percentage of the total score you get, and its weight is the greatest of all the factors. Retention is also another percentage now. Recruiters are now responsible for the student through the 2nd or 3rd week of second class, 7-8 weeks into the program. If the student leaves before then, they do not get the reg.

Under the new plan they can take money away. When they first told everyone about the new plan, the y preached its fairness. But the contract they had them sign says that you can lose money. As they found out more about the new matrix, they discovered that they could, in fact, lose money. He thinks 90-95% of all recruiters who are not new will get a pay cut. Another change is that they are using different performance guidelines for different divisions. The ███ matrix requies more regs because they assume that since the tuition is lower, and since ███ pays, we should be able to reg more.

He knew of the Red Room. He never went there, so he is not real familiar about what went on. His friend ███ went there. The used managers to help folk out with sales tactics. At that time, ███ has a Red-Yellow-Green system. If you were Green, you were okay. If Yellow- shaky ground. Red – bad.

At quarterly meetings: ███ would put up numbers and talk about where UOP was going. UOP is solely stock driven. This year, UOPX has fallen well below objectives. They have not had quarterly meeting since January or February, probably because enrollments are so far below expectations. Growth has slowed down considerably. They are far below what investors are expecting. Now they have daily tracking to try to boost enrollments. They have also set much higher goals.

One of the things they are doing, there has always been a big push to put employees in school. Large push in August to put employees and their spouses into classes. They are waiving app fee for employees and spouses and waiving books for first course for employees. They are trying to get the numbers up before the end of the Fiscal year on August 31.

There is a large push right now to get the "T Drops" (temporary drops) back in. Re-entry folk have own matrix.

Current manager is ███ They are going to set up another call center. They are going to try to qualify student a bit better. Some of the marketing is , well, they use a lot of banner ads. He called a student recently was very irate and just wanted $20 gift certificate. They inquired only because of the offer of a $50 Red Lobster gift certificate. The lead base is becoming very diluted.

DOE APOL 0660

UOP is a total sales environment. It's just like car sales - facts are a little bent. Information is left out or truth is stretched to get regs. The ones who are ethical are not promoted and do not receive raises. Recently they decided to lower the age to 18 for WIU.

If you don't meet your goals, they will yank you out of class. They have threatened to pull him out of class. Recruiters will lose benefits if don't get meets on their enrollments. With the old plan the requirement was 30-35 / quarter. Over 36 was exceeds. If a recruiter had 2 quarters in needs, they lose educational benefits. He has a friend who they also threatened to remove ed benefits. His friend █████████ has had two bad quarters and was very distraught.

 finished his ████ two weeks ago. He began attending UOP after ███████████ August of

He said that he is glad we are looking at this because UOP is very unethical. Totally reg driven.

Recruiters are frequently threatened. If you don't reg, they will fire you. They will say you aren't making enough calls or some other ruse, but everyone knows it's the regs.

This guy is very level headed. He does not sound like he has an agenda. He is glad that he now has his MBA and looks forward to doing something else. He is going to fax me the email from his supervisor that indicates his salary depends on regs. he will also fax his matrix and other documents he thinks might be of interest. He indicated that I could call back at anytime.

DOE APOL 0661

**Rose, Christine**

| | |
|---|---|
| **From:** | ███████████████████ |
| **Sent:** | Sunday, August 08, 2004 2:01 PM |
| **To:** | ███████████████████ |
| **Cc:** | ███████████████████ |
| **Subject:** | New piece of information |

Hey gang,

I found this binder in my new office at work. It had pages of published "best practices" that UOP puts out to help motivate and assist enrollment in so called "being successful". I think you, as well as Jennifer, will find Gail Cameron, Las Vegas-Nevada, especially interesting. How nice of CORPORATE to date it for us too :)
Now, if we weren't paid based on enrollment, then why ever would CORPORATE publish this article in their "best practices"?

DOE APOL 0662

## JANUARY 1999 ENROLLMENT BEST PRACTICES
### *How I Stay Motivated...*
### *(Things that I Read, Do, Listen To, or Think About)*

**Donn Webb, Jacksonville – Florida (continued):**
Goal Setting...I also like to set my own goals in addition to the ones set by my DOE. For example, by the end of this half I want to be in the top 75 of all enrollment counselors...so I set weekly and monthly goals of what I need to do in order to accomplish this. I keep track of appointments scheduled, the number of actual appointments, the number of apps received and the number of new enrollments. I use an Excel spreadsheet that compares my actual numbers to my projected goals, so I can constantly see if I'm on pace to achieve my goals.

Contests...There's nothing like a contest to keep EC's motivated. We all have that competitive spirit that brings out the best in each of us. A contest amongst your fellow EC's seems to take everyone to the next level.

**Dustin Phillips, UOP Online/South Mountain - Arizona:**
4 KIDS UNDER 5 YRS OLD!

**Ehab Hanna, Henderson Learning Center – Nevada:**
I stay motivated by listening to Selling and Motivational tapes in the car on a regular basis. Also, I read current articles, books, and success stories to make me the best on the job and in my personal life.

**Erika Steinlauf, Tampa – Florida:**
I call an already existing student that I know loves the university, his/her program, and/or me and I chat with them to see how everything is going. This helps me to remember that I am making a difference in people's lives and helps me stay motivated to get back on the phones or back into a cheerful mood and do my job effectively.   :-)

**Gail Cameron, Las Vegas – Nevada:**
I am motivated by counting my new enrollments that have already cleared for the half that I am currently in, then I set the money goal that I want to reach. I figure out how many new enrollments I need for the remainder of the half and then set weekly and daily goals that I need to reach to exceed my income goal. And the more money I earn, the more stock purchases I make which increases my savings in stock options watching this grow keeps me motivated!

**Geli Klimek, Jacksonville – Florida:**
Motivation! We all need it one time or another throughout the day. How do I stay motivated? Here are some of the things I do:

1) MUSIC...This is my favorite motivational technique. The kinds of music that motivate me are upbeat, in a major chord, have some movement going on, but no words (words in music tend to distract me). I even have music CD with subliminal messages regarding self-confidence and getting into action! Believe it or not, my best days (both in meetings and on phones) occur when I listen to that CD!

* Indicates Outstanding Best Practice Winner.

DOE APOL 0663

# Interview memo:  University of Phoenix

**To:**   File

**From:**   Donna Wittman

**Date:**   August 23, 2004, 4:10 pm

**Re:**   Telephone Interview. ███████████ (cell); ██████████ Division

---

███████ was concerned about being fired and spoke on condition of confidentiality.

███████ was hired at UOP ██████████ years ago, ██████████ Previously he had worked in ██████
He wanted to get out of that and enrolled as a student at UOP. A fellow classmate at UOP worked at ██████ and told him about the job. He was hired at $28K. When hired, he does not recall the conversations regarding salary, but in training, UOP told trainees that their salary would be based on their enrollments. Their salary could go to 60-70K with 100 enrollments in the first 8 months. They made it clear that they are paid off the regs and that they only got credit for a reg after the student had attended three classes.

He had his first salary evaluation after 8 months. He had 89-90 enrollments, so his salary went to 50K and he was made an EC2. He started out in the ██████████, but was transferred to the ██████ ███████ after ██ years.

UOP ██████ has increasingly become a sales environment. There is more and more pressure to sell, just like selling cars.

His first manager was ██████████. In his first evaluation, ████ just told him: "You did this many students and so your salary is this. X enrollments is X$.

After his first evaluation, his goal was higher and he did not increase his regs enough to get another promotion. (He explained that "goal" meant number of enrollments and that the "goal" was always set by UOP, not him.) His evaluations after the first only resulted in 1 – 2% raises, very small. Evaluations are based on the year's enrollments, but you must get a certain amount each quarter. If you fail to meet one quarter, but do ok in the other quarters, you start all over.

I asked ████ if his managers ever went over the other factors, like talk time, conversion, etc., the other factors on the form. He laughed and said that those factors, the "soft factors", are only there to make it look good. "These factors do not matter if you get the regs."

He said that they go over the soft skills, but everyone knows that it does not matter. "They don't matter at all if you don't have enough enrollments. You could be the very best on all the other numbers, but if you are not enrolling enough, it does not matter and your salary is only going to be set on the basis of enrollments. Nothing else made a difference."

I asked him why he believed this when the evaluation form has the soft skills on it and they were discussed in some of his evaluations. He said that they always touted those with high regs. On the boards they keep a running total – always regs. They only talk about high performers in terms of enrollments, never any other numbers, such as talk time. They never reward the soft skills. They never say the more talk time, the more money, but they do say the more regs the more money.

DOE APOL 0664

I asked him why UOP has the matrix list soft skills and other numbers, such as talk time. "The matrix was only there to to cover their butt."

He reiterated that it is only the enrollments. Right now, he has been told that since his regs are not enough, unless he gets more soon, his salary is going to be cut by 7% - 9%

Six months ago, they announced that there will be a new performance plan. They did not say what the performance expectations were, but required that they sign an agreement. They said that if you are not at 'meets', you might get a raise. They will based the amount on the salary range, depending on performance, but that salary could also go down. He stated that they are "really shady" because while they said they had this new plan six months ago, they did not tell them the expectations until three months into the plan, that is three months ago. And now he learns, three months from the end of the six month evaluation period, that he will probably get a pay cut because he did not perform up to expectations during the entire six months.

Also, suddenly about two weeks ago they are talking about "talk time". Now the stress is on "talk time". They never did that before.

His current manager is ██████. She replaced ██████ a couple of weeks ago when ██████ was promoted. ██████ now stresses talk time.

██████ believes that UOP will not be around much longer. He sees that the company is on a rapidly accelerating downhill slide. The executives have pulled out so much money and become so greedy so fast. He thinks the stock conversion is all a part of a scheme to hide how badly ██████ is doing.

He kept repeating that management is real shady. He feels they are shady based on the lack of information they give employees. They come up with changing standards and apply them retroactively. They managers meet at least weekly, but communicate little to the employees. There is a real lack of communication and guidance. They treat employees with a complete lack of respect.

██████ indicated that he knows some former employees and others who he will refer to me. I thanked him and also told him that UOP may be having its attorneys trying to find out who we talked to. I told him that he should be absolutely honest but that he is also free to tell them that he does not feel comfortable talking to them without being represented by an attorney and that he does not feel it appropriate that he discuss whether he spoke with any federal official.

██████ is soft-spoken and sometimes difficult to understand due to his rapid speech. He is upset with UOP because he now feels trapped. He is still enrolled as a student but not attending a class right now. He does not want to lose this job until he can find another. He commented that a lot of people are looking for other jobs and want out, but cannot afford to be unemployed. He was cooperative, but upset about the fact that his salary is going to be cut.

**DOE APOL 0665**

## Interview memo:  University of Phoenix

**To:**      File

**From:**  Donna Wittman

**Date:**  August 26, 2004, 4:23 pm

**Re:**      Telephone Interview. ███████ ███████████, ██████ Campus; - *spoke with me on the condition of confidentiality since he fears being fired*

---

███████ emailed me the 2004 matrix and EC Guide.

███████ is in his ███████ at UOP in ██████ Before taking the job, he had graduated from the ████████. He had worked as a ████████, then as ███████████ at ███ His Bachelor's degree is in ███████, but he would like to work in the ████ field.  His is ██████████ and currently living ████████

He found the job at UOP on Monster.com. He thought he was responding to an ad for an academic advisor, but the ad seemed unclear as to what the job entailed. He did not see anything that said the job was sales related, but it mentioned that you must be able to achieve numbers. When he went to the first interview, there were 30 applicants. Six from this group, including himself, were chosen for a second interview. The interview was by the director of enrollment who told them that it was a sales job. He was given a number of questions to answer and required to give a presentation. He was one of two hired from the second interview.

When he was hired, he was told that he was eligible for increases every three months. He was hired under the 'old' plan, the 2003 plan. The manager explained that his pay was for performance. At first, he thought this meant so many calls, applications, and so forth. He had no idea at first that performance was enrollments.

He did not discover that enrollments only established salary until July. No one had said what the minimum numbers were. In July, his manager told him that seven was the requirement for his first month. She explained that they had a "Red-Yellow-Green" system. If you are Green, good. Yellow-caution. And Rd is "you are in trouble". After his first month, his manager told him that he was in the red because he did not get the seven enrollments required. It was then that he was told that he had to get seven every month. It dawned on him after this monthly talk that it is enrollments only, that it was purely a sales job. He also realized that this is not what he wanted. He said that he felt deceived because he wanted to be a counselor, not a salesman.

In the mornings they always have an OSIRA meeting. This is a 15-minute get-together to discuss the day's issues. Today, 8/26/04, the presenter talked about the pay scale. She put up a matrix. His manager said: "you know that this is a numbers game. Your salary increase will be based only on one thing – enrollments."

Since he is under the old plan, he may still be eligible for a bonus. They call it a bonus, but it means a raise. If 21 enrollments in the first quarter, you meet expectations. 22 or above, gives an extra $2K-$5K or more. You could get 40K if you get enough enrollments. He thinks it takes 30 enrollments for 3 months to get $40K.

His training was for two weeks. "The techniques they taught seemed deceiving. They taught us to use emotional sales techniques. Nail 'em. Capitalize on their weakness."

DOE APOL 0666

He recalls one day when he had a conversation with a student, with management listening to him. The student wanted to know the cost for the class. I told the student $1,200. His manager chastised him, and told him to not the student that the cost for the class was $1,200, that he should tell the student that the cost is $332 per credit hour. This seemed deceptive to ▇▇▇▇ He knows of a number of ecs who lie to students to get the enrollment. Lying is widespread. For instance, in August, the end of the fiscal year, there is tremendous pressure to get the numbers up. He heard ecs lying to students who wanted to start in September and tell them that the class they wanted only started in August, not September, knowing that this is a lie.

His old manager, ▇▇▇▇▇▇▇, was very deceptive and encouraged deceptive practices by the ecs. He pushed us to get the enrollment even if the student really was unqualified or ineligible and should be somewhere else.

About 80-90% of the ▇▇▇▇▇ team is unhappy right now. The team is not hitting its goal of 405 enrollments. Most are trying to get a job elsewhere. He wanted to transfer to an academic counselor job, but his manager told him that he would not be eligible for a transfer until his enrollments are up.

Management announced that the new 2004 plan was based on a mutual agreement with the Department. It has to do with overtime. UOP will award overtime based on enrollments and any salary increase will also be based on enrollments.

In June they gave a presentation on the new (2004) plan. They were going to be judged on things like retention. Under the old plan, ecs would get credit for the enrollment if they finished their first calls, five weeks. Under the new plan, a student must stay for two classes. ▇▇▇▇▇feels that they "are just trying to screw the average Joe trying to make a living."

I asked him about the other factors in the matrix, such as communication, judgment, etc. He said that they are tracked on phone calls and so forth and if they don't meet those numbers, such as 60 phone calls per day, they will get reprimanded. But his manager, ▇▇▇▇▇▇▇▇▇, made it clear that the salary will be based on enrollments, not the other factors. This is also clear based on their actions. A fellow ec needed 18 enrollments to her raise. She only got 17 enrollments and got no raise after her first three months. "That told us a lot".

He said that they advise on Financial Aid, but he thinks ▇▇▇▇is the only campus that does. He says he has seen ecs help fill out the FAFSAs for students. He knows that there is a lot of confidential information in the FAFSA and that it is a compliance issue. He says that he will not do that. ECs help fill out FAFSAs for students. It concerns him. ▇▇▇▇ his manager, has said that ECs cannot do this, that it is a compliance issue.

▇▇▇▇▇ Is very unhappy and feels deceived by UOP. He is looking for another job and would like to counsel students.

He stated that he just wants to get the truth out, that while it may sound like it, it is not a case of sour grapes. Many ecs feel as he does, but they stay only because they need to establish a job record or feel they have no alternatives.

He will have his first three-month evaluation in September. It has not been scheduled yet. He said that he is concerned because he only has five enrollments in August. He said that he will call me when he has that evaluation and tell me what happened.

▇▇▇▇▇said that he was very surprised that the Department is pursuing this. There is a well-circulated rumor throughout UOP that UOP has paid the Department to keep this quiet. Everyone knows that the Department has conducted a review and is looking at this issue, but since they are increasing their tactics and bonus system and nothing has been published about it, everyone thinks the Department had to be paid off.

DOE APOL 0667

*Impressions: This is a pleasant young man who is soft-spoken and does not sound angry. He views this job as a mistake on his part and wants to get a job that is positive and where he can feel good about himself.*

DOE APOL 0668

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

4 Park Plaza  Irvine, California 92614-8557
(949) 451-3800
www.gibsondunn.com

KDiulio@gibsondunn.com

June 21, 2007

## VIA EMAIL AND FIRST CLASS MAIL

**Direct Dial**
(949) 451-3907
**Fax No.**
(949) 475-4630

**Client No.**
T 03002-00032

Heather D. Graham-Oliver
Assistant United States Attorney
Department of Justice
555 Fourth St., N.W.
Washington, DC 20530

Re:    *In re Apollo Group, Inc. Securities Litigation, No. 06-558 (D.D.C.)*

Dear Ms. Graham-Oliver:

Pursuant to the April 12, 2007 Joint Agreement and the Court's April 16, 2007 Order, the Department of Education ("Department") has produced its final category two privilege log. Our preliminary review of this log has identified a couple of glaring deficiencies that we hope may be quickly and amicably resolved by the Department, as detailed below.

### Limited Volume of Internal Communications

The Department's category two log lists only 52 emails, 43 of which are dated from August 2003, five from July 2003, three from September 2003 and one email from November 2003. The emails included on the category two log are notable given (1) the small number of emails included on the log, and (2) the fact that there are only four emails after August 2003. The parties have agreed that category two includes: "Internal Department documents concerning the conduct of the program review other than documents in Category 1," while category one is limited to documents "that explicitly seek or provide legal advice."

Department attorney Jennifer Woodward claims that the program review team "communicated virtually on a daily basis during the conduct of the program review and the subsequent writing of the Report." June 12, 2007 Declaration of Jennifer L. Woodward at ¶ 14. Yet this "daily" communication is not reflected in the Department's privilege log.

**GIBSON, DUNN & CRUTCHER LLP**

Heather D. Graham-Oliver
June 21, 2007
Page 2

In fact, the Report drafted by Department employee Donna Wittman was not sent to the Apollo Group, Inc. ("Apollo") until February 6, 2004.  And the documents produced by the Department demonstrate that as late as August 23, *2004*, the program review team was still interviewing witnesses in connection with the program review.  *See* DOE APOL 0664-0668. Based on these facts, it is especially curious that the Department included on its log only *four* emails after August 2003.

In sum, the documents produced by the Department and the testimony from a Department attorney appear to be inconsistent with the Department's claim that only 52 emails have been withheld based on the assertion of privilege.  While certainly some additional emails have been withheld pursuant to category one (communications explicitly seeking or providing legal advice), category one simply cannot account for the *months* of *daily* emails that appear to be missing from the Department's privilege log.

Because of these apparent inconsistencies, Apollo requests that the Department reproduce its category two privilege log to include all internal communications that concern the conduct of the program review and do not explicitly seek or provide legal advice.

## Documents Concerning Communications With Apollo

The category two privilege log contains several emails that reflect communications between representatives of the Department and Apollo.  Specifically, emails 30, 35, and 40 concern the August 22, 2003 "exit interview" between the program review team and Apollo officials, while email 41 concerns a telephone call with Apollo employee Robert Collins.

As we have previously discussed, the contents of the communications made during the August 22, 2003 exit interview are extremely relevant in the securities litigation and the Plaintiff in the securities litigation actively disputes the testimony of the Apollo representatives who attended the meeting.  Accordingly, there is an immense need to obtain any Department documents concerning the communications made during the August 22, 2003 meeting.

Although the Department claims that the deliberative process privilege and attorney work product privilege protect these communications, neither is applicable because these emails appear to concern communications between Department employees and Apollo representatives. *See Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 556 F.2d 242 259-60 (D.C. Cir. 1977) (the deliberative process privilege does not protect communications "with a non-governmental party outside the agency"); *see also Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992).

Although we appreciate the steps taken by the Department to comply with the Joint Agreement and the subpoena issued by Apollo, we request that the Department either produce or include on its privilege log *all* of the internal communications concerning the conduct of the

# GIBSON, DUNN & CRUTCHER LLP

Heather D. Graham-Oliver
June 21, 2007
Page 3

program review that do not explicitly seek or provide legal advice.  Furthermore, we request that the Department produce all documents that concern *communications with Apollo*, including all documents regarding the August 22, 2003 exit interview.  Given the on-going schedule in the securities litigation, we request that the Department respond to these concerns by July 2, 2007.

As always, I appreciate your cooperation.  Please feel free to phone me at your convenience to discuss the issues I have identified.

Very truly yours,

Kristopher P. Diulio

KPD/kpd

cc:    Wayne W. Smith
       Douglas R. Cox
       Joseph P. Busch, III

100245127_1.DOC



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE CHIEF INFORMATION OFFICER

AUG 2 6 2004

Douglas R. Cox, Esquire
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

     Re: FOIA Requests for Program Review Report
     <u>Request Nos. FSA/OIG/OGC-03-5355F; FSA-04-5745F; and FSA-04-5930F</u>

Dear Mr. Cox:

As one of the Freedom of Information Act Officers for the U.S. Department of Education
(Department), I am in receipt of your April 5, 2004 letter to Kent D. Talbert of the
Department's Office of the General Counsel (OGC). Your letter was in response to the
Department's invitation to designate information contained in the Program Review
Report (PRR), which your client, the Apollo Group, Inc. and its subsidiary, the
University of Phoenix (University), considered exempt pursuant to exemption (b)(4) of
the Freedom of Information Act (FOIA). 5 U.S.C. § 552(b)(4). The Department notes
that the process envisioned by Executive Order 12600 limits commentary and/or
objections to the release of information pursuant to FOIA exemption (b)(4). However,
OGC, at your request, has permitted you to raise other objections under the FOIA (5
U.S.C. §§ 552(b)(5) and (b)(7)), not related to Executive Order 12600. The Department
considers the arguments that you have raised under the FOIA (5 U.S.C. §§ 552(b)(5) and
(b)(7)) to be advisory in nature.

Upon review and consideration of your April 5, 2004 letter, the Department has
concluded that FOIA exemption (b)(4) does not support withholding the PRR, either in
whole or in part. The Department has also concluded that your recommended use of
FOIA exemptions (b)(5) and (b)(7) does not support withholding the PRR, either in
whole or in part. However, the Department has concluded that the recruiter/employee
names, titles, hire dates, exit dates and compensation amounts are properly excludable
under exemption (b)(6). 5 U.S.C. § 552(b)(6). The employee names, dates, and
compensation amounts are found at pages 2-4, pages 31-32, Appendix A, and Appendix
B of the PRR.

Pages two (2) through ten (10) of this letter will address your arguments relevant to the
Department's use of FOIA exemption (b)(4) in accord with the Executive Order 12600
process. The remainder of this letter will respond to your advisory recommendations
regarding FOIA exemptions (b)(5) and (b)(7).

Douglas R. Cox, Esquire

## (1)    Program Review Report

As an initial matter, the Department disagrees with your characterization of the PRR as an "interim program review report." In the normal course, the Department does not issue "interim" PRRs, since PRRs identify whatever findings the Department has made as a result of its review of a school's records and systems. The Department does, however, issue "interim" final determination letters when it is able to assess liabilities for only certain findings, and intends to take additional time to conclude other findings. In such cases, the determination letter is clearly marked as "interim." But for purposes of this FOIA analysis, the PRR is a discrete final action; its findings outline the alleged violations detected during the Department's review of the University's administration of its Title IV programs. In essence, the PRR represents a "fixed stop" in an ongoing process of assisting an institution in its efforts to comply with the law. Consequently, we do not consider the PRR to be an "interim" report.

Your April 5, 2004 letter also claimed that the PRR is "flawed and internally inconsistent, and its release would impose massive and unfair harm on Apollo, its shareholders and its employees." However, aside from making broad, conclusory statements, you have not presented a cognizable argument under the FOIA. Section 1099c-1(b) of the Higher Education Act affords an institution the opportunity to correct any administrative, accounting or record-keeping error during the program review process. This opportunity is clearly identified in the cover letter to the PRR when the Department requests that an institution "review and respond" to the findings of the PRR. It is the Department's understanding that your client responded to the PRR on March 19, 2004, April 14, 2004 and May 20, 2004. Consequently, your challenges to the reliability of the PRR were appropriate for those earlier responses.

## (2)    Exemption (b)(4) – Trade Secrets, Commercial or Financial Information

After a review of your redactions to the cover letter and PRR, the Department has concluded that the redactions submitted by the University pursuant to exemption (b)(4) are not sustainable, either in whole or in part.

Exemption 4 of the FOIA protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). In assessing the confidential nature of this information, we first determine whether it was a required or voluntary submission to the Department. The Department has concluded that the information submitted by the University, as contained in the PRR, represents a required submission because it is necessarily gathered and reviewed pursuant to the Department's carrying out of an on-site visit and/or review of an

2

Douglas R. Cox, Esquire

institutional program.[1]  "[T]he overall assessment of an institution's administrative and financial capability is determined by examining an institution's FSA policies, procedures and recordings." The 2001 Program Review Guide, p. I-3. Consequently, when the Department reviews an institution as part of its monitoring functions, the institution must provide the Department with access to certain information so that the Department may carry out an effective and efficient review.  34 CFR 668.24.  Therefore, the information, as contained in the PRR, is a required submission.

Because the Department has concluded that the University's information, as contained in the PRR, was a required submission, the information will be withheld if its release will impair the Department's ability to obtain necessary information in the future, or will cause substantial harm to the competitive position of the person from whom the information was obtained. National Parks & Conservation Ass'n v. Morton, 498 F.2d 756 (D.C. Cir. 1974).  The Department has concluded that release of this information will not impair the Department's ability to obtain necessary information in the future.  As part of the Title IV program review, the Department must gather and analyze institutional data and records, and identify any weakness in the institution's procedures for administering program funds.  The 2001 Program Review Guide, p. I-1  The Department will continue to exercise its authority to obtain such information in the future, notwithstanding the release of the PRR.  Therefore, the matter at issue is whether release of this information will cause substantial harm to the University's competitive position in the marketplace.

In analyzing the "substantial harm to the competitive position" of the submitter, the D.C. Circuit has "emphasized" that the "important point for [the] competitive harm [analysis] in the FOIA context . . . is that it is limited to harm flowing from the affirmative use of proprietary information by competitors" and that this "should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement." Public Citizen Health Research Group v. FDA, et al., 704 F.2d 1280, 1291 (D.C. Cir. 1983) (emphasis added).  In other words, the FOIA cannot protect the University from regular marketplace competition from other for-profit institutions of higher education that compete for students.

Your April 5, 2004 letter outlined two (2) categories of protected information contained in the PRR.  With regard to the first category, "the organizational structure of [the University], the organizational chain of command for recruiters or enrollment counselors, the positions and responsibilities of the various employees involved in the student recruiting process, and the techniques and methodologies used by [the University] to track student enrollments," you stated the following:

---

[1] If the information had been deemed to have been submitted voluntarily, the Department's analysis on the release of the PRR under exemption (b)(4) would be in accord with Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992).

3

Douglas R. Cox, Esquire

> To release to the public this sensitive commercial information would allow Apollo's competitors to: (1) scrutinize Apollo's methodology for recruiting and enrolling students; (2) observe Apollo's marketing and recruiting strategies, including its teaming and staffing techniques; (3) see fairly detailed information about Apollo's organizational structure, its personnel, the functions these personnel perform, and their relation to one another in the organizational chain of command; and (4) otherwise have an "inside look" at how Apollo competes for, attracts, and maintains its students. This category of Protected Information reflects Apollo's approach to run a university system efficiently and effectively. It too, represents ingenuity and originality regarding how to recruit qualified students to the university setting. It is the product of years of experience and its disclosure would seriously undermine Apollo's competitive advantage by allowing competitors to have access to Apollo's ideas, processes, internal structure, and methodologies that they otherwise would not have access to or would have had to spend considerable time and funds to develop on their own.

While you have outlined the harm as stated above, you have not demonstrated in your correspondence how these stated harms would occur with the specific release of this category of information. Demonstration of competitive harm under FOIA exemption (b)(4) requires more than conclusory allegations of harm. See Public Citizen Health Research Group v. FDA, 2000 WL 34262802 (D.D.C. 2000); Public Citizen Health Research Group v. FDA, 185 F.3d 898 (D.C. Cir. 1999); TRIFID Corp. v. NIMA, 10 F.Supp.2d. 1087 (E.D. Mo. 1998). The use of FOIA exemption (b)(4) requires a demonstration of the "specific, credible, and likely reasons" why the release of this category of information would actually result in competitive injury to Apollo. Lee v. FDIC, 923 F.Supp. 451, 455 (U.S.D.C. S.D.NY 1996). More precisely, you have not demonstrated with specificity how the release of "the organizational structure of [the University], the organizational chain of command for recruiters or enrollment counselors, the positions and responsibilities of the various employees involved in the student recruiting process, and, the techniques and methodologies used by [the University] to track student enrollments" and its affirmative use by a competitor would cause substantial harm to Apollo's competitive position amongst the for-profit higher education institutions.

Your April 5, 2004 letter outlined a second category of protected information as "information concerning employee compensation and the manner in which employee compensation is purportedly calculated." You further stated that the release of this information would cause competitive harm because, "to disclose the alleged

4

Douglas R. Cox, Esquire

compensation structures of Apollo's employees would allow competitors to copy Apollo's compensation system and to use their knowledge of Apollo's compensation packages to recruit Apollo employees, many of whom possess significant and valuable institutional knowledge. Thus, Apollo considers its compensation system to involve highly confidential commercial and financial information the disclosure of which would cause substantial harm to Apollo's competitive position."

As an initial matter, the Department notes that you refer to Apollo's employee compensation structure as "alleged." To argue that the release of Apollo's employee compensation structure would cause substantial harm to its competitive position, while also citing its existence as "alleged," is inconsistent. You have not demonstrated how the affirmative use of "information concerning employee compensation and the manner in which employees compensation is purportedly calculated" by a competitor would cause substantial harm to Apollo's competitive position.

You also provided the Department with a copy of the PRR identifying and redacting those sections, which you assert are exempt from disclosure "pursuant to Exemption 4 and the Trade Secrets Act." Below, the Department will address each of your proposed redactions.

**(a)    Redactions to PRR's Cover Letter from Donna Wittman to Todd S. Nelson**

You have redacted the following information:

> This report contains a serious finding regarding the school's substantial breach of its fiduciary duty; specifically that the University of Phoenix (UOP) systematically engages in actions designed to mislead the Department of Education and to evade detection of its improper incentive compensation system for those involved in recruiting activities. The finding of noncompliance is referenced to the applicable regulations, and specifies the action required to comply with the regulations and statutes.

These statements do not contain confidential commercial or financial information. Examples of items regarded as commercial or financial information include: business sales statistics; research data; technical designs; customer and supplier lists; profit and loss data; overhead and operating costs; and information on financial condition." U.S. Dept. of Justice, Office of Information Policy, Freedom of Information Act Guide & Privacy Act Overview (May 2000 ed.) (citing Gulf & Western Indus. v. United States, 615 F.2d 527 (D.C. Cir. 1979) and Consumers Union v. VA, 301 F. Supp. 796 (S.D.N.Y. 1969), appeal dismissed as moot, 436 F.2d 1363 (2d Cir. 1971)). These statements represent a brief synopsis of the Department's findings, and do not represent commercial

5

Douglas R. Cox, Esquire

or financial information envisioned by the FOIA statute.  Moreover, FOIA exemption
(b)(4) requires that the confidential commercial or financial information be obtained from
a person. 5 U.S.C. § 552(b)(4).  The term "person" refers to a wide range of entities,
including corporations. See Nadler v. FDIC, 92 F.3d 93 (2d Cir. 1996).  However, the
information at issue was generated by the federal government, and not "obtained from a
person."  Such information is excluded from exemption (b)(4) protection. See Maydak v.
DOJ, 254 F.Supp.2d, 23 (D.D.C. 2003).  While these statements are based upon
information provided by the University, the conclusions found in these statements are the
Department's conclusions and therefore, were not "obtained from a person."
Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of these
statements.

However, the cover letter does identify the University's D-U-N-S number.  As you may
know, the D-U-N-S number is the number by which an institution can draw down funds
that have been awarded to it by the Department.  The Department has concluded that the
D-U-N-S number is exempt from disclosure under the FOIA pursuant to exemption
(b)(2). 5 U.S.C. § 552(b)(2).  This exemption precludes the disclosure of predominantly
internal matters of a substantial nature, the disclosure of which would risk the
circumvention of a statute or Department regulation.  The Department has concluded that
the release of Apollo's D-U-N-S number would place the Department's financial
databases at risk, thus permitting the potential unauthorized draw down of funds.  The D-
U-N-S number will be redacted from the cover letter as well as on page 2 of the PRR.

### (b)    Table of Contents Redactions

Your redactions encompass the Department's generic statements of the University's
recruiter compensation system.  They also include more detailed statements of the
Department's analysis of the University's recruiter system and statements of the alleged
violations found.  Again, these statements do not contain confidential commercial or
financial information as defined in section 2(a) of this letter.  Consequently, FOIA
exemption (b)(4) cannot be invoked to preclude the release of the Department's generic
statements regarding the University's recruiter compensation system.

### (c)    Redactions at pages 2-4 – "Institutional Review Data Sheet"

You have redacted a chart listing the University's Title IV programs and its advance
system of payment for fiscal years 1999-2003.  This chart outlines the amount of federal
funds Apollo has received in order to support its Title IV program from fiscal year 1999
through fiscal year 2003.  The Department acknowledges that this information can be
considered commercial or financial information under the FOIA to the extent that it
relates to Apollo's operation of its business and possibly impacts its strategy for seeking
out and securing non-federal funds. Public Citizen Health Research Group v. FDA, 704
F.2d 1280, 1290 (D.C. Cir. 1983) (terms of FOIA exemption (b)(4) are to be given their

Douglas R. Cox, Esquire

"ordinary meanings"); see also American Airlines, Inc. v. National Mediation Board, 588
F.2d 863, 870 (2nd Cir. 1978) (citing Getman v. NLRB, 450 F.2d 670, 673 (D.C. Cir.
1971))(information is commercial if in and of itself it serves a commercial function or is
of a commercial nature); Washington Post Co. v. HHS, 690 F.2d 252 (D.C. Cir. 1982)
(information is financial if there is financial interest in it). However, the Department has
concluded that the release of this information would not cause substantial harm to
Apollo's competitive position in the marketplace because it identifies the Title IV
programs for which the University was eligible in fiscal years 1999-2003, and the amount
of funds received under each of those programs. This information does not reveal
anything relative to the University and the operations of its business. As a practical
matter there is a strong public interest in knowing how the Department allocates Title IV
funds to various educational institutions. Consequently, FOIA exemption (b)(4) cannot
be invoked to preclude the release of the chart listing the University's Title IV programs
and its advance system of payment for fiscal years 1999-2003.

You have also redacted a chart of University officials (and their titles) who were
interviewed during the program review at the Phoenix, On-Line, San Jose, San Francisco,
San Mateo, Livermore and Oakland campuses, as well as a notation regarding the
interview of former University employees off-site and employees who chose not to reveal
their identities. Based upon the same standard as cited in section 2(a) of this letter, the
Department has again concluded that this information does not qualify as commercial or
financial information that is excludable pursuant to exemption (b)(4). However, as stated
previously, the Department has concluded that employee names and titles are properly
excludable under exemption (b)(6). 5 U.S.C. § 552(b)(6). FOIA exemption (b)(6)
permits the Department to withhold information about individuals in "personnel and
medical files and similar files" when the disclosure of such information "would constitute
a clearly unwarranted invasion of personal privacy." In determining whether release of
the information would constitute a clearly unwarranted invasion of personal privacy, one
must identify and balance an existing protectible privacy interest against the public
interest in disclosure, if any. In addition, the identifiable public interest must be one that
sheds light on the Department's operations.

In this case, the University employees have a privacy interest in their names and
positions. However, there is also a public interest in knowing how the Department
carries out its obligation under Title IV. More specifically, the public has an interest in
knowing how the Department monitors recipients of Title IV funds for compliance with
the Higher Education Act. The Department has concluded that the University's
employees' privacy interests in their names and positions is outweighed by the public's
interest in knowing how the Department handles its Title IV responsibilities because the
public is interested in knowing that the Department is taking the necessary steps to fulfill
its statutory obligations. The public is not necessarily interested in knowing which
specific person was interviewed for purposes of crafting the PRR. Consequently,

7

Douglas R. Cox, Esquire

exemption (b)(6) is applicable to preclude the release of the names and positions of the
interviewed University employees, current and former.

At the end of page 4 of the PRR, you redacted the following statement:

> The reviewers also interviewed former UOP employees off site as
> well as additional current employees who do no want their identities
> revealed for fear of losing their jobs.

The Department has concluded that this sentence does not contain any confidential
commercial or financial information, and does not identify a protectible privacy interest.
Consequently, this sentence is releasable under the FOIA.

### (d)    Redactions at page 6 – "Section 2.4 Growth of Enrollments & Revenues"

You have redacted portions of a chart which lists the University's total degree students,
on-line students and net revenue for 1991-2003, the University's corporate goal for 2002,
and a statement of the frequency with which the University evaluates its recruiters'
performance and award of salary increases.

Regarding the listing of the University's total degree students, on-line students and net
revenue for 1991-2003, the Department acknowledges that this information can be
considered commercial or financial information according to the standard outlined in
section 2(c) of this letter, i.e. to the extent that it relates to Apollo's operation of its
business and possibly impacts its strategy for seeking out and securing non-federal funds.
However, the Department has concluded that the release of this information would not
cause substantial harm to Apollo's competitive position in the marketplace because it
merely represents the University's growth over a twelve-year period and does not identify
any details as to how Apollo achieved this growth. Consequently, FOIA exemption
(b)(4) cannot be invoked to preclude the release of this information.

Regarding the University's statement of its corporate goal for 2002, "[t]he UOP 2002
corporate goal was '5-5-5': Five Years, Five Million Students and Five Billion Dollars,"
the Department has concluded that the release of this information would not cause harm
to Apollo's competitive position because it is does not reveal any details as to how
Apollo would go about achieving this goal. Moreover, the University's corporate goal is
merely a wish of what it would like to achieve within a five-year period; there is no
guarantee that this goal would be met. Consequently, FOIA exemption (b)(4) cannot be
invoked to preclude the release of this information.

As to the recruiter evaluation information, the Department has concluded that the release
of this information would not cause harm to Apollo's competitive position because it is a

Douglas R. Cox, Esquire

statement of how often the reviews are completed, and does not detail the review process itself. If a competitor were to receive this information, it would be limited to knowing the frequency of reviews, but not to how the frequency of the reviews enabled the University to achieve its success in the marketplace. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (e)    Redactions at pages 6-7 – "Section 3 Scope of Review"

You have redacted the following information:

> During the visit, areas of non-compliance were noted. The finding of
> non-compliance is referenced to the applicable regulations. The
> finding specifies the actions to be taken by UOP to bring operations
> of the financial aid programs into compliance with governing
> authority.

The Department has concluded that while these statements may arguably qualify as confidential commercial or financial information, FOIA exemption (b)(4) will not preclude their release. As stated under the standard outlined in Section 2(a) of this letter, these findings are Department-generated conclusions. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (f)    Redactions at pages 7-27 – "Section Findings & Requirements"

You have redacted the Department's statement of the facts resulting from the program review and investigation, including statements of those interviewed. These findings include: the University's promises of substantial compensation when hiring recruiters; recruiter training/motivational methods and success measures; tracking recruiter commissionable sales and sales performance; accounts of current and former University employees; recruiter evaluation system; bonus incentive plans; use of Title IV funds; and alleged violations found by the Department.

As detailed under the standard outlined in section 2(c) of this letter, the Department acknowledges that this information can be considered commercial or financial information under the FOIA to the extent that it relates to Apollo's operation of its business. However, the Department has concluded that the release of this information would not cause substantial harm to Apollo's competitive position in the marketplace because the information generally discusses the University's business practices, and details the factual information gathered by the Department during its site visit related to the alleged specific regulatory violations identified in the PRR. The detailed information describes conduct that would not be acceptable by similar institutions participating in the federal student aid programs, and no competitive harm would be expected to arise from releasing such information. Release of the PRR is not likely to result in such injury as to

9

Douglas R. Cox, Esquire

preclude the University from being able to compete for future students in the for-profit higher education market. See Martin Marietta Corp. v. Dalton, 974 F.Supp. 37, 38, 40 (D.D.C. 1997) ("neither the revelation of cost and pricing data nor proprietary management strategies were likely to result in egregious injury as to disable [submitter from being] effective competitor").

You also redacted the following statement:

> The actions of UOP and the system it has established cultivates and maintains a corporate culture in defiance of UOP's fiduciary duty. UOP has created an environment that puts the strong motivation of individual gain against its fiduciary duty to the Department. It is one that flaunts the Department's regulations and the prohibition against incentive compensation based on enrollments.

The Department has concluded that while these statements may arguably qualify as confidential commercial or financial information, FOIA exemption (b)(4) will not preclude their release. As stated under the standard outlined in Section 2(a) of this letter, these findings are Department-generated conclusions. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (g)    Redactions at p. 30 – "Section 7 Requirements"

You have redacted the following statement:

> In response to this [PRR], UOP is required to make substantial and comprehensive changes to the salary compensation system for its recruiters and their direct supervisors.

You also redacted three (3) bullet items outlining specific documents and information that the Department seeks. In accord with the standard outlined in section 2(a) above, the findings and requirements were developed by the Department, and thus not obtained from a person. Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

### (h)    Redactions at pages 31-32 – "Section 7 Requirements: Documents and Information to Be Provided"

In response to the PRR, the Department outlined several items of information for the University to supply. You have redacted information from paragraphs 3-10 of this section. In accord with the standard outlined in section 2(a) above, the findings and requirements were developed by the Department, and thus not obtained from a person.

10

Douglas R. Cox, Esquire

Consequently, FOIA exemption (b)(4) cannot be invoked to preclude the release of this information.

However, in paragraph eight (8) of this section, the Department identified twelve (12) employees for whom the University must supply personnel files in response to the PRR. These employees are identified in a chart that lists their names, lump sum compensation amounts, and the dates that the compensation was received. In accord with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (i)    Redactions – "Appendix A: List of Recruiters Identified in Report"

You redacted recruiter names and hire dates. In accord with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (i)    Redactions – "Appendix B: List of Employees for Whom Personnel Records are to be Provided"

You redacted recruiter names, hire dates, and exit dates. In accordance with the standard outlined in section 2(c) above, the Department has concluded that information to be properly excludable under FOIA exemption (b)(6) relating to personal privacy. 5 U.S.C. § 552(b)(6).

### (3)    Exemption (b)(5) – Inter-agency or Intra-agency Memorandums or Letters, and the Deliberative Process Privilege

FOIA exemption (b)(5) covers "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). While neither expanding nor creating new privileges, exemption (b)(5) incorporates all civil discovery privileges, including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege. Your recommendations have been made pursuant to the deliberative process privilege of exemption (b)(5). The purpose of the privilege is to allow agency officials to engage in frank and open discussions of issues, and to express their views, opinions and recommendations without the fear or restraint of outside pressure. In order for the privilege to be invoked, the information at issue must be both pre-decisional (coming before the adoption of an agency policy), and deliberative (a direct part of the deliberative process such that the information makes suggestions, or recommendations, or provides opinions on legal or policy matters).

11

Douglas R. Cox, Esquire

As an initial matter, the PRR must meet the threshold requirement of an inter-agency or
intra-agency communication. More precisely, the communication would have to occur
either among individuals of the Department or between individuals of the Department
and another federal agency. However, the courts have expanded this threshold
requirement to include outside consultants who are sometimes both practical and
necessary for an agency to render a policy decision. See Dunns v. Bureau of Prisons, 804
F.2d 701 (D.C. Cir.), cert. granted, judgment vacated on other grounds & remanded, 486
U.S. 1029 (1988). This exemption does not extend to those who are seeking a benefit
from the Department to the detriment of others such as lobbyists or self-advocates.
Department of the Interior v. Klamath Water Users protective Ass'n, 532 U.S. 1 (2001).
In Klamath, several Native American tribes exchanged communications expressing their
views regarding decisions that the Department of Interior would have to make regarding
water allocation in the Klamath River Basin. The Native American tribes not only
expressed their own interests, but also were seeking the government to act in favor of
those interests. The Supreme Court held that the Native American tribes did not qualify
as outside consultants to the Department of Interior, stating "the Tribes are self-advocates
at the expense of others seeking benefits inadequate to satisfy everyone." Id. at 12.

The Department has concluded that the PRR does not meet this threshold requirement,
and thus, FOIA exemption (b)(5) does not preclude release of this information. In this
case, the PRR was created as a result of the Department's routine monitoring of the Title
IV Federal Student Financial Assistance programs administered by the University. The
PRR was not created for the purposes of the Department receiving advice or consultative
services from your client in order to render a policy decision. Rather, the PRR
specifically states that its intent is to advise the institution of the findings made as a result
of the program review. Moreover, the goal of the PRR is to open up a dialogue between
the Department and the University such that the findings of the PRR can be resolved; this
characterizes the University as a lobbyist or self-advocate, rather than a consultant, and
thus, the deliberative process privilege of exemption (b)(5) would not apply to preclude
release of the PRR.

Assuming arguendo that the University did meet the threshold requirement of exemption
(b)(5), the Department has concluded that the document itself is neither pre-decisional
nor deliberative. As stated in the Department's Program Review Guide, "[t]he program
review report is the official [Department] notification to the institution of the findings
discovered during the on-site visit. The report lists the regulatory and statutory findings
and establishes a prima facie case. The report also specifies required corrective actions,
including a time frame for institutional response." The 2001 Program Review Guide, p.
IX-1. Although the program review process envisions a dialogue between the
Department and the institution to resolve shortcomings identified in the PRR, and which
will ultimately be resolved with the Department, the PRR itself is a final document within
the program review process. It outlines the Department's position as a result of the

12

Douglas R. Cox, Esquire

program review. It notes, as appropriate, that an institution has or has not breached its fiduciary duties under Title IV, and outlines necessary corrective action(s). While the Department provides the institution with notice and an opportunity to comment, those comments are not submitted with the idea that a new PRR will be issued.

Consequently, the Department has concluded that FOIA exemption (b)(5) does not preclude the release of the PRR, either in whole or in part.

#### (4)    Exemption (b)(7) – Information Compiled for Law Enforcement Purposes

Your letter of April 5, 2004 also relied upon FOIA exemptions (b)(7)(A), (b)(7)(B) and (b)(7)(C) to preclude release of the PRR. Exemption 7 of the FOIA, as amended, protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, [and] (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(7)(A), (b)(7)(B) and (b)(7)(C). The Department has concluded that exemption (b)(7) does not preclude the release of the PRR, either in whole or in part, for the reasons set for the below.

##### (a)    Exemption (b)(7) Threshold Requirement

As a threshold matter, exemption (b)(7) places the burden of proof upon the agency to demonstrate that the record in question was compiled for a law enforcement purpose. Quiñon v. FBI, 86 F.3d 1222 (D.C. Cir. 1996). The Department disagrees with your characterization that the PRR was compiled for a law enforcement purpose. Contrary to your conclusion, the PRR is a Congressionally mandated tool used by the Department to carry out its responsibilities under the Higher Education Act. The 2001 Program Review Guide, p. i. The PRR is one of many tools used by the Department in an effort to strike a balance between assisting schools in improving compliance through the development of corrective action plans and assessing liabilities resulting from non-compliance. Id. Even if the Department were to agree that the PRR was compiled for a law enforcement purpose (which it does not), the Department would still find that the specific subsections of exemption (b)(7) are not applicable to preclude the PRR's release, as discussed below.

##### (b)    Exemption (b)(7)(A) - Interfere with Enforcement Proceedings

With respect to exemption (b)(7)(A), there is no evidence that release of the PRR could interfere with enforcement proceedings. You have stated that release of the PRR "may hinder or interfere with the Department's review – and with Apollo's and its employees due process rights within that review." As stated earlier, the PRR represents a fixed stop

Douglas R. Cox, Esquire

in an ongoing process. A site visit occurred, and findings were thereafter made on the visit. The PRR does not reveal the scope, direction or nature of any further action that the Department may take regarding the University. In fact, the cover letter to the PRR specifically requests the University "review and respond to the report, indicating the corrective actions taken." At most, the PRR envisions a response from the University and that response serves as a catalyst for further discussion. There is no way for the Department to determine whether it will or will not engage in an enforcement proceeding without knowing the University's response to the PRR. Additionally, we recognize and acknowledge your concern that release of the PRR "could increase the likelihood that *qui tam* relators or other members of the public, such as the media or corporate watchdog groups, would interfere with, threaten, or taint the testimony of, Apollo personnel identified in the [PRR] by virtue of their titles, positions, or job responsibilities." However, and as previously stated in section 2(c) above, it is the Department's position that those interests are privacy concerns to the University personnel, and in order to protect those interests such information would be redacted pursuant to exemption (b)(6). This information appears on pages 2-4, pages 31-32, Appendix A: List of Recruiters Identified in Report and Appendix B: List of Employees for Whom Personnel Records are to be Provided.

### (c)    Exemption (b)(7)(B) - Deprive a Person of a Right to a Fair Trial or an Impartial Adjudication

With respect to exemption (b)(7)(B), there is no evidence to suggest that any individual University employee would be deprived of the right to a fair trial or impartial adjudication. The PRR merely identifies the Department's findings.

### (d)    Exemption (b)(7)(C) - Expected to Constitute an Unwarranted Invasion of Personal Privacy

With respect to exemption (b)(7)(C), the Department has concluded that this exemption does not preclude release of the PRR. The Department agrees that the University employees identified in the PRR have a privacy interest in their names, titles, hire date, exit date and compensation amounts; however, these privacy interests are protected under exemption (b)(6) of the FOIA. Consequently, University employee names, titles, hire dates, exit dates and compensation amounts as they appear on pages 2-4, pages 31-32, Appendix A: List of Recruiters Identified in Report and Appendix B: List of Employees for Whom Personnel Records are to be Provided will be redacted pursuant to FOIA exemption (b)(6).

Douglas R. Cox, Esquire

### (5)     Request for all FOIA Requests Seeking Access to the PRR

At the conclusion of your letter, you asked for "copies of all FOIA requests received by the Department seeking access to the [PRR]." Enclosed please find copies of the FOIA requests we have received for the University's PRR.

### (6)     Conclusion

In sum, the Department disagrees with your conclusions that FOIA exemptions (b)(4), (b)(5) and (b)(7) preclude release of the University's PRR. The Department intends to release the University's PRR to the requesters no later than five working days from the date of this letter, September 2, 2004.

The Department has concluded that the employee/recruiter names, titles, hire dates, exit dates and compensation amounts are properly excludable pursuant to FOIA exemption (b)(6), and this information will be redacted from the PRR. This information is found at pages 2-4, pages 31-32, Appendix A: List of Recruiters Identified in Report and Appendix B: List of Employees for Whom Personnel Records are to be Provided.

The Department has also concluded the University's D-U-N-S number will be redacted from the cover letter and page 2 of the PRR pursuant to exemption (b)(2). To further assist you, we have provided a copy of the PRR in the form in which it will be released to the requesters.

Sincerely,

Jeanne Van Vlandren
Freedom of Information Act Officer
OCIO/RIMG


cc:     Kent D. Talbert, Esq. (OGC)
cc:     Jonathan A. Vogel, Esq. (OGC)

Todd S. Nelson, President
Apollo Group, Inc., Parent Company
University of Phoenix
4615 East Elwood Street
Phoenix, Arizona  85040

RE:    PROGRAM REVIEW REPORT
Program Review August 18 through August 22, 2003
University of Phoenix, OPEID 020988 00
PRCN:    200340922254
TIN:    860344364 / DUNS: 089306492

Dear Mr. Nelson:

On August 18, 2003 through August 22, 2003, a program review was conducted of the Title IV Federal Student Financial Assistance programs administered at your institution.  The findings of that review are presented in the enclosed report.

This report contains a serious finding regarding the school's substantial breach of its fiduciary duty; specifically that the University of Phoenix (UOP) systemically engages in actions designed to mislead the Department of Education and to evade detection of its improper incentive compensation system for those involved in recruiting activities.  The finding of non-compliance is referenced to the applicable regulations, and specifies the action required to comply with the regulations and statutes.

Please review and respond to the report, indicating the corrective actions taken by UOP.  Your response should be sent directly to me **within 45 days**.  So that I can easily identify your program review response, please use the Program Review Control Number (PRCN) as shown above **(PRCN 200340922254).**

If you have any questions concerning the report, please call our office at (415) 556-4291.

Sincerely,


Donna M. Wittman
Institutional Review Specialist
Southwest Case Management Division
Institutional Participation and Oversight Service

Enc.
cc:    James S. Castress, Area Case Director
       Linda Henderson, Co-Team Leader
       Susan Crim, Administrative Actions and Appeals Division, Kansas City Case Management Team
       Martina Fernandez-Rosario, Program Review Specialist, San Francisco Case Management Team
       Shane Dunne, Program Review Specialist, San Francisco Case Management Team
       Steve Hansen, Program Review Team Leader
       David Bergeron, Department of Education Distance Learning Demonstration Project
       North Central Association of Colleges and Schools



**UNITED STATES DEPARTMENT OF EDUCATION**
Student Financial Assistance
Schools Channel / Case Management & Oversight
Case Management Team, Southwest-San Francisco Team
50 United Nations Plaza, Suite 266
San Francisco, California 94102-4987
Voice: (415) 556-4295 FAX: (415) 437-8206

# PROGRAM REVIEW REPORT
## PRCN 200340922254
## University of Phoenix, OPEID 020988 00
## Site Visit of 8/18/2003 – 8/22/2003

**PROGRAM REVIEW REPORT / PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
**Program Review, 8/18/2003 – 8/22/2003**

## TABLE OF CONTENTS

1   INSTITUTIONAL REVIEW DATA SHEET .................................................. 2

2   BACKGROUND ........................................................................................ 5

    2.1   *Entity* ............................................................................................ 5

    2.2   *Programs* ..................................................................................... 5

    2.3   *Admission Standards.* .................................................................. 5

    2.4   *Growth of Enrollments & Revenues* ............................................ 6

3   SCOPE OF REVIEW ............................................................................... 6

4   DISCLAIMER ........................................................................................... 7

5   FINDINGS AND REQUIREMENTS .......................................................... 7

    5.1   *Recruiter Compensation System* ................................................. 7

       5.1.1   When Hiring Recruiters, UOP Promises Substantial Compensation ............ 7

       5.1.2   UOP Student Recruiting System – Focus on the Numbers ........................ 8

          5.1.2.1   Sales Training – "Smoke & Mirrors" .................................... 8

          5.1.2.2   Tracking Commissionable Sales and Sales Performance ........ 11

          5.1.2.3   UOP's Aggressive Sales Motivation System ......................... 12

          5.1.2.4   Intimidation Techniques ..................................................... 15

       5.1.3   Recruiter Evaluation System Reinforces & Ranks the Quantitative ............ 17

       5.1.4   Salaries Actually Based on Quantity of Recruiting Activities ..................... 20

    5.2   *Bonus Incentives Awarded on Basis of Success in Securing Enrollments and Quantity of Recruiting Activities* ................................................ 22

       5.2.1   Sperling Club Trip Awards ..................................................................... 22

       5.2.2   Prizes, Gifts and Bonuses ..................................................................... 23

    5.3   *Ramifications / Results of System in Practice* ............................. 24

       5.3.1   Pressure to Enroll Unqualified Students ................................................. 24

       5.3.2   Focus on Obtaining Credit for Enrollment, Not Completing Education ....... 24

       5.3.3   Intense use of TItleIV Funds as Sales Tool / Culture of Duplicity ............. 25

    5.4   *Conclusion: UOP Violated Incentive Compensation Prohibitions and Breached its Ffiduciary Duty* .......................................................... 25

       5.4.1   Deceptive Practices to Mislead Department ........................................... 25

       5.4.2   Cover Up During Review ........................................................................ 26

6   REFERENCES ...................................................................................... 27

7   REQUIREMENTS .................................................................................. 30

Appendix A:   List of Recruiters identified in Report
Appendix B:   List of Employees for Whom Personnel Records are to be Provided

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 2

## 1   INSTITUTIONAL REVIEW DATA SHEET

| Institutional Data | |
|---|---|
| OPE ID#: | 020988 00 |
| EIN: | 860344364 |
| DUNS: | 089306492 |
| PPA | Full Certification; Expiration Date:  June 30, 2007 |
| TYPE AND CONTROL: | Proprietary For-Profit |
| ACCREDITATION: | North Central Association of Colleges & Schools |

| Cohort Default Rates | 1999 – 4.6% | 2000 – 5.2% | 2001 – 5.8% |
|---|---|---|---|

**University of Phoenix Advance System of Payment**

| Title IV Program | FY 1999 | FY 2000 | FY 2001 | FY 2002 | FY 2003 |
|---|---|---|---|---|---|
| Federal Pell Grant | 11,129,538 | 10,178,395 | 28,394,739 | 51,322,322 | 62,215,646 |
| Federal Direct Loan Programs | 0 | 0 | 0 | 0 | 0 |
| Federal Family Educational Loans | 327,196,185 | 369,067,501 | 486,925,511 | 758,572,984 | 804,578,572 |
| SEOG | 0 | 0 | 21,200 | 1,776,584 | 1,230,889 |
| Perkins Loan | 0 | 0 | 40,000 | 759,000 | 642,000 |
| FWS | 0 | 0 | 0 | 0 | 0 |
| Total | 338,325,723 | 379,245,896 | 515,381,450 | 812,430,890 | 868,667,107 |

| Program Review Data | |
|---|---|
| DATES OF REVIEW: | August 18 –22, 2003 |
| ED REVIEWERS | Donna Wittman, Martina Fernandez-Rosario and Shane Dunne, Southwest Case Management Team; Susan Crim, Kansas City Case Management Team |
| SCOPE OF REVIEW: | Fiscal Records / Enrollment Counselor Compensation Documentation, August 1, 1998 through August 22, 2003 |
| **Corporate Institutional Officials Interviewed** | |
| Todd S. Nelson | President and CEO, Apollo Group, Inc. |
| Kenda B. Gonzales | Chief Financial Officer, Apollo Group, Inc. |
| Bob Collins | Vice President of Student Financial Aid, Apollo Group, Inc. |
| Diane L. Thompson, Esq. | Vice President, Human Resources, Apollo Group, Inc. |
| Bill Brebaugh | Senior Vice President, Enrollment, Apollo Group, Inc. |
| Beverly Young | Corporate Operations Manager, University of Phoenix |
| Heather Cornell | Director of Learning/New Product Development |
| Seth Dosick | Senior Training Manager, Corporate Enrollment, University of Phoenix |
| **Phoenix Campus Officials Interviewed** | |
| Melinda Fernandez | Nursing Enrollment Counselor |

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 3

| | |
|---|---|
| Cylisha Willis | Enrollment Counselor in Training, Certificate Programs |
| Alison Andersen | Enrollment Counselor |
| Jacqueline Laone | Enrollment Counselor |
| **On-Line Campus Officials Interviewed on Site** | |
| Brian Mueller | Chief Executive Officer and Vice President |
| Aaron Wettstein | Director of Admissions, East Coast Division, On-Line Campus |
| Susan Franceschi | Enrollment Manager, East Coast Division, On-Line Campus |
| Craig Lewandowski | Enrollment Counselor, East Coast Division, On-Line Campus |
| Mathew Kuhnau | Enrollment Counselor, East Coast Division, On-Line Campus |
| Dawn Donatoni | Enrollment Counselor, On-Line Campus |
| David Charnock | Enrollment Counselor, On-Line Campus |
| Charles Hansen | Enrollment Counselor, On-Line Campus |
| Felicia Wilbon | Financial Aid Specialist, East Coast Division, On-Line Campus |
| **San Jose Campus Officials Interviewed on Site** | |
| Ann Tye | Associate Director of Enrollment |
| Tamara Garcia | Admissions Manager -- San Jose Campus |
| Robert Jacobs | Enrollment Counselor I |
| Charlotte Gould | Enrollment Counselor I |
| Teresa Salazar | Enrollment Counselor II |
| Rebecca Mackover | Enrollment Counselor I |
| Kathy Schorsch | Enrollment Counselor II |
| Jenny Khan | Enrollment Counselor I |
| Fifi Guibegna | Marketing Coordinator |
| Mary Hendow | Senior Enrollment Counselor |
| Rashida Mirza | Enrollment Counselor I |
| Tamara Nasser | Enrollment Counselor |
| Nada Kegley | Enrollment Counselor I |
| Neale Marquez | Enrollment Counselor |
| **San Francisco Campus Officials Interviewed on Site** | |
| Don Rose | Enrollment Counselor |
| James Wojtak | Enrollment Counselor |
| Mike McKay | Admissions Manager -- San Jose |
| Melanie Enriquez | Marketing Coordinator |
| Suzanne Osbourne | Enrollment Counselor |

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 4

| San Mateo Campus Officials Interviewed on Site | |
|---|---|
| Julie Albertson | Senior Enrollment Counselor |
| Shawn Watson | Enrollment Counselor I |
| **Livermore Campus Officials Interviewed on Site** | |
| Marci Miller | Admissions Manager - Flex Net Program |
| Lisa Wayne | Admissions Manager – Admissions Manager - Livermore |
| Karoline Motola | Marketing Support Coordinator |
| Konstanze Salenga | Enrollment Counselor II |
| Melissa Epperson | Enrollment Counselor II |
| Shannon Bartz | Enrollment Counselor I |
| Victoria Fields | Enrollment Counselor I |
| Daniel Waterman | Vice President/ Director – Northern CA Region |
| Brent Silveria | Enrollment Counselor I – Flex Net |
| Lisa Martinez | Marketing Coordinator |
| Julie O'Farrell | Enrollment Counselor I – Flex Net |
| Karen Phuong | Enrollment Counselor I – Flex Net |
| Tim Gruber | Director of Enrollment – Northern CA |
| **Oakland Campus Officials Interviewed on Site** | |
| Mary Barilovits | Enrollment Counselor |
| Michelle Chinello | Enrollment Counselor |
| Laura Wallace | Admissions Manager – Oakland Campus |
| Alicia Naval | Enrollment Counselor |
| Leah Johnson | Enrollment Counselor |
| Sheri Catalano | Enrollment Counselor |
| Sheri Preston | Marketing Coordinator |

The reviewers also interviewed former UOP employees off site as well as additional current employees who do not want their identities revealed for fear of losing their jobs.

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 5

I.    *INTRODUCTION*

Section 487(a)(20) of Title IV of the Higher Education Act of 1965, as amended (HEA), 20 U.S.C. §1094(a)(20), prohibits the payment of any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments.

2    **BACKGROUND**

2.1    *Entity*

The University of Phoenix (UOP) was established in 1976 by John Sperling to provide higher education to working adults. In 1981, Mr. Sperling incorporated Apollo Group, Inc. (Apollo), now the parent corporation of The University of Phoenix, Inc. Apollo Group, Inc. operates through its subsidiaries, The University of Phoenix; Institute for Professional Development; The College for Financial Planning Institute Corporation; and Western International University, Inc. As of August 31, 2002, UOP operated at 176 locations in 37 states, Puerto Rico and Canada. In its 2002 Annual Report, Apollo boasted that it was the largest private provider of higher education in the United States. Id.

In the early 1990s, UOP issued an initial public offering (IPO). Its debut on the public stock market yielded an infusion of over $34 million in December 1994, and Apollo doubling its total enrollments between 1998 and 2002. Its growth fueled its stock price, resulting in a share of stock – priced at $0.72 at its initial public offering (adjusted for stock splits) – selling at $63.36 by the close of its 2003 fiscal year, August 31, 2003.

In October 2000, Apollo issued another class of stock to track the economic performance of its online division. University of Phoenix Online (UOPX). UOPX stock initially selling at $6.98 per share, sold for $64.50 per share as of the close of the 2003 fiscal year.

2.2    *Programs*

UOP offers degree programs and related areas of specialization, including Associate of Arts in General Studies, Bachelor of Science in Business, Bachelor of Science in Criminal Justice Administration, Bachelor of Science in Human Services, Bachelor of Science in Health Care Services and Bachelor of Science in Information Technology. UOP also offers Master of Arts in Education, Organizational Management, Business Administration, Counseling and Nursing. It also offers continuing education for teachers, custom training for corporations and various certificate programs.

In 1993, UOP began offering distance education (On Line programs) and in 2001, UOP was admitted to the Department's Distance Education Demonstration Program as part of the second cohort of participants. UOP refers to its on line operation as the On Line Campus. The On Line Campus operation is located in Phoenix, Arizona.

2.3    *Admission Standards.*

Historically, UOP required students to be 23 years of age and have at least two years of practical work experience and described its mission as the provision of "current, real-world education" to working adults. As of approximately two years ago, however, UOP lowered the age requirement to 21 and eliminated the work experience requirement.

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 6

### 2.4   Growth of Enrollments & Revenues

Apollo's total degreed enrollments in 1991 of 17,571 grew to 200,100 in 2003.  Revenues grew correspondingly, from $69 million in 1991 to $1.3 billion in 2003.  The On Line operation, UOPX, began slowly in 1993, but began mushrooming in 2000.  On Line students numbered only 1,114 in 1993, but grew to 79,400 by 2003.  The following chart depicts the enrollment, revenues and stock price history of both Apollo (APOL) and the On Line tracking stock, UOPX:

| Year | Total Deg Students | On Line Students | Net Revenue | APOL Stock $* | UOPX Stock $ |
|------|-----|-----|------|------|------|
| 1991 | 17,571 | | $ 68,782,000 | | |
| 1992 | 21,163 | | $ 81,865,000 | | |
| 1993 | 24,987 | 1,114 | $ 97,545,000 | | |
| 1994 | 30,200 | 1,600 | $ 12,472,000 | $ 0.72 | |
| 1995 | 36,848 | 2,400 | $ 163,429,000 | $ 2.63 | |
| 1996 | 46,935 | 3,700 | $ 214,275,000 | $ 7.56 | |
| 1997 | 57,382 | 4,660 | $ 279,195,000 | $ 10.57 | |
| 1998 | 71,400 | 7,200 | $ 384,877,000 | $ 15.22 | |
| 1999 | 86,800 | 10,700 | $ 496,846,000 | $ 9.75 | |
| 2000 | 100,900 | 16,000 | $ 609,997,000 | $ 18.14 | $ 6.98 |
| 2001 | 124,800 | 29,200 | $ 769,474,000 | $ 26.25 | $ 21.00 |
| 2002 | 157,800 | 49,900 | $ 1,009,455,000 | $ 41.83 | $ 28.78 |
| 2003 | 200,100 | 79,400 | $ 1,340,000,000 | $ 63.36 | $ 64.50 |

\* Stock price adjusted for stock splits.  Source:  Annual Reports Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K), from 1996 through 2002.

Apollo's past aggressive growth is magnified in its goals for the future.  The UOP 2002 corporate goal was "5-5-5":  Five Years, Five Million Students and Five Billion Dollars.

The dynamics of public ownership, expectations of investors and lucrative stock options to UOP officers are integral aspects of the UOP system.  Employees at every level are made aware of the importance of meeting the enrollment numbers and revenue expectations of Wall Street on a quarterly basis.  For recruiters of students, UOP stresses the enrollment numbers on a daily, weekly, monthly and quarterly basis.  UOP evaluates its recruiters' performances and provides for salary increases following initial recruiter training, with annual salary evaluations thereafter (at the end of each fiscal year).[1]

## 3   SCOPE OF REVIEW

A program review was conducted of UOP on August 18, 2003 through August 22, 2003 to determine UOP's compliance with §487(a)(20) of the Higher Education Act of 1965, as amended, 20 U.S.C. §§1070, et seq. (HEA) and 34 C.F.R. §668.14(b)(22).  The review consisted of, but was not limited to, an examination of UOP's policies and procedures regarding

---

[1] Until the 2000 Fiscal Year, UOP reviewed the salaries of its recruiters every six months, with salary to be adjusted up or down depending on the recruiters' performance.  The Admissions Counselor Policy Guides provide only for annual salary evaluations thereafter and do not mention the reduction of salary.  UOP's Admissions Counselor Policy Manuals also provide that in addition to these standard salary reviews for recruiters, a salary evaluation is performed after initial training.

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 7

admissions practices and recruiters' compensation.  The reviewers examined the pertinent forms, policies and procedures and personnel documentation at UOP relating to Title IV administration, and conducted interviews with appropriate institutional personnel.

Prior to arrival at UOP, notice of the program review was provided by telephone and fax.

The on-site review encompassed visits to Apollo corporate headquarters, the Phoenix Campus, the Online Campus as well as five campuses in UOP's Northern California Division – Oakland, San Jose, San Francisco, Pleasanton and Livermore.

During the visit, areas of non-compliance were noted.  The finding of non-compliance is referenced to the applicable regulations.  The finding specifies the actions to be taken by UOP to bring operations of the financial aid programs into compliance with governing authority.

## 4    DISCLAIMER

This program review was focused and thorough with regard to the issues of concern.  It cannot be assumed to be all-inclusive.  The absence of statements in the report concerning specific practices and procedures of UOP must not be construed as acceptance, approval or endorsement of those specific practices and procedures.  Furthermore, it does not relieve UOP of its obligation to comply with all of the statutory or regulatory provisions governing the Title IV programs.

## 5    FINDINGS AND REQUIREMENTS

## FINDING #1:  Use of Incentive Compensation Based on Enrollments for Those Involved in Recruiting or Admission Activities in Violation of Title IV Requirements

### 5.1    *Recruiter Compensation System*

#### 5.1.1    When Hiring Recruiters, UOP Promises Substantial Compensation

The reviewers interviewed more than 60 present and former recruiters of students (called "enrollment counselors" by UOP) prior to, during and after the site visit.  While on site, the reviewers asked specifically to speak to those involved in enrolling students, both "on ground" as well as "on line."  UOP officials chose certain recruiters to be interviewed.  The reviewers also, however, randomly chose other recruiters, and interviewed those referred by other UOP employees.

Most of the recruiters said that when hired, UOP told them that the job had tremendous financial potential, and that they "could make a lot of money."  UOP promised to double or triple their salary in three to six months if they successfully perform their duties.  Many of the employees left a higher paying job to work for UOP because of the promise of the increase in salary in such a short period of time.

Drawn by the lure of a large salary potential, UOP employees in other positions transfer to jobs as recruiters.  In particular, a number of academic counselors and advisors transferred to the higher paying recruiter position.  Had these academic advisors not transferred to a recruiting position, they knew that their salary would not only be lower, but that annual salary increases would be minimal, generally only 2-8%.

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 8

UOP's recruiters soon find out that UOP bases their salaries solely on the number of students they enroll.

### 5.1.2    UOP Student Recruiting System – Focus on the Numbers

#### 5.1.2.1    *Sales Training – "Smoke & Mirrors"*

UOP considers recruiters to be "counselors in training" or "freshmen" for their first 13 weeks of employment. During this time, they receive on-the-job training at the location at which they work. Soon after being hired, recruiters attend a one-week "Sales Academy" provided by regional and corporate management at the regional office. The Admissions Counselor Policy Guide for Admissions Managers and Directors of Enrollment considers this 13 week-period to be a "developmental program." Employees learn the system for tracking leads, contacts, appointments, enrollments and other recruiting activities, such as the conversion of an appointment to an application. At the Sales Academy, recruiters learn sales tactics designed to pique the interest of potential students through the progression of enrollment activities, such as probing need, fostering trust, creating urgency and overcoming objections. These sales lessons are reinforced by one-on-one instruction at the school location. Recruiters also receive an orientation in the UOP methodology and history, learn about the programs of UOP and the UOP model of providing educational programs for working adults.

Recruiters are oriented to the personnel policies of UOP and are provided an Enrollment Counselor Policy Guide. Updated annually, the Guide details the recruiter salary levels, evaluation procedures, and rules pertaining to the crediting of enrollments to recruiters for purposes of recruiters' performance. The Guide for 2002 establishes the following salary levels:

| | |
|---|---|
| Freshman Admissions Counselor | $26,000 - $36,000 |
| Admissions Counselor I (ECI) | $26,000 - $40,000 |
| Admissions Counselor II (ECII) | $36,000 - $65,000 |
| Admissions Counselor (Senior EC) | $65,000 – $100,000 |
| Executive Admissions Counselor (Exec. EC) | $75,000 - $120,000 |

Either during, or shortly after, the initial 13-week period, the new recruiter also attends a one week "Student Advisement Workshop" (SAW) at UOP headquarters in Phoenix, Arizona. The SAW is an intense training on traditional sales techniques: probing and developing the potential customer's need for the product, creating urgency and gaining commitment from the potential customer, and closing the deal. Typical of sales training, SAW is one of the tools UOP uses to motivate its sales force. Recruiters said that in spite of the name of the training, the SAW deals only with sales techniques and has little or nothing to do with academically advising students.

Freshmen recruiters advance to the title of "Enrollment Counselor I" (ECI) upon completion of their 13-week developmental program. Advancement to ECI may only be a change in job title, but if the new recruiter enrolls enough students during the 13 weeks, the advancement will also include a raise. Promotion to higher levels is determined on the basis of whether the counselor "meets", "exceeds" or "always exceeds" expectations[2]. Under the 2002 Guide, in order to be promoted to the title of "Enrollment Counselor II" (ECII), a recruiter must have three consistent quarters where performance "often or consistently exceeds expectations." Promotion to the title

---

[2] Under the 2003 Admissions Counselor Guide, an ECI must have accumulated at least two quarters of Often or Consistently Meets Expectations and cannot have any quarters where his or her performance does not at least "Meet Expectations."

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 9

of "Senior Enrollment Counselor" (Senior EC) requires four consistent quarters where performance "often or consistently exceeds expectations." A Senior EC may be promoted to the title of "Executive Enrollment Counselor" by having eight consistent quarters where performance often or consistently exceeds expectations.

Early in a recruiter's training, UOP teaches a recruiter how UOP measures success through the use of a "matrix." The matrix lists specific recruiting activities, the numbers expected for each activity, and how these numbers relate to an overall rating of either "meets expectations," "often exceeds expectations" or "always exceeds expectations" – a rating that determines salary. Freshmen recruiters receive a matrix for each of the 13 weeks of training and they are evaluated weekly on their weekly numbers. The July 2003 SAW training coached counselors to refer to enrollments as "level one student information cards."   At this training, UOP established that at the end of the 13-week training, the following expectations would determine the recruiter's overall rating and salary:

> 30-43 level one information cards (enrollments) = Meets
> 44-59 level one information cards (enrollments) = Exceeds
> 60+ level one information cards (enrollments) = Always
> "Have no more than a 20% flake" (drop-out rate)

At SAW, UOP urges recruiters to use the matrix as a guide to reach their desired "level of success."

The matrix sets forth the rating ("meets," etc.) associated with the number of enrollments, and it is these criteria that supercede all others and actually determine salary. Recruiters are keenly aware of how the matrix numbers establish their salaries. At one time, the matrix had the salary printed on the matrix itself so that a recruiter could readily determine the number of enrollments needed to make a specific salary level. One recruiter said that it was common knowledge among recruiters that each enrollment is worth about $750 in annual salary. In recent years, the matrix (containing the enrollment expectations) and salary levels associated with the matrix are separated into two documents such that recruiters have to simply put the two documents together to determine the salary levels associated with enrollment numbers.

UOP repeatedly reinforces the importance of enrollment numbers throughout its orientation and training of recruiters. Among the documents provided to newly hired recruiters is a document entitled "The Psychology of Enrollment Success at the University of Phoenix." This document touts the benefits and rewards of being a sales professional at UOP, including assertions such as:

- $$$ - No limit on income
- Highest paid people in the world are salespeople
- Never have to worry about $$$ again
- Top 20% Enrollment Counselors @ UOP  = ave. $75,000 +/yr.
        "other" 80%                                    ave. $25,000 +/yr.
- Top 20% = never worry about $$$

**The Winning Edge**

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 10

| | | |
|---|---|---|
| Counselor #1 | 100 activities[3]/half | $65,000 |
| Counselor #2 | 79 activities/half | $36,000 |
| | | $29,000 |

### 3.5 additional activities / month = $29,000

In the case of On Line recruiters, several recounted that their managers told them that UOP calculates their salaries on the basis of one half of the number of students each recruiter enrolls in a six month period; e.g., 90 students enrolled in six months equals $45,000 in salary. On Line recruiters said that even though the matrix lists a number of steps in the recruitment process, such as telephone calls, conversions, etc., the reality is that none of these factors actually affect recruiter salary – except the number of students enrolled. Some of the recruiters consistently exceeded the numbers for all steps except enrollments, yet received an overall evaluation of "needs improvement" simply because their enrollments failed to hit the requisite number. More than one recruiter said that managers simply falsified the numbers on the various factors to make the overall evaluation match the enrollment number and that managers told them that if they get the enrollments, the manager can make the other numbers match. For example, one manager told a recruiter: "You get the enrollments and we'll take care of the matrix. We can fudge the numbers on the matrix."

All recruiters indicated that they were not shown the matrix, or told of how enrollments related to salary, until after they were hired. Recruiters who had not yet completed their first salary evaluation were unaware that their salary would be based on anything but numbers of recruiting activities. New recruiters knew that numbers determined their salary, and generally knew that if they did "make the numbers" they could get a "good bump," but if they did not make their numbers, they would not get the raise they had expected when they were hired. Many commented that the bottom line was: if the enrollments are not there, don't expect a raise.

In addition to these training/motivational methods, UOP's Corporate Director of Enrollment visits the various UOP locations to provide additional training and motivation to recruiters. This corporate officer is known for his ability to motivate by touting the financial rewards of making the numbers, even though recruiters are aware that basing salary on enrollments is against the law. This Director of Enrollment, however, was quoted as telling recruiters: "It's all about the numbers. It will always be about the numbers. But we need to show the Department of Education what they want to see." Forty-four out of 61, or 72%, of the recruiters interviewed stated that it was always about the numbers – all about "butts in seats" or "asses in classes –" to use the vernacular commonly heard at UOP. One recruiter stated that, "the culture in the organization gravitated away from **quality education** and **quality counseling**, to getting bodies in the door. The number of enrollments is what counts."

According to some recruiters, while the Corporate Director of Enrollment stresses the big dollars that come with high enrollments, he characterizes the compensation plan for recruiters as "smoke and mirrors" so that UOP can "fly under the radar" of the Department. More than one recruiter stated that they also heard the Director of Marketing say, when discussing the salary compensation plan for recruiters, "we're flying under the radar of the Department." Both managers and recruiters referred to the matrix as a "smokescreen" or "smoke and mirrors."

---

[3] Over the years, UOP has utilized various euphemisms to define the number of students a recruiter enrolls. Many times, UOP simply uses the word "enrollment" or "activity." As previously mentioned, during 2003 SAW training and on the 2003 matrix, UOP uses the phrase "Level One Student Information Card."

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 11

One recruiter, who recalled the Corporate Director of Enrollment saying "we're flying under the radar of the Department," believes that the "matrix is a way to deceive the Department."

### 5.1.2.2    *Tracking Commissionable Sales and Sales Performance*

In order to track the numbers on the matrix, UOP uses an elaborate tracking system to follow the student's enrollment progression and to track which recruiter is given credit for the enrollment. The computerized system called "Galaxy" tracks incoming calls, outgoing calls, leads to appointments, conversion of appointments to applications, scheduled appointments, actual appointments, referrals, applications, enrollments and "flakes" (withdrawals).  UOP tracks these recruiting activities daily.  Recruiters meet with their managers on a daily, weekly and monthly basis to go over the numbers and discuss how to increase them in order to reach the desired salary, sometimes referred to as the "desired level of success."

Recruiters maintain a manual list of each student they have enrolled when the application is completed.  They then send this list to a regional marketing support coordinator. On a monthly basis, the regional marketing support coordinator prepares a list of all new enrollees and determines which students have attended at least three nights – the point in time at which the recruiter may receive credit for salary purposes -- and also the point at which UOP can charge 100% of the tuition for the course and no longer must pay a refund.  The marketing support coordinator then compiles what UOP has traditionally called a "Commissionable Starts Report"[4] for each recruiter for transmittal to UOP headquarters.  UOP then checks whether each new enrollee has made satisfactory payment arrangements.  If the student has met the attendance and financial arrangement criteria, UOP tentatively gives the recruiter credit for the enrollment, and the student will be on the Commissionable Starts Report of the recruiter for the month. UOP then compiles the Commissionable Start Report for every recruiter at each location and sends them to the Corporate Operations Manager at UOP headquarters in Phoenix, Arizona.

The primary job of the Corporate Operations Manager is to track enrollments to assure that each recruiter receives the appropriate enrollment credit for a "quality enrollment" (an enrollment that has met both attendance and financial arrangement criteria) and to prepare a monthly report that lists enrollments by campus and by enrollment counselor.  Upon receipt of the Commissionable Starts Report for each recruiter, the Corporate Operations Manager again checks whether the enrollment meets the above-listed attendance and financial criteria.  For enrollments that fail to meet these criteria, she strikes their names from the Commissionable Starts Report and prepares a final approved list of students for which each recruiter will be credited.  The Corporate Operations Manager then prepares a separate list for each recruiter. The final approved enrollment list, together with the Commissionable Starts Report showing the stricken students, are then bound by location in a final report referred to as the "Orange Book." UOP then sends the bound report to each location.  This final bound report shows total enrollments by location as well as the final enrollments credited to each recruiter as well as each recruiter's rejected enrollments.

The Corporate Operations Manager then also updates a manually prepared Excel spreadsheet, maintained on a fiscal year basis, that lists all recruiters and their final enrollments for each month.  This spreadsheet ranks all UOP recruiters from all locations by the number of enrollments credited to date.  This spreadsheet is known as the "Stack Rankings," which UOP

---

[4] For years, this report has been referred to as a "Commissionable Starts Report" and ECs referred to it as such.  The report is also referred to as a "Commissionable Starts Report" in the instruction manual for the system that generates it.  In recent years, UOP changed some of the references to the Report to "CPCC701 Enrollment Report."

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 12

sends monthly to the managers who generally distribute it to recruiters. The Corporate Operations Manager maintains a file on each recruiter in the organization that contains all Commissionable Starts Reports and all the monthly Stack Rankings.

In addition to the above procedures, at the local campus level, the Marketing Coordinators continually update and compile a manually prepared monthly report, entitled AC-Self Success Recap. This report captures the enrollment activities of each recruiter at the location. The report describes the "Meets Expectations" standards of each enrollment activity contained within a recruiter's matrix (Outbound Calls, Scheduled Appointments, Referrals, Corporate Information Cards, Student Information Cards, and Enrollments) and the actual numbers achieved by the counselor. The report also captures the conversion rates of each recruiter from "Level One Student Info. Cards" (initial student enrollment) to an enrollment for which the recruiter will receive credit (three classes and financial arrangements). This report has been identified by many of the recruiters as the actual tool the recruiters' managers use in their monthly, quarterly and annual evaluations. UOP requires each manager to forward this report as an attachment to UOP's Corporate Enrollment office each month, no later than the fifth of the following month.

### 5.1.2.3    *UOP's Aggressive Sales Motivation System*

UOP's intense focus on numbers and enrollments per recruiter permeates the working day of each recruiter. Managers bombard the recruiters with emails daily -- listing the top performers based on enrollments, applications, calls and other recruiting activities, with the pace of emails pushing numbers escalating at the end of each fiscal year as the annual report deadline nears.

Each campus holds a daily "morning huddle," formally called an "OSIRA meeting" at which each recruiter must report the number of enrollment activities accomplished the day before. At these meetings, the recruiters also report their goals for the day, projecting, based on their schedule, the number of outbound calls, the number of appointments scheduled and other recruiting activities they expect to perform. These meetings serve to motivate or humiliate the recruiters based on their activities. Managers go over the numbers and either praise or chastise each recruiter in front of the group. The managers then stress the weekly goals and applications UOP requires by the end of the week. The recruitment managers use a large board on which the statistics of activities of each recruiter are listed. Except when "visitors" are expected, UOP managers prominently post the board that lists these statistics.

On Mondays, the morning huddles also include a recap of the prior week. On a monthly basis, the meetings involve a monthly assessment and itemization of goals not met, and issues that need to be resolved in order to meet the goals. Managers also use these meetings to make announcements regarding the overall performance. For example, one Enrollment Director, in a teleconference with Northern California locations during an OSIRA meeting in the Fall of 2002 said:

> My job is on the line. And I need you guys to perform. And there will be no exceptions. If you're not doing your job, you're going to lose your job. And if you're not hitting your goals, that's how we're going to measure if you're doing the job. And by the way, I don't mean applications in. I mean starts."

UOP used these frequent meetings to drive home the message that a recruiter's success in securing enrollments would equate to success in reaching his or her salary goal. For example, one recruitment manager would frequently say: "X is going to make a lot of money at the end of this quarter because he has X enrollments." It was common for managers to remind a recruiter

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 13

how many more enrollments were needed to get his or her stated salary goal. For example, one recruiter told the program reviewers that his manager's tactic was to say: "How much money do you want to make? Well, here are how many students you have to register to make that much."

UOP also frequently runs sales promotions, targeting the increase of enrollments at the end of each fiscal quarter. Such promotions may include the waiver of fees or the cost of books for student customers. Referred to as "blitzes," promotions are generally offered around the end of each quarter. During some "blitzes," UOP managers mandate that recruiters work unpaid overtime by working evenings and Saturdays.

In addition to the frequent face-to-face meetings, managers barrage recruiters with emails to remind them where they are on a ranking basis with respect to other UOP recruiters and emphasize the target number of student enrollments. Examples of such emails sent to recruiters on an On Line team read:

- *From a Director of Admissions on July 23, 2003 to ECs, entitled "July/August Goals":*

  Now you know what is at stake and the rewards available at the end of the month of August, please tell me what your own personal goal is for July/August combined and what your goal is for your next 6 - month review. 140? 130? How much you would like to see your salary increase?

- *From an Enrollment Manager to ECs, April 24, 2002, entitled "Team Meeting this AM"*

  Make sure that if you didn't hit your matrix # for MEETS in June, that you do it in July. EC1 that means 14, EC2 is 16...any questions?

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 14

---

- *From an Enrollment Manager to ECs, June 28, 2002, entitled "Back to Basics":*

   Your job, as Admissions Counselors, and sales professionals is to get in touch with every one of them as soon as possible to evaluate their needs and match the benefits of UOP with those needs, then close the sale.

   **The expectation for EC2 is that you meet the criteria of your matrix, and enroll 16 new students each month.**

   **The expectation for EC1 is that you also meet the criteria of your matrix, and enroll 14 new student each month.**

   **As a CIT, you're shooting for Always Exceeds on your matrix, and 30 new students in your first three months on the floor.**

   These numbers and criteria are measured on a quarterly basis, so know what your evaluation quarters are, and what your goals and running totals are. This is your process to manage. You can use vacation time when it's made available to you, but make sure that your students are taken care of, and that you still meet your expectations. If your production levels can't be maintained because of vacation time that you have planned, you need to work extra before and after the time off to make it a non-issue.

---

- *From an Enrollment Manager to ECs, April 25, 2002, entitled "Please Reply to Me . . Lunches"*

   **We've regged 17 new students in the last 2 days, and 11 of those were on Tuesday, WAY TO GO!!! As of last night we're at 57 REG and 36 APIN, more combined that either March or April, and we've only been prospecting for 5 days!!!!**

   Where are you in relation to your goal?? Right now you should plan on being at half-way (REG/APIN combined) when you walk in the door next Wednesday (May 1). **As a team we're at almost exactly 33% of our promised 275!!!**

   If you think of it, I have the **REG-O-METER** on my door, and I've been updating it for the last couple days. Feel free to add your own when you put 'em in REG!!

---

One enrollment manager puts a spreadsheet on her recruiters' computer desktops that shows how many enrollments each recruiter needs to reach the next salary level. The following is an example:

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 15

| | June | July | August | Sept | Oct | Nov | | |
|---|---|---|---|---|---|---|---|---|
| Cleared | 14 | 13 | 14 | 15 | 20 | 14 | 90 | **45K** |
| Goals | | | 17 | 20 | 25 | 17 | | |

The recruiter who provided us the above spreadsheet explained that her manager placed it on her desktop at the end of July. It shows that the recruiter had 27 enrollments by the end of July. The August through November numbers reflect the number of "cleared" enrollments (non-withdrawals) that the recruiter will need in order to have 90 enrollments in the six-month period – an enrollment number that would result in the recruiter's desired $45,000 salary. Typically, the manager keeps these spreadsheets updated and clearly visible on the recruiters' computer desktops. During the Department's site visit, however, the manager deleted these spreadsheets from the recruiters' desktops. (The reviewers obtained a copy of the spreadsheet from a recruiter who had saved the file before the manager deleted it from the computer desktop.)

### 5.1.2.4    Intimidation Techniques

Just as recruiters are rewarded for meeting or exceeding the enrollment numbers, they are also penalized for not meeting the enrollment numbers. Under UOP's salary policies, UOP also pays managers and directors on the basis of the number of enrollments secured by the recruiters under their supervision. Recruiters said that their managers were under a lot of pressure from UOP's corporate office to meet enrollment numbers. When recruiters fail to meet the enrollment goals set by UOP, the managers made it clear that the recruiters are causing the managers to fail. Many recruiters stated that the managers "tried to make their lives miserable" when their enrollment numbers are not high enough.

A number of recruiters stated that UOP did not hesitate to threaten them with loss of their jobs if they failed to meet the numbers. Several recruiters indicated that some managers' styles are so oppressive that even though one may be a top performer one week and praised as the "greatest," the same person is threatened with termination the next week. "You are constantly threatened if you don't meet the numbers."

Many recruiters expressed concern about losing their tuition benefits if they failed to meet enrollment numbers. Some recruiters who were students indicated that they only intended to stay long enough to finish their degrees at UOP, and that they had to do whatever was necessary to meet the enrollment numbers to attain that goal.

At the On Line Campus, even more harsh methods were used to "punish" those who failed to meet enrollment numbers. Most On Line recruiters stated that their managers used heavy-handed intimidation tactics to humiliate them into improving their numbers. For example, one admissions director (one supervisory level above the admissions manager) is known to tell recruiters, when they fail to make the required enrollments, that they are "stealing from Brian Mueller" (CEO of UOP On Line).

Well known among the recruiters was the "Red Room" – a place viewed with fear and dread by recruiters with whom the reviewers spoke. Sixteen of the On-Line recruiters who were interviewed confirmed knowledge of the Red Room, and several were actually sent to the Red Room, as punishment for not meeting the number of enrollments required and/or expected by management.

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 16

The Red Room was a large room in which tables were lined up in the middle of the room. The room was encased in glass so that all in the area could see who was there. Banks of telephones were on the table, around which the underperforming recruiters were crowded to make telephone calls. Wires hung from the ceiling to provide power to the computers sitting on the tables. Senior recruiters and managers hovered over the unfortunate recruiters, listening to their calls and closely monitoring them. Those who were sent to the Red Room were allowed no vacation time and were allowed no breaks other than those specifically set for those working there. A recruiter sent to the Red Room was required to immediately leave his or her desk and take his or her computer there. Recruiters were required to work in the Red Room until they had attained the required number of enrollments. Recruiters indicate that UOP ceased using the Red Room in late 2002.

At both the On Ground and On Line campuses, a number of recruiters stated that the allocation of fresh leads and floor time was both an intimidation and reward tool to manipulate them into more aggressive and/or unethical tactics. Recruiters viewed leads as the source of obtaining enrollments and salary "bumps." When a recruiter was underperforming, managers would decrease the leads provided to the recruiter. Also, when a recruiter left UOP, the manager would divide up the former recruiter's enrollments. The granting of leads and credit for a former recruiter's enrollments was up to each manager. Those who had high enrollment numbers received more leads, enrollment credits and salary "bumps." Those with less enrollments had leads taken away, received no enrollment credits from former recruiters, received no salary increases and could have potentially suffered a pay cut. A number of the recruiters noted that those who did not "meet the numbers" of enrollments would be deprived of leads and floor time. A day of floor time means that the recruiter gets new leads that come in as walk-ins, as internet referrals, or call-ins. These fresh leads are cherished by recruiters.

This was confirmed by some of the new recruiters as well. Some recruiters were given very little floor time, which prevented them from meeting the number of enrollments expected by UOP. As one recruiter said, "UOP will make you successful if they want to--if they don't want to make you successful, they force you out."

Some Northern California recruiters indicated that in 2002, managers became very intimidating because the enrollment numbers were not up to par. San Jose recruiters were told that their "heads would be on a chopping block" if they did not hit their numbers. UOP also expected recruiters to meet their required enrollment numbers regardless of whether they had vacations, honeymoons, a death in the family, illness or other events that interrupted their work schedules. As one manager stated:

> The expectation will be that if you aren't at your goal by 3/8 (for March) and 4/5 (for April), you and I will plan what additional time you'll be in the office on weekdays and on weekends to get the job done and get back on track. We need to quit thinking of this as a 40 hr/week job, and remember that we're getting paid to at least meet expectations (me included).

One recruiter recounted how her manager responded when she told him that she may need to go to New York for her grandmother's funeral. He said: "You can't afford the time away from the phone. You can't afford five days bereavement leave. And if you go, you have to prove that you went to the funeral and that she is dead."

A recruiter who misses the numbers for any month receives immediate notification from UOP. Managers closely supervise all activities of recruiters, scrutinizing their time as tracked in the

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 17

computer system. Recruiters who do not enroll sufficient numbers receive harsh emails from their manager chastising them.

The formal procedure for discipline of recruiters is set forth in the UOP personnel handbook and is commonly called "going on plan." The employee is given a written warning, set forth in a "Warning Letter" or "Discussion Memorandum." These warnings follow an established UOP format for recruiters. They begin by stating that the recruiter has failed to meet the expectations of the position of an Enrollment Counselor, and specify the numbers that the recruiter must meet in order to retain his or her job. Typically the memo sets forth a table such as the following, showing the "Weekly Goals" and the recruiter's actual performance for a three-month period:

| Activities (Weekly Results) | Goals (Weekly) | May (Weekly Avg) | June (Weekly Avg) | July (Weekly Avg) |
|---|---|---|---|---|
| Contact to Activity | 6% | 2.5% | 7% | 0 |
| New Enrollments | 3 | 2 | 1.25 | .5 |
| Inbound Calls | 40 | 63 | 50 | 46 |
| Outbound Calls | 250 | 393 | 363.25 | 368 |
| Referrals | 1 | 0 | 0 | 0 |
| Lead to Contact | 45% | 55.5% | 47.8% | 39.8% |

Of course, of these activities, only enrollments possess any real significance.

If the recruiter fails to meet these numbers, UOP places him or her on "decisional leave" – one day during which the recruiter is to decide whether he or she "wishes to be successful at UOP." During "decisional leave", the recruiter is not allowed to engage in enrollment activities and is required to set forth a plan of performance improvement to present to his or her manager. If the recruiter's performance fails to "meet" expectations, UOP fired him or her.

### 5.1.3   Recruiter Evaluation System Reinforces & Ranks the Quantitative

More than 70% of the recruiters reported that they were unaware of any basis for compensation other than enrollment numbers and recruiting activities. It is remarkable that the only recruiters who said that their salary also included qualitative factors, such as customer service, were recruiters chosen by UOP to be interviewed by the reviewers. *Literally every recruiter interviewed randomly or outside of the work premises said that the number of enrollments determined their salary.* Some reported that while they were aware that their evaluation form included some "qualitative, highly subjective" factors, their managers always assured them that UOP included these factors simply to deceive the Department and that UOP actually based salary raises solely on the number of students a recruiter enrolls.

During the quarterly evaluations with recruiters, managers consistently focused on the quantitative factors, particularly enrollments. The evaluation forms, however, also list certain qualitative factors at the bottom. Such factors include "Job Performance," "Working Relationships," "Communication" and "Customer Service." These qualitative factors, according to most recruiters, are simply conversions of the quantitative factors and are there simply to deceive the Department.

One recruiter recounted that he had asked his manager how these factors were determined and was told: "It's enrollments. You know it's enrollments. It will always be enrollments." Another recruiter queried his manager during his evaluation about each of these qualitative factors and

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 18

how they are determined. His manager told him that "Job performance" equates to the number of new enrollments, "Communication" means the number of conversions, "Customer Service" means the number of leads to contact, "Working Relationships" means resolving student issues to overcome objections and obstacles and "Judgment" meant getting students in class. This recruiter wrote his manager's response on his performance evaluation form. The form was then signed by both his manager and his manager's supervisor.

On Line Campus recruiters stated that even though the matrix lists a number of factors, such as telephone calls, conversions, etc., none of these factors actually affect the salary level – only enrollments. Some of the recruiters consistently exceeded the numbers for all areas except enrollments, yet received an overall evaluation of "needs improvement," simply because their enrollments failed to hit the expected number. Thus, if they did exceed expectations in all areas except enrollments, there would be no promotion. More than one recruiter said that managers simply falsified the numbers on the various factors to make the overall evaluation match the enrollment number. Managers told them that if the recruiter gets the enrollments, the manager can make the other numbers match.

Recruiters were generally aware that there was a Department prohibition against incentive compensation for enrollments. Thus, it was widely known that the evaluation forms kept in the personnel files were meaningless. Recruiters told reviewers that during the program review, prior to interviews with recruiters, some managers coached their employees to say that their evaluations and salary are based on the qualitative factors, not just enrollments. One of these managers said that it was all "just smoke and mirrors" when referring to the matrix. More than one recruiter said that "the matrix is just a smokescreen," and that "everyone knows that the matrix is a joke." Another recruiter stated that his manager told him that, "Your matrix says that you have to bring in 100 leads a month. Your pay and performance review are based on that." Another recruiter said that her manager told her that, "The matrix doesn't matter, it's the Regs [meaning registrations or enrollments]. We can manipulate the matrix any way. You get the Regs and we'll take care of the matrix." Another recruiter said, "The matrix is a lot of bologna. The matrix talks about customer service, communications, judgment, but when you talk to your manager, the manager tells you that it is the enrollments. If you get 50 Regs/quarter, then you can earn $50K."

According to one Director of Enrollment (previously a recruiter), the qualitative annual review to discuss professional development is just the "touchy, feely" review. "Promotions are based on exceeding numbers only. Other factors that are considered for the annual review are: rapport with students; referrals; etc. These are evaluated for the small annual raise." The following comments about the "qualitative" review were made by different recruiters at the various locations visited by the reviewers:

- "The qualitative factors in the employee handbook are not mentioned. My manager told me that evaluations and salary are based only on the matrix, specifically Info. Cards" – enrollments.

- "If you get the regs., the other numbers of phone calls, appointments, etc., magically appear."

- "Reviews are really based on quantitative factors: They make the things match, but it's really the number of enrollments you have."

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 19

- "The matrix talks about customer service, communications, judgment; but when you talk to your manager, the manager tells you that it is the enrollments that count."

- "The amount of money was dependent on how many students I enrolled. Other factors such as communication are not mentioned."

- One manager told a recruiter during an evaluation: "The qualitative has to align with whatever is on the first page (the quantitative numbers). . . . We have got to make the qualitative portion of your review match where you fit on your numbers."

Some recruiters indicated further that it was widely known that supervisors would simply adjust the "qualitative factors" to match the numbers. Recruiters overwhelmingly confirmed that the number of enrollments was the "bottom line." Recruiters stated that even though the number of enrollments was the actual basis of their salary, management was always careful not to put this in writing due to awareness that the Department prohibited incentive compensation based on enrollments. Recruiters who asked their managers to put the enrollment requirements in writing were refused.

One enrollment director, who had also been an enrollment manager, and was hired in the early 1990s, recalls that when she was hired, the matrix included the number of enrollments. With this old matrix, evaluations were very straightforward. The number of enrollments established the salary. In the late 1990s, however, the Corporate Director of Enrollment issued a directive to managers explaining that UOP could no longer directly put the number of enrollments on the matrix because to compensate recruiters based only on the number of students enrolled was illegal. As a result, UOP introduced "qualitative" factors into the matrix. In addition, UOP began maintaining two files on recruiters; one was the "activity" file, kept at the local campus; the second was the Human Resource/official personnel file, kept in headquarters in Phoenix. The "official" human resource file contains only qualitative ratings. The quantitative data is kept in the activity file and forms the basis for salary evaluations.

This director explained that during performance evaluations, the manager sits down with a recruiter and goes over the recruiter's enrollment goals (number of telephone calls required to be made to prospective students, number of appointments required, number of interviews required out of the appointments set, number of enrollments required per given time period) and compares them to how the recruiter actually performed with respect to these goals. Enrollments are weighted more heavily than other steps in the recruitment process, because a recruiter can make 300 telephone calls, but if they are not "converting" them to enrolled students, then the number of calls made is not important. The matrix is a tracking tool that managers and recruiters use on a weekly basis to track actual performance to goals. As always, the more students a recruiter enrolls, the more money he or she earns.

The switch to including qualitative factors in a performance evaluation was difficult for many managers. With the extra layer, some managers sent evaluations that contained high ratings for a recruiter's ability to communicate well, for instance, when the recruiter was failing to meet his or her enrollment goals. Some managers suggested a pay raise anyway, based on the fact that the recruiter "often or always exceeded expectations" in the manager's opinion in all of the qualitative categories. According to one manager, when this occurred (that a promotion was recommended based on the qualitative factors instead of enrollments) headquarters rejected the recommendation.

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 20

As a result of this confusion by some managers, in late 1999 or early 2000, UOP's Corporate Director of Enrollment came up with a "key"—a document that explained to directors of enrollment how properly to convert quantitative factors into qualitative factors. This key was a line-by-line reproduction of the qualitative factors off of UOP's standard performance evaluation, the one maintained in the "official" personnel file with a translation of how managers should equate these factors with a recruiter's quantitative enrollment numbers. For instance, the key said that if a recruiter wasn't making enough telephone calls, the manager should check the "requires improvement" or the "unsatisfactory" box in category IV. 4. (IV. "Working Relationships" 4."Establishes and promotes constructive working relationships").

### 5.1.4    Salaries Actually Based on Quantity of Recruiting Activities

The evaluation system at UOP, designed to obfuscate the fact that salary evaluations for recruiters is founded solely on the number of students a recruiter enrolls and, did, in fact, result in significant financial rewards for those who rose to the top of the Stack Rankings. For example, UOP promised one recruiter, hired in April 2000 at $32,000, that her salary would double in nine months if she enrolled 116 students – a number that fell in the "exceeds expectations" category on the matrix for the time period. According to UOP's matrix, enrollments in excess of 120 for six months rates as "always exceeds." Under the UOP Enrollment Counselor Policy Effective Fiscal Year 1999, the "always exceeds" salary level is $76,000 - $110,000. This recruiter enrolled 148 students in her first nine months, resulting in an "always exceeds" rating in her first evaluation. UOP increased her salary to $88,000, a raise of $56,000 per year, as of February 1, 2002, only ten months after UOP hired her.

UOP's salary history data substantiates that the above example is no exception. Salaries for recruiters consistently tracked the matrix / salary guidelines set forth in the UOP Enrollment Counselor Policies for each year since August 1, 1999. Thus, as in the above example, some new recruiters, hired at $28,000 - $32,000, received phenomenal raises in their first year, such as:

| Recruiter | # Enrollments In 6 mos Prior to Evaluation | Salary Before Evaluation | Raise | Salary after Evaluation |
|---|---|---|---|---|
| #1, hired 6/1999 | 136 | $28,000 | $58,000 | $86,000 a/o 4/2000 |
| #2, hired 6/1999 | 112 | $32,000 | $47,700 | $79,700 a/o 3/2000 |
| #3, hired 5/2000 | 151 | $28,000 | $57,000 | $85,000 a/o 3/2001 |
| #4, hired 3/2000 | 127 | $30,000 | $50,000 | $80,000 a/o Jan 2001 |
| #5, hired 6/2001 | 100 | $34,000 | $24,000 | $58,000 a/o 3/2002 |
| #6, hired 4/2002 | 100 | $30,000 | $37,000 | $67,000 a/o 5/2003 |

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 21

Recruiters who fell lower on the Stack Rankings-- those who were in the "meets" range for new recruiters--generally 76 – 95 enrollments for six months,[5] received no raise or only a small percentage increase (2% - 10%) raise.

| Recruiter | # Enrollments In 6 Mos prior to Evaluation | Salary Before Evaluation | Raise | Salary after Evaluation |
|---|---|---|---|---|
| #7, hired 4/1999 | 98 | $41,300 | $1,700 | $43,000 a/o 6/2000 |
| #8, hired 11/1999 | 79 | 32,000 | $4,000 | $36,000 a/o 9/2000 |
| #9, hired 11/1999 | 93 | $38,000 | $2,000 | $40,000 a/o 9/2001 |
| #10, hired 1/2000 | 57 | $28,000 | $1,000 | $29,000 |
| #11, hired 9/2001 | 77 | $33,000 | $1,600 | $34,600 |

As a result of the evaluations UOP performs quarterly, the school reviews recruiters' salaries annually.[6] The evaluation form sets forth the various factors of the matrix, rating each factor as "Unsatisfactory", "Requires Improvement", "Meets Expectations", "Often Exceeds Expectations" or "Always Exceeds Expectations." At the bottom of the form, the manager checks an overall performance level of the recruiter, on a quarterly basis. UOP then establishes the salary of the recruiter based on this bottom line rating (Meets, etc.). If the recruiter meets the performance requirements for promotion, the manager completes a Personnel Action Form recommending a salary increase or promotion. This form must then be approved by those in the chain of command at the local level before being sent to the Corporate Operations Manager, the person responsible for maintaining the Stack Rankings, who once again verifies that the enrollments attributed to the recruiter are accurate. The Corporate Operations Manager's approval was obtained on all raises and promotions of recruiters reviewed.

A review of the salary history of UOP recruiters, in conjunction with the Stack Rankings, demonstrates that UOP consistently grants enormous salary increases to those with high enrollment numbers. Generally, recruiters with over 200 enrollments per year have salaries in the $80,000 - $100,000 range, regardless of how long they have worked for UOP. Recruiters who reach this enrollment target can be assured that UOP will reward them with whatever raise necessary to reach this salary level. For example, UOP gave recruiter #1 a $58,000 raise, bringing his salary to $86,000 per year, in 2000 when he enrolled 239 students and was #9 out of 430 in the Stack Rankings. UOP awarded recruiter #3 a $57,000 raise, increasing her salary to $85,000, in 2001 when she enrolled 280 students and was #6 out of 396 in the Stack Rankings. UOP provided recruiter #4 a $50,000 raise, increasing her salary from $30,000 to $80,000 in 2001, a fiscal year in which she enrolled 210 students and ranked #33 out of 396 in the Stack Rankings.

---

[5] The matrix enrollment requirements for each category varied slightly from year to year and between areas of the country. Also, the enrollment requirements for ratings were different depending on whether a recruiter was new or experienced (more than one year).
[6] Currently, and as of the 2000 Fiscal Year (year beginning September 1, 1999), salary evaluations are performed annually after the evaluation following initial training. In prior periods, these evaluation and salary review periods have varied from six months to nine months.

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 22

Until the year 2000, UOP historically also decreased recruiters' salaries when they failed to maintain their level of enrollments. The salary history data of UOP also confirms this practice.

### 5.2   Bonus Incentives Awarded on Basis of Success in Securing Enrollments and Quantity of Recruiting Activities

#### 5.2.1   Sperling Club Trip Awards

Named after the UOP founder, John Sperling, UOP sponsors "Sperling Club Trip Awards." Sperling trips are all-expense paid trips, for the recruiter and his or her partner, to a nice location. Sperling trips cost UOP between $500 - $1,000 per winner. Under the Sperling Club Trip Award program, recruiters may win a Sperling Trip by successfully enrolling a specific number of students within a given period of time. For example in one Sperling Trip promotion, UOP promised that recruiters who enrolled 71 students during the months of June through August 2000 would receive a Sperling trip. One recruiter who won this award enrolled 76 students. She indicated that the trip included wining, dining, awards, kudos, a trip to Universal Studios, a trophy and a plaque. The trip was all-expenses paid, including the expenses of her husband. This recruiter also won a Sperling trip to Las Vegas, and since she significantly exceeded the enrollment goal, UOP also gave her $100 worth of gambling chips.

The majority of recruiters interviewed confirmed knowledge of the Sperling Club Trips. All confirmed that the awards are based on solely on the number of students recruiters enrolled. UOP management in Phoenix insisted that Sperling Club Awards are based on a number of factors, not just enrollments. However, enrollment managers and recruiters all confirmed that Sperling Club Trips for recruiters were awarded based solely on the number of enrollments. One enrollment manager stated: "Sperling is definitely based on enrollments. There is a set goal and the counselor has to obtain it in order to win."

Sperling Club Trip Awards are announced and promoted by managers via email to recruiters. For example, one email recently announced that a Sperling trip is coming up and explained that in order to win, a recruiter must get 50 new students to enroll and complete the first course. Several recruiters confirmed that they had won Sperling Club Trips. Such trips included an all-expense paid trip for one recruiter and her husband to Washington D.C., where UOP covered the costs of accommodations at the Watergate Hotel. This recruiter said that her manager informed her that she had won by sending her the following email: ". . ., it's official. Every new enrollment has been confirmed and you have achieved president's level of the Sperling Trip"

In the recent past, managers have been more careful about announcing the number of enrollments required for a Sperling Club Trip. Aware of the Department's prohibition against incentives based on recruiting activities, managers have typically masked the target number required to win. For example, one director of enrollment sent an email that stated: "You all know that I celebrated my 50th birthday. So seniors, you know how many enrollments are needed. You all know what birthday I celebrated this month." Recently, however, for the 2003 September Sperling Trip to San Francisco, the director of enrollment orally announced the requirements rather than sending an email: EC2s and senior ECs would need 34 starts (not applications) and freshmen and EC1s would need 25. This was announced at an OSIRA meeting attended by all recruiters at the location.

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 23

### 5.2.2    Prizes, Gifts and Bonuses

In addition to awarding expense-paid trips for enrollments, UOP provides incentive awards for securing enrollment applications or numbers of other recruiting activities.  A number of recruiters confirmed having received gift certificates from their managers for obtaining a certain number of applications or otherwise winning a recruiting activity contest within a given period of time.  Such incentive awards included:

- $100 Macy's or other gift certificate
- $100 dinner gift certificate
-  DVD player
- $100 Toys R Us gift certificate
- Electronic digital camera
- Spa packages
- Ski tickets
- Lottery tickets
- A's Baseball tickets
- Cash
- Portable CD Player

UOP ran these contests during months that enrollments were down or numbers were behind.  They generally focused around quarterly or annual reporting periods.

Enrollment managers and recruiters confirmed that UOP bases these awards solely on the numbers of certain recruitment activities.

A typical email for these awards is the following:

---

From:   Enrollment Director
Sent:   1/17/2003
To:     NCAL ENROLLMENT
Subject:  MAKING PROGRESS/CONTEST
Thank you for your commitment this past week. . . You have shown that January is not out of reach. . . And <u>**sitting in my hot little hands is a $100.00 dollar Toys R Us gift certificate**</u> *just waiting to be taken from me and used.*
<u>**HERE'S THE DEAL . . .**</u>
You have from today **1/17** until **5:00 PM on 1/24**  to win it. . . HERE"S HOW
    1.  Whoever takes the most <u>**APPLICATIONS FOR JANUARY from 1/17 to 1/24 WINS. . .**</u>
NOTE:  IT TAKES <u>7</u> APPLICATIONS MINIMUM TO WIN

If each of us can add 3 applications between 1/17 and 1/24 we will be real close to our goal in January which will set the table for a SUPER February. . . Regards,

---

At the On Line Campus, contests were run from time to time, based on enrollments or applications within a given period of time, but such contests were far less generous.  They included a free dinner at PF Changs or a similar prize.  In the quarterly meeting at the end of the most recent fiscal year, ending August 2003, UOP On Line gave overnight hotel stays to recruiters who had 25 enrollments or more.

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 24

UOP's On Line Campus also frequently ran contests that awarded time off – usually Fridays --
where application targets are met within a specific timeline. On the other hand, where numbers
were not met, recruiters might receive an email from their manager informing them that overtime
or weekend time, without pay, would be required.

### 5.3    Ramifications / Results of System in Practice

#### 5.3.1    Pressure to Enroll Unqualified Students

Recruiters frequently mentioned their concern for student customers for whom UOP was not a
good educational option, such as customers who, because of their family and financial situation,
could not reasonably expect to complete a degree program at UOP and would be better served
by other alternatives, such as a community college. UOP managers chastise recruiters who
suggest anything other than UOP. UOP makes it very clear that recruiters are to do whatever it
takes to get the student to enroll. Some mangers told recruiters that if a student drops after the
first five-week course, it should not be their concern, because by then, the recruiter and the
manager will have received the enrollment credit.

Recruiters at both On Ground and On Line stated that they are pressured by management to
enroll students who are not qualified. They indicated that managers chastise them for failing to
pressure students into enrolling or staying in their first class, in spite of the lack of financial
resources. UOP makes it clear that recruiters are expected to find a way to "overcome
objections," e.g., if the problem was insufficient funds, encourage Title IV funding. If the
objection was insufficient Title IV funds, pressure the student to seek a private loan.

Some recruiters who were also UOP students expressed concern that UOP kept students in
class even though they were unable to perform. Some mentioned that UOP pressured
instructors to pass all students, regardless of performance.

#### 5.3.2    Focus on Obtaining Credit for Enrollment, Not Completing Education

From its monthly Commissionable Sales Reports, to its Admissions Counselor Policy Guide, to
its repeated reminders from managers, UOP reinforces to recruiters that UOP evaluates and
pays them solely on the basis of how many students they enroll. Recruiters recounted how they
are careful to follow students until they met the criteria that resulted in credit to the recruiter's
enrollment count for purposes of salary: specifically, that the student must attend three nights of
the first five-week course of a bachelors' program or, for graduate students, attend two nights of
a graduate class and be scheduled to attend a second class. After the student has met these
criteria, the managers do not want the recruiters to spend time with a student. UOP requires
them to pursue new enrollments, not follow those who have already completed one course.

Many recruiters thought that this system of selling the student and then dropping them once the
enrollment credit is earned, underscores UOP's lack of concern for its students. Those who had
been at UOP for several years all stressed that at one time, UOP had been more student and
education oriented. After its Wall Street debut, however, UOP eliminated the focus on students
and became increasingly aggressive in its obsession with numbers: new enrollments, meeting
Wall Street expectations, maintaining profit margin. This is especially acute in the case of UOP
On Line, where in quarterly meetings with recruiters, the Chief Operating Officer has stated that

Program Review Report, PRCN 200340922254
University of Phoenix, Phoenix, Arizona
Page 25

he intends for "UOP On Line to be the Microsoft of on line education" and that "UOPX will crush Capella"[7] or other competitors, "like a grape."

### 5.3.3    Intense use of Title IV Funds as Sales Tool / Culture of Duplicity

Recruiters at the On Line Campus were aware that many improprieties involving Title IV funding and the enrollment process occurred in order to receive credit for enrollments. "People do a lot of sneaky things to get regs (enrollments)." For example, there was one recruiter who created an entire FAFSA and completed all the forms for the student. He created the login and password for the student and the student could not even get into his account because he did not have his password. Recruiters also represented that Title IV funds would pay all costs, and that students would have no out of pocket expense for their UOP education, when, in fact, Title IV funding does not cover all costs. These recruiters all expressed concern that students recruited in this manner were being deceived, because UOP begins vigorous collection efforts as soon as a student withdraws or completes a program – an event that catches many students by surprise. One recruiter went so far as to say that he hears recruiters "lie to students every day."

A number of recruiters at the On Line Campus were aware of instances where other recruiters had forged or "cut and pasted" student signatures electronically onto master promissory notes and other enrollment documents in order to get the application or enrollment credit by announced deadlines. Employees recounted that one recruiter was so good at forging student signatures, that he was dubbed "The Doctor." One manager expected his recruiters to complete paperwork that the student is required to complete. He went so far as to train new recruiters how to complete or modify a student's paperwork in order to expedite the credit of an enrollment.

At the On Line Operation, recruiters are taught how to use Title IV funding as an effective tool for closing a sale. UOP On Line provides its recruiters with financial aid instruction on how to use Title IV to "overcome objections." The training program and sales materials for recruiters teaches them how to use financial aid effectively as a sales tool. One of the strategies is to ask the potential student: "You can afford $50 per month for your bachelors, can't you?" The recruiter then tells the prospective student that all they really need to complete for now is the first five-week course. Title IV funding covers the costs of this course. Students can then withdraw, work on getting CLEP credits and return in a year or two at a higher grade and loan eligibility level. Students do not have to pay back any loan money until six months after withdrawal and the loan payments will only be about $50 per month because the loan is only for the first five-week course. This way, there is no "out-of-pocket" cost. A number of recruiters mentioned this strategy as very effective in "overcoming objections."

## 5.4    Conclusion:  UOP Violated Incentive Compensation Prohibitions and Breached its Fiduciary Duty

### 5.4.1    Deceptive Practices to Mislead The Department

The sales philosophy at UOP and practice is designed around evasion and relies upon euphemisms to avoid detection by the Department. UOP systemically established terminology and procedures to hide the fact that UOP pays distinct and significant financial incentives solely based on recruiters' success in securing enrollments. Since evaluations and salaries based on

---

[7] Capella University, headquartered in Minneapolis, Minnesota, is one of UOP's largest competitors for on line students.

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 26

*enrollments* would be readily detectable by an auditor or Department reviewer, UOP refers to enrollments as "*activities* or *"level one student information cards."*

Several recruiters told the reviewers that they had confronted their managers during evaluations about the fact that they were actually being evaluated on enrollments, not the "fluff" factors printed on the evaluation forms (the subjective factors: Judgment, Customer Service, etc.). All were told by UOP that it will always be about enrollments. One recruiter quoted his manager as saying: "You know you are evaluated on the basis of enrollments and we've always talked about that. You know that. It's never ever been a secret that there is an enrollment number that you are expected to hit." All On Line Campus recruiters who were interviewed, except for those chosen for interview by UOP, stated that their salary was based on the number of students they enroll, a fact that managers reiterate frequently on an oral basis, although they never put it in writing.

Recruiters also told reviewers that whenever "visitors" (government visitors, accreditation visitors) were expected, recruiters are coached by managers on what to say. Typically, according to these recruiters, required enrollment and/or application numbers are very visibly posted on the walls and on desks. When "visitors" are expected, however, these posters and desk 'reminders' are removed until the visitors are gone.

Literally *every current* UOP employee who has worked longer than a year, expressed anxiety over possible retaliation by UOP. Many commented on the fact that in the current economy, jobs are very difficult to find, and UOP never hesitates to replace anyone that it considers to be other than a loyal "team player."

Recruiters consistently mentioned the focus and pressure to increase enrollments to report to Wall Street. Many expressed that while UOP at one time focused on the student and stressed ethical conduct, the culture now is one where the emphasis is on increasing the numbers, the stock price and meeting Wall Street expectations. UOP's corporate culture, steeped in "smoke and mirrors," creates a façade where some can survive, prosper and get rewarded. Often ethics are set aside.

### 5.4.2   Cover Up During Review

UOP's behavior during the program review process further substantiates the ethical concerns expressed by both current and former employees.

One of the On Line recruiters said that her manager called her and one of her teammates aside when it was learned that the Department was reviewing the incentive compensation issue and would visit the On Line operation. The manager coached them to say that salaries were based on a number of factors, not just enrollments. The manager further instructed them that they were not to speak to any former UOP employees about what goes on at UOP.

After the announcement of the program review, UOP informed its recruiters that if they were contacted by someone from the Department for an interview, they were first to inform management prior to speaking with him or her. Recruiters uniformly stated that they felt very intimidated by UOP due to this pronouncement.

On the first day of the review, UOP officials were told that the focus of the review was the compensation plan for those involved in admissions activities, and that the review would encompass both Northern California and Phoenix locations and involve interviews with UOP

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 27

staff. Shortly after this announcement, UOP management told some recruiters at the Northern California locations that they should take leave or attend some function away from the premises. When contacted by the Department after the site visits, these recruiters indicated that they were absent for interviews because they had reputations for being honest and frank.

At the San Francisco location prior to the announcement of the program review, UOP was operating a contest for recruiters that awarded prizes based on the number of applications. This contest (for the busiest month of August) was celebrated by placing Monopoly money on a bulletin board in the office with numbers (corresponding to Applications obtained). Once a recruiter achieved the requisite number of Applications, they could lift the number and find the prize underneath. The lower numbers consisted of lottery tickets, but some of the higher prizes reached into the hundreds of dollars in cash. Upon announcement of the program review, however, UOP removed the Monopoly game.

At the On Line Campus, UOP generally posts large banners ranking the recruiters by the number of enrollments cleared. UOP removed these banners shortly before the arrival of the reviewers for interviews of On Line personnel. The UOP spreadsheets posted on recruiters' computer desktops that showed the salary / enrollment "goals" were also removed the day of the reviewers' arrival at the On Line Campus.

The actions of UOP and the system it has established cultivates and maintains a corporate culture in defiance of UOP's fiduciary duty. UOP has created an environment that pits the strong motivation of individual gain against its fiduciary duty to the Department. It is one that flaunts the Department's regulations and the prohibition against incentive compensation based on enrollments.

## 6    REFERENCES

Sections 487(a) and 487(a)(20) of the Higher Education Act require that:

> In order to be an eligible institution for the purposes of any program authorized under this title an institution . . . shall . . . enter into a program participation agreement with the Secretary. The agreement shall condition the initial and continuing eligibility of the institution to participate in a program upon compliance with the following requirements:

> . . . The institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . .

From July 1994 until November 2002, the General Provisions regulations at 34 C.F.R. §668.14(b)(22) codified this prohibition of commissions or incentives based on securing enrollments in the section relating to Program Participation Agreements, as follows:

> By entering into this program participation agreement, an institution agrees that . . . it will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payments based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance. . . .

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 28

The Department amended the provision to specify 12 "safe harbor" compensation and payment plans. These "safe harbors" were designed to allow institutions to maintain compensation plans that provide for increases to fixed compensation while remaining in compliance with the HEA and implementing regulations. 67 Fed. Reg. 51723 (Aug. 8, 2002). These "safe harbors" included:

- 34 CFR §668.14(b)(22)(ii)(A): Adjustments to fixed employee compensation
- 34 CFR §668.14(b)(22)(ii)(B): Enrollments in programs that are not eligible for Title IV
- 34 CFR §668.14(b)(22)(ii)(C): Contracts with employers
- 34 CFR §668.14(b)(22)(ii)(D): Profit-sharing or bonus payments to all employees
- 34 CFR §668.14(b)(22)(ii)(E): Compensation based upon program completion
- 34 CFR §668.14(b)(22)(ii)(F): Clerical pre-enrollment activities
- 34 CFR §668.14(b)(22)(ii)(G): Managerial and supervisory employees
- 34 CFR §668.14(b)(22)(ii)(H): Token gifts to students or alumni
- 34 CFR §668.14(b)(22)(ii)(I): Profit distributions based on ownership
- 34 CFR §668.14(b)(22)(ii)(J): Internet-based activities
- 34 CFR §668.14(b)(22)(ii)(K): Payments to third parties for non-recruitment activities
- 34 CFR §668.14(b)(22)(ii)(L): Payments to third parties for recruitment activities

As amended in 2002, the regulation now provides, in relevant parts, that an institution agrees that:

> (i) It will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds. . . .

> (ii) Activities and arrangements that an institution may carry out without violating the provisions of paragraph (b)(22)(i) of this section include, but are not limited to:

> > (A) The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. For this purpose, an increase in fixed compensation resulting from a cost of living increase that is paid to all or substantially all full-time employees is not considered and adjustment.

> > (E) Compensation that is based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter. For this purpose, successful completion of an academic year means that the student has earned at least 24 semester or trimester credit hours or 36 quarter credit hours, or has successfully completed at least 900 clock hours of instruction at the institution.

> > (F) Compensation paid to employees who perform clerical "pre-enrollment" activities, such as answering telephone calls, referring inquiries, or distributing institutional materials.

(G) Compensation to managerial or supervisory employees who do not directly manage or supervise employees who are directly involved in recruiting or admissions activities, or the awarding of title IV, HEA program funds.

(H) The awarding of token gifts to the institution's students or alumni, provided that the gifts are not in the form of money, no more than one gift is provided annually to an individual, and the cost of the gift is not more than $100.

34 C.F.R. §668.14(b)(22).

The first safe harbor, pertaining to salary adjustments, was designed to create a "balance between the need of an institution to base its employees' salaries or wages on merit, and concern that such adjustments do not make the statutory prohibition against the payment of commissions bonuses, and other incentive payments meaningless." 67 Fed. Reg. 51723 (Aug. 8, 2002). The Secretary of Education stressed, in the Preamble to the Notice of Proposed Rulemaking, that while salary adjustments based on merit do not, *per se* violate the prohibition; salary adjustments based solely on the number of students recruited, admitted, enrolled, or awarded financial aid do not fall within the safe harbor. Id. The safe harbor was not intended to exclude salary adjustments that are "formulated in a way that circumvents the statutory prohibition against incentive payments." Id.

When enacting §487(a)(20) of the HEA in 1992, the conference report indicated that the drafters did not mean to imply that institutions could not base salaries or salary increases on merit. The Congressional concern addressed by §487(a)(20) was to prevent an institution from providing incentives to its staff to enroll unqualified students. 67 Fed. Reg. 67053 (Nov. 1, 2002). The regulation was drafted to set forth specific arrangements that constitute legitimate business practices that did not support the enrollment of unqualified students. Id. Thus, in discussing the various safe harbors, the Secretary repeated the theme that a payment practice will **not** fall within a safe harbor when it is tied to student recruitment. For example:

- salary adjustments based on success in securing enrollments remain prohibited;
- denial of cost of living increases tied to student recruitment remain prohibited;
- a third party marketing firm that pays its employees on the basis of activities related to recruitment, admissions, enrollment or financial aid also violates the prohibition.

67 Fed. Reg. 67056-67057 (Nov. 1, 2002).

Applying this guidance to UOP's system of recruiter salary compensation, we find that UOP:

- hires its recruiters with the promise of lucrative compensation for success in securing enrollments;
- maintains a recruiter evaluation and salary system that provides incentive payments based both directly and indirectly on success in securing enrollments;
- provides substantial incentives to its staff to recruit unqualified students and students who cannot benefit from the training offered;
- systematically and intentionally operates in a duplicitous manner so as to violate the Department's prohibition against incentive compensation while evading detection.

Accordingly, UOP is in direct violation of §487(a)(20) of the Higher Education Act.

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 30

## 7   REQUIREMENTS

The requirements herein apply to all UOP institutions, including University of Phoenix, University of Phoenix On Line and Western International University.

In response to this Program Review Report, UOP is required to make substantial and comprehensive changes to the salary compensation system for its recruiters and their direct supervisors.  It must also provide the specific documents and information specified below. UOP's response must include:

- policies and procedures for notifying and training its recruiters, admissions managers and admissions directors of the Department's rule prohibiting any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities;

- policies and procedures for any employee of UOP to notify the Department directly and confidentially, by contacting the San Francisco Case Management Team of any plan or program that provides any commission, bonus or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities;

- policies and procedures specifically providing that no retaliation shall be made against any such employee who provides the notification outlined above.

***Documents and Information to Be Provided.***

1. Salary History Report.  UOP is to conduct a review of its salary records for all employees (both UOP and WIU) engaged in any student recruiting or admission activities on or after September 1, 1998 to the date of its response and prepare a salary history report for all such employees, including admissions counselors and managers.  Such report must be in either Excel or Access format and be provided electronically, setting forth the following information with respect to each such employee:

   a. Last Name
   b. First Name
   c. Social Security Number
   d. Date of hire and position for which hired
   e. Beginning salary
   f. Date and amount of each salary change
   g. Amount of each salary change
   h. Each position held at UOP and beginning date for each position
   i. Employee's current status (current employee, terminated, leave of absence)
   j. For terminated employees, the date of termination

2. Monthly Starts/Enrollments Report for each recruiter employed by UOP or WIU for all employees engaged in any student recruiting or admission activities on or after September 1, 1998.  Such report must be in either Excel or Access format and be provided electronically, setting forth the following information with respect to each such employee:

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 31

     a. Last Name
     b. First Name
     c. Social Security Number
     d. Month and Year
     e. Number of enrollments for each month

3. Admissions' Managers and Directors' Documentation used on or after September 1, 1998 to the present, including training materials, instructions, memorandum, charts or any other documents that were provided to, used by and/or were in effect for the purpose of guiding or instructing managers, directors and those involved in management as to how to evaluate any employee, in the position of: enrollment or admissions counselor, academic counselor, financial intake specialist, re-entry counselor, including, but not limited to the "key" and all memoranda and email transmitting the same used to instruct managers with respect to the rating of various factors listed on any evaluation form, matrix and/or other document used in employee evaluations.

4. Admissions Counselors and Admissions Managers and Directors' Matrixes in effect on or after September 1, 1998 to the present.

5. Student Status Report for all students from and after September 1, 1999 to the present. Such report should set forth the following on a fiscal year basis by location:

     a. Total enrollments
     b. Total number of students in each status tracked by UOP and WIU, including students who have the status "temporary drop"
     c. Total number of students enrolled who have not attended in the sixty days prior to your response
     d. Total number of students who have not attended for 180 days or more prior to your response

6. Copies of any and all documents, from or after September 1, 1998 to the date of your response, including emails, memoranda, letters and any other correspondence addressing awards, bonuses or incentive compensation provided to any person or entity engaged in any student recruiting or admission activities, including, but not limited to, Sperling trip awards, gift certificates, trips, hotel stays provided to On Line recruiters in 2003 and electronic equipment.

7. Explanation of and full listing of all "lump sum" payments made from and after September 1, 1998 to the present, to any person or entity engaged in any student recruiting or admission activities.

8. Please specifically explain the following lump sum amounts paid to the following employees, setting forth in your explanation the basis of such payment. Please also provide a copy of the full personnel file for each of the following employees:

| Recruiter | Amount | Date |
| --- | --- | --- |
| Tracy Coomes | $840 | 4/1/02 |
| Nikki Sandoval | $2,018 | 2/1/03 |
| Sandra Ryan | $2,000 | 10/1/02 |
| Karen Berkowitz | $2,080 | 9/1/02 |

**Program Review Report, PRCN 200340922254**
**University of Phoenix, Phoenix, Arizona**
Page 32

| Recruiter | Amount | Date |
|---|---|---|
| Leslie Bruga | $1,883 | 10/1/02 |
| Wendy Vasquez Osborn | $2,550 | 3/1/03 |
| David Ober | $2,490 | 8/1/02 |
| Dean Markado | $1,890 | 4/1/03 |
| JoAnn Drescher | $1,640 | 9/1/02 |
| Eydie Lake | $900 | 6/1/02 |
| Renee Hovden | $1,689 | 5/1/03 |
| Tina Duran | $2,080 | 10/1/02 |

9.  Attached to this report as Appendix B is a list of UOP employees.  In your response, provide a copy of the full personnel file, all evaluations and matrixes and all documents contained in the individuals' files maintained by the Corporate Operations Manager, Beverly Young.  Note:  all employees identified in #8 above are also on Appendix B.

10. A copy of the Excel spreadsheets maintained by the Corporate Operations Manager, Beverly Young, that sets forth recruiter salary and evaluation data for each recruiter, from September 1, 1999 through the date of your response.  (Copies of two such spreadsheets, covering part of the 2003 Fiscal Year, entitled "Online Rep Comp 03.xls" and "On Ground REPCOMP 3.xls" were provided to the reviewers during the site visit.)



INTERVIEW OF ███████

Russ Wolff and Jennifer Woodward conducted this interview with ███████ on ███████, in ███████ at ███████ current employer.

███████ has a ███████ degree from the ███████ an ███████ from ███████ and a ███████ degree in computers from the ███████

She began working for UP on a part time basis in ███████ as a recruiter of students. At the time, she was working full time as a ███████ salesperson and UP could not offer her enough money to work for them on a full time basis. UP only offered her $24K per year. As a half time employee, UP paid her $12K per year, and ███████ continued to work in ███████ sales. In ███████, UP offered to pay her $48K per year to be a ███████ manager, so she quit ███████ sales and became a full time employee at UP's ███████ campus.

███████, UP was paying her $86K as director ███████ had grown to ███████ locations; ███████ had ███████ and ███████ recruiters under her supervision.

When ███████ first started working at UP, ███████ the ███████ corporate vice president since the late ███████, told her that the amount of money she could earn was based on a simple and straightforward formula. UP evaluated its recruiters every six months and the number of students they enrolled determined the amount of salary they earned. In ███████ UP did not cover this fact up. "Starts," however, was the constant in determining recruiter salaries the entire time ███████ worked at UP. A "start" or an "enrollment" were UP's terms for students who enrolled and actually attended the first three classes. If a recruiter did not enroll enough students, UP fired him or her.

The very first performance "matrix," UP's chart for recruiter compensation, ███████ recalled contained a list of "activities;" i.e., steps in the recruitment process, such as making telephone calls to potential students, setting appointments with potential students, whether the appointee actually showed up for an interview, whether the interviewee actually enrolled and whether the enrollee actually "started." The matrix put together the activities and conversion rates—in other words, the number of students started was the measure of a recruiter's efficiency in conducting the previous steps in the recruitment process. ███████ saw many different iterations of the matrix while employed at UP.

At some point [when??], she recalled ███████ from UP's corporate headquarters in Phoenix, Arizona, issuing a directive telling managers that UP could no longer directly put the number of starts/enrollments on the matrix because to compensate recruiters based only on starts was illegal. As a result, UP introduced "qualitative" factors onto the matrix. As another result, UP kept two files on recruiters; one was the "activity" file, which was kept at the local campus; the second was the Human

**DOE APOL 0138**

Resources/official personnel file, kept in headquarters in Phoenix. The "official" HR file contained only qualitative ratings. The quantitative data was kept in the activity file.

During performance evaluations, ▮▮▮▮ would sit down with a recruiter and go over the recruiter's enrollment goals (number of telephone calls required to be made to prospective students, number of appointments required to be set with them, number of interviews required to be conducted out of the appointments set, number of enrollments required per given time period) and compare them to how the recruiter actually performed with respect to these goals. Enrollments were weighted more heavily than other steps in the recruitment process, because a recruiter could make 300 telephone calls, but if they weren't "converting" them to enrolled students, then the number of calls made wasn't important. The matrix was a tracking tool that she and the recruiters used on a weekly basis to track actual performance to goals. As always, the more students a recruiter enrolled, the more money he or she could earn.

▮▮▮▮ says the switch to including qualitative factors in a performance evaluation was difficult for many managers. Before, it was a straightforward, how many you enrolled equaled how much money you made. With the extra layer, apparently some managers sent evaluations that containing high ratings for a recruiter's ability to communicate well, when the recruiter was failing to meet his or her enrollment goals. The managers suggested a pay rise anyway, based on the fact that the recruiter "often or always exceeded expectations" in the manager's opinion in all of the qualitative categories. ▮▮▮▮ said that she herself would never have even considered sending an evaluation of an employee to corporate that wasn't based on the quantitative factors. "If it was based just on qualitative factors, without corresponding quantitative factors, I knew it would be rejected."

As a result of this confusion by some managers, ▮▮▮▮▮▮▮▮ came up with a "key"—a document that explained to directors of enrollment how properly to convert quantitative factors into qualitative factors. ▮▮▮▮ said that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮s administrative assistant, sent this document to all directors of enrollment via an email in ▮▮▮ or ▮▮▮. She recalled it a being a 6–7 page spreadsheet attachment to the email. It was a line-by-line reproduction of the qualitative factors off of UP's standard performance evaluation, the copy of which ▮▮▮▮ identified and is attached hereto, with a translation of how managers should equate these factors with a recruiter's quantitative enrollment numbers. For instance, ▮▮▮ said that ▮▮▮ key said that if a recruiter wasn't making enough telephone calls, the manager should check the "requires improvement" or the "unsatisfactory" box in the IV. 4. (IV. "Working Relationships" 4."Establishes and promotes constructive working relationships") category.

Because the stated purpose of this document was to assist enrollment managers in properly filling out performance evaluations forms, ▮▮▮▮ as director of enrollment for ▮▮▮▮▮▮▮▮ gave the document to all of the enrollment managers she supervised and instructed them on how to use it. She assumed that other directors of enrollment across the country would have done the same thing.

DOE APOL 0139

Bill Brebaugh provided training meetings every six months for all directors of enrollment nationwide. There were approximately 25 directors of enrollment across the country when ██ left in ██ She recalled the last meeting being in Houston in April 2001. Bill primarily conducted these meetings, but she remembers Todd Nelson speaking at them as well.

As a director of enrollment, ██ received a bonus every quarter. UP awarded these bonuses for several different reasons, such as, for starting a new program and for starting enough students to meet the campus' budgeted goal.

In addition, recruiters, enrollment managers and directors could qualify for an all expense paid week/five day trip to a fun location for himself or herself and a guest, which included air fare, meals, group activities, plus a per diem amount for personal entertainment expenses. What qualified a recruitment employee for these trips was getting the most starts at a campus. She recalled the trips as being to New Orleans, Bermuda, Seattle and Vancouver, Canada. UP hyped these trips constantly and used them to reward the top enrollment producers. UP stopped offering these trips as incentives in 1999 or 2000.

Recruiters could also receive Starbuck's gift certificates, movie tickets and lottery tickets (valued at $25 or under) if they started the most students in a given time frame, i.e., "rep of the week").

██ said that she knows of two other former UP recruitment personnel who currently work for ██. The first is ██, who works in the ██ the second works in ██ as the director of ██ for one of ██ could not recall her name). This woman was an enrollment manager in one of UP's ██ campuses. These women may agree to speak with us and may recall/possess the key document explained above.

██ resigned from UP in ██. The reason she cited was because she had recently been a student at UP and was appalled at the lack of quality of the educational programs. She raised a big fuss about this and got into a huge dispute with UP corporate. She left on very bitter terms when UP rebuffed her concerns. ██ believed that she could no longer in good conscience continue to market UP to students because of the lack of quality of the education. ██ signed a "do not disparage" agreement with UP and as a result insisted that the Department not use her name or reveal any factual information about her that might show her identity to UP. She fears that UP will retaliate against her despite the fact that everything she said to us she claims is true and not in any way a disparagement of UP. We assured her that we would keep her name and identity completely confidential.

3

**DOE APOL 0140**

INTERVIEW WITH ███████████

August 19, 2003

███████████ was interviewed by Russ Wolff and Jennifer Woodward in

███████ was hired at UP in ███████ as an Enrollment Counselor I by ███████ at UP's ███████ location at $33K per year. His sole employment responsibility was to enroll students.   He was "forced" to resign ("worked out") by manager, ███████ in ███████ ███████ He claims that this was because he and ███████ simply did not get along.  He claims that he was the senior recruiter–the recruiter with the most seniority at the ███ location.  During most of his tenure at UP, his manager was ███████. ███████ has since been transferred to the ███ ███ location of UP. ███████, his first manager now lives in ███████ She, too, was "squeezed out" of UP.

After being employed at UP for approximately ███ years, UP promoted ███████ to an Enrollment Counselor II. Associated with this promotion was a salary increase.  His new salary was $60K per year.  The "bottom line" for this promotion and raise was enrollments. ███████ said that ███████ pretended that the grounds for ███████ raise was how many phone calls made and how many appointments with potential students ███████ made, but that the true reason was because of how many students ███████ enrolled.

He had to work lots of overtime hours in order to enroll as many students as he did.  When he called UP's HR (human resources) department, they told him he was an exempt employee.  He does not understand why because he was not a manager and had no supervisory duties at UP.  He says he made a lot of money for UP and intends to pursue this issue of why UP failed to pay him overtime with a lawyer.

Upon being hired, he received from ███████ a UP enrollment counselor employee manual dated ███████, which he brought with him and showed to us.  He says he also received a matrix from ███████ ███████ that listed the number of outbound calls, number of appointments scheduled, the number of appointments seen, the number of referrals, the number of corporate info and the number of students enrolled, and then columns noting whether those numbers always met,

**DOE APOL 0141**

often met, or simply met expectations or whether those numbers required improvement or were unsatisfactory. He says that ████ told him that if he enrolled enough students, his salary could double.

He received training at a SAW in Phoenix Arizona about two months after he was hired. This training consisted of a couple of days of intense sales technique training; theme was "put salt in the wound," i.e., make the potential student feel badly that he or she was not going back to school. He also received sales training at the ████ campus. The recruiters learned there that enrollment counselors at UP are considered professional sales persons and that their jobs consisted of "purely sales."

He met Bill Brebaugh at these sales training sessions. Bill was a very good pep talker and public speaker with a lot of energy. His role is to motivate the enrollment department.

For the first 9 months, he had trouble enrolling enough students to qualify him for a raise, due to traditionally slow months (winter, holidays, etc.), but the number of students he enrolled picked up tremendously between January ████ and September ████. In September ████ he received a performance evaluation by ████. This consisted of a meeting with ████ in ████ office. ████ told ████ that ████ was putting him in for a raise to $40K per year. ████ told ████ that he wanted $60K. ████ got angry because of this demand, but then came back and told ████ that he had "negotiated" for him to get ████ a raise to $60K. ████ told him that when he discussed ████ raise with Beverly Young, the person in Phoenix responsible for determining recruiter raises, the only thing she wanted to know was how many students did he enroll. ████ recalled that he enrolled about 130 students in nine months.

████ told ████ and some of the newly hired recruiters that UP began calling the number of students enrolled (enrollments) on the matrix, "level one student info cards" in order to deceive the Department of Education. ("Technically, we can't call them enrollments").

He seemed to vaguely recall that ████ also went through some "qualitative" factors such as communication, judgment, working relationships with ████ at the time of his review, but that the bottom line issue that ████ discussed was how many students he enrolled. ████ said, "You got what you wanted," i.e., your $60K per year.

DOE APOL 0142

To celebrate ███████ promotion, ████ and █████ boss, ████████ took him out to dinner at a very nice restaurant where they all had too much to drink-he went back to the office to "sleep it off."

Because ██████ enrolled so many students, he also won a trip to Tahoe for two with a nice hotel stay-this was called a Sperling trip and was based solely on how many students he enrolled in a quarter. He also recalls that there were some occasional contests for recruiters for who could enroll the most students in a given period of time. The winner would receive prizes such as a video camera.

Once ████ transferred to ███████, █████████ became the manager. ██████ was extremely difficult to work for and caused a number of people to become "stressed out." One recruiter actually became physically ill and gained a tremendous amount of weight as a result of the stress. ██████ says that ████ put far too much pressure on the recruiters to enroll students.

██████ has concerns about the quality of instructors at UP. He claims that UP will hire anybody to teach and that sometimes instructors' spouses show up to fill in.

INTERVIEW WITH █████████

█████████ was interviewed by Russ Wolff and Jennifer Woodward on ████████ at her home in █████████.

█████████ has a ██ degree in █████████ from ████ She has been an █████████ at two other schools prior to working for UP. When she applied for the counselor position at UP's █████████ campus in about August ████ she actually thought she was responding to an ad for an █████████. Instead, the manager who interviewed her, █████████ explained that the position was for student recruiting and convinced her to give the job a try. This interview was quite long—an hour and a half. █████████ explained to her how much money she could make based on how many students she enrolled and offered her $32K per year as a starting salary. █████████ gave her an Enrollment Counselor Policies Handbook, effective 12/2000, along with a matrix. █████████ signed for the Handbook, and ultimately didn't keep the matrix. By putting these two documents together (Handbook at 5-7), █████████ told █████████ she could tell the range of how much money she could make after her first 8 months at UP. █████████ never mentioned anything about other factors such as communication skills, judgment or work relationships as having a bearing upon her salary. █████████ referred to a student recruited as a start," but told █████████ not to call them starts, but rather "enrollments." At the time, █████████ thought this was because the term start was demeaning to a student.

█████████ took the job, even though she did not want to be in sales and did not think she had the right personality to succeed. She was also attending █████████ pursuing her █████████ at ████ She really liked her co-recruiters and she managed to perform very well during her first 8 months by enrolling a lot of students, about 112. █████████ promoted her to an Enrollment Counselor II position for which █████████ received a salary increase from $32K to $73K per year. During her performance evaluation after her first 8 months, █████████ told her that she was going to ask █████████ for a certain amount—she asked for $74,000—and then she subsequently found out that she received $73,000. █████████ further told her that if she did not continue to enroll the same number of students, her $73K per year would go right back down to $32K per year. She also told her that she would have added responsibilities with her new title of ECII that would include enrolling a greater number of students to go on to the next level (Sr. counselor) and to then earn even more money. Potentially, she would also have to train new counselors, but that never happened.

DOE APOL 0144

After receiving her performance evaluation based on the "numbers", she may have gone through a second separate, and brief, review to discuss the qualitative factors. However, her actual review was not based on these factors.

Each day, she and the other recruiters had to fill out a sheet that listed how many phone calls they made to potential students, how many appts. scheduled, how many appointments made and how many students enrolled for that day. ████ kept these numbers on a white board also on a daily basis. Each morning in what was called OSIRA meetings, ████ would meet with the recruiters and they would discuss their goals from the previous day and whether they had met them. ████ would chastise them if they had failed and did not have a good reason why.

Each time one of the recruiters enrolled a student, they had to ring a bell to announce the enrollment!

In addition to the pay increase, ████ and the others received other "incentives" to enroll students. These included the opportunity to win trips, known as "Sperling" trips and lottery tickets. In ████, ████ won a Sperling trip to Las Vegas for her and her husband, which included airfare and all expenses. There was only one event that she was required to attend during the trip and that was a dinner with awards and kudos given to winners—UP called the trip a "training," but in fact it was all pleasure.

She recalled another trip that was offered to the Napa valley. She thought it was odd because emails and other communications referred to the number of "grapes" a recruiter had to achieve in order to win this trip. They referred to "who was stomping the most grapes."

She attended SAW training in ████ that consisted of a week of intense sales motivation training. She also provided us with some cassette tapes and a videotape she received for training purposes. The gist included, "if you want to make the money, here's what you have to do," "never take no for an answer." Truly sales mentality. Some of her potential recruits told her that they thought she sounded as if she was trying to "sell them." If a recruiter started to slump in the number of students enrolled, they were required to take further training.

Because of her ████, ████ left UP for a quarter in ████. She felt that she could not handle the job demands and school at the same time any longer. She returned in ████. In order to receive the same amount of pay, she had to write a letter (she gave us a copy) explaining why she deserved this

**DOE APOL 0145**

level of pay (quote from it).    ▓▓▓▓ told her that the job was going to be more difficult. Pressure had increased and if ▓▓▓▓ "didn't make her numbers, she'd be out."

She occasionally received emails from students who were happy with her, but she said that these did not play a part in her pay increase. When asked about the qualitative factors, she had no recollection of ever having seen or anyone making reference to those factors. She thinks that the level of her pay was based entirely on the number of students she recruited.

Beginning in August ▓▓▓ the pressure on recruiters began to intensify to an uncomfortable level. ▓▓▓ and her boss, ▓▓▓▓▓▓▓ began to threaten to fire them if they didn't produce enough enrollments. Previously, she knew that her salary could go down if she didn't enroll enough students, but now the very existence of her job was being threatened. Previously, recruiters had to insure that students were "financially compliant," i.e., that they could actually pay for tuition (go through the financial aid office), but now they were told to even recruit students for classes that started that very evening. "Enroll them now and we'll figure it out later."

▓▓▓▓ decided that this was just not where she wanted to be because there was too much pressure and it was just too degrading. She is looking to pursue a ▓▓▓▓▓ ▓▓▓▓ and at the end of ▓▓▓▓▓▓▓▓, she resigned from UP. She is currently employed.

3

DOE APOL 0146

**Rose, Christine**

|  |  |
|---|---|
|  | Woodward, Jennifer |
|  | Thursday, July 24, 2003 2:04 PM |
| To: | 'Nancy G. Krop'; 'DanielBartleyLaw@aol.com' |
| Cc: | Wolff, Russell |
| Subject: | RE: Status Update! |

Hi Nancy and Dan,

Department of Education personnel from the San Francisco regional office (the team) are planning to go onsite to corporate and to one or more of the Northern California campuses (different personnel, so these visits will occur simultaneously) the week of either August 11 or August 18 (we should know by tomorrow which week).

Russ Wolff and I will have oversight responsibility for the team during this week. Tentatively, our plans include traveling to the Bay area so that perhaps we might meet with the two of you on that Monday morning and discuss any insights you (and relators) may have about your offer to assist us in locating key documents and witnesses, as well as to obtain further documentation from you. I have provided the team with the index of documents that you gave us and anticipate that we will want to obtain copies of some of them. Such a meeting would greatly assist us in further providing direction to the team during the site visits.

As our plans solidify, we will be in further contact with you. One key item that we would like your input on as soon as possible is which of the Northern California campuses we ought to visit. It is possible that a team member could go to one location for a couple of days early in the week and then go to another later in the week. Please let me know what you think about this.

Thanks to both of you for your ongoing assistance.

-- --Original Message-----
From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
Sent: Wednesday, July 23, 2003 6:33 PM
To: Jennifer.Woodward@ed.gov
Cc: DanielBartleyLaw@aol.com
Subject: Status Update!

Hi Jennifer

We are wondering if the Department of Education ("DOE") intends to take any action regarding the violations by the University of Phoenix ("UOP") of the incentive compensation ban.

We need to serve UOP by September 4 with our lawsuit. As we discussed previously, it would be optimum for the DOE to gather documents before UOP is served and documents "disappear." We are more than willing to discuss strategy with you as far as locating key documents and witnesses.

Also, please let me know if you'd like Julie and Mary to review their deposition transcripts for accuracy.

Thank you for your attention to this matter.

Nancy Krop

DOE APOL 0785

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, July 24, 2003 3:07 PM |
| **To:** | JENNIFER.WOODWARD@ED.GOV |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Fwd: Fw: Application Trend Report |

Re:  University of Phoenix

Jennifer

Forwarded to you, F.Y.I.

Dan Bartley

cc  Nancy Krop

**Daniel Robert Bartley Law Offices**
E-mail  DanielBartleyLaw@aol.com
Mail Address:  Post Office Box 686, Novato, CA  94948 0686
Street Address:  7665 Redwood Blvd., Ste. 200, Novato, CA  94945 1405
Tel 415 898 4741  Fax 415 898 4841

**Confidentiality Note:**  The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above.  If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited.  If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message.  Thank you.

4/26/2007

DOE APOL 0786

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Tuesday, August 05, 2003 6:15 PM |
| **To:** | Russell.Wolff@ed.gov; jennifer.woodward@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Re: SF Visit |

In a message dated 8/5/2003 12:38:05 PM Pacific Daylight Time, Russell.Wolff@ed.gov writes:

> Subj: SF Visit
> Date: 8/5/2003 12:38:05 PM Pacific Daylight Time
> From: Russell.Wolff@ed.gov
> To: DanielBartleyLaw@aol.com, nkrop@kroplaw.com
> CC: Jennifer.Woodward@ed.gov
> *Sent from the Internet*


Dan/Nancy:

Jennifer and I are arranging our schedules so that we will arrive in SF to meet with you on Saturday afternoon, August 16th. We do not know anything specific yet concerning our flights, but there is an American Airline flight that arrives at 1:27 p.m., which seems the most likely. Presumably, we could then meet with you around 3:00. There is a direct flight from DC that arrives a little before noon, which, of course, would be preferable, but the ticket price is exponentially higher, so the government may not pay for it. We will let you know as soon as we have something confirmed.

We certainly appreciate all the recent email traffic and the ongoing insights and suggestions. Unfortunately, you need to realize that we are working with extremely limited resources at this time, compounded by the fact that the budget year expires on September 30, exacerbating our scarcity of funds. We have only been authorized a total of three investigative reviewers; two to visit corporate in Phoenix, and one to visit the campuses in SF, SJ, and perhaps Pleasanton/Livermore. We are trying to secure an additional reviewer, but it is by no means likely we will be successful.

Given the above, one of the things we wanted to address now is the possible existence of other "disgruntled" U of P employees that may wish to meet offsite with Jennifer and me. Obviously, neither of us will be on site, nor can we, or would we, directly solicit interviews with U of P employees. However, should anyone voluntarily wish to come forward and speak with us, we are more than interested in talking to them. Should the relators be aware of anyone who has spoken to them about a desire to reach the Department of Education, we would welcome such an opportunity. Similarly, if there are former U of P employees that may wish to communicate with us, we have no restraints in talking to them. We know of the two individuals in ███████who we hope to meet with at a later date, but for the short term, we're obviously focused on ██████████████and██████ Jennifer and I expect to be in the ████████Saturday thru Tuesday, and then in ████████Wednesday thru Friday, although that may change depending upon where we are needed. Let us know if you have any thoughts.

We look forward to seeing you again soon.

Russ

**DOE APOL 0841**

Russ and Jennifer

Thank you both very much for the adjustment in meeting time.

We are sharing your additional questions with our clients and shortly one of us will get back to you.

Dan Bartley

cc Nancy Krop

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

**Confidentiality Note:** The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

4/26/2007

DOE APOL 0842

**Rose, Christine**

|        |                                                                 |
|--------|-----------------------------------------------------------------|
| To:    | Nancy G. Krop [nkrop@kroplaw.com]                               |
|        | Friday, August 15, 2003 11:54 AM                                |
| Cc:    | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov                  |
|        | ██████████████, ████████████████, ████████ DanielBartleyLaw@aol.com |
| Subject: | Julie's feedback                                              |

Hi Jennifer, Russ:

Comments from Julie:

Not every counselor will have been given a copy of his/her matrix. UOP has gotten very savvy in just showing counselors what they have to do but not giving them out readily. I can bring a copy of each matrix. My recommendation is that each team has a copy of the matrix and asks the counselors what it is. They have all seen one but many will not have copies of one. She definitely should ask (for copies of their matrix) though because you never know who keeps what.

I know for a fact that ██████████ has copies of her reviews, matrixes etc. She would definitely be willing to share with the DOE. She is an ex-employee. I have already forwarded her contact information.

Thanks

Nancy

1

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 15, 2003 5:43 PM |
| **To:** | Woodward, Jennifer |
| **Subject:** | Re: Help |

Here you go!:

████████ returns from ████ Friday, August 15th. She works for the ████████ and is off work right now. Now would be a perfect opportunity for them to contact her. She would be more than happy to fill them in on details. I also know that she too has copies of matrixes, reviews and other documentation that she would gladly turn over if Jennifer and Russ just ask. Her home number is ███ ████████ Cell phone number is ████████████

At 04:51 PM 8/15/2003 -0400, you wrote:

> Nancy, I am trying to find the email with former recruiter ████████ phone number and haven't succeeded-
> might you have it handy?  Thanks so much.

DOE APOL 0862

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Sunday, August 17, 2003 9:09 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | ███████████ ; ███████████ ; DanielBartleyLaw@aol.com |
| **Subject:** | more witness information |

hi folks –

mary has the following information for you.  thanks.  nancy:

████████████ will know how to reach ███████████████ is a former employee who worked in SF as an admissions counselor and then in █████ as an ████████████ I believe she now lives in ███████████ but is in contact with ████████
He may also have contact information for another former manager, ████████████████ was at one time ██████████ She now lives in ████████ but has family is ██████████
If Jennifer is able to reach ██████████ he will be able to help her reach another former employee, ████████ who was the ██████████ campus when he resigned. ██████████
will have contact numbers for former employees, as well, if he cooperates.

DOE APOL 0863

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, August 19, 2003 12:03 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Interviewing recruiters |

Hi

I left messages on the cell and at the hotel, and thought I'd e-mail as well. Mary says her manager Ann Tye directed everyone to answer DOE questions, but not to volunteer any information.

Mary says her co-workers are asking her whether they should volunteer to tell the DOE the management comments they've heard about trying to deceive the DOE (in particular, the "flying under the radar" comments). Mary's told them to tell the DOE whatever they know. But Mary is thinking that it would be good for the DOE interviewers to specifically ask the recruiters if they have heard anyone at UOP make comments about trying to deceive the DOE, such as the flying under the radar comment. Recruiter ████ brought up the issue to Mary.

Thanks

Nancy

**DOE APOL 0864**

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, August 19, 2003 6:26 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com; ██████████████ █████████████ |
| **Subject:** | More witnesses |

Hi

Mary and Julie know a couple more former employees they believe may be good folks for your team to interview:

1.    ██████████████████████████ from San Jose.

2.    ████████████ former employee of the Sacramento campus

They will forward to me the contact information for those two witnesses.

Thanks.

Nancy

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, August 19, 2003 6:34 PM |
| **To:** | Russell.Wolff@ed.gov; Jennifer.Woodward@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com; |
| **Subject:** | Current Employee Interviews |

Hi Russ. Jennifer

More information for you from Julie and Mary.

Per Julie:

Per Mary: at the 9 a.m. meeting with her manager Ann Tye, Ann said to answer the DOE questions honestly. Ann also said that nobody has to give the DOE their reviews. Ann said if she's asked, she'll just give the DOE a blank form. San Jose counselors are telling Mary they are VERY nervous about losing their jobs if they tell the DOE the truth. So we'll see what they do in their interviews.

Mary does not know why anyone is saying documents are at Fresno. Fresno is the financial aid center for NorCal.
The Sperling criteria for enrollment counselors is starts only, now and before. Sperling contests were just for enrollment until the year 2000.

That's all for now!

Nancy

DOE APOL 0866

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Tuesday, August 19, 2003 11:43 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Subject:** | Fwd: RE: More witnesses |

Russ, Jennifer -- FYI, more witness contact information from Mary below.  Thanks. Nancy

> From: "Mary Hendow" <​█████████████>
> Cc: "Mary Hendow" <​█████████████>
>     "Julie Albertson" <█████████
>     "Dan Bartley" <Danielbartleylaw@aol.com>,
>     "Nancy Krop" <nkrop@kroplaw.com>
> Subject: RE: More witnesses
> Date: Tue, 19 Aug 2003 19:37:44 -0700
> X-Mailer: Microsoft Outlook IMO, Build 9.0.2416 (9.0.2911.0)
> Importance: High
> To:nkrop@kroplaw.com
> X-Loop-Detect:1

███████████████████████████████████

█████████████ Worked for Heather Cornell when Heather was DOE at NorCal.  May also have been a counselor at one time.

█████████████ worked at San Jose and San Francisco. Left due to low enrollments.

████████████

█████████ worked at the Pleasanton campus, was a top enrollment counselor.  ██████████████ resigned.

████████████

**DOE APOL 0867**

4/24/2007

████████(will return from ████████September)  cell: ████████████
home: ████████████

████████████ enrollment counselor  Pleasanton campus, worked for Cheryle Bough.

There are others that Julie will send in the morning

-----Original Message-----
**From:** Nancy G. Krop [mailto:nkrop@kroplaw.com]
**Sent:** Tuesday, August 19, 2003 3:26 PM
**To:** Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Cc:** DanielBartleyLaw@aol.com; █████████████ █████████████
**Subject:** More witnesses

Hi

Mary and Julie know a couple more former employees they believe may be good folks for your team to interview:

1. ███████████████████████from San Jose.

2. ███████████former employee of the Sacramento campus

They will forward to me the contact information for those two witnesses.

Thanks.

Nancy

DOE APOL 0868

P ~ e, Christine
_____

**F  ~ :**          Nancy G. Krop [nkrop@kroplaw.com]
**Sent:**        Wednesday, August 20, 2003 11:56 AM
**To:**          Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Cc:**          DanielBartleyLaw@aol.com; █████████████████████████
**Subject:**     Urgent:  Concerns re Current Interviews

Hi Russ, Jennifer

Wanted to pass on to you feedback from Julie and Mary about the employee
interviews.

1. Oakland.  ████████████ (a counselor who is ready to talk with the DOE,
give the DOE her documents and is very upset that her manager wants her to
lie to the DOE) was asked to attend a meeting ████ morning from
She is very open to speaking with the DOE as is her co-worker ████████
They are however nervous that they can get fired for telling the
truth. ████ and ████ will both need assurances of confidentiality from
the DOE interviewer.

2. San Francisco.  Julie had two separate conversations with SF
reps.  Here is her information:

     "One was ████████ who told me that the interviewer asked him questions
about winning DVD players etc. He told them no. He has      never won because
he never enrolled enough students to. He also said that they were asking
him questions about being paid on  enrollment and was vague and did not
ar~wer. When I asked ████ but ████ we are paid based on enrollment" he
   red, "well   yeah I know that". ████ also laughed and said, "Yeah when
met with ████ she tried to enroll him" and laughed.

     Also spoke with ████████████ this evening. He told me that they were in a
meeting this morning laughing about the DOE and the  interviewer. Some one
asked, wanna know how you get the interviewer out of your office fast?, the
new guy ████ stated, "yeah fart".    The San Francisco team is laughing in the
face of the DOE and Mike McKay the manager is joining in with them. I was
absolutely  disgusted with them. ████ also said, well UOP is clean as a
whistle they don't pay us on commission. ████ feels because he
is    salaried he is not paid on commission. He readily admits that in order
to get a raise he has to hit his numbers. ████████████ has    heard ████ say
on many occasions that I am making nothing now, I need to enroll so I can
get a raise."

     Mary had the following to add:

     "████ was at our campus today, he met with DOE in SF. He was joking about
his meeting with other counselors in SJ. It sounds   like one of the
questions is "did you ever win a DVD player?" most counselors could
truthfully answer "no" to that question. All were     eligible for the
contest, however."

My suggestions for the interviewers:  don't only ask the counselors if they
ever won anything.  More critical is whether they ever participated in a
contest to win anything; what were the contest requirements, who won the
contest, do they have documents regarding these contests, etc.  Also,
rather than just open ended questions, I suggest that the interviewers
directly ask the counselors if their enrollment numbers impact their
c~  nsation.  Can they increase their compensation through their
a    ment activities.  If so, explain.

3.  San Jose

**DOE APOL 0869**

Mary reported that counselors are very nervous about their jobs -- that their jobs will be in jeopardy if they tell the truth to the DOE.  As much as your interviewer can assure them confidentiality would be extremely helpful in getting the truth from the counselors.

4.    Friendly Witnesses.

Mary received feedback that a friendly witness felt very intimidated by Russ.  We need these folks to feel comfortable coming forward so please address that situation as you can.

Thanks.

Nancy

2

**Rose, Christine**

| | |
|---|---|
| Sent: | Nancy G. Krop [nkrop@kroplaw.com] |
| | Wednesday, August 20, 2003 12:05 PM |
| To: | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| Cc: | ██████████████, █████████████████ DanielBartleyLaw@aol.com |
| Subject: | More interviewing information |

Hi Russ, Jennifer

More information for the interviewers:

New counselors have a 15 week evaluation.  The San Jose manager may try to hide that information from the interviewer.

The San Jose manager Ann advised the counselors to "answer only what we were asked, nothing more...don't offer information". So, the interviewer is going to have to ask very direct questions, not just open ended questions hoping for information.

Thanks

Nancy

DOE APOL 0871

1

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Wednesday, August 20, 2003 1:01 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Another Former Employee |

Hi

Julie, Mary thought you could try to reach another former employee for a telephone interview:

████████████████ (██████████). He was a counselor and manager at the ███████ campus. He worked for several years with UOP.

Thanks

Nancy

DOE APOL 0872

4/24/2007

**Rose, Christine**

---

**From:** Nancy G. Krop [nkrop@kroplaw.com]
**Sent:** Wednesday, August 20, 2003 7:29 PM
**To:** DanielBartleyLaw@aol.com; Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Subject:** Update from Client: Pressure from Management, and more

Hi

Here's the update today from Julie:

San Mateo/San Francisco:
   Julie's manager Mike tried to coach Julie how to answer the DOE questions. Mike told her that the DOE is asking about Sperling trips, and whether they are paid based on enrollment. Julie told Mike she is paid based on enrollment. Mike got very angry with her, told her not to say that. Mike told Julie to tell the DOE her performance reviews are with H.R. Julie said no, I'll tell the DOE I have copies of my reviews. Mike was furious. Mike said that when he was asked about Sperling contests, he simply said he'd never won one.
   Mike directed Julie to speak to ▆▆▆.
   ▆▆ is up for a promotion. ▆▆ bragged to Julie, "I played Ronald Reagan –-I ~ould not recall a thing." ▆▆ told Julie, "hey UOP might get a slap on the hand for their illegal activities, but UOP is too large and can buy their way out of anything."
   After her interview, Mike asked Julie what she told the DOE. Mike got real angry when Julie said she told them the truth and it was none of his business.

▆▆▆
   Manager Laura told ▆▆▆ to take the day off today when ▆▆▆ tried to return to work today. ▆▆▆ said she wants to talk to the DOE and she's very angry that Laura is trying to keep her from the DOE.

That's it for now.

Nancy

DOE APOL 0873

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Wednesday, August 20, 2003 8:59 PM |
| **To:** | nkrop@kroplaw.com |
| **Cc:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Subject:** | Re: Update from Client: Pressure from Management, and more |

Nancy

My, some these UoP managers certainly are intrepid, cavalier, and obnoxious.

Like a snake writhing under a boot.

Dan

cc Jennifer and Russ

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0874

**Rose, Christine**

|  |  |
|---|---|
|  | Nancy G. Krop [nkrop@kroplaw.com] |
| Se... | Thursday, August 21, 2003 12:27 AM |
| To: | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| Cc: | DanielBartleyLaw@aol.com |
| Subject: | Another current employee witness |

Hi Jennifer, Russ

Julie suggests your team speak with a current employee, ██████████████

"We also had a conversation with ██████████ ██████████
██████████ for ██ today. ██████was on the phone with her prior to Martina
coming out nervous about what he would say and losing his job. He asked
██████████if she heard what was going on and if she has spoken with the DOE
yet. He told me that she stated "No way, I am staying out of the office. If
they talk to me I will have to tell the truth. I am not lying for this
company." She then came into our campus later that evening and reiterated
to me the same thing she said to ██████ She said, " I have been here too
long and know too much. I would not lie to the DOE." She will not be in the
office at all tomorrow and only stopping in very briefly Friday am.

Nancy

**DOE APOL 0875**

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Thursday, August 21, 2003 12:32 PM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Subject:** | DOE Interviewers |

Hi Jennifer, Russ

Please pass on to Shane that both of  the relators are very pleased with
the interviewers and the job that they are doing.  Please give our
apologies to Shane for any hurt feelings.

Thanks
Nancy

1

DOE APOL 0876

Rose, Christine
_____

**From:** DanielBartleyLaw@aol.com
**Sent:** Thursday, August 21, 2003 1:51 PM
**To:** Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Cc:** nkrop@kroplaw.com
**Subject:** Re: Another current employee witness

In a message dated 8/21/2003 10:41:16 AM Pacific Daylight Time, Jennifer.Woodward@ed.gov writes:

> Sounds as if we aren't going to be able to speak with her, if she's never going to be there, so this isn't
> very useful information.
>
> -----Original Message-----
> From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
> Sent: Thursday, August 21, 2003 12:27 AM
> To: Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
> Cc: DanielBartleyLaw@aol.com
> Subject: Another current employee witness
>
>
> Hi Jennifer, Russ
>
> Julie suggests your team speak with a current employee; ██████████████
> ██████████████████████████
>
>   We also had a conversation with ████████████, The ██████████████████
> ███████ for ███ today. ███████ was on the phone with her prior to Martina
> coming out nervous about what he would say and losing his job. He asked
> Clarissa if she heard what was going on and if she has spoken with the DOE
> yet. He told me that she stated "No way, I am staying out of the office. If
> they talk to me I will have to tell the truth. I am not lying for this
> company." She then came into our campus later that evening and reiterated
> to me the same thing she said to ████ She said, " I have been here too
> long and know too much. I would not lie to the DOE." She will not be in the
> office at all tomorrow and only stopping in very briefly Friday am.
>
> Nancy

Jennifer and Russ

I am e-mailing Relators right now to ask whether they can ascertain and supply ████████████ home address or
telephone number.

Dan

cc Nancy

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
    15 898 4741 Fax 415 898 4841

Identiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a
confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message

**DOE APOL 0877**

4/24/2007

is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0878

**Rose, Christine**

| | |
|---|---|
| S:...: | Nancy G. Krop [nkrop@kroplaw.com] |
| To: | Thursday, August 21, 2003 1:38 PM |
| To: | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| Cc: | DanielBartleyLaw@aol.com; mbjaboards@worldnet.att.net; maryroseh@earthlink.net |
| Subject: | Information from Clients re the Renegade Managers! |

Hi Russ, Jennifer

Julie believes we have the paper trail to expose any claim by UOP that
errant managers are setting salaries (I haven't spoken yet with Mary about
this claim).   Julie believes we have the paper trail that salaries are
set/approved by corporate enrollment.

When the DOE completes interviewing the top Phoenix officials, we would
appreciate it if you could share with us all their claims so that
Julie/Mary can provide the rebuttal documentary and/or witness
evidence.   The evidence will show that it is not errant managers acting
without corporate knowledge, but rather these managers following corporate
enrollment direction, and now taking the fall for their corporate loyalty.

Thanks

Nancy

1

DOE APOL 0879

**Rose, Christine**

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, August 21, 2003 1:48 PM |
| **To:** | JENNIFER.WOODWARD@ED.GOV; Russell.Wolff@ed.gov |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Re: Urgent: Concerns re Current Interviews |

In a message dated 8/21/2003 10:03:46 AM Pacific Daylight Time, nkrop@kroplaw.com writes:

> From: "Dunne, Shane" <Shane.Dunne@ed.gov>
> To: "Woodward, Jennifer" <Jennifer.Woodward@ed.gov>, "Wittman, Donna"
>     <Donna.Wittman@ed.gov>, "Crim, Susan" <Susan.Crim@ed.gov>,
>     "Fernandez-Rosario, Martina" <Martina.Fernandez-Rosario@ed.gov>
> Cc: "Wolff, Russell" <Russell.Wolff@ed.gov>, "'nkrop@kroplaw.com'"
>     <nkrop@kroplaw.com>
> Subject: RE: Urgent:  Concerns re Current Interviews
> Date: Thu, 21 Aug 2003 01:30:21 -0400
> X-Mailer: Internet Mail Service (5.5.2655.55)
> X-Loop-Detect:1
>
> Couple more comments:
>
> I never interviewed ▇▇▇▇▇▇
>
> Also, ▇▇▇▇▇ and I never engaged in any enrollment activity.  I was introduced to her by ▇▇▇▇▇▇
> In fact, this exchange was poignant enough because I had to ask ▇▇▇▇▇▇ to leave after the
> introduction (when she attempted to sit in on the interview).  There was a few moments awkward
> moments where ▇▇▇▇▇ had to call someone to give me permission to interview ▇▇▇▇▇.  There was
> no ambiguity in ▇▇▇▇▇ mind as to who I was and why I was there.
>
> Jennifer, I think it might be better to not share the relators thoughts and criticisms about our interviewing
> techniques.  This has been really demoralizing to read and just not productive.
>
> Thanks

Jennifer and Russ

Notwithstanding the fact that any reasonable person would take personal offense at the snide, crude, and terribly insulting remarks made by UoP managers, one must consider the source.  Relators hope you and Russ can convince the investigators that, notwithstanding the terribly offensive content of this information, the information is helpful to your investigative process and very revealing about how some of the UoP managers are being very cavalier, obstructive and contemptuous in their effort to conceal from the investigators evidence of unlawful conduct.

Dan

cc Nancy

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948-0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If

You have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0881

4/24/2007

## Rose, Christine

**From:** Nancy G. Krop [nkrop@kroplaw.com]
**Sent:** Thursday, August 21, 2003 1:55 PM
**To:** Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
**Cc:** DanielBartleyLaw@aol.com

hi Jennifer, Russ

More Information from Julie about the deception of her manager Mike McKay:

Mike advised me that when asked by the interviewer about Sperling trips, he just said " I have never been on a Sperling trip as a manager." I told him that all my Sperling trips had been based on starts. He said "me too but I just said that to avoid telling them and I hid all my Sperling plaques that were in my office prior to him coming."

More information from Julie about compensation is based on the numbers, and keeping Daniel Waterman in the loop:

After I met with their reviewer, Mike asked me what I said to them so he could go back and report to Daniel. I told him that I was not comfortable telling him that so he can just go back and report it to Daniel. He didn't care too much for that answer. While the interviewer was talking with Sean, Mike and I were having a conversation regarding my maternity leave. I have always told him that I will be taking full advantage of the time allowed to me. He was always under the impression that was only 3 months. After telling him, depending on my financial situation, I anticipate between 3-6 months time off. He was shocked and said, "You know you might want to reconsider that because the new matrix is coming out and your salary will go up and down again." I asked him why my salary would be decreased, " well because you won't have any numbers for six months." I told him that I didn't think they could do that and he told me, "well you better look into it if you don't want to reduce your salary."

Nancy

DOE APOL 0882

**Rose, Christine**

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 22, 2003 11:22 AM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Fwd: RE: Another current employee witness |

Please see information below re ▇▇▇▇ in case an interviewer has an opportunity to speak with her.
Thanks.

> From: "Mary Hendow" < ▇▇▇▇▇▇▇▇▇▇ >
> To: "Nancy G. Krop" <nkrop@kroplaw.com>
> Subject: RE: Another current employee witness
> Date: Thu, 21 Aug 2003 17:35:50 -0700
> X-Mailer: Microsoft Outlook IMO, Build 9.0.2416 (9.0.2911.0)
> Importance: Normal
> X-Loop-Detect:1
>
> ▇▇▇ was an enrollment counselor in ▇▇ Then an ▇▇▇▇▇▇ in ▇ She left UOP
> shortly after ▇▇▇▇▇▇ She returned in ▇▇ as an Admission Counselor in ▇
> and then transferred to ▇ She left to work for ▇▇▇▇ and then returned to UOP as a ▇▇▇
> ▇▇▇▇▇ about a year ago. She should know about compensation.


> -----Original Message-----
> From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
> Sent: Thursday, August 21, 2003 11:21 AM
> To: Woodward, Jennifer; Russell.Wolff@ed.gov
> Cc: ▇▇▇▇▇▇▇▇▇▇▇▇▇    DanielBartleyLaw@aol.com
> Subject: RE: Another current employee witness
>
>
> Jennifer, Russ,
>
> I'm hoping that one of the San Francisco interviewers would be willing to speak with
> ▇▇▇▇ after this week. Particularly since she says she knows so much that she is willing
> to share with the DOE.
>
> Thanks
> Nancy
>
> At 01:38 PM 8/21/2003 -0400, you wrote:
>
>
> Sounds as if we aren't going to be able to speak with her, if she's never going to be there, so this isn't very
> useful information.
>
> -----Original Message-----

**DOE APOL 0883**

From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
Sent: Thursday, August 21, 2003 12:27 AM
To: Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
Cc: DanielBartleyLaw@aol.com
Subject: Another current employee witness

Hi Jennifer, Russ

Julie suggests your team speak with a current employee, ██████████████
████████████████████████████

"We also had a conversation with ████████████████████████████████████
██████████ for ████ today. ████ was on the phone with her prior to Martina
coming out nervous about what he would say and losing his job. He asked
████████ if she heard what was going on and if she has spoken with the DOE
yet. He told me that she stated "No way, I am staying out of the office. If
they talk to me I will have to tell the truth. I am not lying for this
company." She then came into our campus later that evening and reiterated
to me the same thing she said to ████ She said, " I have been here too
long and know too much. I would not lie to the DOE." She will not be in the
office at all tomorrow and only stopping in very briefly Friday am.

Nancy

DOE APOL 0884

4/24/2007

**Rose, Christine**

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Friday, August 22, 2003 11:42 AM |
| **To:** | Russell.Wolff@ed.gov; JENNIFER.WOODWARD@ED.GOV |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Fwd: FW: Can you get home telephone/address for ██████████ |

DOE APOL 0885

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | Mary Hendow [maryroseh@earthlink.net] |
| **Sent:** | Thursday, August 21, 2003 8:46 PM |
| **To:** | Mary Hendow; Julie Albertson; Dan Bartley; Nancy Krop |
| **Subject:** | FW: Can you get home telephone/address for ███████ |

Sure. Her number is ██████████

-----Original Message-----
**From:** DanielBartleyLaw@aol.com [mailto:DanielBartleyLaw@aol.com]
**Sent:** Thursday, August 21, 2003 10:54 AM
**To:** ████████████████████████████
**Cc:** nkrop@kroplaw.com
**Subject:** Can you get home telephone/address for Clarissa Falen?

Mary and Julie

Can either of you get the home address and/or telephone number of ████████████ in order that the DOE investigators may have the option of contacting her there?

Dan

cc Nancy

PS  I'm still in Oregon, but simply checking my e-mail this morning before leaving for a day out with the family. Will have my cell phone ███████████ on, but reception is spotty due to the mountains.

Tel ███████████  Room 323  (til checkout tomorrow late morning)

**Daniel Robert Bartley Law Offices**
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

DOE APOL 0886

4/24/2007

onfidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a
nfidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message
not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If
you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies
you may have made of this message. Thank you.

**DOE APOL 0887**

4/24/2007

## Rose, Christine

| | |
|---|---|
| **From:** | DanielBartleyLaw@aol.com |
| **Sent:** | Thursday, August 21, 2003 1:51 PM |
| **To:** | Woodward, Jennifer; Wolff, Russell |
| **Cc:** | nkrop@kroplaw.com |
| **Subject:** | Re: Another current employee witness |

In a message dated 8/21/2003 10:41:16 AM Pacific Daylight Time, Jennifer.Woodward@ed.gov writes:

> Sounds as if we aren't going to be able to speak with her, if she's never going to be there, so this isn't very useful information.
>
> -----Original Message-----
> From: Nancy G. Krop [mailto:nkrop@kroplaw.com]
> Sent: Thursday, August 21, 2003 12:27 AM
> To: Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov
> Cc: DanielBartleyLaw@aol.com
> Subject: Another current employee witness
>
>
> Hi Jennifer, Russ
>
> Julie suggests your team speak with a current employee, ███████████, a
> ███████████████████
>
> "We also had a conversation with ███████████ ███████████████████
> ████████ for ██ today. ███ was on the phone with her prior to Martina
> coming out nervous about what he would say and losing his job. He asked
> ████████ if she heard what was going on and if she has spoken with the DOE
> yet. He told me that she stated "No way, I am staying out of the office. If
> they talk to me I will have to tell the truth. I am not lying for this
> company." She then came into our campus later that evening and reiterated
> to me the same thing she said to ██████ She said, " I have been here too
> long and know too much. I would not lie to the DOE." She will not be in the
> office at all tomorrow and only stopping in very briefly Friday am.
>
> Nancy

Jennifer and Russ

I am e-mailing Relators right now to ask whether they can ascertain and supply ███████████ home address or telephone number.

Dan

cc Nancy

Daniel Robert Bartley Law Offices
E-mail DanielBartleyLaw@aol.com
Mail Address: Post Office Box 686, Novato, CA 94948 0686
Street Address: 7665 Redwood Blvd., Ste. 200, Novato, CA 94945 1405
Tel 415 898 4741 Fax 415 898 4841

Confidentiality Note: The information in this message is an expression of personal opinion, may constitute inside information, and is a confidential and privileged communication intended only for the use of the individual or entity named above. If the receiver of this message

**DOE APOL 0888**

4/24/2007

is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited. If you have received this e-mail in error, please immediately notify us by e-mail or telephone (415 898 4741), and please destroy any copies you may have made of this message. Thank you.

DOE APOL 0889

## Rose, Christine

| | |
|---|---|
| **From:** | Nancy G. Krop [nkrop@kroplaw.com] |
| **Sent:** | Friday, August 22, 2003 11:26 AM |
| **To:** | Jennifer.Woodward@ed.gov; Russell.Wolff@ed.gov |
| **Cc:** | DanielBartleyLaw@aol.com |
| **Subject:** | Witness ███████ |

Hi

Mary relayed this information:

I spoke with ███████ again today, she assured me she would call Jennifer. She has been very, very busy with personal matters and is still new at the company where she works....

DOE APOL 0890

1    LEVENBAUM & COHEN
     GEOFFREY M. TRACHTENBERG (19338)
2    362 North 3rd Avenue
     Phoenix, AZ 85003-1504
3    Telephone: (602) 271-0183
     Facsimile: (602) 271-4018
4
     Local Counsel for the Class
5
     BARRACK, RODOS & BACINE
6    STEPHEN R. BASSER
     SAMUEL M. WARD
7    402 West Broadway, Suite 850
     San Diego, CA 92101
8    Telephone: (619) 230-0800
     Facsimile: (619) 230-1874
9
     BARRACK, RODOS & BACINE
10   LEONARD BARRACK
     GERALD J. RODOS
11   3300 Two Commerce Square
     2001 Market Street
12   Philadelphia, PA 19103
     Telephone: (215) 963-0600
13   Facsimile: (215) 963-0838

14   Lead Counsel for Lead Plaintiff, the Policemen's Annuity and
     Benefit Fund of Chicago and the Class
15

16                   UNITED STATES DISTRICT COURT

17                         DISTRICT OF ARIZONA

18   In re APOLLO GROUP, INC.          )   Lead Case No. CV 04-2147-PHX-JAT
     SECURITIES LITIGATION             )
19                                     )   CV 04-2204-PHX-EHC (Consolidated)
     ─────────────────────────────     )   CV 04-2334-PHX-RCB (Consolidated)
20   This Document relates to:         )
                                       )   CLASS ACTION
21        ALL ACTIONS.                 )
                                       )   JURY TRIAL DEMANDED
22                                     )
     ─────────────────────────────     )
23

24   LEAD PLAINTIFF, THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF
     CHICAGO'S CONSOLIDATED CLASS ACTION COMPLAINT FOR
25            VIOLATIONS OF FEDERAL SECURITIES LAWS

26

27

28

# TABLE OF CONTENTS

                                                              **Page**

I.     NATURE OF THE ACTION ................................................................ 1

II.    JURISDICTION AND VENUE ........................................................ 7

III.   PARTIES ...................................................................................... 8

     A.    Plaintiff ................................................................................. 8

     B.    Defendants ............................................................................ 8

IV.   BACKGROUND FACTS ................................................................ 10

     A.    Financial Aid Fraud and Unethical Practices by For-Profit Schools in the Late '80's and Early '90's Trigger Congressional Restrictions on Compensation ........................................................................ 10

     B.    Title IV Regulations and Funding — Critically Important to For-Profit Schools .................................................................................. 11

     C.    The Serious February 5, 2004 DOE Report Concluding that Apollo's UOP Operations Violate the Law Banning Incentive Compensation ............ 13

           1.    Use of Incentive Compensation Based on Enrollments for Those Involved in Recruiting or Admission Activities in Violation of Title IV Requirements ............................................................ 14

           2.    UOP's Student Recruiting System Focused on the Numbers and Deployed a Sales Training and Compensation Program the DOE Characterized as "Smoke and Mirrors" Designed to Allow UOP to "Fly Under the Radar" of DOE Scrutiny ........................................ 15

           3.    UOP Penalized Enrollment Counselors for Not Meeting the Enrollment Numbers and Used Intimidation Techniques ...................... 23

           4.    UOP's Recruiter Evaluation System and Salary Increases Reinforced the Focus on Hitting Enrollment Numbers — the Quantitative — While Trying to Deceive the DOE ................................ 24

           5.    Bonus Incentives Awarded Based on Securing Enrollments and Recruiting ...................................................................... 27

           6.    Pressure to Enroll Unqualified Students ........................................ 28

           7.    UOP's Intense Use of Title IV Funds as a Sales Tool Amid a Culture of Duplicity ........................................................... 29

           8.    Further Deceptive Practices to Mislead the DOE and Obstruct Its Program Review Audit and Investigation .................................... 29

     D.    UOP Employee Whistleblowers Confirm Its Ongoing, Systemic and Illegal Enrollment Compensation Scheme and Deception of the DOE .............. 31

i

|   |   |   | |
|---|---|---|---|
| 1 | | E. | UOP's Illegal Enrollment Incentive Scheme and Related Unlawful Practices Are Also Confirmed by Numerous Knowledgeable Ex- |
| 2 | | | Employees ........................................................................................... 33 |
| 3 | V. | | MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD............................................................................................. 44 |
| 4 | | A. | False and Misleading Statements During the Class Period ................................... 44 |
| 5 | | B. | The DOE Report and Findings of Systemic Violations of the Law Is |
| 6 | | | Finally Disclosed ......................................................................................... 59 |
| 7 | VI. | | ADDITIONAL SCIENTER ALLEGATIONS ............................................................. 69 |
| 8 | | A. | Defendants Possessed Actual Knowledge of the February 5, 2005 DOE Report at All Times During the Class Period ......................................................... 69 |
| 9 | | | |
| 10 | | B. | Defendants' Concealment of the DOE Report — Which They Actively Believed Was a Material Adverse Event — Further Demonstrates Their |
| 11 | | | Requisite Scienter ......................................................................................... 70 |
| 12 | | C. | Attempts to Conceal UOP's Illegal Conduct from DOE Investigators Further Supports a Strong Inference of Scienter ................................................... 73 |
| 13 | VII. | | MISLEADING FINANCIAL STATEMENTS ............................................................. 74 |
| 14 | VIII. | | CLASS ACTION ALLEGATIONS ........................................................................... 76 |
| 15 | IX. | | ADDITIONAL ALLEGATIONS OF PRESUMPTION OF RELIANCE, FRAUD-ON-THE-MARKET AND CAUSATION ................................................................... 78 |
| 16 | | | |
| 17 | X. | | NO STATUTORY SAFE HARBOR ......................................................................... 80 |
| | XI. | | CLAIMS FOR RELIEF ......................................................................................... 81 |

18
19
20
21
22
23
24
25
26
27
28

1        Lead Plaintiff, The Policemen's Annuity and Benefit Fund of Chicago ("Lead
2  Plaintiff" or "Chicago Police Fund"), on behalf of itself and all other persons similarly
3  situated, by its undersigned attorneys, alleges the following based upon personal
4  knowledge as to itself and its own acts, and information and belief as to all other matters,
5  based upon, *inter alia*, the investigation conducted by and through its attorneys, which
6  included, among other things, a review of defendants' public documents, conference
7  calls and announcements made by defendants, United States Securities and Exchange
8  Commission ("SEC") filings, wire and press releases published by and regarding Apollo
9  Group, Inc., ("Apollo" or the "Company"), reports and advisories about the Company,
10 official reports of the United States Department of Education (the "DOE" or the
11 "Department"), information readily attainable on the Internet, forensic expert analysis
12 and interviews of knowledgeable witnesses.

13 **I.    NATURE OF THE ACTION**

14     1.    This is a federal securities class action on behalf of all persons and entities
15 who purchased or otherwise acquired the securities of Apollo between February 27,
16 2004, and September 14, 2004, inclusive (the "Class Period"), against the Company and
17 its top officers for violations of the federal securities laws arising out of defendants'
18 dissemination of false, deceptive and misleading statements concerning Apollo's results
19 and operations which caused the class to suffer significant damages.

20     2.    Apollo is a for-profit educational institution, which describes itself as a
21 provider of higher education to working adults.  Through its largest subsidiary, The
22 University of Phoenix, Inc., ("UOP"), which accounted for approximately 95% of
23 Apollo's revenues at all times material, and other subsidiaries of lesser financial
24 importance, including the Institute for Professional Development ("IPD"), the Company
25 offers programs and services at campuses and learning centers in 37 states, Puerto Rico,
26 and Canada.  Apollo claims to be the largest private institution of higher education in the
27 United States based on enrollment in its educational programs.

28

3.    Throughout the Class Period, Apollo reported positive financial results and publicly disseminated press releases and filings with the SEC, attributing these results to strong growth in student enrollment in its degree programs, both at local campuses and online.  A material portion of Apollo's revenue is derived from federal financial aid programs — Title IV funding — in which Apollo's students participated to receive tuition assistance.

4.    As a consequence of students' receipt of financial aid from the federal government — which accounted for approximately 62% of Apollo subsidiary UOP's revenue — the Company was subject to extensive regulation by governmental agencies, including licensing and accrediting bodies.  In particular, the Higher Education Act of 1965, as amended ("HEA") and the regulations issued thereunder by the DOE, established numerous standards and regulations that Apollo and its controlled subsidiaries were required to satisfy in order to participate in the various federal student financial aid programs regulated under Title IV of the HEA.  One of the most important regulations promulgated by Congress and administered by the DOE prohibits institutions that receive federal financial aid from paying commissions, bonuses or other incentives on the basis of the success of student recruitment, admission or financial aid awards — clearly banning the payment of incentive compensation, directly or indirectly, for student enrollments.

5.    This ban on paying incentive compensation tied to student enrollments was a critical feature of the 1992 renewal of the HEA and was meant to address significant and widespread abuses in the late 1980's and early 1990's that cost the U.S. government almost 8 billion dollars in student loan defaults.  These abuses were the result of for-profit schools financially incentivizing their employees to enroll as many students as possible to exploit available Title IV funds, ultimately causing employees to submit

///

///

///

2

05-16-05    02:33pm    From-BARRACK - SAN DIEGO    T-796    P.007    F-625

1  phony financial aid applications and enroll unqualified students in an effort to enroll a

2  greater number of students, thereby increasing their own compensation and school

3  profits.

4       6.    In its Form 10-Q filed on July 15, 2004, the Company acknowledged that

5  its success was dependent upon its compliance with Title IV regulations, stating, in

6  relevant part, as follows:

7         Our future success is highly dependent on our ability to obtain,
       maintain, or renew required regulatory approvals, accreditation or state

8         authorizations.  We are subject to extensive private, federal and state
       regulation.  The Higher Education Act of 1965, as amended, and the

9         related regulations govern all higher education institutions participating
       in Title IV programs.

10       7.    But while the defendants were paying lip service to their obligation to

11  comply with the law, UOP, which accounted for almost all of Apollo's revenue, was

12  flagrantly and systemically violating the ban on incentive compensation with respect to

13  student enrollments.  Indeed, the situation had gotten so grave that shortly prior to the

14  commencement of the Class Period, and as a consequence of information provided by

15  UOP employee whistleblowers, the DOE conducted a thorough audit and investigation

16  at several UOP campuses and thereafter rendered a blistering Program Review Report

17  addressed to defendant Todd S. Nelson, Apollo's President and Chief Executive Officer,

18  ("Nelson") on February 5, 2004 (the "DOE Report"), containing "serious" findings and

19  conclusions.  Summarizing the DOE Report was a February 5, 2004 cover letter to

20  defendant Nelson stating in pertinent part:

21         This report contains a *serious finding* regarding the school's substantial

22         *breach of its fiduciary duty*; specifically that the University of Phoenix
       (UOP) *systemically engages in actions designed to mislead the*

23         *Department of Education and to evade detection of its improper*
       *incentive compensation system for those involved in recruiting*

24         *activities*. The *finding of noncompliance* is referenced to the applicable
       regulations, and specifies the action required to comply with the

25         regulations and statutes.

26  The DOE Report concluded as follows:

27         The actions of *UOP* and the *system* it has established *cultivates and*

28         *maintains a corporate culture in defiance of UOP's fiduciary duty*.
       UOP has *created an environment that pits the strong motivation of*

1    *individual gain against its fiduciary duty to the Department.* It is one
2    that *flaunts* the Department's *regulations and the prohibition against*
    *incentive compensation based on enrollments.*

3    (DOE Report at 27)[1]

4        8.    Among its many findings, the DOE also reported that UOP:

5        •    "hires its recruiters with the promise of lucrative *compensation*
6        *for success in securing enrollments;*"

7        •    "maintains a recruiter evaluation and salary system that provides
    *incentive payments based both directly and indirectly on*
8        *success in securing enrollments;*"

9        •    "provides substantive *incentives to* its staff to *recruit unqualified*
    *students* and *students who cannot benefit from the training*
10        *offered;*"

11        •    "systematically and *intentionally operates in a duplicitous*
    *manner* so as to *violate* the *Department's prohibition against*
12        *incentive compensation while evading detection.*"

13    (DOE Report at 29).

14        9.    The DOE Report constituted a serious, adverse and material event as did

15    its scathing findings and conclusions of rampant violations of the law. Its conclusions

16    are supported by considerable relevant evidence and factual findings, as fully discussed

17    below.

18        10.    On February 27, 2004, the first day of the Class Period, despite their

19    receipt of the February 5, 2004 DOE Report, its findings and conclusions and the fact

20    that the Company was indeed, failing to comply with the law with respect to

21    compensation of enrollment counselors (also referred to herein as "student recruiters" or

22    "recruiters"), defendants issued a press release announcing the dismissal of a *qui tam*

23    lawsuit that had included allegations of improper compensation of UOP's enrollment

24    counselors, adding that the government had declined to intervene in the lawsuit and

25    suggesting to the market that there was no merit to those allegations. Defendants'

26    February 27, 2004 press release falsely portrayed the import of the Court's dismissal of

27    the *qui tam* lawsuit and deceived investors by failing to disclose the fact that not only

28
_____
[1]    Emphasis added throughout.

4

1    had the government shown considerable interest in allegations of improper
2    compensation of enrollment counselors, but it had recently conducted an intensive
3    Program Review and investigation of UOP resulting in the DOE Report's findings and
4    conclusions of a serious, systemic and flagrant noncompliance with the law together
5    with intentional acts of "duplicitous" conduct so as to "violate the Department's
6    prohibition against incentive compensation while evading detection." (DOE Report at
7    29)

8         11.    Defendants' active concealment of the truth was patent and egregious. In
9    statements to the investment community on March 12, 2004, defendant Nelson coyly
10   disclosed the fact that the DOE was in the process of a "Program Review," but in a
11   manner intended to minimize its import and comfort investors that nothing untoward had
12   or would result from the investigation, while failing to disclose the fact that the
13   investigation was a serious and material event which already resulted in a detailed
14   investigative report and findings of UOP's violations of the law, as more fully discussed
15   below. In addition, the Company reported favorable results in its second and third
16   quarter fiscal 2004 reports, filed with the SEC, and in its press releases and follow on
17   conference calls communicating those results to the investment community. Defendants'
18   false, deceptive and misleading statements caused the price of Apollo's shares to
19   increase dramatically, from $76.23 at the advent of the Class Period to as high as $98.01
20   during trading on June 8, 2004, settling in at $97.93 at the close of trading that day — an
21   increase of over 28%.

22        12.    By the end of trading on June 22, 2004, Apollo's shares were still trading
23   vigorously, closing at $94.17. But, on June 23, 2004, the media reported an SEC
24   investigation of Apollo's competitor, Career Education, and on June 24, 2004,
25   announced that another competitor, Corinthian Colleges, was violating the law with
26   respect to student financial aid programs and Title IV funding. Investors in Apollo
27   became concerned, particularly in light of the DOE Program Review of Apollo's UOP's
28   operations that they had been informed was taking place, consequently driving the

1 trading price of Apollo's shares from $94.17 per share at the close of trading on June 22,

2 2004, to $85.85 per share in the following 2 days. Hoping to stem any further decline of

3 Apollo's stock price, comfort the market and renew investor enthusiasm in Apollo,

4 defendants disseminated favorable financial results and statements designed to assure

5 investors that not only should they not be concerned with issues respecting Apollo's

6 regulatory compliance but that, in fact, the recent disclosures suppressing Apollo's stock

7 price created a *buying opportunity* for its shares.   At the same time, defendants

8 concealed from investors the DOE Report containing materially adverse findings and

9 conclusions that Apollo's UOP subsidiary was violating the ban on incentive

10 compensation with respect to student enrollments and engaging in other related unlawful

11 practices as a consequence, or that Apollo was looking for solutions to respond to the

12 material adverse impact on its business that would result from being compelled to

13 operate within the boundaries of the law. As a consequence, Apollo's stock continued to

14 trade at falsely inflated prices which caused investors' losses.

15        13.      The truth began to emerge on September 7, 2004. After the close of the

16 market, the Company announced that it had additionally agreed to pay a $9.8 million

17 fine imposed by the DOE in connection with its regulatory investigation into the issue of

18 Apollo's tying the compensation of its enrollment counselors to enrollments numbers.

19 The news caused the price of Apollo common stock to decline. Then, on September 14-

20 15, 2004, articles in the *Arizona Republic* and *The Wall Street Journal*, respectively,

21 disclosed more of the truth with regard to UOP's *flagrant violations of the law* with

22 respect to incentive compensation relating to student enrollments and the prior DOE

23 Report's findings and conclusions, including the DOE's findings of a *"culture of*

24 *duplicity,"* and instances in which UOP recruiters forged student signatures on loan

25 documents. Revelations of the DOE Report and the $9.8 million fine — *the largest ever*

26 *imposed by the DOE* — caused a further decline in the trading price of Apollo's shares,

27 as the market absorbed the adverse news, from a closing price of $80.63 on September

28 13, 2004 to $78.68 at the close of trading on September 15, 2004 and lower still to

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1  $75.82 at market close on September 20, 2004 on trading volumes that were

2  significantly higher than the average daily trading volume of Apollo's shares.

3      14.    Meanwhile, the pressure to ultimately bring its operations fully within the

4  letter of the law had already begun to have a material adverse impact on Apollo.  In

5  addition to paying a fine of $9.8 million with respect to UOP's flagrant violations,

6  Apollo started experiencing a slowing of year-to-year quarterly growth rates in

7  enrollments, revenue and net income.  Nonetheless, the disclosures of Apollo's

8  violations of the law and the DOE action pertaining thereto did not come soon enough as

9  investors who purchased or otherwise acquired Apollo securities during the Class Period

10  have suffered massive losses directly caused by defendants' false, deceptive and

11  misleading statements, in violation of the federal securities laws.

12  **II.**    **JURISDICTION AND VENUE**

13      15.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a)

14  of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule

15  10b-5, 17 C.F.R. §240.10b-5 promulgated thereunder.

16      16.    This Court has jurisdiction over the subject matter of this action pursuant

17  to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

18      17.    Venue is proper in this District pursuant to §27 of the Exchange Act, and

19  28 U.S.C. §1391(b) and (c). Apollo maintains its corporate headquarters in this District,

20  and many of the acts charged herein, including the preparation and dissemination of

21  materially false and misleading information, occurred in substantial part in this District.

22      18.    In connection with the acts alleged in this complaint, defendants, directly

23  or indirectly, used the means and instrumentalities of interstate commerce, including, but

24  not limited to, the mails, interstate telephone communications and the facilities of the

25  NASDAQ national market.

26  ///

27  ///

28  ///

7

1  III.    **PARTIES**

2        A.    **Plaintiff**

3        19.    Lead Plaintiff, the Chicago Police Fund, is a municipal pension fund with

4  assets of approximately $3.4 billion that serves approximately 25,000 members, active

5  and retired, and their families. It employs about 17 people in the city of Chicago. The

6  Chicago Police Fund purchased 61,000 shares of Apollo common stock during the Class

7  Period, as more fully set forth in Exhibit 1 hereto and was damaged thereby.

8        20.    Lead Plaintiff's complaint consolidates all actions filed previously by

9  shareholders in accordance with the April 1, 2005 Order respecting consolidation in the

10  above captioned action.

11       B.    **Defendants**

12       21.    Defendant Apollo is a for-profit educational institution, which is

13  incorporated in Arizona and maintains its principle executive offices at 4615 East

14  Elwood Street, Phoenix, Arizona 85040. Through its subsidiaries, UOP, IPD, the

15  College for Financial Planning Institute Corp. and Western International University,

16  Inc., Apollo offers programs and services at campuses and learning centers in 37 States,

17  Puerto Rico and Canada. During the Class Period, Apollo derived about 95% of its

18  revenue from the operations of its primary subsidiary, UOP.

19       22.    Defendant Nelson was, at all relevant times, the Company's President and

20  Chief Executive Officer. Subsequent to June 30, 2004, Nelson was the Company's

21  Chairman of the Board. On information and belief, Jane Doe Nelson is the spouse of

22  defendant Nelson and is named herein for community property law purposes only.

23       23.    Defendant Kenda B. Gonzales ("Gonzales") was, at all relevant times, the

24  Chief Financial Officer, Secretary and Treasurer of the Company. On information and

25  belief, John Doe Gonzales is the spouse of defendant Gonzales and is named herein for

26  community property law purposes only.

27       24.    Defendant Daniel E. Bachus ("Bachus") was, at all relevant times, the

28  Chief Accounting Officer and Controller of the Company. On information and belief,

8

1  Jane Doe Bachus is the spouse of defendant Bachus and is named herein for community

2  property law purposes only.

3       25.    Defendants Nelson, Gonzales and Bachus are collectively referred to

4  herein as the "Individual Defendants."

5       26.    It is appropriate to treat the Individual Defendants as a group for pleading

6  purposes and to presume that the false, misleading and incomplete information conveyed

7  in the Company's public filings, press releases and other publications as alleged herein

8  are the collective actions of the narrowly defined group of defendants identified above.

9  Each of the above officers of Apollo, by virtue of his or her high-level positions with the

10  Company, directly participated in the management of the Company, were directly

11  involved in the day-to-day operations of the Company at the highest levels and were

12  privy to confidential proprietary information concerning the Company and its business,

13  operations, products, growth, financial statements and financial condition, as alleged

14  herein. Said defendants were involved in drafting, producing, reviewing, certifying and

15  disseminating the false and misleading statements and information alleged herein or

16  were aware or recklessly disregarded that false, deceptive and misleading statements

17  were being issued regarding the Company, and approved or ratified those statements, in

18  violation of the federal securities laws.

19       27.    As officers and controlling persons of a publicly-held company whose

20  common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded

21  on the NASDAQ during the Class Period, and governed by the provisions of the federal

22  securities laws, the Individual Defendants each had a duty to promptly disseminate

23  accurate and truthful information with respect to the Company's financial condition and

24  performance, growth, operations, financial statements, business, products, markets,

25  management, earnings and present and future business prospects, and to correct any

26  previously-issued statements that had become materially misleading or untrue, so that

27  the market price of the Company's publicly-traded securities would be based upon

28

9

05-16-05    02:34pm    From-BARRACK - SAN DIEGO    T-796  P.014/100  F-625

1    truthful and accurate information.  The Individual Defendants' misrepresentations and

2    omissions during the Class Period violated these specific requirements and obligations.

3        28.    The Individual Defendants, because of their positions of control and

4    authority as officers and/or directors of the Company, were able to and did control the

5    content of the various SEC filings, press releases and other public statements pertaining

6    to the Company during the Class Period. Each Individual Defendant was provided with

7    copies of the documents alleged herein to be misleading prior to or shortly after their

8    issuance and/or had the ability and/or opportunity to prevent their issuance or cause

9    them to be corrected.  Accordingly, each of the Individual Defendants is responsible for

10   the accuracy of the public reports and releases detailed herein and is therefore primarily

11   liable for the representations contained therein.

12   **IV.    BACKGROUND FACTS**

13       **A.    Financial Aid Fraud and Unethical Practices by For-Profit
         Schools in the Late '80's and Early '90's Trigger
14       Congressional Restrictions on Compensation**

15       29.    In the late 1980's and early 1990's, the United States government was

16   plagued by skyrocketing default rates respecting federally guaranteed student loans.

17   These increasing default rates were blamed largely on fraudulent and unethical

18   enrollment and recruitment practices at for-profit schools.  In 1990 alone, $2 billion

19   worth of student loans went into default as the total value of defaulted loans reached $8

20   billion as stated in the *Chicago Tribune* article "Colleges Leery [sic] of Plan to Alter

21   Student Loan Program" dated January 27, 1991.

22       30.    In the wake of student loan defaults costing U.S. taxpayers billions of

23   dollars, government investigators uncovered a litany of fraudulent behavior and highly

24   unethical enrollment practices at for-profit schools including:

25       •    Falsifying student enrollment status on federal loan applications;

26       •    Paying homeless people to sign federal student loan applications;

27       •    Submitting financial aid applications for students who had no
             intention of attending classes; and

28

05-16-05    02:35pm    From-BARRACK - SAN DIEGO

- Actively recruiting students in mental health facilities, homeless shelters and public assistance offices.

31. The primary motivating root cause of these fraudulent and unethical practices was the practice of many for-profit schools of financially incentivizing their enrollment counselors to sign as many new students as possible — a large number of whom required financial aid offered by the government. In 1992, recognizing the need to put a halt to this practice motivating for-profit colleges to commit the fraudulent and highly unethical practices plaguing the industry, Congress reauthorized the HEA, but included new restrictions on the compensation of enrollment counselors at for-profit colleges. These new restrictions were designed to bring an end to the abuses of the federal student loan programs associated with Title IV funding. Among the most significant changes enacted in the reauthorization was the ban on incentive or commission based compensation for recruiters. By banning compensation tied to the number of students enrolled by a recruiter, Congress hoped to prevent many of the abuses that had bedeviled student loan programs over the course of the prior decade.

32. To that end, the HEA prohibits educational institutions from providing "any commission, bonus, or other incentive payment based *directly or indirectly* on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance...." 20 U.S.C. §1094(a)(20).

**B.    Title IV Regulations and Funding — Critically Important to For-Profit Schools**

33. Like its competitors, UOP and the other schools operating under the umbrella of Apollo are largely dependent on tuition paid by students from loans obtained under Title IV. In order to maintain eligibility for Title IV funding and accreditation, UOP must conform to a battery of local, state and federal regulations. Failure to abide by the federal regulations underlying the Title IV funding can result in loss of accreditation and, consequently, loss of eligibility to accept student loans secured pursuant to Title IV. If a school loses accreditation, it is not again eligible for

11

1    accreditation for a period of 24 months. Because for-profit secondary education

2    providers like Apollo are so dependent on Title IV loan programs, *any* negative or

3    potentially adverse news or announcements that might impact Title IV qualification or

4    otherwise adversely impact revenue derived from Title IV funding are important to

5    reasonable investors and are material to the market.

6        34.    Failure to comply with Title IV regulations requirements can result in

7    serious adverse consequences to a company — a situation that was well known. For

8    example, in 2000, Computer Learning Centers, then publicly traded on the NASDAQ,

9    was ordered to repay $187,500,000 in loans provided by the federal government for

10    paying commissions to its admissions officers, a practice that is strictly barred by the

11    HEA. Within a few weeks of this order, Computer Learning Center was forced to shut

12    its doors and file for bankruptcy.

13        35.    Title IV funding was critically important to Apollo's business, revenues,

14    profitability and success. And because Title IV funding accounted for approximately

15    60% of its revenues, such funding constituted an important life blood sustaining Apollo.

16    Accordingly, *whether Apollo's affiliates' programs adhered to Title IV requirements,*

17    *especially those specific to compensation of its enrollment counselors*, was a *matter of*

18    *great importance to* the *Company,* its *management,* including the defendants *and the*

19    *investment community.*

20        36.    The DOE was given the responsibility by Congress to monitor for-profit

21    schools and their compliance with the law and is empowered to conduct Program

22    Review audits and investigations of such institutions for that purpose. Since enacted, the

23    ban on incentive-based compensation has been rigorously enforced by the DOE with

24    respect to for-profit schools. The mere threat of a loss of accreditation — one of

25    numerous penalties that can be imposed for violating the ban — can quickly undermine

26    investor confidence in the integrity and trustworthiness of the for-profit college whose

27    shares are publicly traded and can have material adverse consequences with respect to its

28    stock trading price. As more fully discussed below, Apollo's UOP operations were

12

1 engaging in systemic violations of the incentive-based compensation ban with respect to

2 student enrollments at all times material in an effort to achieve revenue and enrollment

3 growth.    Aware of the impact that an adverse report resulting from an audit and

4 investigation by the DOE could and would have on investor confidence, defendants not

5 only failed to disclose to the public the DOE's material investigative findings regarding

6 Apollo, but actively sought to prevent its disclosure and continued to conceal from

7 investors Apollo's unlawful activities.

8  **C. The Serious February 5, 2004 DOE Report Concluding that**
   **Apollo's UOP Operations Violate the Law Banning Incentive**
9   **Compensation**

10  37. Commencing in the late summer of 2003, investigators from the DOE

11 undertook an audit and investigation pursuant to a Program Review at several campuses

12 of UOP, the largest subsidiary of Apollo.   The program review involved examination of

13 "pertinent forms, policies and procedures and personnel documentation at UOP...."

14 (DOE Report at 7).

15  38. DOE staff visited UOP campuses in Phoenix, Oakland, San Jose, San

16 Francisco, Pleasanton and Livermore, as well as UOP's online campus.   In addition,

17 DOE staff interviewed more than 60 then current or former UOP enrollment counselors

18 regarding UOP's compensation practices. (DOE Report at 7).

19  39. As a consequence of its audit and investigation, on February 5, 2004, the

20 DOE rendered a written "Program Review Report" (DOE Report) addressed to

21 defendant Nelson respecting its findings and conclusions.  Summarizing the DOE Report

22 was a February 5, 2004 cover letter to defendant Nelson stating in pertinent part:

23   This report contains a *serious finding* regarding the school's *substantial breach* of its *fiduciary duty*; specifically that the University of Phoenix
24   (UOP) *systemically engages in actions designed to mislead the Department of Education and to evade detection of its improper*
25   *incentive compensation system for those involved in recruiting activities.* The *finding of noncompliance* is referenced to the applicable
26   regulations, and specifies the action required to comply with the regulations and statutes.

27

28

1    The DOE Report concluded as follows:

2       The actions of UOP and the system it has established *cultivates and*
        *maintains a corporate culture in defiance of UOP's fiduciary duty.*
3       UOP has *created an environment that pits the strong motivation of*
4       *individual gain against its fiduciary duty to the Department.* It is one
        that *flaunts* the Department's *regulations and the prohibition against*
5       *incentive compensation based on enrollments.*

6    (DOE Report at 27)

7       40.    In concluding its Report, the DOE also found that UOP:

8       •    "hires its recruiters with the promise of *lucrative compensation*
9            *for success in securing enrollments*;"

10      •    "maintains a recruiter evaluation and salary *system that provides*
             *incentive payments based both directly and indirectly on*
11           *success in securing enrollments*;"

12      •    "provides substantive *incentives to* its staff to *recruit unqualified*
             *students* and *students who cannot benefit from the training*
13           *offered*;"

14      •    "*systematically* and *intentionally operates* in a *duplicitous*
             *manner* so as to *violate* the Department's *prohibition* against
15           incentive compensation *while evading detection.*"

16   (DOE Report at 29).

17      41.    The DOE Report constituted a serious, adverse and material event as did

18   its scathing findings and conclusions of rampant violations of the law. Its conclusions

19   are supported by considerable relevant evidence and factual findings, as fully discussed

20   below.

21              1.    **Use of Incentive Compensation Based on Enrollments**
                     **for Those Involved in Recruiting or Admission**
22                   **Activities in Violation of Title IV Requirements**

23      42.    The DOE determined that during the Class Period and relevant times prior

24   thereto extending over a period of years, *Apollo's UOP for-profit educational*

25   *institution was continuously violating the longstanding HEA ban on incentive-based*

26   *compensation* for recruiting activities in the HEA and was *systemically engaging in*

27   *activities designed to mislead the DOE and otherwise evade detection of its improper*

28   *and illegal conduct.*

                                    14

1    43.    *The DOE found that when hiring recruiters, UOP promises substantial*

2    *compensation.* The DOE was informed by most of the recruiters interviewed that when

3    they were hired, UOP told them that the job had tremendous financial potential and that

4    they could "make a lot of money," with UOP promising to double or triple their salary in

5    3 to 6 months if they successfully performed their duties — promises that enticed many

6    of the UOP employees to leave a higher paying job to work for that institution because

7    of the promise of the increase in salary in such a short period of time. "Drawn by the

8    lure of a large salary potential" a number of academic counselors and advisors

9    transferred to the higher paying recruiter position knowing that, had they not transferred

10   to the recruiting position, their salary would not only be lower, but their annual salary

11   increases would be minimal, generally only 2-8 percent. However, according to the

12   report, it did not take long before UOP's recruiters would "find out that *UOP bases their*

13   *salaries solely on the number of students they enroll.*" (DOE Report at 7-8).

14                2.    **UOP's Student Recruiting System Focused on the**
                       **Numbers and Deployed a Sales Training and**
15                     **Compensation Program the DOE Characterized as**
                       **"Smoke and Mirrors" Designed to Allow UOP to "Fly**
16                     **Under the Radar" of DOE Scrutiny**

17   44.    According to UOP's sales training program, recruiters are considered

18   "counselors in training" or "freshman" for their first 13 weeks of employment. Soon

19   after these recruiters are hired, they are required to attend a one-week "Sales Academy"

20   provided by regional and corporate management at the regional office. "The Admissions

21   Counselor Policy Guide for Admissions Managers and Directors of Enrollment"

22   disseminated by UOP considers this 13 week period to be a "developmental program"

23   where employees learn the system for tracking leads, contacts, appointments,

24   enrollments and other recruiting activities, such as the conversion of an appointment to

25   an application. During the Sales Academy training, these recruiters were taught sales

26   tactics designed to "pique the interest of potential students through the progression of

27   enrollment activities, such as probing need, fostering trust, creating urgency and

28   overcoming objections." Whether during or shortly after the initial 13 week period, new

15

1   recruits then attend a one week "Student Advisement Workshop" at UOP headquarters in

2   Phoenix Arizona, where they receive intense training on traditional sales techniques

3   including "probing and developing the potential customer's need for the product,

4   creating urgency and gaining commitment from the potential customer, and closing the

5   deal." According to recruiters, "in spite of the name of the training," the "Student

6   Advisement Workshop" deals "only with sales techniques and has little or nothing to do

7   with academically advising students." (DOE Report at 8).

8       45.   According to the DOE investigative findings, if a new recruiter enrolls

9   enough students during the first 13 weeks, his or her advancement will also include a

10   raise. Promotion to higher levels is determined on the basis of whether the enrollment

11   counselor "meets," "exceeds" or "always exceeds" expectations. Indeed, under UOP's

12   2002 "Enrollment Counselor Policy Guide," an enrollment counselor must have

13   accumulated at least 2 quarters of "often or consistently meets expectations" and cannot

14   have any quarters where his or her performance does not at least "meet expectations."

15   And under the 2002 guide, in order to be promoted to a higher pay level (from a low of

16   approximately $26,000.00 to the next level — EC II — with pay as high as $65,000.00),

17   the recruiter was required to have 3 consistent quarters where performance "often or

18   consistently exceeds expectations." (DOE Report at 8-9).

19       46.   Promotion to the title of "Senior Enrollment Counselor" ("senior

20   counselor") requires 4 consistent quarters where performance "often or consistently

21   exceeds expectations." A senior counselor may be promoted to the title of "Executive

22   Enrollment Counselor" by having 8 consistent quarters where performance "often or

23   consistently exceeds expectations." (DOE Report at 9).

24       47.   UOP measured success through the use of a "matrix," and the matrix was

25   used to determine salary. Freshman recruiters were given the matrix and were evaluated

26   weekly on their numbers. UOP's matrix established certain levels for enrollments

27   corresponding to "Meets," "Exceeds" or "Always" ratings that themselves would

28   determine the recruiters' overall rating and salary. Recruiters were urged to use this

16

1   matrix as their guide to reaching their desired "level of success" — an instruction given
2   to them at the so-called "Student Advisement Workshop." The DOE further found that
3   "[t]he matrix sets forth the rating ('meets,' etc.) associated with the number of
4   enrollments, and it is these criteria that supersede all others and actually determines
5   salary. Recruiters are keenly aware of how the matrix numbers establish their salaries."
6   (DOE Report at 9).

7       48.   According to one recruiter interviewed by the DOE, "it was common
8   knowledge among recruiters that *each enrollment is worth about $750 in annual*
9   *salary.*" And while in recent years the matrix containing the enrollment expectations
10   and salary levels associated with the matrix were actually separated into 2 different
11   documents, recruiters simply had to put the 2 documents together in order to determine
12   their salary levels associated with enrollment numbers. (DOE Report at 9).

13       49.   UOP repeatedly reinforced the importance of enrollment numbers
14   throughout its orientation and training of recruiters as determined by the DOE and
15   confirmed by a document that was provided to newly hired recruiters entitled "The
16   Psychology of Enrollment Success at the University of Phoenix," which touted the
17   benefits and rewards of being a sales professional, including such assertions as:

18       • $$$ — No limit on income
         • Highest paid people in the world are salespeople
19       • Never have to worry about $$$ again
         • Top 20% Enrollment Counselors @ UOP =ave. $75,000+/yr
20           "other" 80%                          ave. $25,000+/yr
         • Top 20% = never worry about $$$

21                          **The Winning Edge**

22       Counselor #1      100 Activities/half      $65,000
23       Counselor #2      79 Activities/half       $36,000
24                                                  ————————
                                                    $29,000
25

26           3.5 additional activities / month=$29,000

27   (DOE Report at 9-10)

28       50.   The *DOE investigation* further *confirms* that while the matrix listed

                                        17

1   certain steps in the recruitment process, *the reality was that the number of students*
2   *enrolled is what affected recruiter salary*. For example, "[s]ome of the recruiters
3   consistently exceeded the numbers for all steps except enrollments, yet received an
4   overall evaluation of 'needs improvement' simply because their enrollments failed to hit
5   the requisite number." Indeed, the DOE investigators further found that "managers
6   simply falsified the numbers on the various factors to make the overall evaluation match
7   the enrollment number and that managers told them that if they get the enrollments, the
8   manager can make the other numbers match." For example, one Manager told a
9   recruiter, "You get the enrollments and we'll take care of the matrix. We can fudge the
10  numbers on the matrix." (DOE Report at 10).

11      51.    According to the DOE Report, "[a]ll recruiters indicated that they were not
12  shown the matrix, or told of how enrollments related to salary, until after they were
13  hired." In addition, the investigation revealed that new recruiters were aware that
14  enrollment numbers determined their salary and generally knew that if they did "make
15  the numbers" they would be rewarded with a "good bump" but those who did not make
16  the numbers would not get the raise they expected when they were hired, with many
17  recruiters commenting that the bottom line was, "if the enrollments are not there, don't
18  expect a raise." (DOE Report at 10).

19      52.    UOP's own Corporate Director of Enrollment, who visited various UOP
20  locations to provide additional motivation and was known for his ability to motivate by
21  touting the financial rewards for making the numbers, was, according to the
22  investigation, quoted as telling recruiters: "It's all about the numbers. It will always be
23  about the numbers. But we need to show the Department of Education what they want
24  to see." The DOE further found that 44 out of 61, or 72%, of the recruiters interviewed
25  stated that it was "always about the numbers" and that it was "all about 'butts in seats' or
26  'asses in classes'" — to use the vernacular commonly heard at UOP. Indeed, some of the
27  recruiters interviewed acknowledged that the UOP's Corporate Director of Enrollment
28  himself characterized the compensation plan for recruiters as "smoke and mirrors" so

                                        18

1   that UOP could "fly under the radar" of the Department. And according to the DOE

2   Report, "[m]ore than one recruiter stated that they also heard the Director of Marketing

3   say, when discussing the salary compensation plan for recruiters, 'we're flying under the

4   radar of the Department,'" while both managers and recruiters referred to the matrix as a

5   "smokescreen" or "smoke and mirrors." And one recruiter who was interviewed

6   disclosed that *the matrix is a way to deceive the Department."* These statements were

7   made "even though recruiters are aware that basing salary on enrollments is against the

8   law." (DOE Report at 10-11).

9        53.    UOP also used an elaborate tracking system designed to keep abreast of

10  commissionable sales and sales performance, and recruiters met with managers on a

11  daily, weekly and monthly basis to go over the numbers and even discuss how to

12  increase them in order to reach the desired salary, referred to as the "desired level of

13  success." (DOE Report at 11).

14       54.    Pursuant to UOP's elaborate tracking system, the Institution compiles a

15  "Commissionable Starts Report" for each recruiter at each location and sends them to the

16  Corporate Operations Manager at UOP's Headquarters in Phoenix, Arizona. The

17  Corporate Operations Manager prepares a separate list for each recruiter. A final

18  approved enrollment list together with the Commissionable Starts Report is bound by

19  location in a final Report referred to as the "Orange Book" and each bound report is

20  forwarded by UOP to each location. The final bound report shows total enrollments by

21  location as well as the final enrollments credited to each recruiter and each recruiter's

22  rejected enrollments. (DOE Report at 11). The DOE Report found:

23       a.     As part of the tracking system, the Corporate Operations
                Manager also updates a manually prepared Excel spreadsheet
24              maintained on a fiscal year basis that lists all recruiters and their
                final enrollments for each month. This spreadsheet actually
25              ranks UOP recruiters from all locations by the number of
                enrollments credited to them as of that date and is known as the
26              "Stack Rankings" and is sent monthly to the managers who
                generally distribute it to the recruiters. (DOE Report at 11).
27

28       b.     In an *apparent effort to deceive the DOE* or otherwise
                *camouflage* what was in *reality* a commissionable compensation
                scheme based on enrollments, the "Commissionable Starts

Report" was named the "CPCC701 Enrollment Report." (DOE Report at 11).

55.    Recruiters' managers also used a manually prepared monthly report, entitled "AC-Self Success Recap" in their monthly, quarterly and annual evaluations that captured the student enrollment activities of each recruiter at the location including actual number of students they enrolled. The "AC-Self Success Recap" was required to be forwarded as an attachment to UOP's Corporate Enrollment office each month, no later than the 5th of the following month, and is continually updated by the Marketing Coordinators. (DOE Report at 12).

56.    According to the DOE's findings, "UOP's intense focus on numbers and enrollments per recruiter permeates the working day of each recruiter" as managers "bombard the recruiters with e-mails daily — listing the top performers based on enrollments" and other recruiting activities. (DOE Report at 12).

57.    During "morning huddle" formally called an "OSIRA meeting," each recruiter at each campus must report the number of enrollment activities accomplished the day before. The purpose of these meetings is to motivate or humiliate the recruiters based on their activities. At the morning huddles managers would "go over the numbers and either praise or chastise each recruiter in front of the group." Recruitment managers used a large board on which the activities of each recruiter were listed and posted prominently except when "visitors" are expected. Each Monday their morning huddles would include a recap of the prior week. And monthly, the meetings would involve a monthly assessment and itemization of goals not met and issues that needed to be resolved in order to meet those goals. (DOE Report at 12).

58.    UOP utilized these frequent meetings in order to bring home the point that a recruiter's success in securing enrollments would equate to success in reaching his or her salary goals, as exemplified in one recruitment manager's frequent refrain: "X is going to make a lot of money at the end of this quarter because he has X enrollments." And one recruiter told DOE Program Reviewers during the investigation that his

1    manager's tactic was to say: "How much money do you want to make? Well, here are

2    how many students you have to register to make that much." (DOE Report at 12-13).

3         59.    Beyond frequent face to face meetings, recruiters were also barraged with

4    e-mails to remind them where they ranked with respect to other recruiters while

5    emphasizing the target number of student enrollments. For example, e-mails uncovered

6    by the DOE investigation that were sent to recruiters on an On Line Team read:

7              •    From a Director of Admissions on July 23, 2003 to ECs,
                   entitled "July/August Goals":

8
9                  Now you know what is at stake and the rewards available
                   at the end of the month of August, please tell me what
10                 your own personal goal is for July/August combined and
                   what your goal is for your next 6-month review. 140?
11                 130? How much you would like to see your salary
                   increase?

12             •    From an Enrollment Manager to ECs, April 24, 2002,
13                 entitled "Team Meeting this AM":

14                 Make sure that if you didn't hit your matrix # for MEETS
                   in June, that you do it in July. EC1 that means 14, EC2 is
15                 16...any questions?

16             •    From an Enrollment Manager to ECs, June 28, 2002,
17                 entitled "Back to Basics":

18                 Your job, as Admissions Counselors, and sales
                   professionals is to get in touch with every one of them as
19                 soon as possible to evaluate their needs and match the
                   benefits of UOP with those needs, then close the sale.

20
                   The expectation for EC2 is that you meet the criteria of
21                 your matrix, and enroll 16 new students each month.

22                 The expectation for EC1 is that you also meet the criteria
                   of your matrix, and enroll 14 new students each month.

23
                   As a CIT, your shooting for Always Exceeds on your
24                 matrix, and 30 new students in your first three months on
                   the floor.

25
                   These numbers and criteria are measured on a quarterly
26                 basis, so know what your evaluation quarters are, and
                   what your goals and running totals are. This is your
27                 process to manage. You can use vacation time when it's
                   made available to you, but make sure that your students
28                 are taken care of, and that you still meet your

                                        21

expectations.    If your production levels can't be maintained because of vacation time that you have planned, you need to work extra before and after the time off to make it a non-issue.

- From an Enrollment Manager to ECs, April 25, 2002, entitled "Please Reply to Me..Lunches":

We've regged 17 new students in the last 2 days, and 11 of those were on Tuesday, WAY TO GO!!!  As of last night we're at 57 REG and 36 APIN, more combined that either March or April, and we've only been prospecting for 5 days!!!!

Where are you in relation to your goal??  Right now you should plan on being at half-way (REG/APIN combined) when you walk in the door next Wednesday (May 1).  As a team we're at almost exactly 33% of our promised 275!!!

If you think of it, I have the REG-O-METER on my door, and I've been updating it for the last couple of days.  Feel free to add your own when you put 'em in REG!!

(DOE Report at 13-14).

60.    Recruiters received a spreadsheet on their computer desktops from one Enrollment Manager depicting how many enrollments each such recruiter needed to reach the next salary level.  The following is an example:

|         | June | July | August | Sept | Oct | Nov |    |     |
|---------|------|------|--------|------|-----|-----|----|-----|
| Cleared | 14   | 13   | 14     | 15   | 20  | 14  | 90 | 45K |
| Goals   |      |      | 17     | 20   | 25  | 17  |    |     |

(DOE Report at 14-15).

61.    The forgoing spreadsheet exemplar was dated in July 2003 showing that that particular recruiter had 27 enrollments by the end of July, and further showing what was needed in order to achieve 90 enrollments in the 6 month period — the number that would result in the recruiter's desired $45K dollar salary.  According to the DOE investigative findings, although the manager kept these spreadsheets updated and clearly visible in the recruiters' desktops, during the Department's site visit, however, the "manager deleted these spreadsheets from the recruiters' desktops." (DOE Report at 15).

1         3.    **UOP Penalized Enrollment Counselors for Not Meeting the Enrollment Numbers and Used Intimidation Techniques**

2

3    62.    According to the DOE and based on its extensive investigation, "[j]ust as

4    recruiters are rewarded for meeting or exceeding the enrollment numbers, they are also

5    penalized for not meeting the enrollment numbers." Recruiters reported that since

6    managers were under significant pressure from UOP's corporate office to meet

7    enrollment numbers, a recruiter's failure to meet enrollment goals set by UOP likewise

8    caused the managers to fail and, as a consequence, "the managers 'tried to make their

9    lives miserable' when their enrollment numbers are not high enough." (DOE Report at

10    15).

11    63.    A number of recruiters reported that they were threatened with loss of their

12    jobs by UOP if they failed to meet the numbers. "You are constantly threatened if you

13    don't meet the numbers." And many recruiters who were also students at UOP feared

14    losing their tuition benefits if they failed to meet enrollment numbers and that they felt

15    they had to do whatever was necessary to meet the enrollment numbers to attain their

16    degrees. (DOE Report at 15).

17    64.    Even harsher methods were used to "punish" those who failed to meet

18    enrollment numbers at the On Line Campus. According to most online recruiters

19    interviewed by the DOE, managers used "heavy-handed intimidation tactics to humiliate

20    them into improving their numbers." "Well known among the recruiters was the *'Red*

21    *Room'* — a place viewed with fear and dread by recruiters" with whom the DOE

22    reviewers spoke. Reviewers were sent to the Red Room as punishment for not meeting

23    enrollment numbers required and such were expected by management. (DOE Report at

24    15).

25    65.    Until such time as UOP ceased using the Red Room in late 2002, this glass

26    encased room — visible for all in the area to see who was inside — was a place of

27    humiliation amid an environment of high-pressure sales tactics to potential enrollees.

28    Those sent to the Red Room were not allowed vacation time nor were they allowed

23

1  breaks other than those specifically assigned. Recruiters were required to work in the
2  Red Room until such time as they attained the required number of student enrollments.
3  (DOE Report at 16).

4      66.    As an additional tactic, underperforming recruiters would have their leads
5  decreased by managers. Those with high enrollment numbers received more leads with
6  consequent enrollment credits and salary "bumps." Those recruiters who had less
7  enrollments had leads taken away, received no enrollment credits for former recruits,
8  received no salary increases and could potentially suffer a pay cut. (DOE Report at 16).

9      67.    According to the findings of the DOE, "[a] number of the recruiters noted
10  that those who did not 'meet the numbers' of enrollments would be deprived of leads and
11  floor time." Floor time was valuable to recruiters because it gave them access to new
12  leads that came in as walk-ins, internet referrals or call-ins. These fresh leads were
13  cherished by recruiters. (DOE Report at 16).

14      68.    Recruiters who missed numbers for any month received notification
15  immediately from UOP. And such recruiters received harsh emails from their managers
16  chastising them. (DOE Report at 16-17).

17      69.    The DOE also found that if a recruiter failed to meet specified numbers
18  that the recruiter was required to meet in order to retain his or her job, UOP would place
19  him or her on "decisional leave" — one day during which the recruiter was expected to
20  decide whether he or she "wishes to be successful at UOP." "If the recruiter's
21  performance fails to 'meet' expectations, UOP fired him or her." (DOE Report at 17).

        **4.**    **UOP's Recruiter Evaluation System and Salary**
22                   **Increases Reinforced the Focus on Hitting Enrollment**
23                   **Numbers — the Quantitative — While Trying to**
24                   **Deceive the DOE**

25      70.    According to the DOE's investigation report and findings, over 70% of the
26  recruiters interviewed reported that the *basis for compensation was enrollment*
27  *numbers* and recruiting activities. *Literally every recruiter interviewed randomly or*
28  *outside of the work premises said that the number of enrollments determined their*

24

1    *salary.*  Some even reported that while aware of highly subjective or qualitative factors

2    as part of their evaluation, their managers nonetheless always "assured them that *UOP*

3    *included these factors simply to deceive the Department and that UOP actually based*

4    *salary raises solely on the number of students a recruiter enrolls."*  (DOE Report at

5    17).

6         71.    According to one recruiter interviewed by the DOE, when he asked his

7    manager how evaluation factors were determined he was told: *"Its enrollments.  You*

8    *know its enrollments.  It will always be enrollments."*  UOP also monitored certain

9    "qualitative factors" in a way that, according to most recruiters interviewed by the DOE,

10   were nothing more than "conversions of the quantitative factors and are there simply to

11   deceive the Department."  For example, a recruiter asked his manager during his

12   evaluation about these qualitative factors and how they were determined.  In response,

13   the manager told the recruiter that "Job Performance" actually equates to the number of

14   new enrollments.  "Communication" meant the number of conversions.  "Customer

15   service" meant the number of leads to contact.  "Working relationships" meant resolving

16   student issues to overcome objections and obstacles and "Judgment" meant getting

17   students in class.  Indeed, this recruiter interviewed by the DOE actually wrote his

18   manager's response on his performance evaluation form which was then signed by both

19   his manager and his manager's supervisor.  At bottom, it was the number of enrollments

20   that mattered: the remainder of the so-called "qualitative" factors were simply cosmetic

21   in order to camouflage that it was all about the numbers. (DOE Report at 17-18).

22        72.    Recruiters for UOP On Line further confirmed that the factor that actually

23   affected the salary level was the enrollments.  For example, some of the recruiters

24   interviewed by the DOE consistently exceeded the numbers for all areas other than

25   enrollments.  Nonetheless, they received an overall evaluation of "needs improvement"

26   because their enrollments failed to hit the expected numbers.  They would not receive a

27   promotion in that instance.  However, more than one recruiter said that managers simply

28   falsified the numbers on the various factors to make the overall evaluation match the

25

1  enrollment number and told them that if the recruiter gets the enrollments, the manager
2  can make the other numbers match.  The DOE further concluded that it was widely
3  known that the evaluation forms kept in the personnel files of the recruiters were
4  meaningless.  Recruiters also told DOE interviewers during the Program Review that
5  they were coached by managers prior to those interviews to say that their evaluations
6  and salaries were based on qualitative factors, not just enrollments.  And according to
7  the DOE investigation, several recruiters explained that the matrix was simply a joke and
8  that it was all about enrollments.  (DOE Report at 18).

9       73.    According to the DOE's investigative findings, *UOP's Director of*
10 *Enrollment confirmed* that the "*[p]romotions are based on exceeding numbers only.*"
11 Different recruiters at various locations interviewed by the DOE further confirmed that it
12 was "enrollments that count" and that the "amount of money" was "dependent on how
13 many students...enrolled." (DOE Report at 18-19).

14      74.    According    to    the    DOE's    investigative    findings,    "*Recruiters*
15 *overwhelmingly confirmed that the number of enrollments was the 'bottom line.'*
16 Recruiters stated that even though the number of enrollments was the actual basis of
17 their salary, *management was always careful not to put this in writing due to*
18 *awareness that the Department prohibited incentive compensation based on*
19 *enrollments.*" (DOE Report at 19).

20      75.    The DOE further found, based on its investigation and a review of the
21 salary history of UOP recruiters, in conjunction with "Stack Rankings," that UOP
22 consistently granted enormous salary increases to those with high enrollment numbers.
23 (DOE Report at 20).

24      76.    The "Stack Rankings" spreadsheet consisted of a list of all UOP
25 enrollment counselors at every UOP campus and the total number of enrollments
26 credited to each counselor.  The "Stack Rankings" were maintained and regularly
27 updated by UOP's Corporate Operations Manager.  The "Stack Rankings" were sent to
28 enrollment managers on a monthly basis.  In addition, the Corporate Operations

26

1    Manager maintained a file for each enrollment counselor that included the monthly

2    Stack rankings. (DOE Report at 11-12).

3        5.    **Bonus Incentives Awarded Based on Securing**
                **Enrollments and Recruiting**
4

5        77.    The DOE investigators further found that UOP awarded expense-paid trips

6    for enrollments and provided incentive awards for securing enrollment applications,

     including gift certificates for obtaining a certain number of applications, and winning
7
     recruitment activity contests during months that enrollments were down or numbers
8
     were behind. A typical e-mail for these awards was as follows:
9
              From:        Enrollment Director
10            Sent:        1/17/2003
              To:          NCAL ENROLLMENT
11            Subject:     MAKING PROGRESS/CONTEST
12            Thank you for your commitment this past week...You have shown that
              January is not out of reach...And sitting in my hot little hands is a
13            $100.00 dollar Toys R Us gift certificate just waiting to be taken from
              me and used.
14            HERE'S THE DEAL...
              You have from today 1/17 until 5:00 PM on 1/24 to win it...HERE'S
15            HOW
16            1.    Whoever takes the most APPLICATIONS FOR JANUARY from
                    1/17 to 1/24 WINS...
17            NOTE: IT TAKES 7 APPLICATIONS MINIMUM TO WIN
18
19            If each of us can add 3 applications between 1/17 and 1/24 we will be
              real close to our goal in January which will se the table for a SUPER
20            February...Regards,
21
22    (DOE Report at 23).

23        78.    DOE investigators further learned that in a quarterly meeting at the end of

24    Apollo's fiscal year, ending August 2003, UOP On Line gave overnight hotel stays to

25    recruiters who had 25 enrollments or more. Meanwhile, where numbers were not met,

26    recruiters might receive an e-mail from their manager informing them that overtime or

27    weekend time, without pay, would be required. (DOE Report at 23-24).

28        79.    In addition, UOP sponsored "Sperling Club Trip Awards" — all expense

                                         27

1    paid trips for a recruiter and his or her partner pursuant to the "Sperling Club Trip
2    Award program" that could be won by successfully enrolling a specific number of
3    students within a given period of time.  The majority of recruiters interviewed by the
4    DOE confirmed their knowledge of the Sperling Club Trip Awards and all of them
5    confirmed that those awards were based solely on the number of the students recruiters
6    enrolled.  Indeed, enrollment mangers and recruiters "all confirmed that *Sperling Club*
7    *Trips for recruiters were awarded based solely on the number of enrollments*" with one
8    enrollment manager stating "Sperling is definitely based on enrollments.  There is a set
9    goal and the counselor has to obtain it in order to win."  The DOE investigators further
10   found that "*[a]ware of the Department's prohibition against incentives based on*
11   *recruiting activities, managers have typically masked the target number required to*
12   *win" with respect to enrollments* required for this Sperling Club Trip Award.  (DOE
13   Report at 22).

14             **6.    Pressure to Enroll Unqualified Students**

15        80.    The *DOE investigation further found that "UOP makes it very clear that*
16   *recruiters are to do whatever it takes to get the student to enroll," despite recruiters*
17   *frequently mentioned concern that there were student customers for whom UOP was*
18   *not a good educational option* because, for example, they could not reasonably expect
19   to complete a degree program at UOP and would be better served by other alternatives
20   such as community college.  DOE investigators found that UOP managers chastised
21   recruiters who suggested options other than UOP and that some managers told recruiters
22   that if a student dropped out after the first 5 week course, it should not be their concern
23   since, by then, both the recruiter and the manager would have received the enrollment
24   credit. (DOE Report at 24).

25        81.    DOE investigators further learned that *recruiters* stated that they were
26   *pressured by management to enroll students who were not qualified* and chastised by
27   managers for failing to pressure students into enrolling or staying in their first class, in
28   spite of the lack of financial resources.  UOP expected recruiters to overcome financial

                                          28

1  resource objections so that, for example, if the problem was insufficient funds, they were

2  to encourage Title IV funding and if the Title IV funds were insufficient, pressure the

3  students to seek a private loan. (DOE Report at 24).

> 7.    **UOP's Intense Use of Title IV Funds as a Sales Tool**
>        **Amid a Culture of Duplicity**

82.    The DOE further found that UOP provided its recruiters with financial aid

instruction on how to use Title IV funds to "overcome objections" and that at the On

Line operation, recruiters were taught how to use the Title IV funding as an effective

tool for closing the sale. Recruiters received instruction through a training program and

sales materials that taught them how to use financial aid effectively as a sales tool.

(DOE Report at 25).

> 8.    **Further Deceptive Practices to Mislead the DOE and**
>        **Obstruct Its Program Review Audit and Investigation**

83.    Tellingly, the DOE further concluded that *UOP engaged in deceptive*

*practices to mislead the Department in order to hide or otherwise camouflage the fact*

*that it was violating the ban on incentive compensation for enrollments.* In that regard,

the DOE concluded and reported as follows:

> The sales philosophy at UOP and practice is designed around *evasion*
> and relies upon euphemisms to *avoid detection by the Department.*
> UOP systemically established terminology and procedures to *hide the*
> *fact that UOP pays distinct and significant financial incentives solely*
> *based on recruiters' success in securing enrollments.* Since
> evaluations and salaries based on enrollments would be readily
> detectable by an auditor or Department reviewer, UOP refers to
> enrollments as *'activities'* or *'level one student information cards.'*
>
> Several recruiters told the reviewers that they had confronted their
> managers during evaluations about the fact that they were actually being
> evaluated on enrollments, not the 'fluff' factors printed on the evaluation
> forms (the subjective factors: Judgment, Customer Service, etc.). All
> were told by UOP that *it will always be about enrollments.* One
> recruiter quoted his manager as saying: 'You know you are evaluated on
> the basis of enrollments and we've always talked about that. You know
> that. It's never ever been a secret that there is an enrollment number that
> you are expected to hit.' All On Line Campus recruiters who were

29

1    interviewed, except for those chosen for interview by UOP, stated that
2    their salary was based on the number of students they enroll, a fact that
     managers reiterate frequently on an oral basis, although they never put it
3    in writing.

4    Recruiters also told reviewers that whenever 'visitors' (government
5    visitors, accreditation visitors) were expected, recruiters are coached by
     managers on what to say.   Typically, according to these recruiters,
6    required enrollment and/or application numbers are very visibly posted
7    on the walls and one desks.   When 'visitors' are expected, however,
     these posters and desk 'reminders' are removed until the visitors are
8    gone.

9    Literally *every current* UOP employee who has worked longer than a
10   year, expressed anxiety over possible retaliation by UOP.    Many
     commented on the fact that in the current economy, jobs are very
11   difficult to find, and UOP never hesitates to replace anyone that it
12   considers to be other than a loyal 'team player.'

13   *Recruiters consistently mentioned the focus and pressure to increase*
     *enrollments to report to Wall Street.*  Many expressed that while UOP
14   at one time focused on the student and stressed ethical conduct, *the*
15   *culture now is one where the emphasis is on increasing the numbers,*
     *the stock price and meeting Wall Street expectations.*  UOP's corporate
16   culture, steeped in '*smoke and mirrors*,' creates a façade where some
17   can survive, prosper and get rewarded.  Often *ethics are set aside.*

18   (DOE Report at 25-26).

19        84.    The DOE further concluded that UOP's behavior during the review

20   program process further substantiated the ethical concerns expressed by current and

21   former employees.  For example, one recruiter said that her manager called her and one

22   of her teammates aside when it was learned that the Department was reviewing the

23   incentive compensation issue and was visiting the On Line Operation.   They were

24   coached by the manager to say that salaries were based on a number of factors, not just

25   enrollment.  The manager further instructed them that they were not to speak to any

26   former UOP employees about what goes on at UOP.   In addition, after the

27   announcement of the program review, UOP informed its recruiters that if they were

28   contacted by someone from the Department for an interview, they were first to inform

                                              30

1    management prior to speaking with him or her. The DOE investigators further learned

2    that *recruiters uniformly stated that they felt very intimidated by UOP* due to this

3    pronouncement. (DOE Report at 26).

4         85.    UOP management actually told some recruiters at the Northern California

5    locations that they should take leave or attend some function away from the premises.

6    But the Department followed up with respect to those absent interviewees and learned

7    after speaking to them that their reason for being absent was because they had

8    reputations for being honest and frank. In another example of an effort to deceive the

9    DOE, investigators learned that at the On Line Campus, even though UOP generally

10    posted large banners ranking the recruiters by the number of enrollments they cleared,

11    these banners were removed shortly before the arrival of the reviewers for interviews of

12    On Line personnel. And UOP spreadsheets posted on recruiters' computer desktops that

13    showed the salaries/enrollments "goals" were also removed the day of the reviewer's

14    arrival at the On Line Campus. (DOE Report at 27).

15        **D.**    **UOP Employee Whistleblowers Confirm Its Ongoing,**

16               **Systemic and Illegal Enrollment Compensation Scheme and Deception of the DOE**

17         86.    According to information related by knowledgeable UOP employee

18    whistleblowers Mary Hendow ("Hendow") and Julie Albertson ("Albertson") who were

19    employed as enrollment counselors prior to and within the Class Period:

20        &bull;    UOP, in flagrant violation of the Title IV ban, compensated

21              enrollment counselors, including themselves, based directly upon enrollment activities;

22        &bull;    UOP "stack ranks" counselors based upon their number of

23              enrollments;

24        &bull;    The top ranking counselors are among the highest paid

25              counselors, receiving the highest salary as well as incentive trips, awards and gifts based upon their enrollment numbers;

26        &bull;    *UOP is fully aware of the illegality of its compensation scheme*;

27        &bull;    UOP senior management openly boasted to UOP employees about duping the federal government regarding the UOP compensation scheme;

28        &bull;    They boast that they create "smoke and mirrors" so that UOP can

    "fly under the radar" of the DOE regarding its illegal compensation scheme;

- UOP retitles documents to mask the illegal compensation scheme;

- Once the federal government began fining institutions for violating the HEA incentive compensation ban, UOP continued its compensation scheme and simply renamed the reports, removing the title "commissioned starts" ("starts" refers to student enrollments) from monthly reports verifying student enrollments;

- To further mask its illegal compensation scheme, UOP was maintaining separate review files on the enrollment counselors;

- One file contains legitimate review criteria produced to the federal government, and the other secret file containing the actual, illegal quantitative enrollment review criteria; and

- UOP also developed a glossary of "code words" used in documents to further disguise that compensation is based solely on enrollment activities.

    87.   UOP management enrollment counselor Albertson, as of March 2004, was among the highest paid UOP enrollment counselors. Her salary far exceeded that of long-term enrollment counselors with lower enrollment activity levels, even though she had only been employed at UOP for 2 years at that time.

    88.   According to Albertson, internally, UOP openly admits that enrollment counselors' salaries are tied to their enrollment numbers. When Albertson interviewed for an enrollment counselor position at the UOP San Jose campus in April 2000, UOP management expressly promised her salary increases based upon her enrollment activities. Albertson interviewed with a former UOP San Jose Enrollment Manager. During that interview, Albertson expressed concern that the UOP position paid less than her current job. The Enrollment Manager, however, prophetically assured Albertson that if she enrolled enough students, her salary would double within her first 9 months of employment. Albertson's starting salary was $32,000. Management told her that if she enrolled 119 students in her first 8 months, her salary would increase substantially. Albertson enrolled 148.5 students and UOP increased her salary to $88,000 at the end of the 8 month period. Based on her top enrollment numbers, UOP increased her salary

32

1   again to $90,640 at the end of the year.

2       89.    Hendow and Albertson further relate that in addition to salary, UOP
3   illegally compensated enrollment counselors based upon enrollments and enrollment
4   activities through trips, gifts and contest awards.  Counselors achieving enrollment
5   numbers set by management are rewarded with "Sperling Club" trips.  Hendow won
6   "Sperling" trips to La Costa Spa in Carlsbad, California, and Squaw Valley.  Albertson
7   won a trip to Universal Studios by enrolling 75 students during a 3 month period.  UOP
8   also sponsors enrollment contests based upon enrollment activities, with top counselors
9   winning for example, a Sonoma Mission Inn Hotel and Spa Package, lottery tickets or
10  gift certificates.  Hendow won a Sony DVD player based upon her number of new
11  applications.

12      90.    Hendow and Albertson have further confirmed that UOP places enrollment
13  counselors failing to reach acceptable enrollment activity levels on a "performance plan"
14  setting forth minimum enrollment activity goals.  Unsuccessful completion of a
15  "performance plan" leads to termination of the counselor's employment.

16      91.    Also, as related by Hendow and Albertson, in addition to maintaining its
17  illegal compensation scheme prior to and during the Class Period, UOP was knowingly
18  and intentionally deceiving the DOE regarding its violations of the HEA ban on
19  incentive compensation for recruiters.  As UOP's head of Corporate Enrollment openly
20  boasted, UOP masks its illegal compensation scheme through "smoke and mirrors" so
21  that UOP can "fly under the radar" of the DOE.  UOP's head of Corporate Enrollment
22  repeatedly emphasized to the enrollment counselors: "It's all about the numbers.  It will
23  always be about the numbers.  But we need to show the Department of Education what
24  they want to see."

25      E.     **UOP's Illegal Enrollment Incentive Scheme and Related**
26             **Unlawful Practices Are Also Confirmed by Numerous**
               **Knowledgeable Ex-Employees**

27      92.    Numerous former enrollment counselors, advisors and student recruiters
28  have also confirmed the fact that defendants were violating the federal government's ban

33

1  on incentive-based compensation respecting student enrollments at for-profit schools

2  prior to and during the Class Period.  These knowledgeable ex-employee confidential

3  sources relate the following:

4      a.    According to Confidential Source 1, who was employed as an

5  Employment Advisor at UOP's Pasadena, California location from August 2003 through

6  May 2004, performance reviews and any resulting salary or promotions during that time

7  were based on enrollment numbers.  The actual review process took place every 6

8  months;

9      b.    According to Confidential Source 2, who was employed as an

10 Employment Counselor at UOP's Arizona location from June 2001 through November

11 2004, UOP conducted quarterly reviews for enrollment counselors.  Salary promotions

12 from the quarterly reviews were based on a matrix — the primary factor from the matrix

13 for salary promotion was enrollment numbers.  According to Source 2, managers knew

14 that UOP could not legally compensate based on enrollment numbers, but if an

15 enrollment counselor hit his or her enrollment numbers, the managers would then

16 "adjust" the objectives from the matrix to meet salary promotion requirements.  There

17 were contests for awards based on enrollment numbers;

18     c.    According to Confidential Source 3, who was employed by UOP as an

19 Enrollment Counselor in its Sacramento, California location from April 2003 through

20 March 2004 — described as an inside sales position — Source 3's salary promotions

21 during that time were based on performance as compared to a matrix, but enrollment

22 numbers were the primary basis for Source 3's performance evaluation and any

23 consequent salary promotion.  One of the reasons Source 3 left UOP was that there was

24 an attitude of aggressive salesmanship or "poor salesmanship" at the Company.

25 Recruiters were encouraged to say whatever was needed to get people to enroll and

26 Source 3 was uncomfortable with the sales techniques.  Sperling Awards were given out

27 for meeting 110% of performance capability based on enrollment activities every 6

28

34

1 │ months. These awards consisted of trips to locations such as wineries in Napa and San

2 │ Francisco. Source 3 won a Sperling Award by meeting the criteria;

3 │     d.     According to Confidential Source 4, who worked in UOP's Las Vegas

4 │ administrative offices from approximately January 2002 through mid March 2004,

5 │ including employment in UOP's human resources division, while working as a human

6 │ resources liaison, Source 4 would receive, on a monthly basis, a Microsoft Excel

7 │ spreadsheet that included the salary of all employees in the Nevada region (including

8 │ UOP's Las Vegas and Reno campuses). If an employee received a raise, the reason for

9 │ that raise was indicated on the spreadsheet. When enrollment counselors received raises

10 │ it was because "their numbers had increased." It was UOP's policy to review enrollment

11 │ counselors every 3 months and during those reviews, changes to their salaries were made

12 │ based on how many enrollments the counselor had made during that period. Source 4

13 │ further confirmed that *salary increases were based solely on enrollment numbers*. This

14 │ compensation system was still in place at the time Source 4 left UOP in mid-March 2004

15 │ and continued thereafter. Source 4 is aware that the compensation system continued

16 │ thereafter based on conversations with a Director of Operations at one of UOP's

17 │ campuses;

18 │     e.     According to Confidential Source 5, a former UOP Enrollment Counselor

19 │ who was employed in that capacity at UOP's Wayne, Pennsylvania campus from

20 │ October 2003 through June 2004, Source 5 was made aware "every day" that UOP's

21 │ enrollment counselors were paid based on how many students they enrolled, and the fact

22 │ that compensation was dependent on enrollments was "ingrained" in enrollment

23 │ counselors in daily and weekly sales meetings.   Enrollment managers coached

24 │ enrollment counselors, indicating that if they got "this many enrollments then their

25 │ salary would be this." According to Source 5, "if you wanted to get ahead, it was

26 │ understood that you had to get enrollments;"

27 │     f.     According to Source 5, in June 2004, UOP's compensation plan for

28 │ enrollment counselors was changed so that they received performance reviews every 6

35

1   months, rather than every 3 months.  However, under this new plan, compensation could
2   increase or decrease based on enrollment numbers, whereas previously, compensation of
3   the enrollment counselors would increase based on more enrollments, but would stay the
4   same if his or her enrollments dropped.  As of June 2004, when Source 5 left UOP,
5   enrollment counselors were still being compensated based on how many students they
6   enrolled.  Source 5 further confirms that compensation for counselors at other campuses
7   was based on enrollments.  In February 2004, Source 5 attended a 4 day training session
8   in Phoenix, Arizona.    The session was attended by enrollment counselors from
9   throughout the nation where it was confirmed that compensation for counselors at those
10  other campuses was based on enrollments.  In March 2004, Source 5 attended a training
11  session in Newport, Rhode Island, where attendees included trainees from UOP's
12  campuses in Pennsylvania, Boston, New Jersey and Virginia.  Again, it was confirmed
13  that counselors at those campuses were also paid based on the number of students they
14  enrolled;

15      g.    Source 5 further relates that managers did not discourage discussion of the
16  compensation policies at UOP and were quite open about the fact that counselors needed
17  enrollments to get raises, except that managers gave instruction that, should Source 5
18  receive any calls from the media or other people not employed by UOP regarding
19  activities at the Company, no information should be provided about the University.
20  According to Source 5, an Enrollment Manager, Associate Director of Enrollment and
21  the Director of the Wayne Campus, each acknowledged that enrollment counselor
22  compensation was based on the number of students enrolled;

23      h.    According to Confidential Source 6, who was employed between
24  approximately February 2004 through August 2004 by Apollo in the position of Records
25  Evaluator at Apollo's Phoenix, Arizona location, and who was knowledgeable regarding
26  compensation policies for enrollment counselors as a result of Source 6's interest in
27  becoming an enrollment counselor and as a result of communications from enrollment
28  counselors in the course and scope of Source 6's employment as a records evaluator,

36

1   UOP employment counselors were paid based on how many students they enrolled.

2   According to Source 6, whose awareness of incentive based compensation also grew out

3   of an effort to learn more about the position in anticipation of applying for a job as an

4   enrollment counselor at UOP On Line, enrollment counselor compensation was based on

5   enrollments at the following locations:  Santa Teresa and Albuquerque New Mexico

6   campuses, Arizona campuses and southern California campuses.  And while several

7   people recommended that Source 6 become an enrollment counselor because it would

8   enable Source 6 to earn more money, a number of people counseled against such a move

9   because "you have to get X number of enrollments to get X salary."  Enrollment

10  counselors that Source 6 spoke to consistently told Source 6 that their compensation was

11  tied to how many students they enrolled.  In addition, from mid-February 2004 through

12  August 2004, Source 6 received calls from enrollment counselors asking that Source 6

13  check student records to determine whether or not students had registered for masters

14  programs — in fact, enrollment counselors were paid a bonus when students enrolled as

15  undergraduates moved up into masters programs and this practice continued even after

16  Source 6's departure from the Company, as confirmed by communications that Source 6

17  had with then-current UOP employees;

18          i.        According to Confidential Source 7, who was employed as a Student

19  Services Coordinator with UOP from March 2003 through October 2004 in its Atlanta,

20  Georgia campus, those employed at the campus received a quarterly bonus based on the

21  number of students enrolled for the quarter if they "made the numbers."  Source 7 further

22  confirmed that UOP officers encouraged lying or misleading potential students as "part

23  of their practice."  Enrollment counselors would often lie to get students signed up, for

24  example, by lying to students about the transferability of credits from other institutions;

25          j.        According to Confidential Source 8, employed as a Student Services

26  Coordinator between March 2003 and August 2004 at the UOP campus in Plantation,

27  Florida, and who assisted different departments, entering new students in UOP systems

28  so that these students had access to online materials, employees in the Plantation campus

                                         37

1   received a quarterly bonus if the Plantation campus met its enrollment numbers for the
2   quarter. In addition, Source 8 confirmed that UOP enrolled students who were simply
3   not qualified, acknowledging that it would enroll "anyone off the street," including
4   students who "couldn't even speak English" and adding that while UOP claimed to be
5   "like a real university," their enrollment techniques more resembled "a sales pitch."
6   According to Source 8, *if an enrollment counselor did not meet his or her quota, he or*
7   *she would be fired or receive a reduction in pay;*

8       k.      According to Confidential Source 9, who was employed at UOP's Tulsa,
9   Oklahoma campus as an Enrollment Advisor from September 2003 through September
10  2004 and whose job responsibilities included contacting perspective students to schedule
11  appointments, answer questions that they may have and help them enroll at UOP,
12  management established certain numerical goals concerning enrollment that, if met,
13  would then lead to additional compensation increases.   Source 9 confirms that
14  enrollment numbers were the only criteria that truly effected compensation increases.
15  Management encouraged an aggressive attitude toward meeting enrollment number
16  goals and weekly meetings were held to discuss enrollment goals and progress towards
17  meeting them.   Those who did not meet their numbers were put on a disciplinary
18  program called the "Plan" and subjected to a probation period and were obliged to sign
19  documents stating that they would improve their performance. Those on the "Plan" who
20  were unable to increase their enrollment numbers were terminated. According to Source
21  9, a regional meeting was held in Santa Fe, New Mexico in May 2004 attended by the
22  President of UOP and various vice presidents at which time UOP's compensation policy
23  was discussed and those in attendance were alerted to the fact that compensation
24  increases or decreases were going to be more aggressive and that enrollment advisors'
25  salaries could decrease if enrollment number goals were not met;

26      l.      According to Confidential Source 10, who was employed by UOP in
27  Phoenix, Arizona as a Financial Aid Compliance Auditor from July 2001 to May 2004.
28  Source 10's responsibilities included reviewing financial aid information after it was

1  completed and certified to ensure that it was in compliance with federal regulations,
2  including such information from UOP campuses all over the country.  According to
3  Source 10, beginning in 2002, an internal investigation was commenced after a
4  complaint was received from a student regarding the validity of his financial aid
5  application.  The initial investigation looked into the files completed by the specific
6  enrollment counselor who handed out student applications. It was discovered that *many*
7  *financial aid forms had been fraudulently filled out* and signed by that counselor. As a
8  consequence, the investigation was then extended to other counselors at that campus and
9  eventually across all of UOP's campuses throughout the country as *widespread instances*
10 *of fraud relating to financial aid applications was discovered.*  According to
11 Confidential Source 10, *approximately 30% of the files that were reviewed had been*
12 *fraudulently completed by enrollment counselors*.  Source 10 believes based upon
13 experience as a Financial Aid Compliance Auditor that this fraud was being committed
14 by enrollment counselors because of pressure from management to process applications
15 more quickly.  Indeed, by early 2003, *upper management was aware* of the fraudulent
16 completion and signing of applications by enrollment counselors and that it was
17 widespread and should have been reported to the DOE.  Approximately at that time, a
18 conference call was conducted by the Vice President of Financial Aid, with all directors
19 and financial aid managers to discuss problems uncovered during the national internal
20 investigation, which was continuing when Source 10 left UOP's employment in May
21 2004;

22        m.    According to Confidential Source 11, who was employed at UOP from
23 May 2002 through February 2005 as an enrollment counselor at it's Kearny Mesa
24 campus in San Diego, enrollment counselors face "intense sales goals" and managers
25 would ask throughout Source 11's employment "are you going to hit your number?" — a
26 reference to how many students were actually enrolled. According to Source 11, UOP
27 held weekly sales meetings during which counselors' numbers were reviewed and
28 *enrollment counselors who failed to meet their numbers were threatened with being*

39

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1   *fired*. Source 11's manager reviewed enrollments with Source 11 on a weekly basis.

2   During Source 11's tenure, the goals set for enrollment counselors actually became

3   increasingly difficult to meet; and

4         n.    Also according to Source 11, UOP gave "Sperling Awards" for top

5   performers, which usually entailed a weekend trip to a Sperling event. Attendance at

6   these events awarded was based on the number of students enrolled. Source 11 further

7   confirms that while UOP utilized a so called "matrix" of alleged "factors" to assess

8   compensation, and that a new matrix was released in approximately August 2004 with

9   additional factors, throughout Source 11's employment, the key factor in the matrix was

10  "purely ultimately the number" of enrollments and the other factors on the matrix were

11  not considered relevant by management, so much so that if a counselor met his or her

12  enrollment target, he or she would get a raise, even if all the other targets of the matrix

13  were missed and, by the same token, if every other matrix target but enrollments was

14  achieved, the enrollment counselor would not receive a raise. Source 11 further

15  confirms that raises were based on a counselor's ability to meet their enrollment targets.

16        93.    Internet message board postings authored by UOP employees further

17  confirm UOP's *"used-car salesman" atmosphere* and the fact that "Enrollment

18  Counselors" were effectively nothing more than high-pressure salesmen incentivized by

19  UOP's compensation scheme to enroll as many students as they could and "meet the

20  numbers." The financial incentive to enroll as many students as possible itself created

21  such used car salesman-like *and related deplorable sales tactics, the very type of abuses*

22  *that the HEA was attempting to end,* in part, through its ban on incentive compensation

23  for recruiters. For example, these internet message board postings relate:

24    •    Honest Abe
           Posted: Sun Jan 18, 2004 4:18 pm Post subject: My Experience
25         as an Enrollment Counselor

26                               *   *   *

27         As of fall 2001, Enrollment counselors were started at 28K or
           29K. They needed to make a 'quota' within 3 months in order to
28         receive a raise. For enrollment, income was commission based
           and always has been. However, the Department of Education is

                                    40

1    NOT to know this. If the DOE really saw what was going on,
     they would pull Title 4 funding from the school which is
2    financial aid.

3    • Posted: Thur May 13, 2004 9:00 pm Post subject: Re: I work
       there!

4                              * * *

5    Danielle, I can tell you are a relatively new employee at UOP. I
6    worked there for 10 years and as you know the work [sic]
     COMMISSION is never allowed to be said in relation to
7    anything there, but you must be familiar with the MATRIX and
     it's pay incentives. When I worked there the top of the matrix
8    was $120,000. I know that is no longer the case. You will be
     lucky to make $65,000. The demands on the matrix are far
9    more demanding than they were when I first started working
     there. Employees that had been there prior to the new matrix
10   had the choice of staying on the old matrix with new
     unattainable requirements or switching over to the new matrix
11   with less stringent requirements.

12                             * * *

13   I do believe that the school does help some students, but also
     does a disservice to many as there are many students who are
14   enrolled there that shouldn't be.

15   Lilygirl

16   • UofP EC
     Posted: Thur June 03, 2004 8:59 pm Post subject: My Current
17   Employment at UofP

18   I am a current employee of UofP as an Enrollment
     Counselor....I do feel the need to chime in.

19                             * * *

20   As I stated before, the staff is professional at where I work.
21   Saying that, a manager clearly told us, *'it's all about numbers.'*
     Simply put, you are either a salesperson or not. Even with
22   Freshman EC's, the numbers are astronomical. So I do hear a lot
     of my fellow EC's half-assed and half-truthed their way to make
23   that sale. I refuse to do that and by doing so, my numbers prove
     my point. I hear stories of 'not enough time,' 'too expensive,'
24   blah, blah, blah. Unlike other counselors, I do sympathize with
     the customer. I guess that's where my niche comes from, even if
25   I do make 100 calls/day. But *numbers are the bottom line.* I
     guess I can expect to be called in one day and hear those words,
26   as Donald Trump says it, 'You're Fired!'

27   As stated before as well, I feel that there is a lot of micro-
     managing in my department. Oh my, one minute I could be 'tri-
28   connected' to a manager and then my director of enrollment
     comes in and listens to my conversation. They try to mean well

                              41

1    but I end up *getting chewed up for not 'completing that sale.'*
     It's like Big Brother.

2

3    Starting salary for us was $29K, with a possibility of 45K within
     three months.   They tell us it's not commission, it's
     'PERFORMANCE' based...a *loophole for the Department of*

4    *Education to not investigate UofP.*

5                                    *   *   *

6    I do take my job seriously and want to make more money but
     refuse to break my ethical code in doing so, unlike some of my

7    colleagues.

8    •    Mary
          Posted: Thur Jul 01, 2004 6:50 pm Post subject: Interview for

9         'Enrollment Counselor' position...

10   Here was my interesting experience at the University of
     Phoenix-St. Louis campus.  I actually applied for a job there

11   listed   on   the   monster.com   website   as   'Admissions
     Counselor'....The head of the department and two other

12   employees seemed very distraught that I had little to no
     marketing and retail experience.  In the interview, they basically

13   came out and said 'This is a salesman's job.'   Enrollment
     Counselors are not really counselors — they are telemarketers.

14   Their job is to sit in a cubicle and make hundreds of phone calls
     a day just to get you in their school.   There quota is 4

15   applications per week.  They didn't care much about my desire
     for education, just whether or not I could make the company

16   some profits and if I cared enough about 'money.'  If you read
     the 'Enrollment Counselor' description on the Apollo Group, Inc.

17   website, then you will see a description that doesn't match what
     you REALLY are meant to do there.  Needless to say, I didn't

18   get the job.

19   •    Soon to be ex-employee
          Posted: Fri Jul 16, 2004 3:02 pm Post subject: Same thing

20

21   I to [sic] went through the same type of group interview.  the
     main concern that they asked was when I was in sales did I meet
     my quotas.  They told me the same its a sales position!

22

23   •    ex employee
          Posted: Sun Aug 22, 2004 9:45 pm Post subject: Letter is Real

24   I was an admission counselor for over a year and recently quit.
     (thank God).

25

26   ....Some of the practices of management from the top down
     could only be described as deplorable.

27   •    Sold Soul
          Posted: Mon Aug 23, 2004 4:40 pm Post subject: Current EC

28        experience

                                    42

1    I have been at UOP less than a year, I must say first I was
     excited, but then I started seeing the light. At the interview they
2    talk about you changing people lives, and how they want to see
     you succeed. All I have to say to that is BS! The pros that were
3    stated such as benefits, and free school, there is a catch to that.
     Yes, you can go back to school for free only,....IF YOU HIT
4    YOUR NUMBER AFTER YOUR 13 WEEKS!...This is a
     straight up sales position...you need to make sure you get your 4
5    applications a week or you will be on the [expletive deleted]
     list....But to have your job being threaten [sic] because you do
6    not get 4 applications in a week is BS.

7    •    Gladtobeouttauop!!!
          Posted: Thur Sep 16, 2004 3:51 pm Post subject: Wake up
8         Danielle!

9         The 'matrix' is COMMISSION!!!!!! As a former UOP
          enrollment counselor I know that this is just a way to try to cheat
10        the system and give commission. Anything that awards money
          based on your numbers (which we both know is what
11        happens...let's be honest) is commission. Just wanted to clue
          you in so you know the truth about your employer. By the way
12        — check out the DOE Report.

13   •    Interviewee
          Posted: Mon Oct 04, 2004 10:07 am Post subject: Interviewed
14        twice for enrollment counselor

15                               *   *   *

16        On the second interview (one-on-one), I was told that the job
          required a certain ruthlessness. I heard downright cruel
17        examples of how I was to bully people into enrolling, and was
          told that while UOP does not require an enrollment counselor of
18        any specific background, knowledge of marketing and sales was
          desirable. In not so many words, I learned that it's a *numbers
19        game. Enroll as many people as possible*, don't worry about
          how they will pay, and *in return I'd be allowed to stay at UOP
20        and (probably) make a lot of money.*

21   •    Lisalang
          Posted: Mon Dec 06, 2004 7:13 pm Post subject: What UOP is
22        all about

23        I am a counselor at UOP and will give it how it is.

24        First of [sic], UOP is a for profit school, so like all businesses in
          corporate American [sic], they want to make a profit. How they
25        go about it with their employees is what is wrong with the UOP
          system. If you are a counselor there, you probably range from
26        22-36 years in age, usually being in the 21-26 age category.
          Why is this? The reason for this is the UOP is not a career job
27        or is any other for profit schools out there with the online
          divisions....Management is what is wrong at these Universities,
28        but it starts at the top. The management is getting hit over the
          head by their superiors and who do they go and yell at, well it is

                               43

the employees who make the telemarketing calls. No other sales
environment teaches what UOP or online schools do. You are
told to pressure students into starting school. Now in the sales
world, that does not work (if you want to be successful) because
you will get no referrals down the line. People can sense when
you turn on them from being nice to being a jerk because you
didn't want to sign up for school that day. It is such an
*unethical practice* to successful sales that I never use it with my
students. We are told to lie, create the sense of urgency, another
false representation of how things are to be....Remember that
UOP is a telemarketing job where you are to call people 100
times and get them enrolled for school by filling out an
advertisement.

Do not let management make you feel down. They are the ones
who find the whole system of *pressuring people* okay. Face it,
they are *used care [sic] salesmen.*

**V.    MATERIALLY FALSE AND MISLEADING STATEMENTS
ISSUED DURING THE CLASS PERIOD**

94.    As noted above, on February 5, 2004 the DOE issued its Program Review
Report to Apollo, finding and concluding that Apollo was committing a "substantial
breach" of its fiduciary duty, and was in *noncompliance* with the law by reason of its
*"improper incentive compensation system for those involved in recruiting activities,"*
while systemically engaging in actions "designed to *mislead the Department of
Education and evade detection.*" The DOE Report constituted a blistering indictment of
Apollo regarding a matter of the utmost critical importance and its findings and
conclusions are confirmed by numerous knowledgeable sources as discussed above.
Defendants persistently hid the DOE Report and the truth from the market and continued
to foster the false, deceptive and misleading notion and representation that Apollo
operated within the law respecting Title IV, as more fully demonstrated below.

**A.    False and Misleading Statements During the Class Period**

95.    On February 27, 2004, Apollo issued a press release over the *Business
Wire* announcing that a *qui tam* lawsuit brought against the Company by 2 employees
had been dismissed. According to the release, the action alleged that Apollo improperly
compensated its recruitment officers. The Company stated, in relevant part, as follows:

Apollo Group Inc. (NASDAQ: APOL) (NASDAQ: UOPX) learned
today that on Feb. 19, 2004, the U.S. District Court for the Eastern

44

1    District of California granted our motion to dismiss the previously
     disclosed qui tam action.

2

3    The qui tam action was brought by two of our current employees on
     behalf of themselves and the federal government and alleged that we
     improperly compensate our employees who are involved in the
4    recruitment of new students. The government declined to intervene in
     the lawsuit.

5

6    ...'Although we had expected the dismissal of the qui tam lawsuit, we
     were very pleased to obtain this ruling.'

7        96.    This news caused the price of Apollo common stock to rise $3.44 per share

8    or 4.5% from its closing price of $76.23 the day before to close at $79.67 on March 1,

9    2004.

10       97.    Apollo's February 27, 2004 press release announcing the dismissal of the

11   *qui tam* lawsuit was deceptive and materially misleading in all respects. While it was

12   true that a *qui tam* lawsuit brought by 2 employees of UOP had been dismissed,

13   defendants' portrayal of that dismissal was highly inaccurate and falsely conveyed a

14   message that the *qui tam* lawsuit's allegations of improper compensation of employees

15   respecting the recruitment of new students was without merit. In fact, the dismissal was

16   based solely on the grounds that the False Claims Act violation asserted therein could

17   not be brought because such a claim requires that a false certification of compliance be

18   filed and the DOE does not require such a certification. While the description of the *qui*

19   *tam* lawsuit was itself false and misleading, what was even more misleading was

20   defendants' failure to refer to or disclose in any manner the DOE's investigation of

21   Apollo and most importantly, the DOE Report received just 3 weeks earlier on February

22   5, 2004, after the DOE's intensive audit and investigation, that found and concluded that

23   the Company was in flagrant violation of the law with respect to Title IV funding and

24   the related ban on incentive compensation respecting student enrollments, as more fully

25   discussed above, and as was factually alleged in the *qui tam* action.

26       98.    Defendants' statement that the government declined to intervene in the *qui*

27   *tam* suit, while technically accurate, was also, of course, completely misleading. As

28   defendants already knew, the DOE — an agency of the U.S. government — had

                                    45

1    vigorously stepped in and conducted a thorough audit and investigation, pursuant to a

2    Program Review, of UOP employee whistleblower complaints that UOP was violating

3    the law, including the ban on incentive compensation.

4         99.    On March 12, 2004, Apollo reported fiscal 2004 financial results for the

5    second quarter ending February 29, 2004. The Company stated, in relevant part, as

6    follows:

7         Net income attributed to Apollo Education Group for the three months
         ended Feb. 29, 200[sic], was $63.0 million, or $.35 per diluted share,
8         compared to $42.6 million, or $.24 per diluted share, reported for the
         same period last year.

9
         Net income attributed to Apollo Education Group for the six months
10        ended Feb. 29, 2004, was $141.4 million, or $.79 per diluted share,
         compared to $96.4 million, or $.54 per diluted share, reported for the
11        same period last year.

12                                    *   *   *

13        Total consolidated revenues for Apollo Group Inc. for the three months
         ended Feb. 29, 2004, rose 34.4% to $396.9 million, compared with
14        $295.2 million in the second quarter of fiscal 2003. The University of
         Phoenix accounted for 95.5% of the $372.2 million in net tuition
15        revenues from students enrolled in degree programs for the quarter
         ended Feb. 29, 2004. Total revenues for University of Phoenix Online
16        for the three months ended Feb. 29, 2004, rose 57.4% to $184.1 million,
         compared with $117.0 million in the second quarter of fiscal 2003.

17
         Total consolidated revenues for Apollo Group Inc. for the six months
18        ended Feb. 29, 2004, rose 33.9% to $808.7 million, compared with
         $604.1 million in the same period last year. The University of Phoenix
19        accounted for 95.2% of the $759.8 million in net tuition revenues from
         students enrolled in degree programs for the six months ended Feb. 29,
20        2004. Total revenues for University of Phoenix Online for the six
         months ended Feb. 29, 2004, rose 59.3% to $361.8 million, compared
21        with $227.2 million in the same period last year.

22   Commenting on these results, defendant Nelson stated in pertinent part, as follows:

23        'We are pleased with the strong financial performance this quarter. We
         are also pleased to see *continued strong growth in enrollments*, both
24        local and online. We also reached a new milestone in enrollment at
         University of Phoenix, exceeding the 200,000 mark.'

25        100.    On that same day, March 12, 2004, Apollo, via defendants Nelson and

26   Gonzales, held a conference call with analysts to discuss its second quarter of fiscal

27   2004 results. During the call, defendant Nelson coyly mentioned a DOE Program

28

                                        46

1   Review, but without ever disclosing the serious nature of the review or the fact that the

2   DOE had already issued a scathing written report on February 5, 2004, of its material

3   and adverse findings and conclusions, as a product of its thorough review and

4   investigation, that Apollo's UOP was continuously and systemically violating the ban on

5   incentive compensation respecting student enrollments among other unlawful and

6   unethical practices. Instead, Nelson downplayed and minimized the Program Review

7   and concealed the DOE's Report and its adverse findings issued February 5, 2004, in his

8   discussions with analysts who were eager to know more about the review, as follows:

9       TODD NELSON:...The *next area would be U.S. DOE approval*. This
area usually gets a lot of attention because of the visibility. *Their*

10      *involvement usually comes in the form of a program review and*
*(indiscernible) audit. These types of reviews are a normal part of*

11      *doing business*, and it is their responsibility to actually [sic] these types
of reviews. Over the years, we have had many of these kind of

12      reviews. For example, as most of you know, we currently have an OIG
audit involving IPD that has been ongoing for several years. *We also*

13      *have an ongoing program review at The University of Phoenix*.

14      Over the years, although these reviews are complex and time-
consuming, they have *never resulted in a material impact on Apollo*.

15      Our experience with the process is that, *first, there is a visit, then a*
*preliminary draft* — or preliminary report or a draft *report is issued.*

16      *It has also been our experience that it is not unusual that these*
*reports may contain negative comments.* Following the initial reports,

17      though, the institution then has an opportunity to research the issues in
question and draft a response. This information is then considered by

18      the department, and a final report is issued. It is usually at this point
that we realize if there is an issue and normally disclose that matter if it

19      involved any type of material consequences for the school.

20                       \*   \*   \*

21      GREG CAPPELLI: One final one for Todd. Todd, we have been
getting more questions recently just about the Department of Ed. and

22      the processes that they go through during the year. You mentioned the
programming view (ph). How common is it, actually, for you to have a

23      program review? I'm sure you have had them, as you have mentioned,
over the past 10 years. And then any more color on specifically what,

24      in this case, we are looking for?

25      TODD NELSON: Well, the bottom line is, in my history with the
company, especially over the last 10 years, I don't know that there has

26      ever been a time when there hasn't been either a *program review* or an
OIG audit going on. *So it's a very common thing for us...* And so

27      basically, I guess, an answer to your question, we have these things, I
guess, happening on a regular basis. And I would say the good news is

28      our track record has shown that, although during the process, I guess
from our point of view, *your first draft reports or your first indication*

47

1    *back from the initial visit is they usually have questions.  And, in*
*some cases, a very negative reaction to things, in some cases a very*
2    *positive reaction.*

3    ...But the end result, which you have been able to see, has been very
positive — I shouldn't say positive for us, but it has been *immaterial* to
4    us in a sense that *these are things that are, again, interpretation of*
*regulations* versus any intent to do anything wrong.

5

6    *The types of things that I think are the hot button that they certainly*
*look at with us and, I think, with everybody, in particular....*

7    *The other area is incentive compensation.  Again, that's an area that I*
*think all of us have been very interested in how they are interpreting*
8    *that....*

9    Unfortunately, again, you have got some period of time before and how
those things are interpreted and what that actually means.  *The good*
10    *news from our point of view is that as we have looked at this and*
*looked very carefully at what we do, the types of things that we would*
11    *be subject to would be saying, well, you need to change this.*  There
may be some sort of a nominal fine type thing, but short of that we are
12    very comfortable that — nothing that would be material for us.  So we
feel very good about that.

13                            *   *   *

14

15    RICHARD CLOSE, ANALYST, JEFFERIES:  Congratulations as well.
Todd, maybe hitting on that last point, do you have any sort of timetable
16    *when you think the program review will be completed or when any*
*type of report will be issued?*

17    TODD NELSON: *Well, it's, you know, again, tough to say.*  Much like
with the OIG audit that IPD is involved in, from our point of view, once
18    we have had a chance to respond to any issues, that's when we would,
again, feel if there's a problem or not.  And we had an opportunity to do
19    that in both cases, and we feel very good about that response.

20    Unfortunately, the next step sometimes takes months or years.  And in
this particular case, our feeling is that if you just look at the pure, I
21    guess, calendar involved, we would hope that they would both be
resolved soon and that if any others start in the meantime, that they
22    would also go through quickly.  And again, I only say that because I
honestly can't remember a time in the last at least 10 to 12 years that we
23    have not had either one or the other or both going on.  *And I just want*
*to point out again that that's a normal process*.  They are doing their
24    job by doing these kinds of reviews.

25    I think the type of thing that obviously causes most people concern
would be, obviously, because of some of the things that are in the press
26    with some of the other education companies right now, would be how
those things are — if they escalate to another level.  And we are very
27    comfortable that, certainly, as you can see from our track record, that
has not ever happened with us.  But again, it's something that we just
28    take very seriously.  And we have an infrastructure in place to make
sure that we deal with those things on a very proactive basis.

48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RICHARD CLOSE: And then, on a different note, there is the positive news, I guess, on the whistle blower. Is that completely over now, or what exactly — where do you stand on that?

TODD NELSON: Well, *the good news is and we are early in the process, and the first was that it was dismissed, which was good.* Unfortunately, as you know, that doesn't necessarily mean it's over. The opposing counsel always has a chance to amend that or appeal that, and we expect that that is happening. And so, again, the good news is, at least through the first round, we are exactly where we thought we would be.

So other than that, we will respond. *And the old saying, and the truth shall set you free. We're just very grateful that we know what it is we're doing and we feel very comfortable about it.*

\* \* \*

KELLY FLYNN, ANALYST, UBS:   The question relates to the program review, again. I'm sorry to beat a dead horse here. But I'm hoping, Todd, you can just help to manage expectations a little bit more here. How many have you had? And then what are the circumstances that can bring them about? I know some are just regular, and sometimes some event brings them about.

And then, finally, what do you consider normal frequency, that we should expect down the road? If you could speak to that?

TODD NELSON: First off, as far as the amount, I can't really give you off the top of my head. I would say approximately, probably — I don't know, because they take several years to happen. But I would say, probably in the neighborhood of a half dozen or so.

As far as why — they can be brought about for a lot of different reasons. We have found that the most frequent reason from our point of view would be — and this is when they come in, you ask them, is there *reason why* you are here? And typically, the *normal response is no. This is just a known review* — you are a very large school.   You receive a lot of Title IV dollars. And this is part of the process.

\* \* \*

And then your last question, as far as what do we considered [sic] normal, I would say, because we are a large and fast-growing university, that we *can pretty much expect one almost all the time.* It does not mean that you would have, necessarily, three or four going on. But I think, from our point of view, you would expect a program review that would start probably every couple of years.   Because *I think once one gets in the process, it usually takes a couple of years.* And then, by the time that's over, you may have a few months before the next one starts. OAG [sic] audits are probably a little less frequent. But, again, our experience has been that they come through quite often.

101.   Defendant Nelson's failure to disclose the February 5, 2004 DOE Report

1   and its findings was purposeful and designed to hide from the investment community an

2   adverse event and facts that Nelson himself acknowledged in a letter to the DOE dated

3   March 1, 2004, *would cause "great harm"* if disclosed to Apollo's shareholders.

4   Indeed, Nelson's statements not only concealed the existence of the DOE Report, it also

5   deceptively misled the market into believing that nothing adverse had occurred, that no

6   adverse report had been rendered and that the DOE review in question was simply a

7   normal or routine event, thereby comforting investors.

8       102.   These deceptive and misleading statements caused the price of Apollo's

9   stock to increase from $77.75 at the close of trading on March 11, 2004 to close at

10  $80.77 on March 12, 2004 and higher still to close at $81.57 on March 15, 2004, the

11  next trading day.

12      103.   On April 13, 2004, the Company filed its second quarter report with the

13  SEC on a Form 10-Q signed by defendants Nelson, Gonzales and Bachus, reiterating its

14  previously announced results. In addition, the Company reported that, in connection

15  with an *audit of a small Apollo subsidiary, IPD* and certain of its client institutions'

16  administration of federal student aid programs, the DOE's Office of the Inspector

17  General found that IPD's client institutions improperly paid a percentage of its tuition

18  revenues to IPD for recruiting students, and that IPD's compensation of its employees

19  was based upon enrollment figures, in violation of statutory provisions prohibiting the

20  use of such incentive payments. According to the Form 10-Q, the OIG recommended to

21  the DOE that the Company repay any loans disbursed pursuant to the program. In

22  response to the audit relating not to Apollo's UOP operations but to the much smaller

23  IPD portion of its business, the Company said loan repayments were "not appropriate"

24  and that the audit would be resolved without any recourse to the Company:

25          The U.S. Department of Education Office of the Inspector General
            ("OIG") audited the administration of the federal student financial
26          assistance programs in connection with educational programs provided
            pursuant to contractual arrangements between IPD and certain of its
27          client institutions. In audit reports issues to eight client institutions, the
            OIG asserted that the client institutions violated the statutory prohibition
28          on the use of incentive payments for recruiting by paying IPD a
            percentage of tuition revenue. The reports further suggest that IPD paid

                                    50

its employees in a manner that included incentive-based compensation even though IPD based its compensation plans for recruiters on factors or qualities that were not solely related to the success in securing enrollments. Additionally, the audit reports question the client institutions' interpretation of the '12-hour rule.' *Although both IPD and the client institutions believe that the matters in question do not relate to student program or institutional eligibility and, therefore, believe a repayment of federal funds is not appropriate,* the OIG has recommended to the U.S. Department of Education that the client institutions be required to return to lenders all loan funds disbursed. IPD is currently in active negotiations with the U.S. Department of Education to eliminate or settle the issues raised in the audit reports. *Although the Company believes that the OIG's audits of certain IPD client institutions will be resolved without any material effect on its financial position, results of operations, or cash flows, and without any material change in IPD's business strategy, as with any program review or audit,* no assurance can be given as to the final outcome as the matters are not yet resolved.

104. The Form 10-Q also contained a certification submitted pursuant to Section 906 of the Sarbanes-Oxley Act Of 2002, signed by defendant Nelson, which purported to certify the veracity of the Company's financial statements, as follows:

In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended February 29, 2004, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Todd S. Nelson, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A similar certification containing the same representations was signed by defendant Gonzales and included in the Form 10-Q.

105. Once again, and despite mentioning the audit of a very small Apollo controlled subsidiary — IPD — and findings of the DOE's Office of the Inspector General that IPD's client institutions improperly paid a percentage of its tuition revenues to IPD for recruiting students, defendants still purposely failed to disclose the DOE Report of February 5, 2004 or its findings or that UOP — which accounted for about

51

1    95% of Apollo's revenue compared to IPD, which accounted for a fraction of the
2    remaining 5% — was violating the ban on incentive compensation respecting
3    enrollments, a material event to the Company and investors.

4        106.   Defendants' false, deceptive and misleading statements, caused the price of
5    Apollo's shares to rise from $76.23 per share at the close of trading on February 27,
6    2004, the commencement of the Class Period, to as high as $98.01 during trading on
7    June 8, 2004, when it settled into its Class Period high at the close of trading of $97.93,
8    an increase of over 28%.

9        107.   At the close of trading on June 22, 2004, Apollo shares were still trading
10   vigorously, closing at $94.17. But on June 23 and 24, 2004, published reports were
11   issued concerning 2 of Apollo's competitors in the for-profit education field — Career
12   Education and Corinthian Colleges, Inc. On June 23, 2004, it was announced that the
13   SEC had commenced an investigation of Apollo's competitor, Career Education. On
14   June 24, 2004, the *Financial Times* reported, in a story entitled "College Fee Probe
15   Extends to Corinthian," that the DOE had uncovered violations in obtaining federal
16   loans at Corinthian's Bryman College campus in San Jose, California, including
17   allegations that school officials had helped students manipulate financial aid documents
18   to obtain the maximum possible toward tuition fees, by claiming extra dependents to
19   obtain additional financial aid. These reports about Apollo's competitor were viewed by
20   Apollo investors with some concern, particularly in light of the DOE Program Review of
21   Apollo's UOP operations that they were informed was taking place.

22       108.   These announcements, combined with the concerns of Apollo investors
23   that Title IV funding violations and related violations of the law could be widespread in
24   the industry, even though Apollo had time and again falsely informed the shareholder
25   that it was in complete compliance with all DOE regulations, caused the share price of
26   Apollo stock to decline, from a close of $94.17 on June 22, 2004 to close at $90.62 on
27   June 23, 2004, upon the Career Education announcement, on extraordinary volume of
28   6,271,300 shares and to decline even further to close at $85.85 on June 24, 2004 on

52

1  volume of over 14.7 million shares. However, investors still did not know and were not

2  informed that in fact, the DOE had concluded and formally reported to defendants that

3  Apollo's operations did violate the law. Thus Apollo's stock continued to trade at falsely

4  inflated values.

5      109.   Eager to stop the decline in the trading price of Apollo shares, the

6  Individual Defendants disseminated a further series of false, deceptive and misleading

7  statements via media press releases and telephonic conference calls designed to restore

8  investor confidence in Apollo's regulatory compliance and allay investment community

9  concerns.

10     110.   To that end, in a Company press release disseminated to the financial

11 community on June 24, 2004, Apollo reported fiscal 2004 financial results for the third

12 quarter ending May 31, 2004. The article stated in pertinent part:

13     Net income attributed to Apollo Education Group common stock for the
       three months ended May 31, 2004 was $101.1 million, or $.56 per
14     diluted share, compared to $69.8 million, or $.39 per diluted share,
       reported for the same period last year. Net income attributed to
15     University of Phoenix Online common stock for the three months ended
       May 31, 2004, was $8.2 million, or $.48 per diluted share, compared to
16     $4.4 million or $.27 per diluted share, reported for the same period last
       year.

17
       Net income attributed to Apollo Education Group common stock for the
18     nine months ended May 31, 2004 was $242.5 million, or $1.35 per
       diluted share, compared to $166.2 million, or $.94 per diluted share,
19     reported for the same period last year. Net income attributed to
       University of Phoenix Online common stock for the nine months ended
20     May 31, 2004, was $19.6 million, or $1.14 per diluted share, compared
       to $10.4 million or $.64 per diluted share, reported for the same period
21     last year.

22                              *   *   *

23     Total consolidated revenues for Apollo Group, Inc. for the three months
       ended May 31, 2004 rose 36.5% to $497.0 million, compared with
24     $364.2 million in the third quarter of fiscal 2003. The University of
       Phoenix accounted for 95.6% of the $464.5 million in net tuition
25     revenues from students enrolled in degree programs for the quarter
       ended May 31, 2004. Total revenues for University of Phoenix Online
26     for the three months ended May 31, 2004 rose 60.0% to $233.3 million,
       compared with $145.8 million in the third quarter of fiscal 2003.

27
       Total consolidated revenues for Apollo Group, Inc. for the nine months
28     ended May 31, 2004 rose 34.8% to $1.31 billion, compared with $968.2
       million in the same period last year. The *University of Phoenix*

                                      53

1   *accounted for 95.4%* of the $1.22 billion *in net tuition revenues from
2   students enrolled in degree programs for the nine months ended May
    31, 2004.* Total revenues for University of Phoenix Online for the nine
3   months ended May 31, 2004 rose 59.6% to $595.1 million, compared
    with $373.0 million in the same period last year.

4       111.   Thereafter, in a follow-up call with analysts that same day, defendant

5   Nelson further buoyed investor confidence and generated renewed market enthusiasm

6   for purchasing Apollo stock in representations and responses to analysts as follows:

7       TODD NELSON, PRES, CEO, DIRECTOR, APOLLO GROUP:....We
        appreciate you joining us this morning.  We're very pleased to report
8       third quarter results with an EPS number for Apollo of 56 cents versus a
        consensus of 51 cents and UOPX EPS number of 48 cents versus a
9       consensus of 41 cents.   We're also *very pleased to report strong
        enrollment.* With growth of over 239,000 students which despite being
10      over 200,000 students it was a 27.6% increase.

11                              *   *   *

12      That's very strong lead growth in both our online and onground
        campuses.  So that's very encouraging for further growth. *We are sorry
13      that despite what we feel are very good results that some of the bad
        news in the space has put a cloud over today, which would have
14      otherwise been a very good day. So it looks like maybe a good buying
        opportunity for both APOL and UOPX.* I have just two last comments
15      before I turn the time over to Kenda.

16                              *   *   *

17      MARK MAROSTICA: ...I'm wondering if you could update us on the
        status of any program reviews taking place throughout Apollo at this
18      point?

19      TODD NELSON: ...The *program review* at the University of Phoenix
        *continues to go* from our point of view *very smoothly.* There's been a
20      request of information back from us.  We obviously have conducted the
        research and gathered the information and it *looks great.*

21
        And so our hope is that, you know, three to six-month time frame that
22      we'll have that resolved.  Again, as you know for us, for us it's a *normal
        course of business.* Certainly *nothing that we feel that the data that
23      we produced will create any problems for us.*

24                              *   *   *

25      KELLY FLYNN: ...Greg just asked about the regulatory environment.
        You clearly emphasized your goal of to grow in a measured fashion.  Is
26      there anything you've seen in the past couple of months, you know,
        from within the states in general?  I mean, any practices that you think
27      have changed or things that...other companies might be doing that
        might, you know, bring about more regulatory scrutiny?  I don't
28      certainly mean it's only in the public university.  But just within the
        whole university probably.

                                    54

TODD NELSON:  Well, I mean, I think that the comment that I made earlier is not aimed at any other company. Because I do think that there are some excellent companies out there....But I don't think that in and of itself is going to bring more scrutiny.

...As far as some of the other practices that some of the other companies are involved in, you know what?

It probably wouldn't be fair for me to comment on that.  All I can say is I know most of them very well and *they're really fine companies*.  And I think they're doing — trying to *do things the right way*.  And with the exception of, again, you have as like your company and the other industries, you know, *disgruntled employees or former employees*.

Unfortunately, they can *get an audience*.  And that's a bad situation for any company, not just the education companies.  And I honestly think that is *having more of an impact on the stuff that you are seeing going on as far as regulatory scrutiny than any real substantive problem.*

\* \* \*

*The first thing out of their mouth has been when they talked to us is that, 'this is a routine audit.'*  And you are one of the largest recipients of Title 4 funds, therefore, you know, we need to come look at you.... On the program review side, my experience has been it's usually triggered by something.

Again, it can be something significant.  It can be something minor. *My opinion of the last program review probably had something to do with the Qui Tam lawsuit and some of the accusations being made.*  And it's probably one of the reasons why they came in.

*But in our case, it's routine because again* when you're growing rapidly and when you are our size, there are a always lot of different sides....So these things cause and trigger that.  So in answer to your question yet it is. *It doesn't necessarily have to be a negative thing.*

112.  Defendant Nelson's remarks were false, deceptive and misleading.  In truth, UOP was flagrantly, systemically and consistently violating the law with respect to student enrollments and related Title IV funding as discussed above.  The DOE had already issued a scathing report noting such findings and Apollo's illegal and duplicitous conduct.   Whistleblower claims that UOP was incentivizing student enrollment counselors in violation of the law were true and the Company was at risk of a substantial penalty.   Indeed, defendants purposely failed to reveal the *negative* DOE Report knowing, as defendant Nelson conceded in his March 1, 2004 letter to the DOE, that doing so would cause "*great harm.*"  Nor was the Program Review simply "routine."

1  Meanwhile, the DOE Program Review was already beginning to have a material adverse

2  impact on Apollo. As it prepared to deal with anticipated declining enrollment and

3  consequent declines in the growth rate of revenue and net income resulting from being

4  forced to operate within the law, Apollo revoked its own historic ban on enrolling

5  students as young as 18 years old — thus expanding its potential student base.

6  Ultimately, sequential year-to-year quarter growth rates in enrollments, revenue and net

7  income would slow, as illustrated below in ¶¶ 124,125 and 126, and would have slowed

8  or declined even more significantly had UOP strictly and immediately adhered to the

9  letter of the law.

10      113.    Defendants' strategy was successful.    The above-mentioned false,

11  deceptive and misleading June 24, 2004 statements during the Apollo third quarter of

12  fiscal 2004 conference call, and Apollo's earnings announcement proceeding that call,

13  halted the further decline in the trading price of Apollo stock and caused the price of its

14  shares to increase from $85.85 on June 24, 2004 to as high as $88.70 on June 25, 2004,

15  and further still to as high as $89.75 in June 28, 2004, the next trading day.

16      114.    On July 15, 2004, the Company filed its quarterly report with the SEC on

17  Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and

18  reaffirmed the Company's previously announced results. The Form 10-Q also contained

19  a certification submitted pursuant to Section 906 of The Sarbanes-Oxley Act Of 2002,

20  signed by defendant Nelson, that purported to certify the veracity of the Company's

21  financial statements, as follows:

22      In connection with the Quarterly Report of Apollo Group, Inc. (the "Company") on Form 10-Q for the three months ended May 31, 2004,

23      as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Todd S. Nelson, Chairman of the Board,

24      President, and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906

25      of the Sarbanes-Oxley Act of 2002, that to my knowledge:

26      1)    the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

27      2)    the information contained in the Report fairly presents, in all

28      material respects, the financial condition and results of operations of the Company.

56

A similar certification containing the same representation was signed by defendant Gonzales and included in the Form 10-Q.

115.  However, once again, the defendants concealed and failed to disclose the serious DOE findings and conclusions reported to Apollo on February 5, 2004, or the fact that the Company's UOP subsidiary, which accounted for the great majority of its revenue — over 95% — had at all times material, been violating the ban on incentive compensation respecting student enrollments, as discussed above, while giving lip service to the need to comply with the requirements of the Higher Education Act of 1965, stating:

> *Our future success is highly dependent on our ability to obtain, maintain, or renew required regulatory approvals, accreditation, or state authorizations.* We are subject to extensive private, federal, and state regulation. The Higher Education Act of 1965, as amended, and the related regulations govern all higher education institutions participating in Title IV programs.
>
> \* \* \*
>
> All higher education institutions participating in Title IV programs must be accredited by an association recognized by the U.S. Department of Education.  *The U.S. Department of Education reviews all participating institutions for compliance with all applicable standards and regulations under the Higher Education Act.*  Accrediting associations are required to include the monitoring of Title IV programs compliance as part of their accreditation evaluations under the Higher Education Act.
>
> \* \* \*
>
> The Higher Education Act of 1965 and the related regulations adopted by the U.S. Department of Education also impose numerous requirements with which institutions participating in the Title IV programs must comply....*The failure to comply with any of the Title IV requirements could result in adverse action by the U.S. Department of Education* against us, including the termination of Title IV eligibility, the imposition of fines, or the imposition of liabilities by the U.S. Department of Education. Institute for Professional Development client institutions administer their own Title IV programs. The loss of Title IV eligibility would significantly reduce demand for our programs.

116.  On August 25, 2004, the Company provided its business outlook for the first quarter of fiscal 2005 ending November 30, 2004 and the fiscal year ending August 31, 2005. Specifically, the Company stated:

57

1  We are pleased to report that we expect degree enrollments at local
2  campuses to grow between 12% and 13% over the prior year at the end
   of the first quarter of fiscal 2005. In addition, we expect online degree
   enrollments to grow in excess of 40% over the prior year at the end of
3  the first quarter of fiscal 2005.

4  Apollo Group Inc.

5  • We expect revenue for the quarter ending Nov. 30, 2004 to be
     between $529 million and $532 million and to be between $2.285
6    billion and $2.288 billion for fiscal 2005.

7  • Operating margin is expected to be between 32.5% and 33.0%
     for the quarter ending Nov. 30, 2004 and to be between 32.5%
8    and 33.0% for fiscal 2005.

9  Excluding non-cash charges related to the conversion of University of
   Phoenix Online stock options into Apollo Education Group Class A
10 stock options anticipated to be recognized in the fourth quarter of fiscal
   2005, diluted earnings per share are expected to be $.56 for the quarter
11 ending Nov. 30, 2004 and to be $2.40 for fiscal 2005.

12    117.  In a follow-on conference call with the investment community on August

13 25, 2004, hosted by Apollo and defendants Nelson and Gonzales, the following was

14 stated:

15    BRIAN, ANALYST, UBS:  I was wondering if you could give us a
      little bit of a color around the current status of the program review?

16
      TODD NELSON:  Sure.  As you know, this — the program review he's
17    refers [sic] to is one that started last year that was a result of the [qui
      tam] lawsuit and in there they were talking about compensation.  And so
18    we've been going back and forth with the department to, you know, to
      reach a resolution on it.  The good news is, from our point of view, that
19    we still feel very comfortable that the outcome will end up not having
      any impact on our ability to grow on our students or employees or
20    anything of that nature.  But as with any regulatory issue, I mean, it is
      not over until it is over.  And so, you know, we hope to see it resolved
21    within the next, hopefully within the next *few months*.  And we find
      that — think that the end result will be, as I said, *not have any material*
22    *impact on the company in any way.*

23    118.  The defendants' August 25, 2004 statements in Apollo's Press Release and

24 follow-on conference call sparked significant investor enthusiasm and caused the trading

25 price of Apollo's shares to climb from a close of $73.34 per share on August 25, 2004 to

26 as high as $80.47 and closing at $79.42 on August 26, 2004 on volume of 10,603,700

27 shares.

28    119.  The statements contained in ¶¶95-117 were materially false and

                                          58

1  misleading when made because defendants failed to disclose or indicate the following:

2      a.    the DOE issued a written report on February 5, 2004 following an

3  intensive investigation finding and concluding that Apollo's UOP division was in

4  violation of the law banning incentive compensation respecting student enrollment and

5  Title IV funding;

6      b.    that the Company improperly based recruiter's compensation on

7  enrollment figures, in violation of U.S. regulations that forbid schools whose students

8  receive federal financial aid from tying pay directly or indirectly to enrollments;

9      c.    that as a consequence of the foregoing, defendants were able to

10  demonstrate dazzling growth at schools such as UOP, and materially inflate the

11  Company's earning and net income at all relevant times;

12      d.    that, as a consequence, Apollo's financial statements were false, deceptive

13  and misleading by virtue of their failure to disclose the true nature and quality of a

14  material portion of its consolidated revenues and earnings so that investors would be

15  fairly and fully informed; and

16      e.    that Apollo's financial performance and would be adversely and materially

17  impacted as a consequence of yielding, albeit slowly or belatedly, to DOE pressure to

18  fully bring its operations within the ambit of the law.

19  **B.    The DOE Report and Findings of Systemic Violations of the Law**
      **Is Finally Disclosed**

20
21  120.    Then, on September 7, 2004, just after the Labor Day holiday weekend,

22  defendants for the first time revealed any information relating to any report from the

23  DOE, disclosing that the DOE had asserted a negatively toned report respecting UOP's

24  compensation scheme and imposed a $9.8 million fine.  Defendants attempted to

25  downplay the significance of the DOE Report and penalty and continued to actively

26  conceal the whole truth from investors.  In a conference call with the financial

27  community on September 7, 2004, defendant Nelson stated in pertinent part, with regard

28  to the DOE Investigation of its compensation policy, the following:

59

[G]iven the, I think, recent attention that regulatory issues in the education industry are receiving, we thought it would be helpful to at least provide an opportunity to take a few questions.

\* \* \*

[T]he University of Phoenix program review...is...centered around the same issue of incentive comp. And just a little history of that — *the conclusion of the actual fieldwork and ex (ph) interview, we felt positive about the progress of the review, although earlier this year, we then received an interim report, and we were surprised to see the negative tone of the report.*

\* \* \*

[W]e decided to settle this issue now rather than later for $9.8 million and put it behind us....

\* \* \*

*[B]ack in June, we introduced a new comp plan that had actually been being worked on for about a year that is just more transparent.*

\* \* \*

*[T]he old comp plan was not that clear. The new one is — again, it's much more transparent, I guess, for someone to come in and take a look at.*

121.    Defendants' partial disclosure caused the trading price of Apollo's stock to materially decline on September 7, 2004 and thereafter as the market absorbed the knowledge that UOP was fined $9.8 million by the DOE as a product of a negatively toned Program Review, falling from $83.74 a share at the close of the prior trading day on September 3, 2004, to $80.43 per share by the close of trading on September 10, 2004 on unusual trading volumes greatly exceeding their daily average.

122.    Defendants' disclosure about the DOE report was inadequate, failing to provide investors with any of the detail that the DOE Report referenced and its clear conclusions, as discussed above, respecting UOP's illegal conduct and deceptive practices betraying the integrity of Apollo's for-profit educational operations.

123.    And each of defendants' representations discussed above, that the DOE's Program Review, or, later, representations on September 7, 2004 that the DOE action and consequent fine would not have any material adverse impact on Apollo were false, deceptive and misleading. In truth, the $9.8 million fine that Apollo was required to pay

60

1  represented the ***largest DOE fine in history*** and itself was material.  Beyond this, the

2  pressure on Apollo to clean up UOP's illegal and unethical sales and student enrollment

3  practices has materially and adversely impacted growth rates in enrollments, revenue

4  and net income, when comparing Q1 2004 and Q2 2004 to Q1 2005 and Q2 2005

5  (ending November 30 and February 28, respectively), reported after the close of the

6  Class Period, as illustrated below.

7          124.    The  following  chart  reflects  the  sequential  quarterly  year-to-year

8  comparisons of net income growth rates:



21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

125.   The following chart reflects the sequential quarterly year-to-year comparisons of revenue growth rates:



126.   The following chart reflects the sequential quarterly year-to-year comparisons of enrollment growth rates:



LD PLTFS CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

127. As the above charts demonstrate, Apollo's year-to-year enrollment, revenue and net income quarterly growth rates for Q1 2005 (ending November 30, 2004) and Q2 2005 (ending February 28, 2005) — the two quarters reported post-Class Period — when compared to the same quarters of the prior fiscal year, have significantly and materially declined, despite the fact that, in an effort to accommodate for what defendants recognized would be such declining growth rates, UOP surprisingly expanded its student enrollment population to include students as young as 18 years of age — thus now attempting to enroll a student age group that previously was considered to be anathema and problematic.

128. The trading price of Apollo shares continued to crumble as more material adverse information and disclosures regarding its business practices, lack of integrity and related DOE findings came to light and investors thereafter absorbed the new information.

129. On September 14, 2004, the *Arizona Republic* published an article on the DOE's "45 page report" entitled "Student-Recruitment Tactics Blasted by Feds," which stated, *inter alia*:

> *A government review of the University of Phoenix*, the country's largest for-profit *university*, paints a picture of a school so hungry to enroll new students that it has threatened and intimidated its recruitment staff in meetings and e-mail, pressured them to enroll unqualified students and covered up its practices to deceive regulators.

> ...a 45-page report obtained by the Arizona Republic...describes corporate culture overly focused on boosting enrollment. The review, based on site visits and interviews with more than 60 employees and former employees, *led to the largest settlement of its kind last week. The Phoenix-based university agreed to pay $9.8 million without admitting any wrongdoing.*

> \* \* \*

> The Program Review Report details several examples of compensation and sales practices the department says range from illegal to unethical to aggressive. Federal law governing financial aid prohibits basing college recruiters' pay on enrollment.

> \* \* \*

> In the report, enrollment counselors interviewed by regulators told of a glassed-in isolation room, called the Red Room, where underperformers

63

1  were put on display to work the phones under intense management supervision.

2

3  A group of San Jose recruiters recalled being told heads would be on a chopping block if its numbers didn't come up; another recruiter said her manager told her she couldn't afford time away from the phones to go to New York for her grandmother's funeral.

4

5  ...The regulations are in place to protect prospective students from being pressured and taxpayers from potential defaults on student loans. About 60 percent of the school's tuition revenue comes from financial aid.

6

7  ...The report ordered changes.   The school received the report in February...

8

9  The Department of Education said the university was in violation because it:

10

11  * 'Hires its recruiters with the promise of lucrative compensation for success in securing enrollments.'

12  * 'Maintains a recruiter evaluation and salary system that provides incentive payments based both directly and indirectly on success in securing enrollments.'

13

14  * 'Provides substantial incentives to its staff to recruit unqualified students and students who cannot benefit from the training offered.'

15

16  * 'Systematically and intentionally operates in a duplicitous manner so as to violate the department's prohibition against incentive compensation while evading detection.'

17                              *   *   *

18

19  Susan Aspey, spokeswoman for the Education Department, said it stands by the report: 'We are both firm and fair in our administration of the law, and we act in the best interests of the students and taxpayers. *This is the largest fine the department has ever imposed on a school.*'

20

21                              *   *   *

22  The report says *school officials took steps to deceive or thwart regulators* during the review, which included on-site visits in Arizona and California a year ago.

23

24  It says some mangers in northern California told certain recruiters with a reputation for being outspoken to take leave or be out of the office during the review.  Others told of posted materials ranking employees by enrollment performance coming down in advance of the visit. In one case, a recruiter saved a computer spreadsheet that had been displayed before the visit and showed it to regulators.  In another, Monopoly money used in a contest to drum up applications was taken off a bulletin board, the report says.

25

26

27

28

---

64

1
2
    Overall, some employees interviewed said that an elaborate pay matrix was about 'smoke and mirrors' and that the only thing that counted was enrollments.

3
                \*   \*   \*

4
5
    Excerpts from the U.S. Department of Education's Program Review Report:

6
7
8
    \*   'UOP's intense focus on numbers and enrollments per recruiter permeates the working day of each recruiter. Managers bombard the recruiters with e-mails daily — listing the top performers based on enrollments, applications, calls and other recruiting activities, with the pace of e-mails pushing numbers escalating at the end of each fiscal year as the annual report deadline nears.'

9
10
11
    \*   'The dynamics of public ownership, expectations of investors and lucrative stocks options to UOP officers are integral aspects of the UOP system. Employees at every level are made aware of the importance of meeting the enrollment numbers and revenue expectations of Wall Street on a quarterly basis.'

12
13
    \*   '(A) number of recruiters stated that the allocation of fresh leads and floor time was both an intimidation and reward tool to manipulate them into more aggressive and/or unethical tactics.'

14
15
    \*   'UOP makes it very clear that recruiters are to do whatever it takes to get the student to enroll....,Recruiters...stated that they are pressured by management to enroll students who are not qualified.'

16
17
18
    \*   'The training program and sales materials for recruiters teaches [sic] them how to use financial aid effectively as a sales tool. One of the strategies is to ask the potential student: 'You can afford $50 per month for you bachelor's, can't you?''

19
20
21
    \*   'Recruiters consistently mention the focus and pressure to increase enrollments to report to Wall Street. Many expressed that while UOP at one time focused on the student and stressed ethical conduct, the culture now is one where the emphasis is on increasing the numbers, the stock price and meeting Wall Street's expectations.'

22
23
    130.   Then, on September 15, 2004, yet another *Arizona Republic* article, entitled "Univ. of Phoenix Pushes Ahead," disclosed a continuing practice of incentivizing enrollments in the summer of 2004, stating in relevant part:

24
25
26
    The University of Phoenix disputes the government's portrait that it sells education with the zeal of a hard-charging telemarketer, *but recent memos to recruiters reveal tactics similar to those recently cited by federal regulators.*

27
28
    *Internal e-mail obtained by The Arizona Republic suggests a big push to enroll students this summer,* especially last month as the fiscal year drew to a close for the school's publicly traded parent company, Apollo Group, Inc. *'Close those students' was a common refrain.*

65

*One e-mail from Aug. 13 reminds a team of recruiters that August is winding down and that it is poised for an enrollment boom.*

*'Get on the phones and be a part of this HUGE explosion of enrollments that will begin today and carry us through August!!!' the e-mail read.*

*It reminds the team that it is the last month to qualify for top-performers' trip to a resort and the 'last month before most of your reviews.' It lists the top recruiters by enrollments so far and asks, 'Who will be a part of the double-digit club and who will finish #1?!?!?!'*

The contents are noteworthy because the company recently came under government scrutiny over federal financial-aid laws forbidding paying recruiters solely based on enrollments. A critical report detailed *what the government described as corporate culture overly focused on boosting enrollment.*

The company settled the issue with the U.S. Department of Education last week for a record $9.8 million fine.

*   *   *

*Dozens of employees and former employees contacted The Republic to confirm the pressure-filled, numbers-driven recruiting atmosphere after details of the report were published Tuesday.*

*   *   *

But still, the focus on enrollment goes on.

*After the e-mail burst noted above, another e-mail went out to the same group announcing a goal of 750 enrollments by the end of the week, translating to three per recruiters.* Those who signed up four students could wear jeans one day later in the month. That e-mail, too, reminded recruiters that most of their reviews were coming up.

This summer's push also included a drive to enroll employees and their spouses as students. An Aug. 6 memo to all University of Phoenix Online employees, who receive free tuition, offered a waiver of the application and electronic textbook fees. 'It's time to start, re-enter or continue your degree program!!!' the e-mail read. The university held an employee enrollment fair in one of its ballrooms.

In late June, the university announced a 'buy three, get the fourth free' promotion for classes for students starting in July. A script was sent to recruiters to help them pitch the promotion. It noted, among other things, that a passing grade was not required for the promotion.

If a student was reluctant to enroll, presumably due to money, it suggests conferencing in another employee 'to discuss the long-term payment options.'

Sales-drive memos

66

Excerpts from e-mail that managers sent to a team of University of Phoenix Online enrollment counselors for a sales drive last month:

Aug. 17: We have a BIG goal this week: 750 enrollments by Friday!! That means each rep needs 3 REG's (student registrations) this week!! For the last week of August...the last week of 75 percent of your reviews...the last week of promo, we can do this!!!!We have set up a wall of fame for this week. Anytime you get a REG, we want your autograph on the wall of FAME and how many REG's so far this week! All reps who enroll 4 students this week will get to wear jeans on 8/27.

Aug. 18: Here is where we are in our Drive for 750 enrollments!!! Let's keep it going and push extra hard so we can make it!!!

If anyone can do this, CENTRAL DIVISION CAN!!!

Aug. 19: We moved 139 students yesterday and continue to march towards our goal of 750 students....We need 200 students today and tomorrow which is a BIG job!!! Create that urgency and close those students!!

Aug. 31: August proved to be a record month for our employee team at online. Collectively they started almost 800 students!!!!! This was tremendous undertaking and they were dedicated to getting every last employee, faculty and spouse who wanted to begin a program into class! A very special thank you for all the hours they came in early and stayed late to make this happen.

Source: University of Phoenix employees

131.  Also on September 15, 2004, *The Wall Street Journal* published an article entitled "Will Apollo's Bad Report Card Get Its Shares Grounded?" In relevant part, the article read:

Apollo Group, star of the for-profit education business, *just got a rare failing grade from regulators*....A newly disclosed Education Department report blasts Apollo Group Inc.'s flagship University of Phoenix for a *'culture of duplicity'* in which supervisors improperly lavished money on sales employees for signing up scores of new students, including those unable to cut it.

Federal investigators said recruiters -- called 'enrollment counselors' at the University of Phoenix -- faced pressures *more akin to car dealerships than colleges*. Forty-four of 61 counselors interviewed by the government told investigators that salaries were always about enrollment numbers. The Education Department said counselors were told they could as much as double or triple their starting salaries in three to six months if they signed up enough students.

...the report provides fresh details about sales practices in the for-profit education business. *It also raises the question of whether a too-aggressive approach contributed to Apollo's dazzling growth -- and if it now will be forced to tone down its approach and grow more slowly.*

67

05-16-05    02:46pm    From-BARRACK - SAN DIEGO    T-796    P.072/100    F-625

1  The shares have dropped sharply in recent weeks as Apollo's peers
2  faced various legal and regulatory assaults over their recruiting and
   placement practices, but Apollo's stock remains up about 18% year to
3  date. Since the company's initial public offering in 1994, its shares have
   soared from 72 cents apiece to as high as $98 in June, adjusted for stock
4  splits.

5  U.S. regulations forbid schools whose students receive federal financial
   aid from tying pay directly to enrollments. In 2003, about 60% of the
6  University of Phoenix's revenue came from federal student aid, which
   comes in the form of grants and guaranteed loans. Violating the rules
7  runs the risk of losing the aid.

8  Responding to a series of scandals in the 1980s and 1990s, the
   government has sought to prevent entrepreneurial schools from signing
9  up students for programs that don't benefit them, then leaving them
   saddled with loans that they can't repay. Aid recipients are generally
10 low-income students. Many rely heavily on federal aid and pay little or
   nothing out of pocket to cover tuition.

11
12 *Last week*, Apollo Group, based in Phoenix, disclosed it had agreed to
   pay $9.8 million to settle the sales-incentive allegations spelled out in
   the Education Department report. *But the company*, which said the
13 inquiry covered 1998 through June 2004, *disclosed few details*. The
   Wall Street Journal reviewed a copy of the Education Department
14 document, contents of which were detailed yesterday in the Arizona
   Republic.

15                                *  *  *

16 Investigators said the school hired counselors at $26,000 a year from far
17 higher-paying jobs, then promised to bump their salaries up to as much
   as $120,000 if they logged enough enrollments. Internal literature
18 boasted of '$$-No limit on income' and 'Never have to worry about $$
   again.'

19
20 Recruiters with over 200 student enrollments a year earned $80,000 to
   $100,000, regardless of their length of service, the report said. The
   university rewarded top performers with all-expense paid trips,
21 including one to the Watergate Hotel in Washington, the report said.
   Counselors also received $100 gift certificates and spa packages.

22                                *  *  *

23 Investigators said the company kept performance reviews that suggested
24 the company used other criteria, such as rapport with students, to make
   it appear the company wasn't directly tying enrollments to
25 compensation. But they described the efforts as *'smoke and mirrors' to
   avoid government detection.*

26 The *company pressured recruiters to sign up unqualified students*,
27 such as those who don't have the money to complete the program, the
   report said. The recruiters would overcome objections by citing the
28 availability of student aid, stressing no up-front costs and playing down
   loan-repayment obligations, investigators said.

                                   68

1    The *report* cited *'a culture of duplicity,'* with *some counselors even forging student signatures on loan documents.*

2

3    132.  All of this news negatively impacted the trading price of Apollo's stock —

4  causing it to fall from $80.63 at the close of trading in September 13, 2004 to $78.68 by

5  the close of trading in September 15, 2004 on volume of over 4.2 million and 2.8 million

6  shares on September 14 and 15, 2004, respectively, and further declining to $75.82 by

7  the close of trading on September 20, 2004, on trading volume of over 4.68 million

8  shares as the truth continued to be absorbed by the market. Apollo's usual average daily

9  trading volume is 1.9 million shares.

10 **VI.    ADDITIONAL SCIENTER ALLEGATIONS**

11     **A.    Defendants Possessed Actual Knowledge of the February 5, 2005 DOE Report at All Times During the Class Period**

12   133.  On February 5, 2004, the DOE rendered its thorough Program Review

13 Report memorializing its findings and conclusions, supported by significant evidence

14 provided by enrollment counselors, or recruiters, UOP employees and documentation,

15 that the Company was in violation of the law banning incentive compensation based on

16 student enrollments. The DOE Report was also accompanied by a February 5, 2004

17 letter directed to and received by CEO Nelson clearly advising that "[t]his report

18 contains a *serious finding* regarding the school's substantial breach of its fiduciary duty;

19 specifically that the *University of Phoenix (UOP) systemically engages in actions*

20 *designed to mislead the Department of Education and to evade detection of its*

21 *improper incentive compensation system for those involved in recruiting activities.*"

22 Based on the foregoing, including Nelson's September 7, 2004 admission of the DOE

23 Reports' negative tone, defendants possessed actual knowledge at all times relevant to

24 the Class Period of the February 5, 2004 DOE Report and its material and adverse

25 findings and conclusions. The existence or rendering of the DOE Report concerning a

26 matter of significant interest and critical importance to Apollo, the Individual

27 Defendants, and Apollo's stockholders, was purposely concealed from the market and

28

69

1    not disclosed by the defendants until September 7, 2004 — albeit inadequately — just

2    prior to the end of the Class Period, despite numerous instances in which defendants

3    spoke to the market, as more fully discussed above.

4           **B.**    **Defendants' Concealment of the DOE Report — Which They Actively Believed Was a Material Adverse Event — Further**

5                  **Demonstrates Their Requisite Scienter**

6         134.   Apollo's management was aware at all times material that any criticism or

7    finding by the DOE that the for-profit college was in violation of the ban on incentive-

8    based compensation respecting student enrollments would be highly material and have

9    potentially devastating consequences with respect to investors' perception of the

10    Company and its stock price. On *March 1, 2004*, just weeks after receiving the DOE

11    Report on recruiter pay practices at UOP, *CEO Nelson told regulators that a disclosure*

12    *of the DOE Report would cause "great harm" to the Company's shareholders* — a

13    tacit admission of defendants' actual knowledge that the report was adverse and material.

14    This is confirmed by an article entitled "Apollo Told Feds: Inquiry News Would Cause

15    Harm," appearing in the *Arizona Republic* on October 19, 2004, reporting, in pertinent

16    part, as follows:

17           Within weeks of receiving a blistering government report on recruiter

18           pay practices at the University of Phoenix, the school's parent company told regulators that disclosure of the report would cause *"great harm"* to the company's employees, shareholders and students.

19

20           The letter to the U.S. Department of Education and the apparent impact the eventual release of the report had on Apollo's stock raise questions

21           among some experts about whether the company properly disclosed the investigation to shareholders.

22           The *experts say* the warning in the *March 1 letter, written by Apollo*

23           *Group Inc. Chief Executive Todd Nelson, indicates the company considered the report to be a material event, meaning under securities laws it must be disclosed in a timely manner.*

24

25           Nelson and other executives never publicly mentioned the Feb. 5 report until the matter was settled for a record $9.8 million in September and

26           then only in passing on a conference call.

27           'Given the CEO's statement to the Department of Education, investors as well as the SEC should be alarmed as to why this information wasn't

28           made available publicly on a timely basis,' said Lynn Turner, former chief accountant for the Securities and Exchange Commission and

70

former director of the Center for Corporate Financial Reporting at Colorado State University.

* * *

...Nelson said. 'Our shareholders could well have been subjected to an unwarranted share-price drop had we disclosed the report prematurely and with these issues unresolved.'

* * *

At the least, a lack of disclosure can hurt management credibility if negative details emerge later.

Apollo's stock fell last month after media coverage of the details in the reports. It declined 2.4 percent in a two-day period when stories appeared in The Arizona Republic, Wall Street Journal and other newspapers.

* * *

Apollo's stock has since fallen further along with the rest of the for-profit education industry, hitting $68.01 last week, a low it hadn't seen since December...

Stinging review

The questions on disclosure by Apollo relate to a 'program review' of the University of Phoenix's recruiter compensation that dates to August 2003. As part of that review, Apollo received a 45-page report on the review in early February.

The government didn't mince words in its conclusion, saying the University of Phoenix 'systematically engages in actions designed to mislead the Department of Education and to evade detection of its improper incentive compensation for those involved in recruiting activities.'

* * *

The department said the University of Phoenix, the nation's largest private university, with more than 200,000 students, had to make substantial changes to recruiters' and supervisors' salary compensation systems.

*Nelson did disclose the existence of the program review on a March 12 conference call with analysts but spoke of such reviews in general terms and as part of a broad regulatory update, given the high-profile scrutiny of some of its competitors. No mention was made of the report.*

* * *

When shown Nelson's letter, obtained along with other correspondence under a public-records request, some experts said it appears that Apollo should have disclosed the report to investors.

71

1    They say that *Nelson's statement of the potential harm it could have*
2    *caused indicates the company considered it to be a material event.*

3    There are no hard-and-fast rules on what denotes materiality, but in
     general it is information that a reasonable investor needs to know in
4    order to make an informed decision about an investment, SEC
     spokesman John Heine said.

5
     Apollo has pointed out that the amount it paid the government was not
6    material, and Nelson said in his response that it was less than 1 percent
     of the giant company's cash.

7
     Still, materiality goes well beyond money, experts say.
8
     Russell Piccoli, a securities attorney and litigator with the law firm
9    Marsical, Weeks, McIntyre and Friedlander in Phoenix, said a company
     can't have it both ways, saying it's not material but essentially telling
10   regulators it is.

11   *'If they had a fear that release of the information would have a*
     *significant effect on the market price of their shares, then that in and*
12   *of itself is evidence of the fact that it needs to be disclosed'*, he said.

13   Adds Carolyn Brancato, director of the Conference Board's Global
     Corporate Governance Research Center in New York, *'If the company*
14   *writes to someone else and says this is going to have a huge effect on*
     *it, then the company itself has determined that it is going to be*
15   *material.'*

16                            *   *   *

17   There is also a question of whether Apollo might have mislead investors
     with its comments to analysts in conference calls about the program
18   review.

19   In response to a question from an analyst in June, Nelson said the
     program review at the University of Phoenix 'continues to go, from our
20   point of view, very smoothly.'

21   Correspondence through May between the two sides seems to indicate
     some tension.
22
     There was much interest in regulatory updates from Apollo that day
23   because the stock of one of its competitors was falling after a newspaper
     revealed a negative program report it had received from the department.
24   The company, Corinthian Colleges, disclosed some details after the
     newspaper report.  Two days earlier, another competitor announced a
25   formal SEC probe.

26   Piccoli said public companies can get into regulatory trouble if they
     know more than they are revealing about an issue of interest to
27   investors.

28   *'If you're making any sort of public statement that's calculated to*
     *reach the investing public, you have to tell the whole truth,'* he said.

                                  72

*'You can't tell half of it and in any way leave a misleading impression.'*

135.  Defendants' ongoing and purposeful concealment of the DOE Report even in the face of direct analyst inquiries, which CEO Nelson's March 1, 2004 communique to the DOE establishes they actively believed would cause "great harm" thus deflating the trading price of Apollo's shares if disclosed, further and strongly demonstrates that defendants possessed the requisite scienter when making their false, deceptive and misleading Class Period statements artificially buoying and inflating the price of Apollo's shares, as alleged above.

136.  Had the DOE Report been timely and adequately disclosed, the trading price of Apollo securities would have been materially less during the Class Period.

**C.    Attempts to Conceal UOP's Illegal Conduct from DOE Investigators Further Supports a Strong Inference of Scienter**

137.  No doubt concerned that DOE Investigators would uncover significant evidence of rampant violations of the law and illegal conduct associated with UOP's flagrant violation of the ban on incentive compensation respecting student enrollments, once management was made aware that DOE Investigators would be coming on site at UOP campuses, a variety of efforts were undertaken to hide evidence or prevent DOE Investigators from speaking to recruiters who could not be counted on to toe the Company line.

138.  DOE Investigators found and concluded that UOP management or its agents took numerous steps to conceal information of illegal conduct from them.  For example, the DOE Report states:

> On the first day of the review, UOP officials were told that the focus of the review was the compensation plan for those involved in admissions activities, and that the review would encompass both Northern California and Phoenix locations and involve interviews with UOP staff. Shortly after this announcement, UOP management told some recruiters at the Northern California locations that they should take leave or attend some function away from the premises.  When contacted by the Department after the site visits, these recruiters indicated that they were absent for interviews because they had reputations for being honest and frank.

73

1  (DOE Report at 26-27).

2      139.  And according to the DOE Report, efforts were made by UOP to remove
3  evidence of programs that violated DOE regulations once the Program Review was
4  announced.  (DOE Report at 27).  In addition, spreadsheets that evidenced violations of
5  the ban on incentive compensation for student enrollments were deleted from computer
6  desktops with the intention that this information would not fall into the hands of DOE
7  Investigators.  Nevertheless, DOE Investigators obtained this computer spreadsheet
8  thanks to the fact that one of the enrollment counselors personally retained a copy.
9  (DOE Report at 15).

10     140.  Defendants' conscious knowledge of the fact that their compensation
11 scheme violated Title IV funding requirements and the ban on incentive compensation
12 for student enrollments is also established by the fact that UOP utilized a "matrix" and
13 an amendment thereof at all times material that purposefully attempted to camouflage
14 there illegal compensation scheme and used "code words" in a further effort to do so, as
15 found by the DOE Investigators and as confirmed by UOP enrollment counselors
16 Hendow and Albertson.

17 **VII.  MISLEADING FINANCIAL STATEMENTS**

18     141.  During the Class Period, Apollo reported in various press releases and
19 filings with the SEC, as more fully identified in ¶¶95-117 above, its purported financial
20 results including revenues, net income and earnings per share for its second quarter of
21 fiscal 2004 (ending February 28, 2004) and third quarter of fiscal 2004 (ending May 31,
22 2004.)  Each of Apollo's reported financial results in the aforementioned public
23 statements and filings were disseminated to the investment community and designed to
24 convey statements to investors that Apollo enjoyed continuing, sustained and robust
25 prosperity and growth, and that its then existing business condition and operations were
26 strong and healthy.

27     142.  Apollo's financial statements and the statements concerning its quarterly
28 results were each false, deceptive and misleading because they did not constitute a fair

1   representation of the Company's operations due to defendants' active concealment of the
2   fact that the Company was relying on systemic violations of the law and regulations with
3   respect to Title IV funding and, further, had been and was continuing to enjoy and report
4   inflated growth rates in enrollments, revenues, net income and consequent earnings per
5   share by reason of those illegal activities, including consequent abuses as more fully
6   discussed above. Apollo's *financial reporting did not accurately or fully disclose the*
7   *true nature and quality of its revenues and earnings.*

8       143.   Apollo manipulated financial statements by allowing the Company to
9   generate fees which it was not entitled to or otherwise was obtaining through illegal
10  means, which could be required to be forfeited (via fines, judgments and costs associated
11  therewith) and which artificially inflated Apollo's revenue and earnings.

12      144.   Importantly, upon disseminating to the investment community its quarterly
13  financial results, defendants further deceived and misled investors by failing to disclose
14  the serious and adverse findings and conclusions of the February 5, 2005 DOE Report,
15  which, in and of itself, exposed the Company to serious risks of DOE imposed fines or
16  penalties respecting which the Company was required to both set aside adequate reserves
17  and inform investors given the materiality of the DOE Report and the duty of the
18  Company to adequately disclose known risk factors.

19      145.   Financial reporting is required to provide information that is useful to
20  present and potential investors and creditors and other users in making rational
21  investment, credit and similar decisions. (Financial Accounting Standards Board
22  ("FASB") Statement of Concepts No. 1, 34). Financial reporting should also provide
23  information about the economic resources of an enterprise, the claims of those resources,
24  and the effects of transactions, events and circumstances that change resources and
25  claims to those resources. (FASB Statement of Concepts No. 1, 40) Financial reporting
26  should be reliable in that it represents what it purports to represent. The concept that
27  information should be reliable as well as relevant is a notion that is central to accounting.
28  (FASB Statement of Concepts No. 2, 58-59). Apollo's financial results were also

                                          75

1    required to comport with the principal of completeness, which means that nothing is left

2    out of the information that may be necessary to ensure that it validly represents

3    underlying events and conditions. (FASB Statement of Concepts No. 2, 79)

4        146.   The information defendants failed to disclose, including UOP's systemic

5    and continuing violations of the law to generate revenues and growth, or the fact that

6    those violations had now been revealed to and discovered by the DOE, which was

7    responsible for monitoring Apollo's compliance with the law, represented the type of

8    information which, because of regulations of the SEC and the national stock exchanges

9    and customary business practice, is expected by investors and securities analyst to be

10   disclosed.  It is the type of information that is known by corporate officials and their

11   legal and financial advisors to be the type of information which is expected to and must

12   be disclosed, particularly with regard to managements' discussion and analysis of those

13   financial results contained in SEC filings.  Apollo's report of financial results and

14   management's discussion and analysis of those results violated these basic principles,

15   regulations, customs and practices, failed to timely or adequately disclose to investors

16   the serious risks and adverse events already impacting or otherwise existing with respect

17   to Apollo's business and operations, failed to disclose material facts and events relating

18   to Apollo's financial performance which any reasonable investor would have considered

19   important in making a decision to invest in or otherwise transact with regard to Apollo

20   shares and further rendered Apollo's financial statements and the statements regarding

21   them false, deceptive and misleading.

22   **VIII.  CLASS ACTION ALLEGATIONS**

23       147.   Lead Plaintiff brings this action as a class action pursuant to Federal Rules

24   of Civil Procedure 23(a) and 23(b)(3).  The Class is defined as all persons and entities

25   who, during the Class Period, purchased or otherwise acquired the securities of Apollo

26   and who suffered damages caused by the defendants' acts (the "Class").  Excluded from

27   the Class are defendants, the officers and directors of the Company, at all relevant times,

28

76

1  members of their immediate families and their legal representatives, heirs, successors or

2  assigns and any entity in which defendants have or had a controlling interest.

3      148.  The members of the Class are so numerous that joinder of all members is

4  impracticable.  As of July 15, 2004, approximately 192.7 million shares of Apollo

5  common stock were outstanding.  While the exact number of Class members is unknown

6  to Lead Plaintiff at this time and can only be ascertained through appropriate discovery,

7  Lead Plaintiff believes there are thousands of members in the proposed Class.  Record

8  owners and other members of the Class may be identified from records maintained by

9  Apollo or its transfer agent and may be notified of the pendency of this action by mail,

10  using the form of notice similar to that customarily used in securities class actions.

11      149.  Lead Plaintiff's claims are typical of the claims of the members of the

12  Class as all members of the Class are similarly effected by defendants' wrongful conduct

13  in violation of federal law as complained of herein.

14      150.  Lead Plaintiff will fairly and adequately protect the interests of the

15  members of the Class and has retained counsel competent and experienced in class

16  action and securities litigation.

17      151.  Common questions of law and fact exist as to all members of the Class and

18  predominate over any questions solely affecting individual members of the Class.

19  Among the questions of law and fact common to the Class are:

20      a.  Whether the federal securities laws were violated by
           defendants' acts as alleged herein;

21

22      b.  Whether statements made by defendants to the investing
           public during the Class Period misrepresented material
           facts about the business, operations and financial

23         statements of Apollo; and

24      c.  Whether the members of the Class have sustained
           damages caused by the acts of defendants and, if so, what

25         is the proper measure of such damages.

26      152.  A class action is superior to all other available methods for the fair and

27  efficient adjudication of this controversy since joinder of all members is impracticable.

28  Furthermore, as the damages suffered by individual Class members may be relatively

77

1  small, the expense and burden of individual litigation makes it impossible for members

2  of the Class to individually redress the wrongs done to them.  There will be no difficulty

3  in the management of this action as a class action.

4  **IX.  ADDITIONAL ALLEGATIONS OF PRESUMPTION OF RELIANCE, FRAUD-ON-THE-MARKET AND CAUSATION**

5  153.  Lead Plaintiff will rely, in part, upon the presumption of reliance

6  established by the fraud-on-the-market doctrine that:

7
    a.  Defendants made public misrepresentations or failed to
8         disclose material facts during the Class Period;

9      b.  The omissions and misrepresentations were material;

10      c.  The securities of the Company traded in an open and
       efficient market;

11
    d.  The misrepresentations and omissions alleged would tend
12         to induce a reasonable investor to misjudge the value and
       prospects of the Company's securities; and

13
    e.  Lead Plaintiff and members of the class traded in Apollo
14         securities between the time the defendants failed to
       disclose or misrepresented material facts and the time the
15         true facts were disclosed, without knowledge of the
       omitted or misrepresented facts.

16  154.  At all relevant times, the market for Apollo securities was an efficient

17  market for the following reasons, among others:

18
    a.  Apollo stock met the requirements for listing, and was
19         listed and actively traded on the NASDAQ, a highly
       efficient and automated market;

20
    b.  As a regulated issuer, Apollo filed periodic public reports
21         with the SEC and the NASDAQ;

22      c.  Apollo regularly communicated with public investors via
23         established market communication mechanisms, including
       through regular dissemination of press releases on the
24         national circuits of major newswire services and through
       other wide-ranging public disclosures, such as
25         communications with the financial press and other similar
       reporting services; and

26      d.  Apollo was followed by several securities analysts
27         employed by major brokerage firms who wrote reports
       that were distributed to the sales force and certain
       customers of their respective brokerage firms.  Each of
28         these reports was publicly available and entered the public
       marketplace.

78

155. As a result of the foregoing, the market for Apollo securities promptly digested current information regarding Apollo from all publicly available sources and reflected such information in Apollo's stock price. Under these circumstances, the presumption of reliance applies to all those who purchased or acquired Apollo securities during the Class Period.

156. The alleged false, deceptive and misleading statements rendered by defendants during the Class Period credibly entered the market with such frequency and intensity that they succeeded, as they were intended, in overtaking and effectively neutralizing any information in the market that would have informed investors of the material adverse facts, trends and events that plagued Apollo, as alleged above. Indeed, although defendants were continuously faced with inquires by market professionals and the media, all seeking guidance relating to Apollo and the critical trends impacting its business, especially with respect to the DOE monitoring and related Program Review audit and investigation, defendants' false and misleading statements caused the market to believe that Apollo's business condition was healthy and that the Company was in compliance with critically important Title IV funding law and regulations, that any Program Review with respect to Apollo's business and operations would not place it at risk of any material adverse findings and conclusions by the DOE, and that such review by the DOE was merely done in the course and the scope of the DOE's regular monitoring of compliance activities.

157. Investors placed great reliance upon management's report and representations. The fact that defendants' frequent false statements credibly entered the market and comforted and convinced investors that Apollo was operating in compliance with Title IV funding law and regulations and successfully neutralized any disclosure of adverse information in the market with respect to for-profit schools in general, was demonstrated by the fact that defendants' false statements buoyed or inflated its stock price during the Class Period as previously alleged. When Apollo rendered its

79

1    September 7, 2004 disclosure of the fact that the DOE had rendered a Program Review

2    Report with a "negative tone" and that Apollo had agreed to pay a $9.8 million fine to

3    the DOE, and thereafter, when the truth about Apollo's unlawful practices was more

4    fully disclosed by the media on September 14, 2005 and September 15, 2004, the trading

5    price of Apollo's shares declined further from $83.74 at the close of trading on

6    September 3, 2004 to $75.82 at the close of trading on September 20, 2004, as the

7    market continued to absorb and become more fully acquainted with the true picture of

8    Apollo's business and operations.

9        158. Defendants' false, deceptive and misleading statements, including their

10    omissions of material non-public adverse information, during the Class Period, were

11    directly causally connected to the significant damages to Class members who purchased

12    or otherwise acquired Apollo's securities at prices that were artificially inflated by reason

13    thereof, and thereafter saw Apollo's stock price drop significantly as a result of the truth

14    finally being disclosed.

15    **X.    NO STATUTORY SAFE HARBOR**

16        159. The statutory safe harbor provided for forward-looking statements under

17    certain circumstances does not apply to any of the allegedly false statements pleaded in

18    this complaint. Many of the specific statements pleaded herein were not identified as

19    "forward looking statements" when made. To the extent there were any forward-looking

20    statements, there were no meaningful cautionary statements identifying important factors

21    that could cause actual results to differ materially from those in the purportedly forward-

22    looking statements. Alternatively, to the extent that the statutory safe harbor does apply

23    to any forward-looking statements pleaded herein, defendants are liable for those false

24    forward-looking statements because at the time each of those forward-looking

25    statements were made, the particular speaker knew that the particular forward-looking

26    statement was false, and/or the forward-looking statement was authorized and/or

27    approved by an executive officer of Apollo who knew that those statements were false

28    when made.

80

XI.    **CLAIMS FOR RELIEF**

### FIRST CLAIM

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants)**

160.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

161.    During the Class Period, Apollo and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:   (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Apollo's securities; and (iii) cause Lead Plaintiff and other members of the Class to suffer losses.  In furtherance of this unlawful scheme, plan and course of conduct, defendants and each of them, took the actions set forth herein.

162.    Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

163.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §§210.1 *et seq.*, and Regulation S-K, 17 C.F.R. §§229.10 *et seq.* and other SEC regulations, including accurate and truthful information with respect

81

1   to the Company's operations, financial condition and earnings so that the market price of

2   the Company's securities would be based on truthful, complete and accurate information.

3          164.   Apollo and the Individual Defendants, individually and in concert, directly

4   and indirectly, by the use, means or instrumentalities of interstate commerce and/or of

5   the mails, engaged and participated in continuous course of conduct to conceal adverse

6   material information about the business, operations and future prospects of Apollo as

7   specified herein.

8          165.   These defendants employed devices, schemes and artifices to defraud,

9   while in possession of material adverse non-public information and engaged in acts,

10  practices, and a course of conduct as alleged herein in an effort to assure investors of

11  Apollo's value and performance and continued substantial growth, which included the

12  making of, or the participation in the making of, untrue statements of material facts and

13  omitting to state material facts necessary in order to make the statements made about

14  Apollo and its business operations and future prospects in the light of the circumstances

15  under which they were made, not misleading, as set forth more particularly herein, and

16  engaged in transactions, practices and a course of business which operated as a fraud and

17  deceit upon the purchasers of Apollo's securities during the Class Period.

18         1.     Each of the Individual Defendants' primary liability, and controlling

19  person liability, arises from the following facts: (i) the Individual Defendants were high-

20  level executives and/or directors at the Company during the Class Period and members

21  of the Company's management team or had control thereof; (ii) each of these defendants,

22  by virtue of his responsibilities and activities as a senior officer and/or director of the

23  Company was privy to and participated in the creation, development and reporting of the

24  Company's internal budgets, plans, projections and/or reports; (iii) each of these

25  defendants enjoyed significant personal contact and familiarity with the other defendants

26  and was advised of and had access to other members of the Company's management

27  team, internal reports and other data and information about the Company's finances,

28  operations, and sales at all relevant times; and (iv) each of these defendants was aware of

1  the Company's dissemination of information to the investing public which they knew or
2  recklessly disregarded was materially false and misleading.

3      2.    The defendants had actual knowledge of the misrepresentations and
4  omissions of material facts set forth herein, or acted with reckless disregard for the truth
5  in that they failed to ascertain and to disclose such facts, even though such facts were
6  available to them.  Such defendants' material misrepresentations and/or omissions were
7  done knowingly or recklessly and for the purpose and effect of concealing Apollo's
8  operating condition and future business prospects from the investing public and
9  supporting the artificially inflated price of it securities.  As demonstrated by defendants'
10  overstatements and misstatements of the Company's business, operations and earnings
11  throughout the Class Period, defendants, if they did not have actual knowledge of the
12  misrepresentations and omissions alleged, were reckless in failing to obtain such
13  knowledge by deliberately refraining from taking those steps necessary to discover
14  whether those statements were false or misleading.

15      3.    The dissemination of the materially false and misleading information and
16  failure to disclose material facts, as set forth above, caused the market price of Apollo
17  securities to artificially increase during the Class Period.  Lead Plaintiff and the other
18  members of the Class acquired Apollo securities during the Class Period in ignorance of
19  the fact that market prices of Apollo's publicly-traded securities were artificially inflated,
20  and relying directly or indirectly on the false and misleading statements made by
21  defendants, or upon the integrity of the market in which the securities trade, and/or on
22  the absence of material adverse information that was known to or recklessly disregarded
23  by defendants but not disclosed in public statements by defendants during the Class
24  Period.

25      4.    At the time of said misrepresentations and omissions, Lead Plaintiff and
26  other members of the Class were ignorant of their falsity, and believed them to be true.
27  Had Lead Plaintiff and the other members of the Class and the marketplace known of the
28  true financial condition and business prospects of Apollo, which were not disclosed by

83

1   defendants, Lead Plaintiff and other members of the Class would not have purchased or

2   otherwise acquired their Apollo securities, or, if they had acquired such securities during

3   the Class Period, they would not have done so at the artificially inflated prices that they

4   paid.

5          5.    By virtue of the foregoing, defendants have violated §10(b) of the

6   Exchange Act, and Rule 10b-5 promulgated thereunder.

7          6.    Lead Plaintiff and the Class members have suffered losses directly and

8   proximately caused by defendants' false, deceptive and misleading statements and

9   omissions as set forth above and as further demonstrated by the significant declines in

10  the trading price of Apollo's securities as the DOE Report and the truth about Apollo's

11  unlawful and improper incentive compensation system based on student enrollment and

12  related conduct were disclosed.

### SECOND CLAIM

**(Violation of Section 20(a) of
the Exchange Act Against the Individuals Defendants)**

15         7.    Lead Plaintiff repeats and realleges each and every allegation contained

16  above as if fully set forth herein.

17         8.    The Individual Defendants acted as controlling persons of Apollo within

18  the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-

19  level positions, and their ownership and contractual rights, participation in and/or

20  awareness of the Company's operations and/or intimate knowledge of the false financial

21  statements filed by the Company with the SEC and disseminated to the investing public,

22  the Individual Defendants had the power to influence and control and did influence and

23  control, directly or indirectly, the decision-making of the Company, including the

24  content and dissemination of the various statements which Lead Plaintiff contends are

25  false and misleading.  The Individual Defendants were provided with or had unlimited

26  access to copies of the Company's reports, press releases, public filings and other

27  statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these

28

1   statements were issued and had the ability to prevent the issuance of the statements or
2   cause the statements to be corrected.

3       9.    In particular, each of these defendants had direct and supervisory
4   involvement in the day-to-day operations of the Company and, therefore, is presumed to
5   have had the power to control or influence the particular transactions giving rise to the
6   securities violations as alleged herein, and exercised the same.

7       10.    As set forth above, Apollo and the Individual Defendants each violated
8   §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and
9   omissions as alleged in this Complaint. By virtue of their positions as controlling
10  persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

11      11.    Lead Plaintiff and the Class members have suffered losses directly and
12  proximately caused by defendants' false, deceptive and misleading statements and
13  omissions as set forth above and as further demonstrated by the significant declines in
14  the trading price of Apollo securities as the DOE Report and the truth about Apollo's
15  unlawful and improper incentive compensation system based on student enrollments and
16  related conduct was disclosed.

17      WHEREFORE, Lead Plaintiff prays for relief and judgment against defendants
18  on its own behalf and on behalf of the other plaintiffs and the Class as follows:

19      A.    Determining that this action is a proper class action and appointing
20  plaintiff as Lead Plaintiff and its counsel as Lead Counsel for the Class and certifying it
21  as class representative under the Federal Rules of Civil Procedure:

22      B.    Awarding compensatory damages in favor of Lead Plaintiff and the other
23  Class members against all defendants, jointly and severally, for all damages sustained as
24  a result of defendants' wrongdoing, in an amount to be proven at trial, including interest
25  thereon;

26      C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses
27  incurred in this action, including counsel fees and expert fees; and

28      D.    Such other and further relief as the Court may deem just and proper.

LD PLTF'S CONS CLASS ACTION COMPLAINT
Lead Case No. 04-CV-2147-PHX-JAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
SAMUEL M. WARD

STEPHEN R. BASSER

402 West Broadway, Suite 850
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

BARRACK, RODOS & BACINE
LEONARD BARRACK
GERALD J. RODOS
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Lead Counsel for Lead Plaintiff the
Policemen's Annuity and Benefit Fund of
Chicago and the Class

86

05-16-05      02:49pm     From-BARRACK - SAN DIEGO                               T-796    P.091/100    F-625

# EXHIBIT 1

### SWORN CERTIFICATION OF JOHN J. GALLAGHER, JR.
### ON BEHALF OF THE POLICEMEN'S
### ANNUITY AND BENEFIT FUND OF CHICAGO

I, John J. Gallagher, Jr. hereby certify and swear as follows:

1. I am the Acting Executive Director of the Policemen's Annuity and Benefit Fund of Chicago ("PABF"). I have personal knowledge of the facts set forth herein and if called as a witness could and would competently testify thereto.

2. On behalf of PABF, I have reviewed the consolidated complaint filed against Apollo Group, Inc. ("Apollo") and related parties alleging violations of the federal securities laws, and state that PABF is willing to serve as a lead plaintiff and a representative party on behalf of a class in this case and all other related cases that may be consolidated with it, including providing testimony at deposition and trial, if necessary.

3. PABF did not purchase Apollo securities at the direction of its counsel or in order to participate in any private action under the federal securities laws,

4. A description of PABF transactions in the securities of Apollo during the class period specified in the complaint is attached hereto as Exhibit A.

5. PABF has not, with in the 3 year period preceding the date hereof, served as a lead plaintiff on behalf of a class in any action bought under the federal securities laws except the following:

*In re: DaimlerChrysler AG Securities Litigation*: case filed 11/28/00, Civil Action No. 1:00cv00993 (D.Del);

*In re: Siebel Systems, Inc. Securities Litigation*: case filed 3/10/04, Civil Action No. 3:04-cv-00983-CRB (N.D.Cal).

*Sebuck Global Enterprises, et al. v Apollo Group Inc., et al.*, case filed 10/12/04 No. 04-cv-2147 (D.Ariz.)

EXHIBIT 1 page 1 of 9

6.    In addition, the PABF has sought to serve as a class representative in the following cases under the federal securities laws within the last three years:

*Rabbach, et al. v. ICG Communications, et al.*, No. 1:00-cv-01864-REB-BNB (D. Col.)

*Feder v. Elec. Data Sys.*, No. 5:02cv207 (E.D. Tex. 2002)

*In re Adelphia Communications Sec. Litig.*, No. 03cv5755 (S.D.N.Y. 2003)

*Simpson v. Homestore.com, Inc.*, No. 01-CV-11115 GAF (CWx) (C.D. Cal. 2001)

*Cox v. Delphi Corp.*, Civil Action No. 1:05cv02637 - NRB (S.D.NY 2005)

*Priest v. Delphi Corp.*, Civil Action No. 2:05cv70907 - DPH (E.D. Mich. 2005)

7.    PBF will not accept any payment for serving as a representative party on behalf of a class beyond its pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May _13_, 2005

John J. Gallagher, Jr.
Acting Executive Director,
Policemen's Annuity and Benefit Fund of Chicago

EXHIBIT 1 pg 2 of 6

# EXHIBIT A

EXHIBIT 1 page 3.

**CHPOL**
**APOL**

Class Period: February 27, 2004 through September 14, 2004

Account Manager: 2640066

| | PURCHASES / ACQUISITIONS | | | SALES / RETENTION | | | | PROFIT / (LOSS) |
|---|---|---|---|---|---|---|---|---|
| DATE | SHARES | PRICE($) | AMOUNT | DATE | SHARES | PRICE($) | AMOUNT | |
| 04/05/2004 | 5,400 | $89.8555 | 485,225 | RETAINED | 5,400 | $74.6942 | 400,055 [1] | (85,170) |
| 04/06/2004 | 1,800 | $89.8085 | 163,770 | RETAINED | 1,600 | $73.7830 | 118,063 [2] | (25,718) |
| 04/13/2004 | 3,500 | $91.9839 | 321,944 | RETAINED | 3,500 | $73.7830 | 258,241 [2] | (63,703) |
| 04/15/2004 | 2,200 | $91.9008 | 202,182 | RETAINED | 2,200 | $73.7830 | 162,323 [2] | (39,859) |
| 04/16/2004 | 2,000 | $91.9329 | 183,866 | RETAINED | 2,000 | $73.7830 | 147,566 [2] | (36,300) |
| 04/19/2004 | 400 | $91.9484 | 36,779 | RETAINED | 400 | $73.7830 | 29,513 [2] | (7,266) |
| 04/19/2004 | 600 | $91.9484 | 55,169 | RETAINED | 600 | $73.5090 | 44,105 [2] | (11,064) |
| 04/19/2004 | 2,200 | $91.6705 | 201,675 | RETAINED | 2,200 | $73.5090 | 161,720 [3] | (39,955) |
| 04/20/2004 | 549 | $94.9569 | 52,121 | RETAINED | 549 | $73.5090 | 40,356 [3] | (11,779) |
| 04/21/2004 | 1,051 | $94.1040 | 98,903 | RETAINED | 1,051 | $73.5090 | 77,258 [3] | (21,645) |
| 04/27/2004 | 200 | $94.1040 | 18,821 | RETAINED | 200 | $73.2691 | 14,852 [3] | (4,169) |
| 04/27/2004 | 5,200 | $91.6206 | 476,427 | RETAINED | 5,200 | $73.2691 | 380,947 [4] | (95,480) |
| 05/22/2004 | 9,400 | $91.6206 | 861,234 | RETAINED | 9,400 | $72.0369 | 677,147 [4] | (184,087) |
| 06/22/2004 | 2,300 | $86.8156 | 199,678 | RETAINED | 2,300 | $72.0369 | 165,685 [5] | (33,993) |
| 06/24/2004 | 5,300 | $86.8166 | 460,128 | RETAINED | 5,300 | $71.8539 | 380,826 [6] | (79,302) |
| 06/24/2004 | 600 | $86.8156 | 52,090 | RETAINED | 690 | $71.6341 | 42,980 [6] | (9,119) |
| 08/24/2004 | 4,500 | $73.5691 | 331,051 | RETAINED | 4,500 | $71.6341 | 322,353 [7] | (8,708) |
| 08/25/2004 | 6,200 | $73.5691 | 456,128 | RETAINED | 6,200 | $71.2139 | 441,526 [8] | (14,610) |
| 08/25/2004 | 1,100 | $83.0054 | 91,306 | RETAINED | 1,100 | $71.2139 | 78,335 [9] | (12,971) |
| 08/07/2004 | 5,000 | $83.0054 | 415,027 | RETAINED | 5,000 | $70.9908 | 354,954 [9] | (60,073) |
| 09/07/2004 | 1,700 | $83.0054 | 141,109 | RETAINED | 1,700 | $70.3368 | 120,422 [10] | (20,687) |
| | | | | | | | | |
| **Account Totals:** | 61,000 | | $ 5,284,654 | | 61,000 | | $ 4,419,018 | $ (865,637) |
| | | | | | | | | |
| **Grand Total:** | | | | | | | | $ (865,637) |

1. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-11-2004.
2. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-12-2004.
3. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-13-2004.
4. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-14-2004.
5. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-26-2004.
6. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-28-2004.
7. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 10-29-2004.
8. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 11-01-2004.
9. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 11-04-2004.
10. Retention value was calculated using the average of the closing price from 09-15-2004 until the date of sale 11-05-2004.

EXHIBIT 1 page 4 of 6

# CERTIFICATE OF SERVICE

*In re Apollo Group, Inc. Sec. Litig.*
Lead Case No. 04-CV-2147-PHX-JAT

I, the undersigned, declare as follows:

That I am employed in the County of San Diego, State of California; I am over the age of eighteen years, and not a party to or interest in the within action; my business address is 402 West Broadway, Suite 850, San Diego, California 92101, and that on May 16, 2005, I served the within:

**LEAD PLAINTIFF, THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO'S CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

That there is a regular communication by mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of May, 2005, at San Diego, California.

_____
ALISON K. SLOAN

## Service List
## APOLLO - COUNSEL FOR PLAINTIFFS

Page:        1

Gerald J. Rodos Esquire
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:    (215)963-0600
Fax:              (215)963-0838

Samuel M. Ward Esquire
Barrack, Rodos & Bacine
402 West Broadway, Suite 850
San Diego, CA 92101
Telephone:    (619)230-0800
Fax:              (619)230-1874

Stephen R. Basser Esquire
Barrack, Rodos & Bacine
402 West Broadway, Suite 850
San Diego, CA 92101
Telephone:    (619)230-0800
Fax:              (619)230-1874

Leonard Barrack Esquire
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:    (215)963-0600
Fax:              (215)963-0838

William S. Lerach Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins
LLP
401 B Street, Suite 1600
San Diego, CA 92101
Telephone:    (619)231-1058
Fax:              (619)231-7423

Ramzi Abadou Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins
LLP
401 B Street, Suite 1600
San Diego, CA 92101
Telephone:    (619)231-1058
Fax:              (619)231-7423

Lesley E. Weaver Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins
LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:    (415)288-4545
Fax:              (415)288-4534

Patrick J. Coughlin Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins
LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:    (415)288-4545
Fax:              (415)288-4534

## Service List
## APOLLO - COUNSEL FOR PLAINTIFFS

Page:        2

Geoffrey M. Trachtenberg Esquire
Levenbaum & Cohen
362 North 3rd Avenue
Phoenix, AZ 85003
Telephone:   (602)271-0183
Fax:         (602)271-4018

Bruce G. Murphy Esquire
Murphy, Law Offices of Bruce G.
265 Llwyds Lane
Vero Beach, FL 32963
Telephone:   (772)231-4202
Fax:         (772)234-0440

Sharon M. Lee Esquire
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119-0165
Telephone:   (212)594-5300
Fax:         (212)868-1229

Marc M. Umeda Esquire
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone:   (619)525-3990
Fax:         (619)525-3991

Peter E. Seidman Esquire
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119-0165
Telephone:   (212)594-5300
Fax:         (212)868-1229

Richard A. Maniskas Esquire
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone:   (610)667-7706
Fax:         (610)667-7056

Robert D. Mitchell Esquire
Mitchell Law Offices, P.C.
Anchor Centre One, Suite 122B
2201 East Camelback Road
Phoenix, AZ 85016
Telephone:   (602)468-6450
Fax:         (602)468-1311

Tamara Skvirsky Esquire
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone:   (610)667-7706
Fax:         (610)667-7056

## Service List
## APOLLO - COUNSEL FOR PLAINTIFFS

Page:        3

Marc A. Topaz Esquire
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA  19087
Telephone:   (610)667-7706
Fax:          (610)667-7056


Rosemary J. Shockman Esquire
Shockman Law Office, P.C.
8170 North 86th Place, Suite 102
Scottsdale, AZ  85258
Telephone:   (480)596-1986
Fax:          (480)596-2689

## Service List
## APOLLO - COUNSEL FOR DEFENDANTS

Page:        1

Jared M. Toffer Esquire    *
Gibson, Dunn & Crutcher, LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA  92614-8557
Telephone:  (949)451-3800
Fax:        (949)451-4220


Wayne Warren Smith Esquire   *
Gibson, Dunn & Crutcher, LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA  92614-8557
Telephone:  (949)451-3800
Fax:        (949)451-4220


Elizabeth A. Brem Esquire    *
Gibson, Dunn & Crutcher, LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA  92614-8557
Telephone:  (949)451-3800
Fax:        (949)451-4220


Robert E. Palmer Esquire    *
Gibson, Dunn & Crutcher, LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA  92614-8557
Telephone:  (949)451-3800
Fax:        (949)451-4220


Joel Philip Hoxie Esquire   *
Snell & Wilmer
One Arizona Center
400 East Van Buren
Phoenix, AZ  85004-0001
Telephone:  (602)382-6000
Fax:        (602)382-6070


James R. Condo Esquire    *
Snell & Wilmer
One Arizona Center
400 East Van Buren
Phoenix, AZ  85004-0001
Telephone:  (602)382-6000
Fax:        (602)382-6070


* Denotes service via facsimile

# Program Review Guide





## U.S. Department of Education

**Prepared by:**
**Case Management and Oversight**
**Schools Channel**
**Student Financial Assistance**

**August 31, 2001**

We Help Put America Through School



EXHIBIT

701

1-9-07

# Notice

This Program Review Guide is designed to set forth the guidelines and procedures of the U.S. Department of Education intended for Department officials conducting institutional reviews of Title IV student financial assistance programs.

The Guide is not intended to create any substantive or procedural rights enforceable at law. It does not establish any procedures, requirements, or standards for the operations of student financial assistance programs, nor does it bind the Department to particular procedures, requirements, or standards. For any relevant procedures, requirements, and standards, the reader should refer to applicable statutes and regulations and to applicable agreements between institutions and the Department.

This Guide shall be made available to institutions participating in programs authorized under Title IV of the Higher Education Act in accordance with Section 494 of the Higher Education Amendments of 1998, PL 105-244.

# Table of Contents

Introduction .......................................................................................... i

A. Purpose of the Guide ..................................................................... II

B. Additional Publications for Reference ........................................ ii

C. List of Acronyms Used in the Guide............................................ iii

**Chapter I Purpose, Mission, and Scope of Program Reviews**  1

A. Purpose.............................................................................................. 1
1. General................................................................................................. 1
2. Congressional Priorities .................................................................... 1
3. Other Sources of Information............................................................. 2

B. Mission.............................................................................................. 2

C. Scope.................................................................................................. 3
1. Options in Planning the Scope of Program Reviews — A Continuum ........ 3
2. Focused Reviews................................................................................. 4
3. Overall Assessment Reviews.............................................................. 4
4. Expanded Reviews .............................................................................. 5

**Chapter II Review Preparation**  1

A. Review Information in ED Databases .......................................... 1
1. PEPS (Postsecondary Education Participants System)..................... 1
2. Institutional Assessment Model ........................................................ 4
3. NSLDS (National Student Loan Data System)................................... 4
4. Grants Administration and Payment System (GAPS)........................ 5
5. Fiscal Operations Report and Application to Participate (FISAP)/Campus Based-Windows............................................................................................... 6
6. Recipient Financial Management System (RFMS) ............................ 6
7. Direct Loan System............................................................................. 6

B. Access to Other Case Team Records/Resources....................... 7
1. Prior Reviews...................................................................................... 7
2. Prior Audits......................................................................................... 8
3. Complaint Profiles .............................................................................. 8
4. Case Team Files.................................................................................. 8
5. AAAD Liaison...................................................................................... 8
6. Contacts with Other Agencies .......................................................... 9
7. The Internet ........................................................................................ 9

C.    Announced/Unannounced Reviews............................................................9

D.    Coordination of Review Schedules........................................................10

E.    Sample Selection ......................................................................................11

F.    Notice of Visit Letter................................................................................12

G.    Incorporating the SFA Assessment in the Case Management Process ........................................................................................................................13
1.   What is the SFA Assessment?................................................................... 13
2.   Ways to Use the SFA Assessment in the Case Management/ Program Review Process ..................................................................................................... 14

**Chapter III  On-Site Review Procedures**                                      1

A.    Entrance Conference ..................................................................................1
1.   Topics to Discuss......................................................................................... 1
2.   Request for Documents ............................................................................... 3

B.    Program Review Process............................................................................4

C.    Interviewing .................................................................................................5

D.    Documenting Program Review Findings..................................................7

E.    Expanding the Program Review................................................................8
1.   Expanded Program Review Process........................................................... 8
2.   Expanded Review Team Members .............................................................. 9
3.   AAAD/OGC Involvement in Expanded Reviews ....................................... 10

F.    Detecting and Documenting Suspected Fraud and Abuse .................11
1.   Indicators of Fraud and Abuse ................................................................. 11
2.   If Fraud is Suspected................................................................................. 12
3.   Documenting Suspected Fraud ................................................................. 12
4.   Areas for Potential Fraud .......................................................................... 13

G.    Administrative Action Issues..................................................................15
1.   Referral to AAAD ........................................................................................ 16
2.   AAAD Action ............................................................................................... 16

H.    Evaluating Program Review Results ......................................................17
1.   File Reviews................................................................................................ 17
2.   Corrective Action Plans ............................................................................. 18
3.   Technical Assistance.................................................................................. 19

I.     Exit Conference ........................................................................................20

*The 2001 Program Review Guide*

**Chapter IV  Program Review Items** 1

A.    Selecting Which Items to Review ................................................................... 1

B.    Conflicting Information.................................................................................... 1

C.    Program Review Items as Guidance.............................................................. 2

D.    Program Review Items.................................................................................... 3
1.    Institutional Eligibility ............................................................................................... 3
2.    Fiscal......................................................................................................................... 3
3.    Student Eligibility...................................................................................................... 3
4.    Awarding/Disbursement........................................................................................... 3
5.    Other ......................................................................................................................... 4

**Chapter V  Office Systems and Coordination** 1

A.    Offices ............................................................................................................. 1

B.    Computer Systems .......................................................................................... 2

**Chapter VI  Special Focus on Default Prevention** 1

A.    Reviews at Schools With High Cohort Default Rates................................... 1

B.    Review Items .................................................................................................... 1

C.    Cohort Default Rate ........................................................................................ 2
1.    Formulas Used to Calculate a School's Official Cohort Default Rate........................... 2

D.    Sanctions and Benefits for Cohort Default Rates ....................................... 3
1.    Sanctions Associated with High CDRs (effective 7/1/01) ............................................ 3
2.    Benefits Associated with Low CDRs ........................................................................... 3

E.    Changes in School Status .............................................................................. 4

**Chapter VII  Special Considerations for Direct Loan Schools** 1

A.    Background ...................................................................................................... 1

B.    School Origination Options............................................................................ 1

C.    School Responsibilities ................................................................................. 2

D.    Review Procedures.......................................................................................... 3
1.    Loan Origination........................................................................................................ 3
2.    Drawdowns and Disbursements................................................................................ 4
3.    Loan Counseling ....................................................................................................... 6
4.    Reconciliation............................................................................................................ 7

5. Administration, Fiscal Control and Fund Accounting ...................................... 8
6. Reporting Changes in Borrower Enrollment Status to ED ............................ 10
7. Implementing a Quality Assurance System............................................. 11

**E.    Other References for Direct Loans ..........................................11**

**Chapter VIII  Special Focus on Campus Security            1**

**A.    Annual Security Report – Contents ...........................................1**
1. Crime Statistics................................................................................. 1
2. Campus Security Authority ................................................................. 2
3. Policy Statements .............................................................................. 3

**B.    Annual Security Report – Method of Distribution ......................3**

**C.    Reviewing Accuracy of Reporting.............................................4**

**D.    Sources of Data .....................................................................4**
1. Institutional Offices............................................................................. 5
2. Campus Police/Security Department .................................................... 5
3. Local Police........................................................................................ 6

**Chapter IX  After the Site Visit            1**

**A.    The Program Review Report.....................................................1**
1. Report Preparation.............................................................................. 1
2. Timelines for Issuing the Program Review Report................................. 2

**B.    Final Program Review Determinations.......................................3**
1. Expedited Determination Letter (EDL) ................................................. 4

**C.    PEPS Data Entry and File Maintenance .....................................6**
1. PEPS Data Entry ................................................................................ 6
2. Level of Review Seriousness................................................................ 6
3. Deficiency Codes ................................................................................ 6
4. File Maintenance................................................................................. 6

**D.    Appeals .................................................................................7**

**List of Appendices**

# Introduction

*We help put America through school.* We do this by monitoring schools and their use of Federal Student Financial Assistance (SFA) funds – funds intended to provide equal access to education and to promote educational excellence.

As in the cases of initial participation screening, audit resolution, financial analysis and recertification, program review is a tool available to the Case Management Team (CMT) to assess the performance of our schools. Congress mandated that we use this tool "... to strengthen the administrative capability and financial responsibility provisions of" the Higher Education Act. HEA Section 498A(a).

Prepared by a team of central and regional office staff, this major revision of the Guide reflects significant changes to the program review process. Numerous staff within Case Management and Oversight (CMO) and Direct Loan School Relations provided valuable input to this Guide.

The Guide serves as a first point of reference in preparing for and conducting a program review. It is a compendium of procedures to cover many different school situations. Some of these procedures are appropriate only for the most egregious compliance issues. It is the responsibility of the CMT to select those procedures that best fit the individual school being reviewed.

Recognizing that most schools make a good faith effort to be in compliance with the legislation and regulations, this Guide tries to provide a balance between assisting schools in improving compliance through development of corrective action plans, and assessing liabilities resulting from non-compliance. Because of CMO's fiduciary responsibility to ED, Congress, the taxpayer, and the students and their families, we can not ignore instances of non-compliance. However, it is the CMT's responsibility to assess the nature of the non-compliance, the severity, the harm to the student and the programs caused by the non-compliance, and to determine the appropriate resolution. While there needs to be consistency in treatment for similar instances of non-compliance, we must also recognize that one-size fits all monitoring doesn't work.

The Guide is designed to be updated regularly, and will be responsive to regulatory developments and the changing review process. Staff is encouraged to provide comments and suggestions to their supervisors and Performance Improvement and Procedures (PIP) on how to make the Guide a more effective program review resource.

## A.    Purpose of the Guide

The purpose of this guide is to assist CMTs in conducting reviews of the SFA programs at participating institutions.  Also, it is intended to provide guidelines for consistency in the conduct of SFA program reviews nationwide, as mandated by Congress.

## B.    Additional Publications for Reference

Staff can find additional review guidance in the publications listed below and in PIP Procedures, Mailbox Messages, and IRB procedures memoranda.  Many references will be available on the Department's web sites.  The most valuable resource, however, will be the knowledge of CMO staff experienced in program reviews.

- Higher Education Act of 1965, as amended (HEA)
- Federal Registers
- Code of Federal Regulations (CFR)
- Compilation of Federal Regulations
- Federal Student Financial Aid Handbooks
- Counselor's Handbooks
- Dear Colleague Letters (Questions & Answer Bulletins)
- Verification Guides
- Audit Guides
- The Blue Book (Accounting, Recordkeeping, and Reporting by Postsecondary Educational Institutions)
- ED Guide to Payment Management System
- Delivery System Training Materials
- Expected Family Contribution Formula
- Direct Loan Bulletins

## C.    List of Acronyms Used in the Guide

| | |
|---|---|
| **AAAD** | Administrative Actions & Appeals Division |
| **ACD** | Area Case Director |
| **ATB** | Ability to Benefit |
| **CMD** | Case Management Division |
| **CMDD** | Case Management Division Director |
| **CMO** | Case Management and Oversight |
| **CMT** | Case Management Team |
| **COA** | Cost of Attendance |
| **CPA** | Certified Public Accountant |
| **CPS** | Central Processing System |
| **CTL** | Co-Team Leader |
| **DCL** | "Dear Colleague" Letter |
| **DMS** | Default Management System |
| **ED** | U.S. Department of Education |
| **EDL** | Expedited Determination Letter |
| **EDPMS** | Education Payment Management System |
| **EFC** | Expected Family Contribution |
| **ESAR** | Electronic Student Aid Report |
| **FAA** | Financial Aid Administrator |
| **FAT** | Financial Aid Transcript |
| **FCC** | Perkins Loan Federal Cash Contribution |
| **FPRD** | Final Program Review Determination letter |
| **GA** | Guaranty Agency |
| **GAPS** | Grant Administration and Payment System |
| **GED** | General Equivalency Diploma |
| **HEA** | Higher Education Act, as amended |
| **IIS** | Institutional Improvement Specialist |
| **IPS** | Institutional Payment Summary |
| **ISIR** | Institutional Student Information Record |
| **LDA** | Last Date of Attendance |
| **LOA** | Leave of Absence |
| **NSLDS** | National Student Loan Data System |
| **OGC** | Office of the General Counsel |
| **OHA** | Office of Hearings and Appeals |
| **OIG** | Office of the Inspector General |
| **PEPS** | Postsecondary Education Participants System |
| **PIP** | Performance Improvement and Procedures |
| **QAP** | Quality Assurance Program |
| **SAP** | Satisfactory Academic Progress |
| **SAR** | Student Aid Report |
| **SOA** | Statement of Account |
| **SSCR** | Student Status Confirmation Report |
| **SFAP** | Student Financial Assistance Programs |
| **SPS** | Student Payment Summary (Federal Pell Grant) |
| **WIA** | Workforce Investment Act |

**X-Sites**      Experimental Sites Initiative

# Chapter I  Purpose, Mission, and Scope of Program Reviews

## A.    Purpose

Although program reviews are only one of the many tools available to a Case Management Team (CMT), they frequently are the only face-to-face contact between school officials and the Department. As such, a CMT needs to take advantage of this opportunity to establish a partnership with the school to help it strengthen its administration of the Title IV programs.

### 1. General

The purpose of a program review is to promote and improve compliance by improving institutional performance. The reviewer(s) will:

- analyze institutional data and records and identify any weaknesses in the institutional procedures for administering SFA program funds;
- determine the extent to which any weaknesses in the school's administration of SFA funds may subject students and taxpayers to potential or actual fraud and abuse;
- frame corrective actions that will strengthen the school's future compliance with SFA rules;
- quantify any harm resulting from the institution's impaired performance and identify liabilities where non-compliance results in loss, misuse, or unnecessary expenditure of Federal funds; and
- refer schools for administrative action to protect the interests of students and taxpayers, when necessary.

### 2. Congressional Priorities

Congress outlined specific priorities[1] for selecting schools for a program review:

- high cohort default rates (over 25 percent);
- significant fluctuation in FFEL volume or Pell awards between years;

---

[1] See Section 494 of Higher Education Amendments of 1998, PL 105-244 [HEA §498A(1)(a)]

- serious deficiencies as reported by state licensing agencies or accrediting agencies;
- high withdrawal rates; and
- a significant risk of noncompliance with administrative capability or financial responsibility provisions of SFA programs, as determined by the Secretary.

Case Management Teams (CMTs) routinely address the issues of default rates, fund fluctuations and risk in case management (eligibility determinations, audit resolution, financial analysis, and risk management through use of the Institutional Assessment Model). Where the Institutional Assessment Model indicates a high probability of impaired performance or the CMT becomes aware through case management that the school may seriously lack adequate administrative or financial capability, the CMT should use the program review tool to assess the institution's performance. In addition, CMTs may use program reviews to validate information that a school has submitted to ED that is included in the Institutional Assessment Model. During most program reviews, reviewers should provide corrective action guidance if appropriate, and consider whether additional administrative protection for the SFA programs is advisable.

### 3. Other Sources of Information

A CMT may become aware of the need for further school assessment because of:

- reports from agency partners, such as state licensing agencies, guaranty agencies and accrediting agencies;
- referrals from OIG; and/or
- student and/or institutional employee complaints.

## B.    Mission

The mission of a program review is to:

- strengthen administrative capability and financial responsibility under Title IV statutes and regulations through on-site assessments of and technical assistance on institutional administration of the SFA programs.
- address financial harm to the taxpayer through liability assessments.
- tend to those institutions that are seriously mismanaging or abusing the SFA programs through referral for administrative action, including emergency action, and referrals to the Inspector General – Investigative Services when appropriate.

## C.   Scope

The CMT, relying on its experience and professional judgment, must consider not only whether a program review should take place, but also the scope of review likely to actually strengthen the school's compliance performance. The program review team plans and conducts a review based on the needs and directions provided by the CMT consistent with the information contained in this guide and PIP Procedures Memoranda.

### 1.  Options in Planning the Scope of Program Reviews – A Continuum

Typically, the overall assessment of an institution's administrative and financial capability is determined by examining an institution's SFA policies, procedures and records, using selected program review items from Chapter IV as a checklist of issues. To economize resources (both of the CMT and institutions) and to meet the objective of strengthening compliance by improving institutional performance, the CMT should consider whether a review should be limited to specific areas. On the other hand, when the CMT determines that substantial, identifiable weaknesses exist in an institution's administrative or financial capacity and AAAD involvement appears probable, the CMT may find it necessary to expand the review.

The scope of a program review prior to the site visit is determined by the CMT in consultation with the Co-Team Leaders (CTLs) and Area Case Director (ACD). During or after the program review, the review team, in consultation with the CTLs and ACD, may modify the review to expand the scope based on information discovered on site. Review teams must always anticipate the possibility of redefining the review strategy and scope. Thus, the review may change from a focused review to an overall assessment or from overall assessment to a focused review while on site. The change of strategy and scope are decisions within the professional discretion of the review team, but the ACD and CTLs should be consulted regarding the change in scope.



| Focused | Overall Assessment | Expanded |
|---------|--------------------|----------|

Regardless of the scope of the review, the CMT should assure that the team is comprised of members having sufficient experience and knowledge in the areas within the program review's initial review scope. At all stages, the CTLs' role is that of resource management to assist the CMT and review team in completing its task.

## 2. Focused Reviews

Where a program review is needed to address specific issues known to the CMT, it is more appropriate to narrow the scope of the review to focus on those issues, and expanding the review as needed. The CMT should decide the specific issues to be addressed during the program review.

The following are some examples of when a focused review would be appropriate (this is not an exhaustive list):

- confirming documentation for institutions on the reimbursement system of payment;
- determining the extent of compliance and corrective action needed under the Campus Security Act;
- verifying cohort default data;
- determining whether an institution should be removed from the reimbursement system of payment.

If the review reveals only insignificant findings, the review team completes the review, returns to the office, and discusses the findings with the CMT. In consultation with the ACD and CTL, the review team determines when the program review report will be issued. (See section on Timelines for Issuing the Program Review Report.) In general, the team will notify the school, within 15 days of the date that the on-site review ends, when it can expect to receive the report.

## 3. Overall Assessment Reviews

An overall assessment review is normally chosen when the CMT seeks a general evaluation of the school's performance in meeting its administrative and financial obligations relative to the SFA programs. In conducting an overall assessment, the review team examines the institution's SFA records, policies, and procedures keeping in mind the reasons the school was selected for review and checking the key cohort of program review items selected from Chapter IV, as appropriate. In addition, the review team must check on any serious deficiencies noted in previous audits or reviews, as well as on any negative reports received locally. The review team will also examine other compliance issues that reveal themselves during the review.

If the review reveals only insignificant findings, the review team completes the review, returns to the office, and discusses the findings with the CMT. In consultation with the ACD and CTL, the review team determines when the program review report will be issued. (See section on Timelines for Issuing the Program Review Report.) In general, the team will notify the school, within 15 days of the date that the on-site review ends, when it can expect to receive the report.

### 4. Expanded Reviews

Expanded reviews should be conducted when a CMT has information that significant compliance problems may exist at a school, or when other areas of concern are identified. The need for an expanded review may be established during initial case research, upon receipt of information indicating that probable concerns exist, or during a focused or overall assessment review.

During or after an overall assessment or focused review, if the review team concludes that an expanded review is needed, it must consult with the CTLs and ACD. The expanded review may include notice to other ACDs or CM Division Directors requesting assistance of other CMO staff (such as expansion of the review to include additional locations of national chain schools).

The review team leader must assure that the appropriate staff (CMT functional area experts, CMT adjuncts and CMO leadership) are fully apprised of all facts and circumstances indicating the need for further action or review expansion.

### a. Example of an Expanded Review

*Distance education school:* A school participating in the Distance Education Demonstration Program (DEDP) was scheduled for a program review due to allegations of substantial improper financial aid administration by a former employee. The allegations involved the distance education program and FFEL administration. The CMT prepared a program review plan that included participation by three CMT reviewers, a DEDP team member, and guaranty agency reviewers. AAAD and OIG were also involved and kept apprised of the issues and program review plan.

While on site, the staff focused on both the specific allegations of wrong-doing, as well as the review items. The DEDP team member analyzed the institution's administration of the DEDP and advised the review team on DEDP specific issues. The guaranty agency reviewers were able to coordinate and provide GA data and information to the Case Team.

As a result of findings by the review team, the DEDP chose to terminate the institution's participation in the Pilot Program prior to issuance of the program review report. AAAD and OIG worked with the review team to obtain the evidence sufficient to support the termination.

Chapter III includes more detailed information on procedures for conducting and documenting an expanded program review.

# Chapter IX  After the Site Visit

Upon returning from the on-site visit, reviewers should discuss the findings with the CMT, including the Co-Team Leader (CTL), and determine the appropriate next steps. These next steps will include preparation of the program review report, but might also include referral for technical assistance or development of a corrective action plan. In consultation with the ACD and CTL, reviewers determine when the program review report will be issued. In general, reviewers will notify the school, within 15 days of the date that the on-site review ends, when it can expect to receive the report.

If no administrative action is pending, a program review report is prepared and is normally sent to the school within approximately 30 to 60 days after the site visit ends. However, if an administrative action is pending, the ACD/CTL, in consultation with AAAD and OGC may elect **not** to issue a program review report at all, so as not to prejudice the case for administrative action. The ACD/CTL may choose to issue a final program review determination letter in lieu of the program review report. There is no legal requirement that the Department issue a program review report.

Prior to issuing any type of report following an expanded review, a copy of such report must be sent to AAAD and OGC for comment. This will ensure that the findings and citations are accurate and enforceable, should the institution choose to contest any asserted liabilities. Any such report or final determination (like the finding relied upon to justify administrative action) must contain logical narratives of observed violations and must include accurate citations and be supported by relevant documentation.

## A.    The Program Review Report

### 1.  Report Preparation

The program review report is the official ED notification to the institution of the findings discovered during the on-site visit. The report lists the regulatory and statutory findings and establishes a prima facie case. The report also specifies required corrective actions, including a time frame for institutional response.

Appendix N provides an example of a program review report, including a cover letter, institutional review data sheet, and an appendix of students sampled. Reviewers should be guided by this example. Items to be included in the report and in supporting documentation are:

**Type of file sample used**  Describe the type of file sample and how the sample was derived. The recommended language is as follows:

Example: "A sample of XX student files was selected for the review, X each for the 200X-0X and 0X-0X award years. The files were selected randomly from a statistical sample of the total population receiving Title IV student financial assistance for each award year, valid to a 95 percent confidence level with a plus or minus five percent confidence interval.

If additional files were selected on a judgmental basis, describe the number of files, method of selection and purpose of the selection.

The structure for reporting findings is described below.

**Finding** - Describe the statutory or regulatory violation; provide sufficient detail in order to build a strong case. The report should describe the regulatory violations in a way that would be clear to a third-party reader who may have only limited knowledge of Title IV programs. For example, for a finding of unpaid refunds, do not just indicate the school failed to pay a certain refund; include each student's start date, withdrawal date, refund amount, and date due.

**Requirement** - Describe what the statute and/or regulations require and the corrective action to be taken by the institution to return it to compliance.

**Reference** - List the statutes, regulations, and policy issuances supporting the requirement. However, **do not cite a policy issuance alone without a supporting regulation or statute.** Make sure the document cited is in final form, not a draft policy.

**Harm statement** - Include in the finding a concise statement identifying the harm to ED or to students that results from the specific violation. Example, "The institution's failure to make timely refunds of Title IV loans may contribute to an increase in student defaults and cause financial harm to the U.S. Department of Education and students."

Reviewers should state in the program review report whether the school must have a CPA review any required file review results, because the school will have to pay for this. For A-133 schools, however, consistent with PIP Mailbox Message #191, we cannot request any auditor follow-up of program review findings. In addition, the program review report should notify the school that a follow-up visit may be scheduled to test or sample the school's file review results.

## 2. Timelines for Issuing the Program Review Report

Program review reports should be reviewed by the CTL and in most cases, issued **no later than 30 days** after conclusion of the review visit, or as determined after consultation with the CTL. When the level of the review is more

serious or when the case has been referred to AAAD for an administrative action, the Area Case Director (ACD) may approve an extension of an additional 30 days.

Program review reports requiring greater than 60 days should be discussed with the Case Management Division Director.

Similar timelines also apply to the process of reviewing institutional responses to the program review report. School requests for extensions should also be discussed with the CTL/ACD.

## B.    Final Program Review Determinations

PIP 98-02 PIP Procedures Memo provides guidance on preparing the Final Program Review Determination letter (FPRD), including FPRD procedures and models. As with the program review report, a guiding principle for FPRD preparation is to describe the items identified at the institution that did not comply with the Department's regulations in sufficient detail both as to the facts and the legal requirements to state a prima facie case in the FPRD itself.

The cover letter provides the dates of the review and a summary of the findings. The structure for reporting findings is the same as for a program review report.

**Finding** - Describe the statutory or regulatory violation; provide sufficient detail to build a strong case. The FPRD should describe the regulatory violations in a way that would be clear to a third-party reader who may have only limited knowledge of Title IV programs. For example, for a finding of unpaid refunds do not just indicate the school failed to pay a certain refund; include each student's start date, withdrawal date, refund amount, and date due. If a large number of students are involved, this can be done in a chart and included as an attachment.

Reviewers should document fully in the work-papers, and summarize in the FPRD, the reasons supporting resolution of certain findings (i.e., reasons for not including certain program review report findings in the FPRD).

**Requirement** - Describe what the statute and/or regulations require and the corrective action to be taken by the institution to return it to compliance.

**Reference** - List the statutes, regulations, and policy issuances supporting the requirement. However, **do not cite a policy issuance alone without a supporting regulation or statute.** Make sure the document you use is in its final form, not a draft policy.

**Harm statement** - Include in the finding a concise statement identifying the harm to ED or to students that results from the specific violation. Example, "The institution's failure to make timely refunds of Title IV loans may contribute to an increase in student defaults and cause financial harm to the U.S. Department of Education and students."

**Summary of liabilities** - Include a summary of liabilities by finding and by program, with a total for each program.

**Payment instructions** – As necessary, include specific instructions on the amount of funds due to current loan holders for applicable students or on funds due to ED or the program accounts. Include applicable mailing addresses.

However, if the total liability resulting from the review is less than $1000, the liability should be asserted in the FPRD, but the reviewer should not include instructions for payment to ED. Instead, the reviewer should include a statement that mirrors the language for FADs, as shown in PIP 97-20, Procedures for Resolving Deficient Audits. The FPRD should read:

> "Since this liability amount is minimal, we will not require repayment at this time. However, the institution must ensure that it has corrected its procedures, so this type of finding does not recur. If similar findings are noted in future program reviews, we will require repayment of those improper amounts, as well as the amount noted here. In addition, we may refer the matter to Administrative Actions and Appeals for a possible adverse administrative action."

This minimum liability only applies to funds owed to ED, not to students, or lenders/noteholders on behalf of students. See <u>PIP Mailbox Message 233</u>

**Appeal procedures** - Include detailed information on timelines, documents that must be submitted, and applicable addresses for mail and overnight delivery.

Appendix O contains an example of an FPRD.

### 1. Expedited Determination Letter (EDL)

To save time for reviewers and for school staff when reviews uncover only minor deficiencies, the Expedited Determination Letter (EDL) is recommended. This combination program review report/FPRD eliminates the need for ED to generate two separate documents and simplifies the response process for school officials.

The EDL consists of three parts: a cover letter, an attachment that describes the findings noted, and an Appendix that lists the students in the sample. The findings are written just as in a conventional program review report with a

description of the finding, an explanation of the harm and the regulatory reference, but no required actions. It is an expedited process because ED does not require a written school response to the report, and no final determination is issued.

There are two types of EDLs:

**Version A** - The first type is designed to be used when the liabilities identified are minimal and the school corrects the problem(s) identified while the reviewers are on-site or shortly thereafter (before the report is issued). Reviewers can use it for a school that has isolated, minimal liabilities, and funds are due to a student or payable against a student's loan. Reviewers could ask the school to either:

- make the required payment and notify ED of same; or
- make the required payment and submit documentation of same.

The school does not have to provide a detailed response to each finding as is required with the conventional program review report. However, any final determination that contains a requirement that a school repay funds must contain appeal language. (PIP Memo 98-02). Since schools are not necessarily required to submit verifying documents in response to this type of EDL, reviewers should advise them of the follow-up accountability requirements, in accordance with the guidance contained in PIP Mailbox Message #191 dated 3/10/99. <u>Audit Follow-up of FPRD Findings</u>

**Version B** - The second type of EDL that reviewers can use is for schools with isolated problems with no or small liabilities. Version B can be used if liabilities or potential liabilities identified during a site visit are cured or the liabilities are paid **while the reviewer is on site**. Version B cannot be used if funds are owed to students or are payable (on a loan) on their behalf. Version B is also not appropriate if the school is directed to take any action resulting in a payment of liabilities.

Version B of the EDL is used to document the site visit and to make any errors found a part of the official record. The fact that the liabilities were identified and promptly cured or repaid should be included in the EDL. Since no liabilities are assessed in the EDL, do not include the appeal language.

An example of an EDL is included in Appendix J. Please note that the contents must be modified to fit the situation.

**Time frame for EDL issuance** - The Expedited Determination Letter should be reviewed and approved by the ACD/CTL and issued no later than 30 work days,

or as determined after consultation with the CTL, after conclusion of the review visit.

## C.    PEPS Data Entry and File Maintenance

### 1. PEPS Data Entry

Reviewers play a vital role in maintaining the integrity of PEPS. Basic information on entering data into PEPS is found in the PEPS user's manual. It is important that staff enter program review information into PEPS at key points in the process: at the conclusion of the on-site visit, issuance of the review report, issuance of the final program review determination, and closure of the review. The CMIS module should also be updated at the time reviewers return from the review to the office.

### 2. Level of Review Seriousness

The following PEPS codes indicate the five levels of review:

- 0 No regulatory violations
- 1 Moderate deficiencies
- 2 Serious deficiencies
- 3 Very serious deficiencies
- 4 Fraud/abuse: OIG referral/emergency action

### 3. Deficiency Codes

CMO uses deficiency codes for classifying regulatory violations. Entering deficiency codes into PEPS is vital for tracking and analysis. Codes may be entered into PEPS as soon as possible after a review, but no later than issuance of the program review report. Since findings may change, reviewers must assure that the findings in PEPS match the findings in the program review report.

At the issuance of the FPRD or EDL, the lead reviewer should ensure that the deficiency codes and the liability amounts are updated. Should a school appeal and successfully reduce its liability, the lead reviewer will be notified by AAAD and should ensure that PEPS deficiency codes are again updated. Also, revised liability (accounting documents) should be updated and submitted to Finance.

### 4. File Maintenance

Reviewers should maintain a record of work performed during the program review. This includes notes of pertinent discussions with school staff, notes from the entrance and exit conferences, interview notes, work papers, and information on resolved findings. Please refer to the section in Chapter III on Documenting Program Review Findings for additional information. In summary, everything that supports the conclusions of the review should be maintained in the Case Team's files.

Copies of the program review report and the FPRD should continue to be submitted to the Document Receipt and Control Center for filing in the school's file.

## D.    Appeals

Although technically not a part of the program review process, the following information is provided to assist reviewers in understanding the appeals process. The quality of the work performed and the documents prepared during a program review are vital to the appeal process, and reviewers are needed to assist during the entire review process.

Under the Subpart H, General Provisions Regulations, an institution may file a formal appeal if it disagrees with the monetary liabilities asserted in a final program review determination (FPRD). To preserve its appeal rights, the institution must file an appeal within 45 days of its receipt of the FPRD. Standard language in the FPRD contains instructions to the institution for filing an appeal. The institution appeals by submitting a written request for review to the Director of AAAD. The request must state the basis for the appeal, and include any documents that the institution may wish to present to support its case.

Upon receipt of the appeal, the AAAD staff member who is handling the appeal will notify the reviewers, the Co-Team Leaders, and the Area Case Director that a Subpart H appeal has been received. In most instances, the AAAD staff member that is handling the appeal will also be the AAAD liaison to that particular Case Management Team. AAAD will provide a copy of the appeal to the reviewer who prepared the FPRD and request that he/she prepare a detailed assessment of the school's arguments and documentation.

These assessments serve as a valuable aid to AAAD and OGC in litigating administrative appeals. The written assessment must include an analysis and evaluation of the issues that the institution disputes in its appeal. The assessment should not be a synopsis or recapitulation of the institution's appeal letter and/or the FPRD. The reviewer must determine for each finding under appeal, whether the claims or arguments raised by the institution have merit and satisfactorily resolve, or reduce, the liabilities associated with the findings. If the documentation does or does not support the finding, the reviewer must clearly

state the reasons why in the assessment. The written assessment must reflect the total amount appealed. In general, the written assessment must be reviewed by the CTL and transmitted to AAAD within 15 days of the date the reviewer received the appeal from AAAD. However, additional time may be provided depending on work constraints and/or the complexity of the appeal. The assessment may be submitted to AAAD electronically, via e-mail, or in hard copy format.

Frequently, an institution may submit documents as part of an appeal package that, for whatever reason, were not made available to the reviewer earlier in the program review process. The fact that documentation could or should have been submitted earlier in the review process is not a valid reason for failing to prepare an assessment or failing to evaluate the school's arguments and exhibits.

Reviewers may also be asked to answer questions or prepare charts, especially when OGC and AAAD are preparing briefs and exhibits for filing with the hearing official.

AAAD must transmit the administrative record of the appeal, including the request for review and supporting documents, to the Office of Hearing and Appeals (OHA) within 30 days of receipt of the appeal. If, after the assessment, it is determined that satisfactory documentation was submitted with the institution's appeal request, and the reviewer and AAAD staff member agree that the submitted documentation resolves the appealed liabilities, AAAD will resolve the appeal without forwarding it to OHA and OGC. However, if contested liabilities still exist, AAAD will forward the appeal to OHA. The appeal and the reviewer's assessment will also be forwarded to OGC at the same time.

From this point, either a settlement between the institution and the Department is reached, or the hearing official issues an initial decision. Either party may appeal such decisions to the Secretary within 30 days of receipt of the hearing official's decision. Once an appeal has been resolved (either by AAAD, settlement, or final decision), the AAAD staff person will notify the reviewer, the Co-Team Leaders, and the Area Case Director of the resolution, and will provide the appropriate documentation to the reviewer. PIP 98-01 provides further guidance on the Subpart H appeal process. PIP Procedures Memo