## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES<br>LITIGATION<br><br><br><br><br><br><br>This Document Relates To: Subpoena Action | )<br>)<br>)<br>)<br>) **06-MC-0558 (CKK)**<br>) **(D. Ariz., No. CV-04-2147-PHX-JAT)**<br>)<br>)<br>)<br>)<br>) |

### RESPONDENT'S OPPOSITION TO PETITIONER'S SUPPLEMENTAL BRIEF

On June 7, 2007, the United States Department of Education ("Department") produced to

Petitioner, Apollo Group, Inc. ("Apollo") the final Category Two privilege log.  In the April 12,

2007 Joint Agreement ("Joint Agreement"), the parties agreed that the Department would log the

Category Two documents that were defined as "Internal Department documents concerning the

conduct of the program review other than documents contained in Category 1."  Joint Agreement

at 1.  Category One was defined as, "Internal Department documents that explicitly seek or

provide legal advice."  Id.  The Department located, reviewed and listed in the Category Two

privilege log, 52 emails, 17 are attachments which include drafts of strategy and game plan

between the parties involved, draft interview questions and drafts of a letter to Apollo.[1]  The

remaining 35 of those emails consist of communications between and among the program review

staff and two Office of General Counsel attorneys discussing possible strategies and methods for

conducting the program review.  The Department stands by its assertion of the attorney work

---

[1]  Although the final privilege log for Category 2 documents lists 52 emails, there are actually 69 if one counts the attachments to the emails.  For example, p. 1 of the privilege log lists three emails; however, the second email on the list has an attachment of 4 pages.  For purposes of this Opposition, the attachments are being referred to separately. See Apollo Exh. A.

product privilege, and deliberative process privilege, with respect to the emails contained in Category Two and not produced in response to Apollo's subpoena, and respectfully asks the Court to sustain its assertion of these privileges.

## FACTUAL BACKGROUND

The Joint Agreement categorized the documents and outlined a timetable for the Department's production of privilege logs for three categories of documents, including Category Two. Specifically, the privilege log for the Category Two documents was to be produced on a rolling basis with a final production by June 7, 2007. In accordance with the Joint Agreement, the Department produced privilege logs of Category Two documents to Apollo weekly, with productions on April 30, 2007, May 7, 2007, May 14, 2007, May 21, 2007, May 29, 2007, and June 4, 2007. The final Category Two privilege log was completed and produced to Apollo on June 7, 2007.

The documents at issue include:

- 35 email communications between and among the program review staff and Office of General Counsel attorneys deliberating on the conduct of the program review (i.e., what questions to ask during interviews, what sites to visit and when, what documentation to gather on site, how to organize the information gathered, how to conduct the interviews, and what, if any, follow up should occur after the site visits); and

- 17 email attachments of draft documents for review by the program review staff and attorneys and which incorporate edits and comments for review by and between the program review staff and attorneys.

## ARGUMENT

**A.  The Department's Category Two privilege log includes all internal documents concerning the conduct of the program review that do not explicitly seek or provide legal advice.**

Apollo's claim that the Department has not listed all privileged documents that are within the scope of Category Two, apparently based on its belief that there are documents memorializing daily communications regarding the *conduct* of the program review, is baseless speculation.  In fact, the Department's Category Two privilege log lists 205 pages of documents, a number not significantly inconsistent with one quarter of the total estimate for categories one through four in the Department's letter to Apollo dated April 6, 2007.

Category Two documents are identified in the Joint Agreement as internal Department documents "concerning the conduct of the program review."  Joint Agreement at 1.  In gathering and sorting documents into the respective categories, the Department placed in Category Two, only those documents related to the execution, direction or management of the program review.  Documents that substantively discussed the findings of the review, the writing of the program review report, or analyzed the information and substance of the information did not "concern the *conduct* of the program review," and therefore were not placed in Category Two.

The Department's on-site program review was performed during August 2003.  During the on-site review, the Department interviewed witnesses and acquired documents.  See June 11, 2007, Wittman Declaration, ¶ 9.  It is this gathering of the evidence process that the Department defines as the "conduct of the program review."  Therefore, the documents included in Category Two are prior to and during this period of time.  The majority of the communications generated after the on-site review, which the Department has not already produced under Categories Five

and Six, concern the role of the evidence gathered in writing the program review report.[2]
Accordingly, those communications pertaining to the findings of the review, the writing of the
program review report, or analyzing the evidence are not within the scope of Category Two and
were not included in the Department's Category Two privilege log.  There are no other
documents that would comprise Category Two.

### B.  The Attorney Work Product Privilege Protects the Documents Listed in the Privilege Log

The Department continues to assert the attorney work product privilege with respect to
the documents at issue.  The facts are clearly laid out in Ms. Woodward's Declarations.   In May
2003, the Government declined to intervene in the relators' *qui tam* action; rather, Department
lawyers recommended to Federal Student Aid (FSA) that a program review be conducted based
on the initial information received from the relators.  See June 24, 2007 Woodward
Supplemental Declaration, ¶ 6.  From the moment the Department recommended against
intervention in the *qui tam* action, lawyers in the Department's Office of the General Counsel
(OGC) were intimately involved in the administrative direction of the program review.  Id., at ¶
9.  Such OGC involvement at the planning stage of a program review does not typically occur for
a regulatory program review at the Department.  Id., at ¶ 5, 6.   The typical involvement is for
OGC lawyers to be involved when a draft program review report is sent to OGC for legal
sufficiency review. Id. at ¶ 6.  Only because the genesis for this program review was the *qui tam*
complaint, did OGC lawyers have far more involvement in the planning and conduct of the
program review than is usual.  Id.  Because the *qui tam* relators had provided substantial

---

[2] Additionally, many of the documents generated after the onsite program review are contained in Categories Five
and Six.  As of this date, the Department produced over 1500 pages of documents under Category Five and Category
Six which comprise factual information and emails gathered after the gathering of the evidence and during the
program review.  Furthermore, prior to the Department's response to this subpoena, the Department produced in
whole or in part over 5437 pages of records in response to Apollo's previous 2003 FOIA request.

evidence of a violation and had filed a False Claims Act complaint, the OGC attorneys anticipated that any violation found by the Department would be litigated through the administrative hearings process. Id., at ¶ 7 – 10. These lawyers led the team conducting the program review and directed the strategy of the program review at every stage of the process. Therefore, Apollo's assertion that Department lawyers did not anticipate litigation is simply not consistent with the facts.

> [i]  Because the Department Anticipated Litigation, This Program Review Was Not Routine Monitoring

The facts clearly demonstrate that this program review was not routine. After the government declined to intervene in the *qui tam* action, OGC attorneys contacted FSA and recommended a program review. See Woodward Supplemental Declaration, ¶ 6. Additionally, the OGC attorneys interviewed the *qui tam* relators under oath in order to garner information needed to plan the program review and oversaw the investigative activities of the program review staff (where to go, who to interview and how to interview witnesses during the program review). Id. at ¶ 7, 8. These actions do not demonstrate a routine program review conducted by the Department. Id. at ¶ 8. Although mischaracterized by Apollo, the attorneys were not members of the program review team. Rather, the attorneys were leading the team because the Department anticipated that Apollo would contest the findings of the report in litigation. Id. at ¶ 10. For these reasons, Apollo's assertion that the attorney work product does not protect the documents because the program review was routine is baseless.

Apollo asserts that the attorney work product doctrine does not apply to the documents at issue because the program review was merely a form of "routine monitoring." Apollo's argument is based on an August 26, 2004 Department letter regarding the application of FOIA exemptions to the program review report. See Apollo Exh. D. This referenced statement is

taken out of context and is irrelevant to the Department's assertion of the attorney work product privilege.[3]  As the relevant facts clearly show, *this* program review was not routine.

In order for a document to be protected under the attorney work product privilege, litigation need not have ever actually commenced, so long as specific claims have been identified which make litigation probable.[4]  Additionally, in Coastal States Gas Corp. v. Department of Energy, 617 F. 2d 854, 865, (D.C. Cir. 1980)(distinguishing its facts from that of Kent Corp v. NLRB, 530 F.2d 612 (5th Cir. 1976)), the court recognizes that attorney work product could be applied to investigatory audits.  In Kent Corp., the court protected investigatory reports "prepared very early in the course of the agency's involvement in the case, before there has been any determination that the charges had substance." Coastal States at 865.  However, in Coastal States, the court determined that there was no specific charge or allegation under investigation because there the documents in question were responding to questions from auditors to attorneys regarding the general interpretation of regulations.  Id.

This case, by contrast, involved more than simply the general interpretation of regulations, the Department had advised the Department of Justice that it had substantial evidence that the University of Phoenix (UOP) had violated section 487(a)(20) of the Higher Education Act; and that, in view of the declination decision, it was considering what

---

[3] When informing Apollo that, for FOIA purposes, the Department had determined that the program review report was a final agency document and not an interim report the Department described the program review as "routine monitoring."  That statement was made by the Department's FOIA Officer in the context of third party requests for a copy of the program review report under the FOIA and is irrelevant to the privilege determinations regarding the deliberative documents prior to the issuance of that report.  In fact, during this same exchange of letters, Apollo argued that the Department should redact information in the program review report pursuant to Exemption 7 because Apollo viewed the program review as a law enforcement proceeding and not routine monitoring.  See Apollo Exhibit D, pg. 13-14.

[4] See Hertzberg v. Veneman, 273 F. Supp. 2d 67, 80 (D.D.C. 2003)(applying privilege where potential claimants had discussed possibility of pursuing claims).  See also Tax Analysts v. IRS, 152 F. Supp. 2d 1, 19 (D.D.C. 2001)(finding document assessing whether a particular case should be designated for litigation as attorney work product).

administrative action to take against the University on account of the violation.  Woodward

Supplemental Declaration at ¶ 6 (July 24, 2007).  Apollo cannot argue that the Department

lawyers did not identify a specific claim which would make litigation probable.  In fact,

Department lawyers initiated the program review based on specific allegations in the *qui tam*

relators' complaint.  Id., at ¶ 6.  As a result, attorneys directed the strategy of the entire program

review with an eye towards litigation that would have followed had Apollo not settled the

findings of the program review with the Department for 9.8 million dollars.  Id., at ¶ 10, 11; See

also Settlement Agreement.

Apollo contests that the Department reasonably anticipated litigation prior to the planning

of the program review and during it.  Apollo's belief is unfounded, litigation was anticipated

from the outset of the program review.  See Woodward Supplemental Declaration at ¶ 11.  The

fact that attorneys were overseeing the on-site program review is evidence that the Department

anticipated litigation.  Attorneys are not normally involved in the planning and direction of

program reviews. Id., at ¶ 6.  Department attorneys were intimately involved in every detail of

the program review, a procedure not normally followed. Id., at ¶ 6-9, 13.  However, since this

program review was the product of a *qui tam* action, attorneys not only referred the information

to FSA for a program review but had a leadership role in the program review process from that

point on.  Id., at ¶ 6, 7.  Accordingly, the Department reasonably anticipated litigation when it

decided to perform a program review, as evidenced by the steps taken by Department attorneys

to document and substantiate the relators' claims, for example, by taking interview statements

under oath. Id., at ¶ 7.

Apollo inaccurately characterizes the OGC attorneys as members on the program review

team.  Id., at ¶ 9.  Rather, because of their involvement in the decision not to intervene in the *qui*

*tam* action and the subsequent referral of the case to FSA for a program review, OGC lawyers

led the program staff in conducting the program review, devised a strategy for the review,

determining which sites to visit and in what order, who to interview, and what documents to

collect, and later advising program staff on what, if any, follow up steps should occur.

Apollo asserts that because an administrative action was not initiated in this case, the

Department never established a final agency action such that it could have anticipated

administrative litigation.  That statement is simply untrue.  As established in <u>Hertzberg</u>, the

Department need not actually have commenced litigation in order to assert the privilege.

<u>Hertzberg,</u> 273 F. Supp. 2d at 80.  The Department only needed to reasonably anticipate that

such litigation would occur considering the evidence presented by the *qui tam* relators that the

school had violated the Higher Education Act.  The Department did anticipate litigation before

the program review was conducted because it reasonably could foresee that Apollo would

contest the findings in the report.  And, in fact, Apollo did immediately contest the findings in

the report, requesting that the Department not make the document public.  Thereafter, Apollo

negotiated a settlement agreement with the Department over the program review where it paid

the Department $9.8 million.  The settlement agreement specifically stated that the settlement

was reached in order to "resolve the program review and to avoid the cost of *future litigation*."

See Settlement Agreement at p.1 (emphasis added).  Therefore, even Apollo acknowledged that

the Department and Apollo would have litigated the findings of the report but for the settlement.

Apollo's assertion, that the titles of the email communications at issue do not demonstrate

that the documents were prepared in anticipation of litigation, has no bearing on the

Department's privilege claim.  In the Category Two privilege log, the Department included both

descriptions of the documents and the actual titles of the email communications.  Obviously, the

mere labeling of the documents does not control whether it was created with an eye towards litigation. The use of the information in the email titles without any reference to the document descriptions would provide the reader with no substantive information on what the communication actually concerned. An attorney's or other staffer's decision to title an email "University of Phoenix – Site Selection", in the subject line of the email communication, does not lead to the conclusion that the attorneys leading the team in the decision of which sites to visit did not anticipate litigation. Apollo Exhibit A, p. 4, Documents 7 & 8. In fact, the description of this document notes that the emails from the program review team ask the attorneys what kind of records the program review team should review and have access to; and in the next communication, the attorneys respond to those questions and provide their thoughts and strategy as to the information to be gathered during the review. Apollo's form over substance argument in this regard is completely without merit.

Apollo also asserts that documents authored by non-lawyers cannot be protected by the attorney work product privilege. On the contrary, the email communications written by program review staff to other program review staff and OGC attorneys clearly *are* under the purview of the attorney work product privilege. Documents written by program staff performing program review work at the direction and under the guidance of OGC attorneys are covered under the work product doctrine as well. See United States v. Nobles, 422 U.S. 225, 238-39 (1975) (finding that the reality of litigation requires that the work product privilege also be extended to material prepared by an attorney's agent); See also Martin v. DOJ, 2007 U.S. App. LEXIS 12636, *21 (D.C. Cir. 2007) (affirming that a document prepared by an FDIC investigator at the direction of an FDIC attorney was protected by the attorney work product privilege).

The program review here – an investigation by Department attorneys into specific allegations of wrongdoing – was performed in anticipation of an administrative action brought by the Department regarding a violation of section 487(a)(20) of the Higher Education Act and the settlement of such administrative action that resulted after Apollo contested the report. This program review was not routine, but rather a review conducted in response to specific allegations made by the *qui tam* relators. <u>See</u> Wittman Declaration, ¶ 8; Woodward Declaration, ¶ 6. As such, the Department's program review of the University of Phoenix was unquestionably undertaken in anticipation of litigation rather than as a general administrative review.

The courts have extended the attorney work product privilege to administrative proceedings noting that "administrative litigation certainly can beget court litigation and may in many circumstances be expected to do so." <u>Exxon Corp. v. Department of Energy</u>, 585 F. Supp. 690, 700 (D.D.C. 1983). Here, since the program review was initiated based on a specific claim filed in the *qui tam* relators' federal complaint alleging a violation of the False Claims Act, the OGC attorneys were reasonably expected to litigate the program review because of the body of evidence presented to them in the *qui tam* complaint and the subsequent sworn statements of the relators taken under oath.

**C. The Deliberative Process Privilege Protects the Documents Listed in the Privilege Log**

The Department has asserted the deliberative process privilege for the documents in the Category Two privilege log because the documents represent deliberative communications between program review staff and OGC attorneys. The specific emails include: 35 email communications between and among program staff and the attorneys asking questions and making decisions about how to conduct the program review (i.e. what questions to ask, who to interview, what documents to gather, etc.) and 17 email attachments of draft documents. These

documents represent not only the attorneys' strategy in planning the case, protected under the attorney work product privilege, but also the give and take between the program staff and the attorneys antecedent to various decisions and recommendations regarding how to conduct the program review in light of anticipated litigation.

[i]  The Withheld Documents Were Predecisional

In order for a document to be protected under the deliberative process privilege, it must be both predecisional and deliberative. Judicial Watch, Inc., v. Food & Drug Admin., 449 F.3d 141, 151 (D.C. Cir. 2006).  When determining whether a document is predecisional, an agency does not have to specifically point to a final agency decision; rather it is enough for the agency to establish "what deliberative process is involved, and the role played by the documents in issue in the course of that process."  Coastal States, 617 F. 2d at 868.

Although Apollo argues that documents must be deliberations of a *specific policy* decision, its primary authority for the privilege demonstrates that deliberations can account for *both* governmental *decisions* as well as policy initiatives.   NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1975)("NLRB")(demonstrating that the deliberative process privilege protects decisions related to both high level policy initiatives and also more mundane government decisions).  Here, Department lawyers were making a series of government decisions regarding how to conduct the program review in order to gather the necessary evidence of suspected violations of the Higher Education Act.  The emails at issue reveal the deliberations prior to such strategy decisions where the lawyers consulted the program review team on their litigation strategy, and when the lawyers and program staff discussed whether it was necessary to depart from the routine program review practices to fully document the case in light of the anticipated litigation, e.g., number of locations to visit, number of witnesses to interview.  In a footnote, the

11

Court in <u>NLRB</u> found it important to acknowledge that the claim of privilege need not turn on the existence of a specific *policy* decision:

> Our emphasis on the need to protect predecisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower court should be wary of interfering with this process.

<u>NLRB</u>, 421 U.S. at 153. Since the emails in question were generated during the continuing agency decisionmaking process regarding how to conduct the program review in light of anticipated litigation, the predecisional nature of the documents is established and the deliberative process privilege is applicable to the documents at issue. Apollo inaccurately quotes the Court in NLRB for the proposition that, a predecisional document *must* have been "prepared in order to assist an agency decisionmaker in arriving at his decision."[5] That case does not hinge on whether the decisionmaker - the Office of General Counsel of the NLRB - arrived at a final decision. Rather, the case hinges on the determination of whether the OGG memoranda, which make decisions and recommendations on how to proceed in a case, are a final action of the NLRB. <u>NLRB</u>, 421 U.S. at 158.

In the current case, the Department is asserting the deliberative process privilege to deliberative drafts and emails discussing how to conduct the program review. The deliberative process is how to conduct the program review, including questions deliberating on the strategy of the program review. The draft letters, notes, and questions helped the review team formulate its strategy during the review. Furthermore, the open and frank email conversations regarding the strategy assisted the Department in conducting the thorough review necessary to write the program review and prepare for anticipated litigation. It is clear that the documents listed in the

---

[5] See Apollo Brief at 6. Although Counsel sought out the direct quote cited by Apollo in its brief, she has been unable to locate the quote on any page of the 20-page decision.

Category Two log do not entail final actions or decisions of the Department, and that they are predecisional deliberations regarding decisions to be made by the OGC attorneys on program review strategy. Thus, they are protected under the deliberative process privilege.

During the program review, the Department attorneys involved in the *qui tam* litigation declination decision were subsequently assigned to the program review in anticipation that litigation would eventually follow.  At every step of the deliberative process, OGC attorneys led the program review and made government decisions regarding how to conduct the program review.  Apollo incorrectly asserts that, in order to be protected under the deliberative process privilege, the deliberations in question need to involve determinations made by high level senior officials on governmental policy.  However, this assertion is simply untrue.  If high level decisonmaking was required for protection of the privilege then many of the day to day lower level government deliberations would not be protected under the privilege.[6]

Here, Apollo attempts to improperly characterize the two attorneys who led the program review as simply lending a hand in a program review conducted by FSA program review staff.  As earlier explained, the attorneys were not simply two extra sets of hands performing fieldwork.  The Department – anticipating that the program review would lead to litigation – decided that it was in the best interest of the agency for OGC to prepare the strategy for the program review.  Woodward Supplemental Declaration, ¶ 6, 7.  As such, the attorneys made a series of government decisions based on deliberations with the program review staff.  Id., at ¶ 8.  It was unnecessary - in the context of making decisions regarding how to conduct the program review - for the OGC attorneys to make recommendations to senior level officials.  Rather, it is enough to

---

[6] See Strang v. Collyer, 710 F. Supp. 9, 12(D.D.C. 1989); See also Nat'l Wildlife Fed'n v. United States Forest Service, 861 F. 2d 114, 1122 (9th Cir. 1988) (identifying that to the extent that the requestor seeks to identify differences in opinion between lower level personnel, it is attempting to reveal the decisionmaking process of the agency).

show that a government decision was made at the level of the attorneys assigned to litigate the case, after deliberations and consultations with the program review team, in order for the communications of the team deliberations to be characterized as predecisional.

[ii]  The Withheld Documents Were Deliberative

To be protected, a document must not only be predecisional, but also deliberative. Documents commonly protected by the deliberative process privilege include, "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." NLRB, 421 U.S. at 150.  By protecting documents under the deliberative process privilege, courts seek to foster open and frank discussions and communications within an agency.  Coastal States, 617 F.2d  at 866.

The documents at issue here are deliberative because they represent draft documents and other email communications discussing the strategy set out by the attorneys leading the program review team.  As earlier discussed, the generic titles in the subject line of an email often do not convey information concerning the specific matter being discussed.  That is why the Department appropriately described the communications in greater detail in the privilege log.  Apollo completely disregarded the Department's descriptions of the documents and rather only considers their titles.  The courts have consistently held that draft document attachments are deliberative. Exxon, 585 F. Supp. at 698.

Additionally, since the 17 emails discussing the drafts provide comments and information deliberating on what edits and changes should be made in the strategy and plan, they are also deliberative.  The other 35 emails discuss the planning and strategy of the program review team being led by OGC counsel since the Department as a whole anticipated that Apollo would contest the findings.

The release of these communications between attorneys and the program review staff would inhibit the frank and open exchange of information between OGC and FSA staff.  As discussed above, litigation was anticipated and the OGC attorneys assigned to conduct that litigation on the Department's behalf, were making the decisions after gathering information and opinions from the program review team.  If this type of communication is not protected under the deliberative process, future deliberations among program review teams and attorneys will be impacted in cases where litigation is anticipated.

Attorneys were making a series of government decisions regarding how to conduct the program review.  To release the information in the deliberative emails and documents would inhibit attorneys from leading program reviews in the future where litigation was anticipated. The two attorneys were strategizing about the case from the outset.  Woodward Supplemental Declaration, ¶ 7.  In <u>NLRB</u>, where the attorneys authoring the deliberative documents were also the attorneys assigned to conduct the administrative litigation, the documents at issue were not only found to be attorney work product but also predecisional and deliberative documents. <u>NLRB</u>, 421 U.S. at 159-160.  Since the documents at issue here are both predecisional and deliberative, the Department has clearly established that they should be protected under the deliberative process privilege.

**D.  The Category Two Documents Do Not Include Communications With Third Parties.**

Apollo misrepresents that the Category 2 privilege log asserts the attorney work product for email communications to Apollo.  This characterization is untrue.  Specifically, Apollo notes that Documents 30, 35, 40 and 41 cannot be protected by the privilege because they concern third party communications outside of the Department.  Although the documents reference communications with Apollo, the email communications are in fact internal Department

documents where program review staff or attorneys discuss, respond to and deliberate about the exit interview with Apollo during the on-site program review. See Apollo Ex. A. Therefore, the email communications at issue here are not comparable to the documents in Mead Data Cent., Inc. v. United States Dep't of the Air Force, 566 F. 2d 242, 257-258 (D.C. Cir. 1977). In Mead Data, the documents were communications concerning offers and counter offers with a party outside of the Agency. Here, the documents were internal communications of the Department employees and the deliberations and communications were not shared with Apollo. Therefore, the privileges can be extended to the documents.

Apollo also asserts that the Category 2 privilege log include email communications to the *qui tam* relators. The Department has previously logged or released documents that include communications with the *qui tam* relators under Category 6 asserting the appropriate privileges. The documents contained in this log are communications between and among the OGC attorneys and the program review staff. Although the base email of some communications include documents from the *qui tam* relators that were either released or logged during the Category 6 privilege document review, the email communications here in question pertain to the OGC attorneys and the program review staff and deliberating on the information provided by the relators. The OGC attorneys and program review staff discussed how this information would shape the strategy and conduct of the program review. Therefore, these email communications are internal and are appropriately included in Category 2 and protected under the deliberative process and attorney work product privileges.

16

**E.  The Conduct Of The Department Is Not At Issue In The Shareholder Complaint. Rather, The Primary Issue Is Whether Apollo Informed Shareholders Of The Program Review.**

The Department's interest and the interest of the public in protecting the integrity of the government's decision-making process outweigh any need of Apollo for the information requested.  The Department has determined that the specific information withheld, if disclosed, would reveal the internal decision making processes of the Department throughout the program review.  See July 24, 2007 Talbert Declaration, ¶ 9.  Although Apollo asserts it needs the requested documents to discredit the Report and to cross-examine Department witnesses, Apollo chose to settle the program review with the Department, thereby foregoing its opportunity to pursue its criticisms of the Report to judgment.  Id. See also Settlement Agreement. Additionally, Apollo has not demonstrated that any Department witnesses will appear at trial, negating Apollo's claims of need for these documents for use in cross-examination. Furthermore, the Department will not make these witnesses available to testify at trial or deposition and will contest any effort by either party to compel any appearance by these witnesses. See July 24, 2007 Talbert Declaration, ¶ 9.

Although the shareholder complaint makes citations to the Department's program review report, it is important to note that the actual *substance* of the report is not being litigated in the shareholder case.   The shareholder complaint underlying the subpoena here is based on whether Apollo made materially false and misleading statements to its shareholders concerning whether the Department was conducting the program review and once the Report was issued, whether Apollo had actual knowledge of the findings in the Report.  Apollo Exhibit H, p. 69-70, 81. Whether the Department's findings were properly developed or were fully supported is not relevant to these determinations.  If Apollo had wanted to challenge the conduct or the findings

17

of the program review, then it could have done so through the administrative hearing process. However, on September 7, 2004, rather than pursue administrative litigation contesting the findings of the Report, Apollo chose to pay the Department $9.8 million in settlement of the program review.

Although Apollo attempts to contest the findings of the program review report in the shareholder litigation and thereby seeks the underlying documents concerning the conduct of the program review, the Department continues to assert the attorney work product and deliberative process privilege because of its need to protect the documents at issue. As earlier discussed, the protection of such information is not only justified by the privileges, but release of the information would interfere with future government program reviews where litigation is anticipated from the outset. See Talbert Declaration, ¶ 8, 9. Open and frank discussions between program review staff and their attorneys should be encouraged in order to ensure that the Department performs quality program reviews. Furthermore, when the Department reasonably anticipates that a program review will lead to administrative litigation, documents created by attorneys and their agents should be protected in order to shield the thought processes of attorneys and their litigation strategies from being released. In this case, Apollo could have appropriately challenged the Report had it followed through with administrative litigation. However, because Apollo chose otherwise, the documents it seeks are not relevant to the shareholder litigation. Regardless, the privileges apply to the documents at issue and they should not be released.

## **CONCLUSION**

For all of the foregoing reasons, the Department of Education requests that

Apollo's Motion to Compel be denied.

Respectfully submitted,

/s/
_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/
_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/
_____
HEATHER D. GRAHAM-OLIVER
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W.
Washington, D.C.  20530
(202) 305-1334

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION<br><br><br><br><br><br><br><br>This Document Relates To: Subpoena Action | )<br>)<br>)<br>)<br>) 06-MC-0558 (CKK)<br>) (D. Ariz., No. CV-04-2147-PHX-JAT)<br>)<br>)<br>)<br>)<br>) |

## SUPPLEMENTAL DECLARATION OF JENNIFER L. WOODWARD

I,      Jennifer L. Woodward, declare as follows:

1.      I am an attorney with the United States Department of Education's (Department's) Office of the General Counsel (OGC) in the Postsecondary Education Division. I have been an attorney in that division since September 1992.

2.      The statements contained in this declaration are based upon my personal knowledge, and conclusions, and determinations reached and made in accordance therewith.

3.      Through my position as an attorney with the Department, I have personal knowledge concerning the Department's 2003-04 program review of the University of Phoenix (University), owned by Defendant Apollo Group, Inc. (Apollo). Due to the nature of my official duties, I am familiar with the procedures followed by the Department when performing an institutional program review.

4.      The purpose of this declaration is to supplement my declaration of June 12, 2007.

5.      Program review reports typically follow an on-site visit to a school during which Institutional Review Specialists perform a program review of a school's participation in the student financial assistance programs authorized pursuant to Title IV of the Higher Education

Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq.  See generally 20 U.S.C. § 1099c-1; 34 C.F.R. § 668.112(b).

6.    The University program review was unusual in that its genesis was a qui tam False Claims Act complaint.  Typically, OGC lawyers become involved in a program review process when a draft program review report is sent to OGC for a review of its legal sufficiency. However, in this case, when the government on May 6, 2003, declined to intervene in the qui tam matter, the Department advised the Department of Justice that the qui tam complaint had raised substantial credible evidence that the University had violated section 487(a)(20) of the Higher Education Act; and that, in view of the declination decision, the Department was considering what administrative action to take against the University on account of the alleged violation.  After the government declined to intervene in the *qui tam* action, OGC contacted the Department's Federal Student Aid (FSA) and recommended that FSA conduct a program review. Because the genesis for this program review was the *qui tam* complaint, OGC lawyers had far more involvement in the planning and conduct of the program review than is typical.

7.    Prior to the program review, but after the government declined to intervene in the qui tam action, in June 2003, Russell Wolff, Attorney, OGC, and I interviewed the qui tam relators with their counsel present.  Because we anticipated that the program review would lead to further administrative litigation with Apollo, we interviewed the relators under oath before a court reporter.  We asked pointed questions of the relators in order to substantiate the allegations and to garner information related to planning the strategy of the program review.  In sum, we were involved in determining the strategy of the program review from its inception.

8.    Because the Department anticipated that the program review would be contested, Mr. Wolff and I led and advised the program review team on how to conduct the program

review. This included making decisions regarding the conduct of the review (i.e. what questions to ask during interviews, what sites to visit and when, what documentation to gather on site, how to organize the information gathered, how to conduct the interviews, and what, if any, follow up should occur after the site visits). Our involvement in the program review was not routine OGC involvement in program reviews.

9.       I was the attorney assigned to represent the Department in the qui tam case. Mr. Wolff and I were subsequently assigned to oversee and advise the program review team during the program review. We were not members of the FSA program review team. The FSA team that performed the program review consisted of four Institutional Review Specialists from the Department's FSA office. Because the Department anticipated that the program review would be contested, the FSA program review team received legal assistance from the outset from OGC.

10.       In August 2003, the Department conducted the on-site program review at the University. The purpose of the on-site review was to substantiate the allegations, by gathering evidence and, if appropriate, quantify the extent of the violation, in order to set an appropriate fine amount, which the Department anticipated the University would contest. I participated in many of the interviews that were conducted at that time because the entire program review process was conducted with an eye towards the administrative litigation the Department anticipated would follow (and that, indeed, would have followed in the absence of settlement).

11.       On February 5, 2004, the Department issued a program review report (Report) to the University identifying a violation of the Higher Education Act's prohibition against payment of incentive compensation to student recruiters, 20 U.S.C. § 1094(a)(20). From March 2004 through August 2004, the University responded orally and in writing to the findings in the Report. On September 7, 2004, prior to the issuance of a Final Program Review Determination,

and a fine notice, the University paid the Department $9.8 million to settle the program review finding.

12.    Beginning in October 2004, Apollo filed the first of a series of FOIA requests, followed by subpoenas, seeking information about the program review and the settlement. I reviewed all of the documents in possession of OGC and FSA that were located in response to the FOIA requests and relevant to the program review process and resulting settlement.

13.    The program review, program review report, and the settlement negotiation process consisted of a sequence of legal and policy judgments (i.e., how to investigate the allegations and prosecute the alleged violations, whether and how to issue the Report and the nature of its findings, and whether and on what terms to settle the case). The unusual manner in which the Department became aware of the alleged violations (through unsolicited information submitted by qui tam relators, rather than the more customary Department-initiated review of student and school records), the potentially enormous economic and policy implications of the case, the complex nature of the issues involved, the evidentiary analysis required to prove the violation, and the extraordinary cost of the investigation, all represented highly unprecedented challenges requiring Department lawyers and officials to exercise legal and policy judgment ab initio and at every step of the process, including during the program review.

14.    The integrity of the program review process requires that the documents requested by Apollo remain protected from disclosure under the deliberative process and attorney work product privileges. The documents are reflective of the confidential deliberative processes and attorney work product of the attorneys and investigative team that produced the Department's decisions regarding how to conduct the program review, whether, and in what form, to issue the Report, and whether, and on what terms to settle the case with the University.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.

Executed this 24th day of July 2007.

Jennifer L. Woodward
General Attorney
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE APOLLO GROUP, INC. SECURITIES        )
LITIGATION                                 )
                                           )
                                           )
                                           )
                                           ) 06-MC-0558 (CKK)
                                           ) (D. Ariz., No. CV-04-2147-PHX-JAT)
                                           )
                                           )
This Document Relates To: Subpoena Action  )
                                           )
                                           )
_____)

### DECLARATION OF KENT D. TALBERT

I,      Kent D. Talbert, declare as follows:

1.      I am the General Counsel of the United States Department of Education (Department),

and I have been employed at the Department since August 20, 2001.  Prior to becoming the

General Counsel, I was the Deputy General Counsel for Departmental and Legislative Service

from August 2001 through May 2006.   I have been licensed to practice law in the state of South

Carolina since 1985.

2.      In my official capacity as General Counsel of the Department, I supervise approximately

100 employees who staff a total of seven (7) legal divisions whose collective mission is to

provide legal advice to the Secretary of Education (Secretary) concerning the programs and

policies of the Department.  Under 20 U.S.C. § 3472, the Secretary has delegated to me, as

General Counsel, the authority to assert the deliberative process privilege with respect to

Departmental records created, maintained or otherwise related to the Departmental functions for

which I am responsible.  The statements contained in this declaration are based upon my

1

personal knowledge, upon information provided to me in my official capacity, and upon

conclusions and determinations reached and made in accordance therewith.

3.      This declaration supplements and incorporates by reference my June 15, 2007 declaration

to this Court asserting the deliberative process privilege for documents under Category 5 and

Category 6. The purpose of this declaration is to state to the Court and Apollo the basis for the

Department's assertion of the deliberative process privilege with respect to the documents listed

in the Departments privilege log for Category 2.[1]


## DESCRIPTION OF THE RECORDS

4.      The documents denied to Apollo based on the deliberative process privilege consist of

materials that are both predecisional and deliberative and include:

> a.  Category 2 Privilege Log Email communications between Department
>
>     attorneys and Federal Student Aid (FSA) program review staff, which forward
>
>     and attach draft documents including draft interview questions, draft letters,
>
>     and draft strategy plans;2 and
>
> b.  Category 2 Privilege Log Email communications between Department
>
>     attorneys and FSA program review staff which deliberate on the team's plan
>
>     and strategy for how to conduct the Department's program review in light of
>
>     the fact that the Department anticipated that the review would result in
>
>     administrative litigation. The discussions include deliberations on which sites

---

1 In the April 12, 2007 Joint Agreement, the parties agreed to sort the documents responsive to Apollo's subpoena into six categories including: (1) Category 1: Internal Department documents that explicitly seek or provide legal advice; and (2) Category 2: Internal Department documents concerning the conduct of the program review other than documents contained in Category 1.

2 This sub-category includes 17 cover emails commenting on the 17 draft attachments.

to visit, what documents to gather, how to organize the documents, what witnesses to interview, etc.3

## DELIBERATIVE PROCESS PRIVILEGE

5. Since the program review of the University came to the Department's attention through a <u>qui</u> <u>tam</u> False Claims Act complaint, this program review was unusual in that the investigatory team was lead by OGC attorneys, Jennifer Woodward and Russell Wolff. While it is true that, on May 6, 2003, the government declined to intervene in the <u>qui</u> <u>tam</u> case, the Department advised the Department of Justice that the Department had substantial evidence that the University had violated section 487(a)(20) of the Higher Education Act; and that, in view of the declination decision, the Department was considering what administrative action to take against the University on account of the violations. The program review was initiated and lead by OGC; thus it is within my authority to assert the deliberative process privilege as it pertains to the documents and communications related to the conduct of the program review.

6. During the time period from June 2003 through November 2003, the Department engaged in a series of deliberations to determine how to conduct the program review in light of the fact that the Department anticipated that the program review findings would result in administrative litigation. The email communications and draft attachments listed in the Category 2 Privilege log, relate to the Department's consideration of how to conduct the review in light of the anticipated administrative litigation.

7. The conduct of the program review comprised a series of Department legal and policy decisions (<u>i.e.</u>, how to investigate the alleged violations and conduct the program review, how

---

3 This sub-category includes 35 deliberative email communications.

much information to gather in light of the substantive evidence provided to the Department from the qui tam relators, and what strategy to use in light of the anticipated litigation). The unusual manner in which the Department became aware of the alleged violations (through unsolicited information submitted by qui tam relators rather than the more customary Department-initiated review of student and school records), the potentially enormous economic and policy implications of the case, the complex nature of the issues involved, the evidentiary analysis required to prove the violation, and the extraordinary cost of the investigation, all represented highly unprecedented challenges requiring Department lawyers and officials to exercise legal and policy judgment ab initio and at every step of the process.

8.   The Category 2 emails and attachments are reflective of the confidential deliberative processes that produced the Government's decisions regarding how to conduct the program review. 17 of the Category 2 emails forward and comment on draft attachments. Those attachments comprise draft documents generated by Department attorneys and program staff involved in making decisions related to the strategy planning for the program review in light of the anticipated litigation; disclosure of such drafts would reveal the nature of the Department's deliberations. Furthermore, almost all of the Category 2 communications asserting the deliberative process privilege comprise email communications generated by OGC attorneys or the program review staff sharing their opinions, recommendations, or advice about the Department's strategy and approach for conducting the program review.

9.   In addition, the Department's interest and the interest of the public in protecting the integrity of the government's decision-making process outweigh any need of Apollo for the information requested. In making this analysis, the Department has determined that the specific information withheld, if disclosed, would reveal the internal decision making processes of the

Department throughout the program review. Indeed, while Apollo has asserted it needs these documents to discredit the Report and to cross-examine Department witnesses, I note that Apollo chose to settle the program review with the Department, thereby foregoing its opportunity to pursue its criticisms of the Report to judgment.   In addition, Apollo has not demonstrated that any Department witnesses will appear at trial, negating Apollo's claims of need for these documents for use in cross-examination.  If such an appearance were in the offing, the employee would need to obtain permission from the Department to appear. 34 C.F.R. Part 8.  The Department will not make these witnesses available to testify at trial or deposition and will contest any effort by either party to compel any appearance by these witnesses.

    10.   For all of the foregoing reasons, I assert the Department's deliberative process privilege with respect to the documents or portions of documents described in the privilege log for Category 2.


    Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 24th day of July, 2007.

_____
Kent D. Talbert
General Counsel
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

April 4, 2007

Via U.S. Mail and E-Mail

Kristopher P. Diulio, Esq.
Gibson Dunn and Crutcher LLP
4 Park Plaza
Suite 1400
Irvine, CA 92614

                              Re:    In re: Apollo Group Securities Litigation
                                     Misc. No. 06-0558 (D.D.C.)

Dear Mr. Diulio:

My clients very much appreciate the opportunity to meet with you and Messrs. Cox and Boutros on Wednesday, April 4, 2007.  The meeting served the purposes of: (1) identifying areas of agreement and defining remaining obstacles to an agreed plan and production schedule for the Department of Education's privilege log; (2) identifying and prioritizing mutually acceptable categories for documents responsive to your July 3, 2006 subpoena; and (3) exploring possible ways for the parties to narrow the questions remaining for the Court's determination, or possibly to resolve the matter altogether (e.g., the Department's agreement to make a discretionary production of the responsive documents Apollo considers to be most relevant to its defense of the shareholder lawsuit and/or by Apollo's agreement to narrow the scope of its subpoena). These items are discussed in turn below.

At the April 4th meeting, the parties initially confirmed their agreement in prior correspondence (i.e., the Department's letter dated March 28, 2007 and Apollo's letter dated March 30, 2007) as to the form and content of the privilege log and its production on a "rolling" basis. The parties further agreed to the document categories proposed by Apollo in its March 30 letter, with the following modifications and clarifications:  Categories 1 and 2 should be combined; and Category 5 should be modified to read "Department analysis of the information provided by

Apollo in response to the issuance of the February 5, 2004 Program Review Report."[1]  Finally, the parties agreed that the Department will produce its privilege log for Categories 5 and 6 first, based on Apollo's assertion that the documents in those categories are the most relevant and necessary to its defense of the shareholder lawsuit.  The parties continued to be at odds regarding a production schedule for the privilege log, due to the May 11, 2007 filing deadline for Apollo's motion for summary judgment and limited Department resources available for production of the privilege log.

The parties discussed possible ways to deal with this impasse.  Toward this end, Apollo asked the Department, by COB today, to advise Apollo: (1) of the approximate volume of the documents in Categories 5 and 6; (2) of whether it would make a discretionary production of any of the documents in Categories 5 and 6; and (3) of the date(s) on which it would (a) make any such discretionary disclosures and (b) produce the privilege log for the remaining documents in Categories 5 and 6.  I am pleased to respond to Apollo's request with the following offer made by the Department to Apollo in good faith, and for the purpose of resolving this matter without further intervention by the Court:

The Department has undertaken a significant review of the documents at issue and has determined, based on that review, that the documents subject to Apollo's motion to compel (i.e., the documents responsive to the July 3, 2006 subpoena, exclusive of materials eliminated by Apollo at the April 4 meeting (see Note 1 supra)), comprise approximately of 4,000 pages, roughly categorized as follows: Category 6: approximately 2,000 pages; Category 5: approximately 1,000 pages; Categories 1-4: approximately 1,000 pages.

As a matter of administrative discretion and without waiving any otherwise applicable privilege(s), and in exchange for Apollo's agreement to withdraw its motion to compel as it pertains to the internal privileged Department documents in Categories 1 through 4, the Department is prepared to produce to Apollo, on the schedule indicated: (1) Category 6 – All notes of witness interviews, exclusive of information identifying said witnesses (weekly productions, to commence on April 16, 2007, and to be completed on or before April 30, 2007); (2) Category 5 – All data and charts supporting the Department's final trend line analysis prepared in response to the information provided by Apollo after the issuance of the February 5, 2004 Program Review Report, exclusive of information identifying witnesses and other sources (April 11, 2007); (3) Privilege Log for Remaining Category 5 Documents (April 16, 2007); and (4) Privilege Log for Remaining Category 6 Documents (weekly productions, to commence on April 16, 2007, and to be completed on or before April 30, 2007).

I am hopeful that the parties can agree to this proposal, especially in view of Apollo's acknowledgment during the April 4 meeting that the internal Department documents in Categories 1 through 4 are both likely to be found privileged and relatively unimportant to Apollo's defense of the securities case.  Further, I understand from my clients that production of a privilege log for the Category 1-4 documents would be especially burdensome and time-

---

[1]  Apollo further modified its demand to exclude from the scope of the subpoena (and the required privilege log) all documents produced with redactions made only for names, addresses, phone numbers, and/or social security or other identifying numbers.

consuming, due to the fact that logging said documents would require individually listing a high volume of 1-3 page e-mail messages and other communications.

In light of the Department's obligation to submit its proposed plan for producing the privilege log to the Court on April 11, 2007, I am requesting Apollo's response to this proposal for resolving the issues associated with its motion to compel as soon as possible.

_____          Very truly yours,


                                          Jeffrey Taylor
                                          U.S. Attorney


                              By:    _____/s/_____
                                          Heather Graham-Oliver
                                          Assistant United States Attorney

## UNITED STATES DEPARTMENT OF EDUCATION

IN THE MATTER OF
THE UNIVERSITY OF PHOENIX

### SETTLEMENT AGREEMENT

The United States Department of Education (the "Department") and the University of Phoenix Inc. and Western International University Inc. (together "UOP")enter into this Settlement Agreement ("Agreement") for the purpose of resolving the Department's program review regarding compliance by UOP with 20 U.S.C. §1094(a)(20) (the "statute") and 34 C.F.R. §668.14(b)(22) (the "regulation") during the period from September 1, 1998 through June 30, 2004. To avoid the burdens and expenses of continuing the program review, and any other or future Department proceedings or litigation that may arise from the program review, except as referenced in paragraph I.E., and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties hereby agree to resolve the program review as follows:

I.

A.    The Department reviewed UOP's methods of compensating recruiters of students (the "methods") during the period from September 1, 1998 through February 29, 2004 and UOP's implementation of the methods (the "implementation"), and the Department issued a program review report, dated February 5, 2004. The program review report was one step in an ongoing process designed to foster institutional compliance with the law. The program review report explicitly invited and anticipated review and response by UOP. UOP provided the Department with a response to the program review report, including statistical analyses addressing and purporting to rebut the program review report's conclusions. UOP strongly disputes the program review report's methodology and conclusions. This Agreement resolves all issues raised in the program review report, and no final program review determination has been or will be issued.

B.    This Agreement, and all negotiations relating to it, and any proceedings taken hereunder, are not an admission or concession by either party of any liability, wrongdoing or violation whatsoever. But to resolve the program review, and to avoid the cost of future litigation, UOP agrees to pay the sum of $9,800,000 to the Department. UOP will make this payment by sending a check made payable to the "U.S. Department of Education," within 15 calendar days of receiving a copy of this Agreement that has been fully executed by both parties, to the following address:

Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, S.W.
Room 6E300
Washington, D.C. 20202

C.    The Department acknowledges that recently published revisions to the regulation clarify the scope and meaning of the statute. *See* Federal Student Aid Programs, 67 Fed. Reg. 67048, 67049 (Nov. 1, 2002) (codified at 34 C.F.R. § 668.14) (effective July 1, 2003) (amending § 668.14 "to clarify the statutory program participation agreement provision concerning incentive payment restrictions").

D.    This Agreement does not waive, compromise, restrict or settle any future actions against UOP by the Department pursuant to 34 C.F.R. Part 668, Subparts G and H for any alleged violation of the statute or the regulation that occurs outside of the time period covered by the program review. This Agreement also does not waive, compromise, restrict or settle any past, present or future actions by the Department pursuant to 34 C.F.R. Part 668, Subparts G and H that are unrelated to the program review.

E.    The Department does not have the authority to, and this Agreement does not, waive, compromise, restrict or settle any past, present or future violations by UOP, its trustees, officers or employees of the criminal laws of the United States or any action initiated against UOP, its trustees, officers or employees for civil fraud against the United States under 31 U.S.C. §§ 3729-33. Notwithstanding the preceding sentence, the Department warrants and acknowledges that it is not presently aware of any investigations, regulatory proceedings, or administrative or enforcement actions currently contemplated by, or pending before the Department or any other federal agency that relate to the methods or implementation.

F.    Subject to paragraphs I.D. and I.E. of this Agreement, the program review is hereby officially closed and the Department will not (i) undertake any further administrative investigation, audit, review, analysis, examination, inquiry, probe or proceeding whatsoever regarding the methods or the implementation during the period of September 1, 1998 through June 30, 2004; (ii) institute or pursue any other or future administrative action or proceeding against UOP with respect to, arising out of or in any way relating to the methods or the implementation during the period of September 1, 1998 through June 30, 2004; or (iii) impose on UOP any penalty, repayment liability, administrative fine or other sanction (including, without limitation, changing the method by which the institution requests, and the Department provides, federal student financial aid) with respect to, arising out of or in any way relating to the methods or the implementation during the period of September 1, 1998 through June 30, 2004. The Department acknowledges and agrees that this Agreement does not constitute a basis for: a) asserting that UOP lacks administrative capability or financial responsibility under 34 C.F.R. § 668.15, 34 C.F.R. § 668.16, or 34 C.F.R. Part 668, Subpart L; or b) placing or maintaining UOP under a provisional form of Title IV Program Participation Agreement.

II.

A.    Each party agrees to pay its own costs with regard to the program review and settlement.

B.     UOP and the Department each warrant and represent that its undersigned representative is authorized to sign this Agreement on its behalf and bind that party to all of the terms and provisions herein.

C.     This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings between counsel for the parties, and the parties themselves, with respect to the matters provided for herein.  Any amendment to this Agreement must be in writing and signed by the parties to this Agreement or their successors.

D.     Each of the parties participated and cooperated in the drafting and preparation of this Agreement.  Accordingly, the parties agree that neither this Agreement nor its terms should be construed against either of the parties by reason of its lack of participation in the drafting or preparation of the Agreement.

UOP and the Department have each read this Agreement, understand the terms and provisions herein and cause this Agreement to be executed by its duly authorized representative.

DATED:   9/3  , 2004

_____
Todd S. Nelson
Chairman and Chief Executive Officer
Apollo Group, Inc.

DATED:   9/7  , 2004

_____
Victoria Edwards
Acting Director     General Manager
Case Management & Oversight  School
Federal Student Aid               Eligibility
United States Department of Education  Channel