**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | ) ) ) ) ) **06-MC-0558 (CKK)** ) **(D. Ariz., No. CV-04-2147-PHX-JAT)** ) ) |
| This Document Relates To: Subpoena Action | ) ) ) |

**RESPONDENT'S NOTICE OF ADDITIONAL FACTUAL AND**
**LEGAL DEVELOPMENTS**

The Respondent, United States Department of Education ("DOE"), by and through its

undersigned counsel respectfully submits the following Notice of Factual and Legal

Developments pursuant to this Court's Order of May 19, 2008.

I.    Background

On May 6, 2003, the Department of Justice declined to intervene in a qui tam matter.

However, DOE advised the Department of Justice that the qui tam complaint had raised

substantial credible evidence that the University of Phoenix (University), owned by the Apollo

Group Inc., (Apollo) had violated section 487(a) (20) of the Higher Education Act; and that, in

view of the declination decision, DOE was considering what administrative action to take against

the University on account of the alleged violation. See June 24, 2007 Woodward Declaration,

¶ 6.  As a result, Federal Student Aid (FSA) conducted a program review based on the initial

information received from the qui tam relators.  On August 2003, DOE conducted the on-site

program review at the University.  Id. ¶ 10.   The purpose of the on-site review was to

substantiate the allegations, by gathering evidence and, if appropriate, quantify the extent of the

violation, in order to set an appropriate fine amount, which DOE anticipated the University

would contest.  On February 5, 2004, DOE issued a program review report (Report) to the

University identifying a violation of the Higher Education Act's prohibition against payment of

incentive compensation to student recruiters, 20 U.S.C. § 1094(a)(20).  From March 2004

through August 2004, the University responded orally and in writing to the findings in the

Report.  On September 7, 2004, the University paid DOE $9.8 million to settle the program

review.  Id. ¶ 11.

In seeking documents for its defense in a securities class action, Apollo issued a

subpoena to DOE and later filed a Motion to Compel on December 19, 2006.  On January 19,

2007, DOE filed (1) an Opposition to the Petitioner's Motion to Compel and (2) a Cross Motion

to Quash the subpoena issued to DOE.  On March 12, 2007, this Court issued a Memorandum

Opinion and Order that required DOE to produce a privilege log.

On April 12, 2007, DOE and Apollo entered into a Joint Agreement (Agreement)

whereby the DOE agreed to make a voluntary and discretionary production of certain documents

and to produce a privilege log on a rolling basis in exchange for Apollo limiting the scope of the

subpoena.  Pursuant to the Agreement, in a series of weekly responses, on June 7, 2007, DOE

fulfilled its obligations per the Agreement and produced a privilege log encompassing a review

of over 4000 pages of documents and produced over 1600 pages of documents to Apollo.

However, Apollo continued to contest the legitimacy of DOE's asserted privileges.  Therefore,

the parties engaged in motions practice throughout June and July 2007.  DOE filed its final

Opposition Brief on July 24, 2007.  There has been no subsequent briefing or correspondence

related to this specific matter between the parties.

II.    <u>Developments</u>

DOE stands by its assertion of the attorney work product privilege, attorney client privilege and deliberative process privilege, with respect to the documents contained in the privilege log and not produced in response to Apollo's subpoena, and respectfully asks the Court to sustain its assertion of these privileges.   No recent legal developments have impacted the arguments fully supporting the asserted privileges in the DOE's briefings to the Court.  Apollo's assertion that the DOE has failed to comply with the subpoena continues to remain baseless.  In fact, the DOE has consistently responded to Apollo's requests for information and documents through a series of Freedom of Information Act requests and subpoenas since October of 2004. DOE devoted significant manpower to fulfill its legal obligations to produce relevant and responsive records requested by the subpoena while diligently asserting the appropriate legal and government privileges available under the law.  Apollo's failure to obtain records it asserts *may have* assisted in its defense in the securities action, cannot be attributed to any delay on the part of DOE and need not be a consideration by this Court in its consideration of DOE's proper assertion of privileges.

Subsequent to the parties' briefings, the securities action involving Apollo proceeded to a federal jury trial which resulted in a judgment against Apollo on January 30, 2008.  Although Apollo argues that it has been prejudiced by the DOE's failure to produce relevant documents responsive to the subpoena, such assertion is without foundation.  As DOE has continuously argued, the accuracy and truth of the Report is not relevant to the underlying securities action. Rather, the issue in that case was whether Apollo violated any duty to its shareholders when reporting certain information to its shareholders and the financial market in September of 2004. <u>See</u> Plaintiff's Opposition to Defendant's Motion for New Trial Pursuant to Rule 59, p. 6 (March

3, 2008). The disclosures at issue in the underlying securities litigation took place after Apollo settled with DOE and in fact appear to relate to statements made by Apollo in response to the $9.8 million dollar settlement with DOE. In the instant action, before this Court, Apollo argued that the documents at issue were necessary to show that the Report was "inaccurate, biased and otherwise untrustworthy"; ultimately at trial, however, Apollo argued that it was not "challenging the accuracy" of the Report. Id. at p. 20. Because Apollo subpoenaed the materials at issue for the purpose of challenging the report at trial, it cannot now demonstrate any need that could possibly outweigh the DOE's privileges in them. Therefore, because the accuracy of the Report was not and is not at issue in the shareholder litigation the privileged materials at issue should be protected.

Respectfully submitted,

/s/
_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/
_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/
_____
HEATHER D. GRAHAM-OLIVER
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W.
Washington, D.C. 20530
(202) 305-1334

William G. Fairbourn (003399)
Andrew S. Friedman (005425)
Francis J. Balint, Jr. (007669)
Kathryn Jann (020849)
BONNETT, FAIRBOURN, FRIEDMAN
    & BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, AZ  85012
E-mail afriedman@bffb.com
Telephone:  (602) 274-1100
Facsimile:   (602) 274-1199

*Local Counsel for Lead Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| In re APOLLO GROUP, INC. SECURITIES LITIGATION | Lead Case No.  CV 04-2147-PHX-JAT |
|---|---|
| This Document relates to:<br><br>ALL ACTIONS. | <u>CLASS ACTION</u><br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO RULE 59**<br><br>CTRM:   503, 5th Floor<br>JUDGE:  Hon. James A. Teilborg |

# TABLE OF CONTENTS

Page

Memorandum of Points and Authorities ............................................................. 1

I.    Introduction ........................................................................................ 1

II.   Applicable Standard on Motion for New Trial ......................................... 2

III.  Legal Argument .................................................................................. 3

      A.    The Jury Was Correctly and Adequately Instructed .................................. 3

            1.    The Jury Was Properly Instructed Regarding Loss Causation. ......... 3

            2.    The Jury Was Properly Instructed Regarding Duty. ......................... 6

            3.    The Jury Was Properly Instructed Regarding Scienter. .................... 9

            4.    The Jury Was Properly Instructed Regarding Falsity. .................... 11

            5.    The Jury Was Properly Instructed Regarding the "Rapid" Rate
                  of Market Absorption. ...................................................... 12

            6.    The Jury Was Properly Instructed Regarding Materiality. .............. 13

      B.    The Court's Challenged Evidentiary Rulings Were Sound. ....................... 14

            1.    The Court Properly Handled the UBS Reports. ............................ 14

                  a.    The UBS Reports are relevant only for notice to the
                        market of corrective information. ................................. 14

                  b.    Exclusion of Ms. Flynn as an "impeachment" witness was
                        appropriate. ................................................... 15

            2.    The Court Properly Excluded Rationale Testimony by Defendants'
                  Legal Advisors. ................................................................ 16

            3.    The Court Properly Admitted Dr. Feinstein's Limited Testimony. . 18

      C.    There Was No Misconduct by Plaintiffs' Counsel ................................... 20

IV.   Conclusion ...................................................................................... 23

i

# TABLE OF AUTHORITIES

**CASES**                                               **Page**

*Alaska Airlines v. Oszman,*
    181 F.2d 353 (9th Cir. 1950) ................................................. 10

*Allied Chem. Corp. v. Daiflon, Inc.,*
    449 U.S. 33 (1980) .............................................................. 2

*Ambrose v. U.S. Steel Corp.,*
    1985 WL 333 (N.D. Cal. Aug. 28, 1985) ................................ 22

*Anheuser-Busch, Inc. v. Natural Beverage Distributors,*
    69 F.3d 337 (9th Cir.1995)..................................................... 20

*Bachman v. St. Monica's Congregation,*
    902 F.2d 1259 (7th Cir. 1990) ............................................... 6

*Barzelis v. Kulikowski,*
    418 F.2d 869 (9th Cir. 1969) ............................................... 23

*Basic v. Levinson,*
    485 U.S. 224 (1988) ............................................................ 12

*Bisno v. U.S.,*
    299 F.2d 711 (9th Cir. 1961) ......................................... 10, 11

*Chalmers v. City of Los Angeles,*
    762 F.2d 753 (9th Cir. 1985) ............................................... 14

*Claar v. Burlington N.R.R.,*
    29 F.3d 499 (9th Cir. 1994) ................................................. 19

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 U.S. 336 (2005) ............................................................. 3

*In re Daou Sys., Inc. Sec. Litig.,*
    411 F.3d 1006 (9th Cir. 2005) ............................................... 5

*In re Dura Pharmaceuticals, Inc. Sec. Litig.,*
    452 F. Supp. 2d 1005 (S.D. Cal. 2006)..................................... 5

*In re Northern Telecom Ltd. Sec. Litig.,*
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................... 19

*Jinro Am., Inc. v. Secure Invs., Inc.,*
    266 F.3d 993 (9th Cir. 2001) ............................................... 19

*Kaiser Steel Corp. v. Frank Coluccio Constr. Co.,*
    785 F.2d 656 (9th Cir.1986)............................................ 20, 23

*Kendall-Jackson Winery, Ltd. v. E.&J. Gallo Winery,*
    150 F.3d 1042 (9th Cir. 1998) ............................................... 3

*Los Angeles Memorial Coliseum Comm'n v. National Football League,*
    726 F.2d 1381, (9th Cir. 1984) .............................................. 3

*Merrill v. County of Madera,*
 2007 WL 4365579 (E.D. Cal. Dec. 11, 2007) ......................................................22, 23

*Molski v. M.J. Cable, Inc.,*
 481 F. 3d 724 (9th Cir. 2007) ....................................................................................2, 23

*Murphy v. City of Long Beach,*
 914 F.2d 183 (9th Cir.1990) ......................................................................................2, 14

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West*
 *Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ......................................................12, 14

*Ong v. Sears, Roebuck & Co.,*
 459 F. Supp. 2d 729 (N.D. Ill. 2006) ...............................................................................5

*Passantino v. Johnson & Johnson Consumer Prods.,*
 212 F.3d 493 (9th Cir.2000) ......................................................................................2, 23

*Renda v. King,*
 347 F.3d 550 (3d Cir. 2003).............................................................................................17

*SEC v. Bonastia,*
 614 F.2d 908 (3rd Cir. 1980) ...........................................................................................11

*SEC v. Goldfield Deep Mines Co. of Nevada,*
 758 F.2d 459 (9th Cir. 1985) ...........................................................................................10

*Shimko v. Guenther,*
 505 F.3d 987 (9th Cir. 2007) ......................................................................................2, 23

*Sorkilmo v. Qwest Corp.,*
 2006 WL 778706 (D. Ariz. Mar. 27, 2006) ......................................................................2

*U.S. v. Kenny,*
 911 F.2d 315 (9th Cir. 1990) ...........................................................................................10

*United States v. Dring,*
 930 F.2d 687 (9th Cir. 1991) ...........................................................................................17

*United States v. Hanna,*
 293 F.3d 1080 (9th Cir. 2002) .........................................................................................19

Statutes

15 U.S.C. §78u-4(c).............................................................................................................15

Rules

Rule 608(a) ..........................................................................................................................17

Rule 608(a)(2)......................................................................................................................17

## Memorandum of Points and Authorities

## I.    Introduction

The Defendants received a fair trial in this case and were given wide latitude to present their case to the jury.  Following a trial of 24 days, with testimony received from 23 witnesses and the introduction of more than 240 exhibits resulting in a trial transcript that is more than 4000 pages long, Defendants Apollo Group, Inc., Todd Nelson and Kenda Gonzales have cobbled together bits and pieces of the record, misconstrued and out of context, in an effort to create the illusion of unfairness.  In truth, all but seven of the witnesses at trial were either represented by defense counsel or were experts hired by Defendants.  The majority of the documentary evidence was produced by Defendants. The presentation before the jury by Plaintiff was free of undue prejudice and the Court precluded certain evidence that it believed might present a risk of undue prejudice.  The Court permitted the Defendants to attack the accuracy of the Program Review Report and the integrity of the sources relied upon by the Department of Education.  Indeed, the Defendants introduced evidence via witness testimony and documentation in an attempt to contradict both the content and findings of the Program Review Report.  In addition, the Court put Plaintiff through its paces to establish securities fraud liability on the part of Defendants.  In particular, the Court squarely teed up the disputed issue of loss causation, instructing the jury:

> The alleged misrepresentations and omissions in this case could have caused the plaintiff to suffer damages only if you determine that the analyst reports issued by Kelly Flynn on September 20, 2004 were corrective disclosures.  If you conclude that these were not corrective disclosures, then you cannot find that a misrepresentation or omission caused the plaintiff to suffer damages.

[Doc. #496, at 20]. The Defendants were given an adequate opportunity to examine Lead Plaintiffs econometrics and financial expert and engage in a vigorous "battle of experts." The major disagreement between the parties' respective experts, meanwhile, was the length of the appropriate "event window" based on the evidence presented.  Indeed, the Defendants' expert Dr. Kenneth Lehn acknowledged that, accepting *arguendo* Dr. Steven Feinstein's recommended event window, he had no significant dispute with Dr.

Feinstein's damages methodology or $5.55 per share conclusion. Trial Transcript ("Tr."), at 3436:19-3437:10; 3544:11-3545:3; 3547:3-13.

Having weighed the evidence and considered the fact intensive issue of loss causation, the jury entered a verdict for Plaintiff. Now, unhappy with the outcome, Defendants demand a new trial. "Defendants' Motion for New Trial Pursuant to Rule 59 [Doc. #523] (hereinafter, "D. Memo"). As shown below, however, there is no proper basis to retry this case.

## II. Applicable Standard on Motion for New Trial

The grant of a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." *Murphy v. City of Long Beach,* 914 F.2d 183, 186 (9th Cir.1990) (quoting *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36 (1980)). The Ninth Circuit has recently held that "[t]he trial court may grant a new trial *only* if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F. 3d 724, 729 (9th Cir. 2007) (emphasis added) (quoting *Passantino v. Johnson & Johnson Consumer Prods.,* 212 F.3d 493, 510 n. 15 (9th Cir.2000)); *accord Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007).

Defendants in their Motion do not contend the jury's verdict in the present case was "contrary to the clear weight of the evidence," or based on "false or perjurious testimony." Rather, they argue only that the verdict is a "miscarriage of justice," D. Memo at 1:1, because the Court purportedly (a) erred in instructing the jury and (b) erred in the admission or exclusion of certain evidence. D. Memo, at 1:1, 1:7-9 & 3:5-14. To the contrary, the jury was properly instructed and the challenged evidentiary rulings were solid; there is no basis for the Court, in its sound discretion, to conclude that the verdict amounts to a "miscarriage of justice." *Sorkilmo v. Qwest Corp.*, CV 02-2467-PHX-JAT, 2006 WL 778706, at *2 (D. Ariz. Mar. 27, 2006) (denying motion for new trial).

### III.    Legal Argument

#### A.    The Jury Was Correctly and Adequately Instructed

Jury instructions need only describe the applicable law in a manner that permits the jury intelligently to decide the issues. *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 726 F.2d 1381, 1398 (9th Cir. 1984).  "The question ... is whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to insure that the jury fully understood the issues. A court is not required to use the exact words proposed by a party, incorporate every proposition of law suggested by counsel or amplify an instruction if the instructions as given allowed the jury to determine intelligently the issues presented." *Id.* 726 F.2d at 1398 (citations omitted).    District courts have broad discretion in tailoring jury instructions as long as the instructions are fair, adequate and not misleading.  *Kendall-Jackson Winery, Ltd. v. E.&J. Gallo Winery*, 150 F.3d 1042, 1051 (9th Cir. 1998). A trial court may in its discretion grant a new trial only if "firmly convinced" that its error in instruction resulted in a miscarriage of justice.  *Murphy*, 914 F.2d at 187.

#### 1.    The Jury Was Properly Instructed Regarding Loss Causation.

Nothing in the Court's instructions on loss causation and damages was erroneous, inadequate or unfairly prejudicial to Defendants.  The loss causation instruction given by the Court was consistent with the Ninth Circuit Manual of Model Jury Instructions Civil No. 18.6. Defendants' contention that the Ninth Circuit Model Instruction is somehow inconsistent with *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) is completely baseless; in fact, *Dura* is included among the cases cited in support of the Model Instruction!    *See Ward Decl. Ex. K.*[1]  As this point suggests, Defendants fundamentally misconstrue *Dura*.

In *Dura*, the plaintiff had alleged that defendant Dura Pharmaceuticals, Inc. ("DPI") between April 1997 and February 1998 ("the class period") made misleading statements regarding a new asthmatic spray device which at that time was pending FDA

---

[1]  All references to "Ward Decl. Ex. __" herein refer to exhibits attached to the Declaration of Samuel M. Ward filed in concurrently with and in support of this document.

approval.  In November 1998, however, DPI announced that the FDA would not approve DPI's spray device, and the next day DPI's stock price temporarily fell (but almost fully recovered within a week).  The plaintiffs brought suit on behalf of those who purchased during the class period, claiming that they had paid an inflated price for their stock purchases; significantly, though, the plaintiffs did not allege that the stock price drop in November 1998 was caused in any way by the earlier alleged misstatements. The district court dismissed for failure to allege loss causation, but the Ninth Circuit on appeal held that to plead a Rule 10b-5 claim, the plaintiffs need not allege any sort of corrective disclosure and consequent stock price drop:

> [L]oss causation does not require pleading a stock price drop following a corrective disclosure or otherwise.  It merely requires pleading that the price at the time of the purchase was overstated.

339 F.3d at 938.  In doing so, the Ninth Circuit acknowledged that its approach — allowing loss causation to be plead by simply alleging stock price inflation — differed from that followed in other Circuits.  *Id.* at 938 n.4.

The Supreme Court rejected the notion that loss causation is satisfied "simply by alleging in the complaint and subsequently establishing that 'the price' of the security 'on the date of purchase was inflated because of the misrepresentation.'"  544 U.S. at 338 (quoting the Ninth Circuit).  The plaintiff must, rather, allege and then prove that the misleading statement proximately caused an economic loss.  *Id.* at 345-46.  While a plaintiff need not plead loss causation with special particularity, it must still provide a defendant with "some indication of the loss and the causal connection" between the defendant's conduct and that loss. *Id.* at 347.  The Supreme Court concluded: "In sum, we find the Ninth Circuit's approach inconsistent with the law's requirement that a plaintiff prove that the defendants' misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss. We need not, and do not, consider other proximate cause or loss-related questions." *Id*, at 346.  Because the plaintiff had relied exclusively on the allegation of an artificially inflated purchase price, the Supreme Court reversed and remanded. *Id.* at 347-48.

4

Notably, on remand the district court held that allegations in the plaintiffs' third amended complaint linking the stock price drop to a series of corrective disclosures did adequately allege loss causation under *Dura*. *In re Dura Pharmaceuticals, Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1022-23 (S.D. Cal. 2006). The district court in particular rejected the notion that *Dura* precluded the plaintiffs from establishing loss causation based on corrective disclosures that occurred after the class period ended.  452 F. Supp. 2d at 1023.

*Dura* did not, therefore, repudiate the substantive rule that proximate causation is satisfied if the alleged misrepresentation or omission played "a substantial part in causing" the alleged loss.  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (citing extensively to *Dura*) ("[a]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement"); *see generally Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 747-48 (N.D. Ill. 2006) (acknowledging *Dura*'s limited holding). *Dura* instead rejected a lenient pleading standard allowing a plaintiff to allege loss causation by simply alleging stock price inflation or that the misrepresentation otherwise merely "touched upon" the alleged loss.  Lead Plaintiff did neither here at trial.

Nor did the Court instruct the jury using the "touched upon" test of causation criticized by the Supreme Court.  Instead – completely congruent with *Dura* – the Court properly articulated the post-*Dura* tests for the determination of loss causation ["To show that the alleged material misrepresentation or omission was the cause of its economic injury, the plaintiff must prove by a preponderance of the evidence that the alleged misrepresentation or omission played a substantial part in causing the loss plaintiff suffered."] and for the calculation of damages ["Actual damages are calculated as the decline in the plaintiff's stock value that was caused by defendant's misrepresentation or omission."].  Doc. #496, at 20 & 23.  Defendants offer nothing to support their contention that, even though it was given separate instructions on determining the ***fact*** of injury and calculating the ***amount*** of damages, the jury somehow incorrectly equated the two.  D. Memo, at 6:20-23. And because the Court's instructions are unimpeachable, reference to

those instructions in Plaintiffs' closing statement can hardly be said to have prejudiced Defendants. D. Memo, at 7:14-18. Ultimately, Plaintiff **proved** loss causation consistent with *Dura*. Indeed, the loss causation instructions assumed the need to prove a "corrective disclosure" even though those words are mentioned nowhere in *Dura*, such that (if anything) the carefully worded the instruction favored rather than prejudiced Defendants.

### 2.    The Jury Was Properly Instructed Regarding Duty.

The fundamental premise of Plaintiff's case was that Defendants violated a duty not to mislead once they chose to speak to the market. *See*, *e.g.*, Tr. 3404:20 - 3406:15 (emphasizing same); *id.*, at 3727:25 - 3728:4 (Plaintiff's case "does not have anything to do with an absolute duty to disclose. It is premised on the duty that defendants have to speak the truth when speaking to the market."). Defendants themselves acknowledged as much: "[I]t's become clear that [this is] a misrepresentation case, i.e., there was no absolute or affirmative duty to disclose the Program Review Report, but when the defendant spoke to the market about the subject, Plaintiffs claim, the duty arose." Tr. 3401:22-3402:1; *accord*, Tr. 3792:10-15. Defense Counsel in his own closing stated that he "[didn't] know how many times you heard during plaintiff's closing argument here that Apollo didn't paint the complete picture, didn't paint the full picture, didn't paint a clear picture." Tr. 3926:8-11.

Nevertheless, Defendants now argue that they were entitled to have the jury instructed as to a **non-issue**: *i.e.*, that they had no general duty to disclose the Report had they **not** spoken to the market. D. Memo, at 7-8. *But see Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1263 (7th Cir. 1990) ("there is no reason to instruct a jury on a nonissue"). Defendants in their Motion claim three forms of prejudice in the failure of the Court to instruct on this non-issue, none of which have merit.

First, Defendants assert that they were prejudiced because the proposed instructions were correct statements of the law. D. Memo, at 10:5-12. Even if accepted *arguendo*, the point does not amount to prejudice because (as just noted) a party is not entitled to instructions on matters not in issue.

6

Second, based on a few snippets taken out of context from Plaintiff's closing argument, Defendants contend that the case somehow morphed into a "general duty to disclose case." D. Memo, at 10:13-11:7.[2] In reality, in closing argument, Plaintiff made it unequivocally clear that the liability for each alleged misrepresentation or omission was premised on the Defendants' duty to speak the full truth when they spoke to the market; for example:

> That's what this case is all about, and what the evidence has showed, what the evidence has showed is that because of this plan to conceal that information, *to not paint the full picture when they spoke*, they violated the federal securities laws.

Tr. 3840:21-25 (emphasis added). Indeed, Plaintiff's closing argument was replete with references to Defendants' speaking to the market; for example:

> You are not going to hear an instruction that … gives you a bases (sic) *to lie to the market when you talk about the very matter* but you don't make full disclosure, you don't make correct disclosure, you don't make a disclosure of the truth that lets the market know what's really going on.

Tr. 4041:16-23 (emphasis added); and:

> It's not a question of whether [Mr. Nelson] sat back and decided never to say anything. As soon as he opened his mouth, talked about governmental intervention, as soon as he started to speak on the topic he had to speak honestly, truthfully, fully, completely.

Tr. 4045:5-10; *accord* Tr. 4043:2-4 (defendants "keep talking about all the stuff going on around them, but they never talk about what is actually being said to the market.").[3]

---

[2] Defendants also make the absurd and metaphysically impossible suggestion that the supposed morphing of Lead Plaintiff's case *after* January 2, somehow "became a reality" when, four weeks before January 2, Plaintiff questioned Ms. Gonzales on the fact that Apollo had in the past disclosed DOE Program Review Reports in its SEC filings. D. Memo, at 10:13-17. That questioning of Ms. Gonzales was in any event pertinent to the Defendants' state of mind when they made their later statements to the market, and was thus consistent with Plaintiff's overall approach to the case. Indeed, this line of questioning arose because, in opening statement, Defendants argued that they did not disclose the existence of the Program Review Report in SEC filings because it was not "final." Tr. 324:2-325:5. This contention was directly contradicted by the prior SEC filings identified by Plaintiffs at trial. Tr. 1709:17-1712:24.

[3] *See also*, *e.g.*, Tr. 3906: 18-25 ("I respectfully suggest to you, and I know I've taken up a lot of time so far, that each of these statements that I have referenced by the defendants, including the press release that Miss Gonzales and Mr. Nelson issued and the company issued, the conference calls, and the 10-Q of April 13th that Mr. Nelson, Miss Gonzales also issued together with the company, each of them was false, each of them was

7

Plaintiff's counsel specifically asked that the jury "please render a verdict against all defendants; as to the fraud verdict form, to find **each statement that was made** to be false or misleading as to Apollo, as to Miss Gonzales, and in particular as to Mr. Nelson."  Tr. 3921:4-8 (emphasis added).[4]

Never did Plaintiff suggest that Defendants had a general duty to disclose before issuance of the press release on February 27, 2004.  Indeed, the snippets of argument quoted by Defendants, D. Memo at 10:17-25, pertain to materiality and are themselves completely consistent with the asserted obligation of the Defendants to be truthful when speaking to the market.  In fact, the comments were made in the context of arguing liability for statements made to the market by Defendants.  *See*, e.g., Tr. 3842:15 - 3843:3 & Tr. 3916:16.  Especially egregious is Defendants' misquotation of the following underlined argument by Plaintiff's counsel, while omitting the emphasized remainder of his sentence:

> But the point of making sure the marketplace has integrity is that the material information, be it positive or negative, is in the marketplace, and *in particular that when corporate officers, who know the law, they know their duties, when they speak truthfully, they don't conceal material adverse information, they don't conceal material positive information.* And in this way you have a fair price being set by the market.

---

deceptive, each of them was misleading.");  Tr. 4043:19-20 ("you don't tell the market that even though you are talking to them about the process");  Tr. 4064:22-23 ("They should have disclosed it when they spoke to the market on matters related to it.").

[4] Defendants argue that the Court's decision to remove and then restore the April 2004 10Q as an actionable statement bears on the supposed need to give the "no duty" instructions, because doing so somehow allowed Plaintiff to introduce a "new theory" of liability for that particular misrepresentation. D. Memo, at 8:12 - 9:28.  Plaintiff's opposition to the *sua sponte* directed verdict was not, however, based on any "new theory," but rather on the same theory that the Court had upheld in denying Defendants' motion for summary judgment. The Court recognized as much upon further reflection, and reversed its decision for that very reason. Tr. 3822:5-17 & 3835:13-19.  The April 2004 10Q was false and misleading because in it Defendants spoke to the market concerning the state of its regulatory investigations or compliance with the ban on incentive compensation issues and the *qui tam* matter, without any mention of the issuance and findings of the DOE Program Review.  Nothing in the entire episode suggests the need for an instruction on the lack of a general duty to disclose absent Defendants' speaking to the market.

8

Tr. 3863:14-21 (emphasis added). In short, Plaintiff hardly "create[d] an unacceptable risk that the jury would think Defendants had a general duty to disclose" the Report. D. Memo, at 10:25-26.[5]

Finally, Defendants argue that the absence of the two "no duty" instructions somehow enabled Plaintiff to make a supposed "Golden Rule" argument. D. Memo, at 11:8-15. As shown in Section C below, even overlooking the *non-sequitur*, Plaintiff's closing arguments made no such improper "Golden Rule" argument.

### 3. The Jury Was Properly Instructed Regarding Scienter.

Defendants in their Motion argue that the jury was somehow "prevented from fully and fairly weighing Defendants' reliance on the professional advice they received" because the Court did not give their requested instruction entitled "Advice of Professional Advisors." D. Memo, at 11-12 & 12:25-26; *see also id.* at 12:11 (arguing that "without an instruction, the jury was unable to assess properly the legal advice provided"). This is nonsense, for Defendants throughout the trial offered ample, if not highly cumulative, evidence of the advice they received from their "professional advisors." Defendants also repeatedly emphasized this theory in their closing argument. *See*, *e.g.*, Tr. 4037:16-18 ("[Defendants] were following the advice of their advisors and they were doing what they thought was right and what their disclosure counsel told them was legal."); *see generally* Tr. 3962:24-3963:2; Tr. 3952:20 - 3954:17, Tr. 3976:20-25; Tr. 4034:7-22.[6]

Defendants furthermore emphasized that their "advice of professionals" evidence was being offered not as a separate affirmative defense, but rather to rebut the contention

---

[5] At the January 2, 2008 hearing on instructions, Defendants conceded that it was their own questioning of Dr. Feinstein that supposedly elicited testimony suggesting a general duty to disclose. Tr. 3406:18 - 3407:2. Plaintiff did nothing to lead the jury to believe there was an affirmative duty of disclosure absent Defendants' speaking to the market.

[6] *See also, e.g.,* Tr. 3952:15-19 ("it's clear that the executives at the University of Phoenix had the right to rely on the work of this large national auditing firm [KPMG] when they said we've looked at the data and here are the conclusions that we have drawn."); Tr. 3954:14-17 ("it would have been irresponsible had the company not consulted with legal advisors, had not sought legal advice, had not gone to the people that were familiar with the issues and familiar with the company").

that they acted knowingly or recklessly – concepts as to which the jury was instructed correctly and at length. [Doc. #496, at 19]. Defendants cannot claim prejudice by the Court's refusal to give an additional, amplifying instruction simply to echo the theory that they presented to the jury. *Alaska Airlines v. Oszman*, 181 F.2d 353, 353-54 (9th Cir. 1950) (district court is not required to give instructions that would have called more attention to a particular point in the case). Indeed, the Court in even-handed fashion declined to give an elaboration instruction on scienter requested by Plaintiffs. [Doc. # 372, at 93]. In fact, Defendants themselves opposed several of Plaintiffs' proposed instructions as argumentative, on the grounds that elaboration beyond model instructions setting forth the bare elements of the claims was "superfluous." *See, e.g.*, Tr. 3338:11-18.

Nor were Defendants in any event entitled to an "advice of counsel" instruction. First, Defendants' proposed instruction was exclusively premised on a state law provision that is not established to be a defense to liability under federal securities law.[7] Second, Defendants failed to satisfy the prerequisites for an "advice of counsel" instruction, because they produced no evidence that counsel assured them regarding the specific course of conduct challenged by Plaintiffs: *i.e.*, that they need not speak truthfully once choosing to speak to the market. *Bisno v. U.S.*, 299 F.2d 711, 719-20 (9th Cir. 1961) (trial court properly refused instruction); *U.S. v. Kenny*, 911 F.2d 315, 322 (9th Cir. 1990) (same); *see also*, *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance.") (citation omitted). Third, the instruction requested by Defendants was incomplete, for it failed to include the statement that no one can excuse a knowing violation of the law by pleading that he followed the advice of counsel. *Bisno*, 299 F.2d at 720-21. Finally, at trial Defendant Nelson admitted that when speaking to investors he had a "responsibility to tell the truth" and that he was not

---

[7] Doc. # 372, at 145 (citing only "Ariz. Rev. Stat. 10-830, General Standard for Directors; presumption.").

advised by counsel to lie to investors.    Tr. 1073:2-22, 1078:13-14.    Ultimately, Defendants' "advice of counsel" instruction is not applicable to the facts of this case and is inconsonant with the law.

Ultimately, the jury "was entitled to consider the testimony of … counsel for what it was worth and no more."    *Bisno*, 299 F.2d at 720 (holding separate instruction not required).    This jury, however, rejected the contention that Defendants acted without *scienter*; indeed, the jury's verdict specifically determined that Mr. Nelson and Ms. Gonzales acted (a) knowingly and (b) not in good faith. [Doc. #490, at 3, 7, 11, 14 & 16]; *see, e.g., SEC v. Bonastia*, 614 F.2d 908, 914 (3rd Cir. 1980) (advice of counsel contention overridden by specific finding of *scienter*).

### 4.    The Jury Was Properly Instructed Regarding Falsity.

The jury was by stipulation instructed that Plaintiff bore the burden of proving "an untrue statement of material fact or omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading…." [Doc. #496, at 17 (Ninth Circuit Manual of Model Jury Instructions, 18.1 (modified to eliminate elements of the claim not in issue)] Defendants now argue that "certain" statements they made to the market (left unidentified) constituted "optimistic statements of opinion or belief." D. Memo, at 13:2. Therefore, Defendants reason, it was error for the Court not to give a proposed additional instruction on the falsity of a "statement of opinion or belief." *Id.*, at 12-13.[8]

Each of the six actionable statements ultimately submitted to the jury, however, was to the contrary a representation or omission of current ***fact***; none can fairly be characterized as mere "optimistic" statements of "belief" or "opinion."    The proposed instruction was thus irrelevant and unnecessary given the correct instruction of falsity given by the Court.    Nor did the lack of an amplifying instruction preclude Defendants in any way from arguing (as they did) that they "reasonably believed their optimistic

---

[8] Because Defendants failed to request this instruction during the proceedings on January 2, 2008, they filed on January 7, 2008, an untimely request that the Court nevertheless consider it.

statements were true based on advice of counsel." D. Memo, at 13:10-11; *see*, *e.g.*, Tr. 3962:24-3963:2 (arguing in Closing Statement that "Mr. Nelson believed and Mr. Cohen told him that they had a right not to disclose [the Report] while they defended themselves to the Department and while they worked out a resolution").

> 5.    **The Jury Was Properly Instructed Regarding the "Rapid" Rate of Market Absorption.**

In Defendants' own words, "While the Ninth Circuit has rejected any bright line rule as to how fast an efficient market assimilates new information, the lack of immediate reaction is still one factor that may be considered in evaluating materiality." "Defendants' Opposition to Plaintiff's Trial Memo Regarding Testimony of Kenneth Lehn," January 3, 2008 [Doc. #458, at 1:8-10] (citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003)). The Court accordingly instructed the jury:

> In this case, the parties agree that Apollo common stock traded in an efficient market. In an efficient market, new information is rapidly absorbed and reflected in the stock price. How rapidly new information is reflected in the stock price depends upon the facts of each case.

[Doc. #496, at 22]. Defendants now complain that the second sentence of the Court's instruction was not modified to read: "new information is rapidly absorbed and reflected in the stock price, ***ordinarily within hours if not minutes***." D. Memo, at 13:13-19 (emphasis added). However, defense counsel waived this argument at the January 2, 2008 hearing on instructions: "We believe it's appropriate to say 'ordinarily within hours if not minutes' but we would be content to cutting it off at 'stock price.'" Tr. 3380:8-10. The Court did just that. *Id.* at 3380:17-18.

In any event, the Court was correct not to dictate to the jury how quickly information was reflected in the stock price in any given case. *America West*, 320 F.3d at 934; *see generally Basic v. Levinson*, 485 U.S. 224, 249 n.28 (1988) ("we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in the market price"). Once again, Defendants were free to (and did) present evidence and argue that anything more than a few minutes or hours or days was not "rapid" under the circumstances of this particular case. Indeed, the

very evidence now cited by the Defendants in support of their argument was itself admitted at trial.  D. Memo, at 15:1-6 (citing Tr. 2026:5-18 and Ward Decl. Ex. L).  And Defense counsel in closing argued: "Well, how rapidly is rapidly?  As Dr. Lehn testified, one of the learned treatises defines that as five or ten minutes. *** Another learned treatise … says almost immediately."  Tr. 4014:18-25.

The jury was not, then, "left to speculate" about the rapidity of absorption of corrective information by the market, D. Memo, at 15:7; the jury was instead left to **decide** about the rapidity of absorption under the facts of this particular case.  The Court correctly respected the jury's prerogative through the instruction as given.

### 6.    The Jury Was Properly Instructed Regarding Materiality.

The Court amply instructed the jury on the element of materiality. [Doc. #496, at 18] In particular, the Court instructed that "[s]tock price movement in response to the disclosure of information that reveals the fraud to the market does not establish the materiality or immateriality of the misrepresentation or omission, though it is a factor you may consider in making that determination." *Id.* Again, Defendants at trial acknowledged that "there's no bright line rule for how immediately the market must react to [the] information." Tr. 3341:22-24; *id.*, at 3349 ("it's a fact-specific inquiry").

Defendants complain, however, that the Court did not go further and specifically instruct the jury concerning the possibility that the market **overreacted** to the Kelly Flynn reports of September 20, 2004 ("the UBS Reports"). D. Memo, at 15-16. As Defendants put it, "[t]he jury should have been permitted to determine whether the movement of Apollo's stock price on September 21, 2004 suggested short-term overreaction,…" D. Memo, at 15:24 16:1.   But the jury as instructed **was** permitted to make that determination; it just declined to do so.   Indeed, evidence of market movement on September 22 was admitted, Tr. 3534:5-7; Ward Decl. Ex. M, and the possibility of market overreaction was addressed by expert testimony. Tr. 2155:24-2156:14 (acknowledging that stock price movement can under certain circumstances be the result of market overreaction); Ward Decl. Ex. N ("the potential for stock market overreaction is now generally accepted as a factor in stock market behavior").  Defense counsel in

closing even argued that the Apollo stock price movement on September was possibly "just an overreaction or a greater reaction to the Corinthian news." Tr. 4021:6-23.

The Defendants were not, therefore, prejudiced by the lack of a supplemental instruction elaborating on Defendants' theory of market overreaction.  In the words of defense counsel in opposing one of Plaintiff's proposed instructions,

> [A]lthough we certainly appreciate the vigor of Mr. Basser's argument, that's what it is, it's argument.  If he wants to argue to the jury, he certainly can do that.  But we shouldn't have a jury instruction making the argument.

Tr. 3363:24-3364:2.  The same rationale applies here, in the context of the jury's materiality instruction: the jury was free to consider any and all stock price movement based on the evidence presented to it.

## B.    The Court's Challenged Evidentiary Rulings Were Sound.

The Court's discretionary determinations to admit or exclude evidence warrant the grant of a new trial only where the Court is convinced that its ruling was both (a) incorrect and (b) so prejudicial as to beget a miscarriage of justice.  *Murphy*, 914 F.2d at 187; *see also Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir. 1985).  None of the discretionary evidentiary rulings challenged by Defendants amount to error, let alone to prejudicial error.

### 1.    The Court Properly Handled the UBS Reports.

#### a.    The UBS Reports are relevant only for notice to the market of corrective information.

Defendants make much ado about the exclusion of the deposition testimony of Ms. Flynn to explain to the jury what she meant by the UBS Reports.  But those Reports are only relevant as disclosures to the market, *i.e.* for the fact that they said what they said on that particular date.  As the Court explained:

> To then match that up with what she says she meant, it seems to me, is creating a side issue in the case and an issue which is not relevant to what actually got into the market. What actually got into the market is her report, for better, for worse, for good reasons, for bad reasons.

Tr. 2689:4-9.  Indeed, the UBS Reports, as with every other analyst report offered into evidence at trial, was offered for the ***non-hearsay purpose*** of providing notice to the market.  *See*  Tr.  1940:6-11;  2057:2-6;  2172:3-13;  2173:4-15;  2177:23-2178:11.

14

Defendants' post-trial contention that Ms. Flynn had to explain what she intended by the Reports is inconsistent with their position at trial that the Reports were only admissible for non-hearsay purposes.

Similarly, although Defendants attempted at trial (and again on this motion) to contradict the statements in the UBS Reports with other analyst reports generated later in October, such contradictions do not suggest error. As the evidence demonstrated at trial, the statements made to the market on Sept. 20 moved the market. The market is not impacted by hindsight.[9]

### b.  Exclusion of Ms. Flynn as an "impeachment" witness was appropriate.

Ms. Flynn's October 2006 deposition testimony was properly excluded under the Federal Rules of Evidence. *See* Tr. 2686:12-2696:16. The UBS Reports themselves expressed the reasoning for the downgrade. Ms. Flynn's personal, post-hoc opinions on materiality and the reasons for the downgrade other than as stated in the UBS Reports were properly excluded as irrelevant under Federal Rules of Evidence 401 and 402. As the Court correctly explained:

> [W]e start from the proposition that the basic theory is that the Flynn report is the document that was necessary to fully disclose the alleged fraud to the market, and therefore, it is the contents of the report, not what the author may have meant or thought or whatever other unexpressed thoughts she may have had. While I understand the defendants' position is basically to now confront, or rebut, rebut the factual basis for Professor Feinstein's testimony, but, as I've suggested, that could have been done by cross-examination. To now play this testimony as a freestanding witness and to get into these areas with this witness, in my judgment, is not only to inject matters that are fundamentally neither relevant nor material but also to have a great likelihood of confusing this jury in a universe that is rife with the potential for confusion and start creating issues that get into the qualitative work of Miss Flynn.

Tr. 2695:20-2696:16. Both experts were free to (and did) express their opinions regarding market reaction to the content of the UBS Reports. Indeed, if there was any prejudice to the Defendants in this regard it was caused not by the Court's evidentiary

---

[9] Furthermore, to the extent any statements made in October would have impacted the market, there effect would be incorporated in the 90-day mean trading price established by the PSLRA, 15 U.S.C. §78u-4(c), and hence would operate only to mitigate recoverable damages.

rulings or instructions, but rather by Defendants' self-inflicted decision not to cross-examine Dr. Feinstein with Ms. Flynn's testimony.[10]

### 2.    The Court Properly Excluded Rationale Testimony by Defendants' Legal Advisors.

Defendants at trial offered the testimony of Messrs. Hatch and Cohen because, they argued, advice from those gentlemen informed Mr. Nelson's state of mind.  Tr. 1310:19-22, 2767:9-24.   To that end, Messrs. Nelson, Hatch and Cohen were as percipient witnesses allowed to testify at length as to the advice actually communicated to Mr. Nelson  *See, e.g.*, 1310:13-1320:8, 3099:13-15, 3083:18-3094:19, 3095:7-3096:12, 3101:13-3104:3.  Testimony regarding their unexpressed thought processes, on the other hand, could not possibly have informed Mr. Nelson's state of mind.  Such "rationale" testimony properly excluded as undesignated expert testimony which, the Court recognized, furthermore create a substantial risk the testimony by lawyers would "invite[s] a legal analysis" and thus invade the province of the Court. Tr. 2917:12-21. [11]

In arguing that testimony as to the legal conclusions of Messrs. Hatch and Cohen was necessary to assert the credibility of these witnesses, Defendants ignore the fact that

---

[10] As the Court explained to defense counsel:

> You could have -- when Professor Feinstein, as with any expert, reviews a bunch of materials that become the basis for the opinions stated, on cross-examination counsel can confront the expert with any of the materials that the expert may have utilized and if the expert says . . .-- I read Miss Flynn's testimony and here's what she said and/or . . . -- I read Miss Flynn's testimony and . . . -- here's what she was trying to say to the market and here's what she meant,… you could have confronted him with that and said, Professor..., you said you read her testimony and let's -- and if so, let me call to your [attention to] this question and this answer, or whatever you wanted.
>
> You could have cross-examined him about that which formed the basis for his testimony, correct?
>
> *Defense Counsel*: I could have, Your Honor, but I chose instead to call the person who actually gave the testimony, and that's what we propose to do.

Tr. at 2694:25-2695:17.

[11] Defendants acknowledged that the purpose of this "rationale" testimony was to elicit legal opinions such as to "[w]hy did you think it didn't have a material omission?"  Tr. 2913:4-15.

the Court granted them full leeway to "establish from these lawyers their credentials, the role they played….that they were outside counsel, what they told their client . . . that they weren't part of some attack team. Their experience as lawyers . . . and, presumably, the reason Mr. Nelson could rely on that." Tr. 2917:12-21.[12] Indeed, the sole basis for Defendants' claim that they needed to "rehabilitate the credibility" of Mr. Hatch is Plaintiff's assertion that he was an "advocate" for Apollo – an assertion that, both on cross and on re-direct, Mr. Hatch acknowledged to be true. *See* D. Memo, at 19; Tr. 3156:14-3157:19, 3241:5-3242:9.

Even were the Court to determine that referring to a lawyer as an advocate constitutes an attack on that lawyer's credibility, that is not enough to trigger Rule 608(a). In *United States v. Dring* 930 F.2d 687 (9th Cir. 1991), the Ninth Circuit recognized that:

> The purpose of Rule 608(a)(2) is to encourage direct attacks on a witness's veracity in the instant case and to discourage peripheral attacks on a witness's general character for truthfulness. To this end, the Rule prohibits rehabilitation by character evidence of truthfulness after direct attacks on a witness's veracity in the instant case.

*Id.*, at 690-91.[13] In any event, Rule 608(a) only applies where the credibility of a witness has been attacked "by evidence in the form of opinion or reputation," not, as here to a witnesses' own description of his conduct. Here, the questioning cited by Defendants goes to Mr. Hatch's actions in the instant case, not to his good character; thus Defendants have failed to identify any testimony that falls within the narrow framework of Rule 608(a)(2). [14]

---

[12] Similarly, the Court made clear that "if you're suggesting that you'd like to ask them, sir, were you being consulted in your capacity as a lawyer with all of the fiduciary duty and professional obligations you have to your client to give him the best advice you can…that doesn't trouble me." Tr. 2912:19-24.

[13] Indeed, the Ninth Circuit held that assertions by the prosecution that the defendant "lied" or presented a "false alibi" were "insufficient to trigger rehabilitative testimony." *Id.* at 690-91 (citing the Advisory Committee's Note to Rule 608(a) that "[e]vidence of bias or interest does not" qualify as an attack under Rule 608(a)).

[14] Defendants grossly mischaracterize the holding of the one case they cite in support of their contention. D. Memo, at 20. In *Renda v. King*, 347 F.3d 550 (3d Cir. 2003), the Third Circuit recognized that "[d]irect attacks on a witness's veracity in the particular case do not open the door for evidence of the witness' good character." *Id.*, at 554 (citing *United States v. Dring*, 930 F.2d 687, 690-91 (9th Cir. 1991)).

### 3.    The Court Properly Admitted Dr. Feinstein's Limited Testimony.

Noting Defendants' repetition of the "same arguments they made and lost at the summary-judgment stage of this litigation," this Court denied Defendants' motion *in limine* seeking to prevent Professor Feinstein from testifying as to his loss causation and damages opinions: "this Court finds that Dr. Feinstein's opinions are reliable, *i.e.,* his proposed testimony was 'derived by the scientific method' and it 'fits' the facts of this case. November 9, 2007 Order at 10 [Docket #382]. Indeed, Defendants' loss causation and damages expert agreed that Professor Feinstein's methodology was appropriate and reliable. Tr. 3436:19-3437:10; 3544:11-3545:3; 3547:3-13; 3550:15-20. Thus, there is no dispute that Professor Feinstein's testimony was properly presented to the jury as expert opinion testimony.

As noted above, the Court instructed the jury on the issue of materiality with abundant clarity. Tr. 4081:24-4082:16; Doc. #496 at 18. Defendants now argue that the jury must have (a) ignored this instruction and (b) misunderstood Dr. Feinstein's testimony on loss causation as evidence of materiality, by interpreting his use of the term "risk" to mean "material." Defendants are not, based on these painfully strained contentions, entitled to a new trial.

At trial, Lead Plaintiff offered testimony regarding the basis for Dr. Feinstein's loss causation opinion, an opinion that requires a consideration of whether the failure to disclose the Program Review Report and its contents impacted the price of Apollo securities: "we would like to examine Professor Feinstein on the risks that existed at the time the defendants spoke and whether or not they impacted the stock price. That's clear loss causation analysis." Tr. 1877:1-5. Indeed, the testimony cited by Defendants directly relates to just that issue. Tr. 1972:8-14, 1794:4-15. Consistent with the Court's limiting order, Dr. Feinstein offered no testimony, directly or indirectly, that infringed on the jury's duty to determine whether a reasonable investor would have found the statements and omissions at issue material. The testimony now challenged by Defendants is nothing more than Dr. Feinstein's explanation of the basis for his opinion on loss causation.

Had Plaintiffs failed to elicit testimony supporting Dr. Feinstein's loss causation conclusions, they would have faced the problems presented in *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000). In *Northern Telecom,* plaintiffs' expert failed to perform an event study, a crucial step in a loss causation analysis, and the court noted that "Torkelson's testimony is fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information." *Id.*, at 460. It was that failure by plaintiffs' expert that rendered the expert's opinion "speculative and hypothetical." *Id.,* at 461.[15]

Here, in contrast, Dr. Feinstein performed an event study to identify the impact of Defendants' failure to disclose the existence and contents of the Program Review Report:

> I've concluded from looking at the data and documents and conducting a battery of tests that the stock price was indeed inflated over the class period on account of the alleged misrepresentations and omissions. In other words, the stock was trading at a price that was higher than where it would have been had the market known the full truth.

Tr. 1893:20-1894:1. Dr. Feinstein thus necessarily testified at length regarding the tests he performed in order to isolate the inflation in Apollo's stock that arose from Apollo's failure to disclose the Program Review Report and its contents. Tr. 1894:15-1907:4, 1912:17-1919:5.[16]

---

[15] Similarly in *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994), the Ninth Circuit determined that the experts in question had "failed to explain" the reasoning and methods underlying 'the basis for their conclusions[.]"

[16] Defendants' reliance on *United States v. Hanna*, 293 F.3d 1080, 1086-87 (9th Cir. 2002) and *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1001 (9th Cir. 2001) only highlights the reasonable bases for Dr. Feinstein's testimony. In *Hanna*, the Ninth Circuit found that the District Court had created "a significant danger of misleading the jury into believing that it should judge Hanna's letters from the perspective of a highly trained Secret Service agent instead of from the perspective of an average, reasonable person" because the Court allowed three Secret Service officers to " describe[] their reactions to Hanna's letters and indicate[] that they believed the writings were serious threats against the President." 293 F.3d. at 1085-87. In *Jinro*, the court addressed the testimony of a claimed expert on "the business practices of Korean companies — particularly their alleged propensity to engage in fraudulent activity…." As the court noted, the expert "had no formal education or training in business or as a cultural expert"; rather, his claimed expertise arose from "'a hobby of his.'" 266 F.3d at 1001. Dr. Feinstein's testimony in this case does not approach the nature of the testimony in *Hanna* and *Jinro*.

**C.    There Was No Misconduct by Plaintiffs' Counsel**

A new trial is warranted on the ground of attorney misconduct during the trial only "where the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Anheuser-Busch, Inc. v. Natural Beverage Distributors,* 69 F.3d 337, 346 (9th Cir.1995) (internal quotes omitted).    A party must object to alleged instances of attorney misconduct before the jury deliberates to allow the district court "to examine the alleged prejudice and to admonish ... counsel or issue a curative instruction, if warranted." *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.,* 785 F.2d 656, 658 (9th Cir.1986).    Here, without objection from Defendants, the Court recognized the exemplary conduct of counsel at trial, noting the "professionalism and the civility . . . and the integrity that you have all demonstrated and exuded throughout the handling of this case." Tr. 4100:15-17. Because the trial court is "in a superior position to gauge the prejudicial impact of counsel's conduct during the trial," the Ninth Circuit will not overrule a district court's ruling about the impact of counsel's alleged misconduct unless it has "a definite and firm conviction that the court committed a clear error of judgment." *Anheuser-Busch,* 69 F.3d at 346  (internal quotations and citation omitted).

Defendants first argue that Plaintiff was permitted to reference "inflammatory" and "irrelevant" evidence "in an attempt to bolster the veracity of the" DOE Program Review Report. D. Memo, at 23-24.  Defendants greatly overstate the "inflammatory" nature of the evidence presented by Plaintiff. *See, e.g.,* Tr. 1615:8-1616:1.  In any event, although Defendants ultimately argued or noted to the Court rather late in the trial that they were not "challenging the accuracy" of the Program Review Report's contents [Tr. 2743:14-2745:5; 2752:7-2753:12], throughout trial Defendants asserted that the Report and its contents were inaccurate, biased and otherwise untrustworthy.   In opening statement Defendants told the jury that "the University knew that the report was seriously flawed….the language was very intemperate and showed a bias on the part of the author of the report." Tr. 275:7-10.  Defendants further argued in opening statement that "the Program Review Report is wrong" and that Todd Nelson "was upset by the report.  He

thought it was wrong." Tr. 303:10-20, 304:13-14. Defendants' attacks on the Report continued through trial, with Apollo's Attorney Jon Cohen testifying that "there were a *variety* of instances where the company felt strongly that the report was *simply wrong*" and that "the company thought the report was *flawed in almost in its totality*." Tr. 2988:4-5, 2987:12-16 (emphasis added). Indeed, Defendants attacked the Program Review Report in their first communication with the DOE following the issuance of Report, describing it as "irresponsible and outrageous," "devoid of any serious factual or legal analysis," and "biased and unfair." Ward Decl. Ex. O. In addition, Defendants were given great latitude by the Court to discount the limited testimony by enrollment counselors that was offered by Plaintiff. For example, over Plaintiff's objection, Defendants were allowed to elicit testimony that one of the witnesses relied upon by the DOE was a "frustrated" employee who "called" a "little bitty army" to "go against the University of Phoenix." Tr. 1530:22-1531:19. Ultimately, in closing statement, Defendants argued that "[t]he wording of the report is devastating. It would have been devastating to the University of Phoenix to put those *lies* out." Tr. 3930:6-8 (emphasis added). Notwithstanding these constant attacks, Lead Plaintiff was allowed to put on only limited evidence supporting the contents, findings and conclusions of the Program Review Report.

Defendants also ignore the wealth of evidence they were allowed to put on that supported their contentions regarding the contents of the Program Review Report. Indeed, some of the testimony upon which Defendants base their claim of "substantial prejudice" was elicited *by* Defendants. *See*, *e.g.*, Tr. 720:24-721:13. In addition, much of the testimony Defendants cited regarding the "Red Room" was elicited on cross-examination following a lengthy direct examination of Brian Mueller by defense counsel and a lengthy discourse on the "Red Room" in Defendants' Opening Statement. Tr. 298:17-299:21, Tr. 2306:6-2310:13.[17] Indeed, Defendants sought to use this testimony to

---

[17] The Court made it abundantly clear that is would limit the scope of rebuttal testimony, instructing Plaintiffs that they should not "leave something to rebuttal that legitimately should and could be in your case in chief because you might be left without the ability to put it on at the time of rebuttal." Tr. 38:16-22. With this admonition in mind, Lead

shape the jury's opinion of Apollo as Apollo President Brian Mueller testified as to the "very good, positive" environment of the Red Room.  Tr. 2307:18-2308:2.  Prejudice to Defendants, if indeed there was any, likely arose because the jury could not reconcile Mr. Mueller's testimony regarding this "very good, positive" environment with his professed "zero tolerance for lack of effort or success."  Tr. 2353:25-2355:25.

Finally, counsel for Plaintiff made no improper "Golden Rule" argument.[18] Counsel's references to "you" and "your" cited by Defendants, D. Memo, at 11:8-15 (citing Tr. 4044:13-17 and 4049:16-19), were rhetorical devices invoking the objective, reasonable man standard that governs materiality.  Moreover, Defendants fail to show that, in the context of an 8-week trial and 3-hour closing, the seven quoted lines of argument in any way improperly tainted the jurors' assessment of materiality.  *Ambrose v. U.S. Steel Corp.*, No. C-84-2886, 1985 WL 333, at *4 (N.D. Cal. Aug. 28, 1985) ("golden rule" comment harmless and no basis for new trial, given substantial evidence supporting the verdict); *Merrill v. County of Madera*, No. 1:05-CV-0195, 2007 WL 4365579, at *9 (E.D. Cal. Dec. 11, 2007) (same; comment by defense counsel that funds would come from coffers of the county).  Indeed, defense counsel made no less a "Golden Rule" argument when he invited the jurors to place themselves in the position of Defendants: "You got the Program Review Report, you should have disclosed it at every opportunity and because you didn't we win and we want $300 million.  And what we are saying is that goes away when you look at the full process or the full picture."  Tr. 3941:16-20. Furthermore, the Court's instruction that the arguments of counsel are not evidence [Doc.# 496, at 3] cured any conceivable impropriety.  *Merrill*, 2007 WL 4365579, at *9. And, lastly, Defendants' "Golden Rule" contention was waived by their failure to object. *Ambrose*, 1985 WL 333, at *4 (denying new trial motion for failure to object; citing

---

Plaintiff was forced to anticipate Defendants' attacks on the accuracy of the Report and put on evidence in its case in chief addressing those attacks.

[18] A "golden rule" argument is an argument that "urg[es] the jurors to place themselves in the position of ***one of the parties to the litigation***, or to grant a party the recovery they would wish themselves if they were in the same position…."  Jacob A. Stein, *Closing Argument* § 60, at 159 (1985) (emphasis added).

*Barzelis v. Kulikowski*, 418 F.2d 869, 871 (9th Cir. 1969)); *see also, Merrill*, 2007 WL 4365579, at *9 (same; citing *Kaiser*, 785 F.2d at 658 & n.2).

## IV.    Conclusion

A new trial is appropriate "**only** if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F. 3d 724, 729 (9th Cir. 2007) (emphasis added) (quoting *Passantino v. Johnson & Johnson Consumer Prods.,* 212 F.3d 493, 510 n. 15 (9th Cir.2000)); *accord*, *Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007).  For the foregoing reasons, the Court made no such mistake in instructing the jury or in ruling on the admission of evidence.  Nor did counsel for Plaintiff conduct themselves with anything other than the utmost in propriety and professionalism.  Defendants' Motion for New Trial is therefore not well-founded, and should be denied in its entirety.


Dated:  February 29, 2008                    BONNETT, FAIRBOURN, FRIEDMAN
        & BALINT, PC


      s/Francis J. Balint, Jr.
William G. Fairbourn
Francis J. Balint, Jr.
Kathryn Jann
2901 North Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  (602) 274-1100

*Local Counsel for Lead Plaintiff*

Stephen R. Basser
Samuel M. Ward
BARRACK, RODOS & BACINE
402 West Broadway, Suite 850
San Diego, CA 92101
Telephone:  (619) 230-0800

Leonard Barrack
Jeffrey A. Barrack
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street

Philadelphia, PA  19103
Telephone:  (215) 963-0600

*Lead Counsel for Lead Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2008, the attached document was electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to those registered with the Court:

Ramzi Abadou:  ramzia@csgrr.com

Joseph G Adams:  jgadams@swlaw.com, amurray@swlaw.com, docket@swlaw.com

Francis Joseph Balint , Jr:  fbalint@bffb.com, dmoy@bffb.com, rcreech@bffb.com

William J Ban    wban@barrack.com, sstone@barrack.com

Jeffrey A Barrack    jbarrack@barrack.com, mbonatara@barrack.com

Stephen Richard Basser    sbasser@barrack.com

Maureen Beyers    mbeyers@omlaw.com, ecfdc@omlaw.com, lsmock@omlaw.com

Joseph P Busch , III    jbusch@gibsondunn.com, groudabush@gibsondunn.com

Christopher B Campbell    ccampbell@gibsondunn.com, jtravis@gibsondunn.com

James R Condo    jcondo@swlaw.com, docket@swlaw.com, gcarlo@swlaw.com

Kristopher Price Diulio    kdiulio@gibsondunn.com

William G Fairbourn    gfairbourn@bffb.com, tmontford@bffb.com

John L Haeussler    jhaeussler@barrack.com, mgades@barrack.com, srobertson@barrack.com

Joel Philip Hoxie    jhoxie@swlaw.com, jkfisher@swlaw.com

Maura M Logan    mlogan@gibsondunn.com

William J Maledon    wmaledon@omlaw.com, ddunn@omlaw.com, ecfdc@omlaw.com

Dalena Marie Marcott    dmarcott@gibsondunn.com

Robert D Mitchell    robertmitchell@mitchelllaw.com, mitchell_atty@msn.com

Aileen Yen-Hua Mo    amo@gibsondunn.com, dreger@gibsondunn.com

Daniel P Muino    dmuino@gibsondunn.com

Mark R Rosen    mrosen@barrack.com, sdavis@barrack.com

David B Rosenbaum      drosenbaum@omlaw.com, ecfdc@omlaw.com, kdourlein@omlaw.com

Stephen G Schulman      sschulman@milbergweiss.com

Rosemary Joy Shockman      RShock@aol.com, debbieriffle@yahoo.com

Wayne Warren Smith      wsmith@gibsondunn.com

Jessica A Taggart      jboschee@gibsondunn.com, tstephens@gibsondunn.com

Jared M Toffer      jtoffer@gibsondunn.com, gross@gibsondunn.com, groudabush@gibsondunn.com

Geoffrey Mark Trachtenberg      gmt@lclegal.com, proctor85048@cox.net

Marc M Umeda      mumeda@ruflaw.com

Samuel M Ward      sward@barrack.com, mgades@barrack.com


and on February 29, 2008, by U.S. Mail, First Class to the following:

Leonard Barrack                        Patrick Joseph Coughlin
Barrack Rodos & Bacine            Coughlin Stoia Geller
2 Commerce Square                      Rudman & Robbins LLP
2001 Market Street, Ste 3300     100 Pine Street, Ste 2600
Philadelphia, PA  19103            San Francisco, CA  94111

I hereby certified that on March 3, 2008, I hand-delivered a copy of the attached document to:

The Hon. James A. Teilborg
United States District Court
District of Arizona
401 West Washington
Phoenix, AZ  85003


_____ s/Francis J. Balint, Jr. _____