UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APOLLO GROUP, INC. SECURITIES LITIGATION | Misc. Action No. 06-558 (CKK) (D. Ariz., Case No. CV-04-2147-PHX-JAT) |

**MEMORANDUM OPINION**
(June 20, 2008)

Currently pending in the above-captioned miscellaneous action is Apollo Group, Inc.'s

("Apollo") [1] Motion to Compel Respondent, the Department of Education (the "DOE"), to

produce documents responsive to a subpoena *duces tecum* pursuant to Federal Rule of Civil

Procedure 45 (the "Amended Subpoena"), issued from the United States District Court for the

District of Columbia in connection with an underlying securities litigation pending in the District

of Arizona.  The DOE opposes Apollo's Motion to Compel and has filed its own [5] Cross-

Motion to Quash the Amended Subpoena.  Pursuant to this Court's March 12, 2007

Memorandum Opinion and Order, the parties engaged in discussions that resulted in the

narrowing of Apollo's motion to compel, the DOE's production of certain documents requested

in the Amended Subpoena, and the DOE's production of privilege logs for those documents that

it withheld or redacted on the basis of various discovery privileges.  Apollo subsequently filed

two Supplemental Briefs challenging the DOE's withholding and redaction of documents from

three of the categories of documents devised by the parties during their negotiations, and the

DOE filed opposing briefs in which it asserts the claims of privilege asserted in its privilege logs.

Upon a searching review of Apollo's two Supplemental Briefs, the DOE's Oppositions

thereto, the exhibits attached to each party's briefs, the relevant statutes and case law, and the

entire record herein, the Court finds that the DOE has established that the documents it has

wittheld and redacted in response to the Amended Subpoena are covered by a combination of the

deliberative process privilege, the attorney-work product privilege, and the informer's identity

privilege.  The Court shall therefore DENY Apollo's [1] Motion to Compel and GRANT the

DOE's [5] Cross-Motion to Quash.

## I.  BACKGROUND

### A.    *Events Prior to This Court's March 12, 2007 Memorandum Opinion*

Apollo is a defendant in a securities class action pending in the District of Arizona, which

arose out of an August 2003 Program Review conducted by the DOE addressing Apollo's

compliance with federal regulations, contained within Title IV of the Higher Education Act of

1965, which prohibit the payment of incentive compensation to enrollment counselors.  Apollo

Mot. to Compel at 2; 12/25/06 Decl. of Kristopher P. Diulio, Ex. B (Complaint, *In re Apollo*

*Group, Inc. Securities Litigation*).  Apollo is the largest for-profit provider of higher education in

the United States, and operates through several subsidiaries, including the University of Phoenix

("UOP").  Apollo Mot. to Compel at 2.  In early 2003, two former UOP employees brought a *qui*

*tam* action alleging that UOP violated the Higher Education Act.  Apollo Mot. to Compel at 1a.[1]

Although the Department of Justice ("DOJ") declined to intervene in the *qui tam* action on May

7, 2003, and in August 2003, the DOE began an on-site program review of UOP to determine

--------

[1] The first page of Apollo's Memorandum of Points and Authorities in support of its
Motion to Compel does not contain a page number; however, as the second page of the
Memorandum is numbered "1," the Court shall refer to the first page of the Memorandum as
page "1a" in order to avoid confusion.

whether UOP was in compliance with federal regulations and, if not, the extent of the violations. *Id.*; DOE Mot. to Quash at 4.

During the course of the August 2003 Program Review, the DOE issued a Program Review Report (the "Report"), which identified a violation of the Higher Education Act. Apollo Mot. to Compel at 1a; DOE Mot. to Quash at 5. Apollo responded to the Report orally and in writing, and in September 2004, Apollo paid $9.8 million to settle the Program Review issues with the DOE. Apollo Mot. to Compel at 1a; DOE Mot. to Quash at 6. Because of the settlement of the Program Review, the DOE never issued a so-called Final Program Review Determination ("FPRD") specifically assessing the financial liabilities owed to the DOE by UOP. Apollo's Supplemental Brief Pursuant to Orders of March 12 and April 16, 2007 to Compel the DOE to Produce Category Two Documents, Docket No. [28] (hereinafter "Apollo Second Suppl. Br.") at 20-21. After the parties settled the Program Review, the plaintiff shareholders class in the underlying securities litigation sued Apollo, alleging that it violated federal securities laws by failing to timely disclose the contents of the Report. Apollo Mot. to Compel at 1a. Apollo, however, "believes that the Report was legally and factually faulty and was not subject to disclosure," *id.*, and in an attempt to "demonstrate the many flaws in the DOE's Report, sought to obtain the DOE's underlying work papers from the Program Review" in order to defend against the underlying securities litigation, *id.* at 1.

Apollo began its efforts to obtain the work papers in October 2004, by serving the DOE with a Freedom of Information Act ("FOIA") request seeking the work papers. *Id.* at 4; Diulio Decl. Ex. C (10/25/04 Letter from D. Cox to J. Trumble). The DOE responded to Apollo's FOIA request with four interim response letters and a final response dated May 3, 2005. Apollo Mot.

to Compel at 5; Diulio Decl. Exs. D-H (Letters dated 12/29/04, 2/18/05, 2/28/05, 4/8/05, and

5/3/05). The DOE produced a total of 5,353 pages, but withheld 2,022 pages based on certain

FOIA exemptions. Apollo Mot. to Compel at 5; Diulio Decl. Ex. H (5/3/05 Letter from J. Van

Vlandren to D. Cox) at 3. Apollo appealed the DOE's FOIA response on June 15, 2005. Apollo

Mot. to Compel at 5; Diulio Decl. Ex. I (6/15/05 Letter from D. Cox). On October 31, 2005, the

DOE issued its final determination on Apollo's appeal, denying the appeal with respect to the

pages withheld from the original search, producing an additional 185 pages discovered pursuant

to a supplemental search, and withholding an additional 2,061 pages located during that

supplemental search based on various FOIA exemptions. Apollo Mot. to Compel at 5; Diulio

Decl. Ex. J (10/31/05 Letter from M. Clark to D. Cox). The DOE did not provide a log of the

withheld documents, but generally described the fourteen (14) categories of documents withheld

pursuant to FOIA Exemptions 5 and 7(C). *Id.*

In response, on June 5, 2006, Apollo served the DOE with a subpoena *duces tecum*,

issued from the United States District Court for the District of Columbia, seeking production of

the documents withheld from the DOE's FOIA production. Apollo Mot. to Compel at 7; Diulio

Decl. Ex K (6/5/06 Subpoena). After the DOE determined that Apollo's initial subpoena failed

to comply with the DOE's *Touhy* regulations, Apollo served the DOE with a second subpoena

*duces tecum*, dated July 3, 2006 (the "Amended Subpoena"), which sought (1) unredacted

versions of any redacted documents the DOE produced pursuant to the FOIA request; (2) the

4,083 pages of documents that the DOE withheld from its FOIA production; and (3) various

documents pertaining to the Program Review, the Report, or the *qui tam* action, to the extent they

are not covered by categories (1) and (2). Apollo Mot. to Compel at 7; DOE Mot. to Supp. at 6.

The DOE responded to the Amended Subpoena in a letter dated July 13, 2006, asserting that a

> review of [Apollo's] demand under the standards in 34 C.F.R. § 8.5 makes clear
> that authorizing production of the documents sought would be contrary to the
> interests of the United States [because Apollo] has previously sought access to all
> of the records responsive to your subpoena under the FOIA, and the Department
> has produced to you all responsive records that are not exempt from public
> disclosure under that statute.

DOE Mot. to Supp. Ex. 8 (7/13/06 Letter from J. Dailey to K. Diulio) at 2 (citing 34 C.F.R. § 8.5(c)).  On December 19, 2006, Apollo filed the instant Motion to Compel pursuant to Federal Rule of Civil Procedure 45(c)(2)(B).  On January 19, 2007, the DOE opposed Apollo's Motion to Compel and filed its own Cross-Motion to Quash the Amended Subpoena, pursuant to Federal Rules of Civil Procedure 26(b)(1) and 45(c)(3).  As described in detail in this Court's March 12, 2007 Memorandum Opinion, a flurry of additional briefing followed the DOE's Cross-Motion.  *See generally In re Apollo Group Inc. Secs. Litig.*, Misc. Action No. 06-558 (CKK), Memorandum Opinion (D.D.C. Mar. 12, 2007), Docket No. [15].

    B.    *The Court's March 12, 2007 Memorandum Opinion and Subsequent Events*

The Court's March 12, 2007 Memorandum Opinion resolved a number of procedural motions regarding the propriety of the parties' filings subsequent to the DOE's Motion to Quash.  *See id.* at 5-9.  In addition, that Memorandum Opinion found that Apollo could, despite the DOE's arguments to the contrary, pursue the production of documents responsive to the Amended Subpoena via a Motion to Compel pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), and that the documents Apollo sought in the Amended Subpoena met the "relevancy" standard articulated in Rules 26 and 45 of the Federal Rules of Civil Procedure.  *See*

*id.* at 9-14.  The Court noted the DOE's assertion that the documents sought in the Amended

Subpoena were privileged under the deliberative process, attorney-client, and attorney work-

product privileges, but found that it could not assess those claims in the absence of a privilege

log.  *Id.* at 14-16.  The Court therefore ordered the DOE to produce a privilege log for the

documents as to which it claimed privileges and suggested that, before the DOE did so, the

parties should "engage in discussions as to whether it may be possible to limit the scope of the

DOE's privilege log . . . in order to expedite the DOE's production of its privilege log and the

Court's ultimate consideration of the Cross-Motions to Compel and to Quash."  *Id.* at 16.

    The parties subsequently engaged in such discussions, which resulted in the classification

of the documents at issue in Apollo's Amended Subpoena and Motion to Compel into six

categories.[2]  The parties further agreed that "[i]n exchange for Apollo's agreement to withdraw

its motion to compel to the extent that it seeks documents in Categories 1, 3 and 4," the DOE

would produce certain specific documents included in Categories 5 and 6, and would

produce–pursuant to a rolling schedule–privilege logs for all documents from Categories 2, 5,

and 6 not included in the DOE's voluntary production.  Joint Agr. at 2-4.  The parties also agreed

to a schedule for briefing on disputes regarding Apollo's various privilege logs, which provided

that the briefing would be ripe without reply briefs by Apollo.  *Id.* at 4-5.  The Court adopted the

_____

[2] The categories included: (1) Internal DOE documents explicitly seeking or providing legal advice; (2) Internal DOE documents "concerning the conduct of the program review other than documents contained in Category 1;" (3) Internal DOE drafts of the Report; (4) Internal DOE documents concerning the settlement with Apollo or settlement meetings with Apollo; (5) DOE analysis of the information provided by Apollo in response to the issuance of the Report; and (6) "All documents communicated to or received from third parties, including witness statements and communications with Apollo or the *qui tam* relators or their counsel."  Parties' Joint Agr. for the Prod. of Docs, Prod. of a Priv. Log, and Partial Dismissal of Mot. to Compel, Docket No. [18] (hereinafter "Joint Agreement") at 1-2.

parties' proposals by Minute Order dated April 16, 2007.  On May 21, 2007, Apollo filed its

Supplemental Brief seeking to compel the DOE to supplement its production of Category 5 and 6

Documents.  *See* Apollo Suppl. Br. Pursuant to Orders of March 12 and April 16, 2007 to

Compel the DOE to Suppl. Its Doc. Prod. of Category Five and Six Docs., Docket No. [21]

(hereinafter "Apollo First Suppl. Br.").  On July 10, 2007, Apollo filed its Second Supplemental

Brief seeking to compel the DOE to produce Category 2 documents.  The DOE filed its

Oppositions to Apollo's Supplemental Briefs on June 15 and July 24, 2007, respectively.

On May 19, 2008, the Court issued an Order requiring the parties to provide it with any

additional information on factual and legal developments that the parties believed were material

to the Court's consideration of the pending motion.  *See* Order, May 19, 2008, Docket No. [30].

The parties' responses to that Order reveal that the securities action underlying this

miscellaneous action proceeded to trial in January 2008, and resulted in a jury verdict against

Apollo.  *See* Apollo Notice, Docket No. [31] at 4; DOE Notice, Docket No. [32] at 3-4.  Apollo

nevertheless asserts that resolution of the cross-motions pending in this miscellaneous action is

necessary in order "to allow Apollo to defend itself in its post-trial motions for judgment as a

matter of law and a new trial, and on any subsequent appeal."  Apollo Notice at 4.  The Court

notes that Apollo did not bring the trial date in the underlying securities action to this Court's

attention and that, in fact, nothing was filed in this matter by either party between the DOE's July

24, 2007 Opposition to Apollo's Second Supplemental Brief and this Court's May 19, 2008

Order requesting an update on the case from the parties.

## II.  LEGAL STANDARDS

Federal Rule of Civil Procedure 45(c)(2)(B) provides that if a party commanded to

produce documents in response to a subpoena objects to doing so, "the serving party may move the issuing court for an order compelling production or inspection." Fed. R. Civ. P. 45(c)(2)(B). On the other hand, Rule 45(c)(3)(A) states that the Court must quash or modify a subpoena, upon timely motion, that, *inter alia* "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(c)(3)(A). Further, Rule 45(d)(2) states that "[a] person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(d)(2).

## III.  DISCUSSION

Apollo's First Supplemental Brief relates to the DOE's withholding of certain Category 5 and 6 documents on the grounds of the attorney work-product and deliberative process privileges, and redacting of documents in Category 6 in reliance on the informer's identity privilege. *See generally* Apollo First Suppl. Br.  Apollo's Second Supplemental Brief relates to the DOE's withholding of all documents identified as falling within Category 2 on the basis of the attorney work-product and deliberative process privileges. *See generally* Apollo Second Suppl. Br. Although Apollo's Supplemental Briefs thus seek to compel the production of different types of documents, the parties' arguments regarding the privileges applicable to those documents cut across the various categories and are generally based on the circumstances of the Program Review as opposed to the particular types of documents.  As such, for both the attorney work-product and the deliberative process privileges, the Court first addresses the general applicability

of the privilege to the documents Apollo seeks in the Amended Subpoena, and then turns to a

consideration of the specific types of documents withheld by the DOE based on each privilege.

After that, the Court considers the DOE's redaction of documents within Category 6 on the basis

of the informer's identity privilege.  In sum, the Court concludes that the DOE has established

the applicability of all of the privileges it invokes, and thus has properly withheld and redacted

documents sought in the Amended Subpoena based upon those privileges.

      *A.*        *The DOE Properly Invokes the Attorney Work-Product Privilege*

      *1.*        *The Attorney Work-Product Privilege's General Applicability*

The attorney work-product privilege generally protects memoranda and other documents

prepared by an attorney in contemplation of litigation.  *See generally Hickman v. Taylor*, 329

U.S. 495 (1947); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864-85 (D.C. Cir.

1980); *see also* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and

tangible things that are prepared in anticipation of litigation or for trial by or for another party or

its representative (including the other party's attorney, consultant, surety, indemnitor*, insurer, or

agent*)").[3]  The attorney work-product privilege, unlike the attorney-client privilege, is not

intended to protect the confidential relationship between attorney and client, but rather is

intended to protect the adversarial trial process.  *Coastal States*, 617 F.2d at 864.  As the

Supreme Court explained in *Hickman*, "it is essential [to our adversarial system] that a lawyer

work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and

---

[3] Because FOIA Exemption 5 has been construed "to encompass the protections
traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery
context," *Taxation With Representation Fund v. IRS,* 646 F.2d 666, 676 (D.C. Cir. 1981), cases
discussing the attorney work-product and deliberative process privileges in the FOIA context are
relevant to the instant case.

their counsel." 329 U.S. at 510-11.  An attorney's work-product may be reflected in "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways[,]. . . [but] [w]ere such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten." *Id.* at 511.

The limiting principle for the attorney work-product privilege is that it only applies to documents prepared in anticipation of litigation or for trial.  *Coastal States*, 617 F.2d at 864.  The litigation at issue need not be judicial, rather, courts have found that the attorney work-product privilege extends to documents prepared in anticipation of administrative litigation, partially because "administrative litigation certainly can beget court litigation and may in many circumstances be expected to do so."  *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 700 (D.D.C. 1983).  Nevertheless, "the work-product rule does not extend to every written document generated by an attorney; it does not shield from disclosure everything that a lawyer does," rather "there is no privilege at all unless the document was initially prepared in contemplation of litigation."  *Coastal States*, 617 F.2d at 864-65.  The D.C. Circuit has held that the "testing question" for the work-product privilege is "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  *Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 586 n.42 (D.C. Cir. 1987) (citations omitted).  "For a document to meet this standard, the lawyer must have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable."  *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (citation omitted).

Apollo maintains that the DOE cannot establish that any documents created in connection with the Program Review were prepared "in anticipation of litigation" because the DOE itself has described the Program Review as "routine monitoring."  Apollo Second Suppl. Br. at 11-12, Ex. I (8/26/04 DOE Letter) at 12.  As discussed in greater detail below, before the Report was made public, the DOE notified Apollo that it had received FOIA requests seeking the Report. *See* Apollo Mot. to Compel Reply at 4, Ex. A (3/18/04 DOE Letter).  Apollo, in turn, "objected to the release of the Report for a number of reasons."  *Id.* at 4, Ex. B (4/5/04 Apollo Letter).  On August 26, 2004, the DOE rejected Apollo's arguments against release of the Report by letter, stating in relevant part that the Report "was created as a result of the Department's routine monitoring of the Title IV Federal Student Financial Assistance programs administered by [UOP]."  Apollo First Suppl. Br. Ex. I, (8/26/04 Letter from DOE) at 11-12.

Apollo's description of the Program Review as a routine, regulatory investigation is diametrically opposed to the version of facts evinced in the series of Declarations the DOE provides.  These include two Declarations apiece from Jennifer L. Woodward, an attorney with the DOE's Office of the General Counsel ("OGC") who has personal knowledge concerning the Program Review, and Kent D. Talbert, the General Counsel of the DOE.  *See* 6/12/07 Woodward Decl. (attached as Ex. to DOE Opp'n to Apollo First Suppl. Br.); 7/24/07 Woodward Suppl. Decl. (attached as Ex. to DOE Opp'n to Apollo Second Suppl. Br.); 6/15/07 Talbert Decl. (attached as Ex. to DOE Opp'n to Apollo First Suppl. Br.); 7/24/07 Talbert Suppl. Decl. (attached as Ex. to DOE Opp'n to Apollo Second Suppl. Br.).  Ms. Woodward and Mr. Talbert's Declarations stress what they describe as the highly atypical nature of the UOP Program Review. *See generally id.*  In turn, the DOE asserts that the atypical nature of the UOP Program Review

establishes that it was conducted in anticipation of litigation, rather than as a matter of routine

monitoring.  *See* DOE Opp'n to Apollo First Suppl. Br. at 15-17; DOE Opp'n to Apollo Second

Suppl. Br. at 4-10.

According to Ms. Woodward, DOE program review reports "typically follow an on-site

visit to a school during which Institutional Review Specialists perform a program review of a

school's participation in the student financial assistance programs authorized pursuant to Title IV

of the Higher Education Act of 1965," Woodward Suppl. Decl. ¶ 5, and–in a typical Program

Review–"OGC lawyers become involved in a program review process when a draft program

review report is sent to OGC for a review of its legal sufficiency," *id.* ¶ 6.  In contrast, the UOP

Program Review had its genesis in the *qui tam* complaint filed by two former UOP employees.

According to Ms. Woodward, once the DOJ declined to intervene in the *qui tam* action, the DOE

advised the DOJ that the *qui tam* complaint raised credible evidence that UOP had violated the

Higher Education Act and that, as a result, the DOE was considering what administrative action

to take against UOP.  *Id.*  OGC then contacted the DOE's Federal Student Aid ("FSA") division

and "recommended that FSA conduct a program review."  *Id.*

Ms. Woodward avers that "[b]ecause the genesis for [the UOP] program review was the

*qui tam* complaint, OGC had far more involvement in the planning and conduct of the program

review than is typical."  *Id.*  Indeed, she asserts that she and another OGC attorney "were

involved in determining the strategy of the program review from its inception," precisely because

OGC "anticipated that the program review would lead to further administrative litigation with

Apollo."  *Id.* ¶ 7.  According to Ms. Woodward, even before the DOE commenced its program

review (but after the DOJ had declined to intervene), she and the other OGC attorney interviewed

12

the *qui tam* relators under oath with their counsel present, and "asked pointed questions of the relators in order to substantiate the allegations and to garner information related to planning the strategy of the program review." *Id.* Ms. Woodward's planning of the program review involved regular communication with the *qui tam* relators and their counsel "gathering information related to the strategy of the program review, including what locations to focus on, what documents to ask for, and who to interview." Woodward Decl. ¶ 10.

As to the actual conduct of the program review, Ms. Woodward avers that "[b]ecause the [DOE] anticipated that the program review would be contested," she and the other OGC attorney "led and advised the program review team on how to conduct the program review." Woodward Suppl. Decl. ¶ 8. In particular, Ms. Woodward explains that she participated in many of the interviews conducted during the August 2003 on-site review at UOP "because the entire program review process was conducted with an eye toward litigation the [DOE] anticipated would follow." *Id.* ¶ 10. Ms. Woodward stresses that her "involvement in the [UOP] program review was not routine OGC involvement in program reviews," *id.*, and that she and the other OGC attorney "were not members of the FSA program review team" but rather were "assigned to oversee and advise the program review team during the program review." *Id.* ¶ 9.

Ms. Woodward's description of the atypical nature of the UOP Program Review and the OGC attorneys' involvement in that review is echoed in Mr. Talbert's Declaration. Mr. Talbert avers that the "program review was initiated and directed by OGC," and "was unusual in that its genesis was a qui tam False Claims Act complaint." Talbert Decl. ¶¶ 7-8. According to Mr. Talbert, the DOE "anticipated that [UOP] would initiate litigation to contest any Department finding adverse to [UOP]." *Id.* ¶ 8. Ms. Woodward and Mr. Talbert's Declarations thus

constitute strong evidence that the UOP Program Review was significantly different from ordinary DOE program reviews because it arose out of *qui tam* allegations and was directed and overseen by OGC attorneys who were intimately involved in designing and implementing the review process.  Against this strong evidence, Apollo offers only the DOE's previous statement that the Report was the result of "routine monitoring."  As the DOE correctly asserts, however, Apollo's reference to the DOE's "routine monitoring" statement is taken out of context, because the statement was made by the DOE's FOIA Officer in the context of third party requests for a copy of the Report and did not relate to the documents underlying the Report, which Apollo now seeks in the Amended Subpoena.  *See* DOE Opp'n to Apollo Second Suppl. Br. at 5-6.  In short, the Court finds that an out-of-context statement by Apollo's FOIA Officer simply does not cast doubt upon Ms. Woodward and Mr. Talbert's averments that the UOP Program Review was not a matter of "routine monitoring."

Ms. Woodward and Mr. Talbert's Declarations thus establish that the DOE actually anticipated that the UOP Program Review would lead to litigation, and thus meet the work-product privilege requirement that the attorney "had a subjective belief that litigation was a real possibility."  *In re Sealed Case*, 146 F.3d at 884.  As to the second requirement–that "that belief have been objectively reasonable," *id.*–Apollo argues that the Program Review never reached a point where the DOE could reasonably have anticipated litigation.  Apollo Second Suppl. Br. at 19-20.  Apollo stresses that "[d]ocuments prepared for an investigation as part of normal procedures or pursuant to a regulation[, as opposed to in anticipation of litigation,] are not work product."  *Id.* at 16-17 (quoting *Tarpeh-Doe v. United States*, No. 88-0270, 1990 U.S. Dist. LEXIS 15330, at *7 (D.D.C. Nov. 13, 1990)).  Apollo also stresses the D.C. Circuit's findings

that "the mere possibility of litigation" cannot support a broad claim of privilege and that "at the very least some articulable claim likely to lead to litigation, must have arisen." *Coastal States*, 617 F.2d at 865-66. According to Apollo, the DOE cannot show that the Program Review was conducted in reasonable anticipation of litigation because the DOE cannot establish "that a specific claim had arisen, was disputed by the company, and was being discussed in the memorandum," as set forth in *Coastal States*. *See id.* at 866.

However, at least two D.C. Circuit cases since *Coastal States* discussing the "specific claim" requirement suggest that the DOE *can* show that it reasonably anticipated litigation throughout the Program Review. First, in *Safecard Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197 (D.C. Cir. 1991), the D.C. Circuit addressed the question of whether documents created during the course of SEC investigations into potential illegal trading constituted attorney work-product. In that case, the D.C. Circuit recognized that "every document prepared during an investigation is [not] necessarily prepared in anticipation of litigation," but nevertheless held that "where an attorney prepares a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party, it has litigation sufficiently 'in mind' for that document to qualify as attorney work product." *Id.* at 1203. Subsequently, in *In re Sealed Case*, 146 F.3d 881, the D.C. Circuit explained that it required a specific claim in *Coastal States* and *SafeCard* because the documents at issue in those cases were "prepared by government lawyers in connection with active investigations of potential wrongdoing," but had not required a specific claim in two other cases–*Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992) and *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 126-28 (D.C. Cir. 1987)–where "government lawyers acted not

15

as prosecutors or investigators of specific wrongdoers, but as legal advisors protecting their agency clients from the possibility of future litigation." *Id.* at 885.  In the latter category of cases, the D.C. Circuit held, "the absence of a specific claim represents just one factor that courts should consider in determining whether the work-product privilege applies," and a court considering the applicability of the privilege should "determine whether, under all the circumstances, the lawyer prepared them 'in anticipation of litigation,' or whether they were prepared in the ordinary course of business." *Id.* at 887-88.

In this case, Ms. Woodward and Mr. Talbert's Declarations establish that documents relating to the Program Review may meet either standard.  Those Declarations make clear that the Program Review was commenced based upon the specific allegations in the *qui tam* complaint and that the *qui tam* relators' allegations shaped the DOE's strategy and process for the Program Review.  *See* Woodward Suppl. Decl. ¶ 7 (describing pre-Program Review interview with *qui tam* relators, discussed above).  As such, the Program Review can fairly be described as "an active investigation focusing upon specific events and a specific possible violation by a specific party," and thus "in anticipation of litigation" under the standard in *Safecard*.  *See* 926 F.2d at 1203.

Further, to the extent that the OGC lawyers' role in the Program Review was "as legal advisors protecting their agency clients from the possibility of future litigation," *In re Sealed Case*, 146 F.3d at 885, it appears that "under all the circumstances," the OGC lawyers prepared documents "in anticipation of litigation," *id.* at 888.  Again, Ms. Woodward and Mr. Talbert's Declarations establish that the OGC lawyers' very involvement in the Program Review from the outset was the result of the DOE's expectation that Apollo "would initiate litigation to contest

16

any Department finding adverse to [UOP]." Talbert Decl. ¶ 8.  Moreover, the DOE's expectation

does not, in hindsight, appear unreasonable because, as the DOE notes, "Apollo did immediately

contest the findings in the report, requesting that the [DOE] not make the document public."

DOE Opp'n to Apollo Second Suppl. Br. at 8.  Indeed, the settlement agreement that ultimately

resolved the Program Review short of litigation stated that a settlement was reached in order to

"resolve the program review and avoid the cost of future litigation," thus indicating that both

Apollo and the DOE anticipated that the Program Review would actually have led to litigation if

not settled.  *See* Settlement Agreement at 1 (attached as Ex. to DOE Opp'n to Apollo Second

Suppl. Br.).[4]

        In short, the Court finds that the DOE has met its burden of demonstrating that, in

principle at least, documents related to the Program Review may have been created in

anticipation of litigation.  Before turning to an analysis of the particular documents as to which

the DOE invokes the attorney work-product privilege, however, the Court briefly addresses a few

other general arguments regarding the applicability of the work-product privilege in the instant

case.  First, to the extent that Apollo suggests that the work-product privilege may not apply to

documents that were authored by non-lawyers, *see* Apollo First Suppl. Br. at 12-13, Second

---

        [4] In that respect, this case differs significantly from one Apollo relies heavily upon, *Tarpeh-Doe*, because there the court found that, although litigation might have been foreseen during the administrative investigation in that case, the documents at issue "were prepared with a different purpose in mind: reaching a non-reviewable administrative decision."  1990 U.S. Dist. LEXIS 15330, *8.  Here, as Apollo itself explains, after an institution receives a program review report, it has a chance–as Apollo did–to provide the DOE with information responding to the report, after which the Department may issue an FPRD which determines any financial liabilities on the part of the institution. Apollo Second Suppl. Br. at 20-21 (citing Woodward Decl. ¶ 6). The institution may then challenge the FPRD in a hearing before a DOE hearing officer and, following an adverse ruling by the hearing officer, may appeal the finding directly to the Secretary of the DOE.  *Id.* at 120 (citations omitted).

Suppl. Br. at 17-18, that suggestion is incorrect.  As the Supreme Court explained in *United States v. Nobles*, 422 U.S. 225 (1975):

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area in which he can analyze and prepare his client's case.  But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system.  One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial.  It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* at 239.  Here, as discussed above, the OGC lawyers "led and advised the program review team on how to conduct the program review," Woodward Suppl. Decl. ¶ 8, and "communicated virtually on a daily basis [with the Program Review staff] during the conduct of the program review and the subsequent writing of the Report," Woodward Decl. ¶ 14.  In such circumstances, the application of the attorney work-product privilege to documents reflecting communications between the OGC lawyers and the members of the Program Review staff may well have been in anticipation of litigation.

Apollo is also incorrect in asserting that, as a general matter, "factual information received from the relators cannot be converted into work product simply because it was received by a [DOE] attorney."  Apollo First Suppl. Br. at 16.  This assertion incorporates two separate ideas: first, a suggestion that factual matter is not covered by the attorney work-product privilege, and second, that information communicated with third parties cannot be covered by the privilege.  As to the first, Apollo's claim is in error because the D.C. Circuit has explicitly found that, unlike the deliberative process privilege discussed below, the "work-product privilege simply does not distinguish between factual and deliberative material."  *Martin v. Office of Special*

*Counsel, Merit Sys. Protection Bd.*, 819 F.2d 1181, 1187 (D.C. Cir. 1987).[5]

Apollo next asserts that the DOE's communication of certain information to third parties,

i.e., the *qui tam* relators and their counsel, waives the attorney work-product privilege (and all

other privileges) as to all documents or information that fall within the same subject matter as the

voluntarily produced communications.  *See* Apollo First Suppl. Br. at 20-21 (quoting *In re Sealed*

*Case*, 877 F.2d 976, 981 (D.C. Cir. 1989)).  The Court discusses in greater detail below the

specific types of documents reflecting communications with third parties that the DOE has

withheld.  At this point, the Court notes simply that the D.C. Circuit has found that because the

"work product privilege does not exist to protect a confidential relationship, but rather to

promote the adversary system," "the mere showing of a voluntary disclosure to a third person"

"should not suffice in itself for waiver of the work product privilege" if that disclosure is "not

inconsistent with maintaining secrecy against opponents."  *United States v. AT&T*, 642 F.2d

1285, 1299 (D.C. Cir. 1980).  Further, the "existence of common interests between transferor and

transferee is relevant to deciding whether the disclosure is consistent with the nature of the work

---

[5] It is true that different standards may apply to factual information incorporated in work product, as opposed to attorney opinions included in such materials.  For instance, in *Hickman*, the Supreme Court clarified that "[w]here relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to one's case, discovery may properly be had."  329 U.S. at 511.  Similarly, Federal Rule of Civil Procedure 26(b)(3), generally provides that materials prepared in anticipation of litigation are protected from disclosure in civil discovery, but may be subject to discovery only upon a showing of substantial need and undue hardship.  Fed. R. Civ. P. 26(b)(3).  Even still, however, the Rule requires that if a court orders disclosure of such materials, it must nevertheless protect "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  *Id.*  Not surprisingly, then, courts have found that such "opinion work product" "are entitled to special protection and require a stronger showing of necessity to justify release." *Willingham v. Ashcroft*, 228 F.R.D. 1, 3-4 (D.D.C. 2005) (quoting *Byers v. Burleson*, 100 F.R.D. 436, 439 (D.D.C. 1983); *see also Upjohn Co. v. U.S.*, 449 U.S. 383, 400-01 (1981).

product privilege," and "[s]o long as transferor and transferee anticipate litigation against a common adversary on the same issue or issues, they have strong common interests in sharing the fruit of the [litigation] preparation efforts." *Id.* Apollo argues simply that "there is no common interest between the *qui tam* relators and the government because the government declined to intervene in the *qui tam* action." Apollo First Suppl. Br. at 20. As established above, however, the DOJ's decision not to intervene in the *qui tam* action has no bearing on whether the DOE, in determining how to conduct the Program Review, acted in anticipation of litigation against Apollo. Instead, Ms. Woodward's Declarations clearly establish that the OGC attorneys directing the Program Review relied heavily upon information provided by the *qui tam* relators–who were already involved in litigation against Apollo–in devising their Program Review strategy. *See* Woodward Suppl. ¶ 7. As such, at the point of those communications, it can fairly be said that both the DOE and the relators "anticipate[d] litigation against a common adversary on the same issue or issues." *AT&T*, 642 F.2d at 1299.

Having generally determined that the attorney work-product privilege may apply to the documents the DOE has withheld, the Court turns to the specific types of documents withheld by the DOE in reliance upon that privilege.

2.      *The Attorney Work-Product Privilege's Specific Application*

a.      *Category Two Documents*

The parties' Category 2 includes internal DOE documents "concerning the conduct of the program review other than documents contained in Category 1," i.e., internal DOE documents that explicitly seek or provide legal advice. Joint Agr. at 1. The DOE did not produce any Category 2 documents to Apollo, but rather produced a Category 2 Privilege Log including 52 e-

mails, 17 of which have attachments that include drafts of interview questions and drafts of a

letter to UOP announcing the Program Review, and the other 35 of which consist of

communications between and among the Program Review staff and the two DOE OGC attorneys

coordinating the Program Review, which the DOE asserts discuss possible strategies and

methods for conducting the Program Review.  *See* DOE Opp'n to Apollo Second Suppl. Br. at 1;

Apollo Second Suppl. Br., Ex. A (Category 2 Priv. Log).

The Court clarifies a few initial issues regarding the DOE's Category 2 response before

turning to its specific invocation of the attorney work-product privilege.  First, in its Second

Supplemental Brief, Apollo speculates that the 52 documents included on the DOE's Category 2

Privilege Log do not account for all of the DOE's internal documents concerning the program

review because Ms. Woodward has averred that the Program Review team "communicated

virtually on a daily basis during the conduct of the program review and subsequent writing of the

Report," and because the Category 2 Privilege Log does not reflect many e-mails after August

2003.  Apollo Second Suppl. Br. at 3-4 (quoting Woodward Decl. ¶ 14).  The DOE's Opposition,

however, clarifies that the DOE only placed in Category 2 "those documents related to the

execution, direction or management of the program review," while placing documents "that

substantively discussed the findings of the review, the writing of the [Report], or analyzed the

information" but did not "concern the *conduct* of the review" in other categories.  DOE Opp'n to

Apollo Second Suppl. Br. at 3.  As the DOE's explanation adequately explains what Apollo

views as the low number of Category 2 documents, the Court sees no basis to question the

completeness of the DOE's Category 2 documents.

Further, in its brief regarding the DOE's Category 2 withholdings, Apollo suggests that

21

the DOE has improperly withheld documents reflecting communications with Apollo and the *qui tam* relators.  Apollo Second Suppl. Br. at 22-23.  The DOE's Opposition, however, again clarifies that the DOE has not withheld, in the context of Category 2, any documents consisting solely of communications from third parties (either Apollo or the *qui tam* relators).  *See* DOE Opp'n to Apollo Second Suppl. Br. at 15-16.  Instead, the DOE asserts that it has withheld (in Category 2) documents that may have their genesis in a base e-mail from a third-party, but also include internal DOE discussion of "how [such] information [from third-parties] would shape the strategy and conduct of the program review."  DOE Opp'n to Apollo Second Suppl. Br. at 16.  As such, the Court considers Apollo's arguments regarding Category 2 documents from third parties to be without merit.

Turning, then, to the DOE's Category 2 withholding.  The DOE's Category 2 Privilege Log reflects 52 documents, all of which consist of communications between and among the Program Review staff and the two DOE OGC attorneys coordinating the Program Review. Apollo Second Suppl. Br., Ex. A (Category 2 Priv. Log).  Each of the 52 documents is either sent to or by one of the OGC attorneys that directed the Program Review.  *Id.*   The Court's prior discussion of the nature of the OGC attorneys' involvement in the Program Review, which is based on Ms. Woodward and Mr. Talbert's Declarations, suffices to substantiate the DOE's claim that these 52 documents were prepared in anticipation of litigation.  The DOE's Privilege Log and Oppositions make clear that all of the withheld Category 2 documents either directly involve the OGC attorneys' mental impressions and opinions regarding the conduct of the Program Review (which, as discussed above, the DOE has established was conducted in anticipation of litigation) or involve the mental impressions and opinions of the Program Review

staff, who were conducting the Program Review under the direction of the OGC attorneys.  The

Court therefore finds that the DOE has established that the withheld Category 2 documents are

covered by the attorney work-product privilege.

> b.    *Category Five Documents*

The parties' Category 5 includes internal DOE "analysis of the information provided by

Apollo in response to the issuance of the February 5, 2004 Program Review Report."  Joint Agr.

at 1.  The DOE produced 138 pages of Category 5 documents to Apollo, but withheld 27

documents and redacted information from one additional document (document 28).  *See* Apollo

First Suppl. Br. at 7, Ex. H (Category 5 Priv. Log).  Like the Category 2 documents withheld, the

withheld Category 5 documents consist of e-mail communications between and among the OGC

attorneys directing the Program Review and the Program Review staff, and many include

forwarded attachments of draft documents, draft data sets, and draft scatter charts related to the

DOE's analysis of information provided by Apollo.  DOE Opp'n to Apollo First Suppl. Br. at 2;

Apollo First Suppl. Br., Ex. H (Category 5 Priv. Log).

Although, as discussed below, the DOE more strenuously argues that the withheld

Category 5 documents are covered by the deliberative process privilege, it also asserts attorney

work-product privilege over those documents, stating that all of them were used for settlement

purposes.  DOE Opp'n to Apollo First Suppl. Br. at 2 (generally citing Talbert Decl.); Talbert

Decl. ¶¶ 5(1), 13 ("almost all of the Category 5 emails include attachments.  Those attachments

comprise draft documents generated by [DOE] attorneys and program staff involved in making

decisions related to whether and on what terms to settle with [UOP].").  The Court notes that

"[t]he term 'litigation' is interpreted broadly to encompass not only trials and other judicial

proceedings, but also adversarial administrative matters, settlement negotiations, and the *avoidance* of anticipated litigation." *Gen. Elec. Co. v. Johnson.*, No. Civ. A. 00-2855(JDB), 2006 WL 2616187, *11 (D.D.C. Sept. 12, 2006). The Court therefore finds that insofar as the withheld Category 5 documents represent the mental impressions and opinions of the OGC attorneys and Program Review staff (as directed by the OGC attorneys) regarding the settlement of the Program Review, they are properly withheld pursuant to the attorney work-client privilege.

A final issue regarding the DOE's Category 5 production: Apollo asserts that, notwithstanding the parties' Joint Agreement, the DOE has withheld its "final analysis" of the information provided to it by Apollo in response to the Report, noting that the only memorandum the DOE disclosed describing its analysis of the information produced by Apollo is dated before the DOE received all of the information Apollo eventually provided. Apollo First Suppl. Br. at 13-14. That claim, however, is again resolved by the DOE's Opposition. Specifically, the DOE asserts–and the attached Declaration of Donna Wittman, an Institutional Review Specialist who worked on the Program Review establishes–that the April 11, 2004 memorandum the DOE produced describing its analysis is the only such written memorandum that was created. DOE Opp'n to Apollo First Suppl. Br. at 12; Wittman Decl. ¶ 13 (attachment to DOE Opp'n to Apollo First Suppl. Br.). Apollo produced to the DOE the data underlying that memorandum, withheld other draft information, and produced to Apollo its final scatter charts and supporting data, albeit without an accompanying memorandum, but simply because no such memorandum was created. DOE Opp'n to Apollo First Suppl. Br. at 12-13; Wittman Decl. ¶ 13. Thus, Apollo's claim that the DOE has not produced its "final analysis" appears unfounded.

c.      *Category Six Documents*

The parties' Category 6 includes "[a]ll documents communicated to or received from

third parties, including witness statements and communications with Apollo or the *qui tam*

relators or their counsel."  Joint Agr. at 1.  The DOE produced 876 pages of Category 6

documents, but withheld 49 Category 6 documents, consisting of 761 pages.  Apollo First Suppl.

Br. at 14, Ex. L (Category 6 Priv. Log).  These documents are of two types.  First, the DOE has

withheld 3 documents consisting of transcripts of the interviews the OGC attorneys conducted

with the *qui tam* relators during the period after the DOJ declined to intervene but before the

DOE's Program Review commenced (documents 1, 3-4).  Second, the DOE has withheld 43

documents consisting of e-mail communications between and among DOE attorneys, the *qui tam*

relators, and the *qui tam* relators' counsel (documents 6-49).  The Court addresses each in turn.

As discussed above, before the DOE's Program Review began, Ms. Woodward and the

other OGC attorney interviewed the *qui tam* relators with their counsel present "in order to

garner information related to the planning strategy for the program review."  Woodward Decl. ¶

9.  According to Ms. Woodward, the attorneys conducted the interviews as "sworn testimony

before a court reporter" because they "anticipated that the program review would lead to further

administrative litigation with Apollo."  *Id.*[6]  The DOE has withheld the transcripts of those

interviews.  For its part, Apollo argues that "[t]here is simply no rational basis for the [DOE] to

_____

[6] Apollo describes these documents as "deposition transcripts," asserting that the DOE
has used that phrase to describe them.  Apollo First Suppl. Br. at 15 & n.5.  Now, however, the
DOE describes the documents as witness interviews conducted on the record under oath.  DOE
Opp'n to Apollo First Suppl. Br. at 16.  As Apollo acknowledges, the *qui tam* relator interviews
do not appear to have actually been conducted in connection with ongoing litigation (as opposed
to the future litigation the DOE anticipated), and therefore do not appear to be "deposition
transcripts" *per se.*  Apollo First Suppl. Br. at 15 n.5.

produce the August 2003 interview summaries from the *qui tam* relators, while simultaneously

refusing to produce the June and July interview statement[s] that were taken in connection with

the exact same regulatory review."  Apollo First Suppl. Br. at 15-16.  Apollo's argument

overlooks the DOE's explanation of *why* the OGC attorneys conducted these *particular* witness

interviews, i.e., "to garner information related to the planning strategy for the program review."

Woodward Decl. ¶ 9.  The Court has already concluded, above, that the Program Review itself

was conducted in anticipation of litigation, and Apollo offers no reason to doubt the DOE's

assertion that releasing the three witness interview transcripts at issue "would reveal the [OGC]

attorneys' entire plan and strategy for the [DOE]'s program review and the anticipated final

action based thereon."  DOE Opp'n to Apollo First Suppl. Br. at 16-17.

Instead, Apollo argues that "the purported reason for withholding the documents–*i.e.,* that

they might disclose how the attorneys involved intended to conduct the program review–is now

moot" because the Program Review has been completed and settled.  Apollo First Suppl. Br. at

18.  This argument overlooks the fact that the need for attorney work-product protection does not

disappear once the litigation which it was prepared in connection with is over.  *Fed. Trade*

*Comm'n v. Grolier, Inc.*, 462 U.S. 19, 30 (1983) (Brennan, J., concurring); *see also Delaney*, 826

F.2d at 127 ("material prepared in anticipation of litigation remains privileged after litigation

ends) (citing *Fed. Trade Comm'n v. Grolier*).  Accordingly, the Court concludes that, based on

the DOE's representations that they would reveal key attorney mental impressions,  the witness

interview transcripts are properly withheld pursuant to the attorney work-product privilege.

The second type of Category 6 documents as to which the DOE claims the attorney work-

product privilege applies are 43 e-mail communications between and among DOE attorneys, the

*qui tam* relators, and the *qui tam* relators' counsel.  *See* Apollo First Suppl. Br., Ex. L (Category

6 Priv. Log).  To the extent that Apollo argues the DOE cannot claim attorney work-product

privilege as to these e-mails because they include communications with third parties, the Court

has already concluded, above, that the DOE's communications with the *qui tam* relators do not

waive the privilege because they are not inconsistent with maintaining secrecy against the

common opponent, Apollo.  *See AT&T*, 642 F.2d at 1299.  Apollo also argues that the DOE has

waived any privilege as to the withheld e-mail communications because it has produced dozens

of other e-mails between and among DOE attorneys, the *qui tam* relators, and the *qui tam*

relators' counsel and because "Apollo is unable to identify a consistent methodology to

distinguish between the e-mails the [DOE] produced and those it selectively withheld."  Apollo

First Suppl. Br. at 18-19.  Apollo's speculative conclusion that the documents the DOE has

withheld concern the same subject matter as those released (which is based only on the DOE's

Privilege Log descriptions), however, does not overcome Ms. Woodward's sworn statement that

the withheld documents reflect "specific questions [asked] of the relators through email

communications [for the purpose of] gathering information related to the strategy of the program

review, including what locations to focus on, what documents to ask for, and who to interview."

Woodward Decl. ¶ 14.  The Court finds Ms. Woodward's explanation of the contents of the

withheld documents sufficient to establish that they would reveal attorney opinions, mental

impressions, and strategies in anticipation of litigation.  The Court therefore finds that the DOE

has properly withheld them pursuant to the attorney work-product privilege, and shall deny

Apollo's motion to compel insofar as it challenges the DOE's invocation of the attorney work-

product privilege.[7]

      B.       *The DOE Properly Invokes the Deliberative Process Privilege*

          1.      *The Deliberative Process Privilege's General Applicability*

The general purpose of the deliberative process privilege is to "prevent injury to the quality of agency decisions." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975) ("*Sears Roebuck*").  More specifically, the privilege "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism;" "to protect against premature disclosure of proposed policies before they have been finally formulated or adopted;" and "to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States*, 617 F.2d at 866.  To this end, the privilege protects "documents and other materials that would reveal advisory opinions, recommendations, and deliberations comprising part of the process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citations omitted); *see also Sears Roebuck*, 421 U.S. at 151-53.

Although the deliberative process privilege often arises in the context of FOIA cases, it originated as a common law privilege. *Id.* at 150-51.  For the privilege to apply, the government

---

      [7] As noted above, the attorney work-product privilege may be overcome in certain instances, including where a party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(1).  Here, Apollo does not vigorously argue that its "need" for the documents the DOE withholds pursuant to the attorney work-product privilege is sufficient to overcome the DOE's claimed attorney work-product privilege as to classic attorney opinion work-product, and the Court therefore need not reach that issue.

must establish that the material at issue is both "predecisional" and "deliberative" in nature.  *Id.*

Generally speaking, "a document is predecisional if it was prepared in order to assist an agency

decision maker in arriving at his decision, rather than to support a decision already made."

*Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citing

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)).  As the

Supreme Court has stressed, however, "the existence of the [deliberative process privilege does

not turn] on the ability of an agency to identify a specific decision in connection with which a

memorandum is prepared," as many agency memoranda contain "recommendations which do not

ripen into agency decisions."  *Sears Roebuck*, 421 U.S. at 153 n.18.

    At its most basic, the courts have held that a document is deliberative in nature if "it

reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866.  The

deliberative process privilege, however, "does not shield documents that simply state or explain a

decision the government has already made or protect material that is purely factual, unless the

material is so inextricably intertwined with the deliberative sections of documents that its

disclosure would inevitably reveal the government's deliberations."  *In re Sealed Case*, 121 F.3d

at 737 (citing, *inter alia*, *Sears Roebuck*, 421 U.S. at 151; *Mink v. EPA*, 410 U.S. 73, 87-91

(1973)).  Similarly, predecisional materials, "even if 'factual' in form" may be covered by the

privilege if they "reflect an agency's preliminary positions or ruminations about how to exercise

discretion on some policy matter" and thus would "expose the deliberative process within an

agency." *Petroleum Info. Corp.* 976 F.2d at 1434-35.  "Conversely, when material could not

reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-

implementing judgment, the deliberative process privilege is inapplicable." *Id.* at 1435.

Here, Apollo maintains that the "deliberative process is simply inapplicable to this matter because the [DOE] has previously 'concluded that the [Report] itself is neither pre-decisional nor deliberative.'" Apollo First Suppl. Br. at 8 (citing Apollo First Suppl. Br. Ex. I, (8/26/04 Letter from DOE) at 12). Apollo's assertion is based on the DOE's response to Apollo's effort to oppose the original release of the Report in response to third-party FOIA requests, discussed above. Apollo opposed that release on a number of grounds, including "that it believed the Report was a non-final statement of interim findings that reflected the [DOE's] 'predecisional deliberative process.'" *See* Apollo Mot. to Compel Reply at 4, Ex. A (3/18/04 DOE Letter), Ex. B (4/5/04 Apollo Letter). However, on August 26, 2004, the DOE rejected Apollo's arguments in a letter, which explained the DOE's position that the Report constituted a final document for purposes of the deliberative process privilege. *See* Apollo First Suppl. Br. Ex. I, (8/26/04 Letter from DOE) at 11-12. The DOE's letter continued to state that:

> [T]he [Report] was created as a result of the Department's routine monitoring of the Title IV Federal Student Financial Assistance programs administered by [UOP]. The [Report] was not created for the purposes of the Department receiving advice or consultative services from [Apollo] in order to render a policy decision. Rather, the [Report] specifically states that its intent is to advise the institution of the findings made as a result of the program review. Moreover, the goal of the [Report] is to open up a dialogue between the [DOE] and [UOP] such that the findings of the [Report] can be resolved.

*Id.* at 12. According to Apollo, because the DOE has stated that the Report was the result of routine monitoring and meant to advise UOP of its findings, rather than render a policy decision, "the Department's internal communications regarding the conduct of the program review" and decisions made in connection with the Program Review "are simply not predecisional and not protected from discovery by the deliberative process privilege." Apollo Second Suppl. Br. at 7.

Not surprisingly, the DOE's takes a dramatically different position regarding the

deliberative and predecisional nature of the documents sought in Apollo's Amended Subpoena.

The DOE's argument that the documents are both predecisional and deliberative is supported by

Ms. Woodward and Mr. Talbert's various Declarations. According to both Ms. Woodward and

Mr. Talbert:

> The program review, program review report, and the settlement negotiation
> process consisted of a sequence of legal and policy judgments (i.e., how to
> investigate the allegations and prosecute the alleged violations, whether and how
> to issue the Report and the nature of its findings, and whether and on what terms
> to settle the case). The unusual manner in which the [DOE] became aware of the
> alleged violations (through unsolicited information submitted by qui tam relators
> rather than the more customary [DOE]-initiated review of student and school
> records), the potentially enormous economic and policy implications of the case,
> the complex nature of the issues involved, the evidentiary analysis required to
> prove the violation, and the extraordinary cost of the investigation, all represented
> highly unprecedented challenges requiring [DOE] lawyers and officials to exercise
> legal and policy judgments ab initio and at every step of the process.

Woodward Decl. ¶ 23; Talbert Decl. ¶ 12; Woodward Suppl. Decl. ¶ 13; Talbert Suppl. Decl. ¶ 7.

The DOE appears to have the better of this debate. As an initial matter, the fact that the

DOE previously concluded that the Report was a final document that was not intended to render

a policy decision does not, as Apollo maintains, establish that documents regarding the Program

Review *process* are final, non-deliberative documents. As the DOE explains it, the process of

arriving at the final Report involved a series of decisions regarding how to conduct the Program

Review, how to draft the Report, whether to settle with Apollo, and if so, on what terms.

Documents reflecting internal DOE debates on those decisions may well reflect "advisory

opinions, recommendations and deliberations comprising part of a process by which

governmental decisions and policies are formulated," *Sears Roebuck*, 421 U.S. at 150, and are

likely to "reflect the personal opinions of the writer rather than the policy of the agency," *Coastal

States*, 617 F.2d at 866. As such, the Court rejects Apollo's blanket assertion that the

deliberative process privilege is altogether inapplicable to the Program Review.

The Court also rejects Apollo's insinuation that the DOE cannot rely on the deliberative process privilege because it does not "point to any specific 'policy judgments' made during the program review." Apollo Second Suppl. Br. at 7. Significantly, as discussed above, the privilege serves to protect the processes by which "governmental decisions" as well as "policies" are formulated. *In re Sealed Case*, 121 F.3d at 737; *Sears Roebuck*, 421 U.S. at 150. Further, the Supreme Court has expressly rejected the idea that "the existence of the privilege turns on the ability of the agency to identify a specific decision in connection with which a memorandum is prepared." *Id.* at 152. The DOE has identified the series of legal and policy decisions involved in the Program Review, and the Court finds the DOE's briefs and supporting Declarations sufficient to identify the deliberative processes at issue in the documents withheld.

Having concluded that the deliberative process privilege may, as a matter of principle, apply to the documents the DOE has withheld from Apollo, the Court turns to a more specific consideration of the types of documents withheld, and then to a discussion of Apollo's claim that the deliberative process privilege–a qualified privilege–must yield to Apollo's purported need for the documents at issue.

  2. *The Deliberative Process Privilege's Specific Application to the Withheld Documents*

   *a.* *Category 2 Documents*

Again, the DOE has withheld 35 e-mail communications between and among Program Review staff and the two OGC attorneys directing the Program Review–which the DOE asserts discuss possible strategies and methods for conducting the Program Review–as well as 17 e-mail attachments that include drafts of interview questions and drafts of a letter to UOP announcing

the Program Review.  *See* DOE Opp'n to Apollo Second Suppl. Br. at 10-11; Apollo Second

Suppl. Br., Ex. A (Category 2 Priv. Log).  The DOE asserts that these documents reflect "the give

and take between the program staff and the attorneys antecedent to various decisions and

recommendations regarding how to conduct the program review in light of anticipated litigation,"

and explains that, with respect to the withheld Category 2 documents, the "deliberative process is

how to conduct the program review."  DOE Opp'n to Apollo Second Suppl. Br. at 11-12.

Apollo argues that the Category 2 documents the DOE withholds are neither pre-

decisional nor deliberative, and the Court addresses each argument in turn.  Before doing so,

however, the Court notes that, as discussed above, the DOE has clarified that the withheld

Category 2 documents do not include direct communications with third parties, but rather reflect

internal DOE discussions of those third-party communications.  DOE Opp'n to Apollo Second

Suppl. Br. at 15-16.  As such, the Court does not, within its discussion of the Category 2

documents, discuss Apollo's argument that the DOE cannot claim the deliberative process

privilege for documents created by third parties.  *See* Apollo Second Suppl. Br. at 10-11.

Turning, now, to Apollo's arguments regarding the Category 2 documents.  First, Apollo

argues that the withheld e-mails cannot be covered by the deliberative process privilege because

they were not "sent to anyone within the [DOE's] Office of the Secretary, or any of the

leadership of the FSA office, or to the [DOE's] General Counsel or Assistant General Counsel,"

and therefore do not reflect subordinates providing a decisionmaker with pre-decisional

recommendations.  Apollo Second Suppl. Br. at 9-10.  Apollo does not, however, proffer any

case law holding that a document must be transmitted to the ultimate decisionmaker to be

covered by the deliberative process privilege, or that documents reflecting debates among other

33

agency personnel involved in the decisionmaking process are not covered by the privilege.  In

addition, as the DOE explains, for purposes of deciding how to conduct the Program Review, the

OGC attorneys *were* the decisionmakers, and "made a series of government decisions based on

deliberations with the program review staff."  DOE Opp'n to Apollo Second Suppl. Br. at 13-14.

As such, because the withheld Category 2 e-mails reflect deliberations between and among the

OGC attorneys and the Program Review staff, they are properly characterized as pre-decisional.

Apollo next argues that the withheld Category 2 documents reflect factual matters, rather

than policy judgments, and therefore cannot be withheld pursuant to the deliberative process

privilege because it "does not shield documents that simply state or explain a decision the

government has already made or protect material that is purely factual." *In re Sealed Case*, 121

F.3d at 737; Apollo Second Suppl. Br. at 11-14.  In support of this claim, Apollo first asserts that

the withheld documents "concern [] non-policymaking actions regarding a factual investigation."

Apollo Second Suppl. Br. at 11-13.  Similarly, Apollo asserts that "the program review team was

simply implementing the [DOE's] policy of enforcing the incentive compensation regulations

and conducting a factual determination to 'quantify' the extent of the violations by UOP."  *Id.* at

13 (quoting Woodward Decl. ¶ 11).  In some respects, this assertion goes hand-in-hand with

Apollo's claim, rejected above, that the Program Review was simply a matter of routine,

regulatory monitoring.  As such, it is substantially undercut by the Court's conclusion above that

the Program Review was an atypical process conducted in anticipation of litigation.  Apollo's

*ipse dixit* is also undercut by Ms. Woodward and Mr. Talbert's Declarations establishing that

OGC attorneys overseeing the Program Review made a series of government decisions about

how to conduct the Program Review. *See* Woodward Decl. ¶ 23; Talbert Decl. ¶ 12; Woodward

Suppl. Decl. ¶ 13; Talbert Suppl. Decl. ¶ 7.[8]  The Court therefore rejects Apollo's unfounded

assertion that the Program Review was purely factual in nature.

Further, Apollo argues that the actual information transmitted in the Category 2

documents is factual, rather than deliberative, noting that the "category two privilege log includes

documents concerning 'site selection,' witness interviews, and descriptions of documents

'collected' during the program review.  Apollo Second Suppl. Br. at 12-13, Ex. A (Category 2

Priv. Log).  In contrast, the DOE's pleadings and Declarations establish that 17 of the documents

withheld include attachments that are "draft documents generated by Department attorneys and

program staff," such as "draft interview questions, draft letters, and draft strategy plans."  Talbert

Suppl. Decl. ¶¶ 4(a), 8.  As the DOE correctly notes, "[d]raft documents by their very nature, are

typically predecisional and deliberative," because they "reflect only the tentative view of their

authors; views that might be altered or rejected upon further deliberation either by their authors

or by superiors."  *Exxon Corp.*, 585 F. Supp. at 698 (citation omitted).  The DOE's Declarations

also establish that the remaining 35 e-mails "comprise email communications generated by OGC

attorneys or the program review staff sharing their opinions, recommendations, or advice about

the [DOE's] strategy and approach for conducting the program review."  Talbert Suppl. Decl. ¶

8.  The Court agrees with the DOE that "the generic titles in the subject line of an email often do

not convey information concerning the specific matter being discussed."  DOE Opp'n to Apollo

Second Suppl. Br. at 14.  While the DOE's Category 2 Privilege Log could be more descriptive,

_____

[8] While Apollo notes that Ms. Woodward's Declaration states that one purpose of the
Program Review was to "quantify the extent of the violation," she also states that the Review was
meant to "substantiate the allegations," and repeatedly stresses that it "was conducted with an eye
towards the administrative litigation the [DOE] anticipated would follow (and that, indeed,
would have followed in the absence of settlement)."  Woodward Decl. ¶¶ 11-12.

*see* Apollo Second Suppl. Br., Ex. A (Category 2 Priv. Log), the Court finds that its descriptions

are consistent with Ms. Woodward and Mr. Talbert's averments that the withheld e-mails reflect

discussions between and among the OGC attorneys and the Program Review staff regarding the

DOE's decisions as to how to conduct the Program Review.  In short, because the documents

withheld reflect internal DOE discussions regarding how to conduct the Program Review, and

because Mr. Talbert avers that "the specific information withheld, if disclosed, would reveal the

internal decision making processes of the [DOE] throughout the program review," the Court

concludes that the withheld Category 2 documents are properly encompassed by the deliberative

process privilege.

> b.      *Category Five Documents*

As discussed above, the DOE has withheld 27 documents from Apollo based, at least in

part, on the deliberative process privilege.  *See* Apollo First Suppl. Br. at 7, Ex. H (Category 5

Priv. Log).  The Court has already rejected, and therefore does not address, Apollo's argument

that the deliberative process privilege is altogether inapplicable to the Program Review.  Instead,

the Court considers the specific types of Category 5 documents withheld.  Like the withheld

Category 2 documents, the 27 withheld Category 5 documents include two types of materials:

draft documents that were "prepared for presentation to [DOE] officials . . . for internal use in

determining whether or not to settle with Apollo and, if so, on what terms," DOE Opp'n to

Apollo First Suppl. Br. at 13-14,  and e-mail communications between and among the OGC

attorneys overseeing the Program Review and the Program Review staff discussing those draft

documents, i.e., "what data to include, how to describe the data, how to categorize the violations,

the number of violations, etc.," *id.* at 12; *see also* Talbert Decl. ¶¶ 10-13.  Again, draft documents

fall directly within the category of materials that courts have repeatedly found protected by the deliberative process privilege. *See Exxon Corp.*, 585 F. Supp. at 698 (citation omitted). Further, with respect to the withheld e-mail communications, Apollo offers only speculation–based largely on the titles of the withheld documents listed in the Category 5 Privilege Log–that the materials withheld are factual, as opposed to deliberative in nature. As with the withheld Category 2 documents, that speculation does not overcome Ms. Woodward and Mr. Talbert's sworn Declarations that the documents "are reflective of the confidential deliberative process[] . . . that produced the [DOE's] decisions regarding . . . whether, and on what terms to settle the case with the University." Woodward Decl. ¶ 6; Talbert Decl. ¶ 13.

As the DOE explains, it made a policy decision to settle the Program Review with Apollo, and the Category 5 documents withheld reflect preliminary recommendations and draft documents used in arriving at that policy decision. DOE Opp'n to Apollo First Suppl. Br. at 14-15. As such, the Court agrees with the DOE that the withheld documents "implicate the [DOE's] thinking in making the decision to settle with Apollo," such that their disclosure "would have a chilling effect on the internal exchange of views in settlement discussions, to the detriment of future settlement negotiations. *Id.*; Talbert Decl. ¶ 13. The Court therefore concludes that the withheld Category 5 documents are properly encompassed by the deliberative process privilege.

### c.     *Category Six Documents*

The DOE's Category 6 Privilege Log invokes the deliberative process privilege–in addition to the attorney work-product privilege–with respect to most of the 49 Category 6 documents withheld from Apollo. *See* Apollo First Suppl. Br. at 14, Ex. L (Category 6 Priv. Log). Nevertheless, the DOE's Opposition to Apollo's Motion to Compel the withheld Category

6 documents focuses entirely on those documents' coverage under the attorney work-product

privilege.  *See* DOE Opp'n to Apollo First Suppl. Br. at 15 ("The [DOE] has properly invoked

the attorney work-product privilege to deny access to the Category 6 documents at issue.").  As

such, and because the Court has already concluded that the DOE has properly withheld the

Category 6 documents at issue pursuant to the attorney work-product privilege, the Court does

not consider whether the same documents might also be covered by the deliberative process

privilege.

> d.      *The Qualified Nature of the Deliberative Process Privilege Does*
> *Not Render It Inapplicable to the Withheld Documents*

Finally, the Court addresses Apollo's argument that, even if the deliberative process

privilege applies to the various withheld documents, "the privilege would yield in light of the

relevance and need for these documents in the securities litigation," because it is a qualified,

rather than absolute privilege.  Apollo First Suppl. Br. at 10-11; Apollo Second Suppl. Br. at 14-

15.  As part and parcel of this argument, Apollo asserts that the deliberative process privilege is

particularly inapplicable in the instant case because "the underlying agency process itself is at

issue."  Apollo First Suppl. Br. at 11; Apollo Second Suppl. Br. at 14-16 (citing *Dep't of*

*Economic Dev. v. Arthur Andersen & Co.*, 139 F.R.D. 594, 596 (S.D.N.Y. 1993)).  Apollo's

argument, however, glosses over the substance of the case it relies on.  In *Department of*

*Economic Development*, the British Government asserted claims of fraud against Arthur

Andersen that "necessarily place[d] at issue questions of knowledge, justifiable reliance and

causation," as to which the deliberative documents that the British Government sought to

withhold were directly relevant.  *Id.*  Similarly, in *Dominion Cogen, D.C., Inc. v. District of*

*Columbia*, 878 F. Supp. 258 (D.D.C. 1995), the plaintiffs alleged "that they were legally entitled

to the issuance of building permits which were 'indefinitely suspended' by the defendants . . .

based on illegitimate political motives." *Id.* at 268.  Noting that there is "[a]n exception to the

general thought-process rule [] where there are allegations of misconduct or misbehavior," *id.*

(quoting *United States v. AT&T*, 524 F. Supp. 1381, 1389 (D.D.C. 1981)), the *Dominion Cogen*

court found that the plaintiffs' allegations "raise[d] questions of governmental misconduct and

place[d] the deliberative process itself directly at issue," *id.*

Here, there is no question of government misconduct at issue.  Further, as the DOE

correctly argues, the Program Review process is not even directly at issue in the underlying

securities class action.  While the Program Review process may, as Apollo argues, have been

relevant to the "factual accuracy" of the Report, *see* Apollo Second Suppl. Br. at 14, the "factual

accuracy," i.e., the substance, of the Report is not at issue in the underlying securities case.

Instead, that case concerns a claim by a plaintiff shareholders class that Apollo violated federal

securities laws by failing to timely disclose the contents of the Report, which was the result of a

Program Review conducted by the DOE of Apollo's subsidiary UOP.  Apollo Mot. to Compel at

1a.  The Court therefore rejects Apollo's argument that the deliberative process privilege does

not apply in the instant case because the DOE's Program Review process is at issue in the

underlying securities case.

Apollo more forcefully argues that the deliberative process privilege must yield in this

case to its "need" for the withheld documents.  Apollo First Suppl. Br. at 10-11; Apollo Second

Suppl. Br. at 14-15.  Apollo is correct that the "deliberative process privilege is a qualified

privilege and can be overcome by a sufficient showing of need."  *In re Sealed Case*, 121 F.3d at

737.  Further, the D.C. Circuit has instructed that "[t]his need determination is to be made

flexibly on a case-by-case, ad hoc basis . . . taking into account factors such as 'the relevance of the evidence,' 'the availability of other evidence,' 'the seriousness of the litigation,' 'the role of the government,' and the 'possibility of future timidity by government employees.'" *Id.* (quoting *In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 634 (D.C. Cir. 1992)).  The Court therefore engages in that consideration.

The potential relevance of the withheld documents in this case to the underlying securities action has changed as the posture of that case has changed.  Initially, Apollo asserted that it needed the documents at issue in order to mount a defense in the underlying securities action. Now, however, as the underlying case has proceeded to trial and resulted in a jury verdict against Apollo, Apollo argues that the documents at issue are relevant to its motion for a new trial arguing that the admission of the Report unfairly prejudiced Apollo.  Apollo Notice, Docket No. [31] at 4-5.  The DOE vigorously disputes this argument, maintaining that "the accuracy and truth of the Report is not relevant to the underlying securities action," and that "the issue in that case was whether Apollo violated any duty to its shareholders."  DOE Notice, Docket No. [32] at 3.  The DOE also notes that Apollo could have challenged the findings in the Report by pursuing administrative litigation with the DOE but, instead, chose to settle the Program Review.  DOE Opp'n to Apollo Second Suppl. Br. at 18.

Even accepting  Apollo's claim that the documents at issue remain relevant to the underlying securities action (notwithstanding the fact that that case has already proceeded to trial) and that the underlying litigation is serious for Apollo, the Court finds that Apollo has not demonstrated a need sufficient to overcome the DOE's asserted deliberative process privilege. First, Apollo acknowledges that it has other evidence available to it to support its motion for a

new trial, including the documents that it obtained from the DOE pursuant to this action.  Apollo

Notice, Docket No. [31] at 5.  More significantly, even if Apollo is correct that the Program

Review process bears upon the propriety of the Report's admission in the underlying securities

action trial, the Court cannot overlook that it is Apollo's actions–and not the DOE's actions, *per

se*–that are the basis for the liability finding in that case.  As such, the "role of the government"

in this case is tangential.  Finally, the Court accepts the representations in Ms. Woodward and

Mr. Talbert's Declarations that "[t]he integrity of the program review process requires that the

documents requested by Apollo remain protected from disclosure . . . [because they] are

reflective of the confidential deliberative processes . . . that produced the [DOE's] decisions."

Woodward Decl. ¶ 24; Woodward Suppl. Decl. ¶ 14; Talbert Decl. ¶ 13; Talbert Suppl. Decl. ¶ 9.

Because the documents at issue reflect preliminary recommendations, the Court finds that their

release would be likely to foster future timidity by DOE employees in pursuing contentious

Program Reviews.  As the D.C. Circuit explained in *Coastal States*, "[h]uman experience teaches

that those who expect public dissemination of their remarks may well temper candor with a

concern for appearances and for their own interests to the detriment of the decisionmaking

process."  617 F.2d at 866.

        For the foregoing reasons, the Court, in an exercise of its discretion, concludes that

Apollo has not demonstrated that its purported "need" for the documents withheld under the

deliberative process privilege is sufficient to overcome the DOE's justifications for invoking that

privilege.  The Court also notes that, even if it were to find a sufficient showing of need on

Apollo's part, it would not be in a position to order the production of the documents at issue

because it has already concluded that the withheld documents constitute classic "opinion" work-

product.  Accordingly, the Court shall deny Apollo's motion to compel insofar as it challenges

the DOE's withholding of documents pursuant to the deliberative process privilege.

C.       *The DOE's Redaction of Material Under the Informer Identity Privilege*

Although the parties' briefs focus on the DOE's withholding of documents pursuant to

the attorney work-product and deliberative process privileges, Apollo also challenges the DOE's

redaction of certain produced documents.  *See* Apollo First Suppl. Br. at 3-7.  According to

Apollo, while the DOE is entitled to redact "the names and addresses of program review

witnesses" pursuant to the informer's identity privilege, it "has broadly redacted information that

is not protected by that privilege."  *Id.* at 3.  Specifically, Apollo claims that the DOE has

redacted "information from witness interview summaries that far exceed[s] that which is

necessary to preserve the anonymity of certain witnesses," *id.* at 4, "such as the number of UOP

locations or the physical location of the interview," *id.* at 5, and "the names of people quoted by

the witness participating in the interview," *id.* at 6.

The scope of the informer's identity privilege was established in *Rovario v. United States*,

353 U.S. 53 (1957), in which the Supreme Court considered the "Government's privilege to

withhold from disclosure the identity of persons who furnish information of violations of law to

officers charged with the enforcement of that law."  *Id.* at 59.  As the Supreme Court explained,

the "purpose of the privilege is the furtherance and protection of the public interest in effective

law enforcement," and the privilege recognizes that preserving informers' anonymity encourages

them to perform their obligation to communicate with law enforcement officers.  *Id.*  However,

the "scope of the privilege is limited by its underlying purpose," such that "where the disclosure

of the contents of a communication will not tend to reveal the identity of the informer, the

contents are not privileged." *Id.* at 60. As the D.C. Circuit has summarized, "[o]nly the identity

of the informer is privileged. The content of the communication is not privileged *unless it would*

*tend to reveal the identity of the informer*." *Westinghouse Elec. Corp. v. Burlington*, 351 F.2d

762, 768 (D.C. Cir. 1965). Nevertheless, there is "no fixed rule with respect to disclosure,"

rather "the problem is one that calls for balancing the public interest in protecting the flow of

information against the individual's right to prepare his defense." *Rovario*, 353 U.S. at 62.

Here, the DOE does not dispute that it has redacted information beyond the Program

Review witnesses' names and addresses, but it notes that the parties' Joint Agreement, which

governs the DOE's productions, does not limit the scope of identifying information that may be

protected. DOE Opp'n to Apollo First Suppl. Br. at 10. Further, the DOE argues that it redacted

identifying information beyond the witnesses' names and addresses because:

> [I]t is clear from the circumstances of these witnesses' testimony, that other
> information redacted by the [DOE] would also identify them. For example, where
> an office consists of only six employees, four of whom were interviewed and two
> of whom are female, the DOE revealed that a female was interviewed, but
> redacted the name of the supervisor and the location of the office since such
> information would likely lead to the identification of the witness.

*Id.* The Court finds the DOE's explanation for the breadth of its redactions convincing and

appropriate. The informer's identity privilege protects the contents of an informer's

communications where the revelation of those contents "would tend to reveal the identity of the

informer." *Westinghouse Elec.*, 351 F.2d at 768; *see also Rovario*, 353 U.S. at 60. As the Ninth

Circuit has aptly explained, "[t]he privilege identified in *Rovario* protects more than just the

name of the informant and extends to information that would tend to reveal the identity of the

informant," because the underlying purpose of the privilege is "to protect the anonymity of the

confidential source" in order to encourage cooperation with law enforcement officials. *United*

*States v. Napier*, 436 F.3d 1133, 1136 (9th Cir. 2006).

Moreover, Ms. Wittman's Declaration establishes that the DOE often "agree[s] to protect the identities of the confidential witnesses interviewed" because "witnesses often fear retaliation from the employing institution . . . and/or loss of their job." Wittman Decl. ¶¶ 6-7.  In particular, Ms. Wittman explains that the anonymity the DOE offered the Program Review witnesses in this case was key to securing their interviews, because "all employees [other than those UOP selected to be interviewed] stated that they expected UOP to retaliate," and "expressed fear of losing their jobs." *Id.* ¶ 11.  According to Ms. Wittman, "[s]ome former employees indicated that the influence and retaliatory history of UOP were so extensive that they would not be willing to speak unless they could do so anonymously."  *Id.*  Indeed, Ms. Wittman states that "the fear and anxiety of the UOP employees was extraordinary in comparison to any other program review. Every employee seemed to know another former employee that had been fired out of retaliation." *Id.* ¶ 12.  Finally, both Ms. Wittman and Ms. Woodward aver that the DOE assured the witnesses, before interviewing them, "that all efforts would be made by the [DOE] to keep the personal identities of the witnesses confidential." *Id.* ¶ 9; Woodward Decl. ¶ 13.  In short, the Court finds Apollo's Declarations sufficient to establish that protecting the identity of the confidential Program Review witnesses in this case is crucial to "further[ing] and protect[ing] the public interest in effective law enforcement."  *Rovario*, 353 U.S. at 59.

In addition, Ms. Wittman's Declaration specifically explains that the DOE redacted information because "[i]n many cases revealing the office or the supervisor where the employee was interviewed would be likely to lead to revealing the identity of the witness . . . because many of the offices where employees feared retaliation were small settings of 6-10 employees under

one supervisor." Wittman Decl. ¶ 10.  Under those circumstances, the Court agrees with the

DOE that it is appropriate to redact information that "would tend to reveal the identity of the

informer," rather than just the names and addresses of the confidential witness.  *Westinghouse*

*Elec.*, 351 F.2d at 768.  In particular, the Court notes that–insofar as it is necessary to "balanc[e]

the public interest in protecting the flow of information against the individual's right to prepare

his defense,"*Rovario*, 353 U.S. at 62–the DOE has not withheld the witness interview summaries

altogether, but has only redacted potentially identifying information.  DOE Opp'n to Apollo First

Suppl. Br. at 11 (the DOE "has produced to Apollo the facts and substance of the witness

interviews").  The Court also notes that the DOE released to Apollo, in full, a number of witness

statements that it initially withheld upon learning that those witnesses had voluntarily identified

themselves to Apollo.  *Id.* at 2; Apollo First Suppl. Br. at 4 n.2.

Accordingly, the Court shall deny Apollo's motion to compel insofar as it seeks the

production of the information the DOE redacted from witness statements pursuant to the

informer's identity privilege.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the DOE has appropriately invoked

the attorney work-product, deliberative process, and informer's identity privileges in withholding

and redacting documents responsive to Apollo's Amended Subpoena.  The Court shall therefore

DENY Apollo's [1] Motion to Compel and shall GRANT the DOE's [5] Cross-Motion to Quash.

Date:   June 20, 2008

                    _____/s/_____
                    COLLEEN KOLLAR-KOTELLY
                    United States District Judge